**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,**     **Plaintiff,** | **CIVIL ACTION** <br><br> **NO. 18-7889** <br>    **c/w 18-8071,** <br>    **18-8218, 18-9312** |
| **VERSUS** | |
| **PROGRESSIVE WASTE SOLUTIONS OF LA, INC., ET AL.,**     **Defendants.** | **SECTION: "E"(5)** |
| *Related Case:* | |
| **FREDERICK ADDISION ET AL.,**     **Plaintiffs,** | **CIVIL ACTION** <br><br> **NO. 19-11133** |
| **VERSUS** | |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**     **Defendants.** | **SECTION: "E"(5)** |
| *Applies to: All Cases* | **JUDGE: Morgan** <br> **MAGISTRATE JUDGE: North** |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**TO EXCLUDE EXPERT TESTIMONY BASED UPON**
**DATA COMPILED BY SCS ENGINEERS**

*Daubert* commands that expert testimony be both reliable and relevant, and the Fifth Circuit has made clear that "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009); *Williams v. BP Expl. & Prod., Inc.* , No. CV 18-9753, 2019 WL 6615504, at *10 (E.D. La. Dec. 5, 2019).

In this case, Defendants' experts rely quite heavily upon sampling and testing conducted by SCS Engineers in September 2018 (reported in the SCS October 2018 Report, **Ex. 1**) and in June 2019 (reported in the SCS July 2019 Supplemental Report, **Ex. 2** (narrative) and **Ex. 3** (Appendix D to report) (remaining appendices omitted for space considerations) as proof that ***no***

significant odors and gases were *ever* being emitted from the Jefferson Parish Landfill ("JPLF") during the relevant time period.

The SCS individuals who conducted the testing were not designated as expert or fact witnesses in this case; nor could they be. As set forth herein, SCS was not at any time an independent expert.  It had its own work and business relationships to protect, and rendered its reports as part of a public relations campaign on behalf of Waste Connections (hereinafter sometimes "WC"). Its stated conclusions were based not based upon science but instead were dictated by the litigation position of its client.

The President of SCS (one of the named authors of the first report) offered sworn testimony in the state court portion of the *Addison* case that testing conducted on one day to determine emissions from the landfill (which is what SCS did) cannot establish the emissions that occurred on any other day, before or after.  Nevertheless, Defense Experts Hoffnagle (Aptim) and Abichou (Parish) have formed their opinions based entirely upon measurements taken by SCS on a single day and without taking any measurements of their own.  The SCS data and conclusions are wholly unreliable, rendering any testimony based upon such data inadmissible.

A.     **Hired to assist Waste Connections in its public relations campaign, SCS did not render independent opinions.**

SCS was not an independent or unbiased expert.  In fact, SCS had built the expansion of the gas collection system in Phase 3B of the JPL, and therefore had a vested interest in ensuring that its work was not blamed for the emissions from the site that generated so many complaints. [1]

---

[1] *See* **Ex. 4**, SCS contract for Phase 3B gas collection system (selected pages).  In 2017, when the Parish wanted to hire an engineering firm to assess the gas collection system, the Parish notified SCS that it was not eligible, on its own or as a subcontractor, because the Parish wanted "an unbiased company, that is one that hasn't been involved in the installation or maintenance of the system."  **Ex. 5**, July 11, 2017, email thread between Landfill Engineer Rick Buller and SCS Marketing Manager.

SCS also participated in other projects with Waste Connections.[2]  As a result, in the summer of 2018, when there was a great public outcry regarding odors coming from the landfill, SCS had not one, but two, significant large-dollar client relationships to protect.[3]  It was therefore not a surprise that the leading voice for SCS was Mr. James Walsh, the President of SCS.

### B.     SCS authored a report presented to the press intended to remove the attention from the landfill and Waste Connections.

At a press conference on July 23, 2018, Jefferson Parish President Michael Yenni announced "corrective actions to dramatically reduce and outright eliminate noxious odors that are emanating from the Jefferson Parish Landfill," and asserted that WC had violated its contract with the Parish by failing to maintain proper cover and by failing to maintain the leachate collection system.[4]  That evening, WC issued its own press release, denying it was in breach of contract, and asserting that the Parish, not WC, was responsible for maintaining the gas collection system:

> As it relates to the allegation of foul odors coming from the Landfill, the landfill gas collection and control system at the Landfill is designed to capture landfill gases which cause odors.  Jefferson Parish operates and maintains the landfill gas collection and control system at the Landfill, not LRLC.  **It is well documented that the landfill gas collection and control system at the Landfill does not function properly.**

**Ex. 7**, even though (as described later in this Brief) the problems with the gas collection system resulted from the fact that the waste mass was full of water that was supposed to be removed by the leachate collection system.

---

[2] *See* **Ex. 6** February 13, 2017 email by SCS, sent on behalf of Waste Connections, soliciting bids for the White Oaks Landfill in Monroe, Louisiana.

[3] In addition, prior to being employed by Waste Connection, Region Manager, Mr. Brett O'Connor (Waste Connections' Rule 30(b)(6) witness in this case) and Matt Crockett, the Waste Connections engineer that conducted the 22,000 cover depth analysis estimate, had both been employed by SCS.

