**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** | **CIVIL ACTION** |
| **Plaintiff** | **NO. 18-7889** |
| | **c/w 18-8071,** |
| **VERSUS** | **18-8218, 18-9312** |
| **WASTE CONNECTIONS BAYOU, INC., ET AL.,** | **SECTION: "E" (5)** |
| **Defendants** | |
| *Related Case:* | **CIVIL ACTION** |
| **FREDERICK ADDISON, ET AL.,** | |
| **Plaintiffs** | **NO. 19-11133, c/w 19-14512** |
| **VERSUS** | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| **Defendants** | **JUDGE: Morgan** |
| | **MAGISTRATE JUDGE: North** |
| *Applies to: Both Cases* | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**JOINT MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF**
**DR. JAANA PIETARI AND NESTOR SOLER PURSUANT TO FRE 702**

The Consolidated Class Plaintiffs, Jorge Ictech-Bendeck et al, and the *Addison* Plaintiffs
(collectively "Plaintiffs") file this Memorandum in Opposition to the Joint Motion to Exclude
Certain Opinion Testimony of Dr. Jaana Pietari and Nestor Soler Pursuant to FRE 702 filed by
Defendants (*Ictech-Bendeck* Doc. 166; *Addison* Doc. 207).

As a general matter, Defendants' attacks on the factual bases of the Soler and Pietari
opinions go the weight and credibility of their testimony, not admissibility.  Because such attacks
are best left for cross-examination, Defendants' Joint Motion should be denied.

1

## I.      RELEVANT BACKGROUND.

The General Causation analysis requires, as its first step, the determination of what gases and odors are being emitted from the Jefferson Parish Landfill ("JPLF"). This, in turn, requires a computation of how much.  All parties in this case have focused upon hydrogen sulfide gas ("H2S"), which smells like rotten eggs, as a marker for such gases and odors.

The JPLF, like all municipal solid waste landfills ("MSW"), generates gases as the waste and garbage within it degrades and decomposes.  All MSW landfills will generate hydrogen sulfide gas in some amounts.[1]  In 2017, the JPLF began noticing increased levels of H2S, beyond what would ordinarily be expected.[2]  And when the Parish investigated the source of the increased levels of H2S in the spring of 2018, the focus soon narrowed down to the landfill's acceptance of a substance called "spent lime," which the landfill had been accepting in large quantities, beginning in October 2016.

The "spent lime" was created when a product called lime (mostly calcium oxide or calcium hydroxide) was used to remove sulfur from the exhaust gases of burning fossil fuels through a process known as flue gas desulfurization.  The sulfur in the gases combined chemically with the lime.  As a result, a portion of the "spent" lime consisted of sulfur compounds, principally calcium

---

[1] *See* **Exhibit 1,** EPA Doc AP-42, §2.4.4 at page 2.4-3. ("H2S is normally present in LFG at levels ranging from 0 to 90 ppm, with an average concentration of 33 ppm.").  (The most recent version of this document found on the EPA website is the 2008 draft.)  **Exhibit 2,**  Brian DeJean Dep at 60:12-13 ("our belief was that H2S levels should typically be in the 100 to 250 PPM level").  Mr. Soler measured the average H2S content in landfill gas at the JPLF as follows:  Phase 1: 70.2 ppm;  Phase 2: 34.4 ppm; Phase 3A: 15.5 ppm and Phase 3B: 56.5 ppm.  Although the H2S levels in Phase 4A were very high, Dr. Pietari made a separate analysis of the H2S generated by the spent lime in Phase 4A, so Mr. Soler assumed Phase 4A (without the spent lime) to be the same as Phase 3B.  Soler Report at 38-39.

[2] Measurements taken by Carlson in May 2018 exceeded 2000 ppm, the top level of the measuring devices.  Measurements taken by TRC in October 2019 exceeded 6,000 ppm.

sulfate dihydrate, also known as gypsum.  The spent lime involved in this case was produced by a company known as Rain Carbon.

There is a problem with putting such materials in MSW landfills—when they degrade, they can create large quantities of hydrogen sulfide gas.  In fact, in April 2017, Waste Connections' current expert, Jeffrey Marshall, presented a paper at the 2017 World of Coal Ash Conference in Lexington, Kentucky.  The paper was titled, "Hydrogen Sulfide Issues at Coal Combustion Residual and Municipal Solid Waste Disposal Facilities."  In it, Marshall warned that "gypsum decomposition can general problematic amounts of hydrogen sulfide," and that such generation "can have negative impacts for … the landfill operator." **Exhibit 3,** Marshall article at first page and sixth page.  He warned (in April 2017) that "Lower concentration exposures can cause neurological and respiratory effects; irritation to the eyes, nose or throat; fatigue, headaches, and nausea," *id*., at second page—all of which effects have been complained of by one or more of the Plaintiffs in this case.

In May 2018, the consultant hired by the Parish, Carlson Engineering Consultants ("Carlson"), concluded that Marshall's report likely explained what was going on at the JPLF. **Exhibit 4**, 11 ¶25.  After Carlson circulated Marshall's paper as part of its preliminary report, the Parish ordered an immediate end to allowing spent lime into the Landfill. *See* **Exhibit 5,** Lockwood email to O'Connor dated July 2, 2018. Thereafter, Waste Connections hired Marshall to review the special waste accepted into the landfill, including the Rain Carbon spent lime.  His resulting report, which Waste Connections had refused to produce on privilege grounds, confirmed that the single largest potential source of hydrogen sulfide gas in the JPLF was the Rain Carbon spent lime. **Exhibit 6,** Jefferson Parish Landfill Special Waste Odor Evaluation dated September 24, 2019 by

3

Jeff Marshall, P.E. and James Walsh, P.E., BCEE of SCS Engineers (hereafter **"Secret Marshall Report"**), page 3, noting that up to 934 tons of H2S gas could be generated.

To determine the amounts of hydrogen sulfide being emitted at the JPLF, Plaintiffs' experts first had to determine how much was being generated as a whole. To do that, Plaintiffs' experts relied upon a widely used software method developed by the U.S. Environmental Protection Agency called LandGEM (short for "Landfill Gas Emissions Model"), which requires the selection of certain values, including potential generation (expressed in formulas this case as $L_0$ (pronounced "L-naught" or "L-sub-naught" or "L-zero") or $S_0$ (pronounced "S-naught" or "S-sub-naught" or "S-zero") and the decay rate, expressed in the formulas as "k".

In this case, because hydrogen sulfide could be generated by the waste even in the absence of the spent lime, there were two separate calculations made—one to estimate the amount of H$_2$S that would be generated by the ordinary waste, and the other relating to the amounts generated by the spent lime. The first was done by Mr. Nestor Soler. The second was done by Dr. Jaana Pietari, who applied a model analogous to LandGEM and developed by Anderson, et al. (2010) (the LandGEM model outputs for landfill gas was used to convert the Anderson et al. model results of concentrations). The two estimates were then combined for the estimate of the total amount of hydrogen sulfide being generated.

Step two of the process was the determination of how much of the amount that was being generated was thereafter being emitted to the atmosphere. Landfill gas by its nature will find its way to the surface and into the atmosphere unless it is collected, thereby preventing its emission. As a result, whatever is not collected will be emitted. The ratio of the gas collected as compared to the gas generated is the "collection efficiency." Thus, the amount of gas collected can be

4

calculated by multiplying the total amount generated by the collection efficiency. The amount of emissions is the difference between the amount of gas generated and the amount of gas collected.

