UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** <br> Plaintiffs <br><br> **VERSUS** <br><br> **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** <br> Defendants <br><br> *Applies to: Both Cases* | CIVIL ACTION <br><br> NO. 19-11133, c/w 19-14512 <br><br> SECTION: "E" (5) <br><br><br> JUDGE: Morgan <br> MAGISTRATE JUDGE: North |

**OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO DEPOSE A.G. and B.G.**

**MAY IT PLEASE THE COURT:**

The *Addison* Plaintiffs respectfully oppose Defendants' Motion for Leave to Depose A.G. and B.G.. Defendants have failed to show good cause under the Twelfth Case Management Order (Rec. Doc. 429) as to why these depositions should move forward. As such, their Motion for Leave must be denied.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

Between July 2017 and December 2019, the East and Westbank of Jefferson Parish was overcome with pervasive, noxious, unabated odors emanating from the Jefferson Parish Landfill. Among the individuals who were negatively impacted by the odors were the Gremillion family. B.G. and A.G. are the minor children of Scott and Wendy Gremillion. The Gremillions resided in the River Ridge area prior to moving to Seneca, South Carolina, in the spring of 2020, in order to remove their children from the noxious odors. At the beginning of the relevant exposure period, B.G. was five years and four months old. A.G. was eight years and three months old.

1

On June 7, 2023, Mrs. Gremillion was extensively deposed. As part of the deposition, she was questioned about her personal experience with the odor, her symptoms, and the disruption to her and her family's life.[1] She testified that the odors were so pervasive, so disruptive, so putrid in nature, that their presence played a large factor in their decision permanently to move from the Jefferson Parish area.[2][3]

Critically to the issue here, Mrs. Gremillion testified that her children, who were in pre-kindergarten and early grade school at the onset, smelled and commented on the odors describing them in the following terms "smelling like farts" "sour" "smells bad" "it hurts". [4] And further, "But he (B.G.) was young so – I mean, they just relayed it was a fart. You know, that's what it smelled like, like eggs."[5]  Obviously, B.G. and A.G. do not need to be deposed to elicit this testimony because Mrs. Gremillion has already testified to it.

As parents the Gremillions took extreme measures to shield their children from inhaling the odors:

> When the smell was around, it was in your house. When it would come and get in the house, I would -- well, when I would smell it, whether it was in the house or not, I would tape the doors -- the door frames, put towels under the doors, put air -- turn the air condition off, turn the vents in the bathrooms on to eliminate anything coming in, make sure the fireplace flume -- I think it's called the flume -- was closed because it would come in there. It would come in the bathrooms, under doors.[6]

The children's testimony in this regard would be cumulative.

On days when the odors were insufferable, the family was unable to attend the children's sports practices and enjoy recreational activities like visiting their local community club pool or

---

[1] *See* Ex. 1, W. Gremillion Dep. 60:5-12 June 7, 2023.
[2] *Id* at 96:19-22.
[3] *Id* at 131:20-22. *See also* supra at 105:25-106:1-8.
[4] *Id* at 57:2-58:15.
[5] *Id* at 149:4-6.
[6] Id at 113:2-10.

2

attending local summer camps.[7] She also testified that the odors changed their involvement in the community ("We would go to Mass on Sundays. It was inside. If we had an outside event between 2017 and 2019 and that sulfur smell was outside, again, we would not go outside. So any fair, crawfish boil, cookoff, we did not go. We weren't going to go outside when that was around.")[8] Again, the children's testimony to this effect would be cumulative.

The children also suffered from various conditions related to the repeated exposure. B.G. suffered from nausea, cough, lethargy, and upper raspatory illnesses. A.G. suffered from nausea. As a stay-at-home mom, Mrs. Gremillion testified that she would accompany A.G. and B.G. to doctor's appointments. Both children sought medical treatment for symptoms caused by the exposure to Landfill gas. Here, the medical records testify eloquently to anything the children could say in a deposition.

