**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** Plaintiff | **CIVIL ACTION** NO. 18-7889 c/w 18-8071, 18-8218, 18-9312 |
| **VERSUS** | |
| **WASTE CONNECTIONS BAYOU, INC., ET AL.,** Defendants | **SECTION: "E" (5)** |
| *Related Case:* | **CIVIL ACTION** |
| **FREDERICK ADDISON, ET AL.,** Plaintiffs | NO. 19-11133, c/w 19-14512 |
| | **SECTION: "E" (5)** |
| **VERSUS** | |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** Defendants | **JUDGE: Morgan** **MAGISTRATE JUDGE: North** |
| *Applies to: All Cases* | |

**WASTE CONNECTIONS DEFENDANTS' RESPONSE**
**TO PLAINTIFFS' PRIVILEGE LOG OBJECTIONS**

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

   I. The WC Defendants' communications with SCS are not discoverable. ................................. 2

     A. June 2018 LDEQ Compliance Order and Leachate Pump Evaluation Report ................. 2

     B. JPLF Site Evaluation with Respect to Odors .................................................... 6

     C. Opposition to 2019 *Addison* Motion for Expedited Discovery ........................... 8

     D. Surface Pollutant Concentration Measurements March and June 2019 ................... 9

     E. Plaintiffs' November 2019 Site Visit .......................................................... 11

     F. David Fisher September 2019 Site Visit ........................................................ 12

     G. Jeff Marshall Special Waste Odor Evaluation ............................................... 14

     H. Other SCS Consulting Expert Communications and Work Product ...................... 16

   Conclusion ................................................................................................................ 18

## INTRODUCTION

Plaintiffs have made no showing of the exceptional circumstances required to warrant disclosure of these non-testifying consulting expert communications and documents exchanged between the Waste Connections Defendants ("WC Defendants") and SCS. The WC Defendants retained SCS as a non-testifying consulting expert to assist in their legal defense, and throughout this litigation SCS has provided the WC Defendants' legal counsel with confidential consulting expertise, investigations, and evaluations of the company's defenses and potential claims. Plaintiffs' speculation and hyperbole about the purpose of SCS's work and whether the WC Defendants disclosed certain final reports is immaterial to the question of whether the requirements for disclosure under Rule 26(b)(4)(D) have been met.[1] The data and information underlying these reports is already in Plaintiffs' possession and Plaintiffs will have the opportunity to depose SCS. These communications and documents are otherwise protected under the attorney-client privilege, work product doctrine, and the consulting expert work product privilege pursuant to Rule 26(b)(4)(d). For the reasons set forth herein and in the WC Defendants' prior submissions, the Court should reject Plaintiffs' attempt to delve into privileged and protected communications and deny Plaintiffs' motion to compel production of these documents.[2]

---

[1] WC Defendants' Reply Memorandum in Support of Motion to Quash, dated Apr. 27, 2023, at 1–9 (No. 19-cv-11133, ECF No. 388).

[2] The WC Defendants' Motion to Compel incorporated by reference the arguments in support of their Motion to Quash the Addison Plaintiffs' Subpoena to SCS Engineers. WC Defendants' Opposition to Motion to Compel, dated Apr. 24, 2023, at 9–11 and 20–21 (No. 18-cv-07889, ECF No. 329; No. 19-cv-11133, ECF No. 383); WC Defendants' Memo in Support of Motion to Quash, dated Mar. 30, 2023 (No. 19-cv-11133, ECF No. 368-1); WC Defendants' Reply Brief in Support of Motion to Quash, dated Apr. 27, 2023 (No. 19-cv-11133, ECF No. 388); *see also* WC Defendants Motion for Protective Order, dated May 12, 2023, at 5–8 (No. 18-cv-07889, ECF No. 390-1; No. 19-cv-11133, ECF No. 333-1); WC Defendants' Reply Brief on Motion for Protective Order, dated June 9, 2023, at 3–7  (No. 18-cv-07889, ECF No. 346; No. 19-cv-11133, ECF No. 410); WC Defendants' Letter to Court, dated November 15, 2023.

1

# ARGUMENT

## I.  The WC Defendants' communications with SCS are not discoverable.

### A.   June 2018 LDEQ Compliance Order and Leachate Pump Evaluation Report

#### 1.  Leachate Pump Evaluation Report was prepared in anticipation of litigation.

Plaintiffs are not entitled to the twenty documents in the privilege log regarding the Leachate Pump Evaluation Report: Documents **483, 488, 489, 490, 498, 499, 500, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513,** and **514**.[3] Rule 26 protects "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation **or** to prepare for trial and who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(D) (emphasis added).[4] Plaintiffs argue that the Report was never intended to assist counsel for trial preparation purposes but ignore the plain intent of the rule that anticipation of litigation **or** preparation for trial triggers protection of communications with consulting experts. Despite Plaintiffs' speculations, the documents fall within the scope of Rule 26(b)(4)(D).

