**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,** | **CIVIL ACTION** |
|     **Plaintiff** | **NO. 18-7889** |
| | **c/w 18-8071,** |
| **VERSUS** | **18-8218, 18-9312** |
| | |
| **WASTE CONNECTIONS BAYOU, INC., ET AL.,** | **SECTION: "E" (5)** |
|     **Defendants** | |
| | |
| *Related Case:* | **CIVIL ACTION** |
| **FREDERICK ADDISON, ET AL.,** | **NO. 19-11133, c/w 19-14512** |
|     **Plaintiffs** | |
| | |
| **VERSUS** | **SECTION: "E" (5)** |
| | |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
|     **Defendants** | **JUDGE: Morgan** |
| | **MAGISTRATE JUDGE: North** |
| *Applies to: Both Cases* | |

**PLAINTIFFS' OPPOSITION TO THE WASTE CONNECTIONS
DEFENDANTS' MOTION FOR RECONSIDERATION**

Plaintiffs oppose the Waste Connections Defendants' (collectively "Waste Connections")

Motion for Reconsideration (18-7889, Doc. 398; 19-11133, Doc. 470), and respectfully request

that the Court deny it.

Waste Connections has not met the standard for seeking reconsideration. Because Waste

Connections seeks to make arguments that it could and should have made before and has further

misrepresented facts to the Court, the Motion should be denied.

**I.      STANDARD OF REVIEW.**

The Court has ruled previously in this case that motions to reconsider are governed by the

same standards that apply to motions brought under Rule 59(e). 18-7889, R.Doc. 360, Order dated

July 24, 2023 at 3.[1] As a result, a party seeking reconsideration "must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Id.* (citations omitted). This Court instructed that a motion for reconsideration "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of the order." *Id.* (cleaned up, citations omitted).

Waste Connection' Motion consists entirely of arguments that it could and should have raised earlier.

## II.   WASTE CONNECTIONS COULD AND SHOULD HAVE RAISED ITS ARGUMENTS EARLIER BECAUSE IT HAD THE BURDEN OF PROVIDING SUFFICIENT EVIDENCE TO ALLOW ASSESSMENT OF THE PRIVILEGE SINCE THE DAY IT MOVED TO QUASH THE SUBPOENA SERVED ON SCS.

As the party seeking to withhold documents based on a privilege, Waste Connections (from the outset) has borne the burden to establish that the privilege exists. The documents at issue in the current motion were subject to the subpoena served on SCS Engineers on March 1, 2023. When Waste Connections moved to quash the subpoena on March 30, 2023, and sought to claim a privilege or work product immunity upon these materials, Rule 45(e)(2) imposed specific requirements upon it:

> (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
>
> (i) expressly make the claim; and
>
> **(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.**

(bold added). Despite this requirement, Waste Connections refused to provide a privilege log with its motion to quash, instead relying upon conclusory declarations of its attorneys that there existed

---

[1] This order was rendered during the 5th Circuit stay of the *Addison* case and was not filed in *Addison.*

some blanket protection. Although later events have called into question the truthfulness of these declarations,[2] they were insufficient even at that time because there was no information provided to enable the Plaintiffs to assess the claim as to any specific document.[3]

Rather than ordering production for failure to meet the burden, the Court gave Waste Connections a second chance and ordered it to provide a privilege log on or before November 13, 2023. 19-11133, R.Doc. 428. On November 13, 2023, the very day privilege log was due, Waste Connections informed the Court that it had *not yet reviewed* the SCS documents responsive to the subpoena "in order to determine which should be withheld on the basis of privilege or work product protection and logged."  *See* **Exhibit 1,** Letter to the Court from Michael Mims dated November 13.  This meant that when Waste Connections moved to quash the SCS documents on the basis of privilege (eight months earlier), it had not even looked at the documents to determine whether its privilege claim was valid.

---

[2] Waste Connections' Deputy General Counsel declared that he hired SCS to work under his direction to assist him, [11133, R.Doc. 368-3] but neither SCS nor Waste Connections have produced any document showing that this occurred, and the privilege logs identified no communications at all whereby he engaged SCS or directed its work in any manner.

