## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON ET AL.,**<br>　　　**Plaintiffs,**<br><br>**v.**<br><br>**LOUISIANA REGIONAL LANDFILL**<br>**COMPANY, ET AL.,**<br>　　　**Defendants.**<br><br>*Applies to: Both Cases* | **No. 19-11133, c/w 19-14512**<br><br><br>**SECTION: "E" (5)**<br><br><br>**Judge: Morgan**<br>**MAGISTRATE JUDGE: North** |

### PLAINTIFFS' OPPOSITION TO THE WASTE CONNECTIONS DEFENDANTS' MOTION TO COMPEL PRODUCTION OF PLAINTIFFS' AIR SAMPLING DATA

The Waste Connections Defendants' Motion to Compel Production of Plaintiffs' Air Sampling Data (R.Doc. 507) should be denied, and Plaintiffs should be awarded their costs and attorneys' fees expended with respect to it.

## I.　　INTRODUCTION.

In moving to compel, Waste Connections represents to the Court, *as fact*, that "Plaintiffs are hiding some of the only available air sampling data *in their neighborhoods* from the relevant time period," R.Doc. 501-1 at 2 (emphasis added), and that "Plaintiffs have collected air sampling data *at or near Plaintiffs' residences* during the relevant time period." R.Doc. 507-1 at 13 (emphasis added). These statements are not true, and Waste Connections had no good faith basis to believe that they were true when it made them.

Based on these false statements, along with Plaintiffs' *denial* of Requests for Admission (which are not proof of anything), Waste Connections has moved to compel production of "air sampling data," even though it had propounded no discovery request seeking it. Even if there had been such a request, the specific documents at issue concern work product of a consulting expert

1

hired by counsel for the *Addison* Plaintiffs, which is not discoverable, by rule, under Rule 26(b)(4)(D), unless the party seeking it shows "exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." In the correspondence leading up to the motion to compel, Waste Connections admitted, in writing, on two occasions, that it had no facts that established the existence of "exceptional circumstances" unless *Addison* counsel first revealed the very information that is protected work product, including the dates, types and locations of any sampling or monitoring done by the consultant for counsel. Waste Connections offered no authority showing that *Addison* counsel had any duty to do provide such information, and *Addison* counsel declined to do so.

While Plaintiffs should not have to reveal anything about the work done by the consulting expert, and without waiving any privilege, Plaintiffs will state that the "real-world data" that Waste Connections insists is so valuable consists of four air samples taken on a single day at locations near the Landfill, and not near any of the Plaintiffs' residences. **Exhibit 1**, Declaration of Barry S. Neuman ¶ 7. None of the samples were tested for the presence of hydrogen sulfide. Id.

Once again, Waste Connections has shown that very little of what it says can be taken at face value, and once again Plaintiffs must correct the record of false and misleading statements made by Waste Connections.

## II.   "AIR SAMPLING DATA" WAS NOT THE SUBJECT OF AN ACTUAL DISCOVERY REQUEST.

Motions to compel are governed by Rule 37 of the Federal Rules of Civil Procedure, a rule nowhere cited in Waste Connections' motion or brief. As applicable here, Rule 37(b) provides:

> (B) To Compel a Discovery Response. A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if:
> …
> (iv) a party fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34.

F.R.Civ.P., Rule 37(b). Under this rule, before a party can move to compel the production of documents, it must first have asked for them in a Rule 34 document request. Waste Connections filed this motion to compel production of "air sampling data," but there is no outstanding discovery request seeking production of "air sampling data."

Waste Connections has been told, repeatedly in this case, that air sampling was not undertaken at or near the homes of the *Addison* Plaintiffs. The Plaintiff Fact Sheets, which Waste Connections demanded be treated as interrogatories and verified under oath, asked (on page 2, line 60) "Have you had any testing or laboratory analysis performed to determine the presence of JP Landfill Emissions at any of the properties associated with your claim." Each of the Trial Plaintiffs answered "no." **Exhibit 2** (compilation of relevant pages)**.** Waste Connections asked about this again at the depositions, at which time each of the Plaintiffs who was asked responded that testing was not done at their residences.[1] **Exhibit 3.**

Unsatisfied with these answers (and, according to it, drawing conclusions from a "cryptic" statement of counsel during a status conference with the Court), Waste Connections served two requests for admission on December 29, 2023, on each of the Trial Plaintiffs:

> 1. Admit that neither You nor Your attorneys have ever conducted air sampling or monitoring, including but not limited to monitoring for the presence of hydrogen sulfide, at locations offsite of the Jefferson Parish Landfill during the Relevant Time Period.
> 2. Admit that neither You nor Your attorneys have ever conducted air sampling or monitoring, including but not limited to monitoring for the presence of hydrogen sulfide, at any place where You have resided during the Relevant Time Period.

