

# Supplemental Expert Report of Barry A. Kline, P.E.

**In the Matter of:**

Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.)Project Name

**Prepared By:**

TRC

**March 4, 2024**





**EXHIBIT**

B



# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISION ET AL.,**<br>**Plaintiffs,**<br>**VERSUS**<br>**LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**<br>**Defendants.**<br>*Applies to: All Cases* | **CIVIL ACTION**<br>**NO. 19-11133**<br>**SECTION: "E" (5)** |
| | **JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

# Table of Contents

Introduction.................................................................................1

Charge......................................................................................1

Summary of Major Opinions.........................................................2

Site Setting...............................................................................3

GCCS Description.......................................................................8

Basis of Major Opinions..............................................................8

     Opinion No. 1.....................................................................8
     Basis for Opinion No. 1........................................................9
     Opinion No. 2...................................................................11
     Basis for Opinion No. 2......................................................12
     Opinion No. 3...................................................................15
     Basis for Opinion No. 3......................................................16
     Opinion No. 4...................................................................22
     Basis for Opinion No. 4......................................................22
     Opinion No. 5...................................................................36
     Basis for Opinion No. 5......................................................37
     Opinion No. 6...................................................................40
     Basis for Opinion No. 6......................................................40
     Opinion No. 7...................................................................44
     Basis for Opinion No. 7......................................................45
     Opinion No. 8...................................................................49
     Basis Opinion No. 8..........................................................49
     Opinion No. 9...................................................................55
     Basis for Opinion No. 9......................................................55

Rebuttal of Opinions Rendered by Jose Sananes and Summary
Statement...............................................................................58

Submittal Statement..................................................................59

March 4, 2024

**Table**

**Table 1**     **Comparison of 2018 and 2019 Phase IVA Gas Extraction Well Liquid Level Data…………….……………...………..46**

**Figures**

**Figure 1**     **Jefferson Parish Landfill Site Map ………………..…...………6**

**Figure 2**     **Percentage of GCCS Design Wells Installed in Phase IVA vs. Time..……………  …….……………….…..………10**

**Figure 3**     **Percentage of GCCS Design Wells Installed and with Available Vacuum in Phase IVA vs. Time………..…...………28**

**Appendix**

**Appendix A Curriculum Vitae**

**Introduction**

Barry Kline (the author of this report) is a principal remediation engineer in TRC's Environmental, Construction, and Remediation (ECR) Group in TRC's Windsor, CT office.  Mr. Kline has been a professional engineer for 27 years and currently holds professional licensures in Connecticut, Massachusetts, and New Jersey.  Mr. Kline operates, or oversees the operation of, landfill gas (LFG) collection and treatment systems and leachate pumping systems in CT and NY.  Mr. Kline has been employed at TRC for 24 years.  Mr. Kline has designed, operated, and maintained mechanical remediation systems for his entire 32-year career, including various types of oxidizers/incinerators.  For the past 22 years, Mr. Kline has operated, and overseen the operation and maintenance (O&M) of, LFG collection systems, condensate/leachate pumping systems, and LFG gas flares.  Mr. Kline has also designed LFG and leachate collection systems and components during his career.

Mr. Kline is currently overseeing the O&M of seven (7) active LFG collection and flaring systems, and provides consulting services for additional projects related to the design, capping, or operation of gas collection systems at other landfills in CT, MA, NJ, and NY.  Altogether, Mr. Kline has provided such services at over 25 landfills throughout his career.

**Charge**
I have been asked to evaluate APTIM Corporation's (APTIM's) performance as the operator of the Gas Collection and Control System (GCCS) at Jefferson Parish Landfill (JPLF), during the "Relevant Time Period", which includes the period that APTIM operated and maintained the GCCS in Phase IVA from April 2018 to May 17, 2019, relative to the limitations placed on them by the nature of the site and other parties.  The "Relevant Time Period" begins on July 1, 2017 as stated in the Findings of Fact and Conclusions of Law from the general causation trial (Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al., Civ. Action No. 18-7889 c/w 18-8071, 18-8218, 18-9312 (E.D. La.) dated November 29, 2022.  This is the beginning date for which the court ruled, "gases and odors were emitted from Phase 4A of the Landfill."  The general causation trial Findings of Fact and Conclusions ruled that the end date of Plaintiffs' claims, i.e., end of the Relevant Time Period, was December 31, 2019.  It must be noted that APTIM was only under contract to provide GCCS O&M services at JPLF until May 17, 2019.  It should be pointed out, however, that the author does reference dates and activities performed prior to July 1, 2017 and after the date when APTIM was no longer active at the site and/or the end of the general causation-defined Relevant Time Period, where

necessary, to support the opinion that APTIM performed competently and professionally at JPLF relative to the limitations place on it.

This report is to be considered a Supplemental Expert Report to my Original Expert Report dated April 30, 2021, which may be referenced in this report.

## Summary of Major Opinions

I have, after due study, and to a reasonable degree of scientific and engineering certainty, rendered the following opinions:

**Opinion No 1:**    APTIM was only provided with a partially-installed GCCS to operate in Phase IVA and the timing of its installation and expansion was outside of APTIM's control.

**Opinion No. 2:**    APTIM was not responsible for the receipt of waste materials, waste placement, waste processing, or waste solidification, including the deposition or use of materials, such as spent lime or fly ash, that may have led to the increased concentrations of hydrogen sulfide ($H_2S$) within the landfill gas being generated.

**Opinion No. 3:**    APTIM did not have control over the design of the GCCS in Phase IVA nor did APTIM have control over the timing of installation of various GCCS components, such as gas extraction wells and collection system piping. Additionally, APTIM could only operate the partially-installed GCCS in the condition and configuration provided to it by Jefferson Parish.

**Opinion No. 4:**    APTIM did not have control over various limitations placed on the GCCS operation by others, especially when circumstances beyond APTIM's control, such as limited vacuum and vacuum interruptions to the wellfield, further impeded GCCS operation. Such restrictions limited optimization of the GCCS operation and its ability to capture the landfill gas being produced within the landfill by the breakdown of waste materials.

**Opinion No. 5:**    APTIM's work at JPLF was limited by Contract/Agreement provisions and language to specific tasks. Additionally, the Contract/Agreement further limited APTIM's efforts by placing restrictions on the amount of time/effort O&M personnel could

March 4, 2024

2

spend working on the GCCS, including being subject to Jefferson Parish's approval for all non-routine GCCS work and limits on spending relative to expenses necessary for the Operation and Maintenance tasks.

**Opinion No. 6:**   APTIM did not have control over the leachate levels in Phase IVA that allegedly impaired the operation of the GCCS.

**Opinion No. 7:**   APTIM did not have control over the timing of the purchase and installation of the in-well leachate/condensate pumps in Phase IVA gas wells, or in other phases.   APTIM did operate and maintain pneumatic pumps, once installed, in gas wells throughout the landfill.

**Opinion No. 8:**   APTIM did not have control over the specification, procurement, inspection, or placement of landfill cover materials. APTIM was not contracted to maintain any cover materials in any of the Phases of the landfill.   APTIM only inspected landfill cover materials in conjunction with performing NSPS-required Surface Emissions Monitoring on a quarterly basis.

**Opinion No. 9:**   Ambient and environmental monitoring for odors onsite and offsite was outside the scope of APTIM's contract with Jefferson Parish.   Instead, IESI/Waste Connections' Agreement with Jefferson Parish required it to monitor for and control odors.

**Site Setting**

JPLF is located in the Parish of Jefferson, LA with the address given as 5800 US-90 W, Avondale, LA.  JPLF was opened by the Parish Council in 1982 reportedly to serve the residents of Jefferson Parish. The landfill consists of approximately 357 acres separated into four phases.  Two of the phases, phases III, and IV, are further divided into A and B subsections (i.e. Phase IIIA, IIIB, IVA, and IVB).  The most recently active phase of the landfill, Phase IVA, is reportedly 55 acres in size. Based on the last available data reported on the JPLF website (circa 2021), the landfill reportedly received approximately 1,000 tons per day of residential, commercial and construction debris waste generated from within Jefferson Parish[1].   There are

---

[1] Wasteconnections.com/jefferson-parish-landfill

March 4, 2024                                                                                                     3

approximately 110 acres available for future expansion. The Jefferson Parish Landfill is publicly owned, and landfill operation was contracted to Louisiana Regional Landfill Company (LRLC), formerly known as IESI LA Landfill Corporation, and later Waste Connections, Inc. (merger involving New Waste Connections - formerly Progressive Waste Solutions, Ltd. - and Waste Connections US, Inc. in 2016), until December 31, 2020. Operation of the facility's GCCS and leachate control systems are also operated by firms under contract with Jefferson Parish. A general description of a GCCS is provided in this report under the section entitled "GCCS Description".

As described above, the landfill has been constructed in multiple phases. Each individual Phase is described in greater detail below.

**Phase I** is approximately 75 acres in area and was reportedly the first phase to receive waste starting in 1982. Phase I was reportedly closed in 1997 and capped with two feet of clay, with a GCCS installed in 2000. From August 2017 through APTIM's departure from the site in May 2019 there were 47 operable vertical gas wells in the Phase I GCCS[2]. As of December 2020, the last monthly data reviewed by the author, there were reportedly 50 operable vertical gas wells in the Phase I GCCS[3].

**Phase II** is approximately 78 acres in area and reportedly began receiving waste in 1988. Phase II was reportedly closed in 1993 and capped with two feet of clay, with a GCCS installed in 2000. From August 2017 through APTIM's departure from the site in May 2019 there were 31 operable vertical gas wells in the Phase II GCCS[4]. As of December 2020, there were still reportedly 31 operable vertical gas wells in the Phase II GCCS[5].

**Phase IIIA** is approximately 88 acres in area and reportedly began receiving waste in 1998. Phase IIIA was reportedly closed in 2013 and capped with a geosynthetic cap system, including a geomembrane (approximately 73 acres) and interim cover (approximately 15) acres, with a GCCS installed from 2005 to 2007. From August 2017 through APTIM's departure from the site in May 2019 there were 70 operable

---

[2] Operations & Maintenance Monthly Reports, August 2017 and May 2019, CB&I/APTIM (APTIM-0003032, 0180403)
[3] Kelvin – Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending December 3, 2020, River Birch LLC
[4] Operations & Maintenance Monthly Reports, August 2017 and May 2019, CB&I/APTIM (APTIM-0003032, 0180403)
[5] Kelvin – Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending December 3, 2020, River Birch LLC

vertical gas wells in the Phase IIIA GCCS[6].  As of December 2020, there were still reportedly 70 operable vertical gas wells in the Phase IIIA GCCS[7].

**Phase IIIB** has historically been reported as between 46 and 61 acres (a review of site mapping shows approximately 61 acres) in area and reportedly began receiving waste in 2005.  Phase IIIB was reportedly closed in 2013 and capped with a geosynthetic cap system, including a geomembrane (approximately 46 acres) and interim cover (approximately 15) acres, with a GCCS installed from 2014 to 2015. From August 2017 through APTIM's departure from the site in May 2019 there were reportedly 57 operable vertical gas wells in the Phase IIIB GCCS[8].  As of December 2020, there were reportedly 75 operable vertical gas wells in the Phase IIIB GCCS[9].

**Phase IVA** is approximately 55 acres[10] in area and was the active area of the landfill (receiving waste) during the Relevant Time Period (July 1, 2017 through December 31, 2019) addressed by the Findings of Fact and Conclusions of Law from the general causation trial.

Phase IVA reportedly began receiving waste in 2013.  During the Relevant Time Period, areas of Phase IVA had reportedly received daily and interim cover, with installation of GCCS wells beginning in 2018.  The first nine vertical gas wells were brought online with monitoring initiated in April 2018.  An additional six gas wells were brought online in May 2018, and two horizontal collectors were added in June 2018.[11]  Connections to two leachate risers were added to the GCCS in 2018 with the first monitoring of the risers being reported in December 2018.  An additional leachate riser was reportedly connected to the GCCS in January 2019.  At the time of APTIM's departure from the site in May 2019, there were 22 vertical gas wells, two horizontal collectors, and three connections to leachate risers[12] being operated in Phase IVA.  As of December 2020, there were reportedly 51 vertical gas wells

---

[6] Operations & Maintenance Monthly Reports, August 2017 and May 2019, CB&I/APTIM (APTIM-0003032, 0180403)

[7] Kelvin – Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending  December 3, 2020, River Birch LLC

[8] Operations & Maintenance Monthly Reports, August 2017 and May 2019, CB&I/APTIM (APTIM-0003032, 0180403)

[9] Kelvin – Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending  December 3, 2020, River Birch LLC

[10] Wasteconnections.com/jefferson-parish-landfill

[11] Operations and Maintenance Monthly Report, APTIM, December 2018 (ATPIM-0021449)

[12] Operations and Maintenance Monthly Report, APTIM, May 2019 (ATPIM-0180403)

and 21 horizontal collectors operable in the Phase IVA GCCS.[13]   The total number of connected leachate risers was not reported.

**Phase IVB** is reportedly between 110 and 113 acres and was permitted for future waste acceptance.

A site map of JPLF is shown on **Figure 1** below.



**Figure 1 – Jefferson Paris Landfill Site Map**

The Findings of Fact and Conclusions of Law from the general causation trial stated, "*The Plaintiffs have proven by a preponderance of the evidence that gasses and odors were emitted from phase 4A of the Landfill.*"

Available data also supports the assertion that Phase IVA has the greatest potential to emit odors. Since hydrogen sulfide ($H_2S$) is known to be an odorous gas, is known to be present in significant concentrations in the LFG at JPLF, and, based on sampling of the LFG at JPLF by multiple entities, $H_2S$ is known to constitute the highest concentration of all the potential odorous gasses present or being emitted at the site [14,15,16], $H_2S$ will be the focus (serve as a surrogate) of the odor causing

---

[13] Kelvin – Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending December 3, 2020, River Birch LLC

[14] Surface Pollutant Concentration Measurements at the Jefferson Parish Landfill – Supplemental Data Report, SCS Engineers, July 10th, 2019, WC_JPLF_00210732

[15] Collection of Landfill Gas Collection Well Samples, TRC, August 20, 2020

[16] Landfill Gas Sampling Data Report, Ramboll U.S. Corporation, January 2020

compounds discussed in this report. When viewed in the context of $H_2S$ as the major odor causing compound of concern, and when viewing the concentrations of $H_2S$ in the various Phases as documented in multiple studies[17,18,19], it is clear that the highest concentrations of $H_2S$ present at the site, at the ground surface or in gas extraction wells, by at least an order of magnitude, and in some cases many orders of magnitude, are present in Phase IVA. Phase IVA was also the Phase with active landfilling and had not received a final cap during the Relevant Time Period.

Surface emissions monitoring (SEM) was conducted at Jefferson Parish Landfill by APTIM[20], Carlson Environmental Consultants, PC (CEC)[21], and River Birch landfill personnel[22]. Based on the SEM, the majority of the exceedances, indicating the potential emissions of LFG (including odorous gasses such as $H_2S$) through the cover materials at the surface of the landfill, were found in Phase IVA. Exceedances were considered to be detections of methane concentrations greater than 500 parts per million (ppm). It should be noted that SEM is only required in areas where the GCCS is installed, per New Source Performance Standards (NSPS) found in 40 CFR Part 60. Also, per NSPS, areas unsafe for monitoring, *"dangerous areas"*, such as the landfill working face, *"may be excluded from surface testing"*. So certain areas in Phase IVA, that may have been emitting LFG, would not have been monitored, as allowed by NSPS. It should also be noted that, in the case of CEC's monitoring, a threshold methane concentration of 200 ppm was utilized during the surface scans.

For the various reasons mentioned above (including the court's ruling that *"The Plaintiffs have proven by a preponderance of the evidence that gases and odors were emitted from phase 4A of the Landfill"*), since the court did not mention any other phases of the landfill, and since only a partial GCCS was available in Phase IVA during APTIM's time working onsite, Phase IVA will be the primary focus of this report.

