# In the Matter Of:

## ICTECH-BENDECK V. WASTE CONNECTIONS

C/W 18-8071,

---

## BARRY KLINE

*May 02, 2024*

---





800.211.DEPO (3376)
EsquireSolutions.com

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2         EASTERN DISTRICT OF LOUISIANA
 3
 4
     ELIAS JORGE "GEORGE"        CIVIL ACTION
 5   ICTECH-BENDECK           NO. 18-7889 C/W 18-8071,
                                18-8218, 18-9312
 6
     VERSUS                    SECTION E (5)
 7
     WASTE CONNECTIONS BAYOU,
 8   INC., ET AL
 9           RELATED CASE:
10
     FREDERICK ADDISON, ET AL   CIVIL ACTION
11
     VERSUS                    NO. 19-11133 C/W 19-14512
12
     LOUISIANA REGIONAL LANDFILL
13   COMPANY (LRLC), ET AL      SECTION E (5)
14
15
16
     VIDEOTAPED AND REMOTE CONFERENCE DEPOSITION OF BARRY
17   KLINE, TAKEN IN THE OFFICES OF GIEGER LABORDE &
     LAPEROUSE, ON THE 2ND DAY OF MAY, 2024, COMMENCING AT
18   8:58 A.M. AND CONCLUDING AT 4:27 P.M.
19
20
21
     REPORTED BY:
22
23          RUBY M. WALLEN
            CERTIFIED COURT REPORTER
24
25
```

Page 2

```
 1   APPEARANCES:
 2   REPRESENTING THE ICTECH-BENDECK PLAINTIFFS:
 3
            HAMMEL LAW FIRM, LLC
 4          BY:  DOUGLAS S. HAMMEL, ESQ.
            3129 BORE STREET
 5          METAIRIE, LOUISIANA 70001
 6          504.832.9942
            DOUGLASHAMME@GMAIL.COM
 7
             -AND-
 8
            MARTZELL BICKFORD & CENTOLA
 9          ATTORNEYS AT LAW
            BY:  JASON Z. LANDRY, ESQ.
10          338 LAFAYETTE STREET
            NEW ORLEANS, LOUISIANA 70130
11
            504.581.9065
12          JZL@MBFIRM.COM
13           -AND-
14          FORREST CRESSY & JAMES
            ATTORNEYS AT LAW      (VIA ZOOM)
15          BY:  S. ELIZA JAMES
            1222 ANNUNCIATION
16          NEW ORLEANS, LOUISIANA 70130
17           -AND-
18
     REPRESENTING THE ADDISON PLAINTIFFS:
19
            WHITEFORD TAYLOR & PRESTON
20          ATTORNEYS AT LAW
            BY:  ERIC C. ROWE, ESQ.
21          1800 M STREET, NW, SUITE 450N
            WASHINGTON, DC 20036
22
            202.659.6800
23          EROWE@WTPLAW.COM
24
25
```

Page 3

```
 1   REPRESENTING WASTE CONNECTIONS US, INC., WASTE
     CONNECTIONS BAYOU, INC. AND LOUISIANA REGIONAL
 2   LANDFILL COMPANY:
 3          LISKOW & LEWIS
            ATTORNEYS AT LAW        (VIA ZOOM)
 4          BY:  CHERRELL S. TAPLIN
            701 POYDRAS STREET, SUITE 5000
 5          NEW ORLEANS, LOUISIANA 70139
 6          504.581.7979
            CTAPLIN@LISKOW.COM
 7
             -AND-
 8
            BEVERIDGE & DIAMOND
 9          ATTORNEYS AT LAW
            BY:  JOHN H. PAUL, ESQ. (VIA ZOOM)
10          825 THIRD AVENUE, 16TH FLOOR
            NEW YORK, NEW YORK 10022
11
            202.789.6000
12          JPAUL@BDLAW.COM
13
     REPRESENTING APTIM CORP.:
14
            GIEGER LABORDE & LAPEROUSE
15          ATTORNEYS AT LAW
            BY:  JOHN E. BAAY, III, ESQ.
16          701 POYDRAS STREET, SUITE 4800
            NEW ORLEANS, LOUISIANA 70139
17
            504.561.0400
18          JBAAY@GLLLAW.COM
19   REPRESENTING JEFFERSON PARISH:
20          CONNICK AND CONNICK
            ATTORNEYS AT LAW
21          BY:  MICHAEL S. FUTRELL, ESQ.
            MATTHEW D. MOGHIS, ESQ.      (VIA ZOOM)
22          3421 NORTH CAUSEWAY BOULEVARD, SUITE 408
            METAIRIE, LOUISIANA 70002
23
            504.681.6658
24          MFUTRELL@CONNICKLAW.COM
            MOGHIS@CONNICKLAW.COM
25
```

Page 4

```
 1
         THE VIDEOGRAPHER:
 2
 3          DYLAN TURNER
 4   REPORTED BY:
 5
 6          RUBY M. WALLEN
 7          CERTIFIED COURT REPORTER
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

EXAMINATION INDEX

EXAMINATION BY                                    PAGE

Mr. Hammel.............................11

Mr. Futrell...........................187

Mr. Paul..............................268

Page 7

Exhibit 1633.............................258
December 13, 2017 letter to Buller
NSPS Surface Emissions Monitoring-
Fourth Quarter 2017
APTIM-0211099-13

Exhibit 1634.............................
(Not marked on record)

Exhibit 1635.............................258
April 9, 2018 letter to Buller
NSPS Surface Emissions Monitoring-
1st Quarter 2018
APTIM-0025969-91

Exhibit 1636.............................258
June 29, 2018 letter to Buller
NSPS Surface Emissions Monitoring-
2nd Quarter 2018
APTIM-0057939-61

Exhibit 1637.............................259
October 5, 2018 letter to Lockwood
NSPS Surface Emissions Monitoring-
3rd Quarter 2018
APTIM-0045021-23

Exhibit 1638.............................259
December 28, 2018 letter to Lockwood
NSPS Surface Emissions Monitoring-
4th Quarter 2018
Aptim-0197126-48

Exhibit 1638(A).........................
(Exhibit not referred to on record)
March 11, 2019 letter to Lockwood
NSPS Surface Emissions Monitoring-
APTIM-0005037-38 and 5054

Exhibit 1639.............................260
Operations & Maintenance Monthly Report
June 2018
APTIM-0009809-12

Exhibit 1640.............................262
Operations & Maintenance Monthly Report
July 2018
APTIM-0009902-06

Page 6

EXHIBIT INDEX

EXHIBIT NO.                                       PAGE

Exhibit 1623.............................26
Agreement Between the Parish of Jefferson
and CB&I Environmental & Infrastructure, Inc.

Exhibit 1624.............................38
Jeffrey Marshall Created 5/13/2019
SCS_JPLF_00012682-87

Exhibit 1625.............................72
Exhibit B Scope of Work/Services from
RFP 0338

Exhibit 1626............................187
Kline expert report
Exhibit 1627............................196
Jefferson Parish Sanitary Landfill Gas
Collection and Control System Operation and
Maintenance Services Technical Proposal
September 2015
APTIM-0141917-70

Exhibit 1628............................220
First Amendment to Agreement
ADD P00106259-267

Exhibit 1629............................226
Second Amendment to Agreement
ADD_P00106237-47

Exhibit 1630............................228
Third Amendment to Agreement
ADD_P00105768-76

Exhibit 1631............................228
Fourth Amendment to Agreement
APTIM-0109461-68

Exhibit 1632............................256
October 6, 2017 letter to Buller from Aptim
NSPS Surface Emissions Monitoring
3rd Quarter 2017
APTIM-0029359-82

Page 8

Exhibit 1641............................264
Operations & Maintenance Monthly Report
October 2018
Aptim-0022113-16

Exhibit 1642............................265
Operations & Maintenance Report
November 2018
APTIM-0021991-95

Exhibit 1643............................286
5/15/2019 E-mail from Broggi to Lockwood
Subject:  RE:  JP Update
APTIM-0231659-61

Exhibit 1644............................293
Part VII  Solid Waste
Environmental Regulatory Code
December 2023



Page 9

```
1            S T I P U L A T I O N
2
3        It is stipulated and agreed by and between
4   counsel for the parties hereto that the deposition of
5   the aforementioned witness is hereby being taken
6   under the Federal Rules of Civil Procedure, for all
7   purposes, in accordance with law;
8        That the formalities of reading and signing
9   are specifically not waived;
10        That all objections, save those as to the
11   form of the question and the responsiveness of the
12   answer, are hereby reserved until such time as this
13   deposition, or any part thereof, may be used or
14   sought to be used in evidence.
15
16                * * * *
17
18        RUBY M. WALLEN, Certified Court Reporter,
19   in and for the Parish of Orleans, State of Louisiana,
20   officiated in administering the oath to the witness.
21
22
23
24
25
```

Page 10

```
1            BARRY KLINE,
2   after having been first duly sworn by the
3   above-mentioned court reporter, did testify as
4   follows:
5        THE VIDEOGRAPHER:
6        Good morning.  We are on the record.
7   This is the videotaped deposition of Barry Kline.
8   Today's date is May 2nd, 2024.  The current time is
9   8:58 A.M.
10        Counsel, will you please introduce
11   yourselves and affiliations and the witness will be
12   sworn.
13        MR. ROWE:
14            Eric Rowe for the Addison plaintiffs.
15        MR. FUTRELL:
16            Michael Futrell for the Parish of
17   Jefferson.
18        MR. BAAY:
19            John Baay for Aptim Corporation.
20        MR. HAMMEL:
21            Doug Hammel, class counsel.
22        MR. PAUL:
23            John Paul for the Waste Connections
24   Defendants.
25        (Witness sworn.)
```

Page 11

```
1   BY MR. HAMMEL:
2        Q.    Good morning, Mr. Kline.
3        A.    Good morning.
4        Q.    Nice to see you again.
5        A.    See you, too.
6        Q.    So I was looking back at the previous
7   deposition that we did a couple years ago.  Do you
8   recall that?
9        A.    Yes.
10        Q.    Have you given any depositions since
11   that time?
12        A.    No. I have not.
13        Q.    And I think that was the first
14   deposition that you had ever given.
15        A.    That is correct.
16        Q.    So you are a nice guy and we are going
17   to have a conversation today, but I'm going to do my
18   best not to interrupt you and wait for you to answer
19   your question fully.  And if you do the same for me,
20   to ask my question fully, this nice lady will be able
21   to take down everything more accurately.
22        If your attorney, Mr. Baay objects,
23   let him clearly state it.  And then unless he
24   instructs you not to answer the question, you can
25   still go ahead and answer it.  Okay?
```

Page 12

```
1        A.    Okay.
2        Q.    Okay.  And the same rules apply from
3   last time.  If you need to take a break for any
4   reason --
5        A.    Yeah.
6        Q.    -- I just ask that you don't do it
7   while a question is pending.  Okay.
8        So you are an operations and
9   maintenance person.  Is that right?
10        A.    Yeah.  I oversee gas collection
11   systems.  Yes.
12        Q.    Okay.  And I think that the last time
13   we talked you told me that you considered yourself to
14   be a remediation engineer?
15        A.    Yeah.  My job is two parts.
16   Remediation engineer.  So I clean up Superfund sites.
17        Q.    Right.
18        A.    Somebody spills something, clean up,
19   reuse it.  And the other thing is overseeing a series
20   of gas collection systems at landfills.
21        Q.    That's right.  And if I recall
22   correctly, at the time we spoke last time, you were
23   overseeing seven landfill gas collection systems and
24   treatment systems in the Connecticut and New York
25   area?
```

Page 13

1    A.    That is correct.
2    Q.    Are you still doing that?
3    A.    We are now up to eight and two others
4    that we do a lot of work on.  So between eight and
5    10.  But we definitely oversee eight and there are
6    two more that have been put on.
7    Q.    And those, before that, you oversee
8    both the gas collection and the leachate collection.
9    Is that right?
10    A.    That is correct.
11    Q.    And you are also responsible for
12    applying cover?
13    A.    No. We are not.
14    Q.    Okay.  Okay.  And if memory serves me
15    correctly, you have never been qualified as an expert
16    in any court in the field of operations and
17    management of a landfill?
18    A.    No. I have not.
19    Q.    Okay.  And never been qualified as an
20    expert in any court in the field of gas collection
21    and control design?
22    A.    No. I have not.  And that is going
23    back to what we said last time, did the court ever
24    say you were an expert.
25    Q.    So, yes.  So when I say the question,

Page 14

1    qualified as an expert, I mean in a court in the
2    United States of America?
3    A.    Yeah. No.
4    Q.    Never happened?
5    A.    No.
6    Q.    And hasn't happened since the last
7    time that we spoke?
8    A.    No. It has not.
9    Q.    Okay.  Just making sure.
10          And the last time we spoke, have you
11    ever published any papers on the topics of operations
12    and maintenance of a landfill or gas collection and
13    control system design?
14    A.    Just those two specifically, no.  I
15    have not.
16    Q.    Okay.  And then I will ask again.  Or
17    more generally --
18    A.    Yeah.
19    Q.    -- have you ever published any papers
20    or any topics related to landfills?
21    A.    No. I have not.
22    Q.    Okay.  And have you taken any classes
23    or received any certificates since the time of our
24    last deposition?
25    A.    The only one I can think of is my,

Page 15

1    doing an OSHA refresher every year.  That is the only
2    one that off the top of my head I can think of.
3    Q.    That is great.  And that is more of a
4    continuing education, because you were previously
5    qualified by OSHA?
6    A.    Correct.  Yes.
7    Q.    Okay.  Is there anything that you've
8    undertaken since our last deposition that is new?
9    Have you received any certificates or training?
10    A.    Actually, I've taken a three-credit
11    CEU for my New Jersey professional engineer license.
12    Q.    What is CEU?
13    A.    Continuing education unit.  I take 24
14    every two years.  And one of the classes I took there
15    was on landfill, general landfill operations, gas
16    collection system operations.
17    Q.    Are those CEU credits required to
18    maintain your license as a professional engineer?
19    A.    Yes.
20    Q.    Isn't it nice when we can take a
21    continuing education class that is actually
22    applicable to what we do.
23    A.    It is very, it is very nice when you
24    can.
25    Q.    It is very nice.

Page 16

1    A.    I won't go into anymore detail.
2    Q.    Okay.  So I just want to make sure
3    that you have a hard copy of your report in front of
4    you.  Right?
5    A.    Yes, I do.
6    Q.    I just would like you to take a look
7    at Pages 2 and 3 and I want to make sure that the
8    opinions you have written there.
9    A.    Okay.  This is new, too, since last
10    time.
11    Q.    The glasses.  Well, they are very
12    sharp.
13    A.    I'm glad you like them.
14    Q.    Yes.  I have distance ones now since
15    the last time we spoke.
16    A.    Okay.  Pages 2 and 3.
17    Q.    So we are going to start with Opinion
18    No. 1 and just kind of work down through them.
19    A.    Right.
20    Q.    Okay.  So Opinion No. 1, do you want
21    to go ahead and read that first one for me?
22    A.    "Aptim was only provided with a
23    partially installed GCCS, gas collection and control
24    system, to operate in Phase 4A and the timing of its
25    installation and expansion was outside of Aptim's

Page 17

1  control."
2      Q.    So Opinion No. 1 states that Aptim was
3  provided a partially installed gas collection and
4  control system. And by partially installed, do you
5  mean that there was a design plan, but it wasn't
6  completed by the time Aptim left the landfill?
7      A.    Yes. There was a design plan. But by
8  the time Aptim left the landfill, the installation
9  had not been completed.
10      Q.    And I think you get more into that. I
11  just wanted to make sure that is what you meant.
12      A.    Yes, I do.
13      Q.    Okay.
14      A.    And there is a little more to it than
15  that. If I can say, that is on the causation trial
16  findings of fact, which it limited the noted the gas
17  emissions were from Phase 4A of the landfill. So I'm
18  specifically talking in this case about Phase 4A
19  which I mention here.
20      Q.    Thank you for making that
21  clarification.
22      A.    And the other thing about that is if
23  you look at the timeline, I think it is finding
24  number 2 causation. It says --
25      Q.    Okay. I'm sorry. I just need you to

Page 18

1  explain what you mean by that finding number 2?
2      A.    Oh. I'm sorry. The findings of fact
3  in the causation trial.
4      Q.    Yes, sir.
5      A.    Number 2 was that up until April of
6  2018, early April of 2018, there was no gas
7  collection system installed. We know that. Okay.
8      Q.    Agreed.
9      A.    Then it says that starting in November
10  of 2019, that is when the first, say, large scale.
11  It actually says the word large-scale effort to
12  address the gas collection system was. So in that
13  Aptim was, started April, and they were already off
14  site by May.
15      Q.    2019?
16      A.    17. Yeah. May 17th, 2019. So that
17  was six months before what the court said is the
18  large-scale addressing of the gas collection system
19  was. So that is why it is partially installed.
20      Q.    Got it.
21      A.    Both those cases.
22      Q.    You brought up a good point, and I'm
23  not sure if you have this information. But the
24  contract that was signed between Aptim and Jefferson
25  Parish, why don't you just go ahead and get these

Page 19

1  things out of the way, John.
2      MR. BAAY:
3          Okay.
4  BY MR. HAMMEL:
5      Q.    First of all, have you seen that
6  document before?
7      A.    Yes, I have.
8      Q.    Okay. And let's while we are talking
9  about it, if somebody would look for the last exhibit
10  number for me that, that would be great.
11          So my understanding is that contract
12  with, you know, was signed, it looks like December
13  28th, 2015. The first page at the top there.
14      A.    Yes.
15      Q.    The handwritten part. Do you see
16  that?
17      A.    Yes, I do.
18      Q.    December 28th, 2015.
19      A.    Yes, I do.
20      Q.    Okay. So excuse me. And that
21  contract would have went into effect on January 1st,
22  2016. Is that your understanding?
23      A.    I do not see the date when it went
24  into --
25      Q.    So if you look on Page 2 of 15 under

Page 20

1  3.0 Operations. 3.1 --
2      A.    Oh. There it is. January 1st, 2016.
3  Correct. Yep.
4      Q.    And that carried through December
5  31st, 2018. Is that right?
6      A.    That is correct.
7      Q.    Okay. And then it appears as if there
8  were two one-year extensions that the parish could
9  exercise. Is that right?
10      A.    That is correct.
11      Q.    And the parish didn't exercise the
12  full term, but it appeared to me as if they exercised
13  the six-month term?
14      A.    Yes. I believe so.
15      Q.    Approximately?
16      A.    Yes.
17      Q.    And that got Aptim through whenever
18  they left. You said May 17 --
19      A.    Correct.
20      Q.    -- 2019?
21      A.    Yep.
22      Q.    So that would be your understanding of
23  the contract?
24      A.    Yes. That is my understanding of the
25  contract.

Page 21

1    Q.    Okay. Great. The second part of
2  number 1 says that, and number 1, I'm talking about
3  your Opinion No. 1. And as soon as somebody tells me
4  an exhibit number, I will —
5       MR. ROWE:
6            You are going to mark his report?
7       MR. HAMMEL:
8            Not yet.
9       MR. ROWE:
10           Okay.
11      MR. HAMMEL:
12           Do you know what exhibit number it is
13  going to be if we were going to mark it?
14           Whenever you know let me know.
15      MR. ROWE:
16           I'm not sure if I can answer this
17  question now.
18      BY MR. HAMMEL:
19      Q.    So the second part of that Opinion No.
20  1, after being a partially installed gas collection
21  and control system, it says that the timing of its
22  installation and expansion was outside of Aptim's
23  control. Is that right?
24      A.    That is correct.
25      Q.    Okay. And that would have been under,

Page 22

1  whose opinion, in your opinion, whose control was
2  that under?
3       A.    That would have been under Jefferson
4  Parish's control.
5       Q.    And how many wells did Aptim install
6  in Phase 4A?
7       A.    They installed seven wells in Phase 4A
8  at the end of January, early February, end of January
9  2019. The rest of the wells were installed by, I
10  believe Tricon is the company that did that. Yes.
11      Q.    Okay. And when Aptim renewed its
12  contract with the parish that we just went over, in
13  2018, the parish had not or Aptim had not installed
14  any wells in Phase 4A at that time. Is that right?
15      A.    That is correct.
16      Q.    Okay. And at the time that that
17  contract was renewed, was Aptim aware of the gas
18  collection and control system design on Phase 4A?
19      A.    Could you repeat that again?
20      Q.    Sure. So at the time that Aptim
21  renewed its contract with the parish, that six
22  months, at the end of 2018 —
23      A.    Yep.
24      Q.    — was Aptim aware of the gas
25  collection and control system design for Phase 4A?

Page 23

1       MR. BAAY:
2            Object to form. You can answer.
3       THE WITNESS:
4            Yeah. I'm, I'm not sure if they are.
5  They were given a design of some kind to tell them
6  where to install the wells. So they had to have
7  been, at least of those seven wells they had to know
8  where the design was. So beyond that, I'm not sure
9  exactly what they were given as far as where to
10  locate those seven several wells.
11      BY MR. HAMMEL:
12      Q.    Okay.
13      A.    But they were, they were made aware at
14  least of the location of seven wells.
15      Q.    Okay. And at the time that Aptim
16  renewed its contract with the parish, was Aptim aware
17  of the plan of installation for the wells on Phase
18  4A?
19      A.    At the time, at the time of the, let's
20  do this again. At the time of their renewal, which
21  was that six months. So it would have been one year,
22  one year, January. I guess what, what date are we
23  using for the date of the renewal, if I can ask that
24  question.
25      Q.    Well, let's just say, you know, it

Page 24

1  would have taken effect —
2       A.    Right. In January —
3       Q.    — on January 1, 2019 or thereabouts.
4       A.    Right. So they would've renewed and
5  then, oh, so at the time of renewal.
6       Q.    At the time of renewal.
7       A.    They would not have known. They would
8  have renewed and then been given the installation,
9  the location where to install the wells. I guess the
10  answer is I'm not sure when they were given that
11  actual document, because there was an issue with
12  Tricon who was originally going to install those
13  wells. Tricon couldn't install the wells, so the
14  parish went to Aptim to help them out to install
15  those wells. So I'm not sure on what day they
16  actually got their RFP or their map, or whatever it
17  would have been to tell them we want you to put these
18  seven wells in here. Which was done in, again, end
19  of January, February 2019.
20      Q.    Are you familiar with Aptim as a
21  company?
22      A.    Only what I know from these cases,
23  working with them.
24      Q.    Okay.
25      A.    And also I know that they, I know that



Page 25

1 they construct flares as well.
2    Q.    Okay.
3    A.    I think they bought LFG was a company
4 that constructed flares.
5    Q.    Do you know if Aptim has a legal
6 department?
7    A.    No. I don't.
8    MR. BAAY:
9        We gave you the trick water bottle.
10   MR. HAMMEL:
11       Wouldn't want to leak on your fancy
12 table.
13 BY MR. HAMMEL:
14   Q.    So are you familiar with the term due
15 diligence?
16   A.    Yes.
17   Q.    And what does that mean to you?
18   A.    Doing background research.
19   Q.    And do you know if each of these
20 paragraphs contained in the contract and the attached
21 Exhibit B were negotiated by Aptim and the parish?
22   MR. BAAY:
23       Object to form.
24   THE WITNESS:
25       I don't know if they were negotiated

Page 26

1 or not.
2 BY MR. HAMMEL:
3    Q.    Okay. So you don't know.
4    A.    I know they, I would assume knowing
5 contracts, they would have been reviewed. But I
6 don't know what form of negotiation took place.
7        (Deposition Exhibit 1623 marked for
8 identification.)
9    Q.    Okay. Take a look at Opinion No. 2.
10 Before I forget, let's go ahead and mark the contract
11 between, it is called an Agreement Between the Parish
12 of Jefferson Parish and CB&I Environmental &
13 Infrastructure, Incorporated as Exhibit 1623.
14       John, if you could let your copy be
15 the one for the nice lady.
16   MR. BAAY:
17       That is fine.
18   MR. HAMMEL:
19       Okay. So the second —
20   MR. PAUL:
21       This is John Paul. Sorry to
22 interrupt. Can you hear me?
23   MR. BAAY:
24       Yes.
25   MR. PAUL:

Page 27

1        Did you just state that the Aptim
2 contract is Exhibit 1623?
3    MR. HAMMEL:
4        I did.
5    MR. PAUL:
6        Great. Thank you.
7    MR. HAMMEL:
8        Do you agree with that designation,
9 John?
10   MR. BAAY:
11       Sure.
12   MR. HAMMEL:
13       Thank you.
14   MR. PAUL:
15       I have no reason to disagree.
16   MR. HAMMEL:
17       Well, you are usually the one that
18 keeps track. So I just wanted to make sure you
19 didn't have a different number.
20   MR. PAUL:
21       It is going to be hard for me today to
22 keep track of that.
23   MR. HAMMEL:
24       Yeah. We will keep track as we go. I
25 just wanted to make we weren't repeating a number

Page 28

1 from yesterday.
2    MR. PAUL:
3        Thanks.
4 BY MR. HAMMEL:
5    Q.    Sure. Opinion No. 2, Mr. Kline, would
6 you go ahead and read that for me?
7    A.    "Aptim was not responsible for the
8 receipt of waste materials, waste placement, waste
9 processing or waste solidification, including the
10 deposition or use of materials, such as spent lime or
11 fly ash, that may have led to the increased
12 concentrations of hydrogen sulfide within the
13 landfill gas being generated."
14   Q.    Okay. I'm going to move things along
15 a little bit. You agree that these opinions listed,
16 numbers 1 through 9, on Pages 2 and 3, are your
17 expert opinions in this case?
18   A.    Yes. They are.
19   Q.    Are you opining on any other fields
20 other than the nine opinions listed on Pages 2 and 3
21 of your report?
22   A.    No. I'm not.
23   Q.    Okay. So it appears to me, if you
24 look at number 2, which you just read for us. If you
25 take a look at No. 6 which states, Aptim did not have



Page 29

1    control over the leachate levels in Phase 4A that
2    allegedly impaired the operation of the gas
3    collection system.
4          You saw that?
5        A.    Yes.
6        Q.    Okay.  For No. 6, did you, did you
7    read the judge's ruling on general causation in this
8    case?
9        A.    Yes, I did.
10       Q.    So in No. 6 you used the word
11   allegedly impaired?
12       A.    Yes.
13       Q.    Why did you choose that word?
14       A.    I did.  Because I did not have any,
15   for me to render an opinion as to whether there were
16   high leachate levels, there would be additional data
17   that I would want to see.  There would be a program
18   I'd want to go to see if that is the case.  So I
19   wanted to make sure it was clear that I wasn't
20   offering an opinion whether there was or was not high
21   leachate levels in the landfill.
22       Q.    Did you read in the judge's ruling
23   where she determined that high leachate levels
24   impaired the operation of the gas collection system?
25       A.    I don't recall that.  No.

Page 30

1        Q.    You don't remember a part where she
2    said the perforation of the gas collection system
3    were covered with water and leachate liquid?
4        A.    No. I actually do not.
5        Q.    Okay.  And are you aware that the
6    Louisiana Department of Environmental Quality cited
7    the Jefferson Parish Landfill for not keeping the
8    leachate in a pumped-down condition?
9        A.    Yes, I am.
10       Q.    And it lingered so long that it became
11   a compliance order?
12       A.    Yes.  I believe so. Yes.
13       Q.    Okay.  So what other information would
14   you need to determine that the high leachate levels
15   had an impact on the operation of the gas control and
16   collection system?
17       A.    What I would like, I would've have
18   liked to see a boring program in the waste itself to
19   see outside of the wells and outside of the
20   transducers measuring the level inside.  I would like
21   to see was actually throughout the waste.
22       Q.    And you wouldn't have faith in the
23   transducers why?
24       A.    Well, the transducers don't always
25   tell the full story. Because in this case we are

Page 31

1    talking about the difference between, if I remember
2    correctly, there were times the transducers were,
3    again, if I remember correctly, they were out.  Had
4    to be within a foot.  And they were a few inches
5    above that, a few feet above that.  Different
6    transducers and different places.  So if it is going
7    to affect the gas collection system, I would like to
8    see what was happening right in that specific area,
9    how it affects the gas collection system.
10       Q.    Didn't Aptim do well depth
11   measurements of the gas collection wells on Phase 4A?
12       A.    They did in-well measurements, but
13   that is not, that just tells you what's in the well.
14   That doesn't tell you what is in the waste
15   surrounding the wells that are in that area.
16       Q.    Does the liquid in the well covering
17   the perforations of the gas collection pipe impact
18   the gas collection system?
19       A.    Yes.  That is why there is an in-well
20   pumping system.
21       Q.    Okay.  But in order to make that
22   determination of whether or not the liquid in the
23   landfill is impacting the gas collection system, I
24   think you said you would like to see a boring?
25       A.    Yes.  Because the wells, the liquid in

Page 32

1    the wells can come from multiple places.  One, it can
2    be condensate from inside.  The second thing it can
3    be a drainage from perched layers that are
4    temporarily going through the system.  Or it can be,
5    you know, some incidental leachate as well.  If that
6    liquid level does occlude some of the screens, then
7    you pump it out.
8          But as far as outside of the well
9    screen, what is going on in the formation itself in
10   the landfill waste, a boring program, I mean,
11   drilling down through and taking samples and see
12   where you hit the actual level.  Where does it become
13   saturated at.
14       Q.    We are going to talk more about
15   pumping liquid out of gas collection system wells a
16   little bit later.
17       A.    Yep.
18       Q.    But I want to understand if you were
19   going to bore into the waste mass, and then what you
20   would do, measure at the depth that you struck
21   liquids?
22       A.    Well, you would measure all the way
23   down.  So you would go every two to five feet and you
24   collect a sample.
25       Q.    What do you do with the sample?

Page 33

1   A.   What's that?
2   Q.   What do you do with the sample?
3   A.   You observe.  See what the state of
4   saturation is.  Eventually you get to a point where
5   you say, okay, this is wet.  It is completely
6   saturated.  And you would actually, I'm sorry.  You
7   would actually keep going, because as you go through
8   you hit perched layers.  So it's wet, then it's dry.
9   Q.   Potentially?
10   A.   Then it is wet, then it is dry.  Yeah.
11   Q.   Potentially you hit perched layers?
12   A.   Yeah.
13   Q.   Did you review the boring that was
14   done to install the well on Phase 4A?
15   A.   I looked, I looked at some of them.
16   But the way they were, the way they were listed,
17   what, what they used wasn't what I would consider a
18   formal boring program.  If you look at the way the
19   waste came out, they didn't really characterize it.
20   They didn't do it on a, you know, two- or a
21   four-foot, five-foot interval that you would look at.
22   So I looked at them, but I didn't think the data was
23   anything that I could really use to make that
24   determination.
25   Q.   Those borings that was conducted in

Page 34

1   order to install the wells did document when liquid
2   was struck.  Right?
3   A.   Some did.  Some did not.  Some went
4   the whole way and it didn't say anything.  So it is
5   tough to tell.  And the other thing, those weren't,
6   those weren't borings done by a geologist.  These
7   were done by, and I've seen these before.  We will
8   have drillers come out and they do a driller log.  It
9   doesn't always give you the best information.  So
10   based on my experience, I would want to see a
11   geologist's information more than what a driller
12   does.  So that is --
13   Q.   Sorry.  Were you done?
14   A.   I was going to say, because I've done
15   quite, I've done quite a few these drilling through
16   waste mass, drilling through for Superfund sites.
17   Drilling through waste, so.
18   Q.   Okay.  Well, good.  That was my next
19   question was, have you had the experience of hiring a
20   geologist and conducting a boring program at any of
21   the landfills that you operate?
22   A.   One.  Yes.
23   Q.   Okay.
24   A.   One.
25   Q.   And what was the purpose of why you

Page 35

1   did that?
2   A.   We were looking for, we were going to
3   be putting in wells.  So we were looking to see where
4   the liquid level was encountered.  So we did a boring
5   program in the landfill to figure out where we were
6   going to do the, what depths.  We were expanding the
7   gas collection system.  So we wanted to know where
8   the leachate liquid levels were so we knew where to
9   run in our well drilling.
10   Q.   And would you try to avoid those
11   locations where the leachate was with your newly
12   installed gas collection well?
13   A.   Well, in this case, in this case it
14   was a very, it was an older, deeper landfill.  So we
15   drilled down until we hit a liquid, and that is where
16   we stopped our well installation at.
17   Q.   Okay.  Great.  And then if you take a
18   look at your opinion No. 8.  Go ahead and read that
19   for me, please.
20   A.   "Aptim did not have control over the
21   specification, procurement, inspection, or placement
22   of landfill cover materials.  Aptim was not
23   contracted to maintain any cover materials in any of
24   the phases of the landfill.  Aptim only inspected
25   landfill cover materials in conjunction with

Page 36

1   performing NSPS, New Source Performance standard,
2   required surface emissions monitoring on a quarterly
3   basis."
4   Q.   So if we look at your opinion numbers
5   2, 6 and 8, those to me state that Aptim didn't have
6   anything to do with those three aspects of the
7   landfill, Jefferson Parish Landfill.  Is that right?
8   A.   That is, let me just double-check
9   these again.
10   Q.   Yeah.  I think 2, Aptim didn't have
11   anything to do with the waste acceptance and
12   placement at JPLF?
13   A.   Right.
14   Q.   6 was about Aptim didn't have anything
15   to do with the leachate collection.
16   A.   Leachate.  And 8 was.  Yes.  Cover.
17   Yes.  That would be correct.
18   Q.   Are you aware that all three of these
19   aspects of the landfill, a landfill can impede the
20   collection of gas?
21   A.   Yes.
22   Q.   Okay.
23   A.   And I documented that in my report, I
24   believe.
25   Q.   And you are aware that all three of



**Page 37**

1 those aspects can also lead to odors at a landfill.
2 Right?
3     A.    I would say if they impede the
4 collection, I'm going to say if they impede the
5 collection of landfill gas, which contains odorous
6 compounds, then, yes. If it prevents the
7 optimization of the gas collection system, then, yes,
8 it could lead to emissions of gases.
9     Q.    And that is because all gases are
10 odors or all odors are gases. Right?
11    A.    No. That's, I do not believe that is
12 correct. I think you could have fumes.
13    Q.    Fumes are gas?
14    A.    No. No. A fume is actually a very
15 small particulate liquid --
16    Q.    Okay.
17    A.    -- in the air.
18    Q.    So I guess the point I was trying to
19 make is if you are collecting the gases at a
20 landfill, you are also collecting the odors?
21    A.    Right.
22    Q.    Okay.
23    A.    Well, yes. As far as there being
24 odorous compounds in the gases that you collect, then
25 you would be collecting --

**Page 38**

1     Q.    Yeah.
2     A.    -- the odorous gases. Yes.
3     Q.    And in your Opinion 2, because Aptim
4 didn't have anything to do with the waste acceptance
5 or the waste placement at Jefferson Parish Landfill,
6 you are aware that the allegations in this case are
7 that spent lime is the waste stream that caused the
8 odorous hydrogen sulfide?
9     A.    That is correct.
10    Q.    Okay. Do you agree with that?
11    A.    I'm not a, I'm not a waste generation
12 expert. I have a general knowledge that sulfates in
13 waste do break down and form hydrogen sulfide. But
14 as far as the actual generation in this case --
15    Q.    Yep.
16    A.    -- I relied on Jefferson Parish's
17 experts' comments or employees' comments on that.
18          (Deposition Exhibit 1624 marked for
19 identification.)
20    Q.    Here you go. I'm handing both Mr.
21 Baay and Mr. Kline a document that I'm going to mark
22 as Exhibit 1624. And this document was marked by
23 Bates SCS_JPLF_00012682 and I believe it goes through
24 12687. We will get there.
25    MR. ROWE:

**Page 39**

1          Okay.
2     BY MR. HAMMEL:
3     Q.    And have you ever seen this document
4 before, Mr. Kline?
5     A.    No. I have not. I have not seen this
6 document, but I have seen it referenced.
7     Q.    Okay. My scribble-scratch at the top,
8 you can disregard or read it. But this is a document
9 that was created by a Mr. Jeffrey Marshall, and this
10 was his review of potential waste at the Jefferson
11 Parish Landfill that could create hydrogen sulfide,
12 high amounts of hydrogen sulfide. Where have you
13 seen this document referred to previously, if you can
14 recall?
15    A.    Yeah. I'm looking in my report. The
16 assertion of waste degradation of certain compounds
17 leading to the formation of odorous gases, including
18 hydrogen sulfide, was supported by CEC when it stated
19 fly ash sometimes contains soluble sulfates that were
20 mixed with water and conditions commonly found at MSW
21 landfills can produce hydrogen sulfide gas. See
22 attached Exhibit 15A, 15, a study by Jeffrey
23 Marshall.
24          So this was part of, this was part of
25 SCS Engineers. I'm sorry. That describes this

**Page 40**

1 process. So this was an attachment to Carlson's, I
2 believe it was his August 15th I'm looking at. Yeah.
3 Yeah. His August 15th, 2018 landfill gas assessment
4 report.
5     Q.    Right. So if you take a look at it
6 with me for a moment. You can see in the right-hand
7 column is titled Odor Generating Concern. Do you see
8 that?
9     A.    Yes.
10    Q.    And there is a lot of "nos."
11          And then the first one says, "Minor
12 H2S," and it has to do with the wastewater treatment
13 plant sludge at the Jefferson Parish Landfill.
14          Do you see that?
15    A.    Yes. Yes.
16    Q.    And were you aware that wastewater
17 treatment sludge was accepted at the Jefferson Parish
18 Landfill?
19    A.    No. I was not.
20    Q.    The second one that says, "Yes,
21 potentially" is the ribbon blend. Do you see that?
22 The next one underneath the wastewater treatment
23 plant?
24    A.    Yeah. I see the "yes." I don't see
25 the, you called it ribbon. Okay. All the way to the

Page 41

1 left, ribbon blend.
2    Q.    Yeah.  On the left is the name of the
3 producer of the waste.
4    A.    Okay.
5    Q.    And a little lower down they also
6 identify Flopam.  Right.  And he has some notes
7 associated with those waste streams underneath the
8 part that says Odor Generating Concerns.  Do you see
9 that part?
10    A.    Yes, I do.
11    Q.    Okay.  If you flip the page, and I
12 think the third one down on that page is the fly ash
13 that Mr. Carlson was speaking of in his report, or I
14 think that —
15    A.    Okay.  Yeah.  I see it here.  Yep.
16    Q.    Okay.  So it says "yes" but there is
17 only five times.  It is a one-time disposal?
18    A.    Right.
19    Q.    And then if you go all the way down to
20 the bottom of that spreadsheet, the last one listed
21 is the Rain Carbon?
22    A.    Yep.
23    Q.    And you see it says 4,000 tons a year
24 and it is ongoing.  And under Odor Generating Concern
25 it says "Yes, potential for H2S generation via SRB."

