March 8, 2024
6219-352-56-01

# EXPERT REPORT

## JEFFERSON PARISH LANDFILL
### JEFFERSON PARISH, LOUISIANA

Prepared By:

Weaver Consultants Group North Central, LLC
Mr. Ali Hashimi
1316 Bond Street, Suite 108
Naperville, Illinois 60563

Ali Hashimi          Date

Prepared For:
Beveridge & Diamond
Mr. John H. Paul
825 Third Avenue, 16th Floor
New York, New York 10022

PREPARED BY



# TABLE OF CONTENTS

1     BACKGROUND.................................................................................................. 1
      1.1     Qualifications of Expert.................................................................... 1
      1.2     Information Utilized in Formulation of My Opinions ................... 2
      1.3     Jefferson Parish Sanitary Landfill .................................................. 2

2     SUMMARY OF OPINIONS.............................................................................. 3

3     CONTRACTUAL RELATIONSHIP OF PARTIES INVOLVED.................... 8
      3.1     Contractual Arrangement ................................................................ 9
      3.2     Landfill Operations......................................................................... 10
      3.3     Leachate System............................................................................. 12
      3.4     GCCS Design and Installation ...................................................... 13
      3.5     GCCS O&M ..................................................................................... 14

4     MSW LANDFILL ENVIRONMENTAL CONTROL SYSTEMS.......................... 16
      4.1     Typical Environmental Control Systems utilized at MSW Landfills.......... 16
      4.2     Daily and Interim Cover Requirements....................................... 16
      4.3     Leachate Management Systems .................................................. 18
      4.4     Landfill Gas Management Systems ............................................. 21
              4.4.1   Key 40 CFR Part 60, WWW Provisions ........................... 22
              4.4.2   Landfill Gas Engineering Controls ................................. 24
      4.4.2.1          Landfill Cover Systems ........................................................ 25
      4.4.2.2          Gas Collection Systems ....................................................... 26
      4.4.2.2.1        Vertical Extraction Wells ..................................................... 26
      4.4.2.2.2        Horizontal Collectors............................................................ 27
      4.4.2.2.3        Gas Well Liquid Management ............................................... 28
      4.4.2.3          Odor Control Systems ........................................................... 29
      4.5     Environmental Control Implementation ...................................... 30
              4.5.1   Daily and Interim Cover Placement ................................ 30
              4.5.2   Leachate Management System .................................... 30
              4.5.3   Landfill Gas Collection Systems .................................. 30
              4.5.4   Odor Control Systems .................................................. 31

5     LRLC'S RESPONSIBILITIES AND PERFORMANCE ............................ 32
      5.1     LRLC's Installation and Operation of the Phase 4A LCS ...... 32
              5.1.1   LRLC's Construction of the Leachate Collection System in Phase
                      4A ........................................................................................... 32
              5.1.2   LRLC's Operation & Maintenance of the Leachate Collection
                      System in Phase 4A ......................................................... 33
      5.2     LRLC's Application of Daily and Interim Cover Complied with Industry
              Standards and Applicable Requirements. ................................... 34
      5.3     Acceptance and Placement of Waste......................................... 36
              5.3.1   Industry Standards for Controlling Odors from Waste ......... 36
              5.3.2   Diversion of Specific Waste Streams is Not Necessary to Comply
                      with Accepted Standards for Odor Control ................. 37

|       | 5.3.3 | Segregation of Specific Waste Streams is Not Necessary to Comply with Accepted Industry and Regulatory Standards for Odor Control | 37 |
|       | 5.3.4 | Coal Combustion Residue Materials and FGD Wastes Are Commonly Disposed of or Used Beneficially at MSW Landfills | 38 |
| 5.3.4.1 | | FGD Waste & C&D Waste | 39 |
|       | 5.3.5 | LRLC's Acceptance and Use of Wastes Containing Sulfur | 41 |
|       | 5.3.6 | LRLC Relied on the Parish to Install the GCCS as the Primary Odor Control System in Phase 4A. | 44 |

**6   JEFFERSON PARISH'S RESPONSIBILITIES AND PERFORMANCE ........... 45**

6.1   Scope of Services to be Provided ........................................................... 46
6.2   Execution of Scope of Services ............................................................... 47
      6.2.1   Prioritizing GCCS Construction .................................................... 49
      6.2.2   GCCS O&M ................................................................................... 50
      6.2.3   GCCS Liquids Management ......................................................... 53
      6.2.4   Leachate Management System O&M ........................................... 55

**7   APTIM'S RESPONSIBILITIES & PERFORMANCE........................................... 59**

7.1   Scope of Services to be Provided ........................................................... 60
7.2   Execution of Scope of Services ............................................................... 61
      7.2.1   Wellfield Balancing ....................................................................... 61
      7.2.2   GCCS Liquid System Management .............................................. 63

**8   REBUTTAL TO SECOND SUPPLEMENTAL EXPERT REPORT OF JOSE SANANES   66**

8.1   Sananes Report Section 11: Evaluation of Landfill Gas Generation, Gas and Leachate Collection Systems, and Emissions .................................. 66
8.2   Sananes Report Section 15 Titled Standards of Care Applicable to Landfill Owners and Operators ................................................................. 70
8.3   Sananes Report Section 16 Titled Breaches of Standards of Care By Defendants in this Case ......................................................................... 75

<u>FIGURES</u>

**FIGURE 1 – TYPICAL HORIZONTAL LFG COLLECTOR**

<u>TABLES</u>

**TABLE 1 – SITE DEVELOPMENT TIMELINE**
**TABLE 2 – PHASE 4A EXTRACTION WELL LIQUID DEPTHS**

<u>**APPENDICES**</u>

**APPENDIX A – PROFESSIONAL RESUME FOR ALI HASHIMI**
**APPENDIX B – REFERENCES UTILIZED IN REPORT PREPARATION**
**APPENDIX C – ADDITIONAL REFERENCE DOCUMENTS (PROVIDED UNDER SEPARATE COVER)**
**APPENDIX D – SHEETS 14 AND 15 FROM CELL 22 LINER SYSTEM CONSTRUCTION PLANS**

# 1      BACKGROUND

Weaver Consultants Group ("WCG") has been retained as an expert for litigation support services by Beveridge & Diamond (B&D) who are acting as Counsel in connection with *Ictech-Bendeck v. Progressive Waste Solutions of LA, Inc. et. al., No. 2:18-cv-07889 c/w 18-8071, 18-8218, 18-9312 (E.D.L.A.), Schaumburg v. Parish of Jefferson, No. 786-052 (24th Judicial District Court for the Parish of Jefferson); and Addison v. Louisiana Regional Landfill Company, et al., No. 19-11133 c/w 19-14512 (E.D.L.A.)* (Matter).   B&D requested that WCG review documents associated with the Matter and develop opinions regarding management of the facility and its environmental control systems.

## 1.1    Qualifications of Expert

I am a Principal with WCG, which is located at 1316 Bond Street, Ste. 108, Naperville, Illinois, 60563.   WCG specializes in providing engineering and consulting services with respect to, among other things, solid waste engineering, environmental services, air compliance, oil and gas services, land surveying, and construction material testing.   I have been working in the solid waste industry for approximately 34 years since my completion of undergraduate and graduate degrees in engineering.   In connection with that work, I have designed and permitted municipal solid waste landfills including liner systems, leachate collection systems, landfill gas collection systems, and final cover systems. Additionally, I have provided operations support to municipal solid waste landfills including fill sequencing, GCCS phasing, capital and expense budgeting, and stormwater management.   These projects have provided experience in 8 states, primarily in the Midwest.

I have also had the opportunity to act as a Project Manager on several GCCS construction projects installing GCCS projects across the Midwest, West, and South performing over a hundred different GCCS installations.   My experience providing engineering advice for owners/operators and installing GCCS projects as a contractor has allowed me to work on over a hundred landfills in my career.

I received a Bachelor of Science Degree in Geological Engineering from the University of Missouri- Rolla in 1987 and a Master of Science Degree in Geological Engineering from the University of Missouri-Rolla in 1989.   I am a licensed

professional engineer in 5 states.  A copy of my professional resume is attached as **Appendix A.**

WCG is being compensated at its usual and customary billing rates for work performed based upon actual hours incurred and for out-of-pocket expenses. Specifically, my billing rate for this assignment is $250 per hour for consulting expert services and $375 per hour for deposition and trial testimony.  WCG's compensation is not tied to the outcome of this Matter.

The opinions and conclusions expressed herein are subject to change based on additional data, facts, and information that may be received after the date of this report.

## 1.2   Information Utilized in Formulation of My Opinions

During the preparation of this report, numerous documents were reviewed and relied upon to formulate the opinions presented.  A list of these documents is found in **Appendix B**. I also considered numerous documents without specifically relying on them, which are listed in **Appendix C**.

In addition to my review of these documents, I also relied on my education and work experience at multiple landfill facilities across the United States during my professional engineering career.

## 1.3   Jefferson Parish Sanitary Landfill

Jefferson Parish Sanitary Landfill (JPLF) is permitted as a "Type I/II" landfill under Louisiana environmental rules and as such is permitted to accept municipal solid waste (MSW) and industrial waste.  For the purposes of this report, it has been referred to as a "MSW" Landfill.

# 2    SUMMARY OF OPINIONS

The following opinions were developed based on a review of information provided and referenced regarding this Matter and my experience as a solid waste professional for over 30 years.

<u>Opinions:</u>

**Opinion 3.1: Jefferson Parish bore ultimate responsibility for control over all aspects of the operation of the facility, including the operation and maintenance of the landfill gas control and collection system (GCCS) at the facility.**

**Opinion 3.2: Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations.**

**Opinion 3.3: Jefferson Parish bore the responsibility to adequately fund the landfill construction and operation, and to implement process controls and quality assurance procedures despite LRLC being assigned by contract responsibilities to perform those functions and other site operations activities that complemented the Parish's responsibilities to manage landfill gas and odors for the facility.**

**Opinion 3.4: Jefferson Parish created a complicated management structure regarding the Parish's oversight of the facility's GCCS, especially when managing a GCCS.**

**Opinion 3.5: LRLC's responsibilities at the JPLF were defined by the Operating Agreement, which excluded responsibility for the GCCS and for leachate components outside of Phase 4A.**

**Opinion 3.6: Under the Operating Agreement, Jefferson Parish was responsible for the operation, maintenance, and repair of leachate management components outside of Phase 4A. This was the Parish's responsibility because the Parish never tendered the rest of the leachate system to LRLC in good working condition.**

**Opinion 3.7: Jefferson Parish was responsible for the design, installation, operation, and maintenance of the GCCS. Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations.**

**Opinion 3.8: Though Jefferson Parish contracted with another entity to perform O&M on the GCCS, it was Jefferson Parish's responsibility to manage that contractor and to use the information provided by its GCCS contractor.**

**Opinion 4.1: Regulations and industry standards establish distinct parameters and purposes for daily, interim, and final cover systems. Their separate functions and purposes must be understood in evaluating their effectiveness.**

**Opinion 4.2: Leachate collection system components are physically, and operationally separate from the landfill gas collection system, as recognized in regulatory provisions that govern the two systems.**

**Opinion 4.3: As the permit holder and owner of the JPLF, Jefferson Parish was responsible for understanding regulations and its own contract terms governing the requirements for landfill gas control and collection systems. These terms should have put the Parish on notice that compliance with regulatory and industry standards was critical to the control of landfill gas emissions and management of potential odors.**

**Opinion 4.4: Regulations and generally accepted industry standards specify operating standards and limitations for engineering controls that are part of an effective landfill gas collection and control system. Jefferson Parish should have been on notice of these standards in its design, operation, and supervision of the GCCS at JPLF.**

**Opinion 5.1: LRLC's installation, operation, and management of the LCS in Phase 4A conformed with industry standards and did not impair the operations of the landfill gas collection and control system. Liquids measured in landfill gas wells in Phase 4A are not the result of any issues with the LCS, and the system used to remove liquids from gas wells is not**

part of the leachate collection system. LRLC had no responsibility or control over the equipment used to remove liquids from landfill gas wells in Phase 4A.

**Opinion 5.2:** LRLC applied daily cover in compliance with permit requirements and industry standards. LRLC also applied interim cover in compliance with permit requirements and industry standards, and sufficient interim cover was in place to reduce and minimize odors from the waste.

**Opinion 5.3:** Most waste materials accepted at MSW landfills have the potential to produce significant odors. The accepted industry standard for managing odor generation from acceptable wastes relies on the proper design, installation, and operation of landfill gas collection and control systems, the application of daily, interim, and final cover, and the implementation of temporary odor control measures.

**Opinion 5.4:** Diversion of specific wastes from MSW landfills is not a generally accepted or industry standard method of odor control. In fact, the spent lime waste that is the focus of Plaintiffs' expert is commonly used to solidify liquid wastes and stabilize wastes at landfills.

**Opinion 5.5:** Segregated disposal of specific wastes at MSW landfills is not a generally accepted method of odor control. Segregation of relatively minor volumes of waste is not practicable at most MSW landfills. The authorities that Plaintiffs' expert relies on recognize that waste segregation is impractical in most cases.

**Opinion 5.6:** Flue gas desulphurization wastes and other coal combustion residue wastes that may contain gypsum are commonly disposed of in landfills or used beneficially for waste solidification or stabilization. Their use or disposal in this manner is consistent with accepted practices in the solid waste industry.

**Opinion 5.7:** When LRLC accepted spent lime for beneficial use and disposal, it did so in compliance with industry standards.

**Opinion 5.8:** LRLC relied on the Parish and its GCCS contractors to design, install, operate, repair, and maintain the GCCS. The Parish controlled the design, installation, and operation of the landfill gas collection and control system. LRLC's reliance on the Parish was reasonable.

**Opinion 6.1: Jefferson Parish was solely responsible for issues with the landfill gas collection and control system that were identified by LDEQ, Carlson Environmental Consultants, River Birch, and Plaintiffs. LRLC had no responsibility for the landfill gas collection and control system, and based on its assigned duties, LRLC had no ability to improve operations of the system.**

**Opinion 6.2: Jefferson Parish controlled the assignment of work to its contractors and actively supervised the operations at the JPLF. Jefferson Parish should have been aware of any issues that it was in the best position to address as the permittee and owner, and as the entity with control over the design and installation of the GCCS.**

**Opinion 6.3: Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations.**

**Opinion 6.4: Jefferson Parish allowed contracts to lapse for the installation of the GCCS in Phase 4A, delaying its final installation and connection to vacuum. More prudent management of the GCCS installation could have avoided that delay.**

**Opinion 6.5: Based on design, construction, and monitoring of numerous GCCS systems, the numerous conclusions and recommendations provided by CEC indicate that Jefferson Parish did not prioritize O&M of the GCCS.**

**Opinion 6.6: Liquids measured in gas wells in Phase 4A are not the result of flooding from the base of the landfill, nor are they the result of any asserted operational issues with the leachate collection system. This is supported by an understanding of the two systems and by reported direct observations at the landfill.**

**Opinion 6.7: Jefferson Parish's installation, operation, and maintenance of the leachate collection and management system outside of Phase 4A did not comply with applicable industry standards and resulted in deficiencies and operational challenges.**

**Opinion 6.8: Jefferson Parish did not enhance the leachate management system to meet the facility's disposal needs in a proactive manner. Jefferson Parish was responsible for the upgrade of the perimeter leachate management system which provides additional capacity to remove leachate and GCCS liquid from the waste mass. Furthermore, the GCCS liquid removal system forcemain piping was determined to be undersized and not capable of transferring GCCS liquid from LFG extraction wells at the rate needed to maintain LFG well extraction efficiency.**

**Opinion 7.1: The contract between Jefferson Parish and APTIM did not provide sufficient performance goals and standards to ensure efficient and effective operation and maintenance of the GCCS.**

**Opinion 7.2: Third party assessment of the condition of the GCCS in Phase 4A raised several concerns indicating that the GCCS was not being operated in accordance with industry standards for optimizing LFG collection and control.**

**Opinion 7.3: Based on an assessment of the GCCS operations by a third party, the means and methods employed by APTIM to maintain the GCCS did not comply with industry standards.**

**Opinion 7.4: Based on my review of the data provided and previous assessments performed, APTIM's performance was not consistent with typical industry practices for operating and maintaining a GCCS.**

## 3      CONTRACTUAL RELATIONSHIP OF PARTIES INVOLVED

**Opinion 3.1: Jefferson Parish bore ultimate responsibility for control over all aspects of the operation of the facility, including the operation and maintenance of the landfill gas control and collection system (GCCS) at the facility.**

<u>Basis for Opinion:</u>

Jefferson Parish has been the owner and primary permittee of the facility since acquiring it in 1979 and as such is the primary responsible party for the facility. Louisiana Department of Environmental Quality's (LDEQ) regulations assign responsibility for solid waste management activities to parishes like Jefferson Parish.  Municipalities, parishes, and regional commissions are responsible for, among other things *"planning and operating permitted processing and/or disposal facilities while cooperating with the department, or other entities, to implement regional management systems"*.  LAC 33 § 112(B)(2).

The regulations provide further information regarding a solid waste facility permit holder's responsibilities:

> *"The permit holder at all times shall properly operate and maintain all facilities and systems which are installed or used by the permit holder to achieve compliance with the conditions of the permit.  Proper operation and maintenance includes effective performance, adequate funding, adequate operator staffing and training, and process controls including appropriate quality assurance procedures…"*

LAC Title 33, Part VII, Subpart 1, Section 529(A)(4). This provision clearly defines the role of the permit holder as responsible for all facilities and systems necessary for environmental compliance of the facility, including operation of the landfill, protection of groundwater and surface water, and compliance with air regulations pertinent to the facility. Ultimate responsibility cannot be transferred by entering into a contract with a third party.

**Weaver Consultants Group**

## 3.1    Contractual Arrangement

**Opinion 3.2: Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations.**

**Opinion 3.3: Jefferson Parish bore the responsibility to adequately fund the landfill construction and operation, and to implement process controls and quality assurance procedures despite LRLC being assigned by contract responsibilities to perform those functions and other site operations activities that complemented the Parish's responsibilities to manage landfill gas and odors for the facility.**

**Opinion 3.4: Jefferson Parish created a complicated management structure regarding the Parish's oversight of the facility's GCCS, especially when managing a GCCS.**

<u>Basis for Opinions:</u>

Since acquiring the JPLF, Jefferson Parish has permitted, designed, operated, and maintained the facility, choosing to utilize outside entities to perform those tasks. Jefferson Parish has awarded this work through competitive bidding processes specifying the scope of the contractors' responsibilities. For example, operations of the active waste placement at the facility, and the O&M necessary for the facility have been contracted out to different parties since at least 2013, while Jefferson Parish still expressly reserved control over all aspects of the operation. Permitting, design, construction, and O&M of the landfill GCCS has been controlled by Jefferson Parish, who selected various consultants and contractors to perform the work.

Throughout the life of the facility, Jefferson Parish has also contracted landfilling operations to several companies who specialize in landfill operations, including the following:

- John Sexton Sand and Gravel Company

- Waste Management, Inc.

- Louisiana Regional Landfill Company

- River Birch LLC

However, where those functions have been assigned by contract, it is still the Parish's responsibility as the owner and permit holder for all aspects of the facility's operation and compliance, including to adequately fund the landfill construction and operation, and to implement process controls and quality assurance procedures. Jefferson Parish understood this requirement when contracting services to be provided for the facility.

On May 17, 2012, the Parish contracted with LRLC to operate certain aspects of the JPLF. The Parish expressly retained the responsibility for detailed management of the facility. Specifically, the contract stated the following in Section II – Scope of Services of the contract:

> *"Parish shall retain overall control of the Expansion Area at all times, as owner of the Landfill and as the LDEQ Permit holder."*

(Operating Agreement, 2012) Therefore, Jefferson Parish was assigned by regulation, and retained by contract, overall responsibility and control of the JPLF, including the volumes and types of wastes the facility could receive.

## 3.2   Landfill Operations

**Opinion 3.5: LRLC's responsibilities at the JPLF were defined by the Operating Agreement, which excluded responsibility for the GCCS and for leachate components outside of Phase 4A.**

Basis for Opinion:

Under the terms of the landfill operations contract between Jefferson Parish and LRLC (Operating Agreement, 2012), LRLC's primary responsibility was to complete construction of the expansion area and provide for the operation, management, and maintenance of cover in the Existing Phases 1, 2, and 3, and to operate waste placement, leachate collection, and cover application in the expansion area.  However, the contract also excluded activities from the contract, primarily the Landfill Gas Control and Collection System (GCCS), and the Phase

---

1, 2, and 3 leachate management system until repairs were complete and that portion of the leachate system could be handed over in good working condition for 30 days.

Under the operating agreement between LRLC and the Parish, LRLC had the following responsibilities:

- Preparation of construction plans and construction of new cells;

- Installation, operation, and maintenance of the leachate collection system in Phase 4A;

- Acceptance and placement of waste;

- Placement and maintenance of daily and interim cover;

- Maintaining site roadways;

- Maintenance of cover on closed portions of the landfill;

- Installation of Final Cover in the expansion area; and

- Implementation of a comprehensive odor control program.

Operating Agreement (2012).

The odor control program consisted of the following elements.

- Inspection of the landfill cover materials including daily, interim, and final cover areas. Notification was to be made if deficiencies were noted.

- Monitor odor intensity of incoming sludge loads.

- Inspect random loads of incoming solid waste for significant odors.

- Document weather conditions.

- Operate and maintain a misting system.

- Respond to odor complaints.

- Submit an annual report of the previous year's activities.

In summary, the odor control program was focused on observations and notification of potential odor issues.  LRLC was to notify Jefferson Parish of issues so that Jefferson Parish as owner/operator of the GCCS could take action to

improve GCCS operation and resolve odor issues. Operating Agreement § II(B)(5)(H).

