UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | CIVIL ACTION |
| Plaintiffs | NO. 19-11133, c/w 19-14512 |
| V. | SECTION: "E" (5) |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| Defendants | JUDGE: Morgan<br>MAGISTRATE JUDGE: North |
| *Applies to: Both Cases* | |

**PLAINTIFFS' BRIEF IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE "OTHER SOURCES" EVIDENCE**

Pursuant to § VI.2 of the Thirteenth Case Management Order, Plaintiffs submit this motion to exclude any testimony in support of Defendants' affirmative defense that Plaintiffs' injuries were caused by "other sources." Other than the River Birch and Hy 90 landfills, Defendants have not even attempted to meet their burden of establishing another source and, even as to the two landfills, their evidence actually negates their defense, as demonstrated below.

**I.      INTRODUCTION.**

Almost since the beginning of this litigation, Defendants have contended that the horrific odors experienced by the Plaintiffs came from sources other than the Jefferson Parish Landfill. While, at first, the Parish admitted that the Landfill was the problem, it quickly toed Waste Connections' line that some other source was to blame. Similarly, Defendant Aptim hitched its wagon to Waste Connections, and is along for the ride.

In its answer, Waste Connections pled the following as affirmative defenses:

1

>9. Plaintiffs damages, if any, were sustained in whole or in part as a result of intervening or superseding causes.
>
>10. Plaintiffs' claims are barred or diminished to the extent that their damages were due to their own comparative fault or to the comparative fault of third parties who were not under the control of the Waste Connections Defendants.

R.Docs. 113 and 502 (Answers to First and Second Amended Complaint). Defendant Aptim adopted and incorporated these defenses in its Answer to the Second Amended Complaint. R.Doc, 447 at 1-2 (Sixteenth Defense). Jefferson Parish, likewise, asserted as its Sixth Defense that "Plaintiffs' alleged injuries were caused through no fault of [Jefferson Parish], but through the fault of third parties, for whom [Jefferson Parish] is not responsible" and that "[t]he comparative fault of the Plaintiffs and any other responsible party should be assessed in rendering a judgment in this matter." R.Doc. 504 at 21.

Yet in the past six years, Defendants have failed to identify any other source that they contend was actually responsible for the Plaintiffs' injuries. While Waste Connections facially has sought to cast blame on the River Birch and Highway 90 Landfills, and has provided modeling of hydrogen sulfide emission from those facilities, Waste Connections contends that even the emissions from those Landfills was not enough to cause Plaintiffs' injuries; indeed, Waste Connection argues that even three landfills combined did not emit enough H2S to injure the Plaintiffs. *See* **Exhibit __** Expert Report of Dr. Paolo Zannetti at 2 ("Even the Plaintiffs that are closest to the three landfills show concentration impacts that are very low and rarely above the reference levels of 5 ppb and 10 ppb."); at 65 ("Even with the use of very low reference levels of 5 ppb and 10 ppb, the number of simulated concentrations above these levels is low.").

In addition to asserting that none of the three Landfills were to blame, Defendants have offered expert opinions purporting to show that Plaintiffs did not suffer injury from any odor from any source. Defendants' expert Baldwin Justice opines that any effect of the JPLF odors on the

2

Plaintiffs' quality of life would have been reflected in a reduction in the property values—but there was no reduction in property values, he says; therefore, the odors had no detrimental effect on the Plaintiffs. Defense expert Joseph Gardemal opines that if there any been odors, they would have reduced the revenues of the Pine Manor Community Club—but the revenues did not go down; therefore, he concludes, there were no odors. Obviously, if these conclusions were valid, it would apply to all odors from all sources, including all three Landfills.

Similarly, Defendants' expert Dr. Brobson Lutz opines that any complaint by Plaintiffs about the landfill odors would have been reflected in their medical records. He says that he examined more than 41,000 pages of Plaintiffs medical records and did not find any reference to odors in any of them. While he concedes that the odors may well have been a nuisance, he concludes that the odors were not bad enough to cause headaches, nausea and other symptoms complained of by the Plaintiffs in this case. Again, his opinion, if accepted, applies to all odors from all sources, including all three landfills.

For its part, the Parish hired River Birch to replace Waste Connections as the operator of the Jefferson Parish Landfill, and to fix the myriad problems that existed there. In what world would Jefferson Parish have taken this action if River Birch had been the cause of the odors?

