

# EXPERT REPORT OF

# JOHN KIND, PH.D., CIH, CSP

*Elias Jorge "George" Ictech-Bendeck, et al. v.*

*Waste Connections Bayou, Inc. et al.*

Civ. Action No. 18-7889 c/w 18-8071

18-8218, 18-9312 (E.D. La.)

*Frederick Addison, et al. v.*

*Louisiana Regional Landfill Company, et al.*

Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.)

*April 30, 2021*

# Table of Contents

1.0    Executive Summary ................................................................................................ 4

2.0    Statement of Qualifications ................................................................................... 5

3.0    Materials Reviewed and Relied Upon .................................................................... 6

4.0    Background............................................................................................................. 7
4.1    Overview of the Jefferson Parish Landfill and the Surrounding Area................ 7
4.2    Class and Mass Action Allegations and Purpose of Report............................. 10
4.3    On-site Air Monitoring and Sampling ............................................................. 12
4.4    Exponent's Air Dispersion Modeling .............................................................. 14
4.5    Community Air Monitoring and Sampling ...................................................... 16
4.6    Odors and Health Complaints Reported in Plaintiff Fact Sheets .................... 19
4.7    Resident Odor Complaints ............................................................................. 21
4.8    EnviroComp Data Analysis and Air Dispersion Modeling ............................. 26

5.0    Scientific Causation Methodology........................................................................ 27

6.0    Opinions............................................................................................................... 29
6.1    The low concentrations of hydrogen sulfide documented throughout Jefferson Parish and the estimated hydrogen sulfide emissions predicted from the JPLF would not cause adverse health effects, including those complained of by Plaintiffs. .......................................................................................... 29
6.2    Odors associated with JPLF gas emissions are unlikely to present a nuisance, as measured and modeled airborne concentrations throughout most of the community show a lack of hydrogen sulfide levels above the level of distinct odor awareness (10 ppb). Additionally, detections above this level were observed less than 1% of the time, as short-term unsustained spikes above background levels. ............ 35
6.3    Smell reports and other odor complaints by Jefferson Parish residents are unreliable, do not objectively evaluate potential odor sources, and are not validated with meteorological data. As a result, Dr. Schiffman cannot assert without analysis that the odors complained of are attributable to the JPLF. ............................................................................................................................................. 40

7.0    Critique of Dr. Schiffman's Expert Report ........................................................ 41
7.1    Dr. Schiffman disregards dose-response when attributing health claims to JPLF emissions as she ignores that hydrogen sulfide concentrations are not sufficient to cause adverse health effects. .......... 41
7.2    Dr. Schiffman selectively highlights unrepresentative data to opine that hydrogen sulfide levels observed throughout Jefferson Parish must have come from the JPLF. .................................................. 42
7.3    Dr. Schiffman repeatedly opines on the ability of VOCs to cause the Plaintiffs' complaints; however, she has not conducted the requisite analysis to appropriately render these opinions. ............................ 43
7.4    Dr. Schiffman blindly attributes Plaintiffs' alleged nuisance impacts and health complaints to the JPLF, ignoring contributions from adjacent landfills, nearby industry, and other local sources.............. 44
7.5    Dr. Schiffman draws specific causation conclusions without having conducted the requisite analysis to render these conclusions.............................................................................................................. 46
7.6    Dr. Schiffman's opinion that hydrogen sulfide accumulated in Plaintiffs' homes and adsorbed to household items, increasing exposure intensity is speculative and is not supported by science or the facts. .......... 47

8.0    Conclusions.......................................................................................................... 48

9.0    References............................................................................................................ 50

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.    Page | 2



## List of Figures

Figure 1. Jefferson Parish Landfill Phases ................................................................................. 7
Figure 2. Alternate Odor Sources in Jefferson Parish ................................................................ 10
Figure 3. Plaintiffs' Residences in Relation to the JPLF ............................................................ 11
Figure 4 Odor Complaints Reported to JPLF and LDEQ ........................................................... 21
Figure 5. Number of Odor Complaints Reported in 2018 ........................................................... 22
Figure 6 Complaints by Odor Descriptor ................................................................................... 24
Figure 7. 2018 Odor Complaints by Odor Descriptor and Month ............................................... 25
Figure 8 Spectrum of H$_2$S effect levels ................................................................................. 32

## List of Tables

Table 1. Sample of Health Complaints from Plaintiff Fact Sheets .............................................. 20
Table 2. Descriptors Used in Odor Complaints ......................................................................... 23
Table 3. Alleged Health Impacts in Odor Complaints ................................................................ 25
Table 4. Published Odor Thresholds for Hydrogen Sulfide ........................................................ 35
Table 5. State-Specific Hydrogen Sulfide Air Quality Guidelines .............................................. 38

## List of Appendices

Appendix A ............................................................................................... CV and Previous Testimony
Appendix B ............................................................................................ Materials Reviewed and Relied Upon

*Expert Report of John Kind, Ph.D, CIH, CSP*
*Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.*
*Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.*      Page | 3

CTEH

## 1.0    Executive Summary

The Jefferson Parish Landfill ("JPLF") is one of three adjacent landfills located in Avondale, Louisiana. Despite the existence of the two other landfills and numerous other likely significant contributors of odors and emissions in Jefferson Parish, the Plaintiffs and their experts have identified the JPLF as the source of odors throughout Jefferson Parish and the cause of a variety of health and personal injuries, including death. However, the concentrations of hydrogen sulfide ("$H_2S$") and volatile organic compounds ("VOCs") measured at the JPLF and as modeled by experts retained by Plaintiffs, the Parish, and Waste Connections—Mr. James Lape, Dr. Paolo Zannetti, and Dr. Mark Yocke, respectively—demonstrate hydrogen sulfide does not reach Plaintiffs' residences for any duration that would cause widespread nuisance-level odors, let alone adverse health effects. Even conservatively assuming that hydrogen sulfide at concentrations of 10 parts per billion ("ppb")—the level that approximately 50% of the population may be aware of an odor and 10% of the population could experience a strong odor intensity—is a nuisance for purposes of the litigation's General Causation phase, only a relatively small number of Plaintiffs reside in areas in which that level is predicted to occur 1% or more of the time.

Plaintiffs' expert Dr. Susan Schiffman, who is neither a medical doctor nor a toxicologist, opined that very low levels of hydrogen sulfide from the JPLF—1 μg/m³ (approximately 0.7 ppb)—are the cause of malodors in Jefferson Parish and Plaintiffs' health complaints. However, Dr. Schiffman fails to address that these levels are actually lower than the average background levels of urban areas and lower than the background levels for Jefferson Parish estimated by Dr. Yocke. Dr. Schiffman also relies on unknown quantities of unspecified VOCs from both the JPLF and measurements near Plaintiffs' residences to claim that VOCs impact Plaintiffs' health. This opinion is unreliable because there is no evidence of what levels of VOCs are at Plaintiffs' residences, or the fate and transport of VOCs from the JPLF (i.e., whether any VOCs emitted from the JPLF traveled to any residences and at what levels this may have occurred).

In this report, I provide an analysis of the case-related data and documents provided to me by counsel (discussed in further detail below) and relevant scientific literature on hydrogen sulfide, odor transport, and odor detection, recognition, and awareness in humans. Based on this analysis, I make the following opinions regarding emissions of gases and odors from the JPLF:

1.  The low concentrations of hydrogen sulfide documented throughout Jefferson Parish and the estimated hydrogen sulfide emissions predicted from the JPLF would not cause adverse health effects, including those complained of by Plaintiffs.

2.  Odors associated with JPLF gas emissions are unlikely to present a nuisance, as measured and modeled concentrations throughout most of the community show a lack of hydrogen sulfide levels above the level of distinct odor awareness (10 ppb). Additionally, detections above this level were observed less than 1% of the time, as short-term unsustained spikes above background levels.

3.  Smell reports and other odor complaints by Jefferson Parish residents are unreliable, do not objectively evaluate potential odor sources, and are not validated with meteorological data. As a

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 4



result, Dr. Schiffman cannot assert, without analysis, that the odors complained of are attributable to the JPLF.

4. Dr. Schiffman has not conducted the appropriate analysis to conclude that the JPLF is the sole or major source of complaints in the area; her opinions are not consistent with the available information; and she does not follow appropriate scientific methodology when reaching her opinions. Therefore, her opinions are unreliable and do not have proper scientific foundation.

## 2.0   Statement of Qualifications

I am a Principal Toxicologist and Senior Vice President of the Health Sciences Division at CTEH® specializing in risk assessment, exposure assessment, toxicity evaluations, the evaluation of experimental design and methodologies, and assessing causal relationships between chemical exposure and disease. My educational background includes a B.S. in biochemistry with an emphasis in toxicology from Murray State University in 1993 and a Ph.D. in toxicology from The University of Georgia in 2000. I am also a Certified Industrial Hygienist ("CIH") and Certified Safety Professional. I am a member of the Oil and Gas Working Group of the American Industrial Hygiene Association ("AIHA"), American Conference of Industrial Hygienists ("ACGIH®"), the American Society for Testing and Materials ("ASTM") International – Subcommittee D18.26 on Hydraulic Fracturing, the Society of Toxicology ("SOT"), and the American College of Occupational and Environmental Medicine ("ACOE"). I am a member of the AIHA's Emergency Response Planning Guideline ("ERPG") committee, which establishes exposure guidelines for communities after emergency chemical releases. My current duties at CTEH® include serving as a consulting toxicologist and industrial hygienist, providing guidance for risk assessment and remediation plans, leading responses to and providing toxicological and industrial hygiene support for hazardous materials incidents, and providing toxicological support to care providers and workers with potential chemical exposures. I have gained extensive knowledge and experience in the mechanisms and toxicities of a wide range of compounds, including hydrogen sulfide, chlorinated hydrocarbons, VOCs, constituents associated with oilfield exploration and production, polycyclic aromatic hydrocarbons ("PAHs"), pesticides/herbicides, irritant gases, heavy metals, airborne particulates including silica, and asbestos. I have personally led air monitoring and environmental sampling teams on over 50 hazardous materials incidents in the last 14 years, and I have remotely supported dozens more. I have been retained in this case to assess issues related to hydrogen sulfide concentrations and potential odors based on my expertise in Toxicology and Industrial Hygiene. Through my emergency response and industrial hygiene work, I have gained extensive experience addressing hydrogen sulfide exposures.

Toxicology, a blend of biology, chemistry, and medicine, is the science of the adverse effects of substances (e.g., chemicals, physical agents, and drugs) on biological systems including the effects, the recognition, and the mechanisms of a chemical-related disease. Whether a substance is a toxicant depends upon two inseparable criteria: 1) the intrinsic nature of the substance, and 2) the dose, or how much a substance the individual actually takes into their body. In toxicology, we study the dose-response of chemicals on biological systems, with emphasis on understanding the mechanisms of harmful effects. Toxicologists also provide expert opinions with respect to causation in toxic tort litigation. As stated by the Federal Reference Manual on Scientific Evidence (Federal Judicial Center, 2011), *"In tort litigation, toxicologists*

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 5



*offer evidence that either supports or refutes plaintiff's claims that their diseases or injuries were caused by chemical exposures."*

Through my work as both a Toxicologist and a CIH, I have gained extensive experience addressing odors in many situations in the field. I have addressed odors in a multitude of situations including after hazardous materials incidents, in relation to indoor air quality in buildings, and in relation to manufacturing facilities, landfills, confined animal feeding operations and animal processing facilities, and around oil and gas exploration and production facilities, among others. I have led many air monitoring teams in relation to odor concerns, have directed multiple odor investigations using field olfactometry, and am certified by St. Croix Sensory as a Nasal Ranger® Instructor. Regarding air quality, I have evaluated the potential for adverse health effects from airborne chemicals in many different situations over the previous 20 years, including, but not limited to, hazardous materials incidents, facility fires, industrial emissions, vapor intrusion, and indoor air quality concerns.

I have attached a copy of my curriculum vitae and list of testimony in **Appendix A**. CTEH® is compensated at a rate of $415 per hour for my time.

## 3.0   Materials Reviewed and Relied Upon

To form my opinions laid out in this report, I have reviewed case-related documents, including the amending and superseding master class action complaint for damages (Civil Action No. 18-7889 c/w 18-8071, 18-8218, 18-9312), the first amended and supplemental omnibus complaint for damages and injunctive relief (Civil Action No. 19-CV-11133 c/w 19-CV-14512), air monitoring and sampling data collected at the Jefferson Parish Landfill ("JPLF"), and odor data and results from samples collected at the JPLF. I have reviewed air monitoring data (i.e. particulate matter, hydrogen sulfide, carbon monoxide, volatile organic compounds, amines, ammonia, aldehydes, and sulfur dioxide) collected throughout the Jefferson Parish (including in Avondale, River Ridge, Harahan, and Waggaman) by the Louisiana Department of Environmental Quality ("LDEQ"), as well as air monitoring data collected by their Mobile Air Monitoring Laboratory ("MAML"). I have reviewed analytical samples collected by LDEQ for VOCs, sulfur compounds, dust/wipes, and others. Furthermore, I have reviewed comprehensive site reports prepared by Carlson Environmental Consultants, P.C. ("CEC") and SCS Engineers ("SCS"), landfill air and operating permits, Plaintiff Fact Sheets, over 3,000 odor complaints from Jefferson Parish residents to LDEQ and the JPLF odor complaint hotline, and the Jefferson Parish Citizen Smell Reports referenced by Dr. Schiffman. I reviewed Plaintiffs' expert reports of Dr. Susan Schiffman, Dr. Jaana Pietari, Nestor Soler, and James Lape, and rebuttal reports from Dr. Mark Yocke, Dr. Pamela Dalton, Matthew Stutz, Jeffrey Marshall, and Dr. Paolo Zannetti. I also observed the JPLF, including closed and active phases, and neighboring areas throughout Jefferson Parish during a site visit conducted on November 4, 2020.

I have further relied on my experience leading air monitoring teams on dozens of chemical release and hazardous materials incidents in the last 19 years as well as my experience with hydrogen sulfide and the available scientific literature on hydrogen sulfide. These types of materials are scientific resources that I routinely use as an expert in toxicology and odor-related matters. A full list of the documents I have

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 6



reviewed and/or relied upon is included in **Appendix B** of this report. I reserve the right to amend my report as new information and data become available.

## 4.0   Background

### 4.1   Overview of the Jefferson Parish Landfill and the Surrounding Area

The JPLF is a municipal solid waste landfill located in Avondale, Louisiana, on the West Bank of the Mississippi River. The JPLF is owned by the Parish of Jefferson and was operated by the Louisiana Regional Landfill Company ("LRLC") from 2013 through December 31, 2020.

The JPLF opened in 1982 and is divided into six solid waste disposal phases.[1] Phases 1, 2, 3A, and 3B are areas of the JPLF that were previously operational and are now closed. These areas have final cover in place, with the exception of 15 acres of Phases 3A and 3B that currently have interim soil cover. Phase 4A is active, meaning it is the phase where waste is received. It began receiving waste in 2013. Phase 4B is permitted to receive solid waste but has not yet been developed for waste acceptance. Figure 1, below, illustrates the different phases of the JPLF

**Figure 1. Jefferson Parish Landfill Phases**



---

[1] A more detailed description of the JPLF is provided in the expert report of Mr. Stutz, submitted on behalf of Waste Connections.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 7



Most landfill emissions consist of odorless methane and carbon dioxide. Emissions may also contain smaller amounts of nitrogen, oxygen, VOCs, and sulfurous gases, such as hydrogen sulfide. As hydrogen sulfide is the primary odorous constituent of landfill emissions, it is the focus of this report and Dr. Schiffman's report.

As documented in the landfill operating permit, and as further outlined in the expert report of Mr. Stutz, the gas produced as a result of decomposition is collected by the landfill gas collection and control system, which includes a series of landfill gas extraction wells in the various phases (Air Permit No. 1340-00140-V6). The collected gas is combusted through a flare or conveyed to the gas conditioning plant for use as an alternative fuel source. Through these two processes, an overall reduction in landfill emissions occurs. However, landfills may emit low levels of sulfurous gas (including hydrogen sulfide) and VOCs even with all gas controls in place and operating.[2]

In addition to gas, the landfill generates leachate (liquid within the waste). Leachate is collected at low points of each waste containment cell and pumped into the sewer system that leads to the Bridge City Wastewater Treatment Plant.

Two landfills—the River Birch Landfill and the Hwy 90 Construction & Demolition Debris Landfill ("Hwy 90 C&D Landfill")—are directly adjacent to the JPLF. The River Birch Landfill is the largest landfill by volume in the State of Louisiana and accepts municipal solid waste, industrial waste, and construction and demolition debris for disposal (River Birch LLC, 2014). The River Birch Landfill emits hydrogen sulfide, VOCs, and other gases, and has been identified as a potential odor source. River Birch Landfill's Technical Director in fact expressed concerns about "*excessive*" emissions and odors originating from the River Birch Landfill between 2016 and early 2018.[3] The River Birch Landfill property includes a landfill gas refinement plant that processes landfill gas, routing contaminants to a thermal oxidizer for combustion.[4] The thermal oxidizer has also been cited as an odor source by LDEQ on multiple occasions in 2018 and 2019.[5]

The Hwy 90 C&D Landfill disposes of construction and demolition debris. Compared to municipal waste landfills, C&D landfills tend to produce less methane and more hydrogen sulfide and other odorous, reduced-sulfur gases from sulfur-bearing materials such as drywall and sheetrock (OhioEPA, 2001). Many construction and demolition debris landfills do not have a gas collection and control system to control and collect landfill gas.[6] Despite this, the Hwy 90 C&D Landfill is only required to apply cover monthly, as

---

[2] Expert Report of Matthew Stutz (Weaver Consultants Group) § 4 (Apr. 30, 2021).
[3] Email from Vic Culpepper, River Birch to Loren Monahan, River Birch (June 16, 2017 2:32 PM) (RIVER_BIRCH_0001081); Email from Vic Culpepper, River Birch to Tom Nicholson, River Birch (Dec. 12, 2017 4:50 PM) (RIVER_BIRCH_0001140); LDEQ, *Solid Waste Inspection Report* (9/20/2016) (RIVER_BIRCH_0003843); LDEQ, *Incident Report #181646* (Jan. 12, 2018) (RIVER_BIRCH_0019642).
[4] Geosyntec Consultants, *Part 70 Permit Significant Modification and Renewal Application* (Aug. 2019) (GEOSYNTEC_00024268).
[5] LDEQ, *Field Interview Form* (August 29, 2019) (WC_JPLF_00229188); LDEQ, *Field Interview Form* (Dec. 3, 2018) (RIVER_BIRCH_0003896).
[6] Expert Report of Matthew Stutz (Weaver Consultants Group) § 2 (Apr. 30, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 8



compared to the daily cover requirements for the JPLF.[7] On-site odor monitoring logs maintained by the Hwy 90 C&D Landfill have shown hydrogen sulfide concentrations as high as 40 ppm (or 40,000 ppb).[8]

In addition to the River Birch Landfill and the Hwy 90 C&D Landfill, numerous other potential odor sources are located throughout Jefferson Parish. For example, more than 500 sewage lift stations carry wastewater and there are 21,120 manholes throughout Jefferson Parish, including in residential areas near Plaintiffs (Jefferson Parish, 2021). The United States Environmental Protection Agency ("USEPA") cites potential for odors (i.e., mercaptan / rotten egg / sulfide odors) as a key disadvantage of wastewater lift stations (USEPA, 2000). Nine wastewater treatment plants ("WWTPs") are located in Jefferson Parish and emit hydrogen sulfide. The Harahan WWTP, in particular, has been a known source of odors due to materials it has accepted for disposal.[9]

Loading and transport operations along the Mississippi River have similarly been cited as potential odor sources by the State. For example, American River Transportation Co. ("ARTCO")—a mid-stream loader—was identified by the Louisiana Department of Health ("LDH") as a potential odor source due to its use of aluminum phosphide pellets to fumigate grain.[10] ARTCO also sometimes handles odorous loads of wet grain.[11] Cargill's grain loading operation is also susceptible to grain odors and has been cited for maintaining odorous rotten grain on site, as well as for particulate emissions.[12] International-Matex Tank Terminals ("IMTT"), a bulk liquids storage terminal facility, has also been identified as an odor source along the River.[13]

Additional odor complaints have been made regarding emissions from manufacturers, such as Cornerstone Chemical Co. ("Cornerstone") and Vertex Energy. Cornerstone produces products including acrylonitrile, melamine, sulfuric acid, and urea, all of which LDEQ has considered odor causing compounds.[14] Vertex Energy is a refiner of alternative feedstocks and marketer of petroleum products.[15] Its Marrero facility was the subject of two lawsuits relating to noxious emissions.[16]

Natural features, such as bayous, swamps, and marshlands, are also a potential source of odor. In one case, LDEQ has cited a large flock of birds as the source of odors attracting complaints in Jefferson Parish.[17]

[7] Email from Brett O'Connor, Waste Connections to Rick Buller, Jefferson Parish (Apr. 29, 2018 6:24 PM) (WC_JPLF_00269963).

[8] *River Birch Landfill/Hwy 90, LLC Landfill, Air Monitoring Report* (Aug. 22, 2018) (HIGHWAY_90_000073).

[9] Email from Angela Scheuer, LDEQ to Loren Monahan, River Birch (Sept. 1, 2017 2:16 PM) (RIVER_BIRCH_0001142)

[10] LDH, *Final Draft* (Oct. 25, 2018) (JP_JPLF_0019756).

[11] Louisiana Department of Environmental Quality, Incident Report #173716 (Nov. 14, 2018) (REV_WC_JP_00129088).

[12] LDEQ, *Incident Report #187356* (Oct. 19, 2018) (LDEQ_PRR_00001573).

[13] LDEQ, *Incident Report #173713* (Oct. 28, 2016) (REV_WC_JP_00129087).

[14] LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Feb. 19, 2018) (WC_JPLF_00166757).

