## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON ET AL.,**<br>     **Plaintiffs,**<br><br>**VERSUS**<br><br>**LOUISIANA REGIONAL LANDFILL<br>COMPANY, ET AL.,**<br>     **Defendants.**<br><br>*Applies to: Both Cases* | **CIVIL ACTION**<br><br>**NO. 19-11133 c/w 10-14512**<br><br>**SECTION: "E"(5)**<br>**JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

### BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO
### EXCLUDE EXPERT TESTIMONY ON ISSUES LITIGATED
### AND DECIDED IN THE GENERAL CAUSATION PHASE

Pursuant to §VI.2 of the Thirteenth Case Management Order, Plaintiffs submit this Brief in support of their motion to exclude expert testimony on issues litigated and decided in the General Causation Phase. As set forth herein, a large portion of the expert and fact testimony forecast by the Defendants is devoted to re-litigating the issues heard and decided at the trial on General Causation. The trial will be streamlined, and the actual issues for trial may be better presented once Defendants are precluded from re-litigation of the issues. Moreover, by presenting the jury with "alternative facts" as to what has already been found by this Court it is certain to only confuse, or mislead the jury, therefore is not helpful to the trier of fact as required by Fed. R. Evid. 704.

## I.    INTRODUCTION.

This litigation has been pending since 2018. More than four years ago, in 2019, after this case was removed to federal court, the parties to this case, along with the parties to the related class action cases, agreed to a Case Management Order. R.Doc. 109. The First CMO recited that parties agreed that resolution of the issue of "General Causation" would "help narrow the focus of the case and the issues at stake." Id. ¶2. With the consent of the Parties, the issue of General

Causation was tried to the Court in a trial that occurred on January 31, February 1-4, and February 22-25, 2022. Thereafter, the Court issued its ruling on November 29, 2022. R.Doc. 323.

In its ruling, the Court noted that, "parties often address general causation at the outset to establish whether "the drug or other product in question is capable of causing the type of injury which is being claimed by all of the plaintiffs." R.Doc. 323 at 43. In this case, after all, Defendants were treating the incapability of the odors to cause injury as a complete defense, which might have disposed of both the class action and individual cases. Defendants were so confident that they even agreed that class certification proceedings in *Ictech-Bendeck* were unnecessary unless and until the Court ruled in favor of the Plaintiffs on General Causation.

When the Court issued its ruling on General Causation, a number of factual and legal issues in this matter were decided, and in the upcoming trial of this case, these facts and issues should be presented to the jury as having been decided. Plaintiffs have prepared a proposed jury charge on this issue, a copy of which is attached as **Exhibit 1.** Under law-of-the-case- doctrine as well as under Fed.R.Evid. 704, Defendants should be precluded from presenting testimony and argument on issues that have already been adjudicated.

## II.    LAW AND ARGUMENT.

With a definition of General Causation negotiated and drafted by the Parties, the findings and conclusions of the Court at the General Causation Phase were intended to govern further proceedings in this Court. The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *United States v. Samak*, No. CR 91-189, 2019 WL 2026900, at *4 (E.D. La. May 8, 2019) (Morgan, J.) *quoting Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011). Under the "law of the case" doctrine, "an issue decided at one stage of a case is binding at later stages of the same case." *Matter of AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023). Generally, "when

a court decides" an issue, "that decision should continue to govern the same issues in subsequent stages of the same case." Id. The rule applies to issues expressly decided as well as issues decided by necessary implication. Id. Thus, the factual and legal issues that were resolved in the General Causation phase were resolved once and for all. And, more to the point of this Motion, any challenges to the qualifications of the expert and their methodologies had to be brought before the trial on General Causation. Given that Plaintiffs were required to establish an emission rate as part of their proof on General Causations, challenges to the expert qualifications and proof that went into the calculation of the emission rate had to be made during the General Causation phase, not now, after the fact.

