# REQUESTED CHARGE CONCERNING FACTS FOUND IN GENERAL CAUSATION PHASE

There have been prior proceedings in this case.  You may hear them referred to as the General Causation phase, just as you may hear this phase of the case referred to as the Specific Causation phase.

In the General Causation phase, certain facts were determined to be true and can no longer be disputed by the parties.  I am going to give you an overview of those facts but this overview will not include all of the facts determined to be true in the General Causation phase, so you may hear of those additional facts as the case progresses.  But, now, I charge you that the following facts have been determined to be true and are no longer in dispute:

This case concerns the operation of the Jefferson Parish Landfill – which you will hear referred to as the Landfill or JPLF – and the resulting odors which were emitted from the Landfill (p. 5), which the Plaintiffs contend caused them damage during the period from July 1, 2017 through December 31, 2019, which you will hear referred to as "the Relevant Period." (p. 1)

The Jefferson Parish Landfill is an active municipal solid waste landfill owned by Jefferson Parish and located at 5800 Hy 90 West, Avondale, LA, on the west bank of the Mississippi River in Jefferson Parish. (pp. 2, 5).  The Jefferson Parish landfill abuts the River Birch landfill on the east, the Hy 90 construction and demolition landfill on the west and undeveloped land on the south. (p. 5) [use slide showing the location of all three landfills]

Jefferson Parish contracts with others for the operation of its landfill (p. 2), in particular with Louisiana Regional Landfill Company, which operated the landfill from 2013 to June, 2016.  You will hear Louisiana Regional Landfill Company referred to as IESI.  IESI was owned by Progressive Waste Systems, Inc., until June, 2016 when Waste Connections Bayou, Inc. acquired Progressive Waste and, thereby, Waste Connections acquired the contract to operate the landfill.  Waste Connections was succeeded as operator of the landfill by River Birch in May, 2019.  In addition, from July, 2017 through May, 2019, another contractor, Aptim, Inc. had a contract from Jefferson Parish to operate and maintain the gas collection system at the Landfill. (p. 2)

The Landfill consists of several phases.  Phase IV-A was the active phase of the Landfill during the relevant time period.  It began accepting waste in May, 2013. (p. 5)  Phase I through III-B were full and had been closed. (p. 5 and f.n. 18)

The Landfill accepts residential waste from households within Jefferson Parish and commercial waste from businesses within Jefferson Parish – both of these waste types are

called municipal solid waste – as well as some industrial waste which the Landfill was allowed to import from outside Jefferson Parish in limited amounts as "special waste." (p. 5)

In October, 2016, the Landfill first began accepting "spent lime" as a special waste. Spent lime is an industrial byproduct created when an industry uses lime-based compounds to reduce the amount of sulfur dioxide in air emissions. (p. 5)  All spent lime contains sulfates which may generate hydrogen sulfide (known by its chemical symbol as H2S) when there are certain conditions present in the landfill, specifically liquid water, a source of soluble sulfate, sulfur-reducing bacteria, organic material, an anoxic environment (i.e., lacking oxygen), an appropriate pH range (between 4 and 9) and an appropriate temperature range (between 86 deg. F and 100 deg. F).  These conditions are likely present in a municipal solid waste landfill.  In particular, gypsum (known by its chemical symbols as calcium sulfate dihydrite or CaSO2) and fly ash are sources of soluble sulfate.  Spent lime contains gypsum. (p. 6)

The source of the spent lime accepted by the Landfill beginning in 2016 was Rain Carbon LLC which has plants in Norco and Chalmette.  Between October 17, 2016, and July, 2018, the Landfill accepted as special waste 23,000 tons of spent lime from Rain Carbon.  Rain Carbon reported to Landfill and Waste Connections that its spent lime contained 5-20% gypsum.  Rain Carbon later reported to the Louisiana Department of Environmental Quality – whom we'll refer to as the LDEQ - that its spent lime contained 40-50% gypsum.  The Landfill disposed of the spent lime in Phase IV-A.  At first, the Landfill disposed of the spent lime the same way it disposed of other waste – it buried it along with the municipal waste in Phase IV-A. (p. 6) However, beginning in the second half of 2017, the Landfill also began to use the spent lime as a solidification agent in its solidification pit located within Phase IV-A.  The solidification pit was a dug-out area where liquids were mixed with solidification agents so that the waste could be disposed of in Phase IV-A.  One of the liquid wastes solidified with the spent lime was sewerage sludge.  This solidification process mixed sulfate-containing spent lime with liquid. (p. 7)

