

**Expert Report of Pamela Dalton, PhD, MPH**
**March 8, 2024**

*Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.*,
Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.)

**Pamela Dalton, Member**
**Monell Chemical Senses Center**
**3500 Market Street**
**Philadelphia, PA 19104 USA**

**Executive Summary**

I have been engaged by counsel for Defendants Louisiana Regional Landfill Company ("LRLC"), Waste Connections US, Inc., and Waste Connections Bayou, Inc. (collectively "Waste Connections") to review and assess the evidence in this case that pertains to the frequency, intensity, and duration of odors alleged to be emanating from the Jefferson Parish Landfill ("JPLF"), the concentration of hydrogen sulfide ("H$_2$S") likely to cause nuisance and symptom reports, and the alleged injuries of 13 Plaintiffs whose claims are to be tried in August 2024 ("Trial Plaintiffs"). I have also been asked to review the reports prepared by Dr. Susan Schiffman, dated January 28, 2024, Dr. Robert DeLorenzo, dated February 5, 2024, and Dr. Michael Spodak, submitted on behalf of Plaintiffs in *Addison v. Louisiana Regional Landfill Company*.[1]

The JPLF is a municipal solid waste landfill located in Avondale, Louisiana.[2] Two other landfills are adjacent to the JPLF—a municipal solid waste landfill to the northwest (River Birch Landfill) and a construction and demolition debris ("C&D") landfill to the southeast (Hwy 90 C&D Landfill). In addition to the three landfills, the Jefferson Parish area includes a chemical manufacturing complex, petrochemical storage facilities, barge loading and cleaning operations, several wastewater treatment plants, and other industrial facilities and operations.

It is my understanding that this litigation involves allegations that the JPLF emitted offsite nuisance odors. Despite the numerous sources of odors throughout Jefferson Parish, the Trial Plaintiffs and their experts, Dr. Schiffman, Dr. Spodak, and Dr. DeLorenzo, claim that the JPLF was the source of odors and emissions that interfered with the use and enjoyment of their homes and caused a variety of health conditions, including headaches, nausea, and vomiting, between July 1, 2017, and December 31, 2019 (the "relevant time period").

This report describes my qualifications, the materials I considered, and my statement and opinions on the injuries alleged by the Trial Plaintiffs, including regarding the concentration of H$_2$S modeled by the Trial Plaintiffs' expert James Lape and the likelihood that those concentrations resulted in the injuries complained by the 13 Trial Plaintiffs. Overall, it is my opinion to a reasonable degree of scientific certainty that the Trial Plaintiffs' nuisance injuries and health conditions were not likely caused by exposure to emissions from the JPLF. Further, although landfills have the potential to emit odors considered unpleasant or annoying, the opinions provided by Dr. Schiffman that emissions from the JPLF are the primary source of injuries reported by the Trial Plaintiffs, and the opinion of Dr. Schiffman that the Trial Plaintiffs' experience has resulted in psychological effects from learned odor aversions (and Dr. Spodak and Dr. DeLorenzo, to the extent they opine on learned odor aversions), are not scientifically valid, are unreliable, and are not supported by the evidence.

---

[1] *Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.*, Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.).

[2] The expert reports of Dr. John Kind, Dr. Paolo Zannetti, and Michael Corn provide additional information about the lawsuit, the JPLF, and the alternative odor sources throughout Jefferson Parish.

This report supplements my April 30, 2021 report issued in the *Ictech-Bendeck* and *Addison* actions. I reserve the right to supplement or amend my opinions if additional information becomes available.

## Qualifications

I am employed as a senior research scientist and Principal Investigator at the Monell Chemical Senses Center ("Monell Center") in Philadelphia, Pennsylvania, a private, non-profit, research institute devoted to the study of the chemical senses—smell, taste, and chemical irritation. At the Monell Center, since 1996, I have led a research laboratory focused on the human perception of odor, irritation, and acute symptoms from odorous chemical exposures, especially as this perception is influenced by psychological factors. For many years, I have conducted and analyzed studies involving odor monitoring by panelists to document odors from sources such as wastewater treatment plants (Camden, NJ), agricultural operations (Missouri and North Carolina hog farms), and landfills (Bridgeton LF- St. Louis, MO, Congress LF-Chicago, IL., Sunshine Canyon LF, Los Angeles, CA).  I also regularly conduct human panel studies to measure detection and recognition thresholds for the sulfur compounds used as warning agents in natural gas and have 30 years of experience in determining detection, recognition and chemesthetic (irritation) thresholds for a wide variety of odorous chemicals. My research is funded by the National Institutes of Health, the Department of Defense, foundations such as the Bill and Melinda Gates Foundation, and various industrial sponsors of the Monell Center, and is conducted both in the laboratory and in the field. I have served as a consultant to numerous government committees, regulatory agencies, and industry trade associations.

My doctoral-level training was in cognitive psychology and perception and my research focused on the accuracy of and influences on human memory. I also have a Master's Degree in Public Health.

My curriculum vitae is attached to this report. My hourly rate is $550.00 per hour for work performed at the Monell Center (e.g., review of records) and $650.00 per hour plus expenses for testimony (including testifying remotely by web conference) or work requiring travel. My compensation is not dependent on the outcome of this case.

## Documents and Literature Reviewed

In preparation for this report and to inform my opinions, I have considered the discovery responses of the Trial Plaintiffs, odor complaints made by residents to the JPLF odor complaint hotline and Louisiana Department of Environmental Quality ("LDEQ"), "smell reports" collected through the Harahan/River Ridge Air Quality Facebook group, a Louisiana Department of Health ("LDH") report concerning odors and air monitoring by LDEQ in Jefferson Parish, Mobile Air Monitoring Lab reports by LDEQ, news articles and social media posts about odors in Jefferson Parish, declarations of Jefferson Parish residents about odors, and Plaintiff Fact Sheets and depositions describing the symptoms and odors alleged by Plaintiffs. I have also considered the report of the Trial Plaintiffs' experts Mr. Lape, Dr. Schiffman, Dr. Spodak, and Dr. DeLorenzo, and the reports of Waste Connections' experts Dr. Kind, Mr. Corn, and Dr. Zanetti. In the

appendix, I further list the documents and scientific literature I considered to form the basis of my opinions.

**Opinion 1: Exposure to 5 ppb of hydrogen sulfide is not always a nuisance to those exposed and is unlikely to have caused nuisance injuries or health conditions to the Trial Plaintiffs.**

Plaintiffs' expert Dr. Schiffman testified during the General Causation phase (and has again stated in her January 28, 2024 report) that 5 ppb of hydrogen sulfide represented the concentration of hydrogen sulfide that would be considered a common nuisance odor, leading to complaints and symptoms. She based the concentration of 5 ppb on a guideline published by the World Health Organization ("WHO") Regional Office for Europe (WHO, 2020). Following the General Causation trial, the Court found that "exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction." Although the Court determined that 5 ppb of $H_2S$ is *capable* of causing certain injuries—specifically headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and a loss of enjoyment and use of property—the literature shows, and it is my opinion, that the *likelihood* of it causing injury is exceedingly low, particularly for all 13 Trial Plaintiffs given that there is no evidence that they can detect hydrogen sulfide at this low concentration (or at any specific concentration).

While hydrogen sulfide at a concentration of 5 ppb may be detectable and deemed unpleasant by some individuals, it is an extremely conservative estimate of detectability for the general population in real-world conditions. Odor detection thresholds in published studies and cited by various guidance documents, including the WHO guideline document relied on by Dr. Schiffman, represent the concentration of a sample that can be determined to be "different" from a clean air sample under filtered and clean background air conditions. The individual does not have any quality information (e.g., is it floral, musty, fruity, sulfurous?) at the odor detection threshold. Thresholds for $H_2S$ have ranged from 0.5 ppb to over 130 ppb in more than 100 peer-reviewed studies reporting laboratory-collected thresholds, suggesting a wide range of sensitivity to this compound even under the most sensitive circumstances for detecting $H_2S$ odor (i.e., in clean laboratory conditions versus ambient outdoor environmental conditions). Even in the WHO guideline document for $H_2S$, it is stated that "[t]he threshold of perception of this odour ($H_2S$) varies considerably depending on individual sensitivity, but under laboratory conditions, it ranges from 0.0008 to 0.20 mg/m 3 (0.5-130 ppb)" (WHO, 2000).

The concentration at which an individual can detect the quality and the identity of an odor is the odor recognition threshold, which laboratory studies have found is multiple times higher than the odor detection threshold. As stated in the WHO guidance document relied on by Dr. Schiffman, $H_2S$'s "characteristic smell of rotten eggs appears at concentrations 3-4 times higher than the odour threshold" (WHO 2000). And the concentration at which one can recognize that one is smelling $H_2S$ varies across the population, just as the odor detection threshold does. It is important to acknowledge, and it is my opinion, that recognition alone does not imply nuisance.  The WHO guidance document relied on by Dr. Schiffman recognizes this, stating "since annoyance will be influenced by a number of psychological and socioeconomic factors, a nuisance threshold level cannot be defined on the basis of concentration alone" (WHO, 2000).

This observation is supported by numerous peer-reviewed, published field investigations showing that odor complaints and odor annoyance are determined by personality traits and circumstances, not solely by the concentration, intensity, or frequency of odor, as discussed in Opinion 5.  Therefore, depending on the sensitivity of any individual and other factors, the concentration of hydrogen sulfide that is first detected as potentially being recognized or identified (not necessarily causing annoyance) could vary from 1.5-390 ppb.

