```
 1            UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF LOUISIANA

 3    * * * * * * * * * * * * * * * * * * * * * * *

 4   ELIAS JORGE "GEORGE"           CIVIL ACTION
     ICTECH-BENDECK,
 5           Plaintiff              NO. 18-7889
                                    c/w 18-8071,
 6   v.                             18-8218, 18-9312

 7   WASTE CONNECTIONS BAYOU,       SECTION: "E"(5)
     INC., ET AL.,
 8           Defendants             CIVIL ACTION

 9   Related Case:                  NO. 19-11133,
                                    c/w 19-14512
10      FREDERICK REGIONAL
     LANDFILL COMPANY, ET AL.,      SECTION: "E"(5)
11           Defendants

12   Applies to: Both Cases

13
        * * * * * * * * * * * * * * * * * * * * * * *
14

15                     Deposition of
                    PAOLO ZANNETTI, PhD
16
                  taken on April 25, 2024
17                commencing at 9:08 a.m.

18                in New Orleans, Louisiana

19

20

21

22   Reported by:  Evangeline A. Langston, CCR, RPR
                   Certified Court Reporter
23                 in and for the State of Louisiana,
                   Federal Certified Realtime Reporter,
24                 Registered Professional Reporter

25
```



1  still dominant.  But it's not any more five times
2  higher.  It is three times higher.
3       Q.   And you would agree that's a substantial
4  difference?
5            MR. PAUL:  Object to form.
6       A.   In the context of the results of my
7  work, no, it's not a substantial difference.  All
8  the opinions I presented in March remain valid in
9  April with the new emission rates.
10      Q.   They're just about -- the new emissions
11 are close to half what they were from -- between
12 March and April; correct?
13           MR. PAUL:  Object to form.
14      A.   We said before 15 to 25 percent lower,
15 you mentioned, which seems to be correct.  I will
16 have to double-check.  But that doesn't change any
17 of the opinion in my report.  Highway 90 emission
18 remain dominant.
19      Q.   Okay.  Now, you did not try to simulate
20 emissions from any source other than the three
21 landfills; correct?
22      A.   Those are the sources that were provided
23 to me, the emission rates, so I didn't have other
24 data to do other sources.
25      Q.   Were you asked to consider any other



1  potential source of H2S other than the three
2  landfills?
3        A.    No.  These are the only data that were
4  available for my modeling.
5        Q.    And did you suggest any other potential
6  sources?
7        A.    This was discussed somehow because we
8  know that that area is surrounded by industrial
9  activities.  And so certainly I'm aware that there
10 are other sources of H2S, in my pollution roses, by
11 the way, and one must show clearly that that is the
12 case.
13             But in terms of modeling, I could only
14 do the emission rates from the three landfills
15 because those were provided to me.
16       Q.    And did you, for example, discuss
17 emission rates from Cornerstone?
18       A.    Yeah, I remember discussing those.
19       Q.    And you didn't -- you remember not given
20 any emissions data from Cornerstone?
21       A.    No.
22       Q.    Did you ask for emissions data from
23 Cornerstone?
24       A.    Let me clarify.  I didn't use any
25 emission data from Cornerstone in my modeling, as



