1      Q.  Well, let me ask it a different way.

2          If someone omits information that might

3   change the meaning of what they're saying, do you

4   believe that person is making a misrepresentation?

5      MR. FOSTER:

6          Objection to the form.

7      A.  I feel we're having an irrelevant,

8   philosophical question that has nothing to do with

9   this case and is a waste of time.

10  BY MS. BRILLAULT:

11     Q.  If you omitted information about a study

12  that would otherwise change the meaning or your

13  conclusion in that study, do you believe that

14  would be a misrepresentation?

15     MR. FOSTER:

16         Objection to the form.

17     A.  I -- I have to tell you, I am frustrated

18  with the questions because they don't seem to have

19  anything to do with what we're -- what this case

20  has to -- why I'm here as an expert witness.

21  BY MS. BRILLAULT:

22      Q.  Dr. Schiffman, are you able to answer that

23  question?

24      A.  I have no idea what the question means.

25      Q.  Okay.  If you omitted material information

                                                    24

1   into -- regarding an analysis that you were doing

2   in a study, would you consider that a

3   misrepresentation?

4       A.  I would not omit -- I would not omit

5   something that I've done, no.

6       Q.  But if you did, would that be a

7   misrepresentation?

8       A.  I don't know what the situation is, so I

9   can't say.  I'm just telling you I don't omit --

10  you have the data.  You have my analysis.  I

11  didn't know -- I mean, that's what it is.  I don't

12  know what -- do you feel that I've omitted

13  something?

14      Q.  I'm asking you if you -- so you don't omit

15  information because you feel that would be a

16  misrepresentation; is that a fair way to say it?

17          MR. FOSTER:

18              Objection to the form.

19      A.  I don't understand the question.  Somehow

20  or another you're driving at something that has

21  nothing to do with me and my credentials in this

22  case, I have no idea what you're talking about.

23  BY MS. BRILLAULT:

24      Q.  Well, I'm asking:  Do you believe that

25  misrepresentation can be done by omission versus a

25

1  blatant misstatement of --

2      A.  It depends on what they omitted.  I mean,

3  I don't know.

4          MR. FOSTER:

5              Objection to the form.

6  BY MS. BRILLAULT:

7      Q.  And if it was relevant to the final

8  conclusion, that omission would be a

9  misrepresentation?

10      A.  I have --

11          MR. FOSTER:

12              Objection to the form.

13      A.  I don't know what the situation is.  I'd

14  have to see what the situation is.  Otherwise, I

15   have no idea what you're talking about.  It's not

16   relevant to my role in this case.

17   BY MS. BRILLAULT:

18       Q.  That's not the question.

19           But are you familiar with the phrase

20   "compensation neurosis"?

21       A.  Compensation neurosis.  I've heard -- I've

22   heard the word, but I don't know what it is.

23       Q.  Do you understand that it's where there's

24   a monetary incentive involved with respect to a

25   causation determination, that sometimes people

                                                    26

1    will misstate or change the facts in order to --

2        A.  I'm sure that happens.  I'm not --

3            MR. FOSTER:

4                Objection to the form.

5        A.  I would not be surprised if that happens.

6    I used to see workman's comp cases, so I think

7    that there were times that people -- that was

8    always what my role was as a medical psychologist,

9    was to evaluate whether the -- how much of this is

10   a problem and how much of it is not a problem.

11   BY MS. BRILLAULT:

9      Q.  Okay.  And before the EE, you were in --

10     were you in the psychology department before that?

11     A.  I was in the psychiatry department at Duke

12     forever, okay, until I retired from there.  And

13     then -- but I always had -- I had an adjunct

14     appointment at NC State for a long time because I

15     was doing a lot of work in the hog industry doing

16     outdoor air evaluations.

17         So I think -- when was I appointed ag --

18     in ag engineering?  From 1995 to 2007, I had an

19     appointment in that department.

20     Q.  Do you still have a psychology license

21     with the State of North Carolina?

22     A.  Yes.

23     Q.  And it's current?

24     A.  Yes.

25     Q.  Do you know if there's a code of ethics

                                                    42

1      that you're required to follow?

2      A.  Absolutely there's a code of ethics.

3      Q.  And you --

4      A.  We take ethics courses.  In fact, last

5      year they had a special one because of a variety

6    of issues, that we had to take an extra one.   And

7    then I had -- I think I had maybe eight or ten

8    hours of ethics last year.

