### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| **Plaintiffs** | **NO. 19-11133, c/w 19-14512** |
| **V.** | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| **Defendants** | **JUDGE: Morgan** |
| | **MAGISTRATE JUDGE: North** |
| *Applies to: Both Cases* | |

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS, REPORTS AND TESTIMONY BY MATTHEW STUTZ

Pursuant to Federal Rules of Civil Procedure 26 and 37, Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharm, Inc.*, 509 U.S. 579 (1993) and this Court's Case Management Order, the Addison Plaintiffs ("Plaintiffs") file this Motion to Exclude Expert Opinions, Reports and Testimony by Matthew Stutz. Specifically, the Plaintiffs move to exclude the expert testimony of Matthew K. Stutz for the second time in this litigation because his methodology is unreliable, and his testimony will not help the trier of fact understand the evidence or to determine the facts at issue, as required by Fed. R. Evid. 702.  In addition, Mr. Stutz's testimony should be excluded to deny Defendants their attempt to "re-do" issues that were addressed by other defense experts – and could have been addressed by Mr. Stutz – during General Causation.

A copy of Mr. Stutz's opinion is attached as **Exhibit 1**.  Excerpts from his deposition are attached as **Exhibit 2.**

## I.   INTRODUCTION AND BACKGROUND

The general factual background of this case is well known and has been briefed many times in prior Court filings. Therefore, the below Introduction and Background is specific to facts surrounding Mr. Stutz's opinions and this motion.

Defense expert Matthew Stutz testified at the General Causation trial and, even though the rate of emission for hydrogen sulfide was an issue in the trial, Mr. Stutz offered no opinions or testimony on that issue.  Now he comes to Court seeking to provide opinions that he could have provided before, including his own estimate of an emission rate and other arguments to undermine the Court's ruling on General Causation. In addition, Mr. Stutz seeks to offer new testimony regarding emission rates at the two adjacent landfills—River Birch and Hwy 90.  However, these opinions also could have been rendered in General Causation, they have no basis in actual fact and they are not the product of reliable methodologies.   Accordingly, Mr. Stutz's proposed testimony must be excluded from the trial.

**Background as to Hwy 90 Landfill.** Following the General Causation trial in February 2022, this Honorable Court issued Findings of Fact and Conclusions of Law on November 22, 2022. R.Doc 323. In that Ruling, this Court recognized that, when certain conditions are present in a landfill, hydrogen sulfide ("H$_2$S") emissions likely will be generated from sulfates contained in the fly ash and spent lime used during the solidification of waste at the Jefferson Parish Landfill ("JPLF"). R.Doc 323 at 6, 26-27. One of the necessary conditions for this reaction to occur in a landfill is organic or vegetative debris. Id. at 6.

Not all landfills accept construction debris. Construction and Demolition Landfills ("C&D"), as the name suggests, do accept construction debris, including sheetrock or gypsum that contain sulfates.  Id.  As demonstrated by the facts of this case, the co-disposal of gypsum, which

organic waste is likely to generate hydrogen sulfide gas.  Ordinarily, C&D landfills do not accept organic or vegetative waste.

The Hwy 90 Landfill is a C&D landfill.  However, following Hurricane Katrina (which occurred on August 29, 2005), the Highway 90 C&D Landfill was declared an "Emergency Debris Site" by the LDEQ.  *See* **Exhibit 7, (Deposition Exhibit 1556)** at pdf page 20.  Thereafter, and for the next few years, both C&D debris and vegetative debris were disposed of at the Hwy 90 Landfill.  As shown by the Annual Reports submitted to the LDEQ, which are publicly available in LDEQ's EDMS database, in the year ending June 30, 2006, the Hwy 90 Landfill accepted 1,522,846 tons of waste, of which more than 80,000 tons consisted of swamp grass, vegetation, and yard trim. EDMS #304662, page 4. (The reports are collectively attached as **Exhibit 3, (Deposition Exhibit 1550)**.  In the following year (and years after that) the report was divided between "mixed C&D" and "vegetative." Its reports for the next two years showed not only elevated C&D waste totals but also the acceptance of vegetative debris.  Id., EDMS # 5955015, page 5 (2007) and EDMS # 3610715, page 5 (2008). Thus, through June 30, 2008, the totals were these following Hurricane Katrina.

