# SECOND SUPPLEMENTAL EXPERT REPORT OF JOSE SANANES

# EVALUATION OF JEFFERSON PARISH LANDFILL GAS EMISSIONS

## AVONDALE, LOUISIANA – JEFFERSON PARISH

Jose Sananes PE (NJ and NY)
Principal, Ramboll Americas Engineering Solutions, Inc.
February 16, 2024




EXHIBIT A

## CONTENTS


| | | |
|---|---|---|
| **1.** | **QUALIFICATIONS** | **3** |
| **2.** | **FACTS AND DATA CONSIDERED** | **4** |
| **3.** | **LIST OF PUBLICATIONS** | **5** |
| **4.** | **LIST OF DEPOSITION OR TRIAL TESTIMONY** | **6** |
| **5.** | **BASIS OF COMPENSATION** | **7** |
| **6.** | **SUMMARY OF OPINIONS** | **8** |
| 6.1 | Landfill Gas and Leachate Management Problems and Issues | 8 |
| 6.2 | Ramboll's November 2019 Inspection and Gas Characterization | 10 |
| 6.3 | Estimation of Landfill Gas Generation and Emissions | 10 |
| 6.4 | Standards of Care Applicable to Landfill Owners and Operators | 13 |
| 6.5 | Breaches of Standards of Care by Defendants in this Case | 14 |
| **7.** | **EXHIBITS USED TO SUMMARIZE OR SUPPORT OPINIONS** | **17** |
| **8.** | **DESCRIPTION OF REPORT** | **18** |
| 8.1 | Scope and Purpose | 18 |
| 8.2 | Limitations | 18 |
| **9.** | **BACKGROUND** | **19** |
| 9.1 | Site Location and Description | 19 |
| 9.2 | Summary of Landfill Operations | 19 |
| 9.3 | Summary of Landfill Gas and Leachate Management Problems and Issues at the Site | 20 |
| **10.** | **RAMBOLL'S NOVEMBER 4-8, 2019 INSPECTION AND GAS CHARACTERIZATION REPORT** | **24** |
| **11.** | **EVALUATION OF LANDFILL GAS GENERATION, GAS AND LEACHATE COLLECTION SYSTEMS, AND EMISSIONS** | **26** |
| 11.1 | Previous Landfill Gas System Evaluations | 26 |
| 11.1.1 | 2017 Landfill Gas Collection and Control Plan – Golder Associates24F | 26 |
| 11.1.2 | 2018 Landfill Gas System Assessment – CEC26F | 27 |
| 11.1.3 | 2019 High BTU Landfill Gas Utilization Plan – CEC28F | 29 |
| 11.1.4 | 2019 Assessment of Jefferson Parish Landfill Gas Field – CEC and River Birch30F | 31 |
| 11.2 | Leachate Saturation within JP Landfill Areas | 32 |
| 11.2.1 | Summary of the Landfill Gas and Leachate Management at the Site | 34 |
| **12.** | **LANDFILL GAS GENERATION MODELING FROM SOLID WASTE** | **37** |
| 12.1 | Methods for Estimating Landfill Gas Generation from Solid Waste | 37 |
| 12.1.1 | Composition of Landfill Gas | 37 |
| 12.1.2 | Rate of LFG Generation | 38 |
| 12.2 | Application of the LandGEM Model to Estimate $H_2S$ Generation from Solid Waste at the JPL Site | 39 |
| 12.2.1 | Waste Acceptance | 39 |




EXHIBIT A

12.2.2 Selection of the Kinetic Constant k 40
12.2.2.1 Factors Affecting the K Value 40
12.2.2.2 Selected K Value for the JPL Site 41
12.2.3 Selection of the Methane Potential Lo for the JPL Site 41
12.2.4 $H_2S$ Concentration for each Landfill Phase 41
12.3 Results of the Application of the LandGEM Model to Estimate $H_2S$ Generation from Solid Waste 42

**13. ESTIMATED COLLECTION EFFICIENCIES 43**

**14. ESTIMATED EMISSIONS 48**
14.1 $H_2S$ Generation from Spent Lime Operations 48
14.2 $H_2S$ Fugitive Emissions 48

**15. STANDARDS OF CARE APPLICABLE TO LANDFILL OWNERS AND OPERATORS 50**
15.1 Federal and State Design, Operation and Monitoring Requirements 50
15.2 Ideal Conditions for Hydrogen Sulfide Generation 52
15.3 Best Management Practices (BMP) for Hydrogen Sulfide in Landfills 53
15.4 Selected Cases of Hydrogen Sulfide Generation at Landfills 56

**16. BREACHES OF STANDARDS OF CARE BY DEFENDANTS IN THIS CASE 58**
16.1 General 58
16.2 Defendants' Role on the Design, Operation and Maintenance of JPLF 58
16.3 Breaches of Standard of Care by Defendants 60

**17. REFERENCES 66**

## APPENDICES

Exhibits

Appendix A: Curriculum Vitae of Jose Sananes



EXHIBIT A

# 15. STANDARDS OF CARE APPLICABLE TO LANDFILL OWNERS AND OPERATORS

## 15.1 Federal and State Design, Operation and Monitoring Requirements

[166] Federal and State regulations define minimum design, operation and maintenance requirements for waste disposal facilities, including design criteria, operating criteria, and post-closure care. Federal requirements for municipal solid waste landfills are defined in 40 CFR I, Chapter I, Subchapter I Part 258 (40 CFR 258), while in Louisiana the requirements for solid waste facilities are defined in LAC Title 33, Part VII, Subpart 1.

