Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*************************************************************

FREDERICK ADDISON, et al.,

        Plaintiffs,    CIVIL ACTION NO.

vs.    19-11133,

    c/w 19-14512

LOUISIANA REGIONAL LANDFILL COMPANY, et al.,

        Defendants.

*************************************************************

VOLUME I

VIDEOTAPED DEPOSITION OF
ROBERT DeLORENZO, M.D., Ph.D., M.P.H.
May 3, 2024
10:06 a.m. to 6:45 p.m.
Richmond, Virginia

Reported by: Leslie D. Etheredge, RMR, CCR

1             MR. FOSTER:  Objection to form.
2        A.    I can estimate it, just like everybody's
3   estimating; and what the estimate is coming from is
4   that these people were exposed to hydrogen sulfide,
5   and with the time that hydrogen sulfide was in the
6   air like this, there was VOCs, and the VOCs that at
7   some points were measured and the types of VOCs were
8   there, so --
9        Q.    So where were they measured?
10       A.    Well, it was measured different places in
11  the landfill, I don't remember the exact -- there's a
12  map that they show --
13       Q.    Not measured at the plaintiffs' homes;
14  right?
15       A.    No, not in the homes, exactly.  I mean
16  this is all modeling data kind of, and then they used
17  that to do the modeling.
18             So what you're trying to get at, and I
19  don't disagree with what you're saying, I can't prove
20  that this patient breathed in these VOCs.  All I can
21  say is we know these VOCs were in the environment,
22  they were in the environment with the hydrogen
23  sulfide, they come from the same process that
24  produced the hydrogen sulfide-type action in the
25  landfill, and so it's very likely that they were

1  exposed to those.
2          And I believe the judge opined to that
3  effect, I mean I know she did, that they were exposed
4  to that, and she even gave the number.
5     Q.   To break my own rule, I will just remind
6  you, once again, maybe you disagree with me, the
7  judge did not make any finding about the likelihood
8  that these 13 trial plaintiffs were exposed to
9  hydrogen sulfide or VOCs.
10         MR. FOSTER:  Objection to the argument.
11     Form.
12     A.   Well, I don't know if -- you may be
13  right.  It's my interpretation the judge said that
14  they were there when the other -- in the air.  I mean
15  so -- and it was there when the hydrogen sulfide was
16  likely there, and so -- and she said that the type of
17  VOCs at the landfill were almost identical to the
18  VOCs in the area, and she said that gives evidence
19  that that was probably coming from the landfill.
20         Now, she didn't specifically opine that
21  those VOCs were exposing to every plaintiff, because
22  you can't do that, it's impossible.  All you could do
23  is say it's very likely that that happened, but you
24  can't prove it.
25     Q.   You could try to model it.

1    A.    Yeah, and I don't think -- I don't think
2  anybody modeled it, I don't believe they did.
3    Q.    Correct.  Remember, at the beginning of
4  the deposition, when I asked you are you a fate and
5  transport expert?
6    A.    What kind of transport?
7    Q.    Fate and transport expert.
8    A.    I don't remember that, but I don't even
9  know what it means.
10   Q.    Right.  And remember when I asked you if
11 you were an air modeling expert?
12   A.    Yes, I'm not -- fate and transport, I
13 don't even know what it was; and air modeling, I said
14 I'm not.  I don't pretend to be an expert on that, so
15 I'm not trying to say I am.
16   Q.    Okay.  So on this question of okay, there
17 was a certain dosage of VOCs somewhere in the
18 neighborhood, where did it go and what dosage, if
19 any, did it expose the trial plaintiffs to, you are
20 not an expert in that, are you?
21   A.    No, and I would assume that Dr. Lape is
22 going to deal with that, but that's not my, you know,
23 question.
24   Q.    You agreed with me that, in a toxic
25 exposure case, a valid causation analysis relies on

Page 240

1  evidence of dosage; right?
2       A.     Correct.
3       Q.     And if no expert in this case is giving
4  any opinion about the dose at which plaintiffs were
5  exposed to VOCs, that would not be a reliable
6  causation analysis; right?
7              MR. FOSTER:  Objection to the form.
8       A.     Well, given the way you are presenting
9  it, correct; but it is known, from landfill exposures
10 with VOCs, that it's very hard to say which VOC is
11 causing what, and some of them are at lower levels
12 than what normally would cause symptoms, and there's
13 a lot of evidence or theories that there's
14 synergistic effects between them; but, in answer to
15 your question, I would agree with what you said.
16             THE COURT REPORTER:  When you are at a
17        good stopping point, I need a break.
18             MR. MIMS:  Okay.  We can take a break.
19             THE VIDEOGRAPHER:  The time is 3:46
20        p.m. Eastern.  We are now off the record.
21             (Recess from 3:46 p.m. to 3:58 p.m.)
22             THE VIDEOGRAPHER:  And we're back.
23        This is the beginning of media unit number 4
24        in the video-recorded deposition of Dr. Robert
25        DeLorenzo.  The time is 3:58 p.m. Eastern.

