## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **FREDERICK ADDISON, ET AL.,** | * | |
| | * | |
| **PLAINTIFF,** | * | **CIVIL ACTION NO. 19-11133,** |
| | * | **c/w 19-14512** |
| **VERSUS** | * | |
| | * | |
| **LOUISIANA REGIONAL LANDFILL** | * | |
| **COMPANY, ET AL.,** | * | **JUDGE MORGAN** |
| | * | |
| **DEFENDANTS.** | * | **MAGISTRATE** |
| | * | **JUDGE NORTH** |
| **APPLIES TO: ALL CASES** | * | |
| | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO LIMIT
THE TESTIMONY OF PLAINTIFFS' EXPERT, ROBERT DELORENZO, M.D.**

Plaintiffs' expert Robert DeLorenzo, M.D. ("Dr. DeLorenzo") intends to offer general and specific causation testimony as to asthma, allergies, and other injuries for which the Court has already rejected general causation ("Non-Allowed Claims" or "Non-Allowed Injuries"). Dr. DeLorenzo has conceded that exposure to 5 ppb of hydrogen sulfide over 30 minutes, under the current state of the science, is not known to be capable of causing the Non-Allowed Injuries. Dr. DeLorenzo also intends to opine that the Trial Plaintiffs[1] suffered toxic effects from Volatile Organic Compounds ("VOCs"), despite wholly lacking any evidence, either measured or estimated, that any such exposures actually occurred. Dr. DeLorenzo should be precluded from offering any testimony as to (1) general or specific causation for the Non-Allowed Claims; and (2) the Trial Plaintiffs' exposure to VOCs, as he lacks any reliable methodology to support such testimony. *See* Rule 702 of the Federal Rules of Evidence; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## BACKGROUND

Plaintiffs have alleged annoyance and medical symptoms that they attribute to exposure to odors and gases allegedly emitted from the Jefferson Parish Landfill ("JPLF") from 2017 through 2019. On November 5, 2019, this Court issued its first Case Management Order ("CMO"). In the first CMO, the Court established a bifurcated litigation schedule under which the issue of general causation would be resolved first, in order to "narrow the focus of the case and the issues at stake."[2]

In January and February of 2022, the Court held an eight-day *Daubert* and general causation trial. On November 29, 2022, the Court issued its General Causation Order, which limited the relevant time period to July 1, 2017 to December 31, 2019 and found that as a matter

---

[1] "Trial Plaintiffs" refers to the 13 *Addison* Plaintiffs who will proceed to trial in August 2024.
[2] No. 19-11133, ECF Doc. #80 at 1-2; *see also* No. 19-11133, ECF Docs. #80, 95, 110, 116, 122, 174.

of law Plaintiffs met their burden of establishing general causation with respect to Plaintiffs'

complaints "*during the relevant time period* [July 1, 2017 – December 31, 2019] of headaches,

nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a

decrease in quality of life, and a loss of enjoyment or use of property" (hereafter, "Allowed

Claims" or "Allowed Injuries").[3] The Court also explicitly ruled that Plaintiffs *failed* to establish

general causation for physiological symptoms, including complaints of: "irritation to the eyes,

nose, or throat; coughing; trouble breathing; asthma; skin irritation; burning lungs; nose bleeds;

neurological issues; and COPD."[4]

The litigation proceeded to the specific causation phase, and on February 16, 2024,

Plaintiffs produced their initial expert reports on specific causation. In his report,[5] Dr. DeLorenzo

opines on various injuries suffered by the Trial Plaintiffs, but he wholly ignores this Court's

determination on the type and duration of injuries that will be allowed to proceed in this litigation.

