## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| **Plaintiffs** | |
| | |
| **VERSUS** | **NO. 19-11133, c/w 19-14512** |
| | |
| **LOUISIANA REGIONAL LANDFILL** | **SECTION: "E" (5)** |
| **COMPANY, ET AL.,** | |
| **Defendants** | |
| | |
| | **JUDGE: Morgan** |
| *Applies to: All Cases* | **MAGISTRATE JUDGE: North** |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE OPINION TESTIMONY OF SUSAN SCHIFFMAN PURSUANT TO <u>FEDERAL RULE OF EVIDENCE 702</u>

## INTRODUCTION

Susan Schiffman, PhD, a psychologist, should be precluded from testifying on issues outside the scope of her field and/or issues for which she simply has not done the work—including (1) whether hydrogen sulfide ("$H_2S$") lingered inside the Trial Plaintiffs' homes despite lacking such expertise, (2) whether Defendants adhered to best management practices in operating the Jefferson Parish Landfill ("JPLF"), plainly not an issue for a psychologist; (3) whether exposure to volatile organic compounds ("VOCs") contributed to the Trial Plaintiffs' injuries despite lacking evidence that Trial Plaintiffs were actually exposed to VOCs (and not knowing the specific compounds, concentrations, frequencies, and durations), and (4) whether specific causation exists for the Trial Plaintiffs despite admitting she only conducted a general causation analysis. These opinions were not challenged at the general causation phase, are questions of specific causation, and are appropriate for this motion *in limine*.[1]

First, Dr. Schiffman opines that $H_2S$ likely lingered inside the homes of the Trial Plaintiffs[2]—which is scientifically implausible and outside her field of specialization. She offers this conjecture as a means of explaining away a key vulnerability in the Trial Plaintiffs' case, i.e., that Trial Plaintiffs' odor complaints frequently occurred at times when their own air modeling shows that such odors could not have come from JPLF.[3] Dr. Schiffman should be limited to offering opinions on odor perception and its psychological effects—her field of specialization— and precluded from offering opinions on air dispersion, for which she lacks any expertise (and for which she admitted she would not opine at trial). *See* Fed. R. Evid. 702.

---

[1] *See* ECF Doc. 517 (allowing *Daubert* motions for "opinions on topics not covered in the trial on general causation"). The opinions challenged herein all relate either to (1) whether the specific thirteen Trial Plaintiffs experienced specific injuries or exposures; or (2) liability questions such as whether Defendants adhered to best management practices. These are not general causation issues and were not at issue in the trial on general causation.
[2] *See* January 28, 2024 Report of Dr. Schiffman, attached hereto as <u>Exhibit 1</u>, at 15-23.
[3] See id.

Second, again reaching far outside her expertise and qualifications, Dr. Schiffman offers opinions regarding Defendants' responsibilities for the leachate and gas collection and control systems, best management practices for waste disposal, and other issues related to landfill management. Because Dr. Schiffman neither has the experience nor education to opine on these topics, and she admits that her opinions and expertise do not extend to contractual issues, she should be precluded from testifying on landfill operations and contracts too.

Third, Dr. Schiffman attempts to inflate the supposed danger of low levels of $H_2S$ by claiming that the toxicity of this ubiquitous compound was amplified for the Trial Plaintiffs because the $H_2S$ was combined with certain VOCs[4]—but she lacks any evidence, either measured or estimated, that any of the Trial Plaintiffs were actually exposed to VOCs, much less any evidence of *which* specific VOCs they were exposed to, the duration and frequency of such exposure, and/or the concentration (dose) of such exposure.[5] The Trial Plaintiffs' fate and transport expert (Jim Lape) did not model VOCs or otherwise opine on whether the Trial Plaintiffs were exposed to VOCs, and Dr. Schiffman is certainly not qualified under Rule 702 to offer her own fate and transport opinions.

Finally, to the extent that Dr. Schiffman intends to offer a specific causation opinion—which she struggled to answer at her deposition[6]—such opinions should be excluded as she has wholly failed to conduct a specific causation analysis. For example, she has not examined the Trial Plaintiffs,[7] has not reviewed their medical records or otherwise considered their medical history,[8]

---

[4] *See* Ex. 1 at 23-31.
[5] "VOCs are a diverse group of chemicals (of which there are thousands) emitted by many natural, household, and industrial sources. Each specific VOC differs in its chemical, physical, and toxicological properties. These unique properties (e.g., volatility, vapor pressure, vapor density, atmospheric half-life, toxicological mechanism of action, and toxic potency) dictate the fate and transport of the chemical through the environment and its toxicological effect (if any) on an individual." R. Doc. 206-6, para. 15, October 4, 2021 Declaration of Dr. John Kind.
[6] *See* Excerpts of Deposition of Dr. Schiffman, taken on April 26, 2024, attached hereto as Exhibit 2, at 101:24-103:11.
[7] *See id*. at 33:9-14.
[8] *See id*. at 32:1-9.

