Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


FREDERICK ADDISON, ET AL.,        CIVIL ACTION NO.
                                  19-11133,
VS.                               C/W 19-14512

LOUISIANA REGIONAL                SECTION: "E"(5)
LANDFILL COMPANY, ET AL.
                                  JUDGE:  MORGAN

                                  MAGISTRATE JUDGE:
                                  NORTH


         The remote videotaped deposition of

SUSAN SCHIFFMAN, PH.D., appearing from Durham,

North Carolina taken in connection with the

captioned cause pursuant to the following

stipulations before  RITA A. DEROUEN, Certified

Court Reporter, on the 26th of April, 2024,

beginning at 11:05 a.m. Eastern Time.

Page 2

 1   REMOTE APPEARANCES:

 2   REPRESENTING THE ADDISON PLAINTIFFS:

 3
     WHITEFORD, TAYLOR & PRESTON LLP
 4   BY:  C. ALLEN FOSTER, ESQ.
     1,800 M Street, NW
 5   Washington, DC 20036
     202-659-6787
 6   cfoster@whitefordlaw.com

 7       - AND -

 8   FORREST CRESSY & JAMES, LLC
     BY:  S. ELIZA JAMES, ESQ.
 9   1222 Annunciation Street
     New Orleans, Louisiana  70130
10   504-605-0777
     eliza@fcjlaw.com

11

12   REPRESENTING THE ICTECH-BENDECK PLAINTIFFS:

13   HAMMEL LAW FIRM, LLC
     BY:  DOUGLAS S. HAMMEL, ESQ.
14   3129 Bore Street
     Metairie, Louisiana  70001
15   504-832-9942
     douglashammel@gmail.com

16

17   REPRESENTING THE WASTE CONNECTIONS DEFENDANTS:

18   BEVERIDGE & DIAMOND PC
     BY:  MEGAN BRILLAULT, ESQ.
19   BY:  KATRINA M. KREBS, ESQ.
     825 Third Avenue
20   16th Floor
     New York, New York  10022
21   212-702-5456
     mbrillault@bdlaw.com
22   kkrebs@bdlaw.com

23       - AND -

24

25

Page 3

```
 1  REMOTE APPEARANCES:  (CONTINUED)

 2 LISKOW & LEWIS, APLC
    BY:  MICHAEL C. MIMS, ESQ.
 3 BY:  CHERRELL S. TAPLIN, ESQ.
    701 Poydras Street
 4 Suite 5000
    New Orleans, Louisiana  70139
 5 504-581-7979
    mmims@liskow.com
 6 ctaplin@liskow.com

 7
     REPRESENTING THE DEFENDANT JEFFERSON PARISH:
 8
    CONNICK & CONNICK, LLC
 9 BY:  MICHAEL S. FUTRELL, ESQ.
    BY:  MATTHEW D. MOGHIS, ESQ.
10 3421 N. Causeway Boulevard
    Suite 408
11 Metairie, Louisiana  70002
    504-681-6649
12 mfutrell@connicklaw.com
    moghis@connicklaw.com
13

14  REPRESENTING THE DEFENDANT APTIM CORP.:

15 GIEGER, LABORDE & LAPEROUSE, LLC
    BY:  JOHN E.W. BAAY, II, ESQ.
16 701 Poydras Street
    Suite 4800
17 New Orleans, Louisiana  70239
    504-654-1373
18 jbaay@glllaw.com

19  Also Present:

20        William Rain, Videographer
          John Kind, Ph.D., CIH, CSP, Expert Witness
21        Pamela Dalton, Ph.D., Expert Witness

22
    Reported by:
23
          Rita A. DeRouen, Certified
24        Court Reporter No. 2014018
          in and for the State of
25        Louisiana
```

Page 31

1    Q.   I need to know, because I need to know

2  what information you considered.  So --

3    A.   Well, whatever is -- let me see if I can

4  find it here.

5    Q.   Well, we can come to that.  Let me just --

6    A.   Okay.

7    Q.   So we said fact sheets, supplemental fact

8  sheets, deposition transcripts.

9         Did you review any medical records of the

10  individual plaintiffs?

11    A.   Yes.

12    Q.   You did?  You reviewed the medical

13  records?

14    A.   I reviewed the records of -- no, of the --

15  of two -- two -- Delorenzo and one other person.

16    Q.   Spodak?

17    A.   Yes.  I reviewed those.

18    Q.   Okay.  So when you said "the records," you

19  reviewed their expert reports?

20    A.   I reviewed their expert reports, yes.

21    Q.   Did you review the underlying medical

22  records --

23    A.   No, I did not.

24    Q.   Just let me finish so the court reporter

25  can get it.

1          Did you review the underlying medical

2   records for each of the individual plaintiffs?

3      A.  No.

4      Q.  Did you review any of the IMEs,

5   independent medical evaluations, that were

6   performed on the individual plaintiffs?

