```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3
      ELIAS JORGE "GEORGE"                    )CIVIL ACTION
 4    ICTECH-BENDECK,                         )
                 Plaintiff,                   )NO.18-7889
 5                                            )c/w 18/8071
                 vs.                          )18-8218, 18-9312
 6                                            )
      PROGRESSIVE WASTE SOLUTIONS OF LA,      )SECTION "E" (5)
 7    INC., ET AL.,                           )
                 Defendants.                  )
 8                                            )
      Related Case:                           )
 9                                            )
      FREDERICK ADDISON, ET AL.,              )CIVIL ACTION
10               Plaintiff,                   )
                                              )NO. 19-1133
11               vs.                          )
                                              )SECTION "E" (5)
12    LOUISIANA REGIONAL LANDFILL             )
      COMPANY (LRLC), ET AL.,                 )
13               Defendants.                  )

14

15                            9:54 a.m.

16                         August 31, 2021

17

18                   REMOTE VIDEOTAPED DEPOSITION

19                                OF

20                      SUSAN SCHIFFMAN, Ph.D.

21                            (Vol. II)

22

23

24

25
```



```
 1   APPEARANCES:
     For the Addison          MR. ERIC C. ROWE, ESQ.
 2   Plaintiffs:              WHITEFORD, TAYLOR & PRESTON, LLP
                              1800 M Street, N.W.
 3                            Suite 450N
                              Washington, D.C. 20036
 4                            erowe@wtplaw.com

 5   For the                  MR. DOUGLAS D. HAMMEL, ESQ. *
     Ictech-Bendeck           HAMMEL LAW FIRM, LLC
 6   Plaintiffs:              3129 Bore Street
                              Metairie, LA 70001
 7                            douglashammel@gmail.com

 8                            MR. BRUCE C. BETZER, ESQ.
                              LAW OFFICE OF BRUCE C. BETZER, PLLC
 9                            3129 Bore Street
                              Metairie, LA 70001
10                            bruce@brucebetzer.com

11                            MR. JASON Z. LANDRY, ESQ.
                              MARTZELL BICKFORD & CENTOLA
12                            338 Lafayette Street
                              New Orleans, LA 70130
13                            jzl@mbfirm.com

14   For the Taste            MS. MEGAN R. BRILLAULT, ESQ.
     Connections              KATRINA M. KREBS, ESQ.
15   Defendants:              BEVERIDGE & DIAMOND, P.C.
                              477 Madison Avenue
16                            15th Floor
                              New York, NY 10022
17                            mbrillault@bdlaw.com
                              kkrebs@bdlaw.com
18
     For the Aptim            MR. J. MICHAEL DIGIGLIA, ESQ.
19   Corporation              GIEGER, LABORDE & LAPEROUSE, LLC
     Defendants:              701 Poydras Street
20                            Suite 4800
                              New Orleans, LA70163
21                            mdigiglia@glllaw.com

22   For the Parish of        MR. MATTHEW D. MOGHIS, ESQ.
     Jefferson                CONNICK & CONNICK
23   Defendant:               3421 Causeway Boulevard
                              Suite 408
24                            Metairie, LA 70002
                              moghis@connicklaw.com

25
```



```
 1  APPEARANCES (Cont.)

 2  Also Present:          Mr. Patrick Murphy, videographer
                           Ms. Vanessa Lanzia, Esquire Solutions
 3                         Mr. Pablo Sanchez Soria
                           Mr. John Perkey *
 4                         Mr. John Paul
                           Ms. Pamela Dalton
 5                         Mr. John Kind
                           Mr. John Baay *
 6
    * at times noted
 7

 8                  *   *   *   *   *   *   *   *

 9                          I N D E X

10  EXAMINATION                                           PAGE

11     By Ms. Brillault                                    304
       By Mr. DiGiglia                                     434
12
                    *   *   *   *   *   *   *   *
13
                            EXHIBITS
14
    DEFENDANT'S                                           PAGE
15  NUMBER                                                MARKED
    Exhibit 231    LDH Report                              330
16  Exhibit 232    Toxilogical Profile for Hydrogen        349
                   Sulfide and Carbonyl Sulfide
17  Exhibit 233    EPA: About Acute Exposure               365
                   Guideline Levels (AEGLs)
18  Exhibit 234    EPA: Hydrogen sulfide Results
                   AEGL Program
19  Exhibit 235    Plaintiff Fact Sheet                    404
    Exhibit 236    Chart of Symptoms and Smells            406
20  Exhibit 237    Quantification of odors and             413
                   odorants from swine operations in
21                 North Carolina
    Exhibit 238    Critical Review: The Health             430
22                 Significance of Environmental Odor
                   Pollution
23

24                  *   *   *   *   *   *   *   *

25
```



