UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


FREDERICK ADDISON, ET AL          CIVIL ACTION NO.
                                  19-11133, c/w 19-14512
VERSUS
                                  SECTION: "E" (5)
LOUISIANA REGIONAL
LANDFILL COMPANY, ET AL



* * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE VIDEOTAPED DEPOSITION OF:

JASON SCHELLHAAS,

TAKEN AT THE LAW OFFICES OF LISKOW & LEWIS, APLC,

701 POYDRAS STREET, SUITE 5000, NEW ORLEANS, LOUISIANA

70139, ON THURSDAY, THE 18TH DAY OF APRIL, 2024,

COMMENCING AT 9:06 A.M.

* * * * * * * * * * * * * * * * * * * * * * * * * *








Reported by:

    YOLANDA J. PENA, Certified
    Court Reporter No. 2017002
    in and for the State of
    Louisiana

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4        WHITEFORD TAYLOR PRESTON, L.L.P.
          (BY:  HARRY S. JOHNSON, ESQ.)
 5        SEVEN SAINT PAUL STREET
          BALTIMORE, MARYLAND  21202
 6        (410) 347-8743
          hjohnson@whitefordlaw.com
 7
              - AND -
 8
          FORREST CRESSEY & JAMES, LLC
 9        (BY:  S. ELIZA JAMES, ESQ.)
          1222 ANNUNCIATION STREET
10        NEW ORLEANS, LOUISIANA  70130
          (504) 605-0777
11        eliza@fcjlaw.com

12

13    FOR DEFENDANT APTIM CORP.:

          GIEGER, LABORDE & LAPEROUSE, L.L.C.
14        (BY:  J. MICHAEL DIGIGLIA  ESQ.) [VIA ZOOM]
          701 POYDRAS STREET, SUITE 4800
15        NEW ORLEANS, LOUISIANA  70139
          (504) 561-0400
16        mdigiglia@glllaw.com

17

18    FOR DEFENDANT JEFFERSON PARISH:

          CONNICK & CONNICK, LLC
19        (BY:  MICHAEL S. FUTRELL, ESQ.) [VIA ZOOM]
          (BY:  MATTHEW D. MOGHIS, ESQ.) [VIA ZOOM]
20        3421 N. CAUSEWAY BLVD., SUITE 408
          METAIRIE, LOUISIANA  70002
21        (504) 681-6663
          mfutrell@connicklaw.com
22        moghis@connicklaw.com

23

24

25
```

```
                              Page 3
 1              A P P E A R A N C E S (Continued)

 2

 3   FOR THE WASTE CONNECTIONS DEFENDANTS:

 4        BEVERIDGE & DIAMOND, P.C.
          (BY:  KATRINA M. KREBS, ESQ.)
 5        825 THIRD AVENUE, 16TH FLOOR
          NEW YORK, NEW YORK  10022
 6        (212) 702-5400
          kkrebs@bdlaw.com
 7
               - AND -
 8
          LISKOW & LEWIS, APLC
 9        (BY:  MICHAEL C. MIMS, ESQ.)
          701 POYDRAS STREET, SUITE 5000
10        NEW ORLEANS, LOUISIANA  70139
          (504) 581-7979
11        mmims@liskow.com

12
     ALSO PRESENT:
13
          ALBERT BONGARD, VIDEOGRAPHER
14
          JOE GARDEMAL [VIA ZOOM]
15
          AMITA KANCHERLA [VIA ZOOM]
16

