**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

*Related Case:*

| | |
|---|---|
| **FREDERICK ADDISION ET AL.,** | **CIVIL ACTION** |
|       **Plaintiffs,** | |
| | **NO. 19-11133** |
| **VERSUS** | |
| | **SECTION: "E"(5)** |
| **LOUISIANA REGIONAL LANDFILL** | |
| **COMPANY, ET AL.,** | |
|       **Defendants.** | |
| | **JUDGE: Morgan** |
| | **MAGISTRATE JUDGE: North** |
| *Applies to all cases* | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO**
**EXCLUDE H$_2$S EMISSIONS OPINIONS OF JOSE SANANES**

# TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.   Background ............................................................................................................ 2

    A.    Step 1: Mr. Sananes' Methodology for Estimating the Gas Generated Inside the Landfill ........................................................................................................ 3

    B.    Step 2: Mr. Sananes' Methodology for Estimating the Gas Collected by the Landfill's Collection System ................................................................. 5

    C.    Step 3: Mr. Sananes' Methodology for Estimating the Gas Emitted from the Landfill ........................................................................................................ 5

III.  Federal Rule of Evidence 702 and *Daubert* Requirements .................................... 7

    A.    Application of Rule 702 in Jury Trials ........................................................... 9

IV.   Argument ............................................................................................................. 11

    A.    Mr. Sananes' Opinions on $H_2S$ Generation & Emissions are Inadmissible ................ 11

        1.    Mr. Sananes' Estimate of Landfill Gas Generation Volume Departed from EPA's Method and Ignored Daily Data ................................................. 12

        2.    Mr. Sananes' Unreliable Leachate Saturation Percentage Does Not Warrant His Violation of the EPA's Express Instructions................................... 13

        3.    Mr. Sananes' Unreliable Analogy to "Landfill A" Does Not Warrant His Disregard of the EPA's Express Instructions............................................. 17

    B.    Mr. Sananes' Opinions on Emissions of H2S are Inadmissible. .................... 19

        1.    Mr. Sananes Made Up a Method Based on a Facially Unreliable Drawing to Estimate Collection Efficiency .......................................................... 20

        2.    Mr. Sananes' Method Ignores the Existence and Effects of Cover .......................... 22

        3.    Mr. Sananes' Methodology Ignores Every Available Source of Data Actually Measuring Gas Levels........................................................................... 23

    C.    The Court Should Exclude Mr. Sananes' Emissions Estimate under Rule 403 Because it Risks "Confusing The Issues" and "Misleading The Jury."..................... 27

V.    Request for Oral Argument..................................................**Error! Bookmark not defined.**

VI.   Conclusion .......................................................................................................... 29

## I.       Introduction

All Defendants[1] jointly submit this motion to exclude the opinions of Plaintiffs' proposed landfill engineering expert, Mr. Jose Sananes ("Sananes"). In support of Plaintiffs' specific causation case, Mr. Sananes estimates the amount of hydrogen sulfide ("H₂S") gas generated by, and emitted from, the Jefferson Parish Landfill ("Landfill" or "JPLF"). Plaintiffs' air dispersion modeling expert relies on Mr. Sananes' H₂S emissions estimates to estimate how frequently each of the Trial Plaintiffs was exposed to H₂S from the Landfill.[2] But Mr. Sananes agrees that his methods have not been tested or peer reviewed, he cannot quantify their rate of error, and neither the landfill industry nor regulatory agencies have accepted the methods he used to estimate how fast gas was generated in the Landfill, and how much of that gas escaped it.

Plaintiffs intend to present his opinions on H₂S emissions to the jury despite his use of made-up methods and his disregard of relevant data and information. This Court and many others have recognized that the primary purpose of Rule 702 gatekeeping is to protect a jury, which lacks specialized knowledge, from unreliable expert testimony.[3] Opinions based on methods that have

---

[1] Defendants in this matter are Waste Connections US, Inc., Waste Connections Bayou, Inc., and Louisiana Regional Landfill Company (collectively, the "Waste Connections Defendants"), the Parish of Jefferson, and Aptim Corp.

[2] The admissibility of Mr. Sananes' opinions affects the admissibility of the testimony of the other experts who rely on him. *See, e.g., LeBlanc ex rel. Est. of LeBlanc v. Chevron USA, Inc*., 396 Fed. Appx. 94, 101 (5th Cir. 2010) (affirming the exclusion of an expert whose testimony was derivative of the testimony of another expert).

[3] The Court's general causation opinion noted that the Court's gatekeeping role was "diminished in a bench trial" and that the purpose of *Daubert* is to "ensure that only reliable and relevant expert testimony is presented to the jury." *Ictech-Bendeck v. Waste Connections Bayou, Inc*., 2021 WL 5177827, at *3 (E.D. La. Nov. 8, 2021) (Morgan, J.). *See also Talley v. U.S*., 2023 WL 2881293, at *3 (E.D. La. Mar. 16, 2023) (Morgan, J.) (quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district court judge sits as the trier of fact in place of a jury."); *Riverkeeper v. Taylor Energy Co. L.L.C*., 2015 WL 4547611, at *1 (E.D. La. July 23, 2015) (Morgan, J.) (same); *A.R. v. Pohlmann*, No. CV 16-17865, 2019 WL 468528, at *5 (E.D. La. Feb. 6, 2019) (Morgan, J.) (same); *Wallis v. Hornbeck Offshore Operators*, 2014 WL 3809743, at *1 (E.D. La. Aug. 1, 2014) (Morgan, J.) (same). *See also Richardson v. SEACOR Lifeboats, LLC*, 2015 WL 2193907, at *2 (E.D. La. May 11, 2015) (Morgan, J.) ("most of the objectives of *Daubert* are not implicated" in a bench trial).

not been tested, peer reviewed, or accepted by regulatory agencies or the relevant industry, lack the track record of use and improvement in the real world to be "more likely than not" reliable. Mr. Sananes' emissions estimates should be excluded.

## II.    Background

Plaintiffs have retained Mr. Sananes as an expert in landfill engineering. Mr. Sananes is an engineer employed by U.S. Ramboll Consulting ("Ramboll"). Beginning in the general causation phase and continuing into the specific causation phase of the action, Mr. Sananes proposes to testify as to his estimate of the amount of $H_2S$ gas emitted from the Landfill.[4] Mr. Sananes estimated the amount of $H_2S$ gas escaping from the JPLF into the atmosphere from October 2016 to December 2019. At the general causation hearing, he testified that there are no records to determine the amount of gas that was generated from the JPLF, and there is no way to measure it.[5] Under this belief, Mr. Sananes decided to "estimate" the gas emissions using a methodology he called "mass balance."[6] His methodology consisted of three steps. He (1) estimated the amount of gas generated inside the Landfill, (2) estimated the amount of gas collected by the Landfill, and (3) subtracted the collected gas from the generated gas to estimate the amount of gas emitted from the Landfill.[7]

---

[4] *See* Mr. Sananes' Second Supplemental Expert Report, dated February 16, 2024, appended to the accompanying Declaration of John H. Paul (dated June 6, 2024) ("Paul Dec.") as Exhibit 1 (hereafter "Second Supplemental Report") at §§ 12-14.
[5] Transcript from the General Causation Trial, *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, No. 18-7889, Day 1, Afternoon Session (Jan. 31, 2022), appended to the Paul Dec. as Exhibit 2 (hereafter "PM Trial Transcript") at 167:1-8.
[6] PM Trial Transcript at 167:11–168:15.
[7] PM Trial Transcript at 167:11–168:15.

