1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2          CIVIL ACTION NO.  18-7889, C/W 18-8071,
                              18-8218, 18-9312
3          CIVIL ACTION NO.  19-11133, C/W 19-14512
   - - - - - - - - - - - - - - - -
4  ELIAS JORGE "GEORGE"
   ICTECH-BENDECK,
5       Plaintiff,               DEPOSITION OF:
        vs.                  JOSE SANANES SANGROS
6  WASTE CONNECTIONS BAYOU,
   INC., ET AL.,
7       Defendants.
8

   RELATED CASE:
9  FREDERICK ADDISON, ET AL.,
        Plaintiffs,
10      vs.
   LOUISIANA REGIONAL LANDFILL
11 COMPANY, ET AL.,
        Defendants.
12 - - - - - - - - - - - - - - - -
13
14
15          TRANSCRIPT of the stenographic notes of
16 the proceedings in the above-entitled matter as
17 taken by and before RUTHANNE UNGERLEIDER, a
18 Certified Court Reporter and Notary Public of the
19 State of New Jersey, held at the office of RAMBOLL,
20 101 Carnegie Center Drive, Princeton, New Jersey, on
21 Wednesday, April 10, 2024, commencing at
22 approximately 10:13 in the forenoon.
23
24
25

```
                                           Page 2

 1   A P P E A R A N C E S:
 2
     BRUCE BETZER LAW OFFICE
 3   3129 Bore Street
     Metairie, Louisianna  70001
 4       BY:  BRUCE C. BETZER, ESQ.
     Attorneys for Ictech-Bendeck Plaintiffs
 5
     MARTZELL BICKFORD & CENTOLA
 6   338 Lafayette Street
     New Orleans, Louisiana  70130
 7       BY:  JASON Z. LANDRY, ESQ.
     Attorneys for Ictech-Bendeck Plaintiffs
 8
     WHITEFORD TAYLOR PRESTON LLP
 9   1800 M Street NW, Ste. 450N
     Washington, DC  20036
10       BY:  C. ALLEN FOSTER, ESQ.
              ERIC ROWE, ESQ.
11   Attorneys for Addison Plaintiffs
12
     BEVERIDGE & DIAMOND
13   825 Third Avenue, 16th Floor
     New York, New York  10022
14       BY:  JOHN H. PAUL, ESQ.
     Attorneys for Waste Connections Defendants
15
     CONNICK & CONNICK
16   3421 North Causeway Boulevard, St. 408
     Metaire, Louisianna  70002
17       BY:  MICHAEL S. FUTRELL, ESQ.
              MATTHEW D. MOGHIS, ESQ.
18   Attorneys for Parish of Jefferson
19
     GIEGER LABORDE & LAPEROUSE, LLC
20   701 Poydras Street, Ste. 4800
     New Orleans, Louisiana  70139
21       BY:  MICHAEL DiGIGLIA, ESQ.
     Attorneys for APTIM Corporation
22
23   ALSO PRESENT:
     Matt Stutz, Defendant Expert
24   Ali Hashimi, Waste Connections Expert
     Alan Paller, Videographer
25
```

```
                                             Page 60
```

1   into the well because that will be the path of least

2   resistance.  So gas will go, just like water, where

3   it's easier to go.

4        Q     You mentioned that the radius of

5   influence could be amorphous, and you mentioned

6   transmissivity of the waste media, right?

7        A     Uh-huh.

8        Q     Does vacuum have an effect on that?

9        A     It -- it has -- vacuum has an effect on

10  where gas can -- where gas -- vacuum affects where

11  the gas is going to be pulled into.

12              So, by pressure differences, gas will go

13  from an area of -- in case of a vacuum -- high

14  pressure to low pressure and balance and move into

15  that -- into that well.

16              The gas -- the vacuum itself is not

17  going to change the transmissivity unless the

18  materials get dislodged.  You know, you're just

19  working with the -- a void space that exists within

20  the waste media.

21       Q     So all other things being equal, if you

22  increase the vacuum on a gas well, could the radius

23  of influence increase?

