Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FREDERICK ADDISON, ET AL., | CIVIL ACTION NO. 19-11133, |
| VS. | C/W 19-14512 |
| LOUISIANA REGIONAL LANDFILL COMPANY, ET AL. | SECTION: "E"(5) |
| | JUDGE: MORGAN |
| | MAGISTRATE JUDGE: NORTH |

The remote videotaped deposition of SUSAN SCHIFFMAN, PH.D., appearing from Durham, North Carolina taken in connection with the captioned cause pursuant to the following stipulations before RITA A. DEROUEN, Certified Court Reporter, on the 26th of April, 2024, beginning at 11:05 a.m. Eastern Time.

EXHIBIT C

1  it at, right?
2       A.   Right.
3       Q.   Okay.  And so unless you know what that
4  threshold is numerically, you're just assuming
5  that Mr. Lape's modeling at 5 parts per billion is
6  an exposure that they can smell?
7       A.   Correct.
8            MR. FOSTER:
9                 Objection to the form.
10  BY MS. BRILLAULT:
11      Q.   I think you just mentioned that -- I'm not
12  going to start it that way, let me strike it.
13           Your opinions rely on plaintiffs providing
14  accurate and truthful accounts of their
15  experiences; do you agree with that?
16      A.   Say that again.
17      Q.   Your opinions in this case rely on
18  plaintiffs providing accurate and truthful
19  accounts of their experiences?
20      A.   Correct.
21      Q.   Did you question the accuracy or
22  truthfulness of any information that was provided
23  by plaintiffs in their discovery responses, their
24  fact sheets, or their deposition testimony?
25      A.   I assume it's correct.

1   A.   Odor and whether the people could have
2   suffered the complaints that they have and whether
3   it came from Jefferson Parish Landfill.
4   Q.   Odor, whether they could have suffered the
5   complaints they had, and whether the odors came
6   from Jefferson Parish Landfill.
7        Are you providing any opinions on whether
8   the individuals did, in fact, suffer injuries from
9   odors from Jefferson Parish Landfill?
10  A.   That each individual?
11  Q.   Correct.  For each individual of the 13
12  trial plaintiffs.
13  A.   I didn't -- I did not -- those were
14  decisions that were made by others, okay?  I'm
15  just saying what the mechanism would be given that
16  those are the complaints.
17  Q.   So your opinion goes more towards whether
18  it's capable of causing those injuries, not
19  whether it actually did cause those injuries of
20  the trial plaintiffs?
21       MR. FOSTER:
22            Objection to the form.
23  A.   See, I don't -- my work as a medical
24  psychologist has taught me to listen to patients.
25  If they say they have a headache, they have a

1  headache, okay?

2  And whether -- and they said that they got
3  it at the time that this odor came in and that
4  they had an eye irritation, et cetera, et cetera,
5  I listen to that.  Otherwise, you can't solve
6  patients' problems.

7  So from my point of view, from reading
8  what I read, I do believe that these people had
9  these types of symptoms.  But was I there when
10 they had the symptoms?  I wasn't.  I'm just saying
11 that it's highly likely that this is the cause.
12 BY MS. BRILLAULT:
13     Q.  And your opinion that it's highly
14 likely -- "this" meaning the Jefferson Parish
15 Landfill odors are the cause of their injuries --
16 was made looking solely at the Jefferson Parish
17 Landfill and not looking at other sources or other
18 confounding factors?
19          MR. FOSTER:
20              Objection to the form.
21     A.  But we have to go back to LDEQ again,
22 which is that they said that that is the main
23 source.  So that is -- dismissing the amount of
24 work that LDEQ tried to -- I mean, I have to
25 applaud them for the amount of effort they put in,

Page 124

1  seeing a health professional and, if so, whether
2  he saw a health professional more often during the
3  time that he was experiencing odors?
4        A.   I did not look at that.
5            MR. FOSTER:
6                Objection to the form.
7        A.   However, I would also like to say that
8  over the years this is a very common complaint
9  that I've heard, how it ruined intimate
10 relationships.
11           Sexual dysfunction is something I've heard
12 many times, okay?  So this is not out of the
13 ordinary of something that I've heard with regard
14 to unpleasant smells coming into the room.  And
15 one only needs to look at your local law with all
16 the fragrance places, you know, with -- and sexy
17 photos, how this is perfect for you to know that
18 smell is an important function with regard to
19 intimate relationships.
20 BY MS. BRILLAULT:
21      Q.   And in your prior experiences that you
22 were saying that it impacts intimacy in your
23 relationships, was that at a level of 5 parts per
24 billion of hydrogen sulfide?
25      A.   If you can smell it, it's a problem.

