# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **FREDERICK ADDISON, ET AL.,** | * | |
| | * | |
| PLAINTIFF, | * | **CIVIL ACTION NO. 19-11133,** |
| | * | **c/w 19-14512** |
| **VERSUS** | * | |
| | * | |
| **LOUISIANA REGIONAL LANDFILL** | * | |
| **COMPANY, ET AL.,** | * | **JUDGE MORGAN** |
| | * | |
| DEFENDANTS. | * | **MAGISTRATE** |
| | * | **JUDGE NORTH** |
| *APPLIES TO: ALL CASES* | * | |
| | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. BROBSON LUTZ

Plaintiffs do not want the jury to hear a single peep from Defendants'[1] expert Brobson Lutz, M.D. – who has served as a medical expert and public servant for the Greater New Orleans area for decades – because they do not like his testimony.[2] Plaintiffs intend to ask the jury for damages exceeding an average of $210,000 per Trial Plaintiff,[3] and to justify this number, they point to allegedly nonstop symptoms of headaches, nausea, vomiting, and other symptoms that allegedly persisted for 2.5 years (or for some Trial Plaintiffs, allegedly chronic, continuing neurological injuries). Dr. Lutz analyzed more than 41,000 pages of the Trial Plaintiffs' medical records, performed differential diagnoses for each Trial Plaintiff, and concluded that the complained-of medical symptoms were "more likely caused by something other than exposure to extremely low concentrations of hydrogen sulfide…such as preexisting health conditions and diagnoses, side effects of medications, or other factors in the Trial Plaintiffs' lifestyles or environment, as discussed further below in my analysis for the individual Plaintiffs."[4] This opinion and the others offered by Dr. Lutz are relevant, based on well-accepted and valid scientific principles and methods, and will assist the jury in assessing the crucial issues of causation and damages in the upcoming trial.

## BACKGROUND

Trial Plaintiffs contend that exposure to hydrogen sulfide ("$H_2S$") and volatile organic compounds ("VOCs") allegedly emitted from the Jefferson Parish Landfill ("JPLF") between July 1, 2017 and December 31, 2019 ("Relevant Time Period") caused them to suffer a litany of medical symptoms and injuries. In support of those claims, and in the hopes of proving a causative

---

[1] The Defendants in this matter are Aptim Corp., Jefferson Parish, Louisiana Regional Landfill Company, Waste Connections US, Inc., and Waste Connections Bayou, Inc.

[2] *See* ECF Doc. #552, Plaintiffs' Motion to Exclude Testimony of Dr. Brobson Lutz.

[3] This amount was calculated based on daily damages for 913 days and other damages set forth in Plaintiffs' interrogatory responses.

[4] Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report at p. 5.

connection between their exposure and their alleged injuries, Plaintiffs retained Robert DeLorenzo, M.D., a neurologist and toxicologist, as their medical causation expert. Relying on little more than the Trial Plaintiffs' self-serving statements, Dr. DeLorenzo opines that landfill emissions were the likely cause of *dozens* of different physical ailments.[5] Defendants retained Dr. Lutz to assess and rebut Dr. DeLorenzo's report and opinions, as well as render his own independent opinions regarding the Trial Plaintiffs' claimed injuries, which Dr. Lutz addressed in his report.[6]

Dr. Lutz is a medical doctor in full-time private practice. He is board certified in internal medicine with an emphasis in infectious diseases and public health. He has practiced medicine in the Greater New Orleans area for several decades, including serving as the Director of Health for the City of New Orleans from 1983-1995. He has extensive experience in evaluating patients for toxic fume exposure, including management of multiple airborne contamination crises while serving as Director of Health for the City of New Orleans.

To render his opinions on medical causation, Dr. Lutz reviewed more than 41,000 pages of the Trial Plaintiffs' medical records, their depositions, the independent medical examiners' reports for each Trial Plaintiff, medical publications regarding potential adverse health effects from exposure to $H_2S$, and related documents.[7] He relied on his experience and expertise as a medical doctor to perform a differential diagnosis and/or differential etiology for each Trial Plaintiff, where he assessed each Plaintiff's factual allegations, deposition transcripts, medical records, potential alternative causes for their complaints, and relevant scientific literature to render his opinions – in

---

[5] *See generally* Defendants' Exhibit 1 to ECF Doc. #562, Original Report of Dr. DeLorenzo. Due to the agreement between the parties that certain documents be filed under seal, and for the convenience of the Court, Defendants cite to exhibits that have previously been filed elsewhere in the record under seal. If the Court prefers that Defendants re-file said exhibits with a new motion to seal, Defendants will accommodate that request.

