```
                                                         Page 398

 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
 2
 3  ************************************************************
 4  FREDERICK ADDISON, et al.,
 5               Plaintiffs,
                                          CIVIL ACTION NO.
 6  vs.                                   19-11133
                                          c/w 19-14512
 7  LOUISIANA REGIONAL LANDFILL
    COMPANY, et al.,
 8
                 Defendants.
 9
    ************************************************************
10
11
                         VOLUME II
12
13            VIDEOTAPED DEPOSITION OF
14       ROBERT DeLORENZO, M.D., Ph.D., M.P.H.
15             9:12 a.m. to 1:29 p.m.
16                  May 4, 2024
17              Richmond, Virginia
18
19
20
21
22
23
24
25      REPORTED BY:  Rhonda D. Tuck, RPR, CRR
```

1   went back, I said, gee, that doesn't make sense.  And
2   I went back and looked at my billing, and, in fact, I
3   had made a mistake in how I presented the billing.
4           Q.   So when you told me yesterday that your
5   memory was that you spent 15 to 20 hours reviewing
6   medical records, you're changing that answer?
7           A.   Yes, because that was based on your
8   bringing up the billing sheet, and I didn't -- it was
9   late in the day, and I basically was saying, well, you
10  know, if that's what I billed, and I did bill the
11  hour, you came up with a number that would be there,
12  and I said, yeah, that's probably what I did, but when
13  I went back and refreshed my memory, obviously I
14  didn't bill that way.  Now I'm correcting that to make
15  the point clear.
16          Q.   So I'm asking you now, what is your memory
17  of how much time you have spent looking at medical
18  records of the 13 trial plaintiffs prior to issuing
19  your initial report?
20               MR. FOSTER:  Objection.  I think he's
21          already answered.
22               THE WITNESS:  Somewhere around 40 to 50
23          hours, would be my estimate.
24  BY MR. MIMS:
25          Q.   Okay.  So the answer yesterday was 15 to

Page 410

1   20, and the answer today is 40 to 50?
2        A.   Yes.  About double.
3        Q.   Since we -- from the time we took a break
4   last night until this morning, did you have a chance
5   to talk with anybody about your testimony?
6        A.   No.
7        Q.   Did you have a chance to talk with
8   Mr. Foster about your testimony?
9        A.   I didn't talk to him after the report.  I
10  just saw him this morning.
11       Q.   Okay.  Did you talk to Mr. Foster about
12  changing your answer about how much time you spent
13  reviewing medical records?
14       A.   No.
15       Q.   Did you talk --
16       A.   He didn't bring that up.  I basically, you
17  know, with something I was saying, I said, gee, how
18  could I only spend that amount of time?  That's not
19  what I remember.  And then I went and said, let me
20  look at that bill again, because I didn't remember --
21  obviously I didn't remember the bill, and then I
22  refreshed my memory of the fact that that was what had
23  happened.
24       Q.   Any other topic that you talked to
25  Mr. Foster about changing your testimony from

1   that.  I'm coming in saying, "What are your symptoms?"
2   I look at the symptoms.  I look at the medical record.
3   I'm not a perfect person, but I think you can see from
4   what I did on the detailed kind of analysis I did for
5   the landfill as being the source of emission -- I'm
6   trying to show you the quality of the process that
7   goes on here.
8            Now, in my report, do you realize how long
9   this would be if I did that kind of addition to the
10  reports on each patient?
11       Q.   It sounds like a lot of work.
12       A.   It's not just a lot of work.  It's
13  something that's done automatically, and it's
14  unnecessary to be in there.  It doesn't affect my
15  opinion.  Now, if I was --
16       Q.   So I asked you earlier --
17       A.   Go ahead.
18       Q.   I asked you earlier if you thought that
19  Dr. John Kind spent more time than you reviewing the
20  patient's pharmacy records.  What about Dr. Lutz?  Do
21  you think it's fair to say Dr. Lutz spent more time
22  reviewing the trial plaintiffs' medical records than
23  you did?
24       A.   I don't know the answer to that.  I told
25  you I did probably 40 to 60 -- 50 to 60 hours.  I

Page 564

1  complaints to you, that was on November 10th, 2023,
2  right?
3       A.   I'm assuming the date's correct.  I don't
4  have it memorized.
5       Q.   I'm looking at Page 89.
6       A.   Okay.  Yeah.  The day I saw all the
7  plaintiffs.  I've forgotten which date.  I don't know
8  the exact date.  It was in that range.
9       Q.   Okay.  And --
10      A.   Oh, here.  It gives a date, 11/10/23.
11      Q.   And this plaintiff fact sheet is not
12 signed, but I'll represent to you that it was sometime
13 in 2020.
14      A.   Got it.
15      Q.   Relevant time period where there was
16 alleged exposure was July 1st, 2017 through the end of
17 2019, right?
18      A.   Correct.
19      Q.   Do you have any understanding of why in
20 her 2020 fact sheet she says that the odors caused
21 sinus issues and allergies, and when she saw you in
22 2023, she said the odor issues caused headaches,
23 anxiety, stomach irritation with nausea and pain, eye
24 irritation, nasal congestion, and dizziness?
25      A.   Obviously it's a discrepancy.  So, and,

