**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ELIAS JORGE "GEORGE" ICTECH-BENDECK,**<br>**Plaintiff,**<br><br>**VERSUS**<br><br>**WASTE CONNECTIONS BAYOU, INC., ET AL.,**<br>**Defendants.** | **CIVIL ACTION**<br><br>**NO. 18-7889**<br>**c/w 18-8071,**<br>**18-8218, 18-9312**<br><br>**SECTION: "E"(5)** |
| ***Related Case:***<br><br>**FREDERICK ADDISION ET AL.,**<br>**Plaintiffs,**<br><br>**VERSUS**<br><br>**LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**<br>**Defendants.**<br><br>***Applies to: All Cases*** | **CIVIL ACTION**<br><br>**NO. 19-11133**<br><br>**SECTION: "E"(5)**<br><br>**JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

**THE WASTE CONNECTIONS DEFENDANTS' REPLY TO PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO THE WASTE CONNECTIONS DEFENDANTS' MOTION TO UPHOLD EXPERT DESIGNATION OF BISHOW SHAHA, PH.D**

**INTRODUCTION**

Plaintiffs' supplemental opposition challenging Defendants'[1] expert witness designation of Dr. Bishow Shaha does not provide any basis for striking Dr. Shaha's proposed testimony. Following Mr. Jeffrey Marshall's cancer diagnosis, Defendants designated Dr. Bishow Shaha to testify on hydrogen sulfide generation and rebut the opinions of Plaintiffs' expert, Dr. Jaana Pietari. As outlined in Defendants' moving brief, nothing in the Court's Case Management Orders precludes Defendants' timely designation of a new expert witness for the post-General Causation phases of this litigation. Defs. Br. at 4-5 (No. 18-7889, R. Doc. 338-1; 19-11133, R. Doc. 444-1).

As a threshold matter, the Court can easily resolve this dispute given Dr. Pietari's material revisions to her own expert disclosures since the General Causation hearing. For example, Dr. Pietari has completely overhauled her analysis of the spent lime disposed of at the Jefferson Parish Landfill ("JPLF")—a key modeling input for her estimate of hydrogen sulfide generation—and now estimates that the waste may have contained more than 10 times the amount of sulfate she had assumed during the General Causation phase. Dr. Pietari has also incorporated new data and scientific studies regarding two other key inputs to her model: the rate at which the spent lime degrades and the maximum potential hydrogen sulfide the waste can generate. Plaintiffs should not be allowed to make material changes to Dr. Pietari's expert disclosures and then complain about purported differences between Dr. Shaha's proposed testimony and Mr. Marshall's General Causation opinions.

Regardless, Dr. Shaha's proposed testimony comports with the principles federal courts apply when a party's original expert becomes unavailable. Dr. Shaha's opinions critiquing Dr.

---

[1] "Defendants" refers to Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.

1

Pietari's hydrogen sulfide generation estimate are substantively similar to Mr. Marshall's. Both experts broadly criticized Dr. Pietari's adaptation of a modeling approach developed for construction debris for her own use in estimating emissions from spent lime—a completely different type of waste. Shaha Report at 7, 11-12, 22 (No. 18-7889, R. Doc. 441-1; 19-11133, R. Doc. 556-1); Marshall Report at 7, 9, 26-28 (No. 18-7889, R. Doc. 441-3; 19-11133, R. Doc. 556-3). And both experts highlighted the significant reliability and validation problems with Dr. Pietari's work arising from the lack of site-specific data in this case. Shaha Report at 7, 8, 11-14, 23-25, 28-31; Marshall Report at 8, 10, 15, 19, 28-31, 37-38. That Dr. Shaha may have used different language or reached slightly broader conclusions than Mr. Marshall does not serve as a basis to preclude his testimony.

