

# SUPPLEMENTAL EXPERT REPORT OF
# JOHN KIND, PHD, CIH, CSP

In the Matter of Frederick Addison, et al. v.
Louisiana Regional Landfill Company, et al.
March 8, 2024

Based on my review of the data and other information, I have also identified sewage lift stations and natural sources of hydrogen sulfide emissions (e.g., swamps, bayous, and marshlands) as alternative odor sources that could have impacted Plaintiffs.

### 3.2   Air Monitoring and Sampling throughout Jefferson Parish

Hourly air quality data collected by LDEQ across Jefferson Parish between February 2018 and October 2018 reported hydrogen sulfide concentrations ranging between 3 ppb[4] and 40 ppb[5], well below Louisiana's Ambient Air Standard of 237 ppb. Parallel air sampling efforts from LDEQ to evaluate other odorous compounds (including amines, ammonia, carboxylic acids, aldehydes, and sulfides) showed that these constituents were found at levels typically found in unimpacted ambient air, resulting in the conclusion that hydrogen sulfide, sulfur dioxide, and multiple other volatile organic compounds (VOCs) were at levels *"below health-based standards"* and *"do not pose a health risk."*

Data collected during "odor patrols" performed by LDEQ between October and December 2018 showed that odors were not specifically associated with the JPLF. Similarly, odor surveys conducted by SCS on September 2018[6] noted odors near the Hwy 90 C&D Landfill, whereas odors near the JPLF were not significant. SCS concluded:

> *"odor complaint correlation with concurrent wind measurements suggests that numerous sources in the region contribute to odor detection by the public."*

> *"observed odors and measured concentrations of hydrogen sulfide at the JPLF are minimal and not detectable at offsite locations."*

Measurements taken by LDEQ in December 2019 using their Mobile Air Monitoring Lab (MAML) showed that hydrogen sulfide was not detected above 5 ppb.[7]

My April 30, 2021 report issued in the *Ictech-Bendeck* and *Addison* actions, contains a more comprehensive discussion of air monitoring and sampling efforts in Jefferson Parish and at the JPLF including the efforts described above.

### November 29, 2022, Court Ruling

Plaintiffs allege that during the relevant time period, odors from the JPLF purportedly caused injuries to their use and enjoyment of their property and their enjoyment of life, and caused physical and mental

---

[4] LDEQ, Mobile Air Monitoring Lab: River Ridge and Harahan, LA (Feb. 19, 2018) (JP_JPLF_0009800).
[5] LDEQ, Mobile Air Monitoring Lab: River Ridge and Harahan, LA (July 20, 2018) (ADD_P00135782).
[6] SCS Engineers, *Jefferson Parish Landfill Site Evaluation with Respect to Odors* (Oct. 24, 2018) (WC_JPLF_00082561).
[7] LDEQ, *Mobile Air Monitoring Lab: Jefferson Parish Odors* (Dec. 16, 2019) (WC_JPLF_00315889).

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 6



### 5.15.4 Lifestyle, Medications, and Confounders

Prior to July of 2017, Mr. Tyrone Thompson had a medical history significant for obesity, tobacco use, hyperlipidemia, hypertension, hyponatremia, abdominal pain, diverticulitis of the colon, and sinus tachycardia.[374] It was documented in the medical records that Mr. Thompson's abdominal pain was associated with nausea and non-bloody, food content vomiting, reportedly consistent with gastroenteritis versus dyspepsia.[375] Polypharmacy was noted in the reviewed medical records; symptoms of which can be a result of drug interactions or side effects of drugs.[376]

On February 4, 2015, Mr. Thompson was diagnosed with an opioid dependency.[377] Doctor's notes show that he was on Vicodin *"like clockwork."*[378] associated with long-term opioid dependency including respiratory depression, somnolence, and immune and endocrine dysfunction.[379] Mr. Thompson was prescribed Lortab, a form of hydrocodone and acetaminophen, through June of 2017 and reported that *"Lortab gives [him] a headache."*[380] Records from March 26, 2019, show that a urine drug screen was positive for oxycodone, which he was not prescribed. This was the second time he had this violation with the first being in 2018.[381]

