1

2                 UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF LOUISIANA

4

5                                      )Civil Action
     ELIAS JORGE "GEORGE"              )No. 18-7889
6    ICTECH-BENDECK,                   )c/w 18-8071,
              Plaintiff,               )18-8218,
7             vs.                      )18-9312
     WASTE CONNECTIONS BAYOU,          )
8    INC., ET AL.,                     )Section: "E"
                                       )(5)
9             Defendants.              )
                                       )
10   Related Case:                     )
                                       )Civil Action
11   FREDERICK ADDISON, ET AL.,        )
              Plaintiffs,              )NO. 19-11133,
12            vs.                      )c/w 19-14512
     LOUISIANA REGIONAL LANDFILL       )
13   COMPANY, ET AL.,                  )Section: "E"
                                       )(5)
14            Defendants.              )
                                       )
15   Applies to:  Both Cases.          )
     -------------------------------)

16

17

18          HYBRID VIDEOTAPED DEPOSITION OF

19      EXPERT WITNESS PAMELA DALTON, PhD, MPH

20                New York, New York

21              Monday, May 13, 2024

22

23

24   Reported by:
     TAMI H. TAKAHASHI, RPR, CSR
25   JOB NO. J11168217



```
 1

 2                      May 13, 2024

 3                      10:15 a.m.

 4

 5            Hybrid Videotaped Deposition of

 6   Expert Witness PAMELA DALTON, PhD, MPH, held

 7   at the offices of Beveridge & Diamond PC, 825

 8   Third Avenue, 16th Floor, New York, New York,

 9   pursuant to Notice, before TAMI H. TAKAHASHI,

10   a Registered Professional Reporter and Notary

11   Public of the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                       P. Dalton
 2    BY MS. JAMES:
 3         Q.   Correct?
 4         A.   Which report are we speaking of?
 5         Q.   I'm talking about the March 8th
 6    report, 2024, that you rendered in the
 7    Addison case.
 8         A.   Well, in that report I'm talking
 9    about not the general causation decision, but
10    the -- whether or not these specific
11    plaintiffs were impacted at that
12    concentration.
13         Q.   Okay.  I guess we can kind of just
14    transition into this right now, so let
15    me just kind of follow up with what we were
16    talking about a minute ago, though.
17              Other than this case, which you
18    explained has more of a chemical analysis
19    than some of the other landfill cases that
20    you've worked on, have you ever been involved
21    in a case that is -- has asked you to opine
22    on the impacts of hydrogen sulfide emanating
23    from a landfill and whether or not that could
24    cause the injuries alleged by the plaintiffs?
25              MS. KREBS:  Object to form.
```



```
 1                      P. Dalton

 2    by something else, right?  So in a way you

 3    are not -- in a way that you are actually

 4    basing your opinions on those, right, and the

 5    credibility of them in saying that they're

 6    not credible?

 7            MS. KREBS:  Object to form.

 8       A.   I am not saying that they are not

 9    credibly reporting on what they're experience

10    is.  I am questioning the accuracy of their

11    attribution.

12    BY MS. JAMES:

13       Q.   Okay.  So just so we're clear, for

14    the posts that were contemporaneous reports,

15    either that would be Facebook or the reports

16    that were made to the odor hotline or the

17    DEQ, you are not disputing the credibility of

18    those reports, right?

19            MS. KREBS:  Object to form.

20       A.   When you use the word

21    "credibility," it is inferring that there's

22    something beyond what the person is

23    reporting.  I cannot dispute what their

24    experience was or what caused them to call

25    the odor hotline or to post something on
```



```
 1                      P. Dalton
 2      Q.   Okay.  And, in fact, you have
 3  already stated in prior testimony that you
 4  found the complaints of these plaintiffs to
 5  be real and credible; is that correct?
 6           MS. KREBS:  Object to form.
 7      A.   When I testified that they were
 8  real, I'm simply saying that they believed
 9  them at the time they said them.  I have
10  no -- no way of verifying a self-report.  So
11  I'm not accusing them of dissembling or lying
12  about it.  I -- it is a self-report.  I just
13  take it at face value for what it is.
14  BY MS. JAMES:
15      Q.   Um-hum.
16      A.   It wasn't verified by an inspector
17  necessarily, as sometimes can happen in odor
18  cases.  It's -- they're a self-report.
19      Q.   You stand by the statement that you
20  gave at trial regarding the plaintiffs'
21  complaint to be real and credible?
22           MS. KREBS:  Object to form.
23      A.   Their complaint is based on what
24  they reported at the time and what they
25  believed they were experiencing, nothing
```



