**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,**<br>**Plaintiffs**<br><br>**VERSUS**<br><br>**LOUISIANA REGIONAL LANDFILL**<br>**COMPANY, ET AL.,**<br>**Defendants**<br><br>*Applies to: All Cases* | **CIVIL ACTION**<br><br>**NO. 19-11133, c/w 19-14512**<br><br>**SECTION: "E" (5)**<br><br>**JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

**WASTE CONNECTIONS DEFENDANTS'**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**JEFFERSON PARISH'S MOTION TO EXCLUDE TESTIMONY**
**OF ALI HASHIMI, P.E.**

## TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................2

II.  BACKGROUND ...................................................................................................3

A.   The parties and contracts ...............................................................................3

B.   Scope of Mr. Hashimi's opinions ...................................................................4

    1.   Regulatory context ................................................................................4

    2.   Technical aspects of landfill operations................................................5

    3.   Contractual scope of duties ..................................................................6

    4.   Standards of care ...................................................................................8

III.  LEGAL STANDARD.............................................................................................8

IV.  ARGUMENT ........................................................................................................10

A.   Mr. Hashimi will explain how operations and events at the JPLF fit within the contractual scopes of duties. ...................................................................10

    1.   To understand the Contract, the jury will need to understand regulatory and technical terms. ...............................................................11

    2.   To understand the Contract, the jury will need to understand areas the Contract does not address. ................................................................12

B.   Mr. Hashimi's testimony could not be offered through arguments of counsel. ..........................................................................................................13

C.   Mr. Hashimi did not offer opinions on the ultimate issues of liability. ...........................15

V.  CONCLUSION......................................................................................................19

## I.      INTRODUCTION

Contrary to the intent of Defendant Jefferson Parish ("Parish"), its motion to exclude the expert opinions of Ali Hashimi highlights the value of Mr. Hashimi's opinions to the jury in the upcoming specific causation trial. The contract between the Parish and Defendant Louisiana Regional Landfill Company addressed responsibility for parts, but not nearly all, of the operation of Jefferson Parish Landfill ("JPLF" or "the Landfill"). The Landfill is heavily regulated and relies on the operations of several environmental control systems, each one of which is made up of engineered structures and specialized equipment. Different contractors and the Parish itself were responsible for operations and monitoring of different systems, maintenance of different equipment, and construction of different structures, in a complex set of overlapping contractual and regulatory requirements.

The Parish argues that the jury can see these requirements for itself by a review of the contracts, with the assistance of arguments of counsel. But a review of Mr. Hashimi's report and the contract itself, both of which the Parish avoids in its motion, quickly demonstrate that specialized knowledge of regulations, technical terms, and landfill operations is necessary for an understanding of the contract and of the responsibilities it assigns. That specialized knowledge is far beyond the commonplace experience of a jury.

The Parish also asserts without analysis that Mr. Hashimi proposes to render legal conclusions and to allocate fault to the Parish. But a review of Mr. Hashimi's actual opinions in light of the actual issues to be tried shows that Mr. Hashimi does not render any legal conclusions, nor does he intrude on the role of the jury as factfinder. The jury will need to determine whether the Defendants are liable to any Plaintiff, and if so, to allocate fault among the Defendants with respect to each Plaintiff's injuries. Mr. Hashimi does not opine on any of those issues, but his

testimony on specialized topics will be valuable to the untrained lay people of the jury in understanding the facts and the contractual and regulatory setting in which they occurred.

## II.    BACKGROUND

### A.    The parties and contracts

The Parish's motion focuses on Mr. Hashimi's opinions relating to the contract entered into originally by the Parish of Jefferson and IESI LA Landfill Corporation ("IESI") (the "Contract").[1] As explained in other filings in this action, Defendant Louisiana Regional Landfill Corporation ("LRLC") is the successor to IESI through a name change. The Parish's motion refers to LRLC generically and without definition as "Waste Connections," but LRLC is the party to the Contract with the Parish.

