**BROBSON LUTZ, M.D., M.P.H., F.A.C.P.**
Drs. Combs and Lutz, LLC
2622 Jena Street
New Orleans, LA 70115

March 8, 2024

Michael C. Mims
Liskow & Lewis APLC
701 Poydras St., Suite 5000
New Orleans, Louisiana 70139

RE:   *Frederick Addison, et al., v. Louisiana Regional Landfill Company, et al.*, USDC,
Eastern District, NO. 19-11133, Section: "E" (5)

Dear Mr. Mims:

At your request, I reviewed medical records, pharmacy dispensing records, and other
documents related to the above matter. My review has focused on records specific to the
following 13 individuals (hereafter, "Trial Plaintiffs"):

1. Geneva Green
2. Adelyn S. Gremillion
3. Braxton Gremillion
4. Scott Gremillion
5. Wendy Gremillion
6. Vernice Lewis
7. Stanley Meyers
8. Reshaun Richardson
9. Andrew Section
10. Jonathan Tate
11. Terrance Thompson
12. Tyrone Thompson
13. Mary Ann Winningkoff

The plaintiff specific records and documents I reviewed are listed later in this report. I have
personally reviewed approximately 35,188 pages of the Trial Plaintiffs' medical records.

The objective of this report is to address the likelihood that the injuries complained of by the
Trial Plaintiffs were caused by exposure to landfill odors and emissions, versus some other
cause or condition, and related issues discussed below.

These are specific terms and definitions specific to this case and my review:

1. Trial Plaintiffs refer to the 13 named claimants listed above.
2. The Relevant Time Period is from July 2017 through December 2019.
3. Relevant Symptoms: Headaches, nausea, vomiting, loss of appetite, sleep disruption,
   dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment
   or use of property are the complaints, symptoms, and conditions which the Court has

ruled are capable of being caused by exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes.

By way of background, I am in a full-time private practice specializing in internal medicine with an emphasis in infectious diseases and public health. In addition to my M.D. degree from Tulane, I have a Masters in Public Health in epidemiology. From 1983-1995, I served as the Director of Health for the City of New Orleans. I have been a consultant in several matters related to real and possible airborne contaminations since I was asked to assist in a fume related outbreak among RTA workers in their Iberville Street offices in the 1980s. Also, I was the lead physician in the city's command center onsite after a rail car containing butadiene caught fire with its fumes resulting in the evacuation of over 200 city blocks.

In my medical practice I regularly evaluate patients for multiple medical problems including complaints and diseases related to allergic, infectious, dermatologic, respiratory, cardiac, metabolic, neurologic, sleep disorders, and gastrointestinal conditions and diseases.

I also have many years of experience and expertise practicing telemedicine. I consider myself qualified to opine on what is possible, and what is not possible, to achieve during a telemedicine encounter.

Although I am not a psychiatrist or psychologist, a routine part of my practice is to evaluate my patients for symptoms of psychiatric disorders to determine whether a referral to a psychiatrist or psychologist is appropriate. This is consistent with the typical course in which patients obtain care from a mental health specialist – i.e., patients are typically expected to visit with their primary care physician ("PCP") first and, if the PCP deems it appropriate, the PCP will make a referral to a mental health specialist. In the following report, I offer opinions about whether the Trial Plaintiffs met objective criteria under which it would be appropriate for an internal medicine specialist to refer the Trial Plaintiffs to a mental health specialist. That is an area in which I have decades of experience and expertise.

Regarding hydrogen sulfide ("H2S"), from a personal standpoint, I first remember hydrogen sulfide from chemistry experiments in high school. Once, I even injected an ounce or two of hydrogen sulfide into the seat cushion of an unsuspecting high school teacher. The Elk River in North Alabama where I grew up also had mounds of decaying organic matter which were rich in hydrogen sulfide. When he waded in certain areas, clouds of hydrogen sulfide would bubble up to the surface much to the delight of teenage boys who called it "fart gas."

I have attached to this report a copy of my CV and a list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition. My current rates are $500/hour for review of records and other activities that can be performed outside of usual office hours, and $800 per hour plus expenses for trial or deposition testimony. My compensation is not dependent on the outcome of this case.

## BACKGROUND

It is my understanding that the Jefferson Parish Landfill is a municipal solid waste landfill in Waggaman, LA. Adjacent to the Jefferson Parish Landfill are two other landfills: (i) the Highway 90 Landfill is for construction and demolition debris; and (ii) the River Birch Landfill, a much larger landfill, accepts municipal solid wastes, industrial waste, and also construction and

Report of Brobson Lutz, MD
March 8, 2024
Page 3 of 64

demolition debris. There are many other potential odor sources throughout Jefferson Parish including wastewater treatment plants, sewage lift stations, manholes, fleet operations along the Mississippi River, chemical and petroleum industrial sites, and sluggish natural water sources in the area.

Plaintiffs have alleged that the Jefferson Parish Landfill was "the cause of widespread nuisance odors," and those complaints are now consolidated into lawsuits against involved parties alleging injuries sustained between July 2017 through December 31, 2019 (Relevant Time Period). The primary chemical at issue in this litigation is hydrogen sulfide.

I also reviewed the April 30, 2021 report authored by Dr. John Kind, a toxicologist. Dr. Kind reported these clinical effects at specific hydrogen sulfide thresholds:

| | |
|---|---|
| 0.7-66 parts per billion | Mean ambient air hydrogen sulfide concentrations |
| 525 parts per billion | Average hydrogen sulfide in morning breath |
| 4,000 parts per billion | Average hydrogen sulfide in human flatus |
| 10,000+ parts per billion | Irritation threshold |
| 50,000 parts per billion | Onset conjunctival irritation |
| 200,000 parts per billion | Olfactory paralysis |
| 400,000 parts per billion | Pulmonary edema |
| 1 million parts per billion | Unconscious at once and death within minutes |

I also reviewed the March 8, 2024 report authored by Dr. Kind, in which he notes that H2S has been documented to range between 20 and 70 ppb in "unpolluted" areas of the United States. I have also reviewed the February 16, 2024 report of Plaintiffs' expert James Lape, in which he has estimated background levels of H2S as 3 ppb in River Ridge and 4 ppb in Waggaman. *See* Lape 2024 Report, p. 23.

To further research and verify Dr. Kind's report listing human health aspects of hydrogen sulfide, I turned to the Centers of Disease Control and Prevention (CDC) website (Source: https://www.atsdr.cdc.gov/toxprofiles/tp114-c1-b.pdf). The CDC is a frequently accessed internet site for public health information commonly used and cited by clinicians and public health authorities. These are highlights from a Public Health Statement pertaining to hydrogen sulfide:

1. "Hydrogen sulfide is a flammable, colorless gas that smells like rotten eggs."
2. "Your body makes small amounts of hydrogen sulfide. Hydrogen sulfide is produced by the natural bacteria in your mouth. It is also produced when some types of proteins are broken down by bacteria in the intestines."
3. "Hydrogen sulfide occurs both naturally and from human-made processes. It is in the gases from volcanoes, sulfur springs, undersea vents, swamps, stagnant bodies of water, and in crude petroleum and natural gas. Hydrogen sulfide is also associated with municipal sewers and sewage treatment plants, swine containment and manure-handling operations, and pulp and paper operations. Other industrial sources of hydrogen sulfide include petroleum refineries, natural gas plants, petrochemical plants, coke oven plants, food processing plants, and tanneries. Bacteria found in your mouth and gastrointestinal tract produce hydrogen sulfide during the digestion of food containing vegetable or animal proteins."

Report of Brobson Lutz, MD
March 8, 2024
Page 4 of 64

4.  "People usually can smell hydrogen sulfide at low concentrations in air, ranging from 0.0005 to 0.3 parts hydrogen sulfide per million parts of air (ppm)." These thresholds correspond to 0.5 to 300 parts per billion.
5.  "Most of the hydrogen sulfide released to air comes from natural sources such as swamps, bogs, and volcanoes. Hydrogen sulfide can also be released from industrial sources such as petroleum refineries, natural gas plants, kraft paper mills, manure treatment facilities, wastewater treatment facilities, and tanneries."
6.  "Hydrogen sulfide air concentrations from natural sources range between 0.00011 and 0.00033 ppm." These concentrations correspond to 0.11 to 0.33 parts per billion.
7.  "You can have respiratory and neurological effects if you are exposed to higher concentrations of hydrogen sulfide, at least 100 times higher than typical environmental levels. The effects can include eye irritation, nose irritation, throat irritation, difficulty breathing in people with asthma, headaches, poor memory, tiredness, balance problems."

Expected adverse effects and symptoms related to hydrogen sulfide exposures are typically listed as parts per million, not parts per billion. Therefore, I have converted parts per million to parts per billion as documented in a table published on a National Institutes of Health website:

| | |
|---|---|
| 0.5 parts per billion | Lowest concentration detectable by human nose |
| 10-1500 parts per billion | Odor threshold (rotten egg smell) |
| 2000-5000 parts per billion | Prolonged exposure may cause nausea, tearing of the eyes, headaches or loss of sleep. Airway problems in some asthma patients |
| 20,000 parts per billion | Possible fatigue, loss of appetite, headache, irritability, poor memory, dizziness |
| 50,000-100,000 parts per billion | Slight conjunctivitis ("gas eye") and respiratory tract irritation |
| 100,000 parts per billion | Coughing, eye irritation, loss of sense of smell after 2–15 minutes. Altered respiration, pain in the eyes and drowsiness after 15–30 minutes followed by throat irritation after 1 hour. |

In his March 8, 2024 report, Dr. Kind has concluded that exposure to H2S at an average of 5 ppb for 30 minutes "is well below levels at which health effects such as those alleged by the plaintiffs would occur." This conclusion is supported by my own medical research and analysis. These conclusions are also supported by analysis by the Louisiana Department of Health, which noted that air monitoring of H2S in Jefferson Parish during the relevant time period did "not show elevated levels of hazardous compounds that might contribute to health effects" – despite

Report of Brobson Lutz, MD
March 8, 2024
Page 5 of 64

noting that LDEQ took grab samples of H2S as high as 122 ppb, and monitoring showing an average of 14 ppb over 8 hours.[1]

I am aware that, as part of this litigation, the Court has concluded that exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is *capable* of causing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment or use of property (the Relevant Symptoms). Having reviewed this case from an internal medicine and public health practitioner's perspective, I am not aware of any authorities reasonably relied upon in my field which find that extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes) pose a significant risk of causing the Relevant Symptoms or other adverse medical symptoms or conditions. My reference to odors or landfill odors herein includes hydrogen sulfide and VOCs.

## MAJOR OPINIONS

I.   If a patient ever mentioned concerns with exposure to odors or gases to a medical provider, the standard of care would dictate – and I would expect – that a provider would document such complaints in the patient's chart. The Trial Plaintiffs' medical records reviewed do not contain a single medical assessment speaking to odors or gases or symptoms potentially caused by odors or gases. This review included more than 150 medical encounters (i.e., face-to-face visits with a healthcare provider) by the Trial Plaintiffs during the Relevant Time Period.

II.  Based on my experience as an internal medicine and public health practitioner, and my review of relevant authorities in those fields, exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes) is not considered to be a typical or likely source of adverse health symptoms, including headaches, nausea, vomiting, anxiety, fatigue, and/or sleeplessness. This opinion is bolstered by extensive research using numerous search terms in MEDLINE and PUBMED.

III. If the Trial Plaintiffs were experiencing headaches, nausea, vomiting, anxiety, fatigue, sleeplessness and/or other adverse health symptoms from 2017-2020, it is my opinion that such symptoms were more likely caused by something other than exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes), such as preexisting health conditions and diagnoses, side effects of medications, or other factors in the Trial Plaintiffs' lifestyles or environment, as discussed further below in my analysis for the individual Plaintiffs.

IV.  Drs. Spodak and DeLorenzo have attempted to determine the etiology of the Trial Plaintiffs' medical symptoms without performing a differential diagnosis, which is not a reliable medical methodology. There is an established and accepted methodology by which physicians make diagnoses and determine the etiology of medical symptoms, and Drs. Spodak and DeLorenzo failed to follow this methodology in offering their opinions. Differential diagnoses are an integral part of medical decision making as to the etiology of any underlying medical symptom or abnormal physical finding. As to the Relevant Symptoms, a typical differential diagnosis would include the alternative causes listed

---

[1] Louisiana Department of Health, January14, 2019- Final Draft (WC_JPLF_00316722).

Report of Brobson Lutz, MD
March 8, 2024
Page 6 of 64

below – and the failure to consider them would render unreliable any attempt to determine the etiology of the Relevant Symptoms:

    a.    Headaches: the differential diagnosis for primary headache disorders includes migraine, cluster, and tension headaches. Important secondary causes of headache include sinus infections, eye problems, temporal arteritis, brain tumors, aneurysms, subarachnoid hemorrhage, central nervous system infections, dehydration, gastroesophageal reflux disease (GERD), raised intracranial pressure, and medication and alcohol induced headaches.

    b.    Nausea and vomiting: the differential diagnoses for nausea and/or vomiting include both acute and chronic medical problems involving almost all body systems. Just some of the causes that I have seen in my practice include gastrointestinal functional disorders, systemic infections, numerous medications, closed head injuries, brain tumors, foodborne illnesses, alcohol, pregnancy, motion sickness, gallstones, pancreatic diseases, GERD, Meniere's disease, and psychological disorders.

    c.    Anxiety: no mental health disorder is more common than anxiety, including in my own practice where I screen for anxiety on a regular basis. Stress, genetics, trauma, back pain, and brain chemistry are just a few of the many factors associated with anxiety.

    d.    Fatigue: defined as "extreme tiredness resulting from mental or physical exertion or illness." Physicians often hear from patients who have a subjective lack of energy to pursue daily activities. The differential diagnosis includes lifestyle factors as simple as not getting enough sleep to hundreds of possible medical causes. Common underlying medical conditions causing fatigue include anemia, depression, sleep apnea, infections, congestive heart failure, renal disease, and diabetes.

    e.    Sleeplessness: there are dozens of different types of sleep disorders ranging from simple episodic insomnia to obstructive sleep apnea. Alcoholism, psychiatric disorders such as anxiety and depression, chronic obstructive pulmonary disease (COPD), back pain, and both use and misuse of certain medications are additional common conditions that impact sleep. Stimulants, decongestants, beta-blockers, caffeine, alcohol, and albuterol are just a few of the drugs that can cause sleep related problems.

V.    I understand that the Court has already concluded that insufficient evidence exists to link exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes) with symptoms such as irritation to the eyes, nose, or throat; coughing; trouble breathing or asthma; skin irritation; burning lungs; nosebleeds; exacerbation of neurological issues; or exacerbation of COPD ("Excluded Symptoms"). To the extent any of the Trial Plaintiffs have complained of Excluded Symptoms, it is my opinion that these symptoms were caused by something other than exposure to hydrogen sulfide. Likewise, the attempts by Drs. Spodak and DeLorenzo to determine the etiology of the Trial Plaintiffs' complaints of Excluded Symptoms is not a reliable medical methodology, as they have done so without performing a differential diagnosis, without considering the

findings contained in available records from near the time of the incident in question, and without acknowledging that the Excluded Symptoms are not associated with exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes).

a. Particularly with regard to asthma and related symptoms, it is my opinion that Drs. Spodak and DeLorenzo should have performed a differential diagnosis that considered potential exposure to grain dust, including dust from the grain facilities and barge loading and unloading operations that are located near the Trial Plaintiffs' residences. The New Orleans metro area has a history of asthma epidemics that were found to be caused by exposure to soybean dust originating from grain loading and unloading activities along the Mississippi River (including dust originating from the West Bank and causing asthma symptoms in residents located on the East Bank). This history is well known to New Orleans area physicians, and it is a subject on which I have personally authored a book chapter. Drs. Spodak and DeLorenzo failed to consider New Orleans' history of asthma epidemics related to grain loading and unloading, and failed to perform a differential diagnosis whatsoever, rendering their opinions unreliable.

VI. It is my opinion that a differential diagnosis for the Trial Plaintiffs' symptoms should also include what has been labeled as "compensation neurosis." This phenomenon has been described as "an exaggeration of symptoms that occur as a result of the unique stressor of seeking legally awarded compensation. It is brought about primarily by internal motivators coupled with a lesser degree of anticipation of secondary gain."[2] This topic has been addressed in numerous medical publications including an article by Hall and Hall in the 2012 Journal of the American Academy of Psychiatry and the Law. It is my opinion that, for any symptoms of which the Trial Plaintiffs complain that do not present a reliable physiological explanation, and there are no objective criteria to support the symptoms, compensation neurosis belongs in the differential diagnoses. This is especially true considering the phenomena present with the Trial Plaintiffs in this case, where every single one gave 2023 or 2024 deposition testimony which dramatically expanded on the symptoms allegedly suffered versus what was earlier reported in medical records and the Plaintiff Fact Sheets from at or near the time of alleged odor exposure. In my opinion, it is unlikely that the Trial Plaintiffs' memories of their 2017-2019 odor experiences were better in 2023 or 2024 as compared with their memories at or near the time of the odor experiences – rather, compensation neurosis is a likely explanation for the discrepancies in their accounts. In my opinion, the reports of Drs. Spodak and DeLorenzo failed to sufficiently consider alternative causes of the Trial

---

[2] Compensation Neurosis: A Too Quickly Forgotten Concept? Ryan C. W. Hall, Richard C. W. Hall. Journal of the American Academy of Psychiatry and the Law Online Sep 2012, 40 (3) 390-398. The article further notes:

Compensation neurosis is born out of many factors, such as unwarranted suggestions of illness and long-term injury (e.g., by lawyers, friends, family, and experts); the prolonged time and resultant stress incurred when seeking to have the claim heard; tendencies for stress to exacerbate somatization and underlying personality dynamics (dependent, avoidant, borderline, histrionic, and narcissistic disorders); rationalization; a need for justice, retaliation, or vindication; advantages of embracing the role of victim; or a sense of entitlement.

Plaintiffs' alleged symptoms, other than the cause ascribed by the Trial Plaintiffs (primarily as reported in 2023 or 2024), and that any reliable analysis necessarily should have included compensation neurosis.

VII.    Dr. Spodak has attempted to diagnose the Trial Plaintiffs with mental health injuries allegedly caused by landfill odors – and in some cases seems to suggest that such injuries are permanent, e.g., PTSD. It is my opinion, based on my experience, expertise, and review of the relevant records, that the Trial Plaintiffs did not in the past, and do not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that the Trial Plaintiffs suffered mental health injuries related to landfill odors did not sufficiently consider other causes of their alleged mental health injuries, and seemingly did not consider the medical records which show a lack of objective findings of mental health injuries for many of the Trial Plaintiffs. Dr. Spodak's failure to consider these pieces of data runs contrary to well established methods for physicians and renders his opinions unreliable.

VIII.    Dr. DeLorenzo reports exam findings for the Trial Plaintiffs, including five Trial Plaintiffs who were apparently examined by telemedicine only – the four Gremillions and Reshaun Richardson. These exam findings are in multiple respects inconsistent with what is actually possible to observe during a telemedicine encounter, raising questions about where such information actually originated. Given these inconsistencies, in my opinion, Dr. DeLorenzo's exam findings are neither reliable nor helpful for an analysis of these patients' conditions.

IX.    Based on my expertise and experience, the most accurate and reliable history given by a patient is usually the account given at or near the time of the incident in question, as opposed to accounts given further away in time from the incident. For example, for a typical injury following a motor vehicle accident, the most accurate and informative source of information is typically the EMS report (created shortly after the accident), followed by the Emergency Department triage notes, the Emergency Department physician notes, the nursing admit notes, the history and physical taken after admission, and finally the discharge summary, in that order. For these reasons, it is my opinion that the symptoms complained of during medical encounters from 2017 through 2020, and in the 2020 plaintiff fact sheets, are likely to be more accurate than the accounts given by the plaintiffs in their 2023-2024 depositions and 2023-2024 exams with Drs. Spodak, DeLorenzo, Santos, and Rabon.

My opinions and observations pertaining to each of the 13 Trial Plaintiffs are set out below.

**Discussion of Individual Trial Plaintiffs**

REDACTED

I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 3,964 pages and detailing more than 30 different medical encounters during the Relevant Time Period):

REDACTED

REDACTED has a long history of hypertension, mild diabetes, hyperlipidemia, genital herpes, and acid reflux. She was a smoker – one pack per day for decades. Her medications included omeprazole, lisinopril-HCTZ 20-12.5, Lipitor, Bupropion XL to help with smoking cessation, and valacyclovir.

Walgreens records show that physicians prescribed various upper respiratory tract medications for her as far back 2008 when her Walgreens prescription log begins.

1. Dr. Louis du Treil, a women's specialist, prescribed Claritin, a Combivent Inhaler, a Nasonex inhaler, Benadryl, and amoxicillin between December 2008 and January 2009.
2. Later in 2009, Dr. Brigetta Yancy, a family medicine specialist, prescribed a Z-Pac, Claritin three times, Dy-G Liquid, a Ventolin Inhaler, and a course of doxycycline.
3. And then in 2010, Dr. du Treil prescribed Lohist-12D to take as needed for "post-nasal drip."

Medical records document she received medications for nasal antihistamines, steroids, stomach medications, and was counselled about her anxiety way before the alleged July 2017 landfill emissions. These medical problems all PREDATED the Relevant Time Period:

1. She saw a physician as far back as April 2008 who documented that she had a cough related to chronic bronchitis with associated runny nose and sinus congestion.
2. She had a chest x-ray for chronic cough in September 2011.
3. West Jefferson records document that REDACTED had a history of COPD dating back to 2011.
4. An emergency medicine physician diagnosed her with an acute headache in June 2012 and also noted a past history of recurrent headaches.
5. She had a followup with her PCP for stomach pain in January 2014.
6. In July 2014, Dr. William Long treated her for acute bronchitis and sinusitis associated with cigarette smoking. Her medications at that encounter included Astelin and Flonase nasal sprays as needed for her sinus and allergy problems and omeprazole (Prilosec) for stomach problems.
7. Dr. Long treated her again for acute bronchitis in March 2015 and specifically advised her to stop smoking in June 2015 and November 2015.
8. Clinical impressions in September 2015 included gastritis, acute bronchitis, acute pharyngitis, and tobacco use.
9. Diagnoses in November 2015 included gastritis and acute pharyngitis.

Report of Brobson Lutz, MD
March 8, 2024
Page 10 of 64

10. She called The Family Health Clinic in December 2015 requesting medications for a scratchy throat and a productive cough diagnosed a few days later by Dr. Long for acute bronchitis, pharyngitis, sinusitis.
11. She was taking Atarax, an antihistamine for skin itching in March 2015.
12. Dr. Long treated her again for acute bronchitis, pharyngitis, and sinusitis in September 2016.
13. Dr. Long advised her to consider psychiatric care in March 2017 due to depression related to problems with her son. He also noted that she was under treatment for epigastric pain associated with GERD and controlled with omeprazole (Prilosec).
14. Additionally, testing in 2017 revealed that REDACTED has an incompetent lower esophageal sphincter (LES), which is known to cause esophageal irritation.
15. Dr. Long referenced her inability to stop smoking and bronchitis in June 2017.

Her above gastrointestinal, sinopulmonary, dermatology, and psychiatric problems are well documented in her pharmacy records. I combed through 86 pages of prescriptions filled by Walgreens between 2008 and 2023. I counted the number of filled prescriptions for antihistamines (both oral and sprays), steroids commonly used for allergies and sinusitis including Flonase and oral steroids, antitussives, and antibiotics typically prescribed for upper respiratory tract infections.

REDACTED received 12 unique prescriptions used to treat upper respiratory tract conditions in just the year 2009 alone. Her prescription fills for 2014 through 2022 included these:

2014    Flonase, an oral steroid, and an antibiotic
2015    Two courses of antibiotics and a cough suppressant
2016    Nasal antihistamines x2, an antibiotic, and a cough suppressive
2017    A cough suppressant
2018    One oral antihistamine, 5 nasal antihistamines, Flonase, four courses of antibiotics, and a cough suppressant
2019    Three oral antihistamines and three Flonase prescriptions
2020    One nasal antihistamine, 3 nasal steroids, and 2 cough suppressants
2021    Three nasal antihistamines
2022    One oral antihistamine, one nasal antihistamine, one steroid nasal spray, two oral steroids, two cough suppressants, and two courses of antibiotics

Between 2008 and 2022, REDACTED eceived numerous medications commonly prescribed for patients with upper respiratory allergies, irritations, and infections. The classes of medications she received include these:
1. Nasal antihistamine sprays
2. Nasal and respiratory steroid sprays
3. Oral antihistamines
4. Oral steroids

According to her Fact Sheet signed in November of 2020, she stated that the following symptoms began in 2018 and were associated with exposure to landfill odors: sleepiness, stress, asthma, coughing/gagging, throat scratching. On the other hand, in her April 2023 deposition testimony, she stated the following:

Report of Brobson Lutz, MD
March 8, 2024
Page 11 of 64

1. She had no throat problems prior to 2017. Her onset of a scratchy throat began in 2017 prompting her to see Dr. Long. She had had no prior throat problems. She no longer has any abnormal throat symptoms.
2. Dr. Long sent her to a pulmonary specialist in Marrero because she was having breathing problems. One doctor told her that she had a nasal drip and prescribed a "drip nasal spray" and a device with a ball in it for breathing exercises.
3. She had no problems with gagging (clarified as nausea) and coughing prior to 2017. Her cough stopped in 2020.
4. Sleeping problems began in 2017 and reported at some time to Dr. Long. "In my mind the sleeping problem in 2017 was caused because of the odor that I was smelling. No problems sleeping before 2017."
5. She never had stress or complained of stress to a physician before 2017. Also suffered mental illness and stress, because her grandchildren were unable to visit in her home.
6. She never had asthma to her knowledge. "I have a breathing problem. I might have said asthma, but it was the breathing problem that I was having that they gave me the inhaler for."
7. "I couldn't function properly because it assumed me. That smell assumed me."
8. No physician has ever told her that her health issues were caused by odors caused by the Jefferson Parish Landfill.

Highlights from her April 2023 deposition testimony and my selected comments included these:

1. REDACTED has been on disability for years following knee, back, and shoulder problems following work as a crane hooker at Avondale in the late 1970s.

2. She lives with her 34-year-old son who has a mental disability and was hospitalized when she gave her April 2023 deposition.

3. She first noticed an odor she described as "gassy, stinky, trashy" when she moved back into her house after prolonged Katrina repairs in 2017. It lasted until early 2020. She described it not as a gasoline smell but as a stinky trashy odor present "24/7 whether it was summer, winter, whatever. It was there…All I could think of was the fact that I was living in an odor for almost two years, that stink. *COMMENT:  According to the earlier completed Fact Sheet, these landfill odor complaints started in 2018: sleepiness, stress, asthma, coughing/gagging, throat scratching. This would mean that these all started at least 6 months after the July 1, 2017, date recognized by the judge.*

4. She never made odor complaints to Jefferson Parish or the state Department of Environmental Quality. She did complain about the odor to Dr. William Long, Family Doctor, Paxton Street in Marrero. *COMMENT: Dr. Long attributed her respiratory symptoms to chronic cigarette smoking, allergies, and an occasional infection. There is no mention of any fume or odor related complaint in any of his records.*

5. "I got sick. I had headaches. Nausea. I couldn't sleep. I was vomiting. I went to see my doctor when these symptoms and all -- I was just stressed out and went and saw him when these symptoms were -- and I was trying to find out what was some odors in my neighborhood." *COMMENT: In over 20 different medical encounters between 2017 and 2020, there is never any mention of any headache, vomiting or sleeping problem. She*

Report of Brobson Lutz, MD
March 8, 2024
Page 12 of 64

> *did complain of some stomach distress attributed to ibuprofen in Oct 2017, but that problem later resolved with Prilosec.*

6. She was asked if she had any "reason to disagree that your throat scratching issue began in 2018?" She testified: "It didn't begin in 2018. It begin (sic.) in 2017."
   *COMMENT: Based on her medical records, she had respiratory complaints including an "itchy throat" as far back as September 2015 and also November 2015.*

7. She testified that she never had problems with coughing, gagging, and nausea before 2017 and that these symptoms stopped in 2020.
   *COMMENTS:*
   a. *There is no report of her expressing any "gagging" complaints in any of her medical records that I can find.*
   b. *She complained of nausea during a July 2014 office visit with Dr. Long.*
   c. *She was already on nasal steroid and antihistamine sprays by 2014.*
   d. *She described a cough productive of white mucus in July 2014. In her setting of long-term cigarette smoking, such findings represent a classic smoker's cough.*
   e. *Dr. Long attributed an improvement in a cough of two weeks duration to treatment with Flonase and Astelin nasal sprays in March 2015.*
   f. *She complained of intermittent nausea and epigastric discomfort in a November 2015 office visit with Dr. Long.*
   g. *She had a dry cough attributed to an acute bronchitis, pharyngitis, and sinusitis in September 2016.*

8. She testified that the odor caused her problems with sleep. *COMMENT: Despite having 20 different medical encounters between 2017 and 2020, the first and only indication of anything sleep-related was in March 2020 when she was apparently dealing with a cough and was prescribed a narcotic cough suppressant at night to help her sleep.*

According to Dr. Rabon's report, REDACTED reported that her main symptoms during the Relevant Time Period attributed to the odors included "nausea and vomiting, cough and shortness of breath, headaches, loss of sleep, and anxiety." Dr. Rabon addressed the differential diagnoses of her reported gastrointestinal, pulmonary complaints, and anxiety/sleep problems:

1. The differential diagnosis of her nausea and vomiting included GERD and other gastrointestinal disorders, post-tussive emesis, and medication adverse effects.
2. The differential diagnosis of her cough and shortness of breath included chronic obstructive pulmonary disease due to long-term cigarette smoking and allergic rhinitis.
3. As to her anxiety and sleep complaints, Dr. Rabon noted that many factors can "manifest or exacerbate anxiety. It would be very difficult to separate her stress over her son, as he was actively dealing with mental health issues per her report, from her worry about the odor. Given the often-multifactorial nature of anxiety, I cannot completely rule out any particular stressor as a contributing factor to her anxiety."
4. A GAD-7 screening questionnaire was conducted, showing a score of 2, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale).

Review of REDACTED medical records documents the problems Dr. Rabon defines in his differential diagnoses.

MAJOR OPINIONS as to     REDACTED

I.  Review of prescription records from Walgreens clearly show REDACTED had recurrent respiratory conditions dating back to 2008 and 2009 requiring multiple courses of antihistamines, decongestants, bronchodilators, nasal steroids, cough expectorants, and antibiotics.

II.  She has continued to receive numerous prescriptions commonly prescribed for sinopulmonary complaints through 2021. There was no significant increase in such medications use between July 2017 and December 2019.

III.  REDACTED had multiple risk factors and underlying conditions documented in her medical history classic for recurrent sinopulmonary conditions. However, her history and clinical course over the years are classic for what is commonly called a smoker's cough, including a diagnosis of COPD dating back to 2011.

IV.  REDACTED complained of stress and anxiety prior to the Relevant Time Period, including in connection with caring for her son.

V.  I could not find any notation in her medicals that she ever even reported, much less attributed, any symptom or condition to an "odor" problem. There are much more plausible causes for all her reported medical problems and conditions than can be attributed to nuisance odor.

OTHER OPINIONS as to     REDACTED

1.  The most common conditions causing a chronic cough lasting more than 3 to 4 weeks in a person with a normal or near normal chest X-ray are cigarette smoking, postnasal drip syndrome, postinfectious cough, gastroesophageal reflux disease and adverse effects from antihypertensive medications known as angiotensin-converting enzyme inhibitors (ACE).

2.  Smoker's cough is the respiratory tract's chronic response to tobacco smoke. Early pulmonary complications include both acute and chronic bronchitis with and without infections. According to her deposition testimony, she did not stop smoking until January 2023. Long-term cigarette smokers typically develop a chronic cough after age 40 which may or may not be a productive cough. After years of smoking, the cough can continue even after cigarette cessation.

3.  Postnasal drip syndrome is caused by inflammation from chronic nasal and sinus allergies. It is commonly treated with antihistamines and nasal steroids.

4.  Post-infectious coughs occur after viral and bacterial respiratory infections and can last for weeks to months.

5.  Gastroesophageal reflux disease (GERD) is caused by gastric acid backwash. Symptoms are classically gastrointestinal such as heartburn but in some patients the symptoms are all respiratory. Persons with GERD usually respond to an acid reducing medication such as Prilosec or Nexium. Additionally, incompetent LES is associated with nausea and vomiting symptoms.

6. While most ACE inhibitor coughs develop shortly after beginning an ACE inhibitor such as lisinopril, it is not at all uncommon for this sort of cough to start de novo after years of being on the same ACE inhibitor.

CONCLUDING OPINIONS as to REDACTED According to the medical records reviewed, REDACTE never complained of odors or fumes during any of the numerous medical encounters that she underwent during the Relevant Time Period. Her history and clinical course over the years is classic for what is commonly called a smoker's cough. Smoker's cough is the respiratory tract's chronic response to tobacco smoke. Early pulmonary complications include both acute and chronic bronchitis with and without infections. REDACTED medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. REDACTED medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including smoker's cough and a long history of recurrent respiratory ailments.

OPINIONS ON PLAINTIFF EXPERT REPORTS on REDACTED

Dr. Robert DeLorenzo, a neurologist, opined that REDACTED complaints of throat irritation, coughing and gagging, nausea and vomiting, headaches, stress/depression, asthma and decreased appetite associated with fatigue were caused by her exposure to hydrogen sulfide and VOCs during the relevant time period." It is unfortunate that Dr. DeLorenzo apparently did not review available medical records for REDACTED (according to the text of his report). If he had, he would have seen that REDACTED never presented with any wheezing and was never diagnosed with asthma. Moreover, all of her documented medical complaints predated the Relevant Time Period. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Dr. Michael Spodak, a psychiatrist, made several misleading statements in his report including these:
1. He reported that REDACTED was "first diagnosed with an anxiety disorder and depression "in October 2017 and "not before that." This is one of his incorrect conclusions. According to available medical records, Dr. William Long reported in July 2014 that REDACTE) requested a Wellbutrin refill which "helps her depression."
2. Dr. Spodak's medical timeline for REDACTED even records that she suffered depression and stress associated with her son's problems in April 2017.
3. Even her gynecologist noted that she had a history of depression in December 2015.
4. Dr. Spodak also implied that her Wellbutrin dosage was increased to 300 mg daily in December 2017 for "assistance with smoking cessation and because of depression." Contrary to Dr. Spodak's comment, the medical record plainly states that the dose was increased to aid in smoking cessation.

It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTE) did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that REDACTED suffered mental health injuries related to landfill odors did not sufficiently consider other causes of her alleged mental health injuries, and did not consider the findings contained in

Report of Brobson Lutz, MD
March 8, 2024
Page 15 of 64

available records from near the time of the incident in question, which runs contrary to well established methods for physicians and renders his opinions unreliable

Report of Brobson Lutz, MD
March 8, 2024
Page 16 of 64

REDACTED

This child was born in 2009. <sup>REDACTED</sup> and her family moved from River Ridge to South Carolina in April 2020. I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 302 pages and detailing multiple different medical encounters during the Relevant Time Period):

REDACTED

Her father testified as to <sup>REDACTED</sup> complaints:
1. She would complain that the smell caused her to have headaches.
2. She would say, "I don't want to go ride my bike. It stinks out here."
3. She would complain sometimes about having to go to swim practice because she would get headaches with the smell.
4. She did say a few times she felt like she needed to throw up.
5. She would get a cough at times.

Her mother testified that the odors caused her to miss swim practices. She would complain of burning eyes and nose. She testified that <sup>REDACTED</sup> claims were for burning nose and eyes.

Records from Ochsner and East Jefferson show the usual acute and transient medical problems associated with little ones including multiple infections:
1. Otitis media in March 2010
2. Bilateral myringotomy and PE tube placement, with adenoidectomy, May 2010
3. Fever due to an upper respiratory tract infection in Dec 2010
4. A minor dog bite in February 2011
5. Acute influenza A in December 2017
6. An acute upper respiratory infection with a rash in January 2019
7. Upper respiratory infection in December 2020
8. Suspected COVID exposure in January 2021
9. Well child exam in January 2021 and April 2022
10. A neck rash at the time of a laundry detergent change in July 2023
11. Acute diarrhea in December 2023

As for the Relevant Time Period between July 2017 and December 2019, I saw only two medical encounters. Both were from an Urgent Care Clinic in River Ridge. She had a respiratory tract infection and tested positive for influenza in December 2017. A physician's assistant diagnosed her with a viral exanthem and an upper respiratory tract infection in January 2019.

I read <sup>REDACTED</sup> brief deposition testimony given in February 2024. This high school student described her various activities and play including swimming, trampoline jumping, and other sports while living on Robin Lane in Louisiana. She recalled a foul odor described "like a fart" once while riding her bike and also at other times. She also recalled that her parents kept her

Report of Brobson Lutz, MD
March 8, 2024
Page 17 of 64

insides at times because of a malodor. She recalled headaches and eye redness related to the bad smell. The longest she remembered a headache lasting was about an hour.

Dr. Justin Rabon examined REDACTED by Zoom on February 28, 2014. He stated that her history was "limited by REDACTED memory of her time living in Louisiana. For example, she remembered the name of her school, but did not remember the names of her first or second grade teachers." She reported odors occurring several times a month resulting in minor headaches and itchy, red eyes. She denied any "sore throat, nasal congestion, chest pain, or abdominal pain" and did not recall any "cough, nausea, or vomiting."

MAJOR OPINION as to        REDACTED

I.    REDACTED medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period.

OTHER OPINIONS as to        REDACTED

1.   Her medical records and pharmacy records are negative for any mention of headaches or prescription medications for headaches.

2.   The only documentation of any complaints related to foul odors is from her and her parents' deposition testimonies.

3.   All available medical encounters from July 2017 December 2019 had documented non-odor exposure diagnoses.

4.   REDACTED medical records do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide. For example, ear pain can be associated with headaches. Because Ms. Gremillion has undergone a myringotomy and experiences otitis, both affecting the ear, a differential diagnosis for her headaches should include these conditions.

CONCLUDING OPINIONS as to        REDACTED        Her records are consistent with usual childhood medical happenings. There is no documentation or even suggestion of any odor or smell related complaint or diagnosis. REDACTED medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to        REDACTED

Dr. Robert DeLorenzo, a neurologist, opined that REDACTED "complaints of headaches, eye irritation and redness, exacerbation of allergies, and coughing were caused by her exposure to hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill during the relevant time period of July 1, 2017, to December 31, 2019." Dr. DeLorenzo's report fails to indicate whether he reviewed REDACTED medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in REDACTED medical records. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable. Further, it is my opinion that Dr. DeLorenzo's exam findings, apparently gleaned from

Report of Brobson Lutz, MD
March 8, 2024
Page 18 of 64

a telemedicine visit, are in multiple respects inconsistent with what is actually possible to observe during a telemedicine encounter, raising questions about where such information actually originated. Given these inconsistencies, in my opinion, Dr. DeLorenzo's exam findings are neither reliable nor helpful for an analysis of this patient's condition.

Dr. Michael Spodak, a psychiatrist, concluded that REDACTED experienced a number of "somatic and psychological symptoms" during the relevant time period apparently without the benefit of reviewing available medicals. He expressed medical opinions "with reasonable medical probability/certainty" while acknowledging receipt of medical medicals which "are under review." It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTED did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that REDACTED suffered mental health injuries related to landfill odors did not sufficiently consider other causes of her alleged mental health injuries, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 19 of 64

REDACTED

REDACTED was born in 2012. I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 188 pages and detailing multiple different medical encounters during the Relevant Time Period):

REDACTED

His pre-incident prescribed medications before the Relevant Time Period between 2012 and July 2017 included these:

1. Vigamox eye drops commonly prescribed bacterial conjunctivitis.
2. Cefdinir (Omnicef) is an antibiotic often prescribed by pediatricians for real or suspected respiratory tract infections.
3. Bromfed DM is a 3-combo syrup containing an antihistamine, a decongestant, and a cough suppressant commonly prescribed for allergies and respiratory infections.
4. Sulfa-pred eyedrops contain a sulfa antimicrobial and a steroid prescribed for suspected eye infections associated with inflammation.
5. Hydrocodone-Acetaminophen (Norco, Vicodin) is a potent opioid for pain.
6. Azithromycin susp is a broad-spectrum antimicrobial commonly prescribed for children with respiratory tract infections.
7. Ondansetron ODT or Zofran is an oral disintegrating tablet prescribed for nausea and vomiting.
8. Cephalexin (oral Keflex) and Mupirocin Ointment are antimicrobials commonly prescribed together for suspected staphylococcal skin infections.
9. Clindamycin is another antibiotic often prescribed for skin and soft tissue infections especially when a staphylococcal infection is suspected.
10. Bactrim Suspension and Mupirocin ointment is another 2-drug combo usually prescribed together for skin and soft tissue infections.

In summary REDACTED received 21 assorted prescriptions for ENT and respiratory conditions numerous times between April 2013 and July 2017.

The initial medical encounter I reviewed was in November 2013 for diarrhea attributed to a course of antibiotics for an ear infection.  He had tubes inserted in both eardrums for recurrent otitis media in December 2013. Dr. Morici noted an additional history of nasal allergies in April 2015. His medications included Allegra.

For the Relevant Time Period of July 2017 to December 2019, available records document for events:

1. A physician's assistant treated him for an                REDACTED
2.                                         REDACTED

Report of Brobson Lutz, MD
March 8, 2024
Page 20 of 64

3.                                              REDACTED

REDACTED had the normal                                    REDACTED

. He and his family moved from River Ridge to South
Carolina in April 2020.

His Fact Sheet lists his problems as                    REDACTED

His mother testified that                               REDACTED

REDACTED          REDACTED
other complaints included lethargy, headaches, and fatigue according to his father's
deposition testimony.

REDACTED                    gave deposition testimony on February 15, 2024. He reported
on play and other activities dating back to when his family lived in Louisiana. He reported a
"very unpleasant" smell that "was just the talk around the house at times." When asked to
describe the pain he reported "it smelled bad." As to the frequency of the odor, he testified:
"…my nose is very stuffy a lot of the time. But when I smelled it, I smelled it. So sometimes." He
testified that his nose was stuffy "most of the time" when he lived in Louisiana. He recalled
moving to South Carolina in part because of crime concerns locally. He reported that his mother
had said she sometimes taped door frames and closed doors to keep the smell out of their
house, but he did not actually remember any taping.

Dr. Justin Rabon interviewed REDACTED by Zoom on February 28, 2024. These are excerpts from
his report:
1. "The history obtained is limited by REDACTED memory of his time living in Louisiana."
2. "He remembers a "bad smell" that "smelled like a fart." It occurred sometimes," but not
   every day, and was unpleasant."
3. "The symptoms he remembers were headache, nasal congestion, cough. He had a sore
   throat from coughing and remembers difficulty breathing if he was coughing too much."
4. "His father reports that he had to go to the pediatrician for chronic cough during this time
   period. He does not remember if he received antibiotics or other treatment."
5. "He was reportedly evaluated for chronic cough during this time. The differential
   diagnosis for this could include, but is not limited to, persistent cough after viral
   respiratory infection, asthma, allergies, and habit cough. Given the remote symptoms
   with subsequent resolution, it would be difficult to determine the etiology."

MAJOR OPINIONS as to        REDACTED

Report of Brobson Lutz, MD
March 8, 2024
Page 21 of 64

I.  Nothing in REDACTED available medical records documents complaints about any fume or odor related problems.

II.  Drug store records document the prescribing of numerous medications associated with sinopulmonary complaints and seasonal allergies dating back to 2012 including adenoid surgery prior to the Relevant Time Period.

III.  His alleged symptoms are much more likely explained by non-odor related etiologies -- for example, his recurrent otitis media with fluid and adenoid removal, as ear pain can be associated with headaches.

OTHER OPINIONS as to        REDACTED

1.  The only documentation of any complaints related to foul odors is from his and his parents' deposition testimonies.

2.  There was no spike or increased in prescribed medications for this child's allergies and sinopulmonary problems between July 2017 December 2019. His need for these prescriptions continued even after an apparent tonsillectomy in 2013.
    a.  2013  16 allergy, cough, nausea, and antibiotic prescriptions
    b.  2014  5 allergy, cough, nausea, and antibiotic prescriptions
    c.  2015  5 allergy, cough, and antibiotic prescriptions
    d.  2017  2 antibiotic prescriptions in April 2017 and 1 nausea prescription in December 2017
    e.  2019  4 cough, antiviral, antibiotic, and allergy prescriptions
    f.  2020  3 nausea, antibiotic, and antiviral prescriptions

CONCLUDING OPINIONS as to        REDACTED        : Like his sister, young REDACTED had various respiratory tract infections not unexpected for a youngster his age. REDACTED medical records do not support the claim that he suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. REDACTED medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including recurrent sinopulmonary complaints and seasonal allergies.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to        REDACTED

Dr. Robert DeLorenzo, a neurologist, opined that REDACTED had eye burning and cough caused by exposure to hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill during the Relevant Time Period. Dr. DeLorenzo failed to mention review of any actual medical records. None of the medical complaints he reports are reflected in these medical records. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable. Further, it is my opinion that Dr. DeLorenzo's exam findings, apparently gleaned from a telemedicine visit, are in multiple respects inconsistent with what is actually possible to observe during a telemedicine encounter, raising questions about where such information actually originated. Given these inconsistencies, in my opinion, Dr. DeLorenzo's exam findings are neither reliable nor helpful for an analysis of this patient's condition.

Report of Brobson Lutz, MD
March 8, 2024
Page 22 of 64


Dr. Michael Spodak, a psychiatrist, concluded that                REDACTED              , experienced a
number of "somatic and psychological symptoms" during the Relevant Time Period, again
apparently without the benefit of reviewing available medicals. He expressed medical opinions
"with reasonable medical probability/certainty" while acknowledging that the actual medical
medicals "are under review" and apparently not factored into his opinions. It is my opinion,
based on my experience, expertise, and review of the relevant records, that REDACTED did not in
the past, and does not today, meet criteria for referral to a mental health specialist for alleged
mental health injuries related to landfill odors. Dr. Spodak's conclusion that REDACTED suffered
mental health injuries related to landfill odors did not sufficiently consider other causes of his
alleged mental health injuries, and did not consider the findings contained in available records
closer in time to the incident in question, both of which run contrary to well established methods
for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 23 of 64

REDACTED


REDACTED   was born in Alexandria LA in 1978, married Wendy in 2004, has two children, works in sales of used heavy construction equipment, and has lived in South Carolina since April 2020. I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 522 pages and detailing multiple different medical encounters during the Relevant Time Period):

REDACTED


These are the highlights from 495 pages of medicals from Ochsner:
1. Nausea and vomiting, diarrhea, and weakness due to a virus (January 2010)
2. Wellness exam with right ankle sprain (August 2014)
3. Gout left foot (May 2017)
4. Viral URI with cough, postnasal drip (November 2017)
5. Wellness exam and chronic gout (June 2018)
6. Penile lesions and STD check (September 2018)
7. Acute maxillary sinusitis (February 2019)
8. Wellness exam, gout, and fresh blood on stool (July 2019)

These are excerpts from his deposition testimony:
1. Believes smells first started summer 2017 ending late 2019 or early 2020.
2. Smell intensity variable from mild to severe, "the intensity changed, so my symptoms would change. Sometimes it was a mild headache; sometimes it was extreme."
3. "When the smell would come in, immediately headaches would onset. You'd feel nauseous. Would wake you up, couldn't sleep… I never personally vomited."
4. The odors affected wife and children more than him.
5. He did not recall if smells drove him to seek medical care.
6.    REDACTED    would get headaches when the smell was present, "I know she would get headaches she would complain to us about, and that was definitely when the smell was present. I know she would walk outside some days and say, "I don't want to go ride my bike. It stinks out here." She would complain sometimes about having to go to swim practice because she would get headaches with the smell… She did say a few times she felt like she needed to throw up. I don't know. I mean, she would get a cough at times."
7.    REDACTED   ved with a cough for 25 months. He would say, "It stinks." REDACTED problems included lethargy, headaches, bad cough, and fatigue.
8. The odors substantially interfered with his and his family's use and enjoyment of his property.
9. "We left Louisiana [in April 2020] because we were scared for our kids' safety in the long run… we were getting sick all the time, and it was just -- enjoyment of life was -- was going down…"

Dr. Charles Santos conducted a medical examination in 2024 and reported these findings:
1. "Given the historical nature of the examinee's complaints, limitations in his own memory, and the limitations of virtual examinations, as well as limitations in the available records, I do not believe that it is possible to conclude that his complaints of sleeplessness, fatigue, or headache are a result of odors experienced during the relevant time period."

Report of Brobson Lutz, MD
March 8, 2024
Page 24 of 64

2. "If causality is supported by other evidence, his headaches would be more consistent with an exacerbation of a chronic issue and not a new diagnosis."

3. "His complaints of nausea are relatively nonspecific. What he describes might be more consistent with what would be called "globus sensation" than nausea, which is a feeling of something stuck in the throat."

4. A GAD-7 screening questionnaire was conducted, showing a score of 0, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale).

OPINIONS as to     REDACTED     :

1. It is improbable that exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes) was a factor in causing any of     REDACTED     Relevant Symptoms or other adverse medical symptoms or conditions.

2. His medicals are devoid of any complaints or even mentions of odors.

3. His documented medical encounters prior to July 2017 were these:
   a. Nausea, vomiting, and diarrhea consistent with gastroenteritis in January 2010.
   b. Elevated blood pressure and an ankle strain in August 2014.
   c. Acute gouty arthritis in May 2017

4. These were his medical encounters in the targeted period between July 2017 and December 2019:
   a. A classic viral upper respiratory infection with a cough and post-nasal drip in November 2017. His review of symptoms was negative for headaches and no nausea was mentioned.
   b. An annual exam with a negative review of systems for any ENT, sinus, or respiratory complaints in June 2018.
   c. A dermatology skin check for moles in June 2018.
   d. Evaluation for a penile lesion and possible exposure to a sexually transmitted pathogen in September 2018.
   e. Acute maxillary sinusitis treated with antibiotics and steroids in February 2019.
   f. An annual exam with a negative review of systems for fatigue, ENT congestion, postnasal drip, rhinorrhea, sinus pressure, sneezing, sore throat, cough, chest tightness, shortness of breath or wheezing in June 2018.

5. In his deposition testimony,     REDACTED     testified that the odor caused him to have nausea and mild to extreme headaches. On the other hand, the only mention in his medical records of any headache or nausea was in 2010 when he was treated for gastroenteritis.

CONCLUDING OPINIONS as to     REDACTED     : There are no mentions of any odor related complaints or diagnoses in any of his medicals.     REDACTED     medical records do not support the claim that he suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. The differential diagnoses for all his documented medical problems are all explained by alternative etiologies.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to     REDACTED

Report of Brobson Lutz, MD
March 8, 2024
Page 25 of 64

Dr. Robert DeLorenzo, a neurologist, conducted a telemedicine encounter with REDACTED in November 2023. According to Dr. DeLorenzo, REDACTED told him that he had experienced "a near constant odor of hydrogen sulfide from 2017 to 2019." Dr. DeLorenzo opined that this exposure caused nausea, headaches, fatigue, and sleep deprivation. Dr. DeLorenzo's report fails to indicate whether he reviewed REDACTED medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in REDACTED medical records. Dr. DeLorenzo failed to consider differential diagnoses of other likely causes of the reported symptoms such as the urgent care diagnosis of a viral respiratory infection in November 2017. He also ignored REDACTED annual medical exam in June 2019 at which time none of the alleged malodor complaints were reported. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable. Further, it is my opinion that Dr. DeLorenzo's exam findings, apparently gleaned from a telemedicine visit, are in multiple respects inconsistent with what is actually possible to observe during a telemedicine encounter, raising questions about where such information actually originated. Given these inconsistencies, in my opinion, Dr. DeLorenzo's exam findings are neither reliable nor helpful for an analysis of this patient's condition.

Dr. Michael Spodak, a psychiatrist, concluded that REDACTED like his other family members, experienced a number of "somatic and psychological symptoms" during the Relevant Time Period, again apparently without the benefit of reviewing available medicals. He expressed medical opinions "with reasonable medical probability/certainty" while acknowledging that the actual medical medicals "are under review" and apparently not factored into his opinions. It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTI did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that REDACTED suffered mental health injuries related to landfill odors did not sufficiently consider other causes of his alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 26 of 64

REDACTED

REDACTED   was born in Metairie and married REDACTED in 2004. Their family with two children lived at 9701 Robin Lane in River Ridge from April 2009 until early 2020. She has lived in South Carolina since April 2020. I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 715 pages and detailing multiple different medical encounters during the Relevant Time Period):

REDACTED

These are the encounter diagnoses in her Ochsner and East Jefferson medicals:

1. Pharyngitis and acute upper resp tract infection (January 2005)
2. Probable viral gastroenteritis vs. Clostridium difficile (November 2007)
3. Abdominal pain, bloating, and diarrhea (December 2007)
4. Colonoscopy for endometriosis concerns (April 2008)
5. Left calf injury (August 2016)
6. Left wrist injury (November 2016)
7. Viral syndrome and sinus congestion (December 2017)
8. Viral bronchitis (July 2018)
9. Splinter left foot (October 2019)
10. Acute influenza A (February 2020)

These are some highlights from her June 2023 deposition testimony:

1. REDACTED   was born in Metairie and grew up in Kenner. She graduated from Loyola Law School in 2003.

2. She lived with her husband, and two children at 9701 Robin Lane in River Ridge from April 2009 until early 2020. They moved to South Carolina in April 2020.

3. She and her family reported foul odors at their home on Robin Lane about 4 times a week beginning in early 2017. In her Plaintiff Fact Sheet   REDACTED   described these odors as a mixture of chemical smells, petroleum odor, rotten egg, ammonia smell, and garbage smell. In her deposition testimony, she variously described the episodic odors as "smells like farts" (how her kids characterized the odors), "sour", "a sulfur smell", "rotten eggs", "a chemical/petroleum smell", and just "bad".

4. She reported detection of foul odors at other Jefferson Parish areas including the Elmwood Fitness Center, a nearby Winn Dixie, and the Paradise Manor Community Club, a seasonal swimming and sports operation on the River Ridge/Harahan property line. She also testified that the odors affected her two children.

5. The only personal injury she recorded on the Plaintiff Fact Sheet was nausea. Her deposition testimony was more expansive including lifestyle changes as reflected in these excerpts:

Report of Brobson Lutz, MD
March 8, 2024
Page 27 of 64

    a.  "My eyes burn. My throat burn. I mean, you worry about what it is you're -- you're inhaling. I felt nauseous. Headaches. It's not comfortable."

    b.  **"…**the sulfur smell that we were smelling, it was a lot more than just nausea. It was eyes burning, throat, nose, fatigue, gagging, sleepless nights, and a lot of stress."

    c.  "So I didn't sleep much. When I did sleep it was under covers."

    d.  "When the smell was around…I would smell it, whether it was in the house or not, I would tape the doors -- the door frames, put towels under the doors, put air -- turn the air condition off, turn the vents in the bathrooms on to eliminate anything coming in, make sure the fireplace flume -- I think it's called the flume -- was closed because it would come in there. "

    e.  "It would come in the bathrooms, under doors.

    f.  "So I didn't sleep much. It was a very nauseous at times. My ears, my nose, my throat. Very anxious."

    g.  She testified that she was "diagnosed with asthma during this time frame" at a nearby urgent care center.

    h.  "Physical injuries as far as headaches, nausea, inability to breathe at times. There was no fresh air.

    i.  "Nobody wanted to eat when you smelled that. Like, I -- complete loss of appetite."

    j.  "The stress that came along with this, the worry…."

6.  She was aware that the Jefferson Parish Landfill was on the Westbank, aware of River Birch, aware a sewage treatment plant on Earhart Blvd., and supposes other area landfills. But, she attributed the sulfur like odors to improperly contained gases produced by the Jefferson Parish landfill due to media reports and statements made by parish officials.

Dr. Justin Rabon examined   REDACTED   by video conference in January 2024. He made several findings including these:

1.  As to her complaints of anxiety and loss of sleep, many factors can manifest or exacerbate anxiety, and Dr. Rabon could not exclude any particular stressor as a contributing factor to her anxiety.

2.  She told Dr. Rabon that her father died at age 68 with Alzheimer's disease. She apparently did not disclose her father's suicide cause of death to Dr. Rabon.

3.  Dr. Rabon entertained differential diagnoses for her lack of sleep including poor sleep hygiene, increased screen time on Facebook, and difficulty with sleep initiation.

4.  A GAD-7 screening questionnaire was conducted, showing a score of 2, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale). Dr. Rabon stated her "depression and anxiety screens today would not prompt additional evaluation for a mental health disorder."

5.  Her headache descriptions were vague and appeared to be associated with nausea consistent with broad differential diagnoses not considered by the plaintiff experts. He noted that headaches with nausea are common with migraine disorders.

MAJOR OPINIONS as to   REDACTED

I.  There are no mentions in any of her reviewed medical records of any gastrointestinal complaints including no nausea and no vomiting after December 2007.

Report of Brobson Lutz, MD
March 8, 2024
Page 28 of 64

II.     There is a mismatch between her initial complaints as recorded on her Plaintiff Fact
        Sheet and her June 2023 deposition testimony.

III.     REDACTED    testified that she was diagnosed with asthma at an urgent care clinic, but
        her urgent care records fail to confirm or even mention the disease asthma.

IV.     All her documented medical complaints, conditions, and diagnoses are much more likely
        explained by non-odor related etiologies.

OTHER OPINIONS as to    REDACTED

   REDACTED    estified that she was diagnosed with asthma by urgent care clinic staff. This is
incorrect. There was never a diagnosis of asthma recorded in any of her 10 reviewed medical
encounters. These were her encounters involving respiratory complaints:

   a.   She received antibiotics, steroids, and a cough suppressant for pharyngitis and
        an acute upper respiratory infection in January 2005. There was no diagnosis of
        asthma.
   b.   A physician's assistant diagnosed a viral syndrome in December 2017. This
        diagnosis was based on a 7-day history of sinus pressure with drainage,
        earache, sore throat, and family history of influenza. Treatment
        recommendations included a steroid injection, nasal saline washes, Flonase,
        OTC antihistamines, and Benadryl as needed for itching/swelling. There was no
        diagnosis of asthma.
   c.   A nurse diagnosed an acute viral bronchitis in July 2018. She was coughing
        during the examination, but the nurse did not report hearing any wheezing. She
        received a steroid injection and prescriptions for a cough suppressant and an
        albuterol inhaler. It should be noted that albuterol helps to relax airways and is
        commonly prescribed for persons with non-asthma related respiratory conditions.
        There was no diagnosis of asthma.
   d.   She had an evaluation for a cough of two day's duration in February 2020.
        According to her deposition testimony she was no longer reporting any odor
        problems at this time. She told the nurse that wheezing, postnasal drip, and voice
        change accompanied her nonproductive cough. No wheezes were reported on
        exam. Testing was positive for influenza A. Based on this testing, the nurse
        prescribed the antiviral Tamiflu in addition to other respiratory recommendations.
        There was no diagnosis of asthma.

2.   By the time of her June 2023 deposition,    REDACTED    alleged odor related complaints
     escalated from just nausea and vomiting to multiple other subjective complaints:
   a.   Burning eyes
   b.   Burning throat
   c.   Headaches
   d.   Sleep problems
   e.   Ear problems
   f.   Inability to breathe at times.
   g.   Complete loss of appetite at times
   h.   Stress

Report of Brobson Lutz, MD
March 8, 2024
Page 29 of 64

CONCLUDING OPINIONS as to ___REDACTED___ ___REDACTED___ visited multiple healthcare providers during the Relevant Time Period, but none of the medical records from these visits mentions complaints of odors, nor do they mention persistent complaints of any of the Relevant Symptoms. In the instances where complaints of Relevant Symptoms are noted, ᴿᴱᴰᴬᶜᵀᴱ providers attributed them to medical conditions that have nothing to do with hydrogen sulfide exposure (e.g., viral bronchitis in July 2018 – hydrogen sulfide exposure does not cause a viral infection). ___REDACTED___ medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. ᴿᴱᴰᴬᶜᵀᴱ medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including multiple respiratory viruses, grief over her father's suicide, and a possible undiagnosed migraine disorder during the Relevant Time Period. I also note that, as time went on, ___REDACTED___ continued to add new symptoms that she allegedly suffered during the Relevant Time Period. As noted previously, it is my opinion that the complaints provided by ___REDACTED___ closer in time to the Relevant Time Period are more accurate and reliable than those provided on later dates.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to ___REDACTED___

Dr. Robert DeLorenzo, a neurologist, conducted a telemedicine examination of ___REDACTED___ in 2023. According to Dr. DeLorenzo, she reported an almost constant odor of hydrogen sulfide from 2017 to 2019. Dr. DeLorenzo, without acknowledging review of any medical records, opined that low level exposure to sulfur dioxide caused "headaches, burning eyes and redness, burning nose, asthma, and nausea." Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable. Further, it is my opinion that Dr. DeLorenzo's exam findings, apparently gleaned from a telemedicine visit, are in multiple respects inconsistent with what is actually possible to observe during a telemedicine encounter, raising questions about where such information actually originated. Given these inconsistencies, in my opinion, Dr. DeLorenzo's exam findings are neither reliable nor helpful for an analysis of this patient's condition.

Dr. Michael Spodak, a psychiatrist, concluded a Zoom interview with ___REDACTED___ in June 2023. According to Dr. Spodak, ___REDACTED___ ather committed suicide in April of 2018 (during the Relevant Time Period). Dr. Spodak reported a laundry list of 14 complaints she attributed to landfill odors including sleepiness, cough, fatigue, nausea, asthma, anxiety, and others. Dr. Spodak expressed medical opinions "with reasonable medical probability/certainty" while acknowledging that her medical medicals "are under review" and apparently not factored into his opinions. It is my opinion, based on my experience, expertise, and review of the relevant records, that ___REDACTED___ did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that ___REDACTED___ suffered mental health injuries related to landfill odors did not sufficiently consider other causes of her alleged mental health injuries, including the psychological effects of her father's suicide, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 30 of 64

REDACTED

REDACTED    was born in New Orleans. She lived in St. Rose as a baby and then moved to Kenner. She graduated from Destrehan High and attended a business college. She worked at Walmart in Kenner for 13 years prior to going on permanent disability following a leg fracture. I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 1995 pages and detailing more than 15 different medical encounters during the Relevant Time Period):

REDACTED

Various medical providers wrote her prescriptions for Norco dating back to 2005. The first medical encounter in the reviewed records was for a right tibia fracture sustained while roller skating in September 2013. She had an operative repair at University Medical Center. She had continued musculoskeletal problems despite long-term pain medications and extensive physical therapy which she continued until early 2015.

She began seeing Dr. Firas Hijazi, LA Pain Doctor, in Metairie in October 2016. Her pharmacy records documented that he and other providers prescribed Norco up to three times daily for chronic pain well into 2023. Her pharmacy records also show metformin and glipizide being prescribed in 2022 and 2023.

According to the Fact Sheet, REDACTED reported the onset of nausea, vomiting, allergies, and sinusitis beginning in the spring of 2018.

In her deposition REDACTED testified that she first heard about the landfill suit while pumping gas at a corner store in Kenner around 2020. At that time, she linked various symptoms that had been bothering her to landfill odors. She was living at 1116 Starrett Road in Metairie with REDACTI

also a plaintiff in the landfill lawsuit, lives in St. Rose with three children frequently driven to school by REDACTED

REDACTED and three family members above minus her mother reported to a Causeway hotel and filled out some papers which she signed on January 11, 2020. According to the signed forms, REDACTED reported the onset of nausea, vomiting, allergies, and sinusitis in the spring of 2018. However, in her deposition testimony, REDACTED noted several date, odor, and symptom errors in the papers she signed.

She initially testified that her landfill odor claim was limited to three complaints, but she later expanded her complaints to include anxiety and insomnia:

1.  Nausea

Report of Brobson Lutz, MD
March 8, 2024
Page 31 of 64

    a.  Daily nausea beginning summer 2017 and lasted through 2019.
    b.  Nausea would come on immediately when she would smell the odor.
    c.  Never saw a doctor for her nausea but would take Pepto Bismol.
2.  Vomiting 2-3 times a "practically every day."  beginning in the summer of 2017.
    a.  She would vomit immediately when she smelled the odor.
    b.  She never saw a doctor for her vomiting "because I just thought I had a virus or something, that's normal life."
    c.  She would take Pepto Bismol "like twice a day".
    d.  Before 2017 never experienced daily nausea or vomiting.
    e.  When asked by her attorney, she clarified that by vomiting: "Vomiting to me is like I'm gagging."
3.  Allergies
    a.  "Stuffy" and scratching my eyes all the time. Watery."
    b.  Started summer of 2017 and ended beginning 2020.
    c.  Never saw a doctor for stuffy nose, scratchy, running and watery eyes
    d.  Took Sudafed for the allergies.
    e.  Has sinusitis listed on the plaintiff fact form which she groups with allergies.
    f.  Has never been diagnosed with sinusitis.
    g.  Last ENT encounter was when she was a baby.
4.  Anxiety and insomnia were added as additional complaints during questioning by her attorney. Initially said she was not making any claims for anxiety but reversed when questioned by her attorney.

Dr. Justin Rabon examined REDACTED n January 2024. As to her gastrointestinal complaints, Dr. Rabon noted that the differential diagnoses for continued nausea associated with abdominal pain and reflux includes GERD, gastritis, peptic ulcer disease, and certain medications.  Her medical records, not available to Dr. Rabon, documented that she reported chronic acid reflux dating back to before October 2016.  Dr. Rabon also noted that nausea is a common side effect of the pain medications she has taken for decades. As for her chronic headaches, Dr. Rabon described them as "vague" with etiologic diagnoses including migraine and medication overuse headache. He noted that associated symptoms of nausea and phonophobia are common in migraines. Also, both opiates and Tylenol are implicated in medication overuse headache. A GAD-7 screening questionnaire was conducted, showing a score of 0, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale).

MAJOR OPINIONS as to    REDACTED

   I.    Daily nausea as reported by REDACTED was far more likely related to her chronic opiate medications than to low level concentrations of hydrogen sulfide from a landfill.

  II.    Her daily vomiting, defined by her as more of a gagging sensation, is consistent with gastroesophageal reflux disease (GERD). The continuous GERD symptoms as described in her deposition testimony are not consistent with her medical records from July 2017 to December 2019.

 III.    Her medical records fail to document any eye, nasal, or sinus allergy complaints.

 IV.    Her medical records document a sleeping problem as early as October 2016 which predates the Relevant Time Period,

Report of Brobson Lutz, MD
March 8, 2024
Page 32 of 64

V.   There is no mention of anxiety as a symptom or medical complaint in any of the medical records I reviewed.

OTHER OPINIONS as to   REDACTED

1.  Her mother Maxine lived in the same house, smelled the same odors, but suffered no medical problems attributed to the odors.

2.  Norco is a potent pain medication containing hydrocodone bitartrate and acetaminophen.
    a.  REDACTED was taking the highest available strength of Norco 10-325 approved by the FDA.
    b.  Norco 10-325 tablets contain 10 mg of hydrocodone and 325 mg of acetaminophen.
    c.  She was taking two to three Norco 10-325 daily including from July 2017 to December 2019.
    d.  Nausea and vomiting are among the most common adverse effects related to Norco.
    e.  In a randomized double-blind placebo-controlled crossover study of healthy adults, 44 percent of volunteers taking hydrocodone reported nausea. (Source: Minor, JR, in Academic Emergency Medicine, pages 911-914, 2009)

3.  Dr. Hijazi prescribed famotidine, tradename Pepcid, 20 mg twice daily for gastric reflux symptoms in September 2017
    a.  Famotidine is a potent H2-blocker that decreases acid production s. It works by decreasing the amount of stomach acid production.
    b.  In a November 2017 followup, Dr. Hijazi documented: "She is no longer experiencing reflux since we started her on famotidine and was encouraged to stay away from NSAIDs."

4.  When she saw Dr. Hijazi in February 2018, she had been out of her prescribed medications for about a month. She was taking Goody's Powders, and her acid reflux had returned. Dr. Hijazi continued her on famotidine 20 mg twice daily When next seen May 2018 she reported no adverse effects.

5.  Her alleged landfill related symptoms including nausea, "vomiting," and environmental allergies were never reported to any medical provider.

6.  REDACTED was asked several questions about her "vomiting":
    a.  In describing what she labeled vomiting, REDACTED initially testified on Page 83 of her deposition: "Whatever I ate it came – it would come out."
    b.  She testified that she considered the daily occurrence of "vomiting" from summer 2017 until the end of 2019 as "I just thought I had a virus or something, that's normal life."
    c.  She later testified, when questioned by her own attorney, that "vomiting to me is like I'm gagging" on Page 106 of her deposition.

Report of Brobson Lutz, MD
March 8, 2024
Page 33 of 64

CONCLUDING OPINIONS as to  REDACTED  According to the medical records reviewed, REDACTE never complained of odors or fumes during any of the numerous medical encounters that she underwent during the Relevant Time Period. REDACTED was plagued by pain related problems. She received numerous narcotic prescriptions from multiple medical providers dating back to 2005 and continuing into 2023. A month after she received Norco in February 2005, she was prescribed medications to address nausea and gastrointestinal spasms. In October 2016 she completed a medical questionnaire endorsing several medical problems including acid reflux, feet swelling, anemia, headache, various arthritic pains, and trouble sleeping. These symptoms all pre-dated the Relevant Time Period. The 15+ medical encounters during the Relevant Time Period are almost all related to her orthopedic pain complaints.  REDACTED medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period.  REDACTED  medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including side effects from her pain medication and her pre-existing issues with headaches and sleeplessness.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to    REDACTED

Dr. Robert DeLorenzo, a neurologist, conducted an examination of REDACTED in 2023. Like her partner    REDACTED    she reported an almost constant odor of hydrogen sulfide from 2017 to 2019. Dr. DeLorenzo, without acknowledging review of any medical records, opined that low level exposure to sulfur dioxide caused "headaches, burning eyes and redness, burning nose, asthma, and nausea." Dr. DeLorenzo failed to acknowledge review of available medical records which never documented any diagnosis of asthma. He also did not consider differential diagnoses of other likely causes of her reported symptoms. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Dr. Michael Spodak, a psychiatrist, concluded a Zoom interview with REDACTED in May 2023. He described his access to records from Ochsner, University Medical Center, LA Pain Doctor, and Walgreens as "under review" and did not address the specifics of any of her medical records in his report. He attributed all of her complaints to landfill odors without considering other differential diagnoses. It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTED did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that  REDACTED uffered mental health injuries related to landfill odors did not sufficiently consider other causes of her alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 34 of 64

REDACTED

REDACTED    was born in New Orleans and grew up in Gretna and Algiers on the Westbank. I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 5746 pages and detailing at least 30 different medical encounters during the Relevant Time Period):

REDACTED

He graduated West Jefferson High School in 1983. He was in the Navy from 1984 until 1997 being discharged after a service-related injury. He has been married three times and has one child who lives in Jacksonville. He worked for Lyft 3 months beginning in Oct 2018 but quit after a motor vehicle crash in Nov 2018. He smokes Kool cigarettes.

According to his deposition testimony, he first noticed "odors" everyday beginning in the summer 2017. He was living at the Sawmill Creek Apartments, 2100 Sawmill Road in River Ridge. He described the odors as a combination of "chemical smell, petroleum odor, rotten egg, ammonia smell and garbage smell, which he smelled both inside and outside his Sawmill apartment that became stronger midday into the evening.

According to the Fact Sheet, his complaints as listed in a sworn statement in January 2020 included these for which he had had no prior problems:
1. Headaches starting Feb 2017 treated with OTC meds and still present
2. Anxiety starting Feb 2017 and still present
3. Nausea/vomiting starting Feb 2017 treated with OTC meds for nausea and still present
4. Cold sweats starting Feb 2017 and still present
5. Nosebleeds starting Feb 2017 and still present

*Record review for period prior to July 2017*

The first record in my review was a prescription for Norco 10-325 written by a physician in Atlanta in 2014. He also had a coronary bypass grafting in Atlanta (records not available) in 2014 just before moving to New Orleans.

He saw Dr. Daniel Gallagher at the Bone and Joint Clinic for post-operative right shoulder pain in May 2014. Also, nightmares were listed as a 2014 problem according to his VA records. He was already on insulin for diabetes in 2014. Dr. Gallagher ordered a shoulder MRI, but a note in the records stated that he was hospitalized at Tulane (records not available) and would have it there. He returned to see Dr. Gallagher in January 2015 with right knee osteoarthritis.

Report of Brobson Lutz, MD
March 8, 2024
Page 35 of 64

He had multiple VA encounters beginning in 2015. He had an extensive Compensation and Pension Exam evaluations at the VA for multiple problems including fatigue, headaches, and mental health problems in 2015. The clinicians seeing him attributed his fatigue and poor sleep to sleep apnea later confirmed by sleep study testing. He was diagnosed with migraines, which were indicated as impacting his ability to work. He was noted to be on disability for diabetes, rheumatoid arthritis, and heart disease, but told his doctor "If he only had headaches feels he would still miss about 2 days [of work] per week due to them."

In 2016, he presented to the VA cardiology clinic for management of his heart disease. He was noted to have a BMI of 36.8, considered high-risk obesity.

He received prescriptions for oxycodone/acetaminophen 10-325, insulin, ibuprofen, amoxicillin, and Penicillin V according to Walgreens' records of 2015 and 2016. In early January 2017 he received prescriptions for Dicyclomine 100 and Zofran for prn nausea apparently from a nurse practitioner in a Gretna urgency care clinic (records not available).

*Record review July 2017 to December 2019. These are distilled medical events for this period of landfill odor concerns from Ochsner Lapalco, Bone and Joint Clinic, Culicchia Neurological Clinic, VA, and Walgreens:*

1. Assessments by a family medicine physician at Ochsner Lapalco in September 2017 included osteoarthritis of both knees, right shoulder, and right hip in addition to diabetes hypertension, coronary artery disease s/p CABG, insomnia, and eye care at the VA).

2. Laboratory testing showed glucose 503, sodium 129, creatinine 1.7, and hemoglobin A1c 13.4 on September 26, 2017, consistent with very poorly controlled diabetes and renal disease. He was asking to continue pain medications that he had been taking for a couple of years, and Dr. George referred him to Dr. Fred Chui.

3. A PHQ-2 screen for depression was negative in September 2017 at the VA.

4. He was treated for osteoarthritis and initiated care with a new pain doctor in November 2017.

5. He returned to the Ochsner Lapalco clinic in January 2018. Dr. George noted severe obesity with a weight 272 pounds, diabetes uncontrolled on current meds, blurred vision, coronary artery disease, and controlled hypertension. He recommended referrals to endocrine, diabetic educator, and optometry.

6. VA physicians diagnosed an acute viral upper respiratory infection in April 2018 followed by acute sinusitis and allergic rhinitis in November 2018.

7. He had an initial chronic pain syndrome evaluation with Dr. Fred Chiu, with the Bone and Joint Clinic in December 2018. He was taking Bactrim for diabetic toe infection. Dr. Chui recommended that he continue with Percocet 10-325 and gabapentin 300 mg two tablets three times a day.

8. He began treated with an Ochsner podiatrists from February 2018 until his wound had healed by June 2018.

9. He was in a car crash on October 19, 2018, and contacted an attorney who referred him to a chiropractor. A lumbar MRI ordered by chiropractor Michelle Leblanc in November 2018 was consistent with degenerative changes in his lumbar spine.

10. In December 2019, REDACTED presented to the Culicchia Neurological Clinic for treatment in connection with the car accident. He reported that his pain had endured for 1 year and affected his sleep, enjoyment of life, mood, ability to work and perform daily tasks, and caused fatigue. He was also evaluated regarding his lumbar spine and a right foot drop. His medications at that time included NovoLog, hydrochlorothiazide, Percocet, lisinopril, and Lyrica. Assessments included lumbar radiculopathy, lumbar spondylosis, right foot drop, chronic pain syndrome, chronic use of opiates, diabetes, and hypertension.

*Record review January 2020 to March 2023 after the period of landfill odor concerns*

1. He began physical therapy sessions in January 2020, and continued with pain visits to Dr. Chui's office and Percocet refills through March 2023.

2. According to a February 2022 Bone and Joint Clinic note, he was not a candidate for a hip replacement because of a recent diabetic toe infection and amputation. Dr. James Todd recommended additional PT. he was ambulating with a walker in October 2022.

3. Dr. Dr. Long Nguyen, Family Medicine with an office on Lapalco in Marrero, prescribed Levaquin, codeine cough syrup, and a seven-day course of Lasix in October 2022.

OPINIONS as to    REDACTED

1. Between July 2017 to December 2019, REDACTED had over 20 medical encounters with physicians including family medicine, orthopedic, pain management, podiatry, and neurosurgical physicians.

2. Medical problems evaluated by various physicians between July 2017 to December 2019 included multiple arthritic joints with chronic pain on long-term opiates, uncontrolled diabetes, hypertension, coronary artery disease, diabetic foot ulcer with amputation of a toe, and a motor vehicular crash in October 2018 followed by a right foot drop an MRI that showed multilevel degenerative changes in his cervical and lumbar spines.

3. In an orthopedic intake encounter in November 2017, REDACTED completed an information form not checking off specific complaints of headaches, anxiety, nausea, vomiting, chills, bleeding problem, or any ENT complaint. Besides chronic pain and orthopedic complaints, his medical problems included diabetes, coronary artery disease s/p stents, hypercholesterolemia, and hypertension. His review of systems was always negative for anxiety.

4. He had a long history of headaches that clearly predated the Relevant Time Period but were not documented during the Relevant Time Period.

    a. He told a VA physician that he was having headaches 2-3 times a week in 2015. He said these headaches began in 1990 when he was in the Persian Gulf.

    b. A review of systems was negative multiple times for headaches including September 2017, January 2018, February 2018, and May 2018.

    c. In November 2017 REDACTED personally completed an orthopedic checkoff medical history, and he did not check off headaches.

    d. While REDACTED received considerable opiate therapy for chronic pain between 2014 and 2023, none of his medical encounters or pharmacy records noted that these medications were for headache.

5. His mental health history dates back decades and has been an ongoing medical concern for him but there was no flare of anxiety or depression during the Relevant Time Period.

    a. He reported an abusive childhood.

    b. He reported witnessing the decapitation of a fellow servicemember during sailing accident on his Naval tour.

    c. He was hospitalized for depression in Atlanta in 2010 and received antidepressants.

    d. His testimony that his anxiety that began in February 2017 and was ongoing at the time of his deposition was not confirmed by his medical records.

    e. In his November 2017 patient questionnaire, he denied anxiety.

    f. He completed another patient questionnaire in November 2019 again not checking off anxiety.

    g. In over eight encounters between February 2018 and September 2020, the provider noted "No evidence of depression, anxiety, or agitation."

    h. A PHQ-2 screen for depression was negative in September 2017.

    i. In 2021, he attributed his anxiety to being homeless in addition to "persistent worry about several concerns including medical conditions his fiance, his housing situation, employment, and the resolution of legal settlement he is undergoing after a car accident that occured when he was driving for Lyft."

    j. Based on his long-standing mental health problems, he was diagnosed with bipolar disorder in 2021.

6. His allegation of experiencing continuous nausea and vomiting from February 2017 to the day of his deposition is not confirmed in his medical records.

    a. A Dr. R. Crepell prescribed anti-nausea medication in January 2017.

    b. Numerous reviews of systems were negative for nausea and/or vomiting including those of September 2017 and November 2017.

    c. He complained of nausea related to not taking Cipro and clindamycin with "enough food" in February 2018.

    d. Vomiting is not mentioned as a medical complaint in any medical encounter between 2014 and 2023.

7. Cold sweats and nose bleeds are not described in any of his 2014 to 2023 medical records.

8. His sleep and fatigue problems dated back decades, history apparently not reviewed by the plaintiff experts:

     a. He told a VA examiner that his fatigue dated back to his service days in the 1990s. He reported ongoing nightmares and sleep problems.
     b. He states he has been snoring and having apneic spells since the 1990s.
     c. A PCP told him that he probably had sleep apnea prior to 2015.
     d. He attributed his sleep difficulties to several years of back pain in 2021.
     e. A sleep study in 2023 finally confirmed that his sleep problems resulted from "severe obstructive sleep apnea and hypopnea syndrome."

Dr. Charles Santos examined REDACTED in January 2024. REDACTED reported he had smoked cigarettes since 2014. These are some of his pertinent findings, observations, and impressions:

1. REDACTED primary issue is his obesity and complications related to his severe uncontrolled diabetes mellitus."
2. "While he is suspicious that his recurrent Methicillin Resistant Staphylococcus infection is related to particulate matter and odors experienced during the relevant time period, it is more likely that these complaints are complications of poor wound healing and him being insensate in his distal toes."
3. "Severe diabetes can predispose severe infections in affected individuals by several mechanisms, most notably in his case through his peripheral neuropathy, but also through poor wound healing, as well as increasing the susceptibility of the body to infection through persistent hyperglycemia.
4. "Regarding his gastrointestinal complaints, these too could be explained by complications of diabetes mellitus, such as gastroparesis, chronic opioid agonist therapy during the relevant time period, which can predispose one to gastroparesis, constipation, and nausea."
5. Dr. Santos recommended "a gastric emptying study to further evaluate this etiology."
6. "Regarding his headaches, chronologically their onset is synchronous with the relevant time period, but they persist today even after his move, and so are unlikely to be related to a direct odor related complaint. It is more likely than not that they are related to his motor vehicle accident in 2018 for which he says he has persistent spinal issues."
7. "Regarding his sore throat, cough, runny nose, as well as the loss of the sensation of taste or smell, these are non-specific complaints…Most likely, his chronic smoking is the cause for these complaints.
8. "He was also diagnosed with obstructive sleep apnea in or around 2023 but was noted by his girlfriend to be snoring loudly and stopping breathing during his sleep as early as 2018, which could contribute."
9. "Regarding his anxiety, fatigue, and sleeplessness, I again note the diagnosis of obstructive sleep apnea, which likely existed untreated as early as 2018."
10. A GAD-7 screening questionnaire was conducted, showing a score of 0, which Dr. Santos noted "would not prompt additional evaluation for a mental health disorder and would suggest a lack of anxiety or depression-related symptoms at the time of evaluation."

CONCLUDING OPINIONS as to REDACTED Medical records fail to substantiate REDACTI claim that he suffered headaches, anxiety, nausea/vomiting, cold sweats, and nosebleeds beginning in February 2017. There are no documentations of any odor or smell related complaints or diagnoses in over 5000 pages of medical records which I personally reviewed. REDACTED medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including a long history of mental health concerns, headaches, sleeplessness, and chronic pain,

Report of Brobson Lutz, MD
March 8, 2024
Page 39 of 64

as well as complications from his long-term opiate use, uncontrolled diabetes, injuries from a 2018 motor vehicle accident, and several other significant health maladies.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to     REDACTED

Dr. Robert DeLorenzo, a neurologist, opined that " REDACTED  complaints of anxiety, nosebleeds, headaches, sore throat, nausea and vomiting, cold, sweats, swelling in his joints, worsened skin infection, and loss of smell and appetite were caused by his exposure to hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill…." The more likely causes of all these complaints are addressed in my above review of his medical records and Dr. Santos' examination.

One particular opinion by Dr. DeLorenzo deserves special comment: "It is more likely than not that the worsened skin infection experienced by  REDACTED  n March 2020 was caused by his exposure to hydrogen sulfide and VOCs from the Jefferson Parish Landfill." To opine that a groin abscess and necrotizing soft tissue infection was "worsened" by a low-level exposure to hydrogen sulfide is simply poppycock. To the best of my knowledge, no such association has ever been reported in peer reviewed medical literature.

Dr. DeLorenzo's report fails to indicate whether he reviewed  REDACTED  medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in [REDACTED] medical records. Dr. DeLorenzo offered the incredible opinion that "Prior to 2017, [REDACTED] was in a state of general good health," further confirming that he did not review [REDACTED] available medical records which document a litany of significant health maladies pre-dating 2017 – including disability for diabetes, rheumatoid arthritis, and heart disease; migraines affecting his ability to work; and high-risk obesity. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Dr. Michael Spodak, a psychiatrist, wrote a report after reviewing a limited number of available medicals but wrote that others, including almost 4000 pages of VA records were "under review." Several statements in his opinions are directly at odds with medical records which were available to him. For example, he wrote that prior to the Relevant Time Period,  REDACTED  denied any denied psychiatric, psychological, and emotional problems in general and in particular denied difficulty with sleep, appetite, energy level, and depression" – which is explicitly contradicted by   REDACTED   vailable medical records. Psychiatrist Spodak missed the train by not reviewing medical records which he acknowledged receiving.

It is my opinion, based on my experience, expertise, and review of the relevant records, that [REDACTED] did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that  REDACTED  suffered mental health injuries related to landfill odors did not sufficiently consider other causes of his alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 40 of 64

REDACTED

REDACTED   rented a duplex for 6 years from about 2014 to 2020, at 624 Wilker Neal Avenue in River Ridge. She often uses a Sam Lenox Street address in Jefferson, La, as another address. This was where she was raised and is currently her brother's address. She graduated from Riverdale High School and has a single adult child.  I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 13300 pages, and detailing at least 10 different medical encounters during the Relevant Time Period):

REDACTED

*Medical record review for the period prior to July 2017*

REDACTED   was diagnosed with diabetes in 2007. The first medical encounter I reviewed was an office visit with Dr. Rebecca Jones, an Ochsner primary care physician, in March 2015. Dr. Jones saw her for a diabetes followup and also addressed sleep, rhinitis, and constipation problems. She had other 2015 to 2016 Ochsner encounters for allergic conjunctivitis, allergic rhinitis, recurrent headaches attributed to sinusitis, abdominal bloating, vaginitis with a Pap abnormality, hypertension, and bowel complaints possibly related to irritable bowel syndrome, gastritis with nausea and vomiting.

In July 2016,   REDACTED   admitted to being easily agitated, "getting blue sometimes", and having a lack of concentration and motivation. She was diagnosed with depression and referred to psychology.[3]

Medical record review July 2017 to December 2019. These are distilled medical events for Ochsner encounters with various specialists during the Relevant Time Period:

1.  Diabetic eye exam and a blocked tear duct (October 2017)
2.  Right wrist pain (November 2017)
3.  Physical therapy evaluation for right elbow pain (March 2018)
4.  Diabetic foot exam (April 2018 and April 2019)
5.  Well woman GYN exam (July 2018 and July 2019)
6.  Dermatology check for a chronic lip lesion (July, August, and December 2018, September 2019)
7.  Diabetic eye exam ((November 2018 and November 2019)
8.  Hemoglobin A1c elevated (February, October and December 2018 and January 2019
9.  Treatment for H. pylori and GERD (June 2019)
10. Removal of a foreign body right eye (July 2019)
11. Colonoscopy and esophagogastroduodenoscopy (August 2019)
12. Urinary tract infection (August 2019)
13. Uncontrolled diabetes (August 2019)
14. Normal mammogram (October 2019)
15. Anemia with low iron levels (November 2019

---

[3]        REDACTED

Report of Brobson Lutz, MD
March 8, 2024
Page 41 of 64

Record review January 2020 to March 2023 after the period of landfill odor concerns

1. Medical encounters addressed these problems during 2020:
    a. Steroid injection for a lichen planus lesion on her lip
    b. Ongoing diabetic eye and foot exams
    c. Facial acne lesions
    d. Carpal tunnel symptoms bilaterally with surgery on the right wrist
    e. Chronic pelvic pain
    f. Gastroesophageal reflux disease
    g. Iron deficiency anemia
    h. Urinary tract infection

2. Medical encounters during 2021 addressed multiple problems including these:
    a. Carpal tunnel followups
    b. Chronic pelvic pain
    c. Diabetic foot exam
    d. Diabetes control
    e. Motor vehicular crash in November 2021 with subjective complaints and visits to Accident Injury Center chiropractor and physician, including complaints of headache and sleep disruption related to the MVC.
    f. Diabetes and hypertension encounter with her PCP

3. Medical problems addressed in 2022 and 2023 in addition to routine diabetic and hypertension follow-ups:
    a. Worsening sinus problems with bronchitis and wheezing (Jan 2022)
    b. Continued treatments for her 2021 MVC injuries, including diagnosis of anxiety that she attributed to her motor vehicular crash.
    c. Seasonal allergic rhinitis on Claritin, Flonase, and Astelin (Feb and Dec 2022)
    d. Neurology evaluation for post-concussion syndrome and headaches due to MVC in 2021
    e. More soft tissue from a MVC in March 2023
    f. Problems with medication compliance (July 2023)
    g. Vaginal irritation (Oct 2023)

Highlights from her April 2023 deposition:

1. She has worked off and on at Walmart for many years but was on medical leave after a November 2021 MVC which settled in 2022.

2. As to the symptoms attributed to the landfill odor: "The symptoms were headaches, nausea [but] not vomiting, restless sleeping, fidgeting a little." Also she had to get rid of clothes and her sofa prior to moving in 2020.

3. She was diagnosed with anxiety at the Ochsner ED on Jeff Highway in 2022 with complaints including, "So sleeping, jumping out of my sleep, feeling like my heart was palpitating, hard to breathe. Constantly drinking water. And just was shaky like."

Report of Brobson Lutz, MD
March 8, 2024
Page 42 of 64

4. She was diagnosed with diabetes in 2007, and her PCP since around 2010 has been Dr. Rebecca Jones at Ochsner whom she followed to the Old Metairie location.

5. She described ED visits for really bad sinus allergies and COVID. My blood sugar was probably high a few times. Her PCP prescribed a "nasal spray, allergy spray" that she thinks was Flonase some time before 2017. A COVID swab was positive at an Ochsner drive-up clinic in Aug 2021. She had a high blood glucose and was diagnosed with diabetes in 2007.

6. She reviewed her DocuSign document and clarified that her timeframe of odor exposure was only "sometime in 2017" until January 2020. She would smell landfill odors 7 days a week all day long, worse in midday, and a sewer smell. She called her landlord for a suspected sewer problem in 2017. She testified her landlord attributed it to an outside smell.

7. She testified that during summer 2017 through the winter 2020 she experienced the smell all day long, seven days a week: "It never stopped…By the middle of 2020 I was out of there. I moved. I can't stay back somewhere with an odor like that…I like to live comfortable. I don't want to live in an environment where you constantly smelling odors.

8. Her odor complaints include: "Keeping me from going out, being with my friends outside. Sitting outside by myself. And just enjoying my life." Could no longer go down the street and watch baseball games. In addition to a smell like rotten eggs, she noticed some particulate matter like pollen or dusty sand on her car.

9. She was asked if she had reported her odor related headaches, nausea, restlessness or fidgeting to any physician. She responded: "I haven't explained anything about odors to my doctor…As of yet, I haven't explained anything about that to her…I just never brought it up to her. It's not a reason. I just haven't brought it up to my doctor."

Dr. Justin Rabon, unlike the two plaintiff medical experts, conducted a face-to-face medical examination of      REDACTED      in January 2024. These are some of his findings and observations:

1. REDACTED      has a significant history of chronic headaches that have occurred both before and after the incident period…I cannot determine with any reasonable medical certainty whether the foul odor she describes was a trigger for her headaches.

2. The differential diagnoses of her headaches include migraine disorders, chronic tension-type headaches, sinusitis with allergies, iron deficiency anemia, medication overuse headache, and others.

3. Her reported nausea "both associated with headaches and with other gastrointestinal symptoms" likely has multifactorial etiologies which Dr. Rabon catalogs.

4. As for her complaints of anxiety, there are "many factors that manifest or exacerbate anxiety. Her descriptions today were not consistent with anxiety directly brought on by odors. Also, given the often multifactorial nature of anxiety, I cannot completely rule out any particular stressor as a contributing factor to her anxiety…She has anxiety related to air travel and requires medication to help during travel."

5. A GAD-7 screening questionnaire was conducted, showing a score of 2, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale).

Report of Brobson Lutz, MD
March 8, 2024
Page 43 of 64

OPINIONS as to              REDACTED

I. Prior to July 2017,      REDACTED    had multiple medical encounters including those documenting her longstanding diabetes, a sleep disorder, allergic conjunctivitis, allergic rhinitis, recurrent headaches attributed to sinusitis, irritable bowel syndrome, and gastritis with nausea and vomiting.

II. REDACTED     testified that that Ochsner emergency department providers diagnosed her with anxiety, sleep problems, and heart palpation problems in 2022. This was after the Relevant Time Period.

III. As to her complaint that landfill odors caused headaches, nausea, restless sleeping, sinus headaches, anxiety and "fidgeting a little," the differential diagnosis for all of these mostly subjective complaints are multiple as documented earlier in this report.

IV. In addition to documented sinus headaches,      REDACTED    had a post-concussion syndrome with headaches attributed to her November 2021 MVC. Dr. Jose Posas, a nationally known expert on concussions, evaluated her in February 2022. In addition to daily headaches since the MVC, Dr. Posas documented associated memory problems, concentration problems, and dizziness. He characterized her headaches as chronic and post-traumatic and advised some specific medication changes including Cymbalta, Baclofen, and a short course of steroids.

CONCLUDING OPINIONS as to         REDACTED            According to the medical records reviewed,     REDACTED    never complained of odors or fumes during any of the numerous medical encounters that she underwent during the Relevant Time Period. REDACTED testified that she suffered headaches, nausea, sleeping problems, and fidgeting characterized as anxiety because of Jefferson Parish landfill odors. Yet, she had documented allergic conjunctivitis, allergic rhinitis, and recurrent headaches attributed to sinusitis that predated July 2017 and were ongoing in 2023.     REDACTED     medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period.     REDACTED    medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including her allergic conjunctivitis, allergic rhinitis, and recurrent headaches attributed to sinusitis that predated July 2017 and were ongoing in 2023.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to              REDACTED

Neurologist Robert DeLorenzo, MD, opined that     REDACTED    omplaints of headaches, anxiety, stomach irritation with nausea and pain, eye irritation, nasal congestion and dizziness were caused by her exposure to hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill during the relevant time period." Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable. Further, it is my opinion that Dr. DeLorenzo's exam findings, apparently gleaned from a telemedicine visit, are in multiple respects inconsistent with what is actually possible to observe during a telemedicine encounter, raising questions about where such information actually originated. Given these

Report of Brobson Lutz, MD
March 8, 2024
Page 44 of 64

inconsistencies, in my opinion, Dr. DeLorenzo's exam findings are neither reliable nor helpful for an analysis of this patient's condition.

Dr. Michael Spodak, a psychiatrist, opined "to a reasonable degree of medical certainty," that REDACTED complaints of headaches, anxiety, stomach irritation with nausea and pain, eye irritation, nasal congestion and dizziness were caused by her exposure to hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill. It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTED did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that REDACTED suffered mental health injuries related to landfill odors did not sufficiently consider other causes of her alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 45 of 64

REDACTED

I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 77 pages):

REDACTED

REDACTED   testified by deposition that he experienced several odor related medical problems between 2017 and 2020:
1. Headaches lasting 1-3 hours more than once a day
2. Vomiting 2-3 x a week,
3. Weight loss,
4. Insomnia
5. Anxiety and worry about the impact of the smell on his health in the future

Pharmacy records before the Relevant Time Period document that REDACTED received prescriptions for Cialis, pain medications, and muscle spasm medications from 2014 through June 2017.  The only recorded prescription during the Relevant Time Period was for muscle spasms in March 2019. After the Relevant Time Period he received antibiotics, non-steroidal pain meds, and medication for muscle spasms in July 2021 and again in April 2022.

His available provider medical records began with encounters at the Jefferson Community Health Care Centers in July 2022. In an initial encounter to establish medical care, a nurse practitioner reported that sleeping problems began after Hurricane Katrina in 2005. His records reflect that he also denied any headaches, vomiting, or significant weight changes. He had a normal physical examination except for accumulated ear wax in both ears. Routine laboratory screening tests were unremarkable.

He saw a social worker in the same clinic operation in August 2022 with assessments of mixed anxiety and depressive disorder attributed to dealing with Hurricane Katrina, financial issues, and abuse as a child. He told the social worker that he had had bad nerves since he was a child which he attributed to his father – verbal and physical abuse, fighting, shooting at family. He also reported strained relationships with at least one of his children.

According to the Jefferson clinic notes, REDACTED istory included prior childhood psychiatric care due to paternal abuse and nightmares 2-3 times a week attributed to both Hurricane Katrina and childhood physical abuse. Dr. David Nguyen diagnosed post-traumatic stress disorder in addition to mixed anxiety and depressive disorder in November 2022. Dr. Nguyen prescribed prazosin, a medication used to treat PTSD-associated nightmares, and Remeron, an antidepressant which also helps with insomnia.

He had a gastrointestinal evaluation in October 2022 for evaluation of weight loss. According to this note his past medical history included colon polyps, gastric reflux symptoms, history of fatty liver, and hepatitis C treated around 2016. The esophagogastroduodenoscopy (EGD) revealed a short Barrett's segment of his lower esophagus, a small size hiatal hernia, and patchy congestion of his gastric mucosa consistent with mild gastritis. On colonoscopy, he had Grade 1 internal hemorrhoids.

Report of Brobson Lutz, MD
March 8, 2024
Page 46 of 64

Dr. Justin Rabon examined  REDACTED  in January 2024. These are some of his observations and findings:

1. He lives with his girlfriend in Avondale.
2. He has worked as a longshoreman for the last 3 years.
3. He smokes and drinks about one 16 oz beer daily.
4. He "has a self-reported history of depression, anxiety, and PTSD. He is currently not receiving pharmacotherapy or psychotherapy. He was also not receiving either of these treatments during the incident period."
5. A GAD-7 screening questionnaire was conducted, showing a score of 13. According to Dr. Rabon, this "would suggest moderate anxiety disorder, and this would warrant further evaluation, including rule-out of other medical causes, and consideration of treatment."
6. "I cannot say with any degree of reasonable medical certainty that his symptoms were caused by odors. The most notable consideration for  REDACTED  case is his mental health problems."

OPINIONS as to    REDACTED

I.   Medical records do not support any relationship between an odor exposure and REDACTE ubjective complaints and underlying diagnoses not supported by his medical records.

II.   There are more viable explanations for his insomnia and undocumented weight loss including these:
   A. REDACTED  attributed longstanding sleeping problems to Hurricane Katrina distress, not to any odor related situation.
   B. After a TELEMED interview, a mental health counselor assessed "mixed anxiety and depressive disorder" related to Hurricane Katrina, financial problems, abuse as a child, and problems with his children.
   C. There are no references to any 2017-2020 odor problems in any of ten medical and counseling encounters beginning in July 2022.
   D. In his earlier initial claim,  REDACTED  claimed that he had experienced earaches, sinus problems, runny eyes, and stomach issues related to an odor exposure. On the other hand, he denied these four complaints in his deposition testimony.
   E. It is reasonable to expect that anyone with daily headaches and vomiting two to three times weekly would seek a medical evaluation and/or at least mention these prior problems in a July 2022 wellness examination.

CONCLUDING OPINIONS AS TO      REDACTED      :  REDACTED  medical records do not support the claim that he suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period.  REDACTED  medical records and deposition testimony do suggest that he has a long history of anxiety not related to exposure to hydrogen sulfide. In a 2022 office encounter,  REDACTED  eported difficulty sleeping since Katrina in 2005. He denied any other symptoms and had not seen a physician for 5 years. As for the other injuries about which he complains, if they did occur, potential causes would be included in the differential diagnoses I discussed at the beginning of this report, which are more likely causes than exposure to low levels of H2S.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to      REDACTED

Report of Brobson Lutz, MD
March 8, 2024
Page 47 of 64

Neurologist Robert DeLorenzo, MD, wrote that  REDACTED  had "a long history of mental health and emotional difficulties." He also wrote that " REDACTED  was in excellent health until he was exposed at his home to foul smells [that] started in July of 2017." None of these opinions is supported by any medical records. His report does not indicate that he considered other differential diagnoses for his complaints. Dr. DeLorenzo's report fails to indicate whether he reviewed  REDACTED  medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in  REDACTED  medical records. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Dr. Michael Spodak, a psychiatrist, reported that  REDACTED  "noted a number of somatic and psychological symptoms during the relevant time period. He also noted a worsening of some of his preexisting emotional difficulties during the same time period notably anxiety and depression." There are no medicals to support these opinions. It is my opinion, based on my experience, expertise, and review of the relevant records, that  REDACTED  did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that  REDACTED  suffered mental health injuries related to landfill odors did not sufficiently consider other causes of his alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 48 of 64

REDACTED

I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 1093 pages and detailing more than 25 different medical encounters during the Relevant Time Period):

REDACTED

Available medicals prior to July 2017 documented a headache evaluation in 2013, chest and knee pains in 2014, a physical therapy evaluation for multiple complaints in 2015, an appendectomy and repair of a thumb laceration in 2016, and the first of several evaluations and hospitalizations for exertional rhabdomyolysis in 2016. He was also seen for complications of a left ankle injury, low back pain and proteinuria in between April and June 2017.

Regarding the 2013 encounter mentioned above, he presented to the Emergency Department on December 3, 2013, with a chief complaint of "Headache x 2 weeks. no relief with [over the counter] meds…Has at times been nauseated but has not vomited." As to the cause of his headaches, the physician noted "He does have elevated bp which could be the cause."

Regarding the 2014 encounter mentioned above, he presented to the Emergency Department on February 22, 2014 with multiple complaints, including "daily episodes of midsternal chest pain which is not exertional, non-radiating, is associated with shortness of breath." The physician made a diagnosis of hypertension and migraines.

According to the Plaintiff Fact Sheet, REDACTED alleges "upper respiratory issues" starting 2017 and ongoing 2019. Prior to the summer of 2017, he started "smelling 2012/2013." He stated no prior condition. He stated that he had problems using his home "once a week."

I reviewed these medical encounters from the Relevant Time Period of July 2017 through December 2019:

1. Ongoing ankle pain and swelling initially reported in April 2017 and related to an injury that occurred around March 2017. (July 2017, Dec 2017, Jan 2018, March 2018 encounters)
2. The UMC urology clinic referred him to nephrology in September 2017 for proteinuria dating back to his exertional rhabdomyolysis beginning in 2016.
3. He had a normal wellness examination in October 2017. Specifically, his review of systems was negative for sinus problems, sore throat, chest pain, shortness of breath, cough, nausea, vomiting, headaches, depression, sleep disturbances, anxiety, and fatigue.
4. He was treated for an acute upper respiratory tract infection on January 9, 2018, and again on January 19th for acute sinusitis, cough, nausea, and vomiting of four days duration.
5. He was hospitalized at an unknown hospital for traumatic rhabdomyolysis in March 2018 and had a clinic follow-up on April 2, 2018.
6. Ochsner physicians hospitalized him for recurrent rhabdomyolysis with an elevated CPK on April 5, 2018. He had followups with nurse practitioners on April 19th and May 10, 2018, with an interval ED encounter for IV fluids on April 26, 2018.

Report of Brobson Lutz, MD
March 8, 2024
Page 49 of 64

7. He was back at the Avondale clinic with another ankle injury on May 31, 2018. He had a followup visit in Avondale for his ankle injury in June 2018 leading to an MRI and referral to orthopedic surgery.
8. He had a wellness evaluation on September 18, 2018.
9. He had pre-surgical evaluations on September 25, 2018, and January 16, 2019.
10. He had an acute allergic reaction with facial swelling due to a shrimp allergy in July 2019.
11. He returned to the Avondale clinic for evaluation of a positive tuberculin skin test and also reported diarrhea and left wrist pain on August 5, 2019.
12. He was having some episodic chest pains associated with exercise and possibly related to his history of rhabdomyolysis on September 17, 2019.
13. He injured his right wrist at work in October 2019 followed by a wellness exam later that year. His weight was noted to be 290 pounds.
14. An Avondale nurse practitioner detailed these assessments as of December 23, 2019:
    a. Chronic kidney disease stage 2
    b. Rhabdomyolysis - Pt being followed by Rheumatology and cardiology clinics.
    c. Anemia
    d. Diabetes mellitus screening
    e. Sleep apnea
    f. Body mass index 40+ • severely obese
    g. Morbid obesity

Medical events after December 2019 included these:
1. Notation that a sleep study was consistent with obstructive sleep apnea (December 2020)
2. A wellness examination (February 2021)
3. A normal audiogram (February 2021)
4. Cough, vomiting, and dehydration on May 19, 2021, following an ED visit in Mississippi.
5. Cough, vomiting, and dehydration again associated with an elevated CPK and also a followup encounter (June 2021)
6. A wellness examination with impressions obstructive sleep apnea and morbid obesity with a BMI>40. (October 2021)
7. A pre-operative evaluation before left wrist surgery (November 2021)
8. UMC rheumatology clinic evaluations in 2022 for evaluation of his recurrent rhabdomyolysis problems that predated the Relevant Time Period.
9. A wellness evaluation (November 2022).
10. A podiatry encounter (February 2023)
11. A four-month followup with his NP in March 2023. He reported a left-sided headache in aggravated by loud noise and sunlight. The NP adjusted his hypertensive medication and recommended Tylenol for the headache.
12. An LSU neurology evaluation in December 2023 for headaches that began two weeks after a motor vehicular crash. Clinic impressions were post traumatic migraine with aura vs idiopathic intracranial hypertension, post-concussive depression and likely left sciatica.

Highlights of his April 2023 deposition testimony:
1. REDACTED past employment includes work as a Waffle House cook, a freight conductor for CSX Transportation, a correction officer and security guard.

Report of Brobson Lutz, MD
March 8, 2024
Page 50 of 64

2. He was hospitalized for heat related muscle breakdown (aka rhabdomyolysis) while working with the Guard in 2016.
3. He attributed nausea, vomiting as often as twice a day, headaches, and anxiety over harm to his family to his odor exposure. He has not noticed any distinct odors at his house since 2020.
4. He used the terms sulfur smell and rotten eggs in describing the odors which were more sulfur like at night. The odors affected his sleep and social life.
5. In his April 2023 deposition, he clarified that "what I consider upper respiratory issues were the nausea, the vomiting…the nausea or vomiting was so bad to where I would try to take medicine to help it, it wouldn't work. Every now and then I would get a cough or something like that. But it was mainly the vomiting and nausea and headaches to what I would consider upper respiratory."

Dr. Charles Santos took a medical history and examined REDACTED on January 10, 2024. These are some highlights from his report:

1. REDACTED grew up in the house where the alleged exposure took place. He stated that there was "always" an odor smell, which he characterized as a "rotten eggs" smell. Beginning sometime in the spring or summer of 2017, the odor intensified. At this time began to have several symptoms, headaches, coughing, sinus issues or stuffiness, nausea, vomiting, fatigue, trouble sleeping, and anxiety."
2. REDACTED states that his problems with headaches began in 2017 and ran until 2019…He states headaches would occur 3-4 days per week. They would only occur outside. He states he never had a problem with headaches before 2017."
3. REDACTED states that the cough and respiratory issues were the most troublesome of his odor-related complaints. He says that beginning in 2017, and peaking in early 2018, he had a variety of issues such as cough, sinus stuffiness, respiratory issues, but no difficulty breathing."
4. REDACTED says that he would frequently wake up because of the odors experienced in 2017-2019. He says he would wake up and find it difficult to return to sleep "because it smelled so bad." He stated he does not have trouble sleeping now. He states that he did not have trouble sleeping prior to 2017. He states he would often be tired during the day due to this issue as well."
5. "When asked directly if he experienced anxiety related to odor during the time period in question, REDACTED replied in the affirmative. He denied any history of panic attacks. He did not seek any mental health care for these issues but reports noting these symptoms to his primary care provider."
6. A GAD-7 screening questionnaire was conducted, showing a score of 0, which Dr. Santos noted "would not prompt additional evaluation for a mental health disorder and would suggest a lack of anxiety or depression-related symptoms at the time of evaluation."
7. Mr. Tate reported several medical problems to Dr. Santos which are not in the records available for my review.
   a. A 2021 chest pain hospitalization in Hattiesburg, MS, leading to a diagnosis of pulmonary hypertension.
   b. A 2023 hospitalization at Ochsner Baptist for acute pancreatitis.

He was "hit by an 18-wheeler resulting in a concussion and a herniated disk" on the job in June 2023.

Report of Brobson Lutz, MD
March 8, 2024
Page 51 of 64

OPINIONS as to J REDACTED

I. REDACTED primary underlying medical problem is massive obesity with a BMI often over 40

II. Associated medical diagnoses and conditions included hypertension, recurrent rhabdomyolysis attributed to National Guard related physical exertion, inadequately treated obstructive sleep apnea, pancreatitis, shrimp allergy, multiple musculoskeletal injuries, chronic reoccurring headaches dating back to 2013, and more recently an on-the-job injury with a concussion and spinal injury.

III. His medical records revealed respiratory problems prior to 2017. He reported coughing, wheezing, and SOB during an encounter for suture removal on September 19, 2016, well before the Relevant Time Period.

IV. He was diagnosed with hypertension prior to a 2016 encounter with a nurse practitioner at Jefferson Community Health Care Centers dba InclusivCare but did not receive any antihypertensive medications initially.

V. REDACTED attributed odor-related headaches, coughing, sinus congestion, nausea, vomiting, fatigue, trouble sleeping, and anxiety between July 2017 and December 2019 to a rotten egg odor according to Dr. Santos' report. His deposition testimony and history given to Dr. Santos are not consistent with a review of some 23 separate clinic encounters during the Relevant Time Period.

VI. I reviewed his medical records from July 2017 to December 2019 looking specifically for mentions of headaches, coughing, sinus congestion, nausea, vomiting, fatigue, trouble sleeping, and anxiety.

   a. Headaches: REDACTED told Dr. Santos that he would have headaches 3-4 days per week beginning in 2017 until 2019. His clinic records during this period never mentioned headaches. In fact, his medicals documented "no headaches" at least 14 times during the Relevant Time Period. On the other hand, his UMC records record a diagnosis of "migraines" dating as far back as 2014.

   b. Coughing and sinus congestion: His records during the target period document no cough and no sinus problems numerous times. His only respiratory complaints were in January 2018. His symptoms were all acute onset and resolved with treatment of an upper respiratory infection with amoxicillin on January 9, 2018, and another encounter for an acute sinusitis with cough treated with steroids and other medications on January 19, 2018. The next mention of any cough was in May 2021, over one year past the alleged odor exposure.

   c. Nausea and vomiting: Numerous medical records during the Relevant Time Period specifically state no nausea or vomiting. These encounters were in Oct 2017, April 2018, May 2018, twice in September 2018, January 2019, July 2019, August 2019, September 2019, October 2019, and November 2019. His only complaint of nausea and vomiting during the entire Relevant Time Period was associated with his acute sinusitis in January 2018 as mentioned above. The

Report of Brobson Lutz, MD
March 8, 2024
Page 52 of 64

nurse treating him prescribed steroids and other medications for allergic symptoms. There were no mentions of any fume or odor related complaints.

d.  Fatigue: No medical provider ever recorded that REDACTED complained of fatigue. In fact, his records document "no fatigue" 14 times during the Relevant Time Period.

e.  Trouble sleeping: There are numerous mentions of "no sleep problems" prior to December 2019. However, he reported classic symptoms for sleep apnea with snoring, interrupted sleep, apnea periods during sleep, and daytime fatigue on December 23, 2019. A subsequent sleep study in December 2020 confirmed a diagnosis of obstructive sleep apnea, obviously a condition not caused by exposure to any troubling odors.

f.  Anxiety: Numerous medical records in the he Relevant Time Period document "no anxiety." These include encounters in June 2019, August 2019, September 2019, November 2019, and December 2019. Furthermore, I saw no record of his being prescribed any medications for anxiety in any of his medicals before, during, and after the Relevant Time Period.

CONCLUDING OPINIONS as to     REDACTED     There are no mentions of any fume or odor related complaints or diagnoses in the medical records from the numerous medical encounters that REDACTED underwent during the Relevant Time Period. REDACTED medical records do not support the claim that he suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. REDACTED medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including morbid obesity, rhabdomyolysis, sleep apnea, migraine, and pre-2017 difficulties with coughing, wheezing, and shortness of breath.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to     REDACTED

Neurologist Robert DeLorenzo, MD, opined that REDACTED "complaints of nausea and vomiting, headaches, nose burning, respiratory cough with phlegm production and anxiety were caused by his exposure to hydrogen sulfide and VOCs during the relevant time period." Persistent headaches after the Relevant Time Period "as a result of sensitization to hydrogen sulfide and represent a long-term, ongoing neurological condition caused by the hydrogen sulfide exposures." I was unable to find any authoritative medical references that supports such a cause-and-effect analysis. Such an expressed opinion is nothing but junk science not supported by quality peer reviewed medical literature.

Additionally, there are multiple inexplicable discrepancies in Dr. DeLorenzo's exam findings that, in my opinion, renders his findings as unreliable. For example, Dr. DeLorenzo notes that, prior to 2017, "The patient was in excellent health and very athletic until he was exposed at his home to foul smells." As of 2016, REDACTED medical records document that he was 5'11" and 278 pounds (BMI of 38.8, which corresponds with obese, and nearly morbidly obese), had reported recurring chest pains, wheezing and shortness of breath, and was dealing with multiple other maladies including rhabdomyolysis and migraines. Even under the most generous criteria, that does not qualify as "excellent health," and Dr. DeLorenzo's comments to the contrary render his evaluation of the patient unreliable.

Further, Dr. DeLorenzo's report fails to indicate whether he reviewed   REDACTED  edical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in REDACTED medical records. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Dr. Michael Spodak, a psychiatrist, reported that "REDACTED had a number of somatic and psychological symptoms which are associated with exposure to malodor noted to be coming from the Jefferson Parish Landfill." His opinions are not supported by any of REDACTED medical records. It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTED did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that REDACTED suffered mental health injuries related to landfill odors did not sufficiently consider other causes of his alleged mental health injuries, which runs contrary to well established methods for physicians and renders his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 54 of 64

REDACTED

I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 542 pages and detailing multiple different medical encounters during the Relevant Time Period):

- REDACTED

According to his Fact Sheet, REDACTED complained of a garbage like smell beginning in 2015 that became constant in the summer of 2017. His reported complaints included burning eyes, headaches, breathing issues, stuffy nose, sinus issues, and vomiting all since Summer 2017 and still present when he signed his affidavit.

He had numerous medical encounters prior to the Relevant Time Period for these medical problems and diagnoses:

1. Skin sutures (2001)
2. Imaging study of his head (2003)
3. Heavy alcohol consumption (2010)
4. Treatment for a sexually transmitted disease (2010)
5. Acute pansinusitis (2011)
6. Sore throat with cough and headache (2011)
7. Viral pharyngitis (2012)
8. Commercial Driver's License Exam (2015)
9. Acute upper respiratory infection (2015)
10. Nasal congestion of three months duration (May 2017)

As above, he presented to the Ochsner Kenner ED, with the following complaints on May 15, 2017:

> 27M presents with nasal congestion x 3 months. He reports nasal congestion with associated HA [headaches] and chest congestion with cough. No rhinorrhea or fever. He thinks he may have had fever when his symptoms first began. He has been taking Mucinex without relief. He has not tried Afrin or Sudafed. Symptoms are chronic and severe. He cannot breathe out of his nose.

Medical encounters during the Relevant Time Period included these:

1. A negative throat culture (Nov 2017)
2. Seasonal allergic rhinitis with recommendations for an oral antihistamine, a nasal steroid, and an ENT referral (Oct 2018)
3. Seasonal allergic rhinitis due to pollen and left foot infection (April 2019)
4. Urinary frequency and urology referral re Urology referral re uncircumscribed male (April 2019)
5. Left toe and foot problems (May 2019)
6. Post-traumatic right toe pain (June 2019)

Report of Brobson Lutz, MD
March 8, 2024
Page 55 of 64

Subsequent medical encounters after the Relevant Time Period include these:
1. Negative COVID screening (April 2021)
2. Cough, fever, nasal congestion, and headache (December 2021)

Highlights of his deposition include:

1. Terrance's physical complaints include stuffy nose, chest congestion, and nausea/gagging. He testified he did not suffer any of these symptoms prior to his exposure to the odors; however, medical records show he has suffered from sinus and congestion issues frequently prior to the Relevant Time Period.
2. He smelled the odor (10/10 strength) all the time (7 days a week, 24 hours a day)
3. He would gag "every day and night," immediately after smelling the odor, and it would last for about 5 minutes. He described the gagging as 10/10 in intensity.
4. He specifically denied ever suffering depression or anxiety as a result of landfill emissions.

Dr. Justin Rabon examined   REDACTED   on January 23, 2024.   REDACTED   attributed episodes of headache, nausea, and upper respiratory symptoms to often noticed odors. His reported symptoms and medical encounters were consistent with multifactorial "mild allergies" with "many triggers."   REDACTED   reported that he "does not take medications for these symptoms and never was evaluated by a primary care physician or subspecialist physician." While his reported symptoms are most consistent with allergic rhinitis, the expanded differential diagnosis would include migraine disorders, tension headache, and temporomandibular disorders. A GAD-7 screening questionnaire was conducted, showing a score of 0, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale).

OPINIONS as to   REDACTED   nclude:

I.   Pharmacy records from Wal-Mart document that he received several medications commonly used to treat respiratory tract, gastrointestinal, and/or skin conditions in 2010 and 2011 -- several years before the Relevant Time Period of his alleged fume exposure.

II.   If he ever had a problem with vomiting, it was not recorded in his medical record. In addition, pharmacy records do not show that he was ever prescribed medication for nausea and vomiting.

III.   His medical encounters during the Relevant Time Period were all related to specific non-odor related illnesses.

IV.   The available medical records show that   REDACTED   had at least 5 medical encounters for recurrent sinus and allergy problems before 2017 dating back to 2011, with a May 2017 encounter involving 3 months of symptoms with associated headaches.

CONCLUDING OPINIONS as to   REDACTED   According to the medical records reviewed,   REDACTED   never complained of odors or fumes during any of the numerous medical encounters that he underwent during the Relevant Time Period. His medical records do

Report of Brobson Lutz, MD
March 8, 2024
Page 56 of 64

not support the claim that he suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. His medical records and deposition testimony do suggest other more likely causes of complained-of injuries during the Relevant Time Period that are not related to exposure to hydrogen sulfide – including classic seasonal allergy diagnoses which predated the Relevant Time Period and clearly explained his respiratory tract symptoms.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to          REDACTED

                              REDACTED     REDACTED
                    complaints of chest congestion, sinusitis and rhinitis, headaches, sleep disturbances, anxiety and nausea and vomiting were caused by his exposure to hydrogen sulfide and VOCs during the relevant time period of July 1, 2017 to December 31, 2019. His symptoms subsided several months after the exposure ended by the end of December 2019 except for his complaints of chest congestion, sinusitis, headaches, and anxiety." Dr. DeLorenzo's report fails to indicate whether he reviewed          REDACTED          medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in the medical records. The available medical records clearly show that          REDACTED          had at least 4 medical encounters for recurrent sinus and allergy problems before 2017 dating back to 2011. Moreover,          REDACTED          has no medical records from before, during or after the Relevant Time Period showing any complaints related to sleep disturbances, anxiety, and vomiting. The only nausea related event in his medical records was associated with a Zofran prescription in 2011. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Plaintiff psychiatrist Dr. Michael Spodak conducted a Zoom interview with          REDACTED in June 2023.          REDACTED          reported that he completed the 8th grade leaving school in 2007 at age 17 after several suspensions for disruptive behavior. During the Relevant Time Period, he was living with his parents and a grandmother while working 40 hours a week as a truck driver. In part, his report stated that "          REDACTED          reported experiencing a number of somatic and psychological symptoms following the onset of the relevant time period \which he did not report experiencing prior to 7/1/17" and that these symptoms "were caused by his exposure to the malodor during the relevant time period." However, Dr. Spodak apparently did not review Terrance's deposition where he specifically denied depression and anxiety related to landfill emissions. Likewise, he seemingly did not review available past medical records showing a history of heavy alcohol consumption, sinus problems, sore throat, swollen tonsils, nasal congestion, cough, and headaches – all of which predated the Relevant Time Period. He also wrote that the experience that          REDACTED          "endured during the relevant time period was significantly worse than a mere inconvenience." I found nothing in his medical records to justify such a conclusion, which in my opinion renders Dr. Spodak's opinions as unreliable. It is my opinion, based on my experience, expertise, and review of the relevant records, that Terrance          REDACTED          did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that          REDACTED          uffered mental health injuries related to landfill odors did not sufficiently consider other causes of his alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 57 of 64

REDACTED                    )

I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 2039 pages, and detailing more than 15 different medical encounters during the Relevant Time Period):

REDACTED

According to the Fact Sheet,   REDACTED   reported a "mixed nasty smell from chemical plants" daily since 2015 – but he later corrected the onset date to 2017. He also reported allergies, runny eyes, nausea and upset stomach, coughing all since spring 2018 with no prior conditions.

I reviewed medical records from Ochsner Kenner, Louisiana Pain Specialist, University Medical Center, and Walgreens' Pharmacy. His past medical history between 2010 and 2017 included cigarette smoking, significant peripheral vascular disease, chronic back pain on long-term opiates, gastroesophageal reflux disease (2011), prostatitis, Legionella pneumonia (2015), diverticulosis, and internal hemorrhoids. He received Xanax for anxiety in May 2017 which predated the Relevant Time Period.

During the Relevant Time Period, he had some 16 medical encounters all related to his musculoskeletal pain complaints. There are no mentions in any of these records of any complaints of odors, fumes, allergy problems, runny eyes, coughing, nausea, or gastrointestinal problems.

His medical records did reflect a history of acute onset cough, fever, body aches, and sore throat in February 2015. He also had abdominal pain and vomiting. He was treated overnight at Ochsner Kenner and discharged the next day with a diagnosis of community acquired pneumonia. A urinary antigen was also positive for Legionnaires' disease; however, his positive Legionella test was apparently not available until after his hospital discharge.  Of course, all these symptoms occurred way before the Relevant Time Period beginning in July 2017.

REDACTED   had a long history of opiate usage as well as drug seeking behavior:
1. His pharmacy records show opiate usage dating back to 2010
2. He was told that he needed to decrease Percocet in March 2010 but returned to the ED the next month again asking for a Percocet prescription.
3. He had multiple ED encounters requesting opiate refills beginning in 2011 and still ongoing in 2013.
4. He requested and was denied an opiate prescription at a medicine clinic encounter in January 2011.
5. His chief complaint in medicine clinic in June 2012 was "I need pain medicine."
6. He was on a pain medication contract in 2012.
7. He called UMC requesting a higher dose Vicodin in March 2014.
8. Medicine clinic physicians noted a need to wean his opiate usage in August 2014.

Report of Brobson Lutz, MD
March 8, 2024
Page 58 of 64

9. He began getting regular narcotic refills from Louisiana Pain Clinic in June 2015 through August 2021.
10. He had numerous urine drug screening (UDS) violations, and Louisiana Pain Clinic refused further opiate refills in August 2021. Clinic records documented that he "walked out unhappy."

These are excerpts from his June 2023 deposition:

1. REDACTED worked as a truck driver and delivered loads to River Birch and Jefferson Parish landfills. He developed back problems and had been on long term disability. He smokes.
2. He has lived at 1116 Starrett Road in Metairie near the railroad tracks since about 2004.
3. He lives with family members in a house with window units.
4. He first noticed odors described as "like a rotten stinking egg" and "a dead body" around July or August 2017. These odors persisted until the end of 2020:
   a. "It was bad, that we couldn't go outside. But we had to go outside to eat, you know, to make groceries and stuff, you know, and -- and just go do what you got to do for your house and just come back in, you know.
   b. "And the family, they couldn't come over because we didn't want them to get sick or nothing, so the grandchildren, that -- we was dealing with them, like, on the phone, you know. So we couldn't have company or nothing…"
   c. "We was isolated in the house other than going to the store, you know."
   d. He is claiming damages including not being able to see his grandkids or holding crawfish boils and barbecues. He reported symptoms including upset stomach, nausea, vomiting, headaches, and runny eyes.
   e. He never told any provider that he was having any fume or odor medical problems.

Dr. Charles Santos examined REDACTED in January 2024. He described REDACTED most significant complaint as headache with multiple diagnostic considerations. REDACTED did not share his long-term narcotic use with Dr. Santos. Dr. Santos appropriately listed some of the more common diagnoses associated with REDACTED numerous complaints. Establishing differential diagnoses is an essential element in evaluation of a patient with numerous symptoms. Dr. Santos elicited a 60+ pack year smoking history. I agree with Dr. Santos that complications of such a smoking history are "myriad and include many chronic illnesses." A GAD-7 screening questionnaire was conducted, showing a score of 0, which indicates minimal anxiety (the mildest finding available on the GAD-7 scale).

OPINIONS as to REDACTED

I. REDACTED medical records document a litany of medical problems related to his cigarette smoking and chronic pain.

II. REDACTED had at least 16 emergency department encounters between 2010 and 2015 for a variety of medical problems but usually requesting narcotic prescriptions.

III. The only respiratory and gastrointestinal complaints in his medical records occurred in February 2015. He developed fever, a cough, and GI complaints. He was treated overnight at Ochsner Kenner and discharged the next day with a diagnosis of community

Report of Brobson Lutz, MD
March 8, 2024
Page 59 of 64

acquired pneumonia. A urinary antigen was also positive for Legionnaires' disease; however, it I do not see where this positive test was ever noted by his treating physicians.

CONCLUDING OPINIONS as to      REDACTED      According to the medical records reviewed,      REDACTED      never complained of odors or fumes during any of the numerous medical encounters that he underwent during the Relevant Time Period. his medical records do not support the claim that he suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. His medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including his long term pain issues with opiate use and cigarette smoking, which was a major factor in his peripheral vascular disease complications and his hospitalization for pneumonia in 2015.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to      REDACTED

Neurologist Dr. Robert DeLorenzo opined "      REDACTED      complaints of coughing, nausea, runny eyes, allergies, headaches, stomach upset and loss of smell and appetite were caused by his exposure to hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill during the relevant time period." Dr. DeLorenzo's report fails to indicate whether he reviewed REDACTED medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in the medical records. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

In this psychiatric report Dr. Michael Spodak reported that he had read      REDACTED      deposition testimony. He wrote that the medical records were "under review" which I take to mean that they had not been reviewed when he formulated his opinions. It is my opinion, based on my experience, expertise, and review of the relevant records, that      REDACTED      did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that      REDACTED      suffered mental health injuries related to landfill odors did not sufficiently consider other causes of his alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable. Dr. Spodak reported a negative history for "psychiatric, psychological, or emotional problems predating 7/1/17" in spite of medical records documenting frequent prescription narcotic use and drug seeking dating back to 2010 followed by classic drug seeking behavior.

Report of Brobson Lutz, MD
March 8, 2024
Page 60 of 64

REDACTED

I reviewed the patient's medical records, including from the 2024 independent medical examination, the plaintiff fact sheet, the deposition transcript, and the reports of Drs. Spodak and DeLorenzo. The medical records that I have personally reviewed include the following records (totaling 4705 pages and detailing more than 20 different medical encounters during the Relevant Time Period):

REDACTED

I also read      REDACTED      deposition with her testimony that she suffered migraine headaches, difficulty breathing, nosebleeds, burning nose, and cough. She attributed numerous complaints to "the sulfur smell" that was noticeable in and around her Harahan home on certain days in 2017 to 2019.

Her husband had pulmonary fibrosis and died in May 2018. She also has an ex-husband with lung cancer and a history of asbestos exposure. An "advertising attorney" sent her for a pulmonary examination looking for asbestosis, and she was told she had a lung scar.

Medical summary prior to the July 2017 Relevant Time Period:

1. Dr. Patrick Breaux was her longtime physician. It appears that he saw her prior to Hurricane Katrina, but the first encounter in her Ochsner records was in February 2006. She was taking the antihistamine Allegra every day in addition to medications for hypertension, hypercholesteremia, and hypothyroidism. Dr. Breaux treated her for a headache and an allergic rhinitis exacerbation and ordered sinus imaging studies in October 2006.

2.      REDACTED      had a long problem with obesity. Her BMI was 54 consistent with morbid obesity in February 2006. She did lose some weight by 2017 and her October 2018 BMI was 35.1. But by May 2022 her BMI had increased to 38.6 consistent with high-risk obesity.

3. Dr. Breaux recommended Claritin and Tylenol for a periorbital swelling and headache in May 2007. Her records indicate that Dr. Breaux continued Allegra initially documented in 2006 through at least 2012.

4. Dr. Breaux's impressions in April 2016 included non-exertional chest pain, hypertension, hyperlipidemia, and obesity.

Medical encounters during the Relevant Time Period from July 2017 through December 2019 include these:

1. Left shoulder injury (August 2017)
2. Acute upper respiratory infection and sinus related headache (November 2017)

Report of Brobson Lutz, MD
March 8, 2024
Page 61 of 64

3. Upper respiratory tract infection (February 2018)
4. Knee pains (March 2018 through November 2019)
5. Chronic low back pain (May 2018)
6. Routine checkup for hypertension, hypothyroidism, and hyperlipidemia (May 2018 and May 2019)
7. Referral to an allergist for non-seasonal allergic rhinitis (October 2018)
8. Chronic rhinitis and conjunctivitis consistent with allergic symptoms, and testing which showed she was allergic to dust mites and cat dander (indoor allergies); noted that "She does have increased symptoms when in her house." (November and December 2018)
9. Reactive depression (May 2019)
10. Rash right foot possibly starting from an ant bite (June 2019)
11. Diarrhea following several courses of antibiotics prescribed for a dental infection (August 2019)
12. Acute cystitis (November 2019)

Selected medical encounters after the Relevant Time Period ending in December 2019:

1. Rhinosinusitis and Eustachian tube dysfunction (February 2020)
2. Acute non-recurrent sinusitis, non-seasonal allergic rhinitis, and acute otitis externa left ear treated with ear drops, Flonase, and azelastine nasal spray (February 2020)
3. Allergic rhinitis, allergic conjunctivitis, and eye syndrome with bilateral lacrimal duct tubes (March 2020)
4. Ear canals with cerumen impactions (March 2020)
5. Acute and chronic low back pain (May 2020)
6. Routine medical checkup including diagnosis morbid obesity (July 2020)
7. Prescriptions refilled for ear drops, nasal sprays, and eye drops (July 2020)
8. Knee pain (September 2020 through October 2022)
9. Apparent COVID (December 2019)
10. Dry eyes (November 2020)
11. Weight gain following COVID (January 2022)
12. Primary care evaluation at JenCare (May 2022)

She stated that she saw a physician at Ochsner Main when the fumes started and received a nose spray and eye drops. I do see that a nurse at Ochsner's Urgent Care in River Ridge prescribed a Z-Pack, Flonase, and antihistamine nose drops and also administered a steroid injection in November 2017 for an acute upper respiratory tract infection. Such medication combinations are commonly prescribed by Louisiana physicians who treat nasal and sinus allergies compounded by possible bacterial infections.

In her deposition testimony,      REDACTED      testified that she also had difficulty breathing and nosebleeds; however, there is no documentation of any of these complaints in her three encounters for seasonal allergies in 2017, 2018, and 2020.

Dr. Charles Santos examined      REDACTED      n January 2024. Some of his pertinent observations and findings include these:
1. "I don't believe it is possible to conclude with any degree of medical certainty that REDACTED headaches and eye irritation are a result of odor related exposures."

2.  REDACTED  headaches are equivocal for a migraine type headache… Her headaches are somewhat consistent with migraine with or without aura, in that they are unilateral, pulsatile or throbbing, frequent and lengthy."
3.  "Other possibilities for her headache include sinus type headache, often in relation to chronic allergies or a sinus infection…."
4.  "Her sleep disturbances are more consistent with a secondary, rather than a primary, sleep disorder."
5.  A GAD-7 screening questionnaire was conducted, showing a score of 0, which Dr. Santos noted "would not prompt additional evaluation for a mental health disorder and would suggest a lack of anxiety or depression-related symptoms at the time of evaluation."

OPINIONS as to  REDACTED

I.  There are no references in any of her medical records and encounters related to any odor or fume related medical diagnoses.

II.  Medical records do not support any relationship between malodors and REDACTED medical problems. She received treatments for upper respiratory tract complaints and sinusitis in November 2017, February 2018, and February 2020. All of these episodes were consistent with seasonal allergies, likely ragweed.

III.  Heated air and low humidity promote nasal mucosal dryness that leads to spontaneous bleeding of the fragile capillary blood vessels in the nose. Other nosebleed triggers include infections in the nasal linings and sinuses, allergies including hay fever, local trauma, and medications that dry secretions such as several medications listed in the plaintiff's Walgreens' records.

CONCLUDING OPINIONS as to  REDACTED  her medical records do not support the claim that she suffered injuries caused by exposure to hydrogen sulfide during the Relevant Time Period. Her medical records and deposition testimony do suggest other more likely causes of the complained-of injuries that are not related to exposure to hydrogen sulfide – including classic nasal and sinus allergies before, during, and after the Relevant Time Period. She also received treatments for eye problems attributed to dry eyes and/or allergies. Allergies lead the diagnostic differential diagnosis for all of her eye, nose, and sinus problems.

OPINIONS ON PLAINTIFF EXPERT REPORTS as to  REDACTED

Neurologist Dr. Robert DeLorenzo wrote that  REDACTED  enjoyed a "general state of good health" until 2017. Dr. DeLorenzo's report fails to indicate whether he reviewed the patient's medical records, and indeed it seems he did not, as none of the medical complaints he reports are reflected in patient's medical records. If he had reviewed  REDACTED  medical records, he would have discovered that she was treated or was under treatment for numerous medical problems prior to July 2017 including hypertension, morbid obesity, lipid disorder, headaches, hypothyroidism, allergic rhinitis requiring dozens of refills for antihistamines, pruritis consistent with scabies, and chronic ankle pain. Dr. DeLorenzo failed to consider more likely differential diagnoses in formulating his opinions, and did not consider the findings contained in available records from near the time of the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 63 of 64

In this psychiatric report Dr. Michael Spodak reported that he had reviewed some but not all of available medicals. He wrote that    REDACTED    "reported experiencing symptoms following the onset of the relevant time period which she did not report experiencing prior to 7/1/17." It is my opinion, based on my experience, expertise, and review of the relevant records, that REDACTE did not in the past, and does not today, meet criteria for referral to a mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak's conclusion that    REDACTED    suffered mental health injuries related to landfill odors did not sufficiently consider other causes of her alleged mental health injuries, and did not consider the findings contained in available records closer in time to the incident in question, both of which run contrary to well established methods for physicians and serve to render his opinions unreliable.

Report of Brobson Lutz, MD
March 8, 2024
Page 64 of 64

## CONCLUSION

The opinions stated in this report are based on a review of records as available to me at this time and on my education, training, and experience as a physician in diagnosing and treating patients with the various complaints alleged by the Trial Plaintiffs.

All of my opinions contained herein are stated to a reasonable degree of medical certainty. This report does not necessarily include the entirety of my thoughts on this matter. If additional information becomes available, I will gladly issue a supplemental report if asked which may or may not alter or modify my opinions in the light of any new information received later.

Respectfully yours,

Brobson Lutz, M.D., M.P.H., F.A.C.P.

Dated: March 8, 2024

Lutz Appendix 1: Documents Considered
Page 1 of 4

**APPENDIX 1: DOCUMENTS CONSIDERED**

**Medical Records**

REDACTED

Lutz Appendix 1: Documents Considered
Page 2 of 4

REDACTED

**IME Reports**

| Report Date | Plaintiff |
|---|---|
| 3/4/2024 | Green, Geneva |
| 3/4/2024 | Gremillion, Adelyn |
| 3/4/2024 | Gremillion, Braxton |
| 1/27/2024 | Gremillion, Scott |
| 3/4/2024 | Gremillion, Wendy |
| 3/4/2024 | Lewis, Vernice |
| 1/15/2024 | Meyers, Stanley |
| 3/4/2024 | Richardson, Reshaun |
| 3/4/2024 | Section, Andrew |

Lutz Appendix 1: Documents Considered
Page 3 of 4

| | |
|---|---|
| 2/27/2024 | Tate, Jonathan |
| 3/4/2024 | Thompson, Terrance |
| 1/23/2024 | Thompson, Tyrone |
| 1/21/2024 | Winningkoff, Mary Ann |

## Depositions

| Deponent | Date |
|---|---|
| Green, Geneva | 4/7/2023 |
| Gremillion, Adelyn | 2/15/2023 |
| Gremillion, Braxton | 2/15/2023 |
| Gremillion, Scott | 6/8/2023 |
| Gremillion, Wendy | 6/7/2023 |
| Lewis, Vernice | 11/19/2023 |
| Meyers, Stanley | 4/20/2023 |
| Richardson, Reshaun | 4/24/2023 |
| Section, Andrew | 4/18/2023 |
| Tate, Jonathan | 2/8/2024 |
| Thompson, Terrance L | 1/5/2024 |
| Thompson, Tyrone | 6/2/2023 |
| Winningkoff, MaryAnn | 4/19/2023 |

## Plaintiff Fact Sheets

| Plaintiff | Date |
|---|---|
| Green, Geneva | 1/15/2020 |
| Gremillion, Adelyn | 12/9/2020 |
| Gremillion, Braxton | 12/9/2020 |
| Gremillion, Scott | 12/9/2020 |
| Gremillion, Wendy | 12/9/2020 |
| Lewis, Vernice | 1/11/2020 |
| Meyers, Stanley | 1/10/2020 |
| Richardson, Reshaun | 11/11/2020 |
| Section, Andrew | 12/12/2020 |
| Tate, Jonathan | 12/7/2020 |
| Thompson, Terrance | 1/11/2020 |
| Thompson, Tyrone | 11/11/2020 |
| Winningkoff, Mary Ann | 1/12/2020 |

Lutz Appendix 1: Documents Considered
Page 4 of 4

**Other references**

| Date | Title |
|------|-------|
| 3/4/2024 | Expert Report of John Kind - Jefferson Parish Landfill Litigation |
| 2/16/2024 | Expert Report of James F. Lape |
| 11/29/2022 | Findings of Fact and Conclusions of Law |
| 4/30/2021 | Expert Report of John Kind |
| 7/14/2020 | First Amended & Supplemental Omnibus Complaint for Damages & Injunctive Relief |
| 1/14/2019 | Louisiana Department of Health, January14, 2019- Final Draft (WC_JPLF_00316722). |
| 10/7/2017 | National Library of Medicine - Environmental Toxicology of Hydrogen Sulfide, available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5777517/ |
| 12/2016 | ATSDR Public Health Statement: Hydrogen Sulfide, available at: https://www.atsdr.cdc.gov/toxprofiles/tp114-c1-b.pdf |
| 09/2012 | Compensation Neurosis: A Too Quickly Forgotten Concept? Ryan C. W. Hall, Richard C. W. Hall. Journal of the American Academy of Psychiatry and the Law Online Sep 2012, 40 (3) 390-398, available at: https://jaapl.org/content/40/3/390 |
| 1991 | EHP Vol. 94., pp 25-32, 1994 - Symptom Prevalence and Odor-Worry Interaction near Hazardous Waste Sites by Shusterman, Lipscomb Neutra and Satin |

Lutz Appendix 2: CV
Page 1 of 13

**APPENDIX 2: CV**

**BROBSON LUTZ, M.D., M.P.H., F.A.C.P.**
Drs. Combs and Lutz, LLC
2622 Jena Street
New Orleans, LA 70115
504/895-0361

## PERSONAL

Birth date:  August 22, 1947
Birthplace:  Millville, New Jersey

## EDUCATION

| | |
|---|---|
| 1954-1965 | Athens Public Schools, Athens, Alabama |
| 1965-1967 | Auburn University, Auburn, Alabama |
| 1967-1969 | Vanderbilt University, Nashville, Tennessee, B.A. |
| 1969-1974 | Tulane University School of Medicine, M.D. |
| 1975 | Tulane University School of Public Health and Tropical Medicine, M.P.H. |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1974-1975 | Internship, Charity Hospital of Louisiana at New Orleans |
| 1975-1977 | Internal Medicine Residency, Tulane Service, Charity Hospital of Louisiana at New Orleans |
| 1977-1978 | Fellowship, Section of Infectious Diseases, Tulane University School of Medicine, New Orleans |
| 1978- | Private Practice, Internal Medicine and Infectious Diseases, New Orleans |

## CERTIFICATIONS

| | |
|---|---|
| 1974- | Licensure by the Louisiana State Board of Medical Examiners |
| 1979- | Diplomate of the American Board of Internal Medicine (Life) |
| 1983- | Fellow of the American College of Physicians |
| 2013-15 | Ethics Training for Public Servants, Louisiana Board of Ethics |

## NEW ORLEANS DEPARTMENT OF HEALTH

| | |
|---|---|
| 1978-1980 | Medical Director, Delgado Clinic |
| 1980-1983 | Chief of Communicable Diseases |
| 1983-1995 | Director of Health, City of New Orleans |
| 1989-1995 | Administrative Adjudication Officer |

Lutz Appendix 2: CV
Page 2 of 13

1990-1995            Medical Review Officer for the City of New Orleans

## AWARDS AND POSITIONS

1976                 President of Charity Hospital House Staff Association
1980                 Medical Economics Writing Award for "I Couldn't Swallow
                         Cookbook Medicine"
1983-1995            City of New Orleans Mosquito Control Advisory Committee
1983-                Commissioner, Orleans Parish Communications District
1986-1995            United States Conference of Public Health Officers
                         Board of Trustees Task Force on AIDS
1987-                Delta Omega
1989                 Louisiana Civil Service League Monte Lemann Award
1989                 Association of State and Territorial Health Officials
                     HIV Committee representing United States Conference
                         of  Local Health Officers
1990                 Certificate of Appreciation, U.S. Customs Service
1994-1995            National Association of County and City Health Officers
                         Transition Planning Committee, 1994 Board of
                         Directors (1994-1995)
1996-1999            Physician's Recognition Award, American Medical
1996                 Community Service Award, Louisiana State Medical Society
1996                 Nathan Davis Award for Outstanding Government Service,
                         American Medical Association
1996                 **Infectious Diseases Medical Knowledge Self-Assessment Program**,
                     2nd edition, reviewer
2001- 2003           Medicaid Pharmaceutical and Therapeutics Committee,
                         Gubernatorial Appointment
2001                 Top Doctors, **New Orleans Magazine**, Project Chair
2001                 Press Club of New Orleans, award for cover story in **New Orleans**
                     **Magazine** on drinking water
2004-2007            Physicians Recognition Award, AMA
2004                 Alumnus of the Year, Tulane University School of Public Health
                         and Tropical Medicine
2005                 **Wall Street Journal**, Page 1 Profile, September 16, 2005
2006                 French Quarter Business Women's Network, Dawlin' Heart
                          Award, February 14, 2006
2006                 Acclaim Award for Community Health from the Forum for Equality
2006-11              Louisiana's Top Doctors (Infectious Diseases) **Louisiana Life**
2007                 Press Club of New Orleans, First Place for Science, Health, Technology
                     Reporting
2009-2011            Database -- Best Doctors in America
2010                 Health Transition Team for Mayor-elect Mitch Landrieu
2015                 Press Club of New Orleans, Second Place for Best Monthly Column

Lutz Appendix 2: CV
Page 3 of 13

## ACADEMIC APPOINTMENTS

Tulane University School of Medicine, Department of Medicine
                 Clinical Instructor (1977-1983)
                 Clinical Assistant Professor (1983-1992)
                 Clinical Associate Professor (1992-1997)
Tulane University School of Public Health and Tropical Medicine,
      Department of Biostatistics and Epidemiology
                 Adjunct Instructor (1978-1983)
                 Adjunct Assistant Professor (1983-1997)
Tulane University School of Medicine, Department of Microbiology
      and Immunology, Clinical Associate Professor (1997)

## HOSPITAL APPOINTMENTS

| | |
|---|---|
| 1978- | Southern Baptist Hospital / Mercy-Baptist Hospital / Memorial Medical Center, New Orleans, Louisiana Ochsner Baptist Medical Center |
| |      Antibiotic Review Team, Chair (1989-1990) |
| |      Emergency Room Committee (1979) |
| |      Utilization Review Committee (1980) |
| |      Infection Control Committee (1979-1999) |
| |      Executive Committee (1983-1984, 1989-2004) |
| |      Skilled Nursing Committee (1985) |
| |      Quality Assurance Committee |
| |          Hospital Wide (1985-1989) |
| |          Internal Medicine (1982-1984) |
| |      Pharmacy/Therapeutics Committee |
| |          (1985, 1994-2000, 2008-  ) |
| |          (Chair 2008 – 2011) |
| |      Medical Services Department, Chair (1996-2000) |
| |      Quality Improvement Committee (1996-2000) |
| |      Credentials Committee (1996-2000, 2003-5) |
| |      President of Medical Staff (2000-2002) |
| |      Past President of Medical Staff (2003-4) |
| |      Hospitalist Committee, Chair (2004) |
| 1977-1993 | Visiting Physician, Charity Hospital of Louisiana |
| 1989- | Touro Infirmary |
| 1999-2005 | LifeCare Hospital onsite at Memorial Medical Center |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1996- | Emerging Infections Network |
| 1995- | Louisiana & Mississippi Infectious Disease Society, Founding Member |
| 1992- | New York Entomological Society (Lifetime member) |
| 1982- | Infectious Diseases Society of America |
| 1978- | Southern Medical Association |
| | Reviewer for Southern Medical Journal (2008) |
| 1978- | Louisiana Internal Medicine Society |
| 1975- | American College of Physicians |
| 1975- | Louisiana State Medical Society |
| | Public Health Committee (1982-1995) |
| | Subcommittee on AIDS (1987-1989) |
| | Chair (1988-1989) |
| 2002 | Peoples Health Network, Chair of the Pharmacy and Therapeutics Subcommittee |
| 1975- | Orleans Parish Medical Society (1974 -2021) |
| | Medical Association of Southeast Louisiana (Founding member 2021) |
| | Board of Governors (1986-1994) |
| | Secretary (1992-1993) |
| | EMS Committee (1987- 2005) |
| | Subcommittee on Pediatric Drownings, Chair (1997) |
| | Subcommittee Against Tobacco, Chair (1988-1990) |
| | Public Health Committee (1978-2005) |
| | Health Spokesman (1995-   ) |
| | Membership Committee (2001-2005) |
| 1974- | American Medical Association (Lifetime Member) |
| 1974- | American Society for Microbiology |
| 2000-2005 | SHEA – Society for Healthcare Epidemiology of America |
| 2000- | American Academy of HIV Medicine |
| 2001-2004 | Alumni Board, Tulane School of Public Health and Tropical   Medicine |
| 2004-2006 | Governing Board of Memorial Medical Center |
| 2002- | Peoples Health Network |
| | Medical Management Committee |
| | Quality, Policy, Management Committee |
| | Wellness Subcommittee |
| | Appeals and Grievance Subcommittee, Chair, 2008+ |

## PROFESSIONAL ACTIVITIES

**WWL-TV**, The Monday Health Report, Eyewitness Morning News, (1991-2012)
**WVUE-TV**, The Monday Health Report, Morning News, (2012-    )
**WGSO Biz Radio**, The Business of Medicine, daily segment, (1996 - 2005)
**WWL Radio**, Health Updates, 3 times weekly (1983-1993)
**Healthcare New Orleans,** Editorial Advisory Board (1993-1997)
**Prescriber's Letter**, peer reviewer (1997- )
**New Orleans Magazine**, monthly health column (2000- )
Orleans Parish Coroner's Office, Infectious Disease Consultant (2000-2014)
Audubon Nature Institute, Consultant to EMS First Responder Coordinator (2000-2005)
**Journal of the Louisiana State Medical Society**, Reviewer (2005- )
Louisiana Commission on HIV, AIDS, and Hepatitis C (2007-2009)
Mentor to Schweitzer Fellow Erika Lindholm, LSU Medical School student, 2009

## CIVIC ACTIVITIES AND MEMBERSHIPS

Judah Touro Society (2005-2010)
Citizens Care: Advocates for Quality and Choice in Long Term Care (inactive)
Gopher Tortoise Council, Life Member
Forum for Equality, founding member
NO/ AIDS Taskforce, founding member
Bureau of Governmental Research
Friends of Tennessee Williams
Orleans Parish Communication District,
        Board of Commissioners (1987-95, 1996-    )
        Vice Chair (2005-2008 )
        Acting Chair (2008-2009)
Zulu Social Aid & Pleasure Club, member
National Birmingham Roller Club (2012)
New York Transit Museum, Member
Horned Lizard Conservation Society, Life Member
Louisiana Association of Railroad Passengers

Lutz, Brobson: *Galatoires – A Real Hole in the Wall.* A stage reading performed by Claire Moncrief as part of Native Tongues 5: The Food Edition, Carl Walker, producer, Tennessee Williams Festival, Le Petit Theatre, March 27, 2011, and 12 performances Le Chat Noir, April 2011. New Orleans

Lutz Appendix 2: CV
Page 6 of 13

## BIBLIOGRAPHY – PUBLICATIONS AND PRESENTATIONS

1.  Lutz, B., and Mogabgab, W.J.: Therapeutic Efficacy of Piperacillin in Serious
    Infections in Adults.  Presented at the 18th Interscience Conference on     Antimicrobial
Agents and Chemotherapy, Atlanta, Georgia, October 1-4, 1978.

2.  Lutz, B., and Mogabgab, W.J.: Ceforanide, A Long Acting Cephalosporin in     Various
Infections.  Presented at the 18th Interscience Conference on        Antimicrobial Agents and
Chemotherapy, Atlanta, Georgia, October 1-4,        1978.

3.  Lutz, B., and Mogabgab, W.J.: Single Oral Dose Rosoxacin Treatment of
    Acute Gonococcal Urethritis.  Presented at the 30th General Assembly of the
    International Union Against the Venereal Diseases and the Treponematoses, East
    Berlin, Germany, June 6-12, 1980.

4.  Lutz, B.: Statement Before the Subcommittee on Health, House of        Representatives
Serial 96-117, Washington D.C., August 25, 1980.

5.  Lutz, B., Pauling, B., and Mogabgab, W.J.: Poster Session: Single Dose        Treatment of
Uncomplicated Gonococcal Infections with Oral Rosoxacin.        Presented at the 20th
Interscience Conference on Antimicrobial Agents
    and Chemotherapy, New Orleans, Louisiana, September 22-24, 1980.

6.  Lutz, B., Pauling, B., Kosola, J., and Mogabgab, W.J.: A Comparative Study
    of Cefotaxime and Procaine Penicillin G in the Treatment of
    Uncomplicated Gonorrhea.  Presented at the 20th Interscience
    Conference on Antimicrobial Agents and Chemotherapy, New Orleans,     Louisiana,
September 22-24, 1980.

7.  Lutz, B.: A Simplified Technique for the Diagnosis of Acute Gonococcal        Urethritis.
Presented at the American Public Health Association Meeting,        Detroit, Michigan, October
22, 1980.

8.  Lutz, B., Holmes, B., Pauling, B., Williams, L., and Mogabgab, W.J.: Poster     Session:
Comparison of Minocycline and Penicillin in the Treatment of
    Men with Gonococcal Urethritis.  Presented at the 34th American Medical
    Association Winter Scientific Meeting, Atlanta, Georgia, January 24-26,     1981.

9.  Lutz, B., Mogabgab, W.J., and Holmes, B.: Efficacy of Cefoxitin
    Intramuscularly in Adults.  Current Therapeutic Research (2), 1981.

10.  Lutz, B.: I Couldn't Swallow Cookbook Medicine.  Medical Economics,
    March 2, 1981.

11.  Mogabgab, W.J., Lutz, B., Cassidy, M., Pauling, B., Holmes, B., and
    Beville, R.: A Single Injection of Moxalactam for Acute Gonorrhea.        Presented at
the 21st Interscience Conference on Antimicrobial Agents
    and Chemotherapy, Chicago, Illinois, November 4-6, 1981.

12.  Lutz, B., Mogabgab, W.J., Cassidy, M., and Pauling, B.: Comparison of Single Oral Dose Rosoxacin to Penicillin Male and Female Gonorrhea.    Presented at the 21st Interscience Conference on Antimicrobial Agents and Chemotherapy, Chicago, Illinois, November 4-6, 1981.

13.  Lutz, B., Mogabgab, W.J., Williams, L., Pauling, B., and Holmes, B.:   Comparison Minocycline and Penicillin for the Treatment of Gonorrhea. Presented at 1st Sexually Transmitted Diseases World Congress, San Juan, Puerto Rico, November 15-21, 1981.

14.  Mogabgab, W.J., and Lutz, B.: Scientific Exhibit: Treatment of Serious       Infections in Patients with Significant Underlying Diseases.  Presented at the 88th Annual Meeting, Association of Military Surgeons, San Antonio, Texas, November 1-5, 1981.

15.  Mogabgab, W.J., and Lutz, B.: Scientific Exhibit: Treatment of Serious Infections in Patients with Significant Underlying Diseases.  Presented at Meeting of American College of Obstetricians and Gynecologists, Dallas, Texas, April 26-29, 1982.

16.  Mogabgab, W.J., and Lutz, B.: Scientific Exhibit: Treatment of Serious       Infections in Patients with Significant Underlying Diseases.  Presented at the American Urology Meeting, Kansas City, Missouri, May 16-20, 1982.

17.  Lutz, B., Mogabgab, W.J., Williams, L., Pauling, B., and Beville, R.:    Comparison of Minocycline and Penicillin for the Treatment of Gonorrhea. Presented at the 31st General Assembly of the International Union Against the Venereal Diseases and the Treponematoses, Dublin, Ireland, June 19-25, 1982.

18.  Lutz, B., Mogabgab, W.J., Holmes, B., Pollock, B., and Beville, R.: Clinical    Evaluation of the Therapeutic Efficacy and Tolerability of Piperacillin.       Antimicrobial Agents and Chemotherapy (1), 10-14, 1982.

19.  Lutz, B., Mogabgab, W.J., Pauling, B., Holmes, B., and Beville, R.: Ceftriaxone Compared to Penicillin for the Treatment of Uncomplicated    Gonorrhea in Females.  Presented at the 22nd Interscience Conference on Antimicrobial Agents and Chemotherapy, Miami, Florida, October 4-6, 1982. (Abstract No. 468)

20.  Lutz, B., Mogabgab, W.J., Parks, D., Pauling, B., and Beville, R.: Comparison of Ceftizoxime and Penicillin for the Treatment of Uncomplicated Gonorrhea.  Presented at the 22nd Interscience Conference on Antimicrobial Agents and Chemotherapy, Miami, Florida,   October 4-6, 1982. (Abstract No. 470)

21.  Lutz, B., Mogabgab, W.J., Pauling, B., and Beville, R.: Effective New  Betalactam Antibiotics in the Treatment of Gonorrhea.  Presented at the Southern Medical Association 76th Annual Scientific Assembly, Atlanta, Georgia, October 30-November 2, 1982.

22.  Lutz, B., Mogabgab, W.J., Williams, L., Pauling, B., and Holmes, B.:

Scientific Exhibit: Comparison of Minocycline and Penicillin for the Treatment of Gonorrhea.  Presented at the Annual Meeting of the American Academy of Dermatology, New Orleans, Louisiana, December 4-9, 1982.

23.  Lutz, B., Mogabgab, W.J., Parks, D., Pauling, B., and Beville, R.: Comparison of Ceftizoxime and Penicillin for the Treatment of        Uncomplicated Gonorrhea.  J. Antimicrobial.  Chemotherapy, (Suppl. C), 229-235, 1982.

24.  Lutz, B., Ngo, D., Williams, L., Holmes, B., Beville, R., and Mogabgab, W.J.:  Asymptomatic Campylobacter Infections in Male Homosexuals. Presented at the 83rd Annual Meeting, American Society for Microbiology, New Orleans, Louisiana, March 6-11, 1983.

25.  Lutz, B., Mogabgab, W.J., Parks, D., Pauling, B., and Beville, R.: Comparison of Ceftizoxime and Penicillin for the Treatment of Gonorrhea  and Other Antibiotics for the Treatment of Gonococcal Infections. Presented at the Third African Regional Conference on Sexually Transmitted Diseases, Nairobi, Kenya, March 16-20, 1983.

26.  Lutz, B., Mogabgab, W.J., Cassidy, M., Pauling, B., Holmes, B., and Beville, R.: A Single Injection of Moxalactam for Acute Gonorrhea. Clinical Therapeutics.  (5), 509-514, 1983.

27.  Lutz, B., Mogabgab. W.J., and Beville, R.: Effective New Beta Lactam        Antibiotics to Treat Gonorrhea.  Extensive Clinical Trials.  Presented at the 13th International Congress of Chemotherapy, Vienna, Austria, August 28-September 2, 1983.

28.  Mogabgab, W.J., Lutz, B., Thurm, R., Newman, T., and Beville, R.: A Comparison of Azethreonam and Spectinomycin for the Treatment of        Gonorrhea.  Presented at the 13th International Congress of Chemotherapy, Vienna, Austria, August 28-September 2, 1983. (Abstract P54 1/3-10)

29.  Lutz, B., Mogabgab, W.J., Williams, L., Funk, F., Pauling, B., and Holmes, B.: Comparison on Minocycline and Penicillin in the Treatment of Uncomplicated Gonococcal Infections in Adults.  Curr. Ther. Research (2) 165-173, 1985.

30.  Ware, M.A., Lutz, B., Holmes, B., Mogabgab, W.J., and Mogabgab, K.: Single Dose Cefuroxime Axetil for Gonorrhea.  Presented at the 24th        Interscience Conference on Antimicrobial Agents and Chemotherapy,    Washington, D.C., 1984.

31.  Lutz, B., Buntin, D., Taylor, S., Holmes, B., and Mogabgab W.J.: Ofloxacin

Lutz Appendix 2: CV
Page 9 of 13

for Seven Days and Ofloxacin, Single Dose Treatment of Adults with Acute Urethritis.  Presented at 25th Interscience Conference on    Antimicrobial   Agents and Chemotherapy, Minneapolis, Minnesota, 1985.  (Abstract 266)

32.  Lutz, B.: Health Risk Reporting - Focus on AIDS.  Presented to the Associated Press Managing Editor's Convention as a panel discussion    organized by the Georgetown University Medical Center Institute for Health Policy Analysis, San Francisco, California, October 28, 1983.

33.  Mogabgab, W.J., Lutz, B., Holmes, B., Beville, R., and Murray, M.: Treatment of Gonorrhea with Single Oral Dose of Ofloxacin.  Second World Congress on Sexually Transmitted Diseases, Paris, France, June 25-28, 1986.

34.  Lutz, B., Mogabgab, W.J., Holmes, B., Beville, R., and Murray, M.: A  Comparison of Ofloxacin and Doxycycline for the Treatment of Acute        Urethritis and Mucopurulent Cervicitis.  Proceedings of Second World    Congress on Sexually Transmitted Diseases, Paris, France, June 25-28,    1986. (Abstract 27-08)

35.  Lutz, B.: Bag Ladies in Houses.  Presentation at the Volunteer Information    Agency, Second Annual Community Resource Networking, Ochsner        Foundation Hospital, Jefferson, Louisiana, March 19, 1986.

36.  Lutz, B.: AIDS - What You Should Tell Your Family and Patients.  Continuing Education Program Presented by Xavier University of Louisiana, College of Pharmacy, March 20, 1988.

37.  Lutz, B.: Understanding AIDS, A Social Dimension Exploring the Psychological and Spiritual Aspects.  Pendleton Memorial Hospital, April 7, 1988.

38.  Lutz, B.: AIDS, A Public Health Perspective.  American Occupational Health  Conference, April 28, 1988.

39.  Lutz, B.: The New Orleans Response to the HIV Epidemic.  National AIDS    Minority Information and Educational Workshop, February 25, 1989.

40.  Youssef, R., Lutz, B., Buntin, D., Murray, M., Holmes, B., and Mogabgab, W.J.: Cefotetan Therapy of Gonococcal Urethritis and Cervicitis.    Proceedings of the 26th Interscience Conference on Antimicrobial Agents and Chemotherapy, 1986. (Abstract 535)

41.  Buntin, D., Lutz, B., Mogabgab, W.J., and Holmes, B.: Therapeutic Efficacy of Single Dose Oral Ofloxacin in Uncomplicated Gonococcal Infections.    Proceedings of the 5th Regional Conference on STDs, 1987.

42.  Mogabgab, W.J., Youssef, R., Lutz, B., Murray, M., Holmes, B., and
     Beville, R.: Ofloxacin Treatment of Non-gonococcal Urethritis and
     Cervicitis.  Proceedings of the 27th Interscience Conference on     Antimicrobial Agents
     and Chemotherapy, 1987. (Abstract 193)

43.  Youssef, R., Lutz, B., Murray, M., Holmes, B., Beville, R., and Mogabgab,
     W.J.: Enoxacin as Single Dose Therapy of Gonorrhea.  Proceedings of
     the 27th Interscience Conference on Antimicrobial Agents and     Chemotherapy, 1987.
(Abstract 194)

44. Youssef, R., Lutz, B., Buntin, D., Murray, M., Holmes, B., Beville, R., and     Mogabgab,
W.J.: RU 965 Macrolide Treatment of Non-gonococcal
     Urethritis.  Proceedings of the 27th Interscience Conference on
     Antimicrobial Agents and Chemotherapy, 1987. (Abstract 432)

45.  Mogabgab, W.J., Holmes, B., Murray, M., Beville, R., Lutz, B., and \
     Tack, K.J.: Randomized Comparison of Ofloxacin and Doxycycline for     Chlamydia
and Ureaplasma Urethritis and Cervicitis.  Chemotherapy,
     70-76, 1990.

46.  Montalvo, M., Portilla, I., Lutz, B., and Mogabgab, W.J.: Cefixime Therapy of  Acute
     Gonococcal Urethritis and Cervicitis.  Proceedings of the 30th Interscience Conference
     on Antimicrobial Agents and Chemotherapy,
     1990.   (Abstract 97)

47.  Judson, F.N., Eron, L.J., Lutz, B., Rand, K.H., Tennican, P.O., and
     Mogabgab, W.J.: Multicenter Study of a Single 500mg Dose of
     Cefotaxime for Treatment of Uncomplicated Gonorrhea.  Sexually  Transmitted
     Diseases, Jan-March, 41-43, 1991.  (1)

48.  Portilla, I., Lutz, B., Montalvo, M., and Mogabgab, W.J.: Oral Cefixime
     Versus Intramuscular Ceftriaxone in Patients with Uncomplicated   Gonococcal
     Infections.  Sexually Transmitted Diseases.  Mar-April.
     1992,   94-98, (2)

49.  Mogabgab, W.J., and Lutz, B.: Randomized Study of Cefotaxime Versus     Ceftriaxone
for Uncomplicated Gonorrhea.  Sou. Med. J. 1994.
     87(4):461-4.

50.  Mogabgab, W.J., Holmes, B., Murray, M., Beville, R., Lutz, B., and
     Tack, K.J.: Randomized Comparison of Ofloxacin and Doxycycline for     Chlamydia
and Ureaplasma Urethritis and Cervicitis.  Chemotherapy
     1990, 70-76.

51.  Lutz, B., Combs, K., and Mogabgab. W.J.: Low Incidence of CMV Retinitis     Associated
with Zidovudine/Acyclovir Therapy, 9th International
     Conference on AIDS, Berlin, Germany, June, 1993, 4th STD World     Congress.

Lutz Appendix 2: CV
Page 11 of 13

52. Lutz, B., Kron, F., Selle, R., Fishman, D., Bourgeois, Mogabgab, W.J.:      Antibiotic Cost Containment and the Community Hospital: A Case Study,   Infectious Disease Society of America 1993 Annual Meeting, New
          Orleans, Louisiana.

53. Lutz, B., Tillman, K., Santos, M., Morvant, C., and Webb, S.: Life
          Threatening Venous Thrombosis Associated with High Dose Epoetin
          Alf Therapy for HIV- Related Anemia.  9th International Conference on
          Aids, Berlin, Germany, June, 1993.

54. Webb, S., Gouse, V., Ford, A., Lutz, B.: Conflict in the Trenches: Local
          Health Officials and HIV Community Leaders.  9th International
          Conference on AIDS, Berlin, Germany, June, 1993.

55. Perry, E., Lutz, B., Mogabgab, W.J.: Post-mortem Liability of a Physician
          AIDS.  10th International Conference On AIDS, Yokohama, August 1994.

56. Tillman, K., Santos, M., Lutz, B.: Home Administration of Amphotericin B.
          10th International Conference on AIDS, Yokohama, August 1994.

57. Lutz, B., Mogabgab, W.J., Santos, M., Combs, K.: Delayed PML Diagnosis
          and d4t Treatment.  10th International Conference on AIDS, Yokohama,
          August 1994.

58. Lutz, B.: A Simple Approach to Complex Antibiotic Issues.  Parkview
          Hospital, Vicksburg, Mississippi, July 1995.

59. Lutz, B.: Antibiotic Update 1995.  River Parishes Hospital, Laplace,
          Louisiana, November, 1995.

60. Lutz, B.: Germs, Viruses, and Other Bugs in the Workplace.  Special  Presentation to the
          **Times Picayune** employees, December 1995.

61. Lutz, B.: Infectious Disease Case Studies.  Memorial Medical Center,
          September, 1996.

61 Lutz, B., Pitre, R., and Landry, J.: Practical considerations of outpatient
          Infusion therapy in the HIV arena. Infectious Disease Clinics of North
          America 1998;12:951-961.

61 Shannon E, Aseffa A, Pankey G, Sandoval, Lutz B: Thalidomide's ability to
          augment the synthesis of IL-2. Immunopharmacology 2000; 46, 175-179

62.  Lutz, B.: New Orleans Water from river to the lake. Lunchtime lecture
series, Tulane Staff Advisory Council, March 20, 2001

Hoadley D, Wahaj M, McGuire K, Forster A, Dean H, McCaffery K, Lutz B;Tulane University: HIV-related knowledge, attitudes, and practices among homeless adults in New Orleans, Louisiana. 7th International AIDS Conference
Florence, Italy, June 1991  (abstract no. W.D.4013)

Hoadley D, Wahaj M, Forster A, Dean H, McCaffery K, Lutz B: Tulane University, New Orleans. Demographic differences in HIV-related knowledge among homeless adults in New Orleans, Louisiana. 8th International AIDS Conference
Amsterdam, July  1992, (abstract no. PoD 5841)

Broussard M, Lutz B, Chenier G, and Palmisano D: Reporting Medication Errors: Point/Counterpoint Mandatory or Voluntary. Louisiana Society of Health-System Pharmacists Annual Meeting, New Orleans, April 5, 2001

Lutz, B. et al. (reported by) Septic arthritis following anterior cruciate ligament reconstruction using tendon allografts---Florida and Louisiana, 2000. MMWR 2001;50:1081--3.

Lutz, B.: Vaccine update with an emphasis on smallpox.
LAMMICO's 20th Annual Seminar, Orange Beach, AL, August 2003

Lutz, B.: Taking care of you. Employee Safety Seminar, New Orleans Department of Sanitation, New Orleans, LA, August 21 2003

Lutz, B: Curbside infectious disease consults at the Baptist. Grand Rounds, Memorial Medical Center, New Orleans, September 12, 2003

Lutz, B.: Adult immunizations.  Special Presentation to the **Times Picayune** employees, March 2003

Michael Robertson, et. al. and the V520 Study Groups: Safety Review of Merck's Adenovirus Type-5 HIV Vaccines in Healthy Adults. Abstract submitted to the Conference on Retroviruses and Opportunistic Infections, Boston, Feb. 2005

Lutz, B: Healthcare in New Orleans – Panel, French Quarter Town Hall, Oswald's with Harry Anderson, 1331 Decatur Street, March 29, 2006

Lutz, B.: Legionnaires' disease update and response to questions to address employee concerns after death of a coworker. U.S. Army Corps of Engineers, New Orleans Headquarters, April 6, 2006

Holditch, K., Lutz, B., and Hawley, C.: The History, Oddities and Eccentricities of Galatoire's. Tales of the Cocktail, Hotel Monteleone, New Orleans, July 20, 2007

Lutz, B, et.al: THE BREACH, Talkback panel on medical aspects of hurricanes and floods, Southern Rep, September 17, 2007

Lutz Appendix 2: CV
Page 13 of 13

Lutz, B: Influenza, MRSA, and Hurricanes. Presentation at Poydras Home, New Orleans, August 6, 2008

Lutz, B: MRSA – Bugging the Bug, Grand Rounds, Touro Infirmary, New Orleans, September 18, 2008

Lutz, B: What ails Louisiana? The state's 10 top health problems. Louisiana Life, September/October 2009, pp62-65

Lutz, B: Influenza 2009, a community lecture at the East Jefferson Public Library, Metairie, La, October 31, 2009

Lutz, B: New Orleans and the Kennedy Assignation – Dr. Mary's Monkey. Informed Sources, WYES-TV, November 20, 2009

Lutz, B: Special topics, Metairie Literary Guild, February 25, 2010

Lutz, B: Chapter on Health in New Orleans: The First 300 Years, Peggy and Errol Laborde, editors, Pelican Publishing Company, August 2017

Lutz, B: French Quarter Health Department in Exile, Keynote Speaker, 12th Annual Katrina Artistically Revisited, The Theaters at Canal Place, New Orleans, August 28, 2017

Lutz, B: Ignatius Reilly – a medical cornucopia. Presentation at Tuesday Book Club, New Orleans, September 12, 2017

Lutz, B: Panelist, Louisiana Book Festival, Baton Rouge, October 28, 2017

Lutz, B: Flood water hazards, The Weather Channel, July 2019.


Updated: February 2024

**APPENDIX 3: TESTIMONY FROM PRIOR 4 YEARS**

| Date | Case | Court | Retained by | Comments |
|------|------|-------|-------------|----------|
| Jul-20 | Anthony v. Ochsner Kenner, Figueroa | Testimony at a Daubert hearing | Plaintiff | subarachnoid hemorrhage dxed as viral meningitis |
| Jul-20 | Bluver v. Florida Dept of Health | Present for an emergency hearing by zoom | Defense | post-exposure rabies prophylaxis |
| Jul-20 | Anthony v. Ochsner Kenner, Figueroa | Daubert hearing Jefferson Parish | Plaintiff | subarachnoid hemorrhage dxed as viral meningitis |
| Apr-21 | Bertrand v. Sasol Chemicals USA LLC | No. 2:21-CV-00405, (W.D. La) | Defense | fume exposure, asthma |
| Apr-21 | McCraney v. Farm Bureau | Deposition St. Tammany Parish | Defense | MVC, narcotics, resp distress, MRSA |
| Mar-22 | Blanton v. Appalachian Regional and Dr. Echeverria | Deposition Harlan Circuit Court Kentucky | Defense | MRSA, abscess |
| Mar-22 | Linda Amos v Paradise Pools | Deposition Florida | Plaintiff | Legionaires' disease |
| Apr-22 | Harris, Deaton estate | Deposition | My patient | Family dispute |
| May-22 | Boykin,Donald v, | Trial testimony by video Rock Hill, SC | Plaintiff | MRSA sepsis |
| Jun-22 | Moorehead,Myron v Concentra | Deposition for trial Worker's Compensation District 07, Louisiana | Defense | COVID workplace |
| Jun-22 | Elligott (Prince) v. McElligott | Deposition Docket No. 2020-0612-B Lafayette, LA | Defense | STD divorce case |
| Jul-22 | Knoth,Stephanie | Trial Mississippi | Plaintiff | Infectious complications gastric device |
| Jul-22 | Rush v. Hill | Trial testimony Pikeville, KY | Defense | Leg amputation in pt w Charcot-Marie-Tooth Disease |

Lutz Appendix 3: List of Prior Cases
Page 2 of 2

| Aug-22 | KG v. DM | Federal hearing in New Orleans - Magistrate Judge Currault | Plaintiff | HIV transmission Case sealed. |
|--------|----------|------------------------------------------------------------|-----------|-------------------------------|
| Nov-22 | Adams,Wade v. Dr. Wood | Deposition East Baton Rouge Parish | Plaintiff | Fournier gangrene |
| Feb-23 | Young,Steven (Schaefer) v. Bennett Hailey, MD | Deposition Jefferson Parish | Defense | meningitis death case |
| Nov-23 | Chun v. N&F | Deposition Jefferson Parish | Defense | recurrent aspiration pneumonia |
| Nov-23 | Soutullo v. Clark, MD | Deposition Jefferson Parish | Plaintiff | Cervical epidural abscess |
| Jan-24 | Evans,Timothy v. Teamhealth and Travelers | Deposition for trial Louisiana WC case | Defense | COVID workplace |