January 21, 2024

Liskow and Lewis
Attn: Michael Mims, esq.
Hancock Whitney Center
701 Poydras St. Suite 5000
New Orleans, LA, 70139

Re: *Elias Jorge "George" Ictech-Bendeck v. Waste Connections Bayou, Inc., et al.,* No. 18-7889; c/w No. 18-8071, No. 18-8218, and No. 18-9312, Section "E" 5, United States District Court for the Eastern District of Louisiana*; and Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.,* No. 19-11133, Section "E" 5, United States District Court for the Eastern District of Louisiana

Dear Mr. Mims,

As you know, I reviewed the records with regards to the above case*,* and on January 19, 2024, evaluated Mary Ann Winningkoff at the office of Drs. Combs and Lutz on 2622 Jena St. in New Orleans, LA. By way of introduction, I am a physician with dual specialization in Internal Medicine and Psychiatry. My primary employment is with the Southeast Louisiana Veteran's Healthcare System, where I see patients as well as supervise residents and medical students, in both our inpatient medical hospital and outpatient mental health clinic. Mrs. Winningkoff arrived for the appointment on time unaccompanied. Mrs. Winningkoff was advised that the independent medical evaluation would not create a patient-physician relationship and was for the purpose of providing medical findings regarding his case.  She was also told a report would be given to the legal team who requested this evaluation.

A summary of my findings is detailed below.

Note: The phrase "relevant time period" should be considered from the middle of 2017 to the end of 2019, or the time in question for the purposes of this civil case.

**NARRATIVE HISTORY**

Incident History:

1. Mrs. Winningkoff is a 79-year-old woman residing in Jefferson Parish, LA. She first moved to her home in 2006.
2. Prior to 2017, she noticed occasional smells, rarely, that she suspected might be related to the landfill. She never had any medical complications related to these odors but notes that they were infrequent enough that it is difficult to remember.
3. Beginning in 2017 she began noticing frequent noxious odors, which she characterized as a "sulfur, petroleum, burning" type scent. This would occur at least weekly, sometimes several times a week, and might last several days.
4. Mrs. Winningkoff alleges a number of symptoms that occurred as a result of the odor that centers primarily around headaches.

    a. She characterized her headaches as throbbing pain mainly centered behind the right eye. They occurred every other week to every week and would last several days at a time.
    b. She called these headaches "migraines" and said she had had similar headaches in quality prior to 2017. Prior to menopause, she said she frequently got similar headaches around the time of her menstrual cycle, or when she was experiencing significant stress. She does not recall if she ever had headaches in response to an odor before.
    c. The headaches during the relevant time period were similar in quality, but worse in severity and duration. For instance, she said that prior to the relevant time period, when she had a headache, she would take an aspirin or Excedrin and experience significant relief. In contrast, the headaches beginning in 2017 that she associates with odors were unrelieved by over-the-counter analgesics and would go "on and on," sometimes for several days at the time.
    d. She does say that when she left her house, the headache would sometimes improve.
    e. The headaches were frequently associated with other symptoms, most notably irritation around the eyes. She endorses eye irritation, blurry vision, and swelling of her eyes. She showed me a photo on her phone with a timestamp dated Nov 19, 2018, which does show some eye swelling.
        i. She notes that in 2018 she had a procedure with an ophthalmologist that involved draining her lacrimal ducts.
    f. She says that she mentioned her complaints during a 2017 visit to her nurse practitioner Silverman. She was unsure of the diagnosis at that time but notes she was given some "nasal sprays." She does not recall if she sought additional medical attention for the above complaints.

5. She first stated she did not have anxiety during the relevant time period, then revised her response and said she did. She did not visit a medical or mental health professional with these complaints. She denied any difficulty meeting her social or occupational functioning during the relevant time period due to anxiety. For example, she was still able to attend church, social, and family functions without difficulty.
6. She said that she had trouble falling asleep due to the noxious odor during the relevant time period but did not experience fatigue or drowsiness. She denies previous issues with insomnia. She notes that she occasionally has issues with sleeping now since her husband passed away. She did not visit a medical or mental health professional for these complaints.
7. She denies having diarrhea, dizziness, heart issues, hives or rash associated with odors during the relevant time period.

**MEDICAL HISTORY**

Prior to Incident Medical Problems

1. Chronic headache – As above, Mrs. Winningkoff endorses a history of chronic headaches, which she called "migraines," although she notes that she has never been seen by a neurologist or headache specialist. She denies ever having any head imaging.
2. Hyperlipidemia
3. Systolic Hypertension
4. Hypothyroidism
5. Lower Back pain – Mrs. Winningkoff notes that she has been told she has a "weak back" and notes she has had imaging of her spine but is not sure of the results. She says that she was told to do physical therapy and that she completed it.
6. Seasonal Allergies – She notes that she has seasonal allergies and often takes Allegra.

Current Medical Problems

1. She reports no change in her current medical problems.

Additional history

1. She denies a history of chronic asthma or bronchitis.
2. She denies a history of breathing issues.
3. She denies a history of diabetes mellitus or pre-diabetes.
4. She denies a history of sleeping difficulties.
5. She denies a history of mental health treatment.
6. She denies a history of stroke or TIA
7. She denies a history of treatment by a gastroenterologist, pulmonologist, or neurologist.
8. She denies ever having a sleep study.
9. She does note that she has been told that she has "asbestos scarring" on a chest radiograph.

Hospitalizations

1. She has been hospitalized at least 4 times.
    a. For each of her three children she was hospitalized overnight but denied any complications. The years were 1965, 1967, and 1983.
    b. She had a hysterectomy in 1980 that required hospitalization.
    c. She is unsure if she was hospitalized when she had her tonsils removed in 1948 as an infant.

Current Medications

1. Levothyroxine: 100 mcg by mouth daily.
2. Valsartan-hydrochlorothiazide: 320 mg/25mg by mouth once daily.
3. Ezetimibe: 10 mg by mouth once daily.
4. Aspirin: 81 mg by mouth once daily.
5. K-Chlor (potassium supplement): 20 mg by mouth once daily.
6. Allegra – as needed for allergies

Allergies

    She is allergic to codeine, Sulphur, drugs, and Celebrex.
    She states that she is allergic to cats.
    She states she occasionally has seasonal allergies or hay fever.

Surgical History

1. Tonsillectomy (as a child, does not recall year)
2. Hysterectomy at age 35
3. Cataract surgery (unknown year)
4. "Eye Duct Surgery" - 2018
5. "Shoulder Surgery" for torn rotary cuff – unknown year

Family History

Her mother and father both suffered from hypertension.
    Her mother died of "old age."
    Her father died of a cerebral aneurysm.

Social History

1. She is a widow and lives alone.
2. She is a graduate of high school.
3. She is retired from the national guard where she worked most of her career as a civilian bookkeeper.
4. She has three biological children and two stepchildren, all grown, and has seven grandchildren, most of whom live in the area with whom she is close.
5. She is active in a local senior club and attends church regularly
6. She endorses "rare" alcohol consumption.
7. She denies tobacco or nicotine consumption.
8. She denies Illicit drug use.

**REVIEW OF SYMPTOMS**

Constitutional: Denies fever, chills, or unintentional weight loss.
HEENT: Denies changes in vision or hearing.
Respiratory: Denies cough, shortness of breath, wheezing.
Cardiovascular: Denies chest pain or palpitations
GI: Denies nausea, vomiting, diarrhea, abdominal pain.
GU: Denies dysuria and frequency
MSK: Denies current neck, back, or joint pain.
Skin: Denies new rash or pruritis
Neurological: Denies headache, new focal weakness, or vision changes
Psychiatric: Denies recent changes in mood or anxiety.

**EXAMINATION**

Vital Signs: T 97.3; BP 125/83; W 195#; H 63 inches; RR 15; P 73; pO2% not obtained
Gen: Alert, cooperative.

Eyes: EOMI. Anicteric
HENT: Mucous membranes moist. No ulcers noted. Neck supple, circumference grossly enlarged, no lymphadenopathy.
Lungs: Symmetrical expansion. No crackles, wheezes, or rhonchi.
Cardiovascular: Regular Rate and Rhythm, no murmurs, rubs, or gallops. No JVD.
Abdomen: Soft, non-tender, non-distended. BS+ in all 4 quadrants.
Extremities: No swelling.
Neurological: CN II-XII intact. Strength and ROM full. Cautious gait.
Psychiatric: Mood and affect within normal limits.

## ADDITIONAL EVALUATION

STOP BANG – 1
GAD 7 – 0
PHQ 2 - 0

## RECORDS REVIEWED

1. Plaintiff Fact Sheet
2. Deposition dated April 19, 2023.

## SUMMARY:

Mrs. Mary Ann Winningkoff is a 79-year-old woman with a history of hypothyroidism, hypertension, hyperlipidemia, lower back pain, and suspected migraines evaluated in clinic for odor related complaints.

## FINDINGS

1. Based on the historical nature of the patient's complaints, their apparent resolution, and limitations in recollection and memory, I don't believe it is possible to conclude with any degree of medical certainty that Mrs. Winningkoff's headaches and eye irritation are a result of odor related exposures.
2. I do note that, based on history, Mrs. Winningkoff's headaches are equivocal for a migraine type headache.
    a. Mrs. Winningkoff reports a history of migraine, although I note she has never visited a headache specialist or neurologist.
    b. Her headaches are somewhat consistent with migraine with or without aura, in that they are unilateral, pulsatile or throbbing, frequent and lengthy.
        i. Migraine headaches also require nausea, vomiting, photophobia or phonophobia. Mrs. Winningkoff did not experience nausea or vomiting associated with her headaches. She experienced eye irritation and swelling which is equivocal for photophobia.
        ii. Migraine with aura requires reversible neurological symptoms such as deficits in visual, sensory, speech or language processing, motor, or retinal functions. Again, her eye irritation and swelling are equivocal for these diagnostic criteria.

3. If it is determined that her headaches are caused by the odors, her headaches would be more consistent with an exacerbation of a chronic issue rather than a de novo diagnosis because of odors.
    a. She has a history of similar headaches in the past.
    b. Odors are a known trigger for migraine type headaches.
    c. However, I am not certain that these represent true migraine headaches based on the lack of appropriate diagnostic criteria as above.
4. Other possibilities for her headache include sinus type headache, often in relation to chronic allergies or a sinus infection, less likely is a cluster type headache or a cervicogenic headache from her known back injury.
5. Her sleep disturbances are more consistent with a secondary, rather than a primary, sleep disorder.
    a. The American Academy of Sleep Medicine (AASM) distinguishes between primary, unable to attributed to an existing medical, psychiatric, or environmental (such as drug abuse or medications), and secondary, attributable to a primary medical illness, mental disorder, or other sleep disorder. (Source: www.Aasm.org/resources/factsheets/insomnia.pdf).
    b. The AASM also distinguishes insomnia from disturbed sleep, which occurs when an individual does not have the opportunity to get enough sleep (i.e. swing shift workers).
    c. A diagnosis of insomnia requires associated additional symptoms in addition to lack of sleep, typically daytime fatigue or deficits in social or occupational functioning, which Mrs. Winningkoff did not endorse.
6. Based on the historical nature of the complaints, limits in the patient's recollection, and lack of associated medical report, I would be unable to diagnose her with any sort of anxiety disorder based on the evaluation in clinic today.
    a. I note that her GAD-7 score, a common screening tool used by primary care physicians to evaluate for anxiety and the need for mental health referral or initiation of pharmacotherapy, was 0 on my evaluation, which would not prompt additional evaluation for a mental health disorder.
    b. These complaints are historical in nature, which complicates a diagnosis without current manifestations. Historical data is often used to corroborate a diagnosis, but a historical diagnosis typically prompts search for contemporaneous objective evidence for support, particularly in the context of a medicolegal evaluation.
    c. I also note that these complaints did not rise to the severity to warrant evaluation of Mrs. Winningkoff, either voluntary or involuntary, and did not appear to have any impact on her daily life or functioning, which is a core criterion for most anxiety related disorders.
7. I note her findings under "additional evaluation," particularly the PHQ-2. PHQ-2 and GAD-7 are brief, patient reported screening questionnaires intended to evaluate for anxiety or depression-related symptoms at the time of completion. They are frequently used to determine the need for referral to a mental health professional or the initiation of a pharmacotherapy or behavior-based intervention in a primary care clinic. The value of 0

would not prompt additional evaluation for a mental health disorder and would suggest a lack of anxiety or depression-related symptoms.
8. Her STOP BANG score of 1 would not prompt an evaluation for sleep apnea.

**Thank you for the opportunity to participate in the evaluation of Mary Ann Winningkoff. My findings are based on review of the cited records, direct report of the patient, and my personal evaluation of the patient. This evaluation is valid at the time of writing with the information available to me. I reserve the right to revise it should more information become available.**

Respectfully submitted,

X *Charles Santos MD*
  Charles Santos, MD

Charles Santos, MD
Clinical Faculty, Tulane University, Dept. of Psychiatry and Internal Medicine
Staff Physician, Southeast Louisiana Veteran's Healthcare Center
Board Eligible, Internal Medicine and Psychiatry