```
                                                           Page 1

 1         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF LOUISIANA
 2   - - - - - - - - - - - - - - -+
                                  |
 3   ELIAS JORGE "GEORGE"          | CIVIL ACTION NO.
     ICTECH-BENDECK,               |
 4                                 | 18-7889 c/w 18-8071
             Plaintiff,            | 18-8218, 18-9312
 5                                 |
        vs.                        |
 6                                 | SECTION E(5)
     WASTE CONNECTION BAYOU,       |
 7   INC., et al,                  |
                                   |
 8          Defendants.            |
                                   |
 9   - - - - - - - - - - - - - - -+
                                   | CIVIL ACTION NO.
10   Related Case:                 |
                                   | 19-11133, c/w
11   FREDERICK ADDISON, et al,     | 19-14512
                                   |
12      Plaintiffs,                | SECTION E(5)
                                   |
13      vs.                        |
                                   |
14   LOUISIANA REGIONAL LANDFILL|
     COMPANY, et al,               |
15                                 |
         Defendants.               |
16                                 |
     (Applies to Both Cases)       |
17   ----------------------------x
18              Video Deposition of
19                   JAMES LAPE
20            Monday, April 22, 2024
21                  10:28 a.m.
22
23
24
25   Reported by:  Laurie Donovan, RPR, CRR, CLR
```

Page 2

6   April 22, 2024

7   10:28 a.m.

9   Video Deposition of JAMES LAPE, held in
10  person in Washington, D.C. and also via
11  videoconference (Zoom), with the witness appearing in
12  person and some parties participating remotely, some
13  parties appearing in person, pursuant to the Rules of
14  the United States District Court in the Eastern
15  District of Louisiana, subject to such stipulations as
16  may be recited herein or attached hereto, before
17  Laurie Donovan, a Registered Professional Reporter and
18  notary public of the District of Columbia, who
19  officiated in administering the oath to the witness.

1   was emissions from Phase IVA, modeled as an area
2   source located at the ground surface.
3          Does that sound right?
4      A   Correct.
5      Q   So you did not model any emissions from
6   point sources at the landfills, correct?
7      A   That's correct.
8      Q   Am I correct that you don't plan to testify
9   about the bases of Ramboll's estimation of an emission
10  rate?
11     A   Not as a peer review, no.
12     Q   Could you explain what you mean by that?
13     A   Well, as you established, I'm not an expert
14  in that subject area, so that I would consider -- to
15  be able to provide a peer review, I would, I would
16  expect to be an expert.  I have done emissions
17  modeling throughout my career, so I do have expertise
18  in it, but I wouldn't consider myself an expert, if
19  that makes sense.
20     Q   I think it does.
21         So in this case, do I understand correctly
22  you would -- if you refer to Ramboll's methods in
23  estimating landfill gas emissions, you would do so
24  simply for the purpose of characterizing the source?
25     A   Correct.


Page 32

1  emission rate values for the modeling you're
2  presenting in this phase of the case?
3      A    That change came late in the game, late in
4  the process, so I already had all the modeling
5  completed under the supplemental rate, and it was my
6  understanding -- supplemental rate, and my
7  understanding was that this was two, like another
8  sensitivity analysis.  It wasn't meant to replace the
9  supplemental data that we had originally used.
10     Q    Did you -- separate from this table
11 generally, did you form an opinion as to the accuracy
12 of the emission rate that Ramboll provided to you?
13     A    Yes.
14     Q    When we talked about this in the general
15 causation phase, your conclusion, perhaps after some
16 discussion, was no, that you had not formed an opinion
17 as to the accuracy of the emission rate that Ramboll
18 provided to you.
19          Has your opinion on the accuracy of the
20 emission rate changed from general causation to today?
21          MR. FOSTER:  Objection to form.
22          THE WITNESS:  My opinion about the Ramboll
23      emission rate is based on my comparison of the
24      model results to environmental data that I did,
25      so when you look at a model, the concentrations

1      are linearly related to the emission rate.  So
2      when I see concentrations from the model that are
3      consistent with the environmental data, then it
4      gives me confidence that the emission rate is
5      appropriate.
6  BY MR. PAUL:
7      Q    So your opinion on the accuracy of the
8  emission rate is based on your own evaluation of
9  measured data versus your modeling predictions, right?
10     A    Correct.  That comparison, right.
11     Q    It's not based on your evaluation of how
12 Ramboll estimated that emission rate, right?
13     A    No.  Again, that would be the peer review
14 aspect of it that I did not conduct, no.
15     Q    We're going to talk about it later today,
16 but the comparison to measured data that you just
17 mentioned, was that different in this stage of the
18 case than it was in the general causation phase?
19     A    No.  My recollection is that the metrics or
20 the data that I used for that corroboration was the
21 same between the two.
22     Q    We'll come back to that, so if there's any
23 nuance to that, I will give you a chance to answer
24 those questions.
25     A    Thank you.

1   to use in this calculation.
2        Q    And that judgment that it was reasonable to
3   use, is that based on your experience with CalPUFF
4   modeling?
5             MR. FOSTER:  Objection; form.
6             THE WITNESS:  In my experience with modeling
7        overall, yes, absolutely.
8   BY MR. PAUL:
9        Q    You reviewed the reports submitted in this
10  case by Dr. Zannetti, right?
11       A    I was -- I reviewed the report that was
12  submitted three weeks after our report, and then there
13  was another report that just recently came out that
14  I've only been able to marginally look at.
15       Q    And thanks for hearing my question
16  correctly.  I did mean specific, this specific
17  causation phase.  I'm not referring to his report from
18  the general causation phase.
19            So yes, he issued two reports in the
20  specific causation phase.  The second one adjusted his
21  modeling based on a change to the emission rate.
22            Does that sound familiar?
23       A    That's my understanding, yes.
24       Q    Okay.  Do you agree with the CalPUFF method
25  that Dr. Zannetti used?

Page 50

1   A    Yes, because he basically just adopted the
2   modeling that I had done and used the emission rate
3   that he had determined or the emission rate that he
4   wanted to use, so the difference between my modeling
5   and his modeling is exclusively the emission rate.
6       Q    Aside from the emission rates that you both
7   used, do you plan to offer any opinion criticizing
8   Dr. Zannetti's method?
9       A    Insofar as his CalPUFF modeling, I would
10  have no objection to what he did, because it's
11  basically what I did.
12      Q    So I'd like to talk a little more about that
13  method.  There are many variables that can affect the
14  fate and transport of hydrogen sulfide as it moves
15  away from the source, right?
16      A    Yes.
17      Q    And would you agree that wind direction and
18  wind velocity influence fate and transport of hydrogen
19  sulfide?
20      A    Yes.
21      Q    We've touched on this, but would you agree
22  that the concentrations of the modeled compound
23  generally decrease with distance from the source?
24      A    In this case, since we're evaluating a
25  ground level area source, that's generally the

```
 1
 2
 3
 4
 5            CERTIFICATE OF SHORTHAND REPORTER
 6            I, Laurie Donovan, Registered Professional
       Reporter, Certified Realtime Reporter, and notary
 7     public for the District of Columbia, the officer
       before whom the foregoing deposition was taken,
 8     do hereby certify that the foregoing transcript
       is a true and correct record of the testimony
 9     given; that said testimony was taken by me
       stenographically and thereafter reduced to
10     typewriting under my supervision; and that I am
       neither counsel for, related to, nor employed by
11     any of the parties to this case and have no
       interest, financial or otherwise, in its outcome.
12
              IN WITNESS WHEREOF, I have hereunto set my
13     hand and affixed my notarial seal this 24th day
       of April 2024.
14
15
16     _____
17
18     LAURIE DONOVAN, Notary Public
19     for the District of Columbia
20
21
22
23
24
25
```