## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| **Plaintiffs** | **NO. 19-11133, c/w 19-14512** |
| **V.** | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| **Defendants** | **JUDGE: Morgan** |
| | **MAGISTRATE JUDGE: North** |
| *Applies to: Both Cases* | |

---

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT TO DISMISS PLAINTIFFS' TRADITIONAL NEGLIGENCE CLAIMS DUE TO LACK OF EVIDENCE OF SCOPE OF THE DUTY

Plaintiffs oppose the Defendants' Motion For Partial Summary Judgment To Dismiss Plaintiffs' Traditional Negligence Claims Due To Lack Of Evidence Of Scope Of The Duty. For the reasons stated herein, the Motion should be denied.

## I.    INTRODUCTION

In direct defiance of the Court's admonition that Parties should discuss any dispositive motion with the Court, in advance of filing, Defendants have moved for summary judgment on the "traditional negligence claims." Defendants assert that PlaintiffS' expert, Mr. Sananes, was required to, but did not, establish "applicable industry standards" and was required to, but did not, opine on the geographic extent of odors that might escape from the Landfill if Defendants violated their duties to prevent and control odors. Therefore, they say, the "traditional negligence claims" must be dismissed.

No basis exists in fact or law for this Motion.

## II.    STANDARD ON SUMMARY JUDGMENT.

When a party moves for summary judgment for "lack of evidence," that party bears an initial burden of showing that evidence is in fact lacking. *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 160 (1970) ("As the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact.").  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Lozano v. Collier*, 98 F.4th 614, 620 (5th Cir. 2024) *See* F.R.Civ.P, Rule 56 Advisory Committee note, subdivision e ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.")

Here, Defendants assert that there is no evidence to establish the "scope of duty," and rely entirely upon their contention that one of Plaintiffs' experts did not provide that evidence, ignoring all of the other facts that exist, including facts that were established in the General Causation Phase, and particularly including the Court's ruling that general causation has been established in this case.  R.Doc. 323.  Not even being close to showing the absence of a genuine issue of material fact, the motion must be denied.

Defendants assert that, because Plaintiffs are accusing them of "professional negligence," Plaintiffs must establish "applicable industry standards" through expert testimony.  But operation and maintenance of a landfill is not a "profession," and none of the Defendants are "professionals." As a result, their conduct is measured by whether they exercised "reasonable care under the circumstances" and not whether they exercised "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances."

2

Defendants further assert that, because Louisiana courts have used the phrase "scope of duty" in reference to the foreseeability element of the negligence claim, the expert opinion on the existence of the duty must include the geographical extent of the foreseeable harm. Nothing supports this argument.

## III.   STATEMENT OF FACTS.

The following facts were set forth in the Court's Findings and Conclusions on General Causation (R.Doc. 323) (footnotes omitted):

In October 2016, the Landfill first began accepting "spent lime" as a special waste. Spent lime is an industrial byproduct created when an industry uses lime-based sorbents to reduce the amount of sulfur dioxide in air emissions. All spent lime contains some amount of sulfate. Sulfur-containing wastes may generate hydrogen sulfide gas under certain landfill conditions. R.Doc. 323 at 5-6.[1]

---

[1] The dangers of hydrogen sulfide have long been known. In a published opinion in 1956, the Fifth Circuit explained,

> [T]he conclusion is inescapable that the fatal gas was the common, frequently encountered and well-known hydrogen sulphide. In this process it is evident that we must draw on general knowledge, including scientific and technical information, not to arrive at a fact conclusion that it was hydrogen sulphide, but to determine whether a contrary conclusion on this record can have reasonable support. Once that is determined, the consideration of this factual issue of cause, forseeability and prudence becomes a matter for jury decision on the new trial on the basis of evidence, factual and scientific, there presented.

> This analysis starts with the uncontradicted evidence of the 'sulphur' odor, the smell of rotten eggs, and the location of this well in West Texas. The presence of hydrogen sulphide in West Texas oil operations (drilling, transportation, refinery) has long been known as has been the acute hazard to health and life resulting from it.

> Its extreme hazard arises in part from the fact that while, in lower concentrations, it has the characteristic odor of rotten eggs (the gas is a by-product of decomposition, putrefaction of organic matter), this is lost as concentration increases and, in the meantime, continued exposure adversely affects the function of the sense of smell, increases respiration and consequent inhalation of the gases

3

Hydrogen sulfide may be produced in a landfill when there is liquid water, a source of soluble sulfate, sulfate-reducing bacteria, organic material, an anoxic environment (i.e., lacking oxygen), an appropriate pH range (between 4 and 9), and an appropriate temperature range (between 86°F and 100°F).   These conditions will "likely be present in a [municipal solid waste] co-disposal scenario." Gypsum, chemically known as calcium sulfate dihydrate, and fly ash are sources of soluble sulfate. Spent lime contains gypsum.  R.Doc. 323 at 6.

The Parish and the Waste Connections Defendants are Defendants in this case because, beginning in October 2016, they accepted the spent lime into the Landfill when (1) they knew that the spent lime contained sulfates, in particular, gypsum;[2] (2) they knew that the Landfill contained large amounts of liquid water,[3] (3) they knew that the spent lime would be mixed with organic

---

producing, in turn, paralysis of the respiratory system and rapid death. The gas is heavier than air, *50 readily settles in low and damp places, is highly soluble in water with gas being released on agitation and is so toxic that even minute concentrations are deadly. The usual telltale warning of its presence, besides the rotten egg odor, is burning of eyes (conjunctivitis), irritation of the nose, throat and lungs, dizziness, gagging, shortness of breath, vomiting, and similar effects, all of which were present here.

This gas in oil operations has been a killer. It has long been the object of study and investigation on a wide front with recognition by the industry of its hazards in Texas and elsewhere and the precautions necessary to avoid its awful toll. This includes drilling operations and, particularly, drilling contractors.

*Gulf Oil Corp. v. Wright*, 236 F.2d 46, 49–50 (5th Cir. 1956).

[2] *See* **Exhibit 1***,* email from Brian Handley to Rick Buller dated October 5, 2016, JP_JPLF_00343151 , with selected exhibits, including the Waste Connections information form (*184-185) and the Rain Carbon Safety Data Sheet (*186-188).  Both documents recited that the spent lime was 5% to 20% calcium sulfate dihydrate, which is gypsum, and the information sheet explained that material was "generated from reagent hydrated lime in an SO2 [sulfur dioxide] scrubber." (*184). Mr. Buller approved the profiles the next day. **Exhibit 2, WC_JPLF_00263528.**

[3] In particular, by this time, Waste Connections' predecessor had been complaining about deficiencies in the leachate system for more than four years. *See* **Exhibit 3,** letter from WC Vice President Rob Nielsen to Parish Chief Operating Officer Keith Conley, dated May 30, 2018, WC_JPLF_00407619, recounting the history of problems with the leachate removal system, with

materials;[4] and (4) they knew that other conditions for the generation of hydrogen sulfide gas were all present.[5]

Almost at this same moment in time, Waste Connections' "Director of CCR Disposal," Mr. Joe Laubenstein, sent a PowerPoint presentation to Brett O'Connor, the Waste Connections engineer for the Southern Region, who oversaw the Jefferson Parish Landfill. **Exhibit 4, WC_JPLF_00523182.** CCR's are "coal combustion residuals," one of which is materials generated from flue gas desulfurization (FGD), described as a "By-product of scrubber system used to reduce sulfur dioxide"—the same process that produced the Rain Carbon spent lime— (*192), and, importantly, discussed the challenges for municipal solid waste landfills handling CCR's (*211).   The PowerPoint noted that "FGD can be calcium sulfite, magnesium sulfite, calcium sulfate, among others," that "[u]nder conditions within a landfill, bacteria can convert the sulfates and sulfites into hydrogen sulfide which can cause odor problems," and that it "[h]elps not to comingle CCRs and MSW," (id.)  and that the landfill "[m]ay need to segregate the materials." (*215).

Waste Connections further knew that the River Birch Landfill had been accepting the Rain Carbon spent lime, but was stopping its acceptance of spent lime[6] and was discontinuing the

---

attachments.  Note, in particular, page *627 (9/12/2012 email stating "The leachate system again is so backed up leachate is running out of the cleanout pipes."); page *639 ("Leachate forcemain system, sump pumps, Lift Stations, pumping, all appears to be undersized.")

[4] All municipal solid waste landfills contain organic materials.

[5] All municipal solid waste landfills generate hydrogen sulfide case in some amounts, meaning sulfur-reducing bacteria are present, along with the anoxic environment and other conditions.  **Exhibit 5, Nielsen Dep. excerpts,** page 22-23 ("All landfills generate hydrogen sulfide.").

[6] **Exhibit 6,** email thread between Marc Blanco (Rain Carbon) and Dawn Thibodaux dated October 4, 2016 (WC).  Blanco: "River Birch has given us a dead line [sic] of October 14th is the last day they will accept the spent lime.  I have no other location to bring this waste to."

solidification of liquid waste altogether because of problems with odors.[7] In fact, two months earlier, on August 31, 2016, in response to odor complaints in the community, River Birch technical director Vic Culpepper had written to representatives of the Waggaman community (copying Parish officials Rick Buller and Mike Lockwood) regarding River Birch's plan to reduce the odors, which included, among other things, "Re-evaluating all waste streams and eliminating particularly troublesome waste stream not [sic] matter how small or large." **Exhibit 9, Culpepper email RIVER_BIRCH_0003855.** River Birch's decision to stop accepting the Rain Carbon spent lime followed shortly thereafter.

All of these facts (and there are more) establish that Waste Connections and the Parish knew or should have known that accepting the Rain Carbon spent lime in the Jefferson Parish Landfill would lead to the generation of hydrogen sulfide gas in large quantities.

To make matters even worse, when the Parish and the Waste Connections Defendants allowed the spent lime into the landfill, they knew, in 2016, that there was no gas collection system in Phase 4A of the Landfill, where all of the spent lime would be placed, and thus there was no way to collect the hydrogen sulfide gas that would be generated. Then, when some gas wells were installed in part of Phase 4A beginning in 2018, they did not work properly, were constantly flooded with water, and did not collect landfill gas, with the result that landfill gas, including hydrogen sulfide was emitted to the atmosphere. *See generally* **Exhiibt 10,** excerpt from

---

[7] **Exhibit 7,** email thread between landfill manager Rickie Falgoust to District Sales Manager Jonathan DeWitt, September 1, 2016, WC_JPLF_00271367. DeWitt:  River Birch "informed me they will no longer solidify starting 9/15/16."  Falgoust: "River Birch had bad odor complaints of the past couple months" Falgoust then raised the issue with his direct boss, James Gunter:  "The subject of solidification has come up at JP again.  River Birch has chosen to no longer solidify.  Reason being odors….If we choose to begin and [sic] all in solidification pit the citizens may likely from on [sic, probably frown] on us.  What's your opinion?"  **Exhibit 8,** WC_JPLF_00270624.

Assessment of the Jefferson Parish Landfill Gas Field, dated May 22, 2019, by River Birch (finding, *inter alia*, that 50% of the gas wells in Phase 4A lacked sufficient vacuum to collect gas). Aptim is a Defendant because it was Aptim's job to operate and maintain the gas collection system after it was installed in Phase 4A, and part of that job was to remove the water in the gas wells that were preventing gas from being collected.  **Exhibit 11,** Aptim Contract, §2.1 (labor to pump leachate or condensate from gas wells was Routine Served), Exhibit B, Scope of Word, §1.1.1 (routine operations and maintenance included "pumping leachate from gas wells as needed").

The obviously foreseeable result of this negligence was the generation of hydrogen sulfide gas that made its way into the community and made the lives of residents intolerable.

## IV.   ARGUMENT.

At the outset, Defendants forget that expert testimony is governed by Federal Rule of Evidence 702 and, under that rule, expert testimony cannot be used at all unless the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  F.R.Evid. Rule 702(a).  As the Supreme Court of the United States explained decades ago in *Salem v. U.S. Lines Co*., 370 U.S. 31 (1962),

> expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.

370 U.S. at 35 (internal quotation marks and citation omitted).

In this case, it <u>does</u> take specialized knowledge to understand some of the facts, such as the chemical makeup of spent lime and how it is converted to hydrogen sulfide gas, and that sulfates can generate hydrogen sulfide gas when mixed with water and organic materials, along with the other conditions present at the Jefferson Parish Landfill.  However, once those facts are known

and explained (and for the most part those facts are not disputed), it does not take any specialized knowledge to conclude that the Defendants here, knowing what they knew, should not have allowed the spent lime into this Landfill.  Had they refused to accept the spent lime (as, apparently, every other landfill, including River Birch, had done), the odor problems plaguing the community would not have occurred. That conclusion can be drawn as a matter of common sense, and expert testimony is not required to connect the dots.

### A.    The duty/risk analysis under Article 2315.

In negligence cases, Louisiana law relies upon a "duty/risk analysis," under which the plaintiff must prove five separate elements:  There are:

 (1) the defendant had a duty to conform his conduct to a specific standard (the duty element);

(2) the defendant's conduct failed to conform to the appropriate standard (the breach element);

(3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);

(4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of duty element); and,

(5) proof of actual damages (the damages element).

*Farrell v. Circle K Stores, Inc*., 2022-00849 (La. 3/17/23), 359 So. 3d 467, 473.  Under this analysis, the "duty" is not the same as the "standard of conduct," and determining whether the duty exists in the first instance is not the same as determining whether the substandard conduct was a legal cause of the injuries claimed.  Yet, Defendants conflate and confuse these concepts.

As set forth below, the determination of both the duty and the standard of conduct are questions of law.  The purported lack of expert testimony (even if it were true that there was none) is not dispositive of either issue.

**B.      The existence of the duty and the standard of conduct are questions of law.**

"Duty is defined as the obligation to conform to the standard of conduct associated with a reasonable person in like circumstances." *Cook v. Depingre*, 49,527 (La. App. 2 Cir. 1/14/15), 161 So. 3d 914, 916.  Questions of the existence of a duty and the general standard of conduct required by that duty are questions of law. *Cell-O-Mar, Inc. v. Gros*, 479 So. 2d 386, 392 (La. Ct. App. 1985), writ denied, 481 So. 2d 1332 (La. 1986), and writ denied, 481 So. 2d 1333 (La. 1986); *see Farrell*, 359 So.2d at 474.

The basic duty in negligence cases in found in Article 2315 of the Louisiana Civil Code, which states, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  Article 2316 provides that "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."  Thus, the existence of the duty is established by the Civil Code.

The standard of conduct is likewise an issue of law.  More than 50 years ago, the Louisiana Supreme Court explained, "Under [Articles 2315 and 2316] the courts of this state have been given a broad, general principle of legislative will under which we are required to determine when the interest of society is best served by allowing the act of man which causes harm to be accepted as a proper standard of conduct or when society is best served by requiring one who harms another to respond in damages for the injury caused." *Langlois v. Allied Chem. Corp*., 258 La. 1067, 1075, 249 So. 2d 133, 137 (1971).

Louisiana law makes clear that "[e]very negligence case must be decided on its own facts and circumstances." *Todd v. State Through Dep't of Soc. Servs., Off. of Cmty. Servs*., 96-3090 (La. 9/9/97), 699 So. 2d 35, 39.  The Louisiana Supreme Court has instructed that, "In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique

facts and circumstances presented," and that the court "may consider various moral, social, and economic factors, including the fairness of imposing liability; the economic impact on the defendant and on similarly situated parties; the need for an incentive to prevent future harm; the nature of defendant's activity; the potential for an unmanageable flow of litigation; the historical development of precedent; and the direction in which society and its institutions are evolving." *Posecai v. Wal-Mart Stores, Inc*., 99-1222 (La. 11/30/99), 752 So. 2d 762, 766.

The standard of conduct may be found in other sections of the Code, statutes and other laws which deal with the responsibility of certain persons, the responsibility in certain relationships, and the responsibility which arises due to certain types of activities. *Langlois v. Allied Chem. Corp*., 258 La. 1067, 1077, 249 So. 2d 133, 137 (1971). In *Langlois*, a fireman was injured by a release of gases from an industrial facility. The court explained, "One standard of conduct appropriate for consideration here is expressed in Article 669, a specific codal rule of conduct governing the activities of man in relation to his neighbors and a rule of vicinage." That statute reads:

> If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.

Article 669 was applied in *Langlois* as the basis for the standard of conduct. Although *Langlois* was decided before Article 667 was amended to add the "knew or should have known" predicate for liability, courts have consistently found that the vicinage statutes define predicate conduct for liability under Article 2315. *Dean v. Hercules, Inc*., 328 So. 2d 69, 72 (La. 1976) ("it can be said that a violation of article 667 constitutes fault within the meaning of article 2315"); *Thomas v. A. Wilbert & Sons, LLC*, 2015-0928 (La. App. 1 Cir. 2/10/17), 217 So. 3d 368, 388, writ denied,

2017-0952 (La. 11/13/17), 229 So. 3d 478, and writ denied, 2017-0967 (La. 11/13/17), 230 So. 3d 204 ("Dow's negligence in contaminating the aquifer amounted to violations of the duties set out by Civil Code Article 667 and the Mineral Code's article 10, which in turn constitutes "fault" within the meaning of article 2315.).

For example, in *Acadian Heritage Realty, Inc. v. City of Lafayette*, 434 So. 2d 182, 186 (La. Ct. App.), writ denied, 440 So. 2d 733 (La. 1983), and writ denied, 440 So. 2d 733 (La. 1983), a landfill case, the court considered "the trial court's findings of unnecessary odor and flies emanating from the site as a result of the failure to daily cover the garbage as required by the defendant's own rules and regulations" along with testimony "that the smell comes and goes and varies in intensity, depending partly upon weather conditions." 440 So.2d at 186.  Further, the "intervenors testified that, because of the landfill, they have been forced to curb their outside activities greatly and have been deprived of the use and enjoyment of their property"—the same issue as presented in this case.  Id. The court concluded that the duty/risk analysis weighed in favor of the Plaintiffs' recovery.  Id.

In this case, likewise, there can be no doubt that owners and operators of the Jefferson Parish Landfill owed a duty to their neighbors and to the community at large to take reasonable steps to prevent and control odors.  That duty is reflected in statutes (e.g., La. Civ. Code § 667[8]), ordinances,[9] and even in the contracts.  In its contract with Waste Connections, the Parish

---

[8] "Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

[9] Jefferson Parish Code (1961) § 9-23 ("It shall be unlawful for any person to permit or cause the escape of such quantities of soot, cinders, noxious acids, fumes, and gases in any such place or manner as to be detrimental to any person or to the public or to endanger the health, comfort and safety of any such person or of the public, or in any such manner as to cause or have a tendency to cause injury or damage to property or business. The escape of such matter is declared

mandated that Waste Connections "shall implement a comprehensive odor control plan that includes both operational best management practices and odor control systems." **Exhibit 12.** ¶ 5.**H.**   Because landfill operations include the decisions of what waste to accept and what waste to reject, "operational best management practices" for odor control must include decisions on what waste is allowed into the Landfill.

The duty and standard of conduct at issue here required the Waste Connections Defendants and the Parish to refrain from accepting waste into the Landfill that would generate odors they could not control.  In their motion, Defendants do not directly challenge the existence of the duty or the standard of conduct.  Instead, Defendants argue that expert testimony is required to establish "industry standards of care". That argument has no bearing at all here.

## V.   LANDFILL OPERATION AND MAINTENANCE IS NOT A PROFESSION

"Generally, breach of a duty is the failure to exercise reasonable care under the circumstances." *Harvey v. Hamby*, 23-0084, p. 13 (La. App. 4 Cir. 10/4/23), 376 So.3d 225, 236 (citations omitted).   The Sananes Report is not limited to "industry standards" but also refers to the standard of care and best management practices.  It states,

> The following paragraphs: (a) summarize the main opinions detailed in Ramboll's January 28, 2021 Expert Report, Ramboll's June 16, 2021 Expert Rebuttal Report, and Ramboll's August 27, 2021 Supplemental Report; and (b) describe how previously identified operational and maintenance deficiencies at the JP Landfill are inconsistent with **the standard of care, industry standards and best management practices to control hydrogen sulfide generation and emissions at solid waste disposal facilities.**

**Exhibit 13** at 8.

---

to be a public nuisance and may be summarily abated by the director of inspection and code enforcement, or by anyone whom he may designate for such purpose.")

Louisiana recognizes a distinction between standards of care owed by professionals and those owed by others. That distinction is illustrated by *Hutchinson v. Patel*, 637 So.2d 415, 424 (La. 1994), a suit against a psychiatrist for failing to warn the plaintiffs that his patient was a serious danger to others. The court explained that "the duty to predict whether a patient poses a serious danger to others and the duty to warn the foreseeable victim of that danger are separate and distinct duties governed by completely different standards of care." The court explained that: the duty to predict whether a patient poses a serious danger to others—i.e., to diagnose the patient— is owed to the patient and requires the exercise of "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances"; the duty to warn the foreseeable victim of that danger is owed to the third party and requires the exercise of "reasonable care under the circumstances."

Defendants assert that this case is governed by the "general standard of care applicable to all professions," but cites no case or statute to establish that the operation of a landfill is a "profession." Nor do they contend that any of the Plaintiffs are clients of the "professionals." The case it does cite, *Nicholson & Loup, Inc. v. Carl E. Woodward, Inc.*, 596 So. 2d 374, 381 (La. Ct. App.), writ denied, 605 So. 2d 1098 (La. 1992), and writ denied, 605 So. 2d 1098 (La. 1992), was a malpractice suit against an engineering firm. [10]

Plaintiffs are aware of no case, state or federal, holding that the operation and maintenance of a landfill is a profession. It is not. *See Brown's Ferry Waste Disposal Ctr., Inc. v. Trent*, 611 So. 2d 226, 229 (Ala. 1992) (contract to develop and operate a landfill was not a contract for professional services). *See also* PROFESSION, Black's Law Dictionary (11th ed. 2019) ("A

---

[10] Even in professional negligence cases, expert testimony is not required where the facts are such that a lay person can infer negligence. *See Pfiffner v. Correa*, 1994–0924, 1994–0963, 1994-0992 (La. 10/17/94), 643 So.2d 1228.

vocation requiring advanced education and training; esp., one of the three traditional learned professions — law, medicine, and the ministry"); PROFESSIONAL, Black's Law Dictionary (11th ed. 2019) ("Someone who belongs to a learned profession or whose occupation requires a high level of training and proficiency.").

Waste Connections itself did not require any advanced learning for its employees, even those to whom it assigns titles like "engineer" and "environmental scientist." The Southern Region Vice President was not an engineer (Nielsen)[11], and neither was the manager who had overall charge of the Engineering Department for all of Waste Connections and then the Southern Region (Chris Ruane). The Region "Compliance Engineer," Nikki Crews, was not an engineer[12] and "Environmental Scientist" Nick Collins was not a scientist. [13]

Waste Connections also opposed efforts to determine what Waste Connections itself did at other landfills.[14]

Defendants cite *Crane-McNab v. Cnty. of Merced*, 2010 WL 4024936, at *16 (E.D. Cal. Oct. 13, 2010), which stated that "operation a landfill is a specialized area." Similarly, both *Brantley v. Int'l Paper Co*., 2017 WL 2292767, (M.D. Ala. May 24, 2017), and *Nat'l Tel. Co-op. Ass'n v. Exxon Corp*., 38 F.Supp.2d 1, 10 (D. D.C. Nov. 19, 1998), cited by Defendants, merely restated the general rule that expert testimony typically is required to establish the standard of care when the subject matter is beyond the understanding of the average juror. The fact that expert

---

[11] Mr. Nielsen has a degree in agriculture from the University of Maine, and is not a licensed engineer. **Exhibit 5, Nielsen Dep. at 20.**

[12] *See* **Exhibit 14,** deposition of Nikki Crews P.12 L.18-23

[13] *See* **Exhibit 15** deposition of Nick Collins P.34 L.1–P. 35 L.21

[14] *See* R.Doc. 383 (Waste Connections' opposition to Plaintiffs' motion to compel discover) at 15, arguing that information regarding other landfills' acceptance of sulfur containing materials was not relevant.

testimony may be appropriate whenever the subject is beyond the knowledge and understanding of everyday people does not mean that opinions by an expert create a professional duty of care.

As a result, the standard of care applicable here does not require that the services be performed with the same degree of skill and care exercised by others in the same profession in the same general area, but instead requires "reasonable care under the circumstances."  Even as to the negligent design element of Plaintiffs' claims, the professional standard still does not apply because the Plaintiffs are not in the same positions as patients in *Hutchinson*, to who the professional duty was owed but, instead, are in the position of third parties, for whom the standard was "reasonable care under the circumstances."

Even if the exercise of "that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of [that professional specialty] under similar circumstances" were required in this case, there is plenty of evidence of it, because Waste Connections and the Parish did not perform to the same standards as River Birch Landfill, right next door.  Before the Jefferson Parish Landfill began accepting the spent lime, Rain Carbon was disposing of the spent lime in the River Birch Landfill.  When River Birch was having odor problems, it identified the problem, notified the community and undertook to prevent future issues, including by re-evaluating its waste streams.  In particular, as Waste Connections itself knew, River Birch stopped using the Rain Carbon spent lime for solidification of liquid waste and stopped accepting the Rain Carbon spent lime altogether as part of that re-evaluation.

As a result, the Defendants' first proposition—expert testimony is required to establish industry standards of care—must be rejected.

## VI.   THE "SCOPE OF DUTY" PRESENTS ISSUES OF FACT.

The fourth element, of the duty/risk analysis; i.e., the legal causation or scope of duty inquiry, "assumes a duty exists and questions whether the injury the plaintiff suffered is one of the

15

risks encompassed by the rule of law that imposed the duty." *Harris v. Boh Bros. Constr. Co*., LLC, 2020-0248 (La. App. 4 Cir. 5/26/21), 322 So. 3d 397, 415, writ denied, 2021-00910 (La. 10/19/21), 326 So. 3d 254. It is a mixed question of law and fact.

There is no "rule" for determining the scope of the duty. *Roberts v. Benoit*, 605 So. 2d 1032, 1044 (La. 1991), on reh'g (May 28, 1992). "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." Id.  As Justice Crain has explained,

> when the question presented is whether a stated duty will be extended to support liability for a particular circumstance, analysis of the defendant's conduct should be in terms of the scope of the duty. See Louisiana Tort Law at § 5.02[7]. The question is, "should this plaintiff recover from this defendant for these particular damages that arose in this particular manner?" Id. at § 3.05. This inquiry is fact-specific. Id.

*Doe v. McKesson*, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 541 (Crain, J., concurring).

Stated simply, as it relates to the facts of this case, the question is:  should these plaintiffs, who were injured by the odors emanating from the landfill, recover from this defendant who (1) failed to prevent odors from leaving the landfill or (2) caused the odors by allowing hydrogen-sulfide generating materials into the landfill knowing there was no means of controlling the odors generated or (3) failed properly to operate and maintain the leachate and gas collection systems? Because the answer to this question is fact specific, it cannot be resolved on a motion for summary judgement.

In *Depedro v. State through Dep't of Transportation & Dev*., 2022-1028 (La. App. 1 Cir. 12/28/22), writ denied, 2023-00129 (La. 4/4/23), 358 So. 3d 873, the court concluded, "there are genuine issues of material fact as to whether the plaintiff's actions are covered in the defendant's scope of duty," and the court ruled that "[t]hese issues of fact preclude this court from determining whether the defendant's conduct foreseeably resulted in the plaintiff being injured or whether the

plaintiff's conduct was outside of the scope of duty owed by the defendant and was the sole cause

of his injury. Therefore, summary judgment is not appropriate." Id.

The cases cited by Defendants do not provide otherwise; nor do they require expert

testimony.

Indeed, Defendants contend that summary judgment must be entered because Mr. Sananes

did not opine on foreseeability,[15] arguing therefore that proof of foreseeability is a required element

---

[15] Defendants assert that Mr. Sananes' report "is silent on the issue of to whom those duties are owed, such as the geographical areas within which it was foreseeable that Defendants' actions could cause harm." R.Doc. 560-1 at 3.  Mr. Sananes report, however, mentions foreseeability no less than 12 times.  In Section 6.5 beginning on page 14-15 ("Jefferson Parish failed to ensure that Waste Connections, its landfill operator, operated and maintained the landfill gas collection and leachate collection systems so as to prevent noxious odors from escaping from the landfill, ***foreseeably affecting neighboring individuals…*** This failure resulted in adverse impacts to the gas collection system, which in turn caused noxious odors to escape from the landfill, ***foreseeably affecting neighboring individuals***. …(Page 15)  Aptim, the operator of the landfill gas collection system, failed to ensure that it was operated and maintained so as to prevent noxious odors from escaping from the landfill, ***foreseeably affecting neighboring persons***… Jefferson Parish and Waste Connections co-disposed sulfur-containing materials, such as spent lime, with MSW, ***which have the well-known reasonably foreseeable potential to generate noxious odors that would escape the landfill and affect neighboring individuals…*** (Page 58) In general, a landfill owner or operator must exercise reasonable care to prevent noxious odors from escaping its property and/or landfill and ***foreseeably affecting neighboring individuals***….  (Page 60) ("[They] failed to take corrective action, thereby, ***foreseeably causing noxious odors to escape the landfill and harm neighboring individual***s…  Jefferson Parish failed to ensure that Waste Connections, its landfill operator, or Aptim, its landfill has collection system operator, operated and maintained the landfill gas collection and leachate collection systems so as to prevent noxious odors from escaping from the landfill, ***foreseeably harming neighboring individuals***…. This failure resulted in adverse impacts to the gas collection system, which in turn caused noxious odors to escape from the landfill***, foreseeably harming neighboring individuals…*** Furthermore, given the deficiencies in the leachate and gas collection systems, Waste Connections did not undertake other odor control measures to ensure that noxious odors did not escape from the landfill, ***foreseeably harming neighboring individuals***…Aptim, the operator of the landfill gas collection system, failed to ensure that it was operated and maintained to prevent noxious odors from escaping from the landfill, ***foreseeably harming neighboring persons***.  (Page 62) "Jefferson Parish and Waste Connections disposed of sulfur-containing materials, such as spent lime or fly ash, with MSW, which have the ***reasonably foreseeable potential to generate noxious odors that could escape the landfill and affect neighboring individuals***.")  Defendants asked Mr. Sananes in his deposition, **page 73,** "How far away from a landfill is harm foreseeable to the municipal solid waste landfill?" He answered "Well, certainly your adjoining properties. To the extent that there's any complaints

17

in proving negligence. In *Hill v. Lundin & Assocs., Inc.*, 260 La. 542, 549, 256 So. 2d 620 (1972),

however, one of the cases relied upon by the Defendants, the Supreme Court of Louisiana rejected

that very proposition.  The court concluded,

> Foreseeability is not always a reliable guide, and certainly it is not the only criterion
> for determining whether there is a duty-risk relationship. Just because a risk may
> foreseeably arise by reason of conduct, it is not necessarily within the scope of the
> duty owed because of that conduct. Neither are all risks excluded from the scope of
> duty simply because they are unforeseeable.

256 So.2d at 622.  In that case, a contractor left a ladder leaning against a house. Someone else

moved the ladder and left it lying on the ground.  The plaintiff tripped over the ladder, was injured,

and sued the contractor. The court reasoned that there was no evidence the contractor could have

anticipated a third person would move the ladder to where the plaintiff could trip over it, and "A

rule of law which would impose a duty upon one not to leave a ladder standing against a house

does not encompass the risk here encountered."  Id. at 623.  There was no requirement of expert

testimony.  Another case cited by Defendants, *Todd v. State Through Dep't of Soc. Servs., Off. of

Cmty. Servs.*, 96-3090 (La. 9/9/97), 699 So. 2d 35, 39, recognized the same rule, explaining:

> We are mindful that foreseeability, as the determining test, is neither always reliable
> nor the only criterion for comparing the relationship between a duty and a risk.
> Some risks that arise because of a defendant's conduct are not within the scope of
> the duty owed to a particular plaintiff simply because they are unforeseeable.

699 So.2d at 39. Both *Hill* and *Todd* concluded that "The ease of association of the injury with the

rule of conduct that is urged, however, is the proper inquiry."  *Hill*, 256 So.2d at 622; *Todd*, 699

So.2d at 39.  Here, the injury is harm caused to individuals residing in the community surrounding

the Landfill, who were exposed to the stench emanating from the Landfill for extended periods of

---

that are received, you know, the record shows that there's plenty of concerns that are emanating
from all throughout the area, those would be foreseeable neighbors, at least gives you warning that
something may be happening that people are complaining about operations." **Exhibit 21, Sananes
dep. pages.**

time.  The rule of conduct at issue here (the duty to prevent and control odors) is easily associated with injuries resulting from exposure to odors.  While the Defendants urge a geographic limitation, the proper extent of any geographical limitation is an issue of fact based on the specific facts of the case regarding each specific Plaintiff that cannot be resolved on summary judgment.[16]

In this case, the vicinage statutes and even the Jefferson Parish Ordinance imposed a duty on defendants to prevent and control noxious odors from affecting and injuring the neighbors.  As a result, if they fail, damage to the neighbors is foreseeable.  And, who qualifies as a neighbor is an issue for the Court, not expert testimony.  *See Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. CV 18-7889, 2019 WL 4111681, at *4 (E.D. La. Aug. 29, 2019) ("Louisiana courts have held "the word 'neighbor' as used in Article 667 is indefinite and refers to any land owner whose property may be damaged irrespective of the distance his property may be from that of the proprietor whose work caused the damage.").[17]

Defendants cite *Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427, 445 (5th Cir. 2021) for the unremarkable proposition that "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." Because the inquiry is fact-driven, it is not dependent upon whether a particular expert offers an opinion on foreseeability, and it is not a topic for summary judgment.

---

[16] Persons living adjacent to the landfill are perhaps more likely to experience landfill odors than persons living a mile or more away.  But the injuries resulting from the invasion of the odors are not governed merely by proximity, but also by other facts like the amount the emissions, which vary from case to case.  But the duty owed—to prevent the odors—is the same.  Thus, the existence of the duty is not dependent upon proximity.

[17] As discussed extensively elsewhere, experts are not allowed to give opinions on issues of law, and who is and who is not a neighbor is one of those issues.  Despite Defendants contention that Mr. Sananes has not opined on "to whom" the duty was owed, he in fact did so repeatedly in his Report, and in his deposition.

And, in C*tr. for Restorative Breast Surgery, L.L.C. v. Blue Cross Blue Shield of Louisiana*, No. CV 11-806, 2017 WL 3308919, at *8 (E.D. La. Mar. 31, 2017) (Morgan, J.), this Court summarized the law in this area:

> The "legal cause" inquiry—also known as the "scope of the duty" inquiry—"is ultimately a question of policy as to whether the particular risk falls within the scope of the duty." To prove legal causation, Plaintiffs must prove the harm caused to them was within the Defendants' scope of liability, in other words, the risk was within the scope of the duty. Accordingly, the scope of the Defendants' duty and the foreseeability of the Plaintiffs' harm must be established before determining whether legal cause exists.

Id. at *8. Defendants assert that when this Court said, "the scope of the Defendants' duty and the foreseeability of the Plaintiffs' harm must be established before determining whether legal cause exists," the Court was ruling that foreseeability had to be determined as part of determining the existence of the duty. But that is not what the Court, or any of the other courts addressing the issue, have said. Instead, the Court was merely observing that the scope of the duty and foreseeability of harm were elements to be considered in deciding causation.

Other cases cited by Defendants are equally inapposite. In *In re Signal Int'l, LLC*, 579 F.3d 478, 495 (5th Cir. 2009), an admiralty case, the court found that the allision (one ship striking a stationary ship) was foreseeable. Although an expert testified in the case, there was no holding that expert testimony was required to establish foreseeability.

Finally, in *Lloyd's Leasing Ltd. v. Conoco*, 868 F.2d 1447, 1449 (5th Cir. 1989) (per curiam), another admiralty case, the court ruled that "[d]etermination of the tortfeasor's duty, and its parameters, is a function of the court. That determination involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." (citations omitted). In that case, the Court noted that, "The appellants' experts testified that tracking damages are a probable consequence of oil spills that wash ashore in inhabited areas, a commonsense

conclusion that gains little force when voiced by an expert." Id. at 1449. In other words, expert testimony was not required to show foreseeability. Notably, in that case the expert testimony was presented in opposition to a no-evidence motion for summary judgment. Id, at 1450 (concurring opinion). Because the expert testimony did not address the probability of the oil reaching a specific spot, there was no evidence to establish it, expert or otherwise.

## VII.   THE FACTS SHOW THAT ODORS TO PERSONS IN THE COMMUNITY WERE COMPLETELY FORESEEABLE.

In this case, in contrast to Defendants' contention that migrations of H2S odors could not possibly extend beyond the borders of the landfill, such effects are, quite obviously, foreseeable. Experts for both sides have calculated historical wind data and used it to model the dispersion of the odors into surrounding communities. *See* Reports of James Lape and Dr. Paolo ZannettI, and Defendants themselves contend that each of the Plaintiffs was downwind of the Landfill for a certain percentage of the time. *See* Expert Report of Dr. John Kind.

In 2006, the Parish commissioned the engineering firm of Camp, Dresser & McKee (CDM) to prepare an Odor Control Management Program. **Exhibit 16.** The CDM Report recommendations included having a proactive system to respond to complaints, including a hotline, "Daily odor monitoring in surrounding areas and neighborhoods," and an outreach program. Id. at *036.[18] When Waste Connections was the operator, they set up an odor hot line, organized and conducted odor patrols, created odor reports and attended community meetings *See*,

---

[18] That report noted that "The odor potential for industrial waste depends on the material and can range from no odor to extremely high depending on the type of waste. Id at WC_JPLF_00488031. Section 3.1 of the Report, entitled "Odor Control Management Practices," listed three main "strategies" for the odor control program, one of included "waste screening practices." Id at *043. The "waste screening practice" for the JPLF included the identification of problematic wastes and the adoption of specific procedures and protocols regarding them. See id. at *044 to *047.

*e.g.*, **Exhibit 17** Dawn Thibodaux email history of the hotline (WC_JPLF_00413912); **Exhibit 18** (minutes of meeting of Waggaman Civic Association with Parish and Progressive Waste in attendance, six months before the spent lime was accepted), **Exhibit 19** (2015 Annual Odor Report); **Exhibit 20,** Odor Control Plan from Waste Connections 2012 contract.

Defendants certainly knew that odors could affect the community. If it were not foreseeable that odors could leave the Landfill and affect the communities, there would be no need for any of this.

The LDEQ Regulations define "landfill" as "a facility for the disposal of solid waste … in a manner that protects human health and the environment." 33 LA ADC Pt. VII § 115. Landfills like the Jefferson Parish Landfill must have an "area master plan" that includes "the location of the closest population centers," 33 LA ADC Pt. VII § 709.A.1.e., and are required to provide information to LDEQ regarding .the percentage of existing land use in a three-mile radius including land-use for residential, health care facilities, schools, and recreational activities. Id. at § 709.A.5. *See id.*, § 709.A.9 ("A statement of the estimated population, the source of the estimation, and the population density, within a 3-mile radius of the facility boundary, is required for all facilities."). These regulations, likewise, would be unnecessary if the escape of odors into the community could not be foreseen.

As a result, not only is there no law to support the Defendants' motion, no facts exist to support it, either.

**VIII.   CONCLUSION.**

For the foregoing reasons, the Motion should be denied.

Respectfully submitted, this 13th of June. 2024.

_____ /s/ S. Eliza James _____

FORREST CRESSY & JAMES, LLC
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

_____ /s/ Eric C. Rowe _____

C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)
James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com
*Counsel For Addison Plaintiffs*
