## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,**<br>     **Plaintiffs** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-11133, c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL<br>COMPANY, ET AL.,**<br>     **Defendants** | **SECTION: "E" (5)** |
| *Applies to: All Cases* | **JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
## <u>OPINIONS, REPORTS, AND TESTIMONY BY MATTHEW STUTZ</u>

# TABLE OF CONTENTS

I. BACKGROUND ................................................................................................3

    A.  Hwy 90 H2S Concentration ...................................................................3

    B.  Use of LandGEM for C&D Landfills .....................................................9

    C.  Specific Causation ...................................................................................9

    D.  Mr. Stutz's Modeling of Emissions from JPLF .....................................9

II. LAW & ARGUMENT ....................................................................................10

    A.  Federal Rule of Evidence 702 Standard ...............................................10

    B.  Mr. Stutz's opinions regarding H2S emissions from Hwy 90 were based on reliable methods and data ....................................................12

    C.  Mr. Stutz's Emissions Estimate is Not Too Late ................................13

    D.  Mr. Stutz's estimates of emissions from the Jefferson Parish and River Birch Landfills are reliable ......................................................15

III. CONCLUSION .............................................................................................17

Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc., Aptim Corporation, and Jefferson Parish, ("Defendants") submit this memorandum in opposition of the Plaintiffs' motion to exclude expert opinions, reports, and testimony by Defendants' expert, Matthew Stutz ("Mr. Stutz").

Plaintiffs' brief is a perfect example of why Mr. Stutz's testimony is appropriate and necessary. Plaintiffs attack the weight of information that Mr. Stutz used without any input by their own expert, Mr. Jose Sananes. Plaintiffs' uninformed attack on Mr. Stutz's information and methods lays bare the misunderstandings and false impressions that would be presented to the jury without the assistance of testimony by a trained and experienced landfill engineer. The issues raised in Plaintiffs' motion are appropriate topics for cross-examination, but they fall far short of upsetting the reliability and relevance of Mr. Stutz's proposed testimony.

Plaintiffs focus their efforts on attacking Mr. Stutz's use of a 2008 gas concentration from the adjacent Hwy 90 Construction & Demolition ("C&D") debris landfill ("Hwy 90"), arguing that the influence of waste from 2005's Hurricane Katrina makes that concentration unreliable. But Mr. Stutz explains that the mix of sulfur-bearing materials in C&D waste is not significantly changed by storm events, and that an increase in the volume of gas after Hurricane Katrina would not change the concentration of H2S. As a debate over the reliability of underlying data, Plaintiffs may have identified a topic for cross-examination, but not exclusion of Mr. Stutz's testimony.

Plaintiffs also attack Mr. Stutz's use of a well-established model, LandGEM, to estimate gas emissions from the Hwy 90 landfill, arguing that LandGEM cannot be used for C&D landfills. But the use of LandGEM for C&D landfills is accepted in the solid waste industry and specifically anticipated by regulations of the Environmental Protection Agency. Again, Plaintiffs' argument goes to the weight of Mr. Stutz's opinions but not their reliability under Rule 702.

Finally, Plaintiffs question specific aspects of how Mr. Stutz modeled emissions from the Jefferson Parish Landfill ("JPLF"). As with his estimates from Hwy 90, Mr. Stutz used reliable methods and publicly reported data to select reasonable modeling factors for his JPLF emission estimate, and the results of his process are consistent with both EPA default factors and the factors selected for numerous previous modeling efforts for the JPLF. Plaintiffs' arguments on this point do not call into question the reliability of Mr. Stutz's methods or bases under Rule 702.

## I.   BACKGROUND

Most of Plaintiffs' discussion of background facts is an attack by counsel on Mr. Stutz's use of the only measurements of the concentration of hydrogen sulfide (H2S) at the Highway 90 C&D Landfill. Plaintiffs' other background points assert that the model Mr. Stutz used to estimate H2S emissions from Hwy 90 landfill, LandGEM, "was not created for use at C&D landfills." And Plaintiffs assert that because Mr. Stutz did not estimate an emission rate from the Jefferson Parish Landfill ("JPLF"), River Birch Landfill ("RBLF"), or Hwy 90 Construction & Demolition debris landfill ("Hwy 90") during the General Causation phase of this case, he should not be allowed to do so for the specific causation phase. Finally, Plaintiffs argue that Mr. Stutz's method for estimating emissions from the JPLF should have relied on different modeling factors.

### A.   Hwy 90 H2S Concentration

Mr. Stutz modeled H2S emissions from the adjacent Hwy 90 Construction and Demolition debris landfill ("Hwy 90") for use by Defendants' expert Dr. Zannetti in predicting impacts from that landfill on surrounding areas.[1] Plaintiffs appear to argue two points to attack the sufficiency of the H2S concentration Mr. Stutz used. First, Plaintiffs discuss the amount of organic matter

---

[1] See M. Stutz, Addendum to Expert Report (April 4, 2024) ("Stutz Rept.") Executive Summary (ECF Doc. 558-2 at p. 5 of 520).

disposed of in the Hwy 90 landfill in the years following 2005's Hurricane Katrina and distinguish later years in which vegetative wastes were not separately reported. Pl. Br. 2-5. Then Plaintiffs summarize a process in which in 2008 Hwy 90 applied for a permit to operate gas flares, then rescinded that permit application in 2010. Plaintiffs misunderstand that process to indicate that H2S concentrations had dropped to "miniscule" levels by 2010, and on that basis they question Mr. Stutz's reliance on the 2008 H2S measurements.

With regard to the post-Katrina disposal of vegetative material, Plaintiffs' implication is that C&D landfills do not produce significant H2S under ordinary circumstances, but that the addition of Katrina-related vegetative waste increased H2S production. As Mr. Stutz explained in deposition and as explained in his accompanying affidavit, C&D landfills regularly generate H2S under normal conditions.[2] According to Mr. Stutz, the addition of vegetative debris after Hurricane Katrina would not increase the concentration of H2S in Hwy 90's landfill gas, but would increase the total volume of gas, and would likely increase the amount of methane in the gas.

---

[2] Mr. Stutz's affidavit supplements his April 4, 2024 report and does not offer any new opinions. *See* Fed. R. Evid. 26(e) (creating a duty to supplement). As Mr. Stutz stated, the purpose of the affidavit is to supplement his previously disclosed opinions to address the misguided criticisms of Plaintiffs in their motion to exclude. *See Courville v. CITGO Petroleum Corp.*, 2023 WL 3668410, at *2 (W.D. La. Apr. 18, 2023) (allowing expert's supplemental report when it rebutted opponent's challenges and supplemented information provided in the original report). *See also Brown v. WellPet LLC*, 2023 WL 3483935 (N.D. Ind. Mar. 31, 2023) ("[T]he foregoing paragraph in the Declaration responds to the *Daubert* criticisms raised by WellPet in its motion to exclude Cal's opinions and testimony. As such, it does not constitute a new opinion."); *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58 (1st Cir. 2011) (citing *Muldrow ex rel. Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (explaining how Rule 26 permits an expert to supplement, explain and elaborate on material contained in his report); *Caesar Petrochemicals, Inc., v. Dongbu Hannong Chemical Company Limited*, 769 F. Supp. 2d 269, 279 (S.D. N.Y. 2011) (citations omitted) ("[T]o the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery."); *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006) ("While Rule 26 demands that expert disclosures be 'complete,' there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain. In other words, an expert need not stand mute in response to an opposing party's *Daubert* motion.").

In support of their argument that H2S was only created from Katrina-related vegetative matter combined with C&D debris, Plaintiffs incorrectly assert that C&D landfills "do not [ordinarily] accept organic or vegetative waste." Pl. Br. at 3.[3] But C&D waste routinely contains organic materials, such as wood (flooring, roofing, studs) and paper (drywall is bound by two layers of thick paper). Indeed, the Hwy 90 Landfill is a permitted woodwaste landfill. Pls' Ex. 8 at p. 2 ("III. Description"). As Mr. Stutz understood when preparing his model and as explained in his accompanying affidavit, C&D waste contains enough organic material to generate H2S under normal conditions. As explained in a study that Plaintiffs' proposed landfill engineering expert and Mr. Stutz both relied on:

> The results indicate that C&D debris landfills that accept drywall should expect H2S concentrations even without the presence of a carbon source (i.e., yard waste). **The presence of yard waste at C&D debris landfills is neither harmful nor helpful in H2S production, because under ideal conditions the paper backing provides enough carbon for bacterial activity.** Under long-term conditions, yard waste could provide [additional] carbon sources besides the paper backing, but sulfate sources could be depleted by then. (emphasis added)[4]

In other words, the disposal of vegetative waste may have increased the total gas generation at Hwy 90 after Hurricane Katrina, but it would not have affected the concentration of H2S in Hwy 90's gas, which is driven solely by the proportion of drywall (aka sheetrock) in the waste.

Plaintiffs next argue that Hwy 90's withdrawal in 2010 of a 2008 permit application for a gas flare was done because H2S in Hwy 90's gas had "all but vanished" by 2010. Without assistance by any expert, Plaintiffs' argument completely misunderstands the meaning of Hwy

---

[3] Plaintiffs also assert that "not all landfills accept construction debris," (Pl. Br. at 3), apparently unaware that all three of the landfills at issue in this case – River Birch Landfill, Jefferson Parish Landfill, and the Hwy 90 C&D landfill – accept construction and demolition debris. MSW landfills are routinely permitted to accept C&D debris; C&D (Type III) landfills are limited to C&D waste and woodwaste.

[4] Townsend, Timothy, Chadik, Paul, Bitton, Gabriel, Booth, Matthew, Lee, Sue, Yang, Kenton (Towsend, 2002), Gypsum Drywall Impact on Odor Production at Landfills: Science and Control Strategies (January 2002).

90's withdrawal of its application to LDEQ for a permit for flares to burn landfill gas. When Hwy 90 applied for the permit, it explained that it was proposing flares to control odors from Hwy 90 because existing **methane** concentrations—not H2S concentrations—generated by Katrina-related waste were sufficient to fire a passive flare:

> The methane levels encountered are certainly surprising; unfortunately, the increased methanogenesis increases subsurface gas pressures. Conversely, the concentrations allow for the use of affordable passive flares for additional odor control.[5]

Nothing in Hwy 90's correspondence indicated that H2S concentrations in the Hwy 90 landfill had decreased after the initial permit application, nor that H2S concentrations had been necessary for the flare to work in the first place. Instead, after the vegetative waste from Hurricane Katrina decayed, methane and total landfill gas volumes declined to the point that a passive flare could not maintain a flame. Affidavit of Matthew K. Stutz ("Stutz Aff.") at ¶ 9.

After LDEQ approved that permit, Hwy 90 rescinded its application because "landfill gas generation is lower than initial estimates." Pl. Br. at 6.  Plaintiffs incorrectly assert that the permit application was rescinded "because the quantity of H2S being generated was so miniscule that it was insufficient to operate the flares." Pl. Br. at 9. A competent landfill engineer could have pointed out to Plaintiffs their error: the flares could not be used because Hwy 90's gas lacked **methane**, which powers the flame, not H2S, as Plaintiffs suggest. Stutz Aff. at ¶ 9.

Plaintiffs assert that by the time Hwy 90 rescinded its permit application, H2S at the Hwy 90 landfill was "miniscule" and "had all but vanished." Pl. Br. at 9. In making these representations to the Court, Plaintiffs omit Hwy 90's estimate in 2010 that the H2S concentration in emissions from the Hwy 90 landfill was "2,000 ppm". Pls' Ex. 11 (ECF Doc. 558-11, p. 11 of 15). Hwy 90

---

[5] Pls' Ex. 6 (River Birch letter to LDEQ, Request for Pilot Study (April 23, 2008)) (ECF Doc. 558-6 at p. 1 of 2).

did not include the results of any sampling as the basis for that 2,000 ppm estimate of H2S emissions concentration, nor did Hwy 90 state when the "site monitoring" was performed for that concentration. It is within the range of H2S concentrations reported in 2008 ("2,000 – 3,800 ppm"), which Mr. Stutz used in calculating an H2S concentration for his modeling. See Pl. Ex. 5 (ECF No. 558-5, p. 2 of 2). The samples yielding the 2,000-3,800 ppm concentrations of H2S in 2008 were collected from four probes placed into in the Hwy 90 waste mass, approximately 20 feet deep. Stutz Aff. ¶ 10

Plaintiffs also accuse Mr. Stutz of failing to address the permitting correspondence about Hwy 90's permit application in his report, "much less accounted for in his calculation of the H2S concentration." Pl. Br. at 6. Mr. Stutz explained in his deposition that he included the documents that he needed to produce for the model inputs. Deposition of Matthew Stutz, taken on April 12, 2024 ("Stutz Dep.") 172:13-23. As noted above, the correspondence that Plaintiffs append to their motion did not include data other than an estimate of a 2,000 ppm H2S emissions concentration with no supporting information; it was therefore inappropriate to use as a modeling factor. Stutz Aff. at ¶ 10.

Finally, it is Plaintiffs' assumption, unsupported by their proffered expert or any reliable information, that the concentration of H2S in Hwy 90 landfill's gas would have been higher in 2008 gas concentrations Stutz used than in the 2017-2019 period at issue here because of Hurricane Katrina-related waste. The total volume of gas generated in the years following Hurricane Katrina was greater, owing to the greater volume of waste and the influx of vegetative waste. But the composition of C&D waste does not change significantly over time, so the concentration of H2S in Hwy 90's gas would not fluctuate significantly between 2008 and 2019. Therefore, it is

reasonable to assume that the H2S concentration obtained in 2008 at the Highway 90 C&D Landfill is a valid concentration for 2017 through 2019. Stutz Aff. ¶ 5.

EPA data shows that 10% of discarded material during construction is drywall; and that this drywall percentage falls to 2.4% in waste from demolition.[6] Given that most of what occurs after a hurricane is demolition, the percentage of drywall is lower given the increase in other materials such as concrete, bricks, wood, carpet, carpet pads, and insulation. So, during non-flood events, construction activities would be the predominant source of drywall to the Highway 90 Landfill followed by demolition during and after flood events.  It is possible that on a day-by-day or week-by-week basis, the percentage of drywall received at the site could have some variation; however, it does not appear that there are any major shifts in the percentage of drywall accepted or banned from the Highway 90 Landfill. *See* Stutz Aff. at ¶ 6.

The total volume of waste acceptance is a critical factor in estimating emissions.  Only an outright ban or implemented program to reduce drywall at the Highway 90 Landfill would affect a reduction in concentration.  No such plan or ban was in place at the Highway 90 Landfill. *See* Stutz Aff. at ¶ 7.

Even if storms or floods temporarily changed the proportion of gypsum drywall in C&D waste disposed at the Hwy 90 landfill, the area the Highway 90 Landfill serviced continued to have hurricanes, storms, and floods after Hurricane Katrina, from 2006 through 2019. *See* Stutz Aff. at ¶ 8. There is no reason to believe the percentage of drywall in the total waste accepted varied considerably.

---

[6] U.S. EPA, *Construction and Demolition Debris Generation in the United States*, *2015* (Sept. 2018), attached to the accompanying Stutz Aff. as Exhibit 2, at pp. 18-19.

### B. Use of LandGEM for C&D Landfills

Plaintiffs criticize Mr. Stutz's use of the LandGEM model for estimating generation at the Hwy 90 C&D landfill, asserting it was "not created for use at C&D landfills" and that Mr. Stutz's method is therefore unreliable. Plaintiffs base their assertion on the LandGEM User's Guide. Pl. Br. at 7, fn 4. Again, without the assistance of an expert in landfill engineering, Plaintiffs misunderstand the meaning of the language they quote and are unaware of other regulatory provisions specifically anticipating the use of LandGEM for generation of gas at C&D landfills.

Plaintiffs omit Mr. Stutz's deposition testimony that the use of LandGEM to estimate gas generation from C&D landfills is a standard practice in the solid waste industry. Stutz Dep. 210:18 – 202:14. Mr. Stutz has used LandGEM to estimate emissions from "hundreds" of landfills, "almost every day" (*id*. at 76:6-12) and he has used LandGEM to estimate gas generation in C&D landfills "several times." *Id*. at 202:7-14.

In Mr. Stutz's report, he explains that "The EPA has published modeling factors for C&D landfills in 40 CFR 98 Subpart HH, Table HH-1." Stutz Rept. (ECF Doc. 558-2 at p. 15 of 520). These factors can be used in LandGEM. Stutz Aff. at 11 (citing Greenhouse Gas Reporting Program, 40 CFR Part 98).

### C. Specific Causation

Plaintiffs assert that Mr. Stutz's estimates of emissions from the RBLF, JPLF and Hwy 90 landfills "come too late," on the rationale that they were not presented during the general causation hearing. Mr. Stutz explained that he was not asked to estimate emissions from any landfill at the general causation stage. Stutz Dep. at 281-282.

### D. Mr. Stutz's Modeling of Emissions from JPLF

Plaintiffs argue the Mr. Stutz's modeling of emissions from the JPLF was unreliable on the ground that they believe Mr. Stutz should have used a different modeling factor for the rate

of gas generation, and they argue that he should have estimated H2S generated by spent lime separately. As explained in Mr. Stutz's report and discussed below, Mr. Stutz used modeling factors and methods that are well established within the solid waste industry and accepted by regulatory authorities. Mr. Stutz's derivation of a generation rate for the JPLF model used site-specific data based on measured gas generation rates and information reported to the Louisiana Department of Environmental Quality ("LDEQ") by the neighboring landfill, RBLF. Mr. Stutz explained that the H2S from spent lime was reflected in the concentration of H2S actually measured at the JPLF, which he used.[7]

## II.   LAW & ARGUMENT

### A.   Federal Rule of Evidence 702 Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Under *Daubert*, courts, as "gatekeepers," are tasked with making a preliminary assessment of whether expert testimony is both relevant and reliable. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir.2002) (citing *Daubert*, 509 U.S. at 592-

---

[7] Stutz Dep. 261:24 – 262:6.

93). The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).

In *Daubert*, the Supreme Court enumerated the following non-exclusive factors that courts may consider in evaluating the reliability of expert testimony: (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. 509 U.S. at 593-94. "[N]ot every *Daubert* factor will be applicable in every situation...and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004).

As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion." *Rosiere v. Wood Towing, LLC*, No. 07-CV-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)). Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Pipitone*, 288 F.3d at 250 (quoting *Daubert*, 509 U.S. at 596). Courts are not concerned with whether the opinion is correct but whether the preponderance of the evidence establishes that the opinion is reliable. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).

**B.      Mr. Stutz's opinions regarding H2S emissions from Hwy 90 were based on reliable methods and data**

An expert's opinion is admissible under Rule 702 if it is based on reliable methods and data and is relevant to the issues before the jury. *See* Fed. R. Evid. 702. Mr. Stutz's modeling of Hwy 90 emissions was based on a model commonly used in the solid waste industry, and data reported by Hwy 90 to LDEQ. Plaintiffs have offered only speculation, unsupported by data and without assistance from their own expert, that the H2S concentration Mr. Stutz relied on may have changed. And Plaintiffs' attack on Mr. Stutz's methods omitted important parts of his testimony and relevant regulatory language. The Court should allow Mr. Stutz's testimony on H2S emissions from Hwy 90 landfill.

Arguments that underlying data are unreliable are not a basis to bar expert testimony under Rule 702. *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 393 (5th Cir. 2002) (challenge to reliability of underlying data was an issue for cross-examination). Plaintiffs do not challenge the accuracy of the 2008 data that Mr. Stutz used as a measurement of H2S concentration in the Hwy 90 landfill. Rather, they argue that circumstantial factors may have affected the H2S concentration in Hwy 90's landfill gas after 2008, which may affect the weight of Mr. Stutz's opinion, but not its admissibility. *See Rosiere*, 2009 WL 982659, at *1; *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) ("Generally, the fact-finder is entitled to hear [an expert's] testimony and decide whether . . . the predicate facts on which [the expert] relied are accurate."). In relying on these circumstantial arguments, Plaintiffs misunderstand or selectively omit relevant discussions from the correspondence they rely on. *See* § I.A, above. Mr. Stutz's testimony will be valuable to the jury in seeing past such errors of counsel.

Acceptance of an expert's method by the relevant industry and regulatory agencies is a strong indicator of the method's reliability under *Daubert*. *See Kim v. Am. Honda Motor Co., Inc.*,

86 F.4th 150, 162 (5th Cir. 2023); *Pipitone*, 288 F.3d at 246. Mr. Stutz is an experienced landfill engineer who serves on advisory panels for the solid waste industry and the EPA. Stutz Rept. (ECF Doc. 558-2, at p. 517 of 520). Mr. Stutz has testified and explained in his report that his use of LandGEM to estimate gas generation within the Hwy 90 landfill is an accepted method within the solid waste industry and by the EPA. Stutz Rept. (ECF Doc. 558-2 at p. 15 of 520); Stutz Dep. 210:18 – 202:14. Plaintiffs' arguments otherwise do not change these facts or point to any infirmity in Mr. Stutz's methods.

Plaintiffs have not identified any basis under Rule 702 or *Daubert* to exclude Mr. Stutz's opinions on H2S emissions from the Hwy 90 landfill, and the Court should deny their motion.

### C.   Mr. Stutz's Emissions Estimate is Not Too Late

Plaintiffs misguidedly argue that Mr. Stutz is precluded from offering his emissions modeling under the "law of the case" doctrine because he did not do so for the General Causation trial. Pl. Br. at 11-13. Plaintiffs' argument misses the mark for a number of reasons. First, the Fifth Circuit's law-of-the-case doctrine applies only to re-litigation of issues decided at the *appellate* level. *See United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997). There has been no decision on appeal of the General Causation ruling. The Court always has the discretion to revisit its interlocutory orders. *Id.*; *Louisiana v. Guidry*, 489 F.3d 692, 697 (5th Cir. 2007); *see also* Fed. R. Civ. P. 52(a)(5). Plaintiffs' law-of-the-case argument therefore is completely without merit and should not be considered by the Court.

Second, setting aside their law-of-the-case argument, Plaintiffs grossly over-characterize the General Causation opinion and suggest it addressed issues it did not, in an attempt to exclude Mr. Stutz's relevant opinions. The General Causation trial "determine[d] whether odors and gases were being emitted by the [JPLF] during the relevant time period and whether any such odors were

**capable** of producing the injuries claimed by any one or more of the Plaintiffs in this case." Findings of Fact and Conclusions of Law (ECF Doc. 323 at 4 (emphasis added)). The Court's General Causation opinion found only that there were H2S emissions off-site from the JPLF; it did not find any specific emission rate of H2S, nor that any emissions reached any specific location. Therefore, the General Causation opinion does not prevent Mr. Stutz from providing his own emissions rates of H2S from the JPLF, River Birch Landfill, and the Hwy 90 C&D Landfill.

Plaintiffs' critique of Mr. Stutz for not providing an emissions estimate during the General Causation trial also fails to acknowledge that he was not required to do so. The Plaintiffs, not Defendants, had the burden to prove general causation. *See id.* at 44. At that stage, Mr. Stutz limited his testimony to explain the deficiencies in the Plaintiffs' experts' opinions and methodologies. The General Causation ruling did not adopt any expert's emissions modeling, so there is no expert modeling that could be now be binding on Mr. Stutz.

Now, at the specific causation stage – where dose, frequency, duration, and exposure are at issue – Mr. Stutz's emissions estimate is highly relevant to determine whether the Trial Plaintiffs' alleged injuries were actually caused by the JPLF emissions. *See Seaman v. Seacor Marine, LLC*, 326 F. App'x. 721 (5th Cir. 2009) ("knowledge that the plaintiff was exposed to harmful levels of exposure is the second of two "minimal facts necessary to sustain the plaintiff's burden in a toxic tort case"); *see also Couturier v. Bard Peripheral Vascular, Inc.*, 548 F. Supp. 3d 596, 612 (E.D. La. 2021) ("Where there is more than one possible cause to a plaintiff's alleged injuries, a defendant is permitted to present evidence as to any potential alternative and/or intervening causes.") Plaintiffs' law-of-the-case argument is inapplicable and has no bearing on the admissibility of Mr. Stutz's modeling opinions under Rule 702.

**D.     Mr. Stutz's estimates of emissions from the Jefferson Parish and River Birch Landfills are reliable**

Plaintiffs offer a scattershot criticism of Mr. Stutz's methods for estimating H2S emissions from the JPLF and RBLF landfills, arguing that he omitted significant data or used an unreliable method by not separately estimating H2S generated from spent lime disposed at JPLF.[8] Mr. Stutz explained in his report and his deposition how he modeled emissions from JPLF and RBLF using data reported to LDEQ and methods accepted by the solid waste industry and regulatory agencies. Plaintiffs do not rebut those methods nor show any reason that his data or methods were unreliable. His opinions on emissions from River Birch and Jefferson Parish landfills should be admitted in the upcoming trial.

For his estimate of emissions from JPLF, Mr. Stutz used methods long followed within the industry and before regulatory agencies, and he used data and modeling factors relied on by Plaintiffs themselves, or reported by a third party (River Birch) to LDEQ or EPA. Mr. Stutz used the LandGEM model, and Plaintiffs do not contest its use. Mr. Stutz used the same total waste volumes used by Plaintiffs' proffered landfill engineer, and Mr. Stutz separately determined those volumes were reliable. Mr. Stutz used the same H2S concentration that Plaintiff's proffered expert Dr. Pietari used (and which Plaintiffs label "sporadic inside-the waste concentrations," apparently unaware they are attacking one of the few data points their experts actually used). Mr. Stutz separately determined it was acceptable for his use. *See* Stutz Rept. § 3.2.1 (ECF Doc. 558-2 at p. 16-17 of 520).

---

[8] Though Plaintiffs assert that Mr. Stutz's opinions regarding emissions from River Birch landfill "omit significant data," Plaintiffs do not actually argue that point or otherwise address his estimate of emissions from River Birch. Accordingly, that aspect of Mr. Stutz's opinions is not challenged.

Mr. Stutz used a factor for the rate of gas generation – the k factor – that he derived from site-specific data using a method that is accepted in the solid waste industry. Stutz Rept. § 3.1.3 at 13 (ECF Doc. 558-2 at p. 14-15 of 520). Plaintiffs appear to criticize that factor in passing, though the basis of their criticism is unclear.[9] The k factor roughly corresponds to the amount of rainfall a landfill receives. Mr. Stutz used River Birch's reported emissions to EPA, its reported actual gas collection, and River Birch's reported collection efficiency, to "back calculate" the actual rate of gas generation (the k factor) and a site-specific total generation potential (the Lo factor) for River Birch's gas generation. The actual gas collection reported for JPLF, by contrast, was inconsistent and illogical, so Mr. Stutz could not use the same calculation for JPLF. But because the River Birch landfill is next door to JPLF and therefore subject to the same rainfall, Mr. Stutz treated River Birch's actual k factor as the site-specific factor for JPLF, in accordance with an accepted method. *See* Stutz Rept. § 3.1.3 at 13 (ECF Doc. 558-2 at p. 14-15 of 520).

Plaintiffs appear to argue that several generic differences should disqualify the use of River Birch's actual k factor, but Mr. Stutz considered these issues and they do not affect an appropriate k factor for modeling emissions from the JPLF. *Id*. Mr. Stutz's derivation of the River Birch k factor specifically accounted for River Birch's gas system coverage and the types of cover and cover areas that River Birch reported to EPA. *Id*. Finally, the k factor that Mr. Stutz calculated from River Birch and used for JPLF (0.05) was consistent with k factors used by other engineering firms (0.04 to 0.06) during the seven previous modeling efforts for JPLF. Stutz Rept. § 3.1.1 (ECF Doc. 558-2 at p. 13 of 520). And it is

---

[9] "He treats River Birch and JPLF as the same but ignores site-specific data like the robust gas collections system and synthetic liner at River Birch, which JPLF did not have, and the serious leachate collection problems and landfill cover issues that JPLF did have." Pl. Br. at 14.

slightly higher than the default factor of 0.04 that EPA would assign under the LandGEM User's Guide. Id. § 3.1.3 at 14 (ECF Doc. 558-2 at p. 15 of 520).

Plaintiffs' attempt to use cherry-picked testimony from Defendants' expert Dr. Bishow Shaha to undermine Mr. Stutz's modeling misunderstands the purpose of Dr. Shaha's modeling. Pl. Br. at 13. Dr. Shaha was not being asked about the reliability of Mr. Stutz's modeling, nor was he asked about any of the factors that Mr. Stutz used. At most, Plaintiffs could use points made from Dr. Shaha's testimony as a basis for cross-examination, but his unrelated testimony in no way calls into question the reliability of Mr. Stutz's opinions.

## III.    CONCLUSION

Mr. Stutz estimated emissions from the three landfills at issue using methods that have been tested and accepted by the solid waste industry and regulatory agencies. Plaintiffs' attack on Mr. Stutz's methods and the information he used demonstrates the need for a highly qualified expert like Mr. Stutz to inform the jury. Plaintiffs' argumentative points may be appropriate for cross-examination, but they do not call into question the reliability of Mr. Stutz's opinions under Fed. R. of Evid. 702 or *Daubert*.

Date: June 13, 2024

Respectfully submitted,

LISKOW & LEWIS, APLC

By: ___/s/ Michael C. Mims_____
        Michael Cash (#31655)
        Cherrell Simms Taplin (#28227)
        Michael C. Mims (#33991)
        Brady M. Hadden (#37708)
        J. Hunter Curtis (#39150)
        Alec Andrade (#38659)
        701 Poydras Street, Suite 5000

New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108

BEVERIDGE & DIAMOND, P.C.

Megan R. Brillault (*pro hac vice*)
Michael G. Murphy (*pro hac vice*)
John H. Paul (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
Katrina M. Krebs (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410
Austin, TX 78701
(512) 391-8035

*Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

CONNICK AND CONNICK, LLC

By:   */s/ Michael S. Futrell*
William P. Connick, La. Bar No. 14158
Michael S. Futrell, La. Bar No. 20819
Matthew D. Moghis, La. Bar No. 33994
Anya M. Jones, La. Bar No. 36923
3421 N. Causeway Blvd., Suite 408
Metairie, Louisiana 70002
Telephone: (504) 681-6658
Facsimile: (504) 838-9903
E-mail: moghis@connicklaw.com

*Counsel for Defendant Jefferson Parish*

18

GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:   */s/ J. Michael DiGiglia*
       Ernest P. Gieger, Jr. (6154)
       John E. W. Baay (22928)
       J. Michael DiGiglia (24378)
       Nicholas S. Bergeron (37585)
       Blaise Chadwick Hill (*pro hac vice*)
       Gieger, Laborde & Laperouse, L.L.C.
       Hancock Whitney Center
       701 Poydras Street, Suite 4800
       New Orleans, Louisiana 70139
       Telephone: (504) 561-0400
       Facsimile: (504) 561-1011

       *Attorneys for Defendant Aptim Corp.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on June 13, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

By:   */s/ Michael C. Mims*