UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** **Plaintiffs** | **CIVIL ACTION** |
| | **NO. 19-11133, c/w 19-14512** |
| **VERSUS** | |
| | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** **Defendants** | **JUDGE: Morgan** **MAGISTRATE JUDGE: North** |
| *Applies to: All Cases* | |

**WASTE CONNECTIONS' DEFENDANTS'
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY
OF ALI HASHIMI, P.E.**

# TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................2

II. BACKGROUND ...........................................................................................................3

A. The parties and contracts ........................................................................................3

B. Scope of Mr. Hashimi's opinions ...........................................................................3

    1. Regulatory context .............................................................................................4

    2. Technical aspects of landfill operations.............................................................5

    3. Contractual scope of duties ...............................................................................6

    4. Standards of care ................................................................................................8

III. LEGAL STANDARD ...................................................................................................8

IV. ARGUMENT ..............................................................................................................10

A. Mr. Hashimi will explain how operations and events at the JPLF fit within the contractual scopes of duties. ............................................................................10

    1. To understand the Contract, the jury will need to understand regulatory and technical terms. ............................................................................10

    2. To understand the Contract, the jury will need to understand areas the Contract does not address. ..........................................................................12

B. Mr. Hashimi's testimony could not be offered through arguments of counsel. ..................................................................................................................13

C. Mr. Hashimi did not offer opinions on the ultimate issues of liability. ..............13

V. CONCLUSION............................................................................................................22

I.      INTRODUCTION

The Waste Connections Defendants' expert witness Ali Hashimi, P.E. will assist the jury to understand the complicated allocation of work and responsibility created by Jefferson Parish's various contracts for operations at the Jefferson Parish Landfill ("JPLF" or "the Landfill"). These contracts work within a context of multiple regulatory programs, which are applied specifically to the Landfill through its permits, which the Parish holds. Understanding how each regulation, permit term, and contract term applies to each contract party further requires specialized knowledge of landfill operations, structures and equipment, as well as industry standards. Plaintiffs have not challenged Mr. Hashimi's expertise in any of these areas.

However, Plaintiffs leap to the conclusion that Mr. Hashimi proposes to offer legal conclusions or arguments better left to counsel, in opinions that knit together the complicated context of the contracts to define which contract party was responsible for which scope of work. Those determinations often pertain to specific structures or pieces of equipment. These are issues beyond the common sense of a jury or the experience of lay people.

Mr. Hashimi does not offer any opinion on legal conclusions or ultimate issues of fault or allocation of responsibility. Plaintiffs repeatedly and formulaically assert that he does without explaining how, nor could they since his opinions are in every case tied to technical or regulatory aspects of the Landfill's operations, without reference to any injury or any fault. Expert opinions may embrace ultimate issues where the opinions are helpful to the factfinder, and to the extent that Mr. Hashimi's opinions are helpful to the jury's assessment of liability or allocation of fault, his opinions should be allowed. Plaintiffs have not shown any basis to exclude his opinions and the Waste Connections Defendants respectfully request that the Court deny Plaintiffs' motion.

## II.     BACKGROUND

### A.     The parties and contracts

The Plaintiffs' motion criticizes Mr. Hashimi's opinions relating to the contract entered into originally by the Parish of Jefferson ("Parish") and IESI LA Landfill Corporation ("IESI") (the "Contract").[1] Defendant Louisiana Regional Landfill Corporation ("LRLC") is the successor to IESI through a name change.

The Parish also entered a contract with APTIM Corporation for operation of the landfill gas collection and control system (GCCS or gas system) at the JPLF.[2]  Mr. Hashimi addresses the equipment, systems, and regulatory requirements for the gas system operated by APTIM. Though Plaintiffs do not address those opinions in their motion, an understanding of the physical design and operation of the gas system, and how regulatory requirements define and govern such systems, is relevant to understanding which party (LRLC or APTIM) was responsible for which systems and operations under its respective contract with the Parish. As a result, Mr. Hashimi addressed systems operated by all three defendants,[3] and addressed the Contract as well as APTIM's contract with the Parish.

### B.     Scope of Mr. Hashimi's opinions

The Plaintiffs' motion avoids a discussion of the contracts that Mr. Hashimi discusses in his proposed opinions, but the complicated arrangement of duties and systems covered by the contracts is the reason Mr. Hashimi's opinions will be helpful to the jury. Mr. Hashimi's opinions

---

[1] Contract to Provide Services to Operate, Manage, and Maintain the Jefferson Parish Sanitary Landfill Site (May 17, 2012) (ECF Doc. 544-1).

[2] Agreement between The Parish of Jefferson and CB&I Environmental & Infrastructure, Inc. (Dec. 28, 2015) (ECF Doc. 543-1).

[3] Waste Connections US, Inc. and Waste Connections Bayou, Inc. are also defendants in this action, though neither was a party to the contract.

cover regulatory and technical issues in addition to language of the contracts, all of which are relevant to understanding how the contracts assigned scopes of work.

### 1.    Regulatory context

The JPLF is heavily regulated by federal and state regulations that govern the types of waste that can be disposed, air emissions from several locations at the Landfill, management of stormwater (i.e., rainwater), management of leachate within the waste, and construction of the landfill's base liner system and its cover systems, among many other things. Mr. Hashimi explains throughout his report how regulations dictate the design and operations of several of these systems.[4]

The regulations are applied specifically to the JPLF through its permits, which the Parish obtained, and the Parish is the named holder, or permittee, of the permits. Among others, the Parish holds a Part 70 Operating Permit from LDEQ for air emissions, and a Type I/Type II permit for solid waste disposal.

The Contract relies on an understanding of these regulations and permits and frequently refers to or incorporates them in assigning the parties' responsibilities. The Contract does not identify every permit applicable to the JPLF, but nevertheless assigns LRLC responsibility "for complying with the provisions of all applicable NPDES permits, the wastewater discharge permits, the air quality permits, in addition to the LDEQ permits."[5] The Contract also sweeps in broad ranges of regulations as part of its assignment of duties. For example:

> [LRLC] shall provide all necessary personnel, equipment, and funds to: (a) complete construction of the Expansion Area, in compliance with the Permit Documents (LDEQ Solid Waste Permit No. D-051-0090/P-0297R1 issued to

---

[4] See, e.g., A. Hashimi, *Expert Report, Jefferson Parish Landfill* (March 8, 2024) ("Hashimi Rept.") (Ex. 1 to Plaintiffs' Motion, ECF Doc. 573-2), § 3 at p. 8.

[5] See Contract, Ex. 1 to Parish's Motion to Exclude the Report and Testimony of Ali Hashimi, ECF Doc. 544-1, at § IV.B, at p. 23.

Jefferson Parish on January 22, 2010), and in accordance with rules, laws and legal mandates promulgated by the United States Environmental Protection Agency (USEPA), made a part hereof…[6]

Mr. Hashimi's report explains, where relevant, how these regulations and permit requirements supplemented the Contract's terms, and how the regulations and permits defined operations and equipment that the Contract simply incorporated by reference.[7] Mr. Hashimi addresses the requirements of state and federal regulations, which often overlap. In addition, regulations often impose requirements that are relevant to the roles and responsibilities of LRLC, the Parish, and APTIM at the Landfill, and which cannot be transferred by contract.[8]

In light of the context created by the regulations and permits, which is not elucidated in the Contract, Mr. Hashimi's opinions will help inform the jury as to how that context affects the meaning of the Contract's terms.

### 2.    Technical aspects of landfill operations

The JPLF relies on the combination of numerous operational and physical systems to manage physical stability of the landfill and to control potential emissions of gas and liquids from decaying waste. The Contract assigned LRLC responsibility for certain of these systems in the active area of the landfill (Phase IVA, or the "Expansion Area").[9] Specifics of which equipment or physical areas were included within these assignments were generally left to other documents and the parties' understanding of the physical layout of the landfill. For example, the document assigned LRLC the responsibility of "furnishing and installation of daily, interim, and final cover **in accordance with the Permit Documents**," and "final design and installation of **leachate**

---

[6] Contract, § II at p. 5.

[7] *See generally*, Hashimi Rept. § 4 at 16.

[8] *See* Hashimi Rept. § 3.1 at 8.

[9] Contract, § II.B.V.A at p. 12.

collection and transmission systems for the Phase IVA Expansion Area," (emphasis added).[10]
The Contract defines "Permit Documents" as "[a]ll documents related to Landfill Phases I, II, III
and IV-A of the Landfill" and an unlimited set of "solid waste permits, all permit modifications
and Louisiana Solid Waste Regulations, as amended." It is the task of an expert simply to
determine which of these permits and regulations apply, and which do not.

The Contract does not define all or even most of the technical terms it uses; for instance,
the Contract refers variously to "leachate collection and transmission systems," "leachate
collection and pump systems," "leachate collection sumps and sump pumps," and "leachate
collection and treatment systems" without defining any of those systems or the differences between
the various terms. Mr. Hashimi's report explains the physical features of the relevant systems
identified by the Contract, how they are operated, which regulations require them, and –
importantly – which equipment is not part of particular systems.[11]

### 3. Contractual scope of duties

Mr. Hashimi commonly advises landfill owners, operators, and contractors on
responsibilities under operational contracts. These contracts typically have "legal" components
and "engineering or project management" components.[12] The "legal" components, such as terms
and conditions, insurance, bonding, indemnity, etc. are typically outside of the scope of Mr.
Hashimi's advice.[13]  The "engineering or project management" components include items like

---

[10] Contract, § II.B.V.A at p. 12.

[11] *See, e.g.*, Hashimi Rept. § 4.3 at p. 18.

[12] Deposition Transcript of Ali Hashimi, taken April 29, 2024, appended to the Declaration of John Paul ("Paul Decl.") as Exhibit 1 (hereafter "Hashimi Dep.") at 40:6 – 41:13; 62:15 – 63:4.

[13] *See* Affidavit of Ali Hashimi, P.E., sworn to on June 13, 2024 ("Hashimi Aff."), submitted herewith, at ¶ 5. Mr. Hashimi's affidavit supplements his April 4, 2024 report and does not offer any new opinions. *See* Fed. R. Evid. 26(e) (creating a duty to supplement).  As Mr. Hashimi stated, the purpose of the affidavit is to supplement his previously disclosed opinions to address the misguided criticisms of Plaintiffs in their motion to exclude.  *See Courville v. CITGO Petroleum Corp.*, NO. 20-CV-01415, 2023

technical specifications, construction drawings, material quantity estimates, scope, task responsibility, scheduling, and similar provisions.[14] In this case, Defendant LRLC asked Mr. Hashimi to assess task responsibility under the Contract and APTIM's contract. As discussed above, issues of responsibility under the contracts rely on regulatory provisions, permit terms, and technical knowledge that is not plain of the face of the contracts. Therefore, it is relevant and appropriate for Mr. Hashimi to offer opinions on these topics and to explain how the Contract was structured, and which party was responsible for which operations.

For instance, under the Contract, LRLC was not responsible for the landfill gas collection and control (GCCS) system.[15] Yet Plaintiffs' expert Jose Sananes asserts that LRLC was responsible for "ensuring that deficiencies in the gas collection system were either remediated by the Owner or addressed by other control measures."[16]

When executing projects under landfill operational or services contracts, Contract/Project Management is a key function of the project which is typically performed by an engineer. Mr. Hashimi is regularly involved with this aspect of project management.[17] The engineer needs to

_____

WL 3668410, at *2 (W.D. La. Apr. 18, 2023) (allowing expert's supplemental report when it rebutted opponent's challenges and supplemented information provided in the original report). *See also Brown v. WellPet LLC*, 2023 WL 3483935 (N.D. Ind. Mar. 31, 2023) ("[T]he foregoing paragraph in the Declaration responds to the *Daubert* criticisms raised by WellPet in its motion to exclude Cal's opinions and testimony. As such, it does not constitute a new opinion."); *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58 (1st Cir. 2011)  (citing *Muldrow ex rel. Muldrow v. Re–Direct, Inc.*, 493 F.3d 160, 167 (D.C. Cir. 2007) (explaining how Rule 26 permits an expert to supplement, explain and elaborate on material contained in his report); *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006) ("While Rule 26 demands that expert disclosures be 'complete,' there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain. In other words, an expert need not stand mute in response to an opposing party's *Daubert* motion.").

[14] Hashimi Aff. ¶ 6; Hashimi Dep. at 60:16 –63:15.

[15] Hashimi Aff. ¶ 7; Hashimi Dep. at 81:5 – 84:4.

[16] *See* Mr. Sananes' Second Supplemental Expert Report, dated February 16, 2024 (ECF Doc. 566-6) (hereafter "Second Supplemental Report") §16.2, ¶ 184 at 59.

[17] Hashimi Dep. at 24:9 –24:19

understand the responsibilities, the various scopes, and work to be provided by others to ensure successful execution of projects.[18] For example, the engineer is frequently put in a position to explain the contract structure to the parties to the contract.[19] Even seasoned professionals need the assistance of an engineer to understand contract structures and responsibilities, and therefore, it would likely be even harder for a layman to understand it without assistance from an expert.

### 4.    Standards of care

Mr. Hashimi's report also rebutted opinions offered by Plaintiffs' proposed expert, Mr. Jose Sananes, on standards of care applicable to the Defendants. The Plaintiffs' motion does not seek to exclude those opinions. Nevertheless, an understanding of the technical, regulatory, and contractual issues summarized above is necessary to understand the standards of care put at issue by Plaintiffs' proposed expert, and to understand the bases of Mr. Hashimi's rebuttal. For instance, Mr. Sananes offers an opinion relating to technical aspects of how a leachate system may affect operation of the landfill gas collection and control system,[20] and then offers opinions as to which Defendant was responsible for which system.[21] Mr. Hashimi's complete opinions will be important in helping the jury understand the errors in Mr. Sananes' proposed assignments of responsibility.

## III.    LEGAL STANDARD

702 of the Federal Rules of Evidence controls when expert testimony is admissible:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or

---

[18] Hashimi Aff. ¶ 8; Hashimi Dep. 62:2 – 63:4

[19] Hashimi Aff. ¶ 8; Hashimi. Dep. 158:14 – 158:24.

[20] *See* Second Supplemental Report §16.1, ¶ 183(b) at 58.

[21] *See Id*. § 162 at 58-60.

data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) is the seminal case in the realm of expert testimony. It provides a framework for determining whether expert testimony is admissible under Rule 702.   Under *Daubert*, the court takes on the role of "gatekeeper," and makes the preliminary assessment of whether expert testimony is both relevant and reliable.  *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 592-93).  The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).

Under Rule 702, "[w]hether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. 'There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'"  Fed. R. Evid. 702 advisory committee note (1972 Proposed Rules).

When an expert's opinion will be helpful to the trier of fact, it is permissible for the opinion to "[embrace] an ultimate issue." Fed. R. Evid. 704. The admissibility of an expert's conclusion as to allegedly "ultimate" issues depends on the nature of the issue and the circumstances of the case, and courts have wide discretion. *United States v. Milton*, 555 F.2d 1198, 1204 (5th Cir. 1977). Where an expert draws "inferences from the facts which a jury would not be competent to draw," the opinion may be admissible if it would assist the jury. *Id*.

IV.     **ARGUMENT**

A.      **Mr. Hashimi will explain how operations and events at the JPLF fit within the contractual scopes of duties.**

The Plaintiffs argue that Mr. Hashimi's testimony is not appropriate on the grounds that he opines on "upon ultimate issues and issues of common sense and knowledge, which are reserved for the jury." Plaintiffs' Br. at 8. As outlined above, however, the terms of the Contract can only be understood by someone with expertise in the regulations, applicable permits, and technical aspects of landfill management and environmental control systems. The Plaintiffs do not contest Mr. Hashimi's expertise in those areas.

An expert's testimony is appropriate and "required when an issue involves matters beyond jurors' common understanding," *Smith v. Chrysler Grp., L.L.C.,* 909 F.3d 744, 751 (5th Cir. 2018), and inappropriate where people "of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses [who] possess . . . special or peculiar training, experience, or observation." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962). If a layman would not "be qualified to determine intelligently and to the best possible degree" the particular issues, the assistance of an expert with a "specialized understanding of the subject involved in the dispute" is appropriate.[22]

1.      **To understand the Contract, the jury will need to understand regulatory and technical terms.**

A layman could not review the Contract and understand how it assigns responsibility, which equipment is within which specific landfill systems, how to interpret key terms, or which Defendant had responsibility for which operations at the Landfill. Despite arguing that Mr. Hashimi's opinions are simply legal conclusions, the Plaintiffs do not address the substance or

---

[22] Fed. R. of Evid. 702, advisory committee notes.

the bases of Mr. Hashimi's opinions, which make clear that regulatory and technical terms underly any understanding of the Contract. The Contract is replete with provisions that are beyond the experience of people unfamiliar with operations and regulation of a landfill. Listed below are a few examples of items assigned to LRLC that incorporate an understanding of underlying technical or regulatory terms:

- Acquisition, delivery testing and installation of leachate collection pipes, pumps, pump controls and manifolds for the leachate collection systems for Phase IV-A Expansion Area, including installation of piping stubouts for connection to each Landfill Cell and the forcemain (Contract § II.A.1);

- Coordination with landfill gas collection system contractor to extend existing gas wells on the side slopes of Phases III-A and III-B as the fill progresses to reach final elevations (Contract § II.A.1);

- Construction of Cells 20, 21, 22, 23, 25 and 25 of the Phase IV-A Expansion Area, including subgrade, subbase, recompacted clay liner, geosynthetic clay liner, geomembrane liner, geocomposites, geonets, in-cell piping, pipe penetrations and quality assurance testing (Contract § II.A.1);

- Furnishing and installation of daily, interim, and final cover in accordance with the Permit Documents (Contract § II.B.5.A);

- Final design and installation of additional landfill cells and other ancillary facilities comprising the Phase IV-A Expansion Area (Contract § II.B.5.A);

- Operation and maintenance of leachate collection and treatment systems (Contract § II.B.5.A).

Under the Contract, the Parish:

> [S]hall be solely responsible for making sure that the Existing Landfill Units have been operated, maintained, constructed and closed in accordance with all applicable laws, and excepting leachate riser pumps, which the Parish shall warrant for the first thirty (30) days of [LRLC's] management and operation of the Existing Landfill Units, all equipment, materials, utilities, etc. listed above relating to the Existing Landfill Units are in good working order and have been properly maintained prior to handing over such operation and maintenance responsibilities to [LRLC]. Contract § II.B.5.C.

All of the above systems and physical features are governed by regulations and the Landfill's permit.[23] Few of the pieces of equipment or major environmental control systems referred to above are defined in the Contract.[24] It is highly unlikely a layman could reliably understand how all of the above provisions relate to specific actions and areas of responsibility at the Landfill. But Mr. Hashimi is particularly able to apply his education, training, experience, and his understanding of the record of this case to assist the jury to do so. His opinions as to responsibility are the result of that expertise, not legal conclusions.

### 2.   To understand the Contract, the jury will need to understand areas the Contract does not address.

By ignoring the bases and the substance of Mr. Hashimi's opinions, the Plaintiffs miss the fact that the scopes of work assigned to the Parish, LRLC, and APTIM are not evident from the face of any single document. Understanding how the Contract applies to the Defendants' actions will require an understanding of events at the Landfill that are not specifically described in the Contract. For instance, neither the LRLC Contract nor the APTIM contract specifies that the Parish reserved the responsibility to design and install the landfill gas collection and control system. Mr. Hashimi explains how the structure of the contracts and the Parish's role as the permit holder left the responsibility for the GCCS's design and construction with the Parish.[25] Because regulations and permit requirements dictated terms for the technical design and performance of that system, Mr. Hashimi's testimony is appropriate not only to explain the silence in the contracts, but to explain what regulatory requirements the Parish had as it oversaw the design and construction.

---

[23] *See* Hashimi Rept. § 4.

[24] *See* Contract, Definitions, at p. 2 – 4.

[25] Hashimi Rept. § 6.1 at 46 (ECF Doc. 573-2, p. 50 of 95).

**B.** **Mr. Hashimi's testimony could not be offered through arguments of counsel.**

The Plaintiffs argue that Mr. Hashimi's testimony would not bring more to the jury than the lawyers can offer in argument. Plaintiffs' Br. at 8-11. But Mr. Hashimi's opinions will inform the jury of technical terms and features of the Landfill that are not defined in the Contract, as well as the regulatory and contractual context for LRLC and the Parish's responsibilities under the Contract. Arguments of counsel could not replicate Mr. Hashimi's expertise, nor would the jury be able to understand the key issues without it. Mr. Hashimi's testimony may permissibly embrace ultimate issues because it will assist the jury in reaching "inferences from the facts which a jury would not be competent to draw." *Milton*, 555 F.2d 1198, 1204.

Here, Mr. Hashimi's opinions will help the jury to understand regulatory and technical issues that are not clear from the face of the Contract and that are not accessible to the untrained layman.[26] Moreover, arguments of counsel cannot replicate Mr. Hashimi's explanations of how different landfill systems affect each other, which components are relevant to which terms of the Contract, and how the operations of each are governed by regulations and the permit. Mr. Hashimi's testimony achieves exactly what the advisory notes to Rule 702 contemplates. Based on his expertise, he can explain industry practice and standards that are ultimately not "clear" in the document and that a lay witness or attorney cannot explain with the same precision.

**C.** **Mr. Hashimi did not offer opinions on the ultimate issues of liability.**

The Plaintiffs argue that Mr. Hashimi will invade the province of the Court and the jury by offering opinions on the "responsibility" of Jefferson Parish and/or Aptim Corp. for the harms allegedly suffered by the plaintiffs. Plaintiffs' Br. at 3-5. This assertion wholly misstates the scope of Mr. Hashimi's opinions. His opinions stop far short of any ultimate issues of liability or

---

[26] *See* Fed. R. Evid. 702, advisory committee note.

allocation of fault. Instead, Mr. Hashimi's opinions are important to the jury's ability to determine whether any systems or operations at the Landfill could have contributed to any Plaintiff's injury, and how the Contract and applicable regulations assigned responsibility for those systems and operations.

It is clear that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Applying its own similar standard, the Louisiana Supreme Court has held, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So.2d 1219, 1239, *cert. denied*, 546 U.S. 883 (2005). Expert opinions are admissible even if they embrace an ultimate issue if they will be helpful to the jury. Fed. R. Evid. 704; *Milton*, 555 F.2d at 1204. Mr. Hashimi's opinions will assist the jury to understand the relationship between regulatory, contractual, and technical terms and requirements so that they have the information required to make a final decision on their own and fulfill their role as defined under these cases. His opinions do not, however, assign any fault, nor allocate any fault for any alleged harms to the Plaintiffs.

The Plaintiffs list several of Mr. Hashimi's opinions stating that the Parish "was responsible for" various aspects of the landfill's operations, and the Plaintiffs then assert without analysis that the opinions are legal conclusions, invade the province of the jury, or advocacy better suited to be addressed by counsel. Plaintiffs' Br. at 3-5. A review of Mr. Hashimi's report and the

opinions cited by Plaintiffs makes it clear that Mr. Hashimi does not opine on legal issues or ultimate issues of fault or liability.[27]

- **<u>Opinion 3.1 Text</u>**: "Jefferson Parish bore ultimate responsibility for control over all aspects of the operation of the facility, including the operation and maintenance of the landfill gas control and collection system (GCCS) at the facility."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of responsibilities. It does not conclude that the Parish was at fault, an issue reserved for the jury.

- **Opinion 3.2 Text:** "Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of responsibilities, as well as operations that are not directly addressed in the LRLC Contract. It does not conclude that the Parish was at fault, an issue reserved for the jury.

- **Opinion 3.3 Text:** "Jefferson Parish bore the responsibility to adequately fund the landfill construction and operation, and to implement process controls and quality assurance procedures despite LRLC being assigned by contract responsibilities to perform those functions and other site operations activities that complemented the Parish's responsibilities to manage landfill gas and odors for the facility."

---

[27] The opinions addressed here are in Hashimi's Report at pages 8 – 24.

- o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of regulatory and permit provisions to the Contract's assignment of responsibilities. It does not conclude that the Parish was at fault, an issue reserved for the jury, nor does it allocate any fault among the parties to the Contract.

- **Opinion 3.5 Text:** LRLC's responsibilities at the JPLF were defined by the Operating Agreement, which excluded responsibility for the GCCS and for leachate components outside of Phase 4A.

  - o **<u>Basis</u>**: Mr. Hashimi's opinion relies on the application of technical knowledge of leachate systems and components, landfill gas collection systems and components, and correspondence between LRLC and the Parish, to the Contract's assignment of responsibilities. It does not conclude that the Parish was at fault, an issue reserved for the jury, nor does it allocate any fault among the parties to the Contract.

- **Opinion 3.6 Text:** "Under the Operating Agreement, Jefferson Parish was responsible for the operation, maintenance, and repair of leachate management components outside of Phase 4A. This was the Parish's responsibility because the Parish never tendered the rest of the leachate system to LRLC in good working condition."

  - o **<u>Basis</u>**: Mr. Hashimi's opinion applies a technical understanding of the operations and condition of leachate systems to assess whether leachate system components were ever tendered to LRLC in "good working condition" as required by the Contract. His opinion that the Parish retained responsibility for those systems is based on his experience and training in leachate

16

management systems, and he does not offer any opinions on fault or liability, nor could arguments of counsel substitute for Mr. Hashimi's assessment.

- **Opinion 3.7 Text:** "Jefferson Parish was responsible for the design, installation, operation, and maintenance of the GCCS. Jefferson Parish bore the responsibility to be aware of site conditions, how these site conditions may impact the GCCS, and determine when GCCS activities were required to maintain compliance at the facility with the existing permits and regulations."

  - o **Basis**: Mr. Hashimi's opinion as to the Parish's responsibility for design and installation of the gas collection and control system is based on his technical expertise, his reading of two contracts, applicable regulations, and correspondence of the Defendants. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury.

- **Opinion 3.8 Text:** "Though Jefferson Parish contracted with another entity to perform O&M on the GCCS, it was Jefferson Parish's responsibility to manage that contractor and to use the information provided by its GCCS contractor."

  - o **Basis**: Mr. Hashimi's opinion as to the Parish's responsibility for oversight of the operation and maintenance of the gas collection and control system is based on his technical expertise and his reading of two contracts and applicable regulations. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury.

17

- **Opinion 4.3 Text:** "As the permit holder and owner of the JPLF, Jefferson Parish was responsible for understanding regulations and its own contract terms governing the requirements for landfill gas control and collection systems. These terms should have put the Parish on notice that compliance with regulatory and industry standards was critical to the control of landfill gas emissions and management of potential odors."

    o **Basis**: Mr. Hashimi's opinion applies his technical expertise, his knowledge of regulatory provisions, and applicable industry standards to the Parish's responsibilities of regulatory compliance as the holder of the Landfill's permits. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury. Arguments of counsel could not substitute for Mr. Hashimi's combined technical, regulatory, and operational expertise.

- **Opinion 4.4 Text:** "Regulations and generally accepted industry standards specify operating standards and limitations for engineering controls that are part of an effective landfill gas collection and control system. Jefferson Parish should have been on notice of these standards in its design, operation, and supervision of the GCCS at JPLF."

    o **Basis**: Mr. Hashimi's opinion applies his technical expertise, his knowledge of regulatory provisions, and applicable industry standards to the Parish's responsibilities of regulatory compliance as the holder of the Landfill's permits. He does not offer any opinion on fault or liability, or that any aspect

18

of the design or operation of the gas system caused any injury, which are
ultimate issues reserved for the jury. Arguments of counsel could not
substitute for Mr. Hashimi's combined technical, regulatory, and operational
expertise.

- **Opinion 5.8 Text:** "LRLC relied on the Parish and its GCCS contractors to design,
  install, operate, repair, and maintain the GCCS. The Parish controlled the design,
  installation, and operation of the landfill gas collection and control system. LRLC's
  reliance on the Parish was reasonable."

  - o **<u>Basis</u>:** Mr. Hashimi's opinion applies his technical expertise, his knowledge
    of regulatory provisions, and applicable industry standards to the Parish's
    responsibilities of regulatory compliance as the holder of the Landfill's
    permits. He does not offer any opinion on fault or liability, or that any aspect
    of the design or operation of the gas system caused any injury, which are
    ultimate issues reserved for the jury. Arguments of counsel could not
    substitute for Mr. Hashimi's combined technical, regulatory, and operational
    expertise.

- **Opinion 6.1 Text:** "Jefferson Parish was solely responsible for issues with the
  landfill gas collection and control system that were identified by LDEQ, Carlson
  Environmental Consultants, River Birch, and Plaintiffs. LRLC had no responsibility
  for the landfill gas collection and control system, and based on its assigned duties,
  LRLC had no ability to improve operations of the system."

  - o **<u>Basis</u>:** Mr. Hashimi's opinion applies his technical expertise, his knowledge
    of regulatory provisions, and applicable industry standards to the Parish's

responsibilities of regulatory compliance as the holder of the Landfill's
permits. He does not offer any opinion on fault or liability, or that any aspect
of the design or operation of the gas system caused any injury, which are
ultimate issues reserved for the jury. Arguments of counsel could not
substitute for Mr. Hashimi's combined technical, regulatory, and operational
expertise.

- **Opinion 6.2 Text:** "Jefferson Parish controlled the assignment of work to its
  contractors and actively supervised the operations at the JPLF. Jefferson Parish
  should have been aware of any issues that it was in the best position to address as the
  permittee and owner, and as the entity with control over the design and installation of
  the GCCS."

  - **Basis:** Mr. Hashimi's opinion applies his technical expertise, his knowledge
    of regulatory provisions, and applicable industry standards to the Parish's
    responsibilities of regulatory compliance as the holder of the Landfill's
    permits. He does not offer any opinion on fault or liability, or that any aspect
    of the design or operation of the gas system caused any injury, which are
    ultimate issues reserved for the jury. Arguments of counsel could not
    substitute for Mr. Hashimi's combined technical, regulatory, and operational
    expertise.

- **Opinion 6.3 Text:** "Jefferson Parish bore the responsibility to be aware of site
  conditions, how these site conditions may impact the GCCS, and determine when
  GCCS activities were required to maintain compliance at the facility with the existing
  permits and regulations."

- o **<u>Basis</u>:** Mr. Hashimi's opinion applies his technical expertise, his knowledge of regulatory provisions, and applicable industry standards to the Parish's responsibilities of regulatory compliance as the holder of the Landfill's permits. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury. Arguments of counsel could not substitute for Mr. Hashimi's combined technical, regulatory, and operational expertise.

- **Opinion 6.5 Text:** "Based on design, construction, and monitoring of numerous GCCS systems, the numerous conclusions and recommendations provided by CEC indicate that Jefferson Parish did not prioritize O&M of the GCCS."

  - o **<u>Basis</u>:** Mr. Hashimi's opinion applies his technical expertise, his knowledge of regulatory provisions, and applicable industry standards to the Parish's responsibilities of regulatory compliance as the holder of the Landfill's permits. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury. Arguments of counsel could not substitute for Mr. Hashimi's combined technical, regulatory, and operational expertise.

- **Opinion 7.1 Text:** "The contract between Jefferson Parish and APTIM did not provide sufficient performance goals and standards to ensure efficient and effective operation and maintenance of the GCCS."

21

o **Basis:** Mr. Hashimi's opinion applies his technical expertise, his knowledge of regulatory provisions, and applicable industry standards to the Parish's responsibilities of regulatory compliance as the holder of the Landfill's permits. He does not offer any opinion on fault or liability, or that any aspect of the design or operation of the gas system caused any injury, which are ultimate issues reserved for the jury. Arguments of counsel could not substitute for Mr. Hashimi's combined technical, regulatory, and operational expertise.

The jury will need to determine whether the Defendants are liable. Mr. Hashimi does not opine on that issue. If the jury finds any liability, it will need to find that some or all of the Defendants are liable to specific Trial Plaintiffs. Again, Mr. Hashimi's opinions do not reach those issues. And if the jury finds that more than one Defendant is liable to any Trial Plaintiff, it will then need to apportion liability among the Defendants. Mr. Hashimi does not opine as to whether any Defendant was at fault for any Plaintiff's alleged injuries, nor does he allocate the Defendants' share of any potential responsibility. The jury may need to consider whether a particular operation or landfill system was related to its finding of liability and causation, and Mr. Hashimi's opinions are relevant and helpful to a jury in determining whether any Defendant's actions or omissions at the Landfill caused any injury to any Plaintiff.

## V.   CONCLUSION

Mr. Hashimi's opinions are necessary to help the jury as the trier of fact understand complex regulatory, contractual, and technical issues. Those issues are at the heart of the ultimate determinations the jury must make, and Mr. Hashimi's opinions do not intrude on the province of either the Court or the jury. The Plaintiffs' motion does not provide any basis for the Court to exclude Mr. Hashimi's testimony, and the Court should deny the Parish's motion.

Respectfully submitted,

LISKOW & LEWIS, APLC

By:   */s/ Michael C. Mims*
      Michael Cash (#31655)
      Cherrell Simms Taplin (#28227)
      Michael C. Mims (#33991)
      Brady M. Hadden (#37708)
      J. Hunter Curtis (#39150)
      Alec Andrade (#38659)
      701 Poydras Street, Suite 5000
      New Orleans, Louisiana  70139
      (504) 581-7979

      BEVERIDGE & DIAMOND, P.C.

      John H. Paul (*pro hac vice*)
      Megan R. Brillault (*pro hac vice*)
      Michael G. Murphy (*pro hac vice*)
      Katelyn E. Ciolino (*pro hac vice*)
      Katrina M. Krebs (*pro hac vice*)
      825 Third Avenue, 16th Floor
      New York, NY 10022
      (212) 702-5400

      James B. Slaughter (*pro hac vice*)
      1900 N Street, NW, Suite 100
      Washington, DC 20036
      (202) 789-6000

      Michael F. Vitris (*pro hac vice*)
      400 W. 15th Street, Suite 1410
      Austin, TX 78701
      (512) 391-8035

      *Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed on June 13, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

By:   */s/ Michael C. Mims*