# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

In Re: FREDERICK ADDISON, et al

   Plaintiffs

v.

LOUISIANA REGIONAL LANDFILL COMPANY,

   et al

Defendants

Case No.: 19-cv-11133

Section: E  Judge Susie Morgan

Magistrate Judge: Michael North

*Applies to all cases.

*******************************************

   VIDEO DEPOSITION OF ALI HASHIMI taken on Monday, April 29, 2024 at LISKOW & LEWIS, 701 Poydras Street, Suite 5000, New Orleans, LA 70139 beginning at 9:09 a.m. and concluding at 4:44 p.m.

REPORTED BY:

DIANNE C. WININGER, CCR
Certified Court Reporter

1   some of them.  Did you take some of their
2   comments or not?
3        A.   I believe so.
4        Q.   And do you remember in particular
5   anything that they commented to you on that
6   you made an amendment to your report to take
7   into consideration?
8        A.   No.
9        Q.   Now, your report says that you are a
10  principal in the Weaver Consultants Group
11  North Central.  What does a principal mean?
12       A.   I'm an owner in the company and one
13  of the managers.
14       Q.   What are your management
15  responsibilities?
16       A.   Well, presently not much because I'm
17  moving towards retirement, so I've given up a
18  lot of my management responsibilities and more
19  in the project execution part of the business.
20       Q.   You're much too young to retire.
21  How many principals are there in Weaver
22  Consultants Group North Central, LLC?
23       A.   I believe we presently have 18.
24       Q.   And you're located in Naperville,
25  did I say that right, Illinois?

```
 1   expert witness?
 2        A.   Yes.
 3        Q.   So they reviewed your agreement with
 4   Beveridge & Diamond in this case?
 5        A.   Yes.
 6        Q.   Is it part of your responsibilities
 7   at Weaver Consultants to review contracts?
 8        A.   Yes.
 9        Q.   And what is your responsibility in
10   that regard?
11        A.   One of the services that we're hired
12   for is to prepare contract documents to bid
13   projects out.
14        Q.   And does the legal department have
15   the final say when the contract that is issued
16   by or is entered into by Weaver Consultants?
17             MR. PAUL:  Object to form.
18             THE WITNESS:  I'm not sure I
19   understand the question.
20   BY MR. JOHNSON:
21        Q.   Who ultimately decides whether a
22   contract can be accepted by Weaver Consultants
23   or not?  Is it the engineer?  Is it the legal
24   department?  Can you tell me who that is?
25        A.   For a contract for our engagement or
```

```
 1   are you talking about a client's?
 2       Q.   For a client engagement.
 3       A.   For when we're contracting our
 4   services to a client?
 5       Q.   Uh-uh.
 6       A.   Okay.  Ultimately, it's principal.
 7       Q.   So that would be you in a case that
 8   you're involved in doing the work for?
 9       A.   It could be.
10       Q.   Well, it could be.  Who else could
11   it be?
12       A.   It could be any one of the
13   principals.  We all have that authority.
14       Q.   So you may work on assignments that
15   you aren't the person that actually negotiates
16   the contract; is that what you're saying?
17       A.   Correct.
18       Q.   Under your select project experience
19   section, you state that you have served as a
20   project manager and construction quality
21   assurance officer for several construction
22   projects at operating and closed sanitary
23   landfills.  Are those things two different
24   jobs, the project manager and the construction
25   quality assurance officer?
```

 1        A.   I believe the opinions are repeated.
 2   There's a summary in the beginning.  Are you
 3   referring to the summary in the beginning or
 4   later on in the report or does it matter?
 5        Q.   You can refer to both because you
 6   have opinions and then you have some
 7   explication about your opinions later on in
 8   the report.  So feel free to refer to, when I
 9   refer to an opinion, feel free to refer to
10   either your bullet points under opinions that
11   start with Page 3 or your explanation of your
12   opinions later in the report.  Wherever you
13   want to go to answer my question is fine with
14   me.
15        A.   Okay.  Thank you.
16        Q.   So I want to ask you, let's start at
17   Page 3, you say Jefferson Parish bore ultimate
18   responsibility for control over all aspects of
19   the operation of the facility, including the
20   operation and maintenance of the landfill gas
21   control and collection system, GCCS in parens,
22   at the facility.
23        What do you mean or explain to us what
24   you mean by ultimate responsibility for
25   control?

```
 1          A.    As I described in my report,
 2    Jefferson Parish was the owner and still may
 3    be, I shouldn't say was, but the owner and the
 4    permit holder at the time of these events.
 5          Q.    While they were the owner and permit
 6    holder, how does that equate to them having
 7    ultimate responsibility for control over all
 8    aspects of the operation of the facility?
 9          A.    As I mentioned in my report, that's
10    defined in the Louisiana regulations.
11          Q.    Can you tell me the specific
12    regulation that you're referring to?
13          A.    Can I look through?
14          Q.    Yes, sir.  In responding to my
15    question, take whatever time you need to look
16    through your report to respond to my question.
17          A.    So on Page 8, I made references
18    there.
19          Q.    On Page 8 tell me what here, what
20    reference here indicates that Jefferson Parish
21    had ultimate responsibility for control over
22    all aspects of the operation of the facility?
23    I assume you're talking about on Page 8 under
24    Opinion 3.1, is that what you're talking
25    about?
```

```
 1        A.   Yes.
 2        Q.   Okay, tell me where you find
 3   something that indicates Jefferson Parish bore
 4   ultimate responsibility for control over all
 5   aspects of the operation of the facility.
 6        A.   Where I say in the first paragraph
 7   under the basis of the opinion in the last
 8   sentence there where I stated municipalities,
 9   parishes and regional commissions are
10   responsible for among other things planning
11   and operating permitted processing and/or
12   disposal facilities while cooperating with the
13   department or other entities to implement
14   regional management systems.
15        Q.   Okay, where in there does it say
16   that municipalities, parishes and regional
17   commissions bore ultimate responsibility?
18             MR. PAUL:  Object to form.
19             THE WITNESS:  That's how I interpreted
20   what this stated here.
21   BY MR. JOHNSON:
22        Q.   Well, what is the basis for your
23   interpretation of this language?  Is that a
24   legal opinion?
25        A.   No.  I'm not an attorney.
```

```
 1          Q.   Is that an engineering opinion?
 2          A.   That was my understanding of the
 3     responsibility structure for who was
 4     ultimately responsible for activities.
 5          Q.   Assuming that you say that Jefferson
 6     Parish bore ultimate responsibility for
 7     control, who do they owe that responsibility
 8     to?
 9          A.   I'm not sure how to answer that
10     question because it sounds like more of a
11     legal question to me.
12          Q.   Well, if your answer is I can't
13     answer that question because you're asking me
14     a legal question, that's a fair answer if
15     that's what your answer is.
16               MR. PAUL:  Object to form.
17     BY MR. JOHNSON:
18          Q.   Are you saying what I asked you is
19     asking you to render a legal opinion?
20          A.   Could you repeat your question?
21          Q.   My question is if you say Jefferson
22     Parish bore ultimate responsibility for
23     control over all aspects of the operation of
24     the facility, to whom did they owe that
25     responsibility?
```

Ali Hashimi
April 29, 2024

Page 64

```
 1        A.   I don't know who, ultimately who
 2   they owed that responsibility to, no.
 3        Q.   From your review of the materials in
 4   this case, did any other entity have
 5   responsibility for the operation of the
 6   landfill gas control and collection system?
 7        A.   Yes, I believe so.
 8        Q.   Who?
 9        A.   APTIM.
10        Q.   Anyone else?
11        A.   (No response.)
12        Q.   Let me ask you the question this
13   way, make it simpler.  Does the landfill
14   operator have any responsibility over the
15   operation of the landfill gas control and
16   collection system at this facility?
17        A.   No.
18        Q.   Why not?
19        A.   Because that scope of services
20   wasn't excluded specifically from their
21   contract.
22        Q.   Sir, I'm going to show you what
23   we're going to mark as Hashimi Deposition
24   Exhibit #4 and just take a minute to look at
25   that letter please.  And I've handed a copy of
```

  1   to the contract between Jefferson Parish and
  2   IESI after May 17th of 2012, correct, the
  3   three documents I just showed you?
  4        A.   Yes.
  5        Q.   Sir, let's move to your Opinion 3.4.
  6   And on Page 3 your opinion says Jefferson
  7   Parish created a complicated management
  8   structure regarding the parish's oversight of
  9   the facility's GGCS, especially when managing
 10   the GCCS.  First of all, for purposes of the
 11   record, what is GCCS?
 12        A.   Gas collection and control system.
 13        Q.   Can you explain that opinion please?
 14             MR. PAUL:  Object to form.  You can
 15   answer.
 16             THE WITNESS:  Yes.  Based on my review
 17   of how Jefferson Parish organized the work as
 18   it was related to the GCCS, it was my opinion
 19   that it was a complicated management structure
 20   that would have been difficult to handle.
 21   BY MR. JOHNSON:
 22        Q.   In any materials that you reviewed
 23   in this file -- well, take a step back.  I
 24   don't want to misquote your testimony.  You
 25   said this would have been a difficult

 1  management structure to handle; is that what
 2  you just said?
 3       A.   Yes.
 4       Q.   And tell me why you think it was a
 5  difficult management structure to handle.
 6       A.   I found it to be difficult because
 7  of the number of parties that were involved.
 8       Q.   Did you find in your review of all
 9  the materials that you reviewed in this case
10  any complaints from Waste Connections entities
11  about the management structure regarding the
12  parish's oversight of the facility?
13            MR. PAUL:  Object to form.
14            THE WITNESS:  Could you repeat the
15  question please?
16  BY MR. JOHNSON:
17       Q.   In all of the materials that you
18  reviewed in this case, did you see any
19  complaints from the Waste Connections entities
20  about the management structure regarding the
21  parish's oversight of the facility?
22            MR. PAUL:  Same objection.
23  BY MR. JOHNSON:
24       Q.   Excuse me.  Of the oversight of the
25  facility's GCCS.

 1          MR. PAUL:  Object to form.
 2          THE WITNESS:  Yes, I believe I recall
 3   reading some e-mails regarding, from Waste
 4   Connections, sorry, regarding APTIM's
 5   performance in execution of work.
 6   BY MR. JOHNSON:
 7      Q.   And how does that go to address your
 8   opinion about a complicated management
 9   structure?
10      A.   I think that becomes part of my
11   earlier comment when I said there were several
12   parties involved.  It speaks directly to that
13   comment.
14      Q.   Well, you have managed landfills as
15   part of your experience?
16      A.   No.  I have not been a landfill
17   manager.  I've assisted clients with their
18   landfill management activities.  Our company
19   doesn't manage landfills.
20      Q.   So Weaver Consultants does not
21   manage landfills?
22      A.   No.
23      Q.   In all of the materials that you
24   reviewed in this case, did you see any
25   communications from Waste Connections to

Ali Hashimi
April 29, 2024

Page 84

```
 1   Jefferson Parish seeking to change the
 2   management structure for the parish's
 3   oversight of the facility's GCCS?
 4        A.   Yes.
 5        Q.   Identify that for me please.
 6        A.   I don't recall the specific format,
 7   whether it was an e-mail or a letter, but at
 8   some time I believe it was in 2018 Waste
 9   Connections offered to provide those services.
10        Q.   Do you have that reference listed in
11   your materials that you relied on in this
12   case?
13        A.   I don't recall.
14        Q.   And so who at Waste Connections sent
15   that communication that you just discussed?
16        A.   I believe it was Brett O'Connor.
17        Q.   And you said this was an e-mail?
18        A.   I said I wasn't sure.
19        Q.   Do you know when it was sent in
20   2018?
21             MR. PAUL:  Object to form.
22             THE WITNESS:  I believe it was in the
23   summer.
24   BY MR. JOHNSON:
25        Q.   So as I understand what you said,
```

```
 1   project was an assessment of what the source
 2   of the odors were.  So I guess I can't really
 3   speak to that because that's what was part of
 4   the project that was being investigated.
 5        Q.   I'm not sure I follow you.  Was
 6   there a determination that was made as to what
 7   the source of the odors?
 8        A.   That wasn't in my scope of what I
 9   was doing, so that's why I can't really speak
10   to it.  I don't know if they ever reached a
11   conclusion on that.
12        Q.   Understood.  What were you hired to
13   do?
14        A.   Primarily, I became engaged in the
15   project through the course of the
16   owner-operator working with the attorney
17   general's office.  There was an agreement or
18   amendment to an agreement, I'm not sure which
19   it was, that required a professional engineer
20   be contracted to, in essence, act as a liaison
21   between the owner-operator and the attorney
22   general's office and IPA and some other
23   regulatory bodies.  That was primarily my
24   function.
25        Q.   I'm going to shift gears.  You have
```