UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | CIVIL ACTION |
| Plaintiffs | NO. 19-11133, c/w 19-14512 |
| V. | SECTION: "E" (5) |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| Defendants | JUDGE: Morgan<br>MAGISTRATE JUDGE: North |
| *Applies to: Both Cases* | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS MOTION IN LIMINE
TO EXCLUDE OPINIONS OF PLAINTIFFS' EXPERT, JOSE SANANES
ON STANDARDS OF CARE**

Plaintiffs oppose the Defendants' Motion In Limine To Exclude The H2S Emissions Opinions of Jose Sananes. The Motion should be denied.

**I.   INTRODUCTION.**

Mr. Sananes testified at the General Causation Trial. After voir dire, he was tendered as an expert in the field of landfill engineering and evaluation of landfill gas and leachate collection systems. R.Doc. 295 (Day 1, PM) at 29. Defendants responded, "No objection. Your Honor." Id. Thereafter, the Court ruled that "All right. He's qualified to testify in those areas." Id.

With no objection from the Defendants, Mr. Sananes then provided a primer on background information about landfills are built (177-178), the different kinds of landfills (178-179), how gases are generated  and how they escape (180—186, 195), methods that landfills use to control odors, including gas collection systems, covers   (188-294); gas well design (197-202); (what leachate is and why its important (202-206).  He then explained how the presence of water in the

landfill affected the rate at which waste decays, and how the excess water in the Jefferson Parish Landfill called for use of a higher decay rate in calculating the generation of landfill gas. (205-222). He testified about how excess water affected the ability of the gas collection system to collect gas. (238-252). Defendants had no objection to Mr. Sananes' qualifications to testify to any of these issues.

In his Supplemental Report, **Exhibit** 1, Mr. Sananes opines on "Standards of Care Applicable to Landfill Owners and Operators," and these are embodied in § 6.4 of his Report, beginning on page 14. Despite the title of their Motion and some general language in the Motion, Defendants do not appear to challenge (and do not even mention) the opinions expressed in § 6.4 of the Report. Defendants, accordingly, have made no challenge to Mr. Sananes' qualifications to present the opinions in § 6.4 of the Report.

Instead, as discussed on page 2 of Defendants' Brief, Defendants assert that Mr. Sananes' Supplemental Report " in § 6.5 asserts 'Breaches of Standards of Care by Defendants in this Case." R.Doc. 565-1 at 2. Defendants then state that "Mr. Sananes asserts that Defendants breached the standard of care by

- failing to ensure that the landfill gas collection and leachate collection systems were properly designed, constructed, operated, and/or maintained in order to prevent the formation and emission of noxious odors or to collect and treat such odors;

- failing to ensure that the landfill gas collection and leachate collection systems were being operated and maintained properly;

- failing to ensure the improperly designed, maintained, or operated landfill gas collection and leachate collection systems were repaired, replaced or enhanced in a timely manner; and

- accepting waste containing sulfur, "[g]iven that (1) sulfur-containing materials were disposed or processed within the MSW landfill area without waste segregation by physical containment (e.g., isolated cell), (2) the JP Landfill is a municipal landfill containing organic waste, (3)

2

> the JP landfill had historical serious problems in controlling leachate levels and (4) there was no gas collection system in place in Phase 4A to collect any landfill gases that were generated prior to the spring of 2019.

R.Doc. 565-1 at 2-3. So the challenged opinions all relate to the breach of the standard of care, not the standard of care itself.

## II. THE FACTS THAT SHOW BREACH OF THE STANDARD OF CARE ARE NOT IN DISPUTE.

In large part, the facts that establish the breach are not in dispute. It is not disputed in this case that both the leachate collection system and the gas collection systems are integral to the functioning of the landfill. When the leachate system in not properly functioning, the excess water can increase the rate at which landfill gas is generated, and when water accumulates in the gas extraction wells, it will impede the ability of those wells to collect gas.

In July 2018, when the odor issues were coming to a head, the Parish and Waste Connections blamed each other for the improperly functioning leachate collections system. The system was so bad that in 2012, when Waste Connections' predecessor became the operator of the Landfill, it refused to assume control of the leachate system until the Parish first brought it into good working order. *See* **Exhibit 2, Nielsen letter May 2018.** Beginning in August 2018, the Parish spent several million dollars to upgrade and replace portions of the leachate control system. And during the entire time, it was Aptim's job (required by its contract) to pump out any leachate accumulating in gas wells, a duty at which Aptim wholly failed.

Similarly, as to the gas collection system, it is not disputed that there was no gas collection system at all in Phase 4A until the spring of 2018. It is not disputed that when the wells were installed in 2018, they had great difficulties actually collecting gas. It was Aptim's job to operate and maintain the gas collection system.

3

And finally, it is not disputed that when Waste Connections and the Parish decided to accept the sulfate containing spent lime into the Landfill in 2016, they knew there problems with the leachate collection system (they had been arguing about it since 2012) and they knew there was no gas collection system in Phase 4A.  They knew that all of the conditions conducive to the creation of hydrogen sulfide gas were all present, and they decided to accept it anyway—more than 23,000 tons of it.

In the current motion, Defendants do not challenge the substance of any of his testimony that the standards of care were breached—the merely object to Mr. Sananes' qualifications to give it.  And they do so, despite not having challenged Mr. Sananes' qualifications to testify to landfill systems and how they work, or to the standards of care.

### III.   THE CHALLENGE TO MR. SANANES' QUALIFICATIONS MUST BE REJECTED.

In the argument section of the Brief, Defendants do not cite even one case, and the argument appears to boil down to a single proposition.  Defendants assert that "Mr. Sananes has never advised the owner or operator of an operating municipal solid waste ('MSW') landfill on waste acceptance practices, compliance with permit terms, best management practices for waste disposal, odor control programs, or a host of other everyday landfill management decisions."  R.Doc. 5675-1 at 1.  Even assuming the truth of that statement, it does not require disqualification of Mr. Sananes.[1]

---

[1] The very first of the "representative projects listed on Mr. Sananes CV states "Confidential Client, United States (2023 to Present). Led the collection of landfill gas and condensate samples to assess variability between waste disposal areas and evaluated landfill gas collection system design, operation and maintenance in relation to industry standards and best management practices."  Supplemental Report at 94.  When Mr. Sananes was asked about this at his deposition, he stated it was a municipal solid waste landfill that was then in operation.

Rule 702 permits a person who is "qualified as an expert by knowledge, skill, experience, training, **or** education" to testify in the form of an opinion.  The word "or," which the court "must assume the drafters of the rule chose deliberately, suggests that an expert may be qualified on any of the five bases listed." *Lavespere v. Niagara Mach. & Tool Works, In*c., 910 F.2d 167, 176 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp*., 37 F.3d 1069 (5th Cir. 1994). A witness therefore can qualify as an expert even though he lacks practical experience, provided that he has received suitable training or education or has otherwise gained the requisite knowledge or skill.  Id.  Thus, although the absence of hands-on experience is certainly relevant to the determination whether to accept a witness as an expert, it is not determinative.  Id.

Rule 702 does not mandate that an expert be "highly qualified" in order to testify about a given issue. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009).  Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility. Id.

Indeed, *Daubert* itself held that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.  Moreover, "the Daubert standards are flexible, and the most important question is not whether one party's expert is more qualified than the other's, but rather, whether an expert's testimony is reliable." *Huss*, 571 F.3d at 455.

The degree of "knowledge, skill, experience, training, or education" required to qualify an expert witness is only that amount that is necessary to assist the trier of fact to "understand the evidence or to determine a fact in issue. *Maes v. Lowe's Home Centers LLC*, No. EP-17-CV-00107-FM, 2018 WL 3603114, at *3 (W.D. Tex. May 25, 2018).  Mr. Sananes certainly has that.

### IV.     CONCLUSION

The Motion should be denied.

        /s/ S. Eliza James
FORREST CRESSY & JAMES, LLC
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

        /s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)
James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

*Counsel For Addison Plaintiffs*