[4] The press conference can be viewed on-line at https://www.wwltv.com/video/news/local/jefferson/jp-officials-announce-plan-to-stop-foul-odor-in-jefferson-parish/289-8197477.

As part of its public relations campaign, Waste Connections' attorneys commissioned SCS to prepare a report (the "October 2018 SCS Report"). Authored by Walsh, the report was entitled, "Jefferson Parish Landfill Site Evaluation with Respect to Odors" and was issued on October 24, 2018. **Ex. 1.**[5]

Waste Connections used and circulated the October 2018 SCS Report as part of its public relations campaign in response to the public criticism. *See* **Ex. 8,** 10/31/2018 Nielsen email with attached press release and WC summary, stating that the SCS Report would be released to the reporter at the same time it was released to the LDEQ. The Report (**Ex. 1**) nowhere mentions SCS's participation in the expansion of the gas collection system for Phase 3B, the work it was currently performing at the site, or its business affiliations with Waste Connections.

### C.     The October 2018 Report was not based upon reliable data and SCS knew that its conclusion was not reliable when it published the Report.

In its October Report, SCS summarily announced that hydrogen sulfide was not being emitted from the JPL at all. As a result, SCS pronounced, the complained-of odors had to have come from elsewhere. SCS reached these conclusions based upon measurements that were taken on a single day (September 14, 2018) at the landfill's perimeter, using a handheld device (a Jerome meter) to detect hydrogen sulfide. When it announced this conclusion, SCS had not actually sampled the landfill gas, soil gas, condensate, leachate, or flare emissions from the landfill. **Ex. 9**, Chrostowski Aff. ¶ 17. No quality assured odor sampling or measurement had been performed. Id.

---

[5] The other named author was Mr. Thomas Rappolt purportedly "SCS's national expert on odor assessment studies") The report stated on the first page that it was "prepared for" Beveridge & Diamond (WC counsel). Page 4 listed the "data and documents [that] were reviewed and considered in forming opinions." The first four were the class action complaints that had been filed in state court (later removed to this case) and the next 17 were "Waste Connections Provided Documents." **Ex.1** at 4.

At the very time the report was written, the principal author of the report, SCS President Walsh, knew that testing conducted on a single day could not reliably determine what was or was not being emitted from the landfill.

In December 2018, just two months after the report was issued, the *Addison* Plaintiffs filed suit in state court and filed a motion seeking immediate access to the site for inspection and testing. **Ex. 10** (*Addison* Motion)**.**  WC opposed that motion, arguing among other things that *there was no need for plaintiffs to inspect and take samples from the site* because publicly available information (including the October 2018 SCS Report) provided more than enough information. **Ex. 11,** WC Supplemental Opposition at 4-6.  SCS provided the primary support for the Opposition, in the form of sworn affidavits from the authors of the October 2018 Report, Messrs. Walsh **(Ex.12)** and Rappolt **(Ex. 13).**

SCS President Walsh testified, under oath, that the results of gas testing on one day "may be materially different on the next day," because the composition of landfill gas "changes as waste decomposes." **Ex. 12** (Depo. Exh. 206, Walsh Aff. ¶ 42.).  He explained that the composition of landfill gas "as it exists now [January 15, 2019] is likely to be different from the [landfill gas] that existed months and years ago," and that this "also applies to future gas composition." Id. This testimony by Walsh establishes that the central conclusion of the SCS October 2018 Report (that the JPLF was not emitting hydrogen sulfide gas at all) did not have a basis in science.

Other aspects of the Report confirm the conclusion that SCS was acting entirely as an advocate for its client, Waste Connections.

### 1.    The Report stated that the testing was done in areas where it was not.

In addition to improperly using the single-day test results to conclude that no hydrogen sulfide was being emitted from the landfill, the October Report recites that the odor survey work "was conducted in all significant subcomponent areas, including (among others) the working face

and cell construction area in Phase 4A.[6] **Ex. 1** at 1. However, as shown by Figure 1 on the next page of the report, measurements were taken only at the perimeter of the landfill, and not in the working face or the cell construction areas of Phase 4A, and not in any of the other listed locations. Id at 2.

> 2.     **The Report falsely implied that the "tour of the facility" that SCS found to be well maintained and organized, was SCS's initial exposure to the site, and did not reveal that SCS worked on the site previously and was working on the site to improve the leachate collection system.**

On page 3, the Report describes a tour of the facility, and stated the "SCS's initial observations from this tour were that the [JPLF] was well maintained and organized." **Ex. 1** at 3. But SCS had been working at the site for months, and had even been hired by WC to fix broken leachate pumps in several phases of the landfill.

Months earlier, the Parish had hired Carlson Environmental Consultants ("Carlson") to assess the site. In its preliminary report dated May 31, 2018, and later in its final report, Carlson had concluded that "[s]ignificant subsurface liquids at the site are impacting the effectiveness of the LFG[7] system" and that "[l]iquid removal needs to be the primary focus of the Parish at this site." **Ex. 14** at 2. Carlson concluded that the JPLF "is a shallow, wet site, with subsurface liquids impacting the limited pathways of LFG recovery" and that ***"[w]ater within the waste mass is the primary problem*** for optimum operation of the LFG system at this site *and creates or magnifies all other problems noted in this Repor*t." **Ex. 14** at 3.[8]

---

[6] The report on page 1 recites that measurements were made at the leachate storage and processing area.  Page 7 of the same report recites that the "leachate pond was empty due to the effort to replace the liner and all leachate was legally being channeled to the local Publically [sic] Owned Treatment Works (POTW) in a completely enclosed system."  **Ex. 1** at 7.

[7] "LFG" means "landfill gas."

[8] Carlson's final report expanded upon these conclusions.  **Ex.15** at 15-16, 24-25.

With Carlson focusing on the removal of water from the waste mass, in July 2018, WC commissioned SCS to review the leachate collection system—the principal source of the excess water identified by Carlson. **Ex. 16.** Two days later, WC noted that SCS was "onsite getting pumps operational in Phases 1-3." **Ex.17**. On August 1, 2018, WC Region Engineer Brett O'Connor reported to Parish Department of Environmental Affairs Director Mike Lockwood that "SCS finalized the work on evaluating the leachate system on 7/27." **Ex. 18**. He promised to send the SCS evaluation to Lockwood when it was finished. Id. The next day, O'Connor promised to send the SCS evaluation to DeJean.  **Ex. 19**.  However, no such report has been produced in discovery by any party, or mentioned in any subsequent SCS reports.

### 3. The October 2018 Report falsely concluded that there was no evidence of leachate breakouts at the site.

Without mentioning its own work to get the pumps operational in Phases 1-3, SCS noted that "liquids are accumulating in many gas wells," and that "like the gas system, work is backlogged to pump liquids out in order to get the leachate system to operate better," yet SCS completely discounted the problems with the leachate system as contributing to the odor.  **Ex. 1** at 9.  SCS explained that "At many sites with excess liquid buildup in the waste mass, the excess liquids create leachate springs known as "breakouts" on the side slopes of the landfill."  Id. at 9. SCS then stated, "There is no evidence of such breakouts on any phases of the Jefferson Parish Landfill."  Id.

In fact, there had been significant problems with leachate breakouts.  On June 25, 2017, Parish Engineer Buller was told, "we might need to install a sump at the base of cell 21 so that we can capture the leachate that is flowing to that point and direct it to leachate riser 13S," and that Waste Connections "has placed multiple berms and tried blocking the source but the leachate keeps finding a way around these structures." **Ex. 20**, email thread WC_JPLF_00227853-54.  The next

day, Buller directed Waste Connections' Rickie Falgout, "Please look at the leachate seep on PH 3B/4a and see what you can do to contain it."  Id. Falgout replied a day after that, "I added two feet of clay yesterday and the gas has made its way through it."  Falgout noted that there is a well [Well 394] thirty feet "from the blow out."  Id.

In April 2018, the leachate seep in this area still existed. On April 6, Buller wrote to Aptim, "There's a large seep on the top of Ph 3B near GW-390. Can you install a pump in GW 390 and maybe GW 394?" **Ex. 21**, APTIM-0075231. Ten days later, having yet to be addressed, Buller moved the work to "high priority," stating "we are trying to contain a leachate seep on the surface adjacent to GW-394," and approved Aptim's rental of an excavator and additional labor. **Ex. 22**, APTIM-0033409-10.

On May 1, 2018, the Parish told the LDEQ, "Jefferson Parish is aware of three leachate seeps at the Landfill," and provided photos to "show the soil that was spread by IESI [Waste Connections] to contain the seeps." **Ex. 23**, Lockwood (Buller) letter to LDEQ dated May 1, 2018, WC_JPLF_00227730-38.  On July 20, 2018, the Parish informed the LDEQ that a pump had been installed in a gas well "immediately adjacent to the largest seep in the uphill area of Cell 19," and the "The seep was contained but began seeping again recently."  **Ex. 24**, third page, Lockwood (Buller) letter to LDEQ dated July 20, 2018, WC_JPLF_00262512-16.

On October 11, 2018, two weeks before the SCS Report, the Parish noted a leachate breakout north of Riser 21N. **Ex. 25**, JP_PPLF_00030810. On October 16, 2018, Lockwood asked WC to fix it. **Ex. 26**, WC_JPLF_00247841. The next day, the Parish was collecting the leachate using a tanker truck. **Ex. 27**, JP_JPLF_0030792.  On October 23, 24, 25 and 26, 2018, the daily reports noted the "Leachate seep south of leachate riser 21S [a different location] still needs to be addressed."  **Ex. 28**, WCV_JPLF_00264476, **Ex. 29**, WC_JPLF00253186, **Ex. 30**,

8

WC_JPLF_00232127, **Ex. 31**, WC_JPLF_ 00241626.[9] On October 31, 2018, during an LDEQ

inspection, a "leachate breakout" was "observed on the north face of phase 4A." Pictures were

taken and circulated. **Ex. 32**, WC_JPLF_00230388-91.

The statement in the October 2018 SCS Report that there "is no evidence" of leachate

breakouts was simply untrue.

### 4.     The October 2018 SCS Report falsely stated that its conclusions had been corroborated by the LDEQ.

SCS stated that its "finding that the Jefferson Parish Landfill <u>was</u> <u>not</u> the source of odors

detected on April 28th and 29th, 2018" had been <u>corroborated</u> by the Louisiana Department of

Environmental Quality (LDEQ)—in the Mobile Air Monitoring Lab (MAML) report dated April

27, 2018, for River Ridge and Harahan.  Id. (emphasis added). **Ex. 1** at 21.  Acknowledging that

the wind direction recorded by MAML on those days "placed the Jefferson Parish Landfill as one

of the possible alleged sources of the pollutants measured," **Ex. 1** at 22, SCS nevertheless

concluded

> **The elevated H2S levels measured that evening could not be attributed to the Jefferson Parish Landfill due to the fact that the corresponding TO-15 data shows a non-detect of d-limonene and ethyl acetate in all samples.** D-limonene and ethyl acetate are common markers of gaseous emissions from municipal waste but not found in C&D landfills. This is due to the absence of food and other organic wastes in C&D landfills. If the H2S concentrations measured in the samples collected during the odor event on April 28-29 contained d-limonene and/or ethyl acetate, it would have suggested that Jefferson Parish Landfill emissions were contributing to the odors. **The absence of these markers, however, indicates that**

---

[9] WC hired SCS to work on the leachate collection system in these locations, including a project to connect risers (pipes going upward) in the leachate collection system to the gas collection system, so that landfill gas in the leachate collection system could be captured.  **Ex. 33**, JP_JPLF_00523031-46. (SCS Construction Record Report).  For this work, the Parish referred to SCS as a "Waste Connections Subcontractor."  *See* **Ex. 34** Progress/Status Report December 26, 2018, JP_JPLF_00029010 to -013, fourth page ("Work is being done on leachate pump risers 20 N and 21 N by the Waste Connections Subcontractor SCS to run vacuum lines to these units and eliminate fugitive odors noted by LDEQ inspectors.").  SCS returned in April 2019 to extend Riser 20S.  **Ex. 35**, Engineer's Weekly Report April 19,2019.  JP_JPLF_00139733.

**the Jefferson Parish Landfill emissions were not contributing to the odor event experienced that evening.**

WC relied upon this specific finding in its press release announcing the SCS report (**Ex. 8**) and in arguing to the state court that the JPL could not possibly have been the source of odor emissions detected by the LDEQ.  **Ex. 11,** Opposition at 11.  At least two of WC's experts here, Kind and Yocke, are also relying on this conclusion. [10]

SCS's assertion that the absence of d-limonene and ethyl acetate eliminated JPLF as a source could be true only if all of the landfill gas emitted by the JPLF contained both compounds; in other words, if SCS were correct, then both compounds would be found in every sample of landfill gas taken at the site.  However, SCS had not actually made any determination that either compound was actually contained in the landfill gas generated from the Jefferson Parish Landfill.

In another direct contradiction of the October 2018 Report, Walsh would later testify to the state court that "Landfill gas does not have a unique fingerprint of compounds.  There is no way to assign a given compound, or set of compounds, found far from this Landfill uniquely back to this Landfill." **Ex. 12**, Walsh Affidavit ¶ 39.  And in March 2019, when SCS actually did measure the landfill gas inside the JPL gas wells, SCS found that neither d-limonene nor ethyl acetate were detectable in nearly two-thirds of samples of landfill gas taken at the landfill itself.[11]

---

[10] Kind Report at 17 ("SCS concluded that hydrogen sulfide detections could not be attributed to the JPLF due to the absence of d-limonene and ethyl acetate in air samples"); Yocke Report at xv ("the MAML data cannot be linked directly to the JPLF since all of the MAML samples were non-detects for d-limonene and ethyl acetate, two common markers of municipal solid waste landfills like the JPLF.").

[11] D-limonene was NOT detected in 5 of 6 Phase 1 samples, 5 of 6 Phase 2 samples, 7 of 8 Phase 3A samples, and 3 of 12 Phase 4A samples. SCS did not report a test result for d-limonene in Phase 3B. Of the 32 samples, 20 (or 62.5%) were non-detect for d-limonene. **Ex. 36** (selected pages from the SCS May 2019 Supplemental Report). Ethyl acetate was NOT detected in 3 of 5 Phase 1 samples, 5 of 6 Phase 2 samples, 7 of 8 Phase 3A samples, 7 of 8 Phase 3B samples, and 4 of 12 Phase 4A samples.  Of the 39 samples, 26 (or 66.67%) were non-detect for ethyl acetate. Id.

**D.    SCS acted as an advocate opposing the *Addison* Plaintiffs' efforts to obtain an inspection and testing at the site.**

SCS acted purely as a biased advocate and a participant in the events at issue. The central advocacy role that SCS played in preventing the *Addison* plaintiffs from gaining access to the site until after substantial remediation efforts were under way disqualifies SCS from rendering any independent or reliable scientific opinions in this case. *See In re Commercial Money Ctr., Inc.*, 737 F. Supp. 2d 815, 844 (N.D. Ohio 2010) (partisan behavior disqualified expert); *Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 184 (E.D.N.Y. 2001) ("That observation [when expert witnesses become partisans, objectivity is sacrificed to the need to win] is peculiarly applicable here, and the motion to preclude the expert testimony is granted.").

Following the testimony of SCS's President and Vice President, and by order entered on February 6, 2019, the state court denied the *Addison* plaintiffs' request to gain immediate access to the JPL and entered a stay under Civil Code Article 532. **Ex. 37.**   Thus, with the central assistance of SCS's sworn testimony, the Defendants succeeded in preventing the *Addison* plaintiffs from undertaking any discovery, even as the Parish was simultaneously conducting remedial activities at the site that were designed to substantially change–and hopefully improve–conditions at the JPL compared to the conditions that led to Plaintiffs' complaints in 2017, 2018 and 2019.

**E.    Despite its sworn testimony that testing was unnecessary, which resulted in the state court entering an order denying discovery to the *Addison* plaintiffs, SCS then began its own testing at the site.**

Having succeeded in preventing the *Addison* Plaintiffs from conducting testing and sampling, SCS then, just six weeks later, began its own additional on-site sampling and analyses of emissions at the landfill.  Critically, this testing is the basis for all but one of the defense experts' opinions regarding emissions from the site in this case.  Plaintiffs were not informed that this

testing would occur, and the Plaintiffs' experts were not invited to observe or conduct any split samples.

As recorded by notes taken by PPM (a consulting firm advising the Parish), [12] on March 28, 2019, attorneys Brillault and Moghis were both present for the SCS sampling activities. **Ex. 38** at JP_JPLF_00743162.  At sample location 4A-001, at about 11:00 in the morning, there was "noticeable odor present even in upwind condition, and hydrogen sulfide was measured at 170 parts per million (170,000 parts per billion) using a Jerome meter.[13]  Id.  The SCS Report of that site visit, however, contained no mention of the attorneys' presence and, at sample location 4a-001, at 11:00 in the morning, SCS recorded hydrogen sulfide at the "nearest point" at only 4 parts per billion.  **Ex. 36**, SCS May 2019 Report at page 42, Table 20. [14]

> ### F.   SCS knew that changes were being made to the site to reduce the landfill gas emissions, but did not mention the changes in its reports or in its sworn affidavits submitted to the state court.

A central reason that the *Addison* Plaintiffs sought immediate site access when they filed the complaint in December 2018 was their desire to be able to ascertain site conditions and emissions before substantial modifications were made to the landfill gas and leachate collection systems, which modifications could (and were intended to) materially improve the site conditions. Carlson had recommended installation of new piping, force mains and pumps to remove water

---

[12] Consistent with the fact that SCS was there to support the Defendants' litigation position, PPM noted on the first page that the visit was "joint defense." **Ex.38**, p. 1.

[13] These documents were not part of the Parish's initial document production, and were not provided to the Plaintiffs until February 28, 2021, a full month after Plaintiffs served their expert reports. **Ex. 39**.  And even then, pages were missing on those documents. One of the missing documents showed that "Flux chambers were placed and allowed to collect emissions for a period of time (5-10) minutes) prior to the collection of samples." **Ex. 40**, photo of page. The protocol that SCS said it followed required at least 30 minutes be allowed, another non-observance by SCS.

[14] That afternoon, PPM recorded "high" hydrogen sulfide measurements "throughout IVA," and noted that the highest surface scan measurement was 14 parts per million (14,000 parts per billion) and that there was "audible hissing." **Ex. 38.**

(condensate and leachate) from the site.  **Ex.15** at 20-21, 24-25.  By December 10, 2018, a contractor had already installed a total of 21,600 linear feet (about four miles) of 10" pipe for leachate collection in Phases 3B and 4A, and had fused another 22,300 linear feet (another four miles) of pipe in preparation for installation.  **Ex. 41.**  Nine new leachate pumps had been installed, and the progress report noted that "Once the 10-inch leachate force main is approved by LDEQ for service, these pumps will begin pumping leachate out of Phase 3B." Id.  By January 3, 2019, Aptim had been given notice to proceed to install seven new gas extraction wells in Phase 4A.  **Ex. 42**.  The Progress Report noted, "Once completed, this will reduce gas pressure, and fugitive emissions coming from these areas."  Id. Meanwhile, on December 3, 2018, Waste Connections had outlined its plan for placing an additional 22,000 cubic yards of additional intermediate cover Phase 4A, another odor control measure.  **Ex. 43.**

Nevertheless, supported by SCS sworn testimony, Waste Connections represented to the state court in January 2019 that "no significant modifications to the existing landfill gas or leachate collection processes at the Jefferson Parish Landfill have been made" and that, instead, "the Landfill is engaging in ordinary and routine maintenance that will not have an material impact on the emissions profile."  **Ex. 11**, Opposition at 16-17.  To the contrary, however, extensive modifications *were* being made, the very purpose of which was to reduce the emissions.

### G.    SCS waited to begin surface flux testing until after additional new clay interim cover was applied in Phase 4A.

Landfill gas can escape into the atmosphere in different ways.  Some merely flows upward through the surface of the landfill into the air.  This is called "surface flux."  Sometimes there are cracks in the cover, or there are breaks in the lines of the gas collection system, or there is gas collecting and escaping through the leachate collection system.  These other emissions are called "point source emissions."

SCS did not attempt to take surface flux or point source measurements in the sampling that it undertook in March 2019.  Instead, SCS returned three months later, in June 2019, to perform surface flux measurements.  By that time, however, thousands of cubic yards of clay soil, used as "interim cover," had been placed and compacted on Phase 4A of the landfill.  **Ex. 44**, June 17, 2019 Progress Report at 2 (Under the heading "LRLC [Waste Connections] Daily Activities," the report stated that "22,000 yds$^3$ of additional intermediate cover has been completed. Contractor will be on site this week to do measurements to confirm cover depth.").  One purpose, of course, of this additional soil cover was to reduce the amount of landfill gases that were flowing into the atmosphere, which necessarily meant that the surface flux would be lower immediately after the extra cover was applied than it had been in March 2019.[15]  *See* Abichou Tr. at 248:23 to 24 :25 ("The cover also is a barrier.  What does the barrier do?  It reduces the flux so the cover by itself will act as a barrier.").  Following the placement of the additional soil cover, it was to be expected that the surface flux measurements would be reduced in the short term while the gases built up under the new cover.  *See* Abichou Tr. at 249:12 to 249:19 ("And then the interface of the cover and the waste have that barrier effect.  That barrier effect will start to increase the pressures in the landfill and increase, increase, increase, until that pressure is enough to withstand the barrier effect. And the landfill will burp, per se.  Will just -- the gas will exit in fissures and in path of least resistance.").

---

[15] Dr. Abichou testified that in addition to blocking or slowing the flow of gas, clay cover will also absorb hydrogen sulfide and landfill gas like a sponge. Abichou Tr. at 247:25 to 249:19. While there comes a time when the "sponge" is fully saturated and cannot absorb any more, so that all gas generated will flow through, that time does not arrive immediately. As a result, the surface flux immediately after placement of the new cover will necessarily be less that what existed before and what will exist later.

According to Hoffnagle, the additional soil cover placed on the landfill just days earlier should have been obvious (Hoffnagle Dep. at 310:17-22, 312:22, 313:4-8, 314:8-13), but the SCS Report of the June 2019 measurements does not mention it at all.  Nor does the SCS report explain the actual methods and procedures used for testing.

In fact, SCS knew all about this work. The Parish Engineer's Weekly Report dated June 14, 2019 states "Hauling and placement of soil for intermediate cover continues on Phase 4A… SCS performing surface integrity scans." **Ex. 45** WC_JPLF_00181208. After the interim cover was placed, SCS tested its depths. **Ex. 46,** Parish Daily Log June 25, 2019 ("Observed SCS crew testing interim cover depth in phase 4A"); **Ex. 47,** June 26, 2019 ("SCS continuing intermediate cover thickness check."); **Ex. 48**, Engineer's Weekly Report June 28, 2019, WC_JPLF00181210-11 ("SCS subcontractor on site verifying Phase 4A cover thickness.").

Although SCS was well aware of the placement of the new interim cover, and in fact had measured its thickness, the report of the June measurements, issued in July 2019, made no mention of the new additional clay interim cover.

## II.    SCS'S JUNE 2019 MEASUREMENTS ARE NOT A RELIABLE BASIS UPON WHICH TO DETERMINE EMISSION RATES OVER A THREE-YEAR PERIOD.

Surface flux can vary from day to day as it is affected by meteorological factors including temperature, humidity, barometric pressure and wind speed. *See* Hoffnagle Dep. at 82:20 to 85:16; 115:4 to 117:12; Abichou Dep. 21:11 to 21:18. Thus, a set of measurements taken on a single day provides only a snapshot of that particular spot on that particular day.  To measure the surface flux across the entire landfill, measurements must be taken at many more locations over a much longer period of time.  In the study Dr. Abichou relies on, hundreds of measurements were taken over a period of years, in which all seasons were represented in the testing.  Abichou Report at 8; Abichou

Dep. 16:8 to 21:23.  The June 2019 SCS testing took place over a period of three days, June 11 through June 13, 2019.[16]  **Ex. 2**, at 2.  Plaintiffs' experts were not invited to attend.

Many discrepancies exist between the tables included in the SCS report and the actual field data.  For example, at location J-4a-B3, Table 1 in the Report stated the "start time" was 1507, **Ex. 2** at page 5, whereas the field data sheet showed that 1507 was the time of the last measurement taken.  **Ex. 3** at bates # -792.  Hoffnagle testified, "I don't understand why the clock is wrong, why the time recorded in the table are different.  Somebody QA QC's this data."  Hoffnagle Dep at 81:10-21.  Presumably, the quality control would result in the written report matching the field data, not contradicting it.  Here, if there was in fact a quality check, the opposite occurred.  In the field data sheets, vertical velocity was recorded by the persons taking the measurements at "<0.5" on at least six occasions.  **Ex. 3,** WC_JPLF_00210789, -790, -791, -793, -797, -806.  In each occasion, the corresponding table on the written SCS report (**Ex. 2,** pages 4-5) reported the flow rate as "<5," ten times higher.  Hoffnagle assumed that SCS had done a quality control review (Hoffnagle Dep at 81:17-82:2) and thus concluded that the differences were the result of a quality control review.  Id, 78:25-81:18.  But if the quality control review resulted in changes to the reported field data, that means that the data recorded in the field was not accurate.

---

[16]This testing began just one day after the *Addison* case was removed to federal court. Under Rule 26, discovery could not commence until after a Rule 26(f) conference had been convened.  Immediately after removal, the *Addison* Plaintiffs demanded such a conference so that they could have access to the site for inspection and testing.  Without revealing their own testing that was underway, Defendants opposed the request, asserting that no testing by the Plaintiffs should be allowed until after the Court ruled on the Plaintiffs' motion to remand.  After the Court denied the motion to remand, arrangements were finally made to permit the Plaintiffs to conduct testing.  Defendants insisted that their experts be allowed to attend and observe, even though the Defendants had not provided the same courtesy to the Plaintiffs' experts.

At location J-4a-G2, according to the field data sheets, all of the measurements of H2S were taken before the first measurement of the flow. Hoffnagle testified on this issue, "I don't know why the timing is off." Hoffnagle Dep. at 76:12.

Some of the testing occurred during periods of relatively high winds. The wind speed at many locations was 13.4 miles per hour or more (SCS recorded the wind in meters per second, and one meter per second equals 2.23 miles per hour; many of the readings were 6 meters per second or more). SCS July Report at 4-5, WC_JPLF_00210737 to -738 and -747. Wind speed can affect the measurements. *See* Hoffnagle Dep. at 66:1 to 66:20.

The July 2019 SCS report on the June 2019 measurements, **Ex. 2**, contains no description of the methods actually used to make the measurements. Dr. Abichou opined that there are "two direct methods used to estimate surface emissions from landfills"—the "static and dynamic chamber techniques." Report at 5. He concluded that the static chamber technique "is not suitable for measuring surface emissions of [hydrogen sulfide]" (Report at 5) and that the dynamic chamber technique "can lead to an overestimation of emissions due to the build-up of [hydrogen sulfide] inside the chamber." Report at 6. According to Dr. Abichou, SCS did not use either method, but instead used a "hybrid, or what I call an open chamber." Abichou Tr. 75:8-12, 77:13-24. Dr. Abichou has never himself used open chambers. Id. 150:11-15.

Dr. Abichou's report states that the "each test was performed for 30 minutes" and that he "understood" that the readings he relied on were "the readings when the flow and the concentration inside the chambers have equilibrated," Abichou report at 6. However, the actual SCS report nowhere states either of these facts.

In simple terms, the SCS measurements consisted of placing a cylindrical chamber on the ground at the top of the landfill so that any gas flowing through the soil cover would flow in to the

chamber where it could be measured. SCS reported measurements taken inside the chamber, and measurements taken in the ambient air, both taken with a hand-held Jerome meter.  But the July Report does not explain how measurements were taken inside the chamber, or the placement of the Jerome meter for measuring concentrations in ambient air. Neither Mr. Hoffnagle nor Dr. Abichou knows how they did it.  Hoffnagle Tr. 59:25-60:16; Abichou Tr. 79:16-23.

With one exception, each sample location was tested just once, on one day, despite SCS President Walsh's prior sworn testimony that the results of testing on one day can be materially different from testing done on other days.

SCS's field measurements showed that the emissions varied day by day and even minute by minute.  At testing location J-4a-D2 (the only location measured on more than one day), on June 11, 2019, the measured concentration taken inside the chamber at 9:51 a.m went from 44 parts per million to 50 parts per million (an increase of 6,000 parts per billion) in the course of a single minute, while the ambient air measurements outside the chamber showed 170 ppb of H2S at 9:37 a.m. and 240 ppb fifteen minutes later.  **Ex. 2**, at WC_JPLF_00210786.  The next day, at the same location, labeled J-4a-D2-2, the recorded ambient air measurements of H2S went from 770 ppb (three times the highest reading on the day before) to 7,400 ppb (nearly 30 times the day before) over the course of 14 minutes (1:07 p.m. to 1:21 p.m.).  Id. at WC_JPLF_00210806.  Other locations showed similar variations.  *See*, *e.g.*, id. at WC_JPLF_00210789 (at location J-4a-G3, the ambient H2S concentration was recorded as having more than doubled over a single minute, from 200 ppb to 490 ppb).

The defense experts have sought to ignore the variation by asserting that they selected the highest of the readings as a basis for their calculations. But, as demonstrated by the multiple

readings at location D-4a-D2, the highest reading on one day might be a fraction of the readings on the next day.

Aptim expert Gale Hoffnagle agreed that if the SCS measurements were not reliable, then "my calculations in general about the emission rates would not be reliable." Hoffnagle Tr. at 54:5 to 54:10. He then conceded that he could not determine from the SCS report whether the cylinders were purged before the testing, id. at 75:25 to 76:5, or whether the required 30 minutes had elapsed after placement and before testing (id.), or whether the air inside the cylinder had equilibrated before the testing began, id. at 72:22 to 72:25, 75:1 to 75:8.[17]

Waste Connections' expert Mark Yocke explained in his report that "There are uncertainties attendant to the mass fluxes computed from the SCS chamber data because SCS made only a handful of flux chamber measurements over a span of just a few days, measurements encompassed a small fraction of the JPLF's emitting surface area, and the volumetric flow rates through the chamber were near the lower detection limit of the SCS instrument." Yocke Report at 9. And, importantly, Yocke did not rely upon SCS measurements when he calculated an emission rate for hydrogen sulfide at the landfill. Yocke Tr., Page 81:7 to 81:12.

The SCS Report contained no explanation as to the flux chamber testing procedures that were actually used. Critical to such tests is the purging of the chamber with an inert gas and the allowance of sufficient time for the chamber concentrations to stabilize. Abichou Report at 5-6; Soler Rebuttal Report at 49-50. Indeed, until such time as the air already existing in the chamber

---

[17] Table 1 in the Hoffnagle Report lists, for location J-4a-D2-2 (sampled on June 12, 2019), ambient H2S of 7400 ppb, chamber H2S of 29000 ppb and flow of 56.57 cc/min. The actual flow recorded at that location on that day in the field notes was "<0.5 cc." WC_JPLF_00210806. On, June 13, 2019, SCS recorded a flow of 56.57 cc/min (and a flow of 60.79 cc/min) at location J-4a-D2-A. Thus, the flow rate reported by Hoffnagle to produce the 29,000 ppb was taken on a different day at a different location.

is entirely displaced by the gas flowing into the chamber though the landfill surface, any concentrations of hydrogen sulfide will be diluted by the air already in the chamber,[18] with the result that any measured concentrations of hydrogen are necessarily lower that than the actual concentrations of the hydrogen sulfide in the landfill gas being emitted.[19]

## III.   THE SCS TESTIMONY AND "FACTUAL" DATA MUST BE EXCLUDED UNDER RULE 37.

In the alternative, the Federal Rules of Civil Procedure prohibit the Defendants from using information related to SCS at the forthcoming trial of General Causation. Rule 37(c)(1) specifically provides that "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Rule 26(a) required the Defendants to disclose "(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."

None of Defendants identified SCS as a source of potential discoverable information. See Rule 26(a) Disclosures attached as **Exs. 49, 50, 51 and 52**.

Nor was SCS identified as an expert under Rule 26(a)(2).

---

[18] Typically, the process would use monitoring data to indicate that the atmospheric air trapped in the chamber during deployment has been evacuated.  Alternatively, if purging the chamber, a tester would monitor the concentration of the purge gas to show it diminishes to zero, which would indicate that the air in the chamber has been displaced by the gas being emitted. Neither procedure is discussed in the SCS methodology, which was not documented.

[19] In this case, the highest flow rate mentioned was 105.1 cc's per minute.  **Ex. 2**, second page.  Assuming that the 50-liter chambers used in the March testing were used again in the June testing, at a flow rate of 105.1 cc's per minute, it would take nearly 8 hours to fill the chamber entirely with landfill gas.  (There are 1000 cc's in a liter, and thus 50,000 cc's in a 50-liter chamber. At 105.1 cc's per minute, it would take 476 minutes ( or 7.92 hours) to fill the 50-liter chamber.).

Nor did any of the Defendants supplement their disclosures under Rule 26(e) to identify SCS.

As a result, Rule 37(c)(1) applies.  To the extent that Defendants contend that SCS merely provided factual data, then Defendants' failure to disclose SCS as source of discoverable information in the Rule 26(a) Disclosures prohibits the Defendants from using SCS's information to supply evidence at the upcoming hearing.

At the same time, to the extent that SCS is the "real" expert, offering its opinion through the voices of others, then the failure to designate SCS personnel as experts under Rule 26 precludes them from "testifying" now.

Either way, Rule 37(c)(1) provides a further basis to exclude SCS "testimony" and information from this proceeding.

## IV.      CONCLUSION

Given the above, it is evident that the SCS measurements are not reliable but rather the product of intentional, orchestrated manipulation meant to perpetrate Defendants' goal of both obfuscating and burying the truth. Unable to counter the objective facts, SCS – the "fixer" – was injected here to both manufacture facts favorable to the Defendants and prevent Plaintiffs from gathering evidence that Defendants now claim is needed to establish General Causation. The tainted fruits of SCS' advocacy and manipulation have polluted all expert opinions relying upon same.

For the foregoing reasons, the SCS measurements are wholly unreliable, and all expert opinions (including the opinions of Abichou and Hoffnagle) relying upon the SCS measurements must be excluded as inadmissible.

Dated:  October 4, 2021                    **[signatures on following page]**

Respectfully submitted,

_____ S. Eliza James _____
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
FORREST CRESSEY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com


_____ /s/ Eric C. Rowe _____
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Erik D. Bolog (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON,
L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
ebolog@wtplaw.com
mchilders@wtplaw.com

*Counsel For Addison Plaintiffs*

_____ /s/ Bruce C. Betzer _____
Bruce C. Betzer (Bar No. 26800)
Jennifer S. Avallone (Bar No. 35613)
THE LAW OFFICE OF BRUCE C. BETZER
A Professional Limited Liability Company
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964


Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964


Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, Iii (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
Jeremy J. Landry (#30588)
jjl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE


Val Patrick Exnicios, Ta (#19563)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street, Suite 1400
New Orleans, LA 70112 Telephone: (504) 410-9611
Facsimile: (504) 410-9937


Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS

2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

John D. Sileo (La Bar No. 17797)
Casey W. Moll (La. Bar No. 35925)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*Counsel for Ictech-Bendeck Plaintiffs*