In their *Daubert* motion, Defendants do not challenge Dr. Pietari's qualifications as an expert. They do not challenge her methodologies or the equations that she used in determining how much hydrogen sulfide could be generated from the spent lime based on the measured concentrations actually captured from Phase 4A.  In fact, they acknowledge that Dr. Pietari <u>followed</u> the methods outlined in the Anderson study that they rely upon.[3]  Defendants assert only that Dr. Pietari should not have relied upon safety data sheets ("SDSs") provided by the producer of the spent lime as a basis for estimating the sulfur content.[4]

Similarly, in their *Daubert* motion, Defendants have not challenged Mr. Soler's qualifications as an expert. They have not challenged Mr. Soler's use of LandGEM model, his methodology, or the selection of the $L_0$ and $k$ values to be input into the LandGEM model in determining the amount of hydrogen sulfide gas generated.  The attack on Mr. Soler relates solely and entirely upon one aspect of one part of his analysis for a portion of the time period relevant to this case—Defendants contend that he should have used default values established by the EPA for collection efficiency at typical landfills instead of actual data based upon actual conditions at the JPLF.

---

[3] Brief at 4-5 (the "study emphasizes that under the modeling approach used by the authors, the total mass of sulfur deposited into the landfill as derived from the sulfate composition of the waste 'is needed to evaluate the $H_2S$ generation potential of the site.' Accordingly, Dr. Pietari estimated the sulfate composition of the waste, which she then used to estimate the total mass of sulfur that was placed into the landfill[.]").

[4] As discussed later in this Opposition, Waste Connections and the Parish relied upon the same SDSs in deciding whether the accept the spent lime into the Landfill.  And Waste Connections' expert on this issue relied upon the same SDSs when he issued his secret "privileged" report to Waste Connections.

Both arguments must be rejected.

## II.     APPLICABLE LAW

"The district court has considerable discretion to admit or exclude expert testimony under Federal Rule of Evidence 702." *Dalrymple v. United States*, No. CV 18-14237, 2020 WL 9597852, at *2 (E.D. La. July 20, 2020). Rule 702 provides that an expert witness "qualified… by knowledge, skill, experience, training, or education may testify" if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
(b)     the testimony is based on sufficient facts or data;
(c)     the testimony is the product of reliable principles and methods; and
(d)     the expert has reliably applied the principles and methods to the facts of the case.

*Id.* citing Fed. R. Evid. 702. "An expert may base an opinion on facts and data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703.

In *Daubert*, the Supreme Court held that Rule 702 "requires the district court to act as a gatekeeper to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Dalrymple*, 2020 WL 9597852 at *2 *citing Metrejean v. REC Marine Logistics, LLC*, No. 08-5049, 2009 WL 3062622, at *1 (E.D. La. Sept. 21, 2009) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). This gatekeeping function applies to all forms of expert testimony. *Dalrymple*, 2020 WL 9597852 at *2.

"To be sure, the *Daubert* reliability analysis "applies to, among other things, the facts underlying the expert's opinion." *Dalrymple*, 2020 WL 9597852, at *3 citing *Moore v. Int'l Paint*, LLC, 547 Fed. Appx. 513, 515 (5th Cir. 2013) (internal citations omitted). "But *Daubert* excludes testimony on these grounds only when an expert relies on 'completely unsubstantiated factual

assertions,' *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007), or '[w]hen an expert's testimony is 'not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position,'" *Dalrymple*, 2020 WL 9597852 at *3 citing *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *McCrary v. John W. Stone Oil Distrib., L.L.C.*, No. CV 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996). "Furthermore, experts may rely on one version of disputed facts in forming their opinions." *Id.* citing *Moore v. Int'l Paint*, 547 Fed.Appx. at 513. "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts." *Moore v. Int'l Paint*, 547 Fed. Appx. at 515 citing FED. R. EVID. 702 advisory committee's note. "Generally, the 'fact-finder is entitled to hear [an expert's] testimony and decide whether ... the predicate facts on which [the expert] relied are accurate.'" *Id.* citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir.2002). It is "the role of the adversarial system, not the court, to highlight weak evidence." *Id.* quoting *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

"Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on 'completely unsubstantiated factual assertions.'" *Id.* citing *Hathaway*, 507 F.3d at 319 n.4. This is because "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible." *Hathaway*, 507 F.3d at 319 n.4.

Because General Causation will be tried by the bench rather than by a jury, this Honorable Court will be able to fully evaluate the testimony of Dr. Pietari and Mr. Soler at trial to ensure their

opinions are supported by sufficient facts and reliable methodology. See *MC Louisiana Mins., LLC v. Searcy*, No. CIV.A. 12-1237, 2014 WL 508517, at *6 (W.D. La. Feb. 6, 2014); see also *McCrary*, 2016 WL 760744 at *3 ("At this time and without the benefit of the factual record to be developed at trial, the Court cannot conclude that all of Jamison's anticipated opinion testimony is based on completely unsubstantiated factual assertions.")

## III.   DR. PIETARI'S EXPERT OPINIONS AND TESTIMONY ARE RELEVANT AND RELIABLE.

Dr. Pietari estimated the sulfur content of the 23,000 tons of Rain Carbon spent lime that were accepted at the JPLF and buried in Phase IVA between October 2016 and July 2018.  She then estimated the H2S gas generated by the spent lime.  Dr. Pietari's estimates regarding H2S generation from the spent lime were then used as an input into Mr. Soler's estimate as to what was being emitted from the JPLF (*i.e.*, not captured by the Landfill's various control systems) during the relevant time period. Nestor Soler's estimate, which incorporated Dr. Pietari's H2S generation estimates, was then used as the input for Mr. Lape's air modeling.

In their effort to exclude Dr. Pietari, Defendants misconstrue the applicable law, misstate the relevant facts, and mischaracterize Dr. Pietari's testimony, her opinions, and the bases thereof. When viewed without the partisan lens, Dr. Pietari's opinions, testimony, and the bases thereof, are both relevant and reliable under FRE 702 and FRE 703.

### A.   Dr. Pietari Neither Blindly nor "Wholly" Relied upon the Rain Carbon SDSs to Estimate the Sulfate Composition of the Rain Carbon Spent Lime that was Accepted and Buried at the JPLF.

Defendants' single predicate for excluding Dr. Pietari's calculations rests upon the contention that she relied "wholly on the face of" two safety data sheets prepared by the producer of the spent lime, Rain Carbon.  Because the predicate is false, the Defendants' entire argument

lacks any basis in fact.  While Dr. Pietari did in fact consider the two SDSs, they comprise just one part of her analysis.

Among other information, Dr. Pietari considered general information from the literature concerning composition analyses of flue gas desulfurization materials (which includes spent lime), the H2S concentrations captured at the JPLF after the spent lime was buried in Phase IVA,[5] and the Pace Analytical result that Defendants falsely and shamelessly accuse her of ignoring.[6]

The SDSs both state that 5% to 20% of the spent lime consisted of calcium sulfate dihydrate, also known as gypsum. And it is true that Dr. Pietari used the range stated by the SDSs as a starting point.[7]  However, Dr. Pietari then conducted a scientific analysis to determine whether the sulfur percentages corresponding to the range of gypsum within the SDSs' range and the Pace results could explain the measured concentrations of H2S actually captured at the JPLF. (Defendants do not challenge her methodology or the results of this analysis). As Dr. Pietari explained in her expert reports and during her depositions, the sulfate compositions at the low end of the range provided by the SDSs and the Pace results cannot explain the measured concentrations of H2S that were captured at the JPLF.[8] (As confirmed by defense expert Jeffrey Marshall, there

---

[5] The relevant H2S measurements are best divided into two buckets: (1) the Carlson May 2018 and River Birch fall 2018 H2S measurements; and (2) the TRC October 2019 H2S measurements.

[6] **Exhibit 7**, Excerpts of Dr. Pietari's July 1, 2021 Deposition ("Pietari Deposition") at pp. 35:12-23; 56:4-57:5; 207:15-25; (defense counsel acknowledging discussion of Pace results in initial expert report); 212:12-17.

[7] **Exhibit 7**, Pietari Deposition at p. 57:4-5 ("In my work, I considered we had the SDS information. I considered that the range of possible concentrations.").

[8] **Exhibit 7**, Pietari Deposition at pp. 56:4-20; 155:22-156:7; 212:18-214:1.  *See* Doc. 166-3 (Ictech-Bendeck), Doc 215-9 (Addison), Pietari January 29, 2021 Expert Report at p. 29 (¶82); 29-30 (¶84); 31 (¶88-89); 32-33 (¶ 93-96); Doc. 215-10 (Addison)**,** Pietari June 16, 2021 Rebuttal Report at p. 13-15 (Section 3.5), 22-23 (Section 3.10.2).

was no other significant source for the hydrogen sulfide.)  Dr. Pietari concluded from this analysis (which is not challenged in any respect by the Defendants) that the sulfate composition of the spent lime was necessarily above the low range provided by the SDSs (as well as the Pace results).  As a result, the argument that Dr. Pietari simply blindly and "wholly" relied on the SDSs is utter nonsense.

Furthermore, Dr. Pietari's initial analysis demonstrated that the average and high portions of the SDSs' range best explained the measured concentrations of H2S captured by Carlson and River Birch from Phase IVA in 2018.[9]  Given Dr. Pietari's scientific analysis, which Defendants have not attacked, certain portions of the range provided by the SDSs are not "completely unsubstantiated" as Defendants contend. Therefore, Dr. Pietari's reliance upon the average and higher end portions of the SDSs' range is reliable under the circumstances to estimate the H2S generated by the 23,000 tons of Rain Carbon spent lime disposed in Phase IVA.

The reason behind Defendants' conscious ignorance of Dr. Pietari's scientific analysis and the various other information she considered is obvious: presenting the entire context of what Dr. Pietari did to estimate the sulfate content of the spent lime and the universe of her reliance materials betrays any argument that she blindly and solely relied upon the range provided by the SDSs to estimate the sulfate composition of the Rain Carbon spent lime. Of course, had she truly done so, she would not have ruled out the lower end of the range provided by the SDSs or the Pace results.

It is well-settled that exclusion is only proper when an expert's opinion is based solely upon "completely unsubstantiated factual assertions." *Moore v. Int'l Paint* and *Hathaway*, supra.

---

[9] **Exhibit 7**, Pietari Deposition at pp. 156:8-11; 158:25-161:24; Doc. 166-3, Pietari January 29, 2021 Expert Report at p. 30 (¶85); Doc. 215-10 (Addison)**,** Pietari June 16, 2021 Rebuttal Report at p. 23-24 (Section 3.10.3).  **Exhibit 8**, Pietari August 27, 2021 Supplemental Expert Report at p. 6-7 (Section 3.2.1 including Table 3).

Because portions of the SDSs' sulfate ranges relied upon by Dr. Pietari are substantiated by the actual measured concentrations of H2S that were captured at the JPLF, Defendants' attacks are best left to the adversarial process.

> **B.    The SDSs are Reliable for Purposes of Estimating the Sulfate Composition of the Rain Carbon Spent Lime Accepted for Disposal and Buried at the JPLF.**

> 1.    **There is No Precedent Which Deems Composition Information Within an SDS Unreliable for Failure to Provide Details as to How the Composition Information was Determined.**

By limiting their attack to the supposed "unreliability" of SDSs, Defendants are seeking merely to fit this case within the language found in some Fifth Circuit cases that purportedly deem unreliable any expert's opinion based upon composition information set forth in SDSs. However, each case cited by Defendants concerned the reliability of statements within an SDS in the context of an expert's reliance upon the SDS as the basis to establish a causation threshold for the injuries alleged to have been caused by the chemical product at issue.  Those decisions concluded that an expert cannot use the SDS statements to support a causation threshold opinion in the absence of separate information, data, or analysis supporting the causative link between the substance and the injury.

Not one case cited by Defendants involved the reliability of an SDS as it relates to the chemical composition of the product at issue.  Not one of the cases cited by Defendants even insinuates that the composition listed within the SDS is unreliable to support an expert's opinion as to the chemical product's composition.  Of course, the entire purpose of the SDS is to ensure that persons who may be exposed to the product are advised of its chemical composition, and the safety data sheets are prepared with the intention that people will rely upon them.[10]  And in this

---

[10] Manufacturers are federally mandated to provide information speaking to the composition of the chemical products which are the subject of the SDS. 29 C.F.R. §1910.1200(g).

case, Waste Connections and the Parish both demanded and relied upon the safety data sheets in deciding whether to let spent lime into the Landfill.

Moreover, in this case, Defendants do not deny that the spent lime contained calcium sulfate dihydrate; they just want the Court to conclude there was not very much of it.  The SDSs expressed the chemical composition as a range.  Dr. Pietari's analysis (which Defendants have not challenged) established that the sulfate content could not possibly be below the low end of the range, and established that the sulfate content was at the top of the range or higher.  On these facts, Defendants have cited no case that an SDS cannot be used as the starting point in the analysis.

Thus, contrary to Defendants' misrepresentations, the Fifth Circuit and courts around the country have not excluded expert opinions which rely on SDSs for composition information.

### 2. Defendants' Prior Reliance on the SDSs to Determine the Composition of the Spent Lime Betrays Their Attack on the Reliability Thereof.

Defendants' attack upon the reliability of the Rain Carbon SDSs as a basis to estimate the composition of the spent lime, is even more remarkable considering that Waste Connections' own expert, Jeffrey Marshall, did exactly that.  He was engaged to answer the same question that was posed to Dr. Pietari—how much H2S can be generated from the special wastes admitted into the Landfill?  In answering that question, Marshall looked to same data that Dr. Pietari began with— the Rain Carbon SDSs—and he looked at nothing else. [11]

Not surprisingly, Defendants make no mention of Marshall's previously undisclosed expert report, in which he arrived at a nearly identical conclusion as Dr. Pietari, based upon the very same

---

[11] The Secret Marshall Report (**Exhibit 5**) nowhere states that SDSs cannot be relied upon and reference to the December 2016 Pace results is notably absent from Marshall's analysis.

SDSs that Defendants now claim are "highly unreliable."[12] The only thing that Marshall did not do was to compare the potential generation to the concentrations of H2S measured in the landfill gas to see where the sulfate concentration fell within the range. (Instead, he merely assumed that the spent lime was not degrading at all and that the hydrogen sulfide gas was therefore not being generated at all, parroting the party line adopted by the Defendants).

Jeffrey Marshall's prior (and previously undisclosed) reliance upon the SDSs for the very same purpose demonstrates the appropriateness of Dr. Pietari's reliance upon the SDSs to estimate the sulfate content of the spent lime buried at the JPLF. See FRE 703. Accordingly, Defendants' attack on the reliability of the SDSs' composition information should be rejected outright.

However, the weakness of Defendants' attack on the SDSs does not end there. Not only did Marshall rely upon the SDSs when conducting his nearly identical spent lime H2S generation estimate as Dr. Pietari, Waste Connections relied upon the SDSs when creating and maintaining the waste profiles for the spent lime accepted and buried at the JPLF.[13] Moreover, Jefferson Parish, through its former landfill engineer Rick Buller, also relied upon the SDSs when seeking to identify the source of the elevated H2S being observed at the JPLF in 2018.[14]

---

[12] See **Exhibit 5**, Secret Marshall Report, at p. 12-13, Section 4.3 SPENT LIME (WC_JPLF_00406397-98) and Table 1 (WC_JPLF_00406407 at last row and WC_JPLF_00406408 at first row).

[13] See, for example, **Exhibit 9**, July 19-20, 2018 Waste Connections internal email re: "Spent Lime from Rain Carbon and Hydrogen Sulfide Production" (WC_JPLF_00273322); **Exhibit 10**, Waste Profile for Rain Carbon Chalmette certified on Sep. 30, 2016 (JP_JPLF_00343149-50); **Exhibit 11**, Waste Profile for Rain Carbon Norco certified on Sep. 30, 2016 (JP_JPLF_00343184-85); **Exhibit 12**, Waste Profile Approval # 1475267157 (WC_JPLF_00332929-30); **Exhibit 13**, Waste Profile # 1475267157 for Rain Carbon Chalmette (WC_JPLF_00333016-17).

[14] See **Exhibit 14**, June 27-28, 2018 emails re: "Fwd: lime for solidification pit" (WC_JPLF_00256524); **Exhibit 15**, July 18-19, 2018 emails re: "Spent Lime from Rain Carbon" (JP_JPLF_00184292-93).

Given Mr. Marshall's, Waste Connections' and the Parish's previous reliance upon the SDSs to determine the composition of the Rain Carbon spent lime accepted and buried at the JPL, and considering Dr. Pietari's scientific analysis excluding the low end of the SDS range as well as the Pace sample's sulfate percentage, Defendants' argument that the SDSs are "highly unreliable" to serve as a basis to estimate the sulfate content of the Rain Carbon spent lime is disingenuous.

**C.    The Pace Analytical Results Do Not Reliably Reflect the Sulfate Composition of the Rain Carbon Spent Lime Accepted for Disposal and Buried at the JPLF.**

As set forth above, rather than ignoring the Pace Analytical results which purport to analyze a sample of Rain Carbon spent lime, as Defendants falsely accuse her of doing, Dr. Pietari considered those results from the beginning, and ruled them out that as an accurate measurement of sulfate composition percentage in the spent lime shipments as a whole, because the Pace results could not explain the measured concentrations of H2S actually captured at the JPLF.

Further, there is no compelling evidence that Pace sample was even the actual spent lime from Rain Carbon Norco and Chalmette that was accepted and buried at the JPLF.  First, the Pace results relate to a spent lime sample from December 22, 2016—two months after the JPLF had already been burying the spent lime within Phase IVA.[15]  Importantly, a couple weeks <u>after</u> the Pace analysis was received, Rain Carbon issued an updated SDS on January 9, 2017.  That updated SDS made no change to statement in the 2013 SDS, which provided that the spent lime had a calcium sulfate dihydrate content ranging from 5 to 20%. *Ictech-Bendeck* Doc. 166-5; *Addison* Doc. 207-5. The timing of the Pace results and the newly issued SDS implies that the spent lime

---

[15] Doc. 166-3 at p. 10, ¶ 22 citing to WC_JPLF_00255114, excel spreadsheet titled "PIT LOADS", relevant excerpt of which is attached as **Exhibit 16.**

sample analyzed by Pace in December 2016 was not the same spent lime already being accepted for disposal at the JPLF since September 2016.

Importantly, Mr. Marshall in Secret Report did not rely upon the Pace results when estimating the sulfate composition of the Rain Carbon spent lime. Nor is there any indication that the Pace results were ever considered part of the waste profile of the spent lime disposed at JPLF.

Moreover, the Pace results were sent to Mr. Francois Payen of Rain CII Carbon, who was presumably the individual who ordered the analysis. No other document produced by Defendants involves Mr. Payen.  Thus, not much is known about him based on discovery to date.  However, open-source research indicates that Francois Payen was a senior research and development (R&D) engineer for Rain Carbon from January 2015 to July 2017.[16] Mr. Payen's title – Sr. R&D Engineer – and the fact that his name does not appear in any emails or documents speaking to the spent lime buried at the JPLF, including the waste profiles maintained by Waste Connections, of course indicates that the spent lime sample which was the subject of Pace's analysis likely came from an entirely new process rather than an existing one.

Given the lack of any further references to Mr. Payen, the fact the Pace results were not part of the spent lime waste profile maintained by Waste Connections, and the lack of reference to the Pace results by Jeffrey Marshall when he conducted his previously undisclosed estimate of the spent lime's potential H2S generation, it is more likely than not that the sample of spent lime analyzed by Pace was from a new process being developed at one of the Rain Carbon facilities.

In any event, further cutting against the conclusion that the spent lime accepted by the JPLF had a sulfate content congruent with the Pace results is the fact that such sulfate percentages do

---

[16] See **Exhibit 17**, PDF copy of Mr. Payen's LinkedIn profile found at https://www.linkedin.com/in/francoisspayen/ (last viewed on October 14, 2021); see also https://business.sttammanychamber.org/list/member/rain-carbon-inc-20574.

not - and cannot - scientifically explain the measured concentrations of hydrogen sulfide actually captured at the JPLF after burial of this Rain Carbon spent lime, as explained by Dr. Pietari.

Based on the foregoing, Defendants' argument that the Pace results accurately reflect the sulfate composition of the Rain Carbon spent lime buried in Phase IVA falls flat.

**D.      Any Uncertainty as to the Exact Sulfate Composition of the Rain Carbon Spent Lime Leans Towards the Conclusion that the Range Provided by the SDSs is Actually an Underestimate of the Spent Lime's Sulfate Content.**

Consistent with her opinion that her H2S generation estimate from the Rain Carbon spent lime is likely an underestimate, Dr. Pietari concluded it is possible that the high end of the sulfate range set forth within the Rain Carbon SDSs is an underestimate of the sulfate content of the Rain Carbon spent lime and the actual sulfate content was higher than what was stated in the SDS. 2According to Dr. Pietari, the actual measured concentrations of H2S captured at the JPLF after the acceptance and burial of the Rain Carbon spent lime could be explained if the spent lime was comprised of nearly 60% calcium sulfate dihydrate.  As Dr. Pietari opined, the sulfur from a nearly 60% calcium sulfate dihydrate composition would explain the H2S concentrations captured at the landfill while keeping the modeling parameters completely in line with those observed in the literature. **Exhibit 8**, Pietari August 27, 2021 Supplemental Expert Report at p. 11; **Exhibit 18**, Pietari Supplemental Deposition at p. 27:11-28:22; 44:19-46:22; 47:4-48:11.

After receiving Defendants' motion, Plaintiffs re-examined the database of documents obtained in discovery in this case.  Finding nothing additional in the discovery database, Plaintiffs also reviewed the on-line database maintained by the LDEQ.  There, Plaintiffs discovered two "Solid Waste Beneficial Use Applications" submitted by Rain Carbon to the LDEQ relating the

spent lime produced by Rain Carbon at its Norco and Chalmette plants—the same sources of spent lime provided to the JPLF.[17]

These documents, which were certified by Rain Carbon, reported that the spent lime consisted of 40-50% of calcium sulfates, and 20% calcium sulfite—the very range predicted by Dr. Pietari.[18] Not only do these recently discovered documents indicate a higher calcium sulfate dihydrate content than the SDSs, but they also indicate a much larger sulfate content than the one-off Pace Analytical result. In short, Rain Carbon's beneficial use applications provide factual support for Dr. Pietari's opinions and conclusions that the SDSs' sulfate composition ranges are underestimates and that her estimate of the Rain Carbon spent lime's sulfate composition and her estimate of the total H2S generation from the more than 23,000 tons of spent lime buried at Phase IVA of the JPLF are underestimates.

As a result, no basis whatsoever exists to challenge Dr. Pietari under *Daubert.*

## IV.   NESTOR SOLER'S EXPERT OPINIONS AND TESTIMONY ARE RELEVANT AND RELIABLE UNDER FRE 702.

Defendants narrow *Daubert* attack on Nestor Soler likewise fails.  Defendants assert that Mr. Soler should not have relied upon a document prepared by a Carlson Engineering Consultants, an engineering consulting firm hired by the Parish to advise it with regard to issues arising at the Landfill (including odor issues).  Normally such an issue goes to the weight, and not to the

---

[17] These documents were not produced by any party in discovery in this case and were not produced by the LDEQ in response to subpoenas and FOIA requests seeking JPLF-related documents.  Neither application referred specifically to the Jefferson Parish Landfill.

[18] **Exhibit 19**, November 17, 2017 Beneficial Use Plan Application by Rain Carbon Norco (LDEQ-EDMS Document 10878548), p. 6 of 14 (Section 8B), p. 10 of 14 (Attachment 1); p. 12 of 14 (Attachment 2); p. 14 of 14 (Attachment 3); **Exhibit 20**, November 17, 2017 Beneficial Use Plan Application by Rain Carbon Chalmette (LDEQ-EDMS Document 10878550), p. 6 of 14 (Section 8B), p. 10 of 14 (Attachment 1); p. 12 of 14 (Attachment 2); p. 14 of 14 (Attachment 3).

admissibility of the proffered testimony.  *McCrary*, *supra*.  Defendants do NOT contend that Carlson's qualifications were lacking, or that Carlson's conclusions and methodologies were lacking in scientific rigor.

Defendants are NOT attacking Mr. Soler's qualifications, are NOT attacking his experience and are NOT attacking his expertise.  They are NOT attacking his methodologies for estimating the amount of hydrogen sulfide gas that is generated by the landfill.  Nor do they contest the general proposition that what is not collected by the gas collections system will ultimately be emitted to the atmosphere.  Having done no actual calculations of the amount of landfill gases collected by the gas collection system (the "collection efficiency"), Defendants assert that Mr. Soler should have used average values for average gas collection efficiencies at average landfills rather than to rely upon the actual conditions at the JLPF, a dysfunctional landfill. [19]

As Mr. Soler explained in his Report, the first step in determining what is being emitted from the Landfill consists of calculating how much landfill gas is generated (and Defendants do NOT challenge is calculations in this regard).  Mr. Soler's expertise and methods in this regard have not been challenged.  Mr. Soler has explained that "[s]ince some of the LFG that a landfill generates will be captured by the LFG collection system, the amount of LFG that escapes into the ambient air (i.e., fugitive emissions) will be the total amount of the LFG generated, minus the amount of LFG captured by the gas collection system (mainly, the LFG extraction wells)."  Soler Report at 41, ¶131.  Defendants have not challenged this proposition.

---

[19] No records exist to document the actual amounts of gases collected by the gas collection system in Phase 4A.  As discussed in more detail later, the gas collection system did not even become operational in Phase 4A until the second quarter of 2018.

Therefore, Mr. Soler reasoned, "the collection efficiency of the LFG system must be determined and quantified." Doc 215-7 (Addison) Soler Report at 41 ¶ 131. Defendants have not challenged this proposition.

This case principally involves Phase 4A of the Landfill, which began accepting waste in 2013. In October 2016, the landfill began accepting spent lime, which became the source of the H2S gas generated at the landfill. Thus, the "collection efficiency" of the gas collection system in Phase 4A is the subject of Defendants' Motion.

### A. Defendants do not challenge Mr. Soler's opinions relating to the time period before April 2018.

Defendants ignore one critical fact that is nowhere to be found in their moving papers or supporting affidavits—from the time waste began to be placed in Phase 4A in 2013 until monitoring began April 2018, there was no active gas collection system in Phase 4A at all. That means that the until April 2018, the collection efficiency in Phase 4A was zero, by definition.[20]

For that reason, Defendants' attacks do not affect any opinion relating to the time period before April 2018, when active gas collection began in Phase 4A, and the Motion affects only the time period from April 1, 2018 forward.

### B. The EPA guidelines were applied.

Defendants insist that Mr. Soler was required to apply the collection efficiencies determined by the EPA and SWICS (which the EPA adopted). Here is the chart promulgated by the EPA, found in the Code of Federal Regulations, Table HH, found at 40 C.F.R. Pt. 98, Subpt. HH, Table. HH-3:

---

[20] To give the benefit of any doubt to the Defendants, the Ramboll efficiency calculations assumed that the wells began collecting gas approximately one month after the wells were drilled, even though the actual collection began weeks or months later.

19

| Description | Landfill Gas Collection Efficiency |
|---|---|
| A1: Area with no waste in-place...................... | Not applicable; do not use this area in the calculation. |
| A2: Area without active gas collection, regardless of cover type........................................ | CE2: 0%. |
| A3: Area with daily soil cover and active gas collection............................................................ | CE3: 60%. |
| A4: Area with an intermediate soil cover, or a final soil cover not meeting the criteria for A5 below, and active gas collection ........ | CE4: 75%. |
| A5: Area with a final soil cover of 3 feet or thicker of clay or final cover (as approved by the relevant agency) and/or geomembrane cover system and active gas collection............................................................ | CE5: 95% |

As shown by this chart, in any "area" of a landfill "*without active gas collection system, regardless of cover type*," the gas collection efficiency is *zero*.  40 C.F.R. § 98.343(c); 40 C.F.R. Pt. 98, Subpt. HH, Table. HH-3.  *See* **Exhibit 21,** EPA Office of Air and Radiation, Available And Emerging Technologies For Reducing Greenhouse Gas Emissions From Municipal Solid Waste Landfills, June 2011, at 12 (emphasis added).  And that is necessarily so.  Collection efficiency is the percentage of the generated landfill gas that is collected.  *See* Stutz Report at x ("Collection

20

efficiency is an estimated percentage of how much of the total landfill gas generated is collected by the GCCS.").  When there is no collection system, none of the gas that is being generated is being collected.

As a result, it cannot be disputed that, for the time period before April 2018, Mr. Soler applied the amount shown by or in excess of these guidelines.

The same is true regarding the remaining time periods.  The chart further refers to "areas," not landfills as a whole.  In 40 C.F.R 98.343, the definition of "collection efficiency" states that: "If area by soil cover type information is not available, use default value of 0.75 (CE4 in table HH–3 of this subpart) *for all areas under active influence of the collection system*." (emphasis added).  Table HH-3, in turn states that the "area without active gas collection, regardless of cover type," has a collection efficiency of zero percent.  As a result, the values other than zero cannot be applied to any areas of a landfill that are not under active influence of the collection system.

In this case, large portions of Phase 4A were not under the active influence of the gas collection system and those areas consist of areas outside the radius of influence of the gas collection wells.

### C.     Defendants ignore the role of the radius of influence in designing the spacing of gas wells.

In carefully worded declarations, each of the Defendants' paid experts in this case have implied that the radius of influence of a gas well cannot be used in the determination of the collection efficiency of the gas collection system.  But that implication is entirely false and overlooks the role of the radius of influence in the design of a gas collection system.

As stated above, where there is no gas collection system at all, the collection efficiency is zero, by definition.  That was the case here, in Phase 4A, until April 2018.

21

Phase 4A consisted of 55 acres divided across six "cells" (20- 25) and as it existed in April 2018 waste had been deposited in Cells 20, 21 and 22.  The defense experts would have the Court conclude that the addition of a single well anywhere in Phase 4A would automatically raise the collection efficiency in all of Phase 4A from zero to 60% or more, meaning that that one well would collect 60% of the landfill gas generated in that entire area.  Obviously, of course, that is nonsense.

Each well works by sucking landfill gas out of the waste mass.  The well consists of a vertical pipe drilled into the waste mass.  A portion of the pipe, beginning several feet below the surface (in order to prevent air from the atmosphere to be drawn into the well), is perforated with holes, so that the landfill gas can be drawn into the well.  The vertical pipe is attached to the collection system, and a vacuum is applied.  The landfill gas within the waste mass is thereby drawn into the well through the perforations, where it is piped through the collection system to where it is burned off or reused.  In each well, the vacuum will extend out through the perforations and there will come a point at some distance from the well where the strength of vacuum will no longer draw landfill gas toward the well.  This distance is called the "radius of influence," (hereafter "ROI") and the area within ROI is called the "zone of capture."

Because landfill gas that exists outside the ROI and thereby outside the zone of capture, will not be collected the by the well, designers of landfill gas collection systems take ROI into account.  The typical layout of an LFG extraction system is documented in textbooks and can be shown as follows:[21]

---

[21]Tchobanoglous G., H. Theisen, and S. Vigil, Integrated Solid Waste Management, Engineering Principles and Management Issues, McGraw-Hill Inc., 1993, Chapter 11, Disposal of Solid Waste and Residual Matter, Figure 11-22, Equilateral Triangular Distribution for Vertical Gas Extraction Wells – Courtesy of California Integrated Waste Management Board.



In standard designs, the wells are spaced so that their ROIs overlap. This is done in order to increase the capture zones and avoid dead zones and thereby increase the collection efficiency (i.e., provide coverage to those areas where the efficiency would otherwise be zero). As demonstrated by the drawing (where the circles show the zone of capture), for complete coverage, the distance between wells should be no more than twice the ROI. In Appendix E, Collection System Design Plans of the EPA's Municipal Solid Waste Landfills, Volume 1: Summary of the Requirements for the NSP Guidelines for Municipal Solid Waste Landfills, EPA establishes that both perimeter and interior vertical wells should be spaced no more than two times the ROI apart. **Exhibit 22** at E-8. [22]

Defense expert Barry Kline explained that his "evaluation of well spacing initially is based on that's [sic] the initial design." Doc. 216-16 (Addison) Kline Dep. at 88:23-24. That's the same as what Mr. Soler did. Then Kline explained that he would evaluate the well spacing by looking at the results of surface emissions monitoring ("SEM"). Id at 3-4 ("If the SEM results are good, then the well spacing you chose was proper."). In this manner, Kline was recognizing that

---

[22]A complete copy of Appendix E is available on line at https://www.epa.gov/sites/default/files/2016-12/documents/lf-appx-e.pdf.

emissions will occur in areas between the wells that are not within the zones of capture of the wells.[23]

At the same time, among other variables, the ROI of a well is a function of: (a) applied vacuum pressure;[24] (b) landfill configuration and permeability of the waste; (c) well configuration (e.g., depth, diameter, and screen length); and (d) type and quality of the landfill cover system.

With an ROI of 100 feet, the well spacing should be less than 200 feet under EPA recommendations. At the JPLF, the original wellfield design layout (by Hartman Engineers) for Phases I, II, IIIA, and IIIB used a well spacing of 200 feet.[25] A well spacing of 200 feet was also used by Golder Associates Inc., in their layout of the proposed Phase IVA wells.[26] According to

---

[23]The defense motion wrongly states that the SEM data generated for the Landfill "overwhelmingly demonstrate that the GCCS is effectively capturing landfill gas." Surface emission monitoring did not even begin in Phase 4A until September 14, 2018, and even then did not include the active area of Phase 4A. **Exhibit 23,** APTIM-0002973 to -3000, at -2975 and -3000. In that first round of measuring, methane was found to exceed 500 ppm in two areas in between the wells. Id. at -2974 to -2975. The Report noted that corrective actions were taken "including placement of additional soil cover and adjustments to vacuum in the area." Id. at -2975. Subsequent re-monitoring occurred after two ten-day periods and then after 30 days. Id. After the first ten day period, there was only a minimal change to the measurements and the exceedance still existed. Id. The Report noted that, "During the monitoring event, odors were noticed in the area of 4A around exceedance areas." Id.

Exceedances in Phase 4A were found again in the 4th quarter of 2018. **Exhibit 24** (APTIM-0005055 to -5077). And after River Birch took over for Aptim (and did more thorough monitoring), its report for the second quarter of 2019 found even more exceedances in Phase 4A, including one (near well 507, a reading of 45,000 ppm) that was 90 times above the reporting threshold of 500 ppm, and several that had existed for more than 120 days. **Exhibit 25,** JP_JPLF_0003354 to -3490 at -3466. These results corroborate the problems documents elsewhere and validate the assignment of a low collection efficiency for Phase 4A.

[24]Too much vacuum can result in air from the atmosphere being drawn down into the well.

[25]**Exhibit 26,** Landfill Gas Collection and Control Plan, Hartman, October 28, 1998 – APTIM-0002784, -2795 to -2796. This spacing was increased slightly to approximately 220 feet in EMCON/OWT's revised design which was approved by LDEQ in correspondence dated January 18, 2000, **Exhibit 27,** LDEQ in correspondence dated January 18, 2000 ADD_P00009566.

[26]Landfill Gas Collection and Control Plan, Jefferson Parish Sanitary Landfill, Phase IVA, Golder Associates, January 2017. **Exhibit 28** - APTIM-0009091, -9097, -9099.

Golder, the vertical wells at Phase IVA were designed to achieve a theoretical ROI of 100 feet, consistent with the existing design for Phases IIIA and IIIB. **Exhibit 28** at -9097.  The well spacing used by Golder is approximately 200 feet, which is twice the assumed ROI.  At the JPLF, gas extraction wells have been designed and constructed to a minimum and maximum depth of approximately 28 feet and 64 feet, respectively. Id. at -9099.  With an average depth of 46 feet, the Golder-assumed ROI of 100 feet is approximately twice the average well depth (which is 92 feet).

In May 2019, Carlson submitted a design for the collection of high BTU landfill gas. **Exhibit 29.**  For this design, Carlson proposed adding a large number of additional wells, to fill in the spaces between wells, with a reduction in the assumed radius of influence.  Carlson assumed a 60-foot depth for vertical extraction wells, and a 30-foot depth for shallow wells, with a corresponding radius of influence of 75 feet for vertical wells not under a synthetic cap (100 feet where a synthetic cap existed), and a 50-foot ROI for the shallow wells.  Id at 32.  Both of these assumed ROI's were less than twice the depth of the well, and when the depth of the well was reduced from 60 feet to 30 feet, the corresponding ROI was reduced by 33% or 50%, depending on whether the well was shallow or not.

These design assumptions are supported by textbooks.  Specifically, Tchobanoglous 1993 indicates that the ROI of a of a vertical extraction well is essentially a sphere, and that the ROI will also depend on the depth of the landfill and on the design of the landfill cover.  It states that for deep landfills with a composite cover containing a geomembrane (not the case at the JPLF), a 150 to 200 feet spacing is common.  Tchobanoglous adds that a closer spacing (e.g., 100 feet) may be required for landfill with clay and soil covers (like the JPLF) to avoid pulling atmospheric gas into the gas recovery system.

25

Golder's design for Phase 4A called for installation of 38 gas wells in Cells 20, 21 and 22 of Phase 4A (the part of Phase 4A involved here). *See* **Exhibit 28,** drawings.  However, during 2018, only 15 wells were installed and placed into operation, and just seven more were installed in 2019.[27]  As a result, in 2018, well over half of the waste mass in these cells, measured by surface area, was not within the zone of capture of any well, and nearly half was not covered in all of 2019, with the result the actual collection efficiency was necessarily far smaller than the collection efficiency that could have been achieved if all of the wells had been installed according to the design.

Next, Mr. Soler considered that, as a municipal solid waste landfill, the JPLF was required by the Resource Conservation and Recovery Act (RCRA), Subtitle D, to have a leachate collection system that allows leachate to accumulate no more than one (1) foot (30 centimeters) above the bottom liner  (*see* 40 CFR § 258.40(a)(2)).  As established in the design criteria of active LFG extraction systems contained in textbooks and design guidelines, an efficient LFG extraction system should be capable of collecting gas generated within the waste media and should cover all areas generating gas in the landfill.  *See*, *e.g.*, 40 CFR §60.752(b)(2)(ii)).  Obviously, if an active LFG extraction system does not meet these conditions, its collection efficiency will be necessarily less than those stated in Table HH-3, found at 40 C.F.R. Pt. 98, Subpart. HH.

---

[27] According to the drilling logs, ten wells were drilled in Phase 4A between January 28 and February 1, 2018—wells 500, 501, 502, 509, 510, 511, 512, 513, 522 and 524.  **Exhibit 30,** Dep. Exh 142.  However, they did not begin collecting gas until April 2018. **Exhibit 31**, JPLF Semi-annual Report for 1st half of 2018.  On April 27 and 28, 2018, five additional wells were drilled—wells 507, 516, 517, 518, and 519.  **Exhibit 30,** Dep. Exh, 142.  These began collecting gas in May 2018. **Exhibit 31.**  Seven new wells were installed in Phase 4A in 2019: 508, 514, 515, 520, 521, 523, and 526.  Carlson High BTU Landfill Gas Utilization Plan at 13.  These were drilled in January 2018 and monitoring began on February 18, 2019.  **Exhibit 25**, River Birch Semiannual Monitoring Report for first half of 2019, JP_JPLF_0003354 to -3490, at -3365.

Mr. Soler further considered that the conventional methods of estimating collection efficiencies were based upon landfills that <u>do</u> have functional leachate collection and gas collection systems.  These include:

- EPA AP-42, Compilation of Air Emission Factors, which states in its Chapter 2.4 that reported collection efficiencies of municipal solid waste landfills typically ranges from 50% to 95% with a default efficiency of 75%.  **Exhibit 1.**

- EPA document titled *Background Information Document for Updating AP42 Section 2.4 for Estimating Emission from Municipal Solid Waste Landfills (September 2008)*,[28] which states that if the landfill is closed and capped (not the case at the JPLF), specific collection efficiencies may reach 85% to 90% for closed cells where the capture system has been installed.  It adds that open landfills might have an efficiency ranging from 57% to 77%.  *See* pages 7-8.

- Solid Waste Industry for Climate Solutions (SWICS), which in a 2009 document titled Current MSW Industry Position and State-of-the-Practice on LFG Collection Efficiency, Methane Oxidation, and Carbon Sequestration in Landfills proposed the following collection efficiencies:  (a) 50% to 70% (60% average) for landfills or portions of a landfill that are under daily cover;  (b) 54% to 95% (75% average) for landfills or portions of a landfill that contain an intermediate soil cover and (c) 90% to 99% (95% average) for landfills that contain a final soils and/or geomembrane cover. These percentages assume an operational landfill gas collection system.  **Exhibit 32** (excerpts).  Like the EPA, the SWICS authors noted that, "For landfill areas that are

---

[28] This document is available on-line at <u>https://www3.epa.gov/ttn/chief/ap42/ch02/draft/db02s04.pdf</u>

not under any form of LFG collection and are not influenced by LFG collection systems from neighboring areas, a collection efficiency of zero (0) should be used and included in the site-wide weighted average," and that "engineering judgment" should be exercised based on site specific factors.  Id at 17.

- EPA document titled *Available Emerging Technologies for Reducing Greenhouse Gas Emissions from Municipal Solid Waste Landfills (June 2011)* reports that gas collection efficiencies from 36% to 85% have been found using optical remote sensing technologies, that reflects a large range based on landfill design and operational differences.  This EPA document also reports collection efficiencies have been found using flux box measurements ranging from 35% to 90% depending on the soil cover. **Exhibit 21** at 10.  Areas without active gas collection are assigned 0%.  Id at 11..

- EPA's Greenhouse Gas Reporting Rule for Municipal Solid Waste Landfills,[29] which adopts SWICS recommendations and establishes the following LFG collection efficiencies:  (a) 0% for areas without active gas collection, regardless of cover type; (b) 60% for areas with daily soil cover and active gas collection; (c) 75% for areas with an intermediate soil cover, or a final soil cover not meeting the criteria in item "d" below, and active gas collection and (d) 95% for areas with a final soil cover of 3 feet or thicker of clay or final cover (as approved by the relevant agency) and/or geomembrane cover and active gas collection.

However, none of the statistical default guidelines for gas collection efficiencies described above (other than the zero percent) is applicable for Phase IVA, because the JPLF was not an ordinary landfill.

---

[29]*See* 40 C.F.R. § 98.343(c); 40 C.F.R. Pt. 98, Subpt. HH, Tbl. HH-3.

The guidelines are applicable to conventional landfills where there is an operating gas collection system with sufficient coverage over the area generating LFG and where leachate is allowed only one foot above the landfill bottom liner, or at least not as high that will block the perforated portion of properly defined and constructed active LFG extraction wells.  At the JPLF, there was no operating gas collection system at all in Phase 4A until the second quarter of 2018 and, after that, significantly fewer wells than designed were installed, leaving large portions of Phase 4A outside the zone of capture of any well.  And more importantly, in this case, leachate was so pervasive within the waste mass that many of the gas wells were full of leachate, which reduced the ability of the wells to collect gas.[30]

The defense experts agree that this excess liquid affects the ability of the wells to collect landfill gas.  Stutz Report at vi ("Liquids that have collected in a gas well may interfere with the well's collection of landfill gas if the liquid covers the well's perforated piping.").  For the purpose of the current motion, they contend merely that the amount of reduction in efficiency cannot be determined by estimating a reduced ROI based on the amount of the well that is blocked (or unblocked depending on the context).

The presence of several feet of water blocking the perforations in the gas wells necessarily reduced the amount of gas that could be extracted though the wells.  The presence of the excess liquid makes it impossible for the gas collection system to function as intended.  As a result, it could not be assumed that the collection efficiencies were the same as (or anything close to) collection efficiencies recorded in properly functioning landfills.  These wells did not appropriately function to collect gas because of the high leachate levels in the landfill media which blocked the

---

[30] The bottom of each well was ten feet above the bottom of the landfill (the liner), and only a one foot depth of leachate above the liner was supposed to be allowed.

perforated portion of these wells inhibiting gas extraction.  In fact, if all the wells were completely blocked by leachate, the efficiency of the gas collection will be 0%; by the same analysis, if part of the well is blocked by leachate, the efficiency will be somewhere between 0% and whatever maximum could be achieved. The statistical default values thus could not be applied because they would overstate the collection efficiency.

A different method to define the actual zones of capture for these limited gas extraction wells, which were significantly inhibited by high leachate levels in Phase 4A, was therefore required.  Mr. Soler attempted to evaluate the efficiency of individual wells. **Exhibit 38,** Soler Dep. at 376:8-13. He explained that "became a nightmare" because "Aptim was going in every week sometimes to calibrate."  Id.  He also explained that when a well had positive pressure (meaning there was no vacuum to draw out the landfill gas), "there were no significant zone of capture." Id at 14-15.

The presence of the excess liquid was recognized by Carlson in its reports to the Parish in May and August 2018 as one of the most critical issues facing the landfill. **Exhibit 3** at 3.**, Exhibit 33** at 15.  As a result, when Carlson was estimating the impaired performance of the gas collection system, Carlson concluded that the ROI of the wells that were installed in Phase 4A were reduced by the levels of leachate found in the wells, and Carlson prepared a series of drawings to illustrate the conclusion.  Id., Exhibits 12A-12D of the Carlson Report).  Carlson concluded that the liquid in the wells "reduced the ability of the gas system by at least 20% to 50% to collect generated gas from the Landfill."  Id., Carlson Report at 15.  Defendants do NOT contend that what Carlson did was unreliable.

Mr. Soler did not take Carlson's conclusion at face value; instead he reviewed for himself the documentation showing the leachate levels in the wells.  He explained in his deposition that he

had measured the circles shown on the drawings prepared by Carlson and compared those measurements to the liquid data from Aptim on the liquids in the wells, such that he was "reverse engineering Carlson's drawing." **Exhibit 38,** Soler Dep. at 338:19-25. Defendants make no contentions that <u>Carlson's</u> method was novel or untested, and makes no contention that <u>Carlson's</u> conclusions could not be relied upon in deciding how to fix the Landfill. When Mr. Soler adopted and endorsed the calculations performed by Carlson, he relied upon a reasonable calculation of the collection efficiency.

The Carlson drawing that Defendants contend that Mr. Soler blindly relied upon stated that "The ROI shown is 2 x the liquid height measured in each well which represents the amount of perforated pipe blocked." **Exhibit 33,** Carlson Report Exhibit 12B. Defense expert Stutz concluded in his Report that this meant that the ROI was calculated by Carlson as twice the length of the *blocked* pipe, and his Report asserted that "Soler misinterprets CEC's methodology and assumes that CEC's ROI estimates are equal to twice the *unblocked* length of perforated pipe, when the ROIs shown on CEC Exhibit 12B are expressly equal to twice the *blocked* length of perforated pipe." Stutz Report at x (Opinion 5). Mr. Soler explained in his deposition that the statement on the Carlson drawing was wrong, and he (Mr. Soler) knew that because Mr. Soler had himself done the math to verify what Carlson had depicted. **Exhibit 38,** Soler Dep. at 320:18 to 329:10.

Mr. Soler explained that when water level inside the well rises above the perforations in the pipe, the effect is to reduce the depth of the well. **Exhibit 38,** Soler Dep. at 373:6-11. As a result, landfill gas is being collected only from the area above the water level and only through the perforations that are above the water. Accordingly, because the effective depth of the well is reduced, the corresponding radius of influence and zone of capture is also reduced (just as the shallow wells in Carlson's design had a reduced ROI).

31

As a result of the foregoing, when Mr. Soler estimated the collection efficiency based upon the zones of capture of the wells that existed in Phase 4A, he was doing nothing different than what the designer of a landfill gas collection system does when he decides how far apart to space the wells, and what Carlson did when he designed the new gas field in this case.  And when Mr. Soler concludes that areas of the landfill that are outside the active influence the gas collection system will not be collected by the system, he is doing the exact analysis that is required by the "methods" insisted upon by the defense experts.  Mr. Soler's methods are neither novel nor untested.

Finally, even with the reduced ROIs, Mr. Soler's estimate (as he explained in his Report at page 8, ¶ 31) necessarily over-estimates the gas collection because it assumes that all of the wells were in continuous operation.  They were not.  When River Birch performed its analysis of the well field assessment in March or April 2019, it concluded that none of wells in Phase 4A had the required amount of vacuum and fully half of the vertical wells in Phase 4A "lack sufficient vacuum to collect gas" at all.  **Exhibit 34**, River Birch Assessment dated May 22, 2019 at 1.  River Birch explained:

> A typical vertical well should have a capacity of negative 30 inches of water column.  All of the wells in Phase 4A have vacuum capacity of less than negative 5 inches and 11 of these wells has **positive** pressure due to the lack of vacuum.  The inability to extract methane gas from these wells results in excess gas emissions and odors, as well as LDEQ compliance violations.

Id. at 4.  Carlson noted in its May 6, 2019, Report that the Phase 4A wells had been operating "under very low vacuums for several months in 2019" (and only four months had elapsed in 2019 by then) and that nine of the gas wells had had positive pressure for more than two consecutive months.  As shown by Mr. Soler's Report in Appendix C (**Exhibit 37)**, many of the gas wells in Phase 4A (those in the 500 series) encountered issues with positive pressure from the moment they

were placed into service.  Defense expert Mr. Stutz agrees that "if the well is under positive pressure, then it would not have a radius of influence."  Stutz Dep. at 325:24 to 326:1.  Thus, while Mr. Soler made the assumption that all gas within the zone of capture of the existing wells was being collected, in reality, many of the wells in Phase 4A were not collecting any gas at all for extended periods.

Finally, in December 2019, the Parish applied to the LDEQ to renew its operating permit. As part of the renewal process, the Parish reported to the LDEQ that "Fugitive emission rates for the landfill were recalculated and updated *using AP-42 approaches* and current site specific information."  **Exhibit 35,** Renewal application pdf page 6.  In other words, in calculating the fugitive emissions (those not captured by the gas collection system), the Parish used the very same method that the defense experts assert must be used.

In that application, the Parish stated that "a substantial increase in [the] potential fugitive emission rate was calculated relative to the prior permit." Id.  at -5311 ¶ 4.  The prior permitted emission rate for H2S, established before the spent lime was buried in Phase 4A, was 0.78 tons per year.  Id.  at -5314.  The renewal permit raised that amount by more than 200 times to 165.63 tons per year, and recited that, with the increase, "the facility is now classified as a major source of toxic air pollutants."  Id at -5311.  Based upon what was by then in the landfill, and a site-wide estimate for H2S concentration in landfill gas of 3000 ppm (id. at -5311) (the TRC testing in Phase 4A was higher than that), the Parish proposed that it be approved to have emission rates for "fugitive uncollected landfill gas emissions" of H2S of 36.92 pounds per hour and 161.69 tons per year.  Id. at -5367 to -5368.  In this case, the additional H2S was all being generated in Phase 4A and, when calculated across Phase 4A, the emission rate set out in the permit (using the AP-42 methods) is approximately four times greater than the rate calculated by Ramboll in its initial

report, and in the same order of magnitude as the calculations made by Ramboll based upon the measurements of H2S taken by TRC in October 2019.  *See* **Exhibit 36.**

The renewal application establishes that Mr. Soler's estimates of collection efficiency were reasonable and reliable and that the estimated emissions likely underestimate the actual emissions.

Mr. Soler's conclusion that in Phase 4A, the collection efficiency in Phase 4A had risen from zero to 15% by the end of 2019 is supported both by the facts and science.  Carlson itself concluded that the collection efficiency in Phase 4A was 19%.  **Exhibit 33,** Carlson Report, at page 27 and Exhibit 13

## V.   CONCLUSION

For the foregoing reasons, the Motion must be denied.

Respectfully submitted,

<div style="display:flex">
<div>

_____S. Eliza James_____
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
FORREST CRESSEY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com

_____/s/ Eric C. Rowe_____
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Erik D. Bolog (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036

</div>
<div>

_____/s/ Bruce C. Betzer_____
Bruce C. Betzer (Bar No. 26800)
Jennifer S. Avallone (Bar No. 35613)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com

Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com

/s/Jason Z. Landry_____
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, III (#27402)
ljc@mbfirm.com

</div>
</div>

Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
ebolog@wtplaw.com
mchilders@wtplaw.com
*Counsel For Addison Plaintiffs*

Jason Z. Landry (#33932)
jzl@mbfirm.com
Jeremy J. Landry (#30588)
jjl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE

Val Patrick Exnicios, Ta (#19563)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 410-9611
vpexnicios@exnicioslaw.com

Anthony D. Irpino (#24727)
Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

John D. Sileo (La Bar No. 17797)
Casey W. Moll (La. Bar No. 35925)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*Counsel for Ictech-Bendeck Plaintiffs*