The following day, Scott Gremillion was deposed.[9] Much like Mrs. Gremillion, Mr. Gremillion testified about the effects of the odors on his children and his concern that the children may not be able to vocalize complex emotions and symptoms related to the malodors.[10]

[11] Specifically related to B.G. he testified:

> A: I mean, at five years old, like I said, for a kid to tell us how he felt is difficult. But he would get lethargic, and he experienced a bad cough for a prolonged period of time. I don't know those dates. I just know he lived with a cough for months. But you could tell when Braxton is not feeling good because he just seemed fatigued.
> Q: Okay. So lethargic, you personally observed that he would kind of look out of it to you?
> A: Right. I mean, if you have kids, you know when they're not right.

The children's testimony is not necessary to confirm Mr. Gremillion's.

---

[7] *Id. See also* Exhibit 1 at 67:3-6.
[8] *Id* at 64:18-23
[9] Defendants have demanded that named Plaintiffs not be permitted to attend the deposition of other named Plaintiffs, and Mr. Gremillion was not present at the deposition of his wife.
[10] Mrs. Gremillion, when questioned during her deposition A.G.'s fact sheet and she noted that "A.G. would have been too young to understand this [the fact sheet]." A.G. is the older Gremillion child. *See* Exhibit 1 at 78:4-5.
[11] *See* Exhibit 2, S. Gremillion Dep. 70:20-25, 71:1 June 8, 2023.

Both the depositions lasted several hours, with extensive focus on impacts on the family unit, and A.G. and B.G. specifically.

## LAW AND ARGUMENT

Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. See Rule 26(b). "While the discovery rules are accorded broad and liberal treatment to achieve their purpose of adequately informing litigants in civil trials, discovery does have ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). Accordingly, under Rule 26(b)(2)(C) courts may limit the frequency or extent of discovery otherwise allowed, if it determines: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope of Rule 26(b)(1)." Further, Rule 26 "has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011). Plaintiffs are not intending to call A.G. or B.G. at trial.[12]

The procedural complexity, volume of discovery documents and witnesses, as well as the numerosity of *Addison* plaintiffs presents unique challenges and considerations for this Court in managing discovery. To this point, Courts are entitled to flexibility in case management and discovery protocols. ("District courts must be afforded wide latitude in the management of

---

[12] Plaintiffs reserve the right to amend their witness list and to call the minor children at the trial if Defendants are successful on their Motion and do, in fact, depose A.G. and B.G.

4

discovery." *Danny B. ex rel. Elliott v. Raimondo*, 784 F.3d 825 (1st Cir. 2015)). Inherent to that discretion is the determining the scope of discovery "in light of the relevant facts of the particular case." *Lewis v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College*, 2023 WL 3509691 at *3 (M. D. La. May 17, 2023).

   *a.* **Defendants have not established good cause under the CMO to depose A.G. and B.G.**

Courts are given great deference in discovery matters that involve young children. ("The district court is responsible for safeguarding the interests of those minors who appear as litigants before it. *Danny V ex rel. Elliot v. Raimondo*, 784 F.3d 825, 829. *See also Noe v. True*, 507 F.2d 9, 12 (6th Cir. 1974)). The Court has already determined that depositions of minor children in the in the *Addison* case would require a special showing of necessity above and beyond the normal civil action and has required that such depositions will only be permitted following a showing of good cause. (*See* Rec. Doc. 495, wherein deposition of minors requires leave and a showing of "good cause.") Therefore, it is defendants' burden to show that exceptional circumstances exist *in this particular case* for the depositions of children who were five and eight at the onset of exposure and whose disruption of life and symptoms are well documented and observed through a more reliable source, specifically the testimony of their parents and neighbors as well as their medical records.

   In this context, the caselaw cited by the Defendants is unpersuasive and largely inapplicable. Specifically, most of the cases deal with a minor's deposition where a protective order was sought due to potential stress to the deponent child.[13] In *In re Transit Management of*

---

[13] *See Edgin on behalf of I.E., v. Blue Valley USD 220*, 2021 WL 1750861 (D. Kan. May 4, 2021) (ordering the deposition plaintiff despite minor's treating therapist opining on the negative effects the deposition could have on minor.) *See also Kuyper v. Bd. of Cnty. Comm'rs of Weld Cnty.*, 2010 WL4038831 (D. Colo. Oct. 14, 2010).

5

*Southeast Louisiana, Inc*. 761 So.2d 1270 (La. 05/12/00) found that the deposition should move forward after the sole objection raised by the minor deponent was possible stress that would result from questioning. While Plaintiffs, especially the Gremillion parents, certainly acknowledge that subjecting their young children to a deposition would be unnecessarily stressful, cruel, and burdensome, even under the most sensitive and restricted conditions, the relevant question is whether it is warranted, necessary, and probative in this particular case.[14]

Similarly, this case is not one where A.G. and B.G. *were the only witnesses* to the events that gave rise to their claim. *In T.B. by and through Bursch v. Independent School District 112*, a case cited by the defense, parents of minor child Z.P. brought a civil rights action against a school board wherein they alleged discrimination and abuse. *T.B. by & through Bursch v. Indep. Sch. Dist. 112*, 2021 WL 7367136 (D. Minn. Jan. 8, 2021). The Court ultimately permitted the deposition of the minor to move forward with restrictions because the minor child *was the only one with direct knowledge of the alleged assaults*. ("Z.P. potentially has knowledge about his neglect and the assaults at issue that others do not have direct knowledge of, or which was not captured in the documents produced in this case; for example, there allegedly were no other witnesses to at least one of the assaults on Z.P.") *Id* at *4. Here, the conditions of the Jefferson Parish Landfill in the relevant time-period are well documented. The Court has already found that the Landfill emitted odors capable of harming individuals in the Jefferson Parish area. It further noted in the Findings of Fact and Conclusions of Law that there was governmental and community

---

[14] Instead of filing a motion at the beginning of specific causation discovery under the Eleventh and Twelfth CMO, defendants strategically waited until November 13, 2023 to file their Motion for Leave. The practical implication of this delay would force the Gremillion family to travel to New Orleans from South Carolina during the holidays or directly thereafter or would require an extension of the current January discovery deadline. Plaintiffs adamantly oppose any extensions that would jeopardize the current trial date. Contrary to their Motion, defendants have never approached Plaintiff counsel regarding possible deposition conditions. The only discussion of minor depositions was done in the context of negotiating various case management orders.

wide mobilization in response to the odors in the form of citizen odor complaints (3,469 in a three-year time period) and Facebook groups.[15] And, even Defendants' principal expert, Dr. Pamela Dalton, testified that "she found no reason to doubt that the symptoms reported by residents were real, and she found the reports to be credible." Doc. 323 at p. 30 of 46, citing Transcript of General Causation Trial, R. Doc. 273 at 855. Is Defendants' goal to somehow, through the depositions of the minor Gremillion children, impeach the testimony of their expert? That is certainly not good cause for such depositions.

Defendants argue that they need to assess whether A.G. and B.G. actually experienced the odors. and the possible damages exposure Defendants face if Plaintiffs are successful on their claims.[16] But there is no question that these children smelled the odors and that the odors were present in their home and community.[17] During the relevant time period the odors were so well known in the Greater New Orleans area that they were prominently featured in the 2018 Lakeside Mall holiday display.[18] Any benefit the defense could gain from the children testifying during a deposition that they did not smell landfill odors will be rebutted in force by expert testimony regarding the Gremillion family's specific exposure to the malodors at their home, parents' testimony as to what the family experienced, as well as supporting fact witnesses who will testify the noxious odors affected the Gremillion children as well as their own children who also resided

---

[15] *See* Rec. Doc. 323 at 26.

[16] Defendants also argue that the number of damages sought is sufficient for good cause. As the court has noted, the amount of potential damages claimed by each Plaintiff is unknown at this time. Defendants point to Plaintiffs' Amended Initial Disclosure which required a quantum study. Plaintiffs provided the upper-bound of damages. Defendants can cite no case where the amount in controversy the sole – or even principal - basis for deposing minors. Moreover, the damage calculated contains a per diem rate. The possible exposure period is for 942 days. Therefore, even a nominal per diem rate of damages per day of exposure could yield a large damage award.

[17] There is no evidence that either A.G. or B.G. have ever been, diagnosed with anosmia or the inability to smell or perceive odors.

[18] *See* Exhibit 3, S. Serpas Dep. 96:5-25, 97:24, April 5, 2023, *See also Id* at P-1.

in the area.[19] Moreover, Defendants are in possession of the children's medical records which corroborate Mr. and Mrs. Gremillion's testimony that they sought medical treatment for ailments that occurred simultaneous with repeated exposure.

> i. *The selection of the Gremillion family as trial plaintiffs is not good cause to depose A.G. and B.G.*

Defendants' argument that the selection of the Gremillion family as trial plaintiffs is by itself good cause to depose the minor children is misguided. The Court has been clear in its desire that the first *Addison* trial include a diverse group of individuals so that the result of the trial could guide litigation of subsequent claims and/or ultimate resolution for all Plaintiffs. To this end, different iterations of the *Addison* CMOs included requirements for choosing clients based on geography and family status. Both sides were required to pick one family unit for trial. The genesis of this portion of the CMO was due to disagreement as to how claims of minor children should be handled in the first trial. Under the tenth CMO (which was operative at the time of Plaintiff selection), the claims of minor children could *only* be tried as family unit. Minor children make up a large sub-section of the *Addison* plaintiff population. A trial consisting of just single individuals would not yield information useful to future adjudication or to settlement. It is imperative that minor children be part of the initial trial Plaintiff selection. The Court was intentional and thoughtful with implementing these guidelines which was a factor in the selection of this particular family as opposed to a family unit made up of all adults residing in the same home.[20] Therefore,

---

[19] The Court has already found that the Landfill odors lingered due to hydrogen sulfide's ability to accumulate in homes at concentrations that are higher than the outside ambient air. The Court also found that hydrogen sulfide can permeate air conditioning systems, lengthening the duration of exposure. *See* Rec. Doc. 323 at 34.

[20] Defendants selected the Thompson family as their family unit. The Thompson family is made up of three adult individuals- Vernice Lewis, Tyrone Thompson, and Terrance Thompson.

8

any suggestion that the inclusion of A.G. and B.G. in the first pool of trial Plaintiffs is good cause falls flat.

   b. ***Defendants' motives for deposing A.G. and B.G. are strictly to harass, inconvenience and intimidate the Gremillions through their minor children.***

Defendants' real motives for seeking these children's deposition is evidenced by the Rambo style discovery tactics that trial pool plaintiffs were forced to endure over the last year. This started during the Plaintiff pool selection process. Instead of picking Plaintiffs who would be useful for overall valuation of the mass action, Defendants chose various Plaintiffs with serious health conditions (conditions that they were aware of due to their possession of medical records prior to selection) and others with troubling social histories that included felony convictions. After the Court ordered that Defendants select new plaintiffs, Defendants defied this directive and *again* selected a plaintiff who had a criminal record in Jefferson Parish.[21] Defendants ultimately replaced this selection when Plaintiffs threatened bringing this matter to the Court.

It is not disputed that Defendants are entitled to mount their defense in the litigation style of their choosing; however, in doing so, opposing counsel have more than pushed the threshold as to what is relevant and probative in this case, and what is useful only for the purpose of embarrassing and harassing the Plaintiff-deponent. Specific examples of this include asking a Plaintiff repeatedly about recreational drug use after he testified that he does not and has not used recreational drugs. Unsatisfied that the deponent- who is subjected to extremely rigorous and reoccurring employment related drug screenings at both his jobs- was not being truthful, opposing counsel then sought to inquire about how they would obtain results of his work-related drug testing;[22] asking a Plaintiff

---

[21] *See* Exhibit 4, Email chain between E. James and M. Brillault dated April 11, 2023 through April 13, 2023.

[22] *See* Exhibit 5, J. Tate Dep. 139:11-149:13, April 4, 2023. Upon information and belief, the basis for this line of questioning was a Snoop-Dogg Facebook post. Mr. Tate further testified that he was offended by the questions he was asked during his deposition. *Id* at 201:3-5.

9

to describe how his prior marriage ended (a marriage that pre-dates any Landfill odor by almost a decade);[23] inquiring about insect infestations in their residence; inquiring about the ownership of any pets and where and how often those pets go to the bathroom;[24] where they keep kitchen trash and how often they empty their garbage can; and the presence of chickens in their neighborhood.[25] [26]

Moreover, the written discovery to Plaintiffs was equally as perplexing. Defendants deposed most trial Plaintiffs prior to written discovery being propounded. Instead of using written discovery to probe new issues or build off deposition testimony or Plaintiff Fact Sheet responses, Defendants chose to ask the exact same questions and revisit the same topics that each deponent had been questioned about for hours.[27]

A more telling example of how the Plaintiff discovery process is being weaponized instead of being used for actual information gathering of each Plaintiff's claims is the fact that the discovery addressed to each trial Plaintiff was nearly identical. This includes the written discovery addressed to A.G. and B.G. Instead of asking questions tailored to the children's experience of the odors, they propounded discovery requests that were substantively identical to their sibling and parents which yielded the exact same responses on all four of the Gremillion's interrogatories. Specifically, the minor children were asked about their communications with the media and

---

[23] *See* Exhibit 3, S. Serpas Dep. 24:4-6, April 5, 2023.
[24] *See* Exhibit 6, A. Section Dep. 88:9-19, April 18, 2023.
[25] These questions were asked of all trial pool Plaintiffs. *See also* Exhibit 7, G. Green Dep. 98:7-9, April 7, 2023. [25] *See* Exhibit 5 at 74:2-3.

[27] Specific citations of similar questioning between interrogatories and deposition questions are too numerous cite individually. By way of example, Plaintiff Andrew Section and Plaintiff Geneva Green both stated that they did not attend any community meetings regarding the Jefferson Parish Landfill. Interrogatories seeking information on their attendance was propounded on both Plaintiffs. (*See* Exhibit 6 *in globo*, A. Section Dep. 94:19-22, April 18, 2023 and Andrew Section's Response to Interrogatories at 6. *See also* Exhibit 7 *in globo*, G. Green Dep. 98:7-9, April 7, 2023 Geneva Green's Responses to Interrogatories at 6.)

governmental entities, knowledge of individuals with onsite exposure, past workers' compensation claims, and to describe the facts supporting claims that injuries were caused by each defendant. Not one question was tailored to their personal experience with the odors or how the minor child would describe the odors. Axiomatically, one must look no further than this to determine that Defendants are not concerned with the information they may receive but are motivated by the burden and expense to the Plaintiffs. In the context of young children, this is especially egregious.

Having failed to use the other avenues of discovery to seek information that A.G. and B.G. might have, and having propounded boilerplate written discovery to them on irrelevant topics, Defendants have not established good cause for the depositions of the minor children.

## CONCLUSION

The Court likely anticipated that defendants would continue to "over-lawyer" and create burden and expense in the discovery process. Thus, the Twelfth CMO required leave and a showing of "good cause" for minor depositions. When the request to take A.G.'s and B.G.'s depositions is viewed in light of the facts of the case and the need for the information sought, Defendants have failed to meet their burden. As such, their Motion for Leave should be denied. In the event that the Court grants Defendants' Motion, Plaintiffs would request that the Court hold a status conference to discuss reasonable restrictions on the depositions.

Respectfully submitted: November 20, 2023.

**Respectfully submitted,**

**FORREST CRESSY & JAMES, LLC**

/s/ S. Eliza James

Byron Forrest (La. Bar No. 35481)
Nicholas Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)

1222 Annunciation Street
New Orleans, Louisiana 70130
Eliza@fcjlaw.com
Tele: 504.605.0777
Fax:  504.322.3884

OF COUNSEL:
C. Allen Foster (Admitted *Pro Hac Vice)*
Eric C. Rowe (Admitted *Pro Hac Vice*)
**WHITEFORD TAYLOR PRESTON, LLP**
1800 M Street, NW
Suite 450N
Washington, DC 20036
(202) 659-6800

Masten Childers, III (Admitted *Pro Hac Vice*)
Lesley Cayton (*Pro Hac Vice* Application to be Submitted)
Aaron M. Oppegard (*Pro Hac Vice* Application to be Submitted)