The twenty documents, spanning from August 22, 2018 to December 13, 2018, are privileged communications between SCS as a consulting expert and counsel for the WC Defendants (both in-house and outside counsel) prompted by the June 2018 LDEQ Compliance

---

[3] Documents are identified by their Privilege ID. The prefix "WC_JPLF_PRIV_0XXX" has been omitted and only the last three digit of the Privilege ID are included for ease of reference.

[4] Rule 26(b)(4)(D) broadly prohibits discovery from non-testifying consulting experts, including document discovery.  *See Viener v. Casano*, No. 16-cv-18, 2016 WL 10675905, at *2–3 (S.D. Miss. June 10, 2016) (granting Defendants' motion for protective order because non-testifying consultant expert's documents and correspondences were not discoverable); *Nat'l W. Life Ins. Co. v. W. Nat'l Life Ins. Co.*, No. A-09-CA-711 LY, 2011 WL 840976, at *2 (W.D. Tex. Mar. 3, 2011) (no exceptional circumstances justify the production of non-testifying expert's email communications). To construe the rule otherwise would eliminate the rule's protective purpose. The documents also fall within the scope of the attorney-client privilege and work product protection. *See* WC Defendants' Memo in Support of Motion to Quash, dated Mar. 30, 2023, at 8–17 (No. 19-cv-11133, ECF No. 368-1).

Order.[5] *See Ryskamp ex rel. Boulder Growth & Income Fund v. Looney*, No. 10-cv-842, 2011 WL 3861437, at *8 (D. Colo. Sept. 1, 2011) (communications to formulate a legal strategy regarding regulatory compliance issues were privileged); *United States v. Micro Cap KY Ins. Co.*, Nos. 16-cv-278, 16-cv-279, 2017 WL 1745626, at *1 (E.D. Ky. Feb. 8, 2017) (upholding privilege claim over communications between defendants seeking legal advice as to regulatory compliance). The WC Defendants retained SCS in July 2018 to assist in its response to the LDEQ Compliance Order, at which time both a regulatory enforcement action and potential litigation with the Parish over the leachate collection system were reasonably anticipated.[6] The report was never provided to the Parish or to the press and was only recently produced pursuant to Court Order.[7]

Plaintiffs have the Leachate Pump Evaluation Report and the underlying data, as well as the opportunity to depose SCS, but they have no basis under Rule 26 to argue that they are entitled to the communications between SCS and counsel.[8] *See Pride Centric Res., Inc. v. LaPorte*, No. 19-cv-10163, 2020 WL 13608067, at *4 (E.D. La. Nov. 10, 2020) (van Meerveld, J.) (no

---

[5] *See* Declaration of J. Perkey in Support of WC Defendants' Motion to Quash, dated Mar. 29, 2023, at ¶¶ 4, 10 (No. 19-cv-11133, ECF No. 368-3) ("Perkey Declaration"); Declaration of T. Rappolt in Support of WC Defendants' Motion to Quash, dated Mar. 29, 2023, at ¶¶ 4, 5 (No. 19-cv-11133, ECF No. 368-2) ("Rappolt Declaration").

[6] Perkey Declaration ¶ 3. Plaintiffs misconstrue the documents they use to question the purpose of the Leachate Pump Evaluation Report. *See* Plaintiffs' Objections to the WC Defendants' Privilege Log, dated November 13, 2023, at 5–8 (No. 19-cv-11133, ECF No. 436) ("Pl. Br."). The cited documents in fact support the context for the report in light of LDEQ's administrative compliance order and the WC Defendants' disagreement with the Parish over the leachate system. For example, Plaintiffs cite to Mr. O'Connor's July 25, 2018, memorandum, but the memorandum references SCS's site visit to assess the pumping system raised in the context of the timeline for responding to LDEQ's compliance order. Plaintiffs' Motion to Enforce SCS Subpoena, Ex. 10 (No. 19-cv-11133, ECF No. 375-12). Plaintiffs also cited to Louisiana Regional Landfill Company's ("LRLC") response to the Parish's notice of breach, which the Parish issued as a result of the June 2018 Compliance Order. Plaintiffs' Motion to Enforce SCS Subpoena, Ex. 6 (No. 19-cv-11133, ECF No. 375-8). The letter also specifically references that LRLC is working on its response to LDEQ. *Id.*

[7] *See* Order and Reasons on Plaintiffs' Motion to Compel, dated May 26, 2023, at 10–12 (No. 18-cv-7889, ECF No. 338; No. 19-cv-11133, ECF No. 402).

[8] *See* arguments in WC Defendants' Memo in Support of Motion to Quash, at 15–17 (No. 19-cv-11133, No. 368-1).

3

exceptional circumstances when the party was able to review financial records, have its own expert review, analyze, and opine on the records, and depose defendant and representatives about their impressions of the financial records).

Plaintiffs wrongly assert that the communications relating to the Leachate Pump Evaluation Report should not be privileged because they reflect edits or comments by counsel on drafts of the report. Pl. Br. at 7. Plaintiffs speculate that attorney comments on a draft technical report must mean that the report was "prepared for use in the public relations effort." *Id.* But first drafts of a technical report written by engineers will almost certainly require revision and further discussion to be accessible to non-engineers, and even to specialists in different technical areas. SCS's report was prepared for in-house and outside counsel, and to be valuable, also needed to be useful to management and staff of the WC Defendants.[9]

Plaintiffs also speculate that SCS had "another mission" other than to advise counsel and the WC Defendants—claiming that the timing for SCS's July 2018 site visit and that its report was prepared after the completion of field work supports Plaintiffs' theory.[10] As already set forth in the Perkey Declaration (¶ 4), SCS was retained as a consulting expert by in-house counsel for the WC Defendants to assist with legal defenses in administrative or civil litigation arising from the June 2018 Compliance Order, which was prior to the commencement of the legal actions (and prior to outside litigation counsel's retention). Moreover, a report of the results of field work can **only** be

---

[9] With respect to Document **502**, the WC Defendants clarify that the attachment to the email is a draft of the Leachate Pump Evaluation Report that incorporates counsel comments. The provision of information to SCS early in the email thread related to information needed to review SCS invoices. The WC Defendants will provide a privilege log to the Court and the parties reflecting this clarification.

[10] The WC Defendants provided an updated privilege log of the documents withheld from its responses to Plaintiffs' Requests for Production, made pursuant to the ESI Protocol. The Master Services Agreement or communications about SCS's retention in connection with the LDEQ Compliance Order were not collected or withheld, and therefore do not appear on the log. The WC Defendants can provide a copy of that agreement for the Court's in camera review, upon request.

prepared **after** the work is complete. SCS's proposal to complete its evaluation after the completion of field work therefore does not "contradict[] the known facts." Pl. Br. at 6. A brief scan of the Leachate Pump Evaluation Report (which was produced at the Court's direction) shows that it contains extensive engineering interpretations of data collected during the field work. The proposal identified two sequential tasks and specific steps and deliverables under each task. By this time, the first putative class action had been filed and outside counsel retained, and therefore SCS sought the approval of outside litigation counsel as to the final scope of work to be performed to complete the evaluation and the report. *See* Document **483**. The final report was issued in November 2018. Despite Plaintiffs' speculations, this sequence is responsible and logical planning for a useful work product to advise counsel and the WC Defendants of the condition of the leachate pumps due to potential litigation and regulatory compliance issues.

### 2. SCS invoices and related communication are privileged.

Documents **488, 489, 498, 507, 513**, and **514** include consulting expert invoices related to the Leachate Pump Evaluation Report and are not subject to discovery under Rule 26. *Compare* Rule 26(b)(4)(C) *and* (b)(4)(D) (disclosure of compensation information not contemplated for non-testifying expert). The invoices themselves were also properly withheld as they are not relevant to discovery. *See Kan. City S. Ry. Co. v. Nichols Constr. Co.*, No. 05-cv-4653, 2008 WL 11350333, at *2 (E.D. La. Sept. 26, 2008) (Roby, J.) (denying Plaintiff's motion to compel expert bills because the billing entries are not relevant); *Morriss v. BNSF Ry. Co.*, No. 13-cv-24, 2014 WL 128393, at *6 (D. Neb. Jan. 13, 2014) ("the amount a party paid for case preparation is not relevant nor likely to lead to the discovery of information relevant to the issues raised in the parties' pleadings"). The cover emails to the invoices are irrelevant transmittals or include summaries of the work performed, which are protected under the attorney-client privilege, work product protection, and the consulting expert work product privilege pursuant to Rule 26(b)(4)(d).

### 3.   Communications between SCS and non-attorneys

Documents **499** and **500** between SCS and non-attorneys, one of which copies outside counsel, also fall within the protection of the consulting expert privilege. *See CSX Transp., Inc. v. Chicago S. Shore*, No. 13-cv-285, 2015 WL 470393, at *4-5 (N.D. Ind. Feb. 4, 2015) (communications between consulting expert and client, with no attorney involved, protected as work product). Consulting experts routinely communicate with clients to gather and report facts and data. Involving an attorney on every such communication is inefficient and unnecessary.

### B.   JPLF Site Evaluation with Respect to Odors

The communications between SCS and counsel regarding the JPLF Site Evaluation with Respect to Odors, dated October 24, 2018, ("October 2018 Report") are also privileged: Documents **484, 485, 486, 487, 491, 492, 493, 494, 495, 496, 497,** and **501**.[11] Defendants voluntarily produced the October 2018 Report, including the field notes and other data collected and considered by SCS, but Plaintiffs are not permitted to receive the SCS communications and work for the WC Defendants and their lawyers in relation to the October 2018 Report and a related September 2018 site visit, as referenced in the privilege log entries. The email communications between SCS and counsel include substantive notes, impressions, and advice relating to the site visit and drafts of the October 2018 Report, all of which occurred in the context of administrative enforcement and civil litigation. Furthermore, all individuals on the emails were aware that these communications were privileged and confidential, as it was denoted on each email chain.

All parties in this case should be able to correspond with their consultants freely to better understand the highly technical issues presented and rely on them for advice, investigations, and evaluation of claims and defenses. *Commerce & Indus. Ins. Co. v. Grinnell Corp.*, Nos. 97-cv-775,

---

[11] Contrary to Plaintiffs assertion, there are multiple entries related to this report and the related site visit.

97-cv-803, 1999 WL 731410, at *1 (E.D. La. Sept. 20, 1999) (parties shall "freely consult with their expert, without fear that every consultation with an expert may yield grist for the adversary's mill") (citation and quotation omitted). Communications with SCS as a consulting expert helps ensure that the WC Defendants can accurately evaluate legal claims against the WC Defendants and supply relevant information to the other defendants, government agencies, and the public. But Plaintiffs are not entitled to be privy to direct communications between SCS and counsel.[12]

Voluntary disclosure of the October 2018 Report also does not waive privilege or work product protection with respect to any other work or communications between SCS and the WC Defendants. Nor does it convert the purpose of the report into a "public relations" campaign. The consulting expert work product protection cannot be waived, even by voluntary disclosure to third parties. *Costal Towing, Inc. v. Novarco, Ltd*., No. 98-cv-492, 1999 WL 970357, at *2 (E.D. La. Oct. 21, 1999) (immaterial whether party disclosed expert work product to third parties, only question was whether requirements for disclosure met under Rule 26(b)(4)).[13] If, however, the Court determines that consulting expert work product protections can be waived, courts disfavor subject matter waiver, finding that voluntary disclosure "generally results in a waiver *only* of the communication or information disclosed." Fed. R. Evid. 502 Adv. Committee Notes (emphasis added); *BASF Corp. v. Man Diesel & Turbo N. Am., Inc.*, No. 13-cv-42, 2015 WL 542247, at *4, n.8 (M.D. La. Feb. 10, 2015) (work product waiver only applies to documents actually produced); *S.E.C. v. Microtune, Inc.*, 258 F.R.D. 310, 319 n.4 (N.D. Tex. 2009) ("[T]he disclosure of work

---

[12] Plaintiffs assert that the descriptions for Documents **496** and **497** regarding the provision of information to SCS are insufficient. The WC Defendants clarify that the information provided is odor complaint data that have been produced to Plaintiffs. Plaintiffs have no need to delve into protected communications with counsel.
[13] WC Defendants' Reply Brief in Support of Motion to Quash, at 3–6 (No. 19-cv-11133, ECF No. 388).

product to a third party waives protection only as to the materials actually disclosed.").[14] These twelve communications were properly withheld, and Plaintiffs have not demonstrated exceptional circumstances that warrant disclosure.

### C.  Opposition to 2019 *Addison* Motion for Expedited Discovery

The one communication on the privilege log related to the *Addison* Motion for Expedited Discovery, Document **515**, is privileged, attorney work product, consultant work product, and is not discoverable. It includes correspondence between SCS and counsel about litigation strategy and arguments in the opposition motion. Disclosure of SCS's correspondence with counsel here would reveal attorney opinion work product, which "enjoys a near absolute protection."  *Hanover Ins. Co. v. Plaquemines Par. Gov't,* 304 F.R.D. 494, 500 (E.D. La. 2015) (documents that reveal the attorney's opinions regarding the litigation protected).[15] The submission of affidavits also does not waive privilege for attorney communications with the consulting expert. *Hollinger Int'l Inc. v. Hollinger Inc*., 230 F.R.D. 508, 522 (N.D. Ill. 2005) ("[C]ourts have generally held that partial disclosure of a non-testifying expert's work product does not waive a party's right to withhold production of the expert's undisclosed work product."); *see also Costal Towing*, 1999 WL 970357, at *2. If it did, then Plaintiffs must produce all of their communications with Mr. Chrostowski, the expert they used to submit affidavits in support of their discovery motion.

Plaintiffs also argue it is not credible that the privilege log contains only one communication with respect to the motion for expedited discovery. The WC Defendants logged the communications withheld in their prior responses to Plaintiffs' Requests for Production pursuant to the ESI Protocol. Outside counsel for the WC Defendants did not collect or log their

---

[14] *See* WC Defendants' Memo in Support of Motion to Quash, at 11, 13 (No. 19-cv-11133, ECF No. 368-1); WC Defendants' Reply Brief in Support of Motion to Quash, at 3–6 (No. 19-cv-11133, ECF No. 388).
[15] WC Defendants' Reply Brief in Support of Motion to Quash, at 6 (No. 19-cv-11133, ECF No. 388).

own emails during this time period (on which the client was not copied), and such collection was not contemplated by the parties as demonstrated by the ESI Protocol. Plaintiffs have also indicated on meet-and-confer calls that they do not seek such emails. In any event, any responsive communications between outside counsel and SCS will be part of SCS's document collection and logged in the privilege log due December 4, 2023.

### D.  Surface Pollutant Concentration Measurements March and June 2019

Twenty-two communications on the privilege log relate to the SCS's March and June 2019 surface pollution concentration measurements: Documents **516, 517, 518, 522, 523, 527, 528, 529, 530, 538, 541, 542, 552, 553, 554, 555, 556, 558, 559, 560, 561,** and **570.** Plaintiffs argue that they should be able to discover communications concerning SCS's surface pollutant concentration measurements because they cannot obtain the information from any other source. Pl. Br. at 11 *et seq*. To the contrary, the WC Defendants produced to Plaintiffs the data and resulting reports, which describe in detail the methodology, equipment used, and field notes related to surface pollutant concentration measurements taken by SCS in March and June 2019. Plaintiffs can depose SCS concerning these measurements and any other related issues. Thus, Plaintiffs cannot claim prejudice and have not shown exceptional circumstances necessary to require disclosure of otherwise privileged and protected communications between counsel, its consulting expert SCS, and the client. The WC Defendants should not be further punished by being forced to disclose privileged communications and mental impressions because they disclosed a thorough set of data and reports to the Plaintiffs. Plaintiffs "have not explained why their own experts could not generate similar opinions once provided with the raw data and observations." *PacifiCorp v. Nw. Pipeline GP*, No. 10-cv-00099, 2012 WL 13195529, at *3 (D. Or. Feb. 29, 2012) (non-testifying expert opinion on raw data and factual information available to all parties not discoverable); *Galley v. ZOLL Med. Corp.*, No. 18-CV-223, 2019 WL 13193899, at *4 (N.D. Tex. May 21, 2019)

(photographs, protocols, and technical details related to plaintiffs' consulting expert's inspection of product protected from discovery under work product doctrine and consulting expert privilege where parties' claim of need from potential spoliation was speculative).[16]

Documents **516** and **517** are email chains between Ms. Brillault of Beveridge & Diamond, SCS, and the client discussing SCS's proposal to conduct surface pollutant concentration measurements. Document **516** attaches a copy of the proposal, which is addressed to Ms. Brillault and labeled "Privileged and Confidential Attorney/Client Communication and Attorney Work Product." The client was understandably brought into the discussion following Ms. Brillault's discussion of SCS's proposal so that SCS could fulfill the work it proposed at the client's site. Whether counsel is on the "to" or "cc" line is semantics, and does not change the substance of the communications, which is sufficiently described in the privilege log entry.

Plaintiffs also argue that Waste Connections had "engaged" SCS months earlier, so these emails cannot be related to SCS's proposal for work. But as is often the case, the work requested from SCS evolved as the litigation evolved. The timing between when counsel first engaged SCS for consulting work versus when SCS conducted a specific phase of that work has no bearing on protecting privileged communications related to the consulting work.

Documents **518, 522, 523, 527, 528, 529, 530, 538,** and **541** are email chains discussing the planning ("strategy") and coordinating the delivery of equipment needed for SCS's sampling efforts in March 2019. Document **541** relates directly to the sampling event. Plaintiffs conclusively claim that this information is "necessary" to evaluate the data and reports that were provided to

---

[16] Plaintiffs raise an issue that during the General Causation phase, "SCS Field Data did not match data in report." Pl. Br. at 13, n.5. As Plaintiffs are aware, this point has already been clarified, and Plaintiffs have the opportunity to depose SCS about any remaining concerns. Plaintiffs repeatedly omit in communications to the Court that the "non-matching" data was a set of rapidly changing data read from a field instrument, and that the reported value was selected through common quality assurance practices. There is no need to delve into protected communications to resolve these issues.

them. This position is antithetical to the protections afforded in Fed. R. Civ. P. 26(b)(4)(D), and Plaintiffs "have not explained why their own experts could not generate similar opinions once provided with the raw data and observations." *PacifiCorp*, 2012 WL 13195529, at *3. Plaintiffs have the final data reports, which detail the sampling methodology, equipment used, all of the resulting data, and includes the field notes taken during the sampling. The attachments to Document **541**, which relate to the March 2019 surface pollutant concentration measurements, have also been separately produced to Plaintiffs, as indicated in the privilege log.

Documents **552**, **554**, **555**, **556**, **558**, and **561** are communications between Beveridge & Diamond attorneys, SCS, and the WC Defendants planning supplemental testing performed in June 2019, and in Document **561** providing in-house counsel with a draft of the report labeled "Privileged and Confidential Attorney-Client Communication and Attorney Work Product (Draft)." These communications are protected by Fed. R. Civ. P. 26(b)(4)(D) and each email includes a Beveridge & Diamond attorney and is clearly marked "Attorney Client Privileged Communication." The final supplemental data report was produced to Plaintiffs. Plaintiffs have made no showing of exceptional need to delve into protected communications between SCS and counsel, or between the WC Defendants and their outside counsel concerning the report.[17]

### E.  Plaintiffs' November 2019 Site Visit

Plaintiffs improperly ascribe the communications at Documents **570**, **574**, **575**, **576**, **577**, **578**, **579**, **580**, **581**, and **583** to SCS's March and June 2019 surface pollutant concentration measurements, but these communications in fact relate to SCS's visit to the Landfill for Plaintiffs'

---

[17] Plaintiffs selectively and misleadingly quote language from *In re Zofran (Ondansetron) Products Liability Litigation*, omitting any of the facts necessary to understand the quotation. In that case, the subject expert had been retained by plaintiffs' counsel but initially denied that retention in affidavits to the court, and later denied facts of the retention that pertained to the independence of "most critical single piece" of evidence, an article published by the expert. *See In re Zofran (Ondansetron) Prods. Liab. Litig.*, 392 F. Supp. 3d 179, 186-87 (D. Mass. 2019). Those facts are starkly distinct from this case.

November 2019 site inspection and SCS's concurrent off-site sampling work. Pl. Br. at 13. Email chains discussing the planning ("strategy") of and coordinating the delivery of equipment needed for SCS's sampling work, which necessarily required logistical communication with personnel at the Landfill, are not discoverable. Plaintiffs not only have SCS's final report that includes a description of the methodology, equipment used, and field notes, but Plaintiffs also conducted their own on-site and off-site sampling at the same time. Plaintiffs have access to SCS's data in addition to their own data from the November 2019 site visit, from which they can reach their own opinions and analysis, and Plaintiffs cannot establish exceptional circumstances to warrant disclosure of protected communications concerning the report. *See PacifiCorp*, 2012 WL 13195529, at *3 (plaintiff not entitled to discovery of consulting expert's work product where plaintiff "[had] not explained why their own experts could not generate similar opinions once provided with the raw data and observations").

### F.  David Fisher September 2019 Site Visit

For this category, Documents **568**, **569**, and **582** are email communications between SCS, Beveridge & Diamond, and the WC Defendants concerning consulting expert SCS's site visit in September 2019. Documents **568** and **582** are communications among SCS's Dave Fisher, in-house counsel, and outside counsel, and the WC Defendants' engineer Matt Crockett. Document **569** is an email between Dave Fisher and the landfill manager David Jones, forwarding an email copying outside counsel about logistics of SCS's planned observation of sampling by Aptim's consultant TRC. All of these emails are typical communications of a non-testifying consulting expert advising counsel and the client on the expert's evaluation of technical issues, appending tables of observations and photographs. No measurements or data were collected, as the documents show.

Plaintiffs argue that the entire communication must be produced on the bases that (i) the WC Defendants summarized operational conditions from SCS's inspection in a letter to Jefferson Parish, and (ii) Plaintiffs were not able to collect the same observations at the same time.[18] Pl. Br. at 14-15. The information provided to the Parish was the result of a visual inspection that was discernible and likely recorded in greater detail by River Birch, which was operating the gas system at the time and would be the best direct source of that information. Plaintiffs have not sought the information from River Birch, opting instead to litigate the issue in a demand for the WC Defendants' privileged information and communications with a consulting expert. Plaintiffs also recently deposed TRC concerning its October 2019 site visit, which is referenced in Document **569**.

Rule 26(b)(4)(D) protects "facts known or opinions held" by consulting experts. Fed. R. Civ. P. 26(b)(4)(D). Exceptional circumstances and the impracticality of obtaining facts by any other means must be shown for "disclosure of the non-testifying expert's own impressions or conclusions." *PacifiCorp*, 2012 WL 13195529, at *3 (communications with and documents reflecting opinions of non-testifying experts privileged).  No such showing has been made by Plaintiffs here, and in fact it was practicable for Plaintiffs to obtain this information by other means.

Plaintiffs also state incorrectly that two conditions—a 100 ppm measurement of $H_2S$ at the landfill and a buildup of leachate under the cover—were not observed during Plaintiffs' November 2019 site inspection, implying that SCS had something to do with that. Pl. Br. at 14. In fact, Plaintiffs own consultant measured $H_2S$ more than twice as high as 100 ppm, and reported

---

[18] Mr. Nielsen's letter to the Parish Council (Pl. Br. at Ex. 2) was produced in February 2023, after the General Causation phase, because it was not responsive to the general causation categories of discovery or the issues at the general causation trial. Mr. Nielsen's letter, addressed to the Jefferson Parish Council, was also a public document that the Plaintiffs could have obtained by other means at any time. Despite Plaintiffs' conclusory assertion, the letter does not conflict with, nor even relate to, positions taken by the defense relating to leachate management during the general causation phase of these proceedings.

observations of breaches in the landfill cover system and "uncontrolled gas releases (e.g., discolored, stressed and/or limited vegetation, black oxidized residue, gas bubbling, and gasified leachate)" in November 2019.[19] The Court should not base its decision regarding disclosure of privileged material on Plaintiffs' erroneous and baseless speculations as to SCS's role. *See Galley*, 2019 WL 13103899, at *5 (rejecting argument that constantly changing conditions "make every test and observation unique and impossible to reproduce" and the exclusive opportunity to test or observe "does not make that information automatically discoverable") (citation omitted)).

Nor is there any basis to disclose any of the communications between SCS and counsel regarding Mr. Fisher's site visit. Disclosure of SCS's correspondence with counsel here would reveal opinion work product, which "enjoys a near absolute protection." *Hanover Ins. Co.,* 304 F.R.D. at 500.[20]

### G. Jeff Marshall Special Waste Odor Evaluation

Plaintiffs are not entitled to 24 documents that consist of email communications between Mr. Marshall and Waste Connections personnel, in which Waste Connections was providing information to Mr. Marshall in preparation of his September 2019 Special Waste Odor Evaluation, or the single email chain with the WC Defendants' in-house counsel, outside litigation counsel, and WC Defendants personnel discussing privileged impressions of the September 2019 report. These consist of Documents **519**, **520**, **521**, **524**, **525**, **526**, **531**, **532**, **533**, **534**, **535**, **536**, **537**, **539**, **540**, **545**, **546**, **547**, **548**, **549**, **550**, **551**, **557** and **573**. Mr. Marshall's Special Waste Odor Evaluation was produced to Plaintiffs pursuant to Court Order.

---

[19] Ramboll, Landfill Gas Characterization Report (Jan. 2021), Trial Exhibit 511 to General Causation Hearing. Photographs taken by the Parish's consultant PPM during the Plaintiffs' site visit, which Defendants produced at the Court's direction, also demonstrate that the same conditions were apparent.
[20] *See* WC Defendants' Reply Brief in Support of Motion to Quash, at 6 (No. 19-cv-11133, ECF No. 388).

Plaintiffs claim that because Mr. Marshall was a "dual-hat" expert, i.e. was a consulting expert who became a testifying expert, all of the documents related to Mr. Marshall's work are no longer privileged, citing to *Yeda Research and Development Company, Limited v. Abbott GmbH & Company KG*, 292 F.R.D. 97, 108-109, 115 (D.D.C 2013). However, that case concerned the underlying documents that the expert may have "considered" for purposes of Rule 26. It did not address the confidential communications between the expert and counsel. Plaintiffs' reliance on this starkly inapposite case shows that Mr. Marshall's status as both a consulting expert and testifying expert does not render non-privileged his communications related only to his work as a consulting expert. *See Sara Lee Corp. v. Kraft Foods Inc*., 273 F.R.D. 416, 419–20 (N.D. Ill. 2011) (holding undiscoverable communications relating to defendant's consulting expert, who also served as testifying expert; "None of the communications contain facts, data, or assumptions that Dr. Wind could have considered in assembling his expert report, and thus Defendants had no duty to disclose the communications and Plaintiff no right to discover them.").

Here, Mr. Marshall created the Special Waste Odor Evaluation Report pursuant to his retention by outside litigation counsel as a consulting expert, so the communications are privileged. Mr. Marshall did not cite the Special Waste Odor Evaluation Report in support of his testifying expert report, the exclusive purpose of which was to rebut the hydrogen sulfide generation modeling of Plaintiffs' expert Jaana Pietari. In contrast, the Special Waste Odor Evaluation Report Mr. Marshall prepared as a consulting expert was a review of landfill waste records that are available to all parties considering the odor potential of waste disposed at the Landfill and did not involve hydrogen sulfide generation modeling. The Special Waste Odor Evaluation Report has already been produced to the Plaintiffs pursuant to this Court's prior order. And all of the underlying information that Mr. Marshall considered for the report he issued as a testifying expert,

as well as the information considered in his role as a consulting expert, has been produced to Plaintiffs.

Plaintiffs are not entitled to the protected communications concerning the report, drafts of either report, or the communications transmitting the information where the underlying information has already been produced.[21] A consulting expert's communications with non-attorneys are privileged when those communications are made pursuant to the work requested by counsel. Correspondence reflecting facts or opinions known and gathered by an expert in their work as a non-testifying expert is protected. *CSX Transp.*, 2015 WL 470393, at *4-5 (holding communications between consulting expert and client, with no attorney involved, protected as work product).

Plaintiffs have not shown "exceptional circumstances" necessary to discover these privileged communications. Plaintiffs also have Mr. Marshall's report and its underlying information. *Doe v. District of Columbia,* 231 F.R.D. 27, 41 (D.D.C. 2005) (no exceptional circumstances existed when proponent had "other means" to obtain discovery because proponent had access to consulting expert's report and underlying materials and could depose expert).

### H.  Other SCS Consulting Expert Communications and Work Product

Plaintiffs also are not entitled to SCS's consulting work product and related communications for several analyses performed at outside counsel's direction that have not been produced to Plaintiffs.[22] The documents in this category include Documents **542**, **543**, **544**, **553**, **559**, **560**, **562**, **563**, **564**, **565**, **566**, **567**, **571**, **572**, and **583**. In August 2018, SCS performed air

---

[21] As set forth in the privilege log—and ignored by Plaintiffs—the attachments to Documents **524**, **531**, **534**, **535**, **537**, **546**, **548**, and **550** were separately produced to Plaintiffs. The remaining communications involve correspondence requesting and or facilitating the exchange of information, or of draft expert work product.

[22] Rappolt Declaration at ¶ 7 (since August 2018, all work undertaken at direction of Beveridge & Diamond).

dispersion modeling and other analyses using data and information that is available to all the parties. This work product was prepared at the direction of outside counsel to assist them in understanding the technical issues in this case and to inform legal strategy in anticipation of litigation and in preparation for trial. The WC Defendants did not waive any work product protection by distributing the reports to a few Waste Connections personnel[23] after they were shared by outside counsel in Document **572**—with the directive "DO NOT share. Confidential" and an express reference to SCS's preparation of the work product as a consulting expert. *See McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 254 (N.D. Ill. 2000) (privilege applies to communications "relaying legal advice while updating the business people responsible for the operating unit").

Unlike *Glasser v. Hilton Grand Vacations Company, LLC*, cited by Plaintiffs, there is no ambiguity as to SCS's role in preparing these analyses. No. 16-cv-952, 2017 WL 3584930, at *3 (M.D. Fla. July 24, 2017) (denying motion to disqualify Plaintiffs' expert where expert had performed limited consulting services for defendant in a separate case). These analyses and related communications have never been produced in this action and were within the scope of SCS's retention by outside litigation counsel for consulting expert services. The WC Defendants' disclosure of certain unrelated reports by SCS voluntarily or pursuant to Court order does not change that result. Nor does SCS's provision of affidavits in the state court action. *See Positive Techs., Inc. v. Sony Elecs., Inc.*, No. 11-cv-2226, 2013 WL 1402337, at *5 (N.D. Cal. Apr. 5, 2013) (consulting expert that submitted declaration on summary judgment motion could be deposed on

---

[23] At the time, David Jones was Louisiana Regional Landfill Company's ("LRLC") Site Manager, Bruce Emley was the Division Vice President for the Jefferson Parish Landfill District (which included LRLC), and Clay Richardson was the District Manager for the Jefferson Parish Landfill District.

subject matter of his declaration only, and not on the content of any privileged communications with counsel).

Moreover, SCS's analyses were based on data and information to which Plaintiffs have access. And as indicated in the privilege log, the information shared with SCS in Documents **542** and **543** has also been separately produced to Plaintiffs. Plaintiffs have access to the data and can conduct their own analysis. *See PacifiCorp*, 2012 WL 13195529, at *3.

## CONCLUSION

Plaintiffs have already benefited from the WC Defendant's trial preparation through the disclosure of a subset of SCS's consulting expert work product. Plaintiffs otherwise have access to the data and information collected by or provided to SCS to do their own evaluation and will have the opportunity to depose SCS concerning the produced reports. Intrusive discovery into protected communications between SCS, the WC Defendants, and outside litigation counsel would undermine the protection of Rule 26(b)(4)(D), the attorney-client privilege, and the work product protection, and severely prejudice the WC Defendants' trial preparation efforts.

Dated: November 21, 2023

Respectfully submitted,

BEVERIDGE & DIAMOND, P.C.

By:  /s/ Megan R. Brillault
Megan R. Brillault (*pro hac vice*)
Michael G. Murphy (*pro hac vice*)
John H. Paul (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
Katrina M. Krebs (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

18

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

LISKOW & LEWIS, APLC

Michael C. Mims (#33991)
Charles B. Wilmore (#28812)
J. Hunter Curtis (#39150)
Alec Andrade (#38659)
Cecilia Vazquez Wilson (#39373)
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
(504) 581-7979

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2023, the foregoing was transmitted electronically to the Court and counsel of record via email.

 /s/ Megan R. Brillault      

OF COUNSEL