[3] Waste Connections has insisted that both the Plaintiffs and the Court accept its premise that SCS was a "consulting expert"—i.e., an expert hired "only" for trial preparation—just because Waste Connections says so. But neither the Court nor the Plaintiffs are required to accept that position. In the events of this case, SCS personnel wore many hats, including those of being testifying experts and ordinary fact witnesses. Moreover, Waste Connections repeatedly disclosed SCS's work product, thereby waiving any privilege that might have existed, and publicly portrayed SCS as an independent national engineering firm that had prepared reports showing that the Landfill was not the source of the odors. *See* 19-11133, R.Doc. 381-19 at page 2 of 6 (press packet summary of SCS Report stating, "SCS is a national engineering company that is a recognized expert…SCS's report concludes that the Jefferson Parish Landfill is not a significant source of nuisance odors experience in Jefferson Parish."); *id.*, at page 6 of 6 (press release stating "SCS concluded that Jefferson Parish Landfill *could not be* the cause of the vast majority of odor complaints in the area.")(emphasis added); 19-11133, R.Doc. 381-21 (Waste Connections letter to LDEQ, stating on page 2 "[Waste Connections subsidiary] LRLC *independently* retained SCS Engineers to perform an odor survey…Your office ignored the Report.").  This letter was then shared with the press. *See* 19-11133, R.Docs. 381-22 through -24.  Because of the multiple hats and waivers, there could be no blanket assertion that SCS was a "consulting expert" with respect to all documents.  As a result, document by document proof was always required.

Rather than ordering production for <u>this</u> failure, the Court gave Waste Connections a third chance, and ordered it to produce the privilege log by December 4, 2023. 19-11133, R.Doc. 433. When the privilege log was finally provided on December 4, 2023, it was 81 pages long, contained 951 entries and was replete with vague and general entries. It was again impossible for the Plaintiffs to assess the application of the claimed attorney-client privilege or work product immunity. [4]

This resulted in Waste Connections submitting all 951 of the claimed privileged documents to the Court for its review *in camera.* And this was followed by at least two *ex parte* conferences with the Court where the Court made further inquiry. During these submissions and conferences, Plaintiffs were not privy to any additional "facts" urged by Waste Connections in support of the privilege assertions, but after this review, the Court ruled that the documents must be produced.

Only now, after Waste Connections could have provided its arguments in favor of the privilege to the Plaintiffs and the Court on at least five prior occasions, and after the Court has already ruled, does Waste Connections finally seek to explain why it contends the two documents at issue are protected by a privilege. However, not only does Waste Connections' new explanation consist of facts that it should have revealed from the outset, but its new arguments also underscore its complete lack of candor with the Plaintiffs and the Court in this case.

## III.   WASTE CONNECTIONS IS RELYING UPON NEW ARGUMENTS THAT IT WAS REQUIRED TO HAVE RAISED BEFORE.

Waste Connections has asked the Court to reconsider its ruling with respect to two documents dated February 18, 2019. Both documents were described on the privilege log as communications between a non-lawyer employee of SCS (James Walsh) and a non-lawyer employee of Waste Connections (Matt Crockett), with one of Waste Connections' attorneys being

---

[4] On December 4, 2023, SCS produced 11,605 pages of documents for which no privilege was claimed and more were produced a few days later.  *See* **Exhibit 2** (email thread between *Addison* counsel and SCS counsel).

4

shown as a copy recipient:

| # | Description | From/ Author/ Custodian | To | CC |
|---|---|---|---|---|
| 288 | Email chain with attachment concerning planning for SCS's field testing at the Jefferson Parish Landfill and for SCS's preparation of special waste odor potential evaluation at the direction of counsel in anticipation of litigation and in preparation for trial | Jim Walsh (SCS) | Matt Crockett | Megan Brillault, Esq.; Thomas Rappolt (SCS); Jeff Marshall (SCS) |
| 290 | Email chain with attachments concerning planning for SCS's field testing at the Jefferson Parish Landfill and for SCS's preparation of special waste odor potential evaluation at the direction of counsel in anticipation of litigation and in preparation for trial | Matt Crockett | Jim Walsh (SCS) | Matt Crockett; Megan Brillault, Esq.; Thomas Rappolt (SCS); Jeff Marshall (SCS) |

In contrast to the descriptions in the privilege log, Waste Connections' brief now describes the documents as "communications *between outside counsel for the Waste Connections Defendants and their consulting expert SCS Engineers* ("SCS")." 19-11133, R.Doc. 470-1 at 1-2 (emphasis added). The brief on the motion to reconsider is the first time Waste Connections described either document as a communication between Waste Connections' outside counsel and anyone at SCS.

Waste Connections asserts that reconsideration is required because "it appears the Court overlooked the critical fact that they contain SCS's proposals for potential assessments it could perform to aid in the Waste Connections Defendants' defense of the litigation, including proposals for assessments that were not performed or have not previously been disclosed." But this "critical

fact" was nowhere to be found in (1) the privilege log, (2) any of the declarations submitted in support of Waste Connections' motion to quash, or (3) any of the prior briefing. Thus, the "critical fact" was not *overlooked*. It had never before been raised, and thus it cannot be basis for reconsideration. Waste Connections' brief in support of reconsideration then proceeded to list even more facts that were nowhere to be found on the privilege log, the declarations, or the prior briefing:

- both documents "involve a February 15–18, 2019 email chain"—a span of four days—not just the single day listed on the privilege log. R.Doc. 470-1 at 3.

- The documents are both labeled 'Additional asks for JPL Defense (Attorney Client Privileged Communication).'" R.Doc. 470-1 at 3.

- "The email chain begins as a communication between Ms. Brillault of Beveridge & Diamond and Thomas Rappolt and Jim Walsh of SCS." R.Doc. 470-1 at 3.

- "The email chain is later extended to include Jeffrey Marshall of SCS and Matt Crockett, region engineer for the Waste Connections Defendants."

- The attachment to Document 288 contains "detailed, substantive descriptions of SCS's proposals to Beveridge & Diamond of potential assessments SCS could perform to aid in the defense of the litigation."

These facts were not previously revealed to Plaintiffs and cannot be raised on a motion for reconsideration.

Waste Connections' brief then proceeds to contradict facts that were stated in the privilege log. As stated above, the privilege log recited that the documents involved "SCS's field testing at the Jefferson Parish Landfill and for SCS's preparation of special waste odor potential evaluation." Given Waste Connections' most recent arguments, the descriptions set forth within the privilege log imply that these communications were related only to (1) the surface emissions monitoring

known to have been performed by SCS in March 2019 and June 2019 and (2) Mr. Marshall's Secret Report previously ordered produced by this Court. Yet now, for the first time, Waste Connections asserts that these communications contain SCS's "proposals for assessments that were not performed or have not previously been disclosed." Waste Connections thus confirms, for the first time, that the documents involve more than SCS's previously known surface emissions field testing: "The content of the email chains and the attachment to Document 288 contain detailed, substantive descriptions of SCS's proposals to Beveridge & Diamond of *potential assessments SCS could perform to aid in the defense of the litigation*"—some of which were not performed at all.[5] These additional topics were not disclosed previously and cannot be the basis of reconsideration.

The Waste Connections Defendants then proceeded to misrepresent facts to the Court.

Waste Connections states that Mr. Crockett "was a necessary party for SCS to execute on its proposed tasks." R.Doc. 470-1 at 6. Not so. The other party to the communications was James Walsh, the president of SCS, and if anyone was necessary *for SCS* to execute on its proposed tasks, it was Mr. Walsh, not Mr. Crockett. Waste Connections has also insisted that SCS was working under the direction of the lawyers, and Mr. Crockett is not a lawyer.

Waste Connections further states that "as Waste Connections region engineer overseeing the Jefferson Parish Landfill at the time, Mr. Crockett's assessment of SCS's proposal was essential to Waste Connections' understanding and weighing of the value of SCS's work to the outside counsel's advice." Id. However, when Mr. Crockett was deposed on January 5, 2024, he denied ever having made any assessment of SCS proposal and it was clear from his testimony that he did not have the expertise to make such an assessment.

---

[5] As set forth below, Waste Connections disclosed potential SCS assessments in the *Addison* state court five years ago, and its recommendations have been part of the record of this case since this the day the *Addison* case was removed to this Court.

IV.    **WASTE CONNECTIONS WAIVED ANY CONFIDENTIALITY OF THE SCS PROPOSALS FOR WORK THAT COULD BE DONE BY FILING SCS'S RECOMMENDATIONS INTO THE PUBLIC RECORD.**

Even if there were a basis for reconsideration (and there is not), Waste Connections long ago waived any confidentiality attendant to SCS's recommendations regarding testing at the site.

On January 16, 2019, nearly five years ago to the day, in support of Defendants' coordinated effort to keep Plaintiffs from accessing the site in early 2019, Waste Connections filed an affidavit of SCS Vice President Thomas Rappolt in the *Addison* state court case.  Attached to that affidavit (as Exhibit 4) is a report from SCS dated October 9, 2018 (hereinafter "October 9 Report").  *See* 19-11133, R.Doc. 1-6 at pages 83 – 109.[6]

In the October 9 Report, after having concluded for Waste Connections that there were no significant odors coming from the Landfill, SCS stated to Waste Connections that "SCS is recommending the following tasks that could be conducted to provide further substantiation of our opinions and conclusions." The recommended tasks included (1) the creation of a detailed odor emission profile of the landfill including "isolation sampling of surface odor emissions over each sub-area of the Landfill complex,"[7] (2) CALPUFF and AERMOD modeling of the landfill emissions; (3) continuous tracer studies (i.e., introduction of a "tracer" compound to the landfill gas to see if it could be detected in the community), (4) analysis of the historical odor complaint data; (5) development of a landfill gas generation model using LandGEM and relevant information from SCS's proprietary database; and (6) evaluation of data on special and liquid wastes. R.Doc.

---

[6] Plaintiffs discovered this when a complete copy of the Rappolt affidavit containing the October 9 Report was produced by SCS in response to the subpoena, and Plaintiffs compared it to the court file.  Copies of both are attached hereto as **Exhibits 3** and **4.**

[7] SCS explained, "Source samples would be collected and odor emissions determined from each aspect of the Landfill operation. This could include, well heads, leachate ponds, piping systems, working face, daily cover areas, final cover areas, construction sand excavation areas, etc.  This data would be substantial and defensible according to ASTM and EPA standards and applicable to support detailed modeling of odorous emissions from the landfill complex or any subzone." October 9 Report page 24.

1-6 at 108 - 109. On the last item, the recommendations state "SCS would like to further debunk the [Carlson Environmental Consultants] claim that fly ash added as a bulking agent may have created an $H_2S$ odor problem" and "This study may help in debunking other claims about problematic special wastes, liquid wastes, or bulking agents." R.Doc. 1-6 at 109.

Having been open to the public for five years, any privilege attaching to these recommendations no long exists.

Because SCS's recently disclosed February 2019 proposal (the subject of this motion) follows on the heels of Defendants having successfully kept the Plaintiffs off the site, Plaintiffs suspect there to be significant overlap between SCS's October 9, 2018 suggestions and its February 2019 proposal. And any protection for this was long ago waived.

Plaintiffs are unaware of any rule of law that allows a party or its attorneys to hide behind a non-testifying consulting expert "privilege" to create and manipulate the evidence that would be made available to the other parties in litigation. Yet that appears to be exactly what happened here. Rather than collect (or permit the opposing party to collect) all of the information and data which it knew to be critical to the resolution of the issues in this litigation,[8] Waste Connections instead used testimony from the authors of the October 9 recommended tasks to keep Plaintiffs' experts off the site. Then it had SCS perform only some of the recommended measurements, and without inviting Plaintiffs' experts to watch.

During discovery in the general causation phase, Waste Connections freely provided the SCS site measurements taken in March and June 2019 with no claim of any privilege. The resulting reports, which were not addressed to the lawyers, were also provided to the defense experts for

---

[8] By the time Plaintiffs' experts were allowed to the site, it was a different landfill. Several miles of additional piping had been added to aid in the removal of water in the site, and nearly a year's worth of additional trash and at least two feet of interim cover had been placed on top of Phase 4A.

their use.[9] Because of these facts, Plaintiffs have contended that SCS could not possibly be anything other than fact witnesses with regard to these events.[10] In response, and to shield its communications with SCS behind a privilege, Waste Connections has explained in at least two recent status conferences with the Court, that it provided the reports during discovery because Waste Connections knew from the beginning that there would be no other source for the data, and that thus Waste Connections knew (it says) that the reports would fall within the exception to consulting expert immunity under Rule 26(b)(4)(D)(ii).

But that new-found argument proves too much. SCS's measurements began almost immediately after Waste Connections had successfully defeated the *Addison* Plaintiffs' request to the state court that their expert be allowed to take measurements at the site. Having kept the Plaintiffs' expert off the site, Waste Connections then controlled what measurements would be taken, where, when, why and in what manner. And, based on what it says now, Waste Connections knew then it would contend that the SCS measurements would be the only source for calculating the emission rate. Nevertheless, despite their demand that the defense experts be permitted to observe any testing done by Plaintiffs' experts, they did not invite Plaintiffs' expert to this testing; nor did they even inform the Plaintiffs that it had been done. Thus, Waste Connections, by its own admission, sought to control and limit the data that would be available to the Plaintiffs while concealing from the Plaintiffs and the Couret the means by which it was doing so.

―――――――――――――

[9] Some of the defense experts relied upon the SCS data as the only actual data that existed. Defendants further contended that Plaintiffs lacked the necessary data to prove odors were being emitted from the Landfill. *See, e.g.,* 19-11133, R.Doc. 292 (Defendants' Post-Hearing Brief at 21 (Dr. Pietari's average "does not include data for more than half of the Phase 4A gas wells.").

[10] Even if SCS had been a consulting expert, the selective disclosure is a waiver of the privilege. *In re Application of Chevron Corp. v. 3TM Consulting*, LLC, No. MC H-10-134, 2011 WL 13135155, at *3 (S.D. Tex. Jan. 10, 2011)  ("[E]ven if work-product immunity attached to 3TM's documents initially, any immunity attached to 3TM's work was waived when Stratus gave Cabrera 3TM's work. Cabrera is a testifying expert, and disclosure of documents to a testifying expert waives immunity.". )

Waste Connections engages in creative wordsmithing to portray its actions as good faith steps typically taken in contentious litigation, including the following statement on p. 5 of its brief: "By selecting some tasks and pausing or rejecting others, litigation counsel indirectly communicated their litigation priorities and their ranking of the relative value of various forms of information." But this statement is nothing more than attorney double-speak that, at its most basic element, confirms that Waste Connections decided, for litigation purposes, what evidence would be available (and not be available) to the Plaintiffs in this litigation. The Defendants' assertions in this case that Plaintiffs' experts purportedly lack the necessary data to render reliable opinions did not arise coincidentally; they were manufactured when SCS was told not to take certain measurements, after Plaintiffs were precluded from taking their own measurements at the site.

The record of this case shows that the odors emanating from the Jefferson Parish Landfill happened because, from October 2016 through June 2018, Waste Connections allowed (and at times solicited) more than 23,000 tons (46 million pounds) of sulfur-containing spent lime to be placed into Phase 4A of the Landfill, knowing that the Landfill was saturated with water (SCS said on page 9 of its October 9 report "more saturated than most") and knowing that there was no means to collect landfill gas, like final covers or an operable gas collection system, in Phase 4A.

Upon discovering this error, Waste Connections made no contention that the odors were not a foreseeable consequence of the disposal of such wastes. Its own experts (SCS) had warned against the disposal of such waste in municipal landfills without accounting the unique characteristics of it and unless appropriate precautions were undertaken to manage the resulting hydrogen sulfide gas. *See*, *e.g.*, 19-11133, R.Doc. 381-34 (SCS May 2015 Technical Bulletin); R.Doc. 342-3 (Jeffrey Marshall 2017 Paper).  As a result, Waste Connections set out to deny that the Landfill was a source of odors at all, asserting to the media, the Parish, and the LDEQ that SCS, an independent national engineering firm, had concluded that there were no odors emanating

from the Landfill that were capable of causing any injury to anybody. This defense became defined as "general causation" and was tried to the Court. Along the way, Waste Connections lied to the public, lied to the LDEQ, and lied to the Plaintiffs. In the proceedings to come, the credibility of the Waste Connections witnesses must be gauged in light of these falsehoods. And, Waste Connections' conduct to conceal the truth after the fact is circumstantial evidence that it knew or should have known that allowing the spent lime into the Jefferson Parish Landfill would result in significant and substantial odors.

Waste Connections' most recent descriptions of these withheld February 2019 communications tacitly confirm what Plaintiffs have long surmised: that Waste Connections engaged in a concerted, purposeful effort to control and manipulate the available evidence to gain an advantage over Plaintiffs in this litigation.

## V.   CONCLUSION.

All of the arguments presented by Waste Connections could have been raised before the Court ruled, and Waste Connections was required to raise them in order to prove the existence of the work product immunity and privilege.   Waste Connections did not meet its burden on Documents 280 and 290, and the Court properly so ruled.   The fact that Waste Connections now argues new facts that were not contained in the privilege logs, the supporting evidence or any brief only underscores this failure.

For the foregoing reasons, the Motion to Reconsider should be denied,

Dated: January 8, 2024

Respectfully submitted,

_____S. Eliza James_____
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
FORREST CRESSY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com


_____/s/ Eric C. Rowe_____
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac
Vice)
WHITEFORD, TAYLOR & PRESTON,
L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
ebolog@wtplaw.com
mchilders@wtplaw.com

_Counsel For Addison Plaintiffs_


_____/s/ Bruce C. Betzer_____
Bruce C. Betzer (Bar No. 26800)
THE LAW OFFICE OF BRUCE C. BETZER
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
bruce@brucebetzer.com


_____/s/ Douglas S. Hammel_____
Douglas S. Hammel (Bar No. 26915)
HAMMEL LAW FIRM, LLC
3129 Bore Street
Metairie, LA 70001
Telephone: (504) 832-9942
Facsimile: (504) 304-9964
douglashammel@gmail.com


_____/s/ Jason Z. Landry_____
Scott R. Bickford (#1165)
srb@mbfirm.com
Lawrence J. Centola, III (#27402)
ljc@mbfirm.com
Jason Z. Landry (#33932)
jzl@mbfirm.com
Jeremy J. Landry (#30588)
jjl@mbfirm.com
MARTZELL BICKFORD & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504)581-7635 – FACSIMILE

Hon. Max N. Tobias, Jr. (#12837)
LISKA, EXNICIOS & NUNGESSER
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 410-9611
Facsimile: (504) 410-9937
maxtobias504@aol.com

Anthony D. Irpino (#24727)

Louise C. Higgins (#31780)
Pearl Robertson (#34060)
Kacie F. Gray (#36476)
IRPINO, AVIN & HAWKINS
2216 Magazine Street
New Orleans, LA 70130
Ph. (504) 525-1500
Fax (504) 525-1501
airpino@irpinolaw.com
lhiggins@irpinolaw.com
probertson@irpinolaw.com
kgray@irpinolaw.com

John D. Sileo (La Bar No. 17797)
Casey W. Moll (La. Bar No. 35925)
LAW OFFICE OF JOHN D. SILEO
320 N. Carrollton Ave.,
Suite 101 New Orleans, LA 70119
(504) 486-4343
jack@johnsileolaw.com
casey@johnsileolaw.com

*Counsel for Ictech-Bendeck Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on counsel of record for the parties through the Court's ECF system and served by electronic mail on the following:

> MICHAEL C. DREW (#30884)
> TAYLOR K. WIMBERLY (#38942) Jones Walker LLP
> 201 St. Charles Ave., 49th Floor New Orleans, Louisiana 70170-5100 Telephone: (504) 582-8318
> Fax: (504) 589-8318
> mdrew@joneswalker.com
> twimberly@joneswalker.com
>
> *Counsel for SCS*

        /s/ Eric C. Rowe
              Eric C. Rowe