The response to both requests was "denied as written." R.Doc. 507-8. [2]

---

[1] Ms. Gremillion testified that she was "not aware" of testing done at her River Ridge home. *See* Exhibit 3.

[2] Rule 36 does not require an explanation for the basis of the denial, but the requests were properly denied. Because "a matter admitted under this rule is conclusively established," when a request contains compound questions and broad, undefined terms, and particularly when it asks

Waste Connections then treated the *denials* of the requests for admission as affirmative statements of fact, writing to *Addison* counsel on January 31, 2024:

> The trial Plaintiffs' responses to the RFAs denied that neither they nor their attorneys have conducted air sampling or monitoring at locations offsite of the Jefferson Parish Landfill during the relevant time period. We understand this to mean that air sampling or monitoring may have been performed by the trial Plaintiffs or their attorneys on their behalf. …

R.Doc. 507-8 at page 6 of 9. This use of the request for admission was improper. Under Rule 36, a denial of a request to admit is the "functional equivalent of a refusal to stipulate," nothing more. *Medrano v. KLLM Transportation Servs. LLC*, No. CV 21-581-BAJ-EWD, 2022 WL 17833284, at *7 (M.D. La. Aug. 30, 2022).

The denial of a request for admission does not itself admit anything. *Harmon v. Wal-Mart Stores, Inc.*, No. 3:08-CV-309-MEF, 2009 WL 707403, at *4 (M.D. Ala. Mar. 16, 2009)(denial of requests to plaintiff to admit that claims did not exceed $75,000 did not establish that amount in issue did exceed $75,000).[3] Rule 36 cannot properly be used to elicit a denial that is then intended

---

for a negative (like you "never" did something), due care must be taken in responding. Here, Waste Connection defined "You" as including "counsel, experts, investigators, or other persons," in addition to the individual Plaintiff, and asked for an admission regarding "any place where You have resided" (not defined). As to #1, Waste Connections knew when it propounded the request that the Plaintiffs' testifying experts had conducted offsite air sampling and modeling (it was in the reports), so #1 could not ever be admitted and there was not even a good faith basis for the question. As to #2, while it was true that sampling and monitoring was not undertaken at the Plaintiff's homes, the Plaintiffs reside in Jefferson Parish, which is a place where monitoring and testing was done by the testifying experts. As a result, as written, both requests were properly denied.

[3] In a case similar to facts here, *Smith v. Kindred Nursing Ctr. Ltd. P'ship*, No. 05-02106 BV, 2005 WL 2233260, at *2 (W.D. Tenn. Sept. 13, 2005), plaintiffs served a request for admission to have the defendant admit they had no witnesses or evidence other than what was disclosed in the initial Rule 26 disclosures. The defendants responded with the word "denied." The plaintiff then concluded from the denial that the defendants must have additional undisclosed witnesses and evidence and moved to compel. The court rejected the motion, explaining, "Here, the defendants' denials indicate that they were not willing to concede, at that time, that there were no additional witnesses or documents. The denials therefore do not necessarily indicate that the

to be used as affirmative proof, but Waste Connection admits it did exactly that, when it served the requests for admission "[s]eeking a definitive statement on whether any sampling was performed." R.Doc. 507-1 at 6.

And, in fact, relying on the denial, Waste Connections then wrote to Plaintiffs' counsel (R.Doc. 507-9 at 8) asserting that the "air sampling or monitoring data" should have been produced as a result of (1) Plaintiffs' discovery obligations, under the First Case Management Order, to produce "all non-privileged, data, reports, and documents concerning all sampling or monitoring" at "any location in Jefferson Parish other than the Jefferson Parish Landfill," (2) Plaintiffs' document requests served on May 2, 2023, which nowhere mentioned "air sampling or monitoring data" and/or (3) an obligation to list the requested data on a privilege log. R.Doc. 507-9 at 8. But none of this was correct, either.

### A. The First CMO specifically excepted sampling and monitoring conducted by the Plaintiffs' non-testifying experts from the categories of documents to be produced without a discovery request.

As to the First CMO, the very next sentence in the paragraph quoted by Waste Connections in its January 31, 2024, email (R.Doc. 507-9 at 8) stated, "Pursuant to the Court's October 8, 2019, order (Dkt. 73), information and documents referenced in this subsection B.6.a *do not include sampling or monitoring conducted by Plaintiffs' non-testifying experts*." R.Doc. 80 at 5 ¶ 6.a. The October 9, 2019, Order referred to was entered after *Addison* counsel had objected to the disclosure of work done by its consulting expert. *See* R.Doc. 73. Thus, the fact that *Addison* counsel had engaged a consulting expert, who might conduct sampling or monitoring, was known to Waste Connections more than four years ago. Because the First CMO did not require production

---

defendants were aware of such witnesses or documents either at the time of the initial disclosures or at the time of their responses." Id. at *2.

of air sampling done by a consulting expert, the production obligations in the First CMO could not

serve as a basis for a motion to compel, and the current Motion is not based on it.

**B.      The March 2023 Document Requests did not seek air sampling data.**

In its email on January 31, 2024 (R.Doc. 507-9 at 8), Waste Connections next asserted that

sampling or monitoring was required to be produced under two document requests served on the

Trial Plaintiffs nearly a year ago, and for which each of the Trial Plaintiffs gave the same answer.

Neither of those requests asked for "air sampling data":

> **Request for Production 9:** All documents from January 1, 2015, to present,
> relating to the alleged impact on you or your property of emissions, including odors,
> gases, and particulates, that you assert originated from the Jefferson Parish Landfill.

> **Request for Production 14**: Any consultant or expert reports in your possession
> or the possession of your counsel relating to emissions, including odors, gases, and
> particulates, you have smelled at your property or elsewhere in Jefferson Parish.

R. Doc. 507-4 at 3-4. As to the first of these, as stated in the answers to the Plaintiff Fact Sheets

and the questions posed to the Plaintiffs in depositions, there was no testing done at or near the

Plaintiff's residences. As a result, there was no "air sampling data" to produce. Any air sampling

taken elsewhere had no relation to the impact of the emissions on the specific property. The

responses to RFP # 9 stated that no documents were being withheld. R.Doc. 507-5 at 18.

Request #14 sought "consultant … reports in possession of your counsel." Documents

other than reports were not requested, and the phrase "air sampling data" was not contained in the

request. On May 23, 2023, Plaintiffs objected that such reports were not discoverable under Rule

26(b)(4)(D), which by its plain terms precluded discovery of "facts known or opinions held by an

expert who has been retained or specially employed by another party in anticipation of litigation

or to prepare for trial and who is not expected to be called as a witness at trial," unless there are

exceptional circumstances. R.Doc. 507-5 at 22. In the ten months since this objection was lodged,

Waste Connections never followed up on its request for consulting expert reports, and the current Motion to Compel does not seek them.

Because this objection was contained in a timely response to the request for production, and because the privilege for the work of non-testifying experts was recognized in the October 9, 2019, Order and the First CMO, Waste Connections' current contention that the privilege assertion is somehow "belated" has no basis in fact or law.

### C.   Because "air sampling data" had not been requested in discovery, and therefore had not been withheld from any production, there was no reason to list it in on a privilege log.

Before a document must be listed on a privilege log, it must first have been within the scope of a discovery request, and then withheld from production based on the privilege. Waste Connections served no document requests at all in this litigation prior to May 2023, and the "sampling or monitoring conducted by Plaintiffs' non-testifying experts" was specifically *excluded* from production requirements under case management orders in place for the general causation phase. As a result, these documents were not "withheld" from any production, so there is no occasion or requirement to place any of the documents involving the *Addison* consulting expert on a privilege log.

In addition, because an opposing party must establish "exceptional circumstances" before it is entitled even to learn the identity of a consulting expert (*see* cases cited on page 11), the "same logic compels the conclusion that, in most circumstances, a party does not waive the protections of Rule 26(b)(4)(D) by failing to identify communications with, or a report from, a consulting expert on a privilege log. *Strobl v. Werner Enterprises, Inc*., 577 F. Supp. 3d 960, 968 (S.D. Iowa 2022). All that Rule 26 requires is sufficient facts to assess the applicability of the privilege. Here, the privilege applies to the work of a non-testify expert. Those facts were provided.

In fact, Waste Connections itself has taken exactly this position in this litigation. When Waste Connections filed its motion to quash the subpoena to SCS Engineers, and its objections to the Plaintiffs' written discovery, it initially refused to produce a privilege log at all, relying on declarations of the attorneys who said they retained SCS as a consulting expert. *See generally* R. Docs. 368 and 383, and attachments. (The problem was that SCS had multiple roles on the project, and the affidavits were contradicted by the available evidence.).

Waste Connections, last year, explained to the Court that the "do not log" provision in the First Case Management Order benefitted the Plaintiffs as much as the Defendants:

> [That provision] applies to communications after July 25, 2018 "(i) with, between or among outside litigation counsel or (ii) with, between or among in-house counsel … or nonlitigation counsel related to the litigation." **This provision is a common practice by litigants so that the thousands of communications with and among outside counsel do not have to be logged, and it benefits Plaintiffs as much as Defendants.[4]** And as an order of the Court it supersedes the provisions of Rule 26 that Plaintiffs cite. See Fed. R. Civ. P. 26(b)(1). As a result, there is no requirement to provide a privilege log listing communications between outside litigation or inhouse counsel and SCS Engineers.

Letter to the Court dated June 8, 2023, from Waste Connection's attorney Megan R. Brillault, at page 4. Then, based on this same provision, when Waste Connections finally did provide privilege logs, they omitted from the Waste Connections log the communications where the only parties to the communication were attorneys and SCS. (We know this because those same communications *were* listed on a separate privilege log provided by SCS). Having disclaimed any such obligation for its own counsel, Waste Connections can hardly claim that *Addison* counsel was required to log their communications with their consulting experts.

---

[4] In the Motion to Compel, Waste Connections now asserts that the "do not log" provision applied only to Defendants. R.Doc. 507-1 at 9.

**D.      Waste Connections admitted in writing that exceptional circumstances could not be established.**

In their response to Waste Connections' January 31, 2024, email, *Addison* counsel explained all of this, and more, to Waste Connection in writing, including the burden imposed on Waste Connections to show exceptional circumstances and the fact that Waste Connections had made no such showing. R.Doc. 507-9 at 5.

In response, Waste Connections admitted that it had no facts demonstrating the existence of exceptional circumstances, and stated that, in order to determine whether exceptional circumstances existed, they first needed to know whether the consulting expert had "taken air samples or conducted air monitoring at any locations which constitutes private property." R.Doc. 507-9 at 4 (February 22, 2024, email stating, "You have invited us to set out the facts which constitute exceptional circumstances warranting disclosure of consulting expert work product, and in order to do so, we require an answer to the foregoing question …"). Two weeks later, on March 12, 2024, this mushroomed into additional questions concerning the type, dates, and locations of any sampling or monitoring (all of which were involved facts known by the consulting expert) and for information they already knew, such as whether any air sampling or monitoring had been conducted the homes of the Trial Plaintiffs (none had). R.Doc. 507-9 at 3. Not having this information, they said, "precludes Defendants from evaluating whether exceptional circumstances are present that would warrant disclosure of the information," thus admitting a second time that they did not have facts to show the existence of exceptional circumstances. *Id*.

*Addison* counsel responded on March 13, 2024, by once again explaining that Waste Connections had the burden to show exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means:

> You have recognized the application of the rule, and you seek to fall within the exception to the rule, which permits discovery upon "showing exceptional

circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." But you have not to date articulated any facts that show "exceptional circumstances." Conceding that you have no such facts, you have instead demanded that we provide facts to you so that you can make the argument. We are aware of no authority that requires us to do that.

R.Doc. 507-9 at 1. *Addison* counsel also reminded Waste Connections that the document request it relied upon sought only consultant reports and that "the underlying data mentioned in your email is not subject of any outstanding discovery request." Id. Instead of providing any authority that *Addison* counsel was required to provide the information demanded, and instead of serving a document request that actually sought the documents that it now demands, Waste Connections marched into Court, moving to compel the production of privileged documents that were not the subject of any discovery request, and for which it had admitted (twice) that it could not meet the burden to show exceptional circumstances to overcome the privilege.

## III.   WASTE CONNECTIONS' ARGUMENTS FOR PRODUCTION SHOULD BE REJECTED.

None of the arguments offered by Waste Connections to justify its Motion to Compel carries any weight.

### A.   There is no basis for the argument that "Plaintiffs have not satisfied their burden of establishing the air sampling data is privileged."

First, Waste Connections asserts that "Plaintiffs have not satisfied their burden of establishing the air sampling data is privileged." R.Doc. 507-1 at 8. However, because the air sampling data was not within the scope of any document request, Plaintiffs had no obligation to produce it, privileged or not. But, if it is assumed that the air sampling data was within the scope of the prior document request seeking reports of consultants, then the privilege exists by definition. By asking for reports of consultants, Waste Connections asked directly for information protected under Rule 26(b)(4)(D), which is work product protected by rule. As a result, the existence and

applicability of the work product privilege is not even in dispute—the only question that could exist is whether there are "exceptional circumstances" to overcome it.

When Waste Connections argues that *Addison* counsel have not provided it with sufficient information "to assess the privilege," it actually means that *Addison* counsel have not provided information that Waste Connections can use to show that exceptional circumstances exist to overcome the privilege. But *Addison* counsel have no such obligation. Whether exceptional circumstances exist or not is not part of the analysis of whether the privilege exists in the first instance—it is part of determining whether the privilege has been overcome. And the burden is on Waste Connections to do that.

*Addison* counsel have no obligation to explain or reveal to anyone what work they asked their consulting expert to do, or what work the consulting expert did do for counsel, and Waste Connections has cited no authority for that proposition. The type, dates, and locations of any sampling or monitoring conducted for Plaintiffs' counsel by the consulting expert are none of their business. *See Zeiger v. WellPet LLC*, No. 17-CV-04056-WHO, 2018 WL 10151156, at *3 (N.D. Cal. Apr. 10, 2018) ("Plaintiffs have no obligation to disclose other testing or communications with or opinions by consulting experts beyond that specifically referenced in the [complaint]"). Indeed, *Addison* counsel are not even required to disclose the identity of the consulting expert absent "exceptional circumstances." *Cooper v. Revere Life Ins. Co*., No. CIV. A. 96-2266, 1997 WL 289706, at *1 (E.D. La. May 28, 1997) ("the predominant view among courts addressing the issue is that the showing of "exceptional circumstances" required by Rule 26(b)(4)(B) will be required even in connection with discovery of the identity of such experts"); *Ohio Mgmt., LLC v. James River Ins. Co*., No. CIVA 06-0280, 2006 WL 1985962, at *2 (E.D. La. July 13, 2006) ("insofar as the aforesaid requests for production seek disclosure of the identities of any consulting

and/or non-testifying expert, defendant's objections are SUSTAINED in absence of any showing of exceptional circumstances") *Mercury Luggage Mfg. Co. v. Domain Prot. LLC*, No. 3:19-CV-1939-M, 2021 WL 2515753, at *1 (N.D. Tex. June 18, 2021) ("the identity of the broker retained by Domain Protection as a consulting expert is not discoverable"). If the identity is not discoverable, then the actual tasks assigned to the consulting expert are even less so.

Notably, recognizing that the privilege claim is valid, Waste Connections has asked for the data, "excluding any portions of those documents that … reveal the identity of the consulting expert witness." R.Doc. 507-1 at 3.

**B.    There is no basis for the argument that "exceptional circumstances warrant production of the air sampling data."**

Despite having admitted, in writing, on two occasions, that it could not establish that exceptional circumstances exist without additional information, Waste Connections contends that the Court should find that exceptional circumstances exist nevertheless.

First, Waste Connections contends it has a "substantial need" for the information, even though it does not know what the information is. "Substantial need" is one of the tests for obtaining work product generally; it is not by itself sufficient to meet the standard of Rule 26(b)(4)(D), which requires "exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means."

Next, Waste Connections contends that the air sampling data is "fact work product" and that "factual information" is generally discoverable. But Rule 26(b)(4)(D) imposes a rule different from that applicable to work product generally. It specifically provides that "Ordinarily a party may not… discover ***facts known*** … by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Under this Rule, to discover *facts* known by the consulting expert, the party

seeking them must show exceptional circumstances under which it is impracticable for the party to obtain facts on the same subject by other means." That the work product involves facts is not by itself an exceptional circumstance.

The courts have made clear that a party seeking to establish exceptional circumstances carries a heavy burden. *Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.*, No. CV 18-5888, 2019 WL 5418187, at *2 (E.D. La. Oct. 23, 2019). As a result, the party has to show more than a mere desire to see the information. The party has to show that "it is impracticable for the party to obtain facts on the same subject by other means." *See*, *e.g.*, *Walker v. WTM, Inc.*, No. 2:09CV65-KS-MTP, 2010 WL 11681782, at *1 (S.D. Miss. May 20, 2010) (the defective product at the center of the lawsuit had been lost, so exceptional circumstances existed to permit the deposition of a non-testifying expert regarding his observations and opinions).

In this case, Waste Connections does not have any pressing need to obtain the few air samples collected by Plaintiffs' consulting expert. From the commencement of odor issues confronting the Landfill, it was entirely practicable for Waste Connections to obtain facts on odors in the community by means other than the work product of Plaintiffs' consultants, and Waste Connections did so. Waste Connections itself commissioned SCS Engineers to do an odor study in the community surrounding the Landfill. Waste Connections SCS then then submitted SCS' October 9, 2018 report to the state court as evidence [R.Doc l. 1-6 at page 85]; provided another SCS report, dated October 24, 2018, to the general public on November 1, 2018; R.Doc. 208-2, and even informed the LDEQ in December 2018 that the public SCS study was "the most detailed and thorough scientific effort to date on the issues of odors in Jefferson Parish." R.Doc. 381-21, page 2, fourth paragraph**.**

13

In addition, in July 2018, Waste Connections engaged another company, NCM Odor Control, "to complete an odor study including all odor sources in proximity to the JP Landfill." **Exhibit 4.** Waste Connections initially claimed that NCM was a consulting expert hired to survey odors in the community, and accordingly sought to suppress NCM's work product from discovery. After being asked for proof that NCM had been hired to advise the attorneys, Waste Connections recently abandoned that position.

In addition to that, there were odor analyses done by the LDEQ Mobile Air Monitoring Laboratory, the Louisiana Department of Health, and other publicly available studies, so there is zero factual support for the contention that the only source of information is the *Addison* consulting expert.

In contrast to those studies, the *Addison* consultant air sampling data consisted of a handful of samples taken on a single day outside the perimeter of the Landfill. Neuman Declaration ¶.7. Given the limited air sampling conducted by Plaintiffs' consulting expert compared with the massive amount of data that Waste Connections has been able to obtain freely through its own efforts, Waste Connections cannot seriously contend it has an exceptional need to obtain Plaintiffs' privileged work product or that it has been impracticable for Waste Connections to obtain the equivalent data.

Even though the *Addison* Plaintiffs will not introduce the work product of their consulting expert into evidence, Waste Connections protests that any sampling done in confidence for *Addison* counsel to assist in their preparation of the *Addison* case "is highly probative of the issues to be tried"—meaning Waste Connections wants to make an issue of what was and was not done in counsel's evaluation and planning of the case.

14

As the Fifth Circuit has explained, the work product privilege exists "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent." *Shields v. Sturm, Ruger & C*o., 864 F.2d 379, 382 (5th Cir. 1989). The adversary system is not promoted by allowing one side to delve into the files of the opposing attorney to find something to undermine the attorney's case. "Permitting one party to call an expert previously retained or consulted by the other side entails a risk of very substantial prejudice stemming from the fact of the prior retention, quite apart from the substance of the testimony." *Carroll v. Praxair, Inc*., No. 05-0307, 2007 WL 437697, at *3 (W.D. La. Feb. 7, 2007).

Waste Connection's only intent here appears to make mischief, or to seek payback for series of orders that the Court has entered with regard to the SCS documents, neither of which is sufficient reason to require production of protected work product.

## IV. WASTE CONNECTIONS' FALSE CONTENTIONS OF FACT DO NOT ESTABLISH "EXCEPTIONAL CIRCUMSTANCES."

Waste Connections' Brief asserts as fact that, "Plaintiffs are hiding some of the only available air sampling data *in their neighborhoods* from the relevant time period," R.Doc. 501-1 at 2 (emphasis added), and that "Plaintiffs have collected air sampling data *at or near Plaintiffs' residences* during the relevant time period." R.Doc. 507-1 at 13 (emphasis added). As Waste Connections knew from the Plaintiff Fact Sheets and the deposition testimony, these statements are entirely false. Even if Waste Connections thought them to be true, Waste Connections had no good faith basis for stating them as a declarative fact in a brief filed with the Court.

Similarly, Waste Connections states, "Plaintiffs obfuscated for months when Defendants requested a specific response on whether such sampling was performed." Waste Connections' first request for specific response on whether sampling was performed occurred on February 22, 2024. R.Doc. 507-9 at page 4. The Motion to Compel was filed 26 days later. There was no "obfuscation

for months." Even if Waste Connections considers its Requests for Admission to be a request for a specific response (which it cannot be, because a denial is not an admission of the opposite fact), that argument only shows (1) a lack understanding of what requests for admission are and (2) the time period from the response (January 29, 2024) to the motion to compel was 50 days (seven weeks and 1 day), not months.

Waste Connections asserts that "even if Plaintiffs' air sampling was conducted entirely on public property (which they have refused to confirm), Defendants were not invited to conduct parallel samplings and thus could not have foreseen the times and places that Plaintiffs chose to conduct their air sampling." R.Doc. 507-01 at 14. This fact is not relevant and is misleading. First, none of the work done by the *Addison* consulting expert will be offered into evidence, so the supposed inability to conduct parallel samplings is meaningless. Second, when a lawyer asks the consulting expert to conduct a test so she can decide how to approach a case, the last thing she will do is invite the other side to participate. Third, Waste Connections would be estopped from even making such a demand. Waste Connections is the same company that opposed the *Addison* Plaintiffs' December 2018 request to take measurements at the site, obtained orders from the state court precluding the *Addison* Plaintiffs from having access to the site, and then conducted several rounds of its own on-site measurements using SCS Engineers, without inviting Plaintiffs' experts to participate in any of them, and then contended that SCS data was the only competent data available.

### A.    Use of the information to challenge the Plaintiff's air modeling.

Waste Connections next argues that it needs the information because the "data that has the potential to show the jury whether or not Mr. Lape's modeling is backed up by the facts and which can be used for assessing Plaintiffs' claims of $H_2S$ impacts—such data is crucial to the Defendants' preparation for trial." R.Doc. 507-1 at 19. In other words, Waste Connections wants to compare

the consultant's sampling to Mr. Lape's modeling of the $H_2S$ emissions to see if the modeling predicted the $H_2S$ levels found in the sampling. But when it filed the motion to compel, Waste Connections had no way of knowing whether the sampling it had demanded even measured for $H_2S$, so the statement that the information was "crucial to the Defendants' preparation for trial" was, like other representations, not well grounded in fact. Because the sampling did not measure for $H_2S$, it cannot be used to show that Mr. Lape's modeling did not predict the result.

If Waste Connections truly needed the consultant's sampling information to challenge Mr. Lape's modeling, then the time for getting it was in the General Causation phase, when Waste Connections actually challenged Mr. Lape's methodology and contended the modeling could not be validated. But according to its brief, Waste Connections consciously chose not to seek the consulting expert information at that time. R.Doc. 507-1 at 7-8.  Waste Connections' current expert, Dr. Zannetti (the only current defense expert on air modeling) has withdrawn his prior criticisms of Mr. Lape's methodology, found the methodology scientifically sound, and adopted it for use in his own analysis (pages 38-39, and has explained (on page 72 of his report) that the emission rate he used is "the only major difference between my modeling simulations and those performed by Lape." **Exhibit 5** (excerpt from Zannetti Report). The calculation of the emission rate is not affected in the least by the four air samples taken by the *Addison* consulting expert.

### B.   Contrary to Waste Connections' assertion, the documents sought are not equivalent to SCS Reports that Plaintiffs moved to compel.

Waste Connections seeks to draw a false equivalence between the limited air sampling it now seeks from Plaintiffs and the SCS data that it was required to produce to Plaintiffs. But there is no equivalence, and Waste Connections' plea for equity must fail because it does not have clean hands.

There is a very large difference between the actions of the Waste Connections' consulting expert and those of the *Addison* consulting expert. First, there is a real question as to whether SCS Engineers was a consulting expert at all and, if so, the scope of the work that fell outside that role. Based upon defense counsel's representations, the Court has treated SCS as a consulting expert and has taken care not to review information that remains protectable, but the Court has also had to contend with the fact that SCS assisted Waste Connections in the field, assisted Waste Connections in its public relations campaign, took measurements and provided reports to testifying experts, and provided testimony in court, none of which is the work of a consulting expert assisting the lawyers in private. Despite the numerous activities that were not the work of a consulting expert, Waste Connections sought to hide all of SCS's work behind the consulting expert privilege, some after the fact. That effort has caused the Court to review nearly 2,000 documents *in camera*, large numbers of which have been ordered to be produced. Meanwhile, Waste Connections' motion to compel does not identify who the *Addison* consulting expert even is, because the work of the *Addison* consulting expert was confined to assisting the lawyers, and information gathered by the *Addison* consulting expert has not been relied upon by any of the testifying experts offering opinions in this case.

Waste Connections also points to this Court's ruling on documents involving SCS employee David Fisher and off-site surveys, *see* R.Doc. 505, and Plaintiffs arguments about what was necessary to assess the privilege. The comparison is not apt. In asserting that Defendant's privilege log was insufficient, Plaintiffs were not arguing that the privilege log did not provide information to determine whether exceptional circumstances existed—they were arguing the log did not establish the privilege in the first instance. *See* R.Doc. 436 at 14-16.

C.     **Plaintiffs' potential damage claims are irrelevant to the Motion to Compel.**

Waste Connections asserts that it needs the information because the Trial Plaintiffs are seeking large damage awards. But that is not anything newly discovered by Waste Connections, much less an exceptional circumstance. When Waste Connections itself removed this case to federal court, in order to persuade the Court that the jurisdictional amount had been met, Waste Connections explained that "Comparable judgments and settlement awards in recent nuisance cases premised on noxious odors demonstrate that the aggregate amount and the award per plaintiff in such cases have the potential to be significant." R.Doc. 1 at 9 ¶ 22. As Waste Connections told the Court, the very first case that it cited, *Jacobs v. Murphy-Brown LLC.*, No. 7:14-CV-237-2018 WL 4186009 (E.D.N.C. Aug. 3, 2018) involved six plaintiffs "each awarded between $3.5 million and $5 million in compensatory damages, in addition to punitive damages three times the actual damages." R.Doc. 1 at 9, ¶ 22. When Waste Connections itself suggested to the Court the per-plaintiff awards in this case could reach those levels, it can hardly complain that, even at the highest possible calculation, the per-plaintiff *Addison* claims are a fraction of that. (And none of this, of course, has anything to with the current Motion to Compel.)

V.     **CONCLUSION AND RELIEF SOUGHT.**

In what has become a familiar pattern in this case, Waste Connections has once again accused *Addison* counsel of wrongdoing when a careful analysis of the facts reveals quite the opposite. The current motion, which has no basis in fact or law, seeks an order compelling production of documents that are conceded to be within the work product privilege, were never the subject of a discovery request, and for which Waste Connection admitted in writing, on two occasions before filing the motion, that it did not have sufficient facts to overcome the work product privilege. The Brief is replete with statements that are false and arguments that fail a basic test of law and logic.

19

The Rules of Civil Procedure exist for a reason, and the rules relating to the confidentiality of non-testifying experts occupies a critical role in preserving the integrity of the adversary system of justice.  When, as here, the motion lacks any sort of a legal and factual basis, Waste Connections must be called to account for the cost and expense of responding to it.

The Motion should be denied, and the *Addison* Plaintiffs should be awarded their costs and expenses in having to defend it.


Respectfully submitted March 25, 2024:


                          S. Eliza James
                    Byron M. Forrest (La. Bar No. 35480)
                    Nicholas V. Cressy (La. Bar No. 35725)
                    S. Eliza James (La. Bar No. 35182)
                    FORREST CRESSY & JAMES, LLC
                    1222 Annunciation Street
                    New Orleans, Louisiana 70130
                    Tele:(504) 605.0777
                    Fax: (504) 322.3884
                    Email: byron@fcjlaw.com
                          nicholas@fcjlaw.com
                          eliza@fcjlaw.com


                          Eric C. Rowe
                    C. Allen Foster (Admitted Pro Hac Vice)
                    Eric C. Rowe (Admitted Pro Hac Vice)
                    Masten Childers, III (Admitted Pro Hac Vice)
                    James Jeffcoat (Admitted Pro Hac Vice)
                    Harry Johnson (Admitted Pro Hac Vice)
                    Lesley Cayton (Admitted Pro Hac Vice)
                    Aaron Oppegard (Admitted Pro Hac Vice)
                    WHITEFORD, TAYLOR & PRESTON, L.L.P.
                    1800 M Street, NW, Suite 450N
                    Washington, DC 20036
                    Tele: (202) 659.6800
                    Fax: (202) 331.0573
                    Email: cafoster@wtplaw.com
                          erowe@wtplaw.com

mchilders@wtplaw.com