---

[17] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[18] Collection of Landfill Gas Collection Well Samples, TRC, August 20, 2020

[19] Landfill Gas Sampling Data Report, Ramboll U.S. Corporation, January 2020

[20] NSPS Surface Emissions Monitoring at Jefferson Parish Landfill – 3rd Quarter 2018, October 5, 2018, APTIM-0002973, - 4th Quarter 2018, December 28, 2018, APTIM-0005055, 1st Quarter 2019, March 11, 2019, APTIM-0005037

[21] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[22] SEM Reports 2nd, 3rd, and 4th Quarter 2019, River Birch (JP_JPLF_0003465, JP_JPLF_00742761)

**GCCS Description**

During the Relevant Time Period, JPLF employed an "active" GCCS. An "active" GCCS typically utilizes a blower or other means to mechanically create a vacuum, which is applied to vertical gas extraction wells and other collectors. The applied vacuum creates a negative pressure gradient from the waste towards the gas well or collector which induces the flow of LFG through the waste materials toward the extraction wells and collectors. The wells and collectors include sections of slotted pipe (or perforated pipe, referring to holes drilled in the pipe) which, when installed in drilled borings or excavated trenches filled with permeable backfill materials allow the LFG to be drawn into the extraction system components from the waste mass. The wells and collectors typically include an impermeable seal in the well borehole or trench to prevent ambient air from "short-circuiting" or being pulled directly into the wells or collectors as vacuum is applied. The collected LFG is then typically routed through a wellhead containing a manual flow control valve and sample ports, a series of lateral and header pipes, moisture/liquid removal equipment and/or other gas pre-treatment components, and ultimately to a device which combusts the LFG. At JPLF from July 2017 through May 2019, the gas was routed to an onsite compressor station for treatment prior to resale offsite for use as fuel at the Cornerstone Chemical facility, to an onsite flare system for combustion, or both the flare and compressor station. Approval from Jefferson Parish for Aptim to run the flare as a continuous source of vacuum, at the same time the compressor station was running, did not occur until September 2018. The compressor station was initially operated by Renovar, Inc. (Renovar) and reportedly, beginning later in 2018, by River Birch personnel. It was also reported that beginning in early 2019, the GCCS was interconnected to the River Birch Gas Plant. However, APTIM personnel reported that no gas had been transferred to the River Birch Gas Plant prior to May 17, 2019.

**Basis of Major Opinions**

**Opinion No. 1:**

*APTIM was only provided with a partially-installed GCCS to operate in Phase IVA and the timing of its installation and expansion was outside of APTIM's control.*

**Basis for Opinion No. 1:**

Per multiple sources, including a May 30, 2018 letter[23] from Mr. Rob Nielson of Waste Connections to Mr. Keith Conley the Chief Operating Officer of Jefferson Parish, and per CEC[24], waste placement in Phase IVA began on May 1, 2013. As described previously, the trial-related Relevant Time Period begins on July 1, 2017 as stated in the Findings of Fact and Conclusions of Law from the general causation trial. The July 1, 2017 date will therefore be considered the earliest potential start date for APTIM's involvement at Phase IVA relative to the general causation trial findings. However, APTIM did not have a GCCS to operate in Phase IVA until April 2018 as described hereafter. While Phase IVA started receiving waste in 2013, the operation of the GCCS did not begin until 2018. The general causation trial Findings of Fact and Conclusions ruled that the end date of the Plaintiffs' claims was December 31, 2019. The end of APTIM's involvement relative to the Complaint, however, was May 17, 2019, which was the last day that APTIM was under contract to provide GCCS O&M services at JPLF. This means that, of the 30 months (July 2017 through December 2019) addressed by the general causation findings relative to Phase IVA, APTIM only had a GCCS to operate and maintain in Phase IVA for approximately 13.5 months (April 2018 through May 17, 2019). Stated another way, APTIM was not active for 16.5 months (30 – 13.5), or 55% (16.5/30) of the Relevant Time Period, and, by inference, during these 16.5 months it is not possible that APTIM could have had any potential impact on the emission of odorous compounds from Phase IVA.

Using, in part, the dates described above, the timeline of APTIM's involvement in Phase IVA, relative to its operation of the GCCS at Phase IVA, can be further developed. APTIM could not begin operating the first nine (9) gas extraction wells of the GCCS in Phase IVA until April 2018 because Jefferson Parish did not begin the installation of any wells in Phase IVA until early 2018. This equates to nine (9) wells available (9/32) or 28% of the total planned Phase IVA wells being available for extraction as of April 2018. From May 2018 through January 2019, a total of fifteen wells had been installed and made operable. This equates to fifteen wells available (15/32) or 47% of the total planned Phase IVA wells being available for extraction during this period. As of February 2019, seven (7) additional wells were installed and made operable. During the final three-and-a-half (3½) months (February 2019 through mid-May 2019), APTIM operated the partially-installed GCCS in Phase IVA that still only had approximately (22/32) or 69% of the total

---

[23] Letter from Rob Nielson of WCI to Keith Conley of Jefferson Parish, May 30, 2018, JP_JPLF_00074435
[24] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

number of proposed Phase IVA gas extraction wells installed and operating. See Major Opinion No. 3 for additional discussion regarding the installed versus planned Phase IVA wells. Refer to Figure 2 below for a graphical representation of this data.



**Figure 2 – Percentage of GCCS Design Wells Installed in Phase IVA vs. Time**

This figure clearly shows the limited nature of the GCCS that was available for APTIM to operate in Phase IVA during the Relevant Time Period. If all the design prescribed wells had been installed and available for APTIM to extract gas, the graphed line on Figure 2 would be at the 100% level from July 2017 through May 17, 2019. Please note that Figure 2 is actually a best-case scenario, showing the number of wells installed and potentially operable. This Figure does not account for the times when conditions at the site, beyond the control of APTIM, caused the loss of vacuum to various gas extraction wells (as described in Basis for Opinion No. 4). An additional depiction of this data, including vacuum loss considerations, for Phase IVA, is included as Figure 3 in Basis for Opinion No. 4.

It should be noted that by May 14, 2020, approximately one year after APTIM was off the site, the GCCS system had been expanded such that LFG was being extracted from 51 gas wells in Phase IVA[25]. It should also be noted that by July 9, 2020 the system had been expanded further and LFG was being extracted from 51 gas

---

[25] Kelvin-Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending 5.14.20

collection wells plus twenty-one horizontal collectors in Phase IVA[26]. This was a substantial increase in the number of gas collection components installed in Phase IVA after APTIM was no longer active at JPLF (May 17, 2019) and stands in stark contrast to the partially-installed GCCS that APTIM was provided to operate. If the 51 gas extraction wells and 21 horizontal collectors wells are considered the completed GCCS system in Phase IVA, one must bear in mind that APTIM only operated the partially-installed GCCS in Phase IVA from April 2018 through May 17, 2019, or 13½ months, with only 18% (9/51) to 43% (22/51) of the gas wells and only 10% (2/21) of the horizontal collectors installed and operable in Phase IVA (not including the additional reduction in operable wells caused by a loss of vacuum).

It is clear that APTIM's role in Phase IVA was limited based on the short duration of time spent onsite operating the Phase IVA GCCS and based on the limited scale of the partially-installed GCCS during the period when APTIM was onsite. Other various circumstances, beyond APTIM's control, further hindered its ability to optimize GCCS operation (as described in other Bases for Opinion below). Jefferson Parish confirmed the premise of APTIM's limited presence onsite relative to operation of the GCCS in Phase IVA during the December 1, 2020 deposition of Mr. Michael Lockwood who was the Jefferson Parish Director of the Department of Environmental Affairs during the Relevant Time Period. Mr. Lockwood stated, when referring to APTIM's time onsite in Phase IVA during the Relevant Time Period, *"the gas system didn't go into effect into 4A during the whole time period."*[27] Mr. Lockwood also described that only a limited number of gas extraction wells were provided to APTIM.[28]

**Opinion No. 2:**

*APTIM was not responsible for the receipt of waste materials, waste placement, waste processing, or waste solidification, including the deposition or use of materials, such as spent lime or fly ash, that may have led to the increased concentrations of hydrogen sulfide (H₂S) within the landfill gas being generated.*

---

[26] Kelvin-Jefferson Parish Landfill Summary, O&M Summary (Gas Field) – Week Ending 7.9.20
[27] December 1, 2020, Michael Lockwood deposition, page 145, lines 3 through 5
[28] December 1, 2020, Michael Lockwood deposition, page 145, lines 5 through 13

**Basis for Opinion No. 2:**

APTIM's Agreement with Jefferson Parish[29], dated December 28, 2015, stipulated, in Section 2.0 and Exhibit B, the Scope of Work to be performed by APTIM at JPLF. Nowhere in the Agreement, or elsewhere in communications or documentation reviewed by the Author, between APTIM and Jefferson Parish, or between APTIM and Jefferson Parish subcontracted companies, was APTIM directed to take responsibility for any portion of the waste management activities at JPLF.

The entity responsible for the waste acceptance is identified in Jefferson Parish's Agreement with IESI dated May 17, 2012. Section II.B.4 is entitled "Waste Accepted at Landfill". This section includes the following sentence, "*IESI shall accept and dispose of all Residential Solid Waste from Unincorporated Jefferson Parish and all Residential Solid Waste collected through the Parish's collection contracts.*" Additional language in the Agreement further describes the waste materials that IESI can accept and applicable acceptance criteria and protocols. [30] This clearly indicates that waste acceptance at Jefferson Parish Landfill was the responsibility of IESI n/k/a Waste Connections.

An additional confirmation that APTIM did not have control over waste management at JPLF is supported by CEC when it stated, "*Jefferson Parish may consider modifying the permitting and/or construction of future waste cells to allow increased waste depths and/or more effectively coordinating efforts between the landfill waste operations and the landfill gas collection to provide the most effective landfill gas recovery.*" [31] This, again, clearly indicates that the operation of the GCCS was a separate task from the waste management operations.

Several additional lines of evidence, provided by Jefferson Parish, confirm that APTIM did not manage wastes at JPLF. Throughout Mr. Lockwood's December 1, 2020 deposition, when asked about waste management at JPLF he indicated that Waste Connections was the operator of the landfill and was responsible for waste management and documentation[32]. During the November 20, 2020 Deposition of Mr. O'Connor of Waste Connections, he confirmed that as "*the landfill operator*", LRLC [Waste Connections], "*...manage...accept and...dispose of waste at the*

---

[29] Agreement Between the Parish of Jefferson and CB&I Environmental &Infrastructure, Inc., December 18, 2015, ADD_P00105777
[30] Jefferson Parish Agreement with IESI LA Landfill Corporation, May 17, 2012
[31] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[32] December 1, 2020, Michael Lockwood deposition, page 33 lines 10 through 12, page 42 lines 7 and 8, page 45 lines 20 through 25

March 4, 2024                                                                                                                          12

*landfill.*"[33]  During his December 2, 2020 deposition, Mr. Buller described the waste acceptance process utilized by Jefferson Parish and IESI/Waste Connections.  None of the waste acceptance steps described by Mr. Buller in any way involved APTIM[34].

Waste management is a critical item to consider since the types and placement of wastes, along with processes used in waste placement, processing, or solidification, can result in the creation of unexpectedly high quantities of odorous compounds, including $H_2S$, generated within the landfill gas.  Such odorous gasses can be emitted from the landfill as fugitive emissions.  As noted previously, APTIM was only active for a limited time in Phase IVA and was only provided with a partially-installed GCCS to operate.   Therefore APTIM's potential ability to impact odorous gas emissions was limited.

There is no documentation that APTIM was made aware of the elevated concentrations of $H_2S$ within the landfill gas in Phase IVA until after the Landfill Gas Assessment report by CEC[35] was issued.  It should be noted that CEC was originally retained by Jefferson Parish to provide an assessment of the JPLF GCCS and eventually CEC was contracted by Jefferson Parish to "*provide engineering oversight and assistance to all matters affecting Jefferson Parish Landfill's gas collection system...*"[36]

Mr. Buller provided a concise explanation of how the waste processing and placement at JPLF impacted the emissions of odorous gasses from the landfill.  In a July 2, 2018 email from Mr. Buller to Mr. Brett O'Connor of Waste Connections/LRLC, Mr. Buller writes, "*Now we are of the opinion that the sulfates added to waste through the lime or fly ash solidification agent is increasing the production of $H_2S$ within the buried waste.*" [37]  When discussing this email during his December 2, 2020 deposition, and being asked, "*And you are talking about containing and limiting the odors from the landfill.  Correct?*"  Mr. Buller responded, "*Yes.*"  When further asked, "*What odors specifically were you referring to?*", Mr. Buller answered, "*Specifically, I was referring to the hydrogen sulfide that was escaping.*" [38]  In a November 2019 interview, Mr. Buller, then identified as the former Jefferson Parish landfill engineer responsible for overseeing the operation of

---

[33] November 20, 2020, Brett O'Connor deposition, page 35 line 6 and lines 11 through 14

[34] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 19 lines 8 through 24

[35] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[36] Email from Mike Lockwood of Jefferson Parish to Kris Carlson of CEC, February 28, 2019, APTIM_0229779

[37] Email from Rick Buller of Jefferson Parish to Mr. Brett O'Connor of Waste Connections, July 2, 2018, WC_JPLF_00223312

[38] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 90 lines 4 and 5

JPLF, stated *"It was my mistake."*, referring to the receipt of hydrated lime waste at JPLF.  When asked where the odors came from, he stated, *"I think it goes back to the hydrated lime."*  The assertion of waste degradation of certain compounds leading to the formation of odorous gasses, including $H_2S$, was supported by CEC when it stated, *"Fly ash sometimes contains soluble sulfates that when mixed with water in conditions commonly found in MSW landfills can produce $H_2S$ gas. See attached in Exhibit 15 a study by Jeff Marshall, P.E. with SCS Engineers that describes this process. The $H_2S$ emissions noted at the facility were in the areas where the fly ash and lime were used. No $H_2S$ emissions were noted outside of these areas. CEC recommends that the Parish review their waste composition, the solidification materials and process, and any other operation factors that may be contributing to $H_2S$ generation in Phase IVA."*[39]  Additionally, CEC, in the same report expanded upon the waste acceptance program when it wrote, *"CEC believes the $H_2S$ may be from the lime and fly ash solidification process…"*  [40]  When further discussing his report findings, Mr. Kristofer Carlson of CEC, in a June 11, 2018 email responding to Mr. Buller's question, *"Why do you think the $H_2S$ is so high?*  writes, *"I think the high $H_2S$ is related to the waste mixture and fly ash.  The site is in the max $H_2S$ generation stage in that area."* [41]

During his December 2, 2020 deposition, Mr. Buller was questioned about his July 3, 2018 email to Mr. John Perkey, the Associate General Counsel – Director of Compliance for Waste Connections.  In that email, Mr. Buller wrote, *"The permit modification doesn't address the problem of long-term odors generated by the solidified waste.  It states that the wastes generating odors will be covered immediately.  And...that is a short-term solution, but we are concerned with odors being generated by wastes after they were buried."* [42]  When asked to explain the difference between "short-term" versus "long-term" odors, Mr. Buller stated, *"Our -- all MSW landfills, which Jefferson Parish is a municipal solid waste landfill, are required to cover their garbage at the end of every working day...And that is what we referred to as the short-term solution. That is to mitigate any odors escaping from the -- any wastes that had been dumped in the landfill on that day."*  When describing the long-term odor issues associated with waste, Mr. Buller stated, *"At this point I believe the problem was from wastes that had been buried even a couple years earlier, that had been going through this long biochemical reaction within the*

---

[39] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[40] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[41] Email from Kris Carlson of CEC to Rick Buller of Jefferson Parish, June 11, 2018, JP_JPLF_00075216
[42] Email from Rick Buller of Jefferson Parish to John Perkey of Waste Connections, July 3, 2018 WC_JPLF_00270000

landfill and now generating hydrogen sulfide and other gases, you know, from deep within the landfill." He agreed that the concern for long term odors were in Phase IVA. When addressing the effect of the daily cover materials relative to the gasses being generated from waste materials placed deeper within the landfill, Mr. Buller responded, "…it's not a permanent cover, if you will. It is for temporary controls." He also added, "…its just not going to be a permanent solution for that." [43]

The Jefferson Parish government also acknowledged the importance of waste management, relative to potential odor generation, when the Jefferson Parish Council passed a moratorium on taking any industrial waste, solid or liquid, and solidifying wastes starting July 25, 2018. [44, 45]

As stated previously, the court determined that "gases and odors were emitted from Phase 4A of the landfill" in the general causation trial Findings of Fact and Conclusions. Please note that the Author is not offering an independent opinion regarding what types of waste were accepted at Jefferson Parish, or which wastes potentially produced or emitted odorous gasses, including $H_2S$. Jefferson Parish personnel and engineers provided their opinion on that matter. The Author has, however, provided evidence that APTIM did not have any control regarding the management of wastes at JPLF including waste acceptance, waste receipt, waste solidification, waste processing, or waste placement, and therefore had no control over any potential odor generation, including $H_2S$, from such wastes.


**Opinion No. 3:**

*APTIM did not have control over the design of the GCCS in Phase IVA nor did APTIM have control over the timing of installation of various GCCS components, such as gas extraction wells and collection system piping. Additionally, APTIM could only operate the partially-installed GCCS in the condition and configuration provided to it by Jefferson Parish.*

---

[43] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 78 lines 8 through 11, 13 through 16, and 18 through 24, page 79 lines 19 through 17, and page 80 lines 2 and 3

[44] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, Jefferson Parish, August 6, 2018, JP_JPLF_0020128

[45] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 18 lines 22 and 23, page 19 line 1, page 31 lines 5 through 7

**Basis for Opinion No. 3:**

APTIM's Agreement with Jefferson Parish, dated December 28, 2015, stipulated, in Section 2.0 and Exhibit B, the scope of work to be performed by APTIM at JPLF. Nowhere in the Agreement, or elsewhere in communications or documentation, reviewed by the Author, between APTIM and Jefferson Parish, or between APTIM and Jefferson Parish subcontracted companies, was APTIM directed to take responsibility for any portion of the formal design of the GCCS at JPLF. Section 2.0, the "Scope of Agreement" in APTIM's Agreement with Jefferson Parish states that APTIM, "shall provide Landfill Gas Collection and Control System Operation and Maintenance Services for the Jefferson Parish Sanitary Landfill." Even within the "Technical Support" paragraph (subsection 1.1.4 of Exhibit B of the Agreement), "Non-Routine Work" (paragraph 1.2 of Exhibit B of the Agreement), or "Emergency Services" (paragraph 1.3 of Exhibit B of the Agreement), the scope was limited to O&M services with no specific mention of design or major construction responsibilities.

A GCCS design for Phase IVA Cells 20 through 25 was completed in 2017 by Golder Associates (Golder)[46]. Several revisions of the design of Phase IVA were also prepared by Golder in 2017 and 2018. Revision to the design of gas collection in Phase IVA was discussed further in a July 26, 2018 email from Mr. Buller to Angela Scheuer of LDEQ in which Mr. Buller states, "*In the meantime, we have requested a revised design of the expansion to include the areas where we have identified gas seeps, including the one well outside the footprint of the current design (a couple hundred feet). It is in an area that has waste that is only 2 years old.*"[47] Additionally, it should also be noted that a revised GCCS design for Phase IVA was completed by Carlson in May 2019 as part of their High BTU Landfill Gas Utilization Plan[48]. Various engineering plans were also prepared by Franklin Engineers & Consultants (FE&C).

In a May 30, 2018 email from Mr. Conley to Mr. Lockwood, Mr. Conley, when referring to other options to reduce odors writes, "*Other options include running more jumper lines, sealing more soil cracks, and adding more wells.*"[49] Designing

---

[46] Landfill Gas Collection and Control Plan, Jefferson Parish Sanitary Landfill, Phase IVA, Golder Associates, January 2017 (APTIM 9090)
[47] Email from Rick Buller of Jefferson Parish to Angela Scheuer of LDEQ, July 26, 2018, WC_JPLF_49543 from the December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 140 lines 24 and 25, and page 141 lines 1 through 4
[48] High BTU Landfill Gas Utilization Plan for Jefferson Parish Landfill, Carlson Environmental Consultants, PC, May 7, 2019 (PB_PBLF_0019496)
[49] Email from Keith Conley of Jefferson Parish to Mike Lockwood of Jefferson Parish, May 30, 2018, JP_JPLF_00075661

such modification and changes to the landfill and GCCS, such as the need for additional wells and jumper lines around bellies (low spots in piping), were not part of APTIM's scope. Again, simply stated, APTIM was responsible for the O&M of the GCCS that was available onsite for it to operate, that was designed by others, and principally installed by others, except for the seven gas (7) gas extraction wells installed in January 2019 and the limited jumpers Jefferson Parish requested APTIM to install. Regarding engineering required for these tasks completed by APTIM, Mr. Lockwood stated, *"Franklin Engineers provided the engineering component to these efforts."* [50]

The Jefferson Parish Council understood that significant changes to the infrastructure of the GCCS were required. During a Council meeting on September 19, 2018, Jefferson Parish Environmental Affairs Director Mr. Mike Lockwood stated, *"We continue to aggressively repair and upgrade the water or leachate collection system at the landfill and the gas collection system."* Mr. Lockwood further stated, *"We were continuing the improvements and the repairs to the infrastructure with the ultimate goal to get the gas, any fugitive emissions of gas from the landfill under control....work still continues."* Mr. Lockwood then stated, *"We were the first ones to raise our hands and say that we have infrastructure issues at the landfill."* Perhaps most striking was when Mr. Lockwood stated, *"We have infrastructure problems at the landfill that is inhibiting the efficient and effective collection of gas...Everything we are doing right now is to improve the efficiency of gas collection."* [51] The magnitude of the required infrastructure improvement was further defined when the Jefferson Parish Council, on October 2, 2019, approved Amendment No. 7 to Renewable Energy of Jefferson, LLC's contract which, *"authorizes approximately $5 million dollars in upgrades and new gas collection infrastructure in Phases IVA and IIIB of the Jefferson Parish Sanitary Landfill."* [52] This understanding of, and action by, the Jefferson Parish government demonstrates that the issue was not one of performance by the GCCS operation and maintenance contractor, but the central issue was inadequate system infrastructure.

The required GCCS infrastructure upgrades were described in CEC's High BTU Landfill Gas Utilization Plan. [53] Within the plan CEC describes one of the benefits of the upgrades, in this case an increased wellfield density (more gas extraction wells) as *"reduced LFG related odors."* [54] In the same document, CEC also states

---

[50] Email from Mike Lockwood of Jefferson Parish to Kris Carlson of CEC, February 28, 2019, APTIM_0229779

[51] Jefferson Parish Council Meeting Video Recording, Jefferson Parish, September 19, 2018, www. Jeffparish.tv

[52] Letter from Mike Lockwood of Jefferson Parish to LDEQ, October 8, 2019, JP_JPLF_0014165

[53] High BTU Landfill Gas Utilization Plan for Jefferson Parish Landfill, CEC, May 7, 2019 (PB_PBLF_0019496)

[54] High BTU Landfill Gas Utilization Plan for Jefferson Parish Landfill, CEC, May 7, 2019 (PB_PBLF_0019496)

that the upgrades in Phase IIIB and Phase IVA, considered Stage 1 of the system upgrades/expansion, offers the, "*largest potential odor reductions.*"    CEC also states, "*it is evident that the LFG collection system in Phase IVA is underperforming and may require additional collectors and other modifications to effectively control the H2S emissions.*"

When responding to their own rhetorical question, "*Does Jefferson Parish have to make additional LFG System upgrades in 2019 for reasons other than high BTU?*", CEC responds, "*Yes.*"    CEC then goes on to describe the "*poor condition*" of the system infrastructure causing extraction wells in Phase IIIB and Phase IVA to have no available vacuum.  CEC further states that, "*the long-term fix for the problems in Phases IIIB and IVA involve the installation of new infrastructure*" and "*Additional LFG system modifications to correct...odor reductions...are also likely to be required in 2019 and should be evaluated to be included in the next LFG collection system expansion.*"[55]    In this same report CEC describes the significant amount of investment required, with a recommended $3.5 million dollars in infrastructure upgrades.  In a November 6, 2019 Landfill Gas Update presentation, CEC revised this estimate upward to approximately $5 million dollars. [56]  Please note that, as mentioned previously, this was the approximate amount approved for the infrastructure upgrades by the Jefferson Parish Council.  During their November 6, 2019 presentation, the reason given by CEC for the upward revision in the cost estimate was, "*more infrastructure was determined to be unusable and in need of replacement in Phase IVA.*"  As stated previously, APTIM did not design or specify the Phase IVA GCCS infrastructure that was provided to it by Jefferson Parish.

As mentioned in Basis of Opinion No. 1, only a limited number of gas extraction wells were available to APTIM in Phase IVA during the time APTIM was active onsite.  To understand the nature of these limitations one must understand the area where waste had been placed in Phase IVA, the number of gas extraction wells planned for Phase IVA, the actual number of gas extraction wells installed, and the timing of the well installations.

Both Mr. Buller and Mr. Lockwood indicated that waste, during the Relevant Time Period, was being placed in Cells 20 through 22 in Phase IVA.  During his December 2, 2020 deposition, when asked, "*So from the relevant time period of January 2015 through your departure* [July 27, 2018], *the only place that waste was being deposited was cells 20, 21 and 22?*",  Mr. Buller answered, "*Correct.*"[57]  In the same

---

[55] High BTU Landfill Gas Utilization Plan for Jefferson Parish Landfill, CEC, May 7, 2019 (PB_PBLF_0019496)
[56] Landfill Gas Update presentation, CEC, November 6, 2019
[57] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 64 lines 8 through 11

deposition when asked, "*So all of the lime and fly ash that was accepted from October 2016 through July of 2018 would have been deposited into Phase 4A cells 20, 21 and 22?*", Mr. Buller answered, "*Right...*" [58]  When asked, "*And based on your experience which cells were generating the highest -- the most smell?  Of H2S.*", Mr. Buller responded, "*... cells 20, 21, 22.*" [59]  Mr. Buller was further questioned, "*And based on your observation, any observations of the Jerome meter you took with you, you realized that the highest amounts of H2S were coming from cells 20, 21 and 22?*", Mr. Buller answered, "*Yes.*" [60]  Mr. Buller stated, as previously mentioned, "*At this point I believe the problem was from wastes that had been buried even a couple years earlier, that had been going through this long biochemical reaction within the landfill and now generating hydrogen sulfide and other gases, you know, from deep within the landfill.*" [61]  When asked, "*And these long-term concerns about odors was in Phase 4A. Correct?*"  Mr. Buller answered, "*Yes.*"  When questioned further and asked, "*Cells 20, 21 and 22.  Correct?*  Mr. Buller answered, "*Yes.*" [62]

Also, when questioned relative to the disposal and location of H2S generating materials, Mr. Buller was asked, *"...was your thought also directed by your knowledge of amount of lime and constituency of the lime that was deposited in Cells 20, 21 and 22, the same place where you were detecting high levels of hydrogen sulfide?"*, and Mr. Buller answered, "*Yeah. That was my train of thought.*" [63]  Mr. Lockwood stated a similar response when asked about waste placement.  During his December 1, 2020 deposition, when asked, "*So the waste identified here that was only two years old, that meant waste that was in either Cell 20, 21, 22, or a combination thereof.  Correct?*"  Mr. Lockwood answered, "*Yes, Sir.*" [64]

Based on this information provided by Jefferson Parish personnel relative to the deposition of wastes or odor emissions, Cells 20 through 22 were the focus of the GCCS evaluation in Phase IVA. These cells, or portions thereof, were used to define the number of gas extraction wells that were planned for Phase IVA, the actual number of gas extraction wells installed, and the timing of the well installations.

[58] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 64 lines 13 through 17
[59] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 64 lines 18 through 25
[60] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 67 lines 15 through 19
[61] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 78 lines 19 through 24
[62] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 78 line 25 and page 79 lines 1 through 4
[63] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 125 lines 10 through 15
[64] December 1, 2020, Michael Lockwood deposition, page 141 lines 7 through 11

Based on Based on Golder's design for Phase IVA[65], and a review of the topography of the area where waste was placed in Cells 20 through 22 (based on Golder's August 2017 map which showed that waste had been placed in approximately half of Cell 22), 32 gas extraction wells were planned/proposed for this area of Phase IVA (cells, 20 through 22).

From July 1, 2017 through March 2018 there were no gas extraction wells installed or available to operate in Phase IVA. In April 2018 only nine (9) wells were installed and operable in Phase IVA[66]. This equates to nine (9) wells available (9/32) or 28% of the total planned wells being available for extraction during April 2018. From May 2018 through January 2019, a total of fifteen (15) wells had been installed and made operable. [67] This equates to 15 wells available (15/32) or 47% of the total planned wells being available for extraction during this period. As of February 2019, seven (7) additional wells were installed and made operable. No additional gas extraction wells were installed during the final three and a half months (3½) that APTIM was onsite, specifically from February 2019 through May 17, 2019. [68] This equates to 22 wells available (22/32) or only 69% of the total planned wells being operable during the final three and a half months that APTIM was onsite. This percentage of operable wells versus the total number of planned wells is graphically displayed on Figure 2.

It should be noted that Golder revised the Phase IVA design on several occasions to address the sequential installation of various groups of gas extraction wells in Phase IVA. [69] The first revision included 10 gas extraction wells and five (5) horizontal collectors. Three (3) of the horizontal wells were specifically addressed for the central portion of Phase IVA. However, in an April 20, 2018 letter from Jefferson Parish to LDEQ, Jefferson Parish requested to have LDEQ issue a "no objection" letter for a revised design plan. Jefferson Parish requested to eliminate two of the horizontal collectors and instead remobilize to the site within six months to install vertical gas wells. Jefferson's Parish reasoning for the removal of the two horizontal collectors and delay in the expansion of the GCCS was that, *"between the time that the design was advertised for bids, the contract awarded, and contractor mobilization, much more waste was deposited in the area...The grades were changed significantly from the design grades and there was sufficient depth of fill to*

[65] Landfill Gas Collection and Control Plan, Jefferson Parish Sanitary Landfill, Phase IVA, Golder Associates, January 2017, APTIM 9090

[66] Operations and Maintenance Monthly Report, APTIM, December 2018 (ATPIM-0021449)

[67] Operations and Maintenance Monthly Reports, APTIM, December 2018, ATPIM-0021449 and April 2019, ATPIM-0007635

[68] Operations and Maintenance Monthly Report, April 2019, ATPIM-0007635)

[69] Letter from Rick Buller of Jefferson Parish to LDEQ, April 20, 2018, JP_JPLF_0018677

install vertical wells instead of horizontal collectors in some locations...current disposal operations are in the area of the east-west aligned horizontal collectors...The installations can't be made due to safety issues with contractor employees working among the landfill equipment and disposal vehicles." Thus, Waste Connections' filling operations further delayed the installation of GCCS infrastructure, which was another factor beyond Aptim's control. It should be noted that no wells or collectors were installed in the central portion of Phase IVA until the last three and one-half months that ATPIM was onsite when additional gas collection wells were installed and made operable in that area.

The need for additional wells in Phase IVA is further discussed by Mr. Juene Franklin of FE&C in a March 10, 2019 email when he wrote, *"Based on my conversation with Kris Carlson concerning the odors that he detected in Phase IVA of Jefferson Parish landfill during his site visit, the report by the LDEQ that they detected odors in that area, and the fact that we are still in the process of tuning the GCCS to achieve 6% nitrogen/balance gas content required by River Birch at their plant, it seems that the installation of additional extraction wells may be warranted."*[70] Later in the same email Mr. Franklin discusses the need to replace the two horizontal collectors with additional vertical extraction wells. It should be noted that horizontal collectors are typically considered temporary in nature and are installed only until sufficient waste depth is present at the landfill to allow the installation of permanent vertical extraction wells. The capture efficiency of the temporary collectors is difficult to quantify since it is dependent on the installation depth, construction methods, and type of surrounding waste and cover materials.

It must also be pointed out that it typically takes multiple well tuning (monitoring and adjustment) events to balance each well to reach optimal extraction efficiency. Therefore, simply because a well was installed and made operable, does not mean that it was operating at maximum efficiently, as this can take several months of monitoring and adjustment. To reinforce this point (regarding the time-needed to balance a well), after APTIM had been directed to balance the GCCS in February of 2019, to reduce the balance gas to six (6)% (as the system was being readied to transfer gas to the River Birch gas plant), in a February 14, 2019 email from FE&C to Zia Tammami of PPM Co., Mr. Franklin wrote, *"It may take some time for the extraction wells to be tuned to 6% Balance Gas... This is not to say that it can't be done, but I want to make certain that everyone understands that it may take time to achieve these levels."*[71] This description supports the reality that well balancing can

---

[70] Email from Juene Franklin of Franklin Engineers, March 10, 2019,  APTIM_0232982
[71] Email from Juene Franklin of Franklin Engineers to Zia Tammami of PPM Co, February 14, 2019, APTIM_0235838

March 4, 2024                                                                                    21

take a significant level of effort and that results of such balancing efforts are not immediate.

It should be further noted that by May 14, 2020, less than a year after APTIM left the site, gas was being extracted from 51 gas extraction wells in Phase IVA[72] and by July 9, 2020 gas was being extracted from 51 gas extraction wells and 21 horizontal collectors in Phase IVA[73]. This again demonstrates the magnitude of the required system expansion by Jefferson Parish in Phase IVA and is a de facto admission by Jefferson Parish that additional wells (that weren't present while APTIM was onsite) were needed for optimized LFG capture.

If optimizing the GCCS provided to APTIM to improve LFG (and associated fugitive odor emissions) capture was simply a matter of normal system O&M, then the extensive effort and investment by Jefferson Parish to upgrade the GCCS infrastructure, as described above, would not have been required. As described in the author's other Bases of Opinions, even during the short period that APTIM was onsite in Phase IVA, various circumstances beyond APTIM's control further interfered with its ability to optimize operation of the GCCS.

## Opinion No. 4:

*APTIM did not have control over various limitations placed on the GCCS operation by others, especially when circumstances beyond APTIM's control, such as limited vacuum and vacuum interruptions to the wellfield, further impeded GCCS operation. Such restrictions limited optimization of the GCCS operation and its ability to capture the landfill gas being produced within the landfill by the breakdown of waste materials.*

## Basis for Opinion No. 4

One key issue that affected APTIM's ability to optimize the GCCS operation was the ongoing lack of system vacuum to various parts of Phase IVA and vacuum interruptions. Since active GCCS needs to maintain a vacuum on the gas extraction wells to obtain LFG capture and removal, the loss of vacuum can severely inhibit GCCS efficiency, or even prevent its function completely. This is even more

---

[72] Kelvin-Jefferson Parish Landfill Summary, River Birch, May 14, 2020
[73] Kelvin-Jefferson Parish Landfill Summary, River Birch, July 9, 2020

impactful to partially-installed systems like the one that was provided to APTIM in Phase IVA.

The documented loss of vacuum in Phase IVA was due to multiple causes. In some cases landfill operations had damaged the system vacuum headers or laterals. Additionally, APTIM reported the loss of vacuum caused by the formation of low spots (bellies) in header and lateral piping. The formation of low points is typically due to the differential settlement of the underlying wastes caused by different degrees of waste breakdown of different types of waste materials (waste heterogeneity). In severe cases, the piping can become completely blocked with liquids in these low points, resulting in the loss of vacuum to a gas extraction well, or, potentially, to a series of gas extraction wells. The frequent need to repair the issues of low spots is shown in the installation of various "jumpers", or temporary piping, installed to connect a well (or series of wells) to a lateral or header with available vacuum and bypassing areas of the piping that have been impacted by the low points. The loss of vacuum to an extraction well can be determined by monitoring the available vacuum at the piping lateral leading to the well. Such data is collected each time a well is monitored during well balancing activities. If the main header leading to a landfill phase shows significant vacuum, but a sub-header or lateral lacks vacuum, that condition typically indicates a blockage or other restriction somewhere in the system piping. These blockages/restrictions can decrease a well's ability to effectively collect gas from surrounding wastes. Based on a review of GCCS monitoring data, during the time when APTIM was onsite in Phase IVA, a significant number of the gas extraction wells lacked available vacuum. This is discussed further below and graphically depicted on Figure 3.

In a May 30, 2018 email from Mr. Keith Conley to Mr. Lockwood, Mr. Conley writes, "*By Thursday of our assessment week, it became clear to us that there were high H2S emission in Phase 4A…there was a loss of vacuum to several of these new wells…and these were serious problems that needed to be addressed.*"[74] The wells referred to were 507, 516, 518, 519, HW-04 and HW-05. By July 2018, the referenced wells had no available vacuum and were showing positive pressure. As described below, the cause of the loss of vacuum was apparently low spots/bellies in the GCCS header. It should be noted that the vacuum was restored to the wells when a new jumper line was installed in August 2018.

---

[74] Email from Keith Conley of Jefferson Parish to Mike Lockwood of Jefferson Parish, May 30, 2018, JP_JPLF 00075661

March 4, 2024                                                                                            23

Based on a July 19, 2018 meeting between Brett O'Connor, Mr. Nelson Ambeau of APTIM, and Mr. Buller, it was reported in Mr. O'Connor's summary memo that, *"We also discussed the possibility of running a 12" header across 4A to jump any bellies that are in the 10" header line."* The memo also contains the statement, *"Rick mentioned that the new wells that TriCon installed this year, on the south end of Phase 4A, have never had collected gas due to this belly in the header."* [75] This indicates the severity of the limitations placed on APTIM's ability to optimize the GCCS, as entire groups of collection components were, at times, inoperable due to a lack of available vacuum.

In a letter from Mr. Robert A. Nielsen III of Waste Connections to Mr. Conley, a letter in which Waste Connections offers to assume O&M responsibilities of the GCCS in Phase IIIB and Phase IVA, Mr. Nielsen states, *"LRLC anticipates that it may need to construct a 8"-10" header to replace an existing header which parties believe is non-functional."* [76] This is another indication that the system provided to APTIM was not only partially-installed, but also only partially-functional.

The need for significant repairs to gas extraction piping in Phase IVA was again described in Jefferson Parish's August 20, 2018 weekly progress report[77] which indicated that Jefferson Parish approved $56K for APTIM to install a new pipeline to improve vacuum on the south side of Phase IVA. It should be noted that the notice to proceed (NTP) memo[78] for the work had been issued to ATPIM on August 14, 2018. During the previous week's meeting, on August 13, 2018 the work was characterized as being needed to, *"…improve vacuum to eight new gas wells on the south side of Phase IVA. This should eliminate fugitive gas emission from this area."*[79]

CEC also provided comment on the need for improved system piping when it stated, *"There are some areas where the piping has been compromised in Phase IVA near the active waste filling and the available vacuum is limited. The Parish was preparing to install several temporary vacuum lines to correct the reduced vacuum until a permanent gas header could be installed in the Fall of 2018. This should be*

---

[75] July 19, 2018 Memo from Brett O'Connor of Waste Connections WC_JPLF_00401842
[76] July 20, 2018 Letter from Robert Nielsen III of Waste Connections to Jefferson Parish, JP_JPLF_00074477
[77] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, Jefferson Parish, August 20, 2018, JP_JPLF_0020282
[78] August 14, 2018 Letter from Michael Lockwood of Jefferson Parish to Josh Broggi of APTIM, APTIM_0231061
[79] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, Jefferson Parish, August 13, 2018, WC_JPLF_00166426

*a priority for the Parish as this area has the most LFG generation, odors, and H2S emissions.*" [80]

Additionally, based on the August 6, 2018 Jefferson Parish Status Report, landfilling operations had reportedly damaged the GCCS vacuum header in Phase IVA. The report states that there is a, "*Possible sag in vacuum headers where trash road crossed in two places*" and "*This issue is preventing the ability to pull gas from new wells in Phase 4A on the East side of the hill, 5 Vertical Wells & 2 Horizontal Collectors*" [81] This statement was confirmed based on a review of July and early August monitoring data, from ATPIM's monthly reports, showing no available vacuum to multiple wells in Phase IVA.[82]

The vacuum jumper to a leachate riser was damaged by landfilling operations in mid-October 2018. In an October 17, 2018 email from Mr. Richard Mayer of Jefferson Parish to Mr. Ambeau of APTIM, Mr. Mayer writes, "*Riser 20S appears to have had the vacuum jumper put out of service as the area was filled and is venting gas. We need a new Jumper.*" [83] During the week of November 5, 2018, APTIM had to repair the jumper run to leachate riser 20N. The line had to be regraded to remove bellies in the line. [84] It should be noted that running vacuum laterals to a leachate riser was considered Non-Routine work under APTIM's contract and required prior authorization from Jefferson Parish.

During the period from April 2018 through April 2019, APTIM, in their monthly reports, mentions the loss of vacuum in Phase IVA or significant repairs to the vacuum system laterals/headers multiple times, including: a meeting to discuss low vacuum on a header, June 2018[85]; lateral repairs in Phase IVA, July 2018[86]; installing a vacuum jumper from gas extraction well 518 to 517, October 2018[87]; and regrading to remove bellies in jumper lines in Phase IVA, November 2018.[88]

---

[80] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[81] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, Jefferson Parish, August 6, 2018, JP_JPLF_0020128

[82] Operations & Maintenance Monthly Reports, July 2018, APTIM (APTIM-0009902) and August 2018, APTIM, (APTIM-0010005)

[83] Email from Richard Mayer of Jefferson Parish to Nelson Ambeau of ATPIM, October 17, 2018, WC_JPLF_00416879

[84] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, November 5, 2018, WC_JPLF_00082942

[85] Operations & Maintenance Monthly Report, June 2018, APTIM (APTIM-0009809)

[86] Operations & Maintenance Monthly Report, July 2018, APTIM (APTIM-0009902)

[87] Operations & Maintenance Monthly Report, October 2018, APTIM (APTIM-0022113)

[88] Operations & Maintenance Monthly Report, November 2018, APTIM (APTIM-0021991)

Since a new vacuum header was needed to reestablish vacuum to the wells on the south side of Phase IVA, APTIM prepared a proposal for, *"running 1200' of 8" pipe from well 524 to well 518. The reason for this run is because we will be connecting to 8" section of lateral/ sub header in an effort to collect more gas...."* [89]  Aptim also stated the new header would *"allow vacuum to reach the south side of 4A"*.  As described previously, Mr. Lockwood, on behalf Jefferson Parish, approved the work in an email dated August 14, 2018. [90]  APTIM constructed the vacuum "pipeline" to *"improve vacuum to eight gas wells on the south side of Phase IVA"*. [91]  The work was completed on August 23, 2018.  The work performed by ATPIM appeared to be successful as vacuum was restored to the five (5) gas extraction wells (507, 516, 517, 518, and 519) and two horizontal collectors.  This temporary Phase IVA header needed additional non-routine work in May 2019, most likely due to waste settlement or landfilling operations.  In a May 20, 2019 email, Mr. Franklin, wrote to Mr. Lockwood that this header was one that, *"need(s) to have liquid vacuumed from low spots."* [92]    The reason for this header maintenance is described by Mr. Lockwood when he writes in an email to Mr. Chris Mangum of LDEQ that this prescribed work, *"...will allow sufficient vacuum to reach the south side of 4A, eliminating the fugitive emissions from these gas wells."* [93]   During the time period from February 2019 to May 2019 between three (3) and fifteen gas extraction wells did not have adequate vacuum available to extract LFG.  These items again indicate that significant site issues, beyond APTIM's control, limited APTIM's ability to optimize GCCS operation.

A March 12, 2019 email from CEC to Mr. Broggi stated, *"I saw the 8" jumper installed to help the low vacuum issue on the southside of PH IV A.  Do you have an active plan to repair the header in PH 4A that is believed to be bellied below the roadway before your construction crew leaves?"* [94]  Mr. Broggi responded the next day stating, *"There was a design to install a 8" line, see attached drawing, but this work was canceled. We believe all the lines in this corner are pinched, the 8" & 10" lines and even the air and FM. We have taken well reading at the wells around that*

---

[89] Email from Josh Broggi of APTIM to Mike Lockwood of Jefferson Parish, August 10, 2018, JP_JPLF_00103610

[90] Email from Mike Lockwood of Jefferson Parish to Josh Broggi of APTIM, August 14, 2018, JP_JPLF__00103610

[91] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, August 27, 2018, Jefferson Parish (JP_JPLF 0020367)

[92] Email from Juene Franklin of Franklin Engineers to Mike Lockwood of Jefferson Parish, May  20, 1019, DEJEAN_000113

[93] Email from Mike Lockwood of Jefferson Perish to Chris Mangum and Richard Mayer  of LDEQ, August 17, 2018, WC_JPLF_00233803

[94] Email from Kris Carlson of CEC to Josh Broggi of APTIM, March 12, 2019, APTIM-0100151

area and took a reading at CS-6-3B...This 10" line is very deep. We have recommend replacing the 10" jumper." [95]

In an April 16, 2019 email from Mr. Broggi to Mr. Lockwood, Mr. Broggi writes, "We performed our weekly sump inspection on 4/10/19.  During our inspection, we found that sumps CS-2 and 5-3B had the airlines disconnected.  This caused the sumps to fill up with water cutting vacuum off to the back of the landfill, mainly phase 3B & 4A.  We connected the airlines back to the sump and they started pumping right away. The system is still trying to recover from these sumps being disconnected. The vacuum is slowing increasing to Phase 3B & 4A." [96]  This type of incident, someone disconnecting the airlines to condensate sumps, was clearly outside of APTIM's control, but as shown, resulted in operational issues with the GCCS.

An additional discussion of issues with the vacuum headers is provided in a series of emails between CEC and FE&C.  On April 20, 2019 FE&C described APTIM's proposed work to repair vacuum headers including installing aboveground vacuum jumpers.[97]  On May 15, 2019, in an email from Juene Franklin to CEC, Mr. Franklin states, "Due to budgetary constraints that exists in the current contract, the Parish has decided to vacuum out the lines with low spots in them to restore vacuum. This is not a long-term temporary fix, but it should allow the Parish to restore vacuum to the areas once the liquid has been removed." [98]  Mr. Carlson responded that, "The liquid may come back quick which leads me to consider what kind of time the new OM contractor will have to get a fix employed." [99]  This further indicates that Jefferson Parish's engineers and consultants knew of continued issues with the vacuum piping prior to, and through the end of, APTIM's contract period.

Vacuum availability to a well, series of wells, or an entire wellfield obviously has a significant effect on the ability to operate, balance, and optimize a GCCS.  When vacuum is lost, or significantly decreased, the ability to "pull" LFG from the waste materials is lost, or significantly decreased, since the pressure gradient necessary for LFG to flow from the surrounding wastes to the extraction wells is impaired.  As discussed previously, throughout ATPIM's time spent in Phase IVA, vacuum was lost to any number of wells due to recurring issues beyond APTIM's control with the buried and above-ground GCCS piping.  This is particularly true after additional

---

[95] Email from Josh Broggi of Aptim to Kris Carlson of CEC, March 13, 2019, APTIM-0100151

[96] Email from Josh Broggi of Aptim to Mike Lockwood of Jefferson Parish, APTIM_0235763

[97] Email from Juene Franklin of Franklin Engineers to Kris Carlson of CEC, April 30, 2019, APTIM 0233507

[98] Email from Juene Franklin of Franklin Engineers to Kris Carlson of CEC, May 15, 2019, APTIM 0233507

[99] Email from Kris Carlson of CEC to Juene Franklin of Franklin Engineers, May 15, 2019, APTIM 0233507

wells began to be installed and brought online in 2019. During February through April 2019, vacuum was not available at a significant number of gas collection wells in Phase IVA. As previously mentioned, sometimes more than half of the gas extraction wells in Phase IVA had no available vacuum. It should be noted that in May 2019, APTIM reported that there was no available vacuum at 15 (15/22 = 68%) of the wells in Phase IVA.

When viewed in the context of the timeline laid out in Major Opinion No. 1, and the number of installed gas wells described in Major Opinion No. 3, APTIM typically had even fewer available and operable wells in Phase IVA from which to extract LFG than was presented earlier on Figure 2. If Figure 2 is revised to show only gas extraction wells that had available vacuum for the full month (by month), the impact on the system becomes strikingly clear (see Figure 3). Similar to the explanation provided for Figure 2, if all the design prescribed wells were installed and available to extract gas (with available vacuum), the curve would be at the 100% level across the entire graph duration.



**Figure 3 – Percentage of GCCS Design Wells Installed and With Available Vacuum in Phase IVA vs. Time**

As can been seen on Figure 3, there was only one month that APTIM was onsite at Phase IVA during which at least 50% of the design wells were installed and were fully operable (had available vacuum), and that was at only at the 59% level in March

2019. It should be further noted that the data displayed on Figure 3 is conservative as wells that lost vacuum for (only) a portion of the month were still included as an operable well. In many cases various extraction wells in Phase IVA lost vacuum for a number of days in a given month.

Further, ATPIM did not have control over running jumpers or bypasses around blocked vacuum headers in Phase IVA since such activities were non-routine work and required prior Jefferson Parish approval. In addition, APTIM had to periodically respond to other damage that was done to the GCCS by equipment operated by other contractors, such as Waste Connections' heavy equipment and mowing equipment, which interrupted vacuum to portions of the GCCS. In addition to the damage to the gas header from road crossings previously mentioned, other damage was noted. During May of 2019, damage to the GCCS caused by landfill operations was noted. The vacuum line connecting leachate riser 20S to the GCCS header had been damaged (crushed) by truck traffic.[100] Additionally, on May 15, 2019 a vacuum pipe was found damaged under a road crossing.[101] On the same day, a cap on the GCCS vacuum piping was found to be cut off by landfill mowing activities.[102] It should be noted that this damage prevented the operation of the Renovar Compressor Station due to high oxygen concentration in the extracted LFG, which would have interrupted vacuum and upset the overall system-wide GCCS operation and balance. After repair, the oxygen levels returned to normal. In a May 15, 2019 internal APTIM email, Mr. Eric Hammerly of APTIM described the need to repair a cleanout damaged by mowing activities. [103] Individual wells have also been damaged by landfilling operations. For example, in an April 1, 2019 email from Mr. Broggi to Mr. Lockwood, Mr. Broggi writes, *"On Saturday, dirt was dumped on 513 from a landfill excavator. The wellhead was cracked and the forcemain line was damaged."* [104] Again, this damage was not within Aptim's control and was a result of Waste Connection's landfill operations.

Another extremely critical aspect of the GCCS operation is a consistent availability of vacuum from the blower systems associated with the end use/destruction facilities/components. Throughout the period that APTIM was onsite, the LFG was either conveyed to the gas compressor station, for use at the Cornerstone Chemical Plant, using blowers associated with the compressor station, or conveyed to the flare station, using a separate blower system, and combusted in the onsite flare. It must

---

[100] Email from Juene Franklin of Franklin Engineers to Zia Tammami of PPM Co. May 3, 2019, APTIM_0231207
[101] May 15, 2019, 11:10 AM Email from Josh Broggi APTIM to Jefferson Parish, APTIM_0231659
[102] May 15, 2019, 2:35 PM Email from Josh Broggi APTIM to Jefferson Parish, APTIM_0231659
[103] Email from Eric Hammerly, May 15, 2019, APTIM_0231792
[104] Email from Josh Broggi of APTIM to Mike Lockwood of Jefferson Parish, April 1, 2019, APTIM_0235789

be noted that APTIM did not operate the compressor station, including its vacuum blowers, and therefore, did not have control over the amount of vacuum applied to the wellfield when vacuum was supplied by the compressor station. The vacuum provided was based, in part, on compressor station demands. This is a very important factor when evaluating the operation of the GCCS. When the gas demand and/or the discharge pressure requirements for the compressor station changes or fluctuates, as can happen as the end use demand changes, this will affect the amount of vacuum available to promote gas extraction through the GCCS. With fluctuating vacuum to the headers and wellfield, LFG flows from individual wells also fluctuates. Since the wells are balanced/tuned to meet regulatory and performance goals based on wellhead vacuum adjustments, any changes to the vacuum (created by downstream system demands) can create an upset condition within a well or wellfield. An upset can be considered any condition that does not allow the GCCS to operate at maximum efficiency or within regulatory requirement parameters. To optimize system performance, it is generally a best practice to maintain a constant and consistent vacuum at each well with periodic changes made only when data dictates the need to do so. Also, as different effluent treatment or end/use components are used, there will be a time lag between shutdown of one component and the startup of another, such as might occur if treatment/vacuum was switched between the compressor station and the flare system. Such shutdown and startup of vacuum sources causes system-wide upsets in the GCCS that can take several days, or longer, to rebalance.

The approach typically utilized to address potential fluctuations in the influent/vacuum, effluent/pressure, or flows experienced by a vacuum blower system is through the use of a variable frequency drive (VFD). A VFD is used to adjust the speed of the motor driving the blower. When set up in a control strategy mode using influent vacuum, effluent pressure, or flow rate sensors, the VFD can maintain a constant inlet vacuum, effluent pressure, or system flow rate, depending on the control strategy selected. Of these control strategies, the use of a constant vacuum will provide the best methodology of maintaining a balanced wellfield, as described above. It should be noted that the blower system configuration at JPLF, during the period of time that APTIM was active in Phase IVA, did not include VFDs. Therefore, the system vacuum varied based on applied parameters such as outlet pressure/gas demand as described above. CEC confirmed the benefits of VFDs when they stated, *"The blower vacuum was not controlled by inlet pressure readings controlling a variable frequency drive (VFD) on the blowers, but on the outlet pressure to the pipeline. As this pipeline pressure demand changed, the inlet vacuum would fluctuate."* The report also states, *"this fluctuation will cause issues with the wellfield tuning. A stable inlet vacuum is required for maximum fine tuning*

*of a wellfield.*" [105]   Such fluctuations were observed by CEC. [106]  It must be noted that ATPIM provided a quote[107] in September 2018 to install VFDs on the motors for all three (3) flare system gas extraction blowers, but they were not approved for installation before APTIM's departure in May 2019.

Regarding the Renovar compressor station, APTIM noted in its monthly reports that the station, between April 2018 and April 2019[108], was shutdown at least once each month and had an average down time of 154 hours (6.4 days) per month. Twice during that period, the compressor station (then operated by River Birch) was down for over 500 hours in a month, with the maximum downtime being 555 hours (23.1 days) in March 2019. It is not only the duration of a shutdown, but the number of times the treatment components shut down and restart that can lead to vacuum interruptions and system-wide GCCS system imbalances. Based on Control Device Downtime Records data from APTIM's Semiannual Monitoring Report/Semiannual Startup, Shutdown, and Malfunction Plan Reports [109], during the period from April 2018 through December 2018, the control devices (vacuum sources) were shut down 35 times for various reasons outside the control of APTIM.

In an August 15, 2018 internal APTIM email, Mr. Ambeau noted that he had received a phone call (after the fact) that compressor had been shut down for repairs and the flare need to be started."[110]  In some cases, even when the Renovar compressor station gas was operating, it was operating at a reduced vacuum, which also creates a GCCS imbalance. In an August 31, 2018 email from Mr. O'Connor to Mr. Lockwood, Mr. O'Connor writes, *"Rickie mentioned that the gas plant is pulling at ~20 inches of vacuum…"*[111] At this time the required system vacuum was approximately 30 inches, so a less than optimal vacuum was available for the GCCS. While APTIM had no control over the operation of the gas plant (compressor station), this certainly affected ATPIM's ability to optimize the operation of the GCCS.

---

[105] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[106] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[107] Proposal and Pricing, Reference #091818, ATPIM, September 27, 2018, ATPIM_0035402

[108] Operations & Maintenance Monthly Reports, April 2018 through April 2019, CB&I/APTIM (APTIM-0009635, 0009716, 0009809, 0009902, 0010005, 0010116, 0022114, 0021991, 0021449, 0007554, 0007469, 0007857, and 0007635)

[109] Semiannual monitoring Report/Semiannual Startup, Shutdown, and Malfunction Plan Report, January 1, 2018 through June 30, 2018, APTIM, August 27, 2018, APTIM_0002546 and July 1, 2018 through December 31, 2018, APTIM, March 15, 2019, APTIM_0005714

[110] Email from Nelson Ambeau, August 15, 2018, APTIM_0061475

[111] August 31, 2018 Email from Brett O'Connor of Waste Connections to Jefferson Parish  WC_JPLF_00270272

After River Birch purchased the Renovar compressor station in late 2018 or early 2019, operational issues with the plant continued to impact the operation of the GCCS. On February 6, 2019, in an internal email,[112] APTIM field personnel noted difficulty with tuning the new wells in Phase IVA due to a loss of vacuum since the River Birch Gas Plant (gas compressor station) was down. On February 11, 2019 APTIM personnel noted, in an internal email,[113] that the (gas compressor) Plant was down due to maintenance. On March 12, 2019, Mr. Broggi emailed Mr. Lockwood to inform him that the River Birch had informed him (Mr. Broggi) (after the fact) that, *"the plant is down and will be down for close to a month"* [114], when referring to the gas compressor station. On March 14, 2019 the compressor station was down due to Cornerstone Chemical maintenance activities.[115] On May 11, 2019, APTIM personnel observed that the compressor station was again down.[116]. The compressor station had shut down the night before and APTIM was initially told the plant would restart on May 11, but the restart was rescheduled for the following week. On Monday May 13, 2019 APTIM requested to take the flare down for a few hours for a maintenance assessment following an electric storm in the area that caused a power outage at the site. [117] APTIM was asked to wait several additional days since the compressor station was down and, *"you will have no vacuum on the gas field."* [118]

It should be noted that the apparent issues with the compressor station continued after APTIM was no longer onsite. Each of the June through September 2019 Operation and Maintenance Reports, prepared by River Birch for Jefferson Parish, included the statement, *"During the month of...the system vacuum was supplied mostly by the Jefferson Parish flare, while the River Birch maintenance and operations team work to get the medium-BTU gas plant at the Kelvin field to run consistently."* [119]

Based on a recommendation from CEC[120], Jefferson Parish requested that APTIM operate both the flare and the compressor station at the same time and that the vacuum be increased to 40 inches of water column (w.c.) at the blower inlet. CEC

---

[112] Email from Eric Hammerly, February 6, 2019, APTIM_0231748
[113] Email from Eric Hammerly, February 12, 2019, APTIM_0231753
[114] Email from Josh Broggi of Aptim to Jefferson Parish, March 12, 2019, APTIM_0231143
[115] February 6, 2019 Email from Eric Hammerly, APTIM_0231762
[116] March 11, 2019 Email from Eric Hammerly, APTIM_0231789
[117] Email from Josh Broggi of APTIM to Mike Lockwood of Jefferson Parish, May 13, 2019 , APTIM_0234680
[118] Email from Brian DeJean of River Birch to Mike Lockwood of Jefferson Parish, May 13, 2019 , APTIM_0234680
[119] Operation and Maintenance Monthly Report for Jefferson Parish Landfill, River Birch LLC, June, July, August, and September
[120] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

also wrote, "*Please note that there are currently physical limitations in the LFG system that are preventing the system vacuum from being increased beyond 30 in-wc.*" To accomplish the increased system vacuum, the flare was started September 19, 2018, pursuant to Jefferson Parish's approval, and run simultaneously with the compressor station. [121] As APTIM slowly increased the vacuum, this required more frequent tuning of gas extraction wells to keep the wells in compliance (twice per week tuning). This change in operating strategy was significant and indicated that, while sufficient vacuum was historically available to operate the GCCS per NSPS requirements and maximize LFG Quality (per its Agreement with Jefferson Parish), higher vacuum was needed, "*to collect more gas...*"[122], presumably for odor control purposes.

Per CEC, based on APTIM comments, the drip legs, which were not designed by APTIM, could not handle vacuums higher than 40 inches w.c. CEC noted these drip legs should be designed for 60 inches. CEC reported the findings on the drip legs to Jefferson Parish in an email dated June 19, 2018 when it reported, "*The drip detail is shown on the Ph 3A Cell 1-5 Record Dwg 08-10-2005.pdf which was sent to you with the as-built drawings. We saw this detail, but APTIM reported to us that the drip legs were installed different from the details (shallower). This caused the vacuum break in the drip leg to be broken at vacuums higher than the mid-30's.*" [123]

While one might be tempted to believe that by simply increasing the GCCS vacuum, an increased gas flow and associated reductions in fugitive emissions would follow, there are, however, other variables that must to be evaluated to determine if, in fact, increasing the vacuum would provide a beneficial effect on the extraction wellfield. Increasing the vacuum may actually negatively impact well performance if it leads to upwelling of liquids within the gas extraction well. When a vacuum is applied to a well, the liquid column in the well may rise in response to the applied vacuum. As the liquid column rises, additional screened sections of the well may be blocked leading to reduced well performance. This would require even more vigilance regarding the need for in-well pumps and pump performance. The potential issues with increasing vacuum are further characterized in a June 13, 2018 email from Mr. Rellinger to Mr. Buller when these concerns were described as, "*Things to remember with increasing vacuum at Jefferson Parish. This may lead to increased blocked perforations. With the applied vacuum being higher, this usually leads to higher*

---

[121] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, September 24, 2018, WC_JPLF_0021423
[122] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, September 24, 2018, WC_JPLF_0021423
[123] Email from Kris Carlson of CEC to Rick Buller of Jefferson Parish, June 11, 2018, JP_JPLF_00075216

*liquid table within the landfill. Bear in mind sometime higher vacuum can lead to lower [gas] flows...*[124]

While it is possible that increasing GCCS vacuum might help clear blockages of liquids from low points in piping or increase the capture radius of a well or a series of wells, excessive vacuum can lead to the pulling of ambient air from the atmosphere, through the waste, and into the well (called "short-circuiting"). This can lead to increased oxygen and nitrogen concentrations in the LFG and reduced methane concentrations by diluting the gas. Elevated oxygen concentrations in the LFG within the waste materials can also lead to a more aerobic environment within the waste which further degrades "LFG quality" by reducing the ability of the anaerobic methanogenic organisms to produce methane. There can be a conflict between operating a GCCS system to meet regulatory compliance goals or maximizing LFG quality, or for odor control. For example, while decreasing the vacuum to a well may lead to an increase in the well's methane concentration, it may also lead to a decrease in the effective capture radius (the distance from which LFG can be pulled to a well), which may decrease the area from which LFG (and associated odors) is captured. As described further in Basis for Opinion No. 5, APTIM was contracted to operate the GCCS per NSPS requirements and to maximize for LFG quality or flow rates, not for odor control.

One additional item that CEC noted was the age of the flare and GCCS. CEC wrote, *"The blower/flare skid was installed in 2000 and is approximately 18 years old. The typical lifespan of blower/flare equipment is approximately 20 years; therefore, Jefferson Parish should begin to budget for a replacement of this unit in the next 2-3 years."* [125] This indicated that Jefferson Parish knew that flare components were likely near the end of their useful life. As the Author of this report has operated multiple GCCSs relatively the same age as the system at JPLF, he concurs that flare components begin to require significant maintenance, replacement, and/or upgrades after approximately 15 to 20 years of operation (often earlier), depending on the component type. This can lead to issues with GCCS performance and reliability especially, if certain non-routine maintenance activities or component replacements, are not performed on a timely basis.

Another item that APTIM had no control over was the odor neutralization system. If installed operated properly, this can have an impact on the detection of odors offsite. As described in the August 6, 2018 Progress Status Report, this system was

---

[124] Email from Kevin Rellinger of APTIM to Rick Buller of Jefferson Parish, July 6, 2018, JP_JPLF_00055624
[125] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

being repaired after it was damaged by lightning sometime prior to August 3, 2018.
[126] The system was reportedly repaired and placed back into operation August 17, 2018. [127] However, it was noted that an additional "1,000 linear feet of coverage" was needed and would be installed. While each of the next four weekly reports stated that the linear expansion of the odor neutralization system was scheduled for "next week", the system was not expanded and put into full service until September 17, 2018.

In addition to the times when mechanical, landfill operations, or other landfill processes, (such as waste degradation and settlement), affected APTIM's ability to optimize the GCCS operation, there were times when the direct actions of other, non-APTIM personnel, impacted GCCS operation. One critical issue identified was the various occurrences when GCCS components were adjusted without APTIM's knowledge or approval, including adjustments to gas wells. This is extremely important as the adjustments of the wells is a process and should be completed in a methodical manner. When multiple individuals, or entities, are making system adjustments, especially without the knowledge of the GCCS operator, this methodical approach is circumvented and system upsets may occur. The occurrence of other parties adjusting the gas extraction wellfield at the Jefferson Parish landfill has been documented on multiple occasions. CEC documented Renovar personnel having significant input regarding wellfield tuning. [128] In an August 31, 2018 email from Mr. O'Connor to Mr. Lockwood, Mr. O'Connor writes, *"Also Rickie (Falgoust) told me that he has seen River Birch adjusting the wells. I thought that was a responsibility of APTIM, not River Birch, but wanted to make you aware in case you did not know."* [129] In an April 11, 2019 internal ATPIM email[130], Mr. Hammerly writes that he updated Mr. Broggi regarding River Birch personnel being onsite on April 10, 2019. During a January 31, 2024 interview with Mr. Broggi, he stated that these adjustments were made without APTIM's prior knowledge or approval. Mr. Broggi also stated that adjustments to the wells were made frequently by River Birch personnel near the end of APTIM's contract period.

---

[126] Progress/Status Report – Prepared by Jefferson Parish, Jefferson Parish Landfill, Repairs/Improvements, Jefferson Parish, August 6, 2018
[127] Progress/Status Report – Prepared by Jefferson Parish, Jefferson Parish Landfill, Repairs/Improvements, Jefferson Parish, August 20, 2018
[128] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[129] Email from Brett O'Connor of Waste Connections/LRLC to Mike Lockwood of Jefferson Parish, August 31, 2108, WC_JPLF_00270272
[130] Internal APTIM email from Eric Hammerly, April 11, 2019, APTIM_0231773

Additionally, as described in greater detail in Basis for Opinion No. 8, the overall collection efficiency of the GCCS is based, in part, on the landfill cover materials. Cover materials in Phase IVA include a mix of daily and interim cover. Also, as described in Basis for Opinion No. 8, the collection efficiency of an area of a landfill with daily soil cover and active gas collection can range from 50% to 70%. Similarly, the collection efficiency for portions of a landfill under interim soil cover and active gas collection can range from 54% to 95%. Therefore, the EPA acknowledges that even a properly operated GCCS has limitations on the amount (as low at 50%) of LFG it can collect depending on the type of landfill cover materials.

A significant number of other outside forces acted against APTIM's ability to optimize the operation the GCCS. These are described within other Bases of Opinions including:

- APTIM's limited time being active in Phase IVA.
- Others controlling the waste management program at JPLF.
- Others designing and installing the GCCS, which was provided to APTIM for operation as-is/where-is.
- Defined Agreement/Contractual limitations.
- Others controlling the leachate levels within the landfill wastes.
- Limitations on APIM's ability to purchase, install, and operate in-well pumps.
- Other's responsibilities for management of landfill cover materials.
- Ambient and Environment Odor Monitoring which was the responsibility of others.

**Opinion No. 5:**

*APTIM's work at JPLF was limited by Contract/Agreement provisions and language to specific tasks. Additionally, the Contract/Agreement further limited APTIM's efforts by placing restrictions on the amount of time/effort Operation and Maintenance personnel could spend working on the GCCS, including being subject to Jefferson Parish's approval for all non-routine GCCS work and limits on spending relative to expenses necessary for the Operation and Maintenance tasks.*

**Basis for Opinion No. 5:**

As mentioned previously, Exhibit B of the Agreement between APTIM and Jefferson Parish is the Scope of Work/Services that was to be performed by APTIM at JPLF. The scope clearly defines and limits APTIM's work to those O&M tasks associated with the landfill GCCS (referred to in Exhibit B of the Agreement as the LGCCS).

One critical point to note is that nowhere in the Agreement between APTIM and Jefferson Parish, or in the four (4) contract Amendments/extensions. is the specific control of odors mentioned relative to the appliable contract. In fact, the word "odor" is not mentioned anywhere in the Agreement or subsequent Amendments relative to the applicable Agreement.[131] It is clear that "odor control" was not APTIMs responsibility as this task was contractually designated to others. Section II.B.5 H of IESI/LRLC's Agreement with Jefferson Parish, dated May 17, 2012, is entitled, "Odor Monitoring & Control Activities" and specifically states, "*IESI shall implement a comprehensive odor control plan that includes both operation best management practices and odor control systems. IESI shall perform odor monitoring and control activities and services as required by the existing Jefferson Parish Landfill Odor Management Plan, and any amendments thereto...*"[132] Failure to control odors is addressed in the Liquidated ("Stipulated) Damages (Section IV, Paragraph M) of the Contract between IESI and Jefferson Parish. Per Paragraph M, "*Failure to maintain control of landfill odors, when detected off-site, by Jefferson Parish Environmental Affairs personnel or authorized contractors and verified to the reasonable determination of the Landfill Engineer to emanate from the landfill*" would result in fine of "*$3,000.00 per day until corrected.*"[133]

When referring to the operation of the GCCS/LGCCS, in the Agreement between APTIM and Jefferson Parish, the text prescribes how APTIM is to operate the system, including, "*Routine operations and maintenance of the LGCCS includes balancing the wellfield to maintain oxygen, temperature and pressure limits and to maximize LFG quality and flow rate...*". The Agreement further states, "*Balancing the wellfield includes monitoring the methane, oxygen, carbon dioxide, balance gases, temperature, pressure, and flow in the LFG extraction wells, and adjusting control valves as needed for compliance.*" Additionally, the Agreement addressed

---

[131] First Amendment to CB&I Agreement with Jefferson Parish, November 30, 2016, Second, Third, and Fourth Amendments between APTIM and Jefferson Parish, January 11, 2018, July 25, 2018, and December 10, 2018 respectively
[132] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707
[133] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

the requirement for APTIM to, *"...maintain compliance with regulations and Title V Permit."* Since APTIM operated the system to comply with NSPS (applicable regulations) requirements (40 CFR 60.753), ATPIM was mandated to, *"Operate each interior wellhead in the collection system...with either a nitrogen level less than 20 percent or an oxygen level less than 5 percent"*.

While one could argue that operating the GCCS per NSPS requirements (or to maximize LFG quality or flow rate) would, by its nature of removing of LFG (containing some amount of odorous compounds) reduce odors by some amount, tuning the system per NSPS (or to maximize LFG quality or flow rate) does not specifically address odor control. Also, when a system is operated to maximize LFG quality or comply with a regulatory standard, the vacuum to the well is systematically adjusted until a target gas quality (maximum methane concentration, minimum oxygen concentration, etc.) is attained. It should be noted, as described previously, there can be conflict between operating a GCCS for odor control as opposed to operating the system to meet the regulatory compliance goals or maximizing LFG quality. For example, and as described in Basis of Opinion No. 4, as a practical matter, decreasing the vacuum on a well to improve gas quality may reduce the area from which a well can capture LFG and any associated odorous compounds.

Therefore, the effectiveness of a gas extraction well, and subsequently the wellfield, when considering the radius of capture, is constrained by the balancing/compliance/gas concentration goal methodology employed at the site. In the case of JPLF, and as described above referencing APTIM's Agreement stipulations, those protocols include regulatory compliance and gas quality, not maximizing LFG capture area or odor control.

APTIM's Agreement with Jefferson Parish also includes the following limitations, *"All labor (including labor needed to pump leachate or condensate from gas extraction wells) shall be considered Routine Services as long as the services are performed within a 40-hour work week as provided in the Base O&M Service. Any labor provided beyond 40-hours per week may be invoiced at the applicable rate for Additional Labor. FIRM shall submit a request for Additional Labor to the PARISH, prior to providing any Additional Labor."* All overtime work required to operate or maintain the GCCS by APTIM was limited by, and subject to, the approval of Jefferson Parish. Please note that APTIM's Agreement was extended four times (4)

under these same terms. [134] In stark contrast, the RFP issued by Jefferson Parish for landfill GCCS O&M work at JPLF in 2019 (RFP 0393), doubled the baseline required level of effort to 80 hours per week. This, along with the occasional approval to work overtime hours, indicates that Jefferson Parish realized that the true level of effort required to fulfill the scope of work, relative to GCCS O&M, was greater than what was stated in APTIM's Agreement and subsequent extensions. Addendum #1 to the 2019 RFP also included this clarification regarding the required level of effort, *"Please note that these state 'at a minimum'. The Parish expects that vendors will provide adequate personnel to fulfill the scope of the project which is to consistently maintain the specified quality of gas, regulatory compliance, and all infrastructure components..."* [135] This indicates that the actual level of effort to address the required project scope could further exceed the baseline 80 hours.

Section 2.5 of APTIM's Agreement with Jefferson Parish also included the following limitation, *"Any supplies or equipment which cost greater than One Thousand Five Hundred Dollars ($1,500.00) require three quotes from vendors and prior approval from the PARISH Representative."* Therefore, any recommendations from APTIM for repairs and upgrades to the GCCS, such as for procurement of additional well pumps, belly repairs, etc., which cost more than $1,500, could not be implemented without approval from Jefferson Parish (Sec. 2.5 of the Agreement).

APTIM could only make recommendations but had no control over required capital improvements to the infrastructure which, as discussed previously, were substantial (proposed on the order of $5 million), including the addition of gas extraction wells, replacement of gas wells, replacement of GCCS headers, replacement of condensate piping, installation of extraction well condensate/leachate pumps, replacement of air compressors, etc. APTIM did regularly add a "Recommendations" section to their monthly Operations & Maintenance Reports. APTIM's reports included such recommendations as, *"Purchase additional pumps to add to extraction wells and consider running more airline and forcemain..."*

In addition to the personnel needed to provide O&M for the GCCS, CEC recommended, *"at least one (and possibly two) full time pneumatic pump personnel."* [136] That would require an additional 40 to 80 hours of labor.

---

[134] First Amendment to CB&I Agreement with Jefferson Parish, November 30, 2016, Second, Third, and Fourth Amendments between APTIM and Jefferson Parish, January 11, 2018, July 25, 2018, and December 10, 2018 respectively

[135] RFP 0393 Addendum #1, March 15, 2019, APTIM_0234920

[136] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

Near the end of APTIM's time onsite, APTIM personnel stated that Jefferson Parish requested APTIM to limit their work. [137] This was further described in an April 17, 2019 email from Mr. Broggi to Mr. Lockwood which stated, *"As far as tuning 4A & the re-drilled wells in Phase 3B twice a month.  Do you want us to continue doing this?  I know you told me no more additional work"* [138]

It should also be pointed out that APTIM was never notified by Jefferson Parish that it was in breach of contract regarding the operation and/or maintenance of the GCCS, nor did Jefferson Parish indicate that it would be seeking financial compensation from APTIM's performance bond.  In fact, as mentioned previously, Jefferson Parish extended APTIM's period of performance four (4) times, including the fourth addendum to the Agreement which was issued by Jefferson Parish on December 10, 2018.  This is a tacit acknowledgement by Jefferson Parish that they did not take exception with APTIM's work.  Further, Jefferson Parish was extremely complimentary of APTIM's work, even near the end of their time onsite.  In a February 28, 2019 email, Mr. Lockwood states, *"APTIM has really 'stepped up to the plate' during the last few months in providing out of scope services..."*[139]

**Opinion No. 6:**

*APTIM did not have control over the leachate levels in Phase IVA that allegedly impaired the operation of the GCCS.*

**Basis for Opinion No. 6:**

As previously mentioned, APTIM's Agreement with Jefferson Parish, dated December 28, 2015, stipulated, in Section 2.0 and Exhibit B, the Scope of Work to be performed by APTIM at JPLF.  Nowhere in the Agreement, or elsewhere in communications or documentation, reviewed by the author, between APTIM and Jefferson Parish, or between APTIM and Jefferson Parish subcontracted companies, was APTIM directed to take responsibility for any portion of the leachate collection system at JPLF.  In fact, Question #2 of Addendum #1, dated August 19, 2015, of Jefferson Parish's Request for Proposal (RFP) for the GCCS Operation and Maintenance Services Request for Proposal (RFP No. 0338) asks, *"Is management of the leachate pumping system around the perimeter of the JPSL included in the*

---

[137] January 31, 2024 interview with Mr. Broggi
[138] Email from Mr. Josh Broggi of APTIM to Mr. Mike Lockwood of Jefferson Parish, April 4, 2019, APTIM-0235775
[139] Email from Mike Lockwood of Jefferson Parish to Kris Carlson of CEC, February 28, 2019, APTIM_0229779

scope of work?" The Parish's response was, "*No, the leachate collection system is the responsibility of the Landfill operating contractor.*" [140]  This indicated that APTIM was not responsible for the operation of the leachate pumping system. This separation of contracted responsibilities was again confirmed when CEC recommended that, "*the Parish consider moving the responsibility of the leachate pump O&M to the LFG O&M contractor.*"[141]  Additionally, during Mr. Lockwood's December 1, 2020 deposition, he stated, "*Waste Connections was responsible for the leachate collection system inspection and served O&M of that system in 4A. The Parish was working on the leachate collection system in the rest of the landfill.*" [142] This clearly indicates that Jefferson Paris understood that APTIM had no responsibility for the operation of the leachate pumps.  In fact, IESI's Agreement with Jefferson on Parish in Section II, Paragraph B.5.A specifically states that IESI n/k/a Waste Connections' responsibilities, relative to Phase IVA, include, "*operation and maintenance of the leachate collection and treatment systems.*"[143]

APTIM's only responsibilities related to water removal from the landfill regarded the operation of in-well pumps for those wells that had such pumps.  However, the main purpose of in-well pumps is to remove liquids that accumulates within the gas collection wells, which can block the perforated sections of screen used for gas capture.  APTIM was not responsible for operating the separate leachate system which reduces the overall level of the leachate throughout the landfill waste materials.  The pneumatic in-well pumps typically have a much smaller capacity than true leachate pumps, which are typically much larger and have electric motors. The true leachate pumps are installed in permeable materials just above the impermeable bottom liner.  Such was the case in Phase IVA, among others.  The electric leachate pumps are accessed via risers located on the side slopes of the landfill.

Lowering the leachate levels within the waste materials is a common practice at sites with potential higher water tables or waste saturation levels, and where required by applicable regulations.  Not having a properly operated leachate collection system can allow the level of leachate (liquid) to rise within the waste materials and saturate the waste.  As the leachate fills the void spaces in the waste materials, the saturated waste can become less permeable to gas flow and may isolate pockets of LFG from

---

[140] Agreement Between the Parish of Jefferson and CB&I Environmental &Infrastructure, Inc., December 18, 2015, AD_P00105777.

[141] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[142] December 1, 2020, Michael Lockwood deposition, page 116, lines 8 through 12

[143] Jefferson Parish Agreement with IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

the GCCS. Due to the extreme high variability typically found in waste layers in a landfill, the degree to which gas flow is affected by the saturated waste materials is extremely difficult to quantify. However, if a significant percentage of the more permeable materials becomes saturated with leachate, the effective radius of influence of a gas extraction well can decrease. In general gas flow will decrease with increased saturation of a specific waste layer.

CEC, as one of Jefferson Parish's landfill engineering firms, clearly described how they believed saturated wastes at JPLF negatively impacted the GCCS that APTIM was operating. CEC stated, *"Water within the waste mass is the primary problem for optimum operation of the LFG system at the site and creates or magnifies all other problems noted..."*[144] CEC also stated, *"Liquids build-up within a landfill starts with the leachate system and has a domino effect within the LFG system."*

Others also noted issues with the operation of the leachate collection system in Phase IVA. In a September 4, 2018 email from Mr. Rickie Falgout of Waste Connections to Mr. Lockwood, Mr. Falgout writes, *"The leachate pumps on 4A have bad motors due to high head pressure in the force main."* Mr. Falgout also writes, *"The force main must be repaired before placing them back in operation."* [145] Mr. Carlson identified issues with the force main damaging the leachate pumps as he recommends separating the condensate and leachate headers and recommended that, *"the existing 4-inch force main line be fully inspected, jetted, and cleaned to remove likely blockages in the line from sediment and debris."* [146] When further discussing his report findings, Mr. Carlson, in a June 11, 2018 email responding to Mr. Buller, writes, *"...APTIM personnel reported high pressures when they ran more pumps at once."* Mr. Carlson continued that, *"CEC's experience is that you need to jet the lines at least annually or you will see blockages."* [147] During Mr. Lockwood's December 1, 2020 deposition, he states, *"...we came to realize that the main line, the main leachate force main that connected all the phases of the landfill to the lift station, which carried the material off site, was probably undersized or inadequate."*[148] Mr. Lockwood also stated, *"because of the volumes necessary, you know, with each expansion, was inadequate to handle the amount of water. And that*

---

[144] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[145] Email from Rickie Falgout of Waste Connections to Michael Lockwood of Jefferson Parish, September 4, 1028, WC_JPLF_00414810
[146] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[147] Email from Kris Carlson of CEC to Rick Buller of Jefferson Parish, June 11, 2018, JP_JPLF_00075216
[148] December 1, 2020, Michael Lockwood deposition, page 135, lines 14 through 18

*is what was possibly causing the premature failure of leachate pumps.  So we were finding leachate pumps that wouldn't last but a week at a time."* [149]

As with the GCCS, Jefferson Parish Council understood that significant upgrades to the infrastructure to the leachate collection system were needed to improve gas collection at the landfill.  During the Council meeting on September 19, 2018, Mr. Lockwood stated, *"We continue to aggressively repair and upgrade the water or leachate collection system at the landfill...Contractors have replaced thousands of linear feet of leachate collection line and are in the process of final upgrades to the two pumping stations.  As we remove water, the ultimate goal is to increase the pull of gas from the landfill which will then ultimately decrease the fugitive emissions from the landfill."* [150]

It should be noted that IESI n/k/a WCI has been responsible for operating and maintaining the leachate collection system in Phase IVA since it became the contract landfill operator to Jefferson Parish.  This requirement is described in Section II(B)5.A. of the Contract between IESI and Jefferson Parish where it is stated that, *"IESI shall operate manage and maintain the Expansion Area...until the Phase IV-A Expansion Area is filled and closed.  The Service/Work to be performed by IESI under this portion of the Agreement shall include...operation and maintenance of leachate collection and treatment systems."*

In addition to the effect that the leachate collection system can have relative to the operation of the GCCS, the components of the leachate collection system can also provide points for emissions of gases.  For example, leachate risers can provide an avenue for the discharge of gases to the atmosphere.  Leachate risers, as mentioned previously, are sections of piping connected to an underdrain system running beneath a landfill waste cell.  Since the underdrain piping is slotted, it can provide a point for gases to enter the piping where the gas can accumulate and migrate up the risers.  If the LFG is not extracted it can build up and create pressure within the leachate riser.  If the riser is not sealed, the LFG, including odorous gasses, can escape.  This is one reason that the leachate risers are often connected to the GCCS and are maintained under vacuum at all times.  In such cases, the LFG is vented to the GCCS in lieu of discharging to the atmosphere.  APTIM had no responsibility for maintaining the "tightness" of the flanges or to otherwise prevent fugitive LFG emissions from such leachate risers.  Similarly, APTIM had no responsibility for maintaining the "tightness" of the flanges or lids on any leachate collection sumps

---

[149] December 1, 2020, Michael Lockwood deposition, page 135, lines 21 through 25 and page 136 line 1.
[150] Jefferson Parish Council Meeting Video Recording, Jefferson Parish, September 19, 2018

which, when not secured, could lead to fugitive LFG emissions from such sumps. APTIM only connected leachate risers to the GCCS when directed to do so by Jefferson Parish. These risers were not connected to the GCCS until near the end of APTIMs' contract time.

In an email from Mr. Buller, to Mr. Rickie Falgoust of Waste Connections, dated July 15, 2018, Mr. Buller states, *"The leachate riser Cell 22 South needs to be sealed. Gas is escaping and I can smell it 50 feet away."* [151]   When asked about this during his December 2, 2020 deposition, specifically, *"Do you remember what it smelled like."* Mr. Buller responded, *"It had a hydrogen sulfide odor."* [152]   The urgency to have the repair completed was stated by Mr. Buller in the July 15, 2018 email when he wrote, *"This needs to be done tomorrow, even this afternoon…"* [153]   During an August 28, 2018 LDEQ Title V Inspection, a cap was found off the riser for 20-S and a leak was detected at 20-N.  Elevated $H_2S$ concentrations were detected as reported in a September 2018 LDEQ weekly report.  In an October 29, 2018 email from Mr. Michael DeSoto to Mr. Lockwood, Mr. DeSoto, in describing a LDEQ inspection that same day, wrote, *"Major issues noted were leachate seep on Phase 4A, high water levels at multiple risers & fugitive air emissions at multiple leachate risers."* [154]   Ultimately the email was forwarded to Mr. Falgoust of Waste Connections who responded to, among others, Jefferson Parish personnel that, when referring to the leachate risers, *"ATPIM may need to put a vacuum line on these."* [155]

As described above, the leachate collection system had significant issues that required major upgrades to the associated piping infrastructure to function properly. While none of these upgrades were under the control of APTIM, they had the potential to negatively impact the function of the GCCS operated by APTIM or otherwise emit odors due to component malfunction.

**Opinion No. 7:**

*APTIM did not have control over the timing of the purchase and installation of the in-well leachate/condensate pumps in Phase IVA gas wells, or in other phases.*

---

[151] Email from Rick Buller of Jefferson Parish to Rickie Falgoust of Waste Connections, July 15, 2018, WC_JPLF_00271080
[152] December 2, 2020, Joseph "Rick" Buller deposition, page 99 lines 5 through 7 and lines 13 and 14
[153] Email from Rick Buller of Jefferson Parish to Rickie Falgoust of Waste Connections, July 15, 2018, WC_JPLF_00271080
[154] Email from Michael Desoto of Jefferson Parish to Mike Lockwood of Jefferson parish, October 29, 2018, WC_JPLF_00415745
[155] Email from Josh Broggi of APTIM to Mike Lockwood of Jefferson Parish, April 16, 2019, APTIM_0235763

*APTIM did operate and maintain pneumatic pumps, once installed in gas wells throughout the landfill.*

**Basis for Opinion No. 7:**

While APTIM was responsible for the operation and maintenance of in-well pneumatic pumps to remove liquids that accumulated in the gas extraction wells, likely from system condensate, precipitation, and draining of perched water zones, the ultimate decision regarding the purchase of and which wells to equip with in-well pumps (which was non-routine work) resided with Jefferson Parish. This is a key point when viewed relative to when pumps began to be installed in Phase IVA. Based on a review of APTIM's monthly reports from April 2018 until April 2019[156] it is documented that the first pumps in Phase IVA were only installed beginning in early 2019, very near APTIM's departure from the site. When considering the timeline of pump purchase and installation described above, and when considering that it can take weeks or even months to lower the liquid levels in a gas extraction well, it becomes apparent that any effect that well pumping might have had, relative to improvement in GCCS performance, was limited, relative to ATPIM's time onsite.

The use of in-well pumps in individual gas extraction wells is typically beneficial as it may increase the gas collection efficiency of the well. This is accomplished by the lowering of the liquid column within the well, and soils immediately adjacent to the well, such that more of the well's screened interval becomes available for gas collection. In other words, the larger the vertical extent of well screen that is exposed above the liquid level, the greater the probability of intercepting higher permeability waste materials which can allow the well to collect LFG from a greater distance from the well (note, again this is also partly dependent on the degree of saturation of the surrounding waste mass and the waste permeability).

The effect of the installation of dewatering pumps on the liquid levels in gas extraction wells in Phase IVA, at wells where data is available to complete the evaluation, is quite clear. Table 1 presents extraction well gauging data from Phase IVA extraction wells that, 1) had in-well dewatering pumps installed in 2019 and 2) were gauged in both 2018[157] and 2019. [158]

---

[156] Operations & Maintenance Monthly Reports, April 2018 through April 2019, CB&I/APTIM (APTIM-0009635, 0009716, 0009809, 0009902, 0010005, 0010116, 0022114, 0021991, 0021449, 0007554, 0007469, 0007857, and 0007635)

[157] APTIM Gauging Data, 2nd Semi-Annual 2018 (7/1/18 – 12/31/18)

[158] APTIM Gauging Data, Q1 2019 (1/1/19 – 3/31/19), ATPIM-0005004

March 4, 2024                                                                                          45

| Well | Depth to Liquid | | Change in Depth to Liquid |
| :---: | :---: | :---: | :---: |
| | 2018 | 2019 | |
| 500 | 25.93 | 31.10 | 5.17 |
| 501 | 17.92 | 19.70 | 1.78 |
| 510 | 19.14 | 12.00 | -7.14 |
| 512 | 19.83 | 26.50 | 6.67 |
| 513 | 26.45 | 39.20 | 12.75 |
| 516 | 13.10 | 23.70 | 10.60 |
| 518 | 21.90 | 42.30 | 20.40 |
| 524 | 28.30 | 39.80 | 11.50 |

**Table 1**
**Comparison of 2018 and 2019 Phase IVA Gas Extraction Well Liquid Level Data**

Note: Table includes only those gas extraction wells that were gauged in both 2018 and 2019 and were equipped with liquid pumps in 2019.

As the data shows, of the eight (8) Phase IVA gas extraction wells that met this criteria, seven (7) showed decreases in the liquid levels in the wells. This decrease in the liquid column in the seven (7) wells ranged from 1.78 to 20.40 feet, with an average of 9.84 feet. As described above, in general, as the liquid level in the well is lowered, more screen can become available for gas collection.

Jefferson Parish's understanding that liquid accumulating in the wells was problematic for the GCCS becomes clear when reviewing Question #7 of Addendum #1 of Jefferson Parish's RFP for the GCCS Operation and Maintenance Services (RFP No. 0338)[159]. Question #7 asks, *"What aspect(s) of existing LGCCS O&M services would you like to see improved, and what aspects are you working on."* The Parish's response was, *"The primary issue is high oxygen concentrations in several wells, and occasionally high temperature and pressure. Sometimes this is caused by leachate clogging gas well, and is beyond the complete control of the O&M Contractor."* Jefferson Parish echoed this position in their progress reports when they stated, *"...fluid pumps have been installed to date in gas extraction wells that have shown water levels that would adversely affect efficient gas removal."*[160]

---

[159] Attachment to Agreement Between the Parish of Jefferson and CB&I Environmental &Infrastructure, Inc., December 18, 2015, ADD_P00105777.
[160] E.g. Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, April 8, 2019,

CEC provided a list of recommendations[161] to improve the operation of the GCCS at JPLF, several of which were directly related to in-well pumping, including:

- Expediting the [purchase and] installation of new pumps and/or repair any pumps requiring maintenance;
- Exhaust pumps within each well;
- Install a different type of pump known as a "low drawdown" pump'';
- Install an additional larger compressor to supply air to the pneumatic in-well pumps;
- Provide a new separate force main for the liquids recovered from the GCCS components which would include the in-well pumps;
- Provide additional infrastructure to create a dedicated location for pump maintenance; and
- Add at least one (and possibly two) full time pneumatic pump personnel.

These recommendations, most of which, it should be noted, would be considered by APTIM's contract with Jefferson Parish as "Non-Routine Work". Such work, requiring Jefferson Parish's prior approval, shows that Jefferson Parish was aware of the significant effort that was required to upgrade the infrastructure and system components needed to improve the function of the in-well pumping system. While it could be broadly argued that APTIM could have installed pumps in the gas wells to reduce the impact of the liquid levels in gas collection wells, likely due to perched water zones in the waste materials, APTIM had no control over purchasing such pumps without the authorization from Jefferson Parish, and Jefferson Parish only granted such permission for Phase IVA, near the end of ATPIM's time onsite.

An example of the required approval process can be seen, in a June 13, 2018 email from Mr. Kevin Rellinger of APTIM to Mr. Buller, Mr. Rellinger wrote, "*Additional pumps will probably need to be added to decrease liquid levels in wells to allow for proper gas flow.*" [162] Mr. Buller responded in a July 6, 2018 email, "*I think water level measurements were taken recently....Based on these measurements, we may authorize several more pump installations.*" [163]

In a September 4, 2018 email from Mr. Brian Dejean of River Birch LLC (River Birch), Mr. Dejean writes, "*Additional vacuum will not increase gas collection in*

---

[161] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)

[162] Email from Rick Buller of Jefferson Parish to Kevin Rellinger of APTIM, July 6, 2018, JP_JPLF_00055624

[163] Email from Rick Buller of Jefferson Parish to Kevin Rellinger of APTIM, July 6, 2018, JP_JPLF_00055624

*flooded wells…"*[164]   Mr. Falgoust responds in another September 4, 2018 email to Mr. Lockwood, and states, *"I agree that the wells that are flooded in need pumps."*[165]

Additionally, the effect of the installation of additional pumps may have been impacted by the compressed air supply for the pneumatic pumps and the associated force main, which were apparently undersized. CEC documented these issues in their August 2015 Landfill Gas System Assessment report.[166]   As discussed previously, when further addressing his report findings, Mr. Carlson, in a June 11, 2018 email responding to Mr. Buller, writes, *"…APTIM personnel reported high pressures when they ran more pumps at once."* This was part of the discussion related to force man blockages as Mr. Carlson continued that, *"CEC's experience is that you need to jet the lines at least annually or you will see blockages."*[167]

As noted in a January 29, 2019 email, Mr. Josh Broggi of APTIM informed Mr. Lockwood that installing the twenty-two (22) pumps in Phases IIIB and IVA would take the installation of significant infrastructure upgrades including, *"approximately 1,400' of airline and forecemain pipe."*[168]

As late as February 2019 (shortly prior to APTIM's departure from the site), Jefferson Parish was still attempting to remedy issues with the in-well pump supporting infrastructure. On February 5, 2019 Jefferson Parish provided a notice to proceed to APTIM and approved approximately $75K for APTIM to, *"…provide airline and forecemain installation in Phases 3A, 3B, & 4A of the Jefferson Parish Sanitary Landfill."* In the approval letter, Mr. Lockwood stated, *"This is required to provide infrastructure to new condensate pumps in selected gas extraction wells that have been identified as having excess water preventing efficient removal of gas."*[169]

Jefferson Parish further detailed the need for pumps in all wells in Phase IVA for improved operation of the GCCS in an October 8, 2019 letter from Mr. Lockwood to Ms. Lourdes Itturalde, Assistant Secretary in the LDEQ Office of Environmental Compliance, which letter was copied to Parish President Mr. Michael Yenni. The letter includes the statement, when referring to the $5 million in proposed upgrades,

---

[164] Various September 4, 2018 emails between River Birch, Waste Connections, and Jefferson Parish, WC_JPLF 00414810
[165] Various September 4, 2018 emails between River Birch, Waste Connections, and Jefferson Parish, WC_JPLF 00414810
[166] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[167] Email from Kris Carlson of CEC to Rick Buller of Jefferson Parish, June 11, 2018, JP_JPLF_00075216
[168] Email from Josh Broggi of APTIM to Jefferson Parish, January 29, 2019, APTIM_0231058
[169] Letter from Mike Lockwood of Jefferson Parish to Josh Broggi of APTIM, February 5, 2019, JP_JPLF_0018219

"*This will result in ALL gas collection wells in Phases IVA and IIIB having pneumatic liquid collection pumps in every gas collection well in these two phases which should ensure that all available perforations in the wells are pulling gas, thereby significantly increasing the efficiency of gas extraction throughout these two phases which are currently producing the highest volume of gas at the landfill. A notice to proceed on this work was issued on September 20, 2019.*" [170]  The statement in the October 8, 2019 letter, from the Jefferson Parish, to state regulators (LDEQ), are particularly striking when viewed in the context of APTIM's limited time spend at Phase IVA, especially considering that pumps were not installed in select Phase IVA gas extraction wells until just a few months before APTIM left the site. The Parish described to LDEQ the need to have pumps in all wells and the significant amount of capital required for the upgrades. This demonstrates that not only was APTIM provided with a partially-installed GCCS, but APTIM was also only provided with a partially-installed system for in-well pumping, which further limited the ability to optimize operation of the GCCS. As has been evidenced and stated throughout this report, ATPIM could only operate the system in the condition it was provided to them by Jefferson Parish. Where the need for major infrastructure upgrades, like those needed to allow the pumping of water from the Phase IVA wells, was present, ATPIM had no control over the negative impacts to the operation of the GCCS, except in the limited cases where Jefferson Parish approved APTIM to perform non-routine work.

**Opinion No. 8:**

*APTIM did not have control over the specification, procurement, inspection, or placement of landfill cover materials. APTIM was not contracted to maintain any cover materials in any of the Phases of the landfill, including Phase IVA. APTIM only inspected landfill cover materials in conjunction with performing NSPS-required Surface Emissions Monitoring on a quarterly basis.*

**Basis for Opinion No. 8:**

APTIM's Agreement with Jefferson Parish, stipulated, in Section 2.0 and Exhibit B, the Scope of Work to be performed by APTIM at JPLF. Nowhere in the Agreement, or elsewhere in communications or documentation, reviewed by the author, between APTIM and Jefferson Parish, or between APTIM and Jefferson Parish subcontracted

---

[170] Letter from Mike Lockwood of Jefferson Parish to LDEQ, October 8, 2019, JP_JPLF_0014165

companies, was APTIM directed to take responsibility for the specification, procurement, placement, or maintenance of landfill cover materials.

The responsibility to apply the proper cover to the landfill was part of IESI/Waste Connection's contracted responsibilities. Cover material is mentioned multiple times within the Contract between IESI and Jefferson Parish. Section II.B.5.A includes the requirement for, *"furnishing and installation of daily, interim, and final cover..."* Section II.B.5 H includes the requirement that, *"All deposited waste will be covered with an approved alternate daily cover or 6 inches of daily cover materials at the end of each working day. Any waste exhibiting strong odors will be covered immediately upon delivery with soil materials."* [171] In fact, cover material management was considered so important by Jefferson Parish that this item is included in the Liquidated ("Stipulated") Damages section (Section IV, Paragraph M) of the Contract between IESI and Jefferson Parish. Per Paragraph M, *"Failure to provide 6 inches of daily cover or other approved alternative daily cover in accordance with LDEQ Permit, within 24 hours of notification by the Parish or State"* would result in fine of *"$3,000.00 per day until corrected.* [172] Also, *"Failure to provide 12 inches of interim cover in accordance with LDEQ Permit, within 24 hours of notification by Parish or State"* would result in a fine of *"$3,000.00 per day until corrected."* [173]

IESI/Waste Connections responsibilities regarding cover materials was made clear by Mr. Lockwood throughout his December 1, 2020 deposition were he described the responsibilities of, and activities performed by, Waste Connections, relative to the placement of cover materials at JPLF. [174] Additionally, Mr. Buller, in a July 3, 2018 email to Mr. John Perkey, the Associate General Counsel – Director of Compliance for Waste Connections, wrote, *"I have measured higher than expected H2S concentrations down-wind of the working face and seeping from the interim cover in Phase 4A, which is IESI's responsibility."* [175]

Regarding Jefferson Parish's responsibilities, on page 73 of his deposition Mr. Lockwood stated, relative to the landfill cover, *"Our inspections were responsible for documenting daily closure and cover."* [176]

[171] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

[172] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

[173] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

[174] December 1, 2020, Michael Lockwood deposition, page 73 lines 8 through 15, page 98 lines 4 through 7, and page 103 lines 2 through 5

[175] Email from Rick Buller of Jefferson Parish to John Perkey of Waste Connections, July 3, 2018, WC_JPLF_00270000

[176] December 1, 2020, Michael Lockwood deposition, page 73 lines 8 and 9

There are three types of landfill capping or cover materials used at JPLF, which include daily cover, interim cover/interim compacted cover, and final cover, although some may consider interim and interim compacted cover separately. Daily cover is applied at the end of each work day to areas of recently placed waste materials and consists of a minimum of six-inches of silty or sandy clays meeting the requirements of LAC 33:VII.711.B.2a, f, and g. Interim cover consists of a minimum one-foot thick layer of silty clays and interim compacted cover consists of a minimum two-feet thick layer of compacted silty clays (LAC 33:VII.115, LAC33:VII.711.B.2). Interim cover or interim compacted cover is applied on all operating areas of a facility that will not receive solid waste for a period 60 days or longer. The primary difference between interim cover and interim compacted cover is that runoff from operating areas that do not have interim compacted or final cover is considered contaminated (LAC33:VII.711.A.5). Final cover is placed over closed areas of the landfill and, as described previously for Phases I, II, IIIA, and IIIB, may consist of layers of compacted clay or geosynthetic caps among others. Additionally, alternate daily cover materials may be utilized at a landfill if approved by LDEQ. For example, at JPLF tarps[177,178] were also used as daily cover, as was a spray-on hardening cover material[179,180].

During the Relevant Time Period, interim and daily cover had been applied in Phase IVA.[181,182] The placement and maintenance of landfill cover is important as it acts as a cap over the waste materials and performs several functions depending on the type of material being applied. The lower permeability cover materials retard the migration of LFG from the waste materials to the atmosphere. In areas with GCCS, this makes the LFG more readily available for capture by the system.

Jefferson Parish understood the critical nature of the proper cover material and maintenance. In a July 12, 2018 email from Mr. Buller to Mr. Lockwood, Mr. Buller writes, "*Identified 3 areas where gas was seeping through desiccated soil cover in*

---

[177] December 1, 2020, Michael Lockwood deposition, page 99 lines 14 through 19

[178] Progress/Status Report – Jefferson Parish Landfill Repairs/Improvements, Jefferson Parish, September 24, 2018, JP_JPLF_0021423

[179] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 102 lines 4 through 10

[180] Email from Rick Buller of Jefferson Parish to Rickie Falgoust of Waste Connections, July 15, 2018, WC_JPLF_00271080

[181] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 79 lines 15 through 17, page 100 lines 18 through 23

[182] Email from Rick Buller of Jefferson Parish to John Perkey of Waste Connections, July 3, 2018 WC_JPLF_00270000

*active areas of Ph 4A. In my opinion, this is the biggest source of odors on-site.*" [183] The manner in which this situation was addressed was described in Jefferson Parish's August 6, 2018 Progress/Status report that states, "*Identified 3 areas where gas was seeping through desiccated soil cover in active areas of Ph 4A. This may be a source of odors on-site. Areas marked with stakes. Louisiana Regional Landfill Company (LRLC) hauling soil to areas and will spread and compact.*" [184]

The role of cover material in controlling odors is affirmed by Mr. Lockwood during his December 1, 2020 deposition when he is asked, "*Mr. Lockwood, what is the role generally of the landfill ground cover in a landfill? What is its purpose?*" Mr. Lockwood responded, " *Its general purpose is to contain… any emissions or gases coming from the landfill. It also -- depending on what type of cover you are talking about, there are several different types of cover: Daily cover, interim cover, final cover. But it is basically containment of gases and odors and that kind of thing.*" [185] During Mr. Lockwood's deposition, regarding hydrogen sulfide emissions, he was asked, "*…And H2S can emit from seeps in the ground. Correct?*" Mr. Lockwood answered, "Yes." When asked, "*And cracks in the landfill ground cover. Correct?*" Mr. Lockwood answered, "*Yes sir.*" [186]

Throughout APTIM's time onsite in Phase IVA, there were documented issues with the methods or materials utilized for the daily cover activities by IESI/Waste Connections. In an April 19, 2018 letter from Mr. Buller to Mr. Falgoust regarding "*Potential Liquidate Damages for Inadequate Daily Cover*", Mr. Buller noted, among other items, that, "*Jefferson Parish's inspection of daily cover on April 18, 2018 document an approximately ¼-acre area without daily cover.*" The letter also stated that, "*soil stockpiles were not positioned to be pushed over the working face completely.*" The letter went on to state that the Parish would, "*re-inspect the daily cover at closing April 19, 2018 and will assess the liquidated damaged stipulated if the daily cover is found to be inadequate.*" [187] During CEC's May 2018 inspection of the landfill, when addressing Phase IVA, CEC measured elevated H2S concentrations, "*at the ground surface around some soil cracks…As noted previously, these cracks should be sealed with clayey soils or a wet bentonite to*

---

[183] Email from Rick Buller of Jefferson Parish to Mike Lockwood of Jefferson Parish, July 12, 2018, JP_JPLF_00074844

[184] Progress/Status Report – Jefferson Parish Landfill, Repairs/Improvements, Jefferson Parish, August 6, 2018, JP_JPLF_0020128

[185] December 1, 2020, Michael Lockwood deposition, page 97 lines 3 through 12

[186] December 1, 2020, Michael Lockwood deposition, page 64 lines 19 through 24

[187] Letter from Rick Buller of Jefferson Parish to Rickie Falgoust of IESI LA Landfill Corp., April 19, 2018, WC_JPLF_00268181

*prevent emissions.*" [188]   In a July 15, 2018 email from Mr. Buller to Mr. Falgoust, Mr. Buller mentions several quality control issues with the applied materials. First, Mr. Buller states, "*I looked at the daily cover today around 1:30 and it wasn't good. Richard told me that they used sand and limestone for daily cover today…sand and limestone are not acceptable daily cover materials.*" [189]   When expanding on this email in his December 2, 2020 deposition, Mr. Buller stated, "*The sand and limestone is too porous. It would allow the gases and odors, you know, percolate through it. The preferred acceptable material is clay, which has a -- you know, it has a consistency that will prevent the escape of the gases if it is applied properly.*"[190]

Issues with the cover were also noted in November 2018. In a Daily Activities Log, Jefferson Parish inspectors noted, "*Cover being eroded and causing garbage exposure in various locations in cells 20, 21, &22. LRLC has made improvement toward addressing this issue but still needs to be addressed in multiple locations.*"[191] This not only showed problems with proper cover, but also demonstrated that entities other than APTIM were responsible for cover maintenance.

Mr. Lockwood also discusses issues with the cover, specifically in Phase IVA, in his December 1, 2020 deposition. He describes the need for the placement of 22,000 cubic yards of clay that was placed in Phase IVA sometime in 2019. In a May 6, weekly progress report it is stated, "*placement of an estimated 22,000 cubic yards of clay soil for interim cover. The clay cap installation will address erosional surfaces and prevent potential leachate breakout.*" [192]   From pages 102 through 106 of his deposition, Mr. Lockwood describes the planned placement of the additional 22,000 cubic yards of clay cover over Cells 20, 21, and 22 in Phase IVA. He also mentions that LDEQ inspection findings were partially the reason for the need to apply additional cover in these areas when he states, "*That is the nature of interim cover. It has to be 2 feet of interim cover. The reason for this is DEQ felt that there was -- in some places, the cover was not all the way up to 2 feet. And so we had PPM go out and survey the depth of the cover, and Waste Connections was asked to bring the cover to the required 2 feet in all the areas that were not receiving waste for up -- as defined by the interim cover regulations.*"   The completion of these activities, besides being described in Mr. Lockwood's deposition, are also confirmed in a letter dated April 18, 2019 from Jefferson Parish's legal representatives,

---

[188] Landfill Gas System Assessment for the Jefferson Parish Landfill, Carlson Environmental Consultants, PC, August 15, 2018 (ADD_P00135841)
[189] Email from Rick Buller of Jefferson Parish to Rickie Falgoust of Waste Connections, July 15, 2018, WC_JPLF_00271080
[190] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 101 lines 22 through 25, and page 102 lines 1 and 2
[191] Daily Activities Log, Jefferson Parish, November 21, 2018.
[192] May 6, 2019 Progress/Status – Jefferson Parish Landfill Repairs/Improvements JP_JPLF_0019781

Berrigan Litchfield, LLC in response Consolidated Compliance Order (CCO) and Notice of Proposed Penalty (NOPP) Enforcement Tracking No. MM-CN-19-0026. The letter states, *"Respondent recently completed installation of approximately 22,000 cubic yards of additional interim compacted cover on Cells 20, 21, and 22 to verify that a minimum depth of two feet is in-place."*[193]

Properly applied cover materials will mitigate gas from being emitted to the atmosphere as described above, and also mitigate precipitation from infiltrating through the landfill waste and, instead, flow aboveground to stormwater management structures. The decreased infiltration will, in-turn, mitigate the chance for leachate seeps forming at the landfill. A seep is an area where landfill leachate and/or gas breaks through the surface of the landfill. Such seeps can also result in the production of odors, depending on the compounds dissolved in the leachate discharging from the landfill through the seeps. Mr. Buller, during his December 2, 2020 deposition described a seep as, *"...a little hole or fissure within the soil cover where you detect either gas or liquids escaping through the cover."* [194]    The occurrence of seeps at JPLF are described below.

One seep was described in a June 25, 2018 email from Mr. Buller to Mr. O'Connor. Mr. Buller wrote, *"We forgot to talk about the leachate seep near the peak of Ph 4A by the 3B interface. I think we have a large pool, possibly trapped by the 4B interim cover, that is seeping over a pretty wide area. We have tried sealing with soil a couple of times, but nothing has worked. We installed a pump in the gas well adjacent to it but it pumped dry, with no effect on that seep. Aptim has increased vacuum in the adjacent wells to the extent that they can.*[195] In a document that identifies leachate seeps present at the landfill on June 14, 2018, nine different seeps are identified between Phase IIIB and IVA. [196]

A concern regarding the presence of seeps is that they may indicate a poor-quality cover/cap material and/or higher permeable waste materials in the immediate location of the seep. A lack of lower permeable cover in conjunction with high permeable wastes may provide a preferential pathway for odorous LFG to discharge to the atmosphere in addition to the, possibly odorous, seep water.

---

[193] Letter from Berrigan Litchfield, LLC to LDEQ, April 18, 2019, JP_JPLF_0014021

[194] December 2, 2020, Joseph "Rick" Buller, Jr. deposition, page 86 lines 8 through 10

[195] Email from Rick Buller of Jefferson Parish to Brett O'Connor of Waste Connections, June 25, 2018, JP_JPLF_00327342

[196] Maps and Figures showing leachate seeps on 06-14-18, JP_JPLF_0021726

One must also understand how the quality of the cover materials affects the capture efficiency of the GCCS. In the EPA's Mandatory Greenhouse Gas Reporting regulations (40 CFR Part 98 Subpart HH, Table HH-3), an area with daily cover and active gas collection is assigned a collection efficiency of 60% and an area with intermediate cover and active gas collection is assigned a cover efficiency of 75%. The United States Environmental Protection Agency (USEPA or EPA), Table HH-3 (of 40 CFR Part 98 Subpart HH) is based on research by the Solid Waste Industry Climate Solutions (SWICS). The EPA reports the SWICS collection efficiency data (reported by the EPA as SWICS, 2009) for portions of a landfill under daily soil cover and active gas collection to range from 50% to 70% with a mid-range default of 60%. Similarly, the EPA reports the collection efficiency for portions of a landfill under intermediate soil cover and active gas collection to range from 54% to 95% with a mid-range of 75%. What these capture efficiency ranges show is that the management of cover materials does have a significant impact on the amount of LFG being captured by a GCCS. It can be reasoned that poor cover material quality, cover material placement, and/or cover material maintenance can significantly, and negatively, impact GCCS efficiency. It must be noted that the referenced collection efficiencies apply to areas with active gas collection, such as a GCCS. In areas without active gas collection, the collection efficiency is assigned 0% by the EPA.

Placement of the proper type of cover materials is a critically important element for controlling odors at landfills, especially those active landfills with ongoing waste acceptance. Since APTIM clearly had no control over the management of cover materials they were not responsible for any odorous gasses that may have been emitted from Phase IVA based on problems with the specification, procurement, placement, or maintenance of landfill cover materials as described herein.

**Opinion No. 9:**

*Ambient and environmental monitoring for odors onsite and offsite was outside the scope of APTIM's contract with Jefferson Parish. Instead, IESI/Waste Connections' Agreement with Jefferson Parish required it to monitor for and control odors.*

**Basis for Opinion No. 9:**

As previously mentioned in this report, APTIM's Agreement with Jefferson Parish, dated December 28, 2015, stipulated, in Section 2.0 and Exhibit B, the Scope of Work to be performed by APTIM at JPLF. Nowhere in the Agreement, or elsewhere in communications or documentation, reviewed by the author, between APTIM and

Jefferson Parish, or between APTIM and Jefferson Parish subcontracted companies, was APTIM directed to take responsibility for any ambient or environmental odor monitoring. The only data collected by APTIM was related to the gas readings needed for balancing of the GCCS and for the Surface Emissions Monitoring events that monitored for methane as required by NSPS regulations on a quarterly basis.

Section II.B.5.H of the Contract between Jefferson Parish and IESI clearly defines IESI's responsibilities regarding Odor Monitoring. In fact, the paragraph is entitled, "Odor Monitoring & Control Activities". Paragraph H states, "*IESI shall perform odor monitoring and control activities and services as required by the existing Jefferson Parish Landfill Odor Management Plan, and any amendments thereto resulting from local, federal or state regulations adopted and imposed on the landfill operations…including providing personnel, equipment,….and incidentals necessary to comply and execute odor monitoring and control activities.*" [197] Failure to perform the required monitoring is addressed in the Liquidated ("Stipulated) Damages (Section IV, Paragraph M) of the Contract between IESI and Jefferson Parish. Per Paragraph M, "*Failure to perform odor monitoring and control activities as required by the existing Landfill Odor Management Plan*" would result in fine of "*$5,000.00 per day until corrected.*" [198]

During the time that APTIM was active at JPLF, various firms completed $H_2S$ and odor monitoring at the site. However, regarding APTIM's role, during his December 1, 2020 deposition, Mr. Lockwood clarified that APTIM was not responsible for $H_2S$ monitoring. When asked, "*And as we have discussed before, the Aptim monitoring didn't measure or monitor for H2S. Correct?*" Mr. Lockwood affirmed the comment. Mr. Lockwood further clarifies who completed odor monitoring at JPLF during his deposition. When asked, "*… Specifically as to emission of H2S from Phase 4A, would you agree that any measurement you have, that Jefferson Parish has, would be from Buller, LDEQ reports or Carlson….Is that correct?*" Mr. Lockwood answered, "*Correct. Yes Sir.*"[199]

Mr. Buller discusses renting a meter to monitor for $H_2S$ during his December 2, 2020 deposition [200]. Also during his deposition, Mr. Buller was asked, "*You testified that you were measuring the hydrogen sulfide using a Jerome meter. Is that right?*". Mr. Buller responded, "*I did for a brief period of time.*" [201] Mr. Buller also described

---

[197] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

[198] Contract between Jefferson Parish and IESI LA Landfill Corporation, May 17, 2012, WC_JPLF_00418707

[199] December 1, 2020, Michael Lockwood deposition, page 145, lines 13 through 22

[200] December 2, 2020, Rick Buller deposition, page 42, lines 19 and 20

[201] December 2, 2020, Rick Buller deposition, page 107, lines 6 through 9

surveying the entire landfill in May or June 2018. [202]  When asked about Jefferson Parish personnel monitoring $H_2S$ during the "*relevant time period*" Mr. Lockwood, in his December 1, 2020 deposition, stated, "*It is my understanding that Rick Buller at one point rented a Jerome meter.*" [203]  It should be noted that the Jerome meter is an instrument utilized to for real time measurement of $H_2S$ concentrations. Regarding off-site monitoring, in Mr. Lockwood's deposition he also describes how Jefferson Parish and Waste Connections were "*taking surveys*" when responding to odor complaints. [204]

Mr. Buller documented his monitoring for odors in a June 18, 2018 email to APTIM employees, entitled "H2S Concentrations" when he writes, "*I have been using a portable $H_2S$ meter to measure concentrations all around the landfill in areas suspected of causing odors. I found a couple near the working face that were ... (the maximum that the meter could read).*"[205]

In a May 30, 2018 email from Mr. Conley to Mr. Lockwood, Mr. Conley writes, "*I recommended to Rick that after a couple weeks of intense tuning of those wells, he should do another surface scan for gas emissions and see what impact the gas wells are having. This would give an indication of where to focus the next phase of H2S and odor reductions in Phase 4A.*" [206]  This statement reinforces the importance of environmental monitoring for odors, relative to potential odor reduction activities, specifically in Phase IVA.

Mr. Broggi of APTIM was asked during his November 11, 2020 deposition, "*So Aptim had no real role in deciding or in measuring odors that were coming off of the landfill. Is that right?*"  Mr. Broggi responded, "*Correct. That wasn't part of our scope of work.*"  When asked the follow up question, "*Were you ever asked to do that?*"  Mr. Broggi answered, "*No.*" [207]  It is clear that APTIM was never responsible for any monitoring related to site odors or odor complaints.

---

[202] December 2, 2020, Rick Buller deposition, page 107 lines 21 through 25 and page 108 1 through 4
[203] December 1, 2020, Michael Lockwood deposition, page 67, lines 12 and 13
[204] December 1, 2020, Michael Lockwood deposition, page 74 lines 7 through 10 and page 75 lines 3 through 7
[205] Email from Rick Buller of Jefferson Parish to APTIM, June 18, 2018, APTIM_0035379
[206] Email from Keith Conley of Jefferson Parish to Mike Lockwood of Jefferson Parish, May 30, 2018, JP_JPLF 00075661
[207] November 11, 2020, Josh Broggi deposition, page 50 lines 19 through 25

**Rebuttal of Opinions Rendered by Jose Sananes and Summary Statement**

Mr. Sananes states several times in his February 16, 2024 expert report in general, non-substantiated, and non-specific terms, that APTIM (1) inefficiently operated and inadequately maintained the GCCS, (2) breached the standard of care for operation and maintenance of the GCCS, (3) failed to ensure that the GCCS was operated and maintained so as to prevent noxious odors from escaping the landfill, and (4) did not adequately inform the Jefferson Parish or insure that Jefferson Parish remediated the improperly designed, maintained or operated  GCCS.

Based on the entirety of my findings, as described in my Major Opinions, it is my opinion that circumstances that led to odors and/or emissions from the JPLF allegedly experienced by plaintiffs, if any, from Phase IVA at JPLF were reasonably and clearly beyond the control of APTIM.  Thus, for the reason's set forth in the above opinions and bases for those opinions, and as summarized below, Mr. Sananes' four basic opinions set forth above related to APTIM's operations and maintenance of the GCCS and being responsible for emissions of H2S, as a result of ineffective or inadequate operations and maintenance activities, are simply wrong.

- APTIM was only active in Phase IVA for a limited time and was only provided with a partially-installed GCCS.
- APTIM had no control of the waste management at JPLF, including the onsite placement of odor producing waste materials.
- The GCCS that was provided to APTIM was designed and principally installed by others.
- APTIM's ability to optimize GCCS operation was further hampered by factors outside of its control including impediments placed on APTIM's performance by others.
- APTIM's ability to perform work at JPLF was limited by various Contact stipulations.
- APTIM had no control over the operation of the leachate pumping system that managed leachate levels within the wastes at JPLF.
- APTIM had no control over where or when in-well pumps were purchased and installed, or other issues that negatively affect in-well pumping system operation.
- APTIM had no control over the placement of cover and cap materials at JPLF.
- With the exception of SEM, APTIM was not a responsible for any onsite or offsite environmental monitoring activities, including those related to odor monitoring.

March 4, 2024

**Submittal Statement**

My rate is $250.00/hour.

Respectfully submitted,

Barry A. Kline, PE.