Page 42

1 Do you know what that stands for?
2    A.    Sulfate-reducing bacteria.
3    Q.    And biodegradation in the landfill.
4 Right?
5    A.    Yes.
6    Q.    Okay.  If you flip the page, and
7 again, you see the next one at the top of the next
8 page is also Rain Carbon.  And that is from a
9 different facility and they are accepting 2,000 tons
10 a year of that.  Right?
11    A.    2,000 metric tons per year.  Correct.
12    Q.    And then again on Odor Generating
13 Concern it indicates "yes, potential for HS2," the
14 same as it indicated previously?
15    A.    Yep.  Sulfur-reducing bacteria, yep.
16    THE REPORTER:
17       You have to say the words.
18    THE WITNESS:
19       Sorry.  I apologize.  I realized as I
20 said that, I knew I was speaking over Doug and I
21 wasn't speaking clearly.  So yes.
22 BY MR. HAMMEL:
23    Q.    So from this report, Mr. Marshall, do
24 you have any reason to disagree with the
25 determination that Rain Carbon spent lime was the

Page 43

1 most likely waste stream that was causing high
2 amounts of hydrogen sulfide in Phase 4A?
3    A.    I'd have to speculate just because I'm
4 not an expert on the breakdown of this Rain Carbon
5 spent lime and how it would, how it would break down.
6 Again, I have a general understanding of materials
7 that have sulfates in them.
8    Q.    Yep.
9    A.    Do, can break down in a landfill
10 atmosphere to hydrogen sulfide.  But as far as what
11 actually happened out here, I didn't review any of
12 this information in detail.
13    Q.    Okay.  So when I say cover, and I
14 guess I'm speaking specifically about daily and
15 interim uncover.  Okay?
16    A.    Because we are in Phase 4A, so it
17 would be daily interim cover.
18    Q.    And who was responsible for the
19 application of cover on Phase 4A?
20    A.    That would be, and I'm going to use
21 the term Waste Connections, LRLC, IESI, I'm going to
22 use Waste Connections.  So Waste Connections, per
23 their contract.  And, again, I have a section on
24 that.  But it would be Waste Connections, up until,
25 up until the time they were no longer onsite.  But I

Page 44

1 think they were onsite the whole time during the
2 relevant time period we are talking about.
3    Q.    And the relevant time period is July
4 1, 2017 through December 31st, 2019?
5    A.    Correct.
6    Q.    And so during that time Waste
7 Connections was responsible for application of the
8 daily and interim cover?
9    A.    That is correct.
10    Q.    Okay.  And did you review any
11 documents in your preparation for your expert report
12 that indicated that there were violations of the
13 cover?
14    A.    There were some, I want to say some
15 LDEQ reports, some issues with the cover.  I can't
16 remember offhand what they were.  But there were some
17 issues.  I do recall that there were some.
18    Q.    In your experience, is one of the
19 functions of cover to prevent rain infiltration?
20    A.    Yes, it is.
21    Q.    Is one of the functions of, I'm sorry.
22    A.    I'm sorry.  Two parts of that.  Rain
23 infiltration, it not only prevents rain from
24 infiltrating and becoming leachate, it also, it also
25 forms runoff.  So it takes the rain away from the

BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
45–48

Page 45

1 landfill as well. So there is kind of two parts to
2 that. Doesn't go in. And it gets it off the
3 landfill so it doesn't get in later or infiltrates
4 somewhere else. So the cover does both of those
5 functions as far as precipitation goes.
6     Q.    And is another function of the cover
7 to control odors?
8     A.    Yes, it is. And both of those items
9 you just mentioned are in the LAC code. LAC 33:VII.
10 It has a list of what cover is for and those items
11 are in there. It is just not my opinion, which that
12 is what it is. I see it at the landfills we have
13 that are active. We have to make sure that the, we
14 don't have to make sure, but the operators have to
15 make sure they have the cover down. In this case,
16 the LAC code also dictates it as well and what it is
17 for.
18     Q.    Is also part of the function of cover
19 to assist in the gas collection?
20     A.    Yes, it is.
21     Q.    Who was responsible for the collection
22 of leachate on Phase 4A?
23     A.    The collection of leachate?
24     Q.    Yes, sir.
25     A.    Was Waste Connections.

Page 46

1     Q.    And if leachate is not collected, does
2 it back up into the waste mass?
3     A.    It is a possibility. Yes. It can
4 back up in the waste. It can discharge, if you have
5 a cell, over the sides of the cell in the
6 groundwater. But yeah. It can back up into the
7 waste mass.
8     Q.    And who, I might've asked this. But
9 who was responsible for the application of daily and
10 interim cover on Phase 4A?
11     A.    Daily interim cover would have been
12 Waste Connections.
13     Q.    Okay. And who was responsible for the
14 acceptance and placement of waste in 4A?
15     A.    The acceptance and placement of waste
16 would have been Waste Connections as well. And
17 again, if you want to go into it, I have the contract
18 language in here also stating the sections where, so.
19     Q.    I have read your report. You did a
20 very nice job. I just want to confirm that what I
21 read and what I understood is what you meant to
22 communicate through writing in your report.
23     A.    Good.
24     Q.    So you don't need to go to it.
25     A.    Yep.

Page 47

1     Q.    I agree --
2     A.    Okay.
3     Q.    -- with your answer. If there is
4 something that I disagree with, then we will go to
5 the report and dig in.
6     A.    Yep.
7     Q.    I want from the beginning to make sure
8 I understand.
9     A.    There is obviously a lot of
10 information here. I did a lot. So I want to make
11 sure that I'm going back, this was, this was several
12 reports ago yet, so.
13     Q.    And you haven't done a lot of this?
14     A.    A thousand projects. What is that?
15     Q.    And you haven't done a lot of report
16 writing and then giving testimony about the report
17 you read?
18     A.    Yeah.
19     MR. BAAY:
20         Object to form.
21     THE WITNESS:
22         This is my first.
23 BY MR. HAMMEL:
24     Q.    So yeah. No problem. And I forget
25 the number you told me, if it was seven or nine wells

Page 48

1 that Aptim installed in Phase 4A?
2     A.    They installed seven.
3     Q.    Seven. And is there, looking at your
4 I think it is Opinion No. 3, it says that "Aptim did
5 not have control over the design of the gas
6 collection and control system in Phase 4A, nor did
7 Aptim have control over the timing of the
8 installation of various gas control and collection
9 components, such as the extraction wells and
10 collection system piping. Additionally, Aptim could
11 not, could only operate the partially installed gas
12 collection system in the condition and configuration
13 provided to it by the parish." I think I read that
14 correctly.
15     A.    I believe you read it correctly.
16     Q.    So related to No. 3, was there a
17 problem with the gas collection design on Phase 4A?
18     A.    I don't believe there was an issue
19 with the initial gas collection design. What had
20 happened is over time changes were made to the amount
21 of waste that was being placed. So the original
22 design actually got changed I think three times.
23     Q.    Okay. And in any of those three
24 redesigns of the gas collection and control system on
25 Phase 4A, where do you believe the problem with the



Page 49

1  design begin?
2      A.   Well, I'll say, the original, the
3  original design called for, and I don't want to say
4  there was a problem with the design.  It was the, I
5  would say, it would have to do with the phasing of
6  the installation over time.  So it originally called
7  for 32 wells in the area that we are talking about,
8  the particular area of Phase 4A, where it was
9  documented, it was stated that waste was placed.  So
10  it was originally 32 wells.  That was going to be
11  brought in in stages.  At some point there was more
12  waste brought in.  So where certain horizontal
13  collectors were going to go, those were delayed until
14  they had enough waste.  See, to do the horizontal
15  collectors, they said, well, let's wait until we put
16  in actual vertical wells.  And that's about a
17  nine-month delay.  So there was an area called the
18  center part of Phase 4A that there was not, there
19  were no gas collection wells installed.  There were on
20  horizontal collectors or gas collection wells.
21          So as far as problem with the design,
22  I don't want to say the word problem with the design.
23  I want to say there is an issue with the
24  implementation, which Aptim did not have any control
25  over.  First they said we are going to give you nine

Page 50

1  wells.  They were going to have six wells.  They were
2  going to move this around.  There is nothing, no
3  equipment in the central part of the landfill.  Later
4  on we are going to need you to put in seven wells,
5  and those seven wells were only two and a half months
6  before the end of their —
7      Q.   And I think the period —
8      A.   Three and a half months before the end
9  of their —
10      Q.   Sorry.
11      A.   I'm sorry.
12      Q.   I didn't mean to cut you off.
13      MR. HAMMEL:
14          Did you get that?
15      THE REPORTER:
16          No.  Because you guys are talking over
17  each other.
18  BY MR. HAMMEL:
19      Q.   You can finish your answer.
20      A.   Three and a half months until Aptim
21  left the site.
22      Q.   If I understood you correctly, I heard
23  you say that the design was adjusted because more
24  waste was received?
25      A.   Yes.  You know what, I can tell you

Page 51

1  right here.  Because it was in a letter that Mr.
2  Buller wrote to LDEQ asking for no determination so
3  they could make this change in the design.  It was,
4  it was a Golder design, Golder design.  So that was
5  done in April 2018.
6      Q.   What page of your report are you
7  looking at?
8      A.   I'm sorry.  I'm on Page 20.  It
9  states, "It should be noted that Golder revised the
10  Phase 4A design on several occasions to address the
11  sequential installation of various groups of gas
12  extraction wells in Phase 4A."
13          And it talks about the number of
14  changes.  They requested a no objection letter for
15  the last revised design plan or one of the revised
16  design plans.  And Jefferson Parish's reasoning for
17  the rule of the two horizontal collectors, there were
18  actually three horizontal collectors.  So I'm not
19  sure why they asked for a delay of two.  But none of
20  the horizontal collectors were installed.
21          And instead remobilize to the site
22  within six months to install vertical gas wells.
23  Jefferson Parish's reasoning for the removal of the
24  two horizontal collectors and delay in the expansion
25  of the GCCS was that, between the time that the

Page 52

1  design was advertised for bids, the contract awarded,
2  and contractor mobilization, much more waste was
3  deposited in the area.  The grades were changed
4  significantly.  And the design grades are there, from
5  the design grades and there was sufficient depth to
6  fill, of fill to install vertical wells instead of
7  horizontal collectors in some locations.  Current
8  disposal operations are in the area of the east-west
9  aligned horizontal collectors.  The installations
10  can't be made due to safety issues with contractor
11  employees working among the landfill equipment and
12  disposal vehicles.
13      Q.   And then you say, "Thus, Waste
14  Connections' filling operations further delayed the
15  installation of the gas collection and control system
16  infrastructure, which was another factor beyond
17  Aptim's control."
18      A.   That is correct.  They had, they had
19  no control of when or where fill was placed.
20      Q.   You previously stated that emissions
21  through the cap is an indication of a design problem.
22  Do you remember saying that in your previous
23  deposition?
24      A.   Emissions through the cap?
25      Q.   Is an indication of a design problem.



Page 53

1    A.    No. I don't recall saying that.
2    Q.    You said that on Page 39, Line 13 of
3  your prior deposition.
4    A.    Okay.
5    Q.    But do you agree with that statement?
6    A.    Read that again.
7    Q.    Emissions through the cap is an
8  indication of a design problem.  It doesn't mean
9  exclusively.
10    A.    I guess I'd have to know of the, it
11  could be outside of the gas collection and control
12  system.  If you have, you are supposed to have a
13  competent cover.  So I'm not sure what I was
14  referring to there.  But if we are outside the gas
15  collection system, then, yes.  You should have
16  something.  Yes.
17    Q.    In your opinion, are emissions through
18  the cap also an indication of a problem with the
19  operations and maintenance of the gas collection
20  system?
21    A.    Say that again.
22    MR. BAAY:
23        Object to form.
24    THE WITNESS:
25        Read that again.

Page 54

1  BY MR. HAMMEL:
2    Q.    In your expert opinion --
3    A.    Yep.
4    Q.    -- are emissions through the cap,
5  could that also be an indication of a problem with
6  the operations and maintenance of a gas collection
7  system?
8    MR. BAAY:
9        Object to form.
10    THE WITNESS:
11        It would depend.  It would depend on
12  what is causing the emissions in the area.  So we
13  would have to know a little more information.  Again,
14  it could be --
15  BY MR. HAMMEL:
16    Q.    Could be?
17    A.    The cap in the same area.
18    Q.    Okay.
19    A.    Yeah.
20    Q.    And in your expert opinion, are
21  emissions through the cap, possibly, also an
22  indication of a problem with the cover?
23    A.    Yes.  Could be.
24    Q.    And in your expert opinion, can
25  emissions through the cap also be an indication of a

Page 55

1  problem with vacuum?
2    A.    Yes.  They could be.
3    Q.    Okay.  Aptim was responsible for the
4  operation and maintenance of the in-well pumps to
5  remove the liquids from the gas collection and
6  control system wells.  Right?
7    A.    That is correct.
8    Q.    And in Opinion No. 7, go back to that.
9  Could you read that for me, please?
10    THE REPORTER:
11        Slowly, please.
12    MR. HAMMEL:
13        I'll give you a copy of it.
14    THE REPORTER:
15        I have a copy of it, but, you know, if
16  you do this every time you read, I might as well
17  just, what --
18  BY MR. HAMMEL:
19    Q.    Okay.
20    A.    "Aptim did not have control over the
21  timing of the purchase and installation of the
22  in-well/leachate condensate pumps in Phase 4A gas
23  wells or in other phases.  Aptim did not operate,
24  Aptim did operate and maintain pneumatic pumps, once
25  installed, in gas wells throughout the landfill."

Page 56

1    Q.    Okay.  In Opinion No. 7, are you
2  testifying that Aptim was unable to purchase the
3  equipment necessary to perform its obligations under
4  the terms of the contract?
5    A.    That is correct.  They would have had
6  to gotten permission from, permission, approval, and
7  as Rick Buller says, authorization.
8    Q.    Okay.  And if we take a look at what
9  we have previously marked as Exhibit 1623, the
10  contract, and specifically I would like to look at
11  Section 2.3.  It is the bottom of the first page.  Do
12  you see that?
13    A.    Yes.
14    Q.    When it refers to "firm," the firm
15  means Aptim.  Right?
16    A.    Correct.
17    Q.    And it says, "Aptim shall."  Do you
18  understand what the word "shall" means?
19    A.    I believe so.  Yes.
20    Q.    It is not, it is not permissive.
21  Right.  It is not may.  It is shall, which means that
22  it has to.
23    A.    Correct.
24    Q.    Okay.  So it says, "The firm, Aptim,
25  shall provide all vehicles, fuel, tools, equipment,

Page 57

1 safety gear, supplies, consumable materials."
2        It talks about calibration gases,
3 office supplies, other similar materials with the
4 routine services. Right?
5    A.    Correct.
6    Q.    And one of the routine services was
7 for Aptim to pull and clean all of the pumps every
8 three months. Right?
9    A.    Correct.
10    Q.    Okay. And we talked about it was
11 Aptim's responsibility for the operation and
12 maintenance of in-well pumps to remove the liquids.
13        Oh. Thank you.
14        Right?
15    A.    Yes.
16    Q.    Okay. So is it your, are you drawing
17 us a line here where you are saying, well, we
18 couldn't buy the pumps?
19    A.    That is correct.
20    Q.    Okay.
21    A.    Pumps the pumps and installing the
22 pumps. Anything, everything over $1,500, and that is
23 in 2.5. And then again in Section 1.1 point, this is
24 back in exhibit, oh, the scope of work isn't attached
25 to it. But there are two parts of that.

Page 58

1    Q.    Right. And you see --
2    A.    So it would, I'm sorry.
3    Q.    I was going to say, and you say that
4 is also in your Opinion No. 5. Right. Opinion No. 5
5 you say, "Aptim's work at JPLF was limited by
6 contract and agreement provisions and language to
7 specific tasks." Right?
8    A.    Correct.
9    Q.    Okay. But you weren't prevented from
10 making the request for a pump and a well. Right?
11    A.    That was --
12    MR. BAAY:
13        Object to form.
14    THE WITNESS:
15        I'm sorry.
16    MR. BAAY:
17        No. That is okay.
18    THE WITNESS:
19        That was actually done, the chain of
20 command there, and I have it in here, was the gauging
21 information. Rick Buller said, we'll look at the
22 gauging information and determine whether we are
23 going to authorize more pumps or not.
24 BY MR. HAMMEL:
25    Q.    So if you take a look at number 1 of

Page 59

1 that contract previously marked 16 --
2    MR. ROWE:
3        1623.
4 BY MR. HAMMEL:
5    Q.    Thank you. Number 1 says,
6 Administration of Agreement. It says, "all work
7 shall be under the direction of the director of the
8 Department of Environmental Affairs." Right?
9    A.    Correct.
10    Q.    And who was the director of the
11 Department of Environmental Affairs for Jefferson
12 Parish?
13    A.    I believe that was Mike Lockwood.
14    Q.    I believe you are correct. And it
15 says, "All requests, plans, reports, etcetera, shall
16 be submitted to it and all approvals and
17 administration of this agreement shall be through
18 it."
19        Did I read that correctly?
20    A.    That is, that is correct. Well,
21 almost correct. It says the director of the
22 Department of Environmental Affairs or his designee.
23    Q.    Or her designee?
24    A.    His or her designee. Yes.
25    Q.    All right. So do you have any

Page 60

1 indication that Mr. Lockwood designated this
2 authority for this contract to anyone other than
3 himself?
4    A.    No. I do not.
5    Q.    Okay. So do you have requests from
6 Aptim to, directed to Mr. Lockwood, to install pumps
7 in the wells on Phase 4A?
8    A.    I have not seen any. But my
9 understanding in looking at the communications back
10 and forth between Aptim and Jefferson Parish, it
11 appeared that they were going through Mr. Buller for
12 their requests, for multiple, multiple things. He
13 was the, he was the landfill engineer. And this
14 comes from my experience, you typically, typically,
15 the landfill engineer is the person that you are
16 going to contact about these things.
17    Q.    So speaking of your experience, are
18 you a legal expert?
19    A.    A legal expert?
20    Q.    Yes, sir.
21    A.    I don't believe so.
22    Q.    Are you a contractual expert?
23    A.    I've been working under contracts for
24 30-plus years. So I would say an expert in,
25 everything I do is under a contract.



BARRY KLINE                                               May 02, 2024
ICTECH-BENDECK V. WASTE CONNECTIONS                       61–64

**Page 61**

1    Q.    Have you ever taken a class on
2  contract writing?
3    A.    I think I've taken classes on contract
4  interpretation, but I don't think on writing.
5    Q.    And have you received any certificates
6  or completed any classes in contract writing or
7  interpretation?
8    A.    I don't believe. No.
9    Q.    Okay. Do you plan on giving your
10  legal opinion about the contract between Aptim and
11  Jefferson Parish in the trial of this matter?
12    A.    If asked I will, I could give my
13  interpretation on it based on my experience.
14    Q.    Do you have any training other than
15  reading the words on the contract?
16    A.    I —
17  MR. BAAY:
18        Object to form. Go ahead.
19  THE WITNESS:
20        I also write contracts as well. So I
21  write contracts and I work under contracts. I have
22  been doing it for 30, you know, 30-plus years.
23  BY MR. HAMMEL:
24    Q.    And did you have any working, did you
25  have any opportunity to work under the contract

**Page 62**

1  between Aptim and Jefferson Parish?
2    A.    Did I personally have any, no, I did
3  not.
4    Q.    How many times have you been to
5  Jefferson Parish Landfill?
6    A.    I have not been to Jefferson Parish
7  Landfill.
8    Q.    Have you ever had a contract with
9  Jefferson Parish?
10    A.    No. I have not.
11    Q.    Have you ever previously been
12  qualified as an expert in any court in America to
13  interpret contracts?
14    A.    No. I have not.
15    Q.    Have you been qualified as an expert
16  in any court in America related to anything to do
17  with a contract?
18    A.    No. I do not believe so.
19    Q.    Okay. Have you written any papers,
20  books, documents, related to the interpretation of
21  contracts?
22    A.    No. I have not.
23    Q.    And you work for TRC Environmental?
24    A.    That is correct.
25    Q.    How long have you worked for them?

**Page 63**

1    A.    Since '99. So 20 —
2    Q.    25?
3    A.    It will be 25 years coming up.
4    Q.    Congratulations. That is really good.
5  I love to hear long-term employees.
6    A.    Yes.
7    Q.    Is it fair for me to assume that any
8  contract you have interpreted or written has been for
9  TRC?
10    A.    In the last 25 years?
11    Q.    Yes, sir.
12    A.    Yes.
13    Q.    Okay. And we talked previously about,
14  you don't have any knowledge about the negotiations
15  between Jefferson Parish and Aptim related to the
16  contract that we are talking about, do you?
17    A.    Negotiations, no.
18    Q.    Okay. And you don't have any
19  information about the due diligence that was
20  conducted prior to the signing of that contract, do
21  you?
22    A.    You mean by either, by both parties?
23    Q.    Sure.
24    A.    No. I do not.
25    Q.    Okay. Certainly Aptim would have,

**Page 64**

1  well, scratch that.
2        So you don't have, and again, I think
3  I covered this. But you don't have an opinion about
4  what Aptim knew about the gas collection and control
5  system design or plan for 4A when the contract was
6  renewed, do you?
7  MR. BAAY:
8        Object to form.
9  BY MR. HAMMEL:
10    Q.    It is a pretty compounded question.
11  If you need me to break it down, I am happy to.
12    Q.    Let's do that again.
13    Q.    I think we talked about this
14  previously.
15    A.    I think we've already answered this.
16  Okay.
17    Q.    I just want to make sure that you
18  don't have an opinion in this case about what Aptim
19  knew when they signed the contract that we are
20  talking about today?
21    A.    That is correct. I don't know what
22  design plans they had been given up to that point.
23  No.
24    Q.    And as well as, you don't have any
25  knowledge about what they knew about the plan of

BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
65–68

Page 65

1 timing for installation of the wells in 4A when they
2 signed the contract either. Right?
3     A.    No. I do not.
4     Q.    I think it is about five minutes short
5 from a break and I need to have a bio-break. Is it
6 okay if we break right now?
7     A.    Okay.
8     THE VIDEOGRAPHER:
9            It is 9:57 A.M. We are off the
10 record.
11           (Off the record.)
12     THE VIDEOGRAPHER:
13           The time is 10:07 A.M. We are back on
14 the record.
15 BY MR. HAMMEL:
16     Q.    Mr. Kline, we left off talking about
17 contracts and I wanted to ask you, so this document
18 that we have been discussing today, Exhibit 1623.
19 That is a written document. Right?
20     A.    That is correct.
21     Q.    And that document can be presented to
22 the jury in this case for them to read it as well.
23 Is that right?
24     A.    As a, as a physical document?
25     Q.    Yes, sir.

Page 66

1     A.    Yes. It can be presented physically.
2 Yes.
3     Q.    And when it comes to contractual
4 interpretation, are you here to speak to the common
5 industry meaning of the terms within the contract?
6     A.    I'm not sure what that common industry
7 meaning refers to.
8     Q.    Well, I'm trying to figure out what
9 would you add or how you would assist a juror in
10 understanding what the contract means. And I'm
11 trying to make that fit into your expertise or your
12 experience.
13     A.    Okay.
14     Q.    So when it comes to contractual
15 interpretation --
16     A.    Right.
17     Q.    -- are you here to speak to the common
18 industry meaning of any terms in the contract, or are
19 you here to speak to the meaning of the contract?
20     A.    I could only speak as to what I
21 believe the meaning of the contract is based on my
22 experience with similar types of contracts. That is
23 the full answer.
24  ,  Q.    Okay. And, and what you could provide
25 to, you know, because the judge is going to instruct

Page 67

1 the jury on the law in the case. Do you understand
2 that?
3     A.    Yes.
4     Q.    So if you were to provide assistance
5 to the jurors in understanding what the terms of the
6 contract are, what do you bring?
7     A.    Now, how does that work? Does the
8 jury ask the question of the expert?
9     Q. ,  No, sir.
10     A.    Okay.
11     Q.    Well, I'm just trying to figure out
12 how you are going to assist the juror in
13 understanding the terms of the contract, more so than
14 just allowing them to read it.
15     A.    If they were to ask me what the
16 contract means, I would say based on my experience
17 with similar contracts, this is what I would take
18 this to mean. This is what I would do with this
19 particular phrase of a contract. This is how I have
20 done it in the past when I've seen something similar
21 to this.
22     Q.    And your experience would be to assist
23 with industry, you know, the common industry meaning
24 of the words used in the contract. Is that right?
25     A.    Again, I'm not sure what, I'm not sure

Page 68

1 of the difference. You said there were two things.
2 Common industry or something else.
3     Q.    Well, let me ask you this. Let me ask
4 you another question.
5     A.    Yeah.
6     Q.    How many times have you been to court
7 to determine the meaning of a contract?
8     A.    To court, none.
9     Q.    Okay.
10     A.    None in court.
11     Q.    And how many times have you been hired
12 to interpret a contract?
13     A.    From a legal standpoint?
14     Q.    Yes, sir.
15     A.    None.
16     Q.    And by common industry meaning, I mean
17 how terms are defined and understood in the industry.
18     A.    Yes. Yes. That would be what I
19 would, again, because my experience would be based on
20 my work in the industry. So if we are saying it that  ,
21 way, my understanding would be based on my
22 experience, which is in the same industry as this
23 contract applies to, so.
24     Q.    Okay. I'll leave that for now. I'm
25 going to think about that.

Page 69

1    So back to Opinion No. 5 in your, it
2 says, Aptim's work at the JPLF was limited by
3 contract and provisions and the language to specific
4 tasks. Right?
5    A.    It was limited to specific tasks?
6    Q.    That is what it says. Right?
7 Contract/agreement provisions and language to
8 specific tasks.
9    A.    And you are on No. 5.
10   Q.    Opinion No. 5. Yes, sir.
11   A.    I'm sorry. I was in the basis of
12 opinion.
13   Q.    Take your time.
14   A.    Yes. That is correct.
15   Q.    Okay. And so we were talking about
16 that before that the limitations, and I think that
17 you pointed out there was a limitation that anything
18 over $1,500 Aptim had to get approval from the parish
19 to make that spend. Right?
20   A.    Right. For both purchases and of
21 items and also for out of, non-routine work as well.
22 Yes.
23   Q.    Right. And anything over $1,500
24 required three bids, also. Right?
25   A.    It required three bids unless there

Page 70

1 was an exception. So there was an unless, yes.
2    Q.    Unless. So let's take a look at
3 Section 3.3 of the contract that is on the second
4 page of the document that we marked as 1623. Let me
5 know when you are there.
6    Do you see that?
7    A.    Yep. Section 3.3. Correct.
8    Q.    It says "Firm, Aptim, shall maintain
9 such hours as necessary to meet the requirements of
10 this agreement."
11   Is that right?
12   A.    That is correct.
13   Q.    So there was no limitation that Aptim
14 was under in order to provide hours under the
15 contract. Is that right?
16   A.    Yeah. There was a limitation of 40
17 hours routine work.
18   Q.    For routine work?
19   A.    Correct.
20   Q.    Right. And routine work is also
21 defined in the contract as well. Right?
22   A.    That is correct. And apology. But do
23 we have the rest of the attachments to this? Because
24 I'm talking off of those as well.
25   Q.    The Exhibit B?

Page 71

1    A.    Yeah. Exhibit B.
2    Q.    Yeah. We are going to get there. We
3 are going to get there. I'm happy to give you
4 whatever you want.
5    A.    Yeah.
6    Q.    I think it will make more sense if
7 we —
8    A.    Okay.
9    Q.    If you need it, I will show you.
10   A.    The only reason I'm saying this,
11 because what I'm saying —
12   Q.    The limitations in B.
13   A.    Limitations are in Exhibit B.
14   Q.    We will get there.
15   In 3.5 of the same, again, Products
16 and Necessities. And you sort of discussed one of
17 these sections before.
18   But 3.5 says that "Aptim shall furnish
19 all working capital, services, inventory, personnel,
20 materials, tools, machinery, equipment and other
21 items necessary to perform Aptim's obligations under
22 this agreement."
23   Is that correct?
24   A.    That is correct.
25   Q.    Okay. And then if we look at, yes.

Page 72

1 We already looked at 2.3. That Aptim was going to
2 provide the equipment as well. Right? We took a
3 look at that already.
4    A.    Yes.
5    (Deposition Exhibit 1625 marked for
6 identification.)
7    Q.    Okay. So let's go ahead, and perfect
8 time, let's go to Exhibit B to the contract, which
9 I'm going to mark as 1625. This one is the one that
10 is marked.
11   MR. PAUL:
12   Sorry. Is 1625 Exhibit B to the Aptim
13 contract?
14   MR. HAMMEL:
15   Yes, it is. It is going to be, that
16 is exactly right, John.
17   MR. PAUL:
18   Great. Thanks.
19 BY MR. HAMMEL:
20   Q.    Sure. Let's take a look at the last
21 page of that Exhibit 1625 that I just handed to you.
22 And you see this discussion is 1.3, Emergency
23 Services.
24   A.    Yes.
25   Q.    Okay. And it says, "Emergency



Page 73

1 services include any situation related to the
2 landfill gas collection and control system, and
3 constitutes, or that constitutes a potential safety
4 hazard or violation of regulations or current
5 conditions."
6       Did I read that correctly?
7    A.    That is correct.
8    Q.    Okay. So the second paragraph of 1.3
9 Emergency Services says that, again, it says "shall."
10 "Aptim shall respond as needed on an event-by-event
11 basis, seven days a week, 24 hours per day, as soon
12 as possible, but no later than 24 hours after oral or
13 written notification of the problem."
14       Is that right?
15    A.    Did you say 24 or 12? It is 12 hours
16 from oral or written notification.
17    Q.    Correct. But it was available seven
18 days per week, 24 hours per day?
19    A.    That is correct.
20    Q.    Okay. So tell me how with this
21 provision of the contract, your opinion 5 that Aptim
22 was somehow limited to what they could do at the
23 Jefferson Parish Landfill?
24    A.    Yeah. It was limited in the fact that
25 to purchase or conduct out-of-scope, routine, or

Page 74

1 non-routine work, they would've had to have gotten
2 permission. I'm sorry. Authorization from Jefferson
3 Parish.
4    Q.    Okay. Is that the extent of the
5 limitation that you are referring to?
6    A.    One of the limitations I have here,
7 limitations is that odor control is not mentioned in
8 the agreement.
9    Q.    So what --
10    A.    And then the other --
11    Q.    I'm sorry for interrupting you.
12    A.    Yeah.
13    Q.    And I completely, we are going to talk
14 about that, also.
15    A.    Okay.
16    Q.    But I just want to make sure that as
17 far as your Opinion No. 5, and you are contractually
18 limited, as far as work that Aptim could do on the
19 landfill. We talked about a spending limitation of
20 $1,500 that required bids and approval from the
21 parish. Right?
22    A.    Right.
23    Q.    Other than that, is there any other
24 limitation to the ability for Aptim to purchase
25 equipment to do their work at the landfill?

Page 75

1    A.    To purchase, less than $1,500.
2    Q.    Less than $1,500?
3    A.    There would not be a prohibition of
4 that. No.
5    Q.    And then you said there was also, you
6 know, for routine work there was a limitation of 40
7 hours?
8    A.    That is correct.
9    Q.    Okay. So, and the contract defines,
10 like I said, it defines routine and non-routine work.
11 Right?
12    A.    That is correct.
13    Q.    Okay. And if you look at, I think it
14 is Page 14 of 15 of Exhibit B at the bottom where it
15 is Section 1.2. It is Non-Routine Work.
16       Do you see that?
17    A.    Yes.
18    Q.    Okay. Do you see the last sentence of
19 the first paragraph?
20    A.    "Non-routine scheduled services
21 consist mainly of major corrective repair or
22 maintenance work identified during routine work."
23    Q.    Right. So is it your understanding of
24 that provision of this contract that non-routine work
25 mainly comes from problems identified during routine

Page 76

1 work?
2    A.    No. I would not. Because if you read
3 the first, if you read the first sentence,
4 "Non-routine work will include items such as
5 follow-up related to excessive blower vibration,
6 repair of broken or leaking piping not caused by the
7 firm; repair of condensate or leachate pumps
8 requiring replacement of parts; extending well casing
9 as waste fill increases; or pumping leachate from
10 wells."
11       That in my opinion, because we do this
12 all the time, that is not a major corrective repair.
13    Q.    Okay. Is that work that is identified
14 during routine work?
15    A.    It could be identified during routine
16 work or it could be identified, yeah. I would say
17 anytime, and I'm saying anytime they are onsite not
18 doing non-routine work means they are onsite doing
19 routine work. So that is when they would identify an
20 issue. They would have to be on-site doing
21 routine work and they
22 identify more non-routine work as well.
23       So they would have to have Aptim
24 on-site doing routine or non-routine work, seeing one
25 of these minor or major items, and then asking for



BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
77–80

1 additional money to repair it, if it is over $1,500.
2     Q.     Do you understand that Aptim had a
3 presence on the landfill every day?
4     A.     I believe they were onsite Monday
5 through Friday. I don't recall weekend work, but I
6 wouldn't, I'm not sure of that case.
7     Q.     Okay.
8     A.     I think it was Monday through Friday.
9     Q.     And Aptim was responsible for the gas
10 collection and control system on Phase 4A from April
11 2018 through May of 2019, equaling 13.5 months?
12     A.     Yes. That is correct.
13     Q.     And part of Aptim's responsibilities
14 was to, and I'm not sure if these are interchangeable
15 words. You let me know.
16     A.     Yep.
17     Q.     But part of Aptim's responsibility at
18 the Jefferson Parish Landfill was to balance or tune
19 the landfill?
20     A.     Yes.
21     Q.     Gas collection system?
22     A.     Those are, those are interchangeable,
23 those are interchangeable terms for the most part.
24 Yes.
25     Q.     Was that part of Aptim's

1 responsibility?
2     A.     Yes, that was.
3     Q.     Okay. When you tune a well, where is
4 that done?
5     A.     That is done at the wellhead. There
6 is a valve at the wellhead.
7     Q.     So the Aptim personnel, and I believe
8 mainly it was Nelson Ambeau. Is that your
9 understanding?
10     A.     It was Nelson, and then I believe when
11 they needed more help, Eric Hammerly.
12     Q.     Yes. Done at the wellhead. And the
13 vacuum system, is that what is being tuned or
14 balanced?
15     A.     No. You are, you are tuning the system
16 to meet the NSPS requirements, which are oxygen or
17 nitrogen, and you use your balance valve to adjust
18 that. That adjust the vacuum. So you are balancing
19 to a set of parameters, but what is changing is the
20 vacuum. And if that is what you meant, that is
21 correct.
22     Q.     And figuring out the content of the
23 gas is done by taking a reading at the well?
24     A.     That is correct.
25     Q.     And then an adjustment is made to

1 increase or decrease the vacuum based on the reading?
2     A.     That is correct.
3     Q.     So if you wanted to improve the
4 quality of the gas, which means higher methane
5 content, you might turn the vacuum down a little bit?
6     A.     Yes. You might.
7     Q.     Okay. And if you are not collecting
8 enough gas, or if you feel, you know, with your
9 knowledge, you could turn the vacuum up, which would
10 increase the amount of vacuum applied to the well.
11 Correct?
12     A.     Well, I wouldn't do it, I wouldn't do
13 if I wasn't collecting enough gas. I would do it by
14 quality of the gas, not the flow.
15     MR. BAAY:
16         Go ahead.
17     THE WITNESS:
18         You only have so many independent
19 variables. So you have tune to gas concentration,
20 tune to flow, tune to vacuum, tune to capture rate.
21 There are all these different ways you can tune a
22 system. So you have to pick one of those, and
23 everything else is dependent on it, so.
24 BY MR. HAMMEL:
25     Q.     And in your experience, is it best

1 practice to maintain a log of the tuning that was
2 conducted at each well?
3     A.     Yes. That's, that is done in the
4 instrument itself.
5     Q.     Okay.
6     A.     GEM meters are used, it is internal.
7     Q.     It shows what the last adjustment was?
8     A.     It can. Yes. You can pull it up and
9 you can see what the last adjustment is, if you,
10 unless you download the database and erase the
11 memory.
12     Q.     And do you know if the wellheads at
13 the Jefferson Parish Landfill had the capacity to
14 maintain the log of well adjustments?
15     MR. BAAY:
16         Object to form.
17     THE WITNESS:
18         I don't know. I know the meter they
19 used did. I don't know what their actual data
20 management was.
21 BY MR. HAMMEL:
22     Q.     So you don't know if Aptim was keeping
23 a log separate from what is internalized in the
24 wellhead?
25     A.     Yes. They were. Because that gets

Page 81

1 downloaded and it goes into every monthly report. So
2 you can see what was done in every monthly report.
3      Q.     And it gives the information as far as
4 the quality of the gas?
5      A.     Gas concentrations. Yes. We'll say
6 that, when you say quality, you mean the
7 concentration of the gas. And that is correct.
8      Q.     All right.
9      A.     And I don't mean, because some people
10 think quality is something different. So I just want
11 to make sure it is clear.
12      Q.     Any clarification is appreciated. And
13 all of what we have been talking about, that is part
14 of the gas collection system. Right?
15      A.     That is correct.
16      Q.     Okay. And in addition to balancing
17 the gas collection system, Aptim also conducted
18 surface emission monitoring on the Jefferson Parish
19 Landfill. Correct?
20      A.     That is correct.
21      Q.     Okay. And we've discussed this
22 before. But that requires, quarterly at least, a
23 person walking the landfill with a device that test
24 for methane?
25      A.     Correct. In Phase 4A that is, yes.

Page 82

1      Q.     And sorry for interrupting.
2      A.     An instrument that reads methane
3 concentration. Correct.
4      Q.     But that would require Nelson Ambeau
5 or Eric Hammerly or someone from Aptim to walk,
6 physically walk the landfill. Correct?
7      A.     It would, it would require them to, in
8 Phase 4A they would have to have the instrument and
9 they would walk around the areas where the gas, it is
10 in the gas collection well area. So it is not
11 outside. It is where the gas collection area is.
12      Q.     So once wells are installed, it is a
13 requirement that --
14      A.     You go around, that is the area you
15 monitor. Everything outside of that is not in the
16 NSPS.
17      Q.     Okay.
18      A.     And one other thing is, if you have an
19 area where you have waste being placed or someplace
20 else you feel it is unsafe, the working face, now we
21 talked about this before, you can avoid those areas
22 as well.
23      Q.     And is it your understanding that both
24 the tuning of the gas collection system as well as
25 the SEM was part of the routine work?

Page 83

1      A.     Yes.
2      Q.     Okay. And who would be in a better
3 position than Aptim to visually identify problems on
4 the landfill?
5      MR. BAAY:
6           Object to form.
7      THE WITNESS:
8           If you are talking about the area just
9 associated with the gas collection system, that would
10 be Aptim. Areas outside that they would not have
11 gone into. Then it would've been either Jefferson
12 Parish or Waste Connections.
13 BY MR. HAMMEL:
14      Q.     So who, who would be in a better
15 position to request repairs to the gas collection
16 system than Aptim?
17      A.     Repairs, as in maintenance-related
18 repairs?
19      Q.     Who would be --
20      A.     That would be, that would be Aptim.
21 Yes.
22      Q.     So instead of repairs, maybe that was
23 a bad word, who would be in a better position to
24 identify problems with the gas collection system?
25      A.     Yeah. It depends on the problem. If

Page 84

1 the problem was something like loss of vacuum in an
2 area of the landfill, Jefferson Parish got monthly
3 reports and they were looking at that data as well.
4 So I know there is, there is some documentation in my
5 report of communications where a vacuum was lost and
6 there were meetings held between. So that might be,
7 it might be Jefferson Parish looking at the data. It
8 might be Aptim seeing what they are seeing in the
9 field. So it would just, it would depend on what
10 that particular item is that we are talking about.
11      Q.     I understand. So to dig into that a
12 little bit. So the documentation that Jefferson
13 Parish would review monthly was provided by Aptim
14 related to the gas collection system?
15      A.     That is correct.
16      Q.     Okay. So I guess if there was, you
17 know, recognition of a trend or something that you
18 would be able to see monthly, you would think that
19 would be, maybe Jefferson Parish would have equal to
20 ample opportunity to recognize problems?
21      A.     Yeah. I think they were both, both
22 have the chance to look at that data. Yes.
23      Q.     And we are looking again at the
24 Exhibit 1625. I think it is Exhibit B. And we are
25 looking at 1.2, the non-routine work.

Page 85

1    Did Aptim have the responsibility to
2  identify repairs that needed to be done to the gas
3  collection system?
4    A.    Repairs, yes. And in some cases,
5  again, we'll talk about in this case, minor
6  maintenance issues. In some cases, I'm just going to
7  say maintenance activities. And if you look in their
8  report each month, it shows what they identified and
9  how they fixed it. They found this cracked. Found,
10 you know, this, somebody had knocked this hose off
11 and we had to repair it. Somebody, you know, did
12 damage and we fixed it. So those things are in the
13 monthly report. Yes.
14   Q.    Sure. Who is Albert Wilder?
15   A.    Albert Wilder?
16   Q.    Yes, sir.
17   A.    I don't know.
18   Q.    I believe that he served in a
19 supervising role for this report.
20   A.    Oh. Wilder. Albert Wilder.
21   Q.    Sorry. I forgot the L.
22   A.    No. Albert, in this report he reviewed
23 it for me from a typographical standpoint, I guess we
24 will call it.
25   Q.    Okay. And did Mr. Wilder participate

Page 86

1  in writing any part of the expert report?
2    A.    No. He did not.
3    Q.    And did you include his credentials in
4  your report anywhere?
5    A.    No. I did not.
6    Q.    What are his credentials, if you know?
7    A.    He is a former colonel in the air
8  National Guard and he has been a many-year air permit
9  engineer. I'm going to say he is probably 35, 40
10 years as a permit engineer.
11   Q.    Okay. Do you have any opinions in
12 your report about what specific phase of the
13 Jefferson Parish Landfill emissions came from?
14   A.    Yeah. From Phase 4A.
15   Q.    I know we talked about that already.
16 I think that you said H2S gas is known to constitute
17 the highest concentration of all odorous gases being
18 emitted at the site?
19   A.    That is correct.
20   Q.    And Phase 4A had the highest readings
21 of hydrogen sulfide?
22   A.    Well, I don't want, I don't want to
23 say, did you say emitted. Read that again to me.
24   Q.    I believe it is on, let's read your
25 report because it comes from Page 6.

Page 87

1    A.    Yeah. I think you were, I think
2  that's correct. Highest concentration of potential
3  odorous gases is present or being emitted at the
4  site. Yes. That is correct.
5    Q.    Okay. Sorry. I'm getting a message
6  coming in. Okay. Finished it with, sorry, this can
7  wait until tomorrow.
8          What did you rely on to form that
9  opinion on Page 6 of your report?
10   A.    I have, I have all that footnoted.
11 There were multiple studies done by multiple firms
12 sampling the gas in the subsurface as well as gas
13 emissions from the surface.
14   Q.    Okay. And one of the things that is
15 cited on that page is footnote 15 is the collection
16 of landfill gas, well samples conducted by the
17 company that you work for.
18   A.    That is correct.
19   Q.    And I believe that took place in
20 August of 2020?
21   A.    That is correct.
22   Q.    Okay. I'm not familiar with any
23 landfill gas collection well samples conducted by TRC
24 in August of 2020. So if that is accurate, I would
25 ask for production of that document. The one that I

Page 88

1  am aware of related to TRC took place in October of
2  2019. So if there was subsequent sampling, I would
3  ask for production of that.
4    A.    Okay. And I will, well, yes.
5    Q.    Your attorney will contact me if it
6  exist.
7    A.    Yes.
8    Q.    Okay.
9    A.    I'm sorry. You said when this
10 sampling took place?
11   Q.    Yeah.
12   A.    Yeah. That, that August 20, 2020
13 might be the final date report. That might be the
14 date on the report itself. And the sampling was
15 taken, it wasn't that long after all this. And as a
16 matter of fact, I checked, I think I made sure the
17 data was within the relevant time period.
18   Q.    That would make sense.
19   A.    I believe that is the case.
20   Q.    That makes sense.
21   A.    Yeah.
22   Q.    And it looks like the other documents
23 that you relied on, it looks like Kelvin, Jefferson
24 Parish Summary, O&M gas field, that was conducted by
25 River Birch. Is that right?

Page 89

1     A.    That is correct.  The Kelvin reports
2  were, the Kelvin reports were River Birch.
3     Q.    And then you have listed SCS
4  Engineers?
5     A.    That's correct.
6     Q.    On July 10th.  And then also list
7  Ramboll.
8     A.    That is correct.
9     Q.    Are you aware of any measurements that
10 were taken on Phase 4A by Rick Buller or Kris
11 Carlson?
12    A.    Yes.
13    Q.    Okay.
14    A.    Those are also documented in my
15 report.
16    Q.    Okay.  The TRC data that was captured,
17 what did that indicate to you?
18    A.    That indicates elevated concentrations
19 of, and again, because I'm using it as a sarin gas,
20 elevated concentrations of hydrogen sulfide
21 throughout the well sampled in Phase 4A.
22    Q.    And, and those amounts that were
23 captured by TRC, in your expert opinion, those are
24 high levels of hydrogen sulfide to be found in a
25 municipal solid waste landfill?

Page 90

1     A.    They're, they are equal to the highest
2  amount I have in all of my landfills.  So I would
3  consider those to be high.
4     Q.    Okay.  And we talked about this
5  briefly.  I said we would talk about it later.
6           Are you aware that waste containing
7  high-sulfate content can generate hydrogen sulfide
8  when commingled with municipal solid waste and buried
9  in a landfill?
10    A.    I'm not an odor expert.  But my
11 general knowledge and reading for my, being a
12 landfill, you know, being a landfill engineer, gas
13 collection system operator, is, is that, yes,
14 sulfates in waste.  Correct.
15    Q.    How long do you think you've known
16 that?
17    A.    Probably 15 years.
18    Q.    And are you familiar with coal
19 combustion residuals?
20    A.    Coal combustion, not of FGD, coal
21 combustion residuals.
22    Q.    My next question was going to be, or
23 FGD.
24    A.    Okay.
25    Q.    Flue gas desulfurization material?

Page 91

1     A.    I'm familiar, again, I'm generally
2  familiar with what they are.  The coal combustion,
3  left over from coal combustion, FGD is from
4  desulfurization, which include flue gas
5  desulfurization of incinerators or power plants or
6  some kind of combustion activity.  Yes.
7     Q.    Okay.  And do any of the landfills
8  that you operate accept flue gas desulfurization
9  material?
10    A.    I do not know if they do or not.
11    Q.    Are you familiar, but you are familiar
12 with concerns regarding coal disposal of
13 sulfate-containing waste or MSW waste?
14    A.    Yes.
15    Q.    So flue gas desulfurization, generally
16 that process, is it your understanding that a product
17 like lime can be injected into the stack to reduce
18 the sulfur content?
19    A.    Yeah.  And again, this is my general
20 knowledge.  And that is that they inject lime to
21 react with the sulfur.  It actually produces, and
22 this is where I kind of know a little bit about it,
23 and that is because it produces, I think it is a
24 gypsum-like compound.  Gypsum is wallboard.  I have a
25 landfill that is taking a lot of wallboard.  That is

Page 92

1  the one I said that has the high hydrogen sulfide
2  concentration.  So I have this general knowledge
3  because of that, and that is the one I worked at for
4  quite a while, so.
5     Q.    So I think the term that they use for
6  the by-product of that flue gas desulfurization that
7  I have heard is synthetic gypsum.  Have you heard
8  that term before?
9     A.    No.  No.  I've heard synthetic or
10 gypsum-like, which, yeah.
11    Q.    Are you familiar with the chemical
12 composition of calcium sulfate?  Do you know that
13 CaSO4 is calcium sulfate?
14    A.    Yes.
15    Q.    And do you understand that there are
16 different sulfates that are produced from that flue
17 gas desulfurization process?
18    A.    No.
19    Q.    Okay.  All right.  So that is kind of
20 where the line is with your understanding?
21    A.    That is where the line is with my
22 understanding.  Yes.
23    Q.    Okay.  So if you take a look at Page
24 13 of your expert report.  And I'm looking at the
25 last paragraph on that page.  Starts with "Mr.



Page 93

1  Buller."
2      Do you see that paragraph?
3      A.    "Mr. Buller answered?"
4      Q.    "Mr. Buller provided." It is on
5  page --
6      A.    Oh. I'm sorry. The last paragraph.
7  Last sentence. Okay. Yes.
8      Q.    It says, "Mr. Buller provided a
9  concise explanation of how the waste processing and
10  placement at the Jefferson Parish Landfill impacted
11  the emissions of odorous gases from the landfill. In
12  a July 2, 2018 E-mail from Mr. Buller to Brett
13  O'Connor and Waste Connections, Mr. Buller writes,
14  now we are of the opinion that the sulfates added to
15  the waste through the lime or fly ash solidification
16  agent is increasing the production of hydrogen
17  sulfide within the buried waste."
18      Did I read that correctly?
19      A.    That is correct.
20      Q.    Okay. So do you agree with Mr.
21  Buller's explanation?
22      A.    I agree with it that the sulfates
23  could break down. And I agree that there were
24  Jefferson Parish, and I believe it comes up later
25  where he is stating that this did happen. So

Page 94

1  Jefferson Parish is saying that it was put in the
2  landfill and I understand it breaks down. At that
3  point, I don't specifically, I wasn't there when it
4  was put in the landfill.
5      Q.    Sure.
6      A.    But I understand how the chemical
7  process works. Yes.
8      Q.    And is it your understanding in this
9  case that all of the spent lime that was accepted was
10  all buried within Phase 4A of the landfill?
11      A.    Yes.
12      Q.    Is it well-known in the solid waste
13  industry that you do not dispose of gypsum with MSW
14  waste?
15      A.    I don't believe so. I believe, I know
16  the landfill that I work at, they are, they do take
17  gypsum. I have one landfill that I work at that is
18  the C&D form of MSW landfill, and they take it. So I
19  would say in that case, I would have to speculate,
20  because I just don't know the industry as far as
21  acceptance of gypsum right now. I couldn't tell you.
22      MR. BAAY:
23      Can I take just a few-minute break. I
24  need to go deal with something.
25      MR. HAMMEL:

Page 95

1      I won't ask any questions.
2      MR. BAAY:
3      I appreciate it. Thanks.
4      THE VIDEOGRAPHER:
5      10:43 A.M. Off the record.
6      (Off the record.)
7      THE VIDEOGRAPHER:
8      The time 10:52 A.M. We are back on
9  the record.
10  BY MR. HAMMEL:
11      Q.    Mr. Kline, we were talking about the
12  landfills that you oversee up in the northeast. I
13  believe you said it has increased from seven to
14  eight?
15      A.    It is seven to eight and you can
16  probably throw in two more. So somewhere between
17  eight and 10. Yes.
18      Q.    Okay. At the time we spoke last, for
19  seven landfills, and for those landfills you oversee
20  both the leachate collection system and the gas
21  collection system. Right?
22      A.    That is correct.
23      Q.    And you told me you have a team of
24  four dedicated employees that help you with that?
25      A.    Yes.

Page 96

1      Q.    Is that still true today?
2      A.    I'm trying think. One, two, three,
3  four, five.
4      Q.    So you have five dedicated employees?
5      A.    That is correct.
6      Q.    And the last time we spoke, you told
7  me you also had an additional four employees that you
8  could pull as needed?
9      A.    That is correct.
10      Q.    And do you still have that same
11  number?
12      A.    Yeah. I would say so.
13      Q.    Okay. And you told me that two of the
14  dedicated employees have college degrees?
15      A.    Four of them do now.
16      Q.    Four of them do now?
17      A.    Yes.
18      Q.    So you would have one, and he would
19  have the equivalent or have a high school diploma?
20      A.    So he has an associate's degree, an
21  associate's degree. So if that is a college degree.
22      Q.    Sure. And you said that the landfills
23  that you oversee are small and the Jefferson Parish
24  Landfill is medium-sized landfill. Is that still
25  accurate?

Page 97

1    A.    Yeah. The one thing I do, I would say
2  Jefferson Parish, just put it in context, Jefferson
3  Parish is the five phases. So the landfills I have
4  are, some are a little bigger, but they are
5  equivalent to a phase. And most of them are just a
6  little bit bigger than, say, a Phase 4A. So put it
7  that way.
8    Q.    Great. Do you know how many landfills
9  Aptim oversees in Louisiana?
10   A.    No. I do not.
11   Q.    Do you know how many Aptim employees
12 were designated to Jefferson Parish Landfill?
13   A.    Designated to Jefferson Parish?
14   Q.    Dedicated.
15   A.    I'm not, I'm not sure. I've seen, I
16 know the names, but I don't know if there are other
17 people that came and went that I may not know about.
18 So there are reporting-behind-the-scene kind of
19 folks. So I'm not sure.
20   Q.    And do you know if, let's say, for
21 instance, Nelson Ambeau, that he spent eight hours a
22 day at the Jefferson Parish Landfill?
23   A.    I did look at some of his time sheets,
24 and he was roughly spending 40-plus hours at the ones
25 that I looked at. So he would be, I consider a

Page 98

1  full-time employee, eight-plus hours.
2    Q.    Do you know if Aptim has, besides Eric
3  Hammerly which we discussed, do you know how many
4  other employees they could pull as needed?
5    A.    There were a few. Because when they
6  did, I remember them bringing people to do the SEM
7  and to help on other things. I can't tell you how
8  many, there were a pool people they could bring in.
9    Q.    I'm sorry for interrupting. Were you
10 done?
11   A.    Yes. I believe so.
12   Q.    And I believe I saw some things as
13 well, that I think the additional employees were
14 brought in at the Jefferson Parish request?
15   A.    That I don't, I don't know if they
16 were or not.
17   Q.    Okay. In your report do you state any
18 opinions about the appropriateness of the number of
19 employees required to do the O&M at the Jefferson
20 Parish Landfill?
21   A.    No. I do not.
22   Q.    Okay. And you are not going to
23 express any opinions, you don't intend to express any
24 opinions in that regard, do you?
25   A.    Express any here, now or —

Page 99

1    Q.    In court, later, anytime.
2    A.    If I'm asked, I suppose I'll have to
3  give an opinion.
4    Q.    Well —
5    A.    If I'm asked the question.
6    Q.    So today I'm going to ask you the
7  question.
8    A.    Okay.
9    Q.    Are you going to express any opinions
10 about the appropriateness of the number of employees
11 required to do the O&M job at Jefferson Parish
12 Landfill?
13   A.    I'm not trying to, if I'm asked in
14 court, I would have to answer that question. I don't
15 know what they are going to ask me. So I'm not sure
16 if I can say what I'm going to render an opinion on.
17 I just don't know.
18   Q.    Okay. So this is my chance to ask you
19 questions before trial. And if somebody asks you
20 that question, and you haven't expressed an opinion
21 in your written report or here today with me —
22   A.    Okay.
23   Q.    I would say objection, he didn't say
24 that in his report. Right?
25       MR. BAAY:

Page 100

1           Yeah. For what it is worth —
2       MR. HAMMEL:
3           Thanks John.
4       MR. BAAY:
5           — we are not going to ask him to go
6  beyond his report —
7       MR. HAMMEL:
8           Okay.
9       MR. BAAY:
10          — in giving his opinions. They are
11 all expressed. The basis for his opinions are
12 expressed. I mean, so anything that sort of
13 logically flow from those opinions. But I mean, we
14 are not going to, those opinions are in the report.
15      MR. HAMMEL:
16          Okay. And I guess, thank you.
17      MR. BAAY:
18          And happy to be bound by that, as I
19 think we are.
20      THE WITNESS:
21          Thank you both for that explanation.
22 Now I understand what you are saying. Thank you.
23 BY MR. HAMMEL:
24   Q.    Perfect.
25          In your original report you said that

Page 101

1 discussions about leachate were limited to condensate
2 pumps. Did you have that same limitation in this
3 report?
4      A.    I actually have two separate opinions.
5 One opinion is on the leachate pumping and the other
6 one is on the in-well pumping system. Yes. So they
7 are separate. Two.
8      Q.    Is there -- thank you.
9            Is there any other leachate, other
10 than those two that you have expressed in your
11 report?
12     A.    Now, I believe there is a, there would
13 be a third. You would have the two systems operated
14 by two companies doing two different things. But
15 there is also the discussion of, if you have
16 compacted cover. I'm sorry. If you don't have
17 compacted interim cover, if you just have interim
18 cover, any liquid runoff of that is considered
19 contaminated, and it has to be handled appropriately.
20 Not necessarily leachate. But that would be, I don't
21 know, I don't how that is defined. So that might be a
22 third stream.
23           But the only two liquid streams that I
24 know of, or I address, were the leachate system from
25 the underdrain and the liquids removal from the

Page 102

1 in-well pumping system.
2      Q.    Perfect. That is my understanding as
3 well.
4      A.    Okay.
5      Q.    I meant to ask you this before when we
6 were talking about cover. Is part of the function of
7 cover, daily or interim cover, to contain emissions?
8      A.    Yes. And that is in the LAC code.
9 But it is typically, yes.
10     Q.    I'm going to ask you --
11     A.    Contain, yes.
12     Q.    I will ask you a hypothetical
13 question.
14     A.    Okay.
15     Q.    Let's say that there is a, you know
16 what a flux measurement --
17     A.    Yes.
18     Q.    -- is. Let's say that there's --
19     MR. BAAY:
20           There is this flux capacitor from --
21 go ahead. Sorry.
22 BY MR. HAMMEL:
23     Q.    And unfortunately nobody has that
24 state DeLorean time machine. But let's,
25 hypothetically --

Page 103

1      A.    Yes.
2      Q.    If there is a flux measurement taken
3 from this area of the landfill, and I'm expressing
4 with my hand. So there is a flux measurement taken
5 from this area of the landfill. Right?
6      A.    Yes.
7      Q.    And then following that measurement
8 there is 22,000 cubic yards of dirt spread over the
9 landfill. And one month after that it is completed,
10 a flux measurement is taken from the same area --
11     A.    Yes.
12     Q.    -- that it was previously taken.
13 Would you expect the emissions to be lower the second
14 time you take the measurement?
15     A.    What is it --
16     MR. PAUL:
17           This is John Paul. Object to the
18 form.
19     THE WITNESS:
20           What is the material that is being
21 spread made of?
22 BY MR. HAMMEL:
23     Q.    Clay.
24     A.    Because that would be a different.
25     Q.    Clay, dirt.

Page 104

1      A.    If you have clay and how, how thick.
2 You said 22,000. But how thick are you spreading
3 this out? How much are having over that area?
4      Q.    Some areas it goes six inches. Some
5 areas it goes 12 inches.
6      A.    If you put your flex meter on top of
7 an area where you have spread clay as opposed to an
8 area where you haven't spread the clay, there should
9 be a difference in what you are measuring.
10     Q.    And it would be higher or lower?
11     A.    It would be higher, it would be lower
12 after the clay is spread.
13     Q.    Thank you.
14           Your opinions, so we talked before
15 about limiting your opinion with leachate the first
16 time that you gave a report. Are your opinions in
17 this case limited to the landfill gas collection
18 system?
19     A.    I did mention leachate as well.
20     Q.    Uh-huh.
21     A.    Basically in the context, there's
22 couple of context. One is to make sure to understand
23 it was separate from what Aptim was doing, Waste
24 Connections. It is completely different, talking
25 about different things. Also, that any of the



Page 105

1  emissions that would have come from components in the
2  leachate system would not be part of Aptim's as well.
3      Q.    Was the, was the gas collection system
4  at the Jefferson Parish Landfill Phase 4A connected
5  to the leachate collection system?
6      A.    It was towards the later time that
7  Aptim was on-site.  So in Phase 4A it was connected.
8  I have it in here.  Sometime fall of 2018, I would
9  say.
10     Q.    In your experience, is it best
11 practice to connect the leachate risers to the gas
12 collection system?
13     A.    It depends.  I have systems that there
14 is no gas coming out of those.  We don't connect
15 them.  If you think there is, or if you know there is
16 gas coming out of them, whoever is running the
17 leachate system will usually say, you know, we have
18 gas.  Can you connect to it.  And then the operator
19 will connect to it at that point.
20     Q.    All right.  And in your prior report
21 in this case you had expressed some opinions.  And I
22 want to make sure because I didn't see anything in
23 your report that said that you adopt all of the prior
24 opinions from your first report.
25     A.    Okay.

Page 106

1      Q.    So I want to make sure that I
2  understand if you are sticking with those or if you
3  are changing any of them.
4      A.    No. I will, and I scanned through that
5  report again.  I didn't see anything based on the
6  nature of that first report and how I generated those
7  opinions that I've changed.
8      Q.    Okay.  So the first one, we talked
9  about it briefly, was the gas collection and control
10 system at the Jefferson Parish Landfill was properly
11 designed.
12     A.    Correct.
13     Q.    And you discussed that over time that
14 design changed?
15     A.    That is correct.
16     Q.    And that was due to the increased
17 volume of waste?
18     A.    Right.
19     Q.    Do you believe that all of the
20 amendments to that original design are also proper
21 and within regulatory standards?
22     A.    They actually came, or I should say
23 they actually returned at some point to the original
24 design, or near the original design.  So any
25 amendments or the phasing was done on an interim

Page 107

1  basis, and what I saw eventually installed, or as we
2  have described, was back to the original design.
3  Yes.
4      Q.    And that was done by Golder &
5  Associates?
6      A.    It was done by Golder & Associates,
7  yes.  And then after, again, we are talking about
8  when you are in November on, when they started this
9  large-scale change, that was done by, it was at least
10 based on Carlson.  I don't know who did the final
11 design for the install.  But that was Carlson.
12     Q.    Okay.  In the second opinion you
13 stated the gas collection and control system was
14 properly constructed.  Do you agree with that
15 opinion?
16     A.    Yes.  I do.
17     Q.    Okay.  And in both of your prior
18 opinions, that the Jefferson Parish Landfill gas
19 collection and control system was properly designed
20 and constructed, in that report you said you relied
21 on the SEM?
22     A.    That is correct.
23     Q.    Okay.  Is there anything else since
24 the time of that report that you rely on to support
25 your opinion?

Page 108

1      A.    No. Going back, going back, still, the
2  SEM is still valid.
3      Q.    Okay.  And do you still believe that
4  the operation, that the Jefferson Parish Landfill
5  Phase 4A was acceptably operated and maintained?
6      A.    Yes.  And again, as -- we have to make
7  the distinction that the monitoring for the SEM would
8  have been around the area where the gas collection
9  wells were.  So anything that was happening outside
10 that area would not have been applicable.  I did say
11 that, I think in my report, that was the area
12 monitored and addressed by a GCCS, so.
13     Q.    In your opinion, operated and
14 maintained properly, that refers to the gas
15 collection system?
16     A.    Yes.
17     Q.    Your prior Opinion No. 5 had to do
18 with the Phase 4A capture efficiency.
19     A.    Correct.
20     Q.    Okay.  And I think that your statement
21 was that more likely than not the landfill gas
22 capture efficiency in the range of 50 to 70 percent
23 in areas with daily cover?
24     A.    Yes.  And those next two are actually
25 in this report, I believe, as well.



Page 109

1    Q.    Yeah.
2    A.    They were based on EPA guidance
3   documents, which have not changed.
4    Q.    And do you intend to offer an opinion
5   about collection efficiency on Phase 4A for this
6   phase of the litigation?
7    A.    It is in my report. So if asked on
8   it, I could. And again, it would be based upon the
9   EPA guidance information.
10   Q.    So related to the EPA guidance. So in
11  2017 there was no gas collection system on Phase 4A.
12  Correct?
13   A.    That is correct.
14   Q.    So according to the EPA, what would be
15  the collection efficiency on Phase 4A for the year of
16  2017?
17   A.    It would be, if you want the
18  reference, it would be Table HH3, it would be zero.
19   Q.    Zero. And until May of 2018, when the
20  first wells went online, that is when the EPA begins
21  to assign a collection efficiency. Right?
22   A.    Actually, correction. April 2018.
23   Q.    April of 2018.
24   A.    Is when the first nine wells went
25  online. So up until that point that would be a

Page 110

1   collection efficiency, it would be zero.
2    Q.    For 2017, in our relevant time period
3   is July 1, 2017?
4    A.    Yes.
5    Q.    So July 1, 2017, all the way through
6   2017, zero percent?
7    A.    Yes.
8    Q.    And then in 2018, from January 1 until
9   April, I can't remember the date.
10   A.    Yeah. I don't remember the date it
11  was.
12   Q.    But until that time the collection
13  efficiency would also be zero?
14   A.    That is correct. By, by EPA rule.
15  Yeah. Regulation. Yes.
16   Q.    Okay. And online means installed and
17  monitored?
18   A.    And monitored. Correct.
19   Q.    And in 2019, up until the time that
20  Aptim left the Jefferson Parish Landfill, 68 percent
21  of the wells on 4A did not have a vacuum. Is that
22  right? It is on Page 28 of your report.
23          See that first paragraph on the
24  right-hand side you do a little calculation.
25   A.    Yeah. That was one, that was only the

Page 111

1   specific month of May. That was in May of 2019.
2    Q.    So then that's --
3    A.    I believe May of, May of 2019 after it
4   reported there was no available vacuum on 68 percent
5   of the wells.
6    Q.    And that was the time that Aptim left?
7    A.    That was the time Aptim left. Yes.
8    Q.    And you created this Figure 3 right
9   below that on Page 28. Right?
10   A.    Yes. Correct.
11   Q.    So it looks like the first wells went
12  in, according to this, sometime in March.
13   A.    Yeah. It is actually April. There is
14  zero, March is zero and jumps up. You can see a
15  little bump in the line in April.
16   Q.    So in April of 2018 there was vacuum
17  applied to less than 50 percent of the wells. Right?
18   A.    Yes.
19   Q.    And it stayed, the amount of vacuum on
20  the wells stayed well below 40 percent in July of
21  2018. Remained below 50 percent the entire time
22  until about March of '19?
23   A.    Now, this is, this is including the
24  design wells. So this is, if you had the theoretical
25  design in place, and this is how many wells within

Page 112

1   that were installed and had vacuum. So if you had 32
2   wells --
3    Q.    So I think you, I'm sorry for
4   interrupting you. But I think you have two different
5   figures. And your other Figure 2 --
6    A.    Yep.
7    Q.    -- talks about the number of wells
8   installed versus design?
9    A.    Design. Yes.
10   Q.    This seems to say percent of design
11  gas collection wells with available vacuum. It says
12  design wells installed.
13   A.    These are the design, these are the
14  wells that were designed and installed and had
15  vacuum. The first one was percent installed and this
16  was installed with vacuum.
17   Q.    Right. So --
18   A.    Yeah.
19   Q.    Am I accurate to say that, you know,
20  that date in April there was less than 50 percent of
21  the wells installed had vacuum to them?
22   A.    Of the wells that were, it would be
23  the wells, you had 32 well, design wells. So this is
24  the number of wells that were installed with vacuum.
25   Q.    Yeah.

Page 113

1    A.    So it is not the percentage of the
2  wells installed that had vacuum.  It is the
3  percentage of the complete design package that were
4  installed and had vacuum.  So, so let's say you had
5  the first graph, let's say you had 16 wells
6  installed.  That means you have 50 percent of the
7  design wells installed.
8    Q.    Yes, sir.
9    A.    Let's say that at a certain point you
10  lost a header due to a belly, dropped off eight
11  wells, that would show eight wells out of 32 were
12  installed with vacuum.
13    Q.    And that is what this reflects?
14    A.    That is what this reflects.  Yes.
15    Q.    So the 50 percent would be, you know,
16  because how many wells were first installed in April
17  of 2018?
18    A.    Nine, there were nine wells first.
19    Q.    So does that mean that four and a half
20  wells on Phase 4A, a little under maybe four wells,
21  had been installed and had vacuum to them?
22    A.    No.  It would be, it would be nine out
23  of, it would be nine out of 32 minus.  Nine minus how
24  many didn't have vacuum out of 32.  So you subtract
25  that off.

Page 114

1    Q.    Explain that to me, please.
2    A.    Okay.  So in Phase 4A, the area where
3  the waste was placed.  Okay.  To cover that area with
4  a design you had 32 wells installed.  That is the
5  theoretical amount that were supposed to be put in.
6  Okay.  Then a certain number of wells were installed.
7  That is the number of installed wells.
8    Q.    So that, where is that reflected in
9  Figure 3?
10    A.    That is, let's see.  If Figure 2 is
11  revised to show only gas extraction wells that had
12  available vacuum for the full month, by month, the
13  impact on the system becomes strikingly clear.  See
14  Figure 3.
15        So this subtracts off the number of
16  wells that were installed that did not have vacuum.
17  So that is like it doesn't exist.  So the first one
18  just says it doesn't matter what is going on, this is
19  how many wells were installed.  Again, 16 out of 32
20  theoretically would be 50 percent.  But then you
21  start saying, well, some of the wells didn't have
22  vacuum, so we are going to take those out.  And that
23  is what this graph --
24    Q.    Okay.
25    A.    -- represents.

Page 115

1    Q.    And this graph represents that for
2  most of the time that Aptim was on the Jefferson
3  Parish Landfill in Phase 4A, less than 50 percent?
4    A.    Of wells, of wells were installed.
5    Q.    Had vacuum?
6    A.    And had vacuum.  Yes.
7    Q.    Okay.  And that single issue further
8  reduces the collection efficiency?
9    A.    It would not reduce the collection
10  efficiency, as the way I define collection
11  efficiency, because it is just the waste.  It is just
12  the collection efficiency of the materials.  So it
13  would only be around the well that is operating.  To
14  get the overall collection efficiency, if you want to
15  do a calculation of Phase 4A --
16    Q.    Yes.
17    A.    -- then that would affect it.  Yes.
18  Because you would be pulling off sections of the
19  landfill that are covered.  Because if you didn't
20  have a vacuum on that well, or in some ways you can
21  get pressure that could be creating it.  But let's
22  say theoretically that would become a zero area.
23    Q.    So a gas collection well becomes
24  active when vacuum is applied to it.  Is that
25  correct?

Page 116

1    A.    That is correct.  In some cases,
2  depending on the cap and the material, you can
3  actually have a positive pressure that pushes.  There
4  are actually systems that rely on positive pressure
5  to push the system out.  So it could be either way.
6    Q.    But that positive pressure was not the
7  way Jefferson Parish was designed?
8    A.    Typically, Jefferson Parish was
9  designed to have a vacuum --
10    Q.    Yeah.
11    A.    -- on the well, on wellhead.  Yes.
12    Q.    And when there is no vacuum applied,
13  is that called a passive well?
14    A.    It can be.  It can be a pressurized
15  system.  If you have a vent to the atmosphere, it can
16  be called a passive system.  Yes.  And even, even a
17  system that requires a vacuum, if it has a pressure,
18  it can actually have a rate of capture.
19    Q.    So if we are determining the
20  collection efficiency on all of Phase 4A --
21    A.    Yes.
22    Q.    -- does that issue of no vacuum reduce
23  the collection efficiency on 4A?
24    A.    If you are doing a mathematical
25  calculation of all the areas.



**Page 117**

1    Q.    Yep.
2    A.    Yes. It would.
3    Q.    So you have not calculated the overall
4  collection efficiency across 4A, have you?
5    A.    No. I did not.
6    Q.    Okay. So your estimation of 50 to 70
7  percent is not overall collection efficiency on 4A?
8    A.    It would be on the cover, in the area
9  where you have a gas collection system operating.
10  Yes.
11    Q.    All right. Well, that makes sense.
12  Right. Because the EPA I'm sure assumes an installed
13  gas collection and control system is actually
14  collecting gas.
15    A.    Yes.
16    Q.    Let's take a look at your Figure 2 on
17  Page 10. In Figure 2, it appears to me that Figure 2
18  shows that in 2018 April, 50 percent of the wells
19  that were designed were installed. Is that right?
20    A.    In --
21    Q.    Just below 50?
22    A.    Yeah. That is actually not April.
23  That is May. April had nine. May, for the record,
24  that is when it went to 15.
25    Q.    Okay.

**Page 118**

1    A.    So it was 15 out of, 15 out of 32. So
2  it was roughly 47 percent to 50. Say 50 if you want
3  to round up.
4    Q.    Just below 50 percent?
5    A.    Right.
6    Q.    And that was the wells that were
7  designed, and these were the ones, it is a function
8  of ones installed compared to design?
9    A.    Right.
10    Q.    And in 2019 it appears that just under
11  70, or right at 70 percent of the wells that were
12  design were installed. Is that right?
13    A.    Correct. 69 percent.
14    Q.    So for 2018, can the collection
15  efficiency on Phase 4A be more than 50 percent?
16    A.    2018, based on this criteria --
17    Q.    Sure.
18    A.    -- it would, it would not be. Because
19  you are assuming that less than 50 percent of the
20  wells, which would be less than 50 percent of the
21  coverage, were not installed. Correct.
22    Q.    And similarly, in 2019, 70 percent
23  would be the maximum collection efficiency for Phase
24  4A. Is that right?
25    A.    Theoretically, yes, that is correct.

**Page 119**

1    Q.    And then if we take a look back to 3,
2  Exhibit 3, I'm making the court reporter nuts. It is
3  on Page 28. We were just talking about this.
4          And I think my understanding is that
5  Figure 3 depicts 47, just under 50 percent of the
6  wells had vacuum at least on one day that month. Is
7  that right?
8    A.    That is correct.
9    Q.    Okay. So if we take the 45 versus 47
10  percent, let's say 47 percent of the wells in 4A that
11  had vacuum, and we multiply that by, you know, your
12  prior Figure 2, let's say 60 percent, 60 percent of
13  the design wells installed, you get somewhere around
14  26 percent. Right?
15    A.    Say that again.
16    Q.    So we take in the 47 percent from
17  Figure 3.
18    A.    Right.
19    Q.    And when I multiply that by the
20  percentage of design wells, of installed wells versus
21  design from your Figure 2, is that a fair way to get
22  a collection efficiency?
23        MR. PAUL:
24          Object to form.
25        THE WITNESS:

**Page 120**

1          So you take the number of wells
2  installed with vacuum and you multiply that
3  EPA-provided collection efficiency, and everything
4  else is zero, so I guess I'd say it seems like it is
5  a reasonable approximation.
6  BY MR. HAMMEL:
7    Q.    Rudimentary. I'm a lawyer.
8    A.    Yeah. I'm an engineer. But I would
9  have to, of course, I would have to study it in-depth
10  before I'd absolutely agree. But yeah, that sounds,
11  it's percentages.
12    Q.    Okay. Let's take a look at Page 8 of
13  your report. And specifically I'm looking, let's
14  see. It is in that full paragraph. It is about 80
15  percent of the way down. And it is a portion that
16  starts, a sentence that starts with the word
17  "Approval from Jefferson Parish."
18          Do you see that?
19    A.    Yes.
20    Q.    And it says, "Approval from Jefferson
21  Parish for Aptim to run the flare as a continuous
22  source of vacuum, at the same time the compressor
23  station was running, did not occur until September 20
24  of 2018."
25          Is that right?

Page 121

1    A.    That is correct.

2    Q.    Why is that important for you to put
3  in your report?

4    A.    There were, I discuss in my report,
5  but there were issues with the compressor station and
6  its fluctuation as far as vacuum and flows.  And it
7  is noted, you can see it in the data.  Carlson noted
8  it.  So to get additional, we'll say consistent flow.
9  It was based on Carlson's recommendation, Jefferson
10  Parish asked Aptim to start running the flare at a,
11  an additional flow rate.  So it was providing
12  additional flow to the system, and vacuum.

13    Q.    Did that increase, did that increase
14  the vacuum available?

15    A.    You know, I started to look at some of
16  that data.  It is tough to tell, because the Renovar
17  plant was going up and down and online and offline.
18  It is tough to say.  But what I can say is when the
19  flare was online, it was providing additional flow.
20  It was there.  You could see it on the chart
21  recorder.

22    Q.    Okay.  So running the flare in the
23  compressor simultaneously, like you said, it was
24  suggested by Carlson.  And what was that, in August
25  of 2018?

Page 122

1    A.    Yeah.  I'm not sure when he said --

2    Q.    It is on Page 32 of your report where
3  you quote that.  And --

4    A.    On Page 32?

5    Q.    I think so.  Oh.  At the bottom.  It
6  says, "Based on --

7    A.    Oh.  "Based on a recommendation."
8  Yeah.  That was from Carlson.  Jefferson Parish
9  requested that Aptim operate...at the same time the
10  vacuum being increased to 40 inches...at the blower
11  inlet.  Yes.  That is correct.

12    Q.    Okay.  So operating both the
13  compressor and the flare simultaneously is
14  appropriate based on NSPS requirements.  Is that
15  right?

16    A.    Based on NSPS requirements.  No.  As
17  far as Phase 4A, I don't believe they are having any
18  NSPS issues related to the operation.  This was done
19  to, to increase the flow, to be more consistent.

20    Q.    I guess what I was, I'm sorry.  I
21  guess what I was referring to a little further down
22  on that same Page 33, it says, the last sentence of
23  that top paragraph says, "This change in operating
24  strategy was significant and indicated that, while
25  sufficient vacuum was historically available to

Page 123

1  operate the GCCS per NSPS requirements and maximize
2  LFG quality."

3        Did I read that right?

4    A.    Yeah.

5    Q.    So I was just saying that, that
6  operating both the compressor and the flare
7  simultaneously is appropriate based on NSPS
8  requirements?

9    A.    Yeah.  It does not change the NSPS
10  requirements.  Correct.

11    Q.    Doesn't violate it?

12    A.    No.  It does not.

13    A.    It is within the --

14    A.    Right.  Yes.

15    Q.    And Aptim was contracted to operate
16  the gas collection system per those NSPS
17  requirements.  Is that right?

18    A.    That is correct.

19    Q.    And did running both the flare and
20  compressor simultaneously increase the flow to the
21  well field?

22    A.    It looked like at times that it did.

23    Q.    And that began in September of 2018.
24  Is that right?

25    A.    That is, that is correct.

Page 124

1    Q.    Okay.  Was operating the flare and the
2  compressor simultaneously historically available as
3  an option?

4    A.    The reason, the reason I'm thinking
5  about it is, I don't know if they made any changes to
6  operate those simultaneously, it may have been
7  something they could've done.  And obviously, a
8  change like that, the engineer would've had to study
9  and recommend.  But physically capable before that, I
10  guess it is possible.  I just don't know if they made
11  any mechanical changes to make that, make that
12  happen.  I can't remember right now offhand, off the
13  top of my head.

14    Q.    Okay.  And I think that for that
15  sentence that I read about this change in operating
16  was significantly indicated, you cite footnote 122.
17  And footnote 122 is referring to a progress status
18  report, Bates numbered WC_JPLF_0021423.

19    A.    Correct.

20    Q.    And --

21    A.    I believe the 122, that references to
22  collect more gas.  So what was in italics there, that
23  is what that footnote is for.

24    Q.    Got it.  Got it.  And you are
25  referencing in footnotes 121 and 122 the same



Page 125

1 document?
2    A.    Yes.
3    Q.    Okay. Did Aptim make, ever make this
4 suggestion to simultaneously operate the flare and
5 the compressor at Jefferson Parish at any time?
6    A.    I don't know if they did. I would say
7 in my experience, they are the operator, that is an
8 engineer's call. Jefferson Parish had several
9 engineers on staff. So that is something an engineer
10 would look at the data to make the call, and I would
11 want my own O&M.
12    Q.    Would you call, would you call that a
13 technical suggestion?
14    A.    I would call it an engineering
15 suggestion.
16    Q.    Did Aptim have that knowledge, are you
17 aware, if their people that were working at Jefferson
18 Parish for Aptim, did they have that knowledge?
19    A.    The field staff, again, I would say in
20 my, my experience with the people in the field, I
21 don't know if Jefferson, the parish did themselves,
22 to make that kind of change. But I would want an
23 engineer to study that and to make that
24 recommendation, which Carlson did here. It came from
25 Carlson, who was serving in an engineering capacity.

Page 126

1    Q.    Is Josh Broggi an engineer?
2    A.    I do not know if he is or not.
3    Q.    Okay. Was Aptim contractually
4 obligated to suggest solutions to problems with the
5 gas collection system?
6    MR. BAAY:
7         Object to form.
8    THE WITNESS:
9         They were contractually, they were
10 contractually obligated to suggest minor corrections
11 to, for compliance or operations. But in my opinion,
12 this would not be a minor change making, bringing a
13 wholesale piece of equipment online would be not
14 minor.
15 BY MR. HAMMEL:
16    Q.    Okay. If we take a look briefly at,
17 let's look at Section 4 of Exhibit B to the contract.
18 It is on Page 13 of 15 at the bottom. Do you see
19 where I'm looking?
20    A.    Yeah. I'm getting there. Give me a
21 second.
22    Q.    Take your time.
23    A.    What number are we looking at?
24    Q.    B, third page, I think it is 13 of 15,
25 No. 4 at the bottom.

Page 127

1    A.    13 of 15. No. 4 at the bottom. Okay.
2 I see it.
3    Q.    Yeah. I'm just going to say let me
4 ask the question first.
5    A.    Yeah.
6    Q.    So it is my understanding that Aptim
7 was responsible for running the flare.
8    A.    Correct.
9    Q.    And Renovar was responsible for
10 operating the compressor?
11    A.    That is correct.
12    Q.    Okay. So I'm going to direct your
13 attention to that section of Exhibit B to the
14 contract, the first line of No. 4 says, "In
15 coordination with Renovar, document the duration of
16 periods of flow rate when the LFG was diverted
17 through the primary control device."
18    A.    Correct.
19    Q.    What is the primary control device?
20    A.    That is the compressor station.
21    Q.    That is the compressor. So at least
22 for these purposes of documentation, Aptim is
23 supposed to coordinate with Renovar related to the
24 flow rate going to the compressor. Is that right?
25    A.    Say that again, how you said that.

Page 128

1    Q.    Well, it is my understanding that at
2 least related to this section of the contract, that
3 Aptim was to coordinate with Renovar.
4    A.    No. To me this is talking about the
5 duration when the flow rate, in coordination with
6 Renovar, document the duration of periods and flow
7 rate was diverted through the primary control device.
8 So that is one thing. The duration when the flow was
9 run by a flare. That is a second thing. And the
10 durations of time periods when both control devices
11 were inoperable. It is not talking about when the
12 two were operating together specifically, because I
13 think there is some other documentation on that as
14 well. Usually, the way, the way it usually happened
15 here was the Renovar compressor station would go
16 down.
17    Q.    Yeah.
18    A.    For some reason.
19    Q.    Yeah.
20    A.    It was an unplanned outage.
21    Q.    Yeah.
22    A.    Somehow Aptim was on-site or it would
23 come on the site, or somebody would call them and
24 say, hey, the station is down. You've got to turn
25 the flare on. And that is what all this, that is

BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
129–132

Page 129

1 what this documentation, they would have put in
2 there. And they did. If you look in their records,
3 it talks about number of hours the flares were up and
4 down. The number of hours the compressor station was
5 up and down. That is what they had to document here.
6 That is my understanding of this.
7     Q.     Okay. So this section makes clear
8 that Aptim is supposed to coordinate with Renovar
9 related to the flow to the compressor, the duration
10 and flow rate to the flare, and the duration when
11 both were inoperable?
12     A.     Yeah. They were, they were to
13 document those durations.
14     Q.     So Aptim was coordinating with Renovar
15 related to the flow rate at the compressor and the
16 flare. Right?
17     A.     At some point after they started to
18 run together, there would've had to, I can't
19 speculate because I don't see, I didn't see anything
20 where they were, I see the documentation, but I don't
21 know what the communication was when they were doing
22 it together. I know what happened when one would go
23 down, and then it would have to go start it back up.
24 But as far as coordinating of run time, coordinate
25 with Renovar, document the duration and periods of –

Page 130

1 yeah. To me this says coordination with Renovar
2 document, that means Renovar was giving you the
3 information to put in the document.
4          The reason I say that, I think in the
5 table itself, it says information provided by Renovar
6 and that is what they used in that report. So I
7 don't know about the communication on the
8 operation –
9     Q.     Sure.
10     A.     – between the two.
11     Q.     Sure. And there is nothing that you
12 have seen in the contract that would preclude
13 communication between Aptim and Renovar. Right?
14     A.     Preclude?
15     Q.     Yes.
16     A.     No. I don't see anything. But no.
17     Q.     All right. So I guess my point is
18 that even though Aptim was coordinating with Renovar
19 related to the compressor and the flare, no one from
20 Aptim ever suggested, hey, let's run both and
21 increase the flow?
22     A.     No. As I said, as I said before, and
23 this is my experience, I wouldn't expect that to
24 happen. I didn't see that it did or did not happen.
25 But I wouldn't expect it. That would be the engineer

Page 131

1 saying, hey, I looked at the data. You got to turn
2 this other piece of equipment on and run them
3 together. That is, that is no more significant than
4 just your guy out there turning the valves saying,
5 hey, I think I will flip this switch here, so.
6     Q.     But there was, the lack of vacuum on
7 Phase 4A was pretty well-documented beginning in May
8 of 2018 when they installed the first wells. Right?
9     A.     Yeah. But that wasn't due to not
10 having the flare running with the compressor station.
11 That had to do with, a lot of that had to do with
12 this, this jumper. A jumper actually did damage to
13 some of the piping.
14     Q.     I think they referred to the belly in
15 line?
16     A.     Yeah. There was some construction
17 work done. There was belly lines. So it cut off.
18 That's, that's just the absolute stoppage of flow to
19 some extent. That is not, has to do with how much
20 vacuum is or is not available. Those are two
21 separate issues.
22     Q.     Okay. So that would have nothing to
23 help increase the flow on Phase 4A, operating the
24 flare and compressor together?
25     MR. BAAY:

Page 132

1          That is okay.
2     THE WITNESS:
3          Not in those areas that they did not
4 have, that were isolated, we will say, at that point.
5 Isolated from the system.
6 BY MR. HAMMEL:
7     Q.     It would helped the areas that were
8 blocked from the belly line –
9     A.     No.
10     Q.     – that was filled with water?
11     A.     That is correct. Yes.
12     Q.     But it would have increased flow to
13 the rest of the area that was not impacted by that?
14     A.     It is, it's possible.
15     Q.     It is possible?
16     A.     It is possible.
17     Q.     Okay. Okay. We were talking before
18 about well design that was going on in Phase 4A, and
19 you mentioned horizontal wells. Do you remember
20 that?
21     A.     Yes.
22     Q.     Horizontal wells are temporary in
23 nature. Right?
24     A.     That is correct. I was going to go
25 off on a whole explanation of what horizontal wells



Page 133

1  are and I will not.
2      Q.    Don't worry about that.
3      A.    I will not.
4      Q.    You are doing a good job.
5  MR. BAAY:
6          Whenever you get to a breaking point
7  or the end of your outline.
8  THE VIDEOGRAPHER:
9          The time is 11:35 A.M. We are off the
10 record.
11         (Off the record.)
12 THE VIDEOGRAPHER:
13         The time is 11:43 A.M. We are back on
14 the record.
15 BY MR. HAMMEL:
16     Q.    So, Mr. Kline, if we could take a look
17 at Page 23 of your report. So first I want to direct
18 your attention to the bottom of Page 23, the
19 paragraph that begins "In May, in a May 30th, 2018
20 E-mail from Keith Conley to Mr. Lockwood."
21         Do you see where I'm looking?
22     A.    Yes.
23     Q.    You state that "Mr. Conley writes, 'By
24 Thursday of our assessment week, it became clear to
25 us that there were high H2S emission in Phase 4A...

Page 134

1  there was a loss of vacuum to several of these new
2  wells...and these were serious problems that needed
3  to be addressed. The wells referred to were 507,
4  515, 518, 519, HW-04 and horizontal well number 05.
5      A.    Correct.
6      Q.    So "By July of 2018, the referenced
7  wells had no available vacuum and were showing
8  positive pressure."
9          Did I read that correctly?
10     A.    That is correct.
11     Q.    Okay. So that was what we were
12 talking about previously as far as the vacuum, the
13 lack of vacuum on Phase 4A, was apparent from the
14 time that the wells were installed?
15     A.    Yeah. And I believe, I believe there
16 was some vacuum when they were installed. It started
17 to go away, it went away and it went away until July
18 there was none, so.
19     Q.    Okay.
20     A.    Yes.
21     Q.    And then I want to direct your
22 attention to that first paragraph, first full
23 paragraph, second paragraph on the page it says,
24 after "In severe cases," it says, "The frequent need
25 to repair the issues of low spots is shown in the

Page 135

1  installation of various jumpers, or temporary piping,
2  installed to connect a well (or series of wells) to a
3  lateral or header with available vacuum by bypassing
4  the areas of the piping that have been impacted by
5  the low points."
6          Do you see that?
7      A.    Yes.
8      Q.    So when we say a jumper line, that is
9  to make a correction to avoid the area that is
10 blocked, and that is by installing a line that's
11 aboveground?
12     A.    It can be aboveground or it can be
13 below ground. There were several jumpers installed
14 here that were actually below ground. It really
15 depends on what you are using --
16     Q.    You are just jumping around the area
17 that is blocked. Right?
18     A.    Or you are making a connection from
19 someplace that has vacuum to someplace that does not.
20 Just around it. But in this particular case, what we
21 are talking about there was a jumper made from an
22 area that had vacuum on the other side of the site.
23     Q.    Got it. And then it says, "The loss
24 of vacuum to an extraction well can be determined by
25 monitoring the available vacuum at the piping lateral

Page 136

1  leading to the well. Right?
2      A.    Correct.
3      Q.    And that would have been something
4  that would have been collected by Aptim. Right?
5      A.    Yes. That is, yes, that's part of
6  their collection.
7      Q.    And it says, "such data is collected
8  each time a well is monitored during the well
9  balancing activities." Right?
10     A.    Correct.
11     Q.    And then you sum it up at the end of
12 that paragraph by saying, you know, a significant
13 number of the gas extraction wells lacked available
14 vacuum. This is discussed further below and
15 graphically depicted in the figures that we were
16 discussing.
17     A.    Yes.
18     Q.    Okay. Great. At the end of that page
19 it says, "As described below, the cause of the loss
20 of vacuum was apparently low spots/bellies in the
21 header. It should be noted that the vacuum was
22 restored to the wells when a new jumper line was
23 installed in August of 2018."
24         Do you see that?
25     A.    Yes, I do.

Page 137

1    Q.    And is Aptim part of the, did they
2  form part of the plan and installed the jumpers?
3    A.    They did do the installation of
4  jumpers. There were meetings held by multiple
5  parties in June, again in July. A proposal was
6  issued by --
7    Q.    Aptim?
8    A.    Aptim. And as soon as it was approved
9  nine days later, they had actually completed the
10  installation of it and in August they had restored
11  vacuum to that area.
12    Q.    Well, it looks like on Page 24.
13  Right. So this is an August 20th, 2018 weekly
14  progress report.
15    A.    Yeah. 56,000.
16    Q.    Indicated that Jefferson Parish
17  approved a $56,000 expenditure for Aptim to install a
18  new pipeline to improve the vacuum on the outside of
19  4A. Right?
20    A.    Correct.
21    Q.    And is it your opinion that solved the
22  problem of the lack of vacuum on 4A?
23    A.    It solved it. It was a temporary
24  solution. Because if you read later on in my report.
25    Q.    Yep.

Page 138

1    A.    Carlson and I think Franklin discussed
2  that they needed to do some additional work on that
3  jumper to restore vacuum again.
4    Q.    And again, if you look at Page 26 of
5  your report you, in fact, make that statement.
6  Right?
7    A.    Yes.
8    Q.    You recognize that the work Aptim
9  performed, the jumper line, was not continuing to
10  apply vacuum on the south side of 4A? I think it
11  starts, "In a May 20th, 2019 E-mail Mr. Franklin
12  wrote to Mr. Lockwood."
13    A.    Yeah. I know it is in here. It is
14  finding it.
15    Q.    Sometimes it is challenging, I know.
16    A.    Yeah.
17    Q.    Nevertheless, you agree with that,
18  that the vacuum issue continued to be a problem on
19  Phase 4A?
20    A.    Yeah. That header needed more, that
21  jumper that was installed, the eight-inch jumper
22  needed more work in 2019.
23    Q.    Okay. And then if you look at Page 25
24  of your report, that first full paragraph that says,
25  "Possible sag in the vacuum headers where trash road

Page 139

1  crossed in two places."
2    A.    Yes.
3    Q.    "This issue is preventing the ability
4  to pull gas from new wells in 4A on the east side of
5  the hill." Right?
6    A.    Correct.
7    Q.    And those issues, also that issue on
8  the east side of the hill would also reduce the
9  collection efficiency on Phase 4A. Right?
10    A.    That was actually, that was the same
11  issue. The piping that came in, there was several
12  documents, documentation by several people, and there
13  was a talk about they constructed a two and a half,
14  two to two and a half foot gravel road across that
15  area. Apparently that was what had caused the loss
16  of vacuum. So to get away from that jumper, I mean,
17  that piping and brought a jumper down and that is how
18  they connected into those additional wells.
19    Q.    If you take a look at Page 25 of your
20  report. I'm looking at the first full paragraph
21  right in the middle. Oh. I'm sorry. The second
22  full paragraph it says, "The vacuum jumper to a
23  leachate riser was damaged by landfilling operations
24  in mid-October 2018. In an October 17, 2018 E-mail
25  from Mr. Richard Mayer from Jefferson Parish to Mr.

Page 140

1  Nelson Ambeau of Aptim, Mr. Mayer writes, 'Riser 20
2  south," and that would be in Phase 4A. Right? Riser
3  20S?
4    A.    Yes.
5    Q.    -- "appears to have had the vacuum
6  jumper put out of service as the area was filled and
7  is venting gas. We need a new jumper." Right?
8    A.    Yes.
9    Q.    So this is Mr. Mayer from Jefferson
10  Parish informing Mr. Ambeau what needs to take place
11  out at the Jefferson Parish Landfill. Right?
12    A.    That is correct.
13    Q.    Okay. Is the airline part of the gas
14  collection system?
15    A.    The airline, the compressed airline?
16    Q.    Yes.
17    A.    Each gas collection well that has a,
18  that has got to have a pump installed in it, needs a
19  compressed airline and a force main. So it would be
20  part of the in-well pumping system.
21    Q.    Okay.
22    A.    Whether that is considered part of the
23  gas collection system, it goes into the well to be
24  able to have liquid.
25    Q.    In your opinion, would that be an item



Page 141

1 that Aptim would be responsible for repair and
2 placement and maintenance of?
3      MR. BAAY:
4         Object to form.
5      THE WITNESS:
6         Depends on how it was, I guess it
7 depends how it was damaged. Because there was talk
8 of some of these forced mains and air piping being
9 damaged in a much larger sense. There is a statement
10 here where they were pinched. They think it was
11 pinched along with this 10-inch header. So if that
12 is the case, it is going to be something that is a
13 much larger repair. If it is something simple, it
14 happened right at the wellhead, then that would be an
15 Aptim issue.
16 BY MR. HAMMEL:
17      Q.    Okay. I want to direct your attention
18 to Page 30 of your report. On this page of your
19 report you start to discuss upsets. Can you tell me
20 what an upset is?
21      A.    An upset, it is in general anything
22 that inhibits the proper balancing of a well. So it
23 could be loss of vacuum. It could be vacuum
24 fluctuation. Anything that would affect, we'll say
25 the vacuum at the wellhead.

Page 142

1      Q.    You talk about in this page of your
2 report that, you know, how important the consistent
3 flow is in collecting gas.
4      A.    Yes.
5      Q.    Right?
6      A.    That is correct.
7      Q.    Further down on Page 30 at the end,
8 the part where it is in italics —
9      A.    Yep.
10      Q.    You mention the importance of a VFD.
11      A.    That is correct.
12      Q.    And that is a variable frequency
13 drive?
14      A.    That is correct.
15      Q.    Okay. And that is a suggestion that
16 Mr. Carlson made. Right?
17      A.    Yeah. It is a suggestion that he
18 made. It is also something that we do on a lot of
19 our systems. If we want to make sure that we
20 maintain a, a fairly constant vacuum. There was,
21 there was a question whether VFD were or were not
22 installed. But my looking at this report, I could
23 not find anything. And in speaking with Aptim,
24 apparently the VFDs had not been installed.
25      Q.    And it appeared to me like the first

Page 143

1 time VFDs were installed was some time around
2 September 27th, 2018.
3      A.    September 2018?
4      Q.    Yes, sir.
5      A.    Again, I don't recall.
6      Q.    If you look down on the next page of
7 your report, Page 31. It says, "It must be noted
8 that Aptim provided a quote in September of 2018 to
9 install VFDs on the motors for all three flare system
10 blowers."
11      A.    Right.
12      Q.    But they were not approved for
13 installation before their departure in May of 2018.
14      A.    Right.
15      Q.    The first time Aptim suggested
16 installing VFDs was in September of 2018?
17      A.    That is correct.
18      Q.    And is it your opinion that an
19 installed VFD would have provided a more consistent
20 flow of vacuum to the wells in 4A?
21      A.    Yes. I think a VFD would have.
22      Q.    Okay. When you were giving your
23 response earlier, you mentioned, you said you were
24 speaking with Aptim. Can you tell me who at Aptim
25 you spoke with?

Page 144

1      A.    Josh, Josh Broggi.
2      Q.    Josh Broggi?
3      A.    Yes.
4      Q.    And that date is September 27, 2018,
5 that was approximately six months, seven months
6 before Aptim's departure from Jefferson Parish
7 Landfill?
8      A.    That is correct. I do want to say,
9 again, about that, though. Installing VFDs, I want
10 to make sure that would not be something that, again,
11 I would expect my O&M contractor to suggest. That is
12 a big, that takes a lot of engineering. Especially
13 in a complex like this. So I know Carlson suggested,
14 that would be something I would expect an engineer,
15 really a mechanical engineer.
16      Q.    In your contracts that you have in
17 your landfills, are your O&M contractors required to
18 provide solutions to problems?
19      A.    No.
20      Q.    All right. Are they required to
21 provide technical assistance to solve problems?
22      A.    Usually they are, usually there is a
23 comment that says, when asked we will provide.
24      Q.    Got it.
25      A.    Yes. When asked.



Page 145

1    Q.    Back on your Page 29 for a minute.
2  You mention that there was a problem from a lawn
3  mower. Is that here?
4    A.    Yeah.  A lawn mower, on the same day a
5  cap on the GCCS, vacuum found to be cut off by
6  landfill mowing activities.  And the reason that is
7  important, it should be noted this damage prevented
8  operation of the Renovar compressor station due to
9  high oxygen.  So it hit a cap on a vacuum line, that
10  started to suck in oxygen, air, oxygen.  That shut
11  down the compressor station.  Since the compressor
12  station was providing the vacuum to the site, it shut
13  down the whole system.
14    Q.    Do you have people that mow the grass
15  at the landfills that you operate up north?
16    A.    Yes, we do.
17    Q.    Okay.
18    A.    We don't contract any of them.  The
19  owner contracts them, but they do mow the grass where
20  we are.
21    Q.    Certainly.  And do you communicate
22  with the people who mow grass in the landfills that
23  you operate?
24    A.    No. We don't.
25    Q.    You don't tell them, hey, avoid this,

Page 146

1  stay away from that?
2    A.    Our clients do that directly
3  themselves.
4    Q.    Okay.  Because I think that you even
5  cite this, as this being somehow unexpected or
6  outside the control of Aptim.  Right?
7    A.    Yes.
8    Q.    And so, but we are really just talking
9  about training the lawn mower.  Right?
10    A.    Training the lawn mower not to hit the
11  wells?
12    Q.    Yeah.
13    A.    It is harder than you would think.
14  You would think that they would see a big well in
15  front of them, but 10 times a year come see me.
16  Okay.  Phone call.
17    Q.    Kind of unfortunately, I guess it is
18  kind of expected, that there is going to be some
19  damage from the mowers?
20    A.    It shouldn't be.  It should not.  They
21  should be able to miss these for the most part. But
22  grass does grow over them.  This may have been a
23  cleanout. I don't know exactly what it was that they
24  hit. But yeah.
25    Q.    You mentioned when we were talking a

Page 147

1  moment ago about the contract, you know, that you
2  have experience with at the landfills that you
3  operate related to, you know, whether you are getting
4  solutions or technical assistance.  And I think that
5  you said you have a provision in those contracts that
6  say, when asked --
7    A.    Yeah.
8    Q.    -- then they will provide.  Right?
9    A.    Yep.
10    Q.    Is there any such provision like that
11  you are aware in the contract between Aptim and
12  Jefferson Parish?
13    A.    Yes.  Section, Section 1.1.4,
14  Technical Support.
15    Q.    And this is in --
16    A.    I'm sorry.  Page 14 of 15.
17    Q.    In Exhibit B?
18    A.    Yes.
19    Q.    1.1 point --
20    A.    Yes.
21    Q.    I'm sorry.  Could you repeat it?
22    A.    1.1.4.
23    Q.    Okay.  And this is under Technical
24  Support.
25    A.    Yeah.  The second, as I read the

Page 148

1  second sentence, "the parish may request advice to
2  mitigate recurring issues, such as, exceedance of
3  wellhead oxygen, temperature, pressure limits, well
4  dewatering, header or lateral clogging, equipment
5  repair or placement, and similar issues."
6    Q.    Okay.  If I could direct your
7  attention back to Section 1.1.1.  And that is Page 11
8  of 15.  It is entitled Operation and Maintenance.
9          Do you see that?
10    A.    Yes.
11    Q.    Do you see the last three words of
12  that paragraph?
13    A.    And implementing solutions.
14    Q.    Implementing solutions.  Right?
15    A.    Yes.
16    Q.    And you are talking about, you know,
17  the whole section talks about routine operations and
18  maintenance, balancing the well fields to maintain
19  oxygen, pressure, temperature, limit, maximize LFG
20  quality and flow rate, pumping leachate from gas
21  wells as needed.  And it includes, and implementing
22  solutions.
23    A.    Correct.
24    Q.    Do you have any statements like that
25  in the contracts that you operate under at the



Page 149

1  landfills you operate?
2      A.    I don't recall anything specific like
3  that.
4      Q.    Okay.  If we look a little further in
5  1.1.1, and specifically the paragraph, well, I guess
6  there is three of them that start with the word
7  maintenance.
8      A.    Can we go back?
9      Q.    Yeah.  Sure.
10     A.    One second, too.  Because you have,
11 and this is interesting because they have, they
12 maintenance almost the same thing in different ways,
13 and that is 1.1.4.
14     Q.    Yeah.
15     A.    Again, at the top it says, "The firm
16 shall provide technical support as needed for minor
17 compliance or operational issues that may arise
18 during the term of the contract."
19           So that does talk about providing
20 technical support as needed for minor compliance and
21 operational issues.
22     Q.    Sure.  It also uses that word "shall,"
23 which we know is mandatory.  The firm, Aptim, shall
24 provide technical support.  It is not, you know, may
25 or permissive.  Whenever the parish needs it, Aptim

Page 150

1  shall provide it?
2      A.    Right.
3      Q.    And then gives some examples.
4      A.    For minor compliance, correct.  And
5  then it gives examples.
6      Q.    Anyway, this is all contract
7  interpretation.  On Page 34 of your report you make
8  the distinction that we discussed earlier that Aptim
9  was contracted to maximize landfill gas quality, not
10 to control odors.  Right?
11     A.    That is correct.
12     Q.    It is at the end of the first full
13 paragraph, and it is referring back to the basis for
14 Opinion No. 5?
15     A.    Right.  Per NSPS requirements.
16     Q.    Correct.  And so who was, in your
17 opinion, in charge of controlling odors at the
18 Jefferson Parish Landfill?
19     A.    Ultimately Jefferson Parish was the
20 holder of the operating permit.  Now, they did, there
21 is a section in Waste Connections' contract with
22 Jefferson Parish that talks about controlling odors.
23     Q.    Yep.  I remember you cited it in your
24 report.
25     A.    So I cited it.  So it would be

Page 151

1  Jefferson Parish as the overall holder of the
2  contract, and then Waste Connections has the, they
3  have to, there is a section I can find in here.  They
4  have to comply with the odor control plan, so.
5      Q.    And I think we talked about this.  It
6  is hard for me when I go out of order.  But you used
7  the example that sometimes they have to decrease the
8  vacuum to increase the concentrations in gas?
9      A.    That is correct.
10     Q.    But that wasn't the case at the
11 Jefferson Parish Landfill.  Right?
12     A.    Well, they balance it all the time.
13 So it probably was some of the time to see what they
14 got.  Now, Phase 4, Phase 4A.  Okay.  Did not have
15 any oxygen issues.
16     Q.    Okay.  While Aptim was in charge of
17 the gas collection system at the Jefferson Parish
18 Landfill, did the gas that was collected improve?
19 Did the quality of it improve?
20     A.    While they were at, in Phase 4?
21     Q.    In Phase 4.
22     A.    It was always of a, I don't think it
23 changed.  It was at a fairly high methane
24 concentration, low oxygen concentration, the whole
25 time.  I don't recall seeing any significant change.

Page 152

1      Q.    Is it your opinion that the
2  responsibility of Waste Connections to control odors
3  includes odors coming from the gas collection and
4  control system?
5      MR. BAAY:
6           Object to form.  Go ahead.
7      THE WITNESS:
8           No.  It does not.
9  BY MR. HAMMEL:
10     Q.    While Aptim was in charge of the gas
11 collection and control system at the Jefferson Parish
12 Landfill, all phases, the gas become unsalable at a
13 certain point, didn't it?
14     A.    Not that I'm, not that I'm aware of.
15     Q.    You are not aware that Mr. Carlson,
16 one of the reasons he was brought to the Jefferson
17 Parish Landfill was to improve the quality of the gas
18 collection because Cornerstone had stopped purchasing
19 it?
20     A.    Yeah.  I know he was brought on-site
21 to improve the gas quality, but I did not know
22 Cornerstone was not, are you talking about all phases
23 or are we just Phase 4A?
24     Q.    All phases.
25     A.    Okay.  All right.  Well, that would



Page 153

1  have been because he would have been probably
2  contracted for Phase 4A was even brought online.
3      Q.    Did you read the deposition of Josh
4  Broggi in this matter?
5      A.    Josh Broggi?
6      Q.    The person you said that you spoke to.
7      A.    Yes. I did. I believe I did.
8      Q.    Okay. So you are aware that the
9  proposal submitted to Jefferson Parish by Aptim
10  includes odor reduction as one of the items in the
11  proposal?
12      A.    You have to be, have to be careful
13  here. And that is if you look at the, if you look at
14  the contract, it pulls in by reference the scope of
15  work in the proposal. The scope of work does not
16  mention odor control. Odor reductions are only
17  mentioned in the, we'll say down in the sales part of
18  it.
19      Q.    You think that a request for proposals
20  submitted to a government agency is a sales function?
21      MR. BAAY:
22          Object to form.
23  BY MR. HAMMEL:
24      Q.    Is that what I understood?
25      A.    It actually, it actually defines it in

Page 154

1  the contract. What part of that becomes part of the
2  contract.
3      Q.    But you perceive the request for
4  proposal to be a sales function?
5      MR. BAAY:
6          Object to form.
7      THE WITNESS:
8          I recall the proposal, but I would say
9  it has sales material in it. It has marketing
10  material in it, because you obviously want to win the
11  proposal.
12  BY MR. HAMMEL:
13      Q.    Okay. And you don't work for, you
14  don't work for Aptim. Right?
15      A.    No.
16      Q.    Okay. So you have no knowledge of how
17  they operate their proposal, the function of their
18  proposal for a contract?
19      A.    It is actually spelled out if you
20  look. I've done enough proposals that I understand
21  how they, how they work. And they actually have
22  theirs laid out by, they state, you know, this is the
23  part that is the scope of work. They have it.
24      Q.    So —
25      A.    And then they have another part that

Page 155

1  talks about our experience. Another part that is
2  basically just your general sales material. This is
3  what we can do for you. That kind of thing.
4      Q.    So it is your experience to submit a
5  proposal that promises things that do not make it
6  into the contract?
7      A.    The only thing that is guiding, the
8  only thing that is guiding is what is actually in the
9  contract.
10      Q.    That is your opinion?
11      A.    That is my opinion. And based on my
12  experience.
13      Q.    Okay. Let's take a look at Page 30 of
14  your expert report for a quick moment. We were
15  talking about upsets before, remember?
16      A.    Okay.
17      Q.    So let me see. On this page you state
18  that vacuum is extremely critical. Do you agree with
19  that?
20      A.    I'm sorry. Where are we looking? I
21  just want to make sure I get the context here.
22      Q.    I had the wrong section.
23      A.    We are on Page 30, though.
24      Q.    Yes. I believe so. So I guess at the
25  top of the page you say, fourth line down, right-hand

Page 156

1  side, Page 30. You say, "This is a very," you are
2  talking about the vacuum provided was based, in part,
3  on compressor station demands."
4      A.    Yes.
5      Q.    "This is a very important factor when
6  evaluating the operation of a gas collection and
7  control system. When the gas demand and/or discharge
8  pressure requirements for the compressor station
9  changes or fluctuates, as can happen as the end use
10  demand changes, this will affect the amount of vacuum
11  available." Right?
12          And you say, "With fluctuating vacuum
13  at the headers...flows from individual wells also
14  fluctuates."
15          Is there anything more important to a
16  gas collection well than vacuum?
17      A.    I would say it is a very important
18  part of the gas collection system. I'm trying to
19  think off the top of my head if there is some other,
20  there would be something else we could say. I'm
21  going to say it is one of the most important
22  parameters to maintain at a landfill. It is one of
23  the critical parameters.
24      Q.    And if you look at Page 35 of your
25  report, you talk about the fact that other

Page 157

1  individuals were, or other entities were, without
2  Aptim's knowledge, occurrences when other people were
3  adjusting the well field?
4      A.    Correct.
5      Q.    Okay. You say "This is extremely
6  important as the adjustments of the wells is a
7  process and should be completed in a methodical
8  manner." Is that correct?
9      A.    That is correct.
10     Q.    And you identified some times when
11 other individuals or other entities were adjusting
12 the well field. Correct?
13     A.    Correct.
14     Q.    And we talked about it earlier. It is
15 your understanding that, you know, anyone else could
16 pull up the wellhead and see what was done
17 previously.
18     A.    Anyone that had the data.
19     Q.    That had the data?
20     A.    Could look at it. Yes.
21     Q.    So does it show up on the screen on
22 the wellhead? It is something that has to be
23 downloaded?
24     A.    The well, yeah. The well just has a
25 manual vacuum. There is no, nothing electronic with

Page 158

1  it. You have to have basically the monitor, which is
2  a computer.
3      Q.    You connect to it to get the data?
4      A.    Correct.
5      Q.    Who had the computer to get the data
6  off of the wellheads?
7      A.    Aptim.
8      Q.    Okay.
9      A.    Aptim technicians.
10     Q.    Okay. And is it your understanding
11 that these other entities were changing the, tuning
12 or changing the well field balance?
13     A.    That is what my understanding was.
14 But we have no documentation on why they were doing
15 it.
16     Q.    Are you able to, are you able to look
17 back and use that same computer to see when it was
18 adjusted and how it was adjusted?
19     A.    No.
20     Q.    How much? You can't find that same
21 information?
22     A.    No.
23     Q.    Why not?
24     A.    Because you plug the meter in and you
25 take your reading and gives it a time stamp. So then

Page 159

1  you go. If somebody comes around and they are
2  turning the valve, you can adjust the wells without
3  the meter. That is separate. So if somebody screws
4  around with it, we had it done where people,
5  trespassers come --
6      THE REPORTER:
7          Wait. Say that again.
8      THE WITNESS:
9          Trespassers can come on the site and
10 they can screw around with the valves. And you come
11 back and you say, well, what happened. I had
12 methodically adjusted this system and now it is out
13 of balance. Why? Because somebody did something to
14 a well.
15 BY MR. HAMMEL:
16     Q.    Okay.
17     A.    And that is a theoretical, but it
18 shows how it can happen, it's an actual issue.
19     Q.    And if you look at it and the parts
20 that you documented in your report is how that was
21 determined. It wasn't determined that, you know,
22 Nelson came back and connected the machine and it
23 said, oh, this IS completely different than last
24 time?
25     A.    No. This was all, all verbal reports

Page 160

1  or observations.
2      Q.    Okay. That makes sense.
3      MR. PAUL:
4          Sorry to interrupt. Doug, would you
5  be able to move closer to the microphone or vice
6  versa. It is a little hard to hear you.
7      THE VIDEOGRAPHER:
8          I mean, that mic is not connected to
9  that.
10     MR. BAAY:
11         You are picking up on the laptop, on
12 this screen.
13     MR. HAMMEL:
14         Is that any better, John?
15     MR. PAUL:
16         Yeah. But that is okay.
17     MR. HAMMEL:
18         I turned the microphone a little bit.
19 Maybe it opened up.
20     MR. BAAY:
21         The microphone is here. It is not
22 that microphone.
23     MR. HAMMEL:
24         Then why I'm wearing this.
25     MR. BAAY:



1 Because it is going to the camera.
2 BY MR. HAMMEL:
3    Q.    Okay. Got it. In late August of 2018
4 Aptim was approved to construct a pipeline to improve
5 the vacuum to eight new wells in the south side of
6 Phase 4 A. We discussed that. Right?
7    A.    Yep.
8    Q.    Okay. In your experience, is this
9 type of work necessary when the gas is functioning
10 properly?
11    MR. BAAY:
12        Object to form.
13    THE WITNESS:
14        When the gas is functioning properly?
15 BY MR. HAMMEL:
16    Q.    Gas collection.
17    A.    The gas collection system is
18 functioning properly. Jumpers are, you would not be
19 installing a jumper if you didn't need to. There is
20 a reason for it.
21    Q.    Okay. Aptim was under contract to
22 operate and maintain the gas collection system at the
23 Jefferson Parish Landfill since the installation of
24 the first gas wells on Phase 4A. Right?
25    A.    In Phase 4A. Yes.

1    Q.    We were talking before about what type
2 of problems, what does that indicate to you. And I
3 want to ask, would liquids locking the perforations
4 of a gas well, what type of problem does that
5 indicate to you?
6    A.    It depends on how much liquid you have
7 blocking it. You have, you have a well screen, and
8 it has a certain percentage. So it really depends
9 on, and that well screen is in connection with the
10 surrounding materials, which are pulling the gas
11 from. You want as much of the well screen open as
12 possible, because by percentage that gives you a
13 better chance to intercept more permeable layers. It
14 might not be anything if all your gas is coming in
15 from an upper level and it is open. 10 percent of
16 the well screen might be doing it all.
17        But in practice, you want as much open
18 to give yourself the best chance you have to
19 intercept as much of the formation as you can.
20    Q.    And when the perforations are blocked,
21 let's say completely --
22    A.    Yes.
23    Q.    -- what type of problems does that
24 indicate to you?
25    A.    If the perforations are blocked

1 completely?
2    Q.    Yeah.
3    A.    It would, it would either mean that
4 the, it would typically mean the system needs a well,
5 the well needs a pump installed.
6    Q.    And who, and who was responsible to
7 pump the liquids out of the wells in Phase 4A?
8    A.    Once the pumps were installed, it
9 would have been Aptim.
10    Q.    So it is your opinion that Aptim
11 didn't have any responsibility to install or
12 recommend the installation of pumps on --
13    A.    They --
14    Q.    -- gas collection wells on Phase 4A?
15    A.    They actually did recommend some pumps
16 in Phase 4A. And Rick Buller, and I think that was
17 the whole conversation with Rick Buller saying, I
18 will look at the data, the gauging data. Then I will
19 decide if we are going to authorize more pumps. Then
20 we go back to the contract. Those pumps cost, at
21 this time, probably 3,000 apiece. So it would have
22 been over. They would've had to have authorization
23 to purchase.
24    Q.    And it was part of --
25    A.    The pumps.

1    Q.    I'm sorry for interrupting. Were you
2 finished?
3    A.    Yeah. That is it.
4    Q.    And it was part of Aptim's contract to
5 pull all of the pumps, clean them, maintain them,
6 every three months. Right?
7    A.    Correct.
8    Q.    Okay. So do flooded gas wells
9 indicate a problem with operation and maintenance to
10 you?
11    MR. BAAY:
12        Object to form.
13    THE WITNESS:
14        It would depend if there was already a
15 pump. If there was no pump in it, then it wouldn't
16 be part of the operation and maintenance of GCCS,
17 because there would be nothing to operate and
18 maintain. So somebody would've had to recommend
19 putting a pump, authorize putting a pump in the well.
20    A.    Okay.
21    THE REPORTER:
22        Wait. Could we take on second. Let's
23 see why I'm not plugged in.
24        (Off the record.)
25 BY MR. HAMMEL:

Page 165

1   Q.    Mr. Kline, that portion that we were
2   just discussing, that gets into, you know, the
3   request, who is it directed to?
4        A.    Yep.
5        Q.    As well as approval. Right?
6        A.    Yes.
7        Q.    Okay. Were the perforations and gas
8   wells in 4A covered with liquids?
9        MR. BAAY:
10            Object to form.
11       THE WITNESS:
12            In the wells that I looked at, there
13  were, in the 2018 well gauging, there were two that
14  were completely covered. One that was, yeah. There
15  were two that were completely covered. In 2019, I
16  don't believe there were any. Just offhand, if I'm
17  remembering the data correctly.
18  BY MR. HAMMEL:
19       Q.    I'm not sure you are. Did you have a
20  chance to read the judge's ruling in this case?
21       A.    Yes.
22       Q.    Okay. And she talked about the well
23  perforations being covered with liquid. Right?
24       A.    In Phase 4A?
25       Q.    Yeah.

Page 166

1        A.    Yeah.
2        Q.    Okay. How many requests for pumps
3   were submitted by Aptim to Jefferson Parish for wells
4   in Phase 4A?
5        A.    Well, you had 22 wells. Seven of
6   those were put in as part of the final seven, and
7   five were installed. So I haven't seen the request
8   to install the pumps.
9        Q.    Okay.
10       A.    But they did install, I believe they
11  installed seven in the 20, seven wells they installed
12  themselves. And then I believe there were five other
13  wells.
14       Q.    All right. On Page 48 of your report,
15  you identify that CEC, I will wait for you. On Page
16  48 of your report you identify CEC or Carlson brought
17  this point out in a 2015 evaluation. Do you know if
18  Carlson was on the landfill in 2015?
19       A.    Where do you --
20       Q.    I think you say it is, look at the
21  footnote one, the bottom of first full paragraph. It
22  says, "This was part of a discussion related to the
23  force main blockages as Mr. Carlson continued that,
24  'CEC's experience is that you need to jet the lines
25  at least annually or you will see blockages."

Page 167

1        A.    Yep.
2        Q.    What line is he talking about?
3        A.    He is talking about the force mains
4   for the, for the leachate collection system. Now,
5   what did you say about the year, do I have an
6   incorrect year in there? That is June 11, 2018.
7        Q.    I think my note might be wrong. I
8   don't see it.
9        A.    Wait. You are right. It should be
10  August 2018 landfill gas assessment. If you look at
11  166, actually the footnote has that. Yes.
12       Q.    CEC documented these issues in their
13  August 2015 landfill gas system assessment.
14       A.    Yes.
15       Q.    That should be 2018?
16       A.    2018.
17       THE REPORTER:
18            Wait, wait. You guys. You are doing
19  it again.
20       MR. HAMMEL:
21            It is just the correction of a date
22  from 2015 to 2018.
23       THE REPORTER:
24            Yeah. But it's not going to be on the
25  record because you are talking over each over.

Page 168

1        MR. HAMMEL:
2            Well, I just said it. That should
3   make the record.
4        THE REPORTER:
5            So you might want to say it over. It
6   is 166, is that what it is?
7        MR. HAMMEL:
8            You want to read back the question?
9        THE REPORTER:
10            CEC documented these issues in their
11  August 2015, and then that's all I got.
12  BY MR. HAMMEL:
13       Q.    So, Mr. Kline, do you agree that that
14  should read August 2018?
15       A.    I agree that it should.
16       Q.    Okay. It says then, in 2019 Josh
17  Broggi sent an E-mail to Mr. Lockwood about
18  installing 22 pumps and the necessary upgrades.
19       A.    Correct.
20       Q.    And was that, is that the only time
21  that you see that a request was made for pumps
22  related to the Jefferson Parish Landfill?
23       A.    No. There was another made in 2015 by
24  Josh Broggi where he says, he is talking to Rick
25  Buller and Rick Buller says, they are talking about



Page 169

1 Phase 4. He says, we may have to install more pumps.
2    Q.    And again, we talked about that
3 before, but that was directed to Mr. Buller. Right?
4    A.    That was. Correct.
5    Q.    Okay. What would your reaction be if
6 your O&M person came to you and said we need 22
7 pumps?
8    A.    If we needed 22 pumps?
9    Q.    Yeah.
10    A.    If my O&M person came to me and said
11 that?
12    Q.    Just like they did here. Right.
13    A.    Are you looking at the as noted in
14 January 29?
15    Q.    Yeah.
16    A.    Yeah. That actually says installing
17 the 29 pumps. So there were 29 pumps that were
18 requested, it would require, would take a significant
19 amount. So Josh Broggi is not suggesting. It came
20 from Mr. Lockwood. What Josh is saying, if you want
21 to do this in Phase 3B and 4A, we've got to put in
22 1,400 feet of airline and force main.
23    Q.    So, okay. Thank you for that
24 clarification.
25        So this is not Mr. Broggi making a

Page 170

1 suggestion to Jefferson Parish that they need to
2 install 22 pumps. This is Mr. Lockwood informing Mr.
3 Broggi that he believes they need to install 22
4 pumps?
5    A.    Yes.
6    Q.    And as far as you know, that request
7 that was made by Mr. Broggi was approved in February.
8 Right?
9    A.    Yes. I believe it was. Yes.
10    Q.    All right. I'm not sure we are going
11 to make it. So if you want to break for lunch, let's
12 take a quick lunch and try to make it a half hour at
13 1:00.
14    THE WITNESS:
15        Come back at 1:00? Do you guys want
16 to keep going? How much more do you have?
17    THE VIDEOGRAPHER:
18        12:25 P.M. We are off the record.
19        (Off the record.)
20    THE VIDEOGRAPHER:
21        The time is 1:04 P.M. We are back on
22 the record.
23 BY MR. HAMMEL:
24    Q.    Mr. Kline, did you have a nice lunch?
25    A.    Yes. Very nice lunch. How about

Page 171

1 yours?
2    Q.    Good.
3    A.    Good.
4    Q.    So when we left off we were talking
5 about these 22 pumps on phases 3B and 4A on Page 48
6 of your expert report.
7    A.    Yes.
8    Q.    So I just want to be clear that these
9 pumps were to be installed all over Phase 4A and 3B.
10 Right?
11    A.    That is correct. I believe there were
12 five going in Phase 4A. So I think the rest were
13 in --
14    Q.    What makes, what makes you think that,
15 that there were only five for 4A?
16    A.    Because they had already installed
17 seven when the wells were installed.
18    Q.    Oh.
19    A.    And I think this was the last five.
20    Q.    Okay.
21    A.    I'm not, I think I remember that.
22    Q.    I think you are right. And the need
23 for gas wells in, 12 of the gas wells in Phase 4A,
24 did that indicate to you that there was a liquids
25 problem?

Page 172

1    A.    Problem, I think again when I looked
2 at the data, most of the wells in 4A, looks like they
3 had some screen available. But putting the pumps in,
4 definitely going to increase the available screen.
5 So I'm going to say it would, it would probably have
6 some positive effect somewhere.
7    Q.    It would, it would improve the --
8    A.    It could, it could improve the
9 performance, depending. We discussed that a little
10 bit earlier. Yes.
11    Q.    And we also discussed earlier that
12 Aptim was responsible for getting liquids out of the
13 gas collection wells?
14    A.    Once the pumps were installed. Yes.
15    Q.    And that was part of routine
16 maintenance?
17    A.    Pumping liquids out.
18    Q.    Yeah.
19    A.    It is in there twice. It is in once
20 as routine and once as non-routine. That is a bit
21 odd. But my understanding is that if the pumps were
22 in the well, they were going to operated.
23    Q.    All right. And then during routine
24 maintenance, by the terms of the contract, Aptim
25 would inform Jefferson Parish of the needs for

Page 173

1  repairs and things of that nature. Right?
2      A.    In general. Yes. Something,
3  something they came across, the GCCS or in-well
4  pumps.
5      Q.    Yeah. And we read that --
6      A.    And it's in their actual. I'm sorry.
7  In their monthly reports it is included. Yes.
8      Q.    And you also read it in non-routine
9  work, that it consist mainly of work identified
10  during routine work?
11      A.    Right.
12      Q.    And that would have been one of the
13  examples, that during routine work would identify
14  when you pump, we are going to turn to the terms of
15  the contract, Aptim would have to inform Jefferson
16  Parish they would need to get the money to buy a
17  pump?
18      A.    Did you say we need a pump or there is
19  a pump in there? Because again --
20      Q.    We need a pump.
21      A.    If there, if there wasn't, that would
22  be something that Aptim would do, if we are saying we
23  need a pump. Well, it could be. Yes. It could be.
24  Yes. There was a time that they did inform Jefferson
25  Parish we need some pumps. And then it would go

Page 174

1  through the chain of command you just said.
2      Q.    And part of Aptim's responsibilities
3  was to get the liquids out of the gas wells. So if
4  they need a pump to do it, they would have to ask
5  because it was over that $1,500 amount. Right?
6      A.    Yes. Again, yes.
7      Q.    Okay. And we also discussed, pretty
8  extensively I feel, the vacuum issue on Phase 4A.
9  Right?
10      A.    Yes.
11      Q.    And without vacuum, unless there is,
12  you know, like a passive collection into the gas
13  well, there is no active collection of gas for that
14  well. Right?
15      A.    Yes. As you defined it. Yes.
16      Q.    Yes. And if gas is not collected, if
17  gas is not collected, what happens to it?
18      A.    Now, if it is not, not specifically it
19  is not collected by that well. We are going to say
20  for the sake of argument, it is not collected by any
21  of the other wells surrounding.
22      Q.    Sure.
23      A.    Correct. That's what you are saying.
24  That would either have to be stored until the well
25  came online underneath the cap, or it would have to

Page 175

1  migrate somewhere else.
2      Q.    It would be emitted into the
3  atmosphere?
4      A.    It would be emitted, either stored or
5  emitted.
6      Q.    Okay. And the vacuum problem on Phase
7  4A was not just on one well. It was on the whole
8  side of the phase?
9      A.    Yes. A header was pinched or damaged
10  or bellied. Yes.
11      Q.    So we can assume that it wasn't being
12  collected by any of the other wells around it in that
13  area that had the vacuum issue. Is that fair?
14      A.    If an entire group was offline?
15      Q.    Yeah.
16      A.    Then none of them would be collecting
17  gas. That is correct.
18      Q.    Correct. And in your document review
19  for this report, did you review any odor complaints?
20      A.    No.
21      Q.    Did you review any documents that
22  indicated that Jefferson Parish had made public
23  statements about the odors coming from Jefferson
24  Parish Landfill?
25      A.    For this particular report or going

Page 176

1  back?
2      Q.    At any time.
3      A.    Okay. I remember someone named Yenni.
4  Is it Yenni?
5      Q.    Yes.
6      A.    Who made a public statement about, I
7  want to say he was like Jefferson Parish's president.
8      Q.    Correct.
9      A.    And he made a comment about something
10  to do with the odors.
11      Q.    Do you recall seeing any statements by
12  the Louisiana Department of Environmental Quality
13  related to Jefferson Parish being the main source of
14  odors in the community?
15      A.    No. I don't.
16      Q.    Are you aware that there was a
17  significant increase in the number of odor complaints
18  from 2016 through 2019?
19      A.    No.
20      Q.    Are you aware that there are
21  allegations of odor problems from Jefferson Parish
22  Landfill in this litigation?
23      A.    Yes.
24      Q.    Okay. And we previously spoke about
25  Phase 4A was the location on Jefferson Parish



Page 177

1  Landfill with the highest concentration of hydrogen
2  sulfide.
3      A.    Correct.
4      Q.    Do you have an opinion about the cause
5  of the high amounts of hydrogen sulfide on Phase 4A?
6      A.    No. I don't have any independent --
7  MR. PAUL:
8          Object to the form.
9  THE WITNESS:
10         No. I don't have an independent
11 opinion.
12 BY MR. HAMMEL:
13     Q.    And you haven't done any, other than
14 what I showed you today from Mr. Marshall, you
15 haven't done an independent evaluation of the waste
16 streams from Jefferson Parish Landfill?
17     A.    No. That is correct.
18     Q.    Is the waste streams that come into
19 the landfills that you operate, is it screened prior
20 to being deposited in the landfill?
21     A.    Yes. Screened, as meaning every,
22 every one that comes in, they either look at the
23 truck or in the truck and know what is coming in. Not
24 the material itself. They don't go through all
25 material and separate it or do anything like that.

Page 178

1  But they do, they do a survey of the material coming
2  in, call it that.
3      Q.    Okay. Is there any, do you accept
4  special waste at any of the landfills that you
5  operate?
6      A.    Well, I don't operate any of the
7  landfills. I do gas collection systems. At the one
8  landfill, it is the one that is open and receiving
9  right now, they do take some special waste. But I
10 think it is different. That special waste is
11 contaminated soils. They do take, I believe sewer
12 sludge. But that is all that I know, as far as any
13 other waste they might take. I'm not aware of, I
14 don't have that, that is not part of my work with
15 them.
16     Q.    Okay. And is it within your expertise
17 to, at any of the landfills, do you operate the
18 landfill, not just the gas collection and leachate
19 collection?
20     A.    I do not. No.
21     Q.    Do you recognize the importance to
22 evaluate waste for high sulfate content prior to
23 being deposited in a municipal solid waste landfill?
24     A.    Evaluate it, I, general knowledge
25 understand what sulfate-bearing materials can lead

Page 179

1  to.
2      Q.    Yeah.
3      A.    As far as their breakdown of hydrogen
4  sulfide, if that is the answer to the question.
5  Beyond that, I don't do any evaluation of the
6  materials themselves.
7      Q.    Prior to the being accepted into the
8  landfill?
9      A.    Yes. I don't do that.
10     Q.    Is it important to remove leachate
11 from a landfill?
12     A.    It typically, in general practice you
13 remove leachate from the landfill because you don't
14 want to, yes. In general practice, it is important
15 to remove the leachate. Yes.
16     Q.    What does a leachate breakout at a
17 landfill indicate to you that there is a problem?
18     A.    Well, it's, a leachate breakout is
19 where liquid builds up underneath the cap and the
20 pressure of the liquid forces its way through the
21 waste. I mean, through the cap.
22         Now, there is a couple issues with
23 that. One, the liquid itself may have an odor to it.
24 The other issue is if you have enough liquid coming
25 out, it actually opens fissures that gas can come

Page 180

1  out. By example, and I have a picture on my phone,
2  in the last two weeks I found two seeps or breakouts
3  by smell before sight. So that is, that is why we
4  have to fix them, you know, right away, because it
5  can just be liquid to start. Enough comes out, it
6  actually can have an issue with odors through the,
7  through the cap.
8      Q.    It is a point source for odors?
9      A.    It can be. Yes.
10     Q.    Okay. And if there are bubbles coming
11 through the leachate and the leachate break out,
12 would that indicate that is a point source for odors?
13     A.    It can be. The only thing I'll say,
14 you have to be careful, qualify it, because I've had
15 compressed airlines break and I've seen bubbles
16 coming through where people thought it was gas and it
17 wasn't gas. It can be, yes. And you can measure,
18 you can actually take a meter and measure what that
19 gas might be, and then you can decide.
20     Q.    Earlier we had a discussion about
21 liquid in the gas collection well.
22     A.    Right.
23     Q.    All right. And I'm unclear, does a
24 gas collection and the boring go all the way to the
25 bottom of the landfill?



Page 181

1  A.    Typically they do not.
2  Q.    Okay.
3  A.    Typically they do not.
4  Q.    Sure. So what prevents the liquid
5  contained in the gas collection well from draining
6  through?
7  A.    If the well has a pump in it?
8  Q.    With or without the pump.
9  A.    Yeah. The material surrounding the
10 well has some permeability to it. So the liquid
11 drains from that well. It can come from, most of it
12 typically seems to, from my experience, come from
13 perched water gets into that well. If you have a
14 pump in there, the water comes in and it hits that
15 very permeable gravel pack around the well and it
16 gets pumped out. So it doesn't ever, because the
17 material around the well is much less permeable.
18 Especially down deeper where it would tend to drain
19 out into the underlying waste. It would get into the
20 underdrain system. So it's a difference in
21 permeability and timing is what it comes down to.
22 Q.    So if it doesn't have a pump, what
23 prevents the liquid or the leachate from flowing
24 through the bottom?
25     MR. PAUL:

Page 182

1          Object to form.
2      THE WITNESS:
3          Eventually it could. Eventually it
4  could. That is just hydrogeology. You have a liquid
5  head. You have gravity. You have a permeable
6  underdrain. You know. They are very complicated
7  hydrogeologic systems in landfills. But it could
8  flow downward. Yes.
9  BY MR. HAMMEL:
10 Q.    If it doesn't flow downward and it
11 remains filled, what does that indicate to you?
12 A.    If the well remains filled?
13 Q.    Yeah.
14 A.    How high? To what height, above the
15 screen?
16 Q.    Above the screens.
17 A.    Above the screen level?
18 Q.    Yeah.
19 A.    That would indicate that you had some,
20 probably some very old waste material because it
21 would be so impermeable the liquids couldn't drain
22 out of it anymore. So I would say it is probably in
23 an old part of the landfill would be my, if somebody
24 told me that is what they had.
25 Q.    Well, I think that is what we had in

Page 183

1  Phase 4A. Right? And that was not really old waste
2  in Phase 4A. I think they started depositing trash
3  there in 2013?
4  A.    Right.
5  Q.    So there were parts of the gas
6  collection system that were filled with water from
7  the first day they were installed and remained filled
8  with water in 4A?
9  A.    I don't recall that. I don't recall
10 seeing that.
11     MR. PAUL:
12          Object to form.
13 BY MR. HAMMEL:
14 Q.    Do you recall that Mr. Lockwood wrote
15 that letter in May of 2018 saying that we have liquid
16 covering the screens in 4A?
17 A.    Where is that in, let me look at that
18 real quick.
19     MR. ROWE:
20          Page 23.
21 BY MR. HAMMEL:
22 Q.    Page 23.
23 A.    Page 23. Thank you, Mr. Rowe.
24 Q.    You see that paragraph at the bottom.
25 "In a May 30th, 2018." That was the same time that

Page 184

1  the first wells were installed in 4A. Right?
2  A.    Right. But I'm not seeing, by
3  Thursday of our assessment it became clear to us
4  there were high H2S emission in Phase 4A. There was
5  a loss of vacuum at several of these new wells and
6  there were serious problems that needed to be
7  addressed. You can see the wells here, 507. That is
8  not liquid in the wells. That is loss of vacuum, or
9  a loss of vacuum in those wells.
10          I want, I want to say something about
11 that, because that is from Conley to Lockwood. Just
12 so we understand, Conley actually just took Carlson's
13 E-mail verbatim and sent it to Mr. Lockwood. It even
14 had, he signed it as Conley. So I know he just cut
15 and pasted it. But the words are Lockwood's. The
16 E-mail was Conley's.
17 Q.    Do you -- is it important to control
18 odors at a landfill?
19 A.    I'm not a control expert. Is it
20 important to control odors at a landfill? I'm going
21 to say for the general good. And when you say
22 control odors, well, there are multiple parts of
23 control.
24 Q.    Let me rephrase the question.
25 A.    Yeah.



Page 185

1    Q.    Is it important to control odor
2  complaints at a landfill?
3    MR. BAAY:
4         Object to form.
5    THE WITNESS:
6         To control odor complaints, it depends
7  if the odor complaints are actually coming from the
8  landfill. We have sites where we are getting a lot
9  of odor complaints at the landfill, and in those
10  particular cases they are not coming from the
11  landfill. So controlling the complaints, you really
12  can't control the complaints. So I don't want to go
13  any farther than that.
14  BY MR. HAMMEL:
15    Q.    Is it important to control landfill
16  odors from traveling off site?
17    MR. BAAY:
18         Object to form.
19    THE WITNESS:
20         I think most of the, I think that most
21  of the permits that are issued have some type of
22  discussion of odors off site or the boundary. So I
23  would say in accordance with the regulations, it
24  would be. And I don't want to, yes. In accordance
25  with the regulations, most of the regulations have

Page 186

1  something in there about keeping odors from going off
2  site. So yes, it would be important.
3  BY MR. HAMMEL:
4    Q.    Is the regulation the only reason it
5  is important to control odors from traveling off
6  site? Because the regulation makes it mandatory?
7    A.    Right. To stop the odors.
8    Q.    Is that the only reason?
9    A.    I'm going to say in general, in
10  general, you would not want odors leaving a site.
11    Q.    Say it one more time. I'm sorry, Mr.
12  Kline. I apologize.
13    A.    In general.
14    Q.    Yeah.
15    A.    As being part of a community, you
16  would not want the odors to leave the site.
17    Q.    It is just being a good —
18    A.    And that would be for any business
19  owner. Yes.
20    Q.    Even in your home, you don't want to
21  disturb your neighbor with foul odors. Right? Do
22  you agree with that?
23    A.    At my home, disturb my neighbors with
24  foul odors.
25    Q.    We all want not to disturb our

Page 187

1  neighbors with foul odors. Right?
2    A.    I would think as a, in general
3  practice, as an individual or as a business, you
4  would want to be a good neighbor and not have
5  something that disturbs neighbors.
6    Q.    I'm just going to review my notes real
7  quickly. If anybody else has any questions, I think
8  I pass the witness at this point.
9    MR. FUTRELL:
10         I got some.
11    THE VIDEOGRAPHER:
12         Off the record. It is 1:24 P.M.
13         (Off record.)
14    THE VIDEOGRAPHER:
15         The time is 1:26 P.M. We are back on
16  record.
17         (Deposition Exhibit 1626 marked for
18  identification.)
19  BY MR. FUTRELL:
20    Q.    Mr. Kline, my name is Mike Futrell. I
21  represent the Parish of Jefferson in this case. True
22  to form, Mr. Hammel has asked a lot of questions that
23  I would've asked you already, so. But I do have some
24  things that I want to clear up and some couple other
25  areas that I want to go into.

Page 188

1         But before I do that, I want to
2  introduce a copy of your March 4th, 2022 supplemental
3  expert report as Exhibit 1626. And it is my
4  understanding that Mr. Baay will get a clean copy to
5  the court reporter.
6         All right. You had some discussions
7  with Mr. Hammel about the fact that you are
8  responsible for operating or overseeing the
9  operations at, I think you said about five to eight
10  landfills.
11    A.    We are in the seven to 10 range right
12  now.
13    Q.    Okay.
14    A.    That is gas collection systems.
15    Q.    Gas collection systems at those
16  landfills?
17    A.    Yes.
18    Q.    Right. Who retains TRC to, to run the
19  gas collection systems at those landfills?
20    A.    The owner.
21    Q.    The owner. And why does the owner —
22    A.    Sorry. Go ahead. The owner or the
23  municipality, because sometimes the actual owner is
24  different than the municipality. It can be a little
25  bit different. So, so it is either the owner,

Page 189

1  municipality or the operator. In this case right
2  now, it is basically the owner, municipality are all
3  the same right now.
4       Q.    Understood. Kind of a situation as
5  you had at, as exist at the Jefferson Parish
6  Landfill, where it is a governmental body that owns
7  the landfill?
8       A.    Yes.
9       Q.    Okay. And in the landfills that you
10 oversee the operations of the landfill gas collection
11 system, why does the owner hire you?
12      A.    Why does the owner hire us?
13      Q.    Yes.
14      A.    To operate the gas collection system
15 they give to us.
16      Q.    Okay. Because is that something that,
17 do they hire you for your expertise in doing that?
18      A.    In operating the gas collection
19 system?
20      Q.    Yes.
21      A.    They hire us for our ability to
22 operate the gas collection system. So if you want to
23 call it expertise. Yes.
24      Q.    Well, I mean, you couldn't go hire or
25 the owner couldn't go hire somebody off the back of a

Page 190

1  garbage truck to operate the landfill gas collection
2  system, could they?
3       A.    Yes. They do.
4       Q.    They do.
5       A.    Yes.
6       Q.    Okay.
7       A.    They bring in unqualified groups to
8  operate the gas collection systems.
9       Q.    Okay.
10      A.    So, but the reason they hire TRC is
11 because we are experienced and qualified.
12      Q.    Understood.
13      A.    Yeah.
14      Q.    And from everything that you reviewed
15 in this case, is Aptim also experienced and qualified
16 in managing landfill gas collection systems?
17      A.    Everything, everything I've seen, yes.
18 They are. Yes.
19      Q.    So would you agree with me that it is
20 reasonable for the owner to rely on TRC to oversee
21 and manage the landfill gas collection system?
22      MR. BAAY:
23           Object to form.
24      THE WITNESS:
25           Yes. As it is provided, it is. So I

Page 191

1  am given a gas collection system. Sometimes the full
2  system. Sometimes the partial system. They bring me
3  in to operate it. So what I'm given I operate. Yes.
4  BY MR. FUTRELL:
5       Q.    Understood. But before you began to
6  operate the system, you have done, TRC has done its
7  due diligence so they know what they are getting
8  themselves into. Correct?
9       A.    Sometimes, yes. Sometimes, no.
10      Q.    Okay. Well if sometimes, no, then
11 proper due diligence wasn't done?
12      A.    No. I've actually been hired to come
13 to a site, I got a phone call, said you have to start
14 operating our site at midnight. There is no time to
15 do due diligence in that case. I'm just making sure
16 that is clear.
17           Typically, typically you are brought
18 in at some point and you do a, usually a tour of the
19 facility. Get an idea of where the wells are, what
20 the flare look like. You have a little bit of
21 information before that and you are brought in. But
22 that is what I would say. You typically, typically
23 have some time to look at the facility and go from
24 there. You don't have a lot of, because the
25 contracts, and I'm talking about me. Contracts

Page 192

1  change so fast, I can just get yanked in and thrown
2  in, and said just start operating and I have no
3  information of the site. That happens.
4       Q.    I gotcha.
5       A.    Just so you know.
6       Q.    In this particular case, the case that
7  we are here for today.
8       A.    Yeah.
9       Q.    Aptim or its predecessors had been
10 onsite at the Jefferson Parish Landfill I think since
11 1999. Is that correct?
12      A.    That is correct.
13      Q.    Okay. So they had, and I think they
14 put it in their, in their proposal, extensive site
15 experience. Do you agree with me on that?
16      A.    Yes.
17      Q.    Okay. And so Aptim certainly knew of
18 the existing conditions of the landfill gas
19 collection system. Correct?
20      A.    Yes.
21      Q.    And Aptim also knew of the site
22 conditions at the landfill and how those site
23 conditions impacted the landfill gas collection
24 system. Correct?
25      A.    Probably. I don't know when, when the



Page 193

1  phases changed. Because, for example, they weren't
2  doing anything on Phase 4. Waste had been put in
3  there for five years, and then they came in and they
4  had to start to, basically start to understand Phase
5  4A. So the rest of them, they would've, Phase 4A, as
6  it comes online, there would have been a learning
7  curve to understand that. They would've known, you
8  know, the site. They would've seen what waste was
9  going in, understood the -- but they would've had to
10 understand when the system started going in, they
11 would've had to kind of grow with the system you see.
12     Q.    Well, Phase 4A is immediately adjacent
13 to Phase 3B at the Jefferson Parish Landfill.
14 Correct?
15     A.    Yes. Correct.
16     Q.    Okay. So you are saying that Phase 4A
17 is going to have different site conditions than Phase
18 3B?
19     A.    Yeah. And we know that, because if
20 you look at all the gas sampling done, Phase 3B, for
21 example, had one, in this case, it had one 10th or
22 even two orders of magnitude less H2S. That is one
23 thing, obviously, in this landfill gas. So that is
24 one thing.
25          Plus the system was installed in Phase

Page 194

1  4A. It wasn't, it wasn't, it didn't kind of migrate
2  out from Phase 3. There was nothing there and then
3  the system was installed. So it was a new system.
4  The way, the way I look at it is, they are almost
5  each individual landfills. Boom, boom, boom, boom.
6  Suddenly they are in Phase 4A.
7          So there would be some, call it
8  institutional knowledge. But to me, every landfill
9  and every phase is a little bit different. You learn
10 a little bit different, the waste put in. Because the
11 waste in Phase 3B had been there since, and I have it
12 in here, a certain number of years. The waste that
13 was brought in to Phase 4 is going to be different.
14 So there is, there is going to be a difference.
15     Q.    Okay. And maybe, maybe I didn't ask
16 that question correctly. Because I'm talking about
17 if, if the conditions, if there are issues on Phase
18 3B that impact the gas collection system on Phase 3B.
19 Okay. Would you not also expect one of those same
20 issues to exist with respect to Phase 4A?
21     A.    Again, it depends on the, it depends
22 on what the conditions are you are talking about.
23 You would have to, you would have to understand, is
24 it something, for example, issues with the compressor
25 station fluctuating. That you are going to see in

Page 195

1  Phase 3B. So you got to see it in 3, in 4A. So it's
2  not in Aptim's hands. There is something that they
3  obviously would see with that fluctuation. So yeah.
4  Something like that. There is some institutional
5  knowledge that would be transferable from phase to
6  phase.
7      Q.    Right. That was, that was kind of my
8  point is since Aptim had been on-site since 1999,
9  they were aware of certain issues on other phases of
10 the landfill that should at least trigger something
11 to take a look to avoid those issues in Phase 4A.
12 Correct?
13     A.    It could be. Yes. Depending, again,
14 depending on where it is. Yes.
15     Q.    And is it your understanding that the
16 contract, and I think at has been marked as Exhibit
17 1624, that was entered into as part of a competitive
18 bidding process?
19     A.    It was, there was an RFP issued.
20     Q.    Yes.
21     A.    So I'm assuming when there is an RFP,
22 that that is competitive bid. I did not see the
23 bids. I did not review the bids obviously, but I'm
24 assuming.
25     Q.    Have you seen the proposal submitted

Page 196

1  by Aptim in response to the RFP?
2      A.    Yes.
3      Q.    Okay. You don't have a copy of that
4  with you, do you?
5      A.    No. I do not.
6      Q.    I'm going, I don't know if this has
7  already been marked as an exhibit, but I'm going to
8  mark this, we are on 1627.
9      A.    I'm sorry.
10     MR. BAAY:
11          That is fine.
12     MR. FUTRELL:
13          And so --
14     MR. PAUL:
15          Mike, do you have a, do you have a
16 Bates number for that?
17     MR. FUTRELL:
18          I do. It is Aptim, begins at Aptim
19 0141917.
20     MR. PAUL:
21          Thanks.
22          (Deposition Exhibit 1627 marked for
23 identification.)
24 BY MR. FUTRELL:
25     Q.    So I want to draw your, and when you



Page 197

1  reviewed that request for, or the proposal submitted
2  by Aptim, did you see within that document that Aptim
3  on several occasions touts, for lack of a better
4  word, their ability to reduce odors?
5       A.    In the proposal?  I want to make sure,
6  because we talked about this.  The agreement pulls in
7  by reference the scope of work out of the proposal.
8  Okay.  But they do mention the word odor in what I
9  call the sales material, the part of the proposal
10  that says hire us because we either, and in some
11  cases it is very generic in nature.  I think they
12  mentioned odor three times, three or four times.
13  BY MR. FUTRELL:
14       Q.    Okay.
15       A.    But it is, again --
16       Q.    And I'm going to get to the contract.
17  Because that is your interpretation of the contract.
18  Correct?
19       A.    Yes.
20       Q.    All right.  But in general, is it, is
21  it, is it proper for an entity to promise something
22  in their sales pitch knowing, or then not deliver on
23  that?
24       A.    Well, when you say --
25       MR. BAAY:

Page 198

1       Object to form.  Go ahead.
2       THE WITNESS:
3            When you say, when you say reduce
4  odors, they do reduce odors.  Any gas collection
5  system that you operate, that pulls gas out of the
6  ground, that has odorous compounds in it, you are
7  reducing odors.  You are taking those odorous
8  compounds, you are burning them.  SO2 doesn't,
9  doesn't have an odor.  So you are reducing the odors.
10  So if anybody that operates a gas collection system
11  says I reduce odors, I would say that every landfill
12  that I operate I'm responsible for reducing orders.
13  Cause and effect.  Cause, I take gas out of the
14  landfill that has odors in it.  I burn it.  Effect,
15  there is less.  If you have one nanogram less
16  compound of odorous compounds you are reducing odors.
17  So I don't see it makes --
18  BY MR. FUTRELL:
19       Q.    And Mr. Hammel asked you the question,
20  and I don't know, I think you got sidetracked and you
21  didn't get an answer.  Did you review the deposition
22  of Mr. Josh Broggi in this case?
23       A.    Yes.
24       Q.    And do you recall Mr. Broggi
25  indicating in his deposition that he put into the

Page 199

1  proposal submitted by Aptim odor control as part of
2  the sales pitch so that they could get the contract?
3       A.    Yes.
4       Q.    And do you think that is proper?
5       MR. BAAY:
6            Object to form.
7       THE WITNESS:
8            Yeah.  That is what you put, in any
9  proposal you are going to show what you did.  What he
10  is saying wasn't incorrect.  They reduced odors at
11  the landfill.  So you can put that in.  If you reduce
12  odors at the landfill, which by pulling gas out of
13  the landfill has odorous compounds in it, you are
14  reducing odors.  You would put that in your proposal.
15  We have reduced odors at the landfill.
16  BY MR. FUTRELL:
17       Q.    So, Mr. Kline, how does that, how
18  does, how is that not different from your opinion
19  that Aptim had no responsibility for odor control at
20  the Jefferson Parish Landfill?
21       MR. BAAY:
22            Object to form.
23       THE WITNESS:
24            Because it is not in the agreement.
25  You go by what is in the agreement.  The proposal is

Page 200

1  up to, the proposal up to the point, I want you to
2  hire me.  Here is what I'm going to do for you, you
3  hire me.  That ends when you start doing the work at
4  the site.  Then the agreement comes into play, and
5  that is what is in the agreement.  That is what we
6  work under at all our landfills.  We have an
7  agreement.
8  BY MR. FUTRELL:
9       Q.    I understand.  So it is your opinion
10  that it was not within the scope of services for
11  Aptim to reduce odors at the Jefferson Parish
12  Landfill.  Is that correct?
13       A.    Is that in Section 1 or another
14  section?
15       Q.    I am asking your opinion.
16       A.    Is it in Section 1 or another section?
17  In the agreement, the agreement would be what Aptim
18  was responsible for.
19       Q.    Okay.
20       A.    Scope of work.  Scope of work pulls in
21  Section 1.  So if it is mentioned anywhere outside of
22  Section 1, then it would not be part of their
23  agreement.  If it is in Section 1, it would be part
24  of their agreement.
25       Q.    So you tell me.  Is it part of Aptim's



Page 201

1 agreement with Jefferson Parish to reduce odors
2 Jefferson Parish Landfill?
3     A.    Not per the agreement.  No.
4     Q.    Okay.  So your opinion is that's not
5 within Aptim's scope of services at the Jefferson
6 Parish Landfill to reduce odors?
7     A.    It is not in their contractual
8 obligation.
9     Q.    I feel like we are going in circles
10 here.
11     A.    Okay.
12     Q.    What is your opinion with respect to
13 whether or not Aptim has a responsibility to reduce
14 odors at the Jefferson Parish Landfill?
15     MR. BAAY:
16         Object to form.  Asked and answered.
17     THE WITNESS:
18         Not per their contractual
19 responsibilities.
20 BY MR. FUTRELL:
21     Q.    Okay.  Perfect.  Look at on their
22 request for proposal, or their proposal, Page 11,
23 Section 2 where it says Landfill Gas, when you get
24 there.
25     A.    Uh-huh.

Page 202

1     Q.    Section 2 is entitled Landfill Gas
2 Systems, Operations & Maintenance Experience.
3     A.    Correct.
4     Q.    And the first facility listed is
5 Jefferson Parish Sanitary Landfill.  Correct?
6     A.    Yes.
7     Q.    At the top right column of that page,
8 can you read to me the sentence that begins with
9 "specifically"?
10     A.    Specifically, our scope includes.
11     Q.    The first bullet point.
12     A.    "Specifically, our scope includes
13 monitoring and balancing the 204-well system to
14 maximize LFG quality and flow, reduce air...reduce
15 odors and maintain compliance with air regulations."
16     Q.    So would you agree with me that in
17 this section, Aptim itself defines the scope of their
18 duties at the Jefferson Parish Landfill to also
19 include the reduction of odors?
20     MR. BAAY:
21         Object to form.
22     THE WITNESS:
23         No. I do not. Because this is their
24 experience. It is talking about, in my opinion,
25 talking about their 1999 proposal, since '99. So

Page 203

1 this was a previous proposal.  It would not be the
2 current proposal.
3 BY MR. FUTRELL:
4     Q.    What is the date, what is the date of
5 this proposal?
6     A.    No. This is talking about, this is
7 talking about experience.  What they have done in the
8 past.  The scope of what they have done in the past.
9 Because this is before, this is before the date of
10 the, this contract is December 28th.  Okay.  This
11 proposal is September 2015.  So when they say "our
12 scope includes," they are talking about what they are
13 doing, they are doing right now.  This is past.
14 Again, this is experience to me.
15     Q.    So do you think in the contract that
16 Aptim had with the parish before December 28th, 2015,
17 that the reduction of odors was included in that
18 contract?
19     MR. BAAY:
20         Object to form.
21     THE WITNESS:
22         Yes. Yes. I do.
23 BY MR. FUTRELL:
24     Q.    You do?
25     A.    I do.

Page 204

1     Q.    So if it is not —
2     A.    Go ahead.
3     Q.    If it's not specifically included in
4 that contract, would that change your opinion as to
5 the scope applying to past?
6     A.    I would —
7     MR. BAAY:
8         Object to form.
9     THE WITNESS:
10         I would have to go back and look at
11 that contract. Because this, again, this is them
12 stating their experience on that contract. So I
13 would have to look at that contract to make that
14 opinion. And I have not looked at a previous
15 contract.
16 BY MR. FUTRELL:
17     Q.    Okay. Oh. Go back to Page 6 if you
18 don't mind, because I just want to make sure that we
19 get it on the record.
20     A.    Yep.
21     Q.    Under Staff Qualifications, Section 3.
22 Or it begins with "Section 3 provides a project
23 organization and capsule resumes of key staff."
24     A.    Right.
25     Q.    And then the last thing when they talk



Page 205

1 about Mr. Broggi, Mr. Ambeau, Mr. Rellinger, they
2 say, "These individuals have extensive knowledge of
3 the site, O&M service requirements, and excellent
4 relations with parish staff."
5        Do you see that?
6     A.   Yes, I do.
7     Q.   Do you have any reason to disagree
8 with that?
9     A.   No. I do not.
10    Q.   All right. Go to, if you would, Page
11 18. That is the resume of Josh Broggi. Correct?
12    A.   That is correct.
13    Q.   Okay. And under where it says Project
14 Manager, Jefferson Parish Landfill, Avondale,
15 Louisiana, if you go, I don't know, maybe 60 percent
16 of the way down, it says, begins, "As the project
17 manager -- are you with me -- Mr. Broggi is
18 responsible for --
19    A.   Where are we at?
20    Q.   Right here.
21    A.   Yes. "As project manager Mr. Broggi
22 is responsible for." Yep.
23    Q.   The oversight and onsite technician
24 monitoring, the well tuning per NSPS requirements,
25 liquids levels. And that is referring to liquid

Page 206

1 levels within the wells. Correct?
2     A.   Liquid levels, pump maintenance. It
3 could be. Yes. It could be liquid levels. (Witness
4 mumbling.)
5     THE REPORTER:
6        Wait. If you are going to read or not
7 read.
8     THE WITNESS:
9        Yes. Understanding, understanding
10 their responsibilities, I would say that liquid
11 levels refers to liquid levels in gas collection
12 wells.
13 BY MR. FUTRELL:
14    Q.   Okay. And then second to the last
15 line, well, go up fourth-to-the-last line. Also,
16 under this O&M contract Mr. Broggi oversees the
17 monitoring and balancing of the 204-well system to
18 maximize LFG quality and flow. Again, reduce odors
19 and maintain compliance with air regulations.
20        So again, they are touting Mr.
21 Broggi's ability to reduce odors. Correct?
22    A.   Right. As I said, cause and effect.
23 He is reducing odors.
24    Q.   Likewise, if you turn with me to Page
25 20 of the proposal for Mr. Ambeau. And let me ask

Page 207

1 you this. What is, what is your understanding of Mr.
2 Ambeau's role at the Jefferson Parish Landfill?
3     A.   He was the primary technician onsite.
4 So he would have been one that was there most of the
5 time.
6     Q.   Okay. And earlier you said you
7 reviewed some time sheets for Mr. Ambeau?
8     A.   Yeah.
9     Q.   How many hours a week was Mr. Ambeau
10 at the Jefferson Parish Landfill?
11    A.   The ones I looked at, some were, I
12 think some of his were in the 50s, I want to say that
13 I looked at.
14    Q.   Okay. Are you also aware, go ahead.
15    A.   I looked at a limited number. But the
16 ones I sampled, ones I had available to me, you know,
17 he was in the, I think in the 40s and 50s that I'm
18 aware of.
19    Q.   When you reviewed those time sheets,
20 did you also see that Mr. Ambeau was also at other
21 landfills that Aptim had responsibility for?
22    A.   I believe he was. Yes.
23    Q.   Okay. So he was not a dedicated
24 full-time technician at the Jefferson Parish
25 Landfill. Correct?

Page 208

1     A.   Well, some of the, some of the ones I
2 looked at he was. It was all Jefferson Parish on
3 them. There were some other ones that he wasn't.
4 But I don't know on those days, I don't know what the
5 amount was. So I can't tell you that he wasn't full
6 time at Jefferson and then had extra hours somewhere
7 else. That I'm not, that I'm not sure of. But I do,
8 I do know he was a primary technician. I do know I
9 saw he was at other landfills --
10    Q.   Okay.
11    A.   -- or another landfill.
12    Q.   In the materials that you reviewed to
13 prepare your report, did you see communications
14 between Aptim employees basically criticizing the job
15 performance and recordkeeping of Mr. Ambeau?
16    A.   No. I did not.
17    Q.   You didn't. Those weren't --
18    A.   From, I'm sorry. From Jefferson
19 Parish or Aptim internally?
20    Q.   From Aptim internal.
21    A.   On his own, on their own person's
22 internal recordkeeping?
23    Q.   Yes.
24    A.   No. I'm not aware of that.
25    Q.   Okay. For Mr. Ambeau, I want to also



Page 209

1  mention or point out for his technician experience
2  under the Jefferson Parish Landfill, basically
3  mirrors the language included under Josh Broggi. And
4  says, I'm, I guess it is about halfway through that
5  paragraph. As the onsite technician over the
6  contract duration, Mr. Ambeau monitors and balances
7  the 204-four well system.
8     A.    Right.
9     Q.    Are you with me?
10    A.    Yep.
11    Q.    To maximize LFG quality and flow,
12  reduce odors and maintain compliance with air
13  regulators. Correct?
14    A.    Correct.
15    Q.    Air regulations. And then the last
16  sentence under there, "He has successfully increased
17  gas flow, system run time and reduced odors at this
18  facility." Correct?
19    A.    Correct.
20    Q.    So again, Aptim is touting the fact
21  that they reduce odors. Right?
22    A.    Correct. Same, the same answer I gave
23  before. That would be correct as well.
24    Q.    Okay. And when a proposal such as
25  this is submitted to, hold on. Let me strike that.

Page 210

1        When Aptim submitted their proposal
2  for this project, for this contract. If you look to
3  the very last page, it is Attachment B. They
4  submitted a cost proposal, didn't they?
5     A.    Yes. Attachment B is a cost proposal.
6     Q.    Okay. And who prepared that cost
7  proposal? Who signed it?
8     A.    It looks like someone named Steven or
9  Stephen Martin.
10    Q.    And what is Mr. Martin's title?
11    A.    Senior director of operations.
12    Q.    Okay. And at the time Aptim was CB&I.
13  Correct?
14    A.    I believe that is correct. Yes.
15    Q.    Okay. And so you have experience in
16  submitting proposals such as these for RFPs.
17  Correct?
18    A.    Correct.
19    Q.    And, and when you do that, you would
20  take a look at what is being asked for under the RFP
21  and compute how much that will cost and build in a
22  profit for the company. Correct?
23    A.    Correct.
24    Q.    Okay. So is it fair to assume that is
25  what Mr. Martin did when he prepared this cost

Page 211

1  proposal?
2     A.    I did not prepare this one, so I'm not
3  going to speculate on what he did or what their
4  profit was. So I really can't answer that question.
5  I've seen a lot of crazy things in proposals in my
6  time. So I'm not going to speculate.
7     Q.    Okay. But again, Aptim had been
8  onsite at the Jefferson Parish Landfill since 1999.
9  Correct?
10    A.    Correct.
11    Q.    And this proposal was submitted in
12  2015. So they knew what was required to operate the
13  landfill gas collection system?
14    A.    Correct.
15    Q.    And Mr. Martin submitted an estimated
16  annual cost of $202,000?
17    A.    Correct.
18    Q.    He could have submitted any number he
19  wanted there, couldn't he?
20    A.    That is correct.
21    MR. BAAY:
22        Object to form. Go ahead.
23  BY MR. FUTRELL:
24        He obviously read the RFP, looked at
25  what was required and said Aptim could do that job

Page 212

1  for $202,000?
2     A.    Again, I'm not going to speculate what
3  they were trying to do. They might have been trying
4  to win the proposal. I'm not going to speculate. I
5  don't know how he came up with that dollar value. So
6  no.
7     Q.    Okay. Well, that is kind of my point.
8  He could have, he could have submitted at a higher
9  price. Right? Might not have got the contract, but
10  he could have submitted a higher price?
11    A.    Right. Or he could have submitted it
12  at a lower price --
13    Q.    Could've.
14    A.    -- trying to win the contract, so he
15  wouldn't be making a profit or any profit.
16    Q.    And what was the, in the contract
17  itself, did Jefferson Parish cap the contract at
18  $202,000? And I'm referring to Section 4.2.
19    A.    Section 4.2. The annual contract cap
20  shall not exceed $230,000.
21    Q.    Okay. So Jefferson Parish actually
22  gave him more than he asked for as a cap?
23    A.    I don't know. I would have to look at
24  the payment. They encumbered $230,000 that was
25  available for the work. But that is typical. When

Page 213

1 you submit a cost estimate, you want to have more
2 money available for unanticipated costs.
3     Q.    Okay. All right. I want to go to the
4 contract again. And you alluded to this earlier,
5 Section 2.0 where it says, "Firm shall meet the scope
6 of services as part of the RFP number 0338 as amended
7 and the firm's written proposal."
8         And it is your interpretation of that,
9 that that only applies to Section 1 of their
10 proposal?
11    A.    It said, "The firm shall meet the
12 scope of services as per RFP 338 as amended in the
13 firm's written proposal."
14        So yes. If you look at the scope of
15 services they provided, it is almost, it is almost
16 verbatim in many cases as, and you don't have the
17 RFP, but what is in the RFP. So you can see that is
18 their scope of services.
19        This sentence is, my opinion, it is
20 talking about the scope of services. I do this a
21 lot. I don't, if I have an RFP and they are asking
22 me to do the work, that is the work I'm going to do.
23 All the information I provide to sell my company or
24 support it, that is not going to be part of the
25 contract. I've never seen that in 30-plus years.

Page 214

1     Q.    But that doesn't mean that wasn't the
2 intent of this contract is because you haven't seen
3 it. Correct?
4     MR. BAAY:
5         Object to form.
6     THE WITNESS:
7         In my experience, I would say no. I
8 would say no. In my experience, it was the scope of
9 services.
10 BY MR. FUTRELL:
11    Q.    I understand that is your opinion and
12 your interpretation of the contract. But my question
13 was, it doesn't mean that was, it was not the intent
14 to pull in the proposal into this contract. Correct?
15    MR. BAAY:
16        Object to form.
17    THE WITNESS:
18        Yeah. I won't speculate on what it
19 was. Somebody could have another opinion. But that
20 won't be my opinion based on experience.
21 BY MR. FUTRELL:
22    Q.    Okay. Section 2.1, show me in Section
23 2.1 where it says that, that work is limited to 40
24 hours a week?
25    A.    Work is not limited to 40 hours a

Page 215

1 week.
2     Q.    Okay. And Aptim can request
3 additional labor if they need to?
4     A.    That is correct.
5     Q.    Or if they deem, see fit. Correct?
6     A.    Correct. As I had in my, as I had in
7 my report, there were times when they did request
8 overtime.
9     Q.    And I'm going to back up one second.
10 Do you know why Aptim would tout the odor reduction
11 in the proposal if they are only providing basic
12 operation and maintenance of the landfill gas
13 collection system?
14    MR. BAAY:
15        Object to form.
16    THE WITNESS:
17        They are touting their, say that
18 again. Ask me that question again.
19 BY MR. FUTRELL:
20    Q.    Do you know why Aptim would tout their
21 ability to control odors at the JPLF, at the
22 Jefferson Parish Landfill, that we just looked at in
23 that proposal --
24    A.    Right.
25    Q.    -- if it is not part of their scope of

Page 216

1 services?
2     MR. BAAY:
3         Object to form.
4     THE WITNESS:
5         Yeah. They are trying to win the bid
6 based on what they've already done.
7 BY MR. FUTRELL:
8     Q.    So they can put anything in the
9 proposal in order to get the bid, but if it is not in
10 the contract documents, then it is your opinion that
11 they are not bound by it?
12    MR. BAAY:
13        Object to form.
14    THE WITNESS:
15        No. You cannot put anything in the
16 proposal.
17 BY MR. FUTRELL:
18    Q.    Okay. Go back to Section 2.1, where
19 Aptim has the ability to request additional labor.
20 Did you see anything in the materials you reviewed
21 that Aptim requested additional labor?
22    A.    In the materials that I reviewed where
23 Aptim requested additional labor, yes. There was one
24 point where there was a request to tune the wells
25 twice per week. And I think it was Josh, there was

Page 217

1 an E-mail originally I believe from Rick Buller to
2 Josh, and Josh wrote back that says we will need
3 extra labor to go to two times per month I believe it
4 was.
5     Q.     And was that approved?
6     A.     There is no, there is no documentation
7 it was approved or not.
8     Q.     Did you see in the materials that you
9 reviewed that they actually did tune the wells that
10 amount of times?
11    A.     Yeah. Going, starting in 2019 there
12 was twice-per-month well tuning.
13    Q.     So it was obviously approved?
14    A.     At some point along the line it
15 appears to have been approved.
16    Q.     I want to turn to exhibit I think it
17 is Exhibit No. 1625. It is the Exhibit B, the Scope
18 of Work/Services or the RFP. Do you have that in
19 front of you, Page 12 of 15. And I want to point
20 your attention to Section 1.1.2.
21    A.     Okay.
22    Q.     The last two lines of that say, says,
23 has a phrase, "The firm, meaning Aptim, may negotiate
24 a reasonable amendment to the contract with Jefferson
25 Parish subject to the approval of Jefferson Parish

Page 218

1 council."
2            Do you see what I am talking about?
3     A.     Yes.
4     Q.     Do you have any indication that Aptim
5 ever went to Jefferson Parish and said we need more
6 money to do our job?
7     A.     In the extensions that they got after
8 this contract?
9     Q.     Yes.
10    A.     The workstations, yes.
11    Q.     Okay. Well, let me ask you this.
12 Because, well, let's talk about this. We are talking
13 about the amendments to the contract.
14    A.     The ones where they got a year, or a
15 year or six months or whatever added on?
16    Q.     Right.
17    A.     Yes.
18    Q.     Okay.
19    A.     If that is what you are talking about,
20 asking for more money, are you talking about
21 extensions of contracts or within --
22    Q.     Within this original contract first.
23    A.     Okay.
24    Q.     Did they ever go back to the Parish of
25 Jefferson and say we need more than $202,000 to

Page 219

1 perform these services?
2     A.     Well, that E-mail I just wrote about,
3 or I spoke about, Josh said we will need more hours
4 to be able to do the twice-per-whatever well tuning.
5 So they did go to them at least once. They did go
6 for all these proposals they put in for the jumper,
7 the VFD, the additional, the additional header.
8     Q.     Correct.
9     A.     The additional force main and gas
10 piping.
11    Q.     On the cost proposal, though, and part
12 of the contract, there is a provision for additional
13 labor built in there. Correct?
14    A.     I believe.
15    Q.     So that's --
16    A.     That unit costing, is that --
17    Q.     Yes. On the proposal.
18    A.     And they say if we, if we had this
19 many more hours, it will be this many dollars per
20 hour.
21    Q.     Right. So it is built into the figure
22 of the contract?
23    A.     See if this adds up. Let's see.
24       MR. FUTRELL:
25          What is the next exhibit number?

Page 220

1        MR. BAAY:
2           28. 27 was the proposal. Yeah. 28.
3     THE WITNESS:
4           Okay.
5        MR. FUTRELL:
6           Amendments to the contract.
7        MR. BAAY:
8           That wasn't --
9        MR. FUTRELL:
10          What?
11       MR. BAAY:
12          That wasn't attached to the earlier --
13       MR. FUTRELL:
14          No.
15       MR. BAAY:
16          Okay.
17          (Deposition Exhibit 1628 marked for
18 identification.)
19    BY MR. FUTRELL:
20    Q.     So I'm trying, you are trying to see
21 if the costs were built in.
22    A.     Yeah. They have, they have additional
23 costs here. See, there is annual cost. There is a
24 total estimated annual cost with the additional labor
25 built into it.



Page 221

1    Q.    Right.
2    A.    So I don't know if these are the unit
3  costs.
4    Q.    So when Mr. Broggi went or wrote that
5  E-mail you are referring to and says, we need
6  additional labor, it is already built into the --
7    A.    There is some built into here.
8  Correct. Yes.
9    Q.    So other than that, are you aware of,
10  and the other items you spoke of, those would fall
11  under the category of non-routine?
12    A.    It would have been funded through a
13  separate funding line I'm assuming.
14    Q.    Correct. So my question to you was,
15  was there every a situation, did you see any
16  documentation that there was a situation that Aptim
17  went to the Parish of Jefferson under the terms of
18  the original contract and said, we need more money to
19  do our job, the $202,000 that we submitted is not, is
20  not enough?
21    A.    Not that I'm aware of.
22    Q.    Okay. They didn't go and say, we need
23  more than one 40-hour-a-week technician. Did they?
24    A.    Well, they ended up having two people
25  onsite. So at some time that was approved. Whether

Page 222

1  that was out of this additional funding. Because
2  they also had Eric Hammerly onsite. So they had two
3  technicians onsite. I don't know whether that got
4  covered completely under this additional money or
5  whether there was an amendment. I have never seen
6  that. No.
7    Q.    Okay. I'm going to get to the
8  amendments in the contract in just a second. But I
9  also want to ask you on the scope of services, 1.1.4.
10  What does, what does the term technical support mean
11  to you?
12    A.    Technical support is for minor
13  compliance or operational issues.
14    Q.    So what does the term technical
15  support mean to you?
16    A.    So that would mean they would need
17  some kind of, some kind of support to remedy either a
18  compliance issue or an operational issue. They would
19  need, it wouldn't just be going out and doing the
20  typical turning the valves. This would be, they
21  would have to look at something minor in nature.
22  Maybe some small instrumentation. Minor compliance.
23  I'm not sure what minor compliance would be.
24       But technical support would be some
25  kind of, some kind of support that is not, we'll say

Page 223

1  field work, completely field work related. It would
2  have to be some, probably an O&M component to it. So
3  for me it would be, it would be, you know, hey, we
4  have a problem with one of our instruments. We need
5  to fix that.
6    Q.    Solving a problem?
7    A.    So some kind of, some kind of a
8  problem. But it is limited, because here it says
9  minor compliance and operational.
10    Q.    You keep saying that. You keep saying
11  minor compliance and operational. Is it your opinion
12  that Aptim could ignore anything that wasn't minor
13  compliance or operational issues?
14       MR. BAAY:
15          Object to form.
16       THE WITNESS:
17          No. The next line says the parish may
18  request advice to mitigate recurring issues. So to
19  me it looks like they can step up. If the parish
20  wants them to help them, wants them to do something,
21  they can move up that next level.
22  BY MR. FUTRELL:
23    Q.    And that was my question to you. My
24  question to you is, you keep saying that the firm
25  shall provide technical support only applies to minor

Page 224

1  compliance or operational issues. And I understand
2  that's your opinion.
3       Is it also your opinion that Aptim can
4  ignore any problem that is not a minor compliance or
5  operational issue?
6       MR. BAAY:
7          Object to form.
8       THE WITNESS:
9          No. As a matter of fact, they put
10  other issues in their monthly reports.
11  BY MR. FUTRELL:
12    Q.    So you agree with me, if Aptim sees an
13  issue that is not a, quote, minor compliance or
14  operational issue, that they have an obligation and
15  responsibility to report that and provide a solution?
16       MR. BAAY:
17          Object to form.
18       THE WITNESS:
19          They are obligated to report that
20  because it is part of their reporting. There is a
21  monthly report in here. And again, if it falls in
22  this category, yes. Then provide a solution. And
23  they did. They did on their, you know, we look at
24  their monthly reports, you can see they found
25  something and fixed it, so.

1 BY MR. FUTRELL:
2    Q.    Yeah. We are going to go through a
3 couple of monthly reports in a little bit.
4    A.    Yep.
5         (Deposition Exhibit 1628 marked for
6 identification.)
7    Q.    I want to just the record, we have it
8 in the record, I'm just going to hand you these all
9 together. Starting with Exhibit 1628, which is the
10 first amendment to the contract.
11        Have you reviewed those? Have you
12 reviewed the first amendment to the contract?
13    A.    I think I have. But I don't recall.
14 I can't recall for sure if I have or not. I know, I
15 know there were issues. But that was it. I don't
16 know if I reviewed those. No.
17    Q.    Okay. So let me just, I'm just going
18 to point you to a couple of areas on each one.
19 Exhibit 1628 is the first amendment.
20        And JP, for you, the copy that I gave
21 him is ADD_P00106259.
22    MR. PAUL:
23        Thank you.
24 BY MR. FUTRELL:
25    Q.    And this first amendment was entered

1 into on November 30th, 2016. Do you agree?
2    A.    November 30th, 2016. That is correct.
3    Q.    Okay. And from my reading, I think
4 the only thing that was changed is the term of the
5 contract shall be for two years commencing on January
6 1st, 2016 and shall expire on December 31st, 2017.
7        Do you agree with me?
8    A.    Now, where are you?
9    Q.    Section 2. On the amendment it says
10 section, right here.
11    A.    Section 2.
12    Q.    It says Section 3.1 shall be amended
13 as follows. Changes the terms.
14    A.    To commence on January 1st, 2016.
15 Expiring December 31st, 2017. That is correct.
16        (Deposition Exhibit 1629 marked for
17 identification.)
18    Q.    Okay. Now, the next one I'm going to
19 refer you to is Exhibit 1629.
20        JP, I'm sorry, but my copy does not
21 have a Bates number. There is the second --
22    MR. PAUL:
23        That is okay.
24 BY MR. FUTRELL:
25    Q.    The second amendment to the contract

1 dated January 11th, 2017, but it should be 2018 I
2 believe. Are you with me?
3    A.    Yes. It is actually crossed out and
4 says 2018. And does your copy have, it has a Bates
5 number?
6    Q.    Oh. There is a Bates number.
7    A.    There is a Bates number in the corner,
8 lower left corner.
9    Q.    So, JP, the Bates number is
10 ADD_P00106237.
11    MR. PAUL:
12        Thanks.
13 BY MR. FUTRELL:
14    Q.    So this one under Section 2 says
15 Section 3.1, shall be amended as follows. Changes
16 the term of the contract from December 31st, 2017
17 through June 30th, 2018. Correct?
18    A.    Correct.
19    Q.    And then Section 4.2 is amended to
20 basically cut in half that cap of 230 to make it
21 $115,000 for this six-month period. Correct?
22    A.    That is correct.
23    Q.    Okay. So there is no change in the
24 compensation based on this amendment?
25    A.    Per unit, per unit time. No.

1         (Deposition Exhibit 1630 marked for
2 identification.)
3    Q.    Okay. The third, can I see yours for
4 one second.
5         The next exhibit is 1630 and it is
6 Bates number ADD_P00105768. And this is the third
7 amendment to contract that is dated July 25th, 2018.
8 And do you agree with me that under Section 2, the
9 term of this is December 30th, 2018, or the term is
10 extended from June 30th, 2018 to December 30th, 2018.
11 So another six-month extension?
12    A.    Yes. That is correct.
13    Q.    And on this one that six-month
14 contract cap was increased by $25,000 to $140,000.
15    A.    That is correct.
16         (Deposition Exhibit 1631 marked for
17 identification.)
18    Q.    Okay. And then Exhibit 1631, that one
19 I have. Thanks.
20    A.    Got it. Okay. You are welcome.
21    Q.    I don't know why those other ones
22 didn't have it.
23         This one is dated December 10th, 2018,
24 and this Bates number is Aptim-0109461. And under
25 Section 2 the term of the agreement is extended to

Page 229

1  June 30th, 2019. Agreed?
2      A.    That is correct.
3      Q.    And the contract cap for that
4  six-month period is increased to $350,000?
5      A.    That is correct.
6      Q.    Right. Now, do you know how it came
7  to be that the contract cap was increased to
8  $350,000? Did you see any documentation as to why
9  that happened?
10     A.    I believe that was, there was an issue
11  with Tricon not being able to install wells in '20,
12  in 2019. So Aptim had to install, they installed
13  seven wells, pumps, all the piping associated with
14  it. So my guess is, looking at this and knowing the
15  time, this was also about the same time that Mike
16  Lockwood had made the mention of, I forget exactly
17  what he said. He said Aptim's really stepped up to
18  the plate. They've taken on all this extra work. So
19  I'm assuming this went from, extended to June, six
20  months to June 2019. That was probably, and it was
21  when all that other work was done.
22     Q.    And it was also after --
23     A.    That problem.
24     Q.    I'm sorry. It was also after Carlson
25  had issued its report after doing an assessment of

Page 230

1  the leachate collection system at the Jefferson
2  Parish Landfill. Correct?
3      A.    Yeah. Theirs was in, I want to say
4  May.
5      Q.    Right.
6      A.    May of 2018.
7      Q.    And Carlson found a number of, a
8  number of issues?
9      A.    Yes.
10     Q.    And the issues that Carlson found,
11  would you agree with me, those would indicate that
12  Aptim was not living up to its responsibilities under
13  the contract?
14     A.    I don't remember what they were.
15  There were 20, there around 26 issues.
16     Q.    Right. So in order to address the
17  issues that Carlson found, because Aptim was not
18  living up to their responsibilities under the
19  contract, they had to increase the amount of the cap
20  for the contract in that amendment. Correct?
21     MR. BAAY:
22          Object to form.
23     THE WITNESS:
24          I think, I think a lot of those had to
25  do there with there were things to do with the

Page 231

1  leachate and other issues as well. So I'm not going
2  to speculate on what that money was included for.
3  BY MR. FUTRELL:
4      Q.    But at least some of them were dealing
5  with the landfill gas collection system?
6      A.    But it might not have been something
7  to do with Aptim.
8      Q.    Well, who else would've had
9  responsibility for the landfill gas collection system
10  at the time that Carlson did their assessment?
11     A.    It could've been, for example, like
12  the bellies or needing jumpers. That's just the
13  natural work. Just naturally happens at a landfill.
14  That is not anybody's --
15     Q.    Okay. I want to go through your
16  report quickly. Well, quickly in my mind.
17          Your Opinion No. 1. That Aptim was
18  only provided a partially installed GCCS to operate
19  in Phase 4A and the timing of its installation and
20  expansion was outside of Aptim's control.
21          In all the materials that you
22  reviewed, did you ever see anyplace where Aptim
23  voiced concern as to the timing and installation of
24  the expansion of the gas collection system in 4A?
25     A.    They would've had, they would've had

Page 232

1  no reason to do the expansion. They were operating
2  under NSPS. So what they were seeing was, there were
3  no, it wouldn't have been an issue. So no. The
4  answer to your question is no.
5      Q.    But it is your opinion that the
6  partially installed gas collection system impacted
7  the performance or Aptim's ability to operate the
8  landfill gas collection system. Correct?
9      A.    No. The opinion is that they were only
10  provided a partially installed system in Phase 4A. So
11  any of the other areas outside of that system 4A gas,
12  Aptim wouldn't have any control over that. They were
13  only given a partially installed system in Phase 4A.
14     Q.    Well, within Phase 4A, is it your
15  opinion that the partially installed system impacted
16  their ability to operate the landfill gas collection
17  system in 4A?
18     A.    To operate the gas collection system?
19     Q.    Right. Because if not, I don't
20  understand what, what this opinion has to do with
21  this case.
22     A.    The entire Phase 4A was the area.
23  There were only wells installed in part of that, that
24  Aptim was operating. So any areas outside of that,
25  Aptim would not have had any control over what was



Page 233

1  going on in those areas.
2      Q.    Wait.  Say that again.  I'm sorry.
3      A.    Okay.  There were originally 32 wells
4  designed.
5      Q.    For 4A?
6      A.    For 4A.  Okay.  There were nine, 15 and
7  22 installed.  So that's a partially installed
8  system.  So Aptim could only operate what they were
9  given.
10     Q.    And is it your opinion that that
11 partially installed system impacted Aptim's ability
12 to fulfill their requirements under the contract?
13     A.    To fulfill the requirements under the
14 contract, just of the operation of the partially
15 installed system?
16     Q.    All of their obligations under the
17 contract.
18     A.    It would've have --
19           (Talking simultaneously.)
20     THE REPORTER:
21           Wait.  Wait.  Come on, guys.  Go
22 ahead.
23 BY MR. FUTRELL:
24     Q.    All of their obligations under the
25 contract.

Page 234

1      A.    It would not have affected their
2  contractual obligations that they had in Phase 4A.  It
3  would only have affected the gas collection as a
4  whole from Phase 4A.
5      Q.    Okay.  So if it didn't impact their
6  performance and it didn't impact their ability to
7  meet their obligations under the contract, then why
8  do we need this opinion?
9      A.    Because the overall causation ruling
10 addressed all of Phase 4A.  The odors were being
11 emitted from Phase 4A.
12     Q.    Okay.
13     A.    Aptim could only control a part of
14 Phase 4A that was under their control, which was the
15 system that they were providing.
16     Q.    Okay.  Did you see, and kind of gets
17 back to my original question about Opinion No. 1.
18 Have you seen any documentation that says that Aptim
19 voiced any concern over only being provided a
20 partially installed gas collection system to operate
21 in 4A?
22     A.    Let me see if I have anything in the
23 report.  They voiced concern with having a partially
24 installed system?
25     Q.    Wait.  Where is that?

Page 235

1      A.    No. I'm asking you that question.
2  That is what you're saying?
3      Q.    That is what I'm asking you.
4      A.    Did they ever say, we only have a
5  partially installed system in Phase 4A. I don't
6  recall anywhere they did say that.
7      Q.    Okay.
8      A.    No.
9      Q.    So we can take from that, then, that
10 Aptim did not have an issue with only having a
11 partially installed gas collection system in 4A?
12     MR. BAAY:
13           Object to form.
14     THE WITNESS:
15           Aptim to operate, Aptim did not take,
16 I did not see that Aptim took exception to the system
17 they were given in Phase 4A.
18 BY MR. FUTRELL:
19     Q.    Okay.  Your Opinion No. 2.  Aptim was
20 not responsible for the receipt of waste materials,
21 waste placement, and you talked, etcetera.
22     A.    Right.
23     Q.    You talked with Mr. Hammel a little
24 bit about that.  And I think you said that in the
25 facilities that you operate, you have knowledge of

Page 236

1  the waste streams that are brought in to the
2  facility.  Is that correct?
3      A.    No. That is not correct.
4      Q.    Okay. So do you have knowledge at
5  your facilities of the waste streams that are brought
6  into it?
7      A.    We don't operate.  We don't, we do the
8  gas collection systems.  The waste that is brought
9  in, I know what they do from seeing it.  But we don't
10 have any control over --
11     Q.    That is not, that is not my question.
12 And I understand that Aptim had no control, that your
13 opinion is Aptim had no control over the acceptance
14 of waste.
15           My question is, did Aptim or should
16 Aptim have had knowledge of the types of waste that
17 were being introduced into the landfill?
18     A.    No.
19     MR. BAAY:
20           Object to form.
21 BY MR. FUTRELL:
22     Q.    That does not have any impact on how,
23 on their ability to operate the gas control system in
24 the landfill?
25     A.    No. It does not.  Only the



Page 237

1   placement of it relative to, say, elevations.
2   Because you have to raise wells as the waste gets to
3   a certain height. But, for example, I don't know
4   what is coming into a landfill. I have gas
5   collection systems. I don't know what is coming into
6   the landfill around those gas collection systems.
7   They bring in trucks. All kinds of stuff
8   coming in. As an operator of a GCCS, you are not
9   going to know what's being brought in.
10      Q.      Okay. So I guess I know the answer to
11  this question, too, then, based on that.
12           But did Aptim ever, did you review any
13  documentation that Aptim ever expressed concern or
14  object to the introduction of the spent lime in Phase
15  4A of the Jefferson Parish Landfill?
16      A.      No.
17      Q.      Let's go to your Opinion No. 3. Aptim
18  did not have control over the design of the gas
19  collection control system in Phase 4A.
20           And I think you told Mr. Hammel that
21  you don't have an issue with the design of the gas
22  collection control system in Phase 4A. Correct?
23      A.      Right.
24      Q.      Okay. So, and then your last
25  sentence. "Additionally, Aptim could only operate a

Page 238

1   partially installed GCCS in the condition and
2   configuration provided to it by Jefferson Parish."
3           Is this, is this kind of the same as
4   your Opinion No. 1?
5       A.      Yes. It has to do with emissions from
6   the old Phase 4.
7       Q.      Okay.
8       A.      Not specifically the gas collection
9   system.
10      Q.      As part of the technical support
11  required of Aptim in terms of the contract, would
12  they not have the responsibility to advise Jefferson
13  Parish and/or Jefferson Parish's designers regarding
14  the timing of the installation of the gas collection
15  control system in Phase 4A?
16      A.      No.
17      Q.      No?
18      A.      We have the same situation. The
19  engineers are over there. Operators over here. When
20  it comes to expansion, installation, they do their
21  thing. We don't, we don't advise them. They look at
22  the topos. They know when the trash has been there
23  and they want to put in more wells. They design
24  where they are going to go and that is it, so.
25      Q.      Are you saying Aptim does not have

Page 239

1   that type of knowledge as to, say, hey, you know, we
2   should probably have a different time schedule for
3   the installation of these gas wells in Phase 4A?
4       A.      No. That is engineers. That would be
5   Carlson or Franklin or whoever engineers they had.
6   Those are two separate tasks. I've seen that for
7   years. They don't, there is very little interaction
8   when it comes time to walk on to a site, and they'll
9   be getting ready to drill, or they'll be doing
10  something and they'll just say here we go. You know.
11      Q.      And does that, is it your opinion that
12  the timing of the installation of the gas control
13  system in Phase 4A impacted Aptim's ability to
14  perform under the terms of the contract?
15      A.      The timing of the installation, that
16  would be the same thing we've been talking about.
17      Q.      Okay.
18      A.      Yes.
19      Q.      On Page 22 of your report, the last
20  paragraph before Opinion No. 4, where you say, "If
21  optimizing the gas collection control system provided
22  to Aptim to improve LFG (and associated fugitive odor
23  emissions) capture was simply a matter of normal
24  system O&M, then the extensive effort and investment
25  by Jefferson Parish to upgrade the GCCS

Page 240

1   infrastructure, as described above, would not have
2   been required."
3           Are you with me?
4       A.      Yes.
5       Q.      Okay. Did you see any documentation
6   in the, in the materials that you reviewed, that
7   Aptim ever brought anything to the attention of
8   Jefferson Parish that they should, they should
9   undertake extensive effort and investment to upgrade
10  the gas collection control system?
11      A.      Did I ever see anything from Jefferson
12  Parish asking to —
13      Q.      From Aptim?
14      A.      From Aptim.
15      Q.      To Jefferson Parish.
16      A.      Yeah.
17      Q.      So Aptim is running the landfill gas
18  collection system. Right?
19      A.      Right.
20      Q.      And if it needed extensive effort and
21  investment by Jefferson Parish to upgrade it, you
22  would think that Aptim would have told Jefferson
23  Parish, hey, you need extensive effort and investment
24  to upgrade the landfill gas collection system.
25  Correct?



Page 241

1     A.    No. Again, two separate groups. Aptim
2  is running the gas collection system. Engineers are
3  separate.
4     Q.    So as the operator of the gas
5  collection control system, if you, if you as the
6  operator. Let me start that over.
7         If Aptim, as the operator of the gas
8  collection control system, because they have
9  hands-on, supposedly 40-hours-plus a week. Right?
10 Correct?
11    A.    Yes.
12    Q.    You would agree with me that they are
13 the entity in the best position to assess the
14 operation of the gas collection control system.
15 Correct?
16    A.    Yes.
17    Q.    Okay. So they see it every day. They
18 are the best per, entity to assess it. You are
19 telling me they don't have a responsibility to tell
20 the owner you need to upgrade your gas collection
21 control system?
22    A.    To expand it and add additional wells,
23 no, no. That's an engineer going to do that. That's
24 not your operator. No.
25    Q.    So Aptim can take their money and then

Page 242

1  basically just turn a blind eye to, to any problem
2  they see. Is that your position?
3     A.    They can --
4     MR. BAAY:
5         Object to form.
6     THE WITNESS:
7         They can do the work that they are
8  contracted to do. Get paid for it. And that is what
9  they do. If they see a problem with the gas
10 collection system, they can document that. They can
11 remedy whatever is in the contract. But as far as
12 engineering expansion, that is going to be an
13 engineering call.
14 BY MR. FUTRELL:
15    Q.    And it is your opinion that is not a
16 part of the technical support that Aptim agreed to in
17 the contract?
18    A.    No.
19    Q.    Let me ask you on Page 24 of your
20 report. You talk about in that first paragraph at
21 the top. You talk about a memo which contains a
22 statement. "Rick mentioned that the new wells that
23 Tricon installed this year, on the south end of Phase
24 4A, have never had collected gas due to this belly in
25 header."

Page 243

1     A.    Correct.
2     Q.    Do you see what I'm talking about?
3     A.    Yep.
4     Q.    Isn't that something that Aptim should
5  have noticed?
6     A.    Yeah. They actually, this is in July.
7  They put together a monthly report. There was a
8  meeting in June to discuss this and then there was a
9  meeting in July to discuss this. Then Aptim gave a
10 proposal and they actually corrected it in August.
11    Q.    Okay. So that is a problem that Aptim
12 sees and they report it?
13    A.    Right. Within their, it is within
14 their system.
15    Q.    On Page 27 of your report, the second
16 full paragraph, last sentence, you talk about, "This
17 further indicates that Jefferson Parish's engineers
18 and consultants knew of continued issues with the
19 vacuum piping prior to, and through the end of
20 Aptim's contract period."
21    A.    Correct.
22    Q.    Okay. So Aptim knew of the continued
23 issues with the vacuum piping as well. Correct?
24    A.    Yes.
25    Q.    Did Aptim report that to anybody?

Page 244

1     A.    I don't know if they, if they reported
2  it. It is in their monthly reports. I don't know if
3  there was any, let's see. Yes. It was reported
4  April 16th. April 16th, 2019 E-mail from Mr. Broggi
5  to Mr. Lockwood. Mr. Broggi writes, "We performed
6  our weekly sump inspection."
7         I'm sorry. That's, that was when
8  somebody took the inspections off. That was when they
9  were reporting somebody had disconnected the sump
10 lines.
11    Q.    Right. So, because what you are
12 referring to in this paragraph is Mr. Franklin, who
13 is not associated with Aptim, writing something to
14 CEC?
15    A.    Yeah. There were discussions, it is
16 in the paragraph before that. March 12th, 2019, an
17 E-mail from CEC to Mr. Broggi. "I saw the eight-inch
18 jumper installed to help the low vacuum issues on the
19 south side of Phase 4A." That is the liquid in that
20 line.
21         "Do you have an active plan to repair
22 the header in Phase 4A that is believed to be bellied
23 below the roadway before your construction crew
24 leaves?"
25         Mr. Broggi responded the next day

Page 245

1  stating, "There was a design to install an eight-inch
2  line, see attached drawing, but this work was
3  cancelled. We believe" --
4        So there is ongoing conversations
5  between CEC and, you know, Aptim.
6        "We believe all lines in this corner
7  are pinched, eight-inch and 10-inch lines and even...
8  force main. We have taken...reading around the
9  wells, that area. Took a reading at CS-6-3B. We
10 have recommended replacing the 10-inch jumper."
11       Again, that is specific to their
12 issue. They recommended it. Here they are talking
13 to the engineer. So yes. That engineer. And this
14 is the one where there was actually argument of how
15 to fix it between the two engineers, the two
16 engineers for Jefferson Parish.
17    Q.    Okay.
18    A.    And that starts with the due to
19 budgetary constraints. So yes. It was reported.
20    THE REPORTER:
21       What page was that?
22    THE WITNESS:
23       That was Page 27.
24 BY MR. FUTRELL:
25    Q.    Your Opinion No. 5, and I think you

Page 246

1  may have discussed this already. "Aptim's work at
2  JPLF was limited." It is on Page 36.
3    A.    Yep.
4    Q.    "Aptim's work at JPLF was limited by
5  contract/agreement provisions and language to
6  specific tasks."
7        How was, how was Aptim's work limited
8  by contract and agreement provisions and language to
9  specific tasks?
10   A.    Within the agreement, it talks about
11 what their, what their contract said. It's what we
12 talked about. Basically the engineering work was not
13 part of their contract. That was going to be
14 separate.
15   Q.    Did you ever see in the documentation
16 that you reviewed Aptim informing Jefferson Parish,
17 or anyone's else, that they had issues with the,
18 quote/unquote, limits placed upon them by the
19 contract?
20   A.    From Aptim. No. I did not.
21   Q.    Okay. And, in fact, they submitted a
22 proposal to the parish indicating they had the
23 ability to do the job within the parameters of the
24 contract. Correct?
25   A.    That is correct.

Page 247

1    Q.    Not only in 2017, but they did it
2  before that and after that.
3    MR. BAAY:
4        Object to form.
5    THE WITNESS:
6        I didn't see anything before that. So
7  it would just have been the, just been the proposal
8  or the information we have here.
9  BY MR. FUTRELL:
10   Q.    On Page 39, the last full paragraph,
11 last sentence, where you talk about the operation and
12 maintenance reports. It says, "Aptim's reports
13 included such recommendations as purchase additional
14 pumps to add to extraction wells and consider running
15 more airline and force main."
16       Which reports are you referring to?
17   A.    That was, it looks like I do not have
18 that one footnoted. It was in a couple of their, it
19 was in a couple of their reports. In their, sorry,
20 O&M reports.
21   Q.    And were the additional pumps that
22 were to be added to the extraction wells, were those
23 in 4A?
24   A.    I'm not sure.
25   Q.    Okay. So if they weren't in 4A, then

Page 248

1  they don't really have any --
2    A.    They would not be, in this case, not
3  applicable. But I don't, I don't recall what the
4  exact language was.
5    Q.    And the running airline and force
6  mains, that was not in 4A?
7    A.    It would only be applicable if it was
8  in 4A.
9    Q.    Your Opinion No. 6. "Aptim did not
10 have control over the leachate levels in Phase 4A
11 that allegedly impaired the operation of the gas
12 control collection system."
13       Do you agree with me that part of
14 Aptim's scope of responsibilities was to pump
15 leachate from the gas wells. Correct?
16   A.    No. That is not correct. They were
17 pumping liquids from the gas wells. That would be
18 the leachate system and the condensate system were
19 separate.
20   Q.    What if there is leachate in the gas
21 wells?
22   A.    Well, that's what we're going to get
23 into. If, in the gas wells, you could have
24 condensate. You could have drainage from perched
25 water layers. You could have some incidental



1  leachate coming in. But they are two different
2  systems.
3      Q.    Under the scope of services, 1.1.1,
4  does it not indicate that under Operation and
5  Maintenance, that part of Aptim's responsibility is
6  to pump leachate from gas wells as needed?
7      A.    Yes. It says that in the contract.
8  But what is being pumped out of the wells is, it is a
9  combination of things. Other liquids. So there
10 could be some leachate.
11     Q.    So you agree with me that part of
12 Aptim's responsibility was to pump leachate from gas
13 wells?
14     A.    Only incidental leachate that came in
15 as the liquids in the wells. As long as it is clear
16 that it wasn't part of the leachate control system,
17 that was meant to pump leachate from the underdrain.
18 It would be anything that incidentally might've come
19 into the wells.
20     Q.    Show me in the contract where it
21 limits it to what you just said.
22     A.    No. It says in the contract. It says
23 leachate.
24     Q.    Okay.
25     A.    What I'm saying is from experience,

1  what comes into a gas well isn't just leachate.
2  There is a mixture of liquids. That is why I won't,
3  I won't say leachate in a well. I will say liquids.
4  Some of that is leachate.
5      Q.    Well, I'm confused, because at some
6  points you say, if it is not in the contract, then we
7  are not responsible for it. But now you are telling
8  me, if it is in the contract, we are not responsible
9  for it.
10 MR. BAAY:
11         Object to form.
12 THE WITNESS:
13         No. That is not what I said. If the
14 leachate comes into the well, then it is going to be
15 pumped out. Any liquids that come into the well are
16 going to be pumped out. So yes. It could be
17 leachate.
18 BY MR. FUTRELL:
19     Q.    So the contract does not qualify, you
20 agree with me the contract does not qualify when
21 Aptim is to pump leachate from the gas wells, does
22 it?
23     A.    No. It states leachate. If leachate
24 comes into the gas wells, it will be pumped out.
25     Q.    Okay. So Aptim's responsibility under

1  the terms of the contract is to remove leachate from
2  the gas wells. Correct?
3      A.    Yes. With the understanding that it
4  is not the leachate collection system. Its function
5  is to dewater the liquid from the wells.
6      Q.    Right. I understand that.
7      A.    Okay.
8      Q.    So I don't know why, why that was so
9  difficult.
10     A.    Okay.
11     Q.    Did Aptim, did you review any
12 documentation that Aptim voiced any concern over the
13 leachate levels affecting the abilities of the
14 landfill gas collection system?
15     A.    Sorry. Say that again. Did --
16     Q.    Did you review any materials that
17 Aptim voiced any concern about the leachate levels
18 affecting their abilities to perform their
19 responsibilities under the contract?
20     A.    Let me look. Most of that came from
21 Jefferson Parish, Carlson. Issue with the force
22 main. Off the top of my head, I don't recall.
23     Q.    Okay. On the top of Page 44 you said,
24 "Aptim only connected leachate risers to the GCCS
25 when directed to do so by Jefferson Parish."

1          Could Aptim have made recommendations
2  to Jefferson Parish that the leachate risers be
3  connected to the GCCS?
4      A.    No. They did not operate the, they
5  didn't operate the leachate collection system. So
6  they wouldn't have known which risers might've had
7  gas concentrations in them.
8      Q.    Okay. So on the very last sentence
9  before your Opinion No. 7, you say, "While none of
10 these upgrades were under the control of Aptim, they
11 had the potential to negatively impact the function
12 of the gas collection control system operated by
13 Aptim, or otherwise emit odors due to component
14 malfunction."
15         So would you agree with me that if the
16 items that you are referring to had the potential to
17 negatively impact the GCCS, that Aptim should have
18 been aware of those issues?
19 MR. BAAY:
20         Object to form.
21 THE WITNESS:
22         It would, only if it would've shown up
23 in some way affecting the gas collection system
24 operation. They might have been aware of it.
25 BY MR. FUTRELL:

Page 253

1   Q.    And if they were aware of it, they
2   should've made recommendations to correct it.
3   Correct?
4   A.    They should have reported it. Not
5   made recommendations. Correct. Again, this is the
6   leachate collection system. That's under Waste
7   Connections.
8   Q.    Our Opinion No. 7 regarding the timing
9   and purchasing and installation of
10  leachate/condensate pumps in Phase 4A.
11  A.    Yes.
12  Q.    We may have talked about this a little
13  bit.
14        But is it your opinion that given
15  Aptim's extensive experience of the site, that they,
16  that they were in a position to know that these pumps
17  were going to be needed in Phase 4A?
18  A.    The way it is spelled out was that,
19  and it is in the report. I think it was Josh went to
20  Rick Buller and said, we may need more pumps. Rick
21  said, we will look at the data and decide if we are
22  going to authorize more pumps. So that tells me,
23  based again on my experience and that note, that
24  Jefferson Parish was the one reviewing water levels
25  and then deciding where the pumps were going to be,

Page 254

1   be installed. They said they were going to look at
2   the data and then decide if they were going to
3   authorize more pumps.
4   Q.    Other than that one E-mail that you
5   just referred to, did you see anything elsewhere
6   Aptim said we need pumps in 4A?
7   A.    Where Aptim said we need more pumps in
8   4A. That is the only thing I can remember where Aptim
9   said we need more pumps in 4A.
10  Q.    They didn't say it, you didn't see
11  anything where Aptim made that recommendation prior
12  to the pumps, prior to the wells being installed in
13  4A. Correct?
14  A.    Made the recommendation prior to the
15  wells being installed in 4A?
16  Q.    Yeah.
17  A.    Needing to install more pumps?
18  Q.    Yes. Or needing to install a pump
19  with the well when it was installed?
20  A.    Well, I know all seven pumps, all
21  seven wells that were installed by Aptim included
22  pumps, force mains and airlines. So that was all
23  done. That was all done as a package when they were
24  installed.
25  Q.    Okay. And that was when?

Page 255

1   A.    That was in February, end of January
2   or February 2019. So right before they left.
3   Q.    On Page 47 of your opinion, well,
4   strike that.
5         All right. Your Opinion No. 8 dealing
6   with landfill cover materials.
7   A.    Correct.
8   Q.    In all the materials you reviewed, did
9   you ever see any indication that Aptim voiced any
10  concern over the landfill cover materials and its
11  impact on the operation of the landfill gas
12  collection system?
13  A.    Impact on the gas collection system
14  from Aptim?
15  Q.    Yeah.
16  A.    I don't recall that I did.
17  Q.    And then your Opinion No. 9 deals with
18  odors. Would you agree with me that at least part of
19  the reports from the surface emissions monitoring
20  included Aptim reporting whether or not they noticed
21  any unusual odors?
22  A.    I know at least one of them there was
23  a, there was an indication they had noticed an odor.
24  But I remember that one time.
25  Q.    And on the other ones, there were

Page 256

1   notations that said no significant odors noticed?
2   A.    I don't recall.
3   Q.    Okay.
4   MR. BAAY:
5         Do you have a bunch more or can we
6   take a break?
7   MR. FUTRELL:
8         We can take break. I got a little bit
9   more, but not much.
10  MR. BAAY:
11        Okay.
12  MR. FUTRELL:
13        I know JP is going to have some.
14  THE VIDEOGRAPHER:
15        The time is 2:48 P.M. We are off the
16  record.
17        (Off the record.)
18  THE VIDEOGRAPHER:
19        The time is 2:56 P.M. We are back on
20  the record.
21        (Deposition Exhibit 1632 marked for
22  identification.)
23  BY MR. FUTRELL:
24  Q.    All right. I want to show you a few
25  of these. All right. I'm going to give you a stack

Page 257

1 and we will go through them one by one, starting with
2 Exhibit 1632.
3     A.    Okay.
4     Q.    And what is, what is 1632?
5     A.    It is a surface emissions monitoring
6 report.
7     Q.    Okay. And this one is dated October
8 6th, 2017, top right?
9     A.    Yes. That is correct. Yes.
10    Q.    Okay. The second page under
11 Monitoring Summary, second paragraph, towards the
12 middle it says there were no unusual odors?
13    A.    Yes. And that is, that is correct per
14 NSPS. There are certain areas that they want you to
15 specifically monitor, and one of them would be if you
16 notice any odors during your --
17    Q.    Okay.
18    A.    -- SEM.
19    Q.    So part of Aptim's responsibility
20 under the contract was to perform surface emissions
21 monitoring. Correct?
22    A.    That is correct.
23    Q.    And part, and part of what is included
24 is surface emissions monitoring is to take note of
25 any unusual odors?

Page 258

1     A.    That is correct.
2     Q.    Okay. So part of Aptim's
3 responsibility was to monitor for odors when
4 performing the SEMs?
5     A.    Per the SEM. Per the NSPS
6 requirements, that would be correct.
7           (Deposition Exhibit 1633 marked for
8 identification.)
9     Q.    Okay. Exhibit 1633 is the December
10 13, 2017 SEM. And again, under Monitoring Summary on
11 the second page, there were no unusual odors.
12 Correct?
13    A.    Correct.
14          (Deposition Exhibit 1635 marked for
15 identification.)
16    Q.    April 9th, 2018, which is Exhibit
17 1635. Again, there was noted no unusual odors.
18 Correct?
19    A.    Correct.
20          (Deposition Exhibit 1636 marked for
21 identification.)
22    Q.    June 29th, 2018 under monitoring, and
23 that is going to be Exhibit 1636, if I didn't say it.
24 June 29th, 2018. No unusual odors. Correct?
25    A.    That is correct.

Page 259

1           (Deposition Exhibit 1637 marked for
2 identification.)
3     Q.    Exhibit 1637, October 5, 2018. This
4 one they say odors were noticed in the area of 4A
5 around exceedance areas. Correct?
6     A.    Correct.
7     Q.    So what did, other than putting it in
8 the SEM report, what did Aptim do in response to
9 noticing the odors in the area of 4A around the
10 exceedance areas?
11    A.    They had to do a, they had to do an
12 inspection with their FID, and then do the followup,
13 the requisite followups.
14    Q.    So tell me what that, what that
15 entails?
16    A.    Oh. That is checking for, that's
17 checking it for concentration. If you, if you detect
18 an odor, you take your FID and you sample that area.
19          (Deposition Exhibit 1638 marked for
20 identification.)
21    Q.    Okay. And then Exhibit 1638, which is
22 the December 28th, 2018 SEM report. I don't see, and
23 maybe I am wrong, but I didn't see anything in here
24 where they noted whether they, there were odors
25 present or there were not odors present.

Page 260

1           Do you see anything?
2     A.    No. I don't. But you would only, we
3 only report if we see odors. So they are reporting
4 that they don't see odors, so.
5     Q.    Okay. Do you have one more?
6     A.    What is that?
7     Q.    Do you have one more, or is that the
8 last one?
9     A.    Last one.
10          (Deposition Exhibit 1639 marked for
11 identification.)
12    Q.    All right. I want to show you, Ruby,
13 do you have some more stickers. Thanks.
14          I will show you what I'm marking as
15 Exhibit 1639. And can you tell me do you recognize
16 that?
17    A.    Yeah. That is one of their operations
18 and maintenance monthly reports.
19    Q.    Okay. And you reference some of these
20 in your report.
21    A.    Yes.
22    Q.    Correct?
23    A.    Correct.
24    Q.    On page, and this one is dated June of
25 2018. Under the Key Activities for June of 2018, on



Page 261

1  the very last page, which is, this report is Bates
2  numbered Aptim-0009809, do you see the first thing,
3  "On June 7th weekly site meeting to discuss low
4  vacuum on header for new wells, electrical...issues,
5  problems with contractors doing new cell construction
6  and odor complaints."
7       A.    Correct.
8       Q.    Okay. So is it fair to say that, at
9  least as of June 2018, Aptim was aware of odor
10  complaints?
11      A.    According to what this says, in the
12  meeting that they were in, odor complaints were
13  discussed. Yes.
14      Q.    The third bullet points under
15  Scheduled Activities for July of 2018, "Continue
16  close monitoring of wells around Phase 4A area of
17  concern to ensure adequate gas production and address
18  any potential settlement to reduce future events."
19            Do you know what is meant by that?
20      A.    No. I do not. I'd have to speculate.
21  I don't know what they mean by future events.
22      Q.    Well, what about the Phase 4A area of
23  concern, do you know what that is referring to?
24      A.    No. I'd have to speculate, Mike.
25  Yeah. I'd have to speculate, because it is not

Page 262

1  defined what the area of concern is.
2       Q.    To ensure adequate gas production and
3  address any potential settlement, do you know what
4  that is referring to?
5       A.    No. I don't know what they mean by
6  settlement to reduce future events. No.
7       Q.    Okay. One, three, four, six bullet
8  points, and I think we talked about this in the body
9  of your report, "purchase additional pumps and
10  consider running more airline and force main."
11            You are not saying that is in Phase
12  4A, are you?
13      A.    No. According to this, it is not
14  specific, as I said.
15            (Deposition Exhibit 1640 marked for
16  identification.)
17      Q.    I will show you 16, what I marked as
18  1640, which is an Operation & Maintenance Monthly
19  Report from July of 2018. Bates Aptim-0009902. And
20  if you turn with me to the last page, first bullet
21  point under Key Activities for July 2018. "Perform
22  initial tuning of Phase 1, 2, 3A, 3B & 4A."
23      A.    Right.
24      Q.    Why, what is initial tuning?
25      A.    I don't know why they use the term

Page 263

1  initial tuning. Because when I look at these months,
2  there was one tuning done at this time.
3       Q.    Okay.
4       A.    So I'm not sure what their term
5  "initial" means here. It means they are doing a gas
6  tuning.
7       Q.    Okay. Under the Scheduled Activities
8  for August of 2018, second bullet point was to,
9  "Increase vacuum to the well field and tune wells to
10  account for the change in pressure."
11            Do you know what that was, why they
12  needed to account for the change in pressure?
13      A.    Yeah. That was when they, Carlson
14  wanted them to begin increasing from 30 to 40 inches.
15  So they had to tune the wells. As you increase the
16  vacuum, you are going to have to tune the wells.
17      Q.    Okay.
18      A.    So it was the next month's tuning.
19      Q.    And then under that it also includes
20  as a third bullet point and the sixth bullet point,
21  basically the same language from the prior —
22      A.    Right.
23      Q.    — operations and maintenance report.
24  Correct?
25      A.    Correct.

Page 264

1            (Deposition Exhibit 1641 marked for
2  identification.)
3       Q.    I will show you 1641. I will show you
4  1641, which is the October 2018 Operations &
5  Maintenance Monthly Report. Aptim-0022113. The last
6  page under Scheduled Activities for November 2018,
7  third bullet point, again is the same language about
8  continuing close monitoring. Correct?
9       A.    Yes.
10      Q.    Under Recommendations, which is, this
11  is the only, this is the first one that actually had
12  recommendations on it. Correct? Of the ones we
13  looked at?
14      A.    Of the ones we looked at, yes.
15      Q.    Are you aware of any other month that
16  operation and maintenance reports that had
17  recommendations?
18      A.    Yeah. There were some older ones that
19  did.
20      Q.    Okay. This one says, "Purchase
21  additional pumps to add to extraction wells and
22  consider running more airline and force main, if
23  required, to the following wells."
24            And it list 100 series, 200 series and
25  300 series. Correct?

Page 265

1    A.    Correct.
2    Q.    Where were the 100 series wells?
3    A.    They would have been, I believe, Phase
4    1.
5    Q.    And the 200 would be in Phase 2?
6    A.    Phase 2.
7    Q.    And the 300 is in Phase 3?
8    A.    Yes.
9    Q.    Either 3A or B3?
10   A.    Yeah. That is, yes.
11   Q.    Okay. And note, the wells in Phase 4A
12   were 500 series wells, weren't they?
13   A.    That is correct.
14   Q.    So there was no recommendation as of
15   October of 2018 to add pumps to the wells in Phase
16   4A, was there?
17   A.    According to this, that is correct.
18         (Deposition Exhibit 1642 marked for
19   identification.)
20   Q.    I will show you 1642, which is a
21   November 2018 Operations & Maintenance Monthly
22   Report. Aptim-0021991. If you turn with me to the
23   last page or the second-to-last page on this one.
24   A.    Right.
25   Q.    Under Key Activities, well,

Page 266

1    third-to-last page now. Key Activities for November
2    2018. The first one again says, "Perform initial
3    tuning of phases 1, 2, 3A, 3B and 4A."
4    A.    Correct.
5    Q.    Okay. And again, you don't know why
6    they used the language, initial tuning?
7    A.    I don't know why they used the term
8    initial.
9    Q.    All right. And then the second bullet
10   point is, "Pressure or vacuum checks completed to
11   ensure vacuum increase at each phase when flare was
12   placed online, in place of engine shutdown."
13   A.    Right.
14   Q.    Would they not have been doing
15   pressure vacuum checks every month, not just in
16   conjunction with the flare being placed online?
17   A.    No. They do. If you go through all
18   these reports, obviously, you just took the first
19   couple pages. But it has all the data. And you can
20   see that they did them every month.
21   Q.    Okay.
22   A.    Twice a month.
23   Q.    Okay. On the next page, Page 3 of
24   this monthly report, the fifth bullet point from the
25   bottom, "Begin taking liquid level readings."

Page 267

1    A.    Correct.
2    Q.    Had they not taken liquid level
3    readings before?
4    A.    Yes. There is a series of gauging
5    data that they had. That is, I think that's just
6    beginning that month. Maybe it was going to spill
7    over to the next month. But no. They had been taking
8    it all along.
9    Q.    Okay. And again, it has
10   recommendations and it is the same wells that we just
11   talked about in the report from the prior month.
12   Correct?
13   A.    Right. The only recommendation,
14   again, for Phase 4A was that E-mail that we had
15   discussed earlier.
16   Q.    Okay. All right. I think that is all
17   questions that I have, Mr. Kline.
18   A.    All right. Thank you.
19   THE VIDEOGRAPHER:
20         Anybody online?
21   MR. FUTRELL:
22         JP?
23   MR. PAUL:
24         Yes.
25   MR. FUTRELL:

Page 268

1          You got some questions.
2    MR. PAUL:
3          I do have a few. Just to warn
4    everybody, I probably have about as many as Mike
5    Futrell did. But we will see how that goes. Can you
6    hear me okay.
7    THE VIDEOGRAPHER:
8          Yes.
9    BY MR. PAUL:
10   Q.    I'm John Paul. I represent the Waste
11   Connections Defendants. I know I've spoken a couple
12   of times, but it's been a while. So unlike everybody
13   else, I will be sharing my exhibits on the screen.
14   Can you see the screen well enough?
15   A.    Yeah. I can. Yep.
16   Q.    Okay.
17   A.    Could you hear me okay?
18   Q.    Yeah.
19   A.    All right.
20   Q.    Are you looking at a copy of your
21   supplemental expert report?
22   A.    Yes, I am.
23   Q.    Okay. Good. Because that means you
24   are not looking at my notes.
25         So I know that you asked, you answered

Page 269

1 some questions about your background earlier. The
2 audio was a little choppy for me during that time
3 period, so I apologize if I ask any questions you
4 have already answered.
5        You, you walked through with other
6 counsel the landfills that you currently work at.
7 Right?
8     A.    Correct.
9     Q.    And I think that was about eight?
10    A.    Yeah. I work between, between eight
11 and 10. We oversee the gas collection systems at
12 eight of them and there are two more that we are
13 involved in consulting with the gas collection
14 operations.
15    Q.    Okay. For any of those landfills, do
16 you have any responsibility over the leachate
17 collection system?
18    A.    Yes.
19    Q.    And is that operations of the leachate
20 collection system?
21    A.    Yes, it is.
22    Q.    Did you or anyone on your team design
23 any of the leachate collection system?
24    A.    No. We did not.
25    Q.    Okay. You touched on this earlier

Page 270

1 today, but am I correct that you consider the
2 leachate collection system at the bottom liner of the
3 landfill to be a distinct system from the system that
4 removes liquids from gas wells?
5     A.    That is correct.
6     Q.    And is it fair for me to assume that
7 you operated plenty of those liquids removal systems
8 from gas, gas systems?
9     A.    In-well pumping systems or leachate
10 systems?
11    Q.    Pumping systems. Gas well liquid
12 pumping systems, have you operated several of those?
13    A.    Yeah. We've had, we've had a couple
14 landfills with those, with those systems. Yes.
15    Q.    Okay. Do you ever need to measure the
16 depth of leachate on the bottom of the liner of any
17 of the landfills you work at?
18    A.    Yeah. We have, we have pressure
19 sensors in each of those. It is, it is all permit
20 required. We have to report those.
21    Q.    Are those pressure sensors also called
22 transducers?
23    A.    Yes. That is, that is the correct
24 term.
25    Q.    And are they typically located in the

Page 271

1 sumps, in the leachate liner?
2     A.    Yes.
3     Q.    So when you report or at least, let me
4 start over.
5        When you assess compliance with any
6 leachate head requirements, do you rely on those
7 transducer data to do that?
8     A.    Yes. We do.
9     Q.    Have you ever designed a final
10 landfill cover system for municipal solid waste --
11    THE REPORTER:
12        I'm sorry. Could you repeat that?
13 BY MR. PAUL:
14    Q.    Have you ever designed a final
15 landfill cover system for an MSW landfill?
16    A.    For MSW landfill, no.
17    Q.    Yeah.
18    A.    Final cover, no.
19    Q.    Okay. Why do you, why do you qualify
20 as MSW? Have you designed other final cover systems?
21    A.    Yes. We worked, I've worked with a
22 team that we've done for C&D.
23    Q.    Okay. Have you ever overseen the
24 application of daily cover at a municipal solid waste
25 landfill?

Page 272

1     A.    No. I have not.
2     Q.    Have you ever overseen the application
3 of interim cover at a municipal solid waste landfill?
4     A.    No. I have not.
5     Q.    And another, and again here is where I
6 apologize if I'm asking duplicate questions. On your
7 CV you mentioned that you worked for the Pelham Bay
8 Landfill in New York. Is that right?
9     A.    That is correct.
10    Q.    Is that landfill currently operating?
11    A.    No. That landfill is closed.
12    Q.    When, do you know when it last
13 accepted waste?
14    A.    1990s I want to say, but that is off
15 the top of my head. I don't remember exactly. It
16 was closed. Because that also accepted waste. Then
17 that sat for a while. Had temporary cover on it. It
18 was a nuisance. They final closed it. So it
19 might've been before that even. That is, that is a
20 bit of a unique situation. That didn't follow a
21 typical, you know, timeline.
22    Q.    Yeah. Well, you touched on my next
23 question. It has a final cover system on it?
24    A.    Yes, it does.
25    Q.    Was that, is that a Subtitle D

BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
273–276

Page 273

1  compliant final cover?
2      A.      Subtitle D, you know, I'm not sure
3  what that is considered.  It is a New York City haz
4  waste.  I'm not sure if that is considered or not
5  Subtitle D.
6      Q.      Okay.  And your CV mentions that you,
7  you do greenhouse gas reporting rule reports for that
8  Pelham Bay Landfill.  Right?
9      A.      That is correct.
10     Q.      Do you prepare those reports yourself?
11     A.      No.  We have air modeling and
12  permitting engineers that do that.
13     Q.      So what about the collection
14  efficiency piece of that reporting, do you do that?
15     A.      No.  That is done, that is done by our
16  air modelers as well.  I give them input in it as to
17  what the cover is and then they do the calculations.
18     Q.      Okay.  Have the, have parameters of
19  that collection efficiency evaluation changed much
20  while you've been working at Pelham Bay Landfill?
21     A.      No.  It's been closed and a membrane
22  cap the whole time.
23     Q.      So is it possible that the collection
24  efficiency your team assigns to that landfill has
25  been pretty much the same all the time you've been

Page 274

1  working there?
2      A.      Yeah.  That is correct.
3      Q.      Okay.  Do you oversee greenhouse gas
4  reporting rule reports for any other landfill?
5      A.      Yes.
6      Q.      What other landfill is that?
7      A.      It is a, this one is a former, it is a
8  former MSW.  It is still an MSW landfill, but it is
9  currently just taking C&D.  There are other ones we do
10  as well.  But I would say all the other ones that we
11  have, for the most part, are either closed and capped
12  with a membrane system.  So it would be like Pelham
13  Bay, or they are closed and capped with a two to
14  three feet of clay cover.  And we have this one
15  active landfill.  That is why I'm bringing it up,
16  because it is the one that is more or less different
17  than the other ones.
18     Q.      So the active landfill, have you had
19  to change the collection efficiency calculation over
20  time while you've been working for them?
21     A.      Yes.
22     Q.      Again, do you prepare those reports
23  yourself?
24     A.      That particular landfill, I do not
25  prepare that one myself.  But I provide the input on

Page 275

1  the areas that have interim cover, that have daily
2  cover.  So they could do the, we can do the overall
3  calculation.
4      Q.      Right.  And as part of that, for that
5  active landfill, in calculating collection
6  efficiency, do you determine the areas subject to
7  influence of the gas system?
8      A.      For, I don't do that.  I do not do
9  that.  The permitting engineers do that.
10     Q.      Okay.
11     A.      I provide input.  I tell them where it
12  is and, you know, where the wells are, and we talk
13  about the influence, and then they do their
14  calculations on that.
15     Q.      Right.  Okay.  So I'm looking at the
16  summary of major opinions in your supplemental
17  report.  I'm looking at opinion No. 6.  I doubt at
18  this point you need to read it closely, but let me
19  know if that is legible.
20     A.      Okay.  If you tell me the page, I can
21  follow long as well in mine.
22     Q.      Sure.  It is on Page 3.
23     A.      Yep.  That's the leachate level.
24     Q.      Yes.
25     A.      Leachate levels.  Yep.

Page 276

1      Q.      Right.  And you note that Aptim did
2  not have control over the leachate levels in Phase 4A
3  that allegedly impaired the operation of the GCCS?
4      A.      Correct.
5      Q.      Are you offering any opinion as to
6  leachate levels on the bottom liner of Phase 4A?
7      A.      No. I'm not.
8      Q.      And in articulating this Opinion No.
9  6, are you distinguishing between the depths of
10  leachate on the bottom liner and the depths of
11  liquids in gas wells?
12     A.      Yes.  Those are two separate items.
13  Correct.
14     Q.      Opinion No. 8, still on Page 3.  You
15  note in the last sentence here, "Aptim only inspected
16  landfill cover materials in conjunction with
17  performing NSPS-required surface emissions monitoring
18  on a quarterly basis."
19     A.      Correct.
20     Q.      Do you see that?
21     A.      Yes.
22     Q.      And as part of that work, did Aptim
23  monitor penetrations through the cover?
24     A.      No.  They did not.  This was, this was
25  WWW.  Not XXX.



Page 277

1    Q.    Right. So you followed the serpentine
2  path and didn't deviate to go look for penetrations.
3  Right?
4    A.    That is correct. That is what my
5  understanding is. Yes.
6    Q.    As part of that triple W basis surface
7  emissions monitoring, was Aptim required to note, to
8  make a note of significant deficiencies in the cover?
9    A.    As part of NSPS, that's one, you are
10  looking for odors. Phase 4A would not have
11  necessarily cover. But if you did see them, you
12  would make a note of, for example, a fissure, I think
13  that is what is spelled out in NSPS.
14    Q.    So if you had seen a fissure, for
15  instance, in the interim cover, that would have been
16  noted in one of those SEM reports?
17    A.    Yes. It would have.
18    Q.    Of course, when I say you --
19    A.    You mean Aptim.
20    Q.    -- I mean Aptim.
21    A.    Yes.
22    Q.    Yes. I'm sorry to clarify that. We
23  went straight from your CV to Aptim. I didn't
24  know --
25    A.    Yes. In areas monitored, that would

Page 278

1  have been, again, in the areas monitored, if they had
2  seen it, it should be noted.
3    Q.    Sorry. Bear with me. I'm having to
4  filter out questions you've already answered.
5    A.    Well, if you are all set, we are good.
6    Q.    While we are sort of loosely in the
7  neighborhood of the topic of NSPS rules, I would like
8  to look at a statement you made on Page 11. Bear
9  with me as I find it here.
10        So in this discussion on Page 11, you
11  you notice, you note that there was a substantial
12  increase in the number of gas collection components
13  in Phase 4A after Aptim left the site. Right?
14    A.    That is correct.
15    Q.    And then in this sentence you state,
16  I'm highlighting part of the sentence.
17    A.    Yes.
18    Q.    "If the 51 gas extraction wells and 21
19  horizontal collectors wells are considered the
20  complete GCCS system in Phase 4A."
21        Do you see that --
22    A.    Yes.
23    Q.    -- portion that I read there?
24    A.    Yep.
25    Q.    And as far as you understand, the gas

Page 279

1  system design that lead to those 51 gas extraction
2  wells, was that for purposes of compliance with NSPS
3  rules?
4    A.    No. That would've been, my
5  understanding that would have been, that was for
6  several things that are mentioned. One is the
7  increase in the methane concentrations and decrease
8  in oxygen and balanced gas nitrogen for the high, the
9  high BTU plant so it could utilize it. And the other
10  one was, there was an odor component to it as well.
11    Q.    So that change you, that difference
12  you described, the increase in methane versus other
13  gases, how is that accomplished by adding more
14  extraction wells to a gas system?
15    A.    If you have, the more gas wells you
16  have, the denser the collector spacing. If you have
17  a, well, let's go the other way. If you have a much
18  larger collection, collector spacing, to get the same
19  amount of coverage, you have to pull in, and this is
20  NSPS, you want to make sure you are not getting
21  surface emissions, you have to pull in from a further
22  distance. And that tends to lead to getting more
23  ambient intrusion, which is maybe some oxygen, but
24  more balanced gas.
25        If you increase, if you increase the

Page 280

1  density of the collectors, then the area which you
2  draw from is less because you are applying less
3  vacuum. You are getting less ambient air intrusion.
4  So the quality of gas increases.
5    Q.    To state the obvious, I hope out of
6  what you just said, if wells are farther apart and
7  you want the radii of influence to abut each other,
8  is the vacuum higher in that circumstance than it
9  would be if the wells were closer together?
10    A.    Yes. It would be. Higher vacuum,
11  higher vacuum typically is higher ROI. But as we
12  said, that could lead to, hire vacuum could lead to
13  higher intrusion as you get closer to the well.
14    Q.    So let me quibble with your word
15  "complete" here. You, again, you say, if the 51 gas
16  extraction and 21 horizontal collectors are
17  considered the complete GCCS system.
18        Is it, is it fair to compare that
19  system with those 51 gas wells to a system designed
20  for NSPS compliance within Phase 4A?
21    A.    If you want, if you did NSPS
22  compliance, then you would be --
23    Q.    Yes.
24    A.    -- at the 32 wells that I mentioned
25  earlier. This 51 is going to be, assuming that the

Page 281

1  32 wells you are getting NSPS compliance when you do,
2  when you do your SEM monitoring, the 51 wells would
3  be in addition to that.
4      Q.   Right. So a complete GCCS system
5  during Aptim's operations could have been that system
6  with 32 wells. Correct?
7      A.   It could have been. That is correct.
8      Q.   Okay. So I would like to look at Page
9  12 now. We are in your Opinion No. 2, which
10  generally deals with your assertion that Aptim was
11  not responsible for the receipt of waste materials.
12     A.   Yep.
13     Q.   And now at the end of the second
14  paragraph on the basis for Opinion No. 2 you state,
15  I'm highlighting the sentence here.
16         You refer to a couple of contract
17  provisions and say, "This clearly indicates that
18  waste acceptance at Jefferson Parish Landfill was the
19  responsibility of IESI, now known as Waste
20  Connections."
21         Do you see that sentence?
22     A.   Yep.
23     Q.   Is it your understanding that the
24  parish also had to approve special waste coming into
25  Phase 4A?

Page 282

1      A.   I believe, I believe they did have to
2  approve certain waste, but I cannot tell you exactly
3  which ones it was.
4      Q.   But you will agree with me that the
5  decision whether or not to accept any particular
6  waste at Jefferson Parish Landfill, during Aptim's
7  term of operation, was not solely the responsibility
8  of what's, let's call them Waste Connections?
9      MR. FUTRELL:
10         Object to form.
11     THE WITNESS:
12         I believe, I believe that I saw
13  someplace, and I cannot tell you where it was, that
14  Jefferson Parish had some role in the waste
15  acceptance.
16  BY MR. PAUL:
17     Q.   So I don't mean to hang you on a guess
18  here. But what I'm showing you here is, I'm showing
19  what has previously been marked as Deposition Exhibit
20  1543. This is an operating agreement between IESI,
21  LA Landfill Corporation and the Parish of Jefferson.
22         Do you see that first page there?
23     A.   Yes, I do.
24     Q.   And it is dated May 17th, 2012. Do you
25  see that?

Page 283

1      A.   Yes, I do. Yep. No. That is perfect.
2  Thanks, John.
3      MR. BAAY:
4          Sure.
5      THE WITNESS:
6          Or I apologize. John Paul.
7  BY MR. PAUL:
8      Q.   John was correct, actually. But I
9  don't hear the difference anymore.
10     A.   All right.
11     Q.   So let's see. So what I'm showing you
12  here is section, sorry, B4. Yeah.
13     A.   Yeah. I just saw the highlighting.
14  You passed it.
15     Q.   Yep. I wanted to make sure I got the
16  numbering right. So we are in Section B4?
17     A.   Right.
18     Q.   And there is a sentence here under the
19  heading, Approval of Industrial Solid Waste Profiles
20  and Accounts. "Each profile for industrial solid
21  waste must be submitted to the landfill engineer for
22  approval."
23         Is that what you were thinking of when
24  you were aware that Jefferson Parish had some role in
25  waste acceptance?

Page 284

1      A.   That may have been where it came from.
2  I'm trying to think if there was anything in any of
3  the depositions as well. I don't recall offhand.
4  But that might have been, that might have been it.
5      Q.   Right. So I just want to make sure
6  you are comfortable with what I've asked you to agree
7  with. That waste acceptance at the Jefferson Parish
8  Landfill, at least with respect to industrial solid
9  waste, was not solely the responsibility of Waste
10  Connections?
11     MR. FUTRELL:
12         Object to form.
13     MR. ROWE:
14         Object to form.
15     THE WITNESS:
16         According to the contract that you
17  showed me --
18  BY MR. PAUL:
19     Q.   Yes.
20     A.   -- then there would be certainly a
21  Jefferson Parish component to the acceptance.
22     Q.   So I would like to jump ahead to, just
23  a moment. Bear with me. We are here under your
24  opinion number, this is the one, Opinion No. 4.
25         There a discussion of vacuum supplied

Page 285

1  to the, to the gas system.
2  A.    Yeah.
3  Q.    You talked about this quite a bit. I
4  only have a couple targeted questions.
5  A.    What page number is that actually on?
6  I can't see the page number with your picture.
7  Q.    Yeah. It is on Page 29.
8  A.    All right. Page 29. Thank you.
9  Q.    And I will highlight the sentences --
10  A.    Yep.
11  Q.    -- I want to ask you about. So you
12  note some E-mails which we'll look at.
13        "On May 15, 2019 a vacuum pipe was
14  found damaged under a road crossing."
15        And then the second, the next sentence
16  says, "On the same day, a cap on the GCCS vacuum
17  piping was found to be cut off by landfill mowing
18  activities."
19        And both of those sentences cite the
20  same document, an E-mail chain dated May 15, 2019.
21  Right?
22  A.    Yes.
23  Q.    I think you touched on these briefly
24  earlier today. I would like to look at that E-mail
25  chain. So what I'm showing you now is what I would

Page 286

1  like to mark as a new exhibit to the deposition. We
2  are up to, are we on 1643?
3  MR. ROWE:
4        I believe it is 1643 is the next one.
5  MR. PAUL:
6        Thank you.
7        (Deposition Exhibit 1643 marked for
8  identification.)
9  BY MR. PAUL:
10  Q.    So this is an E-mail from 11:10 in the
11  morning on May 15th, 2019. And Josh Broggi is
12  writing Mike Lockwood and copying several others. He
13  notes that "The O2 oxygen is higher than normal at
14  the flare. We believe this from damaged pipe that is
15  inside the CMP going from Phase 3A to Phase 2."
16        Do you know what a CMP is?
17  A.    Yeah. It is corrugated metal pipe.
18  Q.    Okay. So is that corrugated metal
19  pipe essentially a conduit inside which other headers
20  run?
21  A.    Yeah. That is usually, that is
22  usually what you install, that is what is installed
23  when you do a road crossing.
24  Q.    Okay.
25  A.    You run a pipe through it. Yes.

Page 287

1  Q.    So then I'm not clear, I'm not putting
2  one and one together here. So the note says, as
3  pertains to this first bullet and the damaged pipe
4  that is inside corrugated metal piping you note, a
5  vacuum pipe was found damaged under a road crossing.
6  Right?
7  A.    Correct.
8  Q.    Do I understand correctly that that
9  vacuum, the damage was not caused by crushing or
10  bellying of that corrugated metal pipe?
11  A.    I don't, I don't believe the actual
12  cause of the damage was ever identified.
13  Q.    Does that, from that, is it fair for
14  me to understand that you never saw anything further
15  suggesting that the corrugated metal pipe itself had
16  been crushed or damaged?
17  A.    In that case I did not. There was
18  talk about, I think that might have been one they
19  found a hole in the pipe, but they never described
20  the condition of the hole or what it was due to. So
21  no. I believe this is the only notification of that.
22  Q.    Now, the other sentence in this report
23  pertaining to these, "On the same day, a cap on the
24  GCCS vacuum piping was found to be cut off by
25  landfill mowing activities."

Page 288

1        And that is described in the next
2  E-mail up here, also from May 15, a little later in
3  the day from Josh to Mike Lockwood.
4        And you note that "after cutting back
5  the corrugated metal pipe, a quarter-inch hole was
6  found in the HDPE pipe."
7  A.    Yes.
8  Q.    And do you understand this statement,
9  this was pulled with a sample port?
10  A.    I don't know what they mean by it was
11  pulled by, it was pulled with a sample port. I don't
12  know what that means.
13  Q.    Yeah.
14  A.    That doesn't —
15  Q.    Okay.
16  A.    No.
17  Q.    Okay. And then I think, and there is
18  a statement, "We found a cap that was cut off by a
19  bush hog. This has been repaired and the 02 is back
20  to normal." Right?
21  A.    Yes.
22  Q.    Is that the second sentence that you
23  mentioned here in your report?
24  A.    Yeah. I believe it is. If that is
25  referenced, if that is the, if that is what is

Page 289

1 footnoted, yes.
2    Q.    Okay. That wasn't a very dramatic set
3 of questions, was it.
4         So I would like to look at a few
5 things under Opinion No. 5. Without even reading
6 Opinion 5 says that Aptim's work was limited by
7 contract agreement provisions and language to
8 specific tasks. I won't read the rest of, the rest
9 of the opinion.
10   A.    Yep.
11   Q.    In the basis for that opinion you say
12 that, "One critical point to note is that no where in
13 the agreement between Aptim and Jefferson Parish, or
14 in the four amendments is the specific control of
15 odors mentioned relative to the applicable contract."
16   A.    Correct.
17   Q.    Now, I know you talked with Mr.
18 Futrell about that. There was another question I had
19 for you.
20   A.    Yes.
21   Q.    Is, does a landfill gas system control
22 odors?
23   A.    The landfill gas system by its nature
24 removes landfill gas, has odorous components in it.
25 So it would reduce odors. Controlling odors, that

Page 290

1 would include the gas collection system, the capping
2 system. Maybe if you have a misting system as well.
3 There is more to control. So there are components of
4 it.
5    Q.    Right. So the gas collection and
6 control system is at least relevant to the management
7 of fugitive odors. Right?
8    A.    Yeah. In some, in some form. Yes.
9    Q.    Are odors inherently gases?
10   A.    No. As we talked about earlier, no.
11 You can have fumes, which have an order, and they are
12 not gases.
13   Q.    And that is like a volatilized
14 chemical, direct --
15   A.    Yeah.
16   Q.    -- you are instilling directly?
17   A.    Yes. Many, many droplets of liquid,
18 in essence, to suspend in the air. I think you can
19 have a solid fume as well. So there were sort of a
20 question before about RO, are all gases odors, and
21 odors gases. Something like that. And the technical
22 answer is, it is not, but.
23   Q.    Right. But in the case of landfill
24 gas, are most or all the odors from decomposition of
25 waste in a landfill wanting to escape as gas?

Page 291

1    A.    Yeah. They would be, they would be
2 escaping as a gas.
3    Q.    So now I would like to look at your
4 agreement. I have it all as one document, so let me
5 make sure I know which one, which exhibit I'm looking
6 at.
7         So I am looking at Exhibit B which is
8 the scope of services appended to Aptim's contract,
9 which was Exhibit 1625. I note the definition of
10 routine work, Subsection B is "Operation of the
11 landfill collection and control system. In
12 accordance with the air permit, applicable
13 environmental regulations and all other applicable
14 laws, rules and regulations."
15        Do you see that? I will give you a
16 minute or two to find it.
17   A.    I just found it. Page 11 of 15.
18   Q.    I'm sorry.
19   A.    It is Page 11 of, maybe we have
20 different ones. Page 11 of 15 is what I have.
21   Q.    No. That is right. I'm glad we have
22 the same one. I would hate to be talking about
23 different versions of your agreement, of Aptim's
24 agreement.
25   A.    Yes.

Page 292

1    Q.    So operation of a gas system in
2 accordance with the air permit, applicable
3 environmental regulations and all other applicable
4 laws.
5         Is it unfair for me to say that some
6 of those air permit terms or applicable regulations
7 would include control of odors?
8    A.    In this case, say that one more time.
9    Q.    Is it unfair for me to say that the
10 air permit, applicable environmental regulations and
11 other applicable laws, that those other applicable
12 laws and regulations would include provisions
13 requiring control of odors?
14   MR. BAAY:
15        Object to form.
16   THE WITNESS:
17        Yeah. I would have to, I would have
18 to think about that and see if there was anything
19 specific. I can't think of anything specific.
20 Operate under NSPS. NSPS is going to have SEM
21 monitoring. Yeah. I can't think of anything offhand
22 that would be a direct correlation, so.
23   THE REPORTER:
24        Wait. Wait. Wait. You are talking
25 over each other. So please start.



BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
293–296

Page 293

1 BY MR. PAUL:
2    Q.    Sorry, Barry, I didn't mean to cut you
3 off.
4    A.    No. I'm just saying I'd have, I'd
5 have to look at some additional regulations which you
6 have.
7    Q.    I thought you might say so. So here
8 I'm looking at section, I think you can see the
9 headings on the left.
10    A.    Yes.
11        (Deposition Exhibit 1644 marked for
12 identification.)
13    Q.    This is a copy of Louisiana
14 Administrative Code that I downloaded from LDEQ's
15 website. I believe this has been already been
16 tendered as a deposition exhibit, but let's call it
17 1642. (Sic 1644.) Here in Section VII, 11, Standards
18 Governing Type I and Type II Landfills. There is a
19 provision under Facility Operational Standards and
20 Air Monitoring Standards.
21        Do you see that? Is that legible?
22    A.    Yes, I do.
23    Q.    And the way I read this, tell me if I
24 am wrong, this gets to the surface emissions
25 monitoring you were just talking about. Facilities

Page 294

1 subject to this subparagraph are required to maintain
2 a surface monitoring design plan under an effective
3 40 CFR Part 70 Title V operating permit.
4        Do you see that?
5    A.    Yes.
6    Q.    And it states that "such facilities
7 shall comply with the monitoring requirements of the
8 Title V operating permit. Compliance with the
9 monitoring requirements under an effective Title V
10 operating permit shall constitute compliance with the
11 air monitoring requirements of this section."
12        I guess that is just a permit shield.
13 So within this subsection 3A, 3A-6 states, "Odors
14 shall be controlled by the best means practicable."
15        Do you see that?
16    A.    Yes.
17    Q.    I can scroll around if you would like
18 to be more comfortable that this 6 is indeed under
19 3A, but I can represent to you that it is.
20        Do you interpret Aptim's contract as
21 excluding that subsection requiring control by the
22 best means practicable?
23    A.    The first section we are talking
24 about, Title V, the operating permit. If you are
25 pulling in NSPS, that is going to be SEM, which is

Page 295

1 methane monitoring. The odors shall be controlled by
2 the best means practicable or practical, practicable.
3 I can't see. Your cursor is in the way.
4        But no. I wouldn't offer an opinion on
5 that. I would have to look at that and I would have
6 to think about that, what exactly that means.
7 Because we are talking about Phase 4A, which in some
8 cases did not have a GCCS installed. So in areas
9 where there is no GCCS, then the best means
10 practicable obviously could not be the use of a GCCS.
11 It would have to be something else, so.
12    Q.    Right.
13    A.    Yeah.
14    Q.    But once the GCCS is in place, we've,
15 we've agreed that at least it is a component of an
16 odor control system.
17    A.    Yes.
18    Q.    So once it is installed, wouldn't it
19 be fair to read this provision as part of the
20 applicable regulatory requirements under Aptim's
21 contract?
22    MR. BAAY:
23        Object to form.
24    THE WITNESS:
25        It says the best means practical,

Page 296

1 practicable. Once the odor control or GCCS is
2 installed, it would be a component of it. But yeah.
3 Again, I'd have to read a little bit into this. I'd
4 have, I'd have to look at a little more detail of it.
5 I will put it this way. It could be. But it says
6 best means practicable, as part of the odor control
7 system. It could be the cover. I have sites where,
8 where it is all cover material or it is all -- I will
9 say it could, it could be part of the best means
10 practicable.
11 BY MR. PAUL:
12    Q.    Let me go back to, let me go back to.
13 I'm trying real hard not to show my notes.
14        Now, under the same provision of
15 Exhibit B to the contract that we were looking at,
16 1.1, Definition of routine work. It states that
17 "Routine work is the performance of preventive
18 maintenance and repair of the LGCCS in accordance
19 with industry standards."
20        I will skip the rest of that. Do you
21 see that there?
22    A.    Yes, I do.
23    Q.    So I would like to show you an E-mail
24 from Kris Carlson. Do you know who Mr. Carlson is?
25    A.    Yes.



Page 297

1    Q.    Mr. Carlson came in and assessed the
2  gas system at Phase 4A. Right?
3    A.    That is correct.
4    Q.    Now, this is an E-mail between Mr.
5  Carlson and Keith Conley dated May 29th, 2018. It
6  has previously been introduced as a Deposition
7  Exhibit 1308. This is a long-ish E-mail and if you
8  would like to take some time to read it, I would be
9  happy to let you. But I think we can look at a
10  couple of sentences.
11    A.    Yep.
12    Q.    In this E-mail he is making several
13  recommendations and providing some assessment to
14  Keith Conley. Do you see this highlighted sentence
15  in the last paragraph on this page?
16    A.    Yes. That is correct. I see it.
17    Q.    "My primary point, says Mr. Carlson,
18  in making well tuning an urgent priority is that
19  getting gas wells tuned properly is the No. 1 way to
20  reduce gas emissions from a landfill. If you want to
21  make an impact on your site odors, then tune tune
22  tune."
23           Did I read that correctly?
24    A.    Yes. Are you saying, tune tune tune,
25  or are you referring to the fact that the Rolling

Page 298

1  Stones are in town down here in New Orleans.
2    Q.    Well, if it was Byrds, then we would
3  be a little closer.
4    A.    That would be little closer. Okay.
5  Yes. Yes. I do see that highlighted.
6    Q.    So is Mr. Carlson's, I will call it an
7  opinion here --
8    A.    Yep.
9    Q.    -- that tuning is at least a very
10  important way to control landfill gas emissions and
11  odors. Right?
12    A.    That is correct.
13    Q.    Do you have any reason to disagree
14  with that?
15    A.    Tuning a system correctly for, for
16  NSPS, which is what Aptim was under, is not
17  necessarily going to address odors. Again, tuning,
18  we talked about this a little bit earlier. Tuning
19  for NSPS, tuning for capture, tuning for gas balding.
20  Those things can all, they are not necessarily
21  working together. Sometimes they work together.
22  Sometimes they can actually work. It depends what
23  you are tuning for.
24    Q.    So, for instance, if you were tuning
25  to improve methane concentrations in your landfill

Page 299

1  gas, you might not necessarily maximize your odor
2  controls. Right?
3    A.    That is correct.
4    Q.    But in this case, Mr. Carlson is
5  saying if you want to make an impact on your site
6  odors, then, tune tune tune. That suggests that
7  there is a way to tune specifically with the
8  objective of controlling site odors?
9    A.    That is why I don't want to speculate
10  on what, what he is thinking. Okay.
11    Q.    Okay. Subject to your qualification
12  that there can be several kinds of tuning, do you
13  disagree with my statement that tuning is an
14  important method for controlling landfill gas
15  emissions and fugitive odors?
16    A.    If you are, if you are tuning to
17  control emissions. Yes. If you are tuning for some
18  other methodology, then as you pointed out, it could
19  be moving the other direction.
20    Q.    Right. The next sentence I have
21  highlighted here is a bit of a change of topic.
22    A.    Yep.
23    Q.    He is talking about the new gas wells
24  installed in Phase 4A. It is May 29th, 2018 at this
25  point. And he says to Mr. Lockwood, "Starting up a

Page 300

1  new section of wells, as you did, the industry
2  standard is more frequent tuning over the first 60 to
3  90 days. For example, tune them daily for two weeks,
4  then weekly for a month, and then biweekly, biweekly
5  for a month and then monthly."
6    A.    Yes.
7    Q.    Do you agree with that statement of
8  the industry standard?
9    A.    That is, that is pretty close to what
10  we, what I've typically seen. I believe that may be
11  from SWANA. If it is not, it is close to it. We
12  have some other standards we use, but it is pretty
13  close to what I would consider, you know, typical
14  industry standard.
15    Q.    You mentioned SWANA.
16    A.    Right.
17    Q.    Is that Solid Waste Association of
18  North America?
19    A.    That is correct.
20    Q.    And that is one of the standards that
21  is cited under Exhibit B. Right?
22    A.    That is correct.
23    Q.    Yeah. There it is. Solid Waste
24  Association of America. Going back to Mr. Carlson's
25  E-mail.



Page 301

1    A.    Right.
2    Q.    Do you know, based on your review of
3  Aptim's documents, whether Aptim was following this
4  standard at the time in late May when Mr. Carlson
5  wrote this E-mail?
6    A.    It is interesting because this E-mail
7  that you have was summarized by either Lockwood or
8  Buller, or maybe Carlson himself, and they sent it to
9  Aptim. Aptim said we agree with two-week, it was in
10  an E-mail, two-week sampling, and whatever it was,
11  weekly. I think that was weekly sampling for, so it
12  was pretty close to this. And that is the one where
13  Josh, it got to Josh Broggi and Josh Broggi said we
14  agree with these standards. We are going to need
15  more labor to do those.
16        So it was, it was this or close to it.
17  It eventually got passed down to Aptim. Aptim said
18  we agree. We'll do it. We just need more labor
19  money to do it. So it is close to this. Aptim did
20  agree to doing this, close to it. But I don't know
21  if it was ever approved. That, that I couldn't tell
22  you.
23    Q.    And based on that E-mail that you just
24  described to me, it sounds like Josh Broggi was
25  acknowledging that this frequency of tuning had not

Page 302

1  been done up to that point?
2    A.    Well, this, this applies to new wells.
3  So I think you would say —
4    Q.    I'm sorry. Let, let me be clear on
5  the question. The frequency of tuning had not been
6  done up to that point in Phase 4A for the newly
7  installed wells?
8    THE REPORTER:
9        I didn't get the last part of your
10  question. Up to that point Phase 4A for the —
11  BY MR. PAUL:
12    Q.    Newly installed well.
13    A.    No. I think this was, I think they
14  were looking at all the April/May wells as the newly
15  installed wells. So this, this would have been the
16  start with those initial wells in Phase 4A would be
17  my understanding.
18    Q.    Right. Bear with me. Everybody else
19  has been picking the orchard.
20    MR. BAAY:
21        It is all picked out.
22    MR. PAUL:
23        Would now make sense for a break, and
24  I think I can finish when I come back from the break.
25    MR. BAAY:

Page 303

1        Yeah. That sounds great.
2    THE VIDEOGRAPHER:
3        The time is 4:00 P.M. We are off the
4  record.
5        (Off the record.)
6    THE VIDEOGRAPHER:
7        The time is 4:10 P.M. We are back on
8  the record.
9  BY MR. PAUL:
10    Q.    Like I said, I think I will be able to
11  finish with this set of questions. And so I am now
12  looking at a few statements in the basis for opinion
13  No. 6. And you state, "Aptim did not have control of
14  leachate levels in Phase 4A that allegedly impaired
15  the operations of the GCCS."
16        And we already talked about how that
17  opinion is distinct from liquid levels and gas
18  levels. Right?
19    A.    Correct.
20    Q.    Okay. You mentioned an assessment by
21  Carlson on Page 42 of your report.
22    A.    Yes.
23    Q.    There is a sentence, I have a sentence
24  highlighted here. "CEC, meaning Carlson, as one of
25  the Jefferson Parish's landfill engineering firms,

Page 304

1  clearly described how they believed saturated wastes
2  at JPLF negatively impacted the GCCS that Aptim was
3  operating."
4        Do you see that sentence?
5    A.    Yes.
6    Q.    Then you go on, I won't read them in
7  full. But you go on to quote a couple of passages
8  from the CEC August 2018 report about water within
9  the waste mass and liquids built up within the
10  landfill.
11        You reviewed the Carlson report, I
12  assume?
13    A.    I have.
14    Q.    And at least some of your statements
15  about the condition of the leachate control system
16  rely on Carlson's assessment. Right?
17    A.    That is correct.
18    Q.    Do you know whether Carlson
19  specifically assessed the leachate collection system
20  within Phase 4A?
21    A.    I'd have to look back at the report.
22  I can't remember if he did all phases, including
23  Phase 4A. I don't recall.
24    Q.    If I tell you that he did not, nor did
25  Carlson or nor did his associates, if I tell you they



Page 305

1  did not assess leachate, the leachate control system
2  in Phase 4A, would that affect the bases of your
3  opinion regarding the status of the leachate system?
4       A.     If he did not, if it was not in Phase
5  4A?
6       Q.     Yes.
7       A.     Yeah. It would, it would affect it
8  because my report is focused, limited to Phase 4A.
9       Q.     Now, I would like you to look at a few
10 statements made about cover. We are under Opinion
11 No. 8, and you note that "Aptim did not have control
12 over the specification, procurement, inspection, or
13 placement of landfill cover materials."
14      A.     Okay. This is Page 49. Correct?
15      Q.     49. Right. Sorry. I should've said
16 so.
17      A.     Yes.
18      Q.     So you note that the parish is aware
19 of the role of cover material in controlling odors.
20             And then in the paragraph on Page 52,
21 you state that "Throughout Aptim's time onsite in
22 Phase 4A, there were documented issues with the
23 methods or materials utilized for the daily cover
24 activities by IESI/Waste Connections."
25             Do you see that sentence there?

Page 306

1       A.     Yes, I do.
2       Q.     So you note an E-mail from the
3  parish's landfill engineer to IESI's site manager,
4  Rickie Falgoust, on April 19th, 2018. Right?
5       A.     Yes.
6       Q.     Without going to that E-mail, is it
7  your understanding this relates to the conditions of
8  daily cover on a single day?
9       A.     Yes, it does.
10      Q.     Then you note that the Carlson report
11 during its May, during Carlson's May 2018 inspection
12 of the landfill, when addressing 4A, CEC measured
13 elevated H2S concentrations at the ground surface
14 around some soil cracks. Right?
15      A.     That is correct.
16      Q.     Doesn't it sound correct that the
17 highest concentration Carlson detected in ambient air
18 near the ground surface was eight parts per million?
19      A.     I don't recall what he has on his
20 figure. That, yeah. Without looking, I don't
21 recall.
22      Q.     Okay. Does it sound right that
23 Carlson's site inspection in May 2018 covered the
24 days from May 14th to May 18th?
25      A.     I believe that is correct.

Page 307

1       Q.     So that would be five days?
2       A.     Yes.
3       Q.     Right.
4       A.     Correct.
5       Q.     So assuming the conditions described
6  here, okay, existed for all five days of that report,
7  this summary would relate to five days of conditions
8  at the landfill. Right?
9       A.     That would be, that would be assuming
10 that it was, are you saying assuming that it was
11 repaired immediately after? So on the 19th it was
12 repaired?
13      Q.     Well, let's assume conservatively that
14 for all five days that Carlson was there in May 2018,
15 there were soil cracks in the ground surface that
16 allowed H2S to escape.
17      A.     Okay.
18      Q.     If we make that assumption, does this
19 summary relate to at most five days worth of coverage
20 conditions?
21      A.     If, if you make the assumption that it
22 is going to be five days, then it is going to be five
23 days.
24      Q.     I guess that was a truism.
25             Do you have any reason to believe that

Page 308

1  Carlson's report is addressing conditions during the
2  time period when Carlson did not observe them?
3       A.     I just got what you said. I didn't
4  mean to be snippy. I was just thinking five and
5  five.
6             There is no information either way as
7  to how long they were open or when they repaired it.
8  I don't have any information to say that.
9       Q.     Now, in another E-mail on July 15,
10 2018, that you cite in your report, it is a July 15,
11 2018 E-mail from Mr. Buller to Mr. Falgoust. Sorry.
12 This is on Page 53.
13      A.     Okay. Got it.
14      Q.     Mr. Buller mentions -- sorry?
15      A.     I have it.
16      Q.     You got it?
17      A.     Yes.
18      Q.     Okay. Mentions several quality
19 control issues with the applied materials. And first
20 he states, "I looked at the daily cover today around
21 1:30 and it wasn't good. Richard told me that they
22 used sand and limestone for daily cover today."
23             Mr. Buller goes on to state, "Sand and
24 limestone are not acceptable daily cover materials."
25 Did I read that right?

Page 309

1    A.    Yes, you did.
2    Q.    Are you familiar with the regular use
3  of sand and limestone for any surface application at
4  an MSW landfill?
5    A.    No. I'm not. I've, I've only ever
6  seen it used for cover one other time. And it --
7    Q.    My question was, my question was
8  pretty bad. Let me try again.
9         Is it, as far as you are aware, is it
10  common to use sand and limestone for construction of
11  a haul road across the active area of the landfill?
12    A.    We usually see a little stickier
13  material than that. But sand and limestone could be
14  used for a haul road. Yes.
15    Q.    So is it possible that the sand and
16  limestone that Mr. Buller observed was actually
17  associated with the hauling road up to the tipping
18  area?
19    A.    It is possible. Yes. The only thing
20  I will say, go back, go back to that just to be
21  clear. It does say "I looked at the daily cover," so
22  it would have to be. I didn't see any documentation
23  that says it wasn't daily cover, but that it was for
24  a haul road. And I will, I will say there were daily
25  inspections done. So this looks like it was a daily

Page 310

1  event. So there is no additional information
2  provided.
3    Q.    By daily event, you mean the daily
4  inspection of the daily cover?
5    A.    Correct. Right. So this wasn't, this
6  wasn't, this wasn't shown to be where for, for
7  example, there is nothing saying what happened July
8  16th, for example.
9    Q.    Right. Did you review any of those
10  daily activities logs?
11    A.    No. The only daily activity logs that
12  I recall seeing were ones that were referenced, I
13  think in depositions. If you are talking about the
14  length, or are you talking, yes. I think they are
15  the only ones I looked at, the ones that were
16  specifically referenced. So, for example, 191, daily
17  activity log, that might have come from somebody's
18  deposition.
19    Q.    Okay. So just let me to confirm. You
20  didn't, for instance, skim through all of the daily
21  activities logs for the time period that Aptim was
22  active in Phase 4A?
23    A.    No. I did not.
24    Q.    Okay. And in your understanding, do
25  those daily activities logs summarize the condition

Page 311

1  of daily cover?
2    A.    I believe that they do. I believe
3  there is a component in those daily logs based on the
4  daily logs I have seen.
5    Q.    So you are basing the statements in
6  this report on the condition of daily cover on the
7  E-mails that are cited here and not on a holistic
8  review of the daily logs?
9    A.    That is correct.
10    Q.    In this daily activities log that we
11  are looking at here, which is noted in footnote 191,
12  that is the activities log for November 21st, 2018.
13  Right?
14    A.    Correct.
15    Q.    So I will ask my pedantic question
16  again. This relates to a single day's conditions at
17  the daily, at the tipping area in Phase 4A. Right?
18    A.    That is correct.
19    Q.    So by my count, the E-mails of the
20  daily log and the Carlson report identify at most
21  eight days of cover issues. Does that sound right?
22    A.    Making assumptions of how many. It is
23  one day here. Because this one obviously talked about
24  roading materials. They made improvements. But the
25  issue still needs to be addressed in multiple

Page 312

1  locations. So making the assumption you made would
2  make the eight days, I really can't, I would have to
3  speculate how many days. I don't have enough
4  information to say how many days it actually may have
5  been.
6    Q.    Okay. Once per day, I don't know why,
7  the mouth freezes solid.
8    THE REPORTER:
9         Wait. Wait. Where are you reading
10  from? Say that again. I didn't see it.
11    THE WITNESS:
12         His mouth froze.
13  BY MR. PAUL:
14    Q.    On the same page here, 50. Sorry, 53,
15  of your report. You notice, you note that Mr.
16  Lockwood also discussed issues with cover
17  specifically in Phase 4A in his deposition. And I
18  won't attempt to read this whole paragraph.
19         But if you recognize the paragraph, he
20  is talking about the addition of soil cover to bring
21  the depth of interim cover up to 24 inches. Right?
22    A.    Yes.
23    Q.    Elsewhere in your report you note that
24  the regulatory requirements for interim cover is 12
25  inches or one foot. Right?



BARRY KLINE
ICTECH-BENDECK V. WASTE CONNECTIONS

May 02, 2024
313–316

**Page 313**

1　A.　　That is correct.
2　Q.　　And so what's the distinction between
3　having one foot of cover or two feet of cover?
4　A.　　The difference between one feet of
5　cover and two feet of cover, if you have two feet of
6　cover, it is considered interim compacted cover.
7　Q.　　And what is the benefit of having
8　interim compacted cover?
9　A.　　If you have interim compacted cover,
10　then any precipitation is considered runoff and
11　doesn't need to be collected and treated as opposed
12　to if you only have one feet, one foot, you have to
13　collect that and treat it.
14　Q.　　But the regulatory requirement for
15　interim cover is at least 12 inches.  Right?
16　A.　　That is correct.
17　Q.　　Okay.  So what Mr. Lockwood is really
18　discussing here is the amount of additional cover
19　necessary to achieve that stormwater control, not to
20　satisfy the minimum regulatory requirement.  Right?
21　A.　　That would be correct.
22　Q.　　We don't need to look at a specific
23　part of your report.  You talked a couple times about
24　leachate seeps through interim cover today.  Could
25　positive gas pressure beneath interim cover create

**Page 314**

1　penetration through the interim cover?
2　A.　　Could positive gas pressure, yes.
3　Positive, it could do the same thing, I mentioned
4　before liquid pressure pushing through creating a
5　seep. Gas could do the same thing. It could. The
6　only reason it is not quite as likely is because it
7　does not have the same force behind it to scour out
8　fines to open the pathway. But it is possible.
9　Q.　　And the two in combination could also
10　do that.  Right?
11　THE REPORTER:
12　　　Say it again.
13　BY MR. PAUL:
14　Q.　　The two in combination could also do
15　that.  Right?
16　A.　　Yes. They could.
17　Q.　　I have no more questions.
18　THE VIDEOGRAPHER:
19　　　Anybody else?
20　MR. PAUL:
21　　　I'm sorry. I enjoyed this. Thank
22　you, Mr. Kline. I appreciate it.
23　MR. BAAY:
24　　　No. I will reserve my questions.
25　THE VIDEOGRAPHER:

**Page 315**

1　　　This concludes the videotaped
2　deposition of Barry Kline.  The date is May 2nd,
3　2024.  The time is 4:27 P.M. We are now off the
4　record.
5　(Whereupon, the taking of the testimony of the
6　witness was concluded.)

**Page 316**

REPORTER'S CERTIFICATE

I, Ruby Wallen, Certified Court Reporter,
in and for the State of Louisiana, as the officer
before whom this testimony was taken, do hereby
certify that the witness, after having been duly
sworn by me upon authority of R.S. 37:2554, did
testify as set forth in the foregoing pages; that
this testimony was reported by me in stenotype,
prepared and transcribed by me or under my personal
direction and supervision, and is a true and correct
transcript to the best of my ability and
understanding; that the transcript has been prepared
in compliance with transcript format guidelines
required by statute or by rules of the board, and
that I am informed about the complete arrangement,
financial or otherwise, with the person or entity
making arrangements for deposition services, that I
have acted in compliance with the prohibition on
contractual relationships, as defined by Louisiana
Code of Civil Procedure Article 1434 and in rules and
advisory opinions of the board; that I have no
knowledge of any contractual relationship, direct or
indirect, between a court reporting firm and any
party litigant in this matter, nor is there any such
relationship between myself and a party litigant in
this matter.  I am not related to counsel or to the
parties herein, nor am I otherwise interested in the
outcome of this matter.

_Ruby M. Wallen_
RUBY M. WALLEN, CSR NO. 78022

**Page 317**

1  ASSIGNMENT #J11168221

2  ELIAS JORGE "GEORGE" ICTECH-BENDECK V. WASTE

3  CONNECTIONS BAYOU, INC., ET AL AND ADDISON, ET AL V.

4  LOUISIANA REGIONAL LANDFILL COMPANY, ET AL

5

6       DECLARATION UNDER PENALTY OF PERJURY

7       I declare under penalty of perjury that I

8  have read the entire transcript of my Deposition

9  taken in the captioned matter or the same has been

10  read to me, and the same is true and accurate, save

11  and except the changes and/or corrections, if any, as

12  indicated by me on the DEPOSITION ERRATA SHEET

13  hereof, with the understanding that I offer these

14  changes as if still under oath.

15

16      Signed on the _____ day of _____, 2024.

17

18  _____

19  BARRY KLINE

20

21

22

23

24

25

**Page 318**

1       DEPOSITION ERRATA SHEET

2

3  PAGE NO.____LINE NO.____CHANGE TO:_____

4  REASON FOR CHANGE:_____

5  PAGE NO.____LINE NO.____CHANGE TO:_____

6  REASON FOR CHANGE:_____

7  PAGE NO.____LINE NO.____CHANGE TO:_____

8  REASON FOR CHANGE:_____

9  PAGE NO.____LINE NO.____CHANGE TO:_____

10  REASON FOR CHANGE:_____

11  PAGE NO.____LINE NO.____CHANGE TO:_____

12  REASON FOR CHANGE:_____

13  PAGE NO.____LINE NO.____CHANGE TO:_____

14  REASON FOR CHANGE:_____

15  PAGE NO.____LINE NO.____CHANGE TO:_____

16  REASON FOR CHANGE:_____

17  PAGE NO.____LINE NO.____CHANGE TO:_____

18  REASON FOR CHANGE:_____

19  PAGE NO.____LINE NO.____CHANGE TO:_____

20  REASON FOR CHANGE:_____

21  WITNESS

22  SIGNATURE:_____DATE:_____

23  BARRY KLINE

24

25

**Page 319**

1  PAGE NO.____LINE NO.____CHANGE TO:_____

2  REASON FOR CHANGE:_____

3  PAGE NO.____LINE NO.____CHANGE TO:_____

4  REASON FOR CHANGE:_____

5  PAGE NO.____LINE NO.____CHANGE TO:_____

6  REASON FOR CHANGE:_____

7  PAGE NO.____LINE NO.____CHANGE TO:_____

8  REASON FOR CHANGE:_____

9  PAGE NO.____LINE NO.____CHANGE TO:_____

10  REASON FOR CHANGE:_____

11  PAGE NO.____LINE NO.____CHANGE TO:_____

12  REASON FOR CHANGE:_____

13  PAGE NO.____LINE NO.____CHANGE TO:_____

14  REASON FOR CHANGE:_____

15  PAGE NO.____LINE NO.____CHANGE TO:_____

16  REASON FOR CHANGE:_____

17  PAGE NO.____LINE NO.____CHANGE TO:_____

18  REASON FOR CHANGE:_____

19  PAGE NO.____LINE NO.____CHANGE TO:_____

20  REASON FOR CHANGE:_____

21

22

23  _____

24  BARRY KLINE              DATE:

25