## 3.3    Leachate System

**Opinion 3.6: Under the Operating Agreement, Jefferson Parish was responsible for the operation, maintenance, and repair of leachate management components outside of Phase 4A. This was the Parish's responsibility because the Parish never tendered the rest of the leachate system to LRLC in good working condition.**

<u>Basis for Opinion:</u>

The Operating Agreement did not assign LRLC responsibility for leachate control systems outside of Phase 4A until Jefferson Parish was able to turn them over in good working condition for 30 days. Operating Agreement 2012, II(B)(5)(C). Jefferson Parish planned to make repairs to the leachate management systems for Phases I, II, and III prior to turning over O&M responsibilities to LRLC for those phases as stated in Section II(B)(5)(C) of the contract. Based on my review of relevant documents including a letter from Waste Connections to Jefferson Parish (Waste Connections 2018; Bates No. WC_JPLF_00276071), this change in control of the O&M responsibilities never occurred during the duration of LRLC operations contract with Jefferson Parish and, therefore, the leachate management systems for Phases 1, 2, and 3A and 3B remained Jefferson Parish's responsibility.

An instance that required coordination was that Jefferson Parish was still responsible for the O&M of the leachate management system. Operating Agreement 2012, Section II(B)(5)(C). This meant that the contractors operating other systems at the landfill had to collaborate with the owner who was working to operate a leachate management system that needed repair and improved capacity. This type of management requires considerable time, effort, and forward planning to be successfully executed.

## 3.4   GCCS Design and Installation

**Opinion 3.7: Jefferson Parish was responsible for the design, installation, operation, and maintenance of the GCCS. Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations.**

Basis for Opinion:

Under the Operating Agreement, Jefferson Parish retained responsibility for the GCCS, and did not assign LRLC responsibility for the design, installation, operation, or maintenance of the GCCS. Based on my review of the May 17, 2012 agreement with LRLC, Jefferson Parish chose to exclude permitting, design, construction, and O&M of the GCCS from the operations contract with LRLC, as Section II of the May 17, 2012 contract makes no mention of GCCS work included in the Scope of Services. In responses to comments in the Request for Proposals for the contract (RFP Addendum #1, Bates No. JP_JPLF_00692267), Jefferson Parish explicitly stated "The Landfill Gas Management System is maintained and operated by others and not included in this Contract." This contract structure required Jefferson Parish to coordinate permitting, design, construction, and maintenance of the GCCS in Phase 4A while LRLC operated the placement of waste and cover materials.

Jefferson Parish contracted with GCCS design engineering firms to prepare GCCS designs for the planned GCCS in Phase 4A, while still reserving responsibility for design and installation of the GCCS. As documented in correspondence from Mr. Michael Lockwood, Director, Jefferson Parish Department of Environmental Affairs, two separate design and engineering firms were utilized for this project (October 9, 2018, email, Bates No. ADD_P00108258; December 14, 2018 email, Bates No. APTIM_0191844).  Golder Associates originally provided engineering services, however, after the contract with Golder was allowed to lapse, Jefferson Parish determined that it was in the project's best interest to have Franklin Engineers complete the work.

**Weaver Consultants Group**

It was Jefferson Parish's role to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance with the existing permits and regulations. As discussed below, a key responsibility is the requirement to perform surface emissions monitoring of the landfill surface to document the effectiveness of the existing GCCS, which the Parish contracted out to an O&M contractor

## 3.5   GCCS O&M

**Opinion 3.8: Though Jefferson Parish contracted with another entity to perform O&M on the GCCS, it was Jefferson Parish's responsibility to manage that contractor and to use the information provided by its GCCS contractor.**

Basis for Opinion:

In 2018, Jefferson Parish contracted with APTIM to provide O&M services for the GCCS for all phases of the facility. (Agreement Between the Parish of Jefferson and CB&I Environmental & Infrastructure, Inc. (Dec. 28, 2015), Bates No. ADD_P00107800). APTIM, acting as the GCCS O&M contractor, was responsible for ensuring that the GCCS performed in a manner that maintained permit compliance at the facility. This included tuning and balancing the wellfield as necessary to effectively collect landfill gas (LFG) generated from waste decomposition.

APTIM was also under contract to provide O&M services to the GCCS in portions of the facility that LRLC had constructed and was operating, specifically Phase 4A. Even though LRLC and APTIM did not have a contractual relationship, a review of the documents found no issues or hinderance on LRLC's part to APTIM's operations.

As noted above, it was Jefferson Parish's responsibility to be aware of site conditions and account for how site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations. Importantly, the EPA's regulations

**Weaver Consultants Group**

require surface emissions monitoring at, as applicable to the JPLF, 40 C.F.R. Part 60, Subpart WWW. Under these regulations, a landfill is required to install a GCCS, perform monthly wellhead tuning and monitoring, and monitor quarterly surface emissions. Performing this monitoring provides information on the effectiveness of the existing system, and corrective actions to address exceedances may require improvements to, or expansion of, the GCCS.

Jefferson Parish contracted to APTIM the responsibility to perform surface emissions monitoring of the landfill surface to document the effectiveness of the existing GCCS. The measure of performance of a GCCS is its ability to control surface emissions, so the surface emission data is a key component in evaluating the effectiveness of a GCCS. Utilizing this information as well as landfill gas monitoring data regularly collected at the facility, it was the responsibility of Jefferson Parish to understand the dynamic nature of landfill gas and odor generation at the facility and respond accordingly.

This is a complicated management structure, especially when managing a GCCS. Several parties were involved that had different operational goals. These operational goals require active, detailed management by the Parish to determine the best outcome for the facility.

# 4     MSW LANDFILL ENVIRONMENTAL CONTROL SYSTEMS

This section of my report provides a summary of the environmental control systems typical of MSW landfills like the JPLF.

MSW Landfill design, permitting, and construction are regulated in Louisiana under Louisiana Department of Environmental Quality (LDEQ) regulations Title 33, Part VII, Subpart 1 Solid Waste Regulations.  These regulations govern MSW Landfills in the state, as well as provide guidance for accepted methods of meeting the requirements.  This report refers to these regulations for guidance regarding specific requirements for environmental control systems necessary for the operation of a MSW Landfill in the State of Louisiana.

It is important to understand the distinctions between the various types of control systems for a clear understanding of the purpose of each of these systems. Further discussion of some of these distinctions is provided below.

## 4.1    Typical Environmental Control Systems utilized at MSW Landfills

Several environmental control systems are discussed in LDEQ Title 33, Part VII, Subpart 1.  Paragraph 711(B), Plans and Specifications, provides a description for some of these environmental control systems including the following.

- Paragraph 711(B)(2) – Daily and Interim Cover Requirements
- Paragraph 711(B)(4) – Leachate Control, Collection, Treatment, and Removal Systems
- Paragraph 711(B)(6) – Gas Collection/Treatment or Removal Systems

For the purposes of this report, a discussion of Paragraphs 711(B)(2), 711(B)(4) and 711(B)(6) is provided below as they are the most critical environmental controls related to this Matter.

## 4.2    Daily and Interim Cover Requirements

**Opinion 4.1: Regulations and industry standards establish distinct parameters and purposes for daily, interim, and final cover systems. Their separate functions and purposes must be understood in evaluating their effectiveness.**

**Weaver Consultants Group**

Basis for opinion:

Daily and interim cover requirements for the State of Louisiana are found in LDEQ Title 33, Part VII, Subpart 1, Paragraph 711(B)(2).   The cover materials are intended to perform the following functions.

- Minimize vector breeding areas and animal attraction.

- Control leachate generation.

- Reduce fire-hazard potential.

- Minimize blowing paper and litter.

- Reduce noxious odors by minimizing outward movement of methane and other gases.

- Provide an aesthetic appearance to the landfill operation.

- Allow accessibility regardless of weather.

Regarding this Matter, the functions of cover in controlling leachate generation and reducing noxious odors by minimizing outward movement are most pertinent.  The control of leachate generation using daily or interim cover is intended to provide a temporary means of reducing the infiltration of precipitation which would then become leachate.  Without the placement of daily or interim cover, precipitation could freely infiltrate into the landfill with little runoff.  By the placement of daily or interim cover, infiltration is reduced by creating a barrier to infiltration.  Therefore, daily and interim cover will reduce the amount of leachate generated during the operational period of the landfill.

In Louisiana, specific interim cover requirements address precipitation and runoff. LDEQ's regulations require one foot of interim cover in the form of silty clays in areas that will not receive waste for at least 60 days. That depth of cover is sufficient under the regulations for the purposes of interim cover, including the reduction of odors and minimization of movement of methane and other gases (LAC 33, Section 711(B)(2)(b) and (e)). Precipitation or other liquids that fall in an area with one foot of interim cover must be managed as leachate (LAC 33, Section 711(A)(5)). Landfills may apply an additional foot of cover, with compaction, to create 24-inch interim compacted cover (LAC 33, Section 711(A)(5)). In areas with 2 feet of interim compacted cover, precipitation runoff may be managed as stormwater runoff rather than leachate (LAC 33, Section 711(A)(5)). The additional

foot of cover may have incidental odor control benefits but is not intended or required for odor control.

Daily and interim cover can also act as a temporary mechanism to reduce or limit the escape of landfill gas or noxious odors from the landfill.  Through the decomposition of waste materials, landfill gas is generated within the waste mass. Since the landfill gas is confined within the landfill through the construction of liners and covers, the landfill gas seeks ways to relieve pressure building in the landfill. Daily and interim covers are intended to provide a temporary barrier to the release of landfill gas until a GCCS and final cover system can be constructed, and assist the performance of a GCCS when one is installed.

Many waste materials emit a noxious odor even as they are being delivered to the facility.  Daily cover provides a temporary barrier to reduce or limit odors from the waste material that is placed each day (LAC 33, Section 711(B)(2)(a)(v)). Daily cover is not designed or intended to contain significant landfill gas odors from waste that has already been placed in the waste mass.

A schematic figure of how daily and interim cover are intended to perform is provided below.



## 4.3   Leachate Management Systems

**Opinion 4.2: Leachate collection system components are physically, and operationally separate from the landfill gas collection system, as recognized in regulatory provisions that govern the two systems.**

**Weaver Consultants Group**

<u>Basis of Opinion:</u>

Leachate management systems at MSW landfills are intended to control and remove leachate from within the waste mass.  As leachate drains vertically down through the waste mass of a MSW landfill, it eventually enters the leachate collection system found at the base of the MSW landfill.  This environmental control system consists of a layer of material constructed from either naturally occurring materials such as gravel or man-made materials such as geocomposite.  This layer of leachate collection media overlies a leachate migration barrier system, typically a geomembrane, which prohibits the flow of leachate into the environment.  Since the vertical flow of leachate is inhibited by the leachate migration barrier, leachate instead flows along the base of the landfill through the leachate collection system. The leachate collection system provides a drainage path to a collection point commonly referred to as a leachate collection sump.  From the leachate collection sump, liquids are removed from the waste mass for eventual disposal or treatment.

In the State of Louisiana, a leachate collection system must conform to the requirements provided in LDEQ Title 33, Part VII, Subpart 1, Paragraph 711(B)(4). Paragraph 711(B)(4)(f) provides a list of the required components including information regarding their performance criteria, location, and a general description of the component.

Based on this list of components provided in Paragraph 711(B)(4)(f), it is clear that the landfill leachate management system is located at the base of the landfill and meant to manage liquids that drain vertically downward through waste mass until encountering the primary liner system. LDEQ does not define the leachate system to include equipment for removal of liquids from landfill gas collection wells.

As an example of these components, construction plans prepared for Cell 22 have been referenced to show typical details of what these components look like and where they are located within the landfill (Sigma Engineers & Constructors, Construction Plans for Cell 22 (Nov. 2014), Bates No. WC_JPLF_00402368).  Details from these construction plans are included in **Appendix C** for reference.

In addition to these components, leachate management systems typically include monitoring devices to assist in assessing the performance of and maintaining the leachate management system.  Typical components used at landfills are discussed below.

- Flow Meter – Flow meters are commonly used at landfills to measure the quantity of leachate that is pumped out of the landfill.  These flow meters are typically installed at each pumping location so that the operator can monitor the progress of leachate removal from the location.

- Pressure Sensors – Pressure sensors are used at landfills to monitor the pressure within the leachate discharge piping.  This data can be useful in monitoring the performance of the overall system and assessing whether maintenance activities are required, or the system is operating outside of design parameters.

- Liquid Level Sensors – Liquid level sensors (or transducers) are used at landfills to monitor the depth of liquid above the sensor.  A common application of this device is for it to be in a leachate collection system to monitor the depth of leachate within the landfill.

Liquid level sensors were utilized at JPLF to monitor the depth of leachate within the leachate collection sumps.  Beginning in August 2018, daily readings of the leachate level were recorded by Jefferson Parish staff on daily activity logs. A summary of some of the data collected was provided in General Causation Trial Exhibit 1204 from this Matter.  This data shows that the leachate level observed in the leachate collection sumps was typically in the range of 2 to 5 feet in depth.

Direct observations confirm these leachate level observations.   Landfill gas has occasionally been noted as venting from side slope risers, which are the piping connecting the leachate collection sump to the surface. (LDEQ Air, Solid Waste, and Water Assessment Inspection Rept. (Dec. 3, 2018), Bates No.



JP_JPLF_0003152, and July 15, 2016 Email from Jefferson Parish, APTIM_0150447).

As shown in the schematic above depicting a cross-sectional view of a landfill, this phenomenon would not be possible if the landfill were a "bathtub" full of leachate to a depth of 30 to 50 feet, which Plaintiffs' expert has assumed.

## 4.4   Landfill Gas Management Systems

**Opinion 4.3: As the permit holder and owner of the JPLF, Jefferson Parish was responsible for understanding regulations and its own contract terms governing the requirements for landfill gas control and collection systems. These terms should have put the Parish on notice that compliance with regulatory and industry standards was critical to the control of landfill gas emissions and management of potential odors.**

Basis for Opinion:

LFG management systems at MSW Landfills are intended to collect and control LFG from within the waste mass.  As waste materials within a MSW Landfill decompose, LFG is generated.  As more and more LFG is generated, LFG pressures build in the landfill and the LFG attempts to find an outlet to relieve this pressure.  Engineering controls are needed to manage the LFG generated as it tries to escape the waste mass and relieve the pressures within the waste mass.

In the State of Louisiana, a GCCS must conform to the requirements provided in LDEQ Title 33, Part VII, Subpart 1, Paragraph 711(B)(6).  This regulation in and of itself does not provide requirements for a GCCS but refers to requirements provided under Subpart WWW which require an active GCCS and detail the specifications that must be met for the design, construction, operation, maintenance, recordkeeping, and reporting for the GCCS.

## 4.4.1  Key 40 CFR Part 60, WWW Provisions

As stated in the previous section, LDEQ Title 33, Part VII, Subpart 1, Paragraph 711(B)(6) relies on Subpart WWW to provide the requirements necessary for an active GCCS.  It should be noted that after the relevant time of this Matter (2017-2019), updates to the regulations were promulgated, but they do not apply to Phase 4A based on its start of construction.  A review of these requirements is useful to understand what these regulations include and what an Owner/Operator of an active GCCS should do to properly permit, design, construct, and maintain an active gas collection system as required by the Subpart WWW regulations.

§60.751 – Definitions

The air pollution regulations governing landfill gas collection and control systems provides an explanation of what is allowable to receive in a MSW Landfill including commercial solid wastes, household wastes, industrial solid wastes, and sludges.  MSW landfills can typically accept other types of RCRA Subtitle D waste beyond household waste, including industrial solid waste.  Industrial solid waste is defined in 40 CFR §60.751 as follows.

> *Industrial solid waste means solid waste generated by manufacturing or industrial processes that is not a hazardous waste regulated under Subtitle C of the Resource Conservation and Recovery Act, parts 264 and 265 of this title.  Such waste may include, but is not limited to, waste resulting from the following manufacturing processes:*

*electric power generation; fertilizer/agricultural chemicals; food and related products/by-products; inorganic chemicals; iron and steel manufacturing; leather and leather products; nonferrous metals manufacturing/foundries; organic chemicals; plastics and resins manufacturing; pulp and paper industry; rubber and miscellaneous plastic products; stone, glass, clay, and concrete products; textile manufacturing; transportation equipment; and water treatment. This term does not include mining waste or oil and gas waste.*

LDEQ Title 33, Part VII, Subpart 1, Paragraph 711§115 includes the following in its definition of Industrial Solid Waste.

*Industrial Solid Waste — solid waste generated by a manufacturing, industrial, or mining process, or that is contaminated by solid waste generated by such a process. Such waste may include, but is not limited to, waste resulting from the following manufacturing processes: electric power generation; fertilizer/agricultural chemicals; food and related products; byproducts; inorganic chemicals; iron and steel manufacturing; leather and leather products; nonferrous metals manufacturing/foundries; organic chemicals; plastics and resins manufacturing; pulp and paper industry; rubber and miscellaneous plastic products; stone, glass, clay, and concrete products; textile manufacturing; and transportation equipment. This term does not include hazardous waste regulated under the Louisiana hazardous waste regulations or under federal law, or waste that is subject to regulation under the Office of Conservation's Statewide Order No. 29-B or by other agencies.*

Based on these definitions, an Owner/Operator of an active GCCS should be aware that MSW Landfills are allowed to accept industrial solid waste which may include waste derived from electric power generation and numerous other wastes with odor generation potential.

<u>§60.752 – Standards for Air Emissions from Municipal Solid Waste Landfills</u>

This paragraph states that an active GCCS shall collect LFG from each area, cell, or group of cells in which solid waste has been in place for 5 years or within 2 years if the facility is closed or at final grade.  This effectively means that an active GCCS must be in place no later than the fifth anniversary of waste placement in the subject area.

<u>§60.753 – Operational Standards for Collection and Control Systems</u>

This paragraph includes operational standards to be maintained at extraction wellheads including operating each wellhead at a negative pressure, operating

**Weaver Consultants Group**

each wellhead at a temperature less than 131° Fahrenheit, and either a nitrogen level less than 20% or an oxygen level less than 5%.  Additionally, the GCCS should be operated so that the methane concentration is less than 500 ppm at the landfill surface.  This requirement is key to demonstrating sufficient LFG control as it is the performance standard which indicates if the existing GCCS provides sufficient control of LFG being generated by the waste mass. Careful attention to these operating parameters allows a GCCS owner and operator to optimize its LFG collection.

§60.755 Compliance Provisions

This paragraph states that it is the responsibility of Owner/Operator of the system to determine a sufficient density of gas collection wells that are capable of controlling and extracting LFG from all portions of the landfill sufficient to meet all operation and performance standards.  Under accepted regulatory and industry standards, this clearly puts the responsibility of understanding the facility and the requirements necessary to sufficiently control LFG at the facility on the Owner/Operator, and emphasizes the importance of properly designing the GCCS.

§60.759 Specifications for Active Collection Systems

This paragraph states that it is the responsibility of the Owner/Operator to design the active GCCS to consider among other things cover properties, leachate and condensate management, and compatibility with filling operations.  Even though landfill operations may have been contracted to third parties, this did not alleviate Jefferson Parish's responsibility to provide a GCCS that controlled the LFG generated within the waste mass.

**4.4.2  Landfill Gas Engineering Controls**

**Opinion 4.4: Regulations and generally accepted industry standards specify operating standards and limitations for engineering controls that are part of an effective landfill gas collection and control system. Jefferson Parish should have been on notice of these standards in its design, operation, and supervision of the GCCS at JPLF.**

Basis for Opinion:

Several types of landfill gas engineering controls exist that may be utilized as part of a GCCS for a facility.  Some of those controls including cover materials, vertical

LFG extraction wells, horizontal collectors, and odor control systems are described in the following section.

4.4.2.1  Landfill Cover Systems

The placement of daily and interim cover to contain gases within the waste mass is useful in minimizing the migration of landfill gas and reducing noxious odors of the waste materials placed that day.  It should be noted that these types of controls are temporary and not allowed for long-term management.  Daily cover is a minimum of 6-inches thick and installed after each day of filling operations and then may be removed the following day to allow placement of additional waste (LDEQ Title 33, Part VII, Subpart 1, Paragraph 115, and Paragraph 711(B)(2)(b)).  Daily cover materials are removed at the beginning of the following workday to allow intimate contact between each daily portion of waste placed in the landfill.  It is important to note that daily cover is intended for use in controlling landfill gas or odors associated with waste that has been placed that day and has no effect on other areas of the landfill.

Interim cover must be a minimum of 1-foot thick over areas where waste in areas of the landfill that will not receive waste within 60 days (LDEQ Title 33, Part VII, Subpart 1, Paragraph 115, and Paragraph 711(B)(2)(e)).  Interim cover materials are intended to be in place for a longer period, hence the thicker cover requirement.

Given the relatively thin nature and temporary intent of these types of cover systems, daily and interim cover materials are sometimes enhanced by the placement of additional soil materials, soil plugs, or patches to cover areas where LFG or leachate is escaping through cover materials into the environment.  Such escape locations may be found during surface emissions monitoring events or when distressed vegetation or cracks/crevices are seen during the completion of O&M activities around the site.  While these types of engineering controls may be successful in temporarily mitigating uncontrolled releases of LFG or leachate, they are a "band aid" approach as opposed to addressing the source of the issue which is the LFG pressure build up within the waste mass.  These types of temporary "band aid" approaches may be useful in the short term to address issues, but they are not a long-term substitute for engineering controls such as a well-managed GCCS.

Final cover systems are permanent engineering controls that minimize LFG from escaping into the environment.  While this type of engineering control is useful in

**Weaver Consultants Group**

controlling the migration of landfill gas outside the waste and mitigating odors, it does not remove the source of the issue.  In other words, the LFG is still being generated in the landfill and, unless it is properly collected and controlled by a well-designed and operated GCCS, this LFG will try to find a means of relieving the LFG pressure building in the landfill by escaping through the waste mass and cover to the atmosphere. For this reason, established regulatory and industry standards require the continued operation and tuning of a GCCS even in areas under final cover.

Interim and final cover systems can assist the performance of a GCCS by containing and redirecting LFG within the waste mass toward zones of vacuum, or radii of influence, that surround landfill gas collection wells.

### 4.4.2.2  Gas Collection Systems

An active GCCS is the most effective means of LFG control that a facility can employ.  These systems provide a preferential pathway for LFG within a waste mass which actively draws LFG from the landfill and conveys it to a control device for proper management.  The intent of an active GCCS is to provide a vacuum or negative pressure within the waste mass that will direct LFG to the extraction system as opposed to venting through the cover materials or through the subsurface (Subpart WWW §60.753).

A vacuum or negative pressure is applied to extraction well or horizontal collector locations to provide a preferential pathway for the LFG to travel into the GCCS. In other words, the gas well or collector provides a conduit into the waste mass through which landfill gas is extracted from the waste as the gas is generated.  As LFG is extracted from the waste mass, it is directed through piping to a control device, usually a flare for destruction, or a landfill gas to energy plant to beneficially use the methane as a fuel, or a facility which repurposes the gas for some other use.

### 4.4.2.2.1    Vertical Extraction Wells

Gas collection and control systems typically consist of vertical extraction wells installed into the waste mass to provide direct access to the areas where landfill gas generation is occurring, and LFG pressures are building.  This allows for collection of the LFG at the location of its origin.  Extraction wells are typically constructed of solid and perforated piping that is installed in the waste mass.

A drilling rig is used to bore holes into the waste mass to access areas of LFG generation.  Industry standard boreholes are 36 inches in diameter.  Boreholes are typically advanced to within 10 to 15 feet of the landfill liner system.  This separation is provided to eliminate the potential of drilling operations damaging the liner system.  Once the piping is placed in the borehole (typically 6" to 8" diameter), the annular space between the piping and wall of the borehole is backfilled with gravel typically 1 to 3-inch diameter to a height at or above the perforated portion of the well casing.  The upper portion of the boring where solid pipe has been installed is backfilled with materials to seal off the perforated section of piping from the atmosphere.  This construction serves to limit the amount of ambient air from above the landfill surface that could be drawn into the extraction well.

#### 4.4.2.2.2    Horizontal Collectors

In addition to vertical extraction wells, horizontal collectors are also a common means of landfill gas collection.  These devices are typically used in areas where temporary landfill gas collection is required due to active filling constraints, waste is too thin to allow installation of the landfill gas extraction wells, along slopes that will be filled over soon, etc.  In concept, horizontal collectors are similar in design to landfill gas collection wells except, as implied by the name, they are more horizontal in nature than vertical.  Horizontal collectors are typically constructed by excavating a trench 5 to 10 feet deep into the waste mass.  Within the trench, collection piping like that in a vertical extraction well as described above is placed.  Gravel is then backfilled around the piping to allow landfill gas to enter the piping uninhibited.  The trench is then completed by backfilling the remainder of the trench with fine grained soils to seal off the trench from the atmosphere and limit atmospheric intrusion.

Horizontal collectors can also be installed at the base of landfills as part of the liner system construction.  However, instead of being installed in a trench which would impact the liner system, they are typically laid on or within the leachate management system and covered in gravel.  These types of collectors are useful in applying vacuum to a portion of the landfill too deep for vertical extraction wells to reach since they are typically stopped 10 to 15 feet above the liner system.

Another form of these collectors is to connect leachate system cleanouts or risers to the GCCS to reach lower portions of the landfill beyond the depth of the extraction wells.  This type of connection is not typically a regulatory requirement

but can be done as a good practice to collect LFG that accumulates in leachate collection system piping. It is an extension of the GCCS and is typically a component of GCCS design and operation, rather than an aspect of the leachate collection system.

At JPLF, several leachate system risers have been connected to the GCCS to extract landfill gas from the base of the landfill. See SCS Engineers, 2019, JP_JPLF_0018703. The movement of gas into leachate sump risers, either under positive pressure from gas generation, or negative pressure from a GCCS vacuum, demonstrates that unsaturated waste materials are in connection with the side slope riser and providing a conduit for landfill gas to travel up the riser to the atmosphere.  This is a direct observation of the condition of the leachate level in the waste mass that demonstrates that the waste mass is not fully saturated.

### 4.4.2.2.3    Gas Well Liquid Management

A common occurrence in MSW Landfills is for leachate and LFG condensate to collect in the gravel placed in the annular space of extraction well boreholes.  It is important to differentiate between granular material used for a leachate collection system versus gravel material used for extraction well construction.  The intent of the use of granular material in a leachate management system is to provide a preferred flow path for leachate to drain to a collection point located at the lowest portion of the landfill.  The intent of gravel used in an extraction well is to provide a porous media around the extraction well piping to protect it from waste materials and allow LFG to freely flow from the waste mass into the extraction well.  The intent of gravel used in a GCCS is not to provide a means of leachate collection.

However, it has been observed at many landfills throughout the country outside of arid areas that leachate liquids frequently accumulate in extraction well gravel. The liquid accumulating in the extraction wells reduces the efficiency of the extraction well by reducing the amount of perforated pipe that is exposed to the waste mass and, thereby reducing the amount of LFG that can be collected by the GCCS.  To counteract liquids accumulation within the extraction wells, GCCS or gas well liquid management systems are often included as part of the GCCS as a means of enhancing their performance.

A common element of this control system is the installation of a pump in the extraction well to remove the liquid from the extraction well and increase the

perforated pipe length available for LFG extraction.  Typically, pneumatic pumps are used in these applications.  To support the pumping process, air supply piping which delivers pressurized air to energize the pumps and forcemain piping which manages pump liquid discharge are installed as part of the gas well liquid management system.  Although not specifically required by Subpart WWW regulations, it has become common industry practice to use this type of gas well liquid management system to control liquids accumulating in LFG extraction wells.

Another practice that is currently gaining popularity in the industry is the modification of landfill gas collection wells to be in direct contact with the underlying leachate management system.  I have personally seen several types of these designs employed and they tend to have a common component.  Prior to drilling extraction wells after waste is in place, a rock pad or target is constructed as part of the leachate management system which provides a direct connection to the leachate management drainage material and the well gravel placed as part of the gas extraction well.  This allows fluids that flow into the well annular space to drain vertically downward and directly into the leachate management system.  At facilities I have been involved with that typically have to install pumps in all their wells to manage gas well liquids, the need for pumps to drain these liquids is reduced or eliminated.  By removing liquids to allow the perforated pipe to be exposed, this has been found to be an effective means of increasing LFG collection from MSW Landfills.

## 4.4.2.3  Odor Control Systems

Odor mitigation systems are used to mitigate odors emanating from the landfill.  In general, these systems either attempt to mask the odor by providing a more pleasant odor or eliminate the odor by chemically changing the chemical nature of the odor particles and thereby changing their odorous properties.  These types of systems are useful at busier landfills that require a larger operating face where more waste is exposed to the atmosphere and has an opportunity to give off odor.  They are also useful in situations such as JPLF where odors were present, and mitigation of the odor was needed.

## 4.5    Environmental Control Implementation

Implementation of these engineering controls was utilized at the JPLF though the period of LRLC involvement as operator.  A discussion of pertinent engineering controls is provided in the following sections.

### 4.5.1   Daily and Interim Cover Placement

LRLC applied daily and interim cover at JPLF.  As the name implies, LRLC placed daily cover at the end of the working day to cover waste materials received during the day.  This consisted of either a 6-inch-thick layer of soil or an alternate daily cover material, including a tarp system, as approved by the solid waste permit.  These materials may then be removed the following operating day to allow additional waste placement.  Cover materials are removed to allow direct contact with the previously placed waste materials to form a more homogeneous waste mass.  The removal of these materials allows better communication for landfill gas to flow to extraction locations and provides a preferred vertical pathway for leachate to flow downward towards the leachate management system at the base of the landfill where it is intended to be collected.

Interim daily cover is required to be placed in areas where additional solid waste placement is not planned to occur for 60 days.  Interim cover is a soil layer a minimum of 12-inches thick.  Instead of a daily requirement, LRLC would have strategically determined where these areas might occur depending on their filling plan and then place interim cover as needed.  For areas where LRLC intended to divert stormwater off the landfill, interim compacted cover would be placed at a minimum 24-inch thickness.

### 4.5.2   Leachate Management System

Leachate management systems are a required portion of the liner system at the base of the landfill and must be constructed during each liner system construction event.  Accordingly, the installation of these engineering controls is driven by the need to provide more waste placement capacity (air space) at the landfill.

### 4.5.3   Landfill Gas Collection Systems

For facilities required to comply with Subpart WWW, implementation of a GCCS is guided by the age of the waste placed in the landfill or if the landfill has achieved

**Weaver Consultants Group**

final grade.  As discussed in Section 4.4.1, waste that has been in place for 5 years must have an active GCCS installed and operating.  Alternatively, if waste fill grades have reached the designed final grade of the landfill, an active GCCS must be installed and operating within 2 years of reaching design waste grade.  It should be noted and as previously discussed, these are the required deadlines of when a GCCS must be installed and operating.  The landfill owner may install these systems any time prior to these dates and based on my experience, most landfill owners frequently do.

### 4.5.4   Odor Control Systems

Odor control systems are not a required environmental control system for landfills. However, these systems can provide a useful function at a landfill.  Larger landfills that accept high quantities of waste per day (some facilities accept several thousand tons of waste per day) will have larger areas where waste is being placed and, therefore, a higher potential to have odors.  In these instances, an odor control system may be employed to help manage odor generated from the exposure of waste to the atmosphere.

Alternatively, areas of waste that have been in place and an active GCCS is not sufficiently capturing landfill gas being generated by the landfill, an odor control system can be useful in managing odors.

Each of these examples is dependent on the ability of the existing GCCS to collect landfill gas and, therefore, a specific schedule for the implementation of this type of system is site specific.

# 5    LRLC'S RESPONSIBILITIES AND PERFORMANCE

Under the operating agreement between LRLC and the Parish, LRLC had the following responsibilities:

- Construction of new cells;

- Installation, operation, and maintenance of the leachate collection system (LCS) in Phase 4A;

- Acceptance and placement of waste;

- Placement and maintenance of daily and interim cover;

- Maintenance of cover on closed portions of the landfill; and

- Implementation of a comprehensive odor control system.

## 5.1   LRLC's Installation and Operation of the Phase 4A LCS

**Opinion 5.1: LRLC's installation, operation, and management of the LCS in Phase 4A conformed with industry standards and did not impair the operations of the landfill gas collection and control system. Liquids measured in landfill gas wells in Phase 4A are not the result of any issues with the LCS, and the system used to remove liquids from gas wells is not part of the leachate collection system. LRLC had no responsibility or control over the equipment used to remove liquids from landfill gas wells in Phase 4A.**

Basis for Opinion:

### 5.1.1   LRLC's Construction of the Leachate Collection System in Phase 4A

LRLC's construction of the leachate collection system was compliant with the LDEQ Title 33, Part VII, Subpart 1, Paragraph 711(B)(4).  An example of the construction requirements utilized in construction of is provided in the Construction Plans for Cell 22 Jefferson Parish Landfill, Avondale, Louisiana, Jefferson Parish (Bates No. REV_WC_JP_00011965).

### 5.1.2  LRLC's Operation & Maintenance of the Leachate Collection System in Phase 4A

In late 2018, LDEQ inspectors noted that during several inspections, landfill gas was escaping from leachate risers in Phase 4A and other phases (LDEQ Inspection Rept. (2018), Bates No. JP_JPLF_0003152).  In December 2018, LRLC arranged for the GCCS to be connected to several leachate risers, to collect landfill gas from the risers. SCS Engineers 2019. Leachate collection systems are typically separate from landfill gas collection systems, and neither LDEQ's regulations nor the JPLF permit required the GCCS to be connected to the LCS. However, it is not unusual for a landfill operator to connect its gas collection system to the LCS as another route to collect landfill gas. For instance, this was done at River Birch Landfill. See River Birch Depo. Trans. 41:4–17, 44:4-7 (Jan. 15, 2024). This type of connection is an expansion of the GCCS, as it does not typically affect leachate collection.

After the interconnection was made at JPLF, landfill gas was documented as being collected from the sump risers for Cells 20 North, 21 North, and 22 South, which are in Phase 4A (O&M Monthly Rept. (May 2019), Bates No. JP_JPLF_0018718). In March 2019, landfill gas was documented as being collected from the sump risers for Cells 14 and 17 South which are both located in Phase 3B.

In my opinion, this is a critical indicator of the performance of the LCS. The movement of landfill gas into the leachate collection risers demonstrates that these portions of the facility had unsaturated waste columns that allowed landfill gas to flow to the sump riser at the lowest elevation in the cell for that portion of the facility.

This demonstrates the separate functions of leachate collection systems from GCCS liquid removal from the landfill gas extraction wells.  Gas well liquids observed in extraction wells are not indicators of the leachate depth on the landfill liner system.  If they were, they would exhibit similar liquid elevations at every well. And as noted above, if waste were saturated to that depth, gas would not flow into or through leachate risers.  For this reason, landfill operators cannot rely on the LCS as a method to remove leachate that is blocking extraction wells, and a gas well liquid pumping system must be utilized to remove liquids and expose the well screen.

Another direct observation of interior landfill conditions was noted during the drilling of extraction wells as part of GCCS expansion events. When landfill gas collection

wells are installed, a bucket auger drilling rig positioned on the landfill surface drills into the waste to create a bore hole for the gas well's installation. During the drilling, the drill operator records the conditions observed in a well log.  I reviewed well logs completed during the drilling of the wells in Phase 4A to assess the subsurface conditions present within the landfill.  This information was compared to leachate levels measured at LFG extraction wells collected by CEC and APTIM (Bates No. WC_JPLF_00158037 and JP_JPLF_0003491).  **Table 2** compares the leachate levels recorded during each of these events.

During borehole drilling, the LFG extraction wells were essentially dry.  However, when these locations were remonitored, considerable depths of leachate were observed in the wells which had seeped in after installation.  Based on over 30 years of experience drilling LFG extraction wells as an engineer and contractor, this demonstrates that the waste mass was not saturated at the time of drilling, and leachate accumulated in the extraction well later.  This is an accepted and understood condition in the solid waste industry.

In my opinion, the sum of the observations provides clear evidence at most a relatively thin layer of liquid existed at the base of the landfill.

## 5.2   LRLC's Application of Daily and Interim Cover Complied with Industry Standards and Applicable Requirements.

**Opinion 5.2: LRLC applied daily cover in compliance with permit requirements and industry standards. LRLC also applied interim cover in compliance with permit requirements and industry standards, and sufficient interim cover was in place to reduce and minimize odors from the waste.**

<u>Basis for Opinion:</u>

Daily and interim cover was consistently applied and maintained by LRLC. Jefferson Parish monitored these activities through daily inspections performed by Jefferson Parish personnel and documented in Daily Inspection Logs.  I reviewed Daily Cover Inspection Logs to assess LRLC's effort in applying daily cover.  Logs from 2018 and 2019 were reviewed and it was observed that LRLC applied daily cover on a consistent basis throughout this period.  Occasionally, weather or equipment breakdowns prohibited them from performing a complete job, but these issues were noted as being resolved the following day.

During my review of documents associated with this Matter, a review of a June 22, 2018 LDEQ Compliance Order was performed to assess alleged issues with daily cover placement.  The Order alleges that LDEQ inspections performed on April 27, 2018 and April 30, 2018 found that insufficient daily cover was applied at the working face of the landfill.  Daily Inspections Reports prepared by Jefferson Parish staff documented that daily cover consisting of soil, tarps, and mulch had been adequately placed at the end of each working day during this period.  Based on this documentation provided by Jefferson Parish, the validity of LDEQ's allegations appears to be in question.  Furthermore, regarding the effectiveness of the GCCS, since these issues were alleged to be limited to the working face area, this would have no impact on the overall functionality of the GCCS.  It is an industry standard practice for waste placement activities to be performed in areas where an active GCCS is operating.

During a November 5, 2018 LDEQ inspection, LDEQ noted a concern regarding the thickness of interim cover over portions of the landfill surface.  As documented in a December 3, 2018 LRLC letter to Jefferson Parish (Bates No. WC_JPLF_00278210), LRLC took action to address these concerns by performing a cover thickness investigation to estimate the amount of cover soils.  After this investigation, additional interim cover materials were applied to the landfill surface. A subsequent investigation, determined that that a minimum of one foot of interim cover material existing over the areas of the landfill outside of the active fill area and had not received final cover.  (Interim Cover Thickness Investigation, 2019, Bates No. WC_JPLF_00410195)

Measurements that I have reviewed of the surface concentrations of $H_2S$ confirm that cover materials were effective in controlling emissions of gas and odors. For example, Carlson's measurements of surface concentrations of $H_2S$ in Phase 4A in May 2018 are consistent with my experience of conditions in areas of interim cover. When compared to the concentrations that Carlson reported from inside landfill gas collection wells, the surface $H_2S$ concentrations indicate that the cover was effective in minimizing the movement of landfill gas. Carlson 2018, $H_2S$ Scan with Jerome Meter and Draeger Tubes (Bates No. WC_JPLF_00158037).

## 5.3   Acceptance and Placement of Waste

### 5.3.1   Industry Standards for Controlling Odors from Waste

**Opinion 5.3: Most waste materials accepted at MSW landfills have the potential to produce significant odors. The accepted industry standard for managing odor generation from acceptable wastes relies on the proper design, installation, and operation of landfill gas collection and control systems, the application of daily, interim, and final cover, and the implementation of temporary odor control measures.**

<u>Basis for Opinion:</u>

MSW Landfills regularly accept waste materials that have the potential to generate odors.  As stated in LDEQ Title 33, Part VII, Subpart 1, Paragraph 115, solid waste acceptable at landfills includes garbage, refuse, waste treatment sludges, construction/demolition debris, yard waste, and other putrescible materials.  These putrescible materials are well understood in the solid waste industry to create noxious odors as they decompose (LDEQ Title 33, Part VII, Subpart 1, Paragraph 711§115). The potential to generate odor is true for MSW and industrial wastes.

- MSW – Typical household wastes have odor generating potential due to the types of waste disposed of by households.  This odor generation potential is evident from odors generated in waste disposal receptacles (e.g., waste cans, dumpsters, etc.).  The waste decomposition process is well underway on a small scale while the MSW waits to be picked up, and continues throughout transportation to a landfill, placement in a landfill, and decomposition at the landfill.

- Sanitary waste (i.e., sewage) sludges have the potential to have particularly offensive odors as they arrive at the landfill for disposal (CDM, Bates No. WC_JPLF_00488019).  Odors are inherent in the waste mass and do not need time to develop.  For this reason, these materials are typically buried at the landfill and covered as quickly as possible to minimize odors. Furthermore, sludge has the potential to generate hydrogen sulfide ($H_2S$) through bacteria and sulfur present in the sludge.

- Waste materials containing sulfur compounds (e.g., drywall, construction and demolition (C&D) fines, and coal combustion residuals, etc.) have the potential to generate $H_2S$.

- Once waste is disposed in a landfill, it becomes important to manage gases and odors due to the accumulation of large quantities of waste that continue the decomposition process.  It is critical to plan and implement landfill gas collection and odor control measures such that control systems are in place to manage odor generation and migration.  For example, daily and interim cover materials are placed on a regular basis, partly to control odors. Federal and state regulations require for most landfills that a GCCS be permitted, designed, constructed, and in operation within five years after waste placement, based on industry-wide estimates of the gas generation cycle from disposed waste. [Subpart WWW/LDEQ Title 33 § 711(B)(6).] Landfill owners may also install a GCCS before those timeframes to capture saleable methane and to control potential odors.

### 5.3.2  Diversion of Specific Waste Streams is Not Necessary to Comply with Accepted Standards for Odor Control

**Opinion 5.4: Diversion of specific wastes from MSW landfills is not a generally accepted or industry standard method of odor control. In fact, the spent lime waste that is the focus of Plaintiffs' expert is commonly used to solidify liquid wastes and stabilize wastes at landfills.**

<u>Basis for Opinion:</u>

Diversion of specific waste materials from landfills is not commonly applied.  As previously discussed, most waste materials placed in landfills have an odor generation potential.  Knowing this, landfills are designed and managed to control odors.  In limited instances, specific materials that are known to be odorous as they arrive, have special handling procedures.  Typically, these materials are disposed of at the working face and covered immediately to attempt to minimize and contain the odor. For proportionally small quantities of specific wastes, potential odors are commonly managed with the environmental control systems discussed above, including primarily a GCCS.

### 5.3.3  Segregation of Specific Waste Streams is Not Necessary to Comply with Accepted Industry and Regulatory Standards for Odor Control

**Opinion 5.5: Segregated disposal of specific wastes at MSW landfills is not a generally accepted method of odor control. Segregation of relatively minor volumes of waste is not practicable at most MSW landfills. The authorities**

---

**Weaver Consultants Group**

**that Plaintiffs' expert relies on recognize that waste segregation is impractical in most cases.**

Basis for Opinion:

Standard practice in landfill operations is to keep the landfill active face to the smallest size possible to maximize the efficiency of the landfill equipment responsible for waste placement, compaction, and covering.  Designation of separate areas of the active face or operating multiple active faces is not practical especially for landfills that accept smaller quantities of waste daily.  For smaller landfills, it is necessary for each day's waste placement to be limited to smaller areas to allow for proper management.

For reference, LDEQ's regulations specifically address the segregation and diversion of several categories of wastes at LAC 33, section 711(D)(5). That provision does not require the segregation or diversion of wastes based on their potential to create odors, though it allows C&D waste to be disposed in a separate, less-heavily regulated C&D landfill.

### 5.3.4  Coal Combustion Residue Materials and FGD Wastes Are Commonly Disposed of or Used Beneficially at MSW Landfills

**Opinion 5.6: Flue gas desulphurization wastes and other coal combustion residue wastes that may contain gypsum are commonly disposed of in landfills or used beneficially for waste solidification or stabilization. Their use or disposal in this manner is consistent with accepted practices in the solid waste industry.**

Basis for Opinion:

Coal combustion residue materials result from the electric power generation process at coal-fired power plants.  These materials consist of products including fly ash, bottom ash, flue gas desulphurization (FGD) gypsum residual, bottom slag, and others.  Some of these products including FGD wastes are frequently used for waste stabilization and solidification at MSW Landfills.

Exhaust gas from power plants and other facilities that burn fossil fuels is often treated with lime or limestone to remove sulfur dioxide, as an air pollution control to combine sulfur dioxide with lime. This process results in a byproduct that is mineralogically identical to natural gypsum. This product has many potential beneficial uses including use as a soil amendment, the manufacturing of drywall,

**Weaver Consultants Group**

and waste stabilization and solidification (American Coal Ash Association 2021 Survey Report).  Two of the products accepted for use at Jefferson Parish were also approved as a soil amendment beneficial use by LDEQ (Bates No. JP_JPLF_324621 and JP_JPLF_324622).

The American Coal Ash Association (ACAA) reports that from 2012 through 2022, of coal combustion products used for waste stabilization and solidification, 12.4% were FGD gypsum residual products.

During the 2016-2019 timeframe, the following amounts of CCR and FGD materials were used nationwide for waste stabilization and solidification:

- 2019: 737,646 tons of CCR wastes, of which 28,361 tons were from FGD processes;

- 2018: 1,199,692 tons of CCR wastes, of which 53,814 tons were from FGD processes;

- 2017: 1,329,193 tons of CCR wastes, of which 117,672 tons were from FGD processes;

- 2016: 4,967,476 tons of CCR wastes, of which 3,741,300 tons were from FGD processes.

This data shows that it is a nationwide practice to use CCR wastes, including flue gas desulfurization wastes, for waste stabilization and solidification in landfills.

Moreover, the tonnages reported above were listed as a beneficial use of FGD materials. During the years above, approximately 30% to 50% of the FGD materials generated was disposed of at landfills or ash impoundments.[1]

### 5.3.4.1  FGD Waste & C&D Waste

As discussed above, FGD waste was utilized at JPLF in a liquid waste solidification process in Phase 4A, and was disposed at the JPLF.

In addition to FGD wastes, drywall and other gypsum containing products are regularly disposed of at MSW Landfills, most typically in the form of C&D wastes or C&D fines.  While these products are known to have higher sulfur contents and consequently also have odor generating potential, it is the standard practice in the landfill and solid waste industry to manage gases and odors from them with a

---

[1] The ACAA reports do not specify what types of landfills received unused, disposed FGD materials, so it is unlikely that all the unused FGD materials were disposed in MSW landfills.

GCCS and related environmental control systems. As the Owner/Operator of the GCCS, Jefferson Parish, understood that these materials were being either landfilled or utilized at the facility, and Jefferson Parish was in the position to provide for the necessary level of LFG control.  Since Jefferson Parish contracted GCCS operations to a third party, it was their responsibility to notice the contractor and alert them to this waste stream so they could respond proactively to it.

The acceptance of these wastes at MSW landfills is common throughout the solid waste industry. For instance, the neighboring River Birch Landfill has commonly accepted C&D waste and FGD waste.

| Year Submitted | C&D Waste (Tons) | Spent Lime (Tons) | Citation |
|---|---|---|---|
| 2013 (7/1/2012-6/30/2013) | 3,819 | - | River Birch Solid Waste Certification of Compliance (Sept. 20, 2013), LDEQ EDMS Doc. No. 9054179 |
| 2014 (7/1/2013-6/30/2014) | 5,309 | - | River Birch Solid Waste Certification of Compliance (Sept. 22, 2014), LDEQ EDMS Doc. No. 9561991 |
| 2015 (7/1/2014-6/30/2015) | 2,704 | 6,185 | River Birch Solid Waste Certification of Compliance (Sept. 15, 2015), LDEQ EDMS Doc. No. 9948088 |
| 2017 (7/1/2016-6/30-2017) | 2,555 | 5,371 | Solid Waste Certification of Compliance, RIVER_BIRCH_0016707 |
| 2018 (7/1/2017-6/30/2018) | 2,356 | - | Solid Waste Certification of Compliance, RIVER_BIRCH_0016746 |
| 2019 (7/1/2018-6/30/2019) | 2,644 | - | River Birch Solid Waste Certification of Compliance (Sept. 18, 2019), LDEQ EDMS Doc. No. 11881167 |
| 2020 (7/1/2019-6/30/2020) | 2,814 | - | River Birch Solid Waste Certification of Compliance (Sept. 23, 2020), LDEQ EDMS Doc. No. 12370498 |
| 2021 (7/1/2020-6/31/2021) | 5,669 | - | River Birch Solid Waste Certification of Compliance (Oct. 5, 2021), LDEQ EDMS Doc. No. 12932018 |
| 2022 (7/1/2021-6/30/2022) | 3,566 | - | River Birch Solid Waste Certification of Compliance (Sept. 27, 2022), LDEQ EDMS Doc. No. 13488243 |

### 5.3.5 LRLC's Acceptance and Use of Wastes Containing Sulfur

**Opinion 5.7: When LRLC accepted spent lime for beneficial use and disposal, it did so in compliance with industry standards.**

Basis for Opinion:

Based on Jefferson Parish's annual reports to LDEQ and landfill records, between July 2016 and June 2020, the landfill accepted:

- MSW: 1,030,725 tons (approx. 941 tons per day on average);[2]
- Domestic Sewage Sludge: 107,718 tons;
- Industrial Wastes: 95,236 tons;
- Spent Lime: Approximately 23,000 tons[3].

Based on these quantities, MSW comprised 91.5% of the total waste accepted at JPLF during this 3-year period while domestic sewer sludge, which is considered MSW, comprised 9.6% of the total waste accepted. Industrial waste comprised only 8.5% of the total waste accepted while spent lime comprised only 2.0% of the total waste accepted (Bates No. WC_JPLF_00182058 and WC_JPLF_00223815). The figure below shows the proportion of accepted waste during this period that was spent lime.

[2] Jefferson Parish Landfill, 2016–2017 Solid Waste Certification of Compliance Part I & Part II (Sept. 26, 2017); Jefferson Parish Landfill, 2017–2018 Solid Waste Certification of Compliance Part I & Part II (Sept. 26, 2018); Jefferson Parish Landfill, 2018–2019 Solid Waste Certification of Compliance Part I & Part II (Sept. 27, 2019).

[3] Upon review of Dr. Pietari's calculations, we were unable to reproduce the exact quantity based on the references she cited.

**Percentage of Spent Lime Disposed vs. Total Waste Disposed**



For comparison purposes, in a Landfill Odor Management Program prepared by CDM in 2006 (Bates No. WC_JPLF_00488019), the facility reports accepted 2% of its volume as domestic sewer sludge.  So receipt of this waste stream increase almost 500% in the time relevant to this Matter.

Annual C&D waste tonnages are reported to LDEQ based on how each incoming load is categorized. During this period, C&D waste tonnages were not reported as being accepted.  However, when a load of mixed waste containing both C&D and MSW trash arrives at a landfill, it is common for the load to be recorded as MSW, since a load of C&D waste cannot contain other types of waste. So, it is possible that the JPLF disposed of C&D waste in a mixed load.

The JPLF accepted various types of "special waste" for disposal, including an FGD waste called "spent lime." The spent lime disposed at the JPLF was an FGD waste generated by Rain CII Carbon LLC ("Rain Carbon"). Spent Lime Ticket Report 2016–March 2018 (WC_JPLF_00255114); Solidification Agent Tonnage Report (2018) (WC_JPLF_00223815). Rain Carbon produces calcined petroleum coke, a raw material for a variety of industrial processes and products.[4]  Three Rain Carbon facilities disposed of spent lime at JPLF: Chalmette, LA; Norco, LA; and Covington, LA. Spent Lime Ticket Report 2016 – March 2018 (WC_JPLF_00255114). A scrubbing system employed by Rain Carbon's flue gas

---

[4] https://www.raincarbon.com/products-and-services/carbon-products#parentHorizontalTab2

scrubbing system uses hydrated lime (calcium hydroxide, $Ca(OH)_2$) to remove sulfur dioxide from the facilities' exhaust gas, which resulted in the partial conversion of lime to calcium sulfate dihydrate (gypsum, $CaSO_4 \cdot 2H_2O$). Waste Connections Inc., Waste Profile, Rain CII Carbon Chalmette (WC_JPLF_00333198).

During the period October 17, 2016 through July 3, 2018, the JPLF received approximately 23,000 tons of spent lime from Rain Carbon. Spent Lime Ticket Report 2016-March 2018. (WC_JPLF_00255114); Solidification Agent Tonnage Report (2018) (WC_JPLF_00223815).

Special wastes required approval by both LRLC and the Parish, based on both entities' review of detailed information regarding the waste proposed to be disposed. (Operating Agreement §II.B.4).  Waste profiles are typically completed by the generator of the waste, based on the generator's knowledge and description of the waste. The waste profiles that were the basis for LRLC and the Parish's approval of spent lime from Rain Carbon were dated October 5, 2016 for spent lime from Rain Carbon's Norco and Chalmette facilities.

The waste profiles stated that the calcium sulfate dihydrate (gypsum) content of the spent lime was 5% to 20%. [WC_JPLF_00321742 - Waste Connections profile for Rain Carbon Chalmette Spent Lime; Waste Profile Spent Lime Rain Carbon Norco JP_JPLF_00343184-185]. Rain Carbon also supplied Safety Data Sheets for the spent lime, which also indicated that the calcium sulfate dihydrate (gypsum) content of the spent lime was 5% to 20%. [Rain CII Carbon LLC, Safety Data Sheet Spent Reagent Lime JP_JPLF_00343186].

The spent lime was permitted under LDEQ's regulations governing the disposal of industrial waste (LDEQ Title 33, Part VII, Subpart 1, Paragraph 711§115), it was permitted by the facility's permit as a Type I facility, and it was an acceptable waste under LRLC's contract with the Parish (Bates No. WC_JPLF_00418707). Neither LDEQ nor the Parish have asserted that the acceptance of spent lime violated LDEQ's regulations, the permit, or the Operating Agreement between the Parish and LRLC.

It should also be noted that as evidenced in Carlson's August 15, 2018 report, the presence of $H_2S$ was found in locations outside of the spent lime placement area. Therefore, other materials generating $H_2S$ were present in the landfill.

Approximately 10% of the waste accepted at the facility consisted of domestic sewer sludge which has the potential to generate $H_2S$.

### 5.3.6   LRLC Relied on the Parish to Install the GCCS as the Primary Odor Control System in Phase 4A.

**Opinion 5.8: LRLC relied on the Parish and its GCCS contractors to design, install, operate, repair, and maintain the GCCS. The Parish controlled the design, installation, and operation of the landfill gas collection and control system. LRLC's reliance on the Parish was reasonable.**

Basis for Opinion:

In October 2016 and throughout the period that LRLC accepted spent lime, the Parish indicated that it was planning to install a sufficient GCCS. The Parish's delays in installing the GCCS in Phase 4A only became apparent in late 2018 and after all of the spent lime had been accepted. (October 9, 2018, email, Bates No. ADD_P00108258; December 14, 2018 email, Bates No. APTIM_0191844).

The Plaintiffs' expert argues that LRLC assumed responsibility for the GCCS through LRLC's responsibility for a comprehensive odor control system. Sananes Rept. ¶184. The operating agreement does not assign LRLC that responsibility and based on the documents I have reviewed, the Parish has never asserted that LRLC was responsible for the GCCS. No knowledgeable professional in the field of landfill operations would interpret the relevant contract provisions the way that Plaintiffs' expert suggests.

# 6    JEFFERSON PARISH'S RESPONSIBILITIES AND PERFORMANCE

**Opinion 6.1: Jefferson Parish was solely responsible for issues with the landfill gas collection and control system that were identified by LDEQ, Carlson Environmental Consultants, River Birch, and Plaintiffs. LRLC had no responsibility for the landfill gas collection and control system, and based on its assigned duties, LRLC had no ability to improve operations of the system.**

Basis for opinion:

Jefferson Parish as part of their contractual relationship with LRLC, chose to maintain responsibility for permitting, design, construction, and O&M of the facility's GCCS, as opposed to allowing LRLC to be responsible for LFG control in the portion of the facility in which they were operating.  While there is no inherent flaw in this contract structure, it does leave the responsibility of performing this necessary function with the facility Owner.

In addition to maintaining responsibility of the facility GCCS, Jefferson Parish also maintained responsibility for the perimeter leachate management system.  The purpose of this system was to convey leachate and GCCS liquids from the point of collection (e.g., landfill side slope riser constructed as part of the leachate management system or LFG collection wells constructed as part of the GCCS) off-site for management.  The contract envisioned that Jefferson Parish would maintain responsibility for the leachate management system outside of Phase 4A until such time as they could demonstrate 30 days of continuous operation in good working condition (BATES NO. WC_JPLF_00418707).  At that point, O&M of the perimeter leachate management system was to transfer to LRLC.  During the contract period, Jefferson Parish was unable to achieve this performance goal (Bates No. WC_JPLF_00276071).

Jefferson Parish also retained responsibility for approving or rejecting the acceptance of industrial waste (i.e., prior approval from the Parish for all commercial and industrial waste haulers) from every generator of such waste. Every waste profile from every generator of special waste had to be approved by the Parish's Landfill Engineer before it could be accepted at the landfill (Section II(B)(4) of the May 17, 2012 LRLC/Jefferson Parish Agreement). In this way, the

**Weaver Consultants Group**

Parish also retained responsibility for compliance with permit requirements relating to the types of waste that could be disposed at the landfill, as well as the discretion to reject permitted wastes.  Through the Landfill Engineer's approval of each special waste profile, the Parish was also aware of every special waste stream that was approved for disposal at the landfill.

Given that this is the contract structure Jefferson Parish chose to operate under, a review of the work performed and how it was executed was undertaken to assess potential contributing factors to the emission of odors outside of the landfill's boundaries.

## 6.1    Scope of Services to be Provided

**Opinion 6.2: Jefferson Parish controlled the assignment of work to its contractors and actively supervised the operations at the JPLF. Jefferson Parish should have been aware of any issues that it was in the best position to address as the permittee and owner, and as the entity with control over the design and installation of the GCCS.**

Basis for Opinion:

As Owner and Permittee of the JPLF GCCS, Jefferson Parish was responsible for permitting, design, construction, and O&M of the facility GCCS.  GCCS permitting and design services were contracted to consultants who prepared engineering documents for submission to LDEQ.  Once the design and permitting documents were approved by Jefferson Parish and LDEQ, Jefferson Parish awarded installation of this work to a contractor through a competitive bidding process. Contractors would then execute the work while being observed by an engineering consultant to document that the GCCS work was completed in accordance with the design plans and specifications.  Once the GCCS work was accepted by the Owner, Jefferson Parish, the system would commence operations.   Jefferson Parish contracted out O&M of the GCCS to provide for proper LFG control for the facility.  During the 2017-2019 period, the O&M of the GCCS was contracted to APTIM, Inc. and then River Birch. APTIM Operating Agreement Amendment, JP_JPLF_0018035; River Birch Operating Agreement, JP_JPLF_00392921.  As the owner and permittee, Jefferson Parish was responsible for all aspects of executing the work related to the facility GCCS in accordance with permits and applicable regulations.

In addition to managing the work noted above, Jefferson Parish also performed daily inspections of the facility and surrounding areas.  This information included conditions of the active portions of the landfill, odor conditions on and off the landfill, and condition of the GCCS and the O&M services being provided to maintain it.  The Parish also assigned a Parish-employed Landfill Engineer to oversee operations.  Based on this level of engagement at the facility, Jefferson Parish had ample opportunity to observe and assess the day-to-day condition of the facility.

The contract between Jefferson Parish and LRLC also incorporates this definition of Industrial Solid Waste, including waste resulting from electric power generation (Operating Agreement, Definitions Section, Paragraph 16, Industrial Solid Waste).  The contract then goes on to state under the "Waste Accepted at Landfill" section of the contract that Industrial Solid Waste is considered an Acceptable Waste subject to the prior written approval of Jefferson Parish.  Each profile of Industrial Solid Waste was required to be submitted to the Landfill Engineer (employee of Jefferson Parish) for approval prior to receipt of the waste materials.  Therefore, it is reasonable to assume that Jefferson Parish was aware of the potential receipt of these materials at JPLF when executing a contract with LRLC.  Furthermore, they had additional opportunities to assess the suitability of the material at their facility at the time of receipt.

In an October 6, 2016 email from Jefferson Parish to LRLC, spent lime was approved special wastes at the site (Bates No. WC_JPLF_00263258).

## 6.2   Execution of Scope of Services

**Opinion 6.3: Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations.**

<u>Basis for Opinion:</u>

Jefferson Parish was responsible for the permitting, design, construction, and O&M of the facility GCCS.  Jefferson Parish was aware of industrial solid waste being accepted at the facility as they were required to approve acceptance of industrial solid waste prior to its acceptance at the facility.  Information was readily available

about this material which should have been considered as part of Jefferson Parish's management of LFG at the facility.   Jefferson Parish delayed the expansion of the GCCS, which could have contributed to the escape of LFG and odors.

LRLC did have responsibilities to perform site operations activities that complemented Jefferson Parish's responsibilities to manage landfill gas and odors for the facility. For example, the application of daily and interim cover at the facility promotes a more efficient operation of the GCCS by restricting air intrusion into the waste mass as vacuum is applied through operation of the GCCS. Daily and interim cover was consistently applied and maintained by LRLC. Jefferson Parish monitored these activities through daily inspections performed by Jefferson Parish personnel and documented in Daily Inspection Logs. A review of Daily Cover Inspection Logs was performed to assess LRLC's effort in applying daily cover. Logs from 2018 and 2019 were reviewed and it was observed that LRLC applied daily cover on a consistent basis throughout this period. Occasionally, weather or equipment breakdowns prohibited them from performing a complete job, but these issues were noted as being resolved the following day. As discussed above, interim cover was present across Phase 4A at the minimum required depth of 1 foot of clay soils, and much of Phase 4A was covered by more than 1 foot.

Based on my review of the May 17, 2012 agreement with LRLC, Jefferson Parish chose to exclude permitting, design, construction, and O&M of the GCCS from the operations contract with LRLC, as Section II of the May 17, 2012 contract makes no mention of GCCS work included in the Scope of Services. This contract structure required Jefferson Parish to coordinate permitting, design, construction, and maintenance of the GCCS in Phase 4A while LRLC operated the placement of waste and cover materials.   Jefferson Parish created a complicated management structure regarding its oversight of the facility GCCS. This structure included the owner and its reserved responsibility for design and installation of the GCCS, the landfill operator, and a landfill gas-to-energy developer[5], and the GCCS

---

[5] Jefferson Parish contracted with a landfill gas-to-energy developer, Renovar, who utilized the landfill gas collected from the facility to fuel engines and generate electricity.   While I am not aware of any on-site landfill responsibilities that Renovar had, they did have an interest in the quality and quantity of landfill being generated.  As the landfill gas generated at the facility was used as fuel for their electrical generation process,

O&M contractor.  Each entity had a different role to serve regarding GCCS management at the facility.

## 6.2.1  Prioritizing GCCS Construction

**Opinion 6.4: Jefferson Parish allowed contracts to lapse for the installation of the GCCS in Phase 4A, delaying its final installation and connection to vacuum. More prudent management of the GCCS installation could have avoided that delay.**

Basis for Opinion:

A summary of site development activity related to GCCS construction activities is provided on Table 1.  This summary states the amount of landfill cell development that occurred prior to Jefferson Parish having a permitted GCCS ready for installation.  This then caused the installation of the GCCS in Cells 20 and 21 to be delayed to the last possible date to attempt to maintain compliance with requirements of §60.752 (See Section 4.4.1 of this report).  This regulation requires a GCCS to be installed in a new unit or cell of the facility no later than 5 years after the commencement of waste acceptance.  This effectively means that an active GCCS must be in place no later than the fifth anniversary of waste placement in the subject area.  It does not mean that an owner or operator is required to wait five years before installing an active GCCS.  A GCCS may be constructed earlier than the 5-year deadline, and commonly is.

It has been my professional experience that owners or operators who are responsible for active LFG collection at a facility will commence with the installation of a GCCS as waste filling allows and rarely wait until the 5-year requirement is applicable.  It is not uncommon for facilities to install a GCCS to collect LFG and control odors before it is required by the Subpart WWW regulations.  Waiting until compliance issues arise from a lack of LFG control is not prudent as the implementation of this type of work takes time to execute.

In Cells 20 and 21, which are a part of Phase 4A, the first recorded data documenting LFG extraction was April 2018.  Only a portion of the work planned as part of this expansion was completed within the 5-year window.

---

they preferred that oxygen be limited and methane content be as high as possible to increase the BTU value of the landfill gas.

As a result of this delay to the very last moment possible to remain in compliance, a portion of the GCCS planned to be installed during this first GCCS construction event in Phase 4A had to be delayed.  Golder Associates originally provided engineering and design services, and prepared the GCCS design that was approved for Phase 4A. However, Jefferson Parish allowed the contracts with its two GCCS installation contractors to lapse, delaying the installation of the second phase of the gas system in Phase 4A. (December 14, 2018 email, Bates No. APTIM_0191844).  (October 9, 2018 Jefferson Parish Email).  Franklin Engineers was ultimately retained to complete the work, with interim assistance from the GCCS O&M contractor, APTIM.

This lapse in oversight by the Parish delayed the installation of 9 gas wells in Phase 4A from 2018 to early 2019, such that the Parish had to obtain LDEQ's approval to install the gas system after the deadline originally required (Bates No. ADD_P00107758).

As discussed previously, my experience with landfill operations over the years has been that landfill owners are proactive with the installation of their GCCS knowing the risks of an odor nuisance.  Experienced landfill owners are aware of the time it takes to investigate, permit, plan, bid, and construct a GCCS, and factor in extra time to account for the risk of construction or permitting delays.  My experience has shown me that landfill owners begin planning to install GCCS infrastructure at a facility once a sufficient waste thickness allows well installation even if they are temporary and will need to be extended or redrilled in the future.  For landfills with a large waste disposal area that may require an extended period, landfill owners will employ other means of landfill gas control (e.g., horizontal collectors, bottom collectors).  This allows temporary GCCS control systems to be in place to provide proper landfill gas and odor control.

### 6.2.2   GCCS O&M

**Opinion 6.5: Based on design, construction, and monitoring of numerous GCCS systems, the numerous conclusions and recommendations provided by CEC indicate that Jefferson Parish did not prioritize O&M of the GCCS.**

<u>Basis for Opinion:</u>

In May 2018, Jefferson Parish engaged engineering consultants to assess the LFG collection system at the JPLF.  An August 18, 2018, report was issued by Carlson

Environmental Consultants, PC (CEC) titled "Landfill Gas System Assessment for the Jefferson Parish Landfill" (Bates No. WC_JPLF_00158037). This report summarized the findings of a 5-day field investigation (May 14-18, 2018) performed by CEC on the JPLF GCCS and CEC's review of other historical data provided by Jefferson Parish.  Section 3 of this document includes 30 conclusions and recommendations regarding the GCCS.   Within these conclusions and recommendations, some of the items that I believe to be relevant to Jefferson Parish's responsibility for the GCCS are listed below.

- "Water within the waste mass is the primary problem for optimum operation of the LFG system at this site and creates or magnifies all other problems noted in this Report."

- "In consideration of the limited amount of perforated pipe available in most wells, CEC recommends that all pneumatic pumps be exhausted inside each gas well."

- "Another recommendation to help reduce the water levels in gas wells would be to install a 'low drawdown' pneumatic pump."

- "…CEC recommends a minimum of twice per month monitoring, tuning, and recording data."

- "CEC noted during the interviews with Parish, APTIM, and Renovar that Renovar personnel were providing a significant amount of assistance on the wellfield tuning and gas recovery."

- CEC recommended a different equipment configuration to provide improved vacuum to the wellfield in addition to increasing the available vacuum to the wellfield.

- "There are some areas where the piping has been compromised in Phase 4A near the active waste filling area and the available vacuum is limited."

- "The air supply system and piping are in need of upgrades."

- "The condensate force main system is likely in need of significant long-term upgrades."

- "CEC noted that the facility does not have the necessary infrastructure in place to handle significant pump maintenance."

---

**Weaver Consultants Group**

- "…Condensate drip-legs should be investigated further for potential blockages or replacement with condensate sump/pump combinations."

- "CEC noted several locations of LFG system work in Phase 3B and 4A that were not completely finalized."

- "The Parish was working on an updated LFG collection and control system as-built at the time of CEC's assessment."

- "On alternate operating procedures for wells out of compliance"…facilities can become over-reliant on the procedure to delay repairs, dewatering, or other improvements that may both provide additional gas recovery and regulatory compliance."

CEC has further emphasized these issues in an email dated May 29, 2018 to Jefferson Parish (Bates No. JP_JPLF_00328529).   CEC emphasized the importance of proper wellfield tuning to maximize the GCCS effectiveness. Excerpts from this email are provided below to illustrate this issue.

- "there were several wells that were in this area (Phase 4A) that could not be tuned due to their height, there was a loss of vacuum to several of these wells due to a sump issue and a possible header blockage…"

- "As we observed, there was a significant amount of gas pressure in this area (and odors)…"

- "getting gas wells tuned properly is the #1 way to reduce gas emissions from a landfill.  If you what to make an impact on your site odors, the tune, tune, tune." (Emphasis in Carlson's email)

- "Need proper oversight of APTIM to ensure tuning is done, apparently this is a problem."

All the above issues related to operations and control systems within the responsibility of Jefferson Parish or APTIM.

Based on CEC's observations during their site visit, Jefferson Parish had not been proactive in addressing GCCS issues in this area.  Furthermore, their contractor, APTIM, was having issues in performing their O&M tasks.

Additionally, years prior to this event, Jefferson Parish was aware that flooded LFG collection wells negatively impacted the GCCS in other phases than Phase 4A. Below are excerpts from a March 28, 2002 letter from the Jefferson Parish

**Weaver Consultants Group**

Department of Environmental Affairs to the LDEQ regarding the JPLF that illustrate this awareness.

- "The leachate level in some of the wells is high enough to partially, or in some cases completely, flood the perforations in the well casings, preventing the landfill gas from entering the well and being collected by the system."

- "The Parish's Contractor, EMCON/OWT, suggested that several wells could be adapted to install leachate removal pumps, while still functioning as gas extraction wells."

- "While this problem has caused the gas collection system to operate inefficiently, it has not resulted in surface discharges of methane."

- "We are hopeful that the installation of the pumps will reduce the leachate levels in the gas wells, exposing the landfill gas to the perforations, increasing gas collection and reducing oxygen and temperature measurements with the well field.  We are confident that this will also allow the system to maintain a negative pressure at every well."

Jefferson Parish was advised as early as 2002 of the benefits of the installation of a GCCS Liquid Management System which includes installing pumps into LFG extraction wells to manage liquid.  Based on the landfill operations history provided in CEC's August 15, 2018 Landfill Gas System Assessment Report, at the time of the 2002 email, waste was only being accepted in Phase 3A which was well before operation of Phase 4A commenced.  Nevertheless, Jefferson Parish did not fully utilize this knowledge to improve the efficiency of their GCCS as the facility grew and expanded.

### 6.2.3  GCCS Liquids Management

**Opinion 6.6: Liquids measured in gas wells in Phase 4A are not the result of flooding from the base of the landfill, nor are they the result of any asserted operational issues with the leachate collection system. This is supported by an understanding of the two systems and by reported direct observations at the landfill.**

<u>Basis for Opinion:</u>

As discussed in Section 4 of this report, management of gas well liquids as part of maintaining the GCCS is entirely different than management of leachate from the LCS.  The primary performance standard of the LCS is to maintain the leachate head in a pumped-down condition such that not more than 1 foot of head exists above the lowest elevation of the leachate collection piping, LDEQ Title 33, Part VII, Subpart 1, Paragraph 711(B)(4)(a)(viii).  The primary performance standard for removal of gas well liquids is to maintain the GCCS.

There is not a regulatory citation that dictates how or when gas well liquids need to be removed from LFG extraction wells.  This is a part of the maintenance program required to operate the GCCS.  The primary performance standard for operation of the GCCS is maintaining compliance with Subpart WWW § 60.753, and the primary measure of a GCCS's effectiveness is surface emissions monitoring.

The difference in the function of these systems was well illustrated by observations made at the landfill that demonstrate the separate movement and accumulation of liquids in these systems as summarized below.

- The boring logs recorded during extraction well installation in Phase 4A show that extraction wells were not drilled into saturated landfill media. (Limited Construction Documentation Report, 2019 Landfill GCCS Modification Phase II). While the waste is noted as "wet" in several of the logs, that is not an indication of saturation. Different boring equipment is necessary when installing a well in saturated conditions, and the logs do not indicate that such equipment was used.

- Landfill gas has been documented escaping from the LCS side slope risers, which confirms a connection to the perforations at the bottom of the sump to unsaturated waste. (Bates No. APTIM_0150447) If the waste around the slope risers were saturated, gas would not be able to flow through the waste and enter the risers.

- Level sensor readings collected in 2018 and 2019 in Phase 4A show that leachate levels are generally low and do not show several feet of saturated waste.  (General Causation Trial Exhibit 1204)

Based on these direct observations of the condition of the landfill, it is clear that no more than a few feet of leachate exists at the base of the landfill.  While it is important to maintain compliance in operating the LCS, for the LCS is not the cause of flooded or even partially flooded LFG extraction wells and the issues that may cause in operating the GCCS or maintaining daily and interim cover free from leachate seeps.

### 6.2.4  Leachate Management System O&M

**Opinion 6.7: Jefferson Parish's installation, operation, and maintenance of the leachate collection and management system outside of Phase 4A did not comply with applicable industry standards and resulted in deficiencies and operational challenges.**

**Opinion 6.8: Jefferson Parish did not enhance the leachate management system to meet the facility's disposal needs in a proactive manner.  Jefferson Parish was responsible for the upgrade of the perimeter leachate management system which provides additional capacity to remove leachate and GCCS liquid from the waste mass.  Furthermore, the GCCS liquid removal system forcemain piping was determined to be undersized and not capable of transferring GCCS liquid from LFG extraction wells at the rate needed to maintain LFG well extraction efficiency.**

Basis for Opinions:

The perimeter leachate management system includes piping to convey leachate from collection points to off-site facilities that can properly manage leachate and GCCS liquid generated at the facility.  This infrastructure is a key element of the overall facility leachate control as it is the primary means of leachate disposal for the facility.  If the perimeter piping and disposal point are not properly designed, constructed, and maintained, the quantity of liquid the facility can dispose of can be limited.

As a part of the facility development, leachate management forcemain piping was to be rerouted around the perimeter of Phase 3B to allow the liner systems of Phase 3A and 4A to be connected.  This work was to be completed and transferred to LRLC for O&M.  However, due to issues with construction, this portion of the leachate management infrastructure was not completed in time to allow this transfer.  A summary of deficiencies with the LCS was provided in a letter prepared

by LRLC and sent to Jefferson Parish.   (Bates No. WC_JPLF_00276071). A schematic of the division of LRLC and Jefferson Parish's responsibilities is provided below.



As shown in the figure above, Jefferson Parish was responsible for the existing leachate management system that controlled leachate at all the existing phases of the facility.  In contracting LRLC as the operator of the facility, they attempted to delegate this responsibility to LRLC based on the condition that they could restore the existing system to a functioning condition.  They were unable to achieve this performance standard and, therefore, were not able to transfer responsibility. While the leachate management system was a separate and distinct environmental control system necessary for facility operation, this system was also crucial to operation of the GCCS as the leachate management system was relied upon to manage gas well liquids produced from operation of the GCCS.  Without a properly operating leachate management system, the GCCS was also limited in its functionality.

Additionally, CEC noted several issues with the condition of the leachate management system during their May 2018 site visit.  None of these observations related to the leachate collection system within Phase 4A. Some of the items noted include the following.

- The compressed air supply system provides compressed air to the pneumatic pumps in the wellfield that energize the pumps and lift the GCCS liquid from the landfill gas extraction wells and into the facility piping.  This compressed air supply system was found to be in disrepair: either inoperable or in poor working condition.  In this state, the ability of the facility to remove GCCS liquids from the landfill gas extraction wells is compromised.

- CEC noted that the forcemain for the GCCS liquid management system appeared to be undersized further limiting the ability of the system to discharge as efficiently as possible.

- CEC noted a concern that only approximately 50% of the side slope riser pumps for the base leachate management system were operational or could be operated at the time of the inspection.

The intent of this system is to allow no more than 12 inches of leachate to accumulate on the floor of the cell in any given location.  Based on my review of the leachate collection systems constructed as part of Phases 3A, 3B, and 4A, the side slope riser system included perforated sections of piping within the sump area. These perforations allow leachate to flow into the side slope riser piping where a pump then transfers the leachate and delivers it to the perimeter leachate forcemain.

Jefferson Parish email correspondence indicates that at least as far back as 2016, an issue with landfill gas venting from side slope risers was occurring.  According to APTIM's monthly O&M reports, these structures began to be used as landfill gas extraction points as is a common occurrence in the solid waste industry.  In September 2018, the infrastructure associated with the installation of these landfill gas extraction points began according to APTIM's monthly O&M reports.

Based on email correspondence related to the facility, it seems that maintaining a properly operating leachate management system at the facility was a challenge for Jefferson Parish for many years.  A July 29, 2015, email from Renovar to Jefferson Parish discussed issues with the leachate management system inhibiting LFG

collection at the facility (Bates No. JP_JPLF_00346537).  The email goes on to mention that the last improvements were made in 2010.

## 7    APTIM'S RESPONSIBILITIES & PERFORMANCE

**Opinion 7.1: The contract between Jefferson Parish and APTIM did not provide sufficient performance goals and standards to ensure efficient and effective operation and maintenance of the GCCS.**

<u>Basis for Opinion:</u>

APTIM, formerly EMCON/OWT, then CB&I Environmental & Infrastructure, Inc (CBI), was contracted by Jefferson Parish to provide O&M services for the GCCS installed at the JPLF.  Services provided were contracted in a December 28, 2015, Agreement (Contract) Between the Parish of Jefferson and APTIM (Bates No. ADD_P00107800).  Their scope of work included several tasks related to the GCCS.  Some of these scope items included monitoring the GCCS to assess system performance and efficiency and performing regularly scheduled maintenance activities to provide for uninterrupted system operation.

The Contract period was planned to commence on January 1, 2016 and terminate on December 31, 2018.  However, it appears that the Contract was extended an additional 5 months in 2019 based on the monthly reports provided by APTIM.

APTIM acting under the terms of their contract was, among other things, contracted to provide Landfill Gas Collection and Control System Operation and Maintenance Services (Paragraph 2.0, Bates No. ADD_P00107800).  This scope of services included all labor, equipment, and materials necessary to "pump leachate or condensate from gas extraction wells."  The contract goes on further to state in Exhibit B, 1.1.4 Technical Support section of the contract that the Parish may request advice to mitigate recurring issues such as, among other things, well dewatering.  Additional clarity was provided during the bidding process for this contract.  On Page 90 of the contract, a copy of the results of the Question/Answer period were provided.  Question No. 7 was asked by one of the bidders and is provided below along with the answer.

> *7. General Questions: What aspect(s) of existing LGCCS O&M services would you like to see improved, and what aspects are working well?*
>
> *Answer: The primary issue is high oxygen concentrations in several wells, and occasionally high temperatures and pressure.  Sometimes*

> *this is caused by leachate clogging gas wells, and is beyond the complete control of the O&M Contractor.   Jefferson Parish is upgrading the leachate collection system and this should subsequently improve performance of the gas collection system…"*

Based on terms of the contract and Jefferson Parish's response provided above, it is my opinion that APTIM was not provided specific performance requirements to achieve as a part of their contract.  They were simply told to install pumps in landfill gas wells and to pump leachate out of those wells without a goal being provided.  Jefferson Parish further states that the Parish "may request advice to mitigate recurring issues such as ...well dewatering…".  Based on this contract structure, Jefferson Parish was responsible for decisions regarding the leachate pumping activities at the landfill gas extraction wells.

## 7.1    Scope of Services to be Provided

The scope of services requested in the Contract were documented in Section 2.1.1.1 of the Request for Proposal which was included as an attachment to the Contract.  Some of the specific scope requirements which pertain to this Matter are listed below (Bates No. ADD_P00107800, Pages 19 and 20).

- "…balancing the wellfield to maintain oxygen, temperature and pressure limits and maximize LFG quality and flow rate…"

- "…pumping leachate from gas wells as needed…"

- "…monitoring the above ground portion of the LFG wellheads, repairing when required…"

- "…monitoring the performance of the condensate sumps and pumps, repairing or replacing, as necessary…"

- "…and implementing solutions."

APTIM prepared and submitted monthly reports of services they provided to Jefferson Parish as part of their contract scope.  Based on the results of APTIM's findings, they were also required to prepare a written maintenance schedule for the GCCS.

## 7.2   Execution of Scope of Services

**Opinion 7.2: Third party assessment of the condition of the GCCS in Phase 4A raised several concerns indicating that the GCCS was not being operated in accordance with industry standards for optimizing LFG collection and control.**

Basis for Opinion:

A review of APTIM's monthly reports provides information regarding the condition of the GCCS, activities associated with O&M of the GCCS, and recommendations for additional work.   The Carlson Environmental Consultants letter report titled "Preliminary Landfill Gas System Assessment Findings" dated May 31, 2018, and Carlson's report titled "Landfill Gas System Assessment Report," dated August 31, 2018, also provided information regarding the condition of the GCCS.  The Carlson reports are the types of third-party evaluation that experienced landfill engineers commonly rely on in assessing operations at a landfill.  However, the purposes, limitations, and scope of the report must be considered since they provide important context.

Using this information as well as other available data that I judged to be useful or reliable, I made the following observations regarding APTIM's execution of the contracted scope of services.

### 7.2.1   Wellfield Balancing

**Opinion 7.3: Based on an assessment of the GCCS operations by a third party, the means and methods employed by APTIM to maintain the GCCS did not comply with industry standards.**

Basis for Opinion:

Wellfield balancing is a field procedure utilized to maintain optimal performance of a GCCS wellfield while maintaining compliance with the facility's permits and maximizing extraction of landfill gas.   As part of APTIM's execution of the contracted scope of services, wellhead monitoring was performed on a regular basis.  A review of APTIM's monthly reports shows that multiple wells are regularly found to exceed operating parameters under regulatory requirements in Subpart WWW resulting in multiple adjustments to return them to compliance or in some

cases an inability to achieve compliance.  The primary parameters monitored included temperature, available vacuum, and oxygen content.

During the scope of this Contract, temperature exceedances do not appear to have been an issue as few deviations were reported.  Lack of available vacuum issues were noted as occurring at the facility.  However, this appears to have occurred infrequently and was typically resolved in a short period of time.

Oxygen exceedances appear to have been persistent throughout Phases 1, 2, 3A, and 3B during the contract period.  Some of these exceedances were able to be resolved through field adjustments and returned into compliance, however, many were not.

During CEC's field investigation performed in May 2018, CEC noted several observations potentially contributing to these exceedances.  Some of these observations are listed below.

- Given the existing site conditions of high liquid levels in the gas extraction wells and the presence of a landfill gas-to-energy project, more frequent monitoring and tuning were warranted.  Based on a review of APTIM's monthly O&M reports, permission for the additional level of effort was not requested of Jefferson Parish by APTIM.

- Gas extraction well monitoring and tuning was not being performed in accordance with standard of care utilized in the LFG industry.  Wellhead adjustments should have been limited to no more than 10% adjustment per occurrence but were often adjusted by more than that percentage.

- The landfill gas to energy developer that utilized landfill gas from the facility, Renovar, provided significant amount of assistance to APTIM for wellfield tuning.  Tuning a well field to maintain compliance and optimize landfill gas collection for combustion can have different goals and strategies regarding wellfield maintenance.  These competing goals and strategies are liable to result in different wellfield performance. APTIM and Jefferson Parish should have coordinated to ensure that any alterations to the wellfield made by Renovar were appropriate to the goals of Jefferson Parish.

- The blower utilized to provide vacuum to the wellfield and then push it to the landfill gas to energy facility was not configured to provide consistent vacuum to the wellfield.  This allowed for fluctuations in the amount of

available vacuum to the wellfield.  With available vacuum fluctuating, attempts to optimize gas extraction wellhead tuning was like trying to hit a moving target.

- High levels of oxygen and balance gas noted in the monitoring data indicated the landfill gas wellfield was being overpulled and potentially halting anerobic bacteria activity.  Overpulling the wellfield results in a decrease in methanogenic activity which results in less methane being generated and thereby, making it more challenging to balance a wellfield for consistent production.

- Gas extraction wells located in Phase 4A were noted with positive pressure at the wellhead, lack of available vacuum, and surging vacuum indicating landfill gas condensate buildup in poorly graded portions of the pipe, and landfill gas control equipment (e.g., flare, air compressors) either missing or in disrepair.

CEC stated in their report that their assessment relied on data collected during their field investigation and historical data requested from Jefferson Parish of previous monitoring events.  However, CEC's report did not provide comparisons to this historical data or reference what data was reviewed.  Therefore, it is difficult to ascertain how this historical information was utilized.  CEC's report did provide a "snap shot in time" of the condition from an independent party.  Therefore, CEC's report information was used as needed in conjunction with other data available to assess site conditions.

### 7.2.2  GCCS Liquid System Management

**Opinion 7.4: Based on my review of the data provided and previous assessments performed, APTIM's performance was not consistent with typical industry practices for operating and maintaining a GCCS.**

<u>Basis for Opinion:</u>

Another critical element of APTIM's execution of the contracted scope of services including pumping GCCS liquids accumulating in LFG extraction wells, which limits the effectiveness of the LFG extraction wells.  As noted previously in this report, high liquid levels had the potential to develop in the LFG extraction wells thereby having a significant impact on wellfield efficiency (Section 4.4.2.2.3).  These conditions were also observed in the well field during CEC's assessment.

**Weaver Consultants Group**

- Approximately 42% of landfill gas extraction wells throughout the landfill were observed with greater than 50% of perforations blocked (5 of these wells were in the Phase 4A area which had just begun operation the previous month). Approximately 20% of landfill gas extraction wells were observed with their perforations 100% blocked.

- Since the facility had a relatively shallow waste column, landfill gas extraction wells should have been operated to maximize the ability of the extraction pump to dewater the landfill gas extraction well column.  Actions that could have been taken include reconfiguring the wellhead to discharge the pneumatic pump in the extraction well, using pumps with the shortest possible height, and controlling the flow rate of the pumps to limit siltation from occurring within the well.

- In my review of Monthly O&M reports prepared by APTIM, I noted at least 2 occasions where leachate was being pumped from wells.  This was noted in the November 2017 and March 2018 reports.  Based on the descriptions of the events, it appears that the means employed to perform this pumping were performed differently than for wells with pneumatic pumps installed.  The descriptions state that the landfill gas extraction well liquid evacuations were performed with a high-capacity pump that was able to empty the well in a short time so that several could be completed in one day.  This is concerning as high-capacity pumping can draw silt into the well.  As noted by CEC, it appears that as of May 2018, approximately 12% of the perforations were blocked with silt.  It is reasonable to assume that this method of pumping may have contributed to this issue.

- For over 2 years of the contract period, APTIM noted in their monthly O&M reports that additional pumps should be added to enhance GCCS liquid collection at the facility, however the location of the needed pumps was not specified. The reports do not indicate that the Parish responded by adding additional pumps. There was either a lack of sufficient communication or willingness to improve the system for an issue that has historically been a GCCS performance issue at the facility.

- APTIM's contract with Jefferson Parish required the preparation of monthly O&M reports to include a summary of the pump inspection and maintenance activities of the previous month.  While these reports stated that leachate

levels were being collected at a quarterly frequency, the results were only included once (December 2017) during the duration of APTIM's contract.

- Landfill gas extraction wells were noted to be in poor condition including leaning wells and wells with pumps stuck inside the extraction well piping. When a pump is stuck in the well, it cannot be serviced and maintained resulting in a potential flooded well with limited efficiency for LFG collection. These wells have been noted for inspection and repair or replacement.

- GCCS liquid management within the piping and condensate control devices were noted to contain blockages in headers limiting available vacuum supply to landfill gas extraction wellheads and creating surging in the landfill gas collection piping.

Overall, I found CEC's assessment to be useful in assessing the conditions at the facility at the time of their visit. Through their discussions with on-site staff, CEC was able to acquire information that would likely not have otherwise been known from simply reviewing field data. For example, CEC discussed that monitoring data was being collected, but not recorded. CEC stated that apparently other parties were assisting with operation and maintenance of the GCCS. This raises questions regarding the other party's qualifications and experience.

Based on my review of the data provided and previous assessments performed, APTIM's performance was not consistent with typical industry practices for operating and maintaining a GCCS. This was further exacerbated by a lack of support from Jefferson Parish. While Jefferson Parish stated that high oxygen levels in the well field was a primary issue (Section 6.0), it appears that they did not respond to APTIM's requests for additional equipment (e.g., pumps) which could have been critical to resolving that issue. Also, it is my opinion, the scope of services requested by Jefferson Parish as discussed in Section 6.0 provided little direction to the contractor regarding pumping of gas well liquids that Jefferson Parish needed to achieve their goals. The contractor was merely told to pump liquids. This lack of definition of what successful achievement of the task looked like contributes to the difficulty in achieving it.

## 8    REBUTTAL TO SECOND SUPPLEMENTAL EXPERT REPORT OF JOSE SANANES

I was provided the Second Supplemental Expert Report of Jose Sananes to review and provide rebuttal.  Second Supplemental Expert Report Of Jose Sananes, Evaluation Of Jefferson Parish Landfill Gas Emissions (Feb. 16, 2024). There are numerous instances where I disagree with Mr. Sananes's opinions, where I could find no evidence provided to support his opinions, or I believe his opinions to be factually incorrect.  I have followed the format of Mr. Sananes's report in the preparation of this rebuttal.

### 8.1    Sananes Report Section 11: Evaluation of Landfill Gas Generation, Gas and Leachate Collection Systems, and Emissions

[73]    "*I used information on the LFG extraction well design to define leachate levels in the landfill (refer to Sections 11.2).*"

This hypothesis was used as the basis for many of Mr. Sananes's opinions in his report including the one cited above.  In my opinion, Mr. Sananes' hypothesis is factually incorrect and inconsistent with the common industry standard and basic principles of hydraulics and engineering that affect how gas well liquids accumulate in LFG extraction wells.  As discussed in Section 6.2.3 above, Mr. Sananes has erroneously extrapolated leachate levels measured within LFG extraction wells to be predictive of leachate levels throughout the entire waste mass, despite direct site observations to the contrary.

[76]    "*Significantly, Golder recommended that, before installing its proposed new wells, the following remedial actions should be taken:*

a)  *installation of horizontal gas collectors in close proximity to the location of the surface emissions exceedance;*

b)  *dewatering of wells with submerged sections of perforated pipe (well screen) in order to increase LFG flow and improve LFG quality; and*

c)  *improvements to the gas control system to manage condensate.*

*These recommendations show that the LFG extraction system was deficient due to the high levels of liquids within the landfill phases."*

In my opinion, Mr. Sananes has mischaracterized the statements made by Golder in his report.  Golder's report stated concern that the permit approval process for the proposed GCCS Design Plan revisions may take more time than Jefferson Parish would want to wait and Golder categorized its recommendations as "alternatives are proposed as an initial alternative to the installation of additional wells".  I disagree with Mr. Sananes' characterization for the following reasons.

a) It is common industry practice to install temporary gas collection or control features in areas where implementation of the final GCCS is not feasible for either permitting or waste placement considerations. The use of horizontal collectors in temporary situations to control landfill gas is a common industry practice. These steps are not indicative of a lack of compliance with industry standards.  They are consistent with good practices and industry standards.

b) At the time of the GCCS Design Plan submittal, LFG extraction wells had yet to be installed in Phase 4A as they were not permitted yet. Construction of the GCCS in Cells 20 and 21 in Phase 4A did not commence until January 2018 (GCCS Pre-Construction Meeting Notes, Bates No. JP_JPLF_00408141). Golder's recommendations could not reflect deficiencies in a system that wasn't yet installed. I interpret Golder's statement to recommend the installation of air supply piping and leachate forcemain piping while installing landfill gas collection piping.  This is not a remedial action, but prudent planning to anticipate the need to remove liquids from gas wells, which is common at MSW landfills.

c) Golder's report did not cite any issues that the GCCS was not functioning properly, nor did it include design modifications to the gas control system necessary for proper operation.  Their report merely suggests repairs and improvements that could be made to enhance system performance.  This is part of the on-going operation and maintenance process of continually monitoring your system's

---

**Weaver Consultants Group**

performance and making improvements to enhance it, which is common industry practice at MSW landfills.

[92]   *"The 2018 CEC assessment clearly identified the inadequacy of the landfill gas collection system and significant deficiencies in liquid (leachate) collection in the landfill, which resulted in leachate levels so high that they blocked the screens of the LFG extraction wells, thereby impeding an effective collection of gas (including H2S) that was being generated and allowing this gas to be emitted outside the landfill media."*

In my opinion, in the above paragraph, Mr. Sananes misunderstands both the Carlson report and the function of leachate control systems and GCCS liquid removal systems. Based on my review of CEC's report, I find no statements that identify any issues with the GCCS's ability to function properly being the results of operation and maintenance issues with the Leachate Collection System.  CEC's report simply states that deficiencies were found in the landfill gas condensate and leachate collection pumping systems outside of Phase 4A.  Issues with the perimeter leachate forcemain were known to exist at the landfill which could limit the amount of leachate to be discharged.  CEC noted that maintenance appeared to be needed on Phases 1, 2, and 3 leachate sump risers.  CEC did not comment on sump risers in Phase 4A.  Furthermore, CEC did not comment on sump riser performance related to leachate accumulation in the extraction wells.  Only Mr. Sananes has made this claim, which I have disputed in my response above to Paragraph 73.

The design intent of a leachate management system and GCCS is different, and these terms should not be used interchangeably except in the case of atypical situations.  While a GCCS can be utilized to collect leachate and, conversely, leachate management systems can be utilized to collect LFG, the design of these systems was not intended for those purposes.  It is significant that an awareness of the distinction between these two systems is known so that when either of these types of systems is referenced, it is clear which part of the MSW Landfill is being referred to as a means of environmental control.

As an example, a LDEQ Air, Solid Waste, and Water Assessment Inspection Report date December 3, 2018 (Bates No. JP_JPLF_0003152)

---

**Weaver Consultants Group**

referenced an observation of leachate seeps and made the statement that these seeps were associated with the functioning of the leachate collection system.   Leachate seeps are driven by positive LFG pressure within the waste mass attempting to find the easiest pathway to relieve the pressure. Leachate that is perched near the surface is then driven through the cover along with the LFG.   This phenomenon is not associated with the functionality of the leachate collection system but is a symptom of a GCCS that needs additional tuning or expansion to enhance LFG collection in the area where seeps are noted.   This distinction is important, so the remedial efforts are focused on the source of the issue.

[100] *"From [the 2019 River Birch] report, it is evident that the LFG extraction system at the JPL Site continued to perform inadequately primarily due to high liquid levels within the landfill media and improper construction and maintenance of new devices incorporated to remediate a multitude of operational issues."*

Mr. Sananes continues to apply his invalid hypothesis to the May 22, 2019 River Birch report (Bates No. JP_JPLF_0003491).   As I have explained, there is no support for Mr. Sananes' conclusion that leachate accumulation from the landfill liner was the source of liquids observed in gas wells. The River Birch report is also useful in emphasizing my conclusions made in Section 6.3.2 above, regarding the leachate levels observed at the side slope risers.   River Birch reported that all side slope riser pumps in Phase 4A were operating, and LFG was venting from a riser pipe, which indicates that the leachate level in the sump was at or near compliance levels. Gas would not be able to travel through waste and into leachate riser piping if waste surrounding the riser were flooded.   This is all while extraction wells continue to indicate the presence of gas well liquids, which indicates that the gas well liquids were not related to liquids at the bottom of the landfill.

[102] *"Ramboll reviewed several rounds of leachate (liquid) measurements taken by various consultants [in landfill gas collection wells]. Ramboll used these data, along with descriptions of how the gas wells were constructed (refer to Section 11.1) and topographical information, to determine the leachate height above the landfill's bottom liner at each of the measured gas wells."*

Refer to my response to Paragraph 73.

---

**Weaver Consultants Group**

[103] *"Between 2009 and 2019, more than 1,600 leachate level measurements have been made in more than 240 LFG wells to determine the level of leachate saturation in the waste media."*

Refer to my response to Paragraph 73.

[104]  *"As presented in Tables 5-3 through 5-7 of the Expert Report and Exhibit 13, the data show that leachate levels and gas well blockages with leachate have been serious problems at the landfill for many years."*

Refer to my response to Paragraph 73.

[105]  *"Similarly, in 2018 and 2019, CEC and APTIM collected leachate (liquid) measurements of the landfill.  As with the data collected between 2009 and 2016, the degree of saturation of the landfill media at each measured extraction well was calculated."*

Refer to my response to Paragraph 73. The depths of liquids in landfill gas collection wells is not an indication of "the degree of saturation of the landfill media at each measured extraction well."

[107]  *"These high liquid levels measured for years support CEC's conclusion that the landfill was "wet" or saturated with high levels of leachate within the landfill, and that the excessive leachate levels impeded effective gas collection, which meant that more landfill gas and $H_2S$ was released into the atmosphere."*

Refer to my response to Paragraph 73. The depths of liquids in landfill gas collection wells is not an indication of the degree of saturation of the landfill media.

## 8.2    Sananes Report Section 15 Titled Standards of Care Applicable to Landfill Owners and Operators

[173] *"(a) As evidenced by the nature of complaints by the Plaintiffs in this case, as well as numerous other residents of the affected areas, and as detailed in Sections 11.1.2 and 13, the daily and interim covers placed in Phase 4A did not meet the requirement of LAC 33:VII.711.B.2.a.v to mitigate noxious odors and outward movement of gases."*

In my opinion, Mr. Sananes has no basis to conclude that daily and interim covers failed to meet the requirements of LAC 33:VII.711.B.2.a.v. As discussed above in Section 5.2, and based on my review of relevant

documents, cover materials were applied in accordance with regulatory requirements and industry standards, and were effective at controlling landfill gas migration and odors.

[173]  *"(b) The Defendants failed to use best management and engineering practices to control odors as required by LAC 33:VII.711.B.3.a, as evidenced by… the high measured H2S readings in emissions at the site,"*

In my opinion, Mr. Sananes' opinions in this paragraph are incorrect, are not supported by the data, and rely on a misunderstanding of the relevant landfill systems. Refer to my response to Paragraph 73 regarding the statement that leachate levels impeded the collection of LFG. Mr. Sananes does not specify which high H2S readings he is referring to, but based on my review of the documents in this Matter, the vast majority of measurements of H2S in air at the site indicate that landfill gas controls and cover were effectively managing odors and gas emissions.

[173]  *"(c)…This condition was also documented in the LDEQ inspection reports. Further, as indicated in Section 11.2, measured leachate levels are so high within the waste media that the gas wells, the bottom of which are 10 feet above the bottom liner system, are inundated."*

Refer to my response to Paragraph 73. The depths of liquids in landfill gas collection wells is not an indication of the degree of saturation of the landfill media.

[175] *"The standard of care and the obligation to use best management practices in the control of odors entails that the Defendants, with the assistance of their consultants, assess these conditions during the planning phase and prior to accepting the disposal of spent lime in a MSW landfill area and prior to implementing the stabilization of liquid waste and sludge using spent lime, which started in October 2016 in Phase 4A."*

In my opinion, Mr. Sananes' description of the standard of care is not consistent with best practices in the solid waste industry and it is not consistent with regulatory requirements. As discussed above in Section 5.3 of this report, MSW landfills routinely accept waste materials with the potential to generate odors or $H_2S$. It is not a standard or advisable practice in the solid waste industry to assess whether conditions conducive to $H_2S$ generation may exist in a landfill before accepting wastes that are permitted

**Weaver Consultants Group**

under federal and state regulations and by the landfill's permits. Landfills across the country commonly use sulfate-containing wastes for solidification and stabilization. The appropriate planning for controlling odors from acceptable waste streams is the installation and operation of GCCS and cover systems in accordance with applicable regulations and good engineering and operating practices.

[175]   *"…Further, the standard of care and best management practices dictate that any materials with a substantial soluble sulfur content be segregated from MSW in a mono-cell or an area away from those receiving MSW."*

As stated in Section 5.3.3 of this report, during a 3-year period from 2016 to 2019, the landfill received approximately 23,000 tons of spent lime. Construction of a mono-cell for that quantity of waste in not practical from a construction, filling, or O&M perspective.  In my opinion, best management practices provide guidance on the practices that are most effective but they may not be practicable or appropriate under some circumstances, and that they may not be are the only effective means of managing potential odors from a particular waste.  Furthermore, best management practices do not dictate what actions must be taken.  They provide options available for the user who then must determine based on their site-specific situation the best practices that are feasible for them.

[175] "*There is no documentation available to indicate that the Defendants or their consultants conducted any evaluation to address the potential for hydrogen sulfide generation and emissions based on the above conditions at the JPL, specifically in terms of preventing mixing spent lime with MSW. In fact, internal email correspondence from Waste Connection indicates the opposite, specifically Waste Connections' knowledge that the neighboring River Birch Landfill stopped accepting liquid waste requiring solidification around mid-June 2016 due to odor complaints and adverse impacts to their landfill gas production.*"

As noted above, it is my opinion that Mr. Sananes' statement of best management practices and appropriate standards of care are not consistent with accepted standards and practices in the solid waste industry. His reference to internal correspondence does not change that opinion. Whether one landfill accepts any particular kind of waste does not determine whether that waste may be accepted at another landfill, as

specific operational factors may affect that decision at any facility. For example, River Birch sells the methane from its landfill gas, and must account for the costs of removing other gases from its landfill gas stream.

[176] *"Although some of the conditions identified in Section 15.2 cannot be controlled by the landfill operator, several Best Management Practices (BMPs) are typically implemented to control the production of hydrogen sulfide.  These practices aim to minimize the generation of H2S gas and mitigate its release into the atmosphere.  For example, in September 2007, the Massachusetts Department of Environmental Protection (MassDEP) Bureau of Waste Prevention released a document titled Control of Odorous Gas at Massachusetts Landfills (MassDEP 2007), in support of 310 CMR 19.000 – Solid Waste Management Regulations.  MassDEP presented several recommended management practices (RMPs) to prevent and/or reduce the potential impact of hydrogen sulfide and odorous landfill gas emissions.  Similarly, in August 2014, the USEPA published its BMPs to Prevent and Control Hydrogen Sulfide and Reduced Sulfur Compound Emissions at Landfills (USEPA 2014), which defined methods to control H$_2$S generation and emission."*

Refer to my response to Paragraph 175. In my opinion, Mr. Sananes' reliance on publications of best management practices from agencies without direct authority over waste placement is not consistent with accepted industry practices or the standard of care in the solid waste industry. A review of each of these documents illustrates that different sources provide different BMPs, which illustrates that appropriate practices are depend on the specific circumstances and judgement of a landfill and its operators.  None of these sources "dictate" that all of these recommendations must be followed.  As discussed in Section 4, MSW landfills primarily rely on required environmental control systems to manage gases and odors from decomposing waste.  By citing these different references, the point is emphasized that this is useful guidance and recommendations but that site-specific decisions are not limited by such guidance.  Furthermore, many of the recommendations in the documents cited by Mr. Sananes were being followed to the extent possible by the landfill.  Therefore, I believe that BMPs were being used.

As discussed above in Sections 4 and 5, many of the specific practices that Mr. Sananes cites in Paragraph 174(a)-(g) were implemented at the JPLF,

**Weaver Consultants Group**

and others were not practical. Even the sources Mr. Sananes cites acknowledge that the steps he describes are not always practical or advisable. And he does not refer to other documents that would be required to assess whether a recommendation is practical. For example, the paper he cites by the NJDEP Science Advisory Board acknowledges that disposal of waste in segregated areas was not practicable. (NJDEP Science Advisory Board 2015). The Massachusetts DEP has issued guidance to solid waste handling facilities that recognizes that the practices recommended in MassDEP 2007 are not generally implemented, even with regulatory restrictions in place. MassDEP 2013. In my experience, the use of SRB inhibitors is risky and is not a common or accepted practice at MSW landfills.

[177]   *"…However, the Solidification Plan prepared by JP Landfill did not incorporate most BMPs to minimize or control $H_2S$ generation and/or emissions."*

In my opinion, Mr. Sananes misunderstands the purpose and scope of the Solidification Plan he references. The Solidification Plan describes what wastes may be solidified and the process by which the solidification process will occur.   Control of odors is provided in other sections of the facility permits primarily operation and maintenance of the facility GCCS. Therefore, this information is not necessary to include in this plan.

[178]   *"The Solidification Plan also required that "Landfill operations personnel will estimate the approximate solidification ratio for each differing waste stream based on bench scale tests of the actual waste/wastewater or based on past solidification ratios used to successfully achieve a passing result."*

The standard of care for determining the appropriate ratio for liquid waste to be solidified is to utilize site facilities to determine the appropriate ration of liquid waste to solidifying agent to avoid free liquid from draining from the solidified material.   This is the performance standard the facility is attempting to achieve to be able to place the waste materials in the landfill and best determined under field conditions.   Regarding generation of odor, $H_2S$ is a bacterial process that occurs over time and would not be applicable in this situation.   In my opinion, the term bench scale test implies to the process I have described above and seen in the field.

[180]  *"…and it has been determined that the sulfate in the spent lime resulted in the generation of high H2S emissions."*

> In my opinion, Mr. Sananes' statement that spent lime has been determined to be the cause of $H_2S$ at the JPLF is an argumentative position that relies only on Plaintiffs' arguments. It is not typically possible to determine which waste was the cause of any particular gas in a MSW landfill, and there are many sources of $H_2S$. In my review of records relating to this matter, I have not seen a definitive conclusion that $H_2S$ in JPLF's LFG came from any particular source.

## 8.3   Sananes Report Section 16 Titled Breaches of Standards of Care By Defendants in this Case

[183] (a) "*In general, a landfill owner or operator must exercise reasonable care to prevent noxious odors from escaping its property and/or landfill and foreseeably affecting neighboring individuals. Reasonable care includes compliance with all applicable laws and regulations and implementing best management practices, as defined by EPA, State agencies and other stakeholders.*"

> It is my opinion that Mr. Sananes' statement of a standard of care as stated in Paragraph 183 for landfill owners and operators in general is unrealistic and not consistent with accepted industry standards and practices. Reasonable care for odor and landfill gas control may be distinct from compliance with all applicable laws, many of which may not affect LFG or odor control. As explained above, best management practices provide options and information for landfills, but reasonable care and accepted industry standards do not require the implementation of every best management practice that may be published by agencies of other jurisdictions, or by unnamed "other stakeholders." How any best management practice would be applied at any landfill depends on site-specific factors, the judgment of the owner or operator, and the many purposes that a landfill fulfills.

[183]  *"(b)(i) A MSW landfill owner or operator should not accept sulfur containing materials (such as spent lime, gypsum, or fly ash) which are known to produce $H_2S$, without a proper design and plan for their disposal that incorporates best management practices to prevent the generation of noxious gases…"*

---

Many of the best management practices cited by the sources used in this case including limiting the active face size, use of daily and intermediate cover materials, installation of an active GCCS, and an odor control system. Those steps were followed at JPLF. As explained above, it is impractical and inconsistent with industry standards for a landfill owner/operator to make decisions as to whether to accept permitted waste based on forecasts of conditions inside a landfill.

[183] "*(b)(ii) The landfill must have properly designed and constructed landfill gas control and leachate collection systems.  While limited amounts of LFG is typically collected form the leachate collection system compared to the solid waste media, an ineffective leachate collection system will reduce the ability of the gas collection system to collect gas, and thereby resulting in fugitive emissions.*"

"*(b)(iii) The landfill gas control and leachate control systems must be operated, monitored, and maintained to ensure their continued functionality as intended by the design.  The results and recommendations of these activities must be reported promptly to the landfill owner by the landfill operator(s) so corrective actions, if any, are implemented in a timely manner.*"

In my opinion Mr. Sananes continues to misstate standards of care and to confuse landfill systems in these paragraphs. As discussed above, the leachate collection system is separate from systems that remove liquids from gas collection wells, and the two have little or no influence on each other. Evaluation and reporting requirements between an owner and an operator are set out in contractual agreements and practices by the owner and operator and cannot be stated in the one-size-fits-all manner that Mr. Sananes uses.

[183] "*(c) If landfill gas control and leachate controls systems operation, monitoring, and maintenance activities indicate deficiencies, the landfill operator(s) must promptly report these issues to the landfill owner and system design.*"

In my opinion this comment is not relevant to the structure at JPLF, and I refer to my response to paragraph 183(b)(iii).  LRLC was not responsible for the GCCS or the Phase 1, 2, and 3 LCS.  However, it should be noted that on several occasions LRLC was offering assistance to Jefferson Parish. A summary of a few of these examples is provided below.

---

**Weaver Consultants Group**

- April 5, 2018 Email from LRLC to Jefferson Parish.  LRLC notifying Jefferson Parish of leachate pumping issues and notifying Jefferson Parish that they were addressing a seep. (Bates No. WC_JPLF_00242386)

- July 21, 2018 Email from LRLC to Jefferson Parish.  LRLC providing a summary of actions take and assistance provided relating to odor management.  (Bates No. JP_JPLF_00326372)

- August 6, 2018 Email from LRLC to Jefferson Parish.  LRLC notifying Jefferson Parish of addressing seep issues and that additional gas control may be necessary.

It was evident that LRLC worked cooperatively to assist Jefferson Parish with their responsibility to manage the LCS, odor management, and LFG control over this period.  LRLC's actions show its intent to assist with issues that were even outside of their control under the terms of their contract.

[184]  *"IESI LA Landfill Corporation (IESI, a Waste Connections, Inc. company; CEC 2018) was contracted by Jefferson Parish to operate, manage, and maintain the Expansion Area (Phase 4A, comprising Cells 20-25) and Landfill Phases I, II, and III on May 17, 2012 (Jefferson Parish 2012).  According to the contract, Waste Management (Waste Management of Louisiana, LLC d/b/a Waste Management of New Orleans) developed, operated, and maintained Phases I and II.  Phase III (149-acre portion of the Landfill), which was under development during the signing of the document, was also developed, operated, and maintained by Waste Management.  The scope of services to be provided by IESI/Waste Connections for Phase 4A, included, but was not limited to, (i) operation and maintenance, (ii) waste screening and placement, (iii) placement of daily cover, interim and final cover materials, (iv) final design, construction, operation and maintenance of the leachate collection and storm water management systems, (v) installation, operation and maintenance of groundwater monitoring wells, and (vi) environmental monitoring, which specifically included implementing both operational best management practices and use of odor control systems (Jefferson Parish 2012).  Even though the scope seems to exclude activities associated with the landfill gas collection and control system other than repairs to damage caused by IESI/Waste Connections, because IESI was ultimately responsible for "implement[ing] a comprehensive odor control plan that includes both operational*

*best management practices and odor control systems," IESI assumed responsibility for ensuring deficiencies in the gas control system were either remediated by the Owner or addressed by other control measures.  As to the leachate collection system, even if the system had not been fully transferred to IESI, IESI assumed responsibility for ensuring that deficiencies in the leachate collection system were either remediated by the Owner or addressed by other control measures so as to allow for effective odor control."*

It is my opinion that Mr. Sananes misinterprets the operating agreement between Jefferson Parish and LRLC, and that no experienced landfill operator or engineer would interpret it the way he does. To be clear the landfill operations contract didn't "seem" to exclude activities, it **explicitly** excluded activities under its terms defining the odor control plan and specific environmental control systems.  IESI was at no time ultimately responsible for the GCCS or the LCS outside of Phase 4A.  As stated in Section 3.0 of this report, Jefferson Parish as Owner and Permit Holder for the landfill was ultimately responsible as defined in LDEQ regulations.  Regarding the odor control plan, this plan essentially required LRLC to perform odor monitoring, investigate odor complaints, maintain the odor control system, and notify Jefferson Parish of issues.  It was Jefferson Parish's responsibility to then follow up on and resolve these issues. No professional with experience in operating a landfill or a landfill odor control plan would interpret the agreement between LRLC and Jefferson Parish to mean that LRLC assumed any responsibility for deficiencies in the gas collection system or the leachate collection system outside of its scope.

[186]  *"As previously noted, as part of the contract, IESI/Waste Connections agreed to "implement a comprehensive odor control plan that included both operational best management practices and odor control systems." They were required to perform all odor monitoring and control activities and services as required by the existing Jefferson Parish Landfill Odor Management Plan, and any amendments from local, federal, or state regulations adopted and imposed on landfill operations.  The amount of waste exposed to the atmosphere was to be minimized by limiting the size of the active face during normal operations. All deposited waste was to be covered with either an approved alternate daily cover or 6 inches of daily cover at the end of each working day.  Any waste that exhibited strong odors was to be covered immediately upon delivery with soil materials."*

**Weaver Consultants Group**

The intent of this paragraph 186 was unclear as it seems to simply regurgitate contract language.  Nevertheless, based on my review of the documents provided regarding this case, it is my opinion that IESI/Waste Connections performed their tasks as defined in the scope of the contract.

[187]   *"IESI/Waste Connections was responsible for ensuring that leachate was managed according to the provisions of the LDEQ permit."*

In my opinion this statement is inaccurate without the condition that IESI/Waste Connections responsibility was limited to portions of the landfill over which they were authorized to manage by the Owner and Permit Holder, and over which LRLC had taken responsibility under the operating agreement.

[188] *"(a) They failed to ensure that the landfill gas collection and leachate collection systems were properly designed, constructed, operated, and/or maintained in order to prevent the formation and emission of noxious odors or to collect and treat such odors, and failed to take corrective action, thereby, foreseeably causing noxious odors to escape the landfill and harm neighboring individuals."*

In my opinion the conclusions in this paragraph are incorrect for all the reasons discussed in this report. Mr. Sananes has not identified a standard of care consistent with accepted practices in the solid waste industry or regulatory requirements.

[188]   *"(b)(i) Jefferson Parish failed to ensure that Waste Connections, its landfill operator, or Aptim, its landfill gas collection operator, operated and maintained the landfill gas collection and leachate collection systems so as to prevent noxious odors from escaping from the landfill, foreseeably harming neighboring individuals."*

In my opinion, to the extent this paragraph pertains to LRLC, this paragraph does not rely on a reasonable or accepted standard of care, nor on a reasonable understanding of the facts of the GCCS and LCS systems at JPLF.

[188]   *"(b)(ii) Waste Connections, the operator and manager of the landfill responsible for the Phase IV-A landfill construction and its leachate collection system, did not operate and maintain the landfill leachate collection system so as*

*to prevent leachate buildup within the landfill.   This failure resulted in adverse impacts to the gas collection system, which in turn caused noxious odors to escape from the landfill, foreseeably harming neighboring individuals."*

It is my opinion that Waste Connections constructed the Phase 4A LCS in compliance with the facility permit and LDEQ regulations as evidenced by receipt of a permit to operate newly constructed cells in Phase 4A. Unfortunately, Mr. Sananes relies on his inaccurate theory regarding leachate levels in the landfill which were debunked in Section 5.1 and 6.2.4 of this report by observations of the conditions of the leachate level present in the landfill.   This statement is inaccurate based on my review of the records and communications in this matter.

[188]  *"(c)(i) Waste Connections did not adequately inform Jefferson Parish or ensure that the Jefferson Parish remediated the improperly designed, maintained or operated landfill gas collection and leachate collection systems."*

As documented in the Response to Paragraph 183 above, it is my opinion that Waste Connections did inform Jefferson Parish of landfill issues noted. "Adequately" is a subjective description of Mr. Sananes' opinion of actions taken and is not useful in an engineering assessment.  Additionally, it was not Waste Connections' duty under the contract or industry standards to ensure that Jefferson Parish performed the work they were required to perform as Owner and Permit Holder of the facility.

[188] *"(d) Waste Connections and Jefferson Parish accepted sulfur-containing materials without considering BMP for controlling gas fugitive emissions and without implementing a proper and effective odor control plan despite having firsthand knowledge of the issues experienced by River Birch with this same material (refer to Section 6.4) or its own experience with the disposal of other sulfur-containing materials (e.g., coal combustion residuals or CCR) since at least October 2016."*

For the reasons stated elsewhere in this report, it is my opinion that Waste Connections complied with applicable standards of care, regulatory requirements, and contractual responsibilities in accepting what Mr. Sananes calls "sulfur-containing materials." Mr. Sananes relies on a standard of care that is not consistent with industry standards and would not have been realistic or practicable at the JPLF. Mr. Sananes is incorrect

**Weaver Consultants Group**

that Waste Connections did not consider "BMP," as explained elsewhere in this report. However, by referring to the requirement for a comprehensive odor control plan to be executed, it is clear that controlling gas fugitive emissions was considered by LRLC.  LRLC did effectively execute the odor control plan as required by the contract.

[188] "(d)(i-iv) *Waste Connections and Jefferson Parish accepted sulfur-containing materials without considering BMP for controlling gas fugitive emissions and without implementing a proper and effective odor control plan, despite having firsthand knowledge of the issues experienced by River Birch with this same material (refer to Section 6.4) or its own experience with the disposal of other sulfur-containing materials (e.g., coal combustion residuals or CCR) since at least October 2016.*

    i.    *Jefferson Parish and Waste Connections disposed of sulfur-containing materials, such as spent lime or fly ash, with MSW, which have the reasonably foreseeable potential to generate noxious odors that could escape the landfill and affect neighboring individuals.*

    ii.    *As indicated in* **Section 6.4**, *the neighboring River Birch Landfill stopped accepting the liquid waste requiring solidification in around mid-June 2016 due to odor complaints and impacts to their landfill gas production.*

    iii.    *In email correspondence to prospective clients and accompanying 2016-2017 brochure titled "Safe Reliable and Cost-Effective CCR Disposal," Waste Connections presents itself as a leader in the management of CCR, a sulfur-containing material category that includes fly ash, bottom ash, slag, and flue gas desulfurization waste, such as spent lime in this case. Since at least October 2016, when Waste Connections received a presentation on "Energy Waste (CCR) Disposal in Subtitle D Landfills", it has been aware of the challenges for MSW landfills handling CCRs. This document specifically outlined considerations for MSW landfills that may receive CCRs that included, among others, the generation of odors through the conversion of sulfate and sulfites in flue gas desulfurization waste into hydrogen sulfide which can*

---

*cause problems. This document concluded that it "helps to not comingle CCRs with MSW."*

iv.        *Given that (1) sulfur-containing materials were disposed or processed within the MSW landfill area without waste segregation by physical containment (e.g., isolated cell), (2) the JP Landfill is a municipal landfill containing organic waste, (3) the JP landfill had historical serious problems in controlling leachate levels and (4) there was no gas collection system in place in Phase 4A to collect any landfill gases that were generated prior to the spring of 2019, the Jefferson Parish and Waste Connections should have refused to allow the disposal of spent lime in the Landfill.*

In my opinion, the statements and conclusions in this paragraph are not based on a professional engineering judgment of LRLC's operations and the actual conditions at the JPLF. Mr. Sananes is not applying a standard of care recognized by the solid waste industry nor required under regulatory standards. The reasons underlying this opinion are stated throughout this report.

[188]   *"(e) Waste Connections did not "implement a comprehensive odor control plan that included both operational best management practices and odor control systems" or comply with the provisions of Section II.B.5.H of its contract with Jefferson Parish."*

Based on a review of Section II.B.5.H of the contract and my review of the documents and conditions discussed elsewhere in this report, I found no foundation for the statement above that the provisions of the odor control plan were not followed.

[189]   "*Before and during the relevant period, the landfill gas and leachate management systems at the JPL Site were improperly designed and either non-performing or inefficiently operated and improperly maintained, requiring significant infrastructure improvements to correct LFG and leachate extraction deficiencies (Golder 2017; CEC 2018; CEC 2019; River Birch, 2019). Specific design deficiencies included (1) inadequate numbers and placement of gas collection wells and (2) insufficient capacity of leachate collection to prevent accumulation within the landfill. This has been documented extensively by the JP*

*Landfill and its contractors, as detailed in the prior Expert Report and Rebuttal Report, and summarized in this document."*

In my opinion, the statements and conclusions in this paragraph are not based on a professional engineering judgment of LRLC's operations and the actual conditions at the JPLF. Mr. Sananes is not applying a standard of care recognized by the solid waste industry nor required under regulatory standards. The reasons underlying this opinion are stated throughout this report.

[190]  *"As stated in **Section 11.1.1**, Golder's 2017 Landfill Gas Collection and Control (GCCS) Plan that considered 74 vertical wells with a 100-foot ROI; however, the proposed layout would not have achieved 100% capture of LFG as the ROIs of adjoining wells do not overlap. Golder also recommended that, before installing the proposed new wells, several remedial actions, including dewatering wells with submerged sections of perforated pipe, be implemented."*

In my opinion, Mr. Sananes does not correctly understand the purposes of the Golder GCCS design plan, nor how the environmental control systems at the JPLF related to each other. LRLC reasonably relied on the Parish's responsibility to design, install, and operate a GCCS in Phase 4A.

[191]  *"As previously stated in Section 9.3, CEC's 2018 assessment clearly documents the inadequacy of the landfill gas collection system and significant deficiencies in leachate collection in the landfill. These high leachate levels impede collection of the gas that is being generated, which in turn allows this gas to be emitted to ambient air as fugitive emissions. The data evaluated by CEC indicated that liquid removal has not been successful at the  facility as most of the liquid pumps are not in operation or provide minimum liquid withdrawal due to deficiencies in both the landfill gas condensate and leachate collection pumping systems. CEC also noted significant deficiencies in the maintenance and operation of these systems and provided numerous recommendations to improve them."*

In my opinion, CEC's 2018 assessment does not identify any deficiencies in LRLC's operations at the JPLF. The reasons for this are identified throughout this report, and specifically in Section 8.1 of this report.

[192]  *Similarly, as detailed in Section 9.3, deficiencies related to the operation of the LFG extraction and leachate collection systems have been historically reported in documents reviewed by Ramboll, including numerous field inspection, field*

**Weaver Consultants Group**

*monitoring, and maintenance and operation reports dating back to 2013. These have ranged from undesirable operational conditions (e.g., elevated oxygen, H2S detections and odors, and limited flow) to damaged or missing components in both LFG and the leachate and condensate management systems.*

For the reasons explained throughout this report, it is my opinion that the conclusions in this paragraph relating to the effectiveness of the leachate collection system are not supported by the facts or any applicable industry practice or regulatory requirement.

[194] *"As detailed in Section 11.1.1, for the period of 2011 through 2016, using Golder's gas generation estimate and actual landfill gas recovery records, gas collection efficiency gradually decreased from 68.9% to 47.5%."*

In my opinion, Mr. Sananes does not correctly understand the purposes of the Golder GCCS design plan and its gas generation estimates, nor how the environmental control systems at the JPLF related to each other. LRLC reasonably relied on the Parish's responsibility to design, install, and operate a GCCS in Phase 4A.

[195] *"As summarized in Section 11.1.2 and detailed in the prior Expert Report, CEC depicted the individual ROIs of the wells within each landfill phase in maps, clearly indicating inadequate coverage of the landfill gas collection system and significant areas of uncontrolled surface (i.e., fugitive) emissions in all landfill phases. CEC's assessment of the theoretical effective radius of influence of the gas extraction system concluded that: (a) the gas extraction system has lost approximately 12% of its total well depth since original installation; and (b) the elevated leachate levels have reduced the ability of the existing gas control system by 25 to 50%. Moreover, as presented by CEC, in all areas, the effective radius of influence of the gas extraction wells is significantly lower than the design 100-foot radius, resulting in significant areas where uncontrolled landfill gas emissions are taking place (refer to* **Exhibit 12***)."*

It is my opinion, for the reasons discussed throughout this report, that the CEC assessment Mr. Sananes describes in this paragraph is not the result of any operations by LRLC, and that Mr. Sananes misunderstands or misapplies CEC's assessment.

[196] *"Further, CEC's surface emission monitoring, reported damage to the cap in Phase I, II, 3A and 3B, and detected methane in all phases of the landfill at*

**Weaver Consultants Group**

*concentrations as high as the instrument's upper range (i.e., 10,000 ppm). These levels are indicative of an ineffective cap system (CEC, 2018)."*

In my opinion Mr. Sananes' conclusions in this paragraph regarding the effectiveness of the cap system are not supported by the facts he cites. LRLC's application and maintenance of the cap system at the JPLF was effective in controlling LFG movement and odors.

[198]   *"…CEC personnel smelled H2S gas in the Phase 4A area, observed soil cracks with black oxidized residue and detected H2S concentrations between 45 ppm and 60 ppm at the ground level at tested cracks.  These observations indicate improper cover and odor control.*

I disagree with this statement.  As stated in the LDEQ regulations, daily and interim cover materials are to "reduce noxious odors by minimizing outward movement."  As noted in CEC's August 15, 2018 report, $H_2S$ concentrations greater than 2,000 ppm were noted.  If this is level was typical of the landfill, a two-order magnitude reduction in $H_2S$ emissions appears to be occurring. Therefore, it is my opinion that the daily and interim cover was documented as reducing and minimizing noxious odors.

[200]   *"As detailed in Section 11.1.4, in 2019, River Birch identified and described the potential consequences of various problems at the JPL Site, based on its own assessments and those of CEC concerning the LFG extraction and leachate collection systems. Most noteworthy are the conclusions that:*

(a) *"The Parish captures only 37.5% of the entire landfill's gas."*

(b) *"Hydrogen sulfide levels in Phase 4A present a serious safety concern, including the potential of 'nearly instant death'" (concentrations of H2S in some wells exceeded 2,000 ppm).*

(c) *Of all LFG extraction wells at the landfill, 43% fail to meet LDEQ requirements for oxygen content (i.e., less than 5%) and/or pressure (i.e., maintain continuous negative pressure).*

(d) *50% of the vertical wells in Phase 4A lack sufficient vacuum to collect gas.*

(e) *"13% of the leachate risers on the entire landfill are not working," a condition that reduces the ability of the leachate collection system to reduce the leachate levels in the LFG extraction wells, thereby impeding gas extraction.*

---

**Weaver Consultants Group**

(f) *"In 41 % of the LFG extraction wells, more than 50% of the vertical well perforations (screens) are blocked by liquids, inhibiting gas collection."*

(g) *To extract liquids from the wells, allow more gas extraction and reduce emissions and odors, "38% of the wells without pumps on the entire landfill need new pumps."*

This paragraph is a regurgitation of statements made in River Birch's report. For the reasons discussed throughout this report, it is my opinion that these statements and conclusions either do not relate to operations of LRLC or are based on erroneous understandings of the systems at the JPLF.

[200]  *"(e) "13% of the leachate risers on the entire landfill are not working." a condition that reduces the ability of the leachate collection system to reduce the leachate levels in the LFG extraction wells, thereby impeding gas extraction."*

As noted in Attachment 10 of the document referenced in this comment, all risers in Phase 4A were operational.  Therefore, this comment apparently doesn't apply to this portion of the landfill.  However, for the reasons provided in my response to Paragraph 73, it is my opinion that this is an invalid statement.  The leachate collection system is not intended to reduce leachate levels in LFG extraction wells which is why it is necessary to install pumps in the wells to remove gas well liquids.

[201] "*As summarized in Section 11.2.1, information provided by Golder, CEC, and River Birch reveals that the landfill gas and leachate management systems at the JPL Site have been inefficiently operated and maintained, requiring significant infrastructure improvements to correct deficiencies, and that this has contributed to increased gas emissions and odors. The existing landfill gas and leachate control systems are improperly maintained, antiquated, inadequately sized, and/or non-performing because:*

(a) *The landfill is wet, with subsurface liquids impacting the limited pathways of available LFG recovery, contributing to gas emissions, and site odors.*

(b) *The systems have been poorly maintained and operated.*

(c) *The ROI of gas wells in 2018 and 2019 was significantly less than the design ROI of 100 ft used for Phases 3A, IIB, and 4A, and the capture zones of those LFG extraction wells do not provide adequate coverage to extract most of the gas generated in the landfill, even in the absence of liquids within the wells.*

---

(d) *actual landfill gas recovery reported by Golder for the period of 2011 through 2016 indicates that gas collection efficiency gradually decreased from 68.9% to 47.5% using the Golder gas generation estimate, and River Birch reported that the in 2019, the "Parish captures only 37.5% of the entire landfill's gas."*

(e) *there are too few LFG extraction wells to provide coverage for the entire landfill area that requires gas collection. The significant and costly proposed rehabilitation plans indicate the magnitude of the deficiencies in the collection of landfill gas at JPL Site.*

(f) *the landfill cap system has been breached in several locations and shows evidence of landfill gas releases.*

*These conditions result in significant areas of uncontrolled gas emissions and odors in all landfill phases.*

It is my opinion, for the reasons discussed throughout this report and in Section 8.1 above, that the assessments Mr. Sananes describes in this paragraph are not the result of any operations by LRLC, and that Mr. Sananes misunderstands or misapplies those assessments.

[202]  *"…it is evident that the LFG extraction system at the JPL Site continued to perform inadequately primarily as a result of high liquid levels within the landfill media…"*

Refer to my response to Paragraph 73.  The effectiveness of the LFG extraction system was not at all due to liquid levels in the landfill media or the functions of the leachate collection system in Phase 4A.

**Table 1**
**Site Development Timeline**
**Jefferson Parish Sanitary Landfill**
**Avondale, Louisiana**

| Activity Date | Site Development Activity | Observations |
|---|---|---|
| 12/21/2012 | Cell 20 North Approved by LDEQ to Operate | Waste Placement Commences May 2013 |
| 6/14/2013 | Cell 21 North Approved by LDEQ to Operate | |
| 11/7/2013 | Cell 21 South Approved by LDEQ to Operate | |
| 12/27/2013 | Cell 20 South Approved by LDEQ to Operate | |
| 3/2/2016 | Cell 22 Approved by LDEQ to Operate | Half of Phase IVA is Now Accepting Waste |
| 1/20/2017 | Jefferson Parish Submits an Updated GCCS Design Plan | Plan could have been submitted much soon |
| 7/14/2017 | Phase IVA GCCS Design Plan Approved by LDEQ | 4 Years after Initial Waste Placement a GCCS Design Plan is Approved |
| April 2018 | LFG Monitoring in Cells 20 & 21 Commences | JP Requests Extension to Complete the Initial GCCS Proposed |
| 10/3/2018 | Cell 23 North Approved by LDEQ to Operate | |
| 1/31/2019 | Cell 23 South Approved by LDEQ to Operate | |
| 12/30/2019 | Cell 24 South Approved by LDEQ to Operate | |
| 10/6/2020 | Cell 24 North Approved by LDEQ to Operate | |
| 4/14/2022 | Cell 25 North Approved by LDEQ to Operate | |
| 3/30/2023 | Cell 25 South Approved by LDEQ to Operate | |

**Table 2**
**Phase 4A Extraction Well Liquid Depths**
**Jefferson Parish Sanitary Landfill**
**Avondale, Louisiana**

| Well No. | Well Installation Date (1) | Liquid Depth Measured during Installation (1) | Liquid Depth Measured by CEC May 2018 (2) | Liquid Depth Measured by APTIM 1st QTR 2019 (3) |
|---|---|---|---|---|
| 500 | 02/01/18 | 0 | 8 | 14 |
| 501 | 02/01/18 | 0 | 12 | 18 |
| 502 | 02/01/18 | 0 | NM | 7 |
| 507 | 04/28/18 | 0 | 10.5 | 14 |
| 509 | 02/01/18 | 0 | 31 | 0 |
| 510 | 01/31/18 | 0 | 11 | 21 |
| 511 | 01/31/18 | 0 | 7 | 7 |
| 512 | 01/31/18 | 0 | 16 | 14 |
| 513 | 01/31/18 | 0 | NM | 15 |
| 516 | 04/27/18 | 0 | 5 | 26 |
| 517 | 04/28/18 | 0 | NM | 11 |
| 518 | 04/28/18 | 0 | 23 | 2 |
| 519 | 04/28/18 | 0 | 0 | 2 |
| 522 | 02/01/18 | 0 | NM | NM |
| 524 | 01/31/18 | 21-30 | 22 | 11 |
| 522R | 02/15/19 | 5 | NA | 31 |

Notes:
1.  Well Drilling Logs Prepared by Tri-Con Works LLC.
2. CEC August 15, 2018 Landfill Gas System Assessment.
3.  APTIM May 2019 O&M Monthly Report. (Bates No. JP_JPLF_0018718)
4.  NM - Not Measured, Wells were too high to reach
5.  NA- Well did not exist during the monitoring event

F:\PROJECTS\6219-352 - Jefferson Parish B&D\DWG\DWG\JPL0001.dwg;WCGv19b5;ptamboli;March 8, 2024

END CAP

EXISTING EARTH COVER REPLACE
TO PRE-CONSTRUCTION CONDITIONS

GEOTEXTILE OVERLAP
CENTERED ON TRENCH

COMPACTED SOIL
BACKFILL

REFUSE

PERFORATED HDPE PIPE

1"- 3" WASHED
STONE AGGREGATE

REFUSE

REFUSE

BENTONITE PLUG

SOLID WALL PIPE - DISTANCE VARIES

GAS FLOW

HORIZONTAL RISERS

WELLHEAD

FLEX HOSE

LATERAL RISERS

NOT TO SCALE

COPYRIGHT © 2024 WEAVER CONSULTANTS GROUP.  ALL RIGHTS RESERVED.

PREPARED FOR:

**BEVERIDGE & DIAMOND PC**

**TYPICAL HORIZONTAL LFG COLLECTOR**
JEFFERSON PARISH LANDFILL
5800 HIGHWAY 90 WEST
AVONDALE, LOUISIANA

REUSE OF DOCUMENTS
THIS DOCUMENT, AND THE DESIGNS INCORPORATED HEREIN, AS AN INSTRUMENT OF PROFESSIONAL SERVICE, IS THE
PROPERTY OF WEAVER CONSULTANTS GROUP, AND IS NOT TO BE USED IN WHOLE OR IN PART, WITHOUT THE WRITTEN
AUTHORIZATION OF WEAVER CONSULTANTS GROUP.



Weaver
Consultants
Group

NAPERVILLE, ILLINOIS
(630) 717-4848 www.wcgrp.com

| | |
|---|---|
| DRAWN BY: | PPT |
| REVIEWED BY: | AAH |
| DATE: | 02/23/2024 |
| FILE: | 6219-352-DWG |
| CAD: | JPL0001.dwg |

FIGURE 1

**APPENDIX A**

**Professional Resume for Ali Hashimi**

# Weaver Consultants Group



## Ali Hashimi, P.E.

### Principal

**EDUCATION**

B.S. Geological Engineering University of Missouri-Rolla, 1987

M.S. Geological Engineering University of Missouri-Rolla, 1989

**REGISTRATIONS**

Registered Professional Engineer:  Alabama, Illinois, Indiana, Iowa, Kansas, Kentucky, Mississippi, Missouri, Nebraska, West Virginia and Wisconsin

**FIELDS OF EXPERTISE**

Geological Engineering, Solid Waste Design, Permitting, Construction Quality Assurance, and Construction Management

## Professional Summary

Mr. Hashimi is a Principal with Weaver Consultants Group. He is responsible for solid waste engineering projects in the Midwest. Mr. Hashimi has 34 years of landfill engineering experience. His project experience includes design of solid and hazardous waste facilities, construction of landfill gas extraction and gas-to-energy systems, construction quality assurance for landfill construction projects, and permitting solid waste transfer stations. Mr. Hashimi's construction experience includes projects in Illinois, Missouri, Kansas, Oklahoma, Kentucky, Wisconsin, Minnesota, Arkansas, Tennessee, Ohio, Pennsylvania, Michigan, Indiana, Colorado, and Texas.

## Select Project Experience

Mr. Hashimi has served as the Project Manager and Construction Quality Assurance Officer for several construction projects at operating and closed sanitary landfills and ash monofills in Illinois, Indiana, Kentucky, Missouri, Kansas, and Alabama. For over 3 decades, Mr. Hashimi supervised construction of base liner systems, liner overlay systems, final cover systems, landfill gas collection systems, and leachate management systems. Permitting work at some of these facilities includes the preparation of permit applications for branches of land, air, and water at the appropriate state regulatory authority.

Mr. Hashimi served as the Professional Engineer responsible for work coordination between the landfill Owner's and numerous regulatory agencies including the Illinois Attorney General's Office, Illinois EPA Bureau of Land, Illinois EPA Bureau of Air, U.S. EPA, and local village authorities for a high profile accelerated closure and odor management issue in the Chicago suburban area. Mr. Hashimi's responsibilities included execution and review of work performed by numerous contractors and consultants throughout his involvement in the project.

Mr. Hashimi served as the Project Manager for landfill expansion projects in Indiana and Illinois. These projects provided the opportunity to be involved in many phases of the projects including holding public meetings to present the proposed application.

Mr. Hashimi has acted as the design/permit engineer for numerous permit applications in Illinois, Indiana, Kentucky, Nebraska, and Missouri over the course of his career. These applications typically have involved modifications to the landfill design, landfill gas collection systems, and leachate management systems. Based on this experience, he is very familiar with these state regulations and landfill design requirements.

Mr. Hashimi has also provided Expert Witness services in bankruptcy court regarding a matter involving construction of a landfill gas collection system.



## Select Project Experience (continued)

Mr. Hashimi was the Construction Manager for the construction of a groundwater pumping, treatment, and reinjection facility near Kankakee, Illinois. The project included installation of vacuum assisted extraction system, treatment of groundwater by air stripping and granular activated carbon and reapplication and reinjection of treated groundwater to flush the contaminated area and create a hydraulic barrier to contamination migration.

He also served as an Assistant Project Manager for a Remedial Investigation/Feasibility Study at a Superfund Site in Illinois. Tasks included supervision of several remedial investigation activities including groundwater sampling, surface water sampling, stream and pond sediment sampling, leachate sampling, landfill gas monitoring and sampling and report preparation. Feasibility study activities included preliminary screening of remedial technologies and process options, and assembly and evaluation of remedial alternatives based on criteria established by EPA guidance documents.

Mr. Hashimi was the Resident Engineer for Remedial Action at a Superfund site in Illinois. His responsibilities included monitoring placement of approximately 400,000 c.y. of soil; installation of a groundwater extraction system; installation of a passive gas vent system; review of contractor pay applications; and processing all design changes, change orders and contractor inquiries. He also assisted in design of a Type II sanitary landfill in Michigan, performed hydrogeologic investigations for several sites in Illinois, including installation, development, and sampling of monitoring wells, and assisted in design of a liner system for a proposed hazardous waste landfill in Arizona.

# APPENDIX B

## References Utilized in Report Preparation

1. Louisiana Department of Environmental Quality Regulations, Title 33, Part VII, Subpart 1, Solid Waste Regulations.
2. May 17, 2012 Contract to Provide Services to Operate, Manage, and Maintain the Jefferson Parish Sanitary Landfill Site between IESI LA Landfill Corporation and the Parish of Jefferson (Bates No. WC_JPLF_00418707). (Operating Agreement, 2012)
3. "An American Recycling Success Story, Beneficial Use of Coal Combustion Products," American Coal Ash Association, informational flyer, not dated but provides information from 2021. https://acaa-usa.org/wp-content/uploads/2023/12/23-ACAA-Brochure-12-19-23v3-1.pdf
4. "FGD Gypsum Production Process," Gypsum Association website, undated document.
5. "Preliminary Landfill Gas System Assessment Findings," Carlson Environmental Consultants, PC, May 31, 2018. (Bates No. WC_JPLF_00223313)
6. "Landfill Gas System Assessment Report," Carlson Environmental Consultants, PC, August 15, 2018. (Bates No. WC_JPLF_00158037)
7. March 28, 2002 Letter from the Jefferson Parish Louisiana Department of Environmental Affairs to the Louisiana Department of Environmental Quality regarding the Jefferson Parish Sanitary Landfill.
8. December 28, 2015 Agreement Between The Parish of Jefferson and CB&I Environmental & Infrastructure, Inc. (Bates No. ADD_P00107800).
9. "Operations & Maintenance Monthly Report," APTIM Environmental & Infrastructure, Inc., Reports from January 2016 to May 2019.
10. "Attachment 29, Leachate Collection System," prepared by BBEC, MSMM Engineering, LLC, and APTIM Environmental & Infrastructure, Inc.
11. December 14, 2018 Email from Jefferson Parish Department of Environmental Affairs regarding completion of the Phase IVA GCCS installation work. (Bates No. APTIM_0191844)
12. "Construction Plans for Cell 22, Jefferson Parish Landfill, Avondale, Louisianna, Jefferson Parish," prepared by Sigma Engineers & Constructors, Inc., November 2014. (Bates No. WC_JPLF_00402368)
13. July 29, 2015 Email from Renovar Energy Corporation to Jefferson Parish Environmental Department of Environmental Affairs regarding site leachate issues. (Bates No. JP_JPLF_00346537)
14. "Beneficial Use of Coal Combustion Products," 2021 American Coal Ash Association, 2021 Survey Report.
15. American Coal Ash Association Survey Reports 2012 through 2022. https://acaa-usa.org/publications/production-use-reports/
16. "Certification of Compliance," Jefferson Parish Department of Environmental Affairs, September 26, 2017.
17. "Certification of Compliance," Jefferson Parish Department of Environmental Affairs, September 26, 2018.
18. "Certification of Compliance," Jefferson Parish Department of Environmental Affairs, September 27, 2019.
19. "Second Supplemental Expert Report of Jose Sananes," prepared by Ramboll US Consulting, Inc., February 16, 2024.
20. "Landfill Gas Collection and Control Plan, Jefferson Parish Sanitary Landfill, Phase VIA," prepared by Golder Associates, January 2017. (Bates No. SCS_JPLF_00006223)

21. July 14, 2017 Letter from Louisiana Department of Environmental Services to Jefferson Parish Sanitary Landfill regarding approval the January 2017 Phase IVA GCCS Design Plan. (Bates No. WC_JPLF_00160309)

22. "Jefferson Parish Sanitary Landfill, Gas Collection & Control System Expansion, Cells 20-21, Public Works Project No. 2017-072-ENV, Pre-Construction Meeting, January 22, 2018," prepared by Golder Associates. (Bates No. JP_JPLF_00408141)

23. "Assessment of Jefferson Parish Landfill Gas Field," prepared by George Brian DeJean, Jr., dated May 22, 2019. (Bates No. JP_JPLF_0003495)

24. "Control of Odorous Gas at Massachusetts Landfills," Commonwealth of Massachusetts Executive Office of Environmental Affairs, Department of Environmental Protection, dated September 4, 2007.

25. "Best Management Practices to Prevent and Control Hydrogen Sulfide and Reduced Sulfur Compound Emissions at Landfills that Dispose of Gypsum Drywall," USEPA, August 2014.

26. April 5, 2018 Email from LRLC to Jefferson Parish regarding assistance with leachate issues.  (Bates No. WC_JPLF_00242386)

27. July 21, 2018 Email from LRLC to Jefferson Parish regarding assistance with odor and LFG issues.  (Bates No. JP_JPLF_00326372)

28. August 6, 2018 Email from LRLC to Jefferson Parish regarding assistance with LFG control issues.  (Bates No. WC_JPLF_00270584)

29. May 30, 2018 Letter from Waste Connection to Jefferson Parish regarding leachate collection system deficiencies.  (Bates No. WC_JPLF_00276071)

30. "Standards of Performance for New Stationary Sources," Code of Federal Regulations.

31. Spreadsheet providing tonnage of Spent Lime Accepted at Jefferson Parish Landfill from October 2016 through February 2018 (Bates No. WC_JPLF_00182058).

32. Spreadsheet providing tonnage of Spent Lime Accepted at Jefferson Parish Landfill in 2018 as a Beneficial Use material (Bates No. WC_JPLF_00223815).

33. May 29, 2018 Email from CEC to Jefferson Parish regarding Extraction Well Tuning (Bates No. JP_JPLF_00328529).

34. October 9, 2018 Email from Jefferson Parish regarding GCCS installation (Bates No. ADD_P00108258).

35. July 15, 2016 Email from Jefferson Parish regarding LFG venting from side slope risers (Bates No. APTIM_0150447).

36. "Air, Solid Waste, and Water Assessment Inspection Report," prepared by Louisiana Department of Environmental Quality, dated December 3, 2018 (Bates No. JP_JPLF_0003152).

37. December 22, 2017 LDEQ Letter Approving Spent Lime from the Chalmette Calcining Plant for Beneficial Use as a Soil Amendment (Bates No. JP_JPLF_00324621).

38. December 22, 2017 LDEQ Letter Approving Spent Lime from the Norco Calcining Plant for Beneficial Use as a Soil Amendment (Bates No. JP_JPLF_00324622).

39. October 6, 2016 Jefferson Parish Email approving Spent Lime as Special Waste (Bates No. WC_JPLF_00263258).

40. June 19, 2018 LDEQ Letter Approving delay in Construction of GCCS in Phase IVA (Bates No. ADD_P00107758).

41. "Limited Construction Documentation Report, 2019 Landfill Gas Collection and Control System Modification (Phase II)," prepared by Franklin Engineers & Consultants, LLC, dated June 3, 2019.

42. "Jefferson Parish, Landfill Odor Management Program," prepared by CDM, dated March 2006.  (Bates No. WC_JPLF_00488019).

43. "Assessment of Jefferson Parish Landfill Gas Field," prepared by George Brian DeJean, Jr. (River Birch), dated May 22, 2019. (Bates No. JP_JPLF_0003491).

44. "Operations & Maintenance Monthly Report," prepared by APTIM Environmental & Infrastructure, dated May 29, 2019.  (Bates No. JP_JPLF_0018718)

45. "Interim Cover Thickness Investigation, Cells 20 – 22, Jefferson Parish Landfill," prepared by Fourrier & de Abreu Engineers, LLC, dated July 2019.  (Bates No. WC_JPLF_00410195)

46. "Addendum#1, Request for Proposals to Provide Landfill Operation, Management, and Maintenance Services for the Jefferson Parish Landfill, RFP-0227," prepared by Jefferson Parish Louisiana Purchasing Department, dated January 24, 2011.  (Bates No. JP_JPLF_00692267)

47. General Causation Trial Exhibit 1204

48. SCS Engineers, Tie-In of Leachate Collection System Sump Risers to Landfill Gas Collection System, Construction Record Report (January 2019) (Bates No. JP_JPLF_0018703) (SCS Engineers, 2019)

**APPENDIX C**

**Additional Reference Documents**

**(Provided under separate cover)**

## APPENDIX D

## Sheets 14 and 15 from Cell 22 Liner System Construction Plans



## GENERAL NOTES:

THESE CONSTRUCTION DRAWINGS DEVELOPED FROM THE DESIGN BY CAMP DRESSER & McKEE, IN THE JEFFERSON PARISH SANITARY LANDFILL SOLID WASTE PERMIT RENEWAL, AUGUST 2008; AND PHASE 4A OPERATIONS RFP SUPPLEMENTAL DRAWINGS, NOVEMBER 2010.

## NOTES:

1. SEE SHEET 15 FOR SUMP DETAILS.

2. MEDIUM GRAVEL TO BE 1 1/4" TO 2 1/2" (32–64 mm) NON–ANGULAR GRAVEL.

3. ALL ELEVATIONS GIVEN IN NEW CAIRO DATUM.

4. ALL LAYOUT POINTS BASED ON A SITE SPECIFIC GRID COORDINATE SYSTEM.

5. THE APPLICABLE SECTIONS OF THE SUPPLIED TECHNICAL SPECIFICATIONS, AND QAQC PLAN SHALL BE USED FOR THE INSTALLATION OF ALL LAYERS OF THE COMPOSITE LINER /LEACHATE COLLECTION LAYERS.

6. THE CONTRACTOR SHALL REMOVE THE EXISTING ANCHOR TRENCH (CELL 21) BY CUTTING THE EXISTING LINER STRAIGHT AND AT GROUND LEVEL. ALL LINER CUT OUT OF THE ANCHOR TRENCH SHALL BE REMOVED AND DISPOSED OF. THE INSTALLED CLAY LINER SHALL BE KEYED IN WITH THE EXISTING CLAY LINER TO PROVIDE A UNIFORM TRANSITION BETWEEN THE TWO.

SHEET 14

MISCELLANEOUS DETAILS
CONSTRUCTION PLANS
CELL 22
JEFFERSON PARISH LANDFILL
AVONDALE, LA          NOVEMBER 2014



## GENERAL NOTES:

THESE CONSTRUCTION DRAWINGS DEVELOPED FROM THE DESIGN BY CAMP DRESSER & McKEE, IN THE JEFFERSON PARISH SANITARY LANDFILL SOLID WASTE PERMIT RENEWAL, AUGUST 2008; AND PHASE 4A OPERATIONS RFP SUPPLEMENTAL DRAWINGS, NOVEMBER 2010.

## NOTES:

1. ALL ELEVATIONS GIVEN IN NEW CAIRO DATUM.
2. ALL LAYOUT POINTS BASED ON A SITE SPECIFIC GRID COORDINATE SYSTEM.
3. THE APPLICABLE SECTIONS OF THE SUPPLIED TECHNICAL SPECIFICATIONS, AND QAQC PLAN SHALL BE USED FOR THE INSTALLATION OF ALL LAYERS OF THE COMPOSITE LINER /LEACHATE COLLECTION LAYERS.
4. LOCATE 18" RISER PIPE ON EAST SIDE OF 6" CLEANOUT PIPE ON THE NORTH AND SOUTH SIDES.

SHEET
15

## TYPICAL SUMP SECTION (NORTH & SOUTH SIDES) 5-5
SCALE: 1"=4'

## TYPICAL SUMP SECTION (NORTH & SOUTH SIDES) 6-6
SCALE: 1"=4'

## TYPICAL SUMP ELEVATION (CELL 22 NORTH & SOUTH)
NTS

## UNDERDRAIN AND SUMP RISER DETAILS (NORTH & SOUTH SIDES)
SCALE: 1"=4'

NOTE: 12" DIA. & 18" DIA. RISER PIPES TO EXTEND 18" MIN. BEYOND OUTSIDE SLOPE.

## LATERAL LEACHATE COLLECTION PIPE
SCALE: 1"= 5'-0"

## UNDERDRAIN AND LEACHATE COLLECTION SUMP PIPE
SCALE: 1"= 5'

Dale L. Stelb
NAME
CONSTRUCTION
5/2015
DATE
28229
LICENSE #

MISCELLANEOUS DETAILS
CONSTRUCTION PLANS
CELL 22
JEFFERSON PARISH LANDFILL
AVONDALE, LA          NOVEMBER 2014

SIGMA
ENGINEERS & CONSTRUCTORS, INC.

| | | | | | |
|---|---|---|---|---|---|
| 9/3/15 | REVISION 1 - REVISED RAIN FLAP AND DELINEATED TEXTURED/SMOOTH ON THE SIDE SLOPES/FLOOR | | | | |
| DATE | REVISIONS | BY | | | |

DESIGNED: DLS   DRAWN: DMD   CHECKED: CJG   APPROVED: DLS