While the opinions of Mr. Justice, Mr. Gardemal and Drs. Lutz and Zannetti are based on junk science, the fact the Defendants are relying on experts whose opinions (if valid) defeat their "other sources" defense means that the "other sources" defense was never serious. In any event, no evidence has been provided that any other source was even capable of causing any injury to the Plaintiff and much less that some other source actually did so.

As set forth below, for the "other sources" defense, other than the two landfills, Defendants have done little more than identify other potential sources of odors in the community, and they

3

have not demonstrated that any of the Plaintiffs were actually exposed to odors or gases emanating from any of these other potential sources. And, as to the Landfills, Defendants argue that the aggregate emissions were insufficient to cause the Plaintiffs actual harm.

As a result, the Court should preclude the Defendants from offering any evidence that the Plaintiffs' injuries were caused by some other source. Concurrently with this motion, Plaintiffs have moved to exclude the testimony of the proposed experts of the Defendants who have opined with relation to the other sources.

## II.     NO OTHER SOURCES HAVE BEEN IDENTIFIED IN DISCOVERY IN THIS CASE.

On July 23, 2018, nearly six years ago, officials of Jefferson Parish convened a press conference, admitting to the public that the Jefferson Parish Landfill was the source of the odors plaguing the community, naming the acceptance of industrial waste, the woefully insufficient leachate collection system, deferred maintenance, failure to maintain cover and the broken misting system as the causes.[1]  **Exhibit 1 press conference transcript**, at 2 (Parish President Yenni, "I announcing corrective actions … to dramatically reduce and outright eliminated noxious odors that are emanating from the parish landfill in Waggaman."). Thereafter, the Parish Council committed to expending millions of dollars to remediate years of deferred maintenance and improve the landfill systems to eliminate the odors. And, when that work was completed, the odor complaints substantially stopped.

---

[1] While Councilor Johnston named other potential sources which needed investigation, no fair reading of the press conference can conclude other than that it was the Parish's *mea culpa*, and the Parish's alone. He said, "So we know the landfill's causing problems, we know it's a big source of problems, but we feel there may be other issues, and we need to correct them too." **Exhibit 1 at 11.**

Nevertheless, speaking for the other Defendants, including the Parish, the Waste Connections Defendants have asserted since 2018 that some other source was responsible.[2] But after six years of investigation, Waste Connections (speaking for all Defendants) is not able to identify even one that they say actually caused Plaintiff's injuries.[3]

### A. Waste Connections hired NCM Odor Control to identify other sources, and NCM came up empty.

In mid-July 2018, Waste Connections retained NCM Odor Control to perform an odor study to assist with the odor issues.  **Exhibit 2,** WC JPLF 00272294.  Two days later, in response to an inquiry from Mike Lockwood regarding what Waste Connections had done "to assist in the current odor problems," **Exhibit 3,** JP_JPLF_00326372, Brett O'Connor explained that NCM had been hired "to complete an odor study including all odor sources in proximity to JP Landfill including JP Landfill, Riverbirch LF, Riverbirch C&D, Cornerstone, nearby barge operations, nearby sewage treatment facilities and conveyance structures."  Id.  *See* **Exhibit 4,** JP_JPLF_00326550.[4]  Then, on July 23, 2018, Waste Connections announced to the press that

> In addition, LRLC, at its own expense, has hired a nationally known odor mitigation firm *in order to assist the Parish in identifying all sources of local odors*, including the two River Birch landfills immediately adjacent to the Jefferson Parish Landfill. *A final report detailing those findings will be made public in the coming weeks.*

---

[2] Waste Connections' first argument was that there were no odors emanating from the Jefferson Parish landfill capable of causing any harm to anybody.  This issue was litigated and decided in the General Causation phase of this case.  Their current argument is only slightly different: there were no odors sufficient to harm the Plaintiffs, which is just another way of saying that the odors were capable of causing harm.  Plaintiffs have concurrently moved for an order to preclude the Defendants from re-litigating the General Causation order.

[3] As set forth above, Defendants contend the emissions from the River Birch Landfill or the Highway 90 Landfill were insufficient to be the cause of Plaintiffs' injuries, and have offered other expert testimony to show that there were no injuries caused by any odor from any source.

[4] Waste Connections did not produce this email in discovery (a draft of it, however, was produced.  WC_JPLF_00418514, marked "Confidential – Outside Counsel Only.").

5

**Exhibit 5,** WC_JPLF_00270152.  And two days after that, on July 25, 2018, Waste Connections Region Vice President Rob Nielsen confirmed to a reporter that NCM Odor Control was doing the odor study, stressing that it was at "our cost and we make public no matter the results." **Exhibit 6,** WC_JPLF_00421579.

Despite these promises, the NCM report was never made public.  Instead, concealing NCM's inability to identify a different source, Waste Connections asserted that NCM report was privileged, claiming it was the work of a consulting expert for the lawyers.  Waste Connections finally produced the NCM documents on March 18, 2024.  *See* **Exhibits 7 and 8.** (counsel correspondence). These documents did not identify any other sources, and the NCM draft report would be attached to this brief as **Exhibit 9, WC_JPLF_00539899**, but for the fact that that Waste Connections designated this document as "Confidential Outside Counsel Only" under the Agreed Protective Order in this case (R.Doc. 79).  In the coming days, Plaintiffs hope to resolve this issue with Waste Connections and will supplement accordingly.

Thus, the NCM Report did not conclude that any other source was emitting gases or odors in any specific amount.

> **B.** **SCS Engineers did odor studies but could not identify any actual other source.**

According to the confidential SCS Report dated October 9, 2018, SCS Engineers performed an odor survey on September 14, 2018.  **Exhibit 10** That report identified a number of potential other sources, but did not conclude that any of them was the source of the odors complained of in the community.

Three weeks later, Waste Connections made public a second report of SCS Engineers.  The public report stated that the "odor survey activities also conducted at or near off-site locations included":

6

> Other nearby industrial facilities and activities that are potentially a source of odor (the Cornerstone, Evonik, and Kemira facilities complex, ADM grain operations, numerous dredging and barge cleaning operations along the local Mississippi River banks, several waste water treatment facilities, inactive Kelven Sanitary Landfill, and other industrial facilities;
>
> • River Birch Landfill operations (just west of the Jefferson Parish Landfill) and the Highway 90 Construction and Demolition (C&D) Landfill (just east of Jefferson Parish Landfill);
>
> • Nearby areas that could be a natural source of odors (bogs, lakes, farmland, etc.);
>
> • Some of the adjacent neighborhoods that record frequent complaints to obtain a snapshot of potential odors experienced locally including sources in Elmwood, Harahan and River Ridge.

**Exhibit 11.** SCS reported detection of odors near the Highway 90 Landfill, but made no conclusion regarding the sources of the odors affecting the community. The SCS Report did not conclude that any other source was emitting gases or odors in any specific amount.

In its press release announcing the publication of the SCS report, Waste Connections explained that "SCS investigated odors and air quality at the Jefferson Parish Landfill and in the surrounding area, including areas of frequent odor complaints in the neighborhoods of Elmwood, Harahan and River Ridge" and that "SCS measured specific gases, and analyzed wind and weather data to assess possible sources of odors in the area." **Exhibit 12, WC_JPLF_00274330.** However, no specific alternate source of odors was identified.[5]

On October 25, 2018, the Louisiana Department of Health issued a draft of the report of its investigation. It found,

> The strong odors in the area surrounding the landfills and facilities are indicative of a problem with the conditions at the landfills that give rise to persistent noxious odors.

---

[5] The press release did state that "Based on odor evidence and hydrogen sulfide (H2S) measurements collected in September, SCS determined that the gas plant on the River Birch Landfill appears to be producing significant emissions of H2S, a known odor-causing compound." And that "the highest H2S readings during the SCS survey were collected directly downwind from the Highway 90 C&D Landfill.." Defendants currently contend that emissions from these landfills were insufficient to have caused any significant injury to any Trial Plaintiff.

> This is not unexpected because it is known that the odors may be detected by humans at levels far below those that are measured though air sampling. It is also likely that an array of odoriferous sulfur-containing compounds is generated at low levels during the decomposition of the organic wastes that cannot be measured by routine air monitoring, but which contribute to the odors.

**Exhibit 13.**

On December 5, 2018, the LDEQ reported to the Jefferson Parish Council that it had concluded that the Jefferson Parish Landfill was the most significant source of odors. Indeed, Chuck Carr Brown, the Secretary of LDEQ, stated that "LDEQ personnel conducted thirty-three inspections at fourteen facilities [including River Birch and Hy 90 landfills] and conducted …sampling to determine the root of the problem which is definitely, we think, the [JPL] landfill." **Exhibit 14 (Transcript of LDEQ presentation to Parish Council) at 3. Thus, the only independent investigation of the odors did not identify any significant source other than the Jefferson Parish Landfill.**

    **C.    Interrogatory answers revealed that Defendants could not identify any source they contended to have caused Plaintiffs' injuries.**

Throughout this litigation, Waste Connections has been leading the charge on this defense that Plaintiffs' injuries were caused by "other sources." On February 16, 2023, Plaintiffs inquired as to Waste Connections' contentions regarding the other sources. **Exhibit 15.** Interrogatory #1 stated, "Please identify each and every 'other source' of gases and emissions to which You contend the Plaintiffs were exposed in this case." This initial response, served on March 20, 2023 (well over a year ago), identified fifteen facilities and three general categories of sources of odors and stated that "Plaintiffs *may have been* exposed to those emissions." **Exhibit 16 at 6.** Waste Connections further asserted that Interrogatory #1 was a "contention interrogatory" that could not be fully answered until the end of fact discovery. Id. at 5. Plaintiffs moved to compel, and the Court granted the motion to compel on October 23, 2023, ordering Waste Connections to serve its

8

response to Interrogatory #1 on or before February 23, 2024 (R.Doc. 428), although the deadline was later extended to March 8, 2024. (R.Doc.__). None of the other objections to Interrogatory #1 was sustained by the Court when it ruled on the motion to compel. (R.Doc. 428).

Waste Connections' supplemental response, dated September 27, 2023, (**Exhibit 17**) did not identify any sources of odors to which Waste Connections contended that the Plaintiffs were actually exposed. Instead, it again contained a list of possible sources of emissions and repeated that, "the following sources have emitted odors, gases, dust, or particulates into areas within Jefferson Parish and that certain Plaintiffs *may have been exposed* to those emissions." Waste Connections served Second Supplemental Response on March 8, 2024, again listing sources to which Plaintiffs "may have been exposed. **Exhibit 18.**

A week later, Waste Connections served Third Supplemental Response (mislabeled as the Second) revising the "may have been exposed" language to stating that "*as set forth in Defendants' expert reports* submitted March 8, 2024,[6] … the following sources have emitted odors, gases, dust, or particulates into areas within Jefferson Parish and that it is more likely than not that Plaintiffs were exposed to odors, gases, dust, and particulates *from one or more of the following sources*," **Exhibit 19,** leaving it to the Plaintiffs to guess as to which of the alleged sources was actually in contention. Waste Connections' refusal to answer the question was a direct violation of the order granting the motion to compel.

Interrogatory #2, which is dependent upon the answer to Interrogatory #1, asked that Waste Connections provide, with regard to each other source emission that it contended caused the

---

[6] The expert reports listed were those of Matthew Stutz (**Exhibit 20);** Dr. Paolo Zannetti (**Exhibit 21)**, Michael Corn (**Exhibit 22)**, Dr. John Kind (**Exhibit 23)**, Dr. Pamela Dalton (**Exhibit 24)**, and Dr. Brobson Lutz (**Exhibit 25)**, Not one of these reports identified the other sources of gases and emissions to which Waste Connections contended the Plaintiffs were exposed.

9

injuries complained of, the following information: (a) the chemical substance that you contend caused the injury, (b) the dates, times, durations and concentrations of each emission; and (c) the contact information of persons with knowledge of the emissions.

The Third Supplemental Responses to this interrogatory did not provide any information at all, but merely directed the Plaintiffs to the expert reports submitted on March 8, 2024. However, with the exception of the hydrogen sulfide emissions from the River Birch and Highway 90 Landfills discussed in the Stutz and Zannetti reports, none of those reports contains (1) the other sources contended to have caused the injuries; (2) the chemical substance or substances that are contended to have caused the injury; (3) the dates, times, durations and concentrations of each emission of the chemical substance or substances contended caused the injury; or (4) the contact information. **Exhibits 20-25.**[7]

Page 9 of Waste Connections' interrogatory answer stated that "The chemical substances the Waste Connections Defendants contend more likely than not caused Plaintiffs' alleged injuries are identified in" nine separate expert reports, including reports served in the General Causation Phase[8]. **Exhibit 19 at 9.** However, not one of these reports identified the chemical substances that the Waste Connections Defendants contended caused Plaintiffs' injuries. Page 10 of the interrogatory answer stated, "The dates, times, durations, and concentrations of emissions the Waste Connections Defendants contend more likely than not case Plaintiffs' injuries are identified

---

[7] Even the Stutz and Zannetti Report are devoid of any assertion that the emissions from those facilities were the actual cause of Plaintiff's injuries.

[8] The additional reports are Expert Report of Dr. Paolo Zannetti, April 30, 2021, (**Exhibit 26**); Expert Report of Dr. John Kind, April 30, 2021 (**Exhibit 27**); Expert Report of Dr. Pamela Dalton, April 30, 2021(**Exhibit 28**). Each of the references included the phrase, "and the documents and information referenced therein," further underscoring the non-answer to the question.

in the following expert reports," listing six expert reports. Id. at 10. The dates, times, durations, and concentrations of emissions were nowhere to be found in any of them.

Plaintiffs then took the depositions of each of the experts whose reports were listed in the interrogatory answers. None of them could offer any insight into what emissions from what other sources were alleged to have caused the injuries. In fact, it was plain that they had not even been consulted with regard to the interrogatory answers. **Exhibit 29** Corn Dep. at 203 (Corn never told which sources Waste Connections contended Plaintiffs were exposed to); at 208-209 (Corn not asked to calculate durations, concentrations or dates and times of emission from sources); at 209 (Corn does not know the chemical substances that Waste Connections contends caused injuries). **Exhibit 30,** Dalton Dep at 355 (Dalton recalls no participation in preparing the interrogatory answer), at 363 ("·I'm not providing an opinion about the specific chemicals in terms of causing injury.· I have merely stated that these are alternative odor sources in the environment."); **Exhibit 31**, Kind Dep. at 33 (Kind does not recall a specific conversation regarding which sources Waste Connections contended Plaintiffs were exposed to); at 39-40 (report did not go into the level of detail of dates, times, concentrations and durations); **Exhibit 32** Lutz Dep at 27-28 (if Lutz was ever told which sources Waste Connections contended the Plaintiffs were exposed to, he does not remember it); at 32 (Lutz did not identify any chemical substance that caused injuries). **Exhibit 33** Stutz Dep at 315 (opinion limited to River Birch and Highway 90 landfills); at 316-317 (cannot identity which chemicals are contended to have caused injury because he does not know what the injuries are) at 317-318 (Stutz not asked to evaluate any other sources other than River Birch and Highway 90 landfills) at 318-319 (Stutz's opinions limited to hydrogen sulfide and no other chemicals). **Exhibit 34 Zannetti Dep at 30-31** (the only "other sources provided to Zannetti were

11

the landfills and he was not asked to consider any other source), at 81 (Zannetti can't say what the other sources might be); at 219 (Zannetti was not involved in the Corn study)

By asserting that the answers were set forth in the expert reports when in fact they were not, the interrogatory answers were materially false. Nevertheless, Waste Connections representative Brett O'Connor swore under penalty of perjury that the answers were true and correct.[9]

## III. INTERVENING CAUSE IS NOT AN AVAILABLE DEFENSE.

Waste Connections' and the tag-along other Defendants second, and similar, defense is "intervening cause." Under Louisiana law, "[a]n intervening cause is one which comes into play after the defendant's negligent conduct has ceased, but before the plaintiff suffers injury." A*dams*

---

[9] This was not the first instance of false swearing by Waste Connections in this case. To persuade the Court that SCS Engineers was a "consulting expert" whose communications with Waste Connections were privileged, Waste Connections' Deputy General Counsel John Perkey swore under penalty of perjury that he had hired SCS and that SCS had worked under his direction. R.Doc. 368-3. Both statements were false. At the time, Plaintiffs were seeking documents that had been prepared by SCS in July 2018, before Waste Connections hired its outside counsel. *See generally* R.Doc 368 (Waste Connections motion to quash subpoena); R.Doc. 375 (Plaintiffs motion to enforce subpoena). As a result, for the consulting expert privilege to apply, SCS had to have been hired by a lawyer to assist the lawyer with respect to legal issues. At the time Mr. Perkey submitted this declaration to the Court, Waste Connections was refusing to provide a privilege log, and so Waste Connections was asking the Court to take what Mr. Perkey said as true in assessing the applicability of the consulting expert privilege. Thereafter, when a privilege log was provided, it was revealed there were no documents in existence demonstrating that Mr. Perkey had hired SCS or that he had ever directed their work in any away. The documentary evidence that did exist showed that SCS had been hired by Brett O'Connor, not Mr. Perkey. When he was deposed, Mr Perkey acknowledged that no such documents existed, (**Exhibit 35, Perkey Dep. at 192**). He could not recount any actual discussions between him and SCS, and did not recall if he himself actually talked to them. Id. Perkey Dep. at 180:22-181:3. Mr. Perkey could not recall whether he himself had ever hired SCS pursuant to the Master Services Agreement (which is what he had sworn in the declaration). Perkey Dep. at 181, 183-184. As this Court as already concluded, "on August 28, defense counsel declared "[w]e would like to use SCS as a consulting expert, as opposed to a testifying expert - particularly because SCS has already done some work that we intend to use in a consulting fashion (i.e. want to keep it protected)," and further "It was not until September 5, 2018 that SCS and counsel for the Waste Connections Defendants executed the contractor agreement, in which defense counsel formally retained SCS as an expert." R.Doc. 491 (order granting motion to compel). Such after-the-fact protection would not have occurred if Mr. Perkey had in fact already retained SCS as a consulting expert.

*v. Rhodia, Inc*., 983 So.2d 798, 808 (La.2008). The Louisiana Supreme Court has explained that, "[i]n situations in which there is an intervening force that comes into play to produce the plaintiff's injury (or more than one cause of an accident), it has generally been held that the initial tortfeasor will not be relieved of the consequences of his or her negligence unless the intervening cause superceded [sic] the original negligence ***and alone produced the injury*** Id. (emphasis added). If the intervening cause "could or should have reasonably" been foreseen, the initial tortfeasor will be liable "notwithstanding the intervening cause." Id. (citing cases).

The burden of proving a superseding intervening cause rests with defendants. *Turner v. Nationwide Ins. Co*., 503 So. 2d 734, 737 (La. Ct. App. 1987). Conjecture and possibility are insufficient to prove an intervening cause; instead, such intervening cause must be proven by a preponderance of the evidence. *Id. See Lancon v. State Farm Mut. Ins. Co*., 94-256 (La. App. 3 Cir. 10/5/94), 645 So. 2d 692, 697, *writ denied*, 95-0153 (La. 3/17/95), 651 So. 2d 272 ("The defendants bear the burden of proving that the July 29 accident aggravated Mrs. Lancon's preexisting condition."); *Menard v. Federated Mut. Ins. Co*., 2005-85 (La. App. 3 Cir. 6/22/05), 906 So. 2d 746, 755–56, *writ denied*, 2005-1925 (La. 3/10/06), 925 So. 2d 506 ("merely raising the fact of the January 2001 accident is insufficient to deflect causation and consequent responsibility for damages").

Here, Defendants make no contention that the sole cause of Plaintiffs' injuries (or any of them) was something other than the emissions from the Jefferson Parish Landfill. Accordingly, no basis in law or fact exists for the intervening cause defense. As a result, the "other sources" evidence cannot be relevant to support an intervening cause defense.

## IV.  ALLOCATION OF FAULT TO THE "OTHER SOURCES" IS NOT AN AVAILABLE DEFENSE.

Under Louisiana's comparative fault regime, "in any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty." La. Civ. Code art. 2323. As a result, "[w]here non-parties are claimed by a defendant to be at fault in causing damages to the plaintiff, the burden shifts to the defendants to show not only the fault of the non-parties, but the percentage thereof." *Willis v. Noble Drilling (US), Inc.*, 11-598 (La. App. 5 Cir. 11/13/12), 105 So. 3d 828, 841–42.  In other words, the defendant must provide "evidence that fault actually exists on the part of the non-party." *Id.  See also Granger v. United Home Health Care*, 2013-0910 (La. App. 1 Cir. 6/19/14), 145 So. 3d 1071, 1078, writ denied, 2014-1665 (La. 10/31/14), 152 So. 3d 158 ("the defendant bears the burden of showing not only the fault of the other, but the percentage thereof"); *Blake v. City of Port Allen*, 2014-0528 (La. App. 1 Cir. 11/20/14), 167 So. 3d 781, 790 ("the defendant bears the burden of proving comparative fault by a preponderance of the evidence").

Simply stated, "[t]hird-party fault is an affirmative defense" for which "the party pleading third-party fault bears the burden of proving it by a preponderance of the evidence." *Landry v. Doe*, 2019-0880 (La. App. 1 Cir. 6/26/20), 307 So. 3d 1064, 1080–81, writ denied, 2020-00952 (La. 10/20/20), 303 So. 3d 313, and writ denied, 2020-00948 (La. 10/20/20), 303 So. 3d 316. *See Osgood v. Branam Enterprises*, No. CIV.A.97-3713, 2000 WL 1789982, at *2 (E.D. La. Dec. 6, 2000) ("plaintiffs properly note that defendants still must provide the jury with sufficient evidence to assign percentages of fault to any alleged tortfeasors if they intend to blame other parties").

Defendants must show all of the elements – duty, breach, causation and damages. *Bradbury v. Thomas*, 98-1678 (La. App. 1 Cir. 9/24/99), 757 So. 2d 666, 680 ("despite the mandate

of Article 2323, defendants are not relieved of the burden of proving that the phantom tort-feasor's conduct was a causative factor of the damages sustained and was a breach of duty to the plaintiff").

Here, Defendants cannot identify even one "other source" of odors that it contends caused Plaintiffs' injuries, as they contend that not even the River Birch and Highway 90 emissions which Mr. Stutz computes and Dr. Zannetti models are sufficient. Nor can they identify even one "other source" that they contend contributed to Plaintiffs' injuries. Apart from the hydrogen sulfide that they modeled from River Birch and Highway 90, they can show no times, dates, durations or concentrations of any odor or chemical and, even as to them, Defendants do not even attempt to show negligence, causation or damages. Accordingly, no evidence exists to support the "other sources" defense asserted in this case.

Because Defendants have no viable claim for superseding or intervening cause, and no basis upon which to allocate fault, the others sources evidence is not relevant.

**V. DEFENDANTS HAVE NO FACTUAL BASIS FOR ARGUING THAT THE ODORS WERE CAUSED BY THE PLAINTIFFS, THEIR LIFESTYLE, OR A DEFECT IN THEIR PROPERTY.**

Throughout this case, Defendants have attempted to attribute odors to any source other the JPLF, including the Plaintiffs themselves, their pets, lifestyles, cleanliness, and state of their property during the relevant time period. Specific examples of this include: [10]

---

[10] Defendants utilized the same deposition question outline for each and every Plaintiff and therefore the same questions were asked and answered by each Trial Plaintiff (with the exception of the minor children.) The excerpts provided are categorical, and do not represent all questions to Plaintiffs that insinuate Plaintiff fault in causing the odor.

15

1. Asking Stanley Meyers if his dogs ever had accidents in his apartment during the relevant time period, whether his dogs were prone to shedding, his cleaning habits, and whether he had a pest problem in his apartment. **Exhibit 37 *in globo*, Meyers Dep. at 73:10-25, 74:1-9, 75:1-25, 76:1-25, 77:1-25 (April 4, 2023.)**

2. Asking Geneva Green whether she maintains her yard, whether she uses fertilizer, whether she has a garden, if she owns pets, whether any of her neighbors have chickens or "other types of animals" and whether her home is prone to flooding. **Id at Green Dep. at 64-66:1-2 (April 7, 2023).**

3. Asking Jonathan Tate whether his roof leaked, if he ever had a cockroach infestation in his home, and whether he or anyone in his home used recreational drugs in the home, and whether he or his wife (who is not a Trial Plaintiff) wear perfume or cologne. **Id at Tate Dep. at 75:1-25, 145:8-25, 146-149:1-13, 152:11-16 (April 4, 2023).**

Defendants have no proof, and no expert has opined that any of these circumstances were the source of the widespread community odor complaints during the relevant time period or more specifically, the individual Trial Plaintiff odor complaints. By allowing cross examination or arguments by counsel as to this issue would amount to victim blaming masqueraded as an inquiry not rooted in fact, and intended only to confuse and mislead the trier of fact. As such, Defendants' experts and counsel should be precluded from arguing that the Plaintiffs' residence, lifestyle, pets, cleanliness were a source of odor during the relevant time period.

## VI.   CONCLUSION.

For the foregoing reasons, the Motion should be granted, and Defendants' evidence of "other sources" should be excluded from the trial of this matter.

Dated: June 6, 2024

Respectfully submitted,

/s/ S. Eliza James
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)

16

FORREST CRESSY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com


             /s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Harry S. Johnson (Admitted Pro Hac Vice)
James Jeffcoat (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
mchilders@wtplaw.com
*Counsel For Addison Plaintiffs*