[15] Vertex Energy, *About Vertex*, https://www.vertexenergy.com/ (last visited Apr. 26, 2021).

[16] *Davis v. Omega Refining, LLC*, No. 745-579 (24th Judicial Dist. Ct. filed Jan. 6, 2015); *Hart v. Omega Refining, LLC*, No. 779-643 (24th Judicial Dist. Ct. filed Jan. 17, 2018).

[17] LDEQ, *Incident Report #189339* (Mar. 28, 2019) (LDEQ_PRR_00007530).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.      Page | 9



LDH reviewed data collected by LDEQ in River Ridge, Harahan, Waggaman, and Avondale between February 19, 2018, and December 14, 2018 (described in Section 4.5 below) and concurred that the following are potential sources of odors:

- Jefferson Parish and Harahan WWTPs
- River Birch Landfill
- Hwy 90 C&D Landfill
- Jefferson Parish Landfill
- Cornerstone, which is co-located with:
    o Evonik (manufacturer of methyl methacrylate)
    o Kemira Water Solutions (manufacturer of acrylamide)
    o Dyno Nobel (manufacturer of ammonium nitrate)
- IMTT
- ARTCO
- Multiple fleeting services located along the stretch of the Mississippi River on the West Bank

**Figure 2. Alternate Odor Sources in Jefferson Parish**



## 4.2    Class and Mass Action Allegations and Purpose of Report

It is my understanding that several putative class action and mass action complaints have been filed alleging that the JPLF is the cause of widespread nuisance odors, and those complaints are now consolidated into two lawsuits against LRLC and two of its affiliates (Waste Connections Bayou, Inc. and

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 10



Waste Connections US, Inc., collectively "Waste Connections"), the Parish, and Aptim Corp. (a prior contractor for the Parish at the JPLF). There are five named Plaintiffs in the *Ictech* consolidated putative class action. At the time the first amended and supplemental omnibus complaint was filed, there were 812 mass action Plaintiffs in the *Addison* consolidated mass action; however, I understand that 263 Plaintiffs have since been dismissed—leaving a combined 554 Plaintiffs across both the putative class and mass actions. A map illustrating the location of these remaining Plaintiffs' residences in relation to the JPLF is depicted in the figure below.

**Figure 3. Plaintiffs' Residences in Relation to the JPLF**



The *Ictech* and *Addison* Plaintiffs allege that "noxious" odors from the JPLF have caused them substantial loss of the use and enjoyment of their homes and property and have also negatively impacted their property values. Many of the *Addison* Plaintiffs allege that "harmful and toxic" emissions have caused physical harms, including difficulty breathing, coughing, nausea, burning eyes, ears noses and throats, dizziness, loss of appetite, and lethargy.

The purpose of this report is to evaluate whether Plaintiffs' alleged adverse health effects and nuisance impacts could be caused by hydrogen sulfide and other odorous emissions sourced to the JPLF at the levels documented and modeled throughout Jefferson Parish and within the JPLF. In addition, this report analyzes and responds to many of the opinions set forth by Plaintiffs' expert Dr. Schiffman in her January 29, 2021 expert report. To conduct this evaluation, I have reviewed available air monitoring and sampling data collected throughout the community, and at the JPLF. I reviewed the results of Mr. Lape's modeling,

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 11



the results of Dr. Yocke's modeling using inverse modeled mean mass emission rates and using Lape's modeling configuration, and Dr. Zannetti's modeling. I have also considered the Plaintiff Fact Sheets produced to Defendants as of (April 27, 2021) and odor complaints made by Plaintiffs and other Parish residents, along with potential alternative sources of odors and volatile emissions throughout Jefferson Parish. All of these references are listed in **Appendix B**.

I have been retained by Beveridge & Diamond, P.C., on behalf of Waste Connections and Connick and Connick, LLC, on behalf of the Parish to evaluate the available information and provide my opinions on the matter.

## 4.3   On-site Air Monitoring and Sampling

### 4.3.1   September 13–14, 2018 Site Inspection by SCS

During a September 13–14, 2018 site inspection, SCS conducted odor and hydrogen sulfide sampling at the JPLF and in the community (discussed in Section 4.5) to identify odor sources and concentrations and evaluate the potential for fugitive odorous emissions from the gas collection and control and leachate systems.[18] Odor sampling was performed in the significant subcomponents of the JPLF—the borders of the phases with final cover, the working phase and cell construction area, the leachate storage area, intermediate and daily cover areas, and drainage ditches and canals, among other areas—and at or near alternative odor sources. SCS also conducted a visual assessment of the leachate management system and landfill gas collection and control system.[19]

Based on its observations, SCS reported that the JPLF was well maintained and organized—all final cover areas were planted and maintained with no evidence of debris. SCS also stated that the JPLF employed "extensive methods" to minimize the exposed area of new solid waste and to rapidly cover the waste to minimize any odor or fugitive debris. SCS observed only "slight odors" of landfill gas fugitive emissions onsite at the JPLF.

Of the 26 locations at the JPLF evaluated for hydrogen sulfide, only five detections were observed—three of which were below 10 ppb. The highest detection of hydrogen sulfide during this onsite survey was 14 ppb. SCS noted that this location was near the gas refinement plant at the River Birch Landfill, adjacent to the JPLF, with the wind direction primarily from the general direction of the gas refinement plant. SCS concluded:

> *"Although odor potential can vary day to day depending upon weather conditions, it is unlikely that fugitive emissions from Jefferson Parish Landfill could ever rise to a level of odor nuisance off-site under the current conditions of GCCS* [gas collection and control system] *operation at this site."*

---

[18] SCS Engineers, *Jefferson Parish Landfill Site Evaluation with Respect to Odors* (Oct. 24, 2018) (WC_JPLF_00082561).
[19] The SCS report followed an August 2018 report by CEC regarding a May 2018 field assessment of the JPLF. I reviewed the August 2018 report, as well as a May 2019 report by CEC, in drafting my opinions. The CEC reports are further discussed in Mr. Stutz's expert report.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 12



In regard to the leachate collection systems, SCS noted some liquid accumulation (rather than continuous pump out) in gas extraction wells and underperforming pumps. However, SCS found:

> "Despite the above, leachate is not believed to be contributing any detectable odor on or off site. At many sites with excess liquid buildup in the waste mass, the excess liquids create leachate springs known as "break-outs" on the side slopes of the landfill. There is no evidence of such breakouts on any of the phases of the Jefferson Parish Landfill"

SCS ultimately determined, "*Observed odors and measured concentrations of H$_2$S at the* [JPLF] *are minimal and not detectable at off site locations.*" SCS's conclusions with respect to alternative odor sources are discussed in Section 4.5, below.

### 4.3.2   March 25–29, 2019 and June 11–13, 2019 Monitoring and Sampling by SCS

In a May 31, 2019 report, SCS provided surface concentration measurements of odorous and volatile organic compounds, including hydrogen sulfide, reduced sulfur compounds, amines, carboxylic acids, and VOCs, collected at the JPLF between March 25 and 29, 2019.[20] SCS scanned each phase of the JPLF—about two inches above ground surface[21]—with a hydrogen sulfide analyzer (Jerome 631x) and collected discrete samples, using an isolation chamber as a sampling hood that was "sealed to the ground as best as possible." As a result, findings from this report are only informative of emissions at the surface of the JPLF; concentrations of gases detected inches above the ground would *not* be representative of levels in the ambient air within the JPLF or, even more so, in the ambient air offsite. Findings from the SCS measurements across the various phases are summarized below:

- The surface scans indicated that Phases 1, 2, 3A, and 3B (the closed phases) had very low to undetectable levels of hydrogen sulfide at the surface:
  - Phase 1 – 1 detection (1 ppb) out of 55 measurements
  - Phase 2 – 11 detections (all below 5 ppb) out of 44 measurements
  - Phase 3A – 44 detections (all below 5 ppb) out of 54 measurements
  - Phase 3B – 39 detections (38 of which were below 5 ppb, one detection at 6 ppb) out of 41 measurements
- Detections of hydrogen sulfide at the surface of Phase 4A (the active phase) ranged from 1 to 14,000 ppb, with 25 out of 44 measurements below 10 ppb.
  - Again, these levels are informative only of surface concentrations, and are not representative of ambient air within or outside the JPLF property boundary. Furthermore, these data cannot be used to draw conclusions about airborne concentrations within the community without evaluating emission rates.
- The majority of VOC surface measurements were either non-detects or at levels that do not present a health risk. Levels in ambient air (rather than at the surface of the JPLF) would be at even lower levels, both within and outside of the property boundary.

---

[20] SCS Engineers, *Surface Pollutant Concentration Measurements at the Jefferson Parish Landfill – Data Report* (May 31, 2019) (WC_JPLF_00210878.001).

[21] SCS, *Memorandum to Project File – Surface Pollutant Concentration Measurements at the Jefferson Parish Landfill* (Apr. 23, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 13



- No amines were detected in any of the samples collected.

SCS collected supplemental field measurements between June 11–13, 2019, again performing surface scans with a hydrogen sulfide analyzer about two inches above the surface and taking discrete samples using sampling hoods.[22] Surface scans for hydrogen sulfide in Phase 4A ranged from 0 to 21,000 ppb, with 20 out of 23 detections reported under 1,000 ppb. When SCS documented the 21,000 ppb measurement, additional readings collected within minutes at this same location were orders of magnitude below those levels—indicating that small pockets of emissions may explain the highest readings. As with previous surface scans conducted by SCS, these readings were used to evaluate hydrogen sulfide concentrations at the surface of the landfill for the purpose of characterizing potential emission sources; however, concentrations observed during these surveys do not represent ambient air concentrations, or levels that any resident would be exposed to.

### 4.3.3   November 4–8, 2019 Monitoring and Sampling by Ramboll

From November 4–8, 2019, Ramboll US Consulting, Inc. ("Ramboll") (retained by Plaintiffs) conducted various monitoring and sampling activities at the JPLF, including surface emission monitoring (taken a few inches from the surface) and ambient air monitoring (taken within three feet of the surface) for methane, hydrogen sulfide, and VOCs, and field monitoring across potential point sources, such as gas extraction wells, collection risers, and condensate sumps.[23] Ramboll also collected grab samples for analysis of VOCs, aldehydes, mercaptans, ammonia, mercury, and sulfur dioxide. While no conclusions were provided by Ramboll, findings from these evaluations were unremarkable, and have limited value with regard to emissions outside of the JPLF, as these only reflect surface emissions at discrete locations. This is supported by the SCS odor survey conducted throughout the region during this same period, as discussed in Section 4.5.

Additionally, Ramboll collected grab samples onsite from gas extraction wells, the leachate collection system, and ambient air on the JPLF for odor characterization by St. Croix Sensory, Inc. ("St. Croix").

## 4.4   Exponent's Air Dispersion Modeling

### 4.4.1 Exponent's Plume Dispersion Modeling

Dr. Mark Yocke of Exponent estimated emission rates for specific months from Phase 4A of the JPLF and conducted plume dispersion modeling using Weather Research and Forecasting ("WRF") and CALPUFF models to predict concentrations of hydrogen sulfide that could potentially reach Plaintiffs' residences.[24] The WRF model is a weather prediction system used for atmospheric research and operational forecasting applications. My understanding is that Dr. Yocke used WRF to model the non-linear movement of air as it is influenced by terrain, surface features, temperature, and other patterns in the modeling area. CALPUFF

---

[22] SCS Engineers, *Surface Pollutant Concentration Measurements at the Jefferson Parish Landfill – Supplemental Data Report* (July 10, 2019) (WC_JPLF_00210732.001).
[23] Ramboll US Corp., *Landfill Gas Sampling Data Report* (Jan. 2020).
[24] Dr. Yocke provides further information about the plume dispersion modeling, including the inputs and selected modeling period, in Section 5 of his expert report.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 14



is a widely used, non-steady state puff dispersion model that predicts how a certain mass of gas will disperse within a larger air mass, as that air mass moves away from a source, based on atmospheric conditions simulated by WRF. It can predict dispersion over time, under differing emission rates, and in changing weather.

I understand that Exponent's inverse modeling used ambient air measurements collected from two stations within the JPLF over a continuous period starting in October 2019, in conjunction with CALPUFF and the WRF model results, to calculate the mean mass emission rates from the surface of Phase 4A that would be needed for the model predictions to approximately "match" the measured average ambient air concentrations of hydrogen sulfide at the on-site monitoring stations.[25] Exponent then used these emission rates as inputs to CALPUFF to model projected impacts in November 2019, February 2020, and August 2020. My understanding is that Dr. Yocke selected these months because, from the time period for which continuous ambient air measurements were available, they exhibited meteorological conditions conducive to elevated offsite hydrogen sulfide concentrations and were months when high hydrogen sulfide concentrations were recorded. Exponent produced contour maps superimposed on an aerial image of Jefferson Parish showing the percentage of hours within each month when the model predicted hydrogen sulfide emissions from Phase 4A would exceed two concentration thresholds: 10 ppb and 30 ppb (the bases for these thresholds are described in Section 6.2 of my report).

For the three modeled periods, Exponent predicted only limited impacts to portions of the residential areas nearest the JPLF on the West Bank of the Mississippi River at low frequencies.[26] Predicted exposure to 10 ppb of $H_2S$ at frequencies of greater than 1% of each month are only predicted to occur in close proximity to the JPLF property and do not impact the East Bank of the Mississippi River. Predicted exposure to 30 ppb of $H_2S$ at frequencies of greater than 0.5% of each month are predicted to exist in close proximity to the JPLF property and impact only a few residences.

### 4.4.2   Exponent's Modeling Using Mr. Lape's Configuration

Mr. Lape reports the results of his modeling by logging predicted impacts on surrogate receptors instead of demonstrating the results on a receptor grid, as I understand is typical for CALPUFF modeling.[27] As this presentation of model output obscures the spatial patterns of Mr. Lape's predicted hydrogen sulfide concentrations, Dr. Yocke inserted a higher resolution gridded receptor array into Mr. Lape's modeling domain, without changing any of his data inputs. Dr. Yocke then produced the output of CALPUFF runs using Mr. Lape's modeling configuration to show Mr. Lape's modeled results for both annual and monthly periods from 2017 through 2019 on the receptor grid map. Similar to Exponent's CALPUFF model results, these maps show the percentage of hours within specified years when JPLF contributions to ambient

---

[25] The two JPLF stations took continuous long-term measurements of ambient hydrogen sulfide concentrations and meteorological parameters at ground-level locations. Expert Report of Mark Yocke (Exponent) § 4.1 (Apr. 30, 2021).
[26] Further details about the results of Dr. Yocke's modeling is provided in Section 5.2 of his expert report
[27] Section 6 of Dr. Yocke's report discusses the deficiencies in Lape's model that undermine the reliability and reasonableness of his results.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckedk, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 15



hourly-averaged hydrogen sulfide concentrations were predicted by Mr. Lape's modeling to equal or exceed concentrations of 10 ppb and 30 ppb.

Dr. Yocke's production of Mr. Lape's gridded model results demonstrates that Mr. Lape only predicts infrequent periods during which hydrogen sulfide exceeded the odor awareness threshold of 10 ppb and only in limited portions of the residential areas closest to the JPLF at less than 5% of the year (Yocke Report Figures 19 – 21).[28] At 10 ppb, there are no predicted exposure frequencies above 0.5% of the year on the East Bank of the Mississippi River. None of Mr. Lape's surrogate receptors are predicted to experience hydrogen sulfide concentrations above 30 ppb for more than 0.5% of the hours in any modeled year (Yocke Report Figures 22 through 24).

Additionally, Dr. Yocke used Mr. Lape's modeling configuration to conduct inverse modeling of the Phase 4A emission rate for October through December 2019—the only months that Lape modeled for which there were onsite JPLF hydrogen sulfide monitoring data. I understand that the inverse-modeled emission rate was significantly lower than the rate provided by Nestor Soler, which was premised on a 10% landfill gas collection efficiency in Phase 4A. Dr. Yocke then reran Lape's CALPUFF modeling with the inverse-modeled emission rate. The results mapped at odor threshold levels of 10 ppb and 30 ppb are substantially lower than the results using Mr. Lape's original emission rate inputs.

At the 10 ppb threshold, the modeling shows only limited impacts at low frequencies between approximately 0.5–1.0% of the month to a few households in Waggaman. At 30 ppb, there are no predicted impacts to residential areas.[29]

## 4.5   Community Air Monitoring and Sampling

### 4.5.1   LDEQ Mobile Air Monitoring Lab Results

LDEQ conducted MAML monitoring in Jefferson Parish from February 19–December 14, 2018.[30] LDEQ monitored for hydrogen sulfide, carbon monoxide, sulfur dioxide, nitrous oxide, nitrogen dioxide, total hydrocarbon, and particulate matter ($PM_{2.5}$).[31] Monitoring locations included:

- Riverside Baptist Church on 9220 Jefferson Hwy, from February 19 through October 10, 2018;
- Corner of Dandelion Dr and River Rd, on July 26 – 27, 2018; and
- 4040 Hwy 90 Waggaman, LA, on October 10 – 12, 2018.

---

[28] See Section 7.1.1 of the expert report of Dr. Yocke for additional information.

[29] See Section 7.2 of Dr. Yocke's expert report for additional information about these modeling results.

[30] LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Feb. 19, 2018) (JP_JPLF_0009800); LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Apr. 27, 2018) (WC_JPLF_00158132); LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (July 20, 2018) (ADD_P00135782); LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Oct. 8, 2018) (JP_JPLF_0009996).

[31] Louisiana Department of Health, *Final Draft* 19 (Jan. 14, 2019) (WC_JPLF_00316722).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 16



Between February 19–December 14, 2018, the MAML collected 457[32] hourly measurements. The highest reported hourly average for hydrogen sulfide was 40 ppb, and the highest eight-hour average was 14-ppb, both far below the Louisiana Ambient Air Standard of 237 ppb. Sulfur dioxide was detected at a maximum concentration of 4 ppb, well within acceptable levels under the National Ambient Air Quality Standard ("NAAQS"). LDEQ concluded that these levels of hydrogen sulfide and sulfur dioxide are "*below health-based standards*" and "*do not pose a health concern.*"

While LDEQ noted that an odor incident occurred late during the night of April 28, 2018, and into the early morning of April 29, 2018, that was possibly attributable to a landfill, it did not conclude which landfill— Hwy 90 C&D Landfill, River Birch Landfill, or the JPLF—was the source.[33] While LDEQ concluded that Cornerstone was unlikely to be the source of this particular odor incident, it did not absolve Cornerstone from blame for *any* odors as Dr. Schiffman claims.[34] In fact, LDEQ noted that it did not notice any other strong odors during its regular trips through River Ridge and Harahan, except for a "distinctive elemental sulfur smell" next to Cornerstone several days later. Upon evaluation of speciated sulfur compounds and VOC results from samples collected by LDEQ on April 28–29 2018, SCS concluded that hydrogen sulfide detections could not be attributed to the JPLF due to the absence of d-limonene and ethyl acetate in air samples, known to be municipal solid waste landfill markers, as discussed in more detail in Mr. Stutz's expert report.

Furthermore, LDEQ collected eighteen grab samples and analyzed them for VOCs and speciated sulfur compounds. VOCs were found at levels typically associated with background and do not pose a public health concern. Similarly, odorous compounds (including amines, ammonia, carboxylic acids, aldehydes, and sulfides) were either not detected or detected at levels that did not pose a health concern.

While LDH concluded that detections of hydrogen sulfide may have contributed to the odors reported, it did not attribute those odors to JPLF or any other specific source—and LDH in fact concluded that there are multiple potential sources of odor in Jefferson Parish.

From December 16–20, 2019, LDEQ conducted additional MAML monitoring, including for airborne metal levels, in River Ridge and Waggaman.[35] The highest one-hour and eight-hour average detections of hydrogen sulfide were 5 ppb and 4 ppb, respectively. No exceedances of NAAQS were observed for sulfur dioxide, nitrogen dioxide, carbon monoxide, or particulate matter. Additionally, all metals detected in air samples were well below the Louisiana Ambient Air Standards.

LDEQ also took instantaneous readings with a handheld hydrogen sulfide meter during "odor patrols" in adjacent neighborhoods between October 9 and December 14, 2018. LDEQ did not specifically identify the JPLF as the source of any hydrogen sulfide emissions, as Dr. Schiffman suggests. It instead indicated

---

[32] The LDEQ report of MAML data discussed 464 hourly measurements; however, a proportion of the hourly data had missing values for hydrogen sulfide. My review of the MAML data from February 19–December 14, 2018, accounted for 457 entries for hydrogen sulfide concentrations out of the 464 hourly measurements reported.
[33] LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Apr. 27, 2018) (WC_JPLF_00158132).
[34] Expert Report of Susan Schiffman (Schiffman Consulting) 20 (Jan. 29, 2021).
[35] LDEQ, *Mobile Air Monitoring Lab: Jefferson Parish Odors* (Dec. 16, 2019) (WC_JPLF_00315889).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                Page | 17



that readings were taken downwind of the "landfills" or other potential odor sources, including Cornerstone, ARTCO, and IMTT. One high reading of 520 ppb was even taken downwind of Cornerstone. As Dr. Schiffman acknowledges, the readings taken by the odor patrol may represent "brief odor peak concentrations" rather than sustained hydrogen sulfide emissions.[36]

### 4.5.2    September 14, 2018 Regional Odor Survey by SCS

Separate from the SCS site inspection discussed in Section 4.3, SCS conducted a regional odor survey (collecting 16 readings) on September 14, 2018 near alternative odor sources, including the Hwy 90 C&D Landfill, River Birch Landfill, Cornerstone, WWTPs, barge operations, and natural sources of odors.[37] During the odor survey, SCS detected significant odors (with corresponding detections of 58 ppb and 72 ppb) near and directly downwind of the Hwy 90 C&D Landfill. SCS noted that about one hour after taking these measurements, the odors were still present, albeit at lower concentrations associated with higher wind speeds. Based on the odor survey, an analysis of odor complaints, and the MAML data, SCS concluded:

- Odor complaint correlation with concurrent wind measurements suggests that numerous sources in the region contribute to odor detection by the public.
- Observed odors and measured concentrations of $H_2S$ [hydrogen sulfide] at the Jefferson Parish Landfill are minimal and not detectable at offsite locations.
- Results of the Mobile Air Monitoring Lab (MAML) report dated April 27, 2018, River Ridge and Harahan, LA, corroborate the finding that the Jefferson Parish Landfill was not the source of odors detected on April 28th and 29th, 2018.
- Potential Jefferson Parish Landfill emissions do not support downwind instantaneous and hourly impacts of $H_2S$ in the ranges measured by the Louisiana Department of Environmental Quality via the MAML Study – a much more substantial source is responsible.

### 4.5.3    November 4–8, 2019 Offsite Ambient Air Monitoring by SCS

On November 4–8, 2019, during the same period that Ramboll was conducting sampling and monitoring at the JPLF, SCS took hydrogen sulfide ambient air measurements in selected regions of Jefferson Parish and specifically near the Hwy 90 C&D Landfill, River Birch Landfill, Cornerstone, East Bank WWTP, and other potential odor sources.[38] Hydrogen sulfide levels within residential areas were consistent with previous air monitoring efforts from September 2018. Furthermore, hydrogen sulfide detections were observed when the JPLF was not downwind of the monitoring locations, demonstrating that alternative sources contribute to hydrogen sulfide levels within Jefferson Parish.

### 4.5.4    Waggaman Playground Air Monitoring by LDEQ

Since January 2020, LDEQ has collected readings of hydrogen sulfide among other analytes, at the Waggaman Playground, Waggaman, Louisiana. Data collected every 5-minutes from January 31, 2020–

---

[36] Expert Report of Susan Schiffman (Schiffman Consulting) at 19 (Jan. 29, 2021).

[37] SCS Engineers, *Jefferson Parish Landfill Site Evaluation with Respect to Odors* (Oct. 24, 2018) (WC_JPLF_00082561).

[38] SCS, *Hydrogen Sulfide (H₂S) Sampling in the Jefferson Parish Region (November 4 through 8, 2019)* (Apr. 13, 2020) (WC_JPLF_00203231.001).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 18



March 31, 2021, included 226,064 measurements, 225,114 (99.58%) of which were reported below 10 ppb. No measurements above 10 ppb were attributed to a specific source. As Dr. Yocke's explains, the Waggaman Playground air monitoring data corroborates the results of his model.[39]

## 4.6   Odors and Health Complaints Reported in Plaintiff Fact Sheets

Plaintiffs provided verified responses to 8-page Fact Sheets ("Plaintiff Fact Sheets") that were developed collaboratively by all parties and contain basic questions about alleged odors, property damage, and health claims being asserted. While many Plaintiffs failed to complete questionnaires or failed to fully respond to the questions presented, all Plaintiff Fact Sheets received as of April 27, 2021, were reviewed for this report.

The Plaintiff Fact Sheets asked Plaintiffs to identify the types of odors encountered at their home or elsewhere, as well as the type of odor experienced most frequently. This was presented to Plaintiffs as an option to select one or more of the following categories of odors: chemical smell; petroleum odor; rotten egg; ammonia smell; garbage smell; other. Of 550 Fact Sheets, 273 Plaintiffs indicated that they experienced a chemical smell and 101 identified a petroleum odor. Some 333 Plaintiffs provided that they smelled rotten egg, while 127 identified ammonia and 311 identified a garbage smell. Notably, 130 Plaintiffs indicated that they smell an odor identified as "other," with responses covering a wide range of odor descriptions. Some of the "other" odors identified by Plaintiffs include battery acid, burned grain, other burning smells (including burning rubber and burning chemicals), compost, dead animals, death, decaying plants, dirty water, feces, fish, gas, raw sewage (or sewage or sewer), refinery smells, and sulfur. Many Plaintiffs also indicated they smelled unidentifiable odors, e.g., funny smells, bad smells, sour smells, or stinky odors. When asked which odor the Plaintiff encountered most often, the most frequent responses were rotten egg (95 responses) and chemical odors (67 responses). While Plaintiffs identified how many days per week they noticed an odor, they were not required to specify the duration of those odors (e.g. fleeting, intermittent, persistent).

Even those Plaintiff Fact Sheet responses that identify rotten egg, garbage, or sulfur smells cannot be linked to alleged emissions from the JPLF. Plaintiffs who identify these odors also admit that they have been exposed to emissions sources other than the JPLF. For example, Shelia Baskin's Fact Sheet responses provide that she experienced chemical smell, petroleum odor, rotten egg, ammonia smell, and garbage smell, and she admits she was exposed to emissions from chemical plants, wastewater treatment plants, barge loading/unloading, and landfills other than the JPLF. In fact, 146 Plaintiffs noted that they were exposed to emissions from sources other than the JPLF, including chemical plants, oil refineries, wastewater treatment plants, barge loading/unloading operations, other landfills, and other sources. More than 40 of those Plaintiffs indicated that they were exposed to multiple sources other than the JPLF.

Additionally, at least 20 Plaintiffs who identify rotten egg or sulfur odors assert claims associated with properties more than 4 miles away from the JPLF. Specifically, Plaintiffs claim they have smelled rotten egg and/or sulfur odors more than 7 miles from the JPLF, including Dolly Adam Crosley's claim of chemical,

---

[39] Expert Report of Mark Yocke (Exponent) § 5.3.1 (Apr. 30, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 19



rotten egg, and garbage odors at a property that is 9.9 miles away from the JPLF.[40] Others who indicated smelling rotten egg or sulfur also described smelling battery acid, a variety of burning smells, and sewage (among other odors).

The Plaintiff Fact Sheets also show that the most frequent health complaints were of the respiratory system, including asthma, bronchitis, cough, COPD, and well as lung, throat and mouth complaints (310 individuals listing one or more of these as "injury type"). Plaintiff complaints also included headaches and migraines (267 complaints), sinus, cold, congestion and nose bleeds (251 complaints), and nausea and vomiting or other stomach/digestion issues (270 complaints). Eyes were listed as an injury type 165 times. Other complaints included reports of mental anguish, anxiety, allergies, lightheadedness, skin issues, insomnia, chest pain, ears, nervous system, fainting, cancer, stroke, shingles, erectile dysfunction, and memory loss. A summary of counts of each type of health complaint is included in Table 1, below.

**Table 1. Sample of Health Complaints from Plaintiff Fact Sheets**

| Health Complaint(s) | Number of Complaints |
|---|---|
| Allergies or Hives | 71 |
| Appetite | 11 |
| Blood Pressure or Other Blood Issues | 13 |
| Cancer | 3 |
| Death | 1 |
| Diarrhea | 6 |
| Dizzy or Light Headed or Vertigo | 38 |
| Ears | 7 |
| Erectile Dysfunction | 1 |
| Eyes | 165 |
| Fainting | 3 |
| Headache or Migraine | 267 |
| Heart or Chest Pain | 19 |
| Insomnia or Sleep Issues | 36 |
| Memory Loss or Forgetfulness | 2 |
| Mental Anguish, Anxiety, Depression, or Distress | 84 |
| Nausea, Vomiting, or Stomach Issues | 270 |
| Nervous System | 1 |
| Respiratory Issues (Asthma, Bronchitis, Cough, Lung Issues, Breathing Issues) | 310 |
| Shingles | 1 |
| Sinus Issues, Cold, Congestion, or Nose Bleeds | 251 |
| Skin Issues (including Impetigo, Eczema, and Rash) | 38 |
| Stroke | 2 |
| Weakness | 5 |

---

[40] See Plaintiff Fact Sheets of Dolly Adam Crosley, Kayla Rosetta Brooks, and Julie Ann Burke.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 20



The Plaintiff Fact Sheets also require each Plaintiff to identify the time period in which they experienced the condition alleged to be cause by JPLF emissions, including whether the condition was present before 2015. More than 100 Plaintiffs reported that one or more of their health concerns associated with their personal injury claims began before 2015; this means that such health condition pre-dated the alleged exposure to JPLF emissions or the allegations made in this litigation. Specifically, 109 Plaintiffs identified 299 individual health complaints that are allegedly caused by emissions from the JPLF despite the fact that such health complaints began or presented before 2015.

## 4.7    Resident Odor Complaints

### 4.7.1    Odor Complaints Reported to LDEQ and the JPLF Complaint Hotline

Residents have made odor complaints about numerous types of odors and potential odor sources throughout Jefferson Parish to LDEQ and the JPLF odor complaint hotline. In total, I have been provided with 3,821 odor complaints submitted since to these entities since 2012.[41] A substantial percentage (68.6%) of odor complaints were submitted in 2018 and 34% of all complaints were made over a 10-week period between July and August 2018, as illustrated in Figures 4 and 5, below. ***Figure 4 Odor Complaints Reported to JPLF and LDEQ***



---

[41] Dr. Schiffman references "more than 1,800 complaints" submitted to LDEQ about odors but performs no analysis of the substance of the complaints. Expert Report of Susan Schiffman (Schiffman Consulting) at 7 (Jan. 29, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 21



**Figure 5. Number of Odor Complaints Reported in 2018**



In total, 1,002 complainants made 3,821 complaints. Whereas 59% of all complainants only had one complaint throughout a 9-year period, a few vocal individuals complained much more frequently. For example, the top 5 complainants (0.5% of all complainants) accounted for 448 complaints (11.7% of all complaints). Similarly, the top 25 complainants (2.5% of all complainants) accounted for 1,167 complaints (30.5% of all complaints). The most frequent complainant made 113 odor complaints over a two-year period, and one complainant who lives more than seven miles from the JPLF made 39 complaints.

To evaluate patterns of odor descriptions, odor complaints were grouped based on similar character, as summarized in Table 2.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 22



**Table 2. Descriptors Used in Odor Complaints**

| Landfill/Garbage Odors | Sulfide Odors | Sewer | Petrochemical and Chemical | Food & Fragrant | Other |
|---|---|---|---|---|---|
| Dead animal | Egg | Crap | Asphalt | Acidic | Ammonia |
| Decomposing | Eggy | Farts | Burning rubber | Bologna | Ash |
| Dump | H2S | Feces | Caustic | Melon | Bad |
| Dumpster | Hydrogen sulfide | Gassy | Chemical | Sour | Burning |
| Garbage | Rotten | Human Waste | Diesel | Strong | Fertilizer |
| Landfill gas | Rotten eggs | Sewer | Gas | Sweet | Foul |
| Trash | Sulfur | Sewerage | Gasoline | | Funky |
| | Sulfuric | The dump shit | Heavy petrochemical | | Irritating |
| | | Untreated waste | Methane | | Noxious |
| | | Urine | Oil | | Obnoxious |
| | | | Rubber | | Same odor for the last year |
| | | | Sickly sweet petroleum | | Stench |
| | | | Tar | | That smell |
| | | | | | Toxic |

Of all the odor complaints reported between January 2012 and December 2020, 71.7% were categorized as either sewer, petrochemical and chemical, food and fragrant, or other odors, or did not contain an odor descriptor. Approximately 8.4% of odors were categorized as landfill or garbage odors, and 19.9% as sulfide,[42] as illustrated in Figure 5.

---

[42] Residents commonly attribute hydrogen sulfide or rotten egg odors to the JPLF, despite the presence of numerous other sources (including two other landfills, wastewater treatment plants, and lift stations) with the potential to emit these odors.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 23



**Figure 6 Complaints by Odor Descriptor**



When odor complaint data from 2018 are evaluated on a monthly basis, it is evident that complaints attributed to landfill and/or garbage odors and sulfide odors increased significantly in July 2018. As Dr. Dalton explains, residents began increasingly attributing odors to the JPLF following statements in June and July 2018 by government officials, in media, and on social media about the JPLF being a source of odors.[43] Residents also continued to complain about petrochemical and chemical odors, indicating that other sources were contributing odors.

---

[43] Expert Report of Pam Dalton (Monell Chemical Senses Center) at 8–11 (Apr. 30, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.     Page | 24



**Figure 7. 2018 Odor Complaints by Odor Descriptor and Month**



In addition, some of the odor complaints reported to the JPLF odor complaint hotline and LDEQ included health complaints. The most frequent health complaints reported by residents in odor complaints are provided in Table 3, below.

**Table 3. Alleged Health Impacts in Odor Complaints**

| Health Complaint(s) | Number of complaints |
|---|---|
| Allergies | 26 |
| Asthma | 18 |
| Breathing / respiratory issues (non-specific) | 134 |
| Eye, nose, or throat irritation or burning | 291 |
| Headache or migraines | 286 |
| Insomnia/sleep problems | 62 |
| Skin irritation | 3 |
| Vomit, nausea, stomach problems | 94 |
| Other | 81 |

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 25



### 4.7.2   Smell Reports

I understand that certain Jefferson Parish residents asked members of the Harahan/River Ridge Air Quality Facebook group to share odor complaints through an online form and/or Facebook posts—termed smell reports. Residents provided the date, the time, an address, the intensity of the odor indoors and outdoors, and any open-ended comments about the odor. Residents were not required to specify the frequency or duration of the odor, identify the potential source, or provide meteorological information. The responses were also not standardized, with some residents rating the intensity on a 1 to 10 scale and others using terms such as "slight," "strong," "faint," "medium," or "mild."

Dr. Schiffman relies on the smell reports to claim that the odors reported in the Plaintiff Fact Sheets are consistent with those used by "JPL[F] neighbors."[44] But based on my review, fewer than 200 complaints (out of 5,435 records) specifically mentioned the landfill as the potential source. Many complaints also did not include any odor descriptor or identified odors associated with other sources—such as chemical, petroleum, or sewer odors.

As discussed further in Section 6.1, residents also described health impacts that cannot be attributed to odors—at least at the concentrations documented in Jefferson Parish and modeled from the JPLF. For example, one resident stated that they "[h]ad to go to urgent care due to burning sinusitis and cough, headache[.] Received shot, cough med, and antibiotics." Other residents reported that they nosebleeds, had difficulty breathing, had headaches, experienced burning nose, throat, and eyes, or felt nauseous.

## 4.8   EnviroComp Data Analysis and Air Dispersion Modeling

### 4.8.1   EnviroComp's Data Analysis

I understand that Dr. Zannetti of EnviroComp analyzed and processed the available meteorological data to reconstruct the local meteorological conditions in a multi-year period (2015-2019) and in the most recent period (2020) when the Trinity meteorological station was operating onsite.[45] He identified KMSY airport observations as the meteorological data to use for assessing the relation between wind direction and location of odor complaints. Dr. Zannetti identified the location and time of occurrence of odor complaints from the analysis and processing of the information available. Out of a large number of odor complaints, he found that only a limited fraction of them happened when the wind was blowing from the JPLF towards the complaint locations.

Dr. Zannetti also used Trinity onsite data, integrated with KMSY airport data, to simulate the meteorology in 2020. He analyzed the collected data of hydrogen sulfide and methane concentrations at the LDEQ Waggaman Playground air monitoring station in 2020 and created pollution roses to correlate wind direction and constituent concentration measurements. These pollution roses provide a numerical and

---

[44] Expert Report of Susan Schiffman (Schiffman Consulting) at 6 (Jan. 29, 2021).
[45] Expert Report of Paolo Zannetti (EnviroComp Consulting, Inc.) (Apr. 30, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                Page | 26



visual illustration of the directions from which the hydrogen sulfide concentration impacts are higher. Dr. Zannetti concluded that hydrogen sulfide is transported to the monitoring site from all directions.

### 4.8.2 EnviroComp's Dispersion Modeling

Dr. Zannetti ran a three-year dispersion modeling simulation of hydrogen sulfide emitted from the JPLF with the following assumptions: 1) use of the dispersion model AERMOD (instead of the models used by Plaintiff's expert Dr. Lape: WRF + CALMET + CALPUFF); 2) use of the hydrogen sulfide emission rates (best and maximum estimates) calculated by Jefferson Parish's expert witness Dr. Tarek Abichou using actual measurements at the JPLF (instead of the LandGEM model); 3) use of surface meteorological data from the KMSY airport; and 4) vertical meteorological profiles from the KSIL airport. Dr. Zannetti also re-ran the CALPUFF simulation using the model configuration by Dr. Lape but using Dr. Abichou's emission rates. In both cases, Dr. Zannetti's simulated concentrations were extremely low and practically negligible in any residential area around the JPLF.

## 5.0   Scientific Causation Methodology

In order to attribute an adverse health effect to a chemical exposure, a valid scientific causation analysis is required. In this case, the Plaintiffs are alleging various non-specific health effects (i.e. eye irritation, headaches, vomit and nausea, breathing/respiratory issues) and nuisance as a result of exposure to emissions and odors from the JPLF. Furthermore, Plaintiffs allege increased risk and exacerbation of asthma, as well as death from complications related to chronic obstructive pulmonary disease (COPD).

Established and generally accepted methods exist for determining whether an individual's disease or adverse health effect was caused by an alleged chemical exposure. To establish that an alleged chemical exposure resulted in any adverse health condition, two separate analyses must be performed: a general and a specific causation analysis.

1.   General causation is the scientific determination as to whether or not the chemical in question can cause a particular condition in the general population at some specified dose. It is a determination of what toxicities the chemical is known to produce in humans.

2.   Specific causation is a scientific determination as to whether a known or alleged chemical exposure an individual may have received was the most likely cause of the injuries or diseases that individual has and to whether there was an absence of alternate causes that could have resulted in the alleged injuries or diseases.

The issue addressed in a general causation analysis is the following:

- Has/have the chemical(s) in question been shown to cause the disease(s) in question in humans at some specified dose?

The objective methodology for proving general causation, as currently practiced, is a process that has undergone continual refinement for approximately the last 150 years. Probably the first effort to formalize this process occurred when scientists and physicians sought to establish the cause of diseases induced by

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.        Page | 27



infectious agents whose presence could not easily or readily be identified with the naked eye (Evans, 1976; Yerushalmy and Palmer, 1959). A similar process was instituted in the 1960s as scientists began to focus on diseases induced by chemicals associated with the workplace, our environment, or lifestyle choices like smoking (Hill, 1965). At the present time, a number of different criteria have been proposed by scientists as the basis of the scientific method for establishing general causation (Doll, 1984; Evans, 1976; Guidotti and Goldsmith, 1986; Hackney and Linn, 1979; Hill, 1965; Susser, 1977; Susser, 1986; Susser, 1991). Hill (1965) initially summarized these criteria as follows:

1.  The strength of the human association;

2.  The consistency of the human association;

3.  The specificity of the human association;

4.  Temporality (i.e., do biologically realistic temporal relationships exist);

5.  Biological gradient (i.e., the principle of dose-response where within some range of doses the incidence of the response increases with increasing dose);

6.  Biological plausibility (the response in humans is likely to be consistent with the observed response in animal tests or would be predicted from the known animal toxicity and mechanism of action for that toxicity);

7.  Coherence (there is an internal and external consistency to all of the evidence);

8.  Experiment (the response decreases or increases with corresponding decreases or increases in exposure); and

9.  Analogy (structure activity relationships with other chemicals suggest the chemical should be capable of producing the toxicity of interest).

It is well recognized within the scientific/medical community that the above criteria form the scientifically accepted method for establishing general causation. These or very similar criteria have been adopted by the World Health Organization ("WHO") (WHO, 1987), the International Agency for Research on Cancer [IARC] (IARC, 2006), USEPA (USEPA, 2005), and the American Conference of Governmental Industrial Hygienists ("ACGIH") (ACGIH, 2016). Numerous respected epidemiological texts adhere to the Bradford Hill criteria as the methodological basis for evaluating causality (Hernberg, 1992; Mausner and Kramer, 1985; Monson, 1990). Casarett and Doull's Toxicology textbook, which is commonly used to teach toxicology to undergraduate, graduate, and medical students, presents these causation criteria for evaluating epidemiological data (Faustman and Omenn, 2013). A number of occupational medicine textbooks (Eisen and Wegman, 1995; Schenker, 1997) describe these criteria as the method by which epidemiological evidence is evaluated. Finally, this methodology is described in the Reference Manual on Scientific Evidence as the factors that guide judgments about causation (Federal Judicial Center, 2011).

To summarize, there is an established and accepted scientific methodology by which scientists and physicians determine cause and effect relationships. A general causation analysis establishes what toxicities are known to be induced in humans and with what doses or exposure conditions these toxicities are induced. During this analysis, the scientist using this method must ensure that the studies relied upon are known to be internally valid studies (i.e., the observations cannot be explained by chance, bias,

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 28



confounding or some other factor related to the experimental design of the study). A scientist using the scientific method for establishing general causation must also demonstrate the studies being relied upon are known to be externally valid studies (i.e., the totality of the evidence taken from various sources provides a consistent and coherent grounding for an opinion that is based on those studies contributing the greatest weight of evidence).

## 6.0   Opinions

I have reviewed ambient air quality data collected at the JPLF and throughout Jefferson Parish that was produced in this litigation or otherwise publicly available, assessed modeling performed by the various experts involved in this litigation, scientific literature on hydrogen sulfide and VOCs, evaluated potential odor sources throughout Jefferson Parish, and reviewed the opinions set forth in the reports of Mr. Lape and Dr. Schiffman, submitted on behalf of Plaintiffs, and the opinions set forth in the reports of Dr. Yocke, Dr. Dalton, and Mr. Stutz, submitted on behalf of Waste Connections. It is my opinion that the measured hydrogen sulfide concentrations throughout Jefferson Parish and the modeled potential impacts of hydrogen sulfide emissions sourced to the JPLF are not sufficient to cause adverse health effects and, throughout most of the community, are unlikely to rise to a level that would constitute a nuisance in terms of dose, frequency, and duration. It is also my opinion that self-reported odor complaints do not objectively evaluate potential alternate odor sources and are unreliable. These opinions are set forth in more detail below.

### 6.1   The low concentrations of hydrogen sulfide documented throughout Jefferson Parish and the estimated hydrogen sulfide emissions predicted from the JPLF would not cause adverse health effects, including those complained of by Plaintiffs.

Hydrogen sulfide is a colorless gas associated with decomposing organic material containing sulfur and is often described as having the odor of rotten eggs. Hydrogen sulfide is found naturally in the environment in crude petroleum, natural gas, swamps, volcanic gases, and hot springs. It may be found in low levels in cigarette smoke, cigar smoke, and vehicle emissions. For example, hydrogen sulfide concentrations in cigarette smoke have been reported to range from approximately 23,000 to 108,000 ppb (Newsome et al., 1965; Pedersen and Sprinkle, 1963). Hydrogen sulfide is produced naturally in the human body and can be found at measurable levels in human breath and intestinal gas (ATSDR, 2016). The human body produces hydrogen sulfide endogenously through enzymatic and non-enzymatic pathways; and endogenous production of hydrogen sulfide plays a significant physiological role in the human body (Wang, 2012). Additionally, hydrogen sulfide is produced within the oral cavity and gastrointestinal ("GI") tract via bacterial metabolism of sulfur-containing amino acids from plants and animals (ATSDR, 2016; WHO, 2003). Sulfur-containing food items include nuts, eggs, and many vegetables. As reported, hydrogen sulfide "*may compose up to 10% of intestinal gases*" and "*the average levels recorded in intestinal gas have been between 1.4 and 5.6 mg/m³* [1,000 – 4,000 ppb]" (ATSDR, 2016; WHO, 2003). The average hydrogen sulfide concentration in morning breath reported in the scientific literature for healthy individuals with no history of bad breath was 525 ppb, with a maximum concentration of approximately

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.         Page | 29



2,500 ppb (Suarez et al., 2000). Hydrogen sulfide in human flatus (intestinal gas) has been reported at concentrations of 25,000 ppb (Suarez et al., 1998).

Studies have shown varying "background" levels of hydrogen sulfide in ambient air depending on the setting. The National Research Council of the National Academies reported that mean ambient air concentrations for hydrogen sulfide range between 0.7 ppb and 66 ppb (NRC, 2010). In an unpolluted area of Colorado, concentrations between 20 and 70 ppb were measured (Hill, 1973 as cited by ATSDR, 2016). Near ground level by an active underground geothermal vent in New Zealand, hydrogen sulfide concentrations were documented in the range of 125 – 3,900 ppb, which produced no visible adverse effects on indigenous bird or plant populations. Hydrogen sulfide concentrations have been documented at concentrations greater than 90 ppb for intermittent periods near shorelines, in association with decaying seaweed and shellfish (ATSDR, 2016).

During a 12-month hydrogen sulfide study conducted in Dakota City, Nebraska, by the ATSDR and the USEPA, 16 hydrogen sulfide monitors were stationed throughout the city. Findings from these stations showed that hydrogen sulfide was detected frequently within the urban settings, with peak hydrogen sulfide concentrations exceeding 90 ppb (upper detection limit of the instrument) multiple times at four of the 16 locations. Additionally, multiple peak readings in the range of 30 – 50 ppb were recorded in residential areas, and readings between 9 and 19 ppb were recorded in locations distant from known sources of hydrogen sulfide (White, 1999).

In Jefferson Parish, data gathered by various sources show concentrations of hydrogen sulfide consistent with its urban and industrial setting. For example, the LDEQ MAML reported the highest hourly averages of hydrogen sulfide detected in Jefferson Parish during five monitoring efforts as follows: 3 ppb (February 2018)[46], 12 ppb (April 2018),[47] 14 ppb and 40 ppb (July 2018 in River Ridge and Waggaman, respectively),[48] 5 ppb and 7 ppb (October 2018 in River Ridge and Waggaman, respectively),[49] and 5 ppb (December 2019).[50] Similarly, data collected by LDEQ at the Waggaman Playground air monitoring station between January 2020 and March 2021 indicate that none of the hourly hydrogen sulfide measurements (total of 14,223) exceeded 40 ppb. Dr. Yocke also conservatively estimated the local background concentrations of hydrogen sulfide around the JPLF to be about 1 ppb based on measurements taken from an onsite hydrogen sulfide monitoring station.[51] SCS reported measuring instantaneous hydrogen sulfide concentrations during November 2019 in the range of 1–4 ppb along Highway 90 when the JPLF was downwind of the locations where measurements were taken.[52]

---

[46] LDEQ, Mobile Air Monitoring Lab: River Ridge and Harahan, LA (Feb. 19, 2018) (JP_JPLF_0009800).

[47] LDEQ, Mobile Air Monitoring Lab: River Ridge and Harahan, LA (Apr. 27, 2018) (WC_JPLF_00158132).

[48] LDEQ, Mobile Air Monitoring Lab: River Ridge and Harahan, LA (July 20, 2018) (ADD_P00135782).

[49] LDEQ, Mobile Air Monitoring Lab: River Ridge and Harahan, LA (Oct. 8, 2018) (JP_JPLF_0009996).

[50] LDEQ, Mobile Air Monitoring Lab: Jefferson Parish Odors (Dec. 16, 2019) (WC_JPLF_00315889).

[51] Expert Report of Mark Yocke (Exponent) § 5.1.5 (Apr. 30, 2021).

[52] SCS, *Hydrogen Sulfide (H₂S) Sampling in the Jefferson Parish Region (November 4 through 8, 2019)* (Apr. 13, 2020) (WC_JPLF_00203231.001).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 30



Plaintiffs claim a myriad of health impacts that they believe are caused by JPLF hydrogen sulfide emissions, including headaches, migraines, irritation, sleep disruption, nausea, vomiting, coughing, respiratory problems including wheezing, shortness of breath, asthma, dizziness, fatigue, skin irritation, burning lungs, inflammation and tissue damage, nosebleeds, neurological issues, and COPD, and even death. To determine whether hydrogen sulfide could cause one or more of these health conditions, general causation must be established and there must be sufficient concentration and duration of exposure. In other words, the toxicity of hydrogen sulfide is dependent upon and cannot be separated from an analysis of the concentration and duration of such exposure.

The spectrum of health effects and odor perception of hydrogen sulfide spans many orders of magnitude, as illustrated in Figure 8. Findings from animal studies show that hydrogen sulfide has comparable effects to those observed in humans. A variety of reported effects following acute-duration exposures at relatively high concentrations have been documented in the scientific literature. Damage to the nasal olfactory epithelium was observed in rats exposed to 400,000 ppb for 4 hours (Lopez et al., 1988b as cited in ATSDR, 2016), 200,000 ppb for 3 hours, or 80,000 ppb 3 hours/day for 5 days (Brenneman et al., 2002 as cited in ATSDR, 2016). No effects were observed in animals exposed to 10,000 ppb hydrogen sulfide for 6 hours per day, 7 days per week for 10 weeks (USEPA, 2003).

The emergency response planning guideline-1 (ERPG-1) for hydrogen sulfide of 100 ppb, issued by the American Industrial Hygiene Association, is established as the concentration below which it is believed that nearly all individuals could be exposed for up to 1 hour without experiencing other than mild transient adverse health effects or perceiving a clearly defined objectionable odor. Similarly, the 15-minute acute exposure guideline level-1 (AEGL-1) for hydrogen sulfide of 750 ppb, and the 1-hour AEGL-1 value of 510 ppb, issued by the USEPA are established as the concentrations above which it is predicted that the general population, including susceptible individuals, could experience notable discomfort, irritation, or other asymptomatic, nonsensory effects; however, these effects are transient, not disabling, and reversible upon cessation of exposure. Asthmatics represent a population sensitive to hydrogen sulfide and it has been shown that in a small percentage of asthmatics (20%), mild and reversible pulmonary function changes may be observed following 30-minute exposures to 2,000 ppb of hydrogen sulfide (Jappinen et al., 1990). Eye irritation is considered one of the most sensitive indicators of exposure to lower levels of hydrogen sulfide. Reported eye irritation thresholds for exposure to hydrogen sulfide in air have ranged from approximately 5,000 to 50,000 ppb and depend on factors such as the duration of exposure and presence of other irritants in air (ACGIH, 2010; Beauchamp et al., 1984). According to the American Conference of Governmental Industrial Hygienists, who establish health-protective values for workers, peak exposures of 5,000 ppb may produce minor irritation but would not be expected to produce serious effects on the respiratory, central nervous, or cardiovascular systems (ACGIH, 2010).

Prolonged exposures of an hour or more to hydrogen sulfide at levels in excess of 50,000 ppb have been associated with considerable damage to eye tissues, producing findings such as swollen and inflamed conjunctiva, clouding of the cornea, and blurred vision (Ahlborg, 1951; WHO, 2003; Yant, 1930). This condition is known as "gas eye," and is characterized by pain, lacrimation, photophobia, and eventually progressing to vesiculation of the corneal epithelium (ACGIH, 2010).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 31



Exposure to hydrogen sulfide in air at a concentration of 100,000 ppb results in loss of smell through olfactory nerve paralysis in 3-15 minutes (Beauchamp et al., 1984). Loss of smell occurs more rapidly at concentrations greater than 100,000 ppb. Hydrogen sulfide concentrations at this level do not cause rapid unconsciousness, respiratory failure and/or death, as it has been shown that concentrations up to 100,000 ppb can be tolerated for one hour without experiencing or developing life threatening health effects (ERPG, 2014). As a result of relatively low water solubility, hydrogen sulfide can penetrate deeply into the lungs and irritate mucous membranes. This respiratory irritation, presenting as a shortness of breath in some cases, becomes pronounced at levels above those that produce olfactory paralysis (>250,000 ppb) (Guidotti, 2010). Hydrogen sulfide gas is cytotoxic to the alveolar epithelium and in cases of high exposures may yield pulmonary edema, or fluid filled lungs.

Exposures to hydrogen sulfide in air at a concentration of 500,000 ppb for 30-60 minutes may cause unconsciousness, respiratory failure, and death (Beauchamp et al., 1984). Prolonged exposures in this range also would be accompanied by severe eye irritant effects and extreme discomfort. Exposures to hydrogen sulfide in air at concentrations in excess of 500,000-700,000 ppb may cause rapid unconsciousness within a few breaths, respiratory paralysis, and death (Beauchamp et al., 1984; Guidotti, 2010). This is sometimes called a "knock-down" effect that is often described as simply as turning off a switch. If individuals exposed to a knock-down level of hydrogen sulfide are quickly removed from the source of exposure, they can rapidly regain consciousness with no permanent sequelae, and have reportedly returned immediately to work (Ahlborg, 1951; Beauchamp et al., 1984; Burnett et al., 1977; Guidotti, 2010).

Although various health claims are alleged in this case in relation to emissions from the JPLF, none of the effects associated with hydrogen sulfide exposures occur at

**Figure 8 - Spectrum of H$_2$S effect levels**



Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
Page | 32



levels documented throughout the Jefferson Parish. For example, 99.58% of 5-minute measurements collected by LDEQ at the Waggaman Playground air monitoring station (225,114 out of 226,064) were reported below 10 ppb, which is within average urban levels. Similarly, the predicted concentrations of hydrogen sulfide from the JPLF reaching Plaintiffs' residences, based on modeling by both Mr. Lape and Dr. Yocke, establish that the concentration and duration of hydrogen sulfide exposure from JPLF emissions are insufficient to cause Plaintiffs' complained of health conditions. All of the hourly and 8-hour averages from LDEQ's MAML data obtained in River Ridge, Harahan, and Waggaman from 2018 were also below any health-based risk levels for hydrogen sulfide. While the record does contain some instances of elevated hydrogen sulfide sample results, those were instantaneous/grab samples. The mere instantaneous detection or unsustained elevation in the concentration of a chemical may not constitute a health risk, as health impacts depend on both exposure concentration and exposure duration. In this regard, when real-time air monitoring data are evaluated, it is critical to analyze not only the peak concentrations observed, but also to understand the duration and frequency of those measured concentrations.

For context, the highest concentration of hydrogen sulfide recorded around Jefferson Parish was nearly half of the average concentration found in morning breath from individuals without a history of bad breath. On average, hydrogen sulfide readings collected around Jefferson Parish were about 99 times lower than that found in morning breath. Furthermore, even the highest documented peak concentration of 374 ppb was found at half the levels below the 15-minute AEGL-1 value of 750 ppb, and no 1-hour average reading was found above the 100 ppb ERPG-1 value. The allegation that the reported hydrogen sulfide levels around Jefferson Parish could create a health hazard is not supported by the available data.

Plaintiffs' expert, Dr. Schiffman, refers to various samples and air monitoring readings collected throughout the Parish in the 100 − 200 ppb range and contends that these levels explain the health effects claimed by Plaintiffs. As I have detailed above, typically the first signs of exposure to low levels of hydrogen sulfide include eye irritation, reported to begin in the 5,000 to 50,000 ppb range. The establishment of the AEGL-1 values of 750 and 510 ppb for 15-minutes and 1-hour, respectively, further validates the conclusion that the general population, including sensitive individuals, would not experience adverse health effects at the levels discussed by Dr. Schiffman. In fact, review of the MAML data by LDEQ and LDH corroborate this conclusion, as they state that the first objective signs of eye irritation are experienced at approximately 5,000 ppb, and that the levels of hydrogen sulfide, sulfur dioxide, and various other VOCs detected *"were below health-based standards"* and *"do not pose a health concern."*

Additionally, a substantial portion of health claims alleged in these cases are simply not documented to be caused by or associated with hydrogen sulfide exposures at any level, much less at the levels documented throughout Jefferson Parish. For example, sleep disruption and insomnia are alleged in association with exposure to JPLF emissions, yet hydrogen sulfide has not been shown to cause any of these effects. From my review of the scientific literature available, the closest association I found was from a study conducted on 74 subjects that experienced increased symptoms of anxiety following exposures to 5,000 ppb hydrogen sulfide. However, this study showed that those symptoms were not

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 33



present when individuals were exposed to 50 ppb or 500 ppb hydrogen sulfide (Fiedler et al., 2008). These are nowhere near the low levels that are being experienced as a result of emissions from the JPLF

Dr. Schiffman also makes statements about nonspecific symptoms (e.g. headaches) caused by hydrogen sulfide and other constituents (e.g. VOCs,[53] "malodorous mixtures", and "noxious emissions") without providing any specificity about chemical exposures for other compounds. First, causation cannot be evaluated without defining the concentration of *each* constituent in the alleged mixture, which Dr. Schiffman fails to do. Second, non-specific symptoms such as headaches; fatigue; skin, eye, and throat irritation; nasal congestion; shortness of breath; nausea; and general aches and pains are common in the general population without any specific chemical exposure. Barsky and Borus (1995) found that 86-95% of the general population reports at least one of the common somatic (i.e., non-specific) symptoms in any given two- to four-week period and that a typical adult reports one or more non-specific health symptoms every four to six days. These types of general symptoms have been demonstrated to be more common in surveys where there is a perceived threat of pollution, hazards, contamination, or other health threats, whether the threat is real or not (Watson and Pennebaker, 1989; Williams and Lees-Haley, 1993). Headaches are among the most common disorders of the nervous system, and the World Health Organization ("WHO") estimates that approximately 50% of adults experience headaches at least once per year (WHO, 2016). Identifying the etiology of nonspecific symptoms would begin by characterizing the conditions appropriately.

In a survey by the California Department of Health Services ("CDHS"), 183 women responding to self-administered questionnaires reported a one-year prevalence rate of 49.2% for fatigue, 45.9% for eye irritation, 42.1% for sleep disturbance, and 21.9% for skin irritation (Lipscomb et al., 1992). In a similar CDHS survey series of a total of 404 women responding to an interviewer administered questionnaire, 30.4% reported sinus congestion or sneezing, 26.5% irritated or sore eyes, 21% headache, 19.3% allergies or asthma, 16.3% fatigue, 15.6% difficultly sleeping, 14.1% tingling in the limbs, 13.9% trouble breathing, 13.1% skin problems, 13.1% muscle aches or pains, 12.6% dizzy spells, 7.4% ear problems, 5.9% loss of appetite, and 5.7% nausea or vomiting over a period of one year (Lipscomb et al., 1992). Men in the study reported symptoms at a lower frequency, with 22.7% reporting sinus congestion or sneezing, 15.9% irritated or sore eyes, 12.5% headache, 17.0% allergies or asthma, 8.5% fatigue, 12.1% difficulty sleeping, 9.1% tingling in limbs, 8.5% trouble breathing, 9.1% skin problems, 9.1% muscle aches and pains, 7.4% dizzy spells, 7.4% ear problems, 5.1% loss of appetite, and 5.7% nausea or vomiting over a period of one year (Lipscomb et al., 1992). Rhinitis due to allergies alone affects over 58 million people in the United States (Settipane, 2003).

A study by the South Australian Health commission surveyed over 3,000 individuals regarding a variety of symptoms over a two-week period. In this study, one in five individuals reported at least one instance of nasal congestion, headaches, fatigue, cough, sore throat, and/or eye irritation over the two-week period preceding the survey (Heyworth and McCaul, 2001). Nasal congestion was reported by 46% of survey subjects, with 33.0% reporting headaches, 29.8% reporting fatigue, 25.9% reporting cough, 24.7%

---

[53] As described further below, VOCs represent a very diverse group of chemicals with differing chemical, physical and toxicological properties.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 34



reporting eye irritation, and 22.4% reporting sore throats. Skin rash, wheezing, trouble breathing, nausea, diarrhea, and vomiting were all reported by 15% or less of those surveyed (Heyworth and McCaul, 2001). Fatigue can be particularly prevalent among adults. A study from the Department of Symptom Research at the University of Texas reported that 91% of adults reported mild to severe fatigue (Reyes-Gibby et al., 2003).

In short, the hydrogen sulfide levels documented in Jefferson Parish through LDEQ air monitoring and sampling efforts and as modeled by Dr. Yocke and Mr. Lape do not pose any health risks to Plaintiffs. Dr. Schiffman wrongfully asserts that nonspecific emissions such as "VOCs" and "malodorous mixtures" are the cause of nonspecific symptoms that are likely to be documented across populations at any given time. My critique of Dr. Schiffman's approach to causation is further detailed in Section 7.0.

## 6.2   Odors associated with JPLF gas emissions are unlikely to present a nuisance, as measured and modeled airborne concentrations throughout most of the community show a lack of hydrogen sulfide levels above the level of distinct odor awareness (10 ppb). Additionally, detections above this level were observed less than 1% of the time, as short-term unsustained spikes above background levels.

Hydrogen sulfide has a characteristic odor typically described as that of "rotten eggs", with an odor threshold ranging between 0.04 ppb and 3,600 ppb, which can be many orders of magnitude below concentrations associated with adverse health effects. (AIHA, 2013). An odor detection threshold is the lowest concentration at which an odor is perceived by the human nose. Odor thresholds can be reported as either detection or recognition levels, and published values vary substantially, due in part, to the methods used. For example, odor *detection* thresholds are those levels at which a person can correctly determine there is an odor, but it is too faint to identify the type or characteristic of the odor. An odor *recognition* threshold is the level at which a person can identify the character of the odor (e.g. floral, menthol, rotten egg) and may require concentrations 3 – 10 times higher than the odor detection threshold (Wise, Soreth, & Dalton, 2018). Both odor detection and recognition thresholds, such as the proposed 1 μg/m³ odor detection threshold used by Dr. Schiffman, are established in a laboratory setting using a defined amount of the odorous gas (e.g. hydrogen sulfide) in clean air. The American Industrial Hygiene Association (AIHA) second edition of the Odor Thresholds for Chemicals with Established Health Standards (2013) lists 68 studies reporting odor detection and recognition thresholds for hydrogen sulfide documented between 1848 and 2009 (see Table 4). Similarly, the American Conference of Governmental Industrial Hygienists (ACGIH) reports that hydrogen sulfide odor thresholds range from 0.2 to 300 ppb, and the USEPA reports odor thresholds ranging between 8 and 130 ppb (NRC, 2010).

**Table 4. Published Odor Thresholds for Hydrogen Sulfide**

| Publication | Odor Threshold (ppb) | Publication | Odor Threshold (ppb) |
|---|---|---|---|
| Naus, 1982 | 3,600 | Wilby, 1969 | 4.5 |

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 35



| Publication | Odor Threshold (ppb) | Publication | Odor Threshold (ppb) |
|---|---|---|---|
| Lotsch et al., 1997 | 100-2,000 | Thiele et al., 1981 | 0.93-3.8 |
| Valentin, 1848, 1850 | 1,400 | Heeres et al., 1986 | 0.29-3.7 |
| Lehmann, 1897 | < 1,400 | Bedborough & Trott, 1979 | 2.6 |
| Endo et al., 1967 | 1,000 | McGinley & McGinley, 2004 | 0.51-2.3 |
| Kulka & Homma, 1910 | 140-220 | McGinley & McGinley, 2004 | 0.5-2.2 |
| Katz & Talbert, 1930 | 130 | Winkler, 1975 | 2.2 |
| Naus, 1982 | 72 | Winneke et al., 1988 | 1.1-1.9 |
| Sanders & Cheant, 1961 | 29-72 | Winneke et al., 1979 | 1.9 |
| Thiele, 1982 | 62 | Brunekreef & Harssema, 1980 | 0.79-1.7 |
| Nishida et al., 1979 | 53 | Lindvall, 1970 | 0.15-1.7 |
| Stephens, 1971 | 48 | Kobal & Thiele, 1983 | 1.6 |
| Nishida et al., 1975 | 1.0-39 | Logtenberg, 1978 | 1.4 |
| Pomeroy & Cruse, 1969 | 3.0-30 | Thiele, 1984 | 1.3 |
| Loginova, 1957 | 29 | Dollnick et al., 1988 | 1.2 |
| Thomas et al., 1943 | 25 | Thiele, 1979 | 1.1 |
| Dyan - Fen - Djuy, 1959 | 8.6-22 | Hermans, 1989 | 0.04-1.1 |
| Baikov, 1963 | 10-22 | McGinley & McGinley, 2004 | 0.41-1.0 |
| Winkler, 1975 | 22 | McGinley & McGinley, 2004 | 0.46-0.93 |
| Williams et al., 1977 | 19 | Roos et al., 1985 | 0.61-0.75 |
| Bahmuller, 1983 | 1.0-17 | Glindemann et al., 2006 | 0.72 |
| Greenman et al., 2004 | 15.7 | Henderson & Haggard, 1922 | < 0.72 |
| Ueno et al., 2009 | 13 | Mannebeck & Mannebeck, 2002 | 0.35-0.68 |
| Basmadzhieva & Argirova, 1968 | 8.6 | Hill & Barth, 1976 | 0.5 |
| Young & Adams, 1966 | 5.7-7.9 | Anon. 1980 | 0.5 |
| Cederlof et al., 1966 | 7.2 | Moriguchi et al., 1983 | 0.5 |
| Randebrock, 1986 | 6.9 | Hoshika et al., 1993 | 0.5 |

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
Page | 36



| Publication | Odor Threshold (ppb) | Publication | Odor Threshold (ppb) |
|---|---|---|---|
| Adams et al., 1968 | 3.4-6.5 | Nagata, 2003 | 0.41 |
| Anon. 1980 | 5.6 | Ueno et al., 2009 | 0.32 |
| Bahmuller, 1984 | 0.86-5.2 | Roos et al., 1985 | 0.29-0.31 |
| Sakuma et al., 1967 | 5 | Don, 1986 | 0.29-0.31 |
| Jensen & Flyger, 1983 | 2.7-4.8 | Hoshika et al., 1993 | 0.29-0.31 |
| Leonardos et al., 1969 | 0.47-4.7 | Henning, 1924 | 0.07 |
| Nagy, 1991 | 3.9 | Hermans, 1989 | 0.04 |

*Adapted from AIHA, 2013

Given the broad range of odor detection and recognition thresholds reported in the scientific literature, the USEPA has taken an approach to evaluate the odor threshold *across a population*, accounting for factors that influence odor perception, such as gender, age, smoking habits, allergies, and others. As defined by USEPA, the Level of Distinct Odor Awareness ("LOA") is the concentration above which it is predicted that more than half of the exposed population will experience at least a distinct odor intensity, and about 10% of the population could experience a strong odor intensity. The LOA is often used in assessing public awareness of exposure due to odor perception. The LOA for hydrogen sulfide is 10 ppb, and it is derived from an odor threshold of 0.6 ppb[54] following the Fechner function:

$$I = K_w * \log\left(\frac{C}{OT_{50}}\right) + 0.5$$

Where: I = Intensity of distinct odor detection (I = 3)
$K_w$ = Fechner coefficient (default factor of 2.33)
C = Concentration
$OT_{50}$ = Odor threshold at which 50% of people detect an odor

Rearranged to:

$$3 = 2.33 * \log\left(\frac{C}{0.0006}\right) + 0.5$$

---

[54] A consensus value of 0.6 ppb was established by Ruijten et al. (2009) by comparing results of odor detection thresholds from multiple olfactometry methods that met specific criteria for acceptability (i.e. study had sufficient panel size, actual analytical measurements of odorants, calibration procedure, etc.).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 37



To establish a LOA, the resulting concentration is multiplied by an empirical field correction factor that accounts for everyday life factors, including sex, age, sleep, smoking, upper airway infection, and allergy, as well as distraction increase the $OT_{50}$ by a factor of 4. In addition, the LOA takes into account that odor perception is very fast (about 5 seconds) which leads to the perception of concentration peaks. On the basis of current knowledge, a factor of 1/3 is applied to adjust for peak exposure. Adjustment for distraction and peak exposure lead to a correction factor of 4/3 = 1.33 (NRC, 2010).

$$LOA = C * 1.33$$

$$LOA = 10 \; ppb$$

Whereas the LOA may be a level at which an odor is distinctly perceived, it is based on a conservative level for odor detection (0.6 ppb) and it does not necessarily represent a concentration that would be considered an objectionable nuisance. For example, the Emergency Response Planning Guideline-1 (ERPG-1) of 100 ppb established by the AIHA is a 1-hour average value at which individuals could perceive a clearly defined objectionable odor. Similarly, the USEPA established an Acute Exposure Guideline Level (AEGL-1) of 600 ppb for a 30 minute average and 750 ppb for a 10 minute average, as the threshold levels for the general public, including sensitive populations such as children, asthmatics, and pregnant women may experience discomfort, irritation, or other asymptomatic non-sensory effects. Alternatively, various states have established air quality standards and nuisance standards to protect sensitive populations near sources of hydrogen sulfide, which range from 30 ppb for a 30-minute average to 237 ppb for an 8-hr average, as summarized in Table 5, below.

**Table 5. State-Specific Hydrogen Sulfide Air Quality Guidelines**

| State | Hydrogen Sulfide Concentration | Exposure duration | Source |
|-------|-------------------------------|-------------------|--------|
| Arizona | 45 ppb | 1-hr | (ADEQ, 2018) |
| California | 60 ppb<br>30 ppb | 3-min avg.<br>1-hr avg. (acute REL) | (CARB, 2008;<br>SBCAPCD, 2018) |
| Delaware | 60 ppb<br>30 ppb | 3-min avg.<br>1-hr avg. | (DGA, 2014) |
| Louisiana | 237 ppb | 8-hr avg. | (LDEQ, 2014) |
| Maine | 30 ppb | 30-min avg. | (MCDCP, 2006) |
| Minnesota | 50 ppb<br>30 ppb | 30-min avg. (twice/yr)<br>30-min avg. (twice/5 consecutive days<br>Not to exceed 2 times in any 5 consecutive days | (MAR, 2017) |
| Missouri | 50 ppb | 30-min avg. | (MDNR, 2019) |
| Montana | 50 ppb | 1-hr avg. | (MDEQ, 1996) |
| Nevada | 80 ppb | 1-hr avg. | (NDEP, 2012) |
| New Jersey | 30 ppb | 30-min avg. | (NJSA, 2017) |
| Pennsylvania | 100 ppb | 1-hr avg. | (Pa. Code, 1998) |

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 38



| State | Hydrogen Sulfide Concentration | Exposure duration | Source |
|---|---|---|---|
| Texas | 80 ppb (residential and commercial)* | 30-min avg. | (TCEQ, 1976b) |
| | 120 ppb (unoccupied land)* | 30-min avg. | (TCEQ, 1976a) |

*concentration of hydrogen sulfide leaving the property

For the purpose of this report directed to general causation, I am relying on the LOA of 10 ppb, rather than the ERPG-1 of 100 ppb, the AEGL-1 values of 600 ppb (30-min average) and 750 ppb (10-min average), Louisiana's limit of 237 ppb,[55] or the lowest state limit of 30 ppb, to conservatively evaluate potential nuisance impacts across the community from the JPLF.

Based on LDEQ's air monitoring and sampling efforts and Dr. Yocke's and Mr. Lape's modeling, hydrogen sulfide emissions from the JPLF are unlikely to exceed the 10 ppb LOA throughout the majority of the community. As explained in Dr. Yocke's expert report, for the three periods he modeled, Dr. Yocke predicted that hydrogen sulfide concentrations had the potential to reach 10 ppb at less than 5% of hours in the month only in certain residential areas close to the JPLF on the West Bank of the Mississippi River.[56] He predicted that no hydrogen sulfide levels would reach 10 ppb for more than 1% of any month on the East Bank of the Mississippi River, including in River Ridge.

Similarly, Mr. Lape's model, as rerun by Dr. Yocke using a receptor grid, shows that hydrogen sulfide emissions from the JPLF potentially reaching residential areas at 10 ppb for 0.5% of the hours in a year are limited to the West Bank. The impacted area is even smaller when considering only areas with predicted 10 ppb exposure frequencies of at least 1% of the year, which Dr. Dalton identifies as the minimum frequency at which residents must experience hydrogen sulfide levels of 10 ppb for odors to constitute a nuisance.[57] When Dr. Yocke reran Mr. Lape's model with Dr. Yocke's inverse-modeled emission rates, the residential area potentially impacted by hydrogen sulfide emissions at concentrations of 10 ppb for 0.5% and 1% of the hours in a month was even smaller.

Sampling and air monitoring efforts by LDEQ further support the conclusion that odors associated with JPLF emissions did not constitute a nuisance based on the 10 ppb LOA throughout the majority of the community. In total, 255,983 5-minute, 10-minute, and hourly hydrogen sulfide measurements were collected across Jefferson Parish (including MAML locations and the Waggaman Playground air monitoring station) between February 19, 2018 and March 31, 2021. Of those, 99.32% were documented below the 10-ppb LOA with only 0.68% above 10 ppb. And it is important to note that even the measurements above 10 ppb cannot necessarily be attributed to the JPLF, given the numerous alternate sources of hydrogen

---

[55] LDH in fact acknowledges the 237 ppb as a comparison value in discussing the results of LDEQ's sampling and monitoring for hydrogen sulfide.

[56] See Sections 5.2, 7.1.1, and 7.2 of the expert report of Dr. Yocke for additional information about his modeling results.

[57] Expert Report of Pam Dalton (Monell Chemical Senses Center) at 13–14 (Apr. 30, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.        Page | 39



sulfide in Jefferson Parish (including the adjacent River Birch and Hwy 90 C&D Landfills) and time periods when winds were not blowing from the JPLF.

### 6.3 Smell reports and other odor complaints by Jefferson Parish residents are unreliable, do not objectively evaluate potential odor sources, and are not validated with meteorological data. As a result, Dr. Schiffman cannot assert without analysis that the odors complained of are attributable to the JPLF.

Dr. Schiffman relies on smell reports, collected by residents through the Harahan/River Ridge Air Quality Facebook group, and odor complaints reported to LDEQ to support her opinions. Specifically, she claims that the odor descriptors, frequency of odors, impacts to daily lives, and health impacts reported in the Plaintiff Fact Sheets are consistent with those used by "JPL[F] neighbors" in the smell reports.[58] Dr. Schiffman also states that based on odor complaints made to LDEQ, complaints "about malodors from JPL[F] . . . began to spike in August 2017," with "more than 1,800 complaints" between April 2018 and January 14, 2019. But Dr. Schiffman's reliance on the smell reports and LDEQ odor complaints is flawed, as she ignores that numerous odors described in the complaints are consistent with other sources and she does not even attempt to confirm that the JPLF could be the source of odor based on meteorological data. Nor does Dr. Schiffman account for resident bias (including bias from media and social media reports stating that the JPLF is the source of odors) or sensitivities in the complainants, as Dr. Dalton explains is necessary.[59]

In my review of the smell reports, I noted that less than 4% (fewer than 200 out of 5,435 complaints) attributed odors to a landfill (and not always specifically to the JPLF). And as described in Section 4.7.2, many residents described petroleum, chemical, or sewer odors—i.e., odors attributable to other sources—or did not use an odor descriptor in the smell reports. Similarly, 71.7% of odor complaints made to LDEQ or the JPLF odor complaint hotline were categorized as sewer, petrochemical or chemical, food or fragrant, or other odors, or did not contain an odor descriptor. As a result, Dr. Schiffman is wrong to suggest that all odors described in the smell reports were attributed by residents to the JPLF. This is particularly true given the proximity of the River Birch Landfill and the Hwy 90 C&D Landfill to the JPLF, as it is unlikely that residents could determine which of the three landfills was the source of odors.

Additionally, Dr. Schiffman fails to evaluate whether the complaints can be objectively attributed to the JPLF. Many physical and constituent-specific factors, such as wind direction, distance from the source, and topography, determine the fate and transport of odors in the environment. For example, as odorants are released into the air, they disperse and weaken in concentration with distance from the release point. With few exceptions, airborne constituents will travel downwind from the point of release; thus, if a resident is not located in this downwind path, exposure cannot occur. As such, odor complaints require an individualized assessment of distance from the source, wind conditions, and other factors before concluding that such exposures are attributable to the JPLF.

---

[58] Expert Report of Susan Schiffman (Schiffman Consulting) at 6, 7, 10, 12, 26 (Jan. 29, 2021).
[59] Expert Report of Pam Dalton (Monell Chemical Senses Center) at 6–13 (Apr. 30, 2021).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 40



Rather than consider any of these key factors, including the location of each complainant, the distance from the JPLF, and the meteorological data on the day and time of the complaint, Dr. Schiffman groups all of the smell reports and LDEQ odor complaints and contends they must have come from the JPLF. However, based on my review of historical meteorological conditions,[60] a significant portion of the odors occurred at a place and time that would rule out the JPLF as the source. For example:

- On June 15, 2018, at 2:30 PM, Ronald Dupree reported smelling an odor with intensity of 10 out of 10 near the intersection of Citrus Road and Hickory Avenue, approximately 3.5 miles northeast of the JPLF. At the time of the alleged odor, the wind was blowing from the south-southeast, and thus, JPLF could not have been the source.
- On August 9, 2018, at 6:45 AM, Kathy Aponte who lives on 9909 Paula Drive, approximately 3 miles northeast of the JPLF, reported a strong odor through the evening up until 5:15 AM, referencing that "the report yesterday from Paul Johnston shows that the landfill has been totally neglected." At the time of alleged odors, the wind was blowing from the south, and thus, JPLF could not have been the source.
- On November 6, 2018, Karen Hebert who lives at 33 Imogene Street, approximately 1.3 miles north of the JPLF, reported a methane and hydrogen sulfide odor, which she asserted was "landfill emissions definitely." Ms. Hebert stated that she reported the odor, and "they" could not smell it. At the time of the alleged odor, the wind was blowing from the east-southeast, and thus, JPLF could not have been the source. On a separate call on April 8, 2019, Ms. Hebert called to report a sulfur smell and "*wind coming from Cornerstone way. Thank God... NOT landfill rotten egg gas odor*"

These examples are not provided to reach specific conclusions about these residents but to illustrate that Dr. Schiffman's discussion about the smell reports and other odor complaints assumes a causal connection that has not been shown. And indeed, the smell reports and odor complaints made to LDEQ and the JPLF odor complaint hotline are unreliable, and cannot be used to corroborate the odors described in the Plaintiff Fact Sheets or show that the JPLF is the source of odors in Jefferson Parish.

## 7.0   Critique of Dr. Schiffman's Expert Report

### 7.1   Dr. Schiffman disregards dose-response when attributing health claims to JPLF emissions as she ignores that hydrogen sulfide concentrations are not sufficient to cause adverse health effects.

As discussed extensively in my expert report, the dose-response relationship is central to toxicology and whether a given chemical exposure can produce an adverse health effect. Dr. Schiffman makes many statements about irritant effects in Plaintiffs, but nowhere does she demonstrate that any of the Plaintiffs had exposure to hydrogen sulfide or any other airborne constituent from the JPLF that exceed some type of irritation threshold.

In Section 6.1, I discuss the numerous, well-accepted scientific studies that establish the various levels of hydrogen sulfide that are required for various types of health impacts to occur, including sensory

---

[60] As reported by the Louis Armstrong International Airport Station (KMSY).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 41



irritation. In contrast, whereas Dr. Schiffman acknowledges that thresholds exist for sensory irritation, for nearly all of the claimed health conditions, she avoids stating the specific threshold levels for hydrogen sulfide or any of the "VOCs" and exposure times necessary for producing the relevant adverse health effect. Instead, Dr. Schiffman relies on vague assertions about alleged exceedances to claim that Plaintiffs' irritant effects are the result of JPLF emissions. For example, she states: "*When the emissions from JPL were transported to neighboring communities, the concentration of background chemicals at the plaintiffs' homes was elevated to levels that significantly exceeded the threshold for sensory irritation and generated adverse health effects.*"

Dr. Schiffman's failure to address actual, established threshold levels is not surprising since the levels of hydrogen sulfide sourced to the JPLF come nowhere close to what is required for sensory irritation. As discussed in Section 6.1, the measured and modeled hydrogen sulfide concentrations at Plaintiffs' properties are many times below published irritation thresholds and health-protective values for hydrogen sulfide. Even references cited by Dr. Schiffman establish that hydrogen sulfide levels magnitudes higher than those seen in the neighborhoods surrounding the JPLF would be required to cause health impacts. For example, the WHO (2000) study cited by Dr. Schiffman states: "*At concentrations of 15 mg/m³* [9,150 ppb] *and above, hydrogen sulfide causes conjunctival irritation*" and "*The lowest-adverse-effect level of hydrogen sulfide is 15 mg/m³,* [9,150 ppb] *when eye irritation is caused.*"

Instead, Dr. Schiffman opines that very low ppb concentrations of hydrogen sulfide—1 µg/m³ (approximately 0.72 ppb)—can cause irritant effects. However, this concentration is over 12,000 times lower than the WHO threshold for irritation. Moreover, the WHO (2000) study also draws into question the very foundation of Dr. Schiffman's opinion that low concentrations of hydrogen sulfide and odors from the JPLF were the cause of Plaintiffs' health effects: "*Most probably, at concentrations below 1.5 mg/m³ (1 ppm)* [1,000 ppb]*, even in exposure for longer periods, there are very few detectable health hazards in the toxicological sense. The malodorous property of hydrogen sulfide is a source of annoyance for a large proportion of the general population at concentrations below 1.5 mg/[13]* [1,000 ppb]*, but from the existing data it cannot be concluded whether any health effects result*" (WHO, 2000).

In conclusion, Dr. Schiffman has not demonstrated that any Plaintiff received a harmful exposure to any airborne constituent, regardless of the source. Therefore, there is not a proper basis for Dr. Schiffman's conclusion that Plaintiffs have experienced adverse health effects from any airborne emissions, much less any potential emissions from the JPLF.

## 7.2   Dr. Schiffman selectively highlights unrepresentative data to opine that hydrogen sulfide levels observed throughout Jefferson Parish must have come from the JPLF.

In reviewing the MAML data which Dr. Schiffman relies upon as allegedly corroborating Mr. Lape's CALPUFF models, it is clear she has not evaluated the entirety of the air monitoring data available, or that she has ignored the vast majority of it. Throughout her report, Dr. Schiffman selectively highlights short-term instances in which hydrogen sulfide was detected, rather than evaluating the totality of data and fails to further analyze the data to ensure that it accurately reflects her cherry-picked conclusions.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 42



For example, Dr. Schiffman discusses 27 measurements taken by the MAML in Waggaman (the corner of Dandelion and River Road) over a 27 minute period to support her opinion that Mr. Lape's modeling accurately reflects hydrogen sulfide emissions from the JPLF (Schiffman, Table 6). However, the meteorological data recorded by MAML during that time period ranged from 184 degrees to 207 degrees indicating that the Hwy 90 C&D Landfill is more likely a contributor to the hydrogen sulfide concentrations than the JPLF.

Furthermore, there are over 255,000 hydrogen sulfide measurements (including 5-minute, 10-minute and hourly measurements) taken by the LDEQ MAML and the LDEQ Waggaman Playground air monitoring station, 99.32% of which were below the level of distinct odor awareness of 10 ppb.

Similarly, Dr. Schiffman focuses on a LDEQ sampling event on April 28, 2018, in which LDEQ concluded that Cornerstone did not contribute to the hydrogen sulfide readings detected, to opine that JPLF was the major contributory of odor as opposed to Cornerstone or other sources. Had Dr. Schiffman looked further at the data, she would have had to conclude that LDEQ was wrong in its assertion. First, LDEQ's determination was made on the erroneous premise that methane was also detected and therefore the source couldn't have been Cornerstone: "this facility is highly unlikely to be capable of being the source of a combined hydrogen sulfide and methane plume."[61] However, similarly elevated methane readings were detected on April 29, 2018, but the wind direction was from the northwest—the direction of Cornerstone and not JPLF. Moreover, Dr. Schiffman also assumes that the JPLF alone—to the exclusion of the other two adjacent landfills and any other alternative odor source—contributed to the elevated hydrogen sulfide measured by LDEQ. But the wind direction (southwest) for the odor event was associated with all three landfills, not just the JPLF. Dr. Schiffman also fails to acknowledge that only a few days after the April 28, 2018 odor incident, LDEQ staff reported a distinctive elemental sulfur smell on River Road next to Cornerstone, and she ignores opposing findings in which LDEQ documented Cornerstone to be the potential source of odors on multiple dates during odor patrols:

- October 15, 2018
- October 16, 2018
- October 30, 2018
- November 5, 2018
- November 19, 2018
- November 28, 2018

Regardless of the significance of findings from LDEQ or others she cites, the fact Dr. Schiffman omits discussion of the totality of data and cherry-picks those findings that help her pre-determined opinion demonstrate she has not evaluated the data objectively or in a scientifically-reliable manner.

### 7.3   Dr. Schiffman repeatedly opines on the ability of VOCs to cause the Plaintiffs' complaints; however, she has not conducted the requisite analysis to appropriately

---

[61] LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* at 11 (Apr. 27, 2018) (WC_JPLF_00158132).

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 43



render these opinions.

VOCs can be emitted by multiple sources in urban environments, and they are not specific to landfill emissions, much less the JPLF. Dr. Schiffman misleads the reader when she opines that "*VOCs detected in the community where plaintiffs reside are consistent with VOCs emitted by JPL[F].*" This statement suggests that the JPLF is the source of VOCs detected in the neighborhoods but ignores the fact that the vast majority of the VOCs detected across the community are commonly found in indoor air and in urban environments and are emitted by many fixed and mobile sources, including the chemical plants, landfills adjacent to the JPLF, and other facilities. Beyond simply stating that because some VOCs that were detected by MAML were also present at the JPLF, Dr. Schiffman has conducted no scientifically-valid assessment, such as modeling or other dispersion analysis, or even a basic profile assessment of detected constituents and their relative concentrations, to establish the source of VOCs detected in the community. Therefore, her opinion that VOCs from the JPLF contributed to VOCs found in the residential areas or that any of Plaintiffs' health effects could be caused by VOCs sourced to the JPLF is completely unsupported and thus unreliable.

Furthermore, VOCs represent a diverse group of chemicals with differing chemical, physical, and toxicological properties. The unique properties of each VOC (e.g., volatility, vapor pressure, density, and atmospheric half-life) dictate the fate and transport of the chemical constituent throughout the environment. As a result, Dr. Schiffman cannot rely on hydrogen sulfide modeling to opine that the VOCs in the JPLF emissions were dispersed and transported in the same manner.

Moreover, it is not scientifically appropriate to treat VOCs as a single chemical as Dr. Schiffman appears to do when generically referring to health effects she believes are caused by VOCs. Instead, one would need to look at the individual VOC data in comparison to health-based screening values or toxicological benchmarks to see if concentrations and exposure durations were sufficient to cause adverse health effects. Dr. Schiffman makes no attempt to do so, even generally, and her opinion is therefore not based on a reasonable methodology or data.

Finally, Dr. Schiffman speculates about the potential interactive effects of VOC mixtures, but she fails to acknowledge that mixture toxicology is a complex topic. The interactive effects of chemicals in a mixture are mixture-specific and cannot be generalized as Dr. Schiffman does in this case. Not only does Dr. Schiffman fail to describe the specific chemical constituents in the mixtures as she only references a mixture of $H_2S$ and VOCs (which again is a general reference to a group of diverse chemicals), but she does not attempt to describe the concentrations for each constituent in the alleged chemical mixture. Dr. Schiffman instead repeatedly references "background levels of airborne chemicals" without reference to the specific levels. Thus, Dr. Schiffman has not done the requisite work to opine that VOCs—whether on their own or mixed in unknown quantities with hydrogen sulfide—emitted from the JPLF have resulted in any nuisance or adverse health effects in Plaintiffs.

Dr. Schiffman offers this opinion without any credible foundation whatsoever.

### 7.4    Dr. Schiffman blindly attributes Plaintiffs' alleged nuisance impacts and health

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.         Page | 44



complaints to the JPLF, ignoring contributions from adjacent landfills, nearby industry, and other local sources.

As discussed in Sections 4 and 6.3, there are numerous potential sources of odors, including sources of hydrogen sulfide odors, throughout Jefferson Parish. In particular, the JPLF is between two adjacent landfills, both of which are potential sources of hydrogen sulfide and VOC emissions, like the JPLF. Dr. Schiffman's opinion both relies on these other sources of odors for her "additive" theory, but at the same time, discounts these sources as potential contributors. Such contrary positions lack a scientifically sound basis.

Dr. Schiffman definitively states that "*JPL is the main source of the malodors experienced by the plaintiffs*" based on modeling performed by Mr. Lape and the existence of VOCs at the JPLF and in the community. As part of that opinion, Dr. Schiffman acknowledges that the modeling overpredicts the amount of hydrogen sulfide that the JPLF would contribute based on measurements taken at the Waggaman Playground air monitoring station, but somehow also still claims that the levels are "consistent." However, Dr. Schiffman's opinion fails to account for the contribution of hydrogen sulfide from other sources, including the two adjacent landfills, which would result in a greater overprediction of hydrogen sulfide sourced to the JPLF. While Dr. Schiffman states that "*It is possible that some brief peaks of $H_2S$ come from sources other than JPL,*" she fails to explains what is meant by "brief," provides no further analysis, and does not attempt to differentiate or estimate the comparative contributions of hydrogen sulfide and VOCs from the adjacent landfills or other sources in comparison to the JPLF. Dr. Schiffman provides no explanation for otherwise essentially ignoring the impact of emissions from other sources.

Similarly, Dr. Schiffman ignores the contribution potential of other sources to the detections of VOCs in the area, including the two adjacent landfills. As discussed in Section 7.3, VOCs are emitted from numerous fixed and mobile sources, and the simple existence of similar VOCs—particularly without any further evidence, such as dispersion modeling—provides no scientific basis for which to connect JPLF as the source. Dr. Schiffman's opinion is therefore particularly troubling because she reserves no qualification for the opinion and instead indiscriminately applies it to all residences across a wide geographic area regardless of distance from the JPLF or proximity to other known and suspected sources of odors like the Cornerstone Chemical, local wastewater treatment plants, and others.

Dr. Schiffman also relies on Plaintiffs' descriptions of odors (such as rotten egg, chemical, feces, sewage, ammonia, petroleum, foul, noxious, sulfur) for her opinion that the JPLF is the main source of the odors. However, many of these descriptors have been associated with other sources based on LDEQ odor complaints. For example, confirmed odor incidents concerning the River Birch Landfill in July 2017 detailed the odors as foul, strong gas or rotten egg odors as described by the complainants.[62] Likewise, odor complaints sourced to the C&D landfill were described as heavy sulfur odors.[63] Complaints sourced to the

---

[62] APTIM-0013529, APTIM-0014498, APTIM-0014502, APTIM-0014506 APTIM-0014498, APTIM-0014502, APTIM-0014731.
[63] APTIM-0012869, APTIM-0012861, APTIM-0012853, APTIM-0012845, APTIM-0012836, APTIM-0012819, APTIM-0012828, APTIM-0012777, APTIM-0012735.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 45



Harahan Wastewater Treatment Plant and Bridge City Sewage Treatment Plant has similar odor descriptions detailed in the odor complaints (e.g., raw sewage, sulfur, hydrogen sulfide, petroleum, chemical, oil).[64] And complaints sourced to Cornerstone Chemical, International-Matex Tank Terminal, and other chemical and petrochemical operations included the same type of odor descriptions relied upon by Dr. Schiffman (e.g., sulfur, hydrogen sulfide, petroleum, chemical, asphalt, sulfide gas, ammonia, rotten egg, petrochemical).[65] Moreover, many of the Plaintiffs state that they experience odors seven days per week, every season of the year. If JPLF was the source of all of these odors, it would be impossible for emissions to impact the Plaintiffs every day because the wind does not blow from the JPLF to all residential properties 365 days of the year. Despite this evidence, Dr. Schiffman does not account for contribution by any of these other sources, but instead, without conducting a proper analysis, assumes that these types of odors were from primarily from the JPLF.

Dr. Schiffman appears to admit that contributions from other sources may be significant as she states: "*When emissions from JPL were added to background levels of airborne chemicals from other sources, this increased the exposure to levels that exceeded the threshold for sensory irritation.*" However, she appears to approach this from the biased perspective that these emissions could not affect the Plaintiffs on their own but can only have an impact when combined with emissions from the JPLF. Again, she provides no assessment of the relative contribution of any odor source as part of her "additive" theory. This is particularly important since Dr. Schiffman relies on a very low odor detection threshold of 1 $\mu g/m^3$ (0.72 ppb) as the impact level, which is lower than the conservatively estimated local background concentration for hydrogen sulfide.

In conclusion, Dr. Schiffman has not conducted the appropriate analysis to conclude that the JPLF is the sole or major source of complaints in the area, and therefore her opinions lack the necessary proper scientific foundation.

## 7.5    Dr. Schiffman draws specific causation conclusions without having conducted the requisite analysis to render these conclusions.

Dr. Schiffman renders specific causation conclusions multiple times throughout her expert report. For example, she states:

> "*The frequency, intensity, duration, and offensiveness (FIDO characteristics) of the malodorous mixture of H2S along with other volatile compounds caused headaches, nausea or vomiting, irritation to eyes, nose or throat, coughing, dizziness, trouble breathing, sleep disruption, loss of appetite, fatigue, skin irritation, burning lungs, nosebleeds, and asthma over a period of years.*"

and,

---

[64]APTIM-0008310-9171 and APTIM-0010472-17702.
[65] APTIM-0008310-9171 and APTIM-0010472-17702.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.                    Page | 46



> *"The aversive sensory properties of emissions from the JPL landfill caused the symptoms reported by the plaintiffs."*

Dr. Schiffman is neither a medical doctor nor a toxicologist. In addition, as discussed extensively in my expert report, there is a well-defined and generally accepted methodology for determining causation. First, one must establish general causation through an analysis of the available toxicology and epidemiology information to determine if a given exposure can cause a given health effect in general. If a conclusion of general causation is reached, then a specific causation analysis is conducted that evaluates whether or not a specific individual's exposure was capable of causing their claimed adverse impact. Specific causation analysis consists of determining whether or not an individual's dose was sufficient to cause their complaint; whether the temporality of the alleged exposure and complaint are consistent with possible causation; whether alternative causes of the complaint exist and can or cannot be eliminated as a potential cause of the complaint; and finally, whether the coherence of the evidence supports a causal conclusion. Dr. Schiffman has conducted none of these specific causation analysis steps when rendering her opinion that emissions from the JPLF *caused* plaintiffs' complaints. For example, Dr. Schiffman has not attributed any specific complaint to any individual plaintiff, determined that they had a dose of $H_2S$ or any VOC sufficient to cause their complaint, evaluated the temporality of their complaints, or eliminated alternative causes of their complaints.

As discussed extensively in Section 6.1 of my expert report, the non-specific complaints reported by the Plaintiffs occur commonly within the general population and have a myriad of causes. Dr. Schiffman's failure to account for these factors is a fatal flaw and renders her causation opinions unreliable.

## 7.6   Dr. Schiffman's opinion that hydrogen sulfide accumulated in Plaintiffs' homes and adsorbed to household items, increasing exposure intensity is speculative and is not supported by science or the facts.

In her report, Dr. Schiffman states that "*$H_2S$ is heavier than air and accumulates and concentrates in enclosed and low-lying areas within the home (OSHA, 2020) including the basement, under stairs, and under cabinets.*" The potential for indoor accumulation and concentration of hydrogen sulfide exists when there are high, sustained levels of hydrogen sulfide in a confined space, not the low concentrations potentially experienced by Plaintiffs in any indoor space. I am not aware of any documentation that supports that low parts per billion concentrations of hydrogen sulfide accumulates and concentrates in homes, as suggested by Dr. Schiffman.

In support of her opinion, Dr. Schiffman cites an October 2005 the OSHA Fact Sheet on hydrogen sulfide published in response to the Hurricane Katrina recovery effort. The fact sheet states that hydrogen sulfide can collect in "*low-lying and enclosed, poorly-ventilated areas such as basements, manholes, sewer lines, under- ground telephone vaults and manure pits.*" However, OSHA was relying on well-known situations in which hydrogen sulfide can be generated at high concentrations in confined spaces such as manure pits, sewer lines, and basements. For example, it is common for sewer line issues or improperly maintained drain issues to allow high concentrations of hydrogen sulfide generated in sewers to enter and accumulate in basements. The OSHA Fact sheet does not refer to or support an opinion that low parts

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beddeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 47



per billion concentrations of hydrogen sulfide in ambient air would have the same cumulative effect in any indoor space.

Dr. Schiffman's opinion also ignores the fact that, while hydrogen sulfide is heavier than air, when it is present in extremely diluted concentrations, such as in the ambient air in the Plaintiffs' neighborhoods, it does not form dense clouds that accumulate in low-lying areas or indoors. It is also notable that Dr. Schiffman's education and profession as a psychologist would not provide her with the requisite training to opine about the fate and transport of chemicals such as hydrogen sulfide in the environment.

Additionally, Dr. Schiffman opines that: "*Odorants including $H_2S$ adsorb to textiles including drapes, rugs, bed coverings, and clothing. This accumulation and concentration amplifies the odor intensity in indoor air.*" Dr. Schiffman provides no citation to support this blanket statement, and I am not aware of any scientific studies that support her proposition that hydrogen sulfide at concentrations measured and/or predicted to be (based on modeling) at the Plaintiffs' properties can somehow be selectively sequestered by domestic textiles and then result in some type of "amplified" concentration and odor event. In fact, Dr. Schiffman's own research contradicts her hydrogen sulfide adsorption theory. In 2001, Dr. Schiffman published a study in which she placed two cotton fabric swatches in swine houses in North Carolina and drew 320 liters of swine house air through each cotton swatch (Schiffman et al., 2001). Neither hydrogen sulfide nor carbonyl sulfide, dimethyl sulfide, or diethyl sulfide were detected in the cotton fabric samples, indicating a lack of adsorption of hydrogen sulfide to cotton fabrics, in direct contradiction to Dr. Schiffman's broad-based opinions in this case.

In summary, there is no scientific support for Dr. Schiffman's speculative opinion that the low concentrations of hydrogen sulfide at issue in this case were concentrated in the Plaintiffs' homes either by collecting in low-lying/inaccessible areas or through the adsorption to household textiles.

## 8.0   Conclusions

Given the large amount of potential alternate odor sources present throughout the Parish and adjacent to the JPLF, and the lack of supporting air quality data, the available scientific information does not support Plaintiffs' claims of nuisance and adverse health effects from the JPLF. The modeling and available data indicate that while there may be incidents where concentrations of hydrogen sulfide that can be reasonably associated with the JPLF exceed the 10 ppb LOA, those incidents are relatively infrequent and short in duration, and are only predicted to occur in some residential areas on the West Bank of the Mississippi River. Further, there is no credible evidence to indicate that emissions from the JPLF are causing adverse health effects since predicted and measured concentrations (even those predicted by Plaintiffs' air dispersion expert) are far below recognized health impact thresholds at all residential locations.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 48



I reserve the right to amend this report should new information become available.

Respectfully submitted,

John Kind, Ph.D., CIH, CSP
Principal Toxicologist
Senior Vice President, Health Sciences
CTEH, LLC

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.        Page | 49

CTEH

# 9.0    References

ACGIH (2010) 'Hydrogen Sulfide', in ACGIH (ed.) *Documentation of Threshold Limit Values and Biological Exposure Indices.* 7th ed. Cincinnati, Ohio: ACGIH.

ACGIH, American Conference of Governmental Industrial Hygienists (2016) *Documentation of Threshold Limit Values and Biological Exposure Indices.* Cincinnati, Ohio.

ADEQ (2018) *Arizona Administrative Code Title 18. Environmental Quality Chapter 2. Department of Environmental Quality - Air Pollution Control*: Arizona Department of Environmental Quality.

Ahlborg, G. (1951) 'Hydrogen sulfide poisoning in shale oil industry', *AMA Archives of Industrial Hygiene and Occupational Medicine,* 3(3), pp. 247-66.

AIHA (2013) *Odor Thresholds for Chemicals with Established Health Standards.* 2nd edn.: AIHA.

ATSDR (2016) *Toxicological Profile for Hydrogen Sulfide and Carbonyl Sulfide*, Atlanta, GA: Agency for Toxic Substances and Disease Registry.

Beauchamp, R. O., Bus, J. S., Popp, J. A., Boreiko, C. J. and Andjelkovich, D. A. (1984) 'A critical review of the literature on hydrogen sulfide toxicity', *Critical Reviews in Toxicology,* 13(1), pp. 25-97.

Burnett, W. W., King, E. G., Grace, M. and Hall, W. F. (1977) 'Hydrogen sulfide poisoning: review of 5 years' experience', *Canadian Medical Association Journal,* 117(11), pp. 1277-80.

CARB (2008) *Article 2. Ambient Air Quality Standards 70200. Table of Standards*: California Air Resources Board.

DGA (2014) *Air Quality Management Section: 1103 Ambient Air Quality Standards*: Delaware General Assembly.

Doll, R. (1984) 'Occupational cancer: problems in interpreting human evidence.', *The Annals of Occupational Hygiene,* 28(3), pp. 291-305.

Eisen, E. A. and Wegman, D. H. (1995) 'Epidemiology', in Levy, B.S. & Wegman, D.H. (eds.) *Occupational Health: Recognizing and Preventing Work-Related Disease.* 3rd ed. Boston: Little Brown and Company, pp. 103-123.

ERPG 2014. Emergency Response Planning Guidelines for Hydrogen Sulfide. Falls Church, VA: American Industrial Hygiene Association.

Evans, A. S. (1976) 'Causation and disease: the Henle-Koch postulates revisited.', *The Yale Journal of Biology and Medicine,* 49(2), pp. 175-95.

Faustman, E. M. and Omenn, G. S. (2013) 'Risk assessment', in Klaassen, C.D. & al., e. (eds.) *Casarett and Doull's Toxicology: The Basic Science of Poisons.* 8th ed. New York: McGraw-Hill, pp. 123-149.

Federal Judicial Center (2011) *Reference Manual on Scientific Evidence.* 3rd edn. Washington DC: The National Academies Press.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 50



Fiedler, N., Kipen, H., Ohman-Strickland, P., Zhang, J., Weisel, C., Laumbach, R., Kelly-McNeil, K., Olejeme, K. and Lioy, P. (2008) 'Sensory and cognitive effects of acute exposure to hydrogen sulfide', *Environmental Health Perspectives*, 116(1), pp. 78-85.

Guidotti, T. L. (2010) 'Hydrogen sulfide: advances in understanding human toxicity', *International Journal of Toxicology*, 29(6), pp. 569-81.

Guidotti, T. L. and Goldsmith, D. F. (1986) 'Occupational cancer.', *American Family Physician*, 34(3), pp. 146-52.

Hackney, J. D. and Linn, W. S. (1979) 'Koch's postulates updated: a potentially useful application to laboratory research and policy analysis in environmental toxicology.', *The American Review of Respiratory Disease*, 119(6), pp. 849-52.

Heinemann, P. and Wahanik, D. 'Modeling of Odor Generation and Transport from Mushroom Composting Facilities', *Mushroom Biology and Mushroom Products: Proceedings of the 2nd International Conference*, University Park, PA: Pennsylvania State University, 137-145.

Hernberg, S. (1992) 'Internal validity, precision and generalization', in Hernberg, S. (ed.) *Introduction to Occupational Epidemiology*. Chelsea, MI: Lewis Publishers, pp. 103-142.

Hill, A. B. (1965) 'The environment and disease: association or causation?', *Proceedings of the Royal Society of Medicine*, 58, pp. 295-300.

IARC (2006) *Preamble to the IARC Monographs*, Lyon, France: World Health Organization (http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf).

Jappinen, P., Vilkka, V., Marttila, O. and Haahtela, T. (1990) 'Exposure to hydrogen sulphide and respiratory function', *British Journal of Industrial Medicine*, 47(12), pp. 824-8.

LDEQ (2014) *Title 33 Environmental Quality Part III. Air*: Louisiana Department of Environmental Quality.

MAR (2017) *7009.0080 Minnesota Ambient Air Quality Standards*: Minnesota Administrative Rules. Available at: https://www.revisor.mn.gov/rules/7009.0080/ 2019).

Mausner, J. S. and Kramer, S. (1985) 'The concept of causality and steps in the establishment of causal relationships', in Mausner, J.S. & Kramer, S. (eds.) *Mausner & Bahn Epidemiology--an introductory text*. 2nd ed. Philadelphia: W.B. Saunders Company, pp. 180-194.

MCDCP (2006) *Ambient Air Guidelines for Hydrogen Sulfide*: Maine Center for Disease Control & Prevention.

MDEQ (1996) *Rule 17.8.214 Ambient Air Quality Standard For Hydrogen Sulfide*: Montana Department of Environmental Quality.

MDNR (2019) *Rules of Department of Natural Resources Division 10-Air Conservation Commission Chapter 6- Air Quality Standards, Definitions, Sampling and Reference Methods and Air Pollution Control Regulations for the Entire State of Missouri*: Missouri Department of Natural Resources.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 51



Monson, R. R. (1990) 'The interpretation of epidemiologic data', in Monson, R.R. (ed.) *Occupational Epidemiology.* 2nd ed. Boca Raton: CRC Press, pp. 87-101.

NDEP (2012) *NAC 445B.22097 Standards of quality for ambient air*: Nevada Division of Environmental Protection.

Newsome, J. R., Norman, V. and Keith, C. H. (1965) 'Vapor Phase Analysis of Tobacco Smoke', *Tobacco Science,* 9, pp. 102-110.

NJSA (2017) *Site Remediation and Waste Management Solid Waste; Landfills*: New Jersey Statutes Annotated.

NRC (2010) *Acute Exposure Guideline Levels for Selected Airborne Chemicals.* Washington, D. C.: National Research Council of the National Acadamies; The National Academies Press.

OhioEPA (2001) *Methane and Hydrogen Sulfide Gases at C&DD Landfills*, State of Ohio: Ohio Environmental Protection Agency (0669). Available at: https://epa.ohio.gov/portals/34/document/guidance/gd_669.pdf.

Pa. Code (1998) *131.3 Ambient air quality standards*: Pennsylvania Code.

Pedersen, P. M. and Sprinkle, R. S. (1963) 'Determination of hydrogen sulfide in cigarette smoke', *American Tobacco*.

River Birch LLC (2014) *Welcome to River Birch, LLC*. Avondale, LA. Available at: http://riverbirchlandfill.com/default.asp

Ruijten, M. W. M. M., van Doorn, R. and van Harreveld, A. P. (2009) *Assessment of odour annoyance in chemical emergency management*, Bilthoven, the Netherlands: National Institute for Public Health and the Environment (RIVM) (RIVM Report 609200001/2009).

Ruth, J. H. (1986) 'Odor thresholds and irritation levels of several chemical substances: a review', *AIHA Journal,* 47(3), pp. A142-51.

SBCAPCD (2018) *Draft Permit to Operate 14708 and Part 70 Operating Permit 14708 Lompoc Sanitary Landfill*: Santa Barbara County Air Pollution Control District.

Schenker, M. B. (1997) 'Biostatistics and epidemiology', in LaDou, J. (ed.) *Occupational and Environmental Medicine.* 2nd ed. Stamford, CT: Appleton & Lange, pp. 783-804.

Schiffman, S. S., McLaughlin, B., Katul, G. G. and Nagle, H. T. (2005) 'Eulerian-Lagrangian model for predicting odor dispersion using instrumental and human measurements', *Sensors and Actuators B: Chemical,* 106(1), pp. 122-127.

Settipane, R. A. (2003) 'Rhinitis: a dose of epidemiological reality', *Allergy & Asthma Proceedings,* 24(3), pp. 147-54.

Suarez, F. L., Furne, J. K., Springfield, J. and Levitt, M. D. (2000) 'Morning breath odor: influence of treatments on sulfur gases', *Journal of Dental Research,* 79(10), pp. 1773-7.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 52



Suarez, F. L., Springfield, J. and Levitt, M. D. (1998) 'Identification of gases responsible for the odour of human flatus and evaluation of a device purported to reduce this odour', *Gut,* 43(1), pp. 100-4.

Susser, M. (1977) 'Judgment and causal inference: criteria in epidemiologic studies.', *American Journal of Epidemiology,* 105(1), pp. 1-15.

Susser, M. (1986) 'Rules of inference in epidemiology.', *Regulatory Toxicology and Pharmacology,* 6(2), pp. 116-28.

Susser, M. (1991) 'What is a cause and how do we know one? A grammar for pragmatic epidemiology.', *American Journal of Epidemiology,* 133(7), pp. 635-48.

TCEQ (1976a) *Control of Hydrogen Sulfide Rule 112.31 Allowable Emissions--Other Property*: Texas Commission on Environmental Quality.

TCEQ (1976b) *Control of Hydrogen Sulfide Rule 112.31 Allowable Emissions--Residential, Business, or Commercial Property*: Texas Commission on Environmental Quality.

USEPA (2000) *Collection Systems Technology Fact Sheet: Sewers, Lift Station*, Washington, D. C.: U. S. Environmental Protection Agency Office of WaterEPA 832-F-00-073). Available at: https://www3.epa.gov/npdes/pubs/sewers-lift_station.pdf.

USEPA (2003) *Toxicological Review of Hydrogen Sulfide*, Washington, DC: U.S. Environmental Protection Agency (EPA/635/R-03/005).

USEPA (2005) *Guidelines for carcinogen risk assessment*, Washington, DC: U.S. Environmental Protection Agency (EPA/630/P-03/001F)).

Wang, L., Parker, D. B., Parnell, C. B., Lacey, R. E. and Shaw, B. W. (2006) 'Comparison of CALPUFF and ISCST3 models for predicting downwind odor and source emission rates', *Atmospheric Environment,* 40(25), pp. 4663-4669.

Wang, R. (2012) 'Physiological implications of hydrogen sulfide: a whiff exploration that blossomed', *Physiological reviews,* 92(2), pp. 791-896.

White, M. C. (1999) 'Health concerns for communities exposed to hydrogen sulfide -- A perspective from two communities', *Environmental Epidemiology and Toxicology,* 1(3), pp. 236-240.

WHO (ed.) (1987) *Principles of Studies on Diseases of Suspected Chemical Etiology and their Prevention*. Geneva: World Health Organization.

WHO (2003) *Hydrogen sulfide: human health aspects*, Geneva: World Health Organization.

WHO (2016) *Headache disorders*: World Health Organization. Available at: https://www.who.int/news-room/fact-sheets/detail/headache-disorders (Accessed: January 16 2020).

Wilson, G. E., Huang, J. Y. C. and Schroepfer, T. W. (1980) 'Atmospheric sublayer transport and odor control', *Journal of the Environmental Engineering Division,* 106(2), pp. 389-401.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Beckeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 53



Xing, Y., Guo, H., Feddes, J., Yu, Z., Shewchuck, S. and Predicala, B. (2007) 'Sensitivities of four air dispersion models to climatic parameters for swine odor dispersion', *Transactions of the ASABE,* 50(3), pp. 1007-1017.

Yant, W. P. (1930) 'Hydrogen sulfide in industry:  occurrence, effects and treatment', *American Journal of Public Health,* 20, pp. 598-608.

Yerushalmy, J. and Palmer, C. E. (1959) 'On the methodology of investigations of etiologic factors in chronic diseases', *Journal of Chronic Diseases,* 10(1), pp. 27-40.

Expert Report of John Kind, Ph.D, CIH, CSP
Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al.
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.          Page | 54

CTEH

# APPENDIX A

*CV and Previous Testimony*





THE SCIENCE OF READY℠

## JOHN KIND, PhD, CIH, CSP
Principal Toxicologist, Senior Vice President - Health Sciences
jkind@cteh.com

## INTRODUCTION

John Kind is a Principal Toxicologist and the Senior Vice President of Health Sciences at CTEH®, where he works on a broad range of human-health based issues including exposure assessment, dose reconstruction, industrial hygiene, and disease causation. He also participates in the Toxicology Emergency Response Program, leading air monitoring and environmental sampling teams to address worker and public safety after hazmat incidents across the country. Based on this work, he routinely faces a variety of issues and concerns related to chemical releases from fixed facilities, the transportation industry, oil and gas exploration and production, and landfills.  Dr. Kind also serves as an expert witness in toxic tort litigation providing testimony regarding disease causation.

## EDUCATION

**Ph.D., Interdisciplinary Toxicology**
University of Georgia
Athens, Georgia

**B.S., Biochemistry-Toxicology**
Murray State University
Murray, Kentucky

## REGISTRATIONS AND CERTIFICATIONS
• Diplomate American Board of Industrial Hygiene
  – December 2012
• Certified Industrial Hygienist #10224
• Certified Safety Professional #CSP-31865
• 40 Hour HAZWOPER
• TWIC Card

## PROFESSIONAL AFFILIATIONS
• Society of Toxicology - Full Member
• Society of Toxicology - Public Health Specialty Section
• American Board of Industrial Hygiene
• American Industrial Hygiene Association
• American Industrial Hygiene Association - Emergency Response Planning Guidelines (ERPG) Committee
• American Industrial Hygiene Association Toxicology Committee
• Oil and Gas Working Group of the American Industrial Hygiene Association
• The Toxicology Forum
• American Conference of Governmental Industrial Hygienists
• ASTM International
  – Subcommittee D18.26 Hydraulic Fracturing
  – voting member
• American College of Occupational and Environmental Medicine
• Board of Certified Safety Professionals

## EMPLOYMENT

**Sr. Vice President, Health Sciences |** 2017-Present
**Principal Toxicologist |** 2016-Present
**Senior Toxicologist |** 2007-2016
*CTEH®, LLC, North Little Rock, Arkansas*

**Guest Lecturer |** 2005
*University of Florida, Gainesville, Florida*

**Toxicologist |** 2000-2007
*TERRA, Inc., Tallahasse, Florida*

**Graduate Research Assistant |** 1993-2000
*University of Georgia, Department of Pharmaceutical and Biomedical Sciences,  Athens, Georgia*

**Graduate Teaching Assistant |** 1995-1998
*College of Pharmacy at the University of Georgia, Athens, Georgia*

## HONORS & AWARDS
1. Graduate Student Poster Award Competition, Third Annual Meeting of The Interdisciplinary Program in Toxicology, April, 2000: First Place

2. Graduate Student Platform Presentation Award Competition, Southeast Society of Toxicology Meeting, October, 1999: First Place

3. Outstanding Graduate Teaching Assistant, University of Georgia,

1

## JOHN KIND, PhD, CIH, CSP
Principal Toxicologist, Senior Vice President - Health Sciences
jkind@cteh.com



1998-1999.

Honors & Awards (continued):

4. Graduate School Assistantship, University of Georgia, 1996-1998.

5. Pre-doctoral Fellowship, American Foundation for Pharmaceutical Education, 1996-1998

6. Student Poster Award Competition, Southeast Society of Toxicology Meeting, October, 1994: Second Place

7. Dean's List, Murray State University

8. American Chemical Society SEED Grant, 1987

## PUBLICATIONS
### Peer Reviewed Publications:
1. Bisphenol A: Update on newly developed data and how they address NTP's 2008 finding of "Some Concern". Shelnutt, S., Kind, J., and Allaben, W. Food and chemical toxicology : an international journal published for the British Industrial Biological Research Association. 2013; 57:284-95.

2. HF 101: Hydrogen Fluoride and Hydrofluoric Acid. How to Prepare for Potential Exposures. Shelnutt, S. R. and Kind, J. A. The Synergist. 2012; 23(9):30-32.

3. The Gulf Oil Spill: Worker and Community Health Update. Millner, G.; Goad, P., and Kind, J. Presented at 21st Annual Clean Gulf Training & Exhibition, November 30 - December 1, 2011; San Antonio, TX. Houston, TX: Tradefair Group; 2011.

4. Effective Monitoring and Protection of Workers and the Community during Waterway Chemical Spills. Davis, C.; Kind, J.; Shelnutt, S.; Nony, P., and Millner, G. In 2011 International Oil Spill Conference Proceedings; Portland, OR. Washington, DC: American Petroleum Institute; 2011.

5. Investigation of the Radioadaptive Response in Brain and Liver of Pur288 LacZ Transgenic Mice. Kind, J.A., Winn, R.N., Boerringter, M.E.T.I., Jagoe, C.H., Glenn, T.C., and Dallas, C.E. Journal of Toxicology and Environmental Health. 2001; 63(3):207-20.

6. Interspecies Differences in Oxidative Stress Response and Radiocesium Levels in Rodents Inhabiting Areas Highly Contaminated by the Chernobyl Nuclear Disaster. Holloman, K.A., Dallas, C.E., Jagoe, C.H., Tackett, R., Kind, J.A., and Rollor, E.A.. Environmental Toxicology and Chemistry. 2000; 19: 2830-34.

7. Flow Cytometric Analysis of Erythrocyte and Leukocyte DNA in Fish from Chernobyl-Contaminated Ponds in the Ukraine. Dallas, C.E., Lingenfelser, S.F., Lingenfelser, J.T., Holloman, K.A., Jagoe, C.H., Kind, J.A., Chesser, R.K., and Smith, M.H. Ecotoxocology 1998; 7(4): 211-219.

8. Wnek, S. M., Kuhlman, C. L., Harrill, J. A., Nony, P. A., Millner, G. C. and Kind, J. A. 'Chapter 5 - Forensic Aspects of Airborne Constituents Following Releases of Crude Oil Into the Environment A2 - Stout, Scott A', in Wang, Z. (ed.) *Oil Spill Environmental Forensics Case Studies:* Butterworth-Heinemann, 2018; pp. 87-115.

9. Kind, J.A. and Keller, R. (2019). Chapter 3 – Principles of Toxicology in *Toxicology Principles for the Industrial Hygienist 2nd Edition.* AIHA Press.

10. Tuttle, K. Kind, J.A., Nony, P., and Still, K. (2019). Chapter 27 – Asbestos in *Toxicology Principles for the Industrial Hygienist 2nd Edition.* AIHA Press.

### Presentations:
1. December 2017: Crude Oil Derailments – How to Respond Safely and Effectively, Clean Gulf. Houston, TX.

2. June 2017: Case Study of a Worker Exposure Response Call. AIHCE 2017, American Association of Railroads (AAR) Railroad Industrial Hygiene Forum Meeting. Seattle, WA.

3. November 2015: CN Perryville Incident and Response Panel. Railroad Environmental Conference. Champaign, IL.

4. August 2015: Planning for and Dealing with Catastrophic Releases "Better Safe Than Sorry." 27th Annual Texas Environmental Superconference. San Antonio, TX.

5. May 2015: Air Monitoring and Environmental Sampling Strategies in Early Phase Response to Crude Oil Releases. 28th Annual AAR/BOE Hazmat Seminar. Dallas, TX.

6. May 2014: Human Health and Environmental Hazards Associated with Crude Oil. 27th Annual AAR/BOE Hazmat Seminar. Dallas, TX.

7. May 2014: Response to an Airborne Hazardous Material Event. The Clean Air Act: New Directions in Law, Policy, and Practice. Co-sponsored by the American Law Institute and the Environmental Law Institute. Washington, DC.

## JOHN KIND, PhD, CIH, CSP
Principal Toxicologist, Senior Vice President - Health Sciences
jkind@cteh.com



**Presentations (continued):**

8. June 2014: Health and Safety Concerns Associated with Response to Crude Oil Releases.  American Industrial Hygiene Association Annual Meeting.  San Antonio, TX.

9.   November 2013: Human Health and Environmental Hazards Associated with Crude Oils. Railroad Environmental Conference. Champaign, IL.

10.   October 2013: Addressing Potential Hazards and Exposure to Workers During Hydraulic Fracturing Operations. Shale Envirosafe Conference. San Antonio, TX.

11.   August 2013: Overview of Current Public Concerns Associated with Hydraulic Fracturing. 8th Annual Georgia Environmental Conference. Jekyll Island, GA.

12. May 2013: Addressing Potential Hazards and Exposure to Workers During Hydraulic Fracturing Operations. American Industrial Hygiene Association Annual Meeting. Montreal, Canada.

13.   May 2013:  Update on Health Effects Studies From Deepwater Horizon Events of 2010.  Annual Meeting of American College of Occupational and Environmental Medicine.  Orlando, FL.

14.   May 2013: Toxicology of Hydraulic Fracturing. Annual Meeting of American College of Occupational and Environmental Medicine.  Orlando, FL.

15.   November 2012: Natural Gas Production, Chemicals, and Protection of Public Health:  State of the Art Update. Shale Envirosafe Conference.  New Orleans, LA.

16.   October 2012: Scientific Evidence - Daubert Issues Related to Personal Injury and Property Damage Claims. Panel Discussion.  HB Litigation Conference on Shale Gas Drilling Operations.  New York, NY.

17.   September 2012: The East St. Louis Para-Nitroaniline Spill - A Case Study in the Cascading Effects of a Single Exposure Incident.   Annual Meeting of the Alliance of Hazardous Materials Professionals.  Anchorage, AK.

18. August 2012:  Hydraulic Fracturing: Case Study on Communication of Scientific Information in a Highly Politicized Environment.   CTEH® Crisis Communication Seminar.  Little Rock, AR.

19.   June 2012: Background VOCs in Indoor Air: Sources, Concentrations, and Comparison to Health-Based Indoor Air Standards.   Round Table RT 213 - Addressing Background Sources of VOCs During Vapor Intrusion Investigations. American Industrial Hygiene Association Annual Meeting.  Indianapolis, IN.

20. March 2012:  Evaluating "Action" Levels for Methane in Groundwater – What "Action" Should be Taken?  2010 Fayetteville Shale Symposium.  Fort Smith, AR.

21.   February 2012:  What's That Smell? Technologies and Strategies for Characterizing Odor Nuisance and Related Health Impacts and Resulting Legal Claims from Industrial Activities.   Defense Research Institute Toxic Torts and Environmental Law Seminar.  Miami, FL.

22.   September 2011:  Effective Monitoring and Protection of Workers and the Community during Waterway Chemical Spills. Cheminnovations 2011 Conference & Expo.  Houston, TX.

23.   September 2011:  Expected The Unexpected.  A Case Study in Real-World Crisis Communication Experience with Railroad and Non-railroad Chemical Releases.  CTEH® Crisis Communication Seminar.  Little Rock, AR.

24.   May 2011:  The Gulf Oil Spill: Worker, Community, and Environmental Sampling Overview.  AIHCE 2011, American Association of Railroads (AAR) Railroad Industrial Hygiene Forum Meeting.  Portland, OR.

25.   May 2011:  Air Monitoring Air Sampling and Interacting with Regulators During Emergency Response.  Union Pacific Railroad Tank Car Safety Course Emergency Response Training Center, Transportation Technology Center, Inc. Pueblo, CO.

26.   December 2011:  Toxicology of Selected Hazardous Materials Shipped by Rail.  Canadian National Railroad Dangerous Goods Officer Annual Meeting.  Chicago, IL.

27.   October 2010: Overview of the Role of CTEH® in the MC-252 Response.  October 2010 meeting of The Arkansas Bar Association Environmental Law Section.  Little Rock, AR.

28.   April 2009:  Communication Breakdown:  A Case Study in the Cascading Effects of a Single Exposure Incident.   2009 Arkansas Governor's Safety and Health Conference.  Rogers, AR.

# JOHN KIND, PhD, CIH, CSP
Principal Toxicologist, Senior Vice President - Health Sciences
jkind@cteh.com



Presentations (continued):

29. March 2008: Chemical Protective Clothing and Respiratory Protection Overview. BNSF Hamzat Refresher Training, Emergency Response Training Center, Transportation Technology Center, Inc. Pueblo, CO.

30. March 2008: Toxicology for the Emergency Responder. BNSF Hamzat Refresher Training, Emergency Response Training Center, Transportation Technology Center, Inc. Pueblo, CO.

31. March 2008: Poster presentation at the 47th Annual Meeting of the Society of Toxicology, Seattle, WA. The Protective Effect of the Upper Airways Against Water Soluble Irritant Gas Exposure – A Case Study of Acute Ammonia Exposure. Kind, J., Nony, P., Hewitt, D.

32. March 2008: The Role of Toxicology in Emergency Response. Monthly meeting of the La Porte, Texas Local Emergency Planning Committee.

33. August 2007: "Air Monitoring During Hazardous Material Incidents." West Tennessee Emergency Management Association, Local Emergency Planning Committee August 21, 2007.

34. March 2006: Poster presentation at the 45th Annual Meeting of the Society of Toxicology, San Diego, CA. Predicting Blood Lead Levels with IEUBK: Over-Prediction at Moderate Soil Lead Levels? Freeman, R.W., Britt, J.K., Halmes, C, Kind, J.A., and James, R.C.

35. April 2000: Podium presentation at the third annual meeting of The Interdisciplinary Program in Toxicology, The University of Georgia, Athens, GA. Effects of Temperature on Mutagenesis in the λ-LIZ Transgenic Medaka Fish Model. Kind, J.A., Winn, R.N., Jagoe, C.H., Glenn, T.C., Dallas, C.E.

36. April 2000: Poster presentation at the third annual meeting of The Interdisciplinary Program in Toxicology, The University of Georgia, Athens, GA. The Application of Transgenic Mouse Models For Radiation Research. Winn, J.A., Winn, R.N., Boerringter, M.E.T.I., Jagoe, C.H., Glenn, T.C., Dallas, C.E.

37. March 2000: Poster presentation at the 39th Annual Meeting of the Society of Toxicology, Philadelphia, PA. Tissue Specific Differences in the Radioadaptive Response of Pur288 LacZ Transgenic Mice. Kind, J.A., Winn, R.N., Boerrigter, M.E.T.I., Jagoe, C.H., Glenn, T.C., Dallas, C.E.

38. October 1999: Podium presentation at the Southeast Society of Toxicology Meeting, University of Georgia, Athens,

GA. Investigation of the Radioadaptive Response in Brain and Liver of Pur288 LacZ Transgenic Mice. Kind, J.A., Winn, R.N., Boerringter, M.E.T.I., Jagoe, C.H., Dallas, C.E.

39. March 1999: Poster presentation at the 38th Annual Meeting of the Society of Toxicology, New Orleans, LA. Use of a LacZ Plasmid-Based Transgenic Mouse Model for the Detection of Mutations Induced by Ionizing Radiation. Kind, J.A., Boerrigter, M.E.T.I., Winn, R.N., Jagoe, C.H., Dallas, C.E. Department of Pharmacology and Toxicology

40. November 1997: Podium presentation at the 18th Annual Meeting of the Society of Environmental Toxicology and Chemistry, San Francisco, CA. Mercury in Perch (Perca fluviatilis) from Waters in the Transcarpathain Mountain Region, Western Ukraine. Kind, J., Jagoe, C. Oleksyk, T., Dallas, C., Smith, M.

41. February 1996: Seminar presentation to the Department of Pharmacology and Toxicology, University of Georgia. Flow-Cytometric Evidence for the Division of Teolost Erythrocytes in Circulation. Kind, J.A., Jagoe, C.H., Holloman, K.A., McCreedy, C., Lingenfelser, S., and Dallas, C.E.

42. March 1995: Seminar presentation to the Department of Pharmacology and Toxicology, University of Georgia. Application of the p53 Tumor Suppressor Protein as a Biomarker for Environmental Toxicity. Kind, J.A.

43. February 1995: Poster presentation at the 1995 AAAS Annual Meeting and Science Innovation Exposition, Atlanta, GA. Patterns of Aneuploidy and Other Abnormalities in Blood Cell DNA in Fish From Chernobyl-Contaminated Regions in Ukraine. Holloman, K.A., Dallas, C.E., Kind, J.A., Jagoe, C.H., Chesser, R.K., Smith, M.H.

44. October 1994: Poster presentation at the Southeast Society of Toxicology Meeting, University of Tennessee, Knoxville, TN. Variation in Blood Cell DNA Content in Fish From Chernobyl-Contaminated Regions in The Ukraine. Holloman, K.A., Fisher, S.K., Kind, J.A., Lingenfelser, J.T. Dallas, C.E., Jagoe, C.H., Chesser, R.K., Smith, M.H.

45. April 1993: Poster presentation at area Sigma Xi meeting, Murray State University. High Performance Chromatography of Uridine Nucleotides. Kind, J.A. and Musico, O.



# Previous 4 Years of Expert Testimony
## John A. Kind, Ph.D., CIH, CSP

In the Civil District Court for the Parish of Orleans, State of Louisiana
> Thomas Hayden v 3M Company et al.
> No. 2015-3732
> Trial Testimony April 6, 2017

In the 18th Judicial District Court, Parish of Iberville, State of Louisiana
> Henry Williams v Dow Chemical Company
> No. 74,597
> Deposition Testimony May 24, 2017

In the District Court for the State of Minnesota, 4th Judicial District, County of Hennepin
> Jason Carlson v BNSF Railway
> No. 27-CV-16-11771
> Trial Testimony October 6, 2017

In the Montana 4th Judicial District Court, Missoula County
> Brent Wetsch v BNSF Railway
> No. DV-16-1146
> Deposition Testimony December 19, 2017

In the 29th Judicial District Parish of St. Charles, State of Louisiana
> Mark Dufour vs Dow Chemical Company
> No. 69,672
> Trial Testimony April 6, 2018

In the Montana 4th Judicial District Court, Missoula County
> Brent Wetsch v BNSF Railway
> No. DV-16-1146
> Trial Testimony June 7, 2018

In United States District Court, Middle District of Louisiana
 Wendell and Tonya Fisher v Waste Management of Louisiana, et al.
 No. 3 :17-cv-00246-BAL-RLB
 Deposition Testimony July 13, 2018

In the Superior Court of the State of California for the County of Los Angeles
 Houshang and Soraya Sabetian v Exxon et al.
 No. JCCP 4674/BC699945
 Deposition Testimony October 16, 2018

In the 16th Judicial District Court for the Parish of St. Mary, State of Louisiana
 New 90 and Louisiana Wetlands v Chevron
 No. 130528
 Deposition Testimony December 5 2018

In the Circuit Court State of Wisconsin
 Sarah Krentz and Korey Krentz v Briggs & Stratton Corp et al
 No. 17-CV-7030
 Deposition Testimony January 9 2019

In the Superior Court of the State of California
 Mary Ann Corder v Exxon et al.
 Co. BC677617
 Deposition Testimony February 1, 2019

In the 18th Judicial District Court for the Parish of Iberville, State of Louisiana
 Henry Norris and Betty Williams v. Exxon et al.
 Co. 74597
 Deposition Testimony March 12, 2019

In the State of Louisiana, 18th Judicial District Court, Parish of Iberville
 Henry and Betty Williams v Exxon et al.
 No. 74597
 Deposition Testimony March 12, 2019

In the United States District Court, District of Wisconsin
 Andrea Hamilton, et al. v 3D Idapro Solutions
 No. 3:18-cv-0054-jdp
 Deposition Testimony April 2, 2019

In the United States District Court for the Eastern District of Virginia
 Ashton Bell, et al v. Westrock CP, LLC
 No. 3:17cv829
 Deposition Testimony April 12, 2019

In the 16th Judicial District Court for the Parish of Iberia, State of Louisiana
 K&J Supply LLC et al, v. Multi-chem group, LLC et al.
 No. 00118905
 Trial Testimony April 30, 2019

In the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana
 Albert Lumpkins v. Exxon Mobil Corporation, et al.
 No. C665850 Division D
 Deposition Testimony May 10, 2019

In the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana
 Janet Crow, et al. v. IMC Global Operations, Inc, et al.
 No. 667460 Sec 26
 Deposition Testimony June 3, 2019

In the 18th Judicial District Court for the Parish of Iberville, State of Louisiana
 Cheryll Baker et al., v. Anco Insolation et al.
 No. 75860 Division 'C'
 Deposition Testimony July 24, 2019

In the 16th Judicial District Court, Parish of Iberville, State of Louisiana
 McCorvey et al. v Multi-Chem Group, LLC, et al.
 Trial Testimony August 12, 2019

In the Civil District Court for the Parish of Orleans
 Dennis M. Jeter v. Ameron International Corporation, et al.
 Deposition Testimony October 8, 2019

In the Superior Court of Washington for King County
 William J. Tocco v. BNSF
 Deposition Testimony October 10, 2019

In the Superior Court of the State of Arizona
 Ronald Chaff v. Autozone, Inc. et al.
 No. CV2017-091917
 Deposition Testimony February 6, 2020

In the United States District Court for the Eastern District of Louisiana
    Barry Wilburn et al. v. BP Exploration & Production, Inc and BP American Production Company
    No. 2:18-cv-10228
    Deposition Testimony February 19, 2020


In the Superior Court of the State of California, in and for the County of Los Angeles
    John and Gail Metzger v Exxon, et al.
    No. 19STCV27717
    Deposition Testimony February 21, 2020


In the Civil District Court for the Parish of Orleans, State of Louisiana
    Arthur Ray Reinninger v Exxon, et al.
    No. 2016-4992 Division C-10
    Deposition Testimony February 25, 2020


In the 25th Judicial District Court for the Parish of Plaquemines, State of Louisiana
    Hero Lands Company, LLC v. Chevron et al.
    No. 64-320 Division A
    Deposition Testimony October 27, 2020


In the Superior Court of the State of Delaware
    Raymond Reed, v. BNSF Railway Company, et al.
    No. N17C-10-366 EMD
    Deposition Testimony October 30, 2020


In the 25th Judicial District Court for the Parish of Plaquemines of the State of Louisiana
    Hero Lands Company, LLC v. Chevron USA Inc, et al.
    Division A Docket No. 64,320
    Deposition Testimony December 16, 2020


In the 16th Judicial District Court for the Parish of St. Mary of the State of Louisiana
    Louisiana Wetlands, LLC and New 90, LLC v. Energen Resources Corporation, et al.
    Division B Docket No. 130-527
    Deposition Testimony February 12, 2021
    Hearing Testimony February 26, 2021


In the Superior Court of California county of San Francisco
    David Springer and Dorothy Springer v. Asbestos Companies et al.
    No. CGC-20-276849
    Deposition Testimony April 23, 2021

# APPENDIX B

*Documents Reviewed*

Appendix B - Expert Report of John Kind

| Document Type | Summary |
|---|---|
| Pleading | Amending and Superceding Master Class Action Complaint for Damages, Elias Jorge "George" Ictech-Bendeck, et al. v. Waste Connections Bayou, Inc. et al., Civ. Action No. 18-7889 c/w 18-8071, 18-8218, 18-9312 (E.D. La.) (Apr. 10, 2019) |
| Miscellaneous | Agency for Toxic Substances and Disease Registry, *Environmental Odors* (2020), https://www.atsdr.cdc.gov/odors/faqs.html. |
| Miscellaneous | Agency for Toxic Substances and Disease Registry, *Hydrogen Sulfide* (2016), https://www.atsdr.cdc.gov/toxprofiles/tp114-c1-b.pdf. |
| Miscellaneous | Agency for Toxic Substances and Disease Registry, *Toxic Substances Portal - Hydrogen Sulfide Carbonyl Sulfide* (2020), https://www.atsdr.cdc.gov/toxprofiles/tp114.pdf |
| Miscellaneous | American Lung Association, *VOCs Can Harm Health* (2020), https://www.lung.org/clean-air/at-home/indoor-air-pollutants/volatile-organic-compounds. |
| Miscellaneous | APTIM-0008310-9171 |
| Miscellaneous | APTIM-0008310-9171 |
| Miscellaneous | APTIM-0010472-17702 |
| Miscellaneous | APTIM-0010472-17702 |
| Miscellaneous | APTIM-0012735 |
| Miscellaneous | APTIM-0012777 |
| Miscellaneous | APTIM-0012819 |
| Miscellaneous | APTIM-0012828 |
| Miscellaneous | APTIM-0012836 |
| Miscellaneous | APTIM-0012845 |
| Miscellaneous | APTIM-0012853 |
| Miscellaneous | APTIM-0012861 |
| Miscellaneous | APTIM-0012869 |
| Miscellaneous | APTIM-0013529 |
| Miscellaneous | APTIM-0014498 |
| Miscellaneous | APTIM-0014498 |
| Miscellaneous | APTIM-0014502 |
| Miscellaneous | APTIM-0014502 |
| Miscellaneous | APTIM-0014506 |
| Miscellaneous | APTIM-0014731 |
| Report | Carlson Environmental Consultants, *High BTU Landfill Gas Utilization Plan* (May 7, 2019) (JP_JPLF_0019496). |
| Report | Carlson Environmental Consultants, *Landfill Gas System Assessment* (Aug. 15, 2018) (WC_JPLF_00158037). |
| Miscellaneous | Centers for Disease Control and Prevention, *Hydrogen Sulfide* (2020), https://www.cdc.gov/niosh/topics/hydrogensulfide/default.html. |
| Pleading | *Davis v. Omega Refining, LLC* , No. 745-579 (24th Judicial Dist. Ct. filed Jan. 6, 2015). |
| Literature | Davoli et al., *Characterisation of Odorants Emissions from Landfills by SPME and GC/MS* (2002). |
| Miscellaneous | Email from Brett O'Connor, Waste Connections to Rick Buller, Jefferson Parish (Apr. 29, 2018 6:24 PM) (WC_JPLF_00269963). |
| Miscellaneous | Email from D. Wagenecht to M. Algero, B. Tusa, and B. Bailey, LDEQ (July 27, 2018). |
| Miscellaneous | Email from Vic Culpepper, River Birch to Loren Monahan, River Birch (June 16, 2017 2:32 PM) (RIVER_BIRCH_0001081). |
| Miscellaneous | Email from Vic Culpepper, River Birch to Tom Nicholson, River Birch (Dec. 12, 2017 4:50 PM) (RIVER_BIRCH_0001140). |

| | |
|---|---|
| Miscellaneous | EPA, *Toxics Release Inventory (TRI) Program Report for Cornerstone Chemical Co.* (2020), https://enviro.epa.gov/triexplorer/release_fac_profile?TRI=70094MRCNC10800&TRILIB=TRIQ1&V_NA_INDICATOR=.&FLD=&FLD=RELLBY&FLD=TSFDSP&OFFDISPD=&OTHDISPD=&ONDISPD=&OTHOFFD=&YEAR=2017. |
| Expert witness | Expert Report of Jaana Pietari (Ramboll) (Jan. 29, 2021). |
| Expert witness | Expert Report of James Lape (Integral Consulting, Inc.) (Jan. 29, 2021). |
| Expert witness | Expert Report of Jeffrey Marshall (SCS Engineers) (Apr. 30, 2021). |
| Expert witness | Expert Report of Mark Yocke (Exponent) (Apr. 30, 2021). |
| Expert witness | Expert Report of Matthew Stutz (Weaver Consultants Group) (Apr. 30, 2021). |
| Expert witness | Expert Report of Nestor Soler (Ramboll) (Jan. 28, 2021). |
| Expert witness | Expert Report of Pam Dalton (Monell Chemical Senses Center) (Apr. 30, 2021). |
| Expert witness | Expert Report of Paolo Zannetti (EnviroComp Consulting) (Apr. 30, 2021). |
| Expert witness | Expert Report of Susan Schiffman (Schiffman Consulting) (Jan. 29, 2021). |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – August 2020* (September 2020). (WC_JPLF_00337969) |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – February 2021* (March 23, 2021) (WC_JPLF_00402300). |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – January 2021* (February 17, 2021). (WC_JPLF_00402168) |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – July 2020* (August 20, 2020). (WC_JPLF_00337944). |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – June 2020* (July 20, 2020) (WC_JPLF_00337939). |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – May 2020* (June 24, 2020) (WC_JPLF_00295808). |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – November 2020* (December 23, 2020). (WC_JPLF_00402143) |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – October 2020* (November 19, 2020). (WC_JPLF_00401894) |
| Industrial Hygiene | Exponent, Inc., *Jefferson Parish Landfill Air Monitoring for Hydrogen Sulfide – September 2020* (October 5, 2020) (WC_JPLF_00401471). |
| Miscellaneous | Finnerty, M, *What's That Smell? Odor from High Acres Landfill Rankles Residents* , Democrat and Chronicle (Dec. 7, 2017), https://www.democratandchronicle.com/story/news/2017/12/07/high-acres-landfill-perinton-macedon-smell-waste-management/848323001/. |
| Miscellaneous | Geosyntec Consultants, *Part 70 Permit Significant Modification and Renewal Application* (Aug. 2019) (GEOSYNTEC_00024268). |
| Pleading | *Hart v. Omega Refining, LLC* , No. 779-643 (24th Judicial Dist. Ct. filed Jan. 17, 2018). |
| Miscellaneous | Jefferson Parish Smell Report Maps from Apr. 22, 2018 to Sept. 12, 2019 (WC_JPLF_HERBERT_00000381). |
| Miscellaneous | Jefferson Parish, Department of Environmental Affairs, *Jefferson Parish Landfill Progress/Status Reports* (2018 - 2019), https://www.jeffparish.net/departments/environmental-affairs/landfill-reports. |

| | |
|---|---|
| Miscellaneous | LDEQ Air Permit for ADM Grain (Feb. 4, 2020). |
| Miscellaneous | LDEQ Air Permit for American River Transportation Co. (Feb. 1, 2016) (WC_JPLF_00086949). |
| Miscellaneous | LDEQ Air Permit for Cargill (Sept. 17, 2019) (WC_JPLF_00215978). |
| Miscellaneous | LDEQ Air Permit for Cornerstone Chemical Co. (Dec. 28, 2017) (WC_JPLF_00172249). |
| Miscellaneous | LDEQ Air Permit for Cornerstone Chemical Co. (Jan. 6, 2020). |
| Miscellaneous | LDEQ Air Permit for Cornerstone Chemical Co. (June 11, 2018) (WC_JPLF_00173342). |
| Miscellaneous | LDEQ Air Permit for Cornerstone Chemical Co. (Mar. 9, 2020). |
| Miscellaneous | LDEQ Air Permit for Cornerstone Chemical Co. (Sept. 5, 2018) (WC_JPLF_00173572). |
| Miscellaneous | LDEQ Air Permit for Dyno Nobel (Sept. 6, 2019) (WC_JPLF_00216354). |
| Miscellaneous | LDEQ Air Permit for Evonik (Sept. 6, 2017) (WC_JPLF_00175319). |
| Miscellaneous | LDEQ Air Permit for International Matex Tank Terminal (Aug. 14, 2019) (WC_JPLF_00217356). |
| Miscellaneous | LDEQ Air Permit for Jefferson Parish Landfill (June 23, 2015) (WC_JPLF_00085421). |
| Miscellaneous | LDEQ Air Permit for Kemira Chemicals (Jan. 24, 2020). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Apr. 9, 2020). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Aug. 8, 2017) (WC_JPLF_00018732). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Dec. 12, 2019). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Jan. 30, 2018) (WC_JPLF_00022362). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Jan. 30, 2018) (WC_JPLF_00022461). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (July 23, 2018) (WC_JPLF_00027075). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Mar. 21, 2016) (WC_JPLF_00008936). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Mar. 23, 2018) (WC_JPLF_00023704). |
| Miscellaneous | LDEQ Air Permit for Norco Refinery (Oct. 24, 2017) (WC_JPLF_00020425). |
| Miscellaneous | LDEQ Air Permit for River Birch Landfill (May 1, 2017) (WC_JPLF_00176960). |
| Miscellaneous | LDEQ Air Permit for Valero Refining (Apr. 13, 2020). |
| Miscellaneous | LDEQ Air Permit for Valero Refining (May 14, 2020). |
| Miscellaneous | LDEQ Air Permit for Vertex Refinery (Sept. 8, 2015) (WC_JPLF_00222790). |
| Miscellaneous | LDEQ Public Records Response to Request for Calibration and Quality Control Information for the Jefferson Parish Air Monitoring Station (WC_JPLF_00402179 - WC_JPLF_00402299). |
| Industrial Hygiene | LDEQ, *Data Reports for the Jefferson Parish Air Monitoring Station*, https://internet.deq.louisiana.gov/portal/DIVISIONS/AIR-MONITORING/AIR-MONITORING-DATA-WITH-INTERVAL-5-OR-10-MINUTES |
| Miscellaneous | LDEQ, *Incident Report #173713* (Oct. 28, 2016) (REV_WC_JP_00129087). |
| Miscellaneous | LDEQ, *Incident Report #181646* (Jan. 12, 2018) (RIVER_BIRCH_0019642). |
| Miscellaneous | LDEQ, *Incident Report #187356* (Oct. 19, 2018) (LDEQ_PRR_00001573). |
| Miscellaneous | LDEQ, *Incident Report #189339* (Mar. 28, 2019) (LDEQ_PRR_00007530). |
| Report | LDEQ, *Mobile Air Monitoring Lab: Jefferson Parish Odors* (Dec. 16, 2019) (WC_JPLF_00315889). |
| Report | LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Apr. 27, 2018) (WC_JP_00158132). |
| Report | LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Feb. 19, 2018) (JP_JPLF_0009800). |
| Report | LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (July 20, 2018) (ADD_P00135782). |
| Report | LDEQ, *Mobile Air Monitoring Lab: River Ridge and Harahan, LA* (Oct. 8, 2018) (JP_JPLF_0009996). |

| | |
|---|---|
| Miscellaneous | LDEQ, *River Ridge/Harahan Odor Issue* (2018), https://www.deq.louisiana.gov/page/river-ridge-harahan-odor-issue. |
| Miscellaneous | LDEQ, *Solid Waste Inspection Report* (9/20/2016) (RIVER_BIRCH_0003843). |
| Miscellaneous | Louisiana Department of Environmental Quality, Incident Report #173716 (Nov. 14, 2018) (REV_WC_JP_00129088). |
| Report | Louisiana Department of Health, *Final Draft* (Jan. 14, 2019) (WC_JPLF_00316722). |
| Report | Louisiana Department of Health, *Final Draft* (Oct. 25, 2018) (JP_JPLF_0019756). |
| Miscellaneous | National Oceanic and Atmospheric Administration Responses to Public Records Request (May 11, 2020) (WC_JPLF_00295783-88). |
| Miscellaneous | Occupational Safety and Health Administration, *Hydrogen Sulfide (H2S) OSHA Fact Sheet* (2020), https://www.osha.gov/OshDoc/data_Hurricane_Facts/hydrogen_sulfide_fact.pdf. |
| Miscellaneous | Odor Complaints Submitted to LDEQ or JPLF Odor Complaint Hotline from July 8, 2015 to Sept. 30, 2020. |
| Literature | Pierucci et al., *Volatile Organic Compounds Produced During the Aerobic Biological Processing of Municipal Solid Waste in a Pilot Plant* (2003). |
| Miscellaneous Pleading | Pivotal Engineering, LLC, Ambient Air Assessment (May 2019). Plaintiff Fact Sheets (as of Mar. 15, 2021). |
| Pleading | Plaintiffs' First Amended and Supplemental Omnibus Complaint for Damages and Injunctive Relief, Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.) (July 14, 2020). |
| Miscellaneous | Ramboll, *Landfill Gas Characterization Work Plan for the Jefferson Parish Landfill* (October 2019). |
| Analytical results | Ramboll, *Landfill Gas Sampling Data Report* (Jan. 2020). |
| Miscellaneous | Rive Birch Document Production in Response to Subpoena (RIVER_BIRCH_0000001 - RIVER_BIRCH_0019728). |
| Report | *River Birch Landfill/Hwy 90, LLC Landfill, Air Monitoring Report* (Aug. 22, 2018) (HIGHWAY_90_000073). |
| Miscellaneous | River Birch, *Assessment of Jefferson Parish Landfill Gas Field* (May 2019). |
| Miscellaneous | Sara Sneath, *New Orleans is Seeing an Increase in Air Quality Alerts. Here's Why*, Nola.com, (July 12, 2019), https://www.nola.com/news/environment/article_1443d152-2b94-53ff-8631-d5f492eb1010.html. |
| Report | SCS Engineers, *Hydrogen Sulfide (H2S) Sampling in the Jefferson Parish Region (November 4 through 8, 2019)* (Apr. 13, 2020) (WC_JPLF_00203231). |
| Report | SCS Engineers, *Jefferson Parish Landfill Site Evaluation with Respect to Odors* (Oct. 24, 2018) (WC_JPLF_00082561). |

| | |
|---|---|
| Miscellaneous | SCS Engineers, *Memorandum re Surface Pollutant Concentration Measurements at the Jefferson Parish Landfill* (Apr. 23, 2021). |
| Environmental sampling | SCS Engineers, *Surface Polluatant Concentration Measurements at the Jefferson Parish Landfill - Data Report* (May 31, 2019) (WC_JPLF_00210878). |
| Environmental sampling | SCS Engineers, *Surface Pollutant Concentration Measurements at the Jefferson Parish Landfill - Supplemental Data Report* (July 10, 2019) (WC_JPLF_00210732). |
| Pleading | Sworn Affidavit of James J. Walsh, PE, Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 790-369 (24th JDC) (Jan. 15, 2019). |
| Pleading | Sworn Affidavit of Paul C. Chrostowski, PhD, QEP, Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 790-369 (24th JDC) (Dec. 19, 2018). |
| Pleading | Sworn affidavit of Thomas J. Rappolt, QEP, Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 790-369 (24th JDC) (Jan. 16, 2019). |
| Pleading | Sworn Reply Affidavit of Paul C. Chrostowski, PhD, QEP in Further Support of Plaintiffs' Motion for Expedited Discovery, Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 790-369 (24th JDC) (Dec. 22, 2019). |
| Pleading | Third Case Management Order, Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al., Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.) (July 7, 2020). |
| Miscellaneous | TRC Envrionmental Corporation, *Observation of the Collection of Landfill Samples* (Dec. 3, 2019) (APTIM-0225813 - APTIM-0225987). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – April 2020* (May 2020) (WC_JPLF_00211457). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – August 2020* (September 2020) (WC_JPLF_00337955). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – December 2020* (December 2020) (WC_JPLF_00402159). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – February 2021* (March 2021) (WC_JPLF_00402302). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – January 2021* (February 2021) (WC_JPLF_00402170). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – July 2020* (August 2020) (WC_JPLF_00337946). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – June 2020* (July 2020) (WC_JPLF_00337930). |

| | |
|---|---|
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – March 2021* (April 2021) (WC_JPLF_00402311). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – May 2020 (June 2020)* (WC_JPLF_00295793). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – November 2020* (December 2020) (WC_JPLF_00402133). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – October 2019* – February 2020 (March 2020) (WC_JPLF_00203206). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – October 2020* (November 2020) (WC_JPLF_00401896). |
| Environmental sampling | Trinity Consultants, *Summary of Meteorological Data at the Jefferson Parish Landfill Meteorological Tower – September 2020* (October 2020) (WC_JPLF_00401473). |
| Miscellaneous | World Health Organization, *Constitution* (2020), https://www.who.int/about/who-we-are/constitution#:~:text=Health%20is%20a%20state%20of,belief%2C%20economic%20or%20social%20condition. |
| Miscellaneous | World Health Organization, *Hydrogen Sulfide* (2000),https://www.euro.who.int/__data/assets/pdf_file/0019/123076/AQG2ndEd_6_6Hydrogensulfide.PDF. |