Despite their agreement that the decision on General Causation would help narrow the focus of the case and the issues at stake (i.e., their agreement that some factual and legal issues would be decided), Defendants now seek to re-litigate the issues that were heard and decided. The reports of several of the defense expert witnesses directly challenge the Court's findings, and Defendants seek to have them testify to the jury that the Court was incorrect. None of this testimony should be permitted.

These same experts seek to revive their prior criticism of Plaintiffs' experts. The recent reports of Dr. Bishow and Matt Stutz seek to revive challenges to the expert testimony of Dr. Jaana Pietari and Jose Sananes. The reports of Dr. John Kind and Pamela Dalton seek to revive challenges to the expert testimony of Dr. Susan Schiffman. However, those challenges have been heard and decided, and no such challenges should be permitted.

**A.** **The defense experts should not be permitted to testify to facts and conclusions that contradict the Court's ruling on General Causation.**

The defense experts should not be permitted to testify to facts and conclusions that contradict the Court's ruling on General Causation. Not only is such testimony prejudicial to the

case because it undermines the ruling on General Causation, it also creates bases for confusion of the issues. Set out below are some, but by no means all, of the instances in which defense experts have sought to re-litigate the issues that have been heard and decided in this case.

1.    **The Court's finding that an average of 5 ppb of hydrogen sulfide over 30 minutes is capable of causing injuries claimed by the Plaintiffs.**

In the ruling on General Causation (R.Doc. 323) the Court made specific factual findings that "[e]xposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is capable of causing [headaches (p. 35), nausea (p. 36), vomiting (p. 37), loss of appetite (p. 38), sleep disruption (id.), dizziness (id.), fatigue (p. 39), anxiety and worry (id.), and a decrease in quality of life, including a loss of used and enjoyment of property (p. 40)] in the general population."[1]

On December 13, 2022, Defendants moved to certify the order for interlocutory appeal, seeking a ruling from the Fifth Circuit on "Whether exposure to an average of 5 ppb of hydrogen sulfide for thirty minutes is an appropriate threshold for establishing general causation for Plaintiffs' claims arising under Louisiana's laws governing nuisance and negligence. R.Doc. 324. The Court denied this motion by order dated February 2, 2023. R.Doc. 339.[2]

---

[1] The Court concluded that, "the Plaintiffs have proven by a preponderance of the evidence that odors and gases emitted by the Jefferson Parish Landfill during the relevant time period were capable of causing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment or use of property in the general population." Rather than to honor their agreement that the decision would help to narrow the focus of the case and the issues at stake, Defendants set out to do everything they could to overturn it.

[2] Meanwhile, Defendants complained loudly that their rights were being violated and they demanded that no actual trial on the merits occur in either case until after class certification was decided in Ictech-Bendeck. See R.Doc. 330-2 (Memorandum in Support of Motion to Adopt Defendants' Proposed Case Management Order). When this Court the set a trial date for the first set of Addison Plaintiffs before class certification, Defendants sought a writ of mandamus from the Fifth Circuit, representing to the Fifth Circuit that their position was supported by decisions of the United States Supreme Court and Circuit Courts. In fact, there was no support for their position in any Supreme Court or Circuit Court opinion.

Defendants now seek to relitigate General Causation through the guise of expert testimony. In his summary of his opinion, Waste Connections expert John Kind opines that:

> 2. There is insufficient scientific basis for the trial Plaintiffs' claims that airborne exposure to 5 ppb hydrogen sulfide for 30 minutes is capable of causing their claimed nuisance health effects.

**Exhibit 2 Kind Report at 9.** Building on Dr. Kind's opinion, defense expert Dr. Brobson Lutz asserts that "Dr. Kind has concluded that exposure to H2S at an average of 5 ppb for 30 minutes 'is well below levels at which health effects such as those alleged by the plaintiffs would occur.' This conclusion is supported by my own medical research and analysis." **Exhibit 3 Lutz Report at 4.** Defense expert Paolo Zannetti states, "In my opinion, a more suitable reference level than the 5 ppb selected by [the Court] is the H2S air quality standard of the State of California. … The current California Ambient Air Quality Standard (CAAQS) for H2S is 0.03 ppm (30 ppb, 42 ug/m3) for one hour." **Exhibit 4 Zannetti Report at 78** (footnotes omitted). In his Report and Amended Report, at Section 10.2, Dr. Zannetti purports to explain how "odor science" requires recognition that "odors are considered unpleasant/offensive only when a concentration of five to ten times the odor threshold is exceeded." **Id. at p. 79**.[3] In other words, the Court was just wrong when it concluded that, in the ambient air, "exposure over a thirty-minute period of at least 5 ppb" is "capable of causing a reaction in those exposed."

This attempt at relitigating this topic continues in Dr. Dalton's report. There, she disputes the Court's findings numerous times in almost every separate opinion contained therein. By way of example, Dalton opines:

---

[3] Because the odor detection threshold is 0.5 ppb, the 5 ppb nuisance threshold adopted by the Court is ten times the detection threshold. At his deposition, Dr. Zannetti conceded that the 5p ppb over 30 minutes "it is in the range of value that you find in the literature for odor threshold." **Exhibit 7,** Zannetti Dep. at 49, l. 1-10; p. 52, l. 5-16; p. 62, l. 1-20; p. 70, l. 2-16.

While hydrogen sulfide at a concentration of 5 ppb may be detectable and deemed unpleasant by some individuals, it is an extremely conservative estimate of detectability for the general population in real-world conditions." **Exhibit 5 at 8.** "It is my opinion to a reasonable degree of scientific certainty that the Trial Plaintiffs' exposure at an average of 5ppb of hydrogen sulfide for 30 minutes was not always a nuisance or likely ever a nuisance to them." **Id at 6**.

The Bruvold study, which was cited by Dr. Schiffman and the Court for its decision that 5 ppb is capable of causing a nuisance, claimed that exposure to hydrogen sulfide levels from 0.6-5.7 ppb led to interference with daily living along with health concerns. However, in my opinion the Bruvold study does not establish that such a level is likely to cause injuries in the general population…" **Id at 5**.

Thus, she too challenges the Court's finding.[4]

These opinions contradict the issues that have been heard and decided and should not be presented to the jury.

> 2.     **The Court's findings that hydrogen sulfide is heavier than air and accumulates in enclosed and low-lying areas within the home, and can get into air conditioning systems, extending the duration of the exposure. R.Doc 323 at 34.**

On page 34 of the Findings and Conclusions, the Court stated:

The odor from the Landfill also lingered due to hydrogen sulfide's ability to accumulate in homes. Dr. Schiffman's studies, in which she "put monitors outside and inside homes of somebody who is doing a lot of complaining" about odors, showed that the "hydrogen sulfide levels went up inside the home" to detectable levels. She explained in her report that hydrogen sulfide is "heavier than air and accumulates in enclosed and low-lying areas within the home." Hydrogen sulfide can also get into air conditioning systems, extending the duration of the exposure.

R.Doc. 323 at 34 (footnotes omitted).

In his Amended Report, Dr. Zannetti disputes Dr. Schiffman's statement (and the Court's finding) that "$H_2S$ lingers in the air for up to 18 hours and accumulates and concentrates in

---

[4] Dr. Dalton seeks to finesse her way around the Court's findings by explaining "the literature shows, and it is my opinion that the likelihood of it causing injury is exceedingly low, particularly for all 13 Trial Plaintiffs given that there is no evidence that they can detect hydrogen sulfide at this low concentration (or at any specific concentration)." Report at 4,

enclosed and low-lying areas within the home (OSHA, 2020)" on the grounds that "there are no data or simulations available from either party to predict indoor concentrations of H2S and there were no actual measurements of indoor concentrations of H2S, but indoor concentrations are generally significantly lower than outdoor values." **Exhibit 4 at 93.** He also declares: "As an expert in atmospheric dispersion, I assert that this statement by Schiffman is not supported by any reputable scientific literature," **Id at 94.** This statement of course directly contradicts the Court's finding and denigrates OSHA, the Virginia Department of Health and other sources including 2006 ATSDR, as cited by Dr. Schiffman. He argues with the Court's determination (and Dr. Schiffman's opinion) by proffering an EPA diagram which, he says, shows "a typical behavior of outdoor concentrations (red line) versus indoor concentrations (blue dotted line)." **Id.** In fact, the diagram shows that, at a particular point downwind 1.46 miles from the emission source (not dissimilar to some of the Trial Plaintiffs), the indoor air concentrations exceed the outdoor concentrations after about 35 minutes. Thus, Dr. Zannetti's diagram reinforces the Court's Finding of Fact, rather than disputing it.

As a result, defense experts should be precluded from offering any opinion, and Defendants' counsel should be precluded from arguing, contrary to the Court's finding that hydrogen sulfide is heavier than air and accumulates in enclosed and low-lying areas within the home and can get into air conditioning systems, extending the duration of the exposure.

### 3.     The Court's decision that an exposure to H2S at an average of 5 ppb over 30-minutes can cause sleep disturbance.

On page 38 of its opinion, the Court ruled that "Exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is capable of causing sleep disruption in the general population." R.Doc. 323 at 38.

Dr. Dalton directly attacks the Court's finding. In her Report, she states, "[S]cientific literature shows, and it is my opinion, that exposure to odors does not cause sleep disturbances." Exhibit 6 at 10. She further explains: "Although numerous studies confirm that auditory, somatosensory and visual stimuli can perturb sleep by inducing arousal, disrupting sleep length and sleep stages, *the same is not true for olfaction*." **Id.** (Emphasis added). And, she continues, "Thus, it is my opinion that the reports by Trial Plaintiffs of sleep disturbances cannot be causally attributed to exposure to hydrogen sulfide, because such causal relationship is inconsistent with and directly contradicted by the scientific literature." **Id at 10-11.**

4.  **The Court's finding that the perception of the H2S odor would get stronger with time and repeated exposure.**

On page 33 of the Court's Findings of Fact, the Court found that

'[T]he intensity of [an odor] is going to be related to how many times you've been exposed' because if people are 'exposed over and over and over again . . . their receptors are being sensitized, not only peripherally, but centrally.' The odor is 'going to get stronger and stronger with time.' It is true smelling an odor on a regular basis may cause people to 'lose their sensitivity to it.' However, due to the pressurized bursts characteristic of landfill emissions, the odor emitted from a landfill is intermittent and unpredictable. This is a 'stressor' that 'increase[s] the poignancy of that stimulus.' **R.Doc. 323 at 33.**

Dr. Schiffman explanation that the intermittent nature of odors relates to issues of sensitivity was incorporated into the Court's opinion:

'[e]ach time you're able to detect it at a lower level." Dr. Dalton later agreed, admitting that 'when you give someone an odor-threshold test over and over, they get better able to do it, and that also can decrease their threshold' for detecting the odor, resulting in their being 'better able to recognize the quality of that odor from the background of other odors.' **Id at 33-34.**

Dr. Dalton wants to relitigate this finding as well. In Opinion 2 of her report, she opines that the Trial Plaintiffs' descriptions of their odor experiences are inconsistent with what is known about human chemosensory function," arguing that some of the Trial Plaintiffs' reports of "strong

and persistent [odors] over several days, often 24/7" would have led to "very rapid desensitization of the Trial Plaintiffs during the modeled 'odor events,' not continuous odor impact as they reported." In stating this, she ignores her own contrary trial testimony which was adopted and cited by the Court in its opinion. **Id at 34.**)

Regardless, this issue was extensively litigated in the general causation phase and should not be a subject for further evidence, argument of counsel, or findings by the trier of fact.

> **5.    The finding that trigeminally stimulated symptoms, such as headaches, can be caused by exposure to hydrogen sulfide, whether alone or in a mixture with VOCs, (volatile organic compounds), and that the 33 VOCs found in the air samples in this case, combined with hydrogen sulfide, are additive or sub-additive, enhancing the intensity of the odor R.Doc. 323 at 29 and 34.**

The Court made specific findings regarding the mechanism by which odors activate both the olfactory and trigeminal nerves. The Court found that reaction to the odor "leads to symptoms caused by the odor itself, the interaction between the olfactory nerve and the trigeminal nerve." **R.Doc. 323 at 35**. The Court made a finding that the effect of hydrogen sulfide on the trigeminal nerve in conjunction with symptoms like headaches and nausea. **Id at 35-37.** Specifically, the Court found:

> When the olfactory nerve is stimulated, it provides the rotten egg quality to the odor. When the trigeminal nerve is stimulated, which can occur from exposure to hydrogen sulfide, the nerve releases compounds called CGRP and substance P. These compounds cause the blood vessels to dilate, resulting in a release of inflammatory mediators, resulting in a neuro-inflammatory response that causes headaches, including migraines. **Id.**

This is not possible, Dr. Dalton now asserts:

> Based on the scientific literature and my experience, it is my opinion that certain symptoms complained of by the Trial Plaintiffs (such as headaches) are exceedingly unlikely to have been caused by trigeminal nerve activation by H2S emissions, whether alone or in a mixture, because the concentrations required to have a trigeminal impact from H2S are much higher than any that have been measured or

modeled…" **Exhibit 5 at 11.** (i.e., certainly not an average of 5 ppb for 30-minutes, as found by the Trial Court.)

Indeed, Dr. Dalton goes further: "In my opinion, it is *simply not credible* to conclude that H2S in the environment at 5 ppb, or even in the range of 100 ppb, in combination with other unspecified chemicals at low ppb concentrations can produce health effects that only begin to appear at 10,000 ppb for H2S alone." **Id at 12.** (Emphasis added.)[5] Of course, these "health effects" that appear at higher levels are triggered by a different mechanism than reaction to the odor. In this manner, Dr. Dalton and the other defense experts have sought to conflate reactions to the odor with reactions to the toxic effect of the chemical, which occur at different levels. The exposure levels between the odor reaction and the toxic effect of the chemical may be separated by orders of magnitude.

Further, Dr. Dalton goes even further and contradicts the Court's finding on the additive nature of other compounds present in landfill gas. On page 34 of the Findings and Conclusions, the Court stated:

> Although not necessary to the Court's opinion, the Court also finds that other compounds present in the Landfill's emissions enhanced the intensity of the bad odor. In July 2018, LDEQ collected and measured samples of volatile organic compounds during odor events in River Ridge and Waggaman. …Dr. Dalton and Dr. Kind opined that VOCs do not necessarily produce stronger odors, and in fact some individual VOC odors can be suppressed when combined with others. The Court rejects their opinions and finds more credible the results of Dr. Schiffman's experiments using a subset of the 33 VOCs detected in this case combined with hydrogen sulfide. Dr. Schiffman found this subset, when combined with hydrogen sulfide, is sub-additive or additive, enhancing the intensity of the bad odor.

---

[5] Again, Dr. Dalton ignores her own trial testimony that "headache is a type of somatic symptom associated with exposure to malodors" and that "a very strong odor over a long period of time [may] produce, you know, the experience of a headache due to stress." R.Doc. 323 (quoting Dr. Dalton  And, she ignores the LDEQ [LDOH] finding that "the presence of persistent noxious odors themselves may result in . . . headaches." (Id.).

In rejecting this, Dr. Dalton states "Furthermore, it is my opinion that Dr. Schiffman's opinion that H2S mixed with other compounds resulted in trigeminal activation is wrong because it lacks scientific and evidentiary support." **Id.** Dalton goes on to state:

> The Court did not accept the testimony of the defense experts that mixtures of chemicals are largely sub-additive . . .While the Court instead relied on the results of Dr Schiffman's assessment using a subset of the 33 VOCs detected in this case combined with hydrogen sulfide to explain the symptom complaints, *these studies . . . do not support Dr Schiffman's opinion of chemical synergy in this specific matter and Dr. Schiffman present [sic] no analysis showing that the particular chemicals at issue here were additive. My opinions on this issues and my rebuttal to Dr. Schiffman are presented in more fully in my April 30, 2021 report."* **Exhibit 5 at 11 f.n. 16**. (Emphasis added.)

In other words, Dr. Dalton admits that she is relitigating the Court's rejection of her 2021 opinion which was fully explored over the nine day trial. Thus, any expert opinions or argument of counsel on trigeminal nerve activation as well as the additive and sub-additive nature of VOCs should be excluded.[6]

> **6.**     **Dr. Dalton attempts to relitigate the Court's finding that "exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is sufficient by itself *for individuals generally* to be able to smell hydrogen sulfide and for the exposure to cause a reaction." R.Doc 323 at 31.**

The Court's above-quoted finding was specifically the answer to a question posed by the Court for the "general population." ("The question, then, is at what level of exposure are people *in the general population* able to smell hydrogen sulfide . . . and how long does it take for exposure at such a level to cause a symptom." R.Doc 323 at 31. Dr. Dalton seeks to relitigate this finding. ("In fact, based on my experience and the data reviewed specific to this case, it is my opinion that the H2S concentrations modeled by the Trial Plaintiffs' experts in this case are not likely to have

---

[6] Dr. Zannetti concedes that he does not have the expertise to give an opinion on whether other compounds in the JPLF emissions enhance the intensity of the odor.

caused injury to persons of ordinary sensibilities.") **Exhibit 5 at 16**. However, during her deposition, Dr. Dalton concedes that persons of ordinary sensibilities are members of the general population. (cite to her deposition testimony).

As a result, this portion of Dr. Dalton's Opinion 5 should be stricken and her testimony in that regard, or argument based upon it, should be prohibited.

### B. Defendants should be precluded from offering challenges to the testimony of Plaintiffs' experts that were or should have been raised in the General Causation Phase.

General Causation queried whether the odors and gases from the Landfill were capable of causing injury to the Plaintiffs. Specific Causation questions whether they did cause that injury. The issue of whether there were odors or gases emitting from the Landfill sufficient to migrate into surrounding neighborhoods and cause Plaintiffs' claimed injuries was an issue to be resolved in the General Causation Phase. Defendant now seek to show the lack of specific causation by challenging Plaintiffs' ability to prove that odors and gases were being emitted in the first instance—one of the issues litigated and decided in the General Causation Phase.

For example, at General Causation, Plaintiffs presented the testimony of Dr. Jaana Pietari, who calculated the amount of hydrogen sulfide gas generated at the Landfill from spent lime and some C & D waste deposited into the Landfill. Thus, her testimony went to prove that there were emissions from the Landfill capable of causing the injuries (general causation).   Dr. Pietari's methodology can no longer be at issue[7] because it was the foundation of the emissions data which

---

[7] Defendants offer the testimony Dr. Bishow Shaha, who purports to be a replacement for former defense expert Jeffrey Marshall, to challenges Dr. Pietari's calculations of hydrogen sulfide generation at the Landfill. None of Dr. Pietari's methodology or opinions have changed since the ruling on General Causation and Dr. Shaha's entire testimony is a critique of her methodology (which, he says, is not even appropriate for this case, an issue that was necessarily decided in General Causation)

proved Plaintiffs' claim that there were emissions from the Landfill which migrated into surrounding neighborhoods in sufficient intensity, duration and frequency to cause Plaintiffs' claimed injuries.[8]

The same is true with Plaintiffs' expert Jose Sananes, who, based on Dr. Pietari's work, calculated the total emission rate for hydrogen sulfide that was then used in the modeling. Mr. Sananes' testimony was essential for establishing general causation and, therefore, his methodology can no longer be at issue.

Nevertheless, despite the Court's ruling that the Jefferson Parish Landfill was emitting odors sufficient to cause Plaintiffs' claimed injuries, Defendants are contending that there was no specific causation, in part, because, they say, the testimony of Plaintiffs experts is not sufficient to prove that there were in fact any odors of sufficient intensity, duration and frequency actually to cause any injuries.

To re-assert the prior challenges to Mr. Sananes, Defendants offer Mr. Matt Stutz, who asserts in his report that Plaintiffs estimate of emissions was flawed because (a) "this method of determining a [radius of influence] for use in estimating actual emissions is not supported by the industry or regulatory agencies and is not realistic." **Exhibit 6, Stutz Report** at 37 (Opinion 4A); and (b) Plaintiffs' experts reliance on the wet nature of the landfill "leads to an invalid and unrepresentative emission estimate for the site." Id, at 38 (Opinion 4B). These very arguments

---

[8] Notably, Defendants' evidence concerning emissions rate at General Causation was presented by Dr. Tarek Abichou. His emissions estimate was at least 10,000 times less than the emissions rate calculated by Dr. Pietari and Mr. Sananes, and used by Mr. Lape. Consistent with Defendants' position in General Causation that there were no emissions from the Landfill, Dr. Abichou's emissions rate would not have produced any H2S concentration at an average of 5 ppb over 30-minutes anywhere outside of the landfill itself. As a result, when the Court decided General Causation, it necessarily rejected Dr. Abichou's calculations. Then, there being no emissions rate calculation other than Dr. Pietari and Mr. Sananes, the Court must have accepted their calculations in order to reach its conclusions.

were raised before and necessarily were rejected because, had they been meritorious, the Court would have rejected the opinions of the Plaintiff's experts and could not have come to the conclusions that it did.

## III.   CONCLUSION.

Defendants' efforts to relitigate issues decided in the General Causation phase must be rejected, and the defense experts and attorneys must be precluded from offering testimony and argument on these issues. Such efforts will not assist the trier of fact, and instead will only confuse or mislead the jury. As such, they are not proper and should be excluded.

Respectfully submitted, this 6th day June, 2024.

       /s. Eliza James
     FORREST CRESSY & JAMES, LLC
     Byron M. Forrest (La. Bar No. 35480)
     Nicholas V. Cressy (La. Bar No. 35725)
     S. Eliza James (La. Bar No. 35182)
     1222 Annunciation Street
     New Orleans, Louisiana 70130
     Tele:(504) 605.0777
     Fax: (504) 322.3884
     Email: byron@fcjlaw.com
     nicholas@fdjlaw.com
     eliza@fcjlaw.com

       /s/ Eric C. Rowe
     C. Allen Foster (Admitted Pro Hac Vice)
     Eric C. Rowe (Admitted Pro Hac Vice)
     Masten Childers, III (Admitted Pro Hac Vice)
     Harry S. Johnson, (Admitted Pro Hac Vice)
     James R. Jeffcoat (Admitted Pro Hac Vice)
     WHITEFORD, TAYLOR & PRESTON, L.L.P.
     1800 M Street, NW, Suite 450N
     Washington, DC 20036
     Tele: (202) 659.6800
     Fax: (202) 331.0573
     Email: cafoster@whiteforlaw.com
     erowe@whitefordlaw.com

14

mchilders@whitefordlaw.com
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

*Counsel For Addison Plaintiffs*