Citizen odor complaints to Jefferson Parish began increasing in 2017 and continued unabated into 2018 (p. 7) and 2019. The residents' complaints reflect that the odor had the smell of hydrogen sulfide. (p. 28)  Odor complaints from Harahan and River Ridge increased between August and October, 2017, around the time the Landfill began accepting spent lime from Rain Carbon.  Jefferson Parish received so many complaints that it set up a Landfill complaint hotline for residents.  LDEQ also accepted complaints directly.  In 2017 the total number of complaints was 222.  In 2018, the total number of complaints was 2,600.  It 2019, the total number of complaints was 627. (p. 26) There were additional complaints to an Air Quality Facebook page set up by River Ridge and Harahan residents. (p. 28)

Jefferson Parish employees and landfill consultants hired by the Parish were concerned that the use of spent lime and fly ash in the solidification pit was causing elevated hydrogen sulfide emissions.  Beginning in May, 2018, Jefferson Parish retained Carlson Environmental Consultants (whom you will hear referred to as "CEC") to assess the condition and operation of the Landfill's gas collection and control system.  (p. 8) CEC made a basic inquiry into the source

of the elevated hydrogen sulfide emissions and, citing a paper by Jeff Marshall, an expert hired by the Defendants (p. 3 and f.n. 13), reported that fly ash used to solidify liquid wastes can cause odors, noting "fly ash contains soluble sulfates that when mixed with water and the right conditions can produce hydrogen sulfide.  CEC also noted that the hydrogen sulfide emissions at the Landfill were in the area where the fly ash was used. (p. 8)

After reading the preliminary findings from CEC, Richard Buller, the Landfill engineer charged with overseeing the contractors operating the Landfill, believed that the same process that CEC warned about with the fly ash was really applicable to the spent lime as well.  He was convinced that the solidification process was causing the odorous emissions.  Mr. Buller recommended closing the solidification pit, saying that "unless there is another solidification agent that does not contribute sulfate, we need to stop this."  Mike Lockwood, the director of Jefferson Parish Department of Environmental Affairs, asked for a moratorium on the acceptance of liquid industrial wastes that required solidification with fly ash or spent lime. (p. 8)  Mr. Buller forwarded the request to Waste Connections, stating: "We are of the opinion that the sulfates added to the waste through the spent lime or fly ash solidification agent is increasing the production of hydrogen sulfide within the buried waste, [and that] we are concerned with odors being generated by wastes after they are buried."  In July, 2018, the Parish Council passed a resolution approving the moratorium. (p. 9)  In its May 14-18, 2018 field inspection, CEC found abnormally high amounts of hydrogen sulfide in the gas collection wells in Phase IV-A – concentrations in excess of 2,000 ppm.  A normal measurement of hydrogen sulfide in a landfill is around 50 ppm.  Similarly, on August 31, 2018, Brian Dejean, the manager of the River Birch gas plant (p. 9) measured hydrogen sulfide in three gas wells in Phase IV-A, each of which measured 2,000 ppm, the maximum reading on Dejean's device, when 100 ppm is the expected level of hydrogen sulfide in a River Birch gas well.  In May, 2019, River Birch's Mr. DeJean took over management of the JPLF gas collection system. (p. 10)

Phase IV of the Landfill contained excessive leachate.  Leachate is a liquid that has passed through or emerged from solid waste.  Leachate may come from rain water infiltration into the waste or is generated within a landfill as waste degrades.  Each phase of the Landfill has a leachate collection system designed to remove leachate from the Landfill.  LDEQ regulations allow only one foot of leachate to be in the bottom of a landfill cell. (p. 10)

During CEC's May 14-18, 2018 inspection, only half of the leachate riser pumps on the Landfill were operational.  At the end of May, Mr. Buller found excess leachate and pumps which were not working in Phase IV-A. (p. 11)  On July 31, 2018, Mr. Dejean found four out of six leachate pumps in Phase IV-A were not working, with liquids above 15 feet.  On August 3, 2018, Mr. Dejean found 70% of the pumps in the entire Landfill's leachate system did not work and that the leachate collection system overall was flooded.  In Phase IV-A, only one pump was working properly.  Almost a year later, in the week ended June 6, 2019, four of the six pumps in phase IV-A were still not working.  The Landfill's deficiencies in collecting leachate through the use of riser pumps contributed to the generation of hydrogen sulfide.  Flooding of a landfill cell

may cause liquids to seep out onto the surface of the soil, known as a leachate breakout. (p. 11) Leachate breakouts were measured on May 31, 2018, and, on June 22, 2018, the LDEQ issued a Compliance Order to Jefferson Parish based on violations related to the Landfill's leachate collection system, based on inspections in April, 2018.   On September 18, 2018, the LDEQ issued another Compliance Order related to violations by the leachate collection system, based on inspections in July and August, 2018.  On, March 11, 2019, the LDEQ issued another Compliance Order related to leachate collection system violations,  based on inspections in October and November, 2018. (p. 12)

Landfills typically seek to control gas and odors through a gas collection system.  A typical gas collection system consists of (i) vertical wells drilled into the waste to extract gas, (ii) lateral piping and headers to convey the collected gas, (iii) blowers that exert vacuum throughout the system, (iv) a flare to destroy collected gas or a landfill-gas-to-energy system to beneficially reuse the gas, or both.  The vertical wells have perforations and there is a vacuum system to suck the gas through the perforations into the gas collection system. (p. 13)

Phase IV-A had no gas collection system in 2016 or 2017.  Installation of gas collection wells in Phase IV-A did not begin until 2018.  Between January and May, 2018, 15 gas wells were drilled in Phase IV-A.  Seven additional wells were added in January, 2019 and these additional wells were operational by February 1, 2019. (p. 13)

Even though a gas collection system finally was being installed in Phase IV-A in 2018, problems at the Landfill greatly impeded its efficiency throughout 2018 and 2019.  By May, 2018, the Landfill collected approximately 37.5% of the gas generated at that time.  On September 18, 2018, LDEQ issued a Compliance Order due to violations related to the gas collection and control systems, based on inspections in July and August, 2018.  Again, on March 11, 2019, LDEQ issued another Compliance Order due to violations related to the gas collection system, based on inspections in October and November, 2018.

CEC found that leachate within the waste mass was the primary issue impeding efficient gas collection.  Leachate covering perforations in the gas collection wells severely restricted the recovery of landfill gas.  During its May 14-18, 2018 inspection, CEC found that 95 of the total 225 gas collection wells on the Landfill had more than 50% of their perforations covered by leachate.  Of these, 45 had over 100% of their perforations covered by leachate.  (p. 14)

CEC concluded that there were elevated levels of hydrogen sulfide gas in the air surrounding Phase IV-A of the Landfill; that subsurface liquids were contributing to the gas emissions and surface odors; that the hydrogen sulfide may be from the lime and fly ash solidification process, but it may also be from a specific waste stream, sewage sludge, or other process; that the Landfill was generating significant quantities of hydrogen sulfide which may contribute to odor problems; and that the Parish should make repairs and upgrades to the gas collection system.  The levels of leachate in the gas wells reduced the gas collection system's ability to collect gas by 20-50%. (p. 15)

There were also issues with the vacuum in the Phase IV-A gas collection system.  A typical vertical well should have a vacuum capability of negative 30 inches of water column. (p. 16)  That is the pressure exerted by a column of water 30" tall.  On July 31, 2018, Mr. Dejean noted the lack of vacuum in the gas collection system of Phase IV-A.  In March and April, 2019, Mr. Dejean found all of the gas collection wells had less than negative 5 inches of water column.  In addition, 11 wells in Phase IV-A had positive pressure due to a lack of vacuum; that is, the wells were pushing the gas out, rather than sucking it in.  About a year later, on June 6, 2019, 12 of the 25 gas wells in Phase IV-A still had zero or positive pressure.  The vacuum issue originally documented in Phase IV-A in August, 2018, persisted through at least June, 2019.

The landfill also had issues with its cover.  There are three types of cover: daily cover is a six-inch layer of soil or other materials applied at the end of each working day; interim cover is a 12-inch layer of soil applied after 30 days if no waste has been added (p. 16); final cover is applied when the landfill cell reaches final design grade.  Cover is used, in part, to suppress odors and emissions.  Over time, cover may crack, allowing gases and liquids to seep upward and escape.  On June 22, 2018, November 19, 2018 and March 11, 2019, the LDEQ issued Compliance Orders for violations related to insufficient daily cover, based on inspections in April, October and November, 2018. (p. 17)

There were numerous measurements of hydrogen sulfide levels at the Landfill.  In its May, 2018, inspection, CED found H2S emissions up to 50 ppm in the air around some soil cracks, well pipe penetrations, and survey risers in Phase IV-A.  There was hydrogen sulfide in the air above Phases III-B and IV-A up to 0.2 ppm.  Fifty ppm equals 50,000 parts per billion and 0.2 ppm equals 200 ppb.  In June, 2018, Mr. Buller measured hydrogen sulfide up to 50 ppm (50,000 ppb) close to the surface or near the opening he was measuring.  50 ppm is the upper detection limit on the meter he was using, so the actual level likely was higher.  On July 3, 2018, Mr. Buller recorded that he measured higher than expected (p. 18) hydrogen sulfide concentrations down-wind of the working face and seeping from the interim cover in Phase IV-A.  On July 15, 2018, Mr. Buller emailed that gas was escaping from a leachate riser in Phase IV-A and that he could smell it 50 ft. away.  On August 3, 2019, Mr. Dejean witnessed gas pouring out of the ground in Phase IV-A.  As a result, CEC and Mr. Dejean instituted a hydrogen sulfide safety plan which required workers to wear a personal protective meter that would sound an alarm when H2S was detected at 5 ppm, that is, 5000 ppb.  The alarms did go off, including during CEC's field assessment in April, 2019.  On that occasion, CEC measured hydrogen sulfide between 45 and 60 ppm at the ground level in all tested cracks in phase IV-A.  That's between 45,000 and 60,000 ppb.

Jefferson Parish has acknowledged that the Landfill experienced increased hydrogen sulfide generation and emissions during the relevant time period.  On December 18, 2019, the Parish submitted the Landfill's Operating Permit Renewal and Modification Application to LDEQ.  In the application, the Parish explained that it has become aware that elevated levels of hydrogen sulfide (H2S) were present in the site's landfill gas, and recalculation of its emissions

estimates with new hydrogen sulfide concentration data results in a substantial increase in potential fugitive H2S emissions rate.  As a result, (p. 26) the Parish applied for approval of an increase in hydrogen sulfide emissions from the Landfill from 0.78 tons to 165.63 tons per year. (p. 26)

Thus, there is no doubt that there were hydrogen sulfide emissions at the Jefferson Parish Landfill during the relevant time period.  Furthermore, emissions at the Landfill were not limited to hydrogen sulfide.  In March and April, 2019, methane emissions in Phase IV-A, measured by surface emission monitoring, exceeded LDEQ's 500 ppm maximum in 31 locations, 17 of which were over 1,000 ppm and one of which was over 10,000 ppm.  Again, in May, 2019, CEC measured methane levels in 11 locations that exceeded LDEQ's limit. (p. 20)

It is also clear that emissions from the Landfill migrated off the Jefferson Parish Landfill and into surrounding areas.  Throughout 2018 and 2019, LDEQ stationed its Mobile Air Monitoring Lab (MAML) in Jefferson Parish.  The MAML can measure and analyze ambient air, wind speed and direction, temperature, barometric pressure (p. 21) and relative humidity.  On multiple occasions during the periods between April 27-May 2, 2018;  July 20-25, 2018; and July 25-28, 2018, the MAML measured odor events when the wind was coming from the direction of the three landfills.  During the odor event on April 28 and 29, 2018, LDEQ first took a grab sample in River Ridge on the east bank, then drove to Westwego on the West Bank and took a grab sample downwind from the landfills, and finally drove back to the location in River Ridge for a final grab sample.  The LDEQ staff reported the odor in Westwego smelled the same as the odor in River Ridge.  Analysis of the grab samples revealed similar results and all samples contained over 100 ppb of hydrogen sulfide. LDEQ concluded that conditions at the Landfill would certainly explain some of the horrendous odors experienced by residents, but LDEQ did not rule out that the other landfills and other nearby industrial facilities could be contributing factors. (p. 21-24)

Dr. Susan Schiffman, one of the Plaintiffs' experts, opined in her Report and at the General Causation trial that the odors complained of by the residents came from the Jefferson Parish Landfill.  Lab analysis of the MAML air samples from River Ridge and Waggaman in July, 2018, compared to air samples taken from the Jefferson Parish Landfill in November, 2019, showed that of the 41 compounds collected from the air at the Jefferson Parish Landfill, 33 were found in the air collected in River Ridge and Waggaman.  Dr. Schiffman opined that there was a unique chemical signature of what's coming off the landfill and the probability that 33 of the compounds coming from the Landfill came into the community from another source is extremely low.  (p. 25)

In June, 2019, River Birch and CEC submitted a plan to Jefferson Parish for addressing these issues.  Jefferson Parish endorsed the plan and funded the improvements to Phases III-B and IV-A.  The plan called for essentially rebuilding Phase IV-A, (p. 17) including upsizing the main pipe in the leachate collection system from 4" to 10", fixing the vacuum issue and

removing the liquid from the gas collection wells.  Work did not actually begin until October, 2019 and was not complete until approximately May, 2020. (p. 18)

In addition, it has been determined that the odors and emissions from the Landfill were capable of producing the injuries claimed by the Plaintiffs.  (p. 27)  Exposure to malodors, including hydrogen sulfide, is capable of causing a psychological response in those exposed, through the interaction between the olfactory nerve and the trigeminal nerve..  If it's an unpleasant odor, biologically people are programmed to avoid it and, when that is not possible, it produces anxiety and stress. (p. 29, 30, 39-40)  In its January 14, 2019 report about the odors at issue in this case,  LDEQ determined that "Landfill odors are noticeable at low concentrations below the levels that cause toxic effects from the chemical.  For example, hydrogen sulfide is smelled at air concentrations of 0.5 to 10 ppb, but the first objective signs of eye irritation are experienced at 10,038 ppb, a thousand times higher.  The presence of persistent noxious odors themselves may result in discomfort, nausea and headache." (p. 30) The intermittent and unpredictable nature of the JPLF's odor also factors into residents' ability to smell it.  This is a "stressor" that increases the poignancy of the stimulus. (p. 33)  The odor from the Landfill also lingered due to hydrogen sulfide's ability to accumulate in homes.  Hydrogen sulfide can also get into air conditioning systems, extending the duration of the exposure.  And, other compounds present in the JPLF's emissions enhanced the intensity of the bad odor. (p. 34)  Combinations of volatile organic compounds, even when individually below odor detection thresholds, can have an additive, sub-additive or synergistic effect to enhance the bad odor. (p. 35)

Thus, the General Causation phase determined that "the exposure at which people generally are able to smell hydrogen sulfide and which is capable, by itself, of causing a reaction in those exposed is an average exposure over a thirty-minute period of at least 5 ppb." (p. 31, 33)  Such a level of exposure is always a nuisance to the individuals exposed. (p. 31)  It was also determined that the reaction from that level of exposure is capable of causing the individual injuries claimed by the Plaintiffs, including headaches (p. 35), nausea (p. 36), vomiting (p. 37), loss of appetite, sleep disruption, dizziness (p. 38), fatigue, anxiety and worry (p. 39), and decrease in the quality of life, including the loss of use and enjoyment of property (p. 40).

During the relevant period, Jefferson Parish and the LDEQ received thousands of odor complaints, plus the hundreds of malodor descriptions on the Waggaman River Ridge Odor Facebook page. (p. 7, 28, 26).  The Defendants' expert, Dr. Dalton, testified that "she found no reason to doubt that the symptoms reported by residents were real," and she found the reports to be credible. (p. 30)

In conclusion, the foregoing facts have been determined and are no longer in dispute. The issues in this phase of the case are whether exposure to a substance caused an injury to the particular trial plaintiffs who will appear before you (p. 43) and, if so, what are their damages, if any.