The Bruvold study, which was cited by Dr. Schiffman and the Court for its decision that 5 ppb is capable of causing a nuisance, claimed that exposure to hydrogen sulfide levels from 0.6-5.7 ppb led to interference with daily living along with health concerns. However, in my opinion the Bruvold study does not establish that such a level is likely to cause injuries in the general population, let alone among the 13 Trial Plaintiffs. The study was not a controlled exposure study and as with most field studies, the communities were chosen because of their histories of odor problems, having residential areas near wastewater treatment plants and where residents in the "affected communities" had already filed complaints. The sampling equipment to measure $H_2S$ in the "affected" areas took place on the porches of individual residences or businesses within two city blocks of the treatment plants and electrical power for the sampling equipment was supplied by the residents—thus ensuring they understood and indeed supported the purpose of the study. In my opinion this is true of most field studies where individuals are not blinded to the purpose of the study and, depending on their annoyance with odor or non-odor impacts of a business or facility, can therefore be biased to over-report annoyance or interference.

The issues with the studies cited by Dr. Schiffman, including the failure to measure exposures at the receptor in field studies or experimentally exposing individuals to irrelevant chemicals and concentrations significantly higher than those measured or modeled here, have been addressed in my April 30, 2021 report, and I incorporate them herein by reference.[3]

Furthermore, it is my opinion that the WHO nuisance guideline value for $H_2S$ does not define nuisance levels for the general population—instead defining 5 ppb for a 30-minute average as the concentration at which "not more than a small proportion of the population (less than 5%) experiences annoyance for a small part of the time (less than 2%)" (WHO, 2000). Dr. Schiffman ignores this limitation and assumes that all the Trial Plaintiffs are capable of detecting and being annoyed by $H_2S$ at this level.[4] Neither Dr. Schiffman nor any other of the Trial Plaintiffs' experts provided objective evidence to demonstrate that any of the 13 Trial Plaintiffs are able to detect and also be annoyed by concentrations of $H_2S$ at 5 ppb (or at any other concentration) in the natural environment. Nor am I aware of any tests that have been performed to demonstrate that any of the 13 Trial Plaintiffs fall within the most sensitive population that can detect $H_2S$ at this level.

---

[3] Schiffman, S. S., Studwell, C., Landerman, L., Berman, K., & Sundy, J. (2005). Symptomatic Effects of Exposure to Diluted AirSampled from a Swine Confinement Atmosphere on Healthy Human Subjects. *Environmental Health Perspectives, 113*(5), 567-576.

[4] No US jurisdiction has adopted this guideline from the WHO Regional Office for Europe. US jurisdictions that have a nuisance standard for $H_2S$ have adopted a higher concentration. Expert Report of John Kind (CTEH) § 6.2 (Apr. 30, 2021).

In my opinion, Dr. Schiffman's assumption that each of the Trial Plaintiffs would experience a nuisance at 5 ppb over 30 minutes is particularly flawed given that the Trial Plaintiffs vary in age, sex, and pre-existing health status that can dramatically alter and reduce their ability to detect and react to odor (Doty, 1989; Doty, Applebaum, Zusho, & Settle, 1985; Doty et al., 1984; Murphy, 2003). For example, certain of the Trial Plaintiffs, including Vernice Lewis, Mary Ann Winningkoff, Andrew Section, and Tyrone Thompson were all older than 54 years at the onset of the relevant time period.  Males are inferior to females in the ability to identify odors and they are generally less reactive to odor. Several Trial Plaintiffs have an extensive history of health conditions, including Tyrone Thompson who has a history of hypertension, peripheral arterial disease, hyperlipidemia, tobacco use disorder, and chronic lower back pain[5]; Jonathan Tate, who suffers from morbid obesity, untreated obstructive sleep apnea, untreated high blood pressure, and chronic gastrointestinal issues[6]; Stanley Meyers, who has a history of hypertension, diabetes mellitus, obesity, daily tobacco use, obstructive sleep apnea, chronic constipation, and other health issues[7]; and Reshaun Richardson, who has a history of diabetes complicated by hyperglycemia, recurrent sinusitis and allergies, and chronic headaches that occurred both before and after relevant time period.[8]

Given the studies regarding varying odor detection and recognition thresholds, which are conducted in laboratory settings, as well as the widely acknowledged variation in the sensitivity and response to hydrogen sulfide odor, in my opinion it is not credible that all 13 Trial Plaintiffs could detect and be annoyed by exposure to $H_2S$ at 5 ppb over 30 minutes. Nor am I aware of objective evidence demonstrating each Trial Plaintiffs' odor threshold for hydrogen sulfide. Accordingly, it is my opinion to a reasonable degree of scientific certainty that the Trial Plaintiffs' exposure to an average of 5 ppb of hydrogen sulfide for 30 minutes was not always a nuisance or likely even ever a nuisance to them.

**Opinion 2: The Trial Plaintiffs' descriptions of their odor experiences are inconsistent with what is known about human chemosensory function.**

As shown in the table below, in their depositions, the Trial Plaintiffs described the odors as strong and persisting continuously over several days, often 24/7. Seven of the 13 Trial Plaintiffs even stated that the odors occurred seven days per week over all or a portion of the relevant time period.

---

[5] Tyrone Thompson, IME Report, p. 5 (Jan. 23, 2024).
[6] Jonathan Tate, IME Report, p. 5 (Feb. 27, 2024).
[7] Stanley Meyers, IME Report, pp. 6-7 (Jan. 15, 2024).
[8] Reshaun Richardson, IME Report, p. 6 (Jan. 10, 2024).

| Trial Plaintiff | Description of Odor[9] | Duration of Odor[10] | Frequency of Odor[11] |
|---|---|---|---|
| **Jonathan Tate** | Rotten egg, sulfur | Continuous | Summer 2017: 3 days/week<br><br>Fall 2017-Summer 2019: 5 days/week<br><br>Fall 2019: 3 days/week |
| **Mary Ann Winningkoff** | Petroleum, sulfur | All night/lingered during day | Summer 2017-end of 2017: 2-3 days/week<br><br>2018: varying frequency, with constant odors in July and August<br><br>2019: varying frequency (but noted less than 2018) |
| **Andrew Section** | Rotten egg | | Entire relevant time period: 7 days/week |

[9] Tate Tr. 117:14; 123:4-124:17 (2023); Winningkoff Tr. 98:17-23; Section Tr. 67:19; Green Tr. 47:15-48:3; S. Meyers Tr. 84:5-85:7; Richardson Tr. 89:10-12, 118:7-8; W. Gremillion Tr. 123:4-7, 133:13-15; S. Gremillion Tr. 95:8-96:15; A. Gremillion Tr. 33:2-7; Tyrone Thompson Tr. 66:11, 98:4-5; Lewis Tr. 75:16-76:12; Terrance Thompson Tr. 32:13-14.
[10] Tate Tr. 118:3-10 (2023); Winningkoff Tr. 105:9-14; Green Tr. 52:19-23; S. Meyers Tr. 82:8, 85-15:20; Richardson Tr. 82:17-24; W. Gremillion Tr. 145:20-22; A. Gremillion Tr. 32:9-20; Tyrone Thompson Tr. 101:19-102:8; Lewis Tr. 74:17-21; Terrance Thompson Tr. 71:16-72:5.
[11] Tate Tr. 115:19-116:3; 120:6-16 (2023); Winningkoff Tr. 101:2-102:18; Section Tr. 63:5-23; Green Tr. 52:14-15; S. Meyers Tr. 82:8, 85-15:20; Richardson Tr. 82:7-15; W. Gremillion Tr. 145:23-146:10, 147:14-18; S. Gremillion Tr. 94:9-95:7; Tyrone Thompson Tr. 94:15-96:14; Lewis Tr. 74:9-11, 77:21-24; Terrance Thompson Tr. 71:12-72:5.

| | | | |
|---|---|---|---|
| **Geneva Green** | Garbage | All day/night | Entire relevant time period: 7 days/week |
| **Stanley Meyers** | Chemical, petroleum, garbage, ammonia, rotten egg | All day | Entire relevant time period: 7 days/week |
| **Reshaun Richardson** | Sewage, rotten egg | All day | Entire relevant time period: 7 days/week |
| **Wendy Gremillion** | Sulfur, rotten egg | Couple of hours at least | Entire relevant time period: 3-5 days/week |
| **Scott Gremillion** | Mixture | | Entire relevant time period: 4-5 days/week |
| **Adelyn Gremillion** | Fart, rotten egg | Lasted a while/lingered | Entire relevant time period: 3-5 days/week |
| **Braxton Gremillion** | Fart, rotten egg | | |
| **Tyrone Thompson** | Rotten egg, dead body | All day/night | 2017-summer 2019: 7 days/week<br><br>Fall-winter 2019: 3 days/week |
| **Vernice Lewis** | Rotten egg | All day/night | Entire relevant time period: 7 days/week |

| **Terrance Thompson** | Chemical, garbage | All day/night | Entire relevant time period: 7 days/week |
| --- | --- | --- | --- |

However, in my opinion, the Trial Plaintiffs' subjective reports about the duration over which strong $H_2S$ odors were experienced are inconsistent with what is known about the rapid adaptation that is a defining hallmark of olfactory function (Berglund, Berglund, Engen, & Lindvall, 1971; Cain, 1969; Dalton, 2000; Köster & de Wijk, 1991; Steinmetz, Pryor, & Stone, 1970). In a study that compared the time to completely desensitize the odors of $H_2S$ and phenylethyl alcohol (rose-odor) (i.e, perceive the odor to be gone), the perception of $H_2S$ disappeared significantly faster than did the perception of the rose odor (PEA) (Stuck, Fadel, Hummel, & Sommer, 2014). Four concentrations of $H_2S$ were tested (1,000, 2,000, 4,000 and 8,000 ppb). Each concentration was continuously presented to the noses of 20 participants who were asked to state when they could no longer smell the odor. Desensitization was faster for the weaker concentrations, but even at 8,000 ppb, the median time for $H_2S$ odor to disappear was less than one minute. This phenomenon is a normal and reversible response of the olfactory system to an odor and does not represent the olfactory "paralysis"(Guidotti, 2015) (i.e., the complete loss of ability to detect $H_2S$) that exposure to $H_2S$ at 100,000 ppb can produce.



Figure 1. Time to completely desensitize to varying concentrations of $H_2S$ (Panel A) and Phenylethyl alcohol (Panel B) (Reprinted from Stuck et al., Chem Senses, 2014, 39:151-157.)

The positive correlation between concentration and time to adapt to odor suggests that at even weaker concentrations (e.g., 5 to 10 ppb) than those tested in the 2014 study, the ability of an individual to perceive the odor of $H_2S$ should disappear very quickly. Exposure to detectable but weak odors of $H_2S$ should thus have led to very rapid desensitization of the Trial Plaintiffs during the modeled "odor events," not continuous odor impact as they reported. For these

reasons, it is my opinion that the Trial Plaintiffs' testimony regarding their odor experiences is not credible, or at least may not accurately represent their experience with odors as explained in Opinion 7, because it is contradicted by the evidence of human chemosensory function.

**Opinion 3: Exposure to odors is not likely to cause the sleep disturbances claimed by certain Trial Plaintiffs.**

Certain Trial Plaintiffs have alleged that odors from the JPLF disturbed their sleep (although most of these accounts were expressed only in their 2023 depositions, and not in their 2020 Plaintiff Fact Sheets). Specifically, Wendy Gremillion testified that "if it happened overnight, most of the time it (odor) woke me up, and it was in the house."[12] Scott Gremillion stated that he experienced some issues sleeping because of the odor, but later testified that it was due to the behavior of his wife, "[b]ecause she would wake me up every time, and she would get me to help her tape up windows, put towels under doors, turn on vents. . . ." [13]  Mary Ann Winningkoff testified that when she smelled the odor, "You know, I'd be sleeping and it would wake me up."[14] Reshaun Richardson and Jonathan Tate likewise identified issues with sleep disruption due to odors.[15] However, scientific literature shows, and it is my opinion, that exposure to odors does not cause sleep disturbances.

Sleep is characterized by decreased responsiveness to external stimuli. Although numerous studies confirm that auditory, somatosensory and visual stimuli can perturb sleep by inducing arousal, disrupting sleep length and sleep stages, the same is not true for olfaction. In contrast to Dr. Schiffman's claims, a growing body of evidence indicates that purely olfactory or even mildly trigeminal (irritating) odors do not lead to arousal or wake from sleep (Badia, Wesenstein, Lammers, Culpepper, & Harsh, 1990; Carskadon & Herz, 2004; Stuck et al., 2007). This is based on a number of well-controlled studies that presented odorants to sleeping participants and measured the degree to which the odorants elicited arousal or waking. Odorants chosen in these studies have ranged in pleasantness and concentration, such as peppermint or orange oil versus ammonium sulfate, pyridine and hydrogen sulfide. Notably, Stuck et al. presented hydrogen sulfide at concentrations ranging from 1 to 8 ppm (1,000 to 8,000 ppb) during sleep and observed no differences from a no odor control condition in arousal or awakenings as a consequence of these very strong odor exposures (Stuck et al., 2007). These levels of hydrogen sulfide that study participants were exposed to were 200 to 1,600 times higher than the 5 ppb average concentration of $H_2S$ at issue in this case. In contrast, presentation of concentrations of $CO_2$ at 40% and higher, representing painful stimuli activating the trigeminal nerve (CN V) unlike hydrogen sulfide, did increase arousal frequency in the same participants.

Thus, it is my opinion that the reports by Trial Plaintiffs of sleep disturbances cannot be causally attributed to exposure to hydrogen sulfide, because such causal relationship is inconsistent

---

[12] W. Gremillion Tr. 142:14-16.
[13] S. Gremillion Tr. 186:9-12.
[14] Winningkoff Tr. 135:1-2.
[15] Tate Tr. 131:15-24 (2023); Richardson Tr. 41:21-22.

with and directly contradicted by the scientific literature. In my opinion, the low levels of hydrogen sulfide predicted to be present at each of the Trial Plaintiffs' residences as modeled by Dr. Zannetti, but even as modeled by Mr. Lape, are more than likely not the cause of any sleep disturbances reported by those Trial Plaintiffs.

**Opinion 4: The concentration of odors and gases emitted from the JPLF was not likely to cause trigeminally-mediated sensations or physiological-based health conditions in the Trial Plaintiffs.**

Dr. Schiffman opined—and the Court in the General Causation opinion accepted Dr. Schiffman's opinion—that hydrogen sulfide combined with other volatile organic compounds ("VOCs") *could* combine to produce a concentration of an $H_2S$ mixture that is capable of activating the trigeminal nerve and releasing compounds (CGRP and Substance P) that could elicit physical symptoms such as headaches.[16]  While it is still my opinion that such mixtures are more often sub-additive and would not result in such effect, the issue now is whether $H_2S$ combined with other chemicals emitted from the JPLF did *in fact* activate each of the Trial Plaintiffs' trigeminal nerve, causing headaches and other health conditions. Based on the scientific literature and my experience, it is my opinion that certain symptoms complained of by the Trial Plaintiffs (such as headaches) are exceedingly unlikely to have been caused by trigeminal nerve activation by $H_2S$ emissions, whether alone or in a mixture, because the concentrations required to have a trigeminal impact from $H_2S$ are much higher than any that have been measured or modeled.[17]

As initially described in my report from 2021 and in Dr. Schiffman's report, there are two systems for detecting airborne chemicals: olfaction (smell: Cranial Nerve I) and chemesthesis (sensory irritation or "chemical feel": Cranial Nerve V) (Cometto-Muniz, Cain, & Abraham, 2004). Stimulation of the chemesthetic system produces tactile sensations (i.e., tingling, stinging, burning, or cooling/warming). Nearly all volatile chemicals can be smelled at concentrations significantly lower (often one or multiple orders of magnitude lower) than the concentration that elicits sensory irritation (Cometto-Muñiz & Cain, 1993). And for most chemicals, including hydrogen sulfide, odor and sensory irritation provides a warning of exposure at concentrations <u>far</u> below the level of toxicological concern (Arts, Rennen, & De Heer, 2006; Bruning et al., 2014; Nielsen & Wolkoff, 2017).

It is widely acknowledged, and it is my opinion, that eye irritation is the first adverse health effect that can be caused by hydrogen sulfide, albeit at concentrations much higher than that at

---

[16] The Court did not accept the testimony of the defense experts that mixtures of chemicals are largely sub-additive—in other words, that the odor intensities of the individual components of a mixture do not necessarily increase in an additive fashion (B. Berglund & M.J. Olsson, 1993; B. Berglund & M. J. Olsson, 1993; Reddy, Zak, Vergassola, & Murthy, 2018). While the Court instead relied on the results of Dr. Schiffman's assessment using a subset of the 33 VOCs detected in this case combined with hydrogen sulfide to explain the symptom complaints, these studies that do not support Dr. Schiffman's opinion of chemical synergy in this specific matter and Dr. Schiffman present no analysis showing that the particular chemicals at issue here were additive. My opinions on this issue and my rebuttal to Dr. Schiffman are presented more fully in my April 30, 2021 report.

[17] The health conditions that Dr. Schiffman asserts are the result of the activation of the trigeminal nerve would be caused by a physiological mechanism, as compared to those sensory impacts that may be elicited as a psychological response to an odor, discussed below.

which hydrogen sulfide can be detected. The concentration of $H_2S$ at which eye irritation has first been shown to occur, as affirmed in the WHO guideline document cited by Dr. Schiffman (WHO, 2000), is 15 mg/m$^3$ or 10,000 ppb—orders of magnitude higher than any concentrations measured in the ambient air of the community or even at the JPLF gas wells.

Furthermore, it is my opinion that Dr. Schiffman's opinion that $H_2S$ mixed with other compounds resulted in trigeminal activation is wrong because it lacks scientific and evidentiary support. Dr. Schiffman conducted no studies, nor are any available in the literature, demonstrating this effect for $H_2S$ combined with the other VOCs reported to be present in the JPLF emissions.[18] The studies Dr. Schiffman cites are based on chemicals that are different from those measured at the JPLF. Indeed, Dr. Schiffman does not even attempt to identify which VOCs and at what levels they combined with $H_2S$ such that they caused the trigeminal nerve activation in any of the Trial Plaintiffs.

Nor is other evidence presented as to what concentrations of VOC and $H_2S$ mixtures each of the Trial Plaintiffs were exposed. Plaintiffs' expert Mr. Lape only modeled $H_2S$ emissions from the JPLF to each of the Trial Plaintiffs' residences; he did not model or estimate the concentrations of any VOCs emitted from the JPLF at each of the Trial Plaintiffs' homes. No data from sampling of VOCs (or $H_2S$) at the Trial Plaintiffs' homes, where the Trial Plaintiffs testified that they were most often exposed to odors, has been presented.

In my opinion, it is simply not credible to conclude that $H_2S$ in the environment at 5 ppb, or even in the range of 100 ppb, in combination with other unspecified chemicals at low ppb concentrations can produce health effects that only begin to appear at 10,000 ppb for $H_2S$ alone. While the Court's General Causation decision provided that $H_2S$ and VOC mixtures *could* cause trigeminal activation, it is my opinion that such activation in the Trial Plaintiffs was exceedingly unlikely based on the data available in this case. In my opinion, there is no evidence or support to conclude, with a reasonable degree of scientific certainty, that any of the Trial Plaintiffs were exposed to levels of $H_2S$ or an $H_2S$ mixture that in fact caused trigeminal activation and resulted in physiological symptoms, such as headaches.

I therefore considered other explanations and etiologies for the physical symptom reports that are claimed by the Trial Plaintiffs in response to odors from the JPLF, as described in Opinion 5 below.

**Opinion 5: Personality traits, expectations about odor, and misattribution of health conditions to odors or a particular source likely impacted the Trial Plaintiffs' alleged injuries.**

What distinguishes a person who is likely to experience annoyance or a symptom after smelling an odor and one who does not? While it seems intuitive that annoyance would be driven by the intensity and frequency of experienced odors, in a number of community studies, odor annoyance has surprisingly been found to be uncorrelated with either the frequency or intensity of reported odors. In contrast, the literature has established and it is my opinion that

---

[18] I do not offer an opinion as to Dr. Schiffman's claims that matching 29 of 33 VOCs in samples is a fingerprint for JPLF-sourced VOCs. I understand that Dr. Kind and Dr. Zannetti are rebutting her opinion with respect to the source of VOCs.

personality features, personal features, and attitudes that result in a negative perception of odors (e.g., are they harmful? do they depress my property value)—as well as beliefs about odors and their risks, and concerns about the quality of the environment—tend to be the drivers of increased odor annoyance and of more drastic health complaints, including health complaints that are misattributed to the odor exposure (Dalton, 1996; Distel et al., 1999; Distel & Hudson, 2001; Karnekull, Jonsson, Larsson, & Olofsson, 2011; Winters et al., 2003). Indeed, odor is a robust predictor of mass psychogenic illness and results in the subsequent misattribution of symptoms to the odor (Page et al., 2010). It is my opinion that the variability between the Trial Plaintiffs and other residents in the Jefferson Parish area with respect to the concerns and reported annoyance may be due, at least in part, to the personality traits, attitudes, and these other factors influencing the perception of odors.

Based on responses to surveys (Miedema, Walpot, Vos, & Steunenberg, 2000), investigators have attempted to describe the relationship between exposure to environmental odors and an adverse effect, such as annoyance. Results from these surveys have produced "dose-response" functions, ostensibly linking the reported intensity of odor with the degree of annoyance. However, more in-depth studies have established that other variables, when measured, can be more strongly related to the potential for reported annoyance than odor intensity. For example, several studies have found significant associations between individual traits of the "perceiver" and their reported annoyance (Sucker, Both, & Winneke, 2001; Winneke, Neuf, & Steinheider, 1996). Specifically, the level of trait anxiety (a validated stable measure of an individual personality trait) has been consistently and strongly correlated with reported annoyance to environmental (and other) odors (Andersson, Claeson-A-S., Ledin, Wistig, & Nordin, 2013; Pacharra, Schaper, Kleinbeck, Blaszkewicz, & van Thriel, 2016).

Other factors that have been shown to modify annoyance responses, once an odor is recognized, include (i) personal factors, such as age, gender and perceived health status (I. N. Luginaah, S. M. Taylor, S. J. Elliott, & J. D. Eyles, 2002; Steinheider & Hodapp, 1999; Steinheider & Winneke, 1993; Winneke et al., 1996), (ii) attitudes toward the exposure source, (iii) awareness of odors, and (iv) socio-demographics (Cavalini, Koeter-Kemmerling, & Pulles, 1991; Evans, Colome, & Shearer, 1988; Smeets, Schifferstein, Boelema, & Lensvelt-Mulders, 2008).

"Top-down" features, such as expectations and beliefs about the odor, can also drive the perception and identification of odors, in addition to the "bottom-up" features of the odorant (e.g., quality, intensity, and identifiability). More than 100 years ago, a prominent scientist (William James) stated that "Whilst part of what we perceive comes through our senses from the object before us, another part (and it may be the larger part) always comes out of our own mind." Although this applies in general to all sensory systems, odor sensations appear to be more susceptible to suggestion than other sensory experience. It is my opinion that these and other factors can lead to misattribution of annoyance and physical symptoms to odor events and their potential sources that is not warranted.

Several studies illustrate that expectations that an odor may be more healthy or less healthy to breathe can alter how much we attend to the odor and how we react to it when we smell it,

including whether pre-existing symptoms are improperly attributed to odor exposure. In a study to demonstrate this real-world phenomenon, participants were exposed to a normatively neutral odor (pine-balsam) for 20 minutes (Dalton, 1996, 1999). For some of the participants, the odor was characterized as an industrial solvent while for others it was characterized as an aromatherapy agent. Although all participants were exposed to the same odorant at the same concentration, those who had the odorant characterized as "industrial" reported significantly elevated levels of odor intensity and reports of sensory irritation (eyes, nose, and throat) over time and health-related symptoms at the end of the exposure; they also failed to adapt to the odor. Those who were told the odorant was used in aromatherapy reported that the intensity of the odorant decreased significantly within the first 5 minutes and did not report any irritation or physical symptoms. In fact, they reported feeling relaxed and calm following exposure.

Further, Shusterman and colleagues (Neutra, Lipscomb, Satin, & Shusterman, 1991; Shusterman, Lipscomb, Neutra, & Satin, 1991) reviewed three cross-sectional studies of symptom reporting around hazardous waste sites (which the JPLF is not) and reported that both odor perception and worry about environmental health effects from the sites were strongly related to symptom reporting (e.g., headaches, nausea). The combined effects of odor perception and worry were even stronger. The authors concluded that odor perception provides a sensory cue of chemical exposure that results in either stress-related symptoms or simply heightens one's awareness of pre-existing symptoms.

It is my opinion that the Trial Plaintiffs' own testimony illustrates the influence of this top-down effect on how they perceived the alleged odors and source of odors. Tyrone Thompson testified that "we smelled it but didn't pay no mind to it until we seen it on the news, and then we said this where this coming from."[19] He also initially attributed his symptoms to the same symptoms from a 7-day virus that he got every year until Vernice Lewis overheard at the grocery store that folks were complaining about symptoms from the JPLF.[20] Andrew Section's deposition testimony identified when he began to attribute odors to the landfill: "Well, when the president of—the Jefferson Parish president came on TV and said, you know, the landfill had an odor."[21] Prior to that he had called the Jefferson Parish Sewage Department because he attributed the odors he smelled to sewage.[22] Jonathan Tate testified at his deposition that he learned that JPLF was a source of odor from multiple sources. Specifically, he stated "The Jefferson Parish president, when [he] released a statement stating it was coming from the landfill; a news article releasing a statement saying it was coming from the landfill; and then it was shared on social media with the news article that Jefferson Parish knowingly admitted to knowing that that was

---

[19] Tyrone Thompson Tr. 92:7-9.
[20] Tyrone Thompson TR. 145-149.
[21] Section Tr. 81:7-9.
[22] Andrew Section TR. 93-94.

being emitted to a neighborhood, they knew about it but didn't correct it in the right, correct amount of time, they let it go on for so long because they was making a profit."[23]

While it is certainly acknowledged that under extreme exposure conditions, odors can be associated with health-related symptoms, reports of health symptoms such as headaches, nausea and fatigue have been shown to be more clearly associated with odor annoyance than with odor intensity, frequency or duration (Aatamila et al., 2011; I.N. Luginaah, S.M. Taylor, S.J. Elliott, & J.D. Eyles, 2002; Steinheider & Winneke, 1993; Sucker, Both, & Winneke, 2009). This suggests that amplification of internal bodily cues may be a function of anxiety when perceiving an odor believed to be harmful. Or odor perception may be providing a sensory cue of chemical exposure that simply heightens one's awareness of pre-existing symptoms (i.e., the individual may be misattributing a symptom to an odor, even though it has a different cause). But it is my opinion that under either circumstance, the odor itself is not the cause of the symptom, and the odor must be perceived by the individual to elicit such a response.

It is my opinion that Dr. Schiffman incorrectly assumes that each Trial Plaintiff was impacted by each predicted "odor event" as modeled by Mr. Lape. She offers no basis to conclude this, and she ignores that the Trial Plaintiffs, even those living in the same home, perceived the alleged odors differently. For example, only two Trial Plaintiffs—Wendy Gremillion and Mary Ann Winningkoff—registered complaints with the LDEQ or the JPLF odor complaint hotline. Mrs. Gremillion and Mrs. Winningkoff exhibit the characteristics, including likelihood to express health concerns, associated with individuals who are most attentive to and bothered by odor, which is supported by testimony by other Trial Plaintiffs. For example, Scott Gremillion, husband of Wendy Gremillion, testified that "I found that it affected her worse than me" and "I observed somebody who was very nervous about what was going on, very nervous about what this was doing to our kids, and in the long-term health, what is going to be the effect of it. Somebody who could barely sleep and had, you know—I guess her stress was through the roof with it."[24] Wendy Gremillion's daughter, Adelyn Gremillion, also testified that it affected her mom more: "she'd be really affected by it because she smells like really well, like she has a good sense of smell."[25] Mary Ann Winningkoff's husband had been diagnosed with pulmonary fibrosis and occasionally relied on supplemental oxygen. In a complaint registered with LDEQ, Mary Ann Winningkoff stated that her "husband is on oxygen and she's concerned that the fumes are causing additional issues with his breathing problems."[26] And in her deposition, she stated "I truly believe that my husband would be here today if it wouldn't have been that that was damaging his lungs more"[27] – an unsubstantiated concern as there were no exposure levels anywhere near what would be required for such health impacts, as Dr. Kind explained.[28]

---

[23] Tate Tr. 157:9-19 (2023).

[24] S. Gremillion Tr. 77: 8-22.

[25] A. Gremillion Tr. 36: 9-14.

[26] APTIM-0011829.

[27] Winningkoff Tr. 88.

[28] Expert Report of John Kind, CTEH, § 6.1 (Apr. 30, 2021); Expert Report of John Kind, CTEH (Mar. 8, 2024).

In contrast, nine adult Trial Plaintiffs did not make any odor complaints to authorities despite later reporting being sickened or experiencing other health conditions. Other residents did not report experiencing or being impacted by odors. For example, Douglas Brown does not recall smelling landfill odors at any of his tenants' properties, including Reshaun Richardson's property, or anywhere else in Jefferson Parish.[29] Similarly, Terez Harris—the realtor who sold the Gremillions' property—travels all over Jefferson Parish for her profession, and she has not experienced any odors in the area.[30] LDEQ employee Holly Hermann (who lived within blocks of the Gremillions during the relevant time period) testified that odors did not impact her recreational activities or make her sick in any way.[31] Thirty-nine residents in the Jefferson Parish area, many of whom lived in the heart of the alleged odor area during the relevant time period, signed declarations stating either they have not perceived or are not impacted by odors at their homes.[32]

The differences in how the Trial Plaintiffs perceived odor from each other and other residents demonstrates that the primary factors influencing their odor perception were their individual personality traits and other personal factors or top-down influences. Given that there is no evidence that the Trial Plaintiffs are able to detect odors at 5 ppb as addressed in Opinion 1, and due to the role of misattribution, personality traits, expectations about odors, and other factors in odor perception, it is my opinion that, with a reasonable degree of scientific certainty, that (i) odors from the JPLF were not the cause of the symptoms of which the Trial Plaintiffs complain, (ii) the evidence does not establish that the Trial Plaintiffs would experience annoyance each instance that they perceived an odor, and (iii) the evidence does not establish that the experiences of the Trial Plaintiffs with odors, including their level of annoyance, represent that of the ordinary person.

To add to these points, it is my opinion that, given that the Trial Plaintiffs' odor experiences are so deeply shaped by their individual personality traits and other personal factors, the Trial Plaintiffs' mere claim that they experienced an odor event does not establish that an ordinary person would have experienced it the same way or experienced it at all. In fact, based on my experience and the data reviewed specific to this case, it is my opinion that the $H_2S$ concentrations modeled by the Trial Plaintiffs' experts in this case are not likely to have caused injury to persons of ordinary sensibilities. Further, it is my opinion that the Trial Plaintiffs are likely misattributing pre-existing health conditions to the odor, an issue that Dr. Schiffman also does not address. As discussed in the expert reports of Dr. Lutz and Dr. Kind and in Opinion 1 above, the Trial Plaintiffs have histories of health conditions and take medications that may produce or have produced the same symptoms that the Trial Plaintiffs attribute to odors, in many cases having a documented history of such symptoms dating back years prior to the relevant time period.

---

[29] Brown Tr. 18; 36-37; 42-43.
[30] Harris Tr. 57; 62-64.
[31] H. Hermann Tr. 111-114.
[32] WC_JPLF_00292017-WC_JPLF_00292059, WC_JPLF_00539825-827, WC_JPLF00539833-834. A number of the declarants described the quality of the odors as being from a non-landfill source or stated that they believed the odors were from a source other than the JPLF.

**Opinion 6: The Trial Plaintiffs' memories of certain health conditions are likely due to a type of memory reconstruction that often occurs when post-event details become incorporated into an individual's autobiographical memory.**

I observed a number of discrepancies between the health conditions reported by the Trial Plaintiffs in the Plaintiff Fact Sheets, completed in 2020 near the time of the alleged odor event and prior to the General Causation decision, and the health conditions identified during the Trial Plaintiffs' depositions that occurred in 2023 and 2024 after the General Causation decision, and several years after the alleged odor event. The differences in health conditions reported by the Trial Plaintiffs before and after the General Causation decision are summarized below in Table 3 (excerpted from the expert report of John Kind).  Based on my research in the field of memory and recall and on the relevant literature (Loftus, 2017), it is my opinion that these changes in recall are likely due to a type of memory reconstruction that often occurs when post-event details become incorporated into an individual's autobiographical memory. It is my opinion that the accounts of the odor event given by the Trial Plaintiffs at or near the time of the event (e.g., in the Plaintiff Fact Sheets, or in medical records during the relevant time period) are more accurate and reliable than accounts given later in time.

Although memory can be fallible at any time, it is my opinion that it is generally true that memory recall is more accurate the closer in time it occurs to the actual event. The Plaintiff Fact Sheets were completed in 2020, just after the end of the relevant time period and when certain of the Trial Plaintiffs alleged they were still experiencing injuries from odors. In comparison, the Plaintiffs were deposed about three to four years after the relevant time period, and they did not keep records of the odors or their impact. Between completing the Plaintiff Fact Sheets and being deposed, for all of the Plaintiffs, the type and number of reported health complaints increased.

It is my opinion that a likely cause of this increase in the number of reported health complaints is that the Trial Plaintiffs have received post-event information from various sources, such as the types of health conditions associated with much higher concentrations of $H_2S$, that has now been incorporated into their autobiographical experience. Research shows that memories are shaped, and can be misshaped, by people's knowledge and beliefs, attention, and motivation—all processes that are influenced by emotion and can be altered by misinformation. For example, individuals may be exposed to misleading information about events from other witnesses' reports or news reports that impact their memory (Frenda, Nichols & Loftus, 2011). False memories should not be mistaken for lies, nor are they intentionally produced. The individuals reporting false memories are confident in their belief that they are accurate. However, they are not accurate representations of the individual's experience. Witnesses have been shown in studies to be genuinely emotional about memories that are entirely false (Laney & Loftus, 2008; McNally et al., 2004; Shaw & Porter, 2015).

**Table 3. Health Conditions Alleged by the Trial Plaintiffs (from the report of Dr. John Kind).**

| Plaintiff | Health Conditions Alleged, Pertinent to this Case | |
|---|---|---|
| | Prior to General Causation Decision | Post General Causation Decision |
| Geneva Green | None | Headaches, anxiety, vomiting, fatigue |
| Scott Gremillion | Nausea, headaches | Nausea, headaches, sleep disruption |
| Wendy Gremillion | Nausea | Fatigue, headaches, sleepless nights, nausea, loss of appetite, worry |
| Adelyn Gremillion | Nausea | Headaches, nausea |
| Braxton Gremillion | Nausea | Headaches, fatigue |
| Vernice Lewis | Vomiting, nausea | Nausea, vomiting, anxiety and worry |
| Stanley Meyers | Anxiety, headaches, nausea, vomiting | Vomiting, nausea, headaches, sleep disruption, anxiety |
| Reshaun Richardson | None | Headaches, nausea, restless sleep, anxiety |
| Andrew Section | Headaches, loss of appetite | Headaches, vomiting, fatigue |
| Jonathan Tate | None | Nausea, vomiting, headaches, sleep disruption, anxiety |
| Terrance Thompson | Vomiting, headaches | Nausea |
| Tyrone Thompson | Nausea | Nausea, headaches, dizziness, vomiting |
| Mary Ann Winningkoff | Headaches | Headaches, nausea |

**Opinion 7: The concentration of odors and gases emitted from the JPLF was insufficient to cause the Trial Plaintiffs' learned odor aversions, to the extent that they have such aversions.**

As addressed in more detail in my 2021 report, it is my opinion that for aversive odor conditioning to occur in a single instance, a neutral odor stimulus must occur concurrently or immediately prior to (i) a traumatic fearful event (e.g., assault, warfare), (ii) a painful event (e.g., shock, injury), or (iii) an acute onset of illness (e.g., vomiting following ingestion of a food or beverage). It is in this type of a situation that the formerly neutral odor becomes aversive. Dr. Schiffman—and Dr. Spodak and Dr. DeLorenzo, to the extent that they attribute any ongoing health conditions to learned odor aversions—incorrectly applies learned odor aversions and has presented no evidence to show any of these conditions were met such that they could result in learned odor aversions in the Trial Plaintiffs. Further, based on the modeling

and other material I have reviewed, it is my opinion that the conditions necessary to create a learned odor aversion have not been met.

In addition, in an article published in 1987,[33] Dr. Spodak questioned the veracity of reports of PTSD that occurred years after the traumatic event, stating "In a case where the individual finally seeks mental health care one or two years after an incident, one has to wonder how substantial the psychiatric condition is." With respect to the Trial Plaintiffs, I am not aware of any that sought care or treatment for mental health conditions allegedly caused by odors or fumes.[34]

My opinions contained herein are based on a reasonable degree of scientific certainty. This report is based on the facts and information which were available to be reviewed at this time.

_Pamela H Dalton_                                    March 8, 2024

Signed: Pamela H. Dalton, PhD, MPH                  Date

---

[33] Spodak, M.K., A Guide for Post-traumatic Stress Disorder, published in Attorney's Guide to Expert Witnesses, December 1987, Page 8.
[34] Expert Report of Dr. Brobson Lutz (Mar. 8, 2024).

**Reliance Documents[35]**

City of Kenner public records request responsive documents (Dec. 5, 2023) (WC_JPLF_00539076; WC_JPLF_00539160).

Compilation of Group Posts and Comments of Plaintiff Mary Ann Winningkoff, Facebook (generated Nov. 13, 2023) (PLAINTIFFS_001014).

Compilation of Your Comments in Groups of Plaintiff Mary Ann Winningkoff, Facebook (generated Nov. 13, 2023) (PLAINTIFFS_001020).

Compilation of Your Posts, Check Ins, Photos and Videos of Plaintiff Mary Ann Winningkoff, Facebook (generated Nov. 13, 2023) (PLAINTIFFS_001036).

Compilation of Your Uncategorized Photos of Plaintiff Mary Ann Winningkoff, Facebook (generated Nov. 13, 2023) (PLAINTIFFS_001110).

Compilation of Comments of Plaintiff Mary Ann Winningkoff, Nextdoor (generated Nov. 13, 2023) (PLAINTIFFS_001452).

Compilation of FS&F Listings of Plaintiff Mary Ann Winningkoff, Nextdoor (generated Nov. 13, 2023) (PLAINTIFFS_001466).

Compilation of Posts of Plaintiff Mary Ann Winningkoff, Nextdoor (generated Nov. 13, 2023) (PLAINTIFFS_001468).

Declarations of Jefferson Parish residents (WC_JPLF_00292017 – WC_JPLF_00292059; WC_JPLF_00539825 – WC_JPLF_00539827; WC_JPLF_00539833 - WC_JPLF_00539834).

Deposition transcripts of trial Plaintiffs Andrew Section, Geneva Green, Jonathan Tate, Mary Ann Winningkoff, Reshaun Richardson, Scott Gremillion, Stanley Meyers, Terrance Thompson, Tyrone Thompson, Vernice Lewis, Adelyn Gremillion, Braxton Gremillion, and Wendy Gremillion.

Deposition transcripts of supporting witnesses of trial Plaintiffs Breana Tate, Janet McKeel, Kelly Sheasby, Roberto Obando, Stephanie Brooks, Douglas Brown, Curtis Lee Adams, Gerard Herbert and Terez Harris.

Discovery responses of trial Plaintiffs Adelyn Gremillion, Andrew Section, Braxton Gremillion, Geneva Green, Jonathan Tate, Mary Ann Winningkoff, Reshaun Richardson, Scott Gremillion, Stanley Meyers, Terrance Thompson, Tyrone Thompson, Vernice Lewis, and Wendy Gremillion.

Email from Loren Monahan (River Birch) to Andrea Siefers (Geosyntec) re Destruction Efficiency (Sept. 20, 2018) (GEOSYNTEC_00006364).

Expert report of Michael R. Corn (AquAeTer, Inc.) (March 8, 2024).

Expert report of Brobson Lutz (March 8, 2024).

Expert report of Robert DeLorenzo, M.D. (Feb. 16, 2024).

---

[35] These documents are in addition to the materials identified in my April 30, 2021 report.

Expert report of John Kind (CTEH) (March 8, 2024).

Expert report of John Kind (CTEH) (April 30, 2021).

Expert report of James F. Lape in the matter of *Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.*, Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.) (Integral Consulting Inc.) (Feb. 16, 2024).

Expert report / preliminary analysis of John W. Theriot, Jonathan A. Stoltz, and Jason R. Schellhaas (Malcolm M. Dienese LLC) (Feb. 8, 2024).

Expert report of Susan Schiffman (Schiffman Consulting) (Jan. 28, 2024).

Expert reports of Michael K. Spodak, M.D. (Feb. 15, 2024).

Expert report of Paola Zannetti (EnviroComp) (March 8, 2024).

Gas Plant Condensate Laboratory Report (Apr. 20, 2018) (GEOSYNTEC_00005848).

Harahan/River Ridge Air Quality, Facebook Video (WC_JPLF_HERBERT_00014059).

Harahan/River Ridge Air Quality, Facebook (Apr. 24, 2018) (WC_JPLF_HERBERT_00010137).

Harahan/River Ridge Air Quality, Facebook (Jan. 9, 2019) (WC_JPLF_HERBERT_00005065).

Harahan/River Ridge Air Quality, Facebook (Mar. 25, 2019) (WC_JPLF_HERBERT_00003723).

Harahan/River Ridge Air Quality, Facebook (Dec. 9, 2019) (WC_JPLF_HERBERT_00001797).

Harahan/River Ridge Air Quality, Facebook (Aug. 2, 2019) (WC_JPLF_HERBERT_00002757).

Harahan/River Ridge Air Quality, Facebook (Mar. 12, 2020) (WC_JPLF_HERBERT_00001547).

Harahan/River Ridge Air Quality, Facebook (Jan. 11, 2020) (WC_JPLF_HERBERT_00001759).

Harahan/River Ridge Air Quality, Facebook (June 22, 2020) (WC_JPLF_HERBERT_00014069).

Harahan/River Ridge Air Quality, Facebook (July 1, 2020) (WC_JPLF_HERBERT_00014047).

Harahan/River Ridge Air Quality, Facebook (July 13, 2020) (WC_JPLF_HERBERT_00014025).

Harahan/River Ridge Air Quality, Facebook (Aug. 17, 2020) (WC_JPLF_HERBERT_00013950).

Harahan/River Ridge Air Quality, Facebook (Oct. 1, 2020) (WC_JPLF_HERBERT_00014081).

Harahan/River Ridge Air Quality, Facebook (Dec. 9, 2020) (WC_JPLF_HERBERT_00014084).

Harahan/River Ridge Air Quality, Facebook (Dec. 21, 2020) (WC_JPLF_HERBERT_00013799).

Harahan/River Ridge Air Quality, Facebook (Jan. 13, 2021) (WC_JPLF_HERBERT_00013778).

Harahan/River Ridge Air Quality, Facebook (June 28, 2021) (WC_JPLF_HERBERT_00013634).

Harahan/River Ridge Air Quality, Facebook (Nov. 12, 2021) (WC_JPLF_HERBERT_00013523).

Harahan/River Ridge Air Quality, Facebook (May 2, 2023) (WC_JPLF_HERBERT_00013112).

Harahan/River Ridge Air Quality, Facebook (Aug. 11, 2023) (WC_JPLF_HERBERT_00013073).

Harahan/River Ridge Air Quality, Facebook (Aug. 13, 2023) (WC_JPLF_HERBERT_00013072).

Harahan public records request responsive documents (Oct. 11, 2023) (WC_JPLF_00538864; WC_JPLF_00538758; WC_JPLF_00538750; WC_JPLF_00538741; WC_JPLF_00538354; WC_JPLF_00538362; WC_JPLF_00538692; WC_JPLF_00538046; WC_JPLF_00538088; WC_JPLF_00538080; WC_JPLF_00538083; WC_JPLF_00538154; WC_JPLF_00538163; WC_JPLF_00538055; WC_JPLF_00538129; WC_JPLF_00538140; WC_JPLF_00538052; WC_JPLF_00538096; WC_JPLF_00538090; WC_JPLF_00538054; WC_JPLF_00538059; WC_JPLF_00538067).

Independent medical examination reports by Justin Rabon, M.D. and Charles Santos, M.D. for the trial Plaintiffs.

Jefferson Parish Air Quality, Facebook (Apr. 9, 2019) (WC_JPLF_HERBERT_00003468).

Jefferson Parish Air Quality, Facebook (Apr. 23, 2019) (WC_JPLF_HERBERT_00003320).

Jefferson Parish Landfill Odor Control Odor Complaint Reports (2018-2019) (WC_JPLF_00199037; WC_JPLF_00199197; WC_JPLF_00199234; WC_JPLF_00202525; WC_JPLF_00202887; WC_JPLF_00203005).

JP Daily Logs (Apr. 2016) (WC_JPLF_00194194).

JP Daily Logs (Apr. 2016) (WC_JPLF_00261215).

JP Daily Log (Nov. 21, 2016) (ADD_P00109785).

JP Daily Log (Oct. 28, 2017) (ADD_P00109963).

JP Daily Log (Feb. 10, 2018) (ADD_P00110079).

JP Daily Logs (Mar. 2018) (WC_JPLF_00269015).

JP Daily Log (Oct. 11, 2018) (WC_JPLF_00238366).

JP Daily Log (Nov. 1, 2018) (WC_JPLF_00256046).

JP Daily Log (Nov. 2, 2018) (WC_JPLF_00238017).

JP Daily Log (Nov. 3, 2018) (WC_JPLF_00251610).

JP Daily Log (Nov. 10, 2018) (WC_JPLF_00238803).

JP Daily Log (Nov. 20, 2018) (WC_JPLF_00235293).

JP Daily Log (Nov. 27, 2018) (WC_JPLF_00250229).

JP Daily Log (Nov. 27, 2018) (WC_JPLF_00250230).

JP Daily Log (Dec. 3, 2018) (WC_JPLF_00238797).

JP Daily Log (Dec. 28, 2018) (WC_JPLF_00244386).

JP Daily Log (Jan. 29, 2019) (WC_JPLF_00225811).

JP Daily Log (Feb. 12, 2019) (WC_JPLF_00225329).

JP Daily Log (Feb. 16, 2019) (WC_JPLF_00413576).

JP Daily Log (Feb. 24, 2019) (WC_JPLF_00226586).

JP Daily Log (Mar. 15, 2019) (WC_JPLF_00226143).

JP Daily Log (Mar. 26, 2019) (WC_JPLF_00260240).

JP Daily Log (Mar. 28, 2019) (WC_JPLF_00243383).

JP Daily Log (Mar. 29, 2019) (WC_JPLF_00226153).

JP Daily Log (Mar. 29, 2019) (WC_JPLF_00258569).

JP Daily Log (Mar. 30, 2019) (WC_JPLF_00225701).

JP Daily Log (Apr. 8, 2019) (WC_JPLF_00226276).

JP Daily Log (Apr. 21, 2019) (WC_JPLF_00252026).

JP Daily Log (June 9, 2019) (WC_JPLF_00180622).

JP Daily Log (June 10, 2019) (WC_JPLF_00180625).

JP Daily Log (June 23, 2019) (WC_JPLF_00180649).

JP Daily Log (June 25, 2019) (WC_JPLF_00257768).

JP Daily Log (June 26, 2019) (WC_JPLF_00240337).

JP Daily Log (July 26, 2019) (WC_JPLF_00225664).

JP Daily Log (July 29, 2019) (WC_JPLF_00180568).

JP Daily Log (Aug. 3, 2019) (WC_JPLF_00180344).

JP Daily Log (Aug. 3, 2019) (WC_JPLF_00225316).

JP Daily Log (Aug. 13, 2019) (WC_JPLF_00243544).

JP Daily Log (Aug. 22, 2019) (WC_JPLF_00226440).

JP Daily Log (Aug. 23, 2019) (WC_JPLF_00180401).

JP Daily Log (Aug. 27, 2019) (WC_JPLF_00275462).

JP Daily Log (Aug. 28, 2019) (WC_JPLF_00180416).

JP Daily Log (Sept. 5, 2019) (WC_JPLF_00227132).

JP Daily Log (Sept. 6, 2019) (WC_JPLF_00263600).

JP Daily Log (Sept. 14, 2019) (WC_JPLF_00225993).

JP Daily Log (Oct. 5, 2019 ) (WC_JPLF_00411741).

JP Daily Log (Oct. 17, 2019) (WC_JPLF_00287046).

JP Daily Log (Oct. 21, 2019) (WC_JPLF_00287418).

JP Daily Log (Oct. 23, 2019) (WC_JPLF_00287117).

JP Daily Log (Oct. 27, 2019) (WC_JPLF_00287348).

JP Daily Log (Nov. 1, 2019) (WC_JPLF_00287157).

JP Daily Log (Nov. 5, 2019) (WC_JPLF_00287363).

JP Daily Log (Nov. 13, 2019) (WC_JPLF_00287396).

JP Daily Log (Nov. 13, 2019) (WC_JPLF_00290292).

JP Daily Log (Nov. 21, 2019) (WC_JPLF_00287331).

JP Daily Log (Nov. 23, 2019) (WC_JPLF_00291377).

JP Daily Log (Nov. 24 2019) (WC_JPLF_00290185).

JP Daily Log (Nov. 25, 2019) (WC_JPLF_00290338).

JP Daily Log (Dec. 1, 2019) (WC_JPLF_00291559).

JP Daily Log (Dec. 2, 2019) (WC_JPLF_00287258).

JP Daily Log (Dec. 3, 2019) (WC_JPLF_00287211).

JP Daily Log (Dec. 24, 2019) (WC_JPLF_00490603).

JP Daily Log (Mar. 2, 2020 ) (WC_JPLF_00291606).

LDEQ Field Interview Form (Nov. 14, 2018) (WC_JPLF_00165950).

LDEQ Field Interview Form (Nov. 15, 2018) (WC_JPLF_00165943).

LDEQ Field Interview Form (Nov. 16, 2018) (RIVER_BIRCH_0003894).

LDEQ Field Interview Form (Nov. 16, 2018) (WC_JPLF_00165940).

LDEQ Field Interview Form (Dec. 3, 2018) (RIVER_BIRCH_0003896).

LDEQ Field Interview Form (Dec. 3, 2018) (WC_JPLF_00125232).

LDEQ Field Interview Form (Dec. 17, 2018) (WC_JPLF_00227272).

LDEQ Field Interview Form (Dec. 17, 2018) (WC_JPLF_00227288).

LDEQ Field Interview Form (June 13, 2019) (WC_JPLF_00227352).

LDEQ Field Interview Form (Aug. 1, 2019) (WC_JPLF_00227291).

LDEQ Field Interview Form (Aug. 15, 2019) (WC_JPLF_00229170).

LDEQ Field Interview Form (Aug. 29, 2019) (WC_JPLF_00229188).

LDEQ Field Interview Form (Nov. 1, 2019) (WC_JPLF_00287114).

LDEQ Incident Report (Aug. 23, 2017) (WC_JPLF_00174519).

LDEQ Incident Report (Mar. 6, 2018) (WC_JPLF_00167951).

LDEQ Incident Report (Mar. 21, 2018) (WC_JPLF_00166852).

LDEQ Incident Report (Apr. 16, 2018) (WC_JPLF_00168168).

LDEQ Incident Report (May 14, 2018) (JP_PLF_0005341).

LDEQ Incident Report (July 19, 2018) (WC_JPLF_00164844).

LDEQ Incident Report (Nov. 16, 2018)

LDEQ Incident Report (Nov. 25, 2018) (JP_JPLF_0007159).

LDEQ Incident Report (Nov. 27, 2018)

LDEQ Incident Report (Dec. 12, 2018) (APTIM-0011454).

LDEQ Incident Report (Jan. 12, 2019) (WC_JPLF_00316878).

LDEQ Incident Report (Apr. 8, 2019) (WC_JPLF_00317637).

LDEQ Incident Report (Aug. 7, 2019) (WC_JPLF_00318177).

LDEQ Incident Report (Aug. 13, 2019) (JP_JPLF_0008411).

LDEQ Incident Report (Sept. 7, 2019) (WC_JPLF_00318949).

LDEQ Inspection Report (Oct. 2018 - Nov. 2018) (APTIM-0008447).

LDEQ Site Visit (Aug. 29, 2019) (WC_JPLF_00229186).

LDEQ Site Visit (Nov. 1, 2019) (WC_JPLF_00287113).

Odor surveys submitted to Liddle Sheets Coulson (Aug. 16, 2017 - Aug. 28, 2019) (WC_JPLF_LSC_00000001).

Plaintiff Fact Sheets for trial Plaintiffs

Plaintiffs' Rule 26(a) Initial Disclosures, *Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.*, Civ. Action No. 19-11133 c/w 19-14512 (E.D. La.) (May 11, 2023).

River Birch Responses to EPA (May 7, 2019) (GEOSYNTEC_00023101).

Text Messages sent by Trial Plaintiff Wendy Gremillion (Dec. 2018 – Nov. 2019) (PLAINTIFFS_001969 - PLAINTIFFS_001975).

Transcript of Afternoon Session of Trial on Causation / Daubert, Hearing Day 4 (Feb. 2, 2022).

Transcript of Morning Session of Trial on Causation / Daubert, Hearing Day 4 (Feb. 3, 2022).

## References Cited

Aatamila, M., Verkasalo, P. K., Korhonen, M. J., Suominen, A. L., Hirvonen, M. R., Viluksela, M. K., & Nevalainen, A. (2011). Odour annoyance and physical symptoms among residents living near waste treatment centres. *Environ Res, 111*(1), 164-170. doi:10.1016/j.envres.2010.11.008

Andersson, L., Claeson-A-S., Ledin, L., Wistig, F., & Nordin, s. (2013). The influence of health-risk perception and distress on reactions to low-level chemical exposure. . *Frontiers in Psychology, 4*, 1-8.

Arts, J. H. E., Rennen, M. A. J., & De Heer, C. (2006). Inhaled formaldehyde: Evaluation of sensory irritation in relation to carcinogenicity. *Regulatory Toxicology and Pharmacology, 44*(2), 144-160.

Badia, P., Wesenstein, N., Lammers, W., Culpepper, J., & Harsh, J. (1990). Responsiveness to olfactory stimuli presented in sleep. *Physiology and behavior, 48*, 87-90.

Berglund, B., Berglund, U., Engen, T., & Lindvall, T. (1971). The effect of adaptation on odor detection. *Percep. Psychophys, 9*, 435-438.

Berglund, B., & Olsson, M. J. (1993). Odor-intensity interaction in binary and ternary mixtures. *Percep. Psychophys, 53*(5), 475-482.

Berglund, B., & Olsson, M. J. (1993). Odor-intensity interaction in binary mixtures. *J Exp Psychol Hum Percept Perform, 19*(2), 302-314. doi:10.1037//0096-1523.19.2.302

Bruning, T., Bartsch, R., Bolt, H. M., Desel, H., Drexler, H., Gundert-Remy, U., . . . van Thriel, C. (2014). Sensory irritation as a basis for setting occupational exposure limits. *Archives of Toxicology, 88*(10), 1855-1879. doi:10.1007/s00204-014-1346-z

Cain, W. S. (1969). Olfactory adaptation and direct scaling of odor intensity. *Diss. Abs. Intl, 30*(2-B), 696-696.

Carskadon, M. A., & Herz, R. S. (2004). Minimal olfactory perception during sleep: Why odor alarms will not work for humans. *Sleep, 27*(3), 402-405.

Cavalini, P. M., Koeter-Kemmerling, L. G., & Pulles, M. P. J. (1991). Coping with odour annoyance and odour concentrations: Three field studies. *J. Envir. Psychol, 11*, 123-142.

Cometto-Muñiz, J. E., & Cain, W. (1993). Efficacy of volatile organic compounds in evoking nasal pungency and odor. *Archives of Environmental Health, 48*(5), 309-314.

Cometto-Muniz, J. E., Cain, W. S., & Abraham, M. H. (2004). Detection of single and mixed VOCs by smell and by sensory irritation. *Indoor. Air, 14 Suppl 8:108-17.*, 108-117.

Dalton, P. (1996). Odor perception and beliefs about risk. *Chemical Senses, 21*, 447-458.

Dalton, P. (1999). Cognitive influences on health symptoms from acute chemical exposure. *Health Psychology, 18*(6), 579-590.

Dalton, P. (2000). Psychophysical and behavioral characteristics of olfactory adaptation. *Chemical Senses, 25*, 1-6.

Distel, H., Ayabe-Kanamura, S., Martinez-Gomez, M., Schicker, I., Kobayakawa, T., Saito, S., & Hudson, R. (1999). Perception of everday odors--Correlation between intensity, familiarity and strength of hedonic judgement. In *Chemical Senses* (Vol. 24, pp. 191-199). (Reprinted from: On Request).

Distel, H., & Hudson, R. (2001). Judgement of odor intensity is influenced by subjects' knowledge of the odor source. *Chem. Senses, 26*(3), 247-251.

Doty, R. L. (1989). Influence of age and age-related diseases on olfactory function. In *Annals of New York Academy of Sciences* (Vol. 561, pp. 76-86). New York, NY: NY Academy of Science. (Reprinted from: On Request).

Doty, R. L., Applebaum, S., Zusho, H., & Settle, R. G. (1985). Sex differences in odor identification ability: A cross-cultural analysis. *Neuropsychologia, 23*(5), 667-672.

Doty, R. L., Shaman, P., Applebaum, S. L., Giberson, R., Siksorski, L., & Rosenberg, L. (1984). Smell identification ability: Changes with age. In. (Reprinted from: On Request).

Evans, G. W., Colome, S. D., & Shearer, D. F. (1988). PSYCHOLOGICAL REACTIONS TO AIR-POLLUTION. *Environmental Research, 45*(1), 1-15. doi:10.1016/s0013-9351(88)80002-1

Guidotti, T. L. (2015). Hydrogen sulfide intoxication. *Handb Clin Neurol, 131*, 111-133. doi:10.1016/b978-0-444-62627-1.00008-1

Karnekull, S. C., Jonsson, F. U., Larsson, M., & Olofsson, J. K. (2011). Affected by Smells? Environmental Chemical Responsivity Predicts Odor Perception. *Chemical Senses, 36*(7), 641-648. doi:10.1093/chemse/bjr028

Köster, E. P., & de Wijk, R. A. (1991). Olfactory Adaptation. In D. G. Laing, R. L. Doty, & W. Breipohl (Eds.), *The Human Sense of Smell* (pp. 199-215): Springer-Verlag. (Reprinted from: In File).

Loftus, E. F. (2017). Eavesdropping on Memory. *Annu Rev Psychol, 68*, 1-18. doi:10.1146/annurev-psych-010416-044138

Luginaah, I. N., Taylor, S. M., Elliott, S. J., & Eyles, J. D. (2002). Community reappraisal of the perceived health effects of a petroleum refinery. *Social Science & Medicine, 55*(1), 47-61. doi:10.1016/s0277-9536(01)00206-4

Luginaah, I. N., Taylor, S. M., Elliott, S. J., & Eyles, J. D. (2002). Community reappraisal of the perceived health effects of a petroleum refinery. *Social Science and Medicine, 55*, 47-61.

Miedema, H. M. E., Walpot, J. I., Vos, H., & Steunenberg, C. F. (2000). Exposure-annoyance relationships for odour from industrial sources. *Atmospheric Environment, 34*, 2927-2936.

Murphy, C., Doty, R.L., Duncan, H.J. (2003). Clinical disorders of olfaction. In R. L. Doty (Ed.), *Handbook of Olfaction and Gustation* (pp. 461-478). New York: Marcel Dekker.

Neutra, R., Lipscomb, J., Satin, K., & Shusterman, D. (1991). Hypotheses to explain the higher symptom rates observed around hazardous waste sites. *Environ. Health Perspect, 94*, 31-35.

Nielsen, G. D., & Wolkoff, P. (2017). Evaluation of airborne sensory irritants for setting exposure limits or guidelines: A systematic approach. *Regulatory Toxicology and Pharmacology, 90*, 308-317. doi:https://doi.org/10.1016/j.yrtph.2017.09.015

Pacharra, M., Schaper, M., Kleinbeck, S., Blaszkewicz, M., & van Thriel, C. (2016). Olfactory Acuity and Automatic Associations to Odor Words Modulate Adverse Effects of Ammonia. *Chemosensory Perception, 9*(1), 27-36. doi:10.1007/s12078-016-9202-6

Page, L. A., Keshishian, C., Leonardi, G., Murray, V., Rubin, G. J., & Wessely, S. (2010). Frequency and predictors of mass psychogenic illness. *Epidemiology, 21*(5), 744-747. doi:10.1097/EDE.0b013e3181e9edc4

Reddy, G., Zak, J. D., Vergassola, M., & Murthy, V. N. (2018). Antagonism in olfactory receptor neurons and its implications for the perception of odor mixtures. *Elife, 7*. doi:10.7554/eLife.34958

Shusterman, D., Lipscomb, J., Neutra, R., & Satin, K. (1991). Symptom prevalence and odor-worry interaction near hazardous waste sites. *Environ. Health Perspect, 94*, 25-30.

Smeets, M. A. M., Schifferstein, H. N. J., Boelema, S. R., & Lensvelt-Mulders, G. (2008). The Odor Awareness Scale: A New Scale for Measuring Positive and Negative Odor Awareness. *Chemical Senses, 33*(8), 725-734. doi:10.1093/chemse/bjn038

Steinheider, B., & Hodapp, V. (1999). Environmental worry: a concept to explain differences in environmentally conscious behaviour? *Zentralblatt Fur Hygiene Und Umweltmedizin, 202*(2-4), 273-289. doi:10.1016/s0934-8859(99)80030-3

Steinheider, B., & Winneke, G. (1993). Industrial odours as environmental stressors: Exposure-annoyance associations and their modification by coping, age and perceived health. *Journal of Environmental Psychology, 13*, 353-363.

Steinmetz, G., Pryor, G. T., & Stone, H. (1970). Olfactory adaptation and recovery in man as measured by two psychophysical techniques. *Percep. Psychophys, 8*(5B), 327-330.

Stuck, B. A., Fadel, V., Hummel, T., & Sommer, J. U. (2014). Subjective olfactory desensitization and recovery in humans. *Chem Senses, 39*(2), 151-157. doi:10.1093/chemse/bjt064

Stuck, B. A., Stieber, K., Frey, S., Freiburg, C., Hörmann, K., Maurer, J. T., & Hummel, T. (2007). Arousal responses to olfactory or trigeminal stimulation during sleep. *Sleep, 30*(4), 506-510. doi:10.1093/sleep/30.4.506

Sucker, K., Both, R., & Winneke, G. (2001). Adverse effects of environmental odours: reviewing studies on annoyance responses and symptom reporting. *Water Science and Technology, 44*(9), 43-51.

Sucker, K., Both, R., & Winneke, G. (2009). Review of adverse health effects of odours in field studies. *Water Sci. Technol, 59*(7), 1281-1289.

WHO. (2000). *Air Quality Guidelines for Europe*. Retrieved from

Winneke, G., Neuf, M., & Steinheider, B. (1996). Separating the impact of exposure and personality in annoyance response to environmental stressors, particularly odors. In *Environmental International* (Vol. 22, pp. 73-81). (Reprinted from: On Request).

Winters, W., Devriese, S., Van Diest, I., Nemery, B., Veulemans, H., Eelen, P., . . . Van den Bergh, O. (2003). Media warnings about environmental pollution facilitate the acquisition of symptoms in response to chemical substance. *Psychosomatic Medicine, 65*, 332-338.