1  Q. And you're not -- not being an odor
2  expert, you're not in a position to challenge that.
3  Isn't that correct?
4  MR. PAUL: Object to form.
5  A. I'm not challenging anybody -- the
6  judge, for sure. But as a scientist, I've done a
7  literature review, and this value is clearly in
8  the -- sort of the lower end of the range that you
9  can find in the literature, both the scientific and
10 the regulatory literature.
11 Q. Now, in your report at Page 7 --
12 MR. FOSTER: Is that up?
13 MS. JAMES: Yes.
14 BY MR. FOSTER:
15 Q. You make the point that interpreting
16 concentration levels to assess odor impacts is
17 complicated by characterizing the intensity of an
18 odor from bare detection above the odor threshold to
19 recognition of the type of odor to levels that can
20 be considered offensive; correct?
21 A. Yes. You read it correctly.
22 Q. And isn't that exactly what Judge Morgan
23 decided when she found that the exposure at which
24 people generally are able to smell hydrogen sulfide,
25 that's detection and recognition; right?



```
 1   everywhere in your report your contentions that the
 2   court was wrong?
 3              MR. PAUL:  Objection.
 4   BY MR. FOSTER:
 5        Q.   That 5 ppb is the wrong reference level?
 6              MR. PAUL:  Object to form.
 7        A.   I never use this word, "wrong."
 8        Q.   Okay.
 9        A.   But it's very clear to me based on the
10   literature, scientific literature and regulatory
11   literature, that this level is extremely low and at
12   the lower end of the range of acceptable level.
13        Q.   But it is within the range of acceptable
14   level; right?
15        A.   It -- yeah, it is in the range of value
16   that you find in the literature for odor threshold.
17        Q.   Okay.  And odor -- and odor threshold
18   detection, right, and characterization?
19              MR. PAUL:  Object to form.
20        A.   I'm not sure about the -- what you just
21   said.  I would have to double-check.  But certainly
22   if you look at the literature, odor threshold for
23   H2S, 5 ppb is within the range.
24        Q.   And so that's smelling it and
25   identifying it is H2S; correct?
```



```
 1   with hydrogen sulfide emitted by a landfill; right?
 2        A.    I read that.
 3        Q.    And you don't contest that, do you?
 4        A.    That's the opinion of the judge.
 5        Q.    And do you have any evidence to tell me
 6   that that's an incorrect finding by the judge?
 7        A.    The attribution to the landfill,
 8   especially to one of the three landfill, is
 9   questionable.
10        Q.    You're aware, are you not, that the LDEQ
11   conducted an investigation of emissions from all
12   the -- all the facilities under its -- under its
13   jurisdiction?
14              MR. PAUL:  Object to form.
15        A.    Right now, I remember only one case
16   where the LDEQ mentioned that the odor could be --
17   have been caused by the Jefferson landfill.  It is
18   commented in my report.
19        Q.    Yes.
20              Don't you remember that the LDEQ found
21   that the source of the odors was the Jefferson
22   Parish Landfill?
23              MR. PAUL:  Object to form.
24        A.    If we are referring to the same
25   statement, that statement is discussed in my report,
```



1   what page that is in your revised report.
2              Well, so let's -- rather than worry
3   about that, do you disagree with Judge Morgan that
4   an average of 5 parts per billion over 30 minutes is
5   always a nuisance?
6              MR. PAUL:  Object to form.
7        A.    No, I don't have elements to agree or
8   disagree.  I only have my literature review that
9   shows that Judge Morgan decision to select 5 ppb is
10  an extreme one in terms of the normal range found in
11  the literature.
12       Q.    But it is, as we have discussed, within
13  the range?
14       A.    It is within the range of odor
15  thresholds published in the literature.  That is
16  correct.
17       Q.    Do you know what is the definition of a
18  nuisance under Louisiana law?
19       A.    I'm not sure I know.
20       Q.    Now, if Mr. Lape is correct about the
21  number of exposures to 5 parts per billion over
22  30 minutes for each of the trial plaintiffs -- and
23  you've seen his charts with regard to those
24  exposures; correct?
25       A.    Yeah.  Sorry, Counsel, let me clarify my



1      Q.    And you don't take issue with Judge
2  Morgan's finding in that regard, do you?
3            MR. PAUL:  Object to form.
4      A.    I don't take any issue with any opinion
5  of the judge.
6      Q.    Okay.
7      A.    As a scientist, however, I'm aware of
8  the literature on odor thresholds and level of
9  concern and regulatory standards for H2S.  And based
10 on this literature review, I would have used a much
11 larger values.
12     Q.    But we've already discussed that the
13 level that the judge used is within the range of the
14 literature; correct?
15     A.    It is in the range of the odor threshold
16 literature, but not in the range of regulatory
17 concern.  For example, California has a standard of
18 30 ppb.  And California has a reputation of being a
19 state with the very strict environmental
20 regulations.  So it's a complicated issue.
21     Q.    And regulatory standards have to do with
22 physiological health effects; correct?
23           MR. PAUL:  Object to form.
24     A.    Regulatory standards, like the
25 California one, are created after years of


1  BY MR. LANDRY:
2       Q.    That's your expert opinion?
3       A.    That's correct.  I don't know
4  specifically.  I cannot point the finger
5  specifically at one source, but the pollution rose
6  is absolutely clear.
7       Q.    Do you understand that your clients, all
8  three of them, have retained another purported
9  expert, Mr. Michael Corn, to opine as to potential
10 other sources?
11      A.    Yes.  And I was not involved with that
12 study.  I'm sorry.  And I -- as far as I'm
13 concerned, I cannot point the finger at specific
14 sources.  I've not done that work.  If somebody else
15 has done it, fine.  But I've not done that work.
16      Q.    But regardless, you can't really
17 identify what those multitude of potential other
18 sources are, but ultimately, your opinion is that
19 the H2S coming from those unidentified potential
20 other sources was relatively low; right?
21      A.    The pollution rose shows very clearly
22 that there are a multitude of other sources of H2S
23 in the area coming from all direction with a little
24 increment in the sector from southwest.
25      Q.    Do you know what my question was,