9         And I also finished -- I've actually

10   finished my ones for this year already.

11   Q.  Okay.  So --

12   A.  It's really, really important, let me tell

13   you.  I think the ethics part is very important.

14   Q.  I agree.

15        And so because it's really important and

16   you've taken all these classes you are very

17   familiar with the principles for --

18   A.  Very, very.

19   Q.  -- the North Carolina --

20   A.  Very familiar.

21   Q.  Do they follow the American Psychologists

22   Association of --

23   A.  Yes, they do, uh-huh.

24        (Multiple speakers.)

25        (Clarification by reporter.)

43

1    BY MS. BRILLAULT:

2      Q.  If I brought up the code of ethics and we

3   just went through a couple sections, you'd be able

4   to say that you're familiar with it, is that --

5   can we do that quickly?

6      A.  Well, we go by the -- I go by the -- by

7   the North Carolina one.  But you can certainly --

8   it's consistent with the APA.

9      Q.  If I show you something on the APA, it

10  would be consistent with the North Carolina ethics

11  rules for psychology?

12     A.  Uh-huh.

13     Q.  Okay.  So we're going to introduce as

14  Exhibit 4...

15            (Exhibit 4, remotely introduced and

16            provided electronically to the reporter.)

17  BY MS. BRILLAULT:

18     Q.  And Dr. Schiffman, just to be totally

19  transparent, I did go to the North Carolina state

20  website, the bar, and it had the APA link for the

21  code of ethics as its ethics.  So I think you're

22  correct that they're very consistent, or they

23  probably actually adopt the APA.  I think that's

24  fair.

25            Does that make sense?

1      A.  Yes, uh-huh, correct.

2      Q.  So just the interaction -- we'll go down

3   to Section 5.  Sharing the screen, this takes a

4   little while to get through.

5          Section 5 discusses Advertising and Other

6   Public Statements.  5.01 covers Avoidance of False

7   Or Deceptive Statements.

8      A.  Correct.

9      Q.  And it defines public statements to

10  include statements in legal proceedings?

11     A.  Correct.

12     Q.  So that would be you're required not to

13  have any false or deceptive statements in legal

14  proceedings, so that would also include your --

15     A.  It's really important.

16     Q.  And you would agree that it would include

17  your expert opinions in this case?

18     A.  Absolutely correct.

19     Q.  All right.  And Section 8 discusses

20  Research and Publications.  And 8.10 addresses

21  Recording Research Results.

22     A.  Uh-huh, correct.

23     Q.  Let me get to the section.

24      A.  Yeah, I've read through all this stuff

25  before, uh-huh.

45

1       Q.  And it doesn't want you to fabricate data?

2       A.  Correct, uh-huh.

3       Q.  And if you discover significant errors in

4   your data, you should take reasonable steps to

5   correct those errors, right?

6       A.  Uh-huh.

7       Q.  We can take that down.

8           Dr. Schiffman, have you ever been referred

9   to the licensing board for ethical violations?

10      A.  Never.  No.

11      Q.  And do you believe all of your work in

12  this case, as well as your published work,

13  complies with the code of ethics that you are

14  bound by?

15      A.  Yes.

16      Q.  Okay.  Let's go back to Exhibit 2, please,

17  the expert report.  And we'll go back to that

18  qualification section, Dr. Schiffman, so you can

19  follow along.

20      Q.  And that's on page -- it's way at the end.

21      A.  I'm going to have to pull out my CV

22  because I -- well, I'll have to see what you put

23  up there.

24      Q.  Well, actually, it's not way at the end.

25  I think it's stuck in the middle.  Hold on.  I

296

1   should have written it down but I forgot.

2       A.  I don't have a copy of my CV here.

3       Q.  Here it is, page 60, Appendix C.

4           And I com -- to be honest, I compared it

5   to the other -- to the CV that was included in

6   your last report.  There's a few minor changes.  I

7   think we went over kind of the background ones, so

8   we don't have to do that.

9           There was four -- there are four new

10  articles.  So if we go to the publications,

11  there's four new articles, and you added them --

12  they're in reverse chronology, so the oldest is

13  first and the most recent is last.

14      A.  Uh-huh.

15      Q.  Does that make sense?

16          Okay.  So for publications, Dr. Schiffman,

17    are you familiar with an expression of concern as

18    it relates to --

19        A.  Yes.  This is -- this is a problem that

20    I'm having with Heartland Foods.  What happened is

21    I published this paper, it was submitted to the

22    Journal of Toxicology and Environmental Health.

23    And there were three reviews, all of them

24    terrific.  It's a very respectable journal.  It

25    was published.

297

1        My university put out a press release on

2    it, and the -- and it got picked up a lot.  And

3    then they asked me to -- I see two M's in it; oh,

4    my goodness.  And then they called me up and asked

5    me if I would do a news release, and the -- a

6    news -- local news program.  And I said, Well, I'm

7    out of town; I do Zoom.  And after that I got hit

8    with a lawsuit by Heartland Foods.

9        Now, the person who has put in this

10    concern, okay, is claiming that two -- that some

11    of the -- claiming that there's a problem with

12    our -- our analysis of the cytochrome p450.

13          This woman makes a living at doing this,

14   okay?  Look into her.  She is -- that's what

15   she -- this is her line of work.  She complains

16   about people that -- two things look the same to

17   her.  The argument is absolutely irrational.

18          First of all, the data -- those data -- I

19   met with the woman who did it.  She's an associate

20   professor in a cancer center.  We -- we asked her

21   to do the analysis on the cytochrome p450 and the

22   P -- and the P-glycoprotein.

23          I met with her over a weekend, went over

24   the data with her, saw -- I know how to do the

25   data.  You cannot look in a journal and say that

298

1    two things look the same, okay?  What you need is

2    an optical device to be able to look at the raw

3    data and to look at the absorption.

4          So anyway, she's been paid.  She is part

5    of the Heartland lawsuit.  And let us just say

6    that there is nothing wrong with that paper.  In

7    fact, I've been back and forth with the people

8    from Europe, the EFSA, the European Food

9    Authority, who had all the data ahead of time.

10          And so because they can't get anything on

11   this -- this latest paper, they're going back to

12   an earlier paper and have hired this woman to say

13   that the data for our cytochrome p450 and P-gp in

14   that paper, Oh, these two things look the same.

15          There is absolutely nothing to this, it's

16   just causing a lot of trouble and will not go

17   unpunished, let's put it that way.  But it's just

18   a disgusting situation at the moment.

19   Q.  Okay.  Understood.

20          Let's put the Splenda --

21   A.  Splenda?

22   Q.  Yeah, the Heartland Food lawsuit aside.

23          So just with the expression of concern,

24   there was an expression of concern related to a

25   2008 --


                                                    299


1    A.  Correct.

2    Q.  -- article?

3           Okay.  And that basically means that the

4    journal has concerns about the reliability of the

5    data that was used in the report?

6      A.  Just wait, okay?  Just wait.

7      Q.  Did the journal reach out to you and ask

8   for --

9      A.  Yes, yes.  I was going to -- I've written

10   something to submit to them.  My lawyer said,

11   Let's wait.  Okay?

12      Q.  Okay.  So you don't have any more

13   information yet?

14      A.  They've been told that -- I'm not at

15   liberty to say what's going on with this, okay?

16   Other than to tell you don't worry about it, okay?

17      Q.  Is this the only expression of concern

18   you've had issued against your publications?

19      A.  Correct.

20      Q.  And then in the lawsuit -- I'm not going

21   to ask for details, I understand you have separate

22   representation -- but, in general, it's a

23   defamation and misrepresentation lawsuit claim?

24      A.  I can justify everything that I've said.

25   There is nothing wrong with the data.


300

1      Q.  It's the only time that you've been

2   accused of misrepresenting data in a study?

3    A.  That is correct.  It's not even data

4  that -- the data that they're -- the complaint is

5  that I'm saying something is in their product that

6  they say is not in their product.  We won't go any

7  further with that one, okay?

8         And that's -- and the other one is this

9  woman, whatever her name is, who testifies against

10  people in all kind -- she testified against people

11  in a whole bunch of cases.  This is her -- this is

12  the way -- she says, These two things look the

13  same to me.

14         Well, a journal has to take that -- I

15  mean, take that seriously.  And so I got a letter,

16  I gave it off to my attorney, and he said let him

17  deal with it.  And I went through all the data as

18  to why it was incorrect.

19    MS. BRILLAULT:

20         If we take a quick, short break, I'm

21         going to look through my notes, see if

22         there's anything else that I have to do

23         for cleanup.  I'm approaching the end.  So

24         I'm not taking a break just for fun, I

25         really want to speed this along.