| Year ending June 30 | Mixed C&D | Vegetative |
|---|---|---|
| 2006 | 1,434,737 | 88,109 |
| 2007 | 730,870 | 64,528 |
| 2008 | 257,012 | 11,911 |
| Total | 2,422,619 | 164,548 |

Perhaps predictably, with the organic matter being buried with the Katrina-related gypsum sheetrock, by 2008, the Highway 90 C&D Landfill was experiencing issues with H2S emissions, which resulted in the Hwy 90 applying for a permit modification, discussed further below.  In

3

2009, the Hwy 90 Landfill accepted 221,908 tons of C&D waste and 37,885 of vegetative waste, Id, EDMS # 653639 at 2, 8. By comparison, the following two (2) years, the Highway 90 Landfill accepted only 505 tons of vegetative debris and 394,293 tons of C&D waste, and starting in the 2011-2012 reporting period, the Highway 90 Landfill reported that it began to receive vastly fewer tons of vegetative debris, by 2012 it received zero tons of vegetative debris:  Id., EDMS # 7827694, page 5 (2010), EDMS # 8051174, page 5 (2011), EDMS #8691871, page 1 (2012).

| Year ended June 30 | Mixed C&D | Vegetative |
|---|---|---|
| 2010 | 197,916 | 257 |
| 2011 | 195,872 | 248 |
| 2012 | 185,102 | 0 |

Since 2011, the Highway 90 C&D Landfill has never accepted more than 195,000 tons of C&D debris in any reporting period through 2020 and has accepted zero (0) tons of vegetative waste. These annual reports and statistics are readily and publicly available using the LDEQ Electronic Document Management System (EDMS), and Mr. Stutz admitted in this deposition that he had reviewed them.[1]  But he chose not to reveal this information in his Report, or take it into account in his opinions that he had reviewed them.

To support his argument that the Hwy 90 Landfill and not the Jefferson Parish Landfill was the source of the odors complained of by the Plaintiffs in this case, Mr. Stutz based his emissions calculations for 2017-2019 entirely upon hydrogen sulfide measurements taken inside the waste mass at Hwy 90 on February 26, 2008, nearly a decade earlier, and 30 months after the disposal of

---

[1] Mr. Stutz testified he searched the EDMS site for all relevant documents related to the River Birch and Hwy 90 Landfills. **Exhibit 2, Stutz Dep. at 25-26.**  Mr. Stutz explained, "I guess I included in my report what I relied on in making the model."  **Id.** at 172.

Katrina-related sheetrock had begun.  **Exhibit 1 at 18; Exhibit 2, Stutz Dep. at 231.** The document Mr. Stutz relied upon became Attachment 7 to his Report and is **Exhibit 4 (Deposition Exhibit 1555)** to this Memorandum   From these measurements in 2008, which he averaged as 2,900 ppm, Mr. Stutz concluded that the Hwy 90 landfill would generate hydrogen sulfide at the same rate for the next 11 years. On this point, Mr. Stutz had no explanation why the H2S concentration, based on measurements taken on a single day, would be the same every year thereafter, other than he had no information to suggest a different concentration.  **Stutz Dep. at 228-231**. But Mr. Stutz totally omitted from his report, and from his analysis, what happened next.[2]

On April 23, 2008, the Highway 90 C&D Landfill operators (which is River Birch, Inc.) applied to LDEQ for a small source air permit to control the H2S fugitive emissions that were being generated. **Exhibit 5 (Deposition Exhibit 1552).**  Its request to the LDEQ, Hwy 90 stated, "We are committed to reducing the odors and just recently completed re-capping an approximate[ly] 33-acre area with one foot of clay."  Noting that the re-capping with the clay "has already substantially reduced fugitive emissions," Hwy 90 then proposed to install passive flares to burn off the hydrogen sulfide being generated. Id.  When hydrogen sulfide is burned, it becomes sulfur dioxide. The LDEQ approved the plan to evaluate the effectiveness of the flares on May 13, 2008. **Exhibit 6 (Deposition Exhibit 1553).**  On August 15, 2008, the LDEQ approved the request to install three (3) flares.  **Exhibit 7 (Deposition Exhibit 1556).**  In November 2008, Hwy 90 specifically referred to "hydrogen sulfide odors resulting from the disposal of hurricane-related material (sheet rocks)." Hwy 90 told LDEQ that it wanted larger diameter wells to capture even more gas, **Exhibit 8 (Deposition Exhibit 1558),** and wrote again to LDEQ referring to "hydrogen

---

[2] Mr. Stutz admitted in his deposition that gas generation changes year by year, and that both the type of waste and the amount of materials were variables.  **Exhibit 2, Stutz Dep. at 125.** This admission alone renders his H2S emissions estimates from all three landfills unreliable.

sulfide odors resulting from the disposal of hurricane-related material (sheet rocks)." **Exhibit 9 (Deposition Exhibit 1559).**[3]

None of this was addressed Mr. Stutz' report, much less accounted for in his calculation of the H2S concentration.

By December 23, 2010, Hwy 90 (which had done all of this to reduce and control the odors generated by the Katrina-related sheetrock waste combined with the vegetative material) concluded that not enough gas was being generated inside the Highway 90 Landfill to keep the flares burning, and so Hwy 90 asked the LDEQ to rescind its permit. **Exhibit 10 (Deposition Exhibit 1561).** Hwy 90 reported, "The landfill gas flares were there to control odorous substances, primarily hydrogen sulfide, emitted from the landfill.  However, landfill gas generation is lower than initial estimates."  Id at 1.  This meant, of course, that the odor issue that had prompted the permit modification two years earlier no longer existed. In other words, the H2S generation from the Katrina-related sheetrock waste had run its course.   This information did more than "suggest" that the 2008 levels of H2S relied upon by Stutz did not continue into future years, it raised a serious question about Mr. Stutz's assumption, if it did not outright disprove it.  But Mr. Stutz ignored it.

Mr. Stutz tried to explain away the request to rescind the permit by claiming it "shows that they don't really quite know what's going on."  **Exhibit 2, Stutz Dep. at 210.**  However, the original measurements, the original plan for the flares, and the request to rescind the permit were all prepared by the same engineering firm—Enviro One.  As a result, if Mr. Stutz could not rely

---

[3] At this deposition, Mr. Stutz professed not to know that the elevated H2S was the result of the disposal of the wasted following Hurricane Katrina.  **Exhibit 2 at 185.**

upon Enviro One's statements in the request to rescind the permit, then he could hardly rely upon the measurement that led to Hwy 90 seeking the permit to begin with.

Despite Mr. Stutz's contention that he had reviewed all these documents in the LDEQ Electronic Data Management System, **Exhibit 2, Stutz Dep. at 25**, he excluded all of this information from his expert report.  Instead, he assumed the exact same H2S concentration as measured in 2008 to be present for every subsequent year when the actual facts indicated that could not possibly be so.  **Exhibit 2, Stutz Dep. at 228-231**.

To make matters worse, Mr. Stutz testified that he used the EPA's LandGEM model to estimate the amount of landfill gas generated at Hwy 90, a C&D Landfill. While LandGEM is perfectly acceptable for estimating gas generation at municipal solid waste landfills, it was not created for use at C&D landfills.[4]  As a result, Mr. Stutz's methodology is unreliable.

At the General Causation trial, Mr. Stutz's opinions were nothing more than a critique of the Plaintiffs' experts' estimate of emissions from the JPLF.[5] **Exhibit 2, Stutz Dep. at 282-283**. At that time, Mr. Stutz had not conducted any emissions estimate of his own despite having the opportunity to do so, as was done by Defendants' now conspicuously absent experts. **Exhibit 2, Stutz Dep. at 281-282**. Now, however, for Specific Causation, Mr. Stutz has created emissions estimates from all three landfills: the River Birch Landfill, the Highway 90 Landfill, and the Jefferson Parish Landfill.  Mr. Stutz's principles and methodology regarding the emissions

---

[4] The LandGEM User Gude explains that "LandGEM is an automated tool for estimating emission rates for total landfill gas, methane, carbon dioxide, nonmethane organic compounds (NMOCs), and individual air pollutants from MSW landfills." **Exhibit 11 at 1.** The default values in the model "are based on requirements for MSW landfills laid out by the Clean Air Act (CAA)." Id.

[5] As part of Mr. Stutz's critique of Plaintiffs experts' emissions estimate, he also testified regarding conditions at the JPLF.

estimates for Highway 90, River Birch and JPLF are grossly flawed, and his estimate of emissions from the JPLF comes too late.

## II.     LEGAL STANDARD

The admissibility of proffered expert testimony is a determination committed to the trial court's sound discretion. *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006). However, a court must make a threshold determination of the admissibility of expert testimony before relying on it. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993). As such, the court's role has been identified as one of a "'gatekeeper,' excluding 'bad science' that does not carry sufficient indicia of reliability for admission under Rule 702." *Metabolife Int'l., Inc. v. Wornick*, 264 F.3d 832, 840-41 (9th Cir. 2001).

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. *Sanchez–Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 991-92 (S.D. Fla. 2016). According to *Daubert* and its progeny, expert testimony is admitted only if it is both reliable and relevant. *Id.* at 992. "Expert evidence is reliable and relevant—and, therefore, admissible when the following factors are met: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the  testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 992 (quoting *Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005)). With respect to reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert* 509 U.S. at 595.   The Defendants must prove admissibility of its experts' testimony by a preponderance of the evidence. *Id.* at 992 (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 at 589); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

### III.   LAW AND ARGUMENT

Mr. Stutz's opinions should be excluded.

### A.   Mr. Stutz's Opinion 2B regarding his Highway 90 emissions estimate is not the product of reliable principles or methods.

Mr. Stutz's conclusion that the Highway 90 Landfill, and not the Jefferson Parish Landfill, was the main source of odors plaguing our community from July 2017 through December 2020 is only possible by relying on the 2008 outlier H2S concentrations from the Highway 90 Landfill. **Exhibit 2, Stutz Dep. at 133-134**. After Hurricane Katrina, the Highway 90 Landfill accepted and buried more vegetative debris and sulfate-containing waste than ever in its history. As a result, the Highway 90 Landfill experienced increased odor complaints and, thereafter, applied to the LDEQ for a permit to install gas wells and flares at the site for the specific purpose of controlling odors caused by the decomposition of Katrina-related sheetrock waste.  That permit was rescinded only two years later, because the quantity of H2S being generated was so minuscule that it was insufficient to operate the flares.

In addition to the foregoing failures, Mr. Stutz extrapolates that exact same 2008 H2S concentration every year from 2008-2020.  Mr. Stutz's opinion in this regard flies in the face of common sense as his estimate ignores the annual variations in the amount of waste and the content of the waste deposited in the Highway 90 Landfill, both of which undeniably impact H2S volumes and concentrations. By using post-Hurricane Katrina, Highway 90 Landfill data and disregarding irrefutable evidence that the H2S emissions had all but vanished by 2010, Mr. Stutz's opinion that the H2S concentration remains constant is manifestly unreliable.

With his flawed principles (ignoring 2010 measurements that show almost total elimination of H2S generation and thus emissions) and methodology (assuming a landfill has the same H2S concentration year after year despite variations in waste volume and type and decomposition rate),

Mr. Stutz uses LandGEM to estimate the emissions from the Highway 90 Landfill C&D Landfill[6] to contort more than 2.3 million tons of 2006-2007 post-Hurricane Katrina debris, and the resulting 2008 emissions, into his 2017-2020 emissions estimates from the Highway 90 Landfill. Predictably, but deeply flawed, Mr. Stutz opines that the Highway 90 Landfill was our community's main source of odors during the relevant time period. **Exhibit 1, Stutz Report, Executive Summary at iv.**

Mr. Stutz's opinion regarding Highway 90 relies heavily on the scientifically impossible assumption that emissions from Highway 90 Landfill did not change from 2008 through 2020, regardless of the amount and nature of the waste deposited in that landfill. In addition, Mr. Stutz completely ignores the more recent 2010 emissions data from Highway 90, which indicates that there were virtually no H2S emissions from Highway 90. Mr. Stutz did not even include the subsequent LDEQ data in his expert report, despite the fact that the same company captured the measurements he relies upon for 2008. This intentional cherry-picking of data reveals Mr. Stutz's unreliable methodology.

In addition to having adequate qualifications, any qualifying expert must base his opinions "upon sufficient facts or data." Fed. R. Evid. 702; *see Knight*, 482 F.3d at 355 (stating that "[t]he [Rule 702] reliability analysis applies to all aspects of an expert's testimony, [including] the facts

---

[6] Hwy 90 explained to the LDEQ that "We tried to calculate the fugitive emissions from the C&D landfill, but EPA's LandGem was developed from municipal landfills only and could not be used for C&D landfills. The default values in LandGem are inappropriate for C&D landfills since they overestimate the gas generation rates by an order of magnitude." **Exhibit 12 (Deposition Exhibit 1557)** LDEQ-EDMS Document 3597760. Although this document was in the LDEQ database the Mr. Stutz said he reviewed, Mr. Stutz professed not to have seen it. **Exhibit 2 Stutz Dep. at 197-202.** Mr. Stutz said he didn't know that LandGEM was developed form MSW landfills (although the user guide says so), **id. at 199-200**, and that he had used LandGEM on C&D landfills (although "there's not that many C&D landfills), **id. at 202**, and that "it all depends on the factors used," id at 200 (although has not explained how he adjusted the factors to take into account Hwy 90 was a C&D landfill and not an MSW landfill.

underlying the expert's opinion," and quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). An expert's work "is admissible only to the extent that it ... *is founded on data*." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (emphasis added).  Consequently, Mr. Stutz's principles and methodology regarding the Highway 90 Landfill emissions do not have any indicia of reliability required by Rule 702.

> ### B.     Mr. Stutz's emissions estimate from the JPLF comes too late.

As this Court is aware, the agreed-upon definition for the General Causation trial was to "determine whether odors and gases were being emitted by the Jefferson Parish Landfill during the relevant period and whether any such odors and gases were capable of producing the injuries claimed by any one or more of the Plaintiffs in this case."[7]  Clearly, the first element of the General Causation definition was determining whether there were emissions from the JPLF.    Stated differently, proof of an emission rate from the JPLF was an essential element of the Plaintiffs' burden of proof during General Causation.  As a result, the time for Defendants to challenge the Plaintiffs' emission rate for the JPLF was at the trial on General Causation, and not after.

However, Mr. Stutz did not estimate the emissions from the JPLF during General Causation but rather only criticized the Plaintiffs' estimate. Instead, another defense expert, Dr. Tarik Abichou, conducted the emissions estimate during General Causation, clearly indicating that Defendants understood that their opportunity to offer competing emissions rates for the JPLF was during General Causation.  Notably, there was nothing that prevented Mr. Stutz from performing such an estimate--counsel for Defendants simply made a strategic decision to rely on only Dr. Abichou at that time. **Exhibit 2 Stutz Dep. at 283-284.**  Now, frustrated with the complete unbelievability of Dr. Abichou's estimates, Defendants want a "redo." And by eliminating

---

[7] R.Doc 80 (First Case Management Order) at 2.

11

Dr. Abichou (without explanation) and inserting Mr. Stutz for Specific Causation, defense counsel seeks to dissect the General Causation Ruling and redo the first element with a different estimate from a different expert. By removing Dr. Abichou from their expert squad for Specific Causation, then instructing Mr. Stutz to do what had already been done during General Causation, voila, the first element of the General Causation Ruling loses its meaning, and they are able to begin again. Defendants' attempt to flout this Honorable Court's orders dictating when these expert efforts should have been undertaken must be rejected.

As discussed in Plaintiffs' challenges to several of the defense experts, Defendants are simply precluded from relitigating the General Causation ruling. Not only were the findings and conclusions of the Court at the General Causation Phase intended, and were agreed by the Parties, to govern further proceedings in this Court, "The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *United States v. Samak*, No. CR 91-189, 2019 WL 2026900, at *4 (E.D. La. May 8, 2019) (Morgan, J.) *quoting Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011). Under the "law of the case" doctrine, "an issue decided at one stage of a case is binding at later stages of the same case." *Matter of AKD Invs.*, 79 F.4th 487, 491 (5th Cir. 2023).

Remarkably, Mr. Stutz's estimate of emissions from the JPLF is over ten thousand (10,000) times greater than Dr. Abichou's estimate. This stunning change is required to fit the Defendants' ever-changing narrative and thus confirms with undeniable certainty that Defendants want a second bite at the apple on this important issue. During General Causation, the narrative was that the landfill emitted no odors at all, hence the use of Dr. Abichou's minuscule estimate. But now, after the General Causation Ruling, the narrative has changed: the landfill might stink a little, but not nearly as bad as Highway 90. This narrative is incompatible with Dr. Abichou's estimate,

hence the need for Mr. Stutz to take on this role.  This obvious attempt to redo what was already done – and should have already been done during General Causation – should not be permitted by the Court in its gatekeeping function and in its discretion to manage the litigation before it.

Mr. Stutz's opinions 1, 1D, 2A, 2C, 4A, 4B, 4D, 4E, 4F, 4G, and 4H, along with opinions 1A, 1B, 1C 1E (insofar as they relate to the JPLF), all relate to issues heard and decided in the General Causation Phase. Defendants' undisguised attempt to achieve a "redo" must be denied.

### C.    Mr. Stutz's opinions regarding River Birch and JPLF (Opinion 2B) omit significant data.

Based on the documented amounts of spent lime placed into the Jefferson Parish Landfill, it is possible to calculate the total amount of hydrogen sulfide that may be generated from that material.  For the Plaintiffs, these calculations were performed by Dr. Jaana Pietari.  However, Mr. Stutz has made no such calculation for JPLF or River Birch.  Defense expert Dr. Bishow Shaha explained that LandGEM measures landfill gas, not hydrogen sulfide in isolation,  **Exhibit 13 Shaha Dep at. 150-151.**  As a result, the part of the analysis is to estimate the sulfur content in the sulfur-containing waste.  **Id. at 148-149**.  Beginning on page 9 of his report, Dr. Shaha explains the model that he and his mentor, Dr. Meeroff, developed for estimating hydrogen sulfide generated by and MSW landfill that accepted C&D waste.  **Exhibit 14, Shaha Report.**  The first step was to estimate the total landfill gas generated using LandGEM.  **Id.** The "second step was to estimate the sulfur content in the C&D debris."  **Id at 10**.  Dr. Shaha explained in his deposition that "I had to estimate the sulfur content at a reasonable level to make sure that I'm not estimating something that doesn't have any basis. So I had to measure or estimate sulfur content in a level that makes sense, at least based on the literature."  **Id.**  Mr. Stutz made no such calculation, with the result that his estimate of H2S generation is nothing more than a wild guess.

Similarly, Mr. Stutz's calculation appears to compare sporadic inside-the-waste measurements of the H2S concentration with infrequent surface concentrations taken on particular days after mitigation efforts took place at the JPLF (including the addition of 23,000 cubic yards of additional clay cover placed upon Phase IVA by June 2019). Mr. Stutz's calculation completely ignores point source emissions as well as the fact the landfill gas will build up inside the waste mass until it finds a way out (as Dr. Abichou said, the landfill "burps"). Accordingly, it is not possible from Mr. Stutz's methodology to reliably capture all of the landfill emissions.

Mr. Stutz asserts that "site-specific" data must be used, but then he demands that the default values adopted in the industry be used, without adjustment.[8] **Exhibit 1 Stutz Report at 14**. He treats River Birch and JPLF as the same but ignores site-specific data like the robust gas collections system and synthetic liner at River Birch, which JPLF did not have, and the serious leachate collection problems and landfill cover issues that JPLF did have. **Id.**

> **D.    Mr. Stutz's opinion regarding his JPLF emissions estimate is not the product of reliable principles or methods.**

On top of that, Mr. Stutz's H2S emissions estimate from the JPLF does not separately take into account the forty-six million (46,000,000) pounds of Spent Lime buried in Phase IV-A.[9] Instead of calculating the potential H2S generation by Spent Lime, Mr. Stutz simply entered the JPLF waste totals, by mass, into LandGEM to estimate the emissions. The amount of sulfur containing materials placed into this landfill went way beyond ordinary values, and the concentration of hydrogen sulfide at this landfill exceeded "typical" levels by orders of magnitude, something that LandGEM does not account for. **Exhibit 13, Shaha Dep. at 16** (Q…Why wouldn't

---

[8] At the same time, he demands use of the EPA collection efficiency values, which exist regardless of the cover used, while also asserting that the cover in this case "oxidized" nearly all of the H2S being emitted from the landfill. No support at all exists for the latter proposition.

[9] **Exhibit 2 Stutz Dep. at 82** – "I didn't feel the need to separate it out."

just using LandGEM provide an accurate prediction as to future H2S concentrations in the landfill

gas from the C&D waste?  A. LandGEM is not made for that.").

As a result of the spent lime in this case, it is a fact that in 2019 the JPLF modified its air

permit to reflect a 200-fold increase in annual fugitive emissions of H2S from .78 to 165.63 tons

per year. **Exhibit 15, Permit Modification, Deposition Exhibit 1377 selected pages at**

**numbered page 6.**  When asked about this at his deposition:

> Q: what could explain that more than 200-fold increase, other than the
> Spent Lime?
>
> Mr. Stutz replied,
>
> A: There are a lot of reasons why it could be 200 percent greater.  And I
> listed one of them, one of them is the site can choose.

**Exhibit 2, Stutz Dep. at  85**.  With this telling response, it is clear Mr. Stutz believes that the JPLF

"can choose" to put any emissions amount on their air permit, without substantiation. When

questioned further about whether Spent Lime, an industrial byproduct of flue gas desulfurization

process well-known to contain sulfates,[10] could explain the 200-fold increase in H2S emissions:

> Q: And the Spent Lime, correct?
>
> A: Not necessarily.

**Exhibit 2 Stutz Dep. at 86.**  Mr. Stutz's ambiguous denial that Spent Lime, buried in the JPLF, is

even capable of causing the otherwise inexplicable increase in H2S emissions directly contradicts

the findings of the Court.[11]  His principle of steadfastly "holding the company line," despite site-

specific data and contrary defense expert opinions, is not helpful to the trier of fact, in violation of

Rule 702's mandate.

---

[10] R.Doc 323 at 5-6.

[11] Mr. Stutz did not list the Court's Findings of Fact and Conclusions of Law in his
document reviewed and it is clear he did not read the Court's Ruling. **Exhibit 2, Stutz Dep. at 97**.

"If... an expert's opinion is based on reasoning which as a matter of law is insufficient to support the expert's conclusion, that opinion should not be admitted into evidence because, as a matter of law, it cannot be helpful to the trier of fact and is therefore inadmissible." *Bartley v. Euclid, Inc.*, 158 F.3d 261, 288 (5th Cir. 1998), *opinion vacated on other grounds*, 180 F.3d 175 (1998).  Mr. Stutz's principles and methodologies place him far beyond the normal understanding of physical evidence, making his opinions unreliable.

## IV.    CONCLUSION

As discussed above, most of Mr. Stutz's opinions are nothing more than an effort to re-litigate the Court's ruling on General Causation and to render opinions on issues that were – and should have been – covered during General Causation in accordance with this Honorable Court's case management orders. Defendants' attempt to "redo" these issues years later should be rejected.

Mr. Stutz's new opinions are not based on scientifically appropriate facts or data, and his reasoning is so flawed as to be well outside the reliability required by *Daubert, Kumho* and Rule 702.  His reasoning is fatally flawed because his opinions are not based on complete data.  There is no way in which his testimony can be said to apply professionally accepted engineering principles and methods reliably to the facts of this case, as required by Rule 702 and *Daubert*.

This Court cannot admit Mr. Stutz's testimony unless it is certain that he will "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see also Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) ("[T]he expert's testimony must be reliable at each and every step or else it is inadmissible."). Nowhere does Mr. Stutz's testimony, opinions, or report provide the Court with such comfort.

Respectfully submitted, this 6th day June, 2024.

                         **/s/** S. Eliza James
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
FORREST CRESSY & JAMES, LLC
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fcjlaw.com
eliza@fcjlaw.com


                         /s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Harry S. Johnson (Admitted Pro Hac Vice)
James Jeffcoat (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@wtplaw.com
erowe@wtplaw.com
mchilders@wtplaw.com
*Counsel For Addison Plaintiffs*