[167] Federal regulations require that Owners or operators of all municipal solid waste landfills design, construct and maintain the following control systems, for which it defines operating criteria and recordkeeping requirements:

- Leachate in 40 CFR 258.40
- Cover materials in 40 CFR 258.21
- Explosive gas (i.e., landfill gas) in 40 CFR 258.23
- Stormwater run-on/run-off in 40 CFR 258.26 and 40 CFR 258.27

[168] Federal post-closure care requirements in 40 CFR 258.61 include:

- Maintaining the integrity and effectiveness of any final cover, including making repairs to the cover as necessary to correct the effects of settlement, subsidence, erosion, or other events.
- Maintaining and operating the leachate collection system in accordance with the requirements in 40 CFR 258.40.
- Monitoring and maintaining the ground water monitoring system.
- Maintaining and operating the gas monitoring system in accordance with the requirements of 40 CFR 258.23.

[169] Further, Louisiana regulations define design standards governing all Type I and II facilities (LAC 33:VII.711), such as the JP Landfill, for, among others:

- Daily and interim cover in LAC 33:VII.711.B.2, which, per LAC 33:VII.711.B.2.a.v requires that daily and interim "*cover materials shall reduce noxious odors by minimizing outward movement of methane and other gases.*"
- Stormwater control in LAC 33:VII.711.B.3.
- Leachate control, collection, treatment and removal systems in LAC 33:VII.711.B.4 and LAC 33:VII.711.B.5.
- Gas collection/treatment or removal systems in LAC 33:VII.711.B.6.

[170] Louisiana requirements for facility operations (LAC 33:VII.711.B.2) include developing Operational Plans that address, among other items:



EXHIBIT A

- "the methods that will be used to ensure that the leachate collection/treatment system is functioning as designed" in LAC 33:VII.711.D.2g.
- "the measuring protocol, frequency, and recordkeeping used to monitor leachate head and how the leachate will be removed" in LAC 33:VII.711.D.2h.
- "the actions to be taken when monitoring indicates leachate head exceeds the standard in LAC 33:VII.711.B.4.f.viii" in LAC 33:VII.711.D.2i.

[171] Louisiana regulations also define facility operational standards (LAC 33:VII.711.B.3) that include among other items:

- "Facilities receiving waste with a potential to produce methane gas shall be subject to the air-monitoring requirements of LAC 33:VII.711.D.3.a" (LAC 33:VII.711.B.3.a.i).
- Developing a comprehensive air-monitoring plan (LAC 33:VII.711.B.3.a.ii).
- Controlling odors by the best means practicable (LAC 33:VII.711.B.3.a.vi).
- "For nonfunctioning leachate pumps and/or not maintaining liquid head below the 1 foot leachate head standard set forth in LAC 33:VII.711.B.4.f.viii, action to repair and/or to replace pumps shall be initiated and completed within seven days" (LAC 33:VII.711.B.3.e.iii).
- "Sufficient equipment shall be provided and maintained at all facilities to meet the facilities' operational needs" (LAC 33:VII.711.B.4).

[172] Louisiana landfill post-closure care requirements in LAC 33:VII.711.F are very similar to the federal requirements and include:

- "*maintaining the integrity and effectiveness of any final cover (including making repairs to the cover as necessary to correct the effects of settlement, subsidence, erosion, or other events)*"
- "m*aintaining and operating the leachate collection system until leachate is no longer generated or until the permit holder can demonstrate that the leachate no longer poses a threat to human health or the environment in accordance with LAC 33:I.Chapter 13*"
- "*maintaining and operating the collection/treatment or removal system and the gas-monitoring system*"
- "*maintaining the groundwater-monitoring system and monitoring the groundwater in accordance with LAC 33:VII.805*"

[173] As discussed throughout of this document, many of the Louisiana requirements were not complied with. For example:

(a) As evidenced by the nature of complaints by the Plaintiffs in this case, as well as numerous other residents of the affected areas, and as detailed in **Sections 11.1.2 and 13**, the daily and interim covers placed in Phase IVA did not meet the requirement of LAC 33:VII.711.B.2.a.v to mitigate noxious odors and outward movement of gases.

(b) The Defendants failed to use best management and engineering practices to control odors as required by LAC 33:VII.711.B.3.a, as evidenced by the public statements of



EXHIBIT A

Parish officials, findings of the LDEQ, the high measured $H_2S$ readings in emissions at the site, the extremely high leachate levels at the landfill which impeded the efficient collection of LFG, the ineffective operation and maintenance of the LFG collection system, and the nature and frequency of complaints by the Plaintiffs and numerous others in this case.

(c) As detailed in **Sections 11.1.2 and 11.1.4**, a significant portion of the leachate collection system equipment, including pumps within the gas wells, was inoperable and need of replacement or repair for extended time periods, thereby not meeting the requirements of LAC 33:VII.711.B.3.e.iii. This condition was also documented in the LDEQ inspection reports. Further, as indicated in **Section 11.2**, measured leachate levels are so high within the waste media that the gas wells, the bottom of which are 10 feet above the bottom liner system, are inundated.

(d) As documented by the JP Landfill consultants, the absence or malfunctioning equipment indicated a failure to provide or maintain adequate equipment at the JP Landfill to meet the landfill's operational needs as required by LAC 33:VII.711.B.4.

For the same reasons, the requirements of sections II.B.5.A, II.B.5.C, II.B.5.H and II.B.5.K of the contract between Waste Connections and Jefferson Parish were not complied with.

## 15.2 Ideal Conditions for Hydrogen Sulfide Generation

[174] The generation of hydrogen sulfide depends on specific environmental conditions, such as the availability of sulfate ions, anaerobic conditions, appropriate pH and temperature rages, and the presence of organic materials and sulfate-reducing bacteria. The reaction is more likely to occur in confined spaces or in anaerobic digestion processes where organic waste and sulfate containing materials (like gypsum or spent lime) are in close contact. Specifically, hydrogen sulfide can be produced when the following conditions are present:

(a) Water – The biological conversion of sulfate into hydrogen sulfide occurs in the aqueous phase (Gypsum Association 1991). MSW contains inherent moisture, with weight-based moisture contents typically ranging from 15 to 40%, when delivered to disposal facilities (USEPA 2014). Even in landfills with leachate collection systems that effectively reduce the presence of free liquids, the presence of perched and discrete zones of saturation are still common (Marshall 2017). Some MSW landfills recirculate leachate to promote decomposition of waste, which can further increase the production of hydrogen sulfide (USEPA 2014).

(b) Source of Soluble Sulfate – The amount of the sulfate is a function of the amount of sulfate containing materials accepted by the facility, which can vary widely. Gypsum is a source of soluble sulfate due to its high sulfur content. Gypsum can be found as larger pieces of drywall or as fine-grained materials from C&D recycling operations known as recovered screen material (RSM) (USEPA 2014). According to a 1998 laboratory study, sulfate reduction in reactors containing fresh MSW with gypsum produced sulfur emissions 10 times greater than reactors without gypsum drywall (Fairweather and Barlaz, 1998). Other soluble sulfate sources include fly ash and bottom ash (Marshall 2017) and flue gas desulfurization residues and sludges (USEPA 2014).

(c) Sulfate Reducing Bacteria – Sulfate Reducing Bacteria (SRB), which reduce sulfate to hydrogen sulfide, are believed to be commonly present in MSW landfills (Gypsum



EXHIBIT A

Association 1991, Marshall 2017). The presence of moisture allows for SRB to grow and chemical reactions to occur (USEPA 2014).

(d) Organic Material – Organic matter is a necessary substrate for SRB during the production of hydrogen sulfide (Gypsum Association 1991, USEPA 2014). MSW landfills contain high organic content wastes, as a wide variety of organic materials (i.e., wood, paper, cardboard, food, vegetative waste, and fabrics) are disposed of there (Marshall 2017).

(e) Anaerobic Environment – "*Oxygen will kill SRBs*" (Gypsum Association 1991) and SRBs thrive under anaerobic conditions (i.e., lack of oxygen), which are necessary for the reduction of sulfate into hydrogen sulfide to occur. These conditions are common in MSW landfills after the placement and compaction of waste material (USEPA 2014).

(f) Appropriate pH range – SRBs exist/thrive in environments with a pH ranging between 6 and 9 (USEPA 2014) while SRB reduction of sulfate to hydrogen sulfate is reportedly optimum within a pH range of 7 to 8 (Gypsum Association 1991). This condition is typical for a MSW landfill (Marshall 2017).

(g) Appropriate Temperature Range – SRB growth and hydrogen sulfide generation occur within a temperature range of approximately 30 to 38 degrees Celsius, which is a typical range for a MSW landfill (Gypsum Association 1991, Marshall 2017).

[175] Favorable conditions conducive to the generation of hydrogen sulfide in landfills have been recognized by the landfill industry for well over two decades. The standard of care and the obligation to use best management practices in the control of odors entails that the Defendants, with the assistance of their consultants, assess these conditions during the planning phase and prior to accepting the disposal of spent lime in a MSW landfill area and prior to implementing the stabilization of liquid waste and sludge using spent lime, which started in October 2016 in Phase IVA. Further, the standard of care and best management practices dictate that any materials with a substantial soluble sulfur content be segregated from MSW in a mono-cell or an area away from those receiving MSW. There is no documentation available to indicate that the Defendants or their consultants conducted any evaluation to address the potential for hydrogen sulfide generation and emissions based on the above conditions at the JPL, specifically in terms of preventing mixing spent lime with MSW. In fact, internal email correspondence[57, 58, 59] from Waste Connection indicates the opposite, specifically Waste Connections' knowledge that the neighboring River Birch Landfill stopped accepting liquid waste requiring solidification around mid-June 2016 due to odor complaints and adverse impacts to their landfill gas production.

## 15.3 Best Management Practices (BMP) for Hydrogen Sulfide in Landfills

[176] Although some of the conditions identified in **Section 15.2** cannot be controlled by the landfill operator, several Best Management Practices (BMPs) are typically implemented to control the production of hydrogen sulfide. These practices aim to minimize the generation of $H_2S$ gas and mitigate its release into the atmosphere. For example, in September 2007, the Massachusetts Department of Environmental Protection (MassDEP) Bureau of Waste

57 WC_JPLF_00260849

58 WC_JPLF_00270624

59 WC_JPLF_00271367



EXHIBIT A

Prevention released a document titled *Control of Odorous Gas at Massachusetts Landfills (*MassDEP 2007), in support of 310 CMR 19.000 - Solid Waste Management Regulations. MassDEP presented several recommended management practices (RMPs) to prevent and/or reduce the potential impact of hydrogen sulfide and odorous landfill gas emissions. Similarly, in August 2014, the USEPA published its BMPs to Prevent and Control Hydrogen Sulfide and Reduced Sulfur Compound Emissions at Landfills (USEPA 2014), which defined methods to control $H_2S$ generation and emission. Following are BMPs and RMPs landfill operators implement to address hydrogen sulfide in landfills, which were well-known in the industry by 2016:

(a) Waste Segregation and Diversion: Implementing a waste segregation program at the source can help divert sulfate containing materials, which is a significant contributor to $H_2S$ emissions, away from the landfill. Encouraging recycling, composting, and other waste diversion methods can reduce the amount of sulfate containing materials reaching the landfill. The diversion of drywall from disposal has been recommended as a measure to prevent hydrogen sulfide formation in landfills (USEPA 2014), as the relationship between the disposal of gypsum drywall in landfills and the production of hydrogen sulfide has been known for years (Gypsum Association 1991, Townsend et al 2000). In fact, the City of Vancouver, British Columbia, Canada banned drywall from landfill disposal in 1990 due to the issues associated with hydrogen sulfide production (Townsend et al 2000). In addition, the landfilling of biodegradable waste materials with high sulfate content has been prohibited in England and Wales since July 2005 (UK Health Protection Agency, 2011; Ko et al, 2015). Alternatively, the MassDEP RMPs suggest the landfill owner/operator should only accept materials from C&D processing facilities that have separated and removed gypsum from the material prior to disposal.

(b) Landfill Gas Collection and Control: Implementing a landfill gas collection and control system is crucial in managing $H_2S$ emissions. Methane is often present in landfill gas along with $H_2S$. Collecting and properly managing landfill gas through systems like gas extraction wells and flaring or beneficial use will not only control methane emissions but also reduce $H_2S$ emissions. A plan for installing a LFGCS (including $H_2S$ pretreatment) should be part of a landfill's approved operating permit (MassDEP 2007). Methods of treating hydrogen sulfide in landfill gas include thermal, physiochemical, and biological. The most common option for collecting landfill gas is gas incineration on a flare system, which results in converting hydrogen sulfide to sulfur dioxide or sulfuric acid (Ko et al, 2015).

(c) Disposal Practices: Limiting placement of gypsum drywall and other sulfate containing materials to special areas such as: (a) specially constructed "dry" cells in the existing landfills (NJDEP Science Advisory Board 2015); (b) C&D landfills managed to handle the challenges of C&D wastes (NJDEP Science Advisory Board 2015); (c) higher elevation areas of the active face to decrease the potential of moisture contact (USEPA 2014) and (d) away from municipal solid waste.

(d) Moisture Control: Stringent operation and maintenance of leachate and stormwater management systems and implementing measures to control infiltration and contact with stormwater (e.g., minimizing working surfaces, immediate proper placement and grading of daily covers to promote drainage) is necessary to minimize moisture within the landfill (Marshall 2017). Leachate can be a significant source of hydrogen sulfide (Profumo et al 1992), and potentially hazardous atmospheres can form in areas where

leachate may accumulate, such as gas wells, leachate sumps, and cleanout lines. Segregating received drywall or other SCMs to distinct areas and perhaps making note in operations records of areas where larger amounts of drywall were placed (similar to how landfills that accept asbestos make note of incoming quantities and disposal location).

(e) Capping Systems: The installation of a low-permeability layer can help remediate hydrogen sulfide emissions by limiting production as well as preventing emissions. Landfill caps minimize the infiltration of stormwater into the waste, which can curb leachate production. Alternative caps or soil cover amendments, which include compost, wood chips, fine waste materials, quicklime, hydrated lime, calcium carbonated materials, and waste steel (Plaza et al., 2007; Xu et al., 2010a; Xu et al., 2010b; Solan et al., 2010) can also be implemented to help control and attenuate gas emissions from a landfill (refer to Section 3.7 of the Rebuttal Report). The active face should also be kept as small as possible to limit the surface area of exposed waste. Soil daily cover may need to be placed more than once a day to effectively control odor and may need to be greater than the minimum 6-inches required by regulation (MassDEP 2007). Capping systems in combination with an active landfill gas collection and control system has been recommended as a BMP for hydrogen sulfide control at both MSW and C&D landfills (Waste Management 2005; MassDEP 2007; USEPA 2014). Separating sulfur containing materials from organic wastes and placing them in specific areas of the landfill, especially in wet landfills, has been recommended since at least 1991 (Gypsum Association 1991).

(f) SRB Inhibitors: Since most of the hydrogen sulfide emissions from landfills are produced through biological processes, inhibiting SRB can be an effective method of minimizing hydrogen sulfide emissions (Ko et al, 2015). SRB can be inhibited by changing the redox potential of the environment, increasing the pH, stimulating the growth of a competing group of anaerobic bacteria, and adding SRB inhibitors. The redox potential can be adjusted by adding oxidizing agents, for example oxygen and nitrate. The addition of nitrate and ferric compounds can also stimulate the growth of nitrate-reducing bacteria (NRB), which have a large thermodynamic advantage over the SRB. Other chemical inhibitors of SRB include antibodies, detergents, dyes, mercurial, metal ions and complexes, nitro compounds, phenolic substances, sulfate analogs, and sulfonamides (Ko et al, 2015).

(g) Waste Odor Control: Controlling odors from the landfill can help manage $H_2S$ emissions indirectly. The location, sizing, and timing of waste and cover placement should be considered (MassDEP 2007). Using odor control technologies like misting systems, neutralizing agents, or biocovers can help reduce the odor associated with $H_2S$, making the surrounding environment more tolerable. Odor neutralizers do not prevent the production of odorous compounds and should only be considered a temporary measure (USPEA 2014).

(h) Monitoring and Reporting: Regular monitoring of $H_2S$ emissions, landfill gas composition, and environmental air quality is essential. Monitoring allows early detection of potential issues and provides data for effective management and reporting to regulatory agencies. It helps evaluate the success of implemented BMPs and identify areas for improvement. A site-specific BMP guide can allow landfill owners and operators to understand the specific issues and challenges associated with hydrogen

sulfide production and allow for proper documentation to demonstrate procedures used to address hydrogen sulfide emissions (USEPA 2014).

[177] Waste Connections Director of CCR Management (which included flue gas desulfurization materials such as spent lime) since 2016, testified[60] that he was aware of the USEPA BMPs for $H_2S$ control at landfills (USEPA 2014) since its issuance in 2014. However, the Solidification Plan[61] prepared by the JP Landfill did not incorporate most BMPs to minimize or control $H_2S$ generation and/or emissions. Notably, there was no segregation of waste processed during the liquid waste and sludge stabilization using spent lime from the MSW in Phase IVA or use of specifically designed isolated areas to mitigate odors from handling sulfur containing materials. Additionally, the timely installation of the landfill gas collection system was neglected, and it did not specifically account for the location of different waste types, particularly the spent lime. Moisture control measures were not implemented, the capping system was deficient, and there was insufficient consideration of SRB inhibitors or other effective controls for waste odors.

[178] The Solidification Plan[62] also required that "*Landfill operations personnel will estimate the approximate solidification ratio for each differing waste stream based on bench tests of the actual waste / wastewater or based on past solidification ratios used to successfully achieve a passing result*." This requirement is consistent with industry practice (Environmental Research & Education Foundation 2018), which emphasizes the need of performing bench scale testing before accepting any aqueous wastes. This testing ensures satisfactory performance of the material once processed and placed in the landfill by providing critical information, including but not limited to (a) optimal agent-to-waste mixing ratios, (b) reactions between waste materials and solidifying agents, (c) leachability, and (d) odor potential. However, there is no evidence that such tests were performed.

## 15.4 Selected Cases of Hydrogen Sulfide Generation at Landfills

[179] The generation of hydrogen sulfide at JP Landfill has been discussed in this expert report and preceding reports. As indicated in these reports, the emission analysis involved defining the hydrogen sulfide emissions originating from different sources such MSW, and the spent lime disposed of at the landfill, and the solidification activities conducted in Phase IVA.

[180] It should be noted that both gypsum and spent lime have the potential to be sources of soluble sulfate when they undergo dissolution and, therefore, are capable of generating hydrogen sulfide emissions under favorable conditions. In general, gypsum is commonly found in C&D waste and disposed of at landfills that do not accept MSW. Spent lime was disposed in Phase IVA at JP Landfill, and it has been determined that the sulfate in the spent lime resulted in the generation of high $H_2S$ emissions. Spent lime is most likely the primary cause for the elevated $H_2S$ concentrations observed at the JP Landfill.

[181] Following are brief summaries of selected case studies of generation of hydrogen sulfide emissions from MSW landfills that received C&D waste and had subsequent odor issues:

60 Deposition of Joseph William Laubenstein, Ictech-Bendick v Progressive Waste, January 08, 2024.

61 WC_JPLF_00260843 and WC_JPLF_00260844

62 WC_JPLF_00260843 and WC_JPLF_00260844

- Naples Landfill, Collier County, FL: Naples Landfill is a Class I landfill that used processed C&D debris materials as an alternative daily cover. Hydrogen sulfide was measured at 15 ppm in areas with no active gas collection. Leachate seeps or cracks on the landfill cover were observed to have odorous gas detected between 30 to 250 ppm. In addition, seven samples were also collected and found hydrogen sulfide detected between 12 ppb and 5,600 ppm in all samples (Townsend, 2000).
- Central Sanitary Landfill and Recycling Center, Broward County, FL: Central Sanitary Landfill and Recycling Center is a MSW landfill that received C&D debris after Hurricane Andrew. Odor problems began in the surrounding residential areas soon after, and hydrogen sulfide was measured up to 5,000 ppm (Townsend, 2000).
- Sunny Farms Landfill, Fostoria, Ohio: Sunny Farms Landfill is a 510-acre site that accepts MSW, C&D debris, contaminated soils, and specialty wastes[63]. Odor complaints surrounding Sunny Farms Landfill began in 2013. Ohio EPA explained that hydrogen sulfide gas is generated when "high volumes" of dry wall decompose at the landfill. In January 2019, Ohio EPA ordered Sunny Farms to take several actions to remove hydrogen sulfide gases and reduce odors, which included installing an odor control blanket as well as an enhanced LFG collection system (i.e., additional gas wells and gas extraction infrastructure), and a wastewater treatment system (a $4 million investment). The hydrogen sulfide treatment system consists of six vacuum boxes that capture hydrogen sulfide from extracted LFG. The landfill also installed permanent monitors for hydrogen sulfide and reports to Ohio EPA and the health board weekly. The landfill operator reported observing much lower and fewer occurrences of hydrogen sulfide since implementing the additional measures.

[182] The standard of care required the Defendants to have been aware of these cases and/or similar before 2016. However, no considerations or proactive measures were taken by the JP Landfill to mitigate the potential for hydrogen sulfide emissions, despite drawing from the experience provided by historical cases.

63 Contaminated soils and specialty waste profiles must be approved prior to shipment to the landfill. MSW and C&D debris do not require specific approvals.

# 16. BREACHES OF STANDARDS OF CARE BY DEFENDANTS IN THIS CASE

## 16.1 General

[183] Below are relevant standards of care applicable to landfill owners, landfill operators and contractors of landfill gas collection and leachate collection systems, which are well-known and accepted in the landfill industry:

(a) In general, a landfill owner or operator must exercise reasonable care to prevent noxious odors from escaping its property and/or landfill and foreseeably affecting neighboring individuals. Reasonable care includes compliance with all applicable laws and regulations and implementing best management practices, as defined by EPA, State agencies and other stakeholders.

(b) To prevent noxious odors from escaping from the landfill:

i. A MSW landfill owner or operator should not accept sulfur containing materials (such as spent lime, gypsum, or fly ash) which are known to produce $H_2S$, without a proper design and plan for their disposal that incorporates best management practices to prevent the generation of noxious gases (refer to **Section 15.3**). When accepting these types of wastes, the conditions that promote the generation of $H_2S$ should be considered, measured, and a gas emission control plan incorporated into the landfill design, construction, operation, and monitoring (refer to **Section 15.3**).

ii. The landfill must have properly designed and constructed landfill gas control and leachate control systems. While limited amounts of LFG is typically collected from the leachate collection system compared to the solid waste media, an ineffective leachate collection system will reduce the ability of the gas collection system to collect gas, thereby resulting in fugitive emissions.

iii. The landfill gas control and leachate control systems must be operated, monitored, and maintained to ensure their continued functionality as intended by the design. The results and recommendations of these activities must be reported promptly to the landfill owner by the landfill operator(s) so corrective actions, if any, are implemented in a timely manner.

(c) If landfill gas control and leachate control systems operation, monitoring, and maintenance activities indicate deficiencies, the landfill operator(s) must promptly report these issues to the landfill owner and system designer. This allows for (a) recommendations to be evaluated, (b) causes to be investigated, and (c) repairs, replacements or enhancements to the system(s) to be implemented in a timely manner.

## 16.2 Defendants' Role on the Design, Operation and Maintenance of JPLF

[184] IESI LA Landfill Corporation (IESI, a Waste Connections, Inc. company; CEC 2018) was contracted by Jefferson Parish to operate, manage, and maintain the Expansion Area (Phase IVA, comprising Cells 20-25) and Landfill Phases I, II, and III on May 17, 2012 (Jefferson Parish 2012). According to the contract, Waste Management (Waste Management of Louisiana, LLC d/b/a Waste Management of New Orleans) developed, operated, and

maintained Phases I & II. Phase III (149-acre portion of the Landfill), which was under development during the signing of the document, was also developed, operated, and maintained by Waste Management. The scope of services to be provided by IESI/Waste Connections for Phase IVA, included, but was not limited to, (i) operation and maintenance, (ii) waste screening and placement, (iii) placement of daily, interim and final cover materials, (iv) final design, construction, operation and maintenance of the leachate collection and storm water management systems, (v) installation, operation and maintenance of groundwater monitoring wells, and (vi) environmental monitoring, which specifically included implementing both operational best management practices and use of odor control systems (Jefferson Parish 2012). Even though the scope seems to exclude activities associated with the landfill gas collection and control system other than repairs to damage caused by IESI/Waste Connections, because IESI was ultimately responsible for "*implement[ing] a comprehensive odor control plan that includes both operational best management practices and odor control systems*," IESI assumed the responsibility for ensuring that deficiencies in the gas collection system were either remediated by the Owner or addressed by other control measures. As to the leachate collection system, even if the system had not been fully transferred to IESI, IESI assumed the responsibility for ensuring that deficiencies in the leachate collection system were either remediated by the Owner or addressed by other control measures so as to allow for effective odor control.

[185] The term of the contract was for a period starting from the signing of the agreement and ending upon the closure of the permitted area in Phase IVA. Acceptable waste allowed to be disposed of under this agreement included the following:

- Residential Solid Waste from Unincorporated Jefferson Parish,
- Solid Waste from Jefferson Parish Offices,
- Municipal Wastewater Treatment Plant Sludge generated in Jefferson Parish
- Solid Waste from the Jefferson Parish Administrative Departments
- Industrial Solid Waste (generated within Jefferson Parish)
- Commercial Solid Waste (generated within Jefferson Parish)
- Industrial Solid Waste and Commercial Solid Waste generated outside of approval of Jefferson Parish in conformity with Section 16-14 of the Jefferson Parish Code of Ordinances, in which case, it shall be limited to a maximum of 109,5000 tons per calendar year.

[186] As previously noted, as part of the contract, IESI/Waste Connections agreed to "*implement a comprehensive odor control plan that included both operational best management practices and odor control systems*." They were required to perform all odor monitoring and control activities and services as required by the existing Jefferson Parish Landfill Odor Management Plan, and any amendments from local, federal, or state regulations adopted and imposed on landfill operations. The amount of waste exposed to the atmosphere was to be minimized by limiting the size of the active face during normal operations. All deposited waste was to be covered with either an approved alternate daily cover or 6 inches of daily cover at the end of each working day. Any waste that exhibited strong odors was to be covered immediately upon delivery with soil materials.



EXHIBIT A

[187] IESI/Waste Connections was responsible for ensuring that leachate was managed according to the provisions of the LDEQ permit. Any compliance orders, fines, penalties, and corrective action orders related to the operation of the on-site leachate management facilities caused by the actions or inactions of IESI were to be the sole responsibility of IESI (Jefferson Parish 2012).

### 16.3 Breaches of Standard of Care by Defendants

[188] The Landfill Owner, engineers and/or operator(s) in this case breached the foregoing standards of care in the following manners:

(a) They failed to ensure that the landfill gas collection and leachate collection systems were properly designed, constructed, operated, and/or maintained in order to prevent the formation and emission of noxious odors or to collect and treat such odors, and failed to take corrective action, thereby, foreseeably causing noxious odors to escape the landfill and harm neighboring individuals.

(b) They did not ensure that the landfill gas collection and leachate collection systems were being operated and maintained properly. Specifically,

i. Jefferson Parish failed to ensure that Waste Connections, its landfill operator, or Aptim, its landfill has collection system operator, operated and maintained the landfill gas collection and leachate collection systems so as to prevent noxious odors from escaping from the landfill, foreseeably harming neighboring individuals.

ii. Waste Connections, the operator and manager of the landfill responsible for the Phase IV-A landfill construction and its leachate collection system, did not operate and maintain the landfill leachate collection system so as to prevent leachate buildup within the landfill. This failure resulted in adverse impacts to the gas collection system, which in turn caused noxious odors to escape from the landfill, foreseeably harming neighboring individuals. Furthermore, given the deficiencies in the leachate and gas collection systems, Waste Connections did not undertake other odor control measures to ensure that noxious odors did not escape from the landfill, foreseeably harming neighboring individuals.

iii. Aptim, the operator of the landfill gas collection system, failed to ensure that it was operated and maintained to prevent noxious odors from escaping from the landfill, foreseeably harming neighboring persons.

(c) They failed to ensure the improperly designed, maintained, or operated landfill gas collection and leachate collection systems were remediated (i.e., repaired, replaced or enhanced) in a timely manner. Specifically,

i. Waste Connections did not adequately inform Jefferson Parish or ensure that the Jefferson Parish remediated the improperly designed, maintained or operated landfill gas collection and leachate collection systems.

ii. Jefferson Parish did not promptly remediate the improperly designed, maintained or operated landfill gas collection and leachate collection systems in a timely manner.

iii. Aptim did not adequately inform Jefferson Parish or ensure that the Jefferson

Parish remediated the improperly designed, maintained or operated landfill gas collection and leachate collection systems.

(d) Waste Connections and Jefferson Parish accepted sulfur-containing materials without considering BMP for controlling gas fugitive emissions and without implementing a proper and effective odor control plan, despite having firsthand knowledge of the issues experienced by River Birch with this same material (refer to **Section 6.4**) or its own experience with the disposal of other sulfur-containing materials (e.g., coal combustion residuals or CCR) since at least October 2016.

i. Jefferson Parish and Waste Connections disposed of sulfur-containing materials, such as spent lime or fly ash, with MSW, which have the reasonably foreseeable potential to generate noxious odors that could escape the landfill and affect neighboring individuals.

ii. As indicated in **Section 6.4**, the neighboring River Birch Landfill stopped accepting the liquid waste requiring solidification in around mid-June 2016 due to odor complaints and impacts to their landfill gas production[64, 65, 66].

iii. In email correspondence to prospective clients[67] and accompanying 2016-2017 brochure titled "Safe Reliable and Cost-Effective CCR Disposal," Waste Connections presents itself as a leader in the management of CCR,[68] a sulfur-containing material category that includes fly ash, bottom ash, slag, and flue gas desulfurization waste, such as spent lime in this case. Since at least October 2016, when Waste Connections received a presentation on "Energy Waste (CCR) Disposal in Subtitle D Landfills"[69], it has been aware of the challenges for MSW landfills handling CCRs. This document specifically outlined considerations for MSW landfills that may receive CCRs that included, among others, the generation of odors through the conversion of sulfate and sulfites in flue gas desulfurization waste into hydrogen sulfide which can cause problems. This document concluded that it "*helps to not comingle CCRs with MSW*."

iv. Given that (1) sulfur-containing materials were disposed or processed within the MSW landfill area without waste segregation by physical containment (e.g., isolated cell), (2) the JP Landfill is a municipal landfill containing organic waste, (3) the JP landfill had historical serious problems in controlling leachate levels and (4) there was no gas collection system in place in Phase IVA to collect any landfill gases that were generated prior to the spring of 2019, the Jefferson Parish and Waste Connections should have refused to allow the disposal of spent lime in the JP Landfill.

---

64 WC_JPLF_00260849

65 WC_JPLF_00270624

66 WC_JPLF_00271367

67 WC_JPLF_00523445-446

68 WC_JPLF_00523447-450

69 WC_JPLF_00523182-218

(e) Waste Connections did not "*implement a comprehensive odor control plan that included both operational best management practices and odor control systems*" or comply with the other provisions of Section II.B.5.H of its contract with Jefferson Parish.

(f) Waste Connections violated its own internal "*minimum standards and expectations of Waste Connections landfills*," describing in internal communications[70] its "*leachate management practices and gas management practices that are simply not best practices.*" These communications also indicate that if the "*site is experiencing odors or odor complaints from neighbors that is unacceptable*" and define their goal "*to keep less than 12 inches of leachate stored in any sump;*" neither of these two goals was routinely achieved.

This has been extensively documented by the JP Landfill and its contractors, as detailed in the prior Expert Report and Rebuttal Report, and summarized in this document.

[189] Before and during the relevant period, the landfill gas and leachate management systems at the JPL Site were improperly designed and either non-performing or inefficiently operated and improperly maintained, requiring significant infrastructure improvements to correct LFG and leachate extraction deficiencies (Golder 2017; CEC 2018; CEC 2019; River Birch, 2019). Specific design deficiencies included (1) inadequate numbers and placement of gas collection wells and (2) insufficient capacity of leachate collection to prevent accumulation within the landfill. This has been documented extensively by the JP Landfill and its contractors, as detailed in the prior Expert Report and Rebuttal Report, and summarized in this document.

[190] As stated in **Section 11.1.1**, Golder's 2017 Landfill Gas Collection and Control (GCCS) Plan that considered 74 vertical wells with a 100-foot ROI; however, the proposed layout would not have achieved 100% capture of LFG as the ROIs of adjoining wells do not overlap. Golder also recommended that, before installing the proposed new wells, several remedial actions, including dewatering wells with submerged sections of perforated pipe, be implemented.

[191] As previously stated in **Section 9.3**, CEC's 2018 assessment clearly documents the inadequacy of the landfill gas collection system and significant deficiencies in leachate collection in the landfill. These high leachate levels impede collection of the gas that is being generated, which in turn allows this gas to be emitted to ambient air as fugitive emissions. The data evaluated by CEC indicated that liquid removal has not been successful at the facility as most of the liquid pumps are not in operation or provide minimum liquid withdrawal due to deficiencies in both the landfill gas condensate and leachate collection pumping systems. CEC also noted significant deficiencies in the maintenance and operation of these systems and provided numerous recommendations to improve them.

[192] Similarly, as detailed in **Section 9.3**, deficiencies related to the operation of the LFG extraction and leachate collection systems have been historically reported in documents reviewed by Ramboll, including numerous field inspection, field monitoring, and maintenance and operation reports dating back to 2013. These have ranged from undesirable operational conditions (e.g., elevated oxygen, $H_2S$ detections and odors, and limited flow) to damaged or missing components in both LFG and the leachate and condensate management systems.

70 WC_JPLF_00415276-277

[193] As detailed in **Section 11.1.2,** CEC (CEC 2018) determined that the overall wellfield condition was considered to be below average, with notable issues ranging from poorly maintained to broken or inoperable equipment and holes in the cap system. Of the 118 gas wells inspected by CEC, 77% either were not equipped with a pneumatic pump or had an inoperable pump, when ideally at saturated landfills like the JP Landfill, all gas wells should be equipped with a pneumatic pump to lower leachate levels within the extraction well to significantly improve landfill gas capture.

[194] As detailed in **Section 11.1.1,** for the period of 2011 through 2016, using Golder's gas generation estimate and actual landfill gas recovery records, gas collection efficiency gradually decreased from 68.9% to 47.5%.

[195] As summarized in **Section 11.1.2** and detailed in the prior Expert Report, CEC depicted the individual ROIs of the wells within each landfill phase in maps, clearly indicating inadequate coverage of the landfill gas collection system and significant areas of uncontrolled surface (i.e., fugitive) emissions in all landfill phases. CEC's assessment of the theoretical effective radius of influence of the gas extraction system concluded that: (a) the gas extraction system has lost approximately 12% of its total well depth since original installation; and (b) the elevated leachate levels have reduced the ability of the existing gas control system by 25 to 50%. Moreover, as presented by CEC, in all areas, the effective radius of influence of the gas extraction wells is significantly lower than the design 100-foot radius, resulting in significant areas where uncontrolled landfill gas emissions are taking place (refer to **Exhibit 12**).

[196] Further, CEC's surface emission monitoring, reported damage to the cap in Phase I, II, IIIA and IIIB, and detected methane in all phases of the landfill at concentrations as high as the instrument's upper range (i.e., 10,000 ppm). These levels are indicative of an ineffective cap system (CEC, 2018).

[197] With respect to the well field operation, CEC reported that the blower vacuum was not properly controlled, locations of reduced vacuum were identified throughout the wellfield, and wells exhibited positive static pressure (i.e., vacuum was not being applied to these wells). These observations indicate poor system operational conditions.

[198] As stated in **Section 11.1.3**, during the 2019 field inspection, CEC personnel smelled $H_2S$ gas in the Phase IVA area, observed soil cracks with black oxidized residue and detected $H_2S$ concentrations between 45 ppm and 60 ppm at the ground level at tested cracks. These observations indicate improper cover and odor control.

[199] In 2019, CEC concluded that it was "*evident that the LFG collection system in Phase IVA was underperforming and may require additional collectors and other modifications to effectively control the $H_2S$ emissions*."

[200] As detailed in **Section 11.1.4**, in 2019, River Birch identified and described the potential consequences of various problems at the JPL Site, based on its own assessments and those of CEC concerning the LFG extraction and leachate collection systems. Most noteworthy are the conclusions that:

(a) "*The Parish captures only 37.5% of the entire landfill's gas*."

(b) "*Hydrogen sulfide levels in Phase IVA present a serious safety concern, including the potential of 'nearly instant death'*" (concentrations of $H_2S$ in some wells exceeded 2,000 ppm).

(c) Of all LFG extraction wells at the landfill, 43% fail to meet LDEQ requirements for oxygen content (i.e., less than 5%) and/or pressure (i.e., maintain continuous negative pressure).

(d) 50% of the vertical wells in Phase IVA lack sufficient vacuum to collect gas.

(e) "*13% of the leachate risers on the entire landfill are not working*," a condition that reduces the ability of the leachate collection system to reduce the leachate levels in the LFG extraction wells, thereby impeding gas extraction.

(f) "*In 41 % of the LFG extraction wells, more than 50% of the vertical well perforations (screens) are blocked by liquids, inhibiting gas collection.*"

(g) To extract liquids from the wells, allow more gas extraction and reduce emissions and odors, "*38% of the wells without pumps on the entire landfill need new pumps.*"

[201] As summarized in **Section 11.2.1**, information provided by Golder, CEC, and River Birch reveals that the landfill gas and leachate management systems at the JPL Site have been inefficiently operated and maintained, requiring significant infrastructure improvements to correct deficiencies, and that this has contributed to increased gas emissions and odors. The existing landfill gas and leachate control systems are improperly maintained, antiquated, inadequately sized, and/or non-performing because:

(a) The landfill is wet, with subsurface liquids impacting the limited pathways of available LFG recovery, contributing to gas emissions, and site odors.
(b) The systems have been poorly maintained and operated.
(c) The ROI of gas wells in 2018 and 2019 was significantly less than the design ROI of 100 ft used for Phases IIIA, IIB, and IVA, and the capture zones of those LFG extraction wells do not provide adequate coverage to extract most of the gas generated in the landfill, even in the absence of liquids within the wells.
(d) actual landfill gas recovery reported by Golder for the period of 2011 through 2016 indicates that gas collection efficiency gradually decreased from 68.9% to 47.5% using the Golder gas generation estimate, and River Birch reported that the in 2019, the "Parish captures only 37.5% of the entire landfill's gas."
(e) there are too few LFG extraction wells to provide coverage for the entire landfill area that requires gas collection. The significant and costly proposed rehabilitation plans indicate the magnitude of the deficiencies in the collection of landfill gas at JPL Site.
(f) the landfill cap system has been breached in several locations and shows evidence of landfill gas releases.

These conditions result in significant areas of uncontrolled gas emissions and odors in all landfill phases.

[202] As stated in **Section 11.1.4**, based on the CEC and River Birch 2019 Assessment of Jefferson Parish Landfill Gas Field, it is evident that the LFG extraction system at the JPL Site continued to perform inadequately primarily as a result of high liquid levels within the landfill media and improper construction and maintenance of new devices incorporated to remediate a multitude of operational issues. Further, as indicated in **Section 11.1.3**, in 2018, CEC found the

existing infrastructure was in poor condition and required improvements to meet RNG gas quality specifications, adequately control landfill gas emissions, and address LFG-related odors and $H_2S$ safety concerns and thus recommended a comprehensive and extensive rehabilitation of the LFG extraction system.