Page 374

1   Q.   Okay. We have established a few times
2   that you have read Judge Morgan's general causation
3   opinion; right?
4   A.   Yes.
5   Q.   You saw where Judge Morgan found general
6   causation for headaches, nausea, vomiting,
7   sleeplessness, fatigue, anxiety and worry; correct?
8   A.   Correct, and also, you know, quality of
9   life issues.
10  Q.   Correct. Is it your understanding that
11  any injuries that don't fit in those categories are
12  no longer a part of this case?
13  A.   Well, I mean I understand the judge's
14  opinion and, you know, I'm not an attorney looking at
15  these records, okay, so I looked at the judge in
16  regard to what you are referring to as eye, ears,
17  nose and throat kind of symptoms, and because the
18  reported literature that says the level of that is
19  much higher than the 5 parts per billion, that that
20  would be what wouldn't be involved.
21           Now, what happened here is that it's not
22  clear to me, at least the attorneys indicated to me,
23  that the judge -- Dr. Schiffman was going to give an
24  opinion on this, but that she was not qualified as a
25  toxicologist to do that. I don't know why she wasn't

Page 375

1    allowed to give the opinion, okay, so that's one of
2    the reasons I heard that.
3             So, you know, basically, I'm a
4    toxicologist, I can give an opinion on that, and I'm
5    willing to give an opinion on that, and, you know,
6    the judge will determine, you know, my opinion and is
7    it relevant.
8        Q.   Have you been asked to give that opinion
9    in this case?
10       A.   I put it in my reports.
11       Q.   So that's a yes, you have --
12       A.   Yes, of course.
13       Q.   -- been asked.
14       A.   I wasn't asked to do it.  I
15   concluded -- I came up with that by asking the
16   patients -- You know, some of these symptoms, they
17   weren't aware of when I went in, and, you know, I got
18   a good history and, you know, went in to do that.
19       Q.   And so that would include things like
20   respiratory conditions?
21       A.   Well, yeah, respiratory, cough, you know,
22   whatever.  I mean if -- I don't know, you know, how
23   that would work with the judge.  I mean, if this was
24   done at trial, I'll present, you know, my evidence
25   for that or whatever, and it's in my report.

1             But I'm willing -- I mean I put in my
2    report that I felt that that would potentially cause
3    those symptoms.
4        Q.    So you talked a lot about, when it came
5    to the headaches and the nausea and the vomiting,
6    that there was so much that the judge already
7    established in her opinion.  You'd agree that would
8    not apply to cough; right?
9        A.    Right.  She was looking at could it do
10   it, and the answer was it could.
11       Q.    Cough?
12       A.    Oh, no, not cough.  I am saying the
13   judge's opinion.  I already said that the judge did
14   not accept those symptoms as caused by the 5 parts
15   per billion, and the question is why didn't she
16   accept it.
17       Q.    Okay.
18       A.    Okay.  And my understanding, from asking
19   the attorneys why she didn't accept it, because I had
20   put it in my report, and I knew that she had that, is
21   that she -- doctor -- she didn't -- wasn't able to
22   put Dr. Schiffman's opinion in because she didn't
23   feel she was qualified as a toxicologist.
24       Q.    Right.
25       A.    Now, I don't know if that's true, I'm

1  basically -- I mean there were red eyes and things
2  that were in here as well, you don't have in this
3  list, and they all -- the 5 parts per billion does
4  not apply to those.
5         Q.    Okay.  I will add red eyes.  Thank you.
6         A.    Red eyes and eye dryness or scratchiness.
7         Q.    All right.  Looking at our list here, are
8  there any of these where you think there is
9  literature you are aware of that 5 parts per billion
10 can cause these injuries?
11        A.    No.
12        Q.    All right.  So let's do this.  You would
13 agree with me that you are not aware of any
14 literature or other well-accepted understandings in
15 your field of expertise that 5 parts per billion of
16 H2S over 30 minutes can cause either exacerbation of
17 allergies, cough, concern for long-term effects,
18 burning of eyes, nose and throat, red eyes, eye
19 dryness, eye scratchiness, difficulty breathing,
20 asthma, light-headedness, loss of smell, sinusitis,
21 rhinitis, chest congestion, nose bleeds, decreased
22 focus, cold sweats, or joint swelling?
23        A.    I am not aware of a paper that says
24 5 parts per billion causes these symptoms.  Okay.  I
25 am aware of literature that says these symptoms occur

Page 390

1  with exposure to hydrogen sulfate and VOCs, and the
2  literature can explain that, and that's something
3  that's discussed in the literature.
4           So I mean, you know, 4 years from now, I
5  may be able to say this is caused by that; but, right
6  now, I can't say that, from the literature, so to speak.
7           So my argument is that I am saying that
8  the combination of VOCs and hydrogen sulfate may have
9  caused a synergistic effect that could cause these
10 symptoms in the respiratory, the eyes and the nose,
11 and those are so commonly seen in these exposures,
12 that there is clearly a relationship, and it is not
13 just related to the high high levels, and I
14 can't -- you know, that's where -- that's where I got
15 that literature.
16          So there is a literature that relates
17 these to lower levels of hydrogen sulfate, but the
18 literature does not say it's clearly 5 parts per
19 billion.
20     Q.   And because you are not familiar with the
21 dosage of the exposure under which those injuries
22 that I just listed can be caused by H2S in
23 combination with VOCs, you would agree with me that
24 that would not be a reliable causation opinion to
25 offer in this case?

Page 391

1              MR. FOSTER: Objection to form.
2         A.   Well, I said it was potentially caused
3    based on that literature of association. Okay. And
4    I agree with you, that that's not the same as the
5    5 parts per billion.
6              Now, I'd offered the following caveat, I
7    wish I had the time to do this before the deposition.
8    I just -- you know, I'm reviewing things, and I just
9    haven't had the chance to do that.
10             I reserve the right to look at the
11   compounds, and I don't think I am going to find this,
12   but because the levels are not way high in terms of
13   the VOCs, but I want to look, because some of the
14   VOCs were not real low that were there, and I want to
15   look to see if they can cause those symptoms.
16             I am not aware of that right this moment,
17   but I would like to look at that.
18        Q.   So the injuries that I just listed,
19   currently, you have not done the analysis, and you
20   are not able to offer an opinion on whether exposure
21   to 5 parts per billion of H2S over 30 minutes can
22   cause those symptoms?
23        A.   No. That -- I have said that. My
24   analysis was, and the judge was talking about this,
25   that the literature does not support that these

Veritext Legal Solutions
212-279-9424                www.veritext.com                212-490-3430

1  symptoms, the respiratory, occular, whatever comes
2  from 5 parts per billion, it has to be higher than
3  that, okay, and I am not disagreeing with that.
4             And I am saying in my review of the
5  symptoms that these patients complain of, some of
6  these were the most dramatic things that were
7  associated with exposure, okay, so I mean right, I
8  mean I don't know why that is, but it is.
9             And so the question is, you know, you try
10 to look for the literature to substantiate that, and
11 I can't -- you do the 5 parts per billion in that,
12 but the plaintiffs clearly said these were some of
13 the worst symptoms that they had, you know, not all
14 of them, but some of them.
15            And so, if you look in the literature,
16 these are also common symptoms associated with
17 pollution exposure, especially the hydrogen sulfate
18 kind of exposures and VOCs, and so there is a
19 discussion in the literature of why is that, and we
20 may know an answer next year or something, and the
21 only thing I can answer here is I haven't been able
22 to have the time to look at the specific VOCs that
23 were found at the -- in the community, was it the
24 concentration that they found them could potentially
25 cause these symptoms, if there is a literature for that.

Page 394

1   COMMONWEALTH OF VIRGINIA, AT LARGE, to wit:
2
3       I, LESLIE D. ETHEREDGE, a Registered Merit
4   Reporter, Certified Court Reporter and Notary Public
5   for the State of Virginia at Large, do hereby certify
6   that ROBERT DeLORENZO, M.D., Ph.D., M.P.H. appeared
7   before me, was sworn by me and was thereupon examined
8   by counsel; and that the foregoing is a true, correct
9   and full transcript of the testimony adduced, to the
10  best of my ability.
11       I further certify that I am neither related to
12  nor associated with any counsel or party to this
13  proceeding, nor otherwise interested in the event
14  thereof.
15       Given under my hand in Chesterfield, Virginia,
16  this 7th day of May, 2024.
17
18
19  _____
20          LESLIE D. ETHEREDGE
            Registered Merit Reporter, Certified
21          Court Reporter and Notary Public for the
            State of Virginia at Large
22
23  My commission expires:
24  February 28, 2027
25  Notary Registration No:  116406