Dr. DeLorenzo opines on numerous injuries and symptoms that either fall outside of the relevant

time period, or for which Plaintiffs failed to establish general causation regardless of the time

period.[6] Dr. DeLorenzo further opines that VOCs were a driving factor in causing the Trial

Plaintiffs' symptoms, despite the absence of any evidence, either measured or estimated, that any

of the Trial Plaintiffs were actually exposed to VOCs – much less any evidence of *which* specific

---

[3] General Causation Order, No. 18-07889, ECF Doc. #285 at 44 (emphasis added).
[4] *Id*. at 42.
[5] The original and rebuttal reports of Dr. DeLorenzo have been marked as "Confidential – Outside Counsel Only" by Plaintiffs, which, under the terms of the Agreed Protective Order (ECF Doc. #79) requires the parties to meet and confer before the documents may be filed with the Court. Defendants have reached out to Plaintiffs to discuss an agreeable method for filing Dr. DeLorenzo's reports. Defendants will continue to coordinate with Plaintiffs on this issue and will supplement this filing with Dr. DeLorenzo's reports as soon as practicable.
[6] *See* Dr. DeLorenzo's Report, attached hereto as Exhibit 1.

VOCs they were exposed to, the duration of such exposure, and/or the concentration (dose) of such exposure.[7]

Specifically, Dr. DeLorenzo opines that exposure to "hydrogen sulfide and VOC emissions from the Jefferson Parish Landfill were a substantial cause of the health complaints reported by the trial plaintiffs during the relevant time period,"[8] which complaints include, in addition to the Allowed Injuries, the following injuries:

| | |
|---|---|
| Eye Irritation and Redness | Nosebleeds |
| Exacerbation of Allergies | Sore Throat |
| Coughing | Cold Sweats |
| Eye Burning | Swelling in Joints |
| Burning Nose | Infection |
| Asthma | Stomach Irritation |
| Throat Irritation | Stomach Pain |
| Coughing and Gagging | Nasal Congestion |
| Stress | Runny Nose |
| Lightheadedness | Sinus Problems |
| Sinusitis | Earaches |
| Eye Irritation | Respiratory Cough |
| Allergies | Phlegm Production |
| Runny Eyes | Burning Eyes |
| Loss of Smell | Breathing Difficulty |
| Chest Congestion | Exacerbation of Asthma |
| Rhinitis | |

Additionally, Dr. DeLorenzo opines that JPLF emissions have caused some of the Trial Plaintiffs to suffer chronic injuries that are persisting to this day. For example, as to Trial Plaintiff

---

[7] *Id.*; *see also* Declaration of Defendants' Expert John Kind, Ph. D., CIH, CSP, No. 19-11133, ECF Doc. #206-6, para. 15 ("VOCs are a diverse group of chemicals (of which there are thousands) emitted by many natural, household, and industrial sources. Each specific VOC differs in its chemical, physical, and toxicological properties. These unique properties (e.g., volatility, vapor pressure, vapor density, atmospheric half-life, toxicological mechanism of action, and toxic potency) dictate the fate and transport of the chemical through the environment and its toxicological effect (if any) on an individual.").

[8] Exhibit 1 at p. 17.

Jonathan Tate, Dr. DeLorenzo opines: "The headaches continued after the exposure period and have become a long-term neurological condition caused by the exposure to hydrogen sulfide and VOCs."[9] Dr. DeLorenzo offers similar "chronic injury" opinions for several of the Trial Plaintiffs.[10]

Dr. DeLorenzo has conceded that exposure to 5 ppb of hydrogen sulfide over 30 minutes (the exposure threshold at issue in this case), under the current state of the science, is not known to be capable of causing the Non-Allowed Injuries,[11] and is not known to be capable of causing chronic or permanent injuries. Further, Dr. DeLorenzo admits that specific causation cannot be established for VOCs without evidence of a specific dosage to which each Trial Plaintiff was exposed – but he lacks any evidence, either measured or estimated, that any of the Trial Plaintiffs were exposed to VOCs, much less any evidence of *which* specific VOCs they were exposed to, the duration of such exposure, and/or the concentration (dose) of such exposure.[12]

As set forth further below, Dr. DeLorenzo lacks any reliable methodology to support his opinions related to (1) general or specific causation for the Non-Allowed Claims; and (2) the Trial Plaintiffs' exposure to VOCs, and he should be precluded from offering such testimony.

## LAW

### A.  Federal Rule of Evidence 702 and *Daubert* Requirements

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The rule permits experts to offer opinions if (a) the expert's specialized knowledge will help the trier of fact, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product

---

[9] *Id*. at 113.
[10] Dr. DeLorenzo's Rebuttal Report, at p. 40, attached hereto as Exhibit 2.
[11] Deposition of Dr. DeLorenzo V.I, at pp. 389:12-24 – 390:4-6, 391:18-25 – 392:1-3, attached hereto as Exhibit 3.
[12] *Id*. at pp. 237-240 ("I can't prove that this patient breathed in these VOC's").

of reliable principles and methods, and (d) the expert has reliably applied those principles and methods. The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). The Supreme Court has provided a five-factor test for gauging the reliability of an expert's methodology:

> (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999) (citing *Daubert*, 509 U.S. at 593-95). The proponent of the expert bears the burden of establishing these criteria. *Moore*, 151 F.3d at 276.

Strict application of the *Daubert* standard is required for this upcoming jury trial. In 2023, Federal Rule of Evidence 702 was amended to clarify that questionable expert opinions must not go to a jury.[13] The Advisory Committee explained that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" are not questions of weight but questions of admissibility.[14] Rule 702 was revised "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis

---

[13] Fed. R. Evid. 702.

[14] The Advisory Committee stated "the rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Advisory Committee Note, 2023 Amendments. The Committee explained that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." *Id.*

and methodology."[15] The distinction between bench and jury trials motivated this change. The

Advisory Committee explained:

> Judicial gatekeeping is essential because just as jurors may be
> unable, due to lack of specialized knowledge, to evaluate
> meaningfully the reliability of scientific and other methods
> underlying expert opinion, jurors may also lack the specialized
> knowledge to determine whether the conclusions of an expert go
> beyond what the expert's basis and methodology may reliably
> support.[16]

Thus, Rule 702 was revised to clarify that expert opinions "that are unsupported by the expert's

basis and methodology" do not reach the jury.[17] That requirement is imperative in this specific

causation proceeding, where the parties have proffered highly technical expert testimony.

### B.  Causation Proof Requirements in Toxic Tort Cases

This Circuit employs a two-step process in examining the admissibility of causation

evidence in toxic tort cases. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).

A plaintiff must *first* establish general causation and *then* establish specific causation. *Id; see e.g.,*

*Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 724 (5th Cir. 2009) ("First, the district court

must determine whether there is general causation. Second, if it concludes that there is admissible

general-causation evidence, the district court must determine whether there is admissible specific-

causation evidence."); *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010)

("Sequence matters: a plaintiff must establish general causation before moving

to specific causation. Without the predicate proof of general causation, the tort claim fails."). And

evidence of specific causation is only admissible if there is evidence of general causation. *Burst v.*

---

[15] Fed. R. Evid. 702(d), Advisory Committee Note, 2023 Amendments.
[16] *Id.*
[17] *Id.*

*Shell Oil Co.*, No. CIV.A. 14-109, 2015 WL 3952677, at *2 (E.D. La. June 29, 2015), aff'd, 650 F. App'x 170 (5th Cir. 2016) ("Because plaintiff offers no admissible evidence on general causation, she may not present evidence on specific causation.").

General causation requires knowledge of "the harmful level of exposure to a chemical." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198-99 (5th Cir. 1996). In fact, the Fifth Circuit describes this detail as one of two "minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Id.* at 199; *Seaman v. Seacor Marine, LLC*, 326 F. App'x. 721 (5th Cir. 2009) (same).

To establish specific causation, a plaintiff must provide proof that he or she was exposed to quantities known to cause the plaintiff's particular disease. *Allen*, 102 F. 3d at 199. This requirement is the second of the "minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Seaman*, 326 F. App'x. at 723.[18]

Viewed together, the Fifth Circuit's standards for an admissible causation opinion require evidence on four principal questions, and each one must be satisfied:

1. Is there relevant and reliable scientific and medical literature that supports a causal connection between exposure to a particular toxin and the specific illness at issue? [a general causation question; *see Allen*, 102 F.3d at 197; *Knight*, 482 F.3d at 351]
2. If the answer to question number one is yes, what level of exposure to the toxin (dose) is capable of causing the specific injury at issue? [a general causation question; *see Allen*, 102 F.3d at 199; *Seaman*, 326 F. App'x. at 723]
3. What was the plaintiff's level of exposure to the toxicant (i.e., dose)? [a specific causation question; *see Allen,* 102 F.3d at 199]
4. If the plaintiff was exposed to an unsafe level of toxicant, did that exposure cause his illness (i.e., differential diagnosis or differential etiology)? [a specific causation question; *see McNabney v. Lab. Corp. of Am.,* 153 F. App'x 293, 294 (5th Cir. 2005)]

---

[18] This principle is echoed in the *Federal Reference Manual* at 661 ("An opinion on causation . . . should offer an opinion about whether the dose to which the plaintiff was exposed is sufficient to cause the disease.").

Here, as to the Non-Allowed Injuries, Dr. DeLorenzo lacks any evidence as to prong number 2, because he lacks evidence that 5 ppb of $H_2S$ over 30 minutes is capable of causing such injuries. As to his opinions on VOCs, because Dr. DeLorenzo fails to discuss the toxicity of any *specific* VOCs, and he lacks evidence that the Trial Plaintiffs were exposed to *any* VOCs or the concentration of such exposure, he therefore is without any evidence as to all four prongs. Thus, both sets of opinions must be excluded.

## ARGUMENT

**A. Dr. DeLorenzo should be precluded from offering any causation opinion as to the Non-Allowed Injuries.**

As an initial matter, Dr. DeLorenzo should be procedurally barred from testifying as to any injuries or symptoms that fall outside of the relevant time period or for which Plaintiffs have failed to establish general causation. The time to prove general causation has come and gone, and the Court should not allow Plaintiffs a second bite at the apple. *See* Motion for Summary Judgment To Dismiss Certain Claims For Lack Of Evidence Of General Causation, being filed contemporaneously with the present motion. Because Plaintiffs cannot prove general causation for the Non-Allowed Injuries, Rule 702 requires exclusion of such testimony as irrelevant and unhelpful to the jury. *See In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022) ("The object of Rule 702 is to protect juries from unreliable and irrelevant expert testimony.").

Even if Plaintiffs are allowed to relitigate general causation – which they should not be – Dr. DeLorenzo should be barred from testifying about any Non-Allowed Injuries because his testimony does not pass muster under Rule 702. Dr. DeLorenzo himself conceded that exposure to 5 ppb of hydrogen sulfide over 30 minutes (the exposure threshold at issue in this case),

under the current state of science, is not known to be capable of causing the injuries or

symptoms which make up the non-Allowed Injuries:

> Q. You would agree with me that you are not aware of any literature
> or other well-accepted understandings in your field of expertise that
> 5 parts per billion of $H_2S$ over 30 minutes can cause either
> exacerbation of allergies, cough, concern for long-term effects,
> burning of eyes, nose and throat, red eyes, eye dryness, eye
> scratchiness, difficulty breathing, asthma, light-headedness, loss of
> smell, sinusitis, rhinitis, chest congestion, nose bleeds, decreased
> focus, cold sweats, or joint swelling?
>
> A. I am not aware of a paper that says 5 parts per billion causes these
> symptoms. Okay. I am aware of literature that says these symptoms
> occur with exposure to hydrogen sulfate and VOCs, and the
> literature can explain that, and that's something that's discussed in
> the literature. So I mean, you know, **4 years from now, I may be
> able to say this is caused by that; but, right now, I can't say that**,
> from the literature, so to speak . . . So there is literature that relates
> these to lower levels of hydrogen sulfate, but the literature does not
> say it's clearly 5 parts per billion.[19]
>
> …
>
> Q. So the injuries that I just listed, currently, you have not done the
> analysis, and you are not able to offer an opinion on whether
> exposure to 5 parts per billion of $H_2S$ over 30 minutes can cause
> those symptoms?
>
> A. No. That -- I have said that. My analysis was, and the judge was
> talking about this, that the literature does not support that these
> symptoms, the respiratory, ocular, whatever comes from 5 parts per
> billion, it has to be higher than that, okay, and I am not disagreeing
> with that.[20]

Dr. DeLorenzo has also testified that the Trial Plaintiffs suffered and are continuing to

suffer from injuries beyond 2019 – and that testimony is likewise devoid of any scientific

support. The list of post-2019 injuries on which Dr. DeLorenzo has opined is set out on page

---

[19] Exhibit 3 at pp. 389:12-25 – 390:1-6, 16-19 (emphasis added).
[20] *Id*. at 391:18-25 – 392:1-3.

40 of his rebuttal report.[21] But he testified that there is no scientifically accepted understanding of the dosage at which such exposure is capable of causing such injuries:

> Q. Looking at Page 40 of your rebuttal report…For all of those symptoms for those plaintiffs that you believe continued beyond the exposure date, there does not exist any authorities which establish that exposure to 5 parts per billion of $H_2S$ over 30 minutes is capable of causing those symptoms beyond the time of the exposure?[22]
>
> …
>
> THE WITNESS: …there[] isn't a paper that I can say here's somebody that did a study showing that these things persisted.[23]
>
> …
>
> Q. You would agree with me that there is not any authority that establishes that exposure to 5 parts per billion of $H_2S$ over 30 minutes is capable of causing chronic symptoms that postdate the exposure period, right?[24]
>
> …
>
> A. …The cleaner thing would be to say that there isn't a study with this exposure in humans where people have looked at the chronic symptoms and established that it's related. That doesn't exist.[25]
>
> …
>
> Q. Would you agree with me that there is no acceptance in the scientific community that exposure to 5 parts per billion of $H_2S$ over 30 minutes in humans is capable of causing chronic symptoms that postdate the exposure period?[26]
>
> …
>
> THE WITNESS: Yes. You're right. There's no single paper that does that.[27]
>
> …

---

[21] Exhibit 2 at p. 40; Deposition of Dr. DeLorenzo V.II, at pp. 536:21 – 537:2, attached hereto as Exhibit 4.
[22] Exhibit 4 at pp. 536:21-22; 537:3-8.
[23] *Id*. at pp. 537:24-25 – 538:1.
[24] *Id*. at p. 543:19-23.
[25] *Id*. at p. 544:6-10.
[26] *Id*. at p. 544:11-15.
[27] *Id*. at p. 544:17-18.

Q. What I am asking about is whether there is mainstream acceptance in the scientific community connected to specific dosages. And so the question is, you would agree with me that there is not mainstreamed acceptance in the scientific community that exposure to 5 parts per billion of $H_2S$ over 30 minutes is capable of causing chronic symptoms that postdate the exposure period.[28]

…

A. The answer to that specific question would be no.

Q. And that would apply to all of the chronic symptoms that you have listed on Page 40 of your rebuttal report?[29]

…

A. No. You didn't let me finish the first answer. I said that what you're saying wasn't correct, and I'm trying to say to you why it's not correct.

Q. You disagree with my statement?

A. Yes. That's what I'm trying to say.

Q. Okay.

A. And I don't disagree…with part of the statement. I'm disagreeing -- **there is no scientific data that's been done to answer that question.** …**When you say that the scientific community would agree, I'm saying to you there's nothing in the scientific community to look at.**

Q. So there's not mainstream acceptance, right?

A. Well, what do you mean, mainstream acceptance?

Q. You don't know what that means, mainstream acceptance in the scientific community?[30]

…

THE WITNESS: Yeah, I know what that means, but if you don't know the answer to -- if there's no data on it, it doesn't mean it doesn't exist.

Q. Then it's not accepted, right?[31]

…

---

[28] *Id*. at pp. 547:22-25 - 548:1-4.
[29] *Id*. at p. 548:8-12.
[30] *Id*. at pp. 548:15-23, 22-25 - 549:1, 3-12 (emphasis added).
[31] *Id*. at p. 549:14-19.

THE WITNESS: Well, I don't know -- I don't know what you mean by it doesn't exist. I mean, there. I'm saying to you, I'm giving you the point, and I'm not questioning it, that **there is not a study that's answered your question. So that's true.** And I would argue that there is data that would support that, but it's not a carefully controlled study that really needs to be done.

Q: And there's not a study that would support the idea that any of the chronic symptoms on Page 40 of your rebuttal report are capable of being caused by exposure to 5 parts per billion of $H_2S$ over 30 minutes, correct?[32]

THE WITNESS: …the question that I would say I would agree with you on is that **no one has done a study** that takes exposed patients that are known to have the 5 parts per billion get symptoms from those 5 parts per billion and then the symptoms that they have from that exposure don't go away.

Q. My question is --

A. **No one's looked at that.**

Q. And my question is, that's true for all of the symptoms that you have on Page 40 --

A. Correct.

Q. That's true for all of the symptoms that you have on Page 40 of your expert rebuttal report?

A. Correct.[33]

Dr. DeLorenzo's failure to establish the dosage at which exposure to $H_2S$ can cause the Non-Allowed Injuries is fatal to his testimony. This Circuit demands that an expert's general causation analysis requires knowledge of "the harmful level of exposure to a chemical." *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198-99 (5th Cir. 1996). In fact, the Fifth Circuit describes this detail as one of two "minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Id.* at 199; *Seaman v. Seacor Marine, LLC*, 326 F. App'x. 721 (5th Cir. 2009). When an expert fails to identify the dose of exposure that is capable of causing injury, courts

---

[32] *Id*. at pp. 549:21-25 - 550:1-10 (emphasis added).
[33] *Id*. at pp. 550:19-25 - 551:1-9 (emphasis added).

in this district have routinely found the general causation opinion unreliable and inadmissible. *See, e.g., Coleman v. BP Expl. & Prod.*, 609 F. Supp. 3d 485, 497 (E.D. La. 2022) (Vance, J.) (expert's "failure to identify the level of exposure to a relevant chemical that can cause the conditions asserted in plaintiff's complaint renders his opinion unreliable, unhelpful, and incapable of establishing general causation.").

By Dr. DeLorenzo's own admission, current scientific understanding does not support the notion that exposure to 5 ppb of $H_2S$ over thirty minutes is capable of causing the Non-Allowed Injuries – and this is true both as to specific injuries that were not allowed by the Court (e.g., asthma), as well as for injuries allowed by the Court but falling outside of the relevant time period (e.g., headaches persisting beyond 2019). Thus, *Daubert* demands that Dr. DeLorenzo be precluded from testifying as to those Non-Allowed Injuries at trial.

**B.  Dr. DeLorenzo lacks any evidence that any Trial Plaintiff was exposed to VOCs.**

Dr. DeLorenzo's testimony should be limited in a second respect – he should not be allowed to testify regarding VOCs, because he is entirely without any evidence that any Trial Plaintiff was exposed to VOCs, much less the type of VOC or the duration and concentration of the exposure. "VOC" is a generic term referring to a diverse group of thousands of chemicals with differing chemical, physical, and toxicological properties.[34] They are emitted by many natural and household sources and are ubiquitous in modern, everyday life.[35] The term "VOC" does not refer to a specific chemical, nor does it imply a particular concentration or dosage.

In order to reliably opine that VOCs contributed to Plaintiffs' injuries, at a minimum, Dr. DeLorenzo would need evidence which demonstrated (1) that the Trial Plaintiffs were actually

---

[34] *See* Declaration of Defendants' Expert John Kind, Ph. D., CIH, CSP, No. 19-11133, ECF Doc. #206-6, para. 15.
[35] *See Id.*

14

exposed to VOCs; (2) the specific VOCs to which the Trial Plaintiffs were exposed; (3) the duration of such exposure; (4) the concentration (i.e., dose) of the VOCs to which they were exposed. Dr. DeLorenzo has none of this evidence,[36] and without such evidence, his opinions fall woefully short of the reliability standards demanded by the Fifth Circuit. In fact, Dr. DeLorenzo himself agreed that "if no expert in this case is giving any opinion about the dose at which plaintiffs were exposed to VOCs, that would not be a reliable causation analysis [to say that exposure to VOCs contributed to the Trial Plaintiffs' injuries]."[37]

At most, Dr. DeLorenzo is able to point to LDEQ data that speaks to certain VOCs, which were measured at locations *other than* the homes of the Trial Plaintiffs and which were *not* traced back to the Jefferson Parish Landfill. He lacks any evidence as to whether those VOCs were ever present at the Trial Plaintiffs' homes, and therefore he also has no evidence as to the duration, frequency, or concentration of those VOCs at the Trial Plaintiffs' homes[38] (or whether they came from emissions from the JPLF).[39] He admits this would be a job for an air modeler – but Plaintiffs' only air modeling expert (James Lape) conducted no modeling of VOCs.[40]

Again, for toxic tort causation opinions, the Fifth Circuit demands that an admissible opinion must identify the plaintiff's exposure level. *Allen,* 102 F.3d at 199. The Fifth Circuit holds that "knowledge that the plaintiff was exposed to" harmful levels of exposure is the second of two "minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Seaman*, 326 F. App'x at 723. Said another way, an expert must confirm that the plaintiff was exposed to a

---

[36] Exhibit 3 at pp. 239:16-25 - 240:2.
[37] *Id*. at p. 240:3-15.
[38] Because Dr. DeLorenzo does not know *which* VOCs, if any, were present at the homes of the Trial Plaintiffs, he cannot say whether those VOCs are capable *at any concentration* to cause the Trial Plaintiffs' injuries.
[39] Exhibit 3 at pp. 237:13-15, 239:16-23.
[40] *Id*. at pp. 238:25 - 239:1-23.

sufficient level of toxins for a sufficient duration to have caused his alleged injuries. *Williams*, 2019 WL 6615504, at *8. An expert opinion based upon "incomplete or grossly inaccurate dosage or duration data" should be excluded. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991).[41] This Court and other courts in this district routinely reject expert testimony for failing to calculate a plaintiff's dose of exposure. *See, e.g., Williams v. BP Expl. & Prod.*, No. 18-9753, 2019 WL 6615504, at *8 (E.D. La. Dec. 5, 2019) (Morgan, J.) (excluding expert for failing to show plaintiff's "level of exposure to a certain substance over a certain period of time"); *Osmer v. BP Expl. & Prod.*, No. 19-10331, 2021 WL 4206950, at *1 (E.D. La. Sept. 16, 2021) (Lemelle, J.); *Comardelle v. Pennsylvania Gen. Ins. Co.*, 76 F. Supp. 3d 628, 634 (E.D. La. 2015) (rejecting expert's testimony that asbestos was a substantial contributing cause of the plaintiff's mesothelioma because there was allegedly no safe level of asbestos exposure, when expert failed to assess the plaintiff's *degree* of exposure).

In addition to the hornbook law that evidence on dosage is required, Dr. DeLorenzo himself agreed with the premise that "in a toxic exposure case, a valid causation analysis relies on evidence of dosage . . ." and that, specific to this case, "if no expert in this case is giving any opinion about the dose at which plaintiffs were exposed to VOCs, that would not be a reliable causation analysis . . ."[42] It seems that Dr. DeLorenzo assumed that an air modeler was going to fill in this gap in his analysis[43] – but that has not happened. Plaintiffs lack evidence that any Trial Plaintiffs were

---

[41] *See also Allen,* 102 F.3d at 195 (affirming the exclusion of expert testimony on causation because there was no evidence of the level of exposure); *Moore*, 151 F.3d at 278 (concluding that because expert had no accurate information on the level of the plaintiff's exposure, he had no support for his theory that the level of chemicals to which the plaintiff had been exposed caused the plaintiff's symptoms); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (holding that toxicology opinion had "insufficient factual basis" where expert did not have "any knowledge about the amount or duration of [the plaintiff's] exposure.").

[42] Exhibit 3 at pp. 239:24-25 – 240:1-2.

[43] *Id.* at p. 239:21-23 ("I would assume that Dr. Lape is going to deal with that, but that's not my, you know, question.").

exposed to any VOCs, including the duration or concentration thereof – which means that any testimony about VOC exposure is inherently unreliable and must be rejected.

## <u>CONCLUSION</u>

For these reasons, the Court should grant this motion and order that Dr. DeLorenzo be precluded from giving any testimony related to: (1) general or specific causation for the Non-Allowed Claims; (2) general or specific causation for injuries that the Trial Plaintiffs allegedly suffered and/or are continuing to suffer outside of the relevant time period of July 1, 2017 through December 31, 2019; and (3) the Trial Plaintiffs' exposure to VOCs, as he lacks any reliable methodology to support such testimony.

Respectfully submitted,

LISKOW & LEWIS, APLC

By: ___/s/ Michael C. Mims_____
       Michael Cash (#31655)
       Cherrell Simms Taplin (#28227)
       Michael C. Mims (#33991)
       Brady M. Hadden (#37708)
       J. Hunter Curtis (#39150)
       Alec Andrade (#38659)
       701 Poydras Street, Suite 5000
       New Orleans, LA 70139
       Telephone: (504) 581-7979
       Telefax: (504) 556-4108


       BEVERIDGE & DIAMOND, P.C.

       Megan R. Brillault (*pro hac vice*)
       Michael G. Murphy (*pro hac vice*)
       John H. Paul (*pro hac vice*)
       Katelyn E. Ciolino (*pro hac vice*)
       Katrina M. Krebs (*pro hac vice*)
       825 Third Avenue, 16th Floor
       New York, NY 10022

(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

CONNICK AND CONNICK, LLC

By:  \_\_\_/s/ Michael S. Futrell_____
William P. Connick, La. Bar No. 14158
Michael S. Futrell, La. Bar No. 20819
Matthew D. Moghis, La. Bar No. 33994
Anya M. Jones, La. Bar No. 36923
3421 N. Causeway Blvd., Suite 408
Metairie, Louisiana 70002
Telephone: (504) 681-6658
Facsimile: (504) 838-9903
E-mail: moghis@connicklaw.com

*Counsel for Defendant Jefferson Parish*

GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:  \_\_\_/s/ J. Michael DiGiglia_____
Ernest P. Gieger, Jr. (6154)
John E. W. Baay (22928)
J. Michael DiGiglia (24378)
Nicholas S. Bergeron (37585)
Blaise Chadwick Hill (*pro hac vice*)
Gieger, Laborde & Laperouse, L.L.C.
Hancock Whitney Center
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139
Telephone: (504) 561-0400
Facsimile: (504) 561-1011

*Attorneys for Defendant Aptim Corp.*

18

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was electronically filed on June 6, 2024. Notice of this filing will

be sent to all parties by operation of the Court's electronic filing system.

By: <u>     /s/ Michael C. Mims                    </u>