2

has not considered other potential causes of their alleged injuries,[9] and has not attempted to conduct a differential diagnosis—and without taking any of these steps, she cannot speak reliably to specific causation. *McNabney v. Lab'y Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005) ("[causation expert's] failure to consider and exclude other potential causes of [plaintiff's] injury before offering an opinion renders his testimony unreliable."). Thus, she should not be allowed to testify that the Trial Plaintiffs' injuries were more likely than not caused by JPLF emissions.

## LEGAL STANDARD

### I.  Application of Rule 702 In Jury Trials

Strict application of the Rule 702 standard is required for this jury trial. In 2023, Federal Rule of Evidence 702 was amended to clarify that questionable expert opinions must not go to a jury.[10] The Advisory Committee explained that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" are not questions of weight but questions of admissibility.[11] Rule 702 was revised "to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."[12] The distinction between bench and jury trials motivated this change. Thus, Rule 702 was revised to clarify that expert opinions "that are unsupported by the expert's basis and methodology" do not reach the jury.[13] That requirement is imperative in this specific causation proceeding, where the parties have proffered highly technical expert testimony.

---

[9] *See id*. at 279:9-14.

[10] Fed. R. Evid. 702.

[11] The Advisory Committee stated, "the rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Advisory Committee Note, 2023 Amendments. The Committee explained that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." *Id.*

[12] Fed. R. Evid. 702(d), Advisory Committee Note, 2023 Amendments.

[13] Id.

The Court's general causation ruling recognized that the Court's gatekeeping obligation was "diminished in a bench trial" and noted that the purpose of *Daubert* is to "ensure that only reliable and relevant expert testimony is presented to the jury." *Ictech-Bendeck v. Waste Connections Bayou, Inc*., 2021 WL 5177827, at *3 (E.D. La. Nov. 8, 2021) (Morgan, J.). Compared to the earlier general causation hearing, the current specific causation proceeding is subject to a heightened *Daubert* gatekeeping obligation because the factfinder here will be a jury. "In *Daubert*, the Supreme Court's overriding concern was with the problem of exposing the jury to confusing and unreliable expert testimony." *Johnson v. Big Lots Stores, Inc*., 2008 WL 1930681, at *2 (E.D. La. Apr. 29, 2008) (Vance, J.) (citing *Daubert*, 509 U.S. at 595-97).[14] The Supreme Court noted that expert testimony can be "quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 595 (1993). Moreover, the gatekeeper "should also be mindful of" Federal Rule of Evidence 403 and exclude testimony that risks "confusing the issues" or "misleading the jury." *Daubert*, 509 U.S. at 595; Fed. R. Evid. 403.

The Fifth Circuit and this District unanimously recognized the heightened importance of *Daubert* in jury trials.[15] And this Court likewise made that point many times,[16] including at the

---

[14] The gatekeeper must protect the jury because scientific opinions are "confessedly foreign in kind" to the experience of lay jurors. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

[15] The Fifth Circuit recognizes that "the importance of the trial court's gatekeeper role is significantly diminished in bench trials, as in this instance, because there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. Partn. v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010). *See also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *A. Specialty Ins. Co. v. Porter, Inc*., 742 Fed. Appx. 850, n. 4 (5th Cir. 2018); *In re Texas Grand Prairie Hotel Realty, L.L.C*., 710 F.3d 324, 329 (5th Cir. 2013); *In re MBS Mgt. Services, Inc*., 690 F.3d 352, 358 (5th Cir. 2012).

[16] *Talley v. U.S*., 2023 WL 2881293, at *3 (E.D. La. Mar. 16, 2023) (quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district court judge sits as the trier of fact in place of a jury."); *Riverkeeper v. Taylor Energy Co. L.L.C*., 2015 WL 4547611, at *1 (E.D. La. July 23, 2015) (Morgan, J.) (same); *A.R. v. Pohlmann*, No. 16-17865, 2019 WL 468528, at *5 (E.D. La. Feb. 6, 2019) (Morgan, J.) (same); *Wallis v. Hornbeck Offshore Operators*, 2014 WL 3809743, at *1 (E.D. La. Aug. 1, 2014) (Morgan, J.) (same). *See also Richardson v. SEACOR Lifeboats, LLC*, 2015 WL 2193907, at *2 (E.D. La. May 11, 2015) (Morgan, J.) ("most of the objectives of *Daubert* are not implicated" in a bench trial). Because the primary purpose of *Daubert* is to protect a jury, this Court has denied pre-trial *Daubert* motions without prejudice and permitted parties to re-urge *Daubert* arguments at the bench trial. *In re Bordelon Marine, Inc*., 2012 WL 1995802, at

general causation hearing.[17] Because the Trial Plaintiffs' cases will be tried to a jury, the Court must strictly scrutinize the Trial Plaintiffs' proposed expert evidence under the standards set out in *Daubert* and Rule 702, which are set forth more fully below.

## II.  Federal Rule of Evidence 702 and *Daubert* Requirements

Rule 702 permits experts to offer opinions if (a) the expert's specialized knowledge will help the trier of fact, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied those principles and methods. In *Daubert,* the Supreme Court provided a five-factor test for gauging the reliability of an expert's methodology:

> (1) whether the expert's theory can be or has been tested;
> (2) whether the theory has been subject to peer review and publication;
> (3) the known or potential rate of error of a technique or theory when applied;
> (4) the existence and maintenance of standards and controls; and
> (5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999) (citing *Daubert*, 509 U.S. at 593-95). The proponent of the expert bears the burden of establishing these criteria. *Moore*, 151 F.3d at 276.

First, Plaintiffs must establish that an expert has the appropriate qualifications "to testify in a particular field or on a given subject." *United States v. Cooks*, 589 F.3d 173, 179-80 (5th Cir. 2009); *see also Cleveland ex rel. Cleveland v. United States*, 457 F.3d 397, 406 (5th Cir. 2006) (affirming exclusion of expert witness testimony under Daubert in bench trial where proposed testimony was outside expert's qualifications); *Wilson v. Woods*, 163 F.3d 935, 937-39 (5th Cir.

---

*2 (E.D. La. June 4, 2012) (Morgan, J.) (in a case without a jury demand, denying *Daubert* motion without prejudice, and permitting party to re-urge *Daubert* arguments at trial). *See also McDowell v. A. Sounding Co., Inc*., 2012 WL 1656262, at *2 (E.D. La. May 10, 2012) (Morgan, J.) (same).

[17] *Ictech-Bendeck*, 2021 WL 5177827, at *3.

1999) (witness not qualified to testify about accident reconstruction where a court previously refused to qualify him as an accident reconstruction expert and he did not hold a degree or certificate in the field).

Then, as this Court has recognized, it must determine whether the expert's testimony is reliable and relevant. *Ictech-Bendeck*, 2021 WL 5177827, at *3 ("ensure that only reliable and relevant expert testimony is presented to the jury."); s*ee also Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 776-77, 790 (E.D. La. 2015) (Vance, J.) (excluding unreliable expert opinion about exposure to benzene).

"Whether an expert's testimony is reliable is a fact-specific inquiry." *Burleson v. Texas Dept. of Crim. J.*, 393 F.3d 577, 584 (5th Cir. 2004). The reliability of an expert's testimony is determined by assessing "whether the reasoning or methodology underlying [it] is valid." *Burst*, 104 F. Supp. 3d at 776-77, 790 (citing *Daubert*, 509 U.S. at 592-93). "The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation." *Shell Offshore, Inc. v. ENI Petroleum US LLC*, 2018 WL 1518444, at *1 (E.D. La. Mar. 28, 2018) (Morgan, J.) (internal quotation marks and citations omitted) (excluding expert testimony); *see also Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where an expert's opinion is based on insufficient information, the analysis is unreliable.").

In assessing the relevancy of an expert's testimony, "the district court must, at all times, remain 'cognizant of Rule 702's requirement that expert evidence or testimony must assist the trier of fact to understand the evidence or determine a fact in issue . . ..'" *Shell Offshore, Inc.*, 2018 WL 1518444, at *2. "'If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury,' is not relevant to the case, and should be excluded." *Id.* (quoting *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005)). A district court has discretion to exclude expert testimony that

does not meet these essential requirements. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## ARGUMENT

### I.  Dr. Schiffman is not qualified to opine that H₂S accumulated in the Trial Plaintiffs' homes.

Plaintiffs' own air modeling—which Defendants dispute—purports to show that the Trial Plaintiffs were exposed to JPLF emissions of H₂S at 5 ppb for less than 2.5% of the time during the relevant time period—and yet many of the Trial Plaintiffs claim they smelled H₂S during the relevant time period at a frequency of 24 hours per day, 7 days per week, 365 days per year.[18] Rather than concede that the Trial Plaintiffs were exposed to odors not originating from JPLF, Dr. Schiffman attempts to explain away these discrepancies by claiming that JPLF emissions must have entered and accumulated in the Trial Plaintiffs' homes, including clinging to fabrics, and lingered far beyond the actual exposure period.[19] This is a convenient theory—but it's a theory that is scientifically implausible, is not supported by any sampling data, air dispersion modeling, or other objective evidence, and one that Dr. Schiffman is unqualified to offer.

Dr. Schiffman is a psychologist—she is not an environmental scientist, chemist, or air modeler. She does not have any education or degree in toxicology, analytical chemistry, atmospheric chemistry, textile stabilization, the fate and transport of chemicals, or their accumulation in homes and textiles.[20] Plaintiffs' air dispersion expert Mr. Lape only modeled H₂S concentrations to the outside of the Trial Plaintiffs' homes.[21] He did not model or offer opinions

---

[18] *See* Ex. 2 at 199:15-24; 204:11-25.
[19] *See* Ex. 1 at 21-22.
[20] *See* Excerpts of Deposition of Dr. Schiffman, Vol. II, taken on August 31, 2021, attached hereto as <u>Exhibit 3</u>, at 499:20–500:11; Ex. 1 at Appx. C.
[21] *See* Excerpts of Deposition of James Lape, taken on April 22, 2024, attached hereto as <u>Exhibit 4</u>, at 16:3-6; 16:24-17:1; 16:10-15.

on what concentrations may be inside their respective homes.[22] And he confirmed that in order to so do, one would need to be an expert in air dispersion – which Dr. Schiffman is not.[23]

With respect to Dr. Schiffman's "accumulation" theory, Dr. John Kind, a toxicologist, has explained that the theory is scientifically implausible.[24] Perhaps more compelling, Dr. Schiffman's theory belies common sense. As Dr. Kind explains, "if the argument that hydrogen sulfide from JPLF emissions were to adhere to fabrics as alleged by the trial Plaintiffs, then every single sofa couch, bed linens, pants, bathroom towels, etc. worldwide would have an odor problem, and therefore every home would also have an odor problem, as the human body emits hydrogen sulfide in flatulence at concentrations hundreds to thousands of times above 5 ppb."[25] It goes without saying, there is no such universal experience of lingering odor problems from the human body's natural production of $H_2S$.

Dr. Schiffman gets this wrong because she lacks the qualifications to opine on $H_2S$ concentrations or accumulation inside each of the Trial Plaintiffs homes, and she has not followed any reliable or peer-reviewed methodology. Dr. Schiffman makes the extreme claim that "$H_2S$ lingers in the air for up to 18 hours and accumulates and concentrates in enclosed and low-lying areas within the home" and "absorb[s] to textiles" to increase the odor intensity.[26] In support of this claim, she cites to literature from the Virginia Department of Health which states that "Hydrogen sulfide is slightly heavier than air and *may* accumulate in enclosed, *poorly ventilated*, and low-lying areas."[27] She went on to explain that textbook examples of such "low-lying areas" would be a homeowner's basement (not exactly commonplace in South Louisiana).[28]

---

[22] *See id*. at 15:9-11; 17:10-20.
[23] *See id*. at 15:1-8.
[24] *See* March 8, 2024 Report of John Kind, attached hereto as <u>Exhibit 5</u>, at 78-79.
[25] *Id*. at 79.
[26] Ex. 1 at 21-22.
[27] Ex. 2 at 182:23-183:16 (emphasis added).
[28] *Id*. at 182:3-16.

Dr. Schiffman admitted that she is not relying on any actual measurements or data about $H_2S$ concentrations inside the Trial Plaintiffs' homes,[29] because Plaintiffs made the tactical decision not to collect such data (and as mentioned above, Mr. Lape's modeling does not address indoor concentrations). Further, Dr. Schiffman did not analyze the Trial Plaintiffs' homes or consider whether they featured any "enclosed, poorly ventilated, and low-lying areas"[30]—which is one of many examples of Dr. Schiffman continuing to treat this case as a general causation exercise, rather than considering the specific causation questions at issue for the Trial Plaintiffs. *See infra* Section IV. Asked why she did not conduct this specific causation analysis to determine whether the Trial Plaintiffs' homes were poorly ventilated, or otherwise the sort of homes in which $H_2S$ would likely accumulate, Dr. Schiffman replied: "to do what you're asking would be millions and millions and millions and millions of dollars. And it's absolutely worthless because, whether I did it or not, I would come out with the same conclusion."[31] This sort of unwavering conclusion, tied to an expert's dogmatic beliefs rather than consideration of data, is the exact sort of "*ipse dixit*" testimony that the Supreme Court has urged trial courts to reject. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Moore*, 151 F.3d at 277 (stating that there must be "an adequate 'fit' between the data and the opinion offered" and excluding expert causation opinion where the "analytical" gap between the opinion and scientific knowledge and available data was too wide).

Lacking any credentials or peer-reviewed literature to enable her to opine that $H_2S$ likely entered and then lingered in the Trial Plaintiffs' homes for 18 hours, Dr. Schiffman pointed to her "personal experience" visiting homes downwind of hog farms where she noticed it smelled worse

---

[29] *See* Ex. 3 at 363:10–23.
[30] Ex. 2 at 183:24-184:23.
[31] *Id*. at 185:16-20.

inside than outside—causing her to assume, without any scientific analysis, that $H_2S$ was accumulating and lingering inside those homes.[32] Even if Dr. Schiffman's personal anecdotes were scientifically valid—and they are not—the $H_2S$ concentrations outside the homes in that case were in the "parts per million range," many orders of magnitude higher than the concentrations modeled here, and as she readily agreed, "hog farm odors are different than landfill odors."[33] Dr. Schiffman's unscientific guesswork under distinguishable circumstances is not a substitute for the expertise in chemistry and air dispersion needed to opine reliably on the degradation and dispersion of various types of chemicals in air.

Therefore, this Court should limit Dr. Schiffman's testimony to sensations of smell and responses to odor perception—the "lane" for which she testified she is staying in.[34] *See Edmonds v. Illinois Cent. Gulf R. Co.*, 910 F.2d 1284, 1287 (5th Cir.1990). Dr. Schiffman does not have the necessary qualifications, nor has she employed a reliable methodology, to testify that odors and emissions from the JPLF more likely than not accumulated inside the Trial Plaintiffs' homes and absorbed into their textiles. As the recent amendments to Rule 702 confirm, this flimsy testimony must not be allowed to reach the jury.

## II. Dr. Schiffman does not have the qualifications to testify about landfill operations or contractual issues.

Second, the Court should preclude Dr. Schiffman from testifying about landfill operations and contracts as these issues are also well outside her expertise in odor psychology. Dr. Schiffman opines on "best management practice[s]" related to the acceptance of gypsum board and solidification, Defendants' awareness of those practices, and landfill conditions and "maintenance

---

[32] Ex. 3 at 346:18-348:23.
[33] Ex. 3 at 346:4–12; Ex. 1 at 276:1-5.
[34] Ex. 1 at 177:2-6 (Q. "And you're not offering opinions as an air modeling expert in this case? A. "No, I'm not. That was his—that was his lane. I'm staying in my lane. Mine was the odor and where did it come from.").

issues" that allegedly contributed to odors.[35] But by her own admission, Dr. Schiffman has never operated a landfill, a gas collection and control system, a leachate collection system, or an odor misting system; nor has she provided consulting services regarding waste acceptance.[36] Dr. Schiffman also cannot speak to cover application, and she has not read Louisiana regulations governing landfill operations.[37] And Dr. Schiffman is not being offered as an expert in the disposal of spent lime.[38] She has no education or training in these areas either.[39] These opinions about the management of and disposal practices at the JPLF and Defendants' knowledge are therefore far outside the scope of her expertise.

Moreover, despite opining that "Waste Connections and Aptim" were responsible for the leachate and gas collection systems, Dr. Schiffman acknowledged that she is not offering opinions as to contractual claims and that she is not an expert in contracts.[40] The basis for her statement regarding Defendants' responsibilities was "[j]ust looking at who was being sued."[41] Dr. Schiffman does not have the qualifications to testify about contractual issues, and these opinions—as well as her opinions about landfill operations—should not be permitted to reach the jury. *See Edmonds*, 910 F.2d at 1287.

## III. Dr. Schiffman lacks any evidence that any Trial Plaintiff was exposed to VOCs.

Dr. Schiffman's testimony should be limited in a third respect—she should not be allowed to testify regarding VOCs, because she is entirely without evidence that any Trial Plaintiff was exposed to VOCs, much less the type of VOC or the duration and concentration of the exposure. "VOC" is a generic term referring to a diverse group of thousands of chemicals with differing

---

[35] *See, e.g.*, Ex. 1 at 5, 14, 30-31.
[36] *See* Ex. 2 at 98:16-100:5.
[37] *See id.* at 100:6-101:23.
[38] See id. at 78:16-22.
[39] *See* Ex. 1 at Appx. C.
[40] *See* Ex 1 at 30-31; Ex. 2 at 261:23-262:13.
[41] Ex. 2 at 261:23-262:13.

chemical, physical, and toxicological properties.[42] They are emitted by many natural and household sources and are ubiquitous in modern, everyday life.[43] The term "VOC" does not refer to a specific chemical, nor does it imply a particular concentration or dosage.

In order to reliably opine that VOCs contributed to Plaintiffs' injuries, at a minimum, Dr. Schiffman would need evidence which demonstrated (1) that the Trial Plaintiffs were actually exposed to VOCs; (2) the specific VOCs to which the Trial Plaintiffs were exposed; (3) the duration and frequency of such exposure; and (4) the concentration (i.e., dose) of the VOCs to which they were exposed. *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (striking causation opinion as unreliable where expert did not know "the type of chemical or the level, and duration of exposure"). Dr. Schiffman has none of this evidence,[44] and without such evidence, her opinions fall woefully short of the reliability standards demanded by the Fifth Circuit. In fact, Dr. Schiffman admitted during her deposition that the potential impact of a VOC mixture (i.e., whether it could create an odor or cause irritation) depends on the specific chemicals involved—data that she does not have and has not even attempted to collect.[45]

Plaintiffs' only air modeling expert (James Lape) conducted no modeling of VOCs.[46] At most, Dr. Schiffman is able to point to LDEQ data that speaks to certain VOCs, which were measured at locations *other than* the homes of the Trial Plaintiffs and were *not* traced back to the JPLF. She lacks any evidence as to whether those VOCs were ever present at the Trial Plaintiffs'

---

[42] R. Doc. 206-6, para. 15.

[43] *Id*.

[44] *See* Ex. 2 at 254:20-256:3.

[45] *See id*. at 64:11–64:14; 65:16–24. *See also* ATSDR, *Environmental Odors: Frequently Asked Questions* (2020), https://bit.ly/3h2zep9 (cited by Dr. Schiffman, Ex. 1 at 36) (symptoms depend on the "type of substance, its concentration in air," frequency, and duration).

[46] See Ex. 2 at 255:7-10.

homes, and therefore she also has no evidence as to the duration, frequency, or concentration of those VOCs at the Trial Plaintiffs' homes (or whether they came from emissions from the JPLF).[47]

For toxic tort causation opinions, the Fifth Circuit demands that an admissible opinion must identify the plaintiff's exposure level. *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996). The Fifth Circuit holds that "knowledge that the plaintiff was exposed to" harmful levels of exposure is the second of two "minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Seaman v. Seacor Marine L.L.C.*, 326 Fed. Appx. 721, 723 (5th Cir. 2009). Said another way, an expert must confirm that the plaintiff was exposed to a sufficient level of toxins for a sufficient duration to have caused his alleged injuries. *Williams v. BP Expl. & Prod.*, 2019 WL 6615504, at *8 (E.D. La. Dec. 5, 2019) (Morgan, J.). An expert opinion based upon "incomplete or grossly inaccurate dosage or duration data" should be excluded. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991).[48] This Court and other courts in this district routinely reject expert testimony for failing to calculate a plaintiff's dose of exposure. *See, e.g., Williams v. BP Expl. & Prod.*, No. 18-9753, 2019 WL 6615504, at *8 (E.D. La. Dec. 5, 2019) (Morgan, J.) (excluding expert for failing to show plaintiff's "level of exposure to a certain substance over a certain period of time"); *Osmer v. BP Expl. & Prod.*, No. 19-10331, 2021 WL 4206950, at *1 (E.D. La. Sept. 16, 2021) (Lemelle, J.); *Comardelle v. Pennsylvania Gen. Ins. Co.*, 76 F. Supp. 3d 628, 634 (E.D. La. 2015) (rejecting expert's testimony that asbestos was a

---

[47] Because Dr. Schiffman does not know *which* VOCs, if any, were present at the homes of the Trial Plaintiffs, she cannot say whether those VOCs are capable *at any concentration* to cause the Trial Plaintiffs' injuries.

[48] *See also Allen*, 102 F.3d at 195 (affirming the exclusion of expert testimony on causation because there was no evidence of the level of exposure); *Moore*, 151 F.3d at 278 (concluding that because expert had no accurate information on the level of the plaintiff's exposure, he had no support for his theory that the level of chemicals to which the plaintiff had been exposed caused the plaintiff's symptoms); *Thompson v. S. Pac. Transp. Co.*, 809 F.2d 1167, 1169 (5th Cir. 1987) (holding that toxicology opinion had "insufficient factual basis" where expert did not have "any knowledge about the amount or duration of [the plaintiff's] exposure.").

substantial contributing cause of the plaintiff's mesothelioma because there was allegedly no safe level of asbestos exposure, when expert failed to assess the plaintiff's *degree* of exposure).[49]

Given Dr. Schiffman's lack of evidence that the Trial Plaintiffs were exposed to any VOCs—much less the type of VOC or the duration, frequency, and concentration of the exposure—her opinions on VOCs represent nothing more than inadmissible speculation. *Johnson v. Arkema, Inc.*, 685 F.3d 452, 462 (5th Cir. 2012) (opinion excluded where expert did not explain how the chemicals to which plaintiff was exposed were at sufficient concentrations to cause injuries); *Knight*, 482 F.3d at 351 (striking causation opinion as unreliable where expert did not know "the type of chemical or the level, and duration of exposure"); *Moore,* 151 F.3d at 278 (opinion excluded; "Because he had no accurate information on the level of Moore's exposure to the fumes, Dr. Jenkins necessarily had no support for the theory that the level of chemicals to which Moore was exposed caused RADS.").

In Dr. Schiffman's own words, her opinion that VOCs from the JPLF have contributed to the Trial Plaintiffs' physical injuries was merely an "afterthought" to help explain the symptoms reported by the Trial Plaintiffs.[50] An expert may not, however, offer an unsupported causation opinion simply to buttress complaint records. *Burst*, 104 F. Supp. at 790 (opinion excluded where expert unreasonably relied on witness testimony and tried "to produce particular results and support a causation opinion without a reliable basis"); *Radcliff v. Tate & Lyle Sucralose, Inc.*, No. 06-cv-0345, 2008 WL 5071900, at *4 (S.D. Ala. Nov. 25, 2008) (expert opinion that plant caused odor nuisance excluded as unreliable as it was "based on the plaintiffs' complaint of a nuisance

---

[49] In addition, Dr. Schiffman still has not explained which mixture of VOCs and at what concentrations would be capable of causing the alleged injuries to the Trial Plaintiffs. *See* Ex. 2 at 255:11-256:3 (Q: Have you identified the specific mixture – A: No, I have not.)

[50] Excerpts of Deposition of Dr. Schiffman, Vol. I, taken on August 30, 2021, attached hereto as <u>Exhibit 6</u> at 145:16–19; 152:10–19.

and the fact that it [was] theoretically possible for the plant to emit . . . enough [chemicals] to cause a nuisance"). Because Dr. Schiffman's opinions with respect to VOCs are "so sadly lacking as to be mere guesswork," they must be excluded. *See Allen*, 102 F.3d at 198-99 (causation opinions excluded under FRE 702 and 703 that were not based on "scientifically valid reasoning, methodology and evidence" and where information on exposure to ethylene oxide was "so sadly lacking as to be mere guesswork"); *Williams*, 2019 WL 6615504, at *8; *Moore*, 151 F.3d at 279 (excluding speculative testimony where expert "could cite no scientific support for his conclusion that exposure to any irritant at unknown levels triggers [an] asthmatic-type condition"); *Rosen v. Ciba-Geigy Corp*., 78 F.3d 316, 318 (7th Cir. 1996) ("A district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").

**IV. Dr. Schiffman cannot testify to specific causation as she failed to conduct a specific causation analysis.**

Finally, to the extent that Dr. Schiffman intends to offer a specific causation opinion—which she struggled to answer at her deposition—such opinions should be excluded as she has wholly failed to conduct a specific causation analysis. Based on Dr. Schiffman's deposition testimony, it is unclear whether she is merely offering a warmed-over version of her general causation opinions—which should not be allowed as the Court has already determined the issue of general causation—or whether she actually intends to offer a specific causation opinion as to the injuries allegedly suffered by the thirteen Trial Plaintiffs. Defendants attempted to clarify this issue at deposition, but Dr. Schiffman struggled to give a clear answer:

> Q. And to be clear, what expert opinions are you offering in this case?
>
> A. Odor and whether the people **could have** suffered the complaints that they have and whether it came from Jefferson Parish Landfill.

Q. … Are you providing any opinions on whether the individuals did, in fact, suffer injuries from odors from Jefferson Parish Landfill?

A. That each individual?

Q. Correct. For each individual of the 13 trial plaintiffs.

A.· **I didn't -- I did not --** those were decisions that were made by others, okay? **I'm just saying what the mechanism would be given that those are the complaints.**

Q. So your opinion goes more towards whether it's capable of causing those injuries, not whether it actually did cause those injuries of the trial plaintiffs?
…
A.· See, I don't -- my work as a medical psychologist has taught me to listen to patients. If they say they have a headache, they have a headache, okay? And whether -- and they said that they got it at the time that this odor came in and that they had an eye irritation, et cetera, et cetera, I listen to that. Otherwise, you can't solve patients' problems. So from my point of view, from reading what I read, I do believe that these people had these types of symptoms. But was I there when they had the symptoms? I wasn't. I'm just saying that it's highly likely that this is the cause.[51]

As indicated above, Dr. Schiffman seems to be reserving the right to offer a specific causation opinion at trial—even though she did not consider the specific circumstances of the thirteen Trial Plaintiffs, as required in a specific causation analysis. *McNabney*, 153 F. App'x at 295 ("[causation expert's] failure to consider and exclude other potential causes of [plaintiff's] injury before offering an opinion renders his testimony unreliable.").

Plaintiffs bear the burden of proving specific causation, which the Fifth Circuit has defined as "whether a substance caused a particular individual's injury." *Knight*, 482 F.3d at 351. While general causation requires knowledge of "the harmful level of exposure to a chemical," specific causation requires knowledge that (1) the plaintiff was exposed to such quantities, and (2) that the

---

[51] Ex. 2 at 101:24-103:11 (emphasis added).

plaintiff's alleged injuries were more likely caused by the exposure as opposed to some other cause. *Allen*, 102 F.3d at 199; *Seaman*, 326 Fed. Appx. at 723; *McNabney,* 153 F. App'x at 295. These are "minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen*, 102 F.3d at 199.

The Fifth Circuit adheres to demanding standards for admissible specific causation testimony. The opinion must be based on facts in the record, not unsupported assumptions. *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. 513, 516 (5th Cir. 2013) (affirming exclusion of exposure assessment that was based on erroneous and unsupported assumptions). "A court may rightfully exclude expert testimony where a court finds that an expert has extrapolated data, and there is 'too great an analytical gap between the data and the opinion proffered.'" *Burleson*, 393 F.3d at 587 (quoting *Joiner*, 522 U.S. at 146).

Here, Dr. Schiffman has not satisfied the rigorous standards for a specific causation analysis as the Fifth Circuit demands. For example, she has not examined the Trial Plaintiffs, has not reviewed their medical records or otherwise considered their medical history, has not examined their individual residences, has not considered other potential causes of their alleged injuries, and has not attempted to conduct a differential diagnosis[52]—and without taking any of these steps, she cannot speak reliably to specific causation. *McNabney,* 153 F. App'x at 295. In contrast to Dr. Schiffman, Defendants' expert Brobson Lutz, M.D. analyzed more than 41,000 pages of the Trial Plaintiffs' medical records and concluded that many of the Trial Plaintiffs complained of substantially the same symptoms to their healthcare providers before, during, and after the relevant time period—suggesting to him a lack of evidence that such symptoms were caused by JPLF emissions. Dr. Schiffman did not bother to consider the Trial Plaintiffs' individual circumstances,

---

[52] *See* Ex. 2 at 31:21-32:9; 33:9-33:19; 91:23-92:9; 109:25-110:11; 184:8-12; 79:14-19; 279:9-14.

and apparently merely concluded that, because the Trial Plaintiffs say the JPLF caused their long list of maladies, it must be so.[53]

Dr. Schiffman also fails to adequately consider alternate sources of hydrogen sulfide or odors, including major contributors adjacent to the JPLF, such as the Hwy-90 C&D landfill and the River Birch landfill, or other sources identified by LDEQ, including industrial companies in the vicinity. Instead, she assumes that every single complaint and testimony from Plaintiffs was attributable to the JPLF.[54]

The Fifth Circuit demands that a specific causation expert consider alternative causes of a plaintiff's complained-of injury. *McNabney,* 153 F. App'x at 295. Dr. Schiffman admits she failed to do this. Thus, she has not performed a reliable specific causation analysis, and she should not be allowed to testify that the injuries of the Trial Plaintiffs were more likely than not caused by JPLF emissions.

## CONCLUSION

Rule 702, as repeatedly applied by this Circuit, requires that expert opinions be offered from a sufficiently qualified expert who applies widely accepted and reliable scientific methods. In at least four areas addressed in this motion, Dr. Schiffman has relied on assumptions, guesswork, and overgeneralized possibilities instead of analyzing the specific data and circumstances of the thirteen Trial Plaintiffs. Specifically, the Court should exclude Dr. Schiffman's testimony on the following topics:

1. Whether hydrogen sulfide ($H_2S$) accumulated and lingered inside the Trial Plaintiffs' homes, an issue for which she lacks any expertise and failed to apply the criteria of the literature on which she relies;

---

[53] *See* Ex. 2 at 31:21-32:9, 102:7-103:11, 109:25-110:14, 161:9-24, 279:9-14.
[54] *See id.* at 145:4-12; 152:5-18; 235:17-25. It is also noteworthy Dr. Schiffman attributed odors such as those of ammonia to the JPLF, despite having a well characterized emission source of ammonia (Cornerstone Chemical) within Jefferson Parish.

2. Whether Defendants followed best management practices in operating the landfill and accepting and disposing of waste, and Defendants' respective responsibilities for aspects of landfill management, plainly not issues for a psychologist;

3. Whether exposure to VOCs contributed to the Trial Plaintiffs' injuries, given that she lacks any evidence that any Trial Plaintiffs were actually exposed to VOCs, much less any evidence of *which* specific VOCs they were exposed to, the duration of such exposure, and/or the concentration (dose) of such exposure; and

4. Whether the injuries of the Trial Plaintiffs were more likely than not caused by JPLF emissions, given that she has failed to conduct a specific causation analysis.

Dr. Schiffman's opinions on these four topics are not reliable, and they are not matters of the weight of her testimony. Rather, as the recent amendments to Rule 702 indicate, unreliable expert testimony must not be allowed to reach the jury. For these reasons, Defendants respectfully request that the Court grant this motion and limit Dr. Schiffman's testimony in the manner prayed for herein.

Respectfully submitted,

LISKOW & LEWIS, APLC

By: ___/s/ Michael C. Mims_____
      Michael Cash (#31655)
      Cherrell Simms Taplin (#28227)
      Michael C. Mims (#33991)
      Brady M. Hadden (#37708)
      J. Hunter Curtis (#39150)
      Alec Andrade (#38659)
      701 Poydras Street, Suite 5000
      New Orleans, LA 70139
      Telephone: (504) 581-7979
      Telefax: (504) 556-4108

      BEVERIDGE & DIAMOND, P.C.

      Megan R. Brillault (*pro hac vice*)
      Michael G. Murphy (*pro hac vice*)
      John H. Paul (*pro hac vice*)
      Katelyn E. Ciolino (*pro hac vice*)
      Katrina M. Krebs (*pro hac vice*)

825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

CONNICK AND CONNICK, LLC

By:   /s/ Michael S. Futrell
        William P. Connick, La. Bar No. 14158
        Michael S. Futrell, La. Bar No. 20819
        Matthew D. Moghis, La. Bar No. 33994
        Anya M. Jones, La. Bar No. 36923
        3421 N. Causeway Blvd., Suite 408
        Metairie, Louisiana 70002
        Telephone: (504) 681-6658
        Facsimile: (504) 838-9903
        E-mail: moghis@connicklaw.com

*Counsel for Defendant Jefferson Parish*

GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:   /s/ J. Michael DiGiglia
        Ernest P. Gieger, Jr. (6154)
        John E. W. Baay (22928)
        J. Michael DiGiglia (24378)
        Nicholas S. Bergeron (37585)
        Blaise Chadwick Hill (*pro hac vice*)
        Gieger, Laborde & Laperouse, L.L.C.
        Hancock Whitney Center
        701 Poydras Street, Suite 4800
        New Orleans, Louisiana 70139

Telephone: (504) 561-0400
Facsimile: (504) 561-1011

*Attorneys for Defendant Aptim Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on June 6, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ Michael C. Mims

21