7      A.  No.

8      Q.  I'm sorry, did you respond?

9      A.  No, I did not.

10     Q.  You did not review them, okay.  Hold on

11  one sec.

12         Okay.  So going back to the phone calls, I

13  understand that you weren't on the phone calls.

14  Were the phone calls in connection with the fact

15  sheet responses or were they more recently, if you

16  know?

17     A.  No.  The phone calls, what happened I --

18  during -- at some point, I think it was during

19  COVID or whatever, that sometimes people didn't

20  come in and they'd get -- information was gathered

21  by phone call.

22         I had supplemental -- they were labeled in

23  a kind of crazy way, so I couldn't quite figure

24  out exactly what was going on, but I read them.

25  So I don't know exactly how they were obtained,

Page 33

1  whether it was by phone call or in person.

2        But I had the fact sheets and some

3  supplemental information and then the depositions,

4  which are the ones that I relied on.

5     Q.  And then Dr. Spodak's expert report?

6     A.  Right.

7     Q.  And Dr. Delorenzo's?

8     A.  Uh-huh.

9     Q.  You never spoke with the individual

10 plaintiffs?

11    A.  No, I did not.

12    Q.  That means you never had examinations of

13 the individual plaintiffs?

14    A.  I did not.

15    Q.  You didn't speak to any of their

16 physicians, I'm assuming?

17    A.  I did not.  That was the physician -- I

18 mean, that was Dr. Delorenzo.  That was his -- as

19 I understand, that was part of his role.

20    Q.  And so you looked at that information, you

21 looked at the modeling from Mr. Lape that went to

22 each of the eight locations, 13 trial plaintiffs

23 but eight locations; is that accurate?

24    A.  13 people, uh-huh.

25    Q.  And then you provided the opinions on

Page 64

1   fragrance studies, is that --

2       A.  Yeah.  That was -- I was the scientific

3   director for the Fragrance Research Fund in

4   New York for a long time.

5       Q.  When you did those studies, who would you

6   get grants from?  Like who funded them?

7       A.  Fragrance industry.  I think that was from

8   the Fragrance Research Fund.

9       Q.  And some of your other studies have been

10  on sweeteners; is that right?

11      A.  Correct.

12      Q.  Artificial sweeteners maybe?

13      A.  Yes.

14      Q.  And who grants -- who funds those studies,

15  the studies you've done on --

16      A.  I had a large -- I had grants for many

17  years from The NutraSweet Company.

18      Q.  And when -- when was -- sorry, when

19  were --

20      A.  Don't ask me.  I mean, it would have

21  been -- I started working with NutraSweet on salt

22  substitutes probably the end of the '70s and then

23  moved into sweeteners after Jim Schlatter found

24  the -- well, he had already found the dipeptide.

25          And then I ran the sweetener panels for

1   NutraSweet for years.  I've worked with Coca-Cola.

2   I've had grants from Coca-Cola.  I've had grants

3   from Pepsi.  I've had grants from General Foods.

4           General Foods paid for part of my

5   sabbatical in 1981.  Almost the whole -- the food

6   industry.  I've worked with Wrigley's.  I mean,

7   probably -- I have no idea how many.  Lots.  Lots

8   of food industry.  Sugar Association funded; but I

9   didn't have the money from the Sugar Association,

10  that went to somebody else.

11      Q.  Have they funded some of your work?

12      A.  They funded -- the funding did not go to

13  me directly.

14      Q.  Okay.  But it funded the study that you --

15      A.  One study, yes.

16      Q.  All right.  I don't think it's in these

17  first three paragraphs -- wait, actually, no.

18          You talked about educating and training.

19  And I think you mentioned earlier that you teach

20  courses at the -- at the --

21      A.  Right now I just -- right now I just teach

22  like a single lecture, okay?  I'll be 84 this

23  year.  I've done enough lectures in my life.

24      Q.  You look great for 84, Dr. Schiffman.

25          When you -- are those lectures in person

Page 78

```
 1      Q.  -- any minimum impact or effect -- sorry,
 2  I used the word "effect."
 3          Is there any minimum effect that would be
 4  involved in your definition of "neighbor"?
 5      A.  Well, I think it's defined.
 6      Q.  So "nearby" doesn't have any --
 7      A.  Deprives a neighbor of enjoyment or causes
 8  damage to him or her, he is answerable, okay?  He
 9  is answerable for the damages, okay, upon showing
10  that he knew or in the exercise of reasonable
11  care.
12          And this is what the prob -- this is what
13  this whole lawsuit is about.  Anybody in their
14  right mind doesn't put spent lime on a landfill; I
15  mean, it's nuts.
16      Q.  Dr. Schiffman, are you being offered as an
17  expert in disposal of spent lime?
18      A.  As what?
19      Q.  As an expert in the disposal --
20      A.  No, I'm not.  No.
21      Q.  Let me just finish --
22      A.  Only by -- only odor.  Only odor.
23      Q.  All right.  So let's go to page 4.  About
24  halfway down in that paragraph after Footnote 21,
25  in that -- the body of the paragraph, it says, "A
```

1  careful analysis of the H2S data that was used as a

2  tracer of airborne contamination indicates that

3  JPLF was the main source of the odor and resulting

4  complaints."

5       And JPLF you had defined as Jefferson

6  Parish Landfill.  So I think, if we say JPLF, we

7  know it's the Jefferson Parish Landfill; is that

8  fair?

9       A.  Right.

10      Q.  And so with respect to that sentence, you

11  used the words "main source of odor and resulting

12  complaints."

13      A.  Right.

14      Q.  But you were directed to only look at

15  Jefferson Parish Landfill, correct?

16      A.  Correct.

17      Q.  And you didn't look at any other sources

18  of odors?

19      A.  No.

20      Q.  Okay.  So what is your basis of saying

21  that the Jefferson Parish Landfill odors are the

22  main source if you're not looking at any other

23  sources?

24      A.  The pattern of other compounds emitted,

25  the fact that -- I don't know if you've looked at

Page 91

 1          MR. FOSTER:

 2               Objection to the form.

 3      A.   I don't know about how -- I gave a talk in

 4   Japan, must have been 2018.  It was right before

 5   COVID hit.  And I remember having a -- sitting

 6   down with a bunch of people, and they were all

 7   saying -- telling me about all the problems that

 8   they had with odor and how 5 ppb was the

 9   absolute -- we had to find some way of making sure

10   that this was -- this was instituted in law.

11               I said, I don't have anything to do with

12   the law or making legal rules.  I said, I don't

13   know how you do it.

14               But I remember everybody saying that there

15   was a serious problem and they were involved in

16   all this.  I don't know anything about the law

17   in -- I mean, I know what the -- I mean, I've seen

18   the rules in Japan and China.  China is worthless.

19               But I don't know what happens in a court

20   of law.  I have no idea.  I don't know if it has

21   any...

22   BY MS. BRILLAULT:

23      Q.   Let's see.  Page 5, probably the last

24   third of that paragraph, it starts with, "The

25   anxiety and dread of a renewed onslaught of

Page 92

1  malodors which the trial plaintiffs felt during

2  the relevant time period..."

3          Your phrase "trial plaintiffs felt,"

4  that's based on your review of the deposition

5  transcripts and their written statements and the

6  fact sheets and discovery responses?

7      A.  That is correct, uh-huh.

8      Q.  You didn't interview them --

9      A.  No.

10      Q.  -- we've established.

11          Have you ever conducted a physical

12  examination of a patient over Zoom?

13      A.  Have I?  No.

14          I'm -- you know, that's a very interesting

15  question.  Over the -- over the years, there have

16  been physicians who have had problems with trying

17  to figure out a taste or smell disorder and would

18  link a patient in with me asking for help --

19  asking for help, if we could try various kinds of

20  things.

21          So I would ask them to get things from the

22  refrigerator, you know, could they smell this in

23  one nostril, the other nostril.  You know, we

24  would do various kinds of things trying to see if

25  I could isolate the problem.

Page 98

1         And one -- and fly -- what struck me was

2   fly ash and spent lime.  I saw those as a serious

3   problem from the standpoint of odor and should

4   have been stopped earlier than they were or

5   never -- or never started in the first place, from

6   the standpoint of odor.

7      Q.  When was the first time you heard of the

8   phrase "spent lime," Dr. Schiffman?

9      A.  I've heard that word for years.

10     Q.  Give or take, when was the first time?

11     A.  I have absolutely no idea.

12     Q.  And in what context did you hear the words

13  "spent lime"?

14     A.  Because people use it to get rid of sulfur

15  dioxide.  I've heard it many times.

16     Q.  How many landfills have you operated?

17     A.  Have I worked -- I have no idea.

18     Q.  No.  How many landfills have you operated?

19     A.  Never.

20     Q.  How many landfill gas collection systems

21  have you worked on?

22     A.  I have -- I have no idea how many -- I

23  don't work on them.  I collect odor samples or

24  people send me odor samples.

25     Q.  You've never operated a gas collection and

Page 99

1    control system at a landfill?

2        A.   No, I have not.

3        Q.   Is it fair to say you have never operated

4    a leachate collection system at a landfill?

5        A.   I have never operated a leachate.  But I

6    have -- but I have had many samples in my

7    laboratory where I have taken -- had Tedlar bags

8    where I've done odor samples where I've looked at

9    odor thresholds that have been collected from

10   leachate, okay, and also liquid samples looking at

11   how many times I had to dilute it, okay?  Lots of

12   those in order to get rid of the odor.

13       Q.   Have you ever operated or maintained an

14   odor-misting system at a landfill?

15       A.   No.

16       Q.   Have you ever provided consulting services

17   to any landfill with respect to the type of waste

18   it was accepting for disposal at the landfill?

19       A.   I was aware of the different types of

20   waste, but I was not a person who made any

21   decisions about that.

22       Q.   Have you ever made decisions about how

23   waste is handled for disposal at a landfill?

24       A.   Only insofar as various remediation

25   techniques were effective or not.

1     Q.   And by "effective," you mean --

2     A.   With regard to reducing the odor, yes.

3     Q.   Once again, you're just measuring the

4  odor?

5     A.   Correct.

6     Q.   Okay.  How many cover systems have you

7  provided consulting services on with respect to a

8  landfill?

9     A.   I don't do -- it's, again, the same answer

10  to all your questions, which is does a cover

11  system work or not, okay?

12          I've certainly done a lot of that with hog

13  farms as well as to whether it covers on lagoons

14  as to whether -- how thick should -- how thick

15  should the plastic be.  So let's say there's an

16  intervention, okay, of plastic that's this thick

17  or from -- from different providers.

18          So you take your odor samples and then you

19  make a decision as to which is the most effective.

20  I don't make the decision as to how you put the

21  cover on, but I make a decision as to what is the

22  best, most effective one with regard to odor.

23     Q.   Again, your effective determination is

24  based on what odors are occurring, not anything

25  else with respect to the --

 1      A.   Correct.

 2           MR. FOSTER:

 3                Objection to the form.

 4  BY MS. BRILLAULT:

 5      Q.   Are you familiar with regulations

 6  governing covering leachate systems, gas

 7  collection systems in municipal solid waste

 8  landfills in Louisiana?

 9      A.   I probably have read them many times, and

10  it kind of goes in one ear and out the other.

11      Q.   So sitting here today, you're not familiar

12  with respect to the specific regulations regarding

13  covering leachate systems or --

14      A.   I've read them -- I've read them many

15  times.

16      Q.   How many times have you read the

17  regulations?

18      A.   Have I read regulations?

19      Q.   Regulations in Louisiana with respect

20  to --

21      A.   Oh, not with -- no, no, I have not read

22  the regulations in Louisiana, I take that back.

23  No.

24      Q.   And to be clear, what expert opinions are

25  you offering in this case?

SCHIFFMAN SUSAN

1    A.   Odor and whether the people could have

2  suffered the complaints that they have and whether

3  it came from Jefferson Parish Landfill.

4    Q.   Odor, whether they could have suffered the

5  complaints they had, and whether the odors came

6  from Jefferson Parish Landfill.

7        Are you providing any opinions on whether

8  the individuals did, in fact, suffer injuries from

9  odors from Jefferson Parish Landfill?

10    A.   That each individual?

11    Q.   Correct.  For each individual of the 13

12  trial plaintiffs.

13    A.   I didn't -- I did not -- those were

14  decisions that were made by others, okay?  I'm

15  just saying what the mechanism would be given that

16  those are the complaints.

17    Q.   So your opinion goes more towards whether

18  it's capable of causing those injuries, not

19  whether it actually did cause those injuries of

20  the trial plaintiffs?

21        MR. FOSTER:

22            Objection to the form.

23    A.   See, I don't -- my work as a medical

24  psychologist has taught me to listen to patients.

25  If they say they have a headache, they have a

1  headache, okay?

2          And whether -- and they said that they got

3  it at the time that this odor came in and that

4  they had an eye irritation, et cetera, et cetera,

5  I listen to that.  Otherwise, you can't solve

6  patients' problems.

7          So from my point of view, from reading

8  what I read, I do believe that these people had

9  these types of symptoms.  But was I there when

10  they had the symptoms?  I wasn't.  I'm just saying

11  that it's highly likely that this is the cause.

12  BY MS. BRILLAULT:

13     Q.  And your opinion that it's highly

14  likely -- "this" meaning the Jefferson Parish

15  Landfill odors are the cause of their injuries --

16  was made looking solely at the Jefferson Parish

17  Landfill and not looking at other sources or other

18  confounding factors?

19          MR. FOSTER:

20              Objection to the form.

21     A.  But we have to go back to LDEQ again,

22  which is that they said that that is the main

23  source.  So that is -- dismissing the amount of

24  work that LDEQ tried to -- I mean, I have to

25  applaud them for the amount of effort they put in,

Page 109

1  be, okay?  Get rid of the word "threshold."

2          And then the threshold, is it 4.2 or is it

3  4.3, that was -- that was the thinking.  I need to

4  go back and read that.

5      Q.  All right.  So this is the last sentence

6  on 5, you're quoting the WHO, and it goes on to 6,

7  but we can really focus on 5.

8          Health -- you say, quote, "Health is a

9  state of complete physical, mental, and social

10  well-being, not merely the absence of disease or

11  infirmity."

12      A.  Correct.

13      Q.  Okay.  Is it your opinion that, but for

14  the odors and emissions from the Jefferson Parish

15  Landfill, each of the trial plaintiffs would be in

16  a state of complete physical, mental, and social

17  well-being?

18      A.  Each of them had physical complaints, each

19  of them -- they all had mental complaints, and

20  they all had social complaints.

21      Q.  When you say they had complaints, are you

22  talking before the relevant time period or from

23  the odors from the Jefferson Parish Landfill?

24      A.  The odors, yes.

25      Q.  So my question to you is:  Is it your

1   opinion that, but for those odors, so if those

2   odors had not occurred from the Jefferson Parish

3   Landfill, that each of the trial plaintiffs would

4   be in a state of complete physical, mental, and

5   social well-being?

6        A.  No, absolutely not.

7        Q.  Okay.

8        A.  It's exactly what I just said to you.

9   People have vulnerabilities.  Some of them may

10  have -- I mean, I didn't do a medical workup on

11  them, nor did I look at their past history.

12       But either it caused it -- if they were in

13  perfect health, it caused a problem; if they were

14  not in perfect health, it exacerbated the problem.

15       Q.  So because you haven't looked at a

16  complete workup of their medical history or social

17  his -- you know, past -- I guess, how would you

18  attribute the impact of the odors from Jefferson

19  Parish Landfill on each of these individuals if

20  you haven't accounted for what -- where they

21  started with respect to their physical, mental,

22  and social well-being prior to any alleged odors?

23       A.  Well, there was one person who obviously

24  had some emotional problems, okay, I remember

25  reading.  I can't remember which one it was.

Page 145

1    the odor complaints began to spike in August 2017.

2         Do you see that in the next paragraph?

3    A.  Yes.

4    Q.  Okay.  Did you look to see -- did you look

5    at any other source to determine whether they

6    might be the cause or contributing cause based on

7    what was going on with their operations at the

8    time?

9         MR. FOSTER:

10             Objection to the form.

11   A.  I took this from the Court decision.  I

12   assumed they looked into it.

13   BY MS. BRILLAULT:

14   Q.  So you don't know if the Court looked into

15   other sources, but you know that they looked at

16   Jefferson Parish Landfill?

17   A.  No.  But, see, LDE -- from my point of

18   view, LDEQ has spent a lot of time on this, and

19   they came to the conclusion that the basic problem

20   is Jefferson Parish Landfill.

21        I don't think that these people are

22   stupid.  I think they spent a lot of time doing

23   this and tried to find out the problem.  And when

24   I look at how -- I mean, doing spent lime and

25   putting spent lime and all the problems with the

1  okay, for the next year and a half or two that

2  happened at Highway 90 that was different from

3  February, while I do know something that's very

4  different from Jefferson Parish Landfill.

5      Q.  Okay.  And we've talked about that.

6  You're not testifying on the operation.

7         How did you make the conclusion that there

8  was nothing different going on at the Highway 90

9  landfill?

10     A.  I know nothing about it.  I haven't read

11  anything about it.  I haven't seen anything about

12  it.

13     Q.  And when you say you haven't read or

14  haven't seen, is that because you didn't look at

15  any documents related to Highway 90 C&D

16  operations?

17     A.  I don't -- no, no -- I have no data on

18  Highway 90.

19     Q.  So you have no basis to say whether or not

20  something changed at Highway 90 C&D landfill, you

21  just didn't look at -- it's not something you

22  looked into?

23         MR. FOSTER:

24            Objection to the form.

25     A.  I can assure you --

Page 161

1  Then another plane comes in, then it's nothing.

2  Then another one comes in, okay, it's nothing

3  again.

4        So you say, Oh, my God, that smell has

5  been here all day long or it's been here all night

6  long.  But the truth of the matter is it's been

7  discrete times and it's a -- you kind of meld it

8  together as a whole, a Gestalt.

9    Q.  Okay.  Let's go to Section 1.7 on page 12

10  at the very top.  We started talking about the

11  individuals, but I just want to go to the very

12  intro paragraph -- or sentence at 1.7.

13        It says, "A review of the transcripts of

14  the videotaped depositions of the plaintiffs

15  listed in Footnote 4 above shows that exposure to

16  these malodors from JPLF over a multiyear period

17  caused enormous anxiety, worry, stress, and

18  unpleasant feelings."

19    A.  Right.

20    Q.  And in order to come to that conclusion,

21  you were assuming that the odor they described and

22  the experience they described from that odor was

23  from the Jefferson Parish Landfill?

24    A.  Yes.

25    Q.  Plaintiffs didn't have sampling to show

```
 1      A.   It's what his model is showing, correct.

 2      Q.   And you're not offering opinions as an air

 3   modeling expert in this case?

 4      A.   No, I'm not.  That was his -- that was his

 5   lane.  I'm staying in my lane.  Mine was the odor

 6   and where did it come from.

 7      Q.   And his model predicts concentrations to

 8   a -- Mr. Lape's -- I'm sorry, Mr. Tate's

 9   residence, correct?

10      A.   Uh-huh.

11      Q.   Okay.  And that's outdoor air, correct?

12      A.   Outdoor air, correct.

13      Q.   His model is not predicting what the

14   indoor concentration of Mr. Tate's house is --

15      A.   No.

16      Q.   -- in Jefferson Parish?

17           Okay.  And in order for Mr. Tate to have

18   been exposed to 5 parts per billion for a

19   30-minute interval from Jefferson Parish Landfill

20   emissions, he would have to be home at each time

21   the model predicted an odor event?

22      A.   Not necessarily.  Because that odor could

23   have gone into his house, and when he came home,

24   it's there.

25      Q.   Okay.  And we'll get to your indoor --
```

1  air after dispersion.

2      A.  Yeah.

3      Q.  Is this lingering occurring outside or is

4  it occurring inside the house?

5      A.  Well, the lingering that the government

6  agencies talk about is outside, but it lingers --

7  they tell you it collects in -- it collects in low

8  places.  I mean, this is one of the things you do,

9  you go around with your Jerome meter and look --

10  under stairs was always a place that I could

11  always find hydrogen sulfide in these areas.

12          In their house under the stairs, in the

13  basement, yeah, it collects.  And then there's so

14  much government data on this.  And it -- I just

15  don't understand why you're even asking this

16  question, okay?

17      Q.  Well, so the government data you cited --

18  let's pull up one of them.

19      A.  Is Zannetti.  I think I put some of it in

20  here, Zannetti's --

21      Q.  I need to -- let's do the ones, yeah, that

22  you cited.  Let's see.

23          You cited a Virginia DOH, Department of

24  Health, ATSDR, and OSHA.

25      A.  Yeah.

1      Q.  We can pull up -- either Virginia or OSHA

2  is good.  I couldn't find it in ATSDR.

3      A.  You couldn't find it in ATSDR?  I can...

4      Q.  So this is the Virginia Department of

5  Health?

6      A.  Uh-huh.

7          MS. BRILLAULT:

8              Okay.  We're going to mark this as

9          Schiffman 5.

10         (Exhibit 5, remotely introduced and

11             provided electronically to the reporter.)

12  BY MS. BRILLAULT:

13     Q.  And here, I think this is what you're

14  focused on.  "Hydrogen sulfide is slightly heavier

15  than air and may accumulate in enclosed, poorly

16  ventilated, and low-lying areas."

17     A.  Okay.  Right, uh-huh.

18     Q.  All right.

19     A.  Yeah, because the molecular weight of --

20  what we call the molecular weight of air is 28.96,

21  because you've got a combination of nitrogen,

22  oxygen, and a few other things.  And then the

23  molecular weight of H2S, I had 38.

24     Q.  So out of the 13 trial plaintiffs' homes,

25  or the eight residences of the 13 trial plaintiffs

1  which ones were poorly ventilated?

2    A.  You can have poorly ventilated areas in a

3  house that is well ventilated, okay?  You --

4  cabinets, under stairs.  Not everything is

5  ventilated even though you have vents or whatever,

6  or fans or whatever.  You can have areas that

7  aren't ventilated.

8    Q.  Okay.  So you say you could.  So I'm

9  asking you which ones, which homes?

10    A.  I have not been in the house -- I have not

11  been in the houses.  I'm telling you what can

12  happen, okay?

13    Q.  All right.  And you haven't been in the

14  houses.  You haven't assessed whether they have a

15  basement; is that correct?  Did you look to see

16  which of the trial plaintiffs had a basement?

17    A.  No.

18    Q.  Did you look to see which of the trial

19  plaintiffs had stairs in their house?

20    A.  No.  Although some of them looked like --

21  I did look up their -- I did Google -- I forget

22  what it was called.  I looked at each of their

23  houses just from the outside.

24    Q.  And from looking at them from the outside,

25  could you tell which ones were poorly ventilated?

Page 185

1      A.  No.  See, could I tell you -- I'd like to

2  answer -- the types of questions you're asking,

3  it's a what if, what if, what if, okay?

4           There are certain physical properties that

5  happen when you disperse hydrogen sulfide.

6  There's certain global scientific things that

7  happen.  You're trying to make it so that each --

8  that I would have looked at everybody's medical

9  records, that I've been in everybody's house.

10          I still wouldn't have been able to make

11  any of these kinds of conclusions you're looking

12  at.  I am making a general conclusion that is

13  based on scientific data, okay, that these are the

14  things that are most likely to have happened at

15  these particular people's houses.

16          And you're asking -- to do what you're

17  asking would be millions and millions and millions

18  and millions of dollars.  And it's absolutely

19  worthless because, whether I did it or not, I

20  would come out with the same conclusion.  I mean,

21  it's just -- you're asking something that is just

22  not --

23     Q.  Dr. Schiffman, I'm asking -- you pointed

24  to these references for your support that H2S can

25  accumulate inside an individual's home.

SCHIFFMAN SUSAN

1    concentrations in these homes.

2         So Table 2g, Dr. Schiffman, this is

3    totaling the yearly numbers for each plaintiff; is

4    that accurate?

5    A.  D or G?

6    Q.  G, as in George, on page 19.

7    A.  G, yes.

8    Q.  Okay.

9    A.  Yeah, it's just a compilation, uh-huh.

10    Q.  Okay.  And so the number of 30-minute

11   periods over the full two-and-a-half-year period,

12   I have 43,824.

13         Does that sound right?

14    A.  I didn't add them up.

15    Q.  Okay.  Well, I will just represent that

16   that is the total.

17         And if you divide, let's say, Mr. Tate,

18   where his total is 1,059, you get less than

19   2.5 percent of the time that Mr. Lape's model

20   predicts H2S at a concentration over 5 parts per

21   billion for a 30-minute average to the outside of

22   his residence; is that fair?  If the

23   multiplication -- if the division is done.

24    A.  Uh-huh.

25         MR. FOSTER:

SCHIFFMAN SUSAN

1  saying that the main cause, which I am very much

2  relying on the data, on LDEQ conclusions, as well

3  as modeling -- everything we've talked about.

4        I'm saying that the main cause is LDEQ.

5  Did once in a while something come from River

6  Birch?  Possible.  Possible from -- from the

7  Highway 90.  But the main cause of the -- of all

8  these exposures is, in fact, at least with regard

9  to modeling, is Jefferson Parish Landfill.

10  BY MS. BRILLAULT:

11      Q.  And that holds true for Mr. Section,

12  Mr. -- well, I'm just going to say Plaintiffs

13  Section, Lewis, Thompson family, and Richardson,

14  who described perceiving odors seven days a week,

15  but the modeling from Mr. Lape shows that they

16  were impacted less than 2.5 percent of the time.

17        It's still your opinion that Jefferson

18  Parish Landfill is the main source and it's the

19  other sources that are contributing more than

20  2.5 percent of the time?

21        MR. FOSTER:

22              Objection to the form.

23      A.  I don't have any data on other sources in

24  terms of quantity or -- I am relying on odor

25  patrol.  They said it's a -- what is in the

Page 235

1   this -- if these VOCs are coming off Jefferson

2   Parish Landfill and landing in Waggaman and in

3   River Ridge, they're certainly going to end up

4   over in the River Birch landfill.

5       Correct?

6    Q.  You didn't bother to look to see if LDEQ

7   took other grab samples of VOCs in other locations

8   and compared the number of VOCs in that sample to

9   what was being found in the neighborhood to see if

10   that statistical number was higher than the

11   Jefferson Parish number you calculated?

12    A.  No.  I don't have --

13       MR. FOSTER:

14          Objection to the form.

15    A.  I don't have any data like that.

16   BY MS. BRILLAULT:

17    Q.  Okay.  But you did do that in prior cases

18   where you had multiple sources, you looked at

19   multiple sources?

20    A.  That's correct, uh-huh.

21    Q.  You just chose not to do it here?

22       MR. FOSTER:

23          Objection to the form.

24    A.  I didn't choose not to do it.  I wasn't

25   invited to go on the River Birch landfill.  And

Page 254

```
 1      Q.  But, again, you didn't account for wind
 2   direction or wind data; you just looked at a
 3   concentration and said detect or not detect?
 4           MR. FOSTER:
 5               Objection to the form.
 6      A.  Have you ever been out in the field and
 7   collected a sample?
 8   BY MS. BRILLAULT:
 9      Q.  Dr. Schiffman, I have a question pending.
10   If you don't understand the question, I can
11   restate it, but I need you to answer my questions.
12      A.  I did not collect wind data.  I did not
13   collect these samples.  I am analyzing the data
14   collected by LDEQ.
15      Q.  And you didn't analyze wind data either?
16   You didn't collect it, but you didn't even analyze
17   it?
18      A.  I did not, no.
19      Q.  Thank you.
20           All right.  Now, the VOCs you looked at to
21   compare the fingerprint, those were taken in
22   neighborhoods; I think we established that they
23   weren't taken at the resident locations?
24           MR. FOSTER:
25               Objection to the form.
```

 1      A.   Correct.

 2   BY MS. BRILLAULT:

 3      Q.   And you're not aware of any samples of

 4   VOCs taken at the resident locations, the trial

 5   plaintiffs' locations?

 6      A.   I have no data of that type.

 7      Q.   And Mr. Lape didn't do any modeling of

 8   VOCs in this case?

 9      A.   He didn't send me any modeling of VOCs,

10   no.

11      Q.   Have you identified the specific mixture

12   of VOCs that you assert caused the trial

13   plaintiffs' injuries in this case?

14      A.   It is a mixture of all the VOCs.  They are

15   not -- you don't identify them by individual, it's

16   the total amount, and we don't know what that is

17   at the moment.

18      Q.   So you haven't identified a particular

19   mixture?

20      A.   No.

21      Q.   No, you haven't; or, no, that is correct?

22   Sorry, that was a bad question.  Let me rephrase.

23      A.   I feel sad for you.  I feel very sad for

24   you.  That's all I can tell you.

25      Q.   Thank you.  I appreciate it.

1              Have you identified the specific

2    mixture --

3         A.  No, I have not.

4         Q.  On page 29 you have in that first

5    paragraph, underneath the table, towards the end,

6    second-to-last sentence, "VOCs such as n-heptane,

7    n-hexane, n-octane, and n-nonane that were

8    individually below the odor threshold in JPLF and

9    community samples can interact to produce a

10   suprathreshold 'petroleum-like' odor sensation."

11        A.  Right, uh-huh.

12        Q.  What is the basis for your statement

13   there?

14        A.  I've done that.

15        Q.  And when have you done it?

16        A.  We've been doing this -- I've been trying

17   to get samples for standards for -- for landfills,

18   mixtures.  And I know that if you take those

19   together all below threshold, you do affect it by

20   suprathreshold odor.

21        Q.  Is that in a peer-reviewed study?

22        A.  No, no.  This is stuff that we do all the

23   time.

24        Q.  Okay.  And you say "we."  Who is -- you

25   and who?

1          On page 30, towards -- in that last

2    paragraph towards the bottom, you say,

3    "Furthermore, River Birch stopped accepting spent

4    lime as a solidification agent because of odor

5    problems."

6          A.  Uh-huh.

7          Q.  What is the basis for that statement?

8          A.  I think Mr. Foster was telling me about

9    this.

10         Q.  Okay.  So you're not relying on any

11   documents?

12         A.  No document that I know of.

13         Q.  Is that an assumption that Mr. Foster had

14   you consider?

15         A.  Uh-huh.

16         Q.  Okay.  You didn't speak to anyone at River

17   Birch either?

18         A.  What?

19         Q.  You didn't speak to anyone at River Birch

20   either?

21         A.  I don't speak to -- I've never spoken to

22   anybody at River Birch, no.

23         Q.  And then the next sentence that goes on to

24   the next page, "Overall, the data from all of

25   these sources corroborate that H2S odors came from

Page 262

1    the JPLF due to the acceptance of the spent lime,

2    along with the malfunctioning leachate and gas

3    collection systems that were the responsibility of

4    Waste Connections and Aptim."

5        A.  Correct.

6        Q.  Are you offering opinions as to

7    contractual claims in this case?

8        A.  No.

9        Q.  And you're not an expert in contracts?

10       A.  No.

11       Q.  What was the basis for that statement

12   then?

13       A.  Just looking at who was being sued.

14       Q.  Okay.  All right.  I think we can turn to

15   Opinion 4, which starts on page 32.  All right.

16   And this is entitled "Malodor Health Effects."

17       A.  Uh-huh.

18       Q.  And this is where you're saying,

19   "Malodorous emissions from the JPLF are the major

20   contributor to the health complaints reported by

21   the trial plaintiffs."

22           When you say "reported by the trial

23   plaintiffs," that's relying on their deposition

24   testimony, fact sheets, and the discovery

25   responses?

1      Q.  Hog farm odors are different than --

2      A.  Hog farm odors or landfill odors.

3      Q.  Hog farm odors are different than landfill

4  odors?

5      A.  Oh, absolutely, absolutely.

6      Q.  All right.  I'm going to ask the question

7  because I think you said no, but I think you meant

8  no yes.  So let me just ask it slightly different.

9          That sentence, "volatile emissions can

10  stimulate trigeminal nerve endings" --

11      A.  That's correct.

12      Q.  It's a "can," it's not actually a "did"

13  here; is that accurate?

14      A.  I can't -- I can't say that that's what

15  happened with an individual person.

16      Q.  Right.

17      A.  But it happens -- let us say that the

18  animal data is so clear that it can -- it does, in

19  fact, activate the trigeminal nerve.  That's what

20  you do, you put an electrode in -- I mean, I've

21  done this.  I had -- you put it into the

22  trigeminal nerve and record -- and record the

23  spikes.

24          So, yes, you can do it.  But does it do it

25  with these individual people?  We can't put an

Page 279

```
 1      A.  Yes.  Very low-level particulates.

 2      Q.  All right.  So for Tyrone Thompson, Geneva

 3 Green, Scott Gremillion, Wendy Gremillion, and

 4 Andrew Section, you are basing the -- your

 5 opinions based on their self-reports?

 6      A.  Uh-huh, yes.

 7      Q.  And the studies that show it can happen?

 8      A.  Yes, correct.

 9      Q.  And the same goes for what you said

10 before, because you didn't state that you ruled

11 out alternative causes or do a specific analysis

12 of the concentration of VOCs in H2S, you didn't

13 state that in the report, so you didn't do it?

14      A.  Did not do it.  Nobody did it.

15      Q.  Fair enough.

16          4.3, Sleep Disruption, Dizziness, and

17 Fatigue.

18      A.  Yes.

19      Q.  Okay.  So of the studies that you cite for

20 sleep disturbances, which ones looked at sleep

21 disturbances with respect to hydrogen sulfide

22 concentrations?

23      A.  None of them really.  I mean, they're

24 all -- there's hydrogen sulfide in the landfill

25 one.  They're just complaints that people make of
```