1    This is the remote videotaped deposition of SUSAN SCHIFFMAN,
2  Ph.D., taken pursuant to Notice of the parties and in
3  accordance with the North Carolina Rules of Civil Procedure
4  before Shannon J. Colangelo, Notary Public, remotely via Zoom,
5  the court reporter located in Cabarrus County, the witness
6  located in Durham County, North Carolina, on August 31, 2021,
7  beginning at 9:54 a.m.
8    IT IS STIPULATED AND AGREED by and between counsel for the
9  parties that the reading and signing of this transcript by the
10 witness is reserved.



```
 1   A.   That may have been a hog farm.  I'm not sure if it
 2        was a hog farm or a landfill.  I'm not sure.  I can't
 3        remember.
 4   Q.   Do you remember the concentrations, the average
 5        hourly concentrations, that were outside?
 6   A.   No, but I think that -- I think it was around -- it
 7        was in the parts per million range.
 8   Q.   The parts per million range?  Okay.
 9   A.   Yeah.
10   Q.   And we're not taking those levels from Jefferson
11        Parish Landfill, correct?
12   A.   What -- no, we not.
13   Q.   Is it your opinion that a source that is contributing
14        5 PPB outside can cause an indoor concentration of
15        greater than 5 PPB?
16             MR. ROWE:  Object to form.
17   A.   Yes.
18   Q.   So you're saying it accumulates inside the house?
19   A.   Yes, it can accumulate.  Yes.
20   Q.   Where does it -- where would it accumulate, in your
21        opinion?
22   A.   It's heavier than air.  It accumulate under -- where
23        I measured it -- under the kitchen sink, under stairs
24        and so -- and that's -- I couldn't -- that was my
25        first confusion.  I couldn't figure out why the odor
```



```
 1       was more intense inside the house than it was outside
 2       the house.  Where I was measuring it outside, it was
 3       less than it was when I was going inside and that was
 4       when I came up with -- when I realized the ATSDR
 5       statement that it can last for 42 days.
 6   Q.  Yes.
 7   A.  That was part of my initial confusion.  I agree with
 8       that.
 9   Q.  And the ATSDR statement of it lasting for 42 days,
10       was there any discussion of the conversations that
11       would last for 42 days?
12               MR. ROWE:  Object to the form.
13   A.  No.
14   Q.  Do you have an opinion on whether you need a higher
15       concentration to last the full 42 days because
16       there's just more hydrogen sulfide so the time it all
17       degrades, it take 42 days?
18               MR. ROWE:  Object to the form.
19   A.  I mean, you're asking questions that haven't been
20       studied.
21   Q.  Okay.  So the amount of hydrogen -- well, I guess I'm
22       just trying to figure out what the 42 days is based
23       on and you're saying it hasn't been studied?
24   A.  I remember my confusion when I was going into homes
25       and finding it higher inside than outside and I
```



1        couldn't figure out why that would be until --
2        because I always assumed that hydrogen sulfide would
3        be converted to SO2 fairly quickly, but apparently
4        it's not so it --
5    Q.  So in all conditions --
6    A.  What?
7    Q.  Is it in your opinion that H2S doesn't convert into
8        SO2 in all conditions or is it --
9    A.  No, it can convert to all kinds of things, but I just
10       assumed that it would be converted fairly quickly,
11       which was an incorrect assumption.
12   Q.  What is your assumption based on again?  I'm sorry.
13               MR. ROWE:  Object to the form.
14   A.  What?
15   Q.  So when you say --
16   A.  My original assumption, when I couldn't figure out
17       why I would measure it higher inside than outside, I
18       couldn't figure out what the issue was.  I was
19       looking for an inside source and then I realized that
20       major -- one of the major contributing factors to
21       that is that this was accumulating in the house and
22       therefore it was building up and it's not degrading
23       as fast as I thought it was going to degrade.
24   Q.  Okay.  So is it your opinion that 5 parts per billion
25       can remain inside a house for 42 days?



1     sulfide and it says hydrogen -- or "household
2     exposures to hydrogen sulfide can occur through the
3     misuse of drain cleaning materials.  Hydrogen sulfide
4     can be found in well water and can be formed in hot
5     water heaters, giving tap water a rotten egg odor".
6  A. Right.
7  Q. "Cigarette smoke and emissions from gasoline vehicles
8     contain hydrogen sulfide"?
9  A. Right.
10 Q. Did you consider any of those sources of hydrogen
11    sulfide when determining whether Plaintiffs were
12    exposed to hydrogen sulfide inside their home?
13              MR. ROWE:  Object to the form.
14 A. I did not measure hydrogen sulfide inside their
15    homes.
16 Q. Okay.  You said you didn't -- did anyone measure
17    inside their home?
18 A. I have no idea.  I think it would be in an LDH report
19    if it were there.
20 Q. Yeah.  And you didn't review any data about hydrogen
21    sulfide measurements inside Plaintiffs' homes for
22    your opinion?
23 A. No.
24 Q. So your opinion based on the build-up of H2S inside
25    an individual's home is based on literature?



1  Q.  But your post-doc work did not result in an
2      additional degree, correct?
3  A.  No, it's just a post-doc.
4  Q.  Okay.  So you do not have a degree in medical
5      psychology, correct?
6  A.  I'm a -- I was hired as a professor of medical
7      psychology based on the experience and all the
8      clinical work during my post-doc.  You had to have --
9  Q.  Okay.
10 A.  -- in order to be hired in the division of medical
11     psychology within the department of psychiatry, you
12     had to have certain qualifications of working with
13     sick people.  What I was dealing with, you know, a
14     cancer patient comes in and they've got taste and
15     smell problems, they can't eat, what are the things
16     that we can do, what are the psychological aspects of
17     it, what are the physical aspects of it.  So I work
18     with medical records all the time, you know, health
19     complaints, etcetera.
20 Q.  Okay.  But, my question was you do not have a degree
21     in medical psychology, right?
22 A.  There is no such a degree.
23 Q.  Okay.  And you --
24 A.  That I know of.
25 Q.  Fair enough.  You did not attend medical school as a



1           student, right?
2      A.   No, I did not.
3      Q.   And you do not have any kind of a medical degree,
4           correct?
5      A.   No, I don't have a medical degree, no.
6      Q.   And you do not have a degree in toxicology, right?
7      A.   No, but I have a lot of toxicology experience.
8      Q.   And do you have a degree in analytical chemistry?
9      A.   No.
10     Q.   Do you have a degree in atmospheric chemistry?
11     A.   No.
12     Q.   And you mentioned you have a professional licensed as
13          a psychologist?
14     A.   As a psychologist in the state of North Carolina.
15     Q.   And you don't have to be a medical doctor to be a
16          psychologist, right?
17     A.   No, you do not.
18     Q.   And what services do you offer as a licensed
19          psychologist?
20     A.   I don't offer any of them anymore.  I switched -- I
21          left Duke and I'm over in the Department of
22          Electrical Engineering at NC State and I work with
23          electronic nose technology doing work with sensors
24          and certainly comparing with human data.  But, I'm
25          now interested in devices for measurement of odor.