17

18

19

20

21

22

23

24

25
```

Page 4

1                            I N D E X

2

                                                      PAGE
3
    STIPULATION.......................................5
4
    EXAMINATION BY:
5
        MS. KREBS.....................................7
6
    REPORTER'S PAGE.................................142
7
    REPORTER'S CERTIFICATE.........................143
8

9

10                      LIST OF EXHIBITS

11

12  Schellhaas No. 1...................................8
        (Notice of Deposition)
13
    Schellhaas No. 2..................................13
14      (Expert report of
         Mr. Schellhaas)
15
    Schellhaas No. 3..................................13
16      (Rebuttal report of
         Mr. Schellhaas)
17
    Schellhaas No. 4..................................58
18      (Attaining Reasonable
         Certainty in Economic
19       Damages Calculations)

20  Schellhaas No. 5..................................95
        (Extended stay quotes)
21
    Schellhaas No. 6.................................118
22      (Storage unit rental
         quote)
23
    Schellhaas No. 7.................................124
24      (Stanley Steemer instant
         pricing quotes)
25

1                        S T I P U L A T I O N

2

3              IT IS STIPULATED AND AGREED by and among the

4    parties that this deposition is hereby being taken

5    pursuant to the Federal Rules of Civil Procedure.

6              All formalities, excluding the reading and

7    signing of the transcript by the witness, are hereby

8    waived.

9              All objections, except as to the form of the

10   question and responsiveness of the answer, are

11   considered reserved until trial or other use of the

12   deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 39

1   landfill and caused them personal injury and the loss

2   of the use and enjoyment of property," correct?

3        A.   That's correct.

4        Q.   Okay.  What do you mean by "personal injury"

5   as used in this sentence?

6        A.   My understanding of the personal injury would

7   be the physical ailments that were, you know, allegedly

8   suffered by the plaintiffs in this case.

9        Q.   Okay.  What is your -- the basis for your

10  understanding that plaintiffs are asserting personal

11  injury claims?

12       A.   That would have been based upon instruction by

13  counsel.

14       Q.   And what do you mean by "loss of use of

15  enjoyment of property" as used in the sentence?

16       A.   I think it was an allegation somewhere in one

17  of the documents, and that's not necessarily something

18  that's going to be discussed in this report or

19  calculated in this report.

20       Q.   Okay.  So just to clarify, your calculations

21  in this report go to the personal injuries aspect of

22  the -- of the harm claimed by plaintiffs?

23       A.   Yes.

24       Q.   Okay.  And just to be clear for the record, so

25  they do not go to the loss of use and enjoyment of

Page 40

```
 1   property aspect?

 2        A.   That's --

 3             MR. JOHNSON:   Objection.

 4             Go ahead.

 5        A.   That's correct.

 6   BY MS. KREBS:

 7        Q.   Okay.  So when you use the phrase "personal

 8   injuries" throughout the report, does it have the same

 9   meaning that you just described there?

10        A.   Yes.

11        Q.   Okay.  And looking at the third paragraph and

12   the sentence at the end -- and I'll give you a moment

13   to read it over so -- because it's a long sentence.

14        A.   Yes.

15        Q.   Okay.  You reference in this sentence,

16   "Plaintiffs' allegations that odors released from the

17   landfill into plaintiffs' home and immovable property."

18   Is it your understanding that plaintiffs are seeking

19   damages for injury to immovable property?

20             MR. JOHNSON:   Objection.

21             Go ahead.

22        A.   I read somewhere in the Gardemal report that

23   they are not.

24   BY MS. KREBS:

25        Q.   Okay.  And --
```

Page 44

1      A.   That's correct.

2      Q.   Okay.  Did you perform any investigation into

3   the accuracy of this assumption?

4      A.   No, I did not.

5      Q.   And you are not offering opinions on this

6   first assumption, correct?

7      A.   No, I'm not.

8      Q.   Okay.  Please take a moment to read the second

9   assumption.

10     A.   Okay.

11     Q.   Am I correct in understanding that you're

12  assuming everything described in the second assumption

13  is true for purposes of your opinion?

14     A.   That's correct.

15     Q.   Okay.  What is your understanding of the bases

16  for the second assumption?

17     A.   It's my understanding that counsel has asked

18  us to assume that these measures of damages would be

19  accepted by the -- the court as acceptable measures of

20  damages in this particular case suffered by the

21  plaintiffs.

22     Q.   Okay.  Did you review the transcript or video

23  from the July 23rd, 2018, press conference refer- --

24  referenced in this assumption?

25     A.   I did read the transcript, yes.

Page 46

1    Dr. Kanter's deposition taken in January 2024 in this

2    case?

3        A.   No, I did not.

4        Q.   What is your understanding of what Dr. Kanter

5    meant by "leave the area" --

6                MR. JOHNSON:  Objection.

7    BY MS. KREBS:

8        Q.   -- during the --

9                MR. JOHNSON:  Sorry.

10               MS. KREBS:  Sorry.

11   BY MS. KREBS:

12       Q.   -- during -- let me start the question over.

13               During the July 23rd, 2018, press conference,

14   what is your understanding of what Dr. Kanter meant by

15   "leave the area"?

16               MR. JOHNSON:  Objection.

17       A.   My understanding of what he meant was that

18   if you were being impacted by these smells, that he

19   recommended that you leave the area.

20   BY MS. KREBS:

21       Q.   Do you know whether Dr. Kanter recommended

22   that residents leave the area during the entirety of

23   July 1st, 27 -- 2017, to December 31st, 2019?

24               MR. JOHNSON:  Objection.

25       A.   No, I do not.

Page 48

1             Now.

2      A.   No, I do not.

3  BY MS. KREBS:

4      Q.   Okay.  Do you know whether Dr. Kanter stated

5  that residents should hire a cleaning company to remove

6  odors from furniture and personal property upon their

7  return to their residences?

8                 MR. JOHNSON:  Objection.

9      A.   No, I do not.

10  BY MS. KREBS:

11      Q.   Okay.  Do you know whether any of the trial

12  plaintiffs had the means to leave the area when odors

13  were present?

14                 MR. JOHNSON:  Objection.

15      A.   No, I do not.

16  BY MS. KREBS:

17      Q.   Are you aware of whether any of the trial

18  plaintiffs actually left the area due to odors between

19  July 1st, 2017, and December 31st, 2019?

20      A.   No, I'm not.

21      Q.   Did you perform any investigation, separate

22  from what we've already discussed, into the accuracy of

23  the second assumption?

24      A.   No, I did not.

25      Q.   And you're not opining on the statements in

Page 52

1    were simply occupants at a residence?

2         A.   Yes, that's correct.

3         Q.   Okay.  What is your understanding of the bases

4    for the third assumption?

5         A.   I was instructed that -- I mean, my

6    understanding is that all of these assumptions are, you

7    know, legal arguments.  And so the bases of that is a

8    legal matter, is my understanding.

9         Q.   Okay.  Did you perform any investigation into

10   the bases for this third assumption to confirm whether

11   it was accurate?

12        A.   No, I did not.

13        Q.   Do you know whether any of the trial

14   plaintiffs rent their homes?

15        A.   I believe three of them rented homes.

16        Q.   Do you know whether any trial plaintiffs

17   occupy a home without being an owner or a renter of

18   that home?

19        A.   By renter of the home, do you mean the person

20   that's on the lease or the person that's making the

21   rental payments?

22        Q.   The person on the lease.

23        A.   Yes, I believe that's correct.

24        Q.   Okay.  And I'm going to just repeat this for

25   the record just to make sure I fully understand.

Page 53

1              So do you know whether any of the trial

2   plaintiffs are the individual on the lease or an owner

3   of a home?

4        A.   It's my understanding that multiple trial

5   plaintiffs are the owner of a home.  I believe three of

6   the trial plaintiffs were living in a rental property,

7   and I believe that one or two of them may have been

8   living in and paying for a property that they were not

9   technically on the -- the leaseholder of.

10       Q.   And what is -- where does that understanding

11  come from?

12       A.   Looking through the plaintiffs' deposition,

13  the plaintiffs' fact sheets.

14       Q.   You are not opining on the statement in the

15  third assumption, correct?

16       A.   Correct.

17       Q.   Based on the assumptions listed here, it is my

18  understanding that to the extent you identified various

19  costs be included in the damages calculation, that was

20  based on direction from counsel.  Is that correct?

21       A.   Can you ask me that again?

22       Q.   Yeah.  It's my understanding, based on the

23  these assumptions, that to the extent that you

24  identified costs to be included in your damages

25  calculation, that was because you were directed by

Page 54

1    counsel.  Is that correct?

2                   MR. JOHNSON:  Objection.

3         A.   Based on those assumptions, yes, that's

4    correct.

5    BY MS. KREBS:

6         Q.   Okay.  Did you perform any independent

7    assessment into the appropriate measure of damages for

8    personal injuries?

9                   MR. JOHNSON:  Objection.

10        A.   I was asked to assume that for purposes of

11   this case, these are the appropriate measures of damage

12   in -- in this matter.

13   BY MS. KREBS:

14        Q.   Okay.  And apart from that assumption, did

15   you perform any investigation on your own into the

16   appropriate measure of damages for the types of

17   personal injuries alleged in this case?

18        A.   No, I did not.  Primarily, what I did is,

19   utilizing these assumptions, made the calculations

20   based upon these assumptions.

21        Q.   Okay.  All right.  I'd like to turn to page 9

22   of your March 29th, 2024, report.

23                   MS. JAMES:  I'm sorry.  Which page is it

24        again?

25                   MS. KREBS:  Page 9.

Page 86

1    more.

2        A.   Okay.

3        Q.   So several of these assumptions, specifically

4    assumption 1 and assumption 2 here, they talk about --

5    they reference the actions of defendants and also

6    odors, as well, and statements by Dr. Kanter related

7    to odors.

8            If you did not consider any portions of

9    assumption 1 or assumption 2 here related to the

10   actions of defendants or statements about odors, would

11   that change your damages calculation?

12               MR. JOHNSON:   Objection.

13       A.   I guess the question is under that scenario,

14   if it is still -- I'm assuming I'm still being asked to

15   make these calculations, so --

16   BY MS. KREBS:

17       Q.   Yes, under that scenario.

18       A.   Assuming I'm still being asked to make these

19   calculations, no, it would not impact the damage

20   calculations.

21       Q.   Okay.  So the key assumptions here are that --

22   if I'm understanding correctly -- and feel free to

23   correct me.  But the key assumptions here, as I

24   understand it, are that you were asked to calculate

25   lodging costs for temporary lodging away from a

Page 87

```
 1   particular area?

 2        A.   Yes.

 3        Q.   Replacement costs for meals are part of

 4   damages?

 5        A.   Yes.

 6        Q.   That moving and storage costs for furniture

 7   and personal property out of the area is a component of

 8   damages?

 9        A.   Yes.

10        Q.   That cleaning costs for furniture and personal

11   property is a component of damages?

12        A.   Yes.

13        Q.   And that lodging costs are owed whether the

14   plaintiff owned or rented their property during the

15   relevant period.  That's another essential assumption,

16   correct?

17        A.   Yes.

18        Q.   Okay.  And as we talked about earlier, that

19   would also apply to residents who just occupy their

20   home, correct?

21        A.   That's correct.

22        Q.   Okay.  So those assumption that we went over

23   are the key here, and the other statements in these

24   assumptions would not change your -- if you disregarded

25   them, it would not change your opinion, correct?
```

Page 88

1        A.   I --

2               MR. JOHNSON:   Objection.

3        A.   I agree.

4   BY MS. KREBS:

5        Q.   Okay.  All right.  Thank you.  Okay.  Let's

6   turn to lodging costs, which begins on page 5 of your

7   report, so you don't need flip.  Okay.

8               MS. KREBS:   And I'll just clarify for

9               the record, based on the court's guidance, as

10              I go through, I'm going to be omitting some of

11              the language here -- in particular, related to

12              odors.  So that might just be why I'm

13              paraphrasing some of the portions of the

14              report.

15              THE WITNESS:   Okay.

16              MR. JOHNSON:   Can I -- can I just

17              suggest that we -- we ask the witness -- and

18              I'm doing this in front of everybody and on

19              the record, so it's straight up -- I'm not

20              coaching or anything else --

21              MS. KREBS:   Uh-huh.

22              MR. JOHNSON:   -- that we just say assume

23              odors are not part of the calculation and then

24              ask the question based on that because I think

25              that's where we are, as far as I understand.

1    BY MS. KREBS:

2        Q.   Okay.  Is it your understanding that the jury

3    would then make that determination to determine how

4    many days it's recoverable for, and then your damages

5    calculation would be adjusted based on those

6    determinations?

7        A.   If they determined that it was appropriate to

8    calculate those damages for less than the -- the period

9    of the relevant period, then yes.

10       Q.   Okay.  And under "Summary of Findings 9(b)5"

11   in the second paragraph, you state that cleaning and

12   storage costs are to be presented to the trier of fact

13   so they can award damages based on the evidence

14   presented at trial.

15            Similar question.  How will your calculations

16   assist the trier of fact in awarding damages as to

17   cleaning and storage costs?

18       A.   So kind of similar response in the sense that

19   any assumptions to the report were asked to assume that

20   these two costs are element of damages.  So what we're

21   doing is making a calculation of those elements of

22   damages.

23       Q.   Okay.  And the jury would make the ultimate

24   finding as to whether those are recoverable as an

25   element of damages?

Page 111

```
 1        A.    That's my understanding.

 2        Q.    Okay.  And so based on that finding and the

 3   number of days that the jury found that the trial

 4   plaintiffs could recover those particular cleaning and

 5   storage costs for, then your damages calculation would

 6   be adjusted to reflect those findings?

 7        A.    Again, if it was for a period less than the --

 8   the relevant period of July 1, 2017, through

 9   December 31st, 2019, yes.

10        Q.    Okay.  And so you're calculations would be

11   adjusted based on the jury's findings?

12        A.    If they determined that it's appropriate to

13   calculate damages for a different period of time or a

14   lesser period of time, then yes.

15        Q.    Okay.  Have you previously calculated lodging

16   costs in other cases in which you have offered damages

17   opinions?

18        A.    No, I don't believe so.

19        Q.    Okay.

20              MS. KREBS:  Could we take a short break?

21              MR. JOHNSON:  Sure.  How long you need?

22              THE VIDEOGRAPHER:  Going off the record

23              at 12:26 p.m.

24                  (Recess taken.)

25              THE VIDEOGRAPHER:  We're back on the
```

```
 1              record at 12:34 p.m.

 2  BY MS. KREBS:

 3      Q.   I want to turn to your calculation of meal

 4  costs beginning on page 6 of your March 29th, 2024,

 5  report, on Schellhaas 3.

 6              In the first sentence, it says, "We have been

 7  asked to assume that a measure of damages in this case

 8  is a cost -- is cost of meals that would have been

 9  incurred while using the extended-stay lodging,"

10  correct?

11      A.   Correct.

12      Q.   Okay.  So you are not opining on whether meal

13  costs are an appropriate measure of damages?

14      A.   That's correct.

15      Q.   Okay.  That's just an assumption that you're

16  making here, correct?

17      A.   That's correct.

18      Q.   Okay.  To determine meal costs, why did you

19  rely on the "USDA Food Plans: Cost of Food at Homes"

20  tables?

21      A.   We calculate meal costs fairly often in

22  various litigation matters, and that's the -- the table

23  that we always utilize, is the USDA's "Cost of Food at

24  Home" table.

25      Q.   You said that you calculate them fairly often.
```

1    somebody can make an argument that they relied on the

2    cheapest one.  Quite frankly, it's kind of right in the

3    middle, so it's -- it's what we use to determine the

4    cost of meals for each particular plaintiff.

5         Q.   Okay.  Did you consider how much the trial

6    plaintiffs currently spend on food in your calculation

7    of damages?

8         A.   No, I did not.

9         Q.   Okay.  Are the USDA food plans region

10   specific?

11        A.   I don't believe so.

12        Q.   All right.  I want to turn to page 23 of your

13   report.  Your March 29th, 2024, report, just for

14   clarity of the record.  All right.

15             And this is the -- the chart titled "Mary Ann

16   Winningkof: Detailed Damage Calculation," correct?

17        A.   That's correct.

18        Q.   Okay.  So to the left of monthly food rate,

19   there's a column called "Female" and then "Male," and

20   there's differing rates.  Does that account for the

21   differing food costs for males and females reflected in

22   the USDA charts?

23        A.   That's correct.

24        Q.   Okay.  Who is the male being considered in

25   this chart?

Page 116

1        A.    It's my understanding that Ms. Winningkof's

2    husband was alive until 2018, and that is the male

3    being considered in this chart.

4        Q.    Okay.  Why did you include Ms. Winningkof's

5    husband in this chart?

6        A.    I was instructed by counsel that it was

7    appropriate to include Ms. Winningkof's husband in this

8    chart.

9        Q.    Okay.  Do you know whether there being -- let

10   me rephrase the question.

11            Do you know whether claims are being asserted

12   on behalf of Ms. Winningkof's husband in this

13   litigation?

14        A.    I mean --

15            MR. JOHNSON:  Objection.

16        A.    He's deceased, and so otherwise, no, I do not.

17   BY MS. KREBS:

18        Q.    Okay.  Turning back to page 6.  When you say,

19   at the end of the paragraphs under "Meal Costs," that

20   "the percentage determined by the jury would be

21   multiplied to the values below," what do you mean?

22        A.    Similar to your question on if these amounts

23   represent the meal costs for 100 percent of the time.

24   So if the jury or the judge were to determine something

25   less than 100 percent would be appropriate, if you

1    for your calculation of storage costs?

2         A.   Yes, it is.

3         Q.   Okay.  What is your understanding of how the

4    particular storage facility Riverfront Self Storage was

5    selected?

6         A.   My understanding is that they were looking

7    for a self-storage facility that was outside of the

8    immediately impacted area to determine pricing of

9    storage.

10        Q.   Did you provide any input into where the

11   self-storage facility should be located?

12        A.   No, I did not.

13        Q.   Did you provide any input into how to locate a

14   self-storage facility to use in the calculation?

15        A.   No, I did not.

16        Q.   Do you know from how many other storage

17   facilities, if any, counsel obtained rates?

18        A.   No, I do not.

19        Q.   Do you know how many other storage facilities

20   counsel considered in -- prior to selecting this

21   storage facility?

22        A.   No, I do not.

23        Q.   Apart from the location of the facility, do

24   you know any other criteria counsel considered in

25   selecting a storage facility?

SCHELLHAAS JASON

Page 120

1          A.   No, I do not.

2          Q.   Did you independently request a quote from

3    Riverfront Self Storage?

4          A.   Not from Riverfront Self Storage, no.

5          Q.   Did you request a quote from any other storage

6    facilities?

7          A.   I didn't request a quote, personally.  I do

8    have clients that we do accounting for that, as part of

9    their business, have paid for a storage facility.  So

10   I'm familiar with what at least one particular client

11   is paying, and it was in this same range.  Other than

12   that, I did not request any independent quotes, no.

13         Q.   Okay.  And with respect to that rate that that

14   one particular client is paying, do you recall what

15   that amount is?

16         A.   It's somewhere between 250 and $300 a month.

17   It tends to change every year.

18         Q.   Okay.  And do you know the name of that

19   facility?

20         A.   It's the storage place that has the orange in

21   the logo.  Other than that, no, I don't really recall

22   the name.  Maybe Public Storage but --

23         Q.   Okay.  Do you recall where that storage

24   facility is located?

25         A.   I think it's not too far over the Crescent

1  City Connection bridge on the Westbank.

2      Q.   Okay.  So apart from that knowledge from your

3  other client, you did -- you did not independently

4  research other storage facilities where furniture and

5  personal belongings could have been stored, correct?

6      A.   That's correct.

7      Q.   Okay.  So I asked earlier about whether you

8  requested a quote from Riverfront Self Storage.  Did

9  you perform any other investigation into the rates

10  offered at Riverfront Self Storage?

11     A.   No, I did not.

12     Q.   What is your understanding of how Mr. Oppegard

13  selected the size of the storage units that's listed in

14  this email in Schellhaas 6?

15     A.   Can you ask me that one more time?

16     Q.   Yeah.  So here, it says, "Riverfront Self

17  Storage quoted me a medium-sized unit."

18          What is your understanding of why Mr. Oppegard

19  looked at options for a medium-sized unit with the two

20  sizes listed here?

21          MR. JOHNSON:  Objection.

22     A.   My understanding is I was asked to assume that

23  this was the appropriate sized storage.  Other than

24  that, I don't know what his criteria were for why he

25  selected this particular sized storage as opposed to a

1    small storage or as opposed to a large storage.

2    BY MS. KREBS:

3        Q.   Okay.  And so you didn't have any input into

4    the selection of the storage facility size -- or

5    storage unit size?

6        A.   I did not.

7        Q.   Okay.  Did you investigate other sizes of

8    storage units available at Riverfront Self Storage?

9        A.   No, I did not.

10       Q.   Did you perform any investigation into the

11   size of the storage unit needed by the trial

12   plaintiffs?

13       A.   No, I did not.

14       Q.   Okay.  Were the same sized storage units used

15   for both the individual trial plaintiffs and the

16   Thompson and Gremillion families?

17       A.   Yes, they were.

18       Q.   Okay.  Why was that?

19       A.   Again, I was asked to assume that the storage

20   costs were an element of damage and that this was

21   indicative of the cost of the storage.

22       Q.   Okay.  In your report, you state that the cost

23   of the storage unit is 279 per month.  Why did you use

24   279 in your storage calculation as opposed to 159,

25   which was also identified in this email?

SCHELLHAAS JASON

Page 126

1      A.   My understanding is he selected Stanley

2  Steemer as it was a cleaning company that allowed you

3  to price the services for the different plaintiffs.

4      Q.   Okay.  Do you know whether counsel considered

5  costs in selecting Stanley Steemer?

6      A.   No, I do not.

7      Q.   Do you know whether counsel considered quality

8  of services in selecting Stanley Steemer?

9      A.   No, I do not.

10      Q.   Do you know whether counsel considered the

11  location of operations in selecting Stanley Steemer?

12      A.   No, I do not.

13      Q.   Okay.  Are you aware of any other factors or

14  criteria that counsel considered in selecting Stanley

15  Steemer?

16      A.   No.

17      Q.   Okay.  Do you know whether counsel also

18  obtained quotes from other cleaning companies?

19      A.   No, I do not.

20      Q.   Do you know whether counsel compared Stanley

21  Steemer's rates to other cleaning companies?

22      A.   No, I do not.

23      Q.   Did you independently obtain quotes from

24  Stanley Steemer?

25      A.   I did go on their website and check one or two

Page 127

1    of these to see if I would come up with the same

2    answer, and I did.  And other than that, no, I did not

3    independently obtain any additional quotes.

4         Q.   Okay.  Which ones did you check?

5         A.   I think Ms. Winningkof, and I don't recall the

6    other.

7         Q.   Okay.  Did you obtain quotes from other

8    cleaning companies?

9         A.   No, I did not.

10        Q.   Did you compare Stanley Steemer's rates to

11   other cleaning companies?

12        A.   No, I did not.

13        Q.   Did you perform any other investigation to

14   confirm Stanley Steemer's rates are reasonable compared

15   to other cleaning companies?

16        A.   No, I did not.

17        Q.   All right.  I'd like to turn back to the first

18   email in the chain, the one dated January 30th, 2024,

19   with Geneva Green at the top of the email.

20             I assume that this is the quote that applies

21   to Geneva Green, correct?

22        A.   Yes.

23        Q.   Okay.  All right.  I'd like to walk through

24   the items listed in this email.

25             What is "carpet cleaning" referring to?

Page 131

1    been stored will also be cleaned; is that correct?

2         A.   You know, I -- I think it's none of -- I'm

3    trying to think of how to explain.  You know, some

4    things clearly, yes.  Could you have moved them --

5    could you have moved them before the odors started?

6    You know, I don't know that that's really possible.

7    Were they were exposed to the odors and then they get

8    moved?  Certainly, some things you cannot move, like

9    the -- the carpet, et cetera.

10            So I guess to the extent that if it were

11   determined that, you know, you were to move all of the

12   furniture items out of the home and it had no furniture

13   items in it to be cleaned, then I don't think that you

14   would then get paid to clean the same furniture items.

15        Q.   Okay.  So if I'm understanding correctly, if a

16   furniture item were stored between July 1st, 2017, and

17   the end of December 31st, 2019, then the cleaning costs

18   should not be subject to those particular items?

19        A.   I would agree.

20        Q.   Okay.  All right.  So if I were to ask you

21   about what these other particular items meant --

22   leather cleaning, tile and grout, floor cleaning,

23   hardwood floor cleaning, air duct cleaning, and in-home

24   area rug cleaning -- would your understanding of the

25   scope of that cleaning be tied to, like, the

Page 132

1    description provided here?

2        A.   Yes.

3        Q.   Okay.  Just trying to avoid going through each

4    of these.

5        A.   Understood.

6        Q.   Do you know whether the numbers provided here

7    in this email are directly copied from the quote

8    received from Stanley Steemer, or did counsel modify

9    the quote in any way?

10                MR. JOHNSON:  Objection.

11       A.   It's my understanding that these numbers were

12   directly from the quote.

13   BY MS. KREBS:

14       Q.   Okay.  Have you seen the original quotes from

15   Stanley Steemer?

16       A.   No.  My recollection is you'd pull up a -- you

17   have, like, a screenshot of it when you do it.  So no,

18   I have not seen the original quote.

19       Q.   Okay.

20                MS. KREBS:  I'm close.

21                MR. JOHNSON:  I'm looking.  You're

22        getting close to that last page.

23   BY MS. KREBS:

24       Q.   All right.  I want to look at page 3 of this

25   exhibit.  And I'm looking at the email at the bottom

1  the original quote?

2      A.   That's correct.

3      Q.   Okay.  And was this a change that you

4  requested that counsel make to the quote?

5      A.   No.

6      Q.   Did you review any documents to confirm

7  whether the details of the trial plaintiffs' homes and

8  furnishings were accurate as provided in the quotes?

9      A.   No, I did not.

10     Q.   Did you perform any other investigation to

11 confirm the accuracy?

12     A.   No, I did not.

13     Q.   Can you please walk me through how you

14 adjusted the cleaning cost for inflation?

15     A.   Sure.  Similar to the storage and the lodging,

16 cleaning costs fall under domestic services category in

17 CPI.  So same thing; pull the data from CPI from 2024

18 back to the relevant period and looked at the

19 year-over-year increases or decreases and those costs.

20 Started with the current period costs and worked

21 backwards to get to, you know, a decreased cost in

22 2017, 2018, 2019.

23     Q.   Okay.  Did you perform any investigation to

24 confirm that adjusting the cleaning costs using the

25 historical inflation rates adequately adjusted for any