## A.    Step 1: Mr. Sananes' Methodology for Estimating the Gas Generated Inside the Landfill

Mr. Sananes first estimated how much $H_2S$ gas was generated inside the Landfill. He used a computer model designed by the U.S. EPA for regulatory purposes called the Landfill Gas Emissions Model (known as "LandGEM").[8] LandGEM estimates the rate that gas is generated inside a landfill,[9] not emitted out of a landfill.[10] The program's results depend on the inputs selected by the user.[11] One of the inputs – called the "k factor" – represents how quickly waste will produce gas.[12] Increasing the k factor means that gas is generated faster. The EPA provides a default k factor for LandGEM that should be used unless site-specific information is available: 0.04. Mr. Sananes did not use the EPA's default factor, but instead chose a k factor of 0.11.[13] By using a k factor nearly triple the EPA's default k factor, Mr. Sananes told the program to estimate gas generation nearly three times faster than the rate that EPA assigns in the absence of site-specific information.[14]

The EPA's instructions for LandGEM state that a user who does not want to use the default k factor must generate a new k factor using site-specific data.[15] But Mr. Sananes did not follow these instructions.[16] Instead, his methodology for selecting a new k factor was to analogize the Landfill to an unidentified "Landfill A" in a 2005 EPA study.[17] The 2005 paper estimated k factors

---

[8] Transcript from the General Causation Trial, *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, No. 18-7889, Day 2, Morning Session (Feb. 1, 2022), appended to the Paul Dec. as Exhibit 3 (hereafter "Trial Transcript") at 305:2-5.
[9] Trial Transcript at 305:6-9.
[10] Trial Transcript at 305:13-15.
[11] Trial Transcript at 305:10-12.
[12] Trial Transcript at 315:3-13.
[13] Trial Transcript at 315:3-13.
[14] Trial Transcript at 315:14-316:7.
[15] Trial Transcript at 318:22-13.
[16] Trial Transcript at 318:6-13.
[17] Trial Transcript at 316:8-11. The study is titled "First-Order Kinetic Gas Generation Model Parameters for Wet Landfills."

at "wet" bioreactor landfills, but the JPLF was not a bioreactor landfill.[18] "Landfill A" was flooded from an underground aquifer, but the JPLF was not.[19] Prior to this case, Mr. Sananes had never used this method to select a k factor.[20] Mr. Sananes testified that his method for selecting the k factor from "Landfill A" was based on his professional judgment.[21] He admitted that his gas generation estimate depends on the 0.11 k factor that he selected, and if that value is incorrect, his estimate is incorrect.[22]

Mr. Sananes' justification for disregarding the EPA's instructions for selecting a k factor was that the JPLF was saturated. This determination was also based on "a lot of professional judgment."[23] Mr. Sananes assumed that leachate flooded up from the bottom of the Landfill to 51% of the depth of the waste.[24] He used liquid measurements from the Landfill's gas wells to make that determination. But he could not identify any studies validating the method of using gas wells to estimate waste saturation.[25] Nor could he say that the method is generally accepted.[26] He has never measured leachate levels in gas wells before.[27] Moreover, Mr. Sananes could not identify anyone who has ever used a leachate-saturation percentage to select a k factor for LandGEM.[28]

---

[18] A bioreactor landfill is a landfill that intentionally keeps the waste wet to make it decay faster. PM Trial Transcript at 203:23-204:4. The Landfill is not a bioreactor landfill. *Id.* at 204:5-7; 321:1-7.
[19] Trial Transcript at 323:3-324:10; 324:11-13.
[20] Trial Transcript at 324:14-22.
[21] Trial Transcript at 324:23-325:7.
[22] Trial Transcript at 320:7-15.
[23] Trial Transcript at 321:15-17. His designation of the Landfill as a "wet" landfill was not based on any industry standard but his explanation that there are measurements indicating that "leachate has been an issue at this landfill" in all of its phases. *Id.* at 321:15-24.
[24] Trial Transcript at 307:3-6.
[25] Trial Transcript at 308:22-309:6.
[26] Trial Transcript at 310:23-311:10.
[27] Trial Transcript at 308:14-21.
[28] Trial Transcript at 316:16-317:2.

**B.**     **Step 2: Mr. Sananes' Methodology for Estimating the Gas Collected by the Landfill's Collection System**

Mr. Sananes next estimated how much of this landfill gas was *collected* by the Landfill's Gas Collection and Control System ("GCCS"). His methodology started with a drawing in a draft report prepared by contractors at Carlson Environmental Consultants ("Carlson") for the Landfill.[29] The draft report included blue circles showing Carlson's estimate of the radius of influence ("ROI") of each well.[30] Mr. Sananes copied these drawings directly into his own report.[31] Mr. Sananes assumed that all gas generated inside those circles was collected, and that all gas generated outside the circles escaped to the atmosphere.

Mr. Sananes admitted that the ROI (the circles) drawn in the Carlson report are meant for the purpose of *designing* a landfill gas system.[32] He is not aware of any studies that describe or support the methodology he used for Step 2, explaining only that "this is simple application of mass balance."[33] Kris Carlson, the author of the Carlson report, later testified that the ROIs depicted in his report were *not* designed for use in estimating landfill emissions.[34]

**C.**     **Step 3: Mr. Sananes' Methodology for Estimating the Gas Emitted from the Landfill**

In the third step of his methodology, Mr. Sananes estimated how much gas was emitted from the Landfill. To do this, he assumed that all of the gas generated outside of the ROIs escaped through the surface of the Landfill.[35] To determine that amount, Mr. Sananes first calculated what

---

[29] Trial Transcript at 326:15-17. Jefferson Parish retained CEC to assess how to improve gas collection for use in a gas-to-energy plant, and CEC also developed suggestions for the control of potential fugitive emissions and odors. *See* Second Supplemental Rept. ¶ 53.

[30] Trial Transcript at 327:3-5.

[31] Trial Transcript at 326:18-21.

[32] Trial Transcript at 336:14-337:9. Mr. Sananes has never designed a landfill. *Id.* at 304:22-23.

[33] Trial Transcript at 338:5-24.

[34] Deposition Transcript of Kris Carlson, taken January 17, 2024, appended to the Paul Dec. as Exhibit 4 (hereafter "Carlson Dep.") at 257:19-24.

[35] Trial Transcript at 331:16-332:8.

percentage of the landfill's surface was covered by his circles – which he deemed the collection efficiency percentage. He then multiplied the amount of gas generated inside the Landfill by his estimated collection efficiency percentage, and then subtracted that "collected" percentage from his total estimate of gas generation. Mr. Sananes repeated this exercise for every month from October 2016 through December 2019.

Mr. Sananes did not account for factors present at the Landfill that decrease emissions.[36] Chief among these factors was the presence of between one and two feet of cover soils. Mr. Sananes deemed the effect of the cover soils "negligible."[37]

After completing this exercise, Mr. Sananes did not validate his results by comparing his calculations to the data measuring any actual emissions.[38] Mr. Sananes admitted that surface concentrations of $H_2S$ were measured many times during his modeling period.[39] He also helped direct a five-day on-site sampling event during the week of November 4, 2019.[40] But he admitted that Ramboll did not attempt to determine the actual ROI during that site investigation, with his only excuse being that it would involve "invasive work."[41] The Defendants took parallel samples and measurements during the site investigation, and they provided the data from that investigation to Mr. Sananes.[42] Overall, Mr. Sananes admitted that he did not use any of the sources of surface emission data. Rather than using any gas data to form his gas estimates, the only data he used were the liquid concentrations measured inside the gas wells.[43]

---

[36] Mr. Sananes did not account for the cover placed over the waste. Trial Transcript at 335:23-336:11.
[37] Deposition Transcript of Jose Sananes, taken April 10, 2024, appended to the Paul Dec. as Exhibit 5 (hereafter "Sananes Dep.") at 137:19-25; Second Supplemental Rept. ¶ 33, at p. 12.
[38] He did not compare his estimate to data in the reports from SCS Engineers, in CEC's draft report, or from the landfill's quarterly surface emissions monitoring. Trial Transcript at 339:25-340:25.
[39] Trial Transcript at 339:3-6.
[40] Trial Transcript at 339:7-15.
[41] Trial Transcript at 339:16-20.
[42] Trial Transcript at 339:21-24.
[43] Trial Transcript at 341:5-19.

Mr. Sananes made up methods to estimate landfill gas generation and emissions with no scientific justification for doing so. Accepted methods were available to him, as were the data necessary to implement those methods. His approach is a methodology made up purely for litigation, and intended solely to reach a pre-determined result. As the gatekeeper under Rule 702, the Court should not let junk science disguised as real science into the courtroom to confuse the jury.

### III.     Federal Rule of Evidence 702 and *Daubert* Requirements

Rule 702 of the Federal Rules of Evidence ("FRE") governs the admissibility of expert testimony. The rule permits experts to offer opinions if the proponent demonstrates that it is more likely than not that (a) the expert's specialized knowledge will help the trier of fact, (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied those principles and methods. The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) "provides the analytical framework for determining whether expert testimony is admissible under Rule 702." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002). The Supreme Court has provided a five-factor test for gauging the reliability of an expert's methodology:

(1) whether the expert's theory can be or has been tested;
(2) whether the theory has been subject to peer review and publication;
(3) the known or potential rate of error of a technique or theory when applied;
(4) the existence and maintenance of standards and controls; and
(5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999) (citing *Daubert*, 509 U.S. at 593-95). The proponent of the expert bears the burden of establishing these criteria. *Moore*, 151 F.3d at 276.

*Daubert* asks "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The Court must assess "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007). This Court has recognized that the purpose of *Daubert* is to "ensure that only reliable and relevant expert testimony is presented to the jury."[44]

Expert testimony "must be reliable at each and every step or else it is inadmissible." *Knight*, 482 F.3d at 355. The Fifth Circuit has clarified that "the existence of sufficient facts and a reliable methodology is in all instances mandatory."[45] The expert's testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. This requires "objective, independent validation of the expert's methodology." *Moore*, 151 F.3d at 276. The Supreme Court, the Fifth Circuit, and judges of this District have acknowledged that the application of *Daubert* will prohibit juries from hearing "insights and innovations," propounded in the scientific search for truth, since trials are concerned with "the particularized resolution of legal disputes," not the outer boundaries of scientific investigation.[46] Opinions are ripe for exclusion if instead of "proposing to testify about matters growing naturally and directly

---

[44] *Ictech-Bendeck v. Waste Connections Bayou, Inc*., 2021 WL 5177827, at *3 (E.D. La. Nov. 8, 2021) (Morgan, J.).

[45] *Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007) (excluding expert testimony because it was based on "extrapolation" based on "a number of supposed facts not in the record").

[46] *Daubert*, 509 U.S. at 597. The Fifth Circuit expressed the same principle. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("In sum, the law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available."). See also *Ruffin v. BP Expl. & Prod*., No. 20-334, 2023 WL 7271087, at *4 (E.D. La. Oct. 31, 2023) (Africk, J.) (quoting *Hendrix ex rel. G.P. v. Evenflo Co., Inc*., 609 F.3d 1183, 1203 (11th Cir. 2010) ("the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.").

8

out of research they have conducted independent of the litigation," the expert, like Mr. Sananes in this case, has "developed their opinions expressly for purposes of testifying."[47]

Courts also exclude expert testimony if there is "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). This analysis considers "whether there is an adequate 'fit' between the data and the opinion proffered." *Moore*, 151 F.3d at 276 (citing *Joiner*, 522 U.S. 136). An expert opinion "based on 'insufficient, erroneous information,' fails the reliability standard." *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. 513, 515 (5th Cir. 2013).[48] "Whether an expert's testimony is reliable is a fact-specific inquiry." *Burleson v. Texas Dept. of Crim. J.*, 393 F.3d 577, 584 (5th Cir. 2004).

### A.     Application of Rule 702 in Jury Trials

Stringent application of the *Daubert* standard is required for this jury trial. The Fifth Circuit and the judges of this District have uniformly recognized *Daubert*'s heightened importance in jury trials, as compared to bench trials where it is "diminished."[49] This Court has made that point many times. *See, e.g., Talley v. U.S.*, 2023 WL 2881293, at *3 (E.D. La. Mar. 16, 2023) (quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are

---

[47] *Atlantic Specialty Ins. Co. v. Porter, Inc.*, No. 15-570, 2016 WL 6126062, at *2 (E.D. La. Oct. 20, 2016) (Vance, J.), *aff'd*, 742 Fed. Appx. 850 (5th Cir. 2018) (excluding expert as unreliable for lack of critical data and failure to test hypothesis) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

[48] "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009). The Fifth Circuit has clarified that "the existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007).

[49] The Fifth Circuit recognizes that "the importance of the trial court's gatekeeper role is significantly diminished in bench trials, as in this instance, because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. Partn. v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010). *See also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *A. Specialty Ins. Co. v. Porter, Inc.*, 742 Fed. Appx. 850, n. 4 (5th Cir. 2018); *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 329 (5th Cir. 2013); *In re MBS Mgt. Services, Inc.*, 690 F.3d 352, 358 (5th Cir. 2012).

not as essential in a case such as this where a district court judge sits as the trier of fact in place of a jury.").[50] Indeed, the Court made that point at the general causation hearing, in which the Court was the trier of fact, emphasizing that the purpose of *Daubert* is "to ensure that only reliable and relevant expert testimony is presented to the jury."[51] Judge Vance has explained that the *Daubert* obligation is more "urgent" in jury trials because of the risk of "exposing the jury to confusing and unreliable expert testimony."[52] Likewise, Judge Barbier has stated that "the objectives of *Daubert* … are no longer implicated" in a bench trial, but more essential in a jury trial.[53]

In 2023, Federal Rule of Evidence 702 was amended to clarify that a proponent must prove to the Court that it is "more likely than not" that all of the criteria of Rule 702 are satisfied as to the proffered opinions.[54]  The Advisory Committee explained that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology" had often been incorrectly applied as questions of weight rather than questions of admissibility.[55] While the Supreme Court recognized in *Daubert* that "cross-examination, presentation of contrary evidence,

---

[50] *See also Riverkeeper v. Taylor Energy Co. L.L.C.*, 2015 WL 4547611, at *1 (E.D. La. July 23, 2015) (Morgan, J.) (same); *A.R. v. Pohlmann*, No. 16-17865, 2019 WL 468528, at *5 (E.D. La. Feb. 6, 2019) (Morgan, J.) (same); *Wallis v. Hornbeck Offshore Operators*, 2014 WL 3809743, at *1 (E.D. La. Aug. 1, 2014) (Morgan, J.) (same). *See also Richardson v. SEACOR Lifeboats, LLC*, 2015 WL 2193907, at *2 (E.D. La. May 11, 2015) (Morgan, J.) ("most of the objectives of *Daubert* are not implicated" in a bench trial).

[51] *Ictech-Bendeck*, 2021 WL 5177827, at *3 ("the Court's 'role as the 'gate-keeper' is diminished in a bench trial,'" since "'the purpose of Daubert motion[s] is 'to ensure that only reliable and relevant expert testimony is presented to the jury.'") (quoting *Kinnerson v. Arean Offshore, LP*, No. 16-720, 2019 WL 2571627, at *2 (E.D. La. June 21, 2019) and *Thompson v. Rowan Cos., Inc*., No. 06-3218, 2007 WL 724646, at *1 (E.D. La. March 6, 2007) (Barbier, J.)).

[52] *Atlantic Specialty Ins. Co. v. Porter, Inc*., 2016 WL 6569346, at *3 (E.D. La. Nov. 4, 2016) (Vance, J.), *aff'd*, 742 Fed. Appx. 850 (5th Cir. 2018).

[53] *Deville v. Comar Marine Corp*., 2009 WL 1870896, at *1 (E.D. La. June 25, 2009) (Barbier, J.). *See also Thompson v. Rowan Companies, Inc*., 2007 WL 724646, at *1 (E.D. La. Mar. 6, 2007) (Barbier, J.) ("the purpose of *Daubert* motion is 'to ensure that only reliable and relevant expert testimony is presented to the jury'") (quoting *Rushing v. Kansas City Southern Ry. Co*., 185 F.3d 496, 506 (5th Cir. 1999)); *Hebert v. Cannon*, 2005 WL 3533695, at *2 (E.D. La. Oct. 31, 2005) (Barbier, J.) ("the concerns of *Daubert* are largely moot in this case since it is set as a bench trial, and *Daubert* was preoccupied with the courts' gatekeeping function vis-a-vis the jury.").

[54] Fed. R. Evid. 702.

[55] Fed. R. Evid. 702, Advisory Committee Note, 2023 Amendments.

and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," the amendments to Rule 702 emphasize that the evidence must be admissible under the preponderance standard of Rule 104(a) in the first place.

The Court allowed Mr. Sananes to testify as to his $H_2S$ emissions opinions during the general causation hearing, despite his use of novel and untested methods, because the Court's gatekeeping obligation was "diminished in a bench trial."[56] The trier of fact in the specific causation trial will be a jury, and the Court's *Daubert* gatekeeping obligation is therefore more "essential," "urgent," and "critical," in the words of the Fifth Circuit, this Court, Judges Barbier and Vance, and the Advisory Committee.

The Court should not allow Mr. Sananes to offer his opinions on $H_2S$ emissions because Plaintiffs cannot prove by a preponderance that (a) his specialized knowledge will help the trier of fact, (b) his testimony is based on sufficient facts or data, (c) his testimony is the product of reliable principles and methods, and (d) he has reliably applied those principles and methods. Mr. Sananes' proposed opinions fail these criteria, and therefore the opinions must be excluded.

## IV.   ARGUMENT

### A.   Mr. Sananes' Opinions on $H_2S$ Generation & Emissions are Inadmissible

Expert testimony "must be reliable at each and every step or else it is inadmissible." *Knight*, 482 F.3d at 355. The Fifth Circuit has clarified that "the existence of sufficient facts and a reliable methodology is in all instances mandatory."[57] Each of Mr. Sananes' methods was made up for this matter and he excluded relevant, contrary data in implementing each one, which is the very definition of junk science: a scientific method made up solely for litigation, and used only in

---

[56] *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, 2021 WL 5177827, at *3 (E.D. La. Nov. 8, 2021) (Morgan, J.).
[57] *Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007) (excluding expert testimony because it was based on "extrapolation" based on "a number of supposed facts not in the record").

11

litigation without acceptance by the relevant industry or government agencies.[58] As a result, Plaintiffs cannot show that his opinions are "more likely than not" reliable, his testimony fails the requirements of Rule 702, and it risks confusing the jury under Rule 403. The Court should exclude his testimony from this specific causation proceeding.

### 1.   Mr. Sananes' Estimate of Landfill Gas Generation Volume Departed from EPA's Method and Ignored Daily Data

*Daubert* considers whether the method has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 594. An expert must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. For this reason, an expert cannot use methodologies developed by the EPA in a manner that contravenes the purpose for which they were designed.[59]

Mr. Sananes used an EPA program, LandGEM, which as discussed above provides a default k factor. But he chose to input a k factor of 0.11, nearly three times the EPA's default k factor, which increased the estimated rate of gas production to nearly three times the EPA's default rate.[60] The EPA's User's Guide for LandGEM sets out the EPA's required methodology for selecting a k factor other than the EPA's default k factor. Mr. Sananes openly admitted that he did not follow the EPA's instructions, which require users to determine a site-specific k value only if it is based on user-collected, site specific data.[61] He did not collect any site-specific data that could

---

[58] *See Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 777 (E.D. La. 2015) (Vance, J.) (*quoting Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995)). In assessing reliability under *Daubert*, courts consider "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'" *Id.*

[59] *See In re Voluntary Purchasing Groups, Inc. Litig.*, No. CIV.A. 3:94CV2477H, 2000 WL 1842779 (N.D. Tex. Dec. 14, 2000) (excluding testimony of engineer who used an EPA method for a purpose other than the "context for which it was originally devised" and an air modeling expert who used a model that was "generally accepted, including by the EPA, and has been peer reviewed and tested" but not in the context of what was actually at issue in the case).

[60] Trial Transcript at 315:3-316:7.

[61] Trial Transcript at 318:22-13.

be used for this purpose.[62] Contrary to the EPA's instructions, Mr. Sananes used a k factor that a 2005 EPA paper had calculated for a flooded bioreactor landfill identified only as "Landfill A."[63] He was unable to say that his methodology for selecting the higher k factor for an unknown landfill from another state was generally accepted in the solid waste industry.[64] This decision renders his methodology unreliable, as experts cannot use EPA methods other than for their intended purposes.[65]

In addition, Mr. Sananes could only explain his choice of k factor by claiming that that the Landfill is a "wet" landfill, rather than a "conventional" landfill.[66] In doing so, Mr. Sananes referred to the leachate-saturation percentage that he calculated. But his method – estimate a leachate depth, decide that it renders a landfill "wet," and look for a k factor from another "wet" landfill in another state studied by someone else – did not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[67] In fact, Mr. Sananes could not identify *anyone* who has ever used a leachate-saturation percentage to select a k factor for LandGEM.[68] Mr. Sananes' use of the leachate-saturation percentage lacks peer review or general acceptance in the relevant field.[69] And this approach further renders his methodology unreliable, as experts cannot use EPA methods other than for their intended purposes.[70]

### 2.    Mr. Sananes' Unreliable Leachate Saturation Percentage Does Not Warrant His Violation of the EPA's Express Instructions.

---

[62] Trial Transcript at 318:6-13.

[63] Trial Transcript at 316:8-11.

[64] Trial Transcript at 317:2-25.  He only offered the circular explanation that it was appropriate to do so because it was appropriate to do so.  *Id.*

[65] *In re Voluntary Purchasing Groups*, 2000 WL 1842779, at *3.

[66] Trial Transcript at 321:8-14.

[67] *Kumho*, 526 U.S. at 152.

[68] Trial Transcript at 316:16-317:2.

[69] *Daubert*, 509 U.S. at 593-94.

[70] *In re Voluntary Purchasing Groups*, 2000 WL 1842779, at *3.

As another one of the basic *Daubert* factors, an expert's testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. In estimating the amount of leachate in the JPLF – which was his basis in selecting a high gas generation rate – Mr. Sananes did not consider hundreds of routine daily measurements of the depth of leachate in the Landfill. Mr. Sananes' opinions based on his calculation of leachate depth therefore fail to satisfy this basic *Daubert* factor and should not be presented to a jury.

More importantly, Mr. Sananes' leachate-saturation percentage was also unreliable because he used gas well data instead of the specific data required by the EPA for selecting a k factor. He used measurements made by others of the depth of liquids inside the Landfill gas extraction wells to conclude that the entire landfill was flooded with leachate. Those depth measurements were not performed for the purpose of estimating the depth of leachate in the landfill.[71] This methodology again violates basic *Daubert* factors. He could not identify any studies validating the method of using gas wells to estimate waste saturation.[72] Nor could he say that the method is generally accepted.[73] Indeed, before this case, he has never even measured leachate levels in gas extraction wells for the purpose of estimating leachate depth. [74] Instead, in the past, he has measured liquid levels in landfills by using wells that were installed for the purpose of measuring liquid levels.[75]

Every "inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. But Mr. Sananes' made-up alternative to the EPA's guidance is demonstrably less scientific and less reliable than the EPA's required method. Mr. Sananes admitted that (1) the liquid

---

[71] *See* Second Supplemental Rept. § 11.1.2, at ¶ 79. Mr. Sananes admitted the gas wells "were installed for the purpose of collecting gas" but claimed "over time, they have flooded, and they are giving also information with respect to those leachate levels."  Trial Transcript at 310:23-311:10.
[72] Trial Transcript at 308:22-309:6.
[73] Trial Transcript at 310:23-311:10.
[74] Trial Transcript at 308:14-21.
[75] Trial Transcript at 308:14-21.

measurements in the gas wells around Phase IV-A were not all the same height,[76] (2) some of the gas wells around Phase IV-A were dry, not wet,[77] and (3) the gas wells do not extend all the way to the bottom of the Landfill liner.[78] Thus, his leachate depth estimate is an average of disparate measurements.

Despite these scientific problems, Mr. Sananes did not attempt to check his work against other sources of data, nor to use other relevant data in the first place. The Landfill recorded daily measurements of leachate depth from transducers (devices installed to measure leachate depth) that were placed in each landfill cell.[79]

Plaintiffs originally designated another engineer at Ramboll, Nestor Soler as their landfill engineering expert. Mr. Soler originally performed the landfill saturation estimate and modeling presented in Mr. Sananes' opinions.[80] When Mr. Soler became ill shortly before the general causation hearing in this matter, Plaintiffs substituted Mr. Sananes for Mr. Soler. Plaintiffs agreed that Mr. Sananes' opinions would testify consistently with Mr. Soler's deposition responses.[81] When Mr. Soler first estimated the amount of leachate in the JPLF, he was unaware of the existence of devices installed at the base of the Landfill – called transducers – to measure the depth of leachate.[82] Mr. Soler agreeing that transducers "would be a more accurate way to measure leachate

---

[76] Trial Transcript at 308:1-3.
[77] Trial Transcript at 308:4-6.
[78] Trial Transcript at 307:7-25.
[79] Trial Transcript at 311:13-19.
[80] *See* Plaintiffs' First Amended Disclosure of Expert Witnesses in the General Causation Phase (Jan. 7, 2022) at 5, appended to the Paul Dec. as Exhibit 6 ("Mr. Sananes will be testifying to the same opinions as provided by Mr. Soler, and the Reports containing the opinions to which Mr. Sananes will testify have been previously provided. Mr. Sananes is expected to testify consistently with the Reports and the deposition testimony of Mr. Soler taken in this matter, regarding the emissions from the Jefferson Parish Landfill.")
[81] *Id.*
[82] Deposition Transcript of Nestor Soler, taken June 28, 2021 appended to the Paul Dec. as Exhibit 7 (hereafter "Soler Dep."), at 192:1 – 192:20; 199:18 – 200:4.

depth from the bottom liner than liquid measurements in the gas wells."[83]  When Mr. Soler learned

of the transducers at deposition, he professed to be "happy to hear that."[84]

Mr. Sananes did not use the Landfill's daily transducer data, despite admitting that a

transducer generally gives a more accurate measurement of leachate.[85] Nor did he consider the

Landfill's daily activity reports that presented this data; his belated rationale after learning of the

data was that the transducer results were inaccurate because they were in locations that were

drawing water.[86] Moreover, Mr. Sananes admitted that Ramboll did not collect any data about the

leachate in the gas wells, stating, "We did not measure water levels."[87] Given his failure to use or

account for the voluminous data actually measuring leachate depth when attempting to estimate

the leachate depth, Mr. Sananes' methodology is contravened by the "good grounds" required by

*Daubert*.[88]

*Daubert* requires "objective, independent validation."[89]  But Mr. Sananes did not validate

his leachate depth estimate against the Parish's records of daily depth measurements.[90] He did not

compare the leachate levels measured by transducers to liquid levels measured in nearby gas

---

[83] Soler Dep. 199:18 – 200:4.

[84] Soler Dep. 199:18 – 200:4.

[85] Trial Transcript at 312:3-313:11. *See also* Soler Dep. 191:17 – 192:20; 193:23 – 194:1 (Soler: "Yeah. Transducers and the density of the leachate that if you wanted to be more accurate, that would be a better method to calculate the saturation of the landfill."); 199:18 – 200:4 (Soler agreeing that transducers "would be a more accurate way to measure leachate depth from the bottom liner than liquid measurements in the gas wells.").

[86] Trial Transcript at 312:3-313:11.

[87] Trial Transcript at 308:7-13.

[88] *Daubert*, 509 U.S. at 590.

[89] *Daubert* considers "the facts underlying the expert's opinion."  *Knight*, 482 F.3d at 355. The expert's opinions "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. This requires "objective, independent validation."  *Moore*, 151 F.3d at 276.

[90] Judge Vance excluded an expert who "made his calculations in a vacuum without any attempt to validate his results against reality."  *Burst v. Shell Oil Co.*, 104 F. Supp. 3d 773, 781 (E.D. La. 2015).

wells.[91] This failure to validate his estimate, apart from his failure to use or consider relevant data in the first place, falls short of *Daubert*'s standards.

### 3.     Mr. Sananes' Unreliable Analogy to "Landfill A" Does Not Warrant His Disregard of the EPA's Express Instructions.

Expert opinions must be "based on sufficient facts or data." Fed. R. Evid. 702(b). An expert's methodology cannot utilize "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. In other words, expert testimony "may rely on disputed facts, but not unsubstantiated assertions."[92] An expert opinion "based on 'insufficient, erroneous information,' fails the reliability standard." *Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. 513, 515 (5th Cir. 2013).[93] The Court may exclude expert testimony when there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. For example, it was unreliable for an engineer to use "analogy and extrapolation" to compare emissions from two different facilities, where he lacked "definitive information" about the facilities to establish that they were "sufficiently similar."[94] An emissions estimate is also unreliable if it is based on an analogy to data gathered from dissimilar areas.[95] In other words, an analogy or extrapolation must be an apples-to-apples

---

[91] Trial Transcript at 314:6-9.

[92] *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 409 (S.D. Tex. 2021) (summarizing the *Daubert* test).

[93] *See also Paz v. Brush Engineered Materials, Inc*., 555 F.3d 383, 388 (5th Cir. 2009) ("Where an expert's opinion is based on insufficient information, the analysis is unreliable."); *Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007) ("the existence of sufficient facts and a reliable methodology is in all instances mandatory").

[94] *Voluntary Purchasing*, 2000 WL 1842779, at *3 (unreliable for environmental engineer to estimate arsenic emissions from the scrubber flare of the plant by "analogy and extrapolation" to another plant where the engineer "lacked definitive information on certain features" of the plant and failed to establish that they plants were "sufficiently similar.").

[95] *Cannon v. BP Products N.A., Inc*., No. 3:10-CV-00622, 2013 WL 5514284, at *7 (S.D. Tex. Sept. 30, 2013) (environmental chemist's emissions estimate compared "emissions levels for the control area using air monitors ranging from 5.7 to 20.7 miles away from the center of the control areas, while he measured emissions levels for the class area using air monitors not only within the class boundary, but within the boundary of the Refinery itself").

comparison based on objective facts. And an expert cannot point to his own professional judgment – i.e., "because I say so" – to justify "the lack of objective support for his findings."[96]

Mr. Sananes used analogy and extrapolation from the unidentified "Landfill A" in the 2005 EPA paper to select the 0.11 k factor.[97] The 2005 paper estimated k factors at bioreactor landfills.[98] In other words, it pertained to landfills that <u>intentionally</u> kept the waste wet to make it decay faster.[99] Mr. Sananes unequivocally testified that the Landfill is <u>not</u> a bioreactor landfill.[100] Even worse, he admitted that "Landfill A" was also flooded from an underground aquifer.[101] Yet there is no evidence that groundwater is flowing into the Landfill here.[102] It was unreliable for Mr. Sananes to use "analogy and extrapolation" to compare the Landfill to "Landfill A" because he lacked "definitive information" to establish that the landfills are "sufficiently similar."[103] The comparison is apples to oranges, and there is "too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. This error alone warrants the exclusion of Mr. Sananes' testimony based on his own admission: Mr. Sananes admitted that if his chosen k value is incorrect, then his entire estimate is incorrect.[104]

Mr. Sananes' method for selecting the k factor from "Landfill A" violates the most basic factors of the *Daubert* test. *Daubert* considers "the known or potential rate of error." *Daubert*, 509 U.S. at 594. But Mr. Sananes could not define an error rate for his methodology of estimating the

---

[96] *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 536-37 (5th Cir. 2013) (expert's "education and experience" insufficient to make up for "the lack of objective support for his findings"). *See also Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

[97] Trial Transcript at 316:8-11.

[98] A "wet" or "bioreactor" landfill is a landfill where leachate is recirculated throughout the waste to quicken the rate at which the waste decays and generates landfill gas.

[99] PM Trial Transcript at 203:23-204:4.

[100] PM Trial Transcript at 204:5-7; Trial Transcript 321:1-7.

[101] Trial Transcript at 323:3-324:10.

[102] Trial Transcript at 324:11-13.

[103] *Voluntary Purchasing*, 2000 WL 1842779, at *3.

[104] Trial Transcript at 320:7-15.

Landfill's rate of gas generation.[105] *Daubert* considers whether the method has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 594. But Mr. Sananes admitted that his method was not based on industry practice.[106] The *Daubert* test considers "whether the theory or technique has been subjected to peer review and publication." *Daubert*, 509 U.S. at 593. But Mr. Sananes has never published any articles in the field of engineering,[107] and his method is so novel that even Mr. Sananes has never used it before outside of this litigation.[108] Mr. Sananes testified that his method for selecting the k factor from "Landfill A" was based on his professional judgment.[109] But an expert cannot point to professional experience to justify "the lack of objective support for his findings."[110] Further, *Daubert* requires "objective, independent validation."[111] But Mr. Sananes did not collect or use any field data that would allow him to estimate the rate of gas generation.[112] Every "inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. But Mr. Sananes' method lacks the basic hallmarks of genuine science identified by the Supreme Court.

### B.   Mr. Sananes' Opinions on Emissions of H2S are Inadmissible.

To satisfy Rule 702, every "inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. An expert must rely on the "methods and procedures of science," not "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The Fifth Circuit has clarified that "the existence of sufficient facts and a reliable methodology is in all

---

[105] Trial Transcript at 325:8-16.
[106] Trial Transcript at 324:23-325:7.
[107] Trial Transcript at 304:6-8.
[108] Trial Transcript at 324:14-22.
[109] Trial Transcript at 324:23-325:7.
[110] *Brown*, 705 F.3d at 536-37 (expert's "education and experience" insufficient to make up for "the lack of objective support for his findings"); *Viterbo*, 826 F.2d at 424 ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").
[111] *Moore*, 151 F.3d at 276; see also *Knight*, 482 F.3d at 355 (*Daubert* considers "the facts underlying the expert's opinion").
[112] Trial Transcript at 325:22-326:1.

instances mandatory."[113] And of course, to admit an expert's opinion, the Court must conclude that it is "more likely than not" reliable. FRE 702.

### 1. Mr. Sananes Made Up a Method Based on a Facially Unreliable Drawing to Estimate Collection Efficiency

Mr. Sananes' method of estimating collection efficiency must be based on sufficient facts and a reliable methodology to be admissible. His method of calculating collection efficiency has never been used to support an emissions estimate, and it is based entirely on a drawing that was not prepared to assist in an emissions estimate. The Court should prohibit Mr. Sananes from presenting any opinion relying on his collection efficiency estimates.

To estimate the amount of gas collected by the Landfill, Mr. Sananes relied on a drawing in a draft report by a JPLF contractor, Carlson Environmental Consultants.[114] He copied Carlson's draft circles, which showed a theoretical Radius of Influence ("ROI") around each gas extraction well, directly into his own report.[115] Mr. Carlson's drawing was of "theoretical" ROIs. Mr. Carlson explained in his 2024 deposition that the theoretical ROIs do not reflect the actual reach of the gas extraction wells, and that several other factors would need to be considered to determine the actual ROI ("typical waste consistency, the cover conditions, applied vacuum, and the resulting gas quality desired").[116] Among the factors that will increase an ROI is the amount of vacuum applied to the gas well, and Mr. Sananes admitted that as vacuum applied to a well increases, the ROI around a well will increase.[117] At a minimum, Mr. Sananes did not consider vacuum or cover from the factors Mr. Carlson identified, in using Mr. Carlson's ROIs to estimate how much gas was

---

[113] *Hathaway v. Bazany*, 507 F.3d 312, 318-319 (5th Cir. 2007) (excluding expert testimony because it was based on "extrapolation" based on "a number of supposed facts not in the record").
[114] Trial Transcript at 326:15-17; 327:3-5.
[115] Trial Transcript at 326:18-21.
[116] Deposition of Kris Carlson at 246:5-247:12; 255:1-257:7.
[117] Sananes Dep. at 60:21 – 61:17.

actually collected at the JPLF.[118] The drawings were "theoretical" because they were prepared for a different purpose. Mr. Carlson has testified – and Mr. Sananes has admitted – that the ROI drawings were created for the purpose of *designing* a landfill gas system, not for estimating emissions from the surface of a landfill.[119]

Mr. Sananes did not change the size of the circles in the draft drawing when he copied them into his report.[120] But he changed their meaning. A note on the draft drawing said that the ROI drawings represented two times the length of pipe that was blocked by water, but Mr. Sananes determined that they actually showed two times the pipe that was **not** blocked by water.[121] Mr. Sananes' only explanation for changing the meaning of the ROI drawings was that he had performed calculations by hand (which he did not show the Defendants).[122] In other words, he copied the circles from the draft Carlson report into his own report, and performed his own calculations by hand, from which he deduced they are the opposite of what the note in the Carlson draft report said they were.[123] Though Mr. Carlson confirmed in 2024 that the ROI drawings were meant to show two times the unblocked pipe in each well,[124] Mr. Sananes did not know that in January 2021 when he adapted the circles for his own use.

Expert opinion may be excluded when "an expert has extrapolated data, and there is 'too great an analytical gap between the data and the opinion proffered.'"[125] Mr. Sananes admitted that

---

[118] Trial Transcript at 335:23-336:11. Mr. Sananes did not change his opinions after reading Carlson's deposition. Sananes Dep. at 136:8-137:3 (April 10, 2024).

[119] Trial Transcript at 336:14-338:4. Notably, Mr. Sananes has never designed a landfill. *Id.* at 304:22-23.

[120] Trial Transcript at 327:11-13.

[121] Trial Transcript at 329:16-20. The draft report included a note saying that "The ROI shown is two times the liquid height which represents the amount of perforated pipe blocked." Carlson Dep. at 63:25-64:4 (discussing note 2 in Carlson's report); *see* Second Supplemental Rept., Ex. 11 (appending the figure from the Carlson report). Despite this note, Mr. Sananes used the ROI graphics to signify the opposite: the height of the pipe that had *no* liquid in it. Trial Transcript at 327:14-328:2.

[122] Trial Transcript at 328:3-10.

[123] Trial Transcript at 328:17-329:15.

[124] Carlson Dep. at 260:17 – 271:6.

[125] *Burleson*, 393 F.3d at 587 (quoting *Joiner*, 522 U.S. at 146).

the draft report depicted ROIs as circles even though ROIs in reality are not circles, explaining that the drawings are meant "to sort of simplify or visualize what those capture zones are like."[126] Mr. Carlson agreed in his deposition that the theoretical circles do not reflect the irregular zones where gas is actually captured, and that additional factors need to be considered to define the actual capture zone.[127] In addition, Mr. Sananes performed independent calculations of what the circles represented and concluded that the note on Carlson's drawing was an error, yet he never communicated with Carlson about anything, let alone the draft ROI drawings.[128]

Mr. Sananes' use of the draft ROI drawings violates the basic hallmarks of reliability identified in *Daubert*.[129] Mr. Sananes has never used this method to estimate an ROI before, nor to estimate emissions from a landfill surface.[130] His method is not generally accepted by regulatory agencies for the purpose of estimating emissions.[131] And he could not identify any studies that describe or support the method he used for Step 2.[132] His method extrapolates theoretical circles from a different engineer's draft drawing and puts them to a different use, without communicating with that engineer or otherwise ensuring that his extrapolation was accurate.

### 2. Mr. Sananes' Method Ignores the Existence and Effects of Cover

Landfill cover materials reduce emissions of gas from the landfill surface, and EPA requires landfill operators to account for the types and areas of cover in estimating a landfill gas system's collection efficiency. Mr. Sananes ignored evidence of cover materials at the JPLF,

---

[126] Trial Transcript at 327:6-9.
[127] Carlson Dep. at 260:17-261:6.
[128] Trial Transcript at 328:11-16.
[129] These hallmarks include peer review, general acceptance, and the known or potential error rate. *Daubert*, 509 U.S. at 593-94. The technique must also have "objective, independent validation." *Moore*, 151 F.3d at 276.
[130] Trial Transcript at 330:16-19. Likewise, he has never used this method to estimate emissions. *Id.* at 336:14-338:4.
[131] See discussion below of EPA method for estimating collection efficiency, at IV.B.3.
[132] Trial Transcript at 338:5-24.

deemed the effect of cover "negligible," and estimated his collection efficiency and landfill gas emissions as if there were no cover in place. Mr. Sananes' estimates of landfill gas emissions should not be presented to the jury because they do not use an accepted method and they omit the effects of relevant information.

The EPA requires landfill operators to report emissions of landfill gas every year, under the EPA's Greenhouse Gas Reporting Rule. As part of that rule, EPA requires that operators follow a process for estimating the collection efficiency of a landfill gas collection system.[133]   That process requires the operator to calculate the efficiency depending on areas with various types and thickness of cover and active gas collection systems. Mr. Sananes did not use this method in estimating his collection efficiency.[134]

Mr. Carlson, whose drawing is the basis for Mr. Sananes' collection efficiency calculations, agreed that the presence of cover will, in general, improve the performance of a landfill gas collection system and increase the size of ROIs around gas wells.[135] The Landfill prepared two summaries of the depth of cover soils, in November 2018 and July 2019. Mr. Sananes was aware of those summaries, and agreed that at least as of November 2018, most of the Landfill was covered with at least 12 inches of soil cover, which was the regulatory minimum, and that by July 2019 most of the Landfill was covered with at least 24 inches of soil cover.[136] But Mr. Sananes did not account for the presence of that cover in his estimates of collection efficiency or emissions, though those cover conditions were in place during his modeling timeframe.

### 3. Mr. Sananes' Methodology Ignores Every Available Source of Data Actually Measuring Gas Levels.

---

[133] 40 C.F.R. § 98.343(c), Table HH-3.
[134] Sananes Dep. at 129:10 – 130:9.
[135] Carlson Dep. at 254:14-257:7.
[136] Sananes Dep. at 139:7-146:10.

An expert's testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known," *Daubert*, 509 U.S. at 590, and should not rely on "too great an analytical gap between the data and the opinion proffered."[137] Mr. Sananes did not attempt to validate his emissions estimates against voluminous available data. The Court should exclude Mr. Sananes' opinions on H2S emissions because the lack of validation demonstrates that his estimates are not "more likely than not" reliable.

Mr. Sananes estimated how much gas was emitted out of the Landfill, but he did not use or consider any of the sources of data that actually measured gases at the Landfill. To calculate the emissions, Mr. Sananes used his estimates from Step 1 and Step 2. He multiplied his inflated estimate of the amount of gas generated inside the Landfill by his estimated collection efficiency percentage, and he then subtracted that "collected" percentage from his total estimate of gas generation. As discussed above, the methodologies he used in Step 1 and Step 2 did not utilize any actual data measuring concentrations of gases at the landfill surface or in ambient air.

Instead, Mr. Sananes' steps relied on theoretical assumptions, based in part on measurements of liquid levels from within wells (in Step 1). Yet Mr. Sananes admitted that he did not use any of the sources of data on surface emissions of gas in preparing his estimates, and the only data he incorporated into his model were liquid depths in the gas wells as applied to records of total waste volumes.[138]

Moreover, after estimating emissions from the Landfill into the ambient air in Step 3, Mr. Sananes did not validate his results by comparing his calculations to the data measuring any actual gas emissions. This was not due to a lack of data. This was by choice. Copious emissions data is available from multiple sources. He did not compare his estimate to data in the reports from SCS

---

[137] *Burleson*, 393 F.3d at 587 (quoting *Joiner*, 522 U.S. at 146); *Moore*, 151 F.3d at 276.
[138] Trial Transcript at 341:5-19.

Engineers, in Carlson's draft report, or from the Landfill's quarterly emissions monitoring.[139] Mr. Sananes helped direct a five-day on-site sampling event during the week of November 4, 2019.[140] The Defendants took parallel samples and measurements during the site investigation, and they provided the data from that investigation to Mr. Sananes.[141] Mr. Sananes did not use any of that data to validate or corroborate his emissions estimates, even though his estimates covered the same times and locations as the measurements.

His failure to validate his emissions estimates with actual emissions data was critical here because his methodology ignored factors that decrease emissions and assumed that all of the gas generated outside of his theoretical ROIs was emitted to the atmosphere.[142] Nevertheless, Mr. Sananes claimed he cannot define the rate of error of his method "because we have no actuals."[143] Even worse, he knew that surface concentrations of H2S were measured many times during his modeling period.[144] Overall, Mr. Sananes admitted that he ignored all sources of surface data and solely relied on measurements within the gas wells:

> Q. I guess what I'm asking is: You didn't use any of that surface sampling data to corroborate your estimate of emissions from the landfill, did you?

[139] Trial Transcript at 339:25-340:25.
[140] Trial Transcript at 339:7-15.
[141] Trial Transcript at 339:21-24.
[142] Mr. Sananes assumed that **all** of the gas generated outside of the ROIs escaped through the surface of the landfill. Trial Transcript at 331:16-332:8. This decision completely ignored the major factors that decrease emissions: the cover placed over the waste (*id.* at 335:23-336:11) and the horizontal movement of gas (*id.* at 334:9-335:12). This choice is not "supported by appropriate validation." *Daubert*, 509 U.S. at 590. Mr. Sananes acknowledged that compaction will increase the density of waste (Trial Transcript at 335:13-15) and that more waste added to the landfill will increase the density of the waste (*id.* at 335:16-19). Mr. Sananes ignored the horizontal movement of gas on the basis that (1) it cannot easily be quantified, (2) materials are torn through the compaction equipment, and (3) the covers would not provide much of a barrier. *Id.* at 334:9-335:12. These naked assertions are not "derived by the scientific method." *Daubert*, 509 U.S. at 590. By ignoring the factors that decrease emissions, Mr. Sananes did not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.
[143] Trial Transcript at 338:25-339:2.
[144] Trial Transcript at 339:3-6.

A. No, we did not look at that surface emission data. Again, one -- **we did not look at that surface emission data**.

Q. And you did not use the results of that surface sampling data in your modeling; right?

A. No. The model looked at -- **the only data that was incorporated into the model were the hydrogen sulfide concentrations measured in the gas wells**.

Q. And that's through the process that you described earlier where you tell the model what percent of H$_2$S it should assume the total generation includes; right?

A. Right. It tells the proportion of hydrogen sulfide in the total gas that the model will define.[145]

Mr. Sananes purports to estimate airborne emissions, but he did not utilize any actual data collected in the air. Because his emissions estimate is not based on any emissions data, it lacks "'good grounds,' based on what is known."[146] An expert attempting to estimate airborne emissions should utilize data measuring "the amounts of chemicals or substances actually released into the air" and cannot use inputs that differ from the "actual emissions."[147] Exposure modeling is inadmissible when it is based on assumptions "not supported in the evidence."[148] This Court and Judge Vance have both ruled that toxic tort opinions were inadmissible for failure to utilize the

---

[145] Trial Transcript at 341:5-19.

[146] *Daubert*, 509 U.S. at 590.

[147] *Sadler v. Int'l Paper Co*., No. 09-1254, 2014 WL 4925178, at *5 (W.D. La. Sept. 30, 2014) (unreliable for air modeling expert and environmental scientist to base their opinions on emission levels that "did not show the amounts of chemicals or substances actually released into the air" but instead merely showed permitted emission levels, where "the actual emissions were lower than the permitted emissions").

[148] *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 791-92 (S.D. Tex. 2000) (exposure modeling was based on assumptions "not supported in the evidence") ("The fact that Dr. Rose's modeling calculations resulted in an estimated level of benzene exposure that would have resulted in simultaneous gasoline exposure at an explosive, if not lethally toxic, level underscores the unreliability of his selected methods.").

exposure data that was available.[149] A toxic tort opinion based upon "incomplete or grossly inaccurate dosage or duration data" should be excluded.[150]

Even worse, he did not even attempt to validate his modeling by comparing it to the actual air measurements collected by multiple sources. That failure also renders his report unreliable. *Daubert* requires "objective, independent validation."[151] Yet his methodology relied on extrapolations and assumptions.[152] His failure to validate his estimates with actual emissions data is a critical flaw because the Fifth Circuit demands accurate data of the plaintiff's level of exposure to prove specific causation.[153]

### C.    The Court Should Exclude Mr. Sananes' Emissions Estimate under Rule 403 Because it Risks "Confusing The Issues" and "Misleading The Jury."

---

[149] *Harrison*, 2022 WL 2390733, at *7 (Morgan, J.) (expert failed to utilize the "massive quantity of high-quality environmental data" available); *Burst*, 104 F. Supp. 3d at 781 (Vance, J.) (expert "made his calculations in a vacuum without any attempt to validate his results against reality.").

[150] *Christophersen*, 939 F.2d at 1114. *See also Allen,* 102 F.3d at 195 (affirming the exclusion of expert testimony on causation because there was no evidence of the level of exposure); *Moore*, 151 F.3d at 278 (concluding that because expert had no accurate information on the level of the plaintiff's exposure, he had no support for his theory that the level of chemicals to which the plaintiff had been exposed caused the plaintiff's symptoms); *Thompson*, 809 F.2d at 1169 (expert had "insufficient factual basis" where expert did not have "any knowledge about the amount or duration of [the plaintiff's] exposure."); *Reference Manual* at 661 ("An opinion on causation . . . should offer an opinion about whether the dose to which the plaintiff was exposed is sufficient to cause the disease.").

[151] *Daubert* considers "the facts underlying the expert's opinion." *Knight*, 482 F.3d at 355. The expert's opinions "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. This requires "objective, independent validation." *Moore*, 151 F.3d at 276.

[152] *Moore*, 547 Fed. Appx. at 516 (exposure assessment was based on erroneous and unsupported assumptions).

[153] *Christophersen*, 939 F.2d at 1114 (specific causation opinion based upon "incomplete or grossly inaccurate dosage or duration data" is inadmissible); *Allen,* 102 F.3d at 195 (affirming the exclusion of expert testimony on causation because there was no evidence of the level of exposure); *Moore*, 151 F.3d at 278 (concluding that because expert had no accurate information on the level of the plaintiff's exposure, he had no support for his theory that the level of chemicals to which the plaintiff had been exposed caused the plaintiff's symptoms); *Thompson*, 809 F.2d at 1169 (expert had "insufficient factual basis" where expert did not have "any knowledge about the amount or duration of [the plaintiff's] exposure."). *Harrison v. BP Expl. & Prod.*, No. 17-4346, 2022 WL 2390733, at *7 (E.D. La. July 1, 2022) (Morgan, J.) (expert failed to utilize the "massive quantity of high-quality environmental data" available); *Burst v. Shell Oil Co*., 104 F. Supp. 3d 773, 781 (E.D. La. 2015) (Vance, J.) (expert "made his calculations in a vacuum without any attempt to validate his results against reality.").

Courts should exclude proffered expert opinions that risk "confusing the issues" or "misleading the jury."[154] Mr. Sananes' methodology omits consideration of complex facts and dynamics that are not obvious to a layman, but that are addressed by accepted methods to reach reliable results. Unlike a bench trial such as the general causation hearing in this case, where the litigants can trust the trial judge to filter out junk science, a jury cannot be relied on to understand the difference. Rule 702 relies on the Court to protect juries from methods made up for litigation that are designed to confuse at best and, at worst, mislead.

Expert testimony based on highly technical modeling risks confusing the jury when the model does not reflect the facts of the case: "Normally, the truth regarding differences in models and demonstrations surfaces with vigorous cross-examination; however, where technical information is involved, it is easier for the jury to get lost in the labyrinth of concepts."[155] That risk is undoubtedly present here because Mr. Sananes used extrapolations and assumptions in every step of his methodology, while omitting evidence and factors that did not support his goal.[156] His opinions lack a substantial connection to the available facts and data, and he failed to validate his estimates by comparing his results to the emissions data actually gathered from the Landfill site.[157]

---

[154] *Daubert*, 509 U.S. at 595; Fed. R. Evid. 403.

[155] *Guillory v. Domtar Industries Inc*., 95 F.3d 1320, 1330-31 (5th Cir. 1996) (affirming trial court's decision to limit expert's testimony in a products liability case involving a forklift accident where the expert used a highly technical model that differed significantly from the actual accident at issue, which risked confusing the jury).

[156] *Moore*, 547 Fed. Appx. at 516 (exposure opinion was based on erroneous and unsupported assumptions). *See also Thompson*, 809 F.2d at 1169 (noting a lack of expert evidence to support causation, in part, because plaintiffs' expert focused on alleged exposure at locations other than plaintiff's location); *McGill*, 830 Fed. Appx. at 432-33 (expert failed to analyze the plaintiff's workspace to evaluate exposure level).

[157] *Christophersen*, 939 F.2d at 1114 (specific causation opinion based upon "incomplete or grossly inaccurate dosage or duration data" is inadmissible); *Allen,* 102 F.3d at 195 (affirming the exclusion of expert testimony on causation because there was no evidence of the level of exposure); *Moore*, 151 F.3d at 278 (concluding that because expert had no accurate information on the level of the plaintiff's exposure, he had no support for his theory that the level of chemicals to which the plaintiff had been exposed caused the plaintiff's symptoms); *Thompson*, 809 F.2d at 1169 (expert had "insufficient factual basis" where expert did not have "any knowledge about the amount or duration of [the plaintiff's] exposure."); *Reference Manual* at 661 ("An opinion on causation . . . should offer an opinion about whether the dose to which the

His purported emissions estimates therefore risk "confusing the issues" and "misleading the jury."[158]

The risk of confusion is even more urgent because Mr. Sananes has layered made-up methods on top of each other. As discussed above, he used methods that have never been published, that he has never seen anyone else use, and that he himself has never used before, including his newly made-up alternatives to EPA protocols. Untested methods may have a place in experimentation outside of the courtroom, but as Judge Africk recognized, "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it."[159]

## V.   CONCLUSION

Mr. Sananes' made-up methodology is subject to compounding errors and unsupported assumptions at every step, each one of which independently renders his emissions estimate inadmissible. He deviated from established EPA protocols by inventing alternative methodologies to estimate landfill gas generation and emissions. Mr. Sananes generated an emissions estimate using a novel methodology that did not utilize any of the available emissions data, including data he collected, and he failed to validate his results by comparing them to the actual emissions data. His modeling bears all the marks of opinions developed for the first time in litigation, for the express purpose of testifying. The Court should exclude his testimony as it is not "more likely than not" reliable.

---

[158] plaintiff was exposed is sufficient to cause the disease."); *Harrison*, 2022 WL 2390733, at *7 (Morgan, J.) (expert failed to utilize the "massive quantity of high-quality environmental data" available); *Burst*, 104 F. Supp. 3d at 781 (Vance, J.) (expert "made his calculations in a vacuum without any attempt to validate his results against reality.").
[158] *Daubert*, 509 U.S. at 595; Fed. R. Evid. 403.
[159] *Ruffin v. BP Expl. & Prod.*, No. 20-334, 2023 WL 7271087, at *4 (E.D. La. Oct. 31, 2023) (Africk, J.) (quoting *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1203 (11th Cir. 2010).

Respectfully submitted,

LISKOW & LEWIS, APLC

By:    /s/ Michael C. Mims
         Michael Cash (#31655)
         Cherrell Simms Taplin (#28227)
         Michael C. Mims (#33991)
         Brady M. Hadden (#37708)
         J. Hunter Curtis (#39150)
         Alex Andrade (#38659)
         701 Poydras Street, Suite 5000
         New Orleans, LA 70139
         Telephone: (504) 581-7979
         Telefax: (504) 556-4108


         BEVERIDGE & DIAMOND, P.C.

         Megan R. Brillault (*pro hac vice*)
         Michael G. Murphy (*pro hac vice*)
         John H. Paul (*pro hac vice*)
         Katelyn E. Ciolino (*pro hac vice*)
         Katrina M. Krebs (*pro hac vice*)
         825 Third Avenue, 16th Floor
         New York, NY 10022
         (212) 702-5400

         James B. Slaughter (*pro hac vice*)
         1900 N Street, NW, Suite 100
         Washington, DC 20036
         (202) 789-6000

         Michael F. Vitris (*pro hac vice*)
         400 W. 15th Street, Suite 1410
         Austin, TX 78701
         (512) 391-8035

         *Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

CONNICK AND CONNICK, LLC

By:     /s/ Michael S. Futrell
         William P. Connick, La. Bar No. 14158
         Michael S. Futrell, La. Bar No. 20819
         Matthew D. Moghis, La. Bar No. 33994
         Anya M. Jones, La. Bar No. 36923
         3421 N. Causeway Blvd., Suite 408
         Metairie, Louisiana 70002
         Telephone: (504) 681-6658
         Facsimile: (504) 838-9903
         E-mail: moghis@connicklaw.com

         *Counsel for Defendant Jefferson Parish*


GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:     /s/ J. Michael DiGiglia
         Ernest P. Gieger, Jr. (6154)
         John E. W. Baay (22928)
         J. Michael DiGiglia (24378)
         Nicholas S. Bergeron (37585)
         Blaise Chadwick Hill (*pro hac vice*)
         Gieger, Laborde & Laperouse, L.L.C.
         Hancock Whitney Center
         701 Poydras Street, Suite 4800
         New Orleans, Louisiana 70139
         Telephone: (504) 561-0400
         Facsimile: (504) 561-1011

         *Attorneys for Defendant Aptim Corp.*

31

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that the foregoing was electronically filed on June 6, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Michael C. Mims
Michael C. Mims