24       A     Up to a point.  Up to the point of you

25  now introducing atmospheric air because you're

```
                                            Page 61
 1    essentially short-circuiting the gas well.
 2               Right.
 3               The gas well ideally is pulling from the
 4    waste media and should not be pulling anything from
 5    atmospheric air.  If you pull too hard, I think some
 6    of your experts have alluded to this as well, you
 7    know, you'll start introducing atmospheric air, which
 8    is an undesirable condition.
 9               But, you know, if you have an infinite
10    cover, yes, the more vacuum applied, you know, the
11    further out you should be able to go, you know, if
12    none of the other factors play -- have a play.
13        Q     And before the point at which a radius
14    of influence starts pulling atmospheric air through
15    the cover, if you increase vacuum, the radius of
16    influence will increase, right?
17        A     Yes.
18        Q     So I'd like to look at section 6.5.  We
19    will -- this is a summary of your opinions that are
20    stated later in the report, but we'll look at this
21    now and then look in more detail later.
22               This is the first time in this case that
23    you have articulated standards of care that apply to
24    the Defendants in this case, is that right?
25        A     Yes.
```

1    use methods that are based on the system -- the

2    collection system's coverage to define what the

3    collection efficiency is.

4         Q     And so in paragraph 141 you're saying

5    the collection efficiency was defined as function of

6    the collection system coverage as recommended by

7    USEPA?

8         A     Yeah, that's sort of what I was just

9    saying.

10        Q     But you did not use the method specified

11   under the current greenhouse gas reporting rule, did

12   you?

13        A     If you mean assigning a fixed percentage

14   based on the type of -- whether a system is in place

15   and there's -- certain type of cover system in place,

16   no, we did not use that precisely as described, but

17   it wouldn't fit the definitions that we're dealing

18   with here.

19              Those guidelines are for landfills where

20   your control systems are operating properly, where

21   you don't have issues -- leachate accumulating and

22   affecting your gas collection system, so then you can

23   apply those general rules.

24              It's developed under -- the

25   understanding is that they're developed under certain

1    assumptions, you know, it's not just I have a gas

2    system, is the gas system running.  You assume yes,

3    it's running, and that it's running properly.  Yes,

4    it's running properly.

5             So, again, given that those conditions

6    did not really -- sorry -- the site conditions didn't

7    really fit those assumptions, given the leachate

8    levels, those guidelines were looked at, but at the

9    end they didn't really apply like one would hope.

10       Q    Are those assumptions spelled out in

11   EPA's greenhouse gas reporting rule?

12       A    No, but if you're going to tell me

13   because I put a well somewhere, I put no vacuum on it

14   and I call it a gas collection system, I can apply a

15   75 percent collection efficiency, then I would

16   question that.

17             It doesn't say that you cannot do that,

18   but somebody with some common sense would say, "Yeah,

19   that is probably not what it intends to say."

20       Q    Is that common sense or engineering

21   judgment?

22       A    Call it whatever you want.  To me, it

23   seems like it's common sense, but I'm an engineer, so

24   maybe it's both.

25       Q    The extent of a radius of influence from

                                           Page 136

1    do not see reference to the deposition of Chris

2    Carlson.

3              Should these references be amended?

4        A    Well, I mean, to the extent that the --

5    that that testimony -- or that deposition is

6    referenced in this document, then it should be

7    included in these references.

8        Q    Did you account for anything you read in

9    that deposition in this report?

10       A    I -- I don't think so.

11             What I was primarily looking at was

12   discussion -- there was some question related to the

13   ROI piece and maybe the selection -- I forget what

14   else.

15             I don't know -- if it's not referenced

16   in this document, it would not have been -- sorry --

17   yeah, if it's not referenced in the text of this

18   report, it would not be included in the references.

19             There may have been a document that I

20   looked at that I didn't rely on to make any type of

21   opinion.  Like that, there's hundreds.  You know, the

22   boring logs that we talked about earlier, you know,

23   we looked at those, and they're not listed anywhere

24   either.

25       Q    So after reviewing Mr. Carlson's

Page 137

```
 1    deposition transcript, or pieces of it, you did not
 2    change any of your opinions?
 3         A     No.
 4         Q     I'd like to look back at your second
 5    supplemental report.
 6               Looking now at paragraph 150.
 7               And 150(b), you write, "During my visit
 8    to the site, the materials used for cover appeared to
 9    be largely sand soils and some silt material."
10               Am I correct in assuming that that does
11    not refer to any visit of yours to the site?
12         A     No, that refers to Nester Soler's visit
13    in 2019 as part of the sampling.
14               Like we said before, this -- this part
15    of the report is mostly repetition of or a summary of
16    the prior two reports, consolidating information, and
17    that may be a transcription issue, because I was not
18    at the site.
19         Q     But the last part of this paragraph
20    seems to be new.  You state that, "For these
21    reasons," listed above, "attenuation of emissions,"
22    and I'll say that's through the cover, "was
23    considered negligible."
24               Is that a fair reading of that sentence?
25         A     Yeah.
```

```
                                                    Page 139
 1    opinion.
 2                    If there's something else that --
 3    documents that I have not seen that information put
 4    forward in -- in any of your expert reports that
 5    would have argued about, for instance, the adequacy
 6    of the cover system.
 7         Q      I'm showing you what we will mark as
 8    Exhibit 1537.
 9                    (Whereupon Document Bates-stamped
10    WC_JPLF_00487559 is received and marked as Exhibit
11    1537 for identification.)
12         Q      This is a 2018 Interim Compacted Cover
13    Thickness Investigation Log prepared by Sigma.  It
14    has Bates number WC_JPLF_00487559.
15                    Have you seen this document before?
16         A      I have.
17         Q      Why didn't you list it in that paragraph
18    we were just looking at?
19         A      Well, I looked at this one.  There is
20    another one that I think is from July or so that
21    shows conditions before all this was remedied,
22    similar -- similar figure, except, again, I cannot
23    see this very well.
24         Q      I can expand it.
25         A      You know, I think this one is about five
```

```
 1   months after all the issues on the cover were
 2   identified and, you know, shows that they were
 3   rectified and, you know, that everything conforms,
 4   and there's some areas that have excess cap material
 5   in place.
 6        Q     So just based on your recollection, and
 7   I don't mean this question to be unfair, you
 8   understand this figure to represent cover conditions
 9   after they were fixed?
10        A     This would have been the conditions in
11   November of whatever it was -- 2019 or '18.
12        Q     That's 2018.
13        A     '18.
14              But, again, the way that this was looked
15   at is looking at a condition that was identified on
16   that prior figure that I referred that maybe was July
17   of the same year.  You're talking about a lapse of
18   four to five months before conditions were rectified
19   on this cover.
20        Q     So I would like to introduce another
21   exhibit.  It will be numbered 1538.
22              This is an exhibit prepared by Fourrier
23   Engineers.  Bates-stamped WC_JPLF_00410195.
24              (Whereupon Document Bates-stamped
25   WC_JPLF_00410195 is received and marked as Exhibit
```

                                        Page 141

 1   1538 for identification.)

 2       Q       I'll expand this document as well.

 3               This was prepared in July 2019.

 4               Do you see that?

 5       A       Uh-huh.

 6       Q       So is it possible this is the document

 7   you were thinking of as the post- -- the document

 8   prepared after cover was added to the surface?

 9       A       Right.

10               It may be.

11               Maybe I got my dates mixed.  But

12   essentially one of the documents were showing

13   deficiencies in the cover system and the second

14   showing how those were addressed.

15       Q       So if we -- sorry, I'm wrestling with

16   the sharing system here.

17               All right.

18               Let me take us back to the first

19   document I showed you.

20               So this is the November 2018 document

21   that we're looking at here.

22               You reviewed this before.

23               What do you understand it to be?

24       A       Yeah, this is just -- the way that I

25   understood this to be, and it's essentially, if you

Page 142

```
1    look at the fourth, fifth and sixth column, the two
2    that precede the highlighted column, the first of
3    those list what is the thickness that's required, the
4    second lists what's observed, and anything that's --
5    the difference between those two is represented in
6    the color-coded column.  Anything that's yellow is
7    deficient, it doesn't meet the cover thickness
8    requirement.  Everything that's green is good.  And I
9    think there was another color at the bottom, I can't
10   recall, but I think it just dealt with phases that
11   maybe were not being constructed or whatnot.  But
12   ultimately that's what this table shows.
13                 So what you want to see, or the way that
14   I read this is, that highlighted column, if it's all
15   green, it's all good; if it's all yellow, it's not
16   good, and there's a lot of yellow on this page.
17         Q     What was the requirement that this
18   figure is assessing?
19         A     24-inch.  It's an interim cover.
20         Q     And what is the 24-inch depth required
21   for?
22         A     That is for some -- for areas that are
23   not going to be receiving waste for a certain amount
24   of time.
25         Q     Is that the minimum required depth?
```

1        A       No, there's the other requirement for a

2   12-inch cap, whether it's compacted or not.

3        Q       And what's the difference between those

4   two requirements?

5        A       The level of -- one is going to be

6   compacted and the other one is not.

7        Q       What I mean is, what is the regulatory

8   distinction between 12 inches of cover and 24 inches

9   of cover?

10       A       If I recall correctly, it has to do with

11  the time that it's going to take or that's

12  anticipated it will take to come back and re-open

13  that area to, you know, proceed with fill.

14       Q       So what's the 12-inch requirement?

15       A       I'm sorry?

16       Q       When is the 12 inches of interim cover

17  required?

18       A       Yeah, I need to look at the specifics of

19  that rule, but, again, from what I recall, is

20  12 inches would be required if it's anticipated that

21  filling operations in that area will resume within a

22  certain amount of time, and I forget how many months

23  that is.  If it exceeds that amount, then the cover

24  would -- would be -- the cover thickness would be

25  increased.

Page 144

1          But I would need to look at the
2   specifics of that rule.
3      Q       Before we leave this document, this is
4   the 2018 document.  You'll notice in the column
5   titled "Thickness of Cover Observed" -- that's where
6   my cursor is hovering.
7      A       Yep.
8      Q       Are you able to read those figures?
9      A       Yeah.
10     Q       It looks to me like they are almost all
11  12 inches or greater.
12          Does that seem correct?
13     A       Yeah, there's a lot of -- yeah, most are
14  12 inches or greater, yeah.
15     Q       And then to look at the second figure
16  that we looked at, this one was prepared in
17  July 2019.  Here we have subsequent assessment, and
18  if you could read that same -- the equivalent column,
19  "Thickness of Cover Observed," here we have, again,
20  pretty much all more than 12, right?
21     A       They're all more than 12, you know, but,
22  again, it's highlighting that they were aiming for a
23  total thickness of so much, 24 in most cases, and --
24  and certainly an improvement because a lot of the
25  deficiencies with respect to that goal are a lot

Page 145

1    smaller.  Most of them are single digit shortages.

2         Q      So as late as November 2018 there was a

3    foot of cover over most of Phase IV(A), is that a

4    fair way to summarize that first document that we

5    looked at?

6         A      Can you zoom out?

7         Q      Sure.

8                This is the -- this is the 2019

9    document.

10               I don't mean to confuse you.

11        A      No, no, that's fine.  I would need to

12   just see -- what I don't see here, what the cell

13   limits are for the cells that were active at the

14   time.  Because this is using a different grid system.

15               You know, it makes sense for the purpose

16   of cap thickness verification.

17        Q      At least in the first document -- I

18   don't mean to keep snapping this on and off, it just

19   won't let me change documents without doing it.

20               So as of -- this is the November 2018

21   figure.  You'll agree with me, won't you, that at

22   least as of November 2018 most of the locations shown

23   on this survey were covered with at least a foot of

24   interim cover, is that correct?

25        A      Yeah.

1      Q      And if we take a look at paragraph 150,

2   it reads, "In fact, available documentation indicate

3   that the materials used for soil cover would provide

4   negligible LFG attenuation, if any."

5             Do you see that?

6      A      Yep.

7      Q      And this list of materials here does not

8   list either of those two cover thickness evaluation

9   reports that we just looked at, does it?

10     A      It does not.

11     Q      What was your reasoning for omitting

12  those two from this paragraph?

13     A      What we're looking at here is the

14  totality of the data, and, yeah, things eventually

15  got taken care of, but what you see is, and even from

16  our site visit, we observed certain materials being

17  used for daily cover and other purposes, testimony

18  indicating that the cover was inadequate.  LDEQ

19  inspection reports and other site inspection reports

20  indicating that the cover system was deficient in one

21  way or the other.

22             We have plenty of photographic evidence

23  showing, and that has been included in two reports

24  right now, showing what the conditions of the cover

25  system were.

Page 263

1           C E R T I F I C A T E

2

3           I, RUTHANNE UNGERLEIDER, a Certified Court

4    Reporter and Notary Public of the State of New

5    Jersey, certify that the foregoing is a true and

6    accurate transcript of the stenographic notes of the

7    deposition of said witness who was first duly sworn

8    by me, on the date and place hereinbefore set forth.

9           I FURTHER CERTIFY that I am neither

10   attorney, nor counsel for, nor related to or

11   employed by, any of the parties to the action in

12   which this deposition was taken, and further that I

13   am not a relative or employee of any attorney or

14   counsel in this case, nor am I financially

15   interested in this case.

16

17

18

19

20   _____

     RUTHANNE UNGERLEIDER, C.C.R., C.R.R.

21   LICENSE NO. XIO1634, XIO0115

22

23

24

25