1  some of that is going to be in his house, okay?
2  Now, whether it's above 5 ppb, I don't know, or
3  whether it's accumulating, don't know.
4      Q. But you also are assuming, at some point,
5  he's going to return to his house within a day or
6  two; is that fair?
7      A. I don't know anything about Mr. Tate. He
8  may have a girlfriend on the other side of town,
9  okay? Other than the fact of what I read, okay?
10      The point of the matter is, is that this
11  is a community -- it stems from the original -- my
12  original report. This is a community that has
13  been exposed to malodor -- a malodor assault over
14  a two-and-a-half-year period.
15      It interfered with people's lives, their
16  health, and all kinds of other -- certainly
17  anxiety and worry due to a problem at the
18  landfill. And I consider it Jefferson Landfill
19  because I -- of the reasons that we described.
20      Whether -- with each individual person
21  here, I have not been following them around, okay,
22  with a monitor. So I don't know where they're at,
23  and I also don't know the level in their house,
24  but I know that it could be in their house, okay?
25      And I've asked these questions of ATSDR.

1  They shift me from one person to another and they
2  say, Oh, you need to talk to so-and-so; and then I
3  move over to somebody else, and somebody else
4  answers the phone; they tell me some male, and
5  some female answers the phone.
6  　　　　And that's the kind of response I get.
7  And they say, Oh, it can definitely be in the
8  house, we measure it all the time in the house.
9  And then I said, Well, can you give me some --
10 give me some literature on that? And before you
11 know it, we're off the phone, okay, and they're on
12 to another phone call.
13 　　　　So this is the problem. I can give you
14 the reference which I gave to you, which is
15 published. And I can also tell you, in my own
16 experience, I have measured it in homes many,
17 many, many times, okay.
18 　　Q.　Again, you didn't measure it in these
19 homes, they didn't measure it in these homes, and
20 you don't know --
21 　　A.　Correct.
22 　　　　(Multiple speakers.)
23 　　　　(Reporter clarification.)
24 BY MS. BRILLAULT:
25 　　Q.　And you have no data to show the

Page 219

1    They're not -- they're not recorded anyplace.  So
2    that's the best I can say.
3         Q.  And if wind direction is not accurate,
4    then Mr. Lape's model is not accurate?
5         A.  Yeah, it can be a problem.  I mean,
6    that's -- those are -- those are some of the
7    limitations.  I mean, you do the best you can with
8    what you have.
9              And from my point of view, Mr. Lape did
10   the best he can with what he had, and it's
11   consistent with my own experience of people's
12   complaints and the kinds of times that they --
13   amount of time that they get exposed to it and how
14   many times over, you know, the World Health
15   Organization.
16             You know, it's all consistent with one
17   another.  But perfection is never a guarantee with
18   modeling.
19        Q.  With respect to the Table 3b, you said
20   they ruled out Cornerstone as a source?
21        A.  Yes.
22        Q.  I'm just going to try to clarify.
23             Do you -- are you remembering that LDEQ
24   concluded that Cornerstone was not a source of a
25   different odor event on April 28, 2018?  Because

Page 259

1  by themselves, below the detection level."
2      A.  Correct.
3      Q.  You don't have evidence of what VOCs at
4  what concentration --
5      A.  No.
6      Q.  -- for every particular trial plaintiff,
7  correct?
8      A.  Correct.
9      Q.  So you're just assuming this to be true?
10     A.  I'm assuming it to be true on the basis of
11 50 years of experience.
12     Q.  But you just said concentration matters of
13 VOCs.
14     A.  There are at least 400 compounds coming
15 off of that landfill, and you add hydrogen sulfide
16 to it, and I can assure you that it certainly will
17 affect the threshold.
18     Q.  But you're not citing to any peer-reviewed
19 articles for the --
20     A.  No.
21     Q.  Okay.  And you don't have evidence of any
22 particulate mixture that reached any particular
23 plaintiff in this case; is that accurate?
24     A.  If I went through the literature, I'm sure
25 I could find something.  But I don't at the

1  this, I -- shouldn't say that I'm relying on their
2  reports.  I'm relying on my own experience of
3  having dealt with this for 50 years and on some
4  literature.
5      Q.  And then you're relying on the
6  self-reports by plaintiffs --
7      A.  Correct.
8      Q.  -- through their fact sheet or deposition
9  testimony?
10     A.  Right, uh-huh.
11     Q.  All right.  I hate to do this, but if we
12  go back up to page 4, it's in the Overview.
13     A.  Uh-huh.
14     Q.  Sorry, I'm just trying to find that.
15  Okay.  There.  Thanks.  I'm on the wrong page,
16  that's what I'm doing.  Okay.
17          So on page 4, this is in your Overview of
18  Opinions.  The sentence actually starts on page 3,
19  but "The frequency, intensity, duration, and
20  offensiveness (FIDO characteristics) of the
21  malodorous mixture of H2S along with other volatile
22  organic compounds caused psychological effects
23  with physiological underpinnings, including
24  headaches, nausea, or vomiting."
25     A.  Correct.