[6] *See* Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report.

[7] *See id*.

3

other words, he did exactly what the Fifth Circuit demands of specific causation experts. *See McNabney v. Lab'y Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005) ("[causation expert's] failure to consider and exclude other potential causes of [plaintiff's] injury before offering an opinion renders his testimony unreliable."); *Becnel v. Lamorak Ins. Co.*, No. CV 19-14536, 2022 WL 3704028, at *4 (E.D. La. Aug. 26, 2022) (specific causation analysis properly involves "determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." (citing *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012)).

Ultimately, Dr. Lutz concluded that the Trial Plaintiffs' medical symptoms "were more likely caused by something other than exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes), such as preexisting health conditions and diagnoses, side effects of medications, or other factors in the Trial Plaintiffs' lifestyles or environment."[8]

Plaintiffs now seek to entirely preclude Dr. Lutz from testifying, challenging only the relevance and helpfulness of his testimony – they do *not* challenge his qualifications or the reliability of his methodology. Attempting to downplay the relevance of Dr. Lutz's testimony, Plaintiffs resort to misrepresenting his opinions. Contrary to Plaintiffs' representations, Dr. Lutz does not intend to merely recite the Trial Plaintiffs' medical records to the jury. Rather, based on his review of the medical records and other documents, and applying his experience and expertise, Dr. Lutz intends to give his opinions on the most likely causes of the Trial Plaintiffs' medical symptoms, which will be offered to rebut the causation and damages testimony of Plaintiffs and

---

[8] Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report at p. 5.

their experts. These are not irrelevant issues, as Defendants must be allowed to mount a defense on causation and damages.

## **LAW AND ANALYSIS**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as interpreted by *Daubert* and its progeny.[9] Expert testimony "must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

Expert testimony is reliable and relevant when the following criteria are met: (1) the expert is sufficiently qualified to testify about the matters he or she intends to address; (2) the methodology used is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact to understand the evidence or to determine a fact in issue. *Daubert,* 509 U.S. 589. The court's "gatekeeper" role is not intended to supplant the adversary system or the role of the jury. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002); *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019). Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Pipitone*, 288 F.3d at 250.

Here, Plaintiffs do not seek to exclude Dr. Lutz on the basis of his qualifications, or even the reliability of his methodology. Rather, they claim that his opinions are irrelevant and unhelpful to the jury. Plaintiffs are wrong. Dr. Lutz's testimony is relevant and helpful in several respects,

---

[9] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

including: (1) he highlights the shortcomings in the so-called methodologies of Plaintiffs' experts Dr. DeLorenzo and Michael Spodak, M.D.; (2) he rebuts that landfill emissions are the most likely explanation for the Trial Plaintiffs' 2017-2019 medical symptoms; (3) he gives crucial testimony on damages, e.g., even if Trial Plaintiffs suffered from symptoms caused by landfill emissions, the symptoms, at most, constituted modest worsening of already existing conditions; and (4) he explains the medical reasons why Plaintiffs' 2023-2024 descriptions of their injuries conflict with the descriptions they gave closer to the relevant time period.

This testimony is crucial to the Defendants' ability to provide a defense on the issue of specific causation and damages. If Plaintiffs take issue with Dr. Lutz's opinions, their remedy is vigorous cross examination, not exclusion of the testimony.

### I.     Dr. Lutz's opinions are relevant in this exposure-based injury case.

Because causation is a necessary element of proof for Plaintiffs' claims,[10] and Plaintiffs have submitted their own expert report on the issue of medical causation,[11] the Defendants are entitled to wide latitude to present rebuttal testimony on the issue of causation, and to provide expert opinions on Defendants' own theory of alternative causation and damages.

The Trial Plaintiffs intend to tell the jury that their medical symptoms were caused by landfill emissions, including some Trial Plaintiffs who complain of *daily* vomiting and other

---

[10] In toxic tort cases, the Fifth Circuit has given specific guidance on what is required of experts who want to provide causation testimony. It is a "two-step process." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). An expert must first establish general causation (i.e., "whether [the] substance is capable of causing a particular injury or condition in the general population"). Then the expert must establish specific causation (i.e., "whether [the] substance caused a particular individual's injury"). *Id.*; *see also Seaman v. Seacor Marine L.L.C.*, 326 Fed. Appx. 721, 724 (5th Cir. 2009).

[11] *Richardson v. SEACOR Lifeboats, LLC*, No. CIV.A. 14-1712, 2015 WL 2193907, at *2 (E.D. La. May 11, 2015) (noting that a defendant undercut their argument to exclude expert opinions on liability by hiring their own expert to opine on liability) (Morgan, J.).

persistent medical symptoms for 2.5 years.[12] In rebuttal, Dr. Lutz intends to testify that the most likely explanation for Trial Plaintiffs' 2017-2019 symptoms were non-odor related causes.

For example, one Trial Plaintiff complains that she suffered, among other injuries, nausea that began in 2017 and *persists to this day*.[13] Plaintiffs' expert Dr. DeLorenzo has opined that her alleged 2017-2019 exposure to landfill emissions is the most likely cause of her nausea, including the nausea she is still experiencing today.[14] In rebuttal, Dr. Lutz has noted that this Trial Plaintiff has chronically used opiate medication for many years, including as recent as 2023, and that "Daily nausea as reported by [Trial Plaintiff] was far more likely related to her chronic opiate medications than to low level concentrations of hydrogen sulfide from a landfill."[15] In support, Dr. Lutz explains that Trial Plaintiff was taking a daily regimen of extremely high dosages of hydrocodone, 2-3 times per day, and that hydrocodone is known to cause nausea in at least 44% of patients.[16]

Dr. Lutz's testimony is also relevant because he speaks to all of the ways in which Plaintiffs' experts' have failed to sufficiently establish specific causation. For example, Dr. Lutz points out that Dr. DeLorenzo's report fails to mention that he reviewed any of the 41,000 pages of the Trial

---

[12] Defendants are not exaggerating the Plaintiffs' claims. Defendants are merely informing the Court as to what the Trial Plaintiffs themselves and their experts have stated in depositions and expert reports. *See, e.g.,* Excerpt of Deposition of Vernice Lewis at pp. 87:22-25; 88:23-25 – 89:1-5, attached hereto as Exhibit 1 (testifying that she vomited 2-3 times per day, every day, from 2017-2019); Excerpt of Deposition of Tyrone Thompson at p. 161:13-20, attached hereto as Exhibit 2 (testified that he vomited once a day during entire 2017-2019 time period); Excerpt of Deposition of Andrew Section at pp, 73:19-25 – 74:1-8, attached hereto as Exhibit 3 (testified that he threw up 2-3 days a week due to odor); Excerpt of Deposition of Jonathan Tate dated Feb. 8, 2024 at p. 60:12-24, attached hereto as Exhibit 4 (testifying as to vomiting twice a day due to odors for a few months during 2017-2019 period); ); Excerpt of Deposition of Stanley Meyers at pp. 100:20-23, 104:7-8, 106:6-8, 107:23-25 – 108:1-4, 110:5-12, 114:6-11, attached hereto as Exhibit 5 (testifying that every week, he experienced sore throat on 3-4 days per week, nausea: 2x per week, night sweats: 3x per week, headaches: 5 days a week (lasting 1-3 hours); anxiety: 4x per week, nosebleeds: 3x/week, at least); Defendants' Exhibit 2 to ECF Doc. #562, DeLorenzo Rebuttal Report at p. 40, (opining that eight of the Trial Plaintiffs are still today suffering from chronic, recurring symptoms from their alleged 2017-2019 exposures).

[13] Defendants' Exhibit 2 to ECF Doc. #562, DeLorenzo Rebuttal Report at p. 40

[14] *Id*.

[15] Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report at p. 31.

[16] *Id*. at 32.

7

Plaintiffs' medical records,[17] fails to mention potential alternative causes of injury (such as the above Trial Plaintiff's opiate use), and wholly fails to demonstrate that he conducted a differential diagnosis at all. This testimony is relevant as to whether Dr. DeLorenzo performed a scientifically valid specific causation analysis. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir. 1987) (affirming exclusion of plaintiff's expert given failure to consider potential alternative causes of injury); *McNabney,* 153 F. App'x at 295 (same).

In contrast to Dr. DeLorenzo, Dr. Lutz conducted his specific causation analysis by personally reviewing 41,000 pages of the Trial Plaintiffs' medical records, along with depositions and other records, and forming a differential diagnosis – which is exactly the sort of specific causation analysis endorsed by the Fifth Circuit. *McNabney,* 153 F. App'x at 295; *Becnel v. Lamorak Ins. Co.*, 2022 WL 3704028, at *4; *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 804 (E.D. La. 2011). Thus, Dr. Lutz's testimony is plainly relevant, as it has a tendency to make Plaintiffs' allegations of causation less probable[18] – and that is true whether he is rebutting Dr. DeLorenzo's analysis or the Trial Plaintiffs' own testimony.[19]

Further, Dr. Lutz's opinions are relevant not only as to causation, but also as to damages. Even if the jury concludes that the Trial Plaintiffs' preexisting maladies were exacerbated by

---

[17] Dr. DeLorenzo's report includes 8 pages of documents that he reviewed to render his opinions. Medical records are not listed. Dr. DeLorenzo admits that his report does not mention any of the Trial Plaintiffs' medical records. He also admits that none of his invoices to counsel mention that he reviewed medical records or set out the time spent reviewing medical records. Nevertheless, he insists that he indeed reviewed the Trial Plaintiffs' medical records. At his deposition, he couldn't decide whether he reviewed the records for 10 hours (Deposition of Dr. DeLorenzo Vol. I at p. 299:18-21, attached hereto as Exhibit 6), 15-20 hours (Exhibit 6 at pp. 330:23-25 – 331:1-2), 40-50 hours (Deposition of Dr. DeLorenzo Vol. II at pp. 409:16-23 – 410:1-2, attached hereto as Exhibit 7), or 50-60 hours (Exhibit 7 at p. 493:18-25).

[18] Fed. R. Evid. 401 provides that "evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[19] Should the Court preclude Plaintiffs' medical experts from testifying at trial, Dr. Lutz would remain a necessary and crucial expert for the Defendants. His opinions are not limited to rebutting Plaintiffs' experts. He will also rebut the testimony of Plaintiffs themselves regarding the most likely explanations for the symptoms they were allegedly suffering from 2017-2019, and therefore his testimony is relevant regardless of whether Dr. DeLorenzo and/or Dr. Michael Spodak testify at trial.

landfill odors – which Defendants deny – Dr. Lutz's testimony will be vital in helping the jury understand the severity of the exacerbation. For example, he will be able to offer opinions on the severity of the Trial Plaintiffs' symptoms before the relevant time period, during the relevant time period, and after the relevant time period – all based on his expert interpretation of the Trial Plaintiffs' medical records.[20]

Defendants are entitled to present a defense on causation and damages, and Dr. Lutz's expert opinions – whose reliability Plaintiffs have not questioned – are a fundamental piece of Defendants' rebuttal to Plaintiffs' claims and should not be excluded.

## II.     Plaintiffs misrepresent Dr. Lutz's opinions.

Faced with plainly relevant testimony from Dr. Lutz, Plaintiffs resort to misrepresenting his opinions. Contrary to Plaintiffs' representations, Dr. Lutz does not intend to merely recite the Trial Plaintiffs' medical records to the jury. Further, exclusion is not warranted simply because Dr. Lutz relied on independent medical examinations performed by two other highly qualified physicians rather than conducting the exams himself.

A physician need not personally examine a plaintiff when rendering an expert opinion on medical causation – rather, so long as the expert reviews the medical records, and has sufficient expertise, this is a scientifically valid methodology. *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994) (doctor was qualified under *Daubert* to give an expert opinion as to causation based on his review of plaintiff's medical records, the coroner's records, and a broad spectrum of published materials).[21]

---

[20] Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report at p. 62 (noting that one Trial Plaintiff suffered "classic nasal and sinus allergies before, during, and after the Relevant Time Period.").

[21] *See also Mendoza v. Lafarge N. Am., Inc.*, No. CV 15-1257, 2016 WL 153952, at *3-4 (E.D. La. Jan. 13, 2016) (holding that an examination of pertinent medical records is an acceptable methodology, and the lack of a physical examination does not render a medical causation expert's testimony inadmissible"); *Walker v. Soo Line R. Co.*, 208

Of course, Dr. Lutz did review the Trial Plaintiffs' medical records in this case. Dr. Lutz also reviewed the independent medical examiner's reports, the deposition transcripts of the Trial Plaintiffs, and their Plaintiff Fact Sheets. Dr. Lutz also consulted various medical authorities on the health effects of $H_2S$, and he reviewed Dr. John Kind's report on the same subject.[22] After reviewing that universe of information, Dr. Lutz performed what is known as a differential diagnosis or a differential etiology to render an opinion on specific causation. This scientific method is favored by the Fifth Circuit for addressing the question of specific causation. *See Wagoner,* 813 F. Supp. 2d at 804.

Dr. Lutz reviewed the Trial Plaintiffs' medical records as one piece of the puzzle in making his determinations as to specific causation in this case. The Fifth Circuit recognizes that as being part of a valid specific causation methodology, and therefore it does not warrant Dr. Lutz's exclusion.

---

F.3d 581, 591 (7th Cir. 2000) (admitting opinion testimony from a physician who performed a records review without an examination, noting that "[t]he lack of an examination...does not render [the physician's] testimony inadmissible"); *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (admitting expert testimony of physician who had not personally examined the plaintiff, noting that the physician's opinions and inferences "were based on his review of [the plaintiff's] medical records, as well as his knowledge, experience, training and education."); *Kannankeril v. Terminix Int'l, Inc*., 128 F.3d 802, 807 (3d Cir. 1997) (explaining that in the context of medical testimony, "it is perfectly acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners" and the fact that the physician did not himself perform a physical examination does not necessarily diminish his opinion); *Woods v. Abrams*, No. 06-757, 2008 WL 4950149, at *1 (W.D. Pa. Nov. 17, 2008) ("The case law is clear that an expert witness need not personally examine a plaintiff, and that an examination of the pertinent medical records is 'perfectly acceptable.'").

[22] Dr. Lutz's opinions do not rely on any of Dr. Kind's findings. Rather, Dr. Lutz noted that Dr. Kind's conclusions on the health effects of $H_2S$ are "supported by my own medical research and analysis." Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report at p. 4.

### III. Dr. Lutz's opinions will assist the trier of fact.

Plaintiffs next argue that Dr. Lutz's opinions – which involve an internal medicine doctor making differential diagnoses – somehow are matters of common knowledge.[23] They are wrong and their caselaw does not apply here.

Plaintiffs cite *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, No. MDL 07-1873, 2009 WL 2169224, at *1 (E.D. La. July 15, 2009) for the proposition that an expert's cumulative appreciation of other experts' testimony – something the jury can and will do – should be excluded from trial. But that case deals with a purported "human factors/warnings expert" not a medical causation expert. Courts are wary of human factor experts, noting that they resemble "jack of all trades" experts which are a "master of none."[24] Human factor experts merely review the opinions of other experts to make a determination on something that the jury can assess for themselves, usually warnings about a products safety.[25]

Here, Dr. Lutz's opinion on medical causation is based on his own experience and expertise, his consideration of the Trial Plaintiffs' medical records and claims, and his differential diagnosis, a methodology favored by the Fifth Circuit. *Wagoner,* 813 F. Supp. 2d at 804. This is not a situation where Dr. Lutz's opinions will supplant the role of a juror, because medical causation is far outside the province of the lay juror.

The Trial Plaintiffs also cite *Conday v. Offshore Drilling Co.*, No. CV 07-0882, 2010 WL 11575031 (W.D. La. Jan. 5, 2010), where the court recommended that expert testimony on the

---

[23] The Trial Plaintiffs also summarily state that experts may not testify as to legal opinions, but they provide absolutely no explanation as to how Dr. Lutz is offering legal opinions, and indeed he is not.

[24] *Calvit v. Procter & Gamble Manufacturing Company*, 207 F.Supp.2d 527 (M.D. La. 2002); *see also Thibodeaux v. Wellmate*, No. CV 12-1375, 2016 WL 2962822, at *3 (E.D. La. May 23, 2016) (excluding a human factor expert's non-technical, specialized, or outside the common knowledge opinion on his perception of the adequacy of warnings) (Morgan, J.).

[25] *Id.*

11

proper way to physically lift a "set of slips" with a co-worker should not be permitted and would only cause confusion, because "[j]urors with common sense knowledge of the 'real world' are equipped to make the determination in this case of whether or not the lift required, under the circumstances presented in this case, was unsafe." *Id.* at *5. In contrast to *Conday*, which concerned the proper procedure for safely picking an object up, here, a medical doctor is opining on potential alternative medical causation in an exposure-related injury case, which is not a question for a lay jury.[26]

Finally, Plaintiffs cite a series of cases all speaking to a plaintiff's burden of proof to defeat summary judgment – which has nothing to do with the relevance of Defendants' proposed expert rebuttal testimony. *See Guidry v. Dow Chemical Co.*, No. 19-12233, 2021 WL 4460505, at *2 (E.D. La. Sept. 29, 2021); *Stephens v. BP Expl. & Prod. Inc.*, No. CV 17-4294, 2022 WL 1642136, at *4 (E.D. La. May 24, 2022). Those cases stand for the proposition that a plaintiff may survive summary judgment without providing evidence of specific causation, where the claimed injuries are the types of temporary or transient type that are within the common knowledge of lay persons. They say nothing about precluding a defendant from providing expert opinions on medical causation and damages to rebut the plaintiff's claims. Certainly, Defendants are allowed to present a defense as to causation and damages, even as to so-called "common sense" injuries, and those cases say nothing to the contrary.

---

[26] Trial Plaintiffs' other cases cited on this point are similarly unhelpful as they do not speak to issues of medical causation. *Richardson v. SEACOR Lifeboats, LLC*, No. CIV.A. 14-1712, 2015 WL 2193907, at *2 (E.D. La. May 11, 2015) (holding that an expert's knowledge and expertise on crane operations and personnel basket transfers, his opinions on the reasonable standard of care concerning the same, and whether defendant met that standard of care, would be helpful to the Court); *Lee v. Offshore Logistical & Transp., LLC*, No. CV 15-2528, 2017 WL 6501151, at *4 (E.D. La. Dec. 19, 2017) (excluding expert testimony regarding whether the absence of non-slip paint increases the chances of slipping or twisting a knee).

Further, Dr. DeLorenzo has opined that landfill emissions have caused the Trial Plaintiffs to suffer chronic injuries which are recurring beyond the exposure period – in other words, *not temporary or transient*.[27] These are certainly not the types of claims that are within the common knowledge of lay jurors, and Dr. Lutz must be allowed to offer rebuttal testimony.

### IV.    Dr. Lutz explains the medical reasons why the Trial Plaintiffs' stories have changed over time.

As Dr. Lutz emphasized multiple times in his deposition, he has not, and will not, opine on whether the Trial Plaintiffs are being truthful.[28] He will testify as to *medical reasons* to explain why patients' accounts of their injuries tend to evolve over time, which the jury can use in deciding which account of the events to believe. For example, Dr. Lutz has observed that the Trial Plaintiffs' 2023-2024 descriptions of their injuries (given during depositions and examinations by litigation experts) are vastly different from the descriptions they gave closer to the relevant time period. In explaining how a reliable physician accounts for such conflicting information when making a differential diagnosis, Dr. Lutz opines – *and Plaintiffs' experts Dr. DeLorenzo and Dr. Spodak agree*[29] – that a physician must consider the possibility of a recognized medical phenomenon known as "compensation neurosis." This is not a concept invented by defense attorneys – rather, it has been analyzed in medical journals, and is used by physicians when conducting a differential diagnosis.[30] Compensation neurosis does not refer to plaintiffs lying for money, but instead to a medical phenomenon where the stresses of the litigation process affect the patient's perception of

---

[27] Defendants' Exhibit 2 to ECF Doc. #562, DeLorenzo Rebuttal Report at p. 40.

[28] Dr. Lutz repeatedly refused to opine on this in his deposition. *See* Excerpts of Dr. Lutz's Deposition at p. 141:21-24, attached hereto as Exhibit 8 (Q. So do you think her father was lying? / A. I don't know. I'm not an expert in telling the truth); *Id.* at p. 123:23-25 ("Q. So do you disbelieve her when she talks about the odors? / A. I'm not saying she's lying . . ."); *Id.* at p. 142:11-12 ("Am I saying he's lying? No.").

[29] Exhibit 7 at pp. 573:4-25 – 574:1-2, attached hereto as Exhibit 7; Deposition of Dr. Spodak at p. 256:7-21, attached hereto as Exhibit 9.

[30] *See* Trial Plaintiffs' Exhibit 1 to ECF Doc. #552, Dr. Lutz's Expert Report at p. 7.

their injuries. Plaintiffs' experts agreed that, as part of reaching their specific causation opinions, they thought it was appropriate to consider compensation neurosis in their differential diagnosis.

Dr. Lutz does not intend to supplant the role of the jury, nor will he testify that the Trial Plaintiffs should not be believed. He is prepared to testify as to how a reliable physician factors in the possibility of compensation neurosis when making his differential diagnosis, leaving it to the jury to decide whether that phenomenon explains the Trial Plaintiffs' evolving stories or not.

Multiple courts have addressed the concept of compensation neurosis and recognized it as a legitimate medical phenomenon that is relevant and appropriate for the trier of fact to consider. *See Bridges v. Drilling*, 84-5732, 1986 WL 14422, at *3, n. 14 (E.D. La. Dec. 11, 1986); *Frost v. Teco Barge Line, Inc*., No. 04-CV-752-DRH, 2007 WL 420152, at *6 (S.D. Ill. Feb. 5, 2007).

Here, Dr. DeLorenzo admits that multiple Trial Plaintiffs' accounts of their symptoms contain significant discrepancies, for example:

> Q. Do you have any understanding of why in her 2020 fact sheet she says that the odors caused sinus issues and allergies [symptoms later disallowed by the Court's general causation decision], and when she saw you in 2023, she said the odor issues caused headaches, anxiety, stomach irritation with nausea and pain, eye irritation, nasal congestion, and dizziness [mostly symptoms allowed by the Court's general causation decision]?
>
> A. Obviously it's a discrepancy…
>
> ...
>
> …obviously that's a discrepancy. What can I say?
>
> ...
>
> Now, for compensation neurosis, your argument would be that this supports something like that. I'm saying it certainly doesn't exclude it…[31]

The jury will be tasked with resolving the discrepancies in the Trial Plaintiffs' stories. They will

---

[31] Exhibit 7 at pp. 564:19-25, 565:16-17, 567:14-17.

14

be assisted by the testimony of Dr. Lutz, who will explain his decades of experience in taking patients' histories and making differential diagnoses. He will further be prepared to explain the medical phenomenon of compensation neurosis, and how a physician needs to consider that in his differential diagnosis under appropriate circumstances (again, Plaintiffs' experts agree). Expert testimony on this medical phenomenon will be helpful testimony for the jury, who would otherwise be left with little information to help them resolve this difficult issue. Dr. Lutz's valuable expertise and experience should not be kept from the jury.

## CONCLUSION

Dr. Lutz's opinions should not be excluded by this Court. His opinions on medical causation are relevant in this exposure-based injury case to rebut the Trial Plaintiffs' medical causation expert and to provide an independent opinion on alternative causation and damages. Additionally, those opinions are the product of a well-accepted and scientifically valid methodology, and they will assist the trier of fact with the determination of a crucial issue in this case: are landfill gases the most likely explanation for the symptoms that the Trial Plaintiffs experienced during the relevant time period?

Accordingly, Defendants pray that this Court deny the Trial Plaintiffs' Motion to Exclude the Testimony of Dr. Brobson Lutz, M.D.

Respectfully submitted,

LISKOW & LEWIS, APLC

By:    /s/ Michael C. Mims
      Michael Cash (#31655)
      Cherrell Simms Taplin (#28227)
      Michael C. Mims (#33991)
      Brady M. Hadden (#37708)
      Alec N. Andrade (#38659)
      J. Hunter Curtis (#39150)

701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

BEVERIDGE & DIAMOND, P.C.

Megan R. Brillault (*pro hac vice*)
Michael G. Murphy (*pro hac vice*)
John H. Paul (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
Katrina M. Krebs (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

CONNICK AND CONNICK, LLC

By: ___/s/ Michael S. Futrell___
William P. Connick, La. Bar No. 14158
Michael S. Futrell, La. Bar No. 20819
Matthew D. Moghis, La. Bar No. 33994
Anya M. Jones, La. Bar No. 36923
3421 N. Causeway Blvd., Suite 408
Metairie, Louisiana 70002
Telephone: (504) 681-6658
Facsimile: (504) 838-9903
E-mail: moghis@connicklaw.com

*Counsel for Defendant Jefferson Parish*

16

GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:   /s/ J. Michael DiGiglia
     Ernest P. Gieger, Jr. (6154)
     John E. W. Baay (22928)
     J. Michael DiGiglia (24378)
     Nicholas S. Bergeron (37585)
     Blaise Chadwick Hill (*pro hac vice*)
     Gieger, Laborde & Laperouse, L.L.C.
     Hancock Whitney Center
     701 Poydras Street, Suite 4800
     New Orleans, Louisiana 70139
     Telephone: (504) 561-0400
     Facsimile: (504) 561-1011

*Attorneys for Defendant Aptim Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on June 13, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

By:   /s/ Michael C. Mims