1  you know, I -- one question is -- I mean, this person
2  has a 12th grade education.  She's a very lovely
3  woman.  I don't know what she was thinking about when
4  she filled out the form.  I don't know.  On this
5  form -- is there other discussions of symptoms
6  anywhere else on this form?
7       Q.   No, sir.
8       A.   Okay.  Well, then that's a discrepancy.
9       Q.   How, if at all, did you analyze those
10 discrepancies in reaching your opinions?
11      A.   Well, I took -- when I took her history, I
12 felt that she was credible.  I don't remember if I
13 confronted her about that.  On one or two of the
14 patients, I confronted them with that, with the fact
15 sheet.  In her case, I don't remember if I did,
16 because it was a telemedicine one, and so obviously
17 that's a discrepancy.  What can I say?
18      Q.   And in general -- not talking about
19 Reshaun Richardson.  In general, when you are making a
20 causation opinion about whether an exposure years ago
21 was the cause of symptoms being reported years later,
22 how do you use a discrepancy like that?
23      A.   You know, it's there.  You know, I have to
24 evaluate it, and I evaluated that I thought her
25 testimony to me was valid and was there.  Now, I don't

Page 567

1          you know, it's a lot of data, and it goes on,
2          in terms of the trial data as well.
3                  So, I mean, you know, did one of the
4          attorneys coach her or something?  I don't
5          know.  I doubt it, just like, you know, I doubt
6          that they had an influence on this.  This case,
7          they didn't influence her to do that on this
8          fact sheet.  Whether she changed because of
9          them, I can't tell.  I mean, that has to be
10         taken into account, and I -- you know, I felt
11         that her history was credible when I took it.
12         I looked for -- I didn't see any signs of
13         malingering or anything like that.
14                 Now, for compensation neurosis, your
15         argument would be that this supports something
16         like that.  I'm saying it certainly doesn't
17         exclude it, but I had a look at that, and it
18         was my opinion that her testimony was -- I
19         mean, her description of her symptoms was
20         valid.
21    BY MR. MIMS:
22         Q.   So we're going to pull --
23         A.   I didn't have -- I don't know if there's
24    corroborating evidence in what she posted on Facebook,
25    or I don't think she was one of the ones that did any

1  Q. Right.
2  A. Or somebody. And I don't think that
3  happened. I have no reason to believe that.
4  Q. But just like with Reshaun Richardson, the
5  fact that new injuries were added four to six years
6  after the event and that they happen to align with
7  what the judge said were permissible injuries, as part
8  of your analysis, you would consider the possibility
9  that those additional injuries were the result of
10 something like compensation neurosis?
11 A. Possibility. In my opinion, talking to
12 him and looking at these issues and trying to look at
13 his history, I didn't get the impression, and I didn't
14 feel that he had that. I mean, that's -- determining
15 that is more of an art than a science. I mean, there
16 are sort of methods that you can use, but it's sort of
17 an art rather than a science. You know, I talked to
18 these people. I asked some questions about things,
19 and I thought he was a reliable person.
20 Q. I understand that you concluded that he
21 didn't add new injuries because of compensation
22 neurosis. But you thought it was important to
23 consider the possibility that his complaints of
24 injuries in 2023, that he did not list in 2020, you
25 wanted to rule out the possibility of compensation

Page 574

1  neurosis as the reason for that?
2       A.   Correct.  I was thinking about that.  Now,
3  I don't know if there's any -- I don't think
4  everybody -- I mean, there's going to be some
5  variabilities on complaints, I think, obviously.  I
6  don't think every one of these patients this is
7  occurring in.  But the question is, you know, is there
8  some reason why this was there.  I mean, somebody
9  could ask him.  I don't think you're going to want to
10 do that, but -- and I don't know if the other side is
11 going to want to do that, but that would be one way to
12 probe this.  You know, "Why didn't you say something
13 about this?"
14           Now, if he says, "I didn't know how to
15 answer the sheet; I just gave the worst symptoms,"
16 sometimes people do that.  They think of what's the
17 biggest problem I'm having, and then they don't list
18 all the other symptoms.  But we don't know that that
19 happened.  So, you know, I don't know what else could
20 be done, other than my evaluation and looking into his
21 reliability.
22      Q.   You read the deposition of Jonathan Tate,
23 right?
24      A.   Yeah.  I don't remember the details of it.
25      Q.   Do you remember what he said when we asked