Further, any purported prejudice arising from differences in Dr. Shaha and Mr. Marshall's opinions has been cured. Plaintiffs have been aware of Dr. Shaha's designation since September 29, 2023, over eleven months before trial.[2] Plaintiffs have deposed Dr. Shaha, and their own expert has issued a report rebutting Dr. Shaha's opinions. Finally, Plaintiffs' "law-of-the-case" argument has no merit. The Court's denial of Defendants' prior *Daubert* challenge of Dr. Pietari does not preclude Defendants in any way from offering expert testimony rebutting Dr. Pietari's opinions at trial.

The Court should uphold Defendants' designation of Dr. Shaha and allow him to testify to the full scope of his expert report.

---

[2] *See* Defendants' Witness List (No. 18-7889, R. Doc. 377; 19-11133, R. Doc. 418).

**ARGUMENT**

I.     **The law-of-the-case doctrine is irrelevant to this motion.**

Plaintiffs argue that the Court's denial of Defendants' *Daubert* challenge during General Causation bars any expert rebuttal testimony of Dr. Pietari's opinions at trial—by Dr. Shaha or anyone else—under the law-of-the-case doctrine. Pls. Supp. Opp'n at 2 (No. 18-7889, R. Doc. 441; 19-11133, R. Doc. 556). But that is not how the law-of-the-case doctrine works. "The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (quotation and citation omitted). "[T]he law of the case doctrine is a discretionary rule," *United States v. Agofsky*, 516 F.3d 280, 283 (5th Cir. 2008) (citation omitted), and "applies only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not." *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 239 (5th Cir. 2012) (quotation and citation omitted).

Plaintiffs' argument fails because the Court's only prior ruling related to Dr. Pietari is the Court's denial of Defendant's *Daubert* motion.[3] November 8, 2021 Order at 9 (No. 18-7889, R. Doc 221; 19-11133, R. Doc. 256). Plaintiffs cite no authorities holding that a court's denial of a *Daubert* challenge somehow boomerangs to bar any rebuttal expert testimony offered by the moving party. Nor would such a rule make any sense. A court's ruling on a *Daubert* challenge—or its admission of an expert's testimony at trial—is nothing more than an evidentiary ruling under Rule 702. Plaintiffs' backwards interpretation of the law-of-the-case doctrine has no merit.

---

[3] In fact, the Court's General Causation decision does not include a single reference to Dr. Pietari apart from her inclusion in a list of the witnesses who testified at the hearing. November 29, 2022 Order at 3 (No. 17-889, R. Doc. 285; 19-11133, R. Doc. 323).

3

## II. The Court should not impose any limitations on Dr. Shaha's testimony because Dr. Pietari made material changes to her general causation opinions.

The Court has a quick, simple, and fair avenue to resolve this dispute without scrutinizing the similarities and differences between Dr. Shaha and Mr. Marshall's opinions. Contrary to Plaintiffs' assertions, Dr. Pietari made significant and material changes to her expert disclosures. These substantive revisions to Dr. Pietari's analyses should wipe the slate clean and allow Defendants to respond to Dr. Pietari's opinions fully and fairly without any limitations on the scope of Dr. Shaha's disclosed opinions. Allowing Dr. Pietari to amend the bases and reasoning of her opinions while freezing the scope of Defendant's rebuttal testimony is unfairly prejudicial.

For example, Dr. Pietari applies a mathematical model to estimate the amount of hydrogen sulfide generated from spent lime disposed of in the landfill. Expert Report of Jaana Pietari, Ph.D, dated February 2, 2024, appended to the accompanying Declaration of Michael F. Vitris (dated June 13, 2024) ("Vitris Decl.") as Exhibit 1 ("2024 Pietari Expert Report") at 20. One of the inputs into this model is the amount of sulfate in the spent lime. *Id*. at 13, 20. During General Causation, Dr. Pietari derived this model input using information from Safety Data Sheets prepared by the generator of the spent lime. *Id*. at 12-13, 21, and 35. Following the Court's decision on General Causation, however, Plaintiffs subpoenaed the generator of the waste and received laboratory data on the composition of the generator's spent lime. *Id*. at 13, 35. Dr. Pietari used this data—which could have been obtained prior to the General Causation hearing—to estimate that the amount of sulfate in the spent lime was more than 10 times greater than her original estimate using the Safety Data Sheets. *Id*. at 36, 39. Using this new data, Dr. Pietari's supplemental expert report includes an <u>entirely new</u> application of her model. *Id*. at 35-39.

4

Dr. Pietari made other significant changes to the bases for her expert opinions and modeling inputs. In addition to the amount of sulfate in the spent lime, two additional inputs into Dr. Pietari's model are:

- The rate at which the spent lime degrades into hydrogen sulfide. This is called the "First-Order $H_2S$ Decay Rate," sometimes symbolized as (k); *id*. at 25-26, and

- The potential amount of hydrogen sulfide that can be generated from one ton of spent lime. This is called the "$H_2S$ Generation Potential," sometimes symbolized as (So). *Id*. at 26-28.

Whether Dr. Pietari developed reasonable assumptions for these two model inputs directly affects the reliability of her hydrogen sulfide generation estimates. In an attempt to shore up the reliability of her (k) and (So) assumptions developed during General Causation, Dr. Pietari has now incorporated into her analysis data from two additional scientific studies—Geosyntec (2014) and Malmir (2023)—not cited in her General Causation expert report.[4] Compare 2024 Pietari Expert Report at 25-26 (Table 6) and 27-28 (Table 7) with Expert Report of Jaana Pietari, Ph.D, dated January 29, 2021, appended to the Vitris Decl. as Exhibit 2 (hereafter "2021 Pietari Expert Report") at 24-25 (Table 6) and 26 (Table 7).

Dr. Pietari included several other new studies not cited in her prior reports. For example, Dr. Pietari cites two new scientific articles[5] to argue that the spent lime disposed of at the JPLF

---

[4] *See* (1) Geosyntec. 2014. Review of hydrogen sulfide gas abatement options. Fenimore Landfill, Roxbury Township, New Jersey. Geosyntec Consultants, Columbia, MD. March and (2) Malmir, T, D. Lagos, and U. Eicker. 2023. Optimization of landfill gas generation based on a modified first-order decay model: a case study in the province of Quebec, Canada. Environmental Systems Research. Vol. 12:6.

[5] *See* (1) Bigham, J.M., D.A. Kost, R.C. Stehouwer, J.H. Beeghly, R. Fowler, S.J. Traina, W.E. Wolfe and W.A. Dick. 2005. Mineralogical and engineering characteristics of dry flue gas desulfurization products. Fuel. Vol. 84: 1839-1848; and (2) Butler, S.K. W.R. Roy, and Z. Lasemi. 2015. Chemical and mineralogical characteristics of flue

5

likely contained other calcium sulfate hydrates, increasing the amount of sulfate available to produce hydrogen sulfide. 2024 Pietari Expert Report at 9, 13. Likewise, the generation of $H_2S$ from sulfate-containing wastes requires moisture, and Dr. Pietari now cites for the first time a scientific article[6] to argue that entrained water from incoming waste is the largest source of landfill moisture. *Id*. at 19. Another contested issue is whether the landfill pH levels are conducive to hydrogen sulfide generation. In her original report, Dr. Pietari stated that the landfill bacteria will not reduce sulfate to generate $H_2S$ when pH levels are outside of a range from about 4 to 9. 2021 Pietari Expert Report at 10. Dr. Pietari now cites a new scientific article[7] to argue that the bacteria can generate $H_2S$ even at pH levels lower than 4 or higher than 9. 2024 Pietari Expert Report at 10.

Other seemingly small changes in Dr. Pietari's expert disclosures go to the heart of disputed issues in this case. For example, one of Plaintiffs' chief complaints about Dr. Shaha's substitution appears to be Plaintiffs' belief that they scored points against Mr. Marshall during the General Causation hearing, mischaracterizing his testimony to argue that the landfill should have collected measurements of hydrogen sulfide in the landfill gas. Pls. Supp. Opp'n at 9. But Dr. Pietari is the one playing games with this issue. In her original expert report, Dr. Pietari correctly stated that hydrogen sulfide measurement data are "<u>not always</u> available" at landfills. 2021 Pietari Expert Report at 24 (emphasis added). Now, well aware that the absence of this data for the JPLF renders her hydrogen sulfide generation estimate extremely unreliable, Dr. Pietari

---

gas desulfurization by-products and swine manure mixtures after controlled leaching experiments. In Z. Lasemi, ed., Proceedings of the 47th Forum on the Geology of Industrial Minerals: Illinois State Geological Survey, Circular 587.

[6] Krause, M.J., W. Eades, N. Detwiler, D. Marro, A. Schwarber, and T. Tolaymat. 2023. Assessing moisture contributions from precipitation, waste, and leachate for active municipal solid waste landfills. Journal of Environmental Management. Vol. 344: 118443.

[7] Qian, Z., H. Tianwei, H.R. Mackey, M.C.M. van Loosdrecht and C. Guanghao. 2019. Recent advances in dissimilatory sulfate reduction: From metabolic study to application. Water Research. Vol. 150: 162-181.

tweaked this language in her report to say that H$_2$S measurement data are "<u>generally readily</u> available for landfills." 2024 Pietari Expert Report at 25 (emphasis added). This small change in wording aligns with Plaintiffs' attempt to wrongly cast blame on the JPLF for not collecting H$_2$S data and explain away the serious problems with Dr. Pietari's analysis.

Dr. Pietari's material changes to her expert disclosures relieves the Court of wading through Dr. Shaha and Mr. Marshall's expert reports and deposition and hearing transcripts to try and compare similarities and differences. Plaintiffs should not be allowed to substantively change Dr. Pietari's bases and reasoning in support of her opinions—and offer an entirely new application of her hydrogen sulfide generation model—while Defendants are precluded from making any deviation from Mr. Marshall's General Causation opinions. The Court should uphold Defendants designation of Dr. Shaha as an expert in hydrogen sulfide generation and allow him to testify to all opinions disclosed in his expert report.

### III. Dr. Shaha's opinions are substantively similar to Mr. Marshall's and the Court should allow him to testify to the full scope of his expert report.

Setting aside Dr. Pietari's changes to her original opinions, the Court should not impose any restrictions on Dr. Shaha's testimony because his disclosed opinions are substantively similar to Mr. Marshall's. "Generally, courts allowing expert substitutions after the close of discovery have limited the subject matter opinions to those that were included in the first expert's report." *Smith v. State Farm Lloyds,* No. 21-cv-837, 2023 WL 359495, at *3 (E.D. Tex. Jan. 23, 2023) (collecting cases). But "this does not mean that the substituted expert is limited to the exact same conclusion as the previous expert, so long as the new opinion is substantively similar and not contrary or inconsistent with the original opinion." *Id.* "[T]he substitute is not normally required to simply adopt the prior expert's conclusions verbatim—in effect, doing little more than authenticating and confirming the prior expert's conclusions." *Am. Can! v. Arch Ins. Co.*, No.

20-cv-850, 2022 WL 1467424, at *3 (N.D. Tex. Apr. 6, 2022) (citation and quotation omitted). Instead, "[t]he substitute expert may use different language and even reach slightly broader conclusions so long as the new report is substantially similar in all material respects to the previous report." *Id*.

Dr. Shaha and Mr. Marshall addressed the same subject matter and reached substantively similar conclusions. "[T]he caselaw does not clearly require a line-by-line (or even a rough) comparison of old and new expert reports, so long as the conclusions are the same." *Abbott v. Lockheed Martin Corp.*, No. 06-cv-701, 2014 WL 6613148, at *2 (S.D. Ill. Nov. 21, 2014). Both experts broadly criticized Dr. Pietari's adaptation of a modeling approach developed for construction debris for her own use in estimating emissions from spent lime—a completely different type of waste. Shaha Rept. at 7, 11-12, 22; Marshall Rept. at 7, 9, 26-28. And both experts highlighted the significant reliability and validation problems with Dr. Pietari's work arising from the lack of site-specific data in this case. Shaha Rept. at 7, 8, 11-14, 23-25, 28-31; Marshall Rept. at 8, 10, 15, 19, 28-31 37-38. Dr. Shaha's opinions are therefore "substantively similar and not contrary or inconsistent with" Mr. Marshall's. *Smith,* 2023 WL 359495, at *3.

Although these broad substantive similarities should be sufficient to uphold Dr. Shaha's designation, even a more detailed comparison of Dr. Shaha and Mr. Marshall's opinions demonstrates that, contrary to Plaintiffs' assertions, Dr. Shaha's opinions are not "all new and completely untethered to Mr. Marshall." Pls. Supp. Opp'n at 4.

8

| **Shaha Opinions** | **Marshall Expert Report/Testimony** |
|---|---|
| **Opinion 1:** Dr. Pietari misapplied Shaha & Meeroff methodology and her $H_2S$ generation estimate lacks scientific reliability. Shaha Rept. at 7.<br><br>• Model parameters (decay rate and $H_2S$ generation potential) for estimating $H_2S$ generation from C&D waste are not representative of spent lime, a different type of waste. Shaha Rept. at 7.<br><br>• Reliability of Dr. Pietari's estimate is limited by lack of historical $H_2S$ data, unknown peak $H_2S$ concentration, and incompleteness of measured JPLF data. Shaha Rept. at 7.<br><br>• Shaha (2020) study employed conservative methodology and | • C&D waste and spent lime are physically different wastes and would be expected to decompose differently. Marshall Rept. at 7, 9.<br><br>• Absence of historical site-specific data (including $H_2S$ data) precludes reliable application of methodologies outlined in Anderson (2010) and Shaha (2020). Marshall Rept. at 8 and 10.<br><br>• Dr. Pietari's reliance on partial sets of JPLF $H_2S$ data renders her $H_2S$ generation estimates unreliable Marshall Rept. at 10.<br><br>• The Anderson (2010) study, which was modified by Shaha (2020), was designed to predict, looking forward, how much |

9

| **Shaha Opinions** | **Marshall Expert Report/Testimony** |
|---|---|
| assumptions, with objective to determine the forward-looking design life of $H_2S$ treatment system—not estimate $H_2S$ generation to scientific certainty. Shaha Rept. at 11. | $H_2S$ would be generated by C&D waste in landfills. Trial Tr., Day 7 PM, 1603:13-1603:17.[8] |
| **Opinion 2:** Dr. Pietari's analysis and LandGEM modeling parameters (provided by Soler/Sananes) rely on an assumption that the JPLF was extremely inundated with water, similar to a bioreactor landfill. But the JPLF was more likely to function as a conventional landfill. Dr. Pietari's assumption causes her to significantly overestimate landfill gas and hydrogen sulfide generation. Shaha Rept. at 20. | • "Dr. Pietari's LandGEM modeling relied on inputs provided by Nestor Soler (Soler 2021). The report of Matt Stutz (Stutz 2021) identifies the problems with Soler's LandGEM inputs. Because Pietari adopts Soler's key LandGEM inputs, Stutz's analysis applies with equal force to Pietari's LandGEM modeling and further impairs the reliability of her $H_2S$ generation estimate." Marshall Rept. at 32, n.5. |
| **Opinion 3:** The sulfur content of the spent lime does not impact the overall predicted generation of $H_2S$ under the Shaha (2020) modeling approach. Shaha Rept. at 8. | (As discussed below, Dr. Pietari has completely changed her analysis of the sulfur content of the spent lime. Accordingly, the Court should not limit Dr. |

---

[8] Transcript from the General Causation Trial, *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, No. 18-7889, Day 7, Afternoon Session (Feb. 23, 2022), appended to the Vitris Decl. as Exhibit 3.

10

| Shaha Opinions | Marshall Expert Report/Testimony |
|---|---|
| | Shaha's analysis of sulfur content to Mr. Marshall's opinions.) |
| **Opinion 4:** Dr. Pietari's $H_2S$ generation estimates were not validated by Dr. Pietari using site-specific data, severely compromising the reliability of Dr. Pietari's model output. Shaha Rept. at 8. | • Dr. Pietari did not validate the output of her model using site-specific data, an important and necessary step in the application of the Anderson (2010) and Shaha (2020) methodologies. Marshall Rept. at 11-12. |

A perfect match between Dr. Shaha and Mr. Marshall is not required, and a substitute expert's opinions need only be "substantially similar" to the original expert, and the new expert is permitted to "reach slightly broader conclusions." *Am. Can!*, 2022 WL 1467424, at *3. Dr. Shaha's proposed testimony comports with these principles, and he should be allowed to testify to the full scope of his expert disclosures.

      Plaintiffs also make several misstatements and misleading representations in their brief. First, Plaintiffs complain that Dr. Shaha does not repeat Mr. Marshall's criticisms of Dr. Pietari regarding the reliability of her estimate of the sulfate content of the spent lime and the lack of supporting data. Pls. Supp. Opp'n at 4-5. Defendants should not be bound by any of Mr. Marshall's opinions regarding sulfate content given that Dr. Pietari has completely changed her analysis on this topic since General Causation. As noted above, based on new evidence that could have been obtained prior to the General Causation hearing, Dr. Pietari now asserts that the sulfate content of the spent lime may have been 10 times higher than her original estimate. 2024

11

Pietari Expert Report at 36, 39. Plaintiffs cannot completely rework Dr. Pietari's analysis on the one hand and try to handcuff Defendants' experts with the other.

Plaintiffs also vaguely assert that Mr. Marshall focused his criticisms on Dr. Pietari's reliance on the Anderson (2010) study, and argue that his critiques of Dr. Pietari's reliance on the Shaha (2020) study were "essentially limited" to her assumption that model inputs for the JPLF would be similar to those used in Shaha (2020). Pls. Supp. Opp'n at 6. But Plaintiffs defeat their own argument in the very next sentence, acknowledging that "Mr. Marshall expressed other opinions as to whether Dr. Pietari's use of the Shaha & Meeroff methodology could be applied to reliably estimate $H_2S$ generation from the spent lime." *Id*. at 7. Indeed, Mr. Marshall extensively cited the Shaha (2020) study to critique Dr. Pietari in his expert report.[9]

Plaintiffs next cite several specific contentions by Dr. Shaha they argue were not raised by Mr. Marshall during General Causation. But each of these opinions are either "substantively similar" to Mr. Marshall's opinions or represent no more than "slightly broader conclusions." *Am. Can!*, 2022 WL 1467424, at *3. As noted in the chart above, Dr. Shaha states that the model he developed in the Shaha (2020) study was designed to assist with determining the type and timing of future implementation for $H_2S$ treatment systems at landfills—not for Dr. Pietari's purpose of estimating $H_2S$ generation to a reasonable degree of scientific certainty. Shaha Rept. at 11. As a threshold matter, Dr. Shaha should not be precluded from describing to the jury basic background information about his own study such as the study's objective. Regardless, Mr. Marshall similarly testified at trial that the Anderson (2010) study relied on by Dr. Pietari— which he notes was later modified by the Shaha (2020) study—was also designed to be <u>forward</u>-looking. Trial Tr., Day 7 PM, 1602:12-18; 1603:13-17. In sum, both experts called attention to

---

[9] Marshall Rept. at 8, 9, 12, 15, 17-20, 26-28, 32-34, 36-38.

the objectives of the studies Dr. Pietari relies on, which were designed to estimate $H_2S$ generation in the <u>future</u>. And even if Mr. Marshall did not frame his critique in precisely the same language as Dr. Shaha, Mr. Marshall broadly criticized Dr. Pietari's application of the Shaha (2020) study to the JPLF. *See* n.4, *supra*; *Am. Can!*, 2022 WL 1467424, at *4 (refusing to exclude substitute expert's opinions not specifically addressed in original expert's report because they "do not materially stray from the subject matter of [the original expert's] opinions."). Dr. Shaha should not be precluded from providing additional detail on the same general conclusion.

Plaintiffs also seek to exclude Dr. Shaha's opinion critiquing Dr. Pietari's adoption of Mr. Sananes' LandGEM input values to estimate landfill gas at the JPLF. Pls. Supp. Opp'n at 7. But, as again noted in the chart above, Mr. Marshall squarely raised this issue in his expert report, stating that Dr. Pietari's adoption of Mr. Soler's LandGEM inputs impairs the reliability of her $H_2S$ generation estimate. Shaha Rept. at 20. Dr. Shaha goes into more detail on this point than Mr. Marshall, but he is not raising the issue for the first time. *See Sikkelee v. Precision Airmotive Corp.*, No. 07-cv-886, 2021 WL 392101, at *6 (M.D. Pa. Feb. 4, 2021) (denying motion to strike where substitute expert's new analyses merely supplemented original expert's opinions with additional evidence). Likewise, Dr. Shaha's opinion on the unknown peak $H_2S$ concentration is reasonably related to Mr. Marshall's opinions. While Mr. Marshall did not specifically single out the "unknown peak $H_2S$ concentration," he broadly criticized how the lack of historical site-specific $H_2S$ concentration data for the JPLF undermines the reliability of Dr. Pietari's work. Marshall Rept. at 8. These opinions should not be excluded.

Likewise, Dr. Shaha's opinions about (1) Dr. Pietari's focus on the parabolic relationship of her modeling inputs and (2) the inconsistency between the site-specific data and her modeling results do not contradict Mr. Marshall's opinions. Shaha Rept. at 8. These sub-opinions are

13

simply detailed support for Dr. Shaha's broader criticism that Dr. Pietari did not validate her modeling results, which significantly undermines the reliability of her work. Mr. Marshall reached the exact same conclusion, and Dr. Shaha's elaboration on the problems with Dr. Pietari's failure to validate her modeling results should not be excluded. Marshall Rept. at 37. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, No. 18-md-2846, 2021 WL 3617152, at *2 (S.D. Ohio Aug. 16, 2021) (denying motion to strike substitute expert even though new expert offered "additional grounds" explaining his opinion).

Finally, Plaintiffs ask the Court to exclude Dr. Shaha's Opinion 3, regarding the sulfur content of the spent lime, as inconsistent with Mr. Marshall's opinions. Pls. Supp. Opp'n at 7. As outlined above, Dr. Pietari has completely overhauled her analysis of the likely sulfur content of the spent lime. The Court should not impose any restrictions on Dr. Shaha's rebuttals related to sulfur content.

In sum, both Mr. Marshall and Dr. Shaha broadly criticized the reliability of Dr. Pietari's hydrogen sulfide generation estimates and Dr. Shaha's analysis is consistent with Mr. Marshall's conclusions. Dr. Shaha should be allowed to testify to the full scope of his expert report.

**IV.     Any prejudice arising from differences in Dr. Shaha and Mr. Marshall's opinions was cured by Dr. Pietari's rebuttal report and Plaintiffs' deposition of Dr. Shaha.**

Even if the Court finds that Dr. Shaha has issued an opinion that is not substantively similar to Mr. Marshall's conclusions, any purported prejudice was cured by the disclosure of Dr. Shaha eleven months before trial,[10] Dr. Pietari's 42-page expert report rebutting Dr. Shaha's opinions,[11] and Plaintiffs' 6.5-hour deposition of Dr. Shaha.[12] *See e.g.*, *Smith v. Harris Cnty.,*

---

[10] *See* Defendants' Witness List (No. 18-7889, R. Doc. 377; 19-11133, R. Doc. 418).

[11] Rebuttal Report of Jaana Pietari, Ph.D, dated March 29, 2024, appended to the Vitris Decl. as Exhibit 4.

[12] Deposition Transcript of Bishow Shaha, taken April 30, 2024 (No. 18-7889, R. Doc. 441-2; 19-11133, R. Doc. 556-2).

14

*Tex.*, No. 15-cv-2226, 2017 WL 11845920, at *2 (S.D. Tex. Oct. 5, 2017) (prejudice arising from untimely expert disclosure cured where opposing party would have adequate time to depose new experts and supplement its own experts' opinions); *DAK Americas Miss., Inc. v. Jedson Eng'g, Inc.*, No. 18-cv-31, 2019 WL 8375811, at *4 (S.D. Miss. Sept. 27, 2019) (same).

Plaintiffs' real complaint appears to be that they secured admissions from Mr. Marshall during General Causation that they wish to raise at trial. Pls. Supp. Opp'n at 5. But Plaintiffs are free to do so, as nothing prevents Plaintiffs from challenging Dr. Shaha with Mr. Marshall's General Causation testimony. *See, e.g.*, *Abbott*, 2014 WL 6613148, at *2 (denying motion to exclude substitute expert and reasoning that "plaintiffs can certainly use the last expert's deposition testimony against the new expert."); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 22 (D.P.R. 2009) (granting motion for leave to substitute expert and reasoning that defendant could not "escape from the concessions or admissions" of the original expert because plaintiffs could challenge the substitute expert with the original expert's deposition testimony).

## V. The Court should deny Plaintiffs' requests to broadly preclude Dr. Shaha from testifying on 26 different topics.

Toward the end of Plaintiffs' brief—without any analysis or citations to legal authority—Plaintiffs state that "Dr. Shaha should be precluded from offering the following testimony or opinions," and list 26 broad topics with citations to Dr. Shaha's deposition. Pls. Supp. Opp'n at 8. Despite providing no explanation for why Dr. Shaha should be precluded from testifying about these topics, a review of Plaintiffs' citations to Dr. Shaha's deposition suggests that Plaintiffs are citing to questions posed by counsel to which Dr. Shaha stated he did not have an opinion. But like any other expert witness, Dr. Shaha's testimony is limited to the scope of his expert report. If Dr. Shaha strays beyond the scope of his expert disclosures, Plaintiffs are free to object and confront him with his deposition testimony. Preemptively precluding Dr. Shaha from testifying

15

on Plaintiffs' 26 broadly-phrased topics will only embolden Plaintiffs to try and shoehorn Dr. Shaha's properly-disclosed opinions into narrow details on which he stated he had no opinion. The Court should instead address at trial any objections to Dr. Shaha's testimony as beyond the scope of his expert disclosures.

## CONCLUSION

After Mr. Marshall was diagnosed with cancer, Defendants retained Dr. Shaha to take Mr. Marshall's place. Dr. Shaha was timely designated as an expert witness under the Court's Case Management Orders. Plaintiffs were made aware of Dr. Shaha's substitution eleven months before trial. Plaintiffs have deposed Dr. Shaha, and Plaintiffs' expert Dr. Pietari has issued an expert report rebutting Dr. Shaha's opinions. Any purported prejudice arising from Dr. Shaha's substitution has been cured. Further, Dr. Shaha's opinions are substantively similar to and not inconsistent with Mr. Marshall's conclusions. And any remaining differences between Dr. Shaha and Mr. Marshall's opinions should be allowed given Dr. Pietari's material changes to her own expert disclosures. Defendants' designation of Dr. Shaha as an expert witness should be upheld and he should be allowed to testify to the full scope of his expert report.

Respectfully submitted,

LISKOW & LEWIS, APLC

By: /s/ Michael C. Mims
　　Michael Cash (#31655)
　　Cherrell Simms Taplin (#28227)
　　Michael C. Mims (#33991)
　　Brady M. Hadden (#37708)
　　J. Hunter Curtis (#39150)
　　Alec Andrade (#38659)
　　701 Poydras Street, Suite 5000
　　New Orleans, Louisiana  70139
　　(504) 581-7979

16

BEVERIDGE & DIAMOND, P.C.

Megan R. Brillault (*pro hac vice*)
Michael G. Murphy (*pro hac vice*)
John H. Paul (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
Katrina M. Krebs (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed on June 13, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        /s/ Michael C. Mims
        OF COUNSEL