Mr. Thompson's tobacco history included one pack of cigarettes a day for twenty years, as reported in the medical records dated in 2015.[382] In addition, Mr. Thompson had a stent placed in his left leg for a blockage in 2015 and now walks with a cane.[383] Medical records state that Mr. Thompson was prescribed Xanax for anxiety on May 25, 2017.[384]

### 5.16 Mary Ann Winningkoff

### 5.16.1 Background

Mary Ann Winningkoff was born on March 9, 1944.[385] Ms. Winningkoff resides at 47 Donelon Drive, Harahan, Louisiana, 70123 and has lived there since late 2005.[386] She retired from the Louisiana Army and Air National Guard in 2004 after 26 years of service.[387] Ms. Winningkoff and her husband were married

---

[374] 2023.06.01. Thompson_Lewis_RFRD Produced_Supplemental ("Thompson_Lewis"): 0077, 0079, 0097, 0108, 0319, 0530; WCI_Thompson, Tyrone_Ochsner-Metarie_0000007.
[375] Thompson_Lewis: 0319.
[376] Thompson_Lewis: 0408, 0416.
[377] WCI_Thompson, Tyrone_Ochsner-Kenner_000032.
[378] WCI_Thompson, Tyrone_UMC_000100-101
[379] WCI_Thompson, Tyrone_Ochsner-Kenner_000038.
[380] WCI_Thompson, Tyrone_UMC_000286
[381] WCI_Thompson, T_La Pain Specialists_000090, 000096; WCI_Thompson, T_La Pain Specialists_000244
[382] Thompson_Lewis: 0070, 0078, 0302.
[383] Thompson Dep. Tr. 115, 133.
[384] WCI_Thompson, T_La Pain Specialists_000310.
[385] Winningkoff Dep. Tr. 19:4-5; Winningkoff PFS; Winningkoff Medical Records.
[386] Winningkoff Dep. Tr. 43:10-17; Winningkoff PFS.
[387] Winningkoff Dep. Tr. 21:14-22:25.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 40



for 25 years before he passed away on May 17, 2018.[388] Ms. Winningkoff has three daughters, and two stepsons.[389]

Ms. Winningkoff recognized the Plaintiff Fact Sheet and stated that she handwrote the responses herself and someone else typed it up.[390] She confirmed that she reviewed the document and signed it.[391] Ms. Winningkoff explained that she learned of the lawsuit through Facebook.[392]

### 5.16.2 Odor Experience

Ms. Winningkoff testified that she is not very familiar with the Jefferson Parish Landfill but believes it is located across the river.[393] Initially, she did not know where the odor was coming from, but she read online that her neighbors speculated the odor was coming from the Jefferson Parish Landfill.[394]

Ms. Winningkoff indicated that she experienced two odors from her residence: one she believed came from the Harahan Pump Station, but wasn't certain, and a much stronger odor coming from an unspecified location.[395] The odors first started at or around 2017, and she noted that she did not smell the odors from the pump station as frequently as the other *"sulfur smell."*[396] She differentiated the odor sources based on whether they were sulfurous in nature – she attributed the sulfur odors to the Harahan pump station, describing the odor as *"rotten egg type"* when driving by it.[397] She noted that odors from the Harahan pump station were at an eight, on a scale from zero to ten, ten being the worst.[398]

Ms. Winningkoff testified that she made an odor complaint in 2017 to LDEQ where she reported a strong odor, like that of *"sewage or gas petroleum fumes,"* being emitted from the Harahan sewage treatment plant after hearing that they were accepting Chalmette refinery waste.[399] However, when questioned about it later she testified, *"I [do] not remember typing [that] in."*[400]

When asked to describe the other odor she experienced between 2017 to 2019, Ms. Winningkoff stated it smelled like *"petroleum sulfate."*[401] She specified that the odor was worse around the summer months of 2017 and 2018.[402] She explained that the intensity would depend on the direction of the wind and the

---

[388] Winningkoff Dep. Tr. 28:2-11.
[389] Winningkoff Dep. Tr. 28:13-16; Winningkoff PFS.
[390] Winningkoff Dep. Tr. 13-14.
[391] Winningkoff Dep. Tr. 14, 16.
[392] Winningkoff Dep. Tr. 151:18-152:8.
[393] Winningkoff Dep. Tr. 77:20-78:7.
[394] Winningkoff Dep. Tr. 79:14-80:1.
[395] Winningkoff Dep. Tr. 87:1-6, 91:11-92:1, 93, 115:7-19.
[396] Winningkoff Dep. Tr. 92:12-13, 93, 115; Winningkoff PFS.
[397] Winningkoff Dep. Tr. 115:7-19.
[398] Winningkoff Dep. Tr. 93:19-20, 94, 115.
[399] Winningkoff Dep. Tr. 84-86, 95, 90:1.
[400] Winningkoff Dep. Tr. 168:15.
[401] Winningkoff De. Tr. 98:17; Winningkoff PFS.
[402] Winningkoff Dep. Tr. 100, 101, 102.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 41



time of year.[403] She advised that she would leave in the mornings to run her errands in places where the odor was not present.[404] She also stated that, unless she had to, she would avoid going outside at her home.[405] Ms. Winningkoff testified she would *"very seldom"* notice an odor by 2019 defining *"very seldom"* to mean every few months.[406]

Ms. Winningkoff testified that her grandkids would sometimes come and visit between 2017 and 2019, unless the odor was bad, then she would go visit them.[407] According to her Plaintiff Fact Sheet, Ms. Winningkoff was unable to have guests over, unable to sit outside on her patio, and unable to garden or walk due to the odor.[408] In addition to her personal residence, Ms. Winningkoff claims she experienced odors in the River Ridge and Harahan areas, including at both St. Rita and St. Mathew churches.[409]

### 5.16.3  Health Complaints

Regarding her own personal injuries, Ms. Winningkoff claimed that the odor caused debilitating migraines.[410] She noted that she would get a migraine every time she would smell the *"sulfur smell."*[411] When asked if she still experiences migraines, she stated, *"not really. I haven't had one in a good while."*[412] Ms. Winningkoff testified that her headaches would subside if she left the house where she experienced odors.[413] Ms. Winningkoff also listed eye irritation and swelling, trouble breathing, and a tight chest as symptoms she experienced on her plaintiff fact sheet.[414]

### 5.16.4  Lifestyle, Medications, and Confounders

Prior to July of 2017, Ms. Winningkoff had a documented medical history that included the following: hypertension, hypercholesterolemia, morbid obesity, hypothyroidism, gastroesophageal reflux disease, headache, chronic sinusitis, obstructive sleep apnea, malaise and fatigue, and menopause.[415]

Several side effects from medications were reported from the multitude of medications Ms. Winningkoff was taking.[416] For example, gastrointestinal disturbances were claimed side effects following antibiotic use in August of 2019.[417] During a telephone encounter in 2007, Ms. Winningkoff reported poor sleep and

[403] Winningkoff Dep. Tr. 100, 101, 102.
[404] Winningkoff Dep. Tr. 111.
[405] Winningkoff Dep. Tr. 111, 112.
[406] Winningkoff Dep. Tr. 106, 107:2.
[407] Winningkoff Dep. Tr. 170-171.
[408] Winningkoff PFS.
[409] Winningkoff Dep. Tr. 103:22-105:7.
[410] Winningkoff Dep. Tr. 88, 110, 112; Winningkoff PFS.
[411] Winningkoff Dep. Tr. 136:12.
[412] Winningkoff Dep. Tr. 137:7-8.
[413] Winningkoff Dep. Tr. 135-136:1-2.
[414] Winningkoff PFS.
[415] WCI_WINNINGKOFF, MARY_OCH-NOLA_000096, 000109, 000111, 000114, 000127, 000263, 000344, 004128.
[416] WCI_WINNINGKOFF, MARY_OCH-NOLA_000186; 003614; WCI_WINNINGKOFF, MARY_Claiborne Derm_000025.
[417] WCI_WINNINGKOFF, MARY_OCH-NOLA_002350-2351.



3. Potential alternate causes of the condition or health effect (confounders) can be adequately ruled out as being the substantial cause of the condition or health effect (eliminating alternative possible etiologies for the condition).

4. There is coherence and consistency in the evidence evaluated in this specific case (establishing that the evidence is consistent with all scientific facts).

Because both specific and general causation must be established, it is my opinion that if it were shown that the trial Plaintiffs were exposed to hydrogen sulfide at an average of 5 ppb or greater for 30 minutes, this would be inadequate to establish specific causation (i.e., that the trial Plaintiffs' alleged injuries were in fact caused by the exposure) without consideration of additional factors and alternate etiologies of the alleged injuries, as further discussed in this report.

**6.2    There is insufficient scientific basis for Plaintiffs' claims that airborne exposure to 5 ppb hydrogen sulfide for 30 minutes is capable of causing their claimed nuisance health effects.**

The Court previously ruled in its general causation decision that exposure to hydrogen sulfide at an average concentration of at least 5 ppb for 30 minutes is capable of causing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment and use of property. In reaching this conclusion, the Court cited Dr. Pam Dalton's statement that people need to be able to smell an odor as a "prerequisite" to experience symptoms. Under this framework exposures to hydrogen sulfide at 5 ppb for 30 minutes is necessary (i.e., a prerequisite) to elicit symptoms. But that is not sufficient for the specific causation inquiry - described above  because such exposure must also be sufficient to elicit a response. In other words, whereas smelling an odor may be <u>required</u> to elicit a response, smelling an odor may not be <u>sufficient</u> to elicit such a response in a particular person.

Applying that standard here where specific causation is being determined with respect to the 13 trial Plaintiffs, such a concentration must be sufficient to elicit a response in each particular trial Plaintiff and result in the health conditions for that particular trial Plaintiff. Said another way, is 5 ppb for 30 minutes a level at which each particular trial Plaintiff is able to detect, recognize, and be annoyed by hydrogen sulfide in the environment and to experience health conditions?

In applying this framework, it is important to understand how the WHO Regional Office for Europe defined its own guidance level and refer to other health-protective benchmarks and guidance values. As discussed in detail in Section 5.4 of this report and in my 2021 report, those types of health-protective benchmarks and guidance values inherently overestimate risk, as they are intended to be protective in nature. For

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 45

 CTEH®

example, WHO qualified that its odor nuisance guidance value was established to minimize annoyance associated with odors by identifying a concentration of hydrogen sulfide—5 ppb for 30 minutes—that would result in annoyance in no more than 5% of the population for less than 2% of the time.[433] Even the most sensitive 5% of the population would not experience odor annoyance at this concentration for at least 98% of the time.  In other words, 95% of the population would not experience annoyance after 30 minutes of exposure to 5 ppb of hydrogen sulfide, and those that do would only experience annoyance for a very short period of time (i.e., less than 2% of the time).

This conservative nature of guidance levels is well described by the WHO in their health risk evaluation of hydrogen sulfide, stating that:

> "_Most probably, at concentrations below 1.5 mg/m³ (1 ppm) [1,000 ppb], even in exposure for longer periods, there are very few detectable health hazards in the toxicological sense. The malodorous property of hydrogen sulfide is a source of annoyance for a large proportion of the general population at concentrations below 1.5 mg/m³ [1,000 ppb], but from the existing data it cannot be concluded whether any health effects result_" emphasis added.[434]

In establishing the guideline, value of 5 ppb of hydrogen sulfide over 30 minutes, the WHO Task Group noted that odor nuisance would not generally be expected at this value:

> "_The Task Group considered that a level of 0.007 mg/m³ [5 ppb] averaged over 30 min should not produce odour nuisance in most situations._" emphasis added.[435]

The California Ambient Air Quality Standard (CAAQS) of 30 ppb is consistent with this concept. The California Air Resources Board notes that this is the level at which, on a population basis, is the average odor detection threshold (between 30 and 50 ppb), emphasizing that:

> "_health effects have only been reported with exposures greater than 50 ppm (eye irritation), considerably higher than the odor threshold based standard._"

and

> "_hydrogen sulfide is regulated as a nuisance based on its odor detection level. If the standard were based on adverse health effects, it would be set at a much higher level._" [436]

Given the conservatism of the WHO guidance value, it is my opinion that merely modeling hydrogen sulfide exceedances of the 5 ppb for 30 minutes guidance value proposed by WHO is insufficient and

---

[433] WHO, 2000
[434] WHO, 2000.
[435] WHO, 1981.
[436] CARB, 2023.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 46



symptoms.[535] Ms. Winningkoff's also has a history of menopause, which could be a source of her sleep disruption. Salari et al. (2023) conducted a meta-analysis of 41 studies, finding approximately 51.6% of postmenopausal women with sleep disorders (Salari et al., 2023).[536] In addition, since Ms. Winningkoff's medical records indicate that she previously suffered from sleep apnea prior to July 2017, this may also be a cause of her symptom of sleep disruption. Of note, studies show that sleep disruption is associated with headaches.[537] Ms. Winningkoff's previously established medical conditions should be considered with regard to her alleged symptoms. Ms. Winningkoff's reports of stress were previously reported to be associated with her husband's deteriorating health, thus, unrelated to odors. Therefore, I cannot agree to a reasonable degree of scientific and toxicological certainty that Ms. Winningkoff's alleged health conditions were more likely than not caused by exposure to hydrogen sulfide at the concentrations at issue in this case.

In summary, it is my opinion that there is substantial evidence of potential confounders and alternate causes for each and every one of the trial Plaintiffs and their alleged conditions in this matter. Given that the conditions alleged in this case could possibly be associated with pre-existing medical conditions or side effects from their medications, the trial Plaintiffs and their experts cannot conclude to a reasonable degree of scientific or medical certainty that the conditions experienced by any of the trial Plaintiffs are attributable to alleged exposures to hydrogen sulfide from the JPLF.

### 6.4    Emission fate and transport data do not support the trial Plaintiffs' allegation that the JPLF is a substantial factor contributing to the cause of the nuisance impacts claimed by the trial Plaintiffs.

The human olfactory system can sense an odor when an interaction occurs between a sufficient concentration of volatile odorous compounds and interact with sensory receptors located in the olfactory epithelium tissue within the nasal cavity. In other words, odors are perceived by people when those odorous compounds are inhaled through the nose, regardless of the source of the odorant molecules or how far those odorous compounds may have traveled before reaching the human nose. Thus, identification of odor sources involves not only identifying the odor character (i.e., rotten egg), but also identifying all potential sources of those odors (i.e., rotten eggs, trash, flatulence, sewer, sewage treatment plants, decaying organic material in water bodies, etc.), as well as the fate and transport of odorous compounds in the environment. Because most airborne constituents travel downwind from the point of release, generally, individuals smelling odors would need to be in a downwind path from the actual source to attribute an odor to that source.

---

[535] Antunes et al., 2023; Brzana & Koch, 1997; Clarrett & Hachem, 2018; Gerson et al., 2011.
[536] Salari, 2023
[537] Luntamo et al., 2012; Brennan & Charles 2009; Korabelnikova, et al., 2020



In my review of case materials and deposition testimony, it is noteworthy that multiple trial Plaintiffs reported constant odors they attributed to the JPLF. For example, Ms. Green testified that she smelled an odor around her home 24-hours per day, 7-days per week between 2017 and 2020.[538] Similarly, Ms. Richardson noted she experienced odors 24-hours per day 7-days per week starting from the summer of 2017 up until she moved in April of 2020.[539] Mr. Thompson reportedly began experiencing an odor on his property seven days a week in the summer of 2017 and it continued through the winter of 2019. As demonstrated below, it is not physically possible for these individuals to have experienced constant odors attributable to the JPLF over these time periods.

To evaluate the likelihood of these odors being continuously attributable to the JPLF, I conducted an evaluation of wind direction data from Louis Armstrong New Orleans International Airport (MSY) to determine whether prevailing winds would support the conclusion that JPLF could be the continuous source of odors. For each of the trial Plaintiffs' residences, I evaluated the percentage of time (throughout the relevant period) they were downwind of the JPLF. In addition, I evaluated the percentage of time they were downwind of potential alternate odor sources. For each residence, I provide a summary figure illustrating downwind percentages when considering a wind angle of 30° from the potential odor source. Additional analyzes of downwind percentages were conducted at 20°, 45° and 60°, and are provided in **Appendix D**. The proportion of time Plaintiffs' residences were found downwind of the JPLF, and the various facilities considered as alternate odor sources did not change substantially between the 20°, 45° and 60° wind angles when compared to the 30° wind angle illustrated below.

---

[538] Green Dep. Tr. 50, 52.
[539] Richardson Dep. Tr. 82, 87, 88, 93, 108, PFS.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 69

CTEH®

**Figure 3. Percentage of Time Geneva Green's Residential Address was Downwind of the JPLF during the Relevant Time Period**



| Facility | Percent of Time Plaintiff Downwind of Facility |
|---|---|
| American River Transportation Co. LLC | 21.31% |
| Harahan Sewage Treatment Plant | 7.93% |
| Cargill Inc | 7.52% |
| Wood Resources | 7.46% |
| International-Matex Tank Terminal (Avondale) | 7.17% |
| Cornerstone Chemical Company | 5.46% |
| Dyno Nobel LA Ammonia | 5.46% |
| Evonik Cyro LLC | 5.46% |
| Kemira Chemicals Inc. | 5.46% |
| JPLF | 4.33% |
| ADM Grain River System Inc | 4.17% |

As illustrated in Figure 3, above, Ms. Green's residence was downwind of the JPLF and other west bank landfills approximately 4.33% of the time. In contrast, her residence was found downwind of individual alternate odor sources up to 21.31% of the time, nearly five times more frequently than the JPLF. Cumulatively, Ms. Green's residence (205 Cabinet Drive, Avondale, LA 70094) was downwind of alternate odor sources over 77% of the time. Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to JPLF does not support the allegation that the JPLF is a substantial cause of the odor impact alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 70

**CTEH**®

**Figure 4. Percentage of Time Scott, Wendy, Braxton, and Adelyn Gremillion's Residential Address was Downwind of the JPLF during the Relevant Time Period**



As illustrated in Figure 4, above, the Gremillion family's residence was downwind of the JPLF and other west bank landfills approximately 5.17% of the time. In contrast, their residence was found downwind of individual alternate odor sources up to 10.83% of the time, nearly double in comparison to the JPLF. Cumulatively, the Gremillion's residence (9701 Robin Lane, River Ridge, LA 70123) was downwind of alternate odor sources over 58% of the time. Their residence is located 3.48 miles away from the JPLF with other odors sources such as Harahan Sewage Treatment Plant being located closer (0.93 miles). Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to JPLF does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 71

**CTEH**®

**Figure 5. Percentage of Time Vernice Lewis and Terrance and Tyrone Thompson's Residential Address was Downwind of the JPLF during the Relevant Time Period**



As illustrated in Figure 5, above, the Thompson family's residence was downwind of the JPLF and other west bank landfills approximately 6.65% of the time. In contrast, their residence was found downwind of individual alternate odor sources up to 11.49% of the time. Cumulatively, their residence (1116 Starrett Road, Metairie, LA 70003) was downwind of alternate odor sources about 70% of the time period. Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to JPLF does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 72

CTEH®

**Figure 6. Percentage of Time Stanley Meyers' Residential Address was Downwind of the JPLF during the Relevant Time Period**



As illustrated in Figure 6, above, Mr. Meyers' residence was downwind of the JPLF and other west bank landfills approximately 4.17% of the time. In contrast, his residence was found downwind of individual alternate odor sources up to 21.31% of the time, more than five times more frequently that the JPLF. Cumulatively, his residence (1041 Magnolia Drive, Westwego, LA 70094) was downwind of alternate odor sources about 66% of the time period. Mr. Meyers' residence is located 6.95 miles away from the JPLF with other odors sources such as Wood Resources, LLC being located closer (1.97 miles). Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to JPLF does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 73

CTEH®

**Figure 7. Percentage of Time Reshaun Richardson's Residential Address was Downwind of the JPLF during the Relevant Time Period**



As illustrated in Figure 7, above, Ms. Richardson's residence was downwind of the JPLF and other west bank landfills approximately 6.65% of the time. In contrast, her residence was found downwind of individual alternate odor sources up to 11.49% of the time, nearly twice that of the JPLF. Cumulatively, Ms. Richardson's residence (624 Wilker Neal Avenue, River Ridge, LA 70123) was downwind of other odor sources approximately 69% of the time. Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to the time downwind of the JPLF, does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 74

CTEH®

**Figure 8. Percentage of Time Andrew Section's Residential Address was Downwind of the JPLF during the Relevant Time Period**



As shown in Figure 8, above, Mr. Section's residence was downwind of the JPLF and other west bank landfills approximately 4.17% of the time. In contrast, his residence was downwind of the Harahan Sewage Treatment Plant 23.39% of the time, more than five times more frequently that the JPLF. Cumulatively, Mr. Section's residence (537 George Street, Westwego, LA 70094)) was downwind of other odor sources approximately 78% of the time. His residence is located 2.56 miles away from the JPLF with other odors sources such as International-Matex Tank Terminal being located closer (1.13 miles). Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to the time downwind of the JPLF, does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 75

CTEH®

**Figure 9. Percentage of Time Jonathan Tate's Residential Address was Downwind of the JPLF during the Relevant Time Period**



| Facility | Percent of Time Plaintiff Downwind of Facility |
|---|---|
| Wood Resources | 10.00% |
| American River Transportation Co. LLC | 8.85% |
| International-Matex Tank Terminal (Avondale) | 8.85% |
| Cargill Inc | 7.46% |
| Harahan Sewage Treatment Plant | 7.38% |
| JPLF | 5.10% |
| Dyno Nobel LA Ammonia | 4.17% |
| Kemira Chemicals Inc. | 4.17% |
| Cornerstone Chemical Company | 3.80% |
| Evonik Cyro LLC | 3.80% |
| ADM Grain River System Inc | 3.14% |

As illustrated in Figure 9, above, Mr. Tate's residence was downwind of the JPLF and other west bank landfills approximately 5.10% of the time. In contrast, his residence was found downwind of individual alternate odor sources up to 10% of the time, nearly twice as often as the JPLF. Cumulatively, Mr. Tate's residence (21 Richelle Street, Westwego, LA 70094) was downwind of other odor sources approximately 61% of the time. His residence is located 2.08 miles away from the JPLF with other odors sources such as American River Transportation Co., LLC being located closer (0.73 miles). Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to the time downwind of the JPLF, does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 76

CTEH®

**Figure 10. Percentage of Time Mary Ann Winningkoff's Residential Address was Downwind of the JPLF during the Relevant Time Period**



As illustrated in Figure 10, above, Ms. Winningkoff's residence was downwind of the JPLF and other west bank landfills approximately 3.29% of the time. In contrast, her residence was found downwind of individual alternate odor sources up to 20.80% of the time, more than six times more frequently that the JPLF. Cumulatively, Ms. Winningkoff's residence (47 Donelon Drive, Harahan, LA 70123) was downwind of other odor sources approximately 67% of the time. Her residence is located 2.87 miles away from the JPLF with other odors sources such as International-Matex Tank Terminal being located closer (0.93 miles). Thus, it is my opinion that the percentage of time downwind of alternate odor sources, in comparison to the time downwind of the JPLF, does not support the allegation that the JPLF is a substantial cause of the odor impacts alleged.

In summary, these evaluations of available meteorological data indicate that the JPLF would not be the most predominant upwind potential source of odors for any of the trial Plaintiffs. In fact, most of the identified alternate potential odor sources were found more frequently upwind of the trial Plaintiffs' homes than the JPLF. Thus, based on prevailing wind data, it is my opinion to a reasonable degree of scientific certainty that the scientific evidence does not support the claim that trial Plaintiffs' were subjected to near-constant emissions from the JPLF.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 77

**CTEH**®