PAMELA DALTON, PHD, MPH                                    May 13, 2024
Ictech-Bendeck vs Waste Connections Bayou                          107

```
 1                        P. Dalton
 2    more, nothing less.
 3    BY MS. JAMES:
 4        Q.   Okay.  All right.  Okay.  Let's --
 5    okay.  And, generally speaking, you know,
 6    it's your opinion that memories that were --
 7    and memory recall is usually more accurate
 8    closer to the event, correct?
 9             MS. KREBS:  Object to form.
10        A.   That is generally true.
11    BY MS. JAMES:
12        Q.   Okay.  But in formulating your
13    opinions, you stated that you had preferred
14    to use testimony that was given four and some
15    years after the event because it was under
16    oath, right?
17             MS. KREBS:  Object to form.
18        A.   Well, there were also declarations
19    or interrogatories filled out in a prior
20    period, a lot of them were done right after
21    the relevant period.  So I looked at those
22    also.
23    BY MS. JAMES:
24        Q.   Okay.  And by "declarations and
25    interrogatories," are you talking about the
```



```
 1                      P. Dalton
 2            MS. KREBS:  I think we did 1624, so
 3       you're on 1625.
 4            MS. JAMES:  Okay.  Thank you.
 5            (Plaintiffs' Exhibit 1625, Judge's
 6       opinion on findings of facts and
 7       conclusions of law, marked for
 8       identification as of this date.)
 9   BY MS. JAMES:
10       Q.   All right.  Do you recognize this
11   document, Dr. Dalton?
12       A.   Yes.
13       Q.   Okay.  And is this the document you
14   reviewed in regards to the judge's opinion on
15   findings of facts and conclusions of law?
16       A.   Yes, it is.
17       Q.   Okay.  And when you said you were
18   working with -- in the judge's framework of
19   this opinion, what specifically do you mean
20   by that?
21       A.   That, for purposes of my analysis,
22   I'm acknowledging that the Court determined
23   that 5 parts per billion of hydrogen sulfide
24   was capable of causing some of the injuries
25   that the plaintiffs were alleging.
```



1                          P. Dalton

2    sulfide?

3         A.   Right now, as I sit here, I'm not

4    aware of any -- recalling any.

5         Q.   Okay.  And in relation to

6    Ms. Green, are you aware of any conditions

7    that -- let me actually withdraw that.

8              Okay.  So same thing for Mr. Tate,

9    what evidence do you have to show that

10   Mr. Tate has a reactive odor threshold?

11             MS. KREBS:  Object to form.

12        A.   I didn't talk about a reactive odor

13   threshold.  I talked about an odor threshold,

14   and then I talked about reactions to odor.

15   BY MS. JAMES:

16        Q.   Okay.  So thank you for clarifying

17   that, I appreciate it.

18             So with Mr. Tate, do you have -- or

19   what do you -- what information do you have

20   to support that Mr. Tate is reactive to odors

21   of 5 ppb over 30 minutes of hydrogen sulfide?

22             MS. KREBS:  Object to form.

23        A.   Well, his sensitivity to odors

24   could be impaired because of some of his

25   health conditions.



```
 1                         P. Dalton
 2    BY MS. JAMES:
 3         Q.   Okay.  What health conditions
 4    specifically for Mr. Tate?
 5         A.   Well, hypertension for one, very
 6    much is associated with deficiencies in the
 7    ability to smell.
 8         Q.   Any other health -- health
 9    conditions for Mr. Tate that you would use to
10    support that opinion?
11         A.   There are a lot that have been
12    identified in the literature and a lot that
13    have yet to be identified, so yes.  I'm
14    just -- I'm honing in on hypertension because
15    there have been some studies of that most
16    recently.
17         Q.   Are you going to offer opinions at
18    trial that hypertension would exclude an
19    individual from being in that general
20    population that the judge had determined is
21    affected by the 5 ppb over 30-minute
22    threshold?
23              MS. KREBS:  Object to form.
24         A.   My opinion doesn't take Mr. Tate
25    out of the general population.  And, again, I
```



1                        P. Dalton

2      think the Court found it's capable of causing

3      this issues, not it does always cause these

4      issues or annoyance.  So that's -- that does

5      not take Mr. Tate out of general population.

6      It simply says that, among the general

7      population, there is a range of sensitivity

8      to any odor.

9      BY MS. JAMES:

10          Q.    Um-hum.

11          A.    And a range of reactivity to odor.

12     And, at this point, I don't have any evidence

13     that Mr. Tate or any of the trial plaintiffs

14     are in that very sensitive subgroup of

15     individuals.

16          Q.    What about their testimony, is that

17     not evidence of their experience with the

18     odors?

19          MS. KREBS:  Object to form.

20          A.    It depends what odors they were

21     being exposed to.

22     BY MS. JAMES:

23          Q.    Okay.  Well, odors that they

24     attribute to the landfill.

25          A.    Again, that's their self-report and



```
 1                    P. Dalton
 2    their attribution.  I can't confirm that
 3    that's correct, largely because the frequency
 4    at which they report experiencing odors is
 5    not even closely aligned with the modeling
 6    data.
 7         Q.   Okay.  Do you dispute that hydrogen
 8    sulfide has the ability to be absorbed in
 9    fabrics?
10              MS. KREBS:  Object to form.
11         A.   I am not aware of that
12    literature -- I'm not aware of the hydrogen
13    sulfide has been shown to be absorbed in
14    fabrics.  It's outside of the scope of my
15    opinion.  I believe Dr. Kind talks about it
16    in his report.
17    BY MS. JAMES:
18         Q.   Okay.  But are you going to be
19    offering any opinions at trial about whether
20    or not hydrogen sulfide can linger after, you
21    know, an exposure event has passed?
22              MS. KREBS:  Object to form.
23         A.   No, not specifically with respect
24    to these plaintiffs, no.
25    BY MS. JAMES:
```



1                              P. Dalton

2          A.   I'm applying the same factors that

3    I applied to Ms. Green and to some degree to

4    Jonathan Tate, also.

5          Q.   Okay.  So just so I'm clear, the

6    primary -- the primary factors you're

7    considering is the amount of the duration of

8    the odors events that she reported and how

9    that does not align to what we know about

10   odor adaptation; is that -- is that a fair

11   summary of your testimony?

12              MS. KREBS:  Object to form.

13         A.   It doesn't align with the functions

14   of the olfactory system.  And it doesn't

15   align with the data that's been modeled for

16   the emissions coming from the Jefferson

17   Parish Landfill.

18   BY MS. JAMES:

19         Q.   Okay.  But what about -- we had

20   talked a little bit earlier about adaptation

21   and odor adaptation.  Does that have any

22   bearing on your opinion about Ms. Richardson

23   and her injuries?

24         A.   Again, she is reporting that the

25   odors were experienced by her all day for the



```
 1                    P. Dalton

 2   descriptions of the odors that he was

 3   smelling, suggesting that they were not all

 4   or sometimes ever hydrogen sulfide odors.

 5   BY MS. JAMES:

 6       Q.   Okay.  Okay.  Do you -- is it your

 7   opinion that Mr. Meyers would -- it's not

 8   likely that Mr. Meyers' injuries were caused

 9   by the 5 ppb over 30 minutes of hydrogen

10   sulfide exposure because his -- sorry.  I

11   keep hiccupping.  Excuse me.

12            MS. JAMES:  Can we go off record

13       for one second?  I just need to drink

14       water.

15            THE VIDEOGRAPHER:  We're going off

16       the record, and the time is 15:02.

17            (Recess taken.)

18            THE VIDEOGRAPHER:  We are back on

19       the record, and the time now is 15:09.

20   BY MS. JAMES:

21       Q.   Okay.  So, Dr. Dalton, we've gone

22   through several of the plaintiffs.  I want to

23   keep doing that.  Let's talk about Wendy

24   Gremillion.

25            What do you -- what evidence do you
```



```
1                        P. Dalton
2    have that Wendy Gremillion's injuries were
3    not likely to have been caused by an exposure
4    of 5 ppb for 30 minutes of hydrogen sulfide?
5         A.   Well, the same factors that I
6    applied to the other plaintiffs.  I mean,
7    these are all factors that should be taken
8    into consideration when looking at specific
9    causation.
10        Q.   Okay.  And just so the record is
11   very clear, when you say "the same factors,"
12   because --
13             MR. HAMMEL:  You guys are on mute.
14             MS. JAMES:  Can you hear us, Doug?
15             MR. HAMMEL:  Thank you.
16   BY MS. JAMES:
17        Q.   All right.  So excuse me.  For
18   Wendy Gremillion, and if you look at the
19   chart that you made as part of your report,
20   she lists the description of the odor as
21   "sulfur" and "rotten eggs," right?
22        A.   She does.
23        Q.   Okay.  And so you would agree that
24   that is consistent with what hydrogen sulfide
25   smells like to most people?
```



```
 1
 2                    C E R T I F I C A T E
 3   STATE OF NEW YORK     )
 4                         : ss.
 5   COUNTY OF NEW YORK    )
 6
 7            I, TAMI H. TAKAHASHI, a Notary
 8       Public within and for the State of New
 9       York, do hereby certify:
10            That PAMELA DALTON, PhD, MPH, the
11       witness whose deposition is hereinbefore
12       set forth, was duly sworn by me and that
13       such deposition is a true record of the
14       testimony given by the witness.
15            I further certify that I am not
16       related to any of the parties to this
17       action by blood or marriage, and that I
18       am in no way interested in the outcome
19       of this matter.
20            IN WITNESS WHEREOF, I have hereunto
21       set my hand this 15th day of May 2024.
22
23
24       _____
25            TAMI H. TAKAHASHI
```