The Parish also entered a contract with APTIM Corporation for operation of the landfill gas collection and control system (GCCS or gas system) at the JPLF.[2]  Mr. Hashimi addresses the equipment, systems, and regulatory requirements for the gas system operated by APTIM. Though the Parish does not address those opinions in its motion, an understanding of the physical design and operation of the gas system, and how regulatory requirements define and govern such systems, is relevant to understanding which party (LRLC or APTIM) was responsible for which systems and operations under its respective contract with the Parish. As a result, Mr. Hashimi addressed systems operated by all three defendants,[3] and addressed the Contract as well as APTIM's contract with the Parish.

---

[1] Contract to Provide Services to Operate, Manage, and Maintain the Jefferson Parish Sanitary Landfill Site (May 17, 2012) (ECF Doc. 544-1).

[2] Agreement between The Parish of Jefferson and CB&I Environmental & Infrastructure, Inc. (Dec. 28, 2015) (ECF Doc. 543-1).

[3] Waste Connections US, Inc. and Waste Connections Bayou, Inc. are also defendants in this action, though neither was a party to the contract.

**B.      Scope of Mr. Hashimi's opinions**

The Parish's motion quotes sparingly and selectively from Mr. Hashimi's expert report and his deposition and makes several misrepresentations either overtly or through omission. Mr. Hashimi's opinions cover regulatory and technical issues in addition to language of the contracts.

**1.      Regulatory context**

The JPLF is heavily regulated by federal and state regulations that govern the types of waste that can be disposed, air emissions from several locations at the Landfill, management of stormwater (i.e., rainwater), management of leachate within the waste, and construction of the landfill's base liner system and its cover systems, among many other things. Mr. Hashimi explains throughout his report how regulations dictate the design and operations of several of these systems.[4]

The regulations are applied specifically to the JPLF through its permits, which the Parish obtained, and the Parish is the named holder, or permittee, of the permits. Among others, the Parish holds a Part 70 Operating Permit from LDEQ for air emissions, and a Type I/Type II permit for solid waste disposal.[5]

The Contract relies on an understanding of these regulations and permits and frequently refers to or incorporates them in assigning the parties' responsibilities. The Contract does not identify every permit applicable to the JPLF, but nevertheless assigns LRLC responsibility "for complying with the provisions of all applicable NPDES permits, the wastewater discharge permits,

---

[4] *See, e.g.*, A. Hashimi, *Expert Report, Jefferson Parish Landfill* (March 8, 2024) ("Hashimi Rept.") (Ex. 1 to Parish's Motion, ECF Doc. 544-2), § 3 at p. 8.

[5] Hashimi Rept.

the air quality permits, in addition to the LDEQ permits."[6] The Contract also sweeps in broad

ranges of regulations as part of its assignment of duties. For example:

> [LRLC] shall provide all necessary personnel, equipment, and funds to: (a)
> complete construction of the Expansion Area, in compliance with the Permit
> Documents (LDEQ Solid Waste Permit No. D-051-0090/P-0297R1 issued to
> Jefferson Parish on January 22, 2010), and in accordance with rules, laws and
> legal mandates promulgated by the United States Environmental Protection
> Agency (USEPA), made a part hereof...[7]

Mr. Hashimi's report explains, where relevant, how these regulations and permit

requirements supplemented the Contract's terms, and how the regulations and permit defined

operations and equipment that the Contract simply incorporated by reference.[8] Mr. Hashimi

addresses the requirements of state and federal regulations, which often overlap. In addition,

regulations often impose requirements that are relevant to the roles and responsibilities of LRLC,

the Parish, and APTIM at the Landfill, and which cannot be transferred by contract.[9]

In light of the context created by the regulations and permits, which is not elucidated in the

Contract, Mr. Hashimi's opinions will help inform the jury as to how that context affects the

meaning of the Contract's terms.

### 2. Technical aspects of landfill operations

The JPLF relies on the combination of numerous operational and physical systems to

manage physical stability of the landfill and to control potential emissions of gas and liquids from

decaying waste. The Contract assigned LRLC responsibility for certain of these systems in the

---

[6] *See* Contract, Ex. 1 to Parish's Motion to Exclude the Report and Testimony of Ali Hashimi, ECF Doc.
544-1, at § IV.B, at p. 23.

[7] Contract, § II at p. 5.

[8] *See* generally, Hashimi Rept. § 4 at 16.

[9] *See* Hashimi Rept. § 3.1 at 8.

active area of the landfill (Phase IVA, or the "Expansion Area").[10] Specifics of which equipment or physical areas were included within these assignments were generally left to other documents and the parties' understanding of the physical layout of the landfill. For example, the document assigned LRLC the responsibility of "furnishing and installation of daily, interim, and final cover **in accordance with the Permit Documents**," and "final design and installation of **leachate collection and transmission systems** for the Phase IVA Expansion Area," (emphasis added).[11] The Contract defines "Permit Documents" as "[a]ll documents related to Landfill Phases I, II, III and IV-A of the Landfill" and an unlimited set of "solid waste permits, all permit modifications and Louisiana Solid Waste Regulations, as amended." It is the task of an expert simply to determine which of these permits and regulations apply, and which do not.

The Contract does not define all or even most of the technical terms it uses; for instance, the Contract refers variously to "leachate collection and transmission systems," "leachate collection and pump systems," "leachate collection sumps and sump pumps," and "leachate collection and treatment systems" without defining any of those systems or the differences between the various terms.

Mr. Hashimi's report explains the physical features of the relevant systems identified by the Contract, how they are operated, which regulations require them, and – importantly – which equipment is not part of particular systems.[12]

### 3. Contractual scope of duties

Mr. Hashimi commonly advises landfill owners, operators, and contractors on responsibilities under operational contracts. These contracts typically have "legal" components

---

[10] Contract, § II.B.V.A at p. 12.

[11] Contract, § II.B.V.A at p. 12.

[12] *See, e.g.*, Hashimi Rept. § 4.3 at p. 18.

and "engineering or project management" components.[13] The "legal" components, such as terms and conditions, insurance, bonding, indemnity, etc. are typically outside of the scope of Mr. Hashimi's advice.[14]  The "engineering or project management" components include items like technical specifications, construction drawings, material quantity estimates, scope, task responsibility, scheduling, and similar provisions.[15] In this case, Defendant LRLC asked Mr. Hashimi to assess task responsibility under the Contract and APTIM's contract. As discussed above, issues of responsibility under the contracts rely on regulatory provisions, permit terms, and technical knowledge that is not plain of the face of the contracts. Therefore, it is relevant and appropriate for Mr. Hashimi to offer opinions on these topics and to explain how the Contract was structured. For instance, under the Contract, LRLC was not responsible for the GCCS system.[16] Yet, Plaintiffs' expert Jose Sananes asserts that LRLC was responsible for "ensuring that deficiencies in the gas collection system were either remediated by the Owner or addressed by other control measures."[17]

When executing projects under landfill operational or services contracts, Contract/Project Management is a key function of the project which is typically performed by an engineer. Mr. Hashimi is regularly involved with this aspect of project management.[18] The Engineer needs to understand the responsibilities, the various scopes, and work to be provided by others to ensure

---

[13] Deposition Transcript of Ali Hashimi, taken April 29, 2024, appended to the Declaration of John Paul ("Paul Decl.") as Exhibit 1 (hereafter "Hashimi Dep.") at 40:6 – 41:13; 62:15 – 63:4.

[14] *See* Affidavit of Ali Hashimi, P.E., sworn to on June 13, 2024 ("Hashimi Aff."), submitted herewith, at ¶ 5.

[15] Hashimi Aff. ¶ 6; Hashimi Dep. at 60:16 –63:15.

[16] Hashimi Aff. ¶ 7; Hashimi Dep. at 81:5 – 84:4.

[17] *See* Mr. Sananes' Second Supplemental Expert Report, dated February 16, 2024 (ECF Doc. 566-6) (hereafter "Second Supplemental Report") §16.2, ¶ 184 at 59.

[18] Hashimi Dep. at 24:9 –24:19

successful execution of projects.[19] For example, the Engineer is typically the first "line of defense" in assessing the validity of and responding to potential change orders. They are frequently put in a position to explain the contract structure to the parties to the contract.[20] Even seasoned professionals need the assistance of an Engineer to understand contract structures and responsibilities, and therefore, it would likely be even harder for a layman to understand it without assistance from an expert.

### 4.    Standards of care

Mr. Hashimi's report also rebutted opinions offered by Plaintiffs' proposed expert, Mr. Jose Sananes, on standards of care applicable to the Defendants. The Parish's motion does not seek to exclude those opinions. Nevertheless, an understanding of the technical, regulatory, and contractual issues summarized above is necessary to understand the standards of care put at issue by Plaintiffs' proposed expert, and to understand the bases of Mr. Hashimi's rebuttal. For instance, Mr. Sananes offers an opinion relating to technical aspects of how a leachate system may affect operation of the landfill gas collection and control system,[21] and then offers opinions as to which Defendant was responsible for which system.[22] Mr. Hashimi's complete opinions will be important in helping the jury understand the errors in Mr. Sananes' proposed assignments of responsibility.

### III.   LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence controls when expert testimony is admissible:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[19] Hashimi Aff. ¶ 8; Hashimi Dep. 62:2 – 63:4

[20] Hashimi Aff. ¶ 8; Hashimi. Dep. 158:14 – 158:24.

[21] *See* Second Supplemental Report §16.1, ¶ 183(b) at 58.

[22] *See Id*. § 162 at 58-60.

> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the testimony
> is the product of reliable principles and methods; and (d) the expert has
> reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is the seminal case in

the realm of expert testimony. It provides a framework for determining whether expert testimony

is admissible under Rule 702.  Under *Daubert*, the court takes on the role of "gatekeeper," and

makes the preliminary assessment of whether expert testimony is both relevant and reliable.  *See*

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 592-

93).  The reliability of expert testimony "is determined by assessing whether the reasoning or

methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*,

482 F.3d 347, 352 (5th Cir. 2007).

In *Daubert*, the Supreme Court established the following non-exclusive factors that courts

may consider to evaluate the reliability of expert testimony: (1) whether the expert's theory can or

has been tested, (2) whether the theory has been subject to peer review and publication, (3) the

known or potential rate of error of a technique or theory when applied, (4) the existence and

maintenance of standards and controls, and (5) the degree to which the technique or theory has

been generally accepted in the scientific community. 509 U.S. at 593-94.  "[N]ot every *Daubert*

factor will be applicable in every situation...and a court has discretion to consider other factors it

deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).

Under Rule 702, "[w]hether the situation is a proper one for the use of expert testimony is

to be determined on the basis of assisting the trier. 'There is no more certain test for determining

when experts may be used than the common sense inquiry whether the untrained layman would

be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'"  Fed. R. Evid. 702 advisory committee note (1972 Proposed Rules).

When an expert's opinion will be helpful to the trier of fact, it is permissible for the opinion to "[embrace] an ultimate issue." Fed. R. Evid. 704. The admissibility of an expert's conclusion as to allegedly ultimate issues depends on the nature of the issue and the circumstances of the case, and courts have wide discretion. *United States v. Milton*, 555 F.2d 1198, 1204 (5th Cir. 1977). Where an expert draws "inferences from the facts which a jury would not be competent to draw," the opinion may be admissible if it would assist the jury, even when it embraces an ultimate issue. *Id*.

## IV.   ARGUMENT

### A.   Mr. Hashimi will explain how operations and events at the JPLF fit within the contractual scopes of duties.

The Parish argues that Mr. Hashimi's testimony is not appropriate on the grounds that "the words of the contract are clear and explicit and therefore no interpretation may be made," and that the terms of the Contract are "well within the common sense understanding of jurors." Parish Br. at 10-11. As outlined above, however, the terms of the Contract can only be understood by someone with expertise in the regulations, applicable permits, and technical aspects of landfill management and environmental control systems. The Parish does not contest Mr. Hashimi's expertise in those areas, and Mr. Hashimi should be allowed to testify.

An expert's testimony is appropriate and "required when an issue involves matters beyond jurors' common understanding," *Smith v. Chrysler Grp., L.L.C.,* 909 F.3d 744, 751 (5th Cir. 2018), and inappropriate where people "of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses

[who] possess . . . special or peculiar training, experience, or observation." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962). If a layman would not "be qualified to determine intelligently and to the best possible degree" the particular issues, the assistance of an expert with a "specialized understanding of the subject involved in the dispute" is appropriate.[23]

### 1. To understand the Contract, the jury will need to understand regulatory and technical terms.

A layman could not review the Contract and understand how it assigns responsibility, which equipment is within which specific landfill systems, how to interpret key terms, or which Defendant had responsibility for which operations at the Landfill. The Parish conspicuously does not quote a single word from the Contract except the heading "Definitions." *See* Parish Br. at 15. But the Contract is replete with provisions that are beyond the experience of people unfamiliar with operations and regulation of a landfill. Listed below are a few examples of items assigned to LRLC that incorporate an understanding of underlying technical or regulatory terms:

- Acquisition, delivery testing and installation of leachate collection pipes, pumps, pump controls and manifolds for the leachate collection systems for Phase IV-A Expansion Area, including installation of piping stubouts for connection to each Landfill Cell and the forcemain (Contract § II.A.1);

- Coordination with landfill gas collection system contractor to extend existing gas wells on the side slopes of Phases III-A and III-B as the fill progresses to reach final elevations (Contract § II.A.1);

- Construction of Cells 20, 21, 22, 23, 25 and 25 of the Phase IV-A Expansion Area, including subgrade, subbase, recompacted clay liner, geosynthetic clay liner, geomembrane liner, geocomposites, geonets, in-cell piping, pipe penetrations and quality assurance testing (Contract § II.A.1);

- Furnishing and installation of daily, interim, and final cover in accordance with the Permit Documents (Contract § II.B.5.A);

- Final design and installation of additional landfill cells and other ancillary facilities comprising the Phase IV-A Expansion Area (Contract § II.B.5.A);

---

[23] Fed. R. of Evid. 702, advisory committee notes.

- Operation and maintenance of leachate collection and treatment systems (Contract § II.B.5.A).

Under the Contract, the Parish:

> [S]hall be solely responsible for making sure that the Existing Landfill Units have been operated, maintained, constructed and closed in accordance with all applicable laws, and excepting leachate riser pumps, which the Parish shall warrant for the first thirty (30) days of [LRLC's] management and operation of the Existing Landfill Units, all equipment, materials, utilities, etc. listed above relating to the Existing Landfill Units are in good working order and have been properly maintained prior to handing over such operation and maintenance responsibilities to [LRLC]. Contract § II.B.5.C.

All of the above systems and physical features are governed by regulations and the Landfill's permit.[24] Few of the pieces of equipment or major environmental control systems referred to above are defined in the Contract.[25] It is highly unlikely a layman could reliably understand how all of the above provisions relate to specific actions and areas of responsibility at the Landfill. But Mr. Hashimi is particularly able to apply his education, training, experience, and his understanding of the record of this case to assist the jury to do so, and the Court should allow his testimony.

### 2.      To understand the Contract, the jury will need to understand areas the Contract does not address.

The Parish's argument that no expert testimony is necessary for the jury to interpret the Contract also misses the fact that the Contract does not address critical areas of responsibility at the Landfill. Understanding how the Contract applies to the Defendants' actions will require an understanding of events at the Landfill that are not specifically described in the Contract. For instance, neither the LRLC Contract nor the APTIM contract specifies that the Parish reserved

---

[24] *See* Hashimi Rept. § 4.

[25] *See* Contract, Definitions, at p. 2 – 4.

the responsibility to design and install the landfill gas collection and control system. Mr. Hashimi explains how the structure of the contracts and the Parish's role as the permit holder left the responsibility for the GCCS's design and construction with the Parish.[26] Because regulations and permit requirements dictated terms for the technical design and performance of that system, Mr. Hashimi's testimony is appropriate not only to explain the silence under the contracts, but to explain what requirements the Parish had as it oversaw the design and construction.

**B.      Mr. Hashimi's testimony could not be offered through arguments of counsel.**

The Parish suggests that Mr. Hashimi's testimony would not bring more to the jury than the lawyers can offer in argument. Parish Br. at 11-12. But Mr. Hashimi's opinions will inform the jury of technical terms and features of the Landfill that are not defined in the Contract, as well as the regulatory and contractual context for the defendants' responsibilities under the Contract. Arguments of counsel could not replicate Mr. Hashimi's expertise, nor would the jury be able to understand the key issues without it. Mr. Hashimi's testimony may permissibly embrace ultimate issues because it will assist the jury in reaching "inferences from the facts which a jury would not be competent to draw." *Milton*, 555 F.2d 1198, 1204. Mr. Hashimi should be allowed to testify to the opinions expressed in his report, his deposition, and the accompanying affidavit.[27]

---

[26] Hashimi Rept. § 6.1 at 46 (ECF Doc. 544-2, p. 50 of 95).

[27] Mr. Hashimi's affidavit supplements his April 4, 2024 report and does not offer any new opinions. See Fed. R. Evid. 26(e) (creating a duty to supplement).  As Mr. Hashimi stated, the purpose of the affidavit is to supplement his previously disclosed opinions to address the misguided criticisms of Plaintiffs in their motion to exclude.  See Courville v. CITGO Petroleum Corp., 2023 WL 3668410, at *2 (W.D. La. Apr. 18, 2023) (allowing expert's supplemental report when it rebutted opponent's challenges and supplemented information provided in the original report). *See also Brown v. WellPet LLC*, 2023 WL 3483935 (N.D. Ind. Mar. 31, 2023) ("[T]he foregoing paragraph in the Declaration responds to the Daubert criticisms raised by WellPet in its motion to exclude Cal's opinions and testimony. As such, it does not constitute a new opinion."); *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58 (1st Cir. 2011)  (*citing Muldrow ex rel. Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (explaining how Rule 26 permits an expert to supplement, explain and elaborate on material contained in his report); *Allgood v.*

The Parish cites Judge Sear's opinion in *Tasch* without explaining how it is relevant to Mr. Hashimi's testimony, but reiterating the admonition that an expert bring to the jury more than the lawyers can offer in argument.[28] In a dispute over fees owed under a painting and sandblasting contract, the expert in *Tasch* was barred from addressing issues of interpretation of the parties' intentions, the language of the contract, and whether there ultimately was a breach of contract. *Id*. at *2. The *Tasch* court found that the proffered "management expert," who did not offer opinions on technical matters, proposed only to testify as to matters within a jury's commonsense understanding that would also be argued by counsel. *Id*.

Here, Mr. Hashimi's opinions will help the jury to understand regulatory and technical issues that are not clear from the face of the Contract and that are not accessible to the untrained layman.[29] Moreover, arguments of counsel cannot replicate Mr. Hashimi's explanations of how different landfill systems affect each other, which components are relevant to which terms of the Contract, and how the operations of each are governed by regulations and the permit. None of those facts were present before the *Tasch* court, and *Tasch* does not apply. Rather, Mr. Hashimi's testimony achieves exactly what the advisory notes to Rule 702 contemplates. Based on his expertise, he can explain industry practice and standards that are ultimately not "clear" in the document and that a lay witness or attorney cannot explain with the same precision.

---

*Gen. Motors Corp.*, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006) ("While Rule 26 demands that expert disclosures be 'complete,' there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain. In other words, an expert need not stand mute in response to an opposing party's Daubert motion.").

[28] *In re Tasch, Inc.*, No. 97-15901 JAB, 1999 WL 596261, at *2 (E.D. La. Aug. 5, 1999) (*quoting In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1233 (5th Cir. 1986)).

[29] *See* Fed. R. Evid. 702 advisory committee note.

### C.      Mr. Hashimi did not offer opinions on the ultimate issues of liability.

The Parish argues that Mr. Hashimi will invade the province of the Court and the jury by offering opinions on ultimate issues of fault and liability. Parish Br. at 7. But his opinions stop far short of any ultimate issues of liability or allocation of fault. Instead, Mr. Hashimi's opinions are important to the jury's ability to determine whether any systems or operations at the Landfill could have contributed to any Plaintiff's injury, and how the Contract and applicable regulations assigned responsibility for those systems and operations.

It is clear that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Applying its own similar standard, the Louisiana Supreme Court has held, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, 1239, *cert. denied*, 546 U.S. 883 (2005). Expert opinions are admissible even if they embrace an ultimate issue if they will be helpful to the jury. Fed. R. Evid. 704; *Milton*, 555 F.2d at 1204. Mr. Hashimi's opinions will assist the jury to understand the relationship between regulatory, contractual, and technical terms and requirements so that they have the information required to make a final decision on their own and fulfill their role as defined under these cases.

The Parish lists several of Mr. Hashimi's opinions stating that the Parish "was responsible for" various aspects of the landfill's operations, and the Parish then asserts without analysis that "these are all legal conclusions and testimony [that] goes to the ultimate issue." The Parish specifically cites, without excerpting, the following of Mr. Hashimi's opinions: 3.1, 3.2, 3.3., 3.6, 3.7, 3.8, 4.3, 6.1, and 6.3. *See* Parish Br. at 8. A review of Mr. Hashimi's report and the

language that the Parish omitted makes it clear that Mr. Hashimi does not opine on legal issues or ultimate issues of fault or liability.[30]

- **<u>Opinion 3.1 Text</u>**: "Jefferson Parish bore ultimate responsibility for control over all aspects of the operation of the facility, including the operation and maintenance of the landfill gas control and collection system (GCCS) at the facility."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of responsibilities. It does not conclude that the Parish was at fault, an issue reserved for the jury.

- **Opinion 3.2 Text:** "Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of responsibilities, as well as operations that are not directly addressed in the LRLC Contract. It does not conclude that the Parish was at fault, an issue reserved for the jury.

- **Opinion 3.3 Text:** "Jefferson Parish bore the responsibility to adequately fund the landfill construction and operation, and to implement process controls and quality assurance procedures despite LRLC being assigned by contract responsibilities to perform those functions and other site operations activities that complemented the Parish's responsibilities to manage landfill gas and odors for the facility."

---

[30] The opinions addressed here are in Hashimi's Report at pages 8 – 24.

- o **Basis**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of responsibilities. It does not conclude that the Parish was at fault, an issue reserved for the jury.

- **Opinion 3.6 Text:** "Under the Operating Agreement, Jefferson Parish was responsible for the operation, maintenance, and repair of leachate management components outside of Phase 4A. This was the Parish's responsibility because the Parish never tendered the rest of the leachate system to LRLC in good working condition."

  - o **Basis**: Mr. Hashimi's opinion applies a technical understanding of the operations and condition of leachate systems to assess whether leachate system components were ever tendered to LRLC in "good working condition" as required by the Contract. His opinion that the Parish retained responsibility for those systems is based on his experience and training in leachate management systems, and he does not offer any opinions on fault or liability.

- **Opinion 3.7 Text:** "Jefferson Parish was responsible for the design, installation, operation, and maintenance of the GCCS. Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations."

  - o **Basis**: Mr. Hashimi's opinion as to the Parish's responsibility for design and installation of the gas collection and control system is based on his reading of two contracts, applicable regulations, and correspondence of the Defendants. He does not offer any opinion on fault or liability, or that any aspect of the

design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury.

- **Opinion 3.8 Text:** "Though Jefferson Parish contracted with another entity to perform O&M on the GCCS, it was Jefferson Parish's responsibility to manage that contractor and to use the information provided by its GCCS contractor."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion as to the Parish's responsibility for oversight of the operation and maintenance of the gas collection and control system is based on his reading of two contracts and applicable regulations. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury.

- **Opinion 4.3 Text:** "As the permit holder and owner of the JPLF, Jefferson Parish was responsible for understanding regulations and its own contract terms governing the requirements for landfill gas control and collection systems. These terms should have put the Parish on notice that compliance with regulatory and industry standards was critical to the control of landfill gas emissions and management of potential odors."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of the Parish's responsibilities of regulatory compliance as the holder of the Landfill's permits. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury.

The Parish also asserts that "[n]owhere in Ali Hashimi's opinions does he identify the responsibilities of [LRLC]." Parish Br. at 9. That statement is false. A glance at the report's Table of Contents shows that Mr. Hashimi's report dedicates 12 pages to LRLC's responsibilities, not to mention his discussions of them elsewhere in the report.[31]

The jury will need to determine whether the Defendants are liable. Mr. Hashimi does not opine on that issue. If the jury finds any liability, it will need to find that some or all of the Defendants are liable to specific Trial Plaintiffs. Again, Mr. Hashimi's opinions do not reach those issues. And if the jury finds that more than one Defendant is liable to any Trial Plaintiff, it will then need to apportion liability among the Defendants. Mr. Hashimi does not opine as to whether any Defendant was at fault for any Plaintiff's alleged injuries, nor does he allocate the Defendants' share of any potential responsibility. The jury may need to consider whether a particular operation or landfill system was related to its finding of liability and causation, and Mr. Hashimi's opinions are relevant and helpful to a jury in determining whether any Defendant's actions or omissions at the Landfill caused any injury to any Plaintiff.

## V.   CONCLUSION

Mr. Hashimi's opinions are necessary to help the jury as the trier of fact understand complex regulatory, contractual, and technical issues. Those issues are at the heart of the ultimate determinations the jury must make, and Mr. Hashimi's opinions do not intrude on the province of either the Court or the jury. The Parish's motion does not provide any basis for the Court to exclude Mr. Hashimi's testimony, and the Court should deny the Parish's motion.

---

[31] *See* Hashimi Rept. § 5 at p. 32 ("LRLC's Responsibilities and Performance").

Respectfully submitted,

LISKOW & LEWIS, APLC

By:   */s/ Michael C. Mims*
     Michael Cash (#31655)
     Cherrell Simms Taplin (#28227)
     Michael C. Mims (#33991)
     Brady M. Hadden (#37708)
     J. Hunter Curtis (#39150)
     Alec Andrade (#38659)
     701 Poydras Street, Suite 5000
     New Orleans, Louisiana  70139
     (504) 581-7979

     BEVERIDGE & DIAMOND, P.C.

     John H. Paul (*pro hac vice*)
     Megan R. Brillault (*pro hac vice*)
     Michael G. Murphy (*pro hac vice*)
     Katelyn E. Ciolino (*pro hac vice*)
     Katrina M. Krebs (*pro hac vice*)
     825 Third Avenue, 16th Floor
     New York, NY 10022
     (212) 702-5400

     James B. Slaughter (*pro hac vice*)
     1900 N Street, NW, Suite 100
     Washington, DC 20036
     (202) 789-6000

     Michael F. Vitris (*pro hac vice*)
     400 W. 15th Street, Suite 1410
     Austin, TX 78701
     (512) 391-8035

     *Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed on June 13, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

By: __*/s/ Michael C. Mims*_____