UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | CIVIL ACTION |
| Plaintiffs | NO. 19-11133, c/w 19-14512 |
| V. | SECTION: "E" (5) |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| Defendants | JUDGE: Morgan<br>MAGISTRATE JUDGE: North |
| *Applies to: Both Cases* | |

**PLAINTIFFS' OBJECTIONS AND OPPOSITION DEFENDANTS' MOTION IN LIMINE TO EXCLUDE OPINION TESTIMONY OF SUSAN SCHIFFMAN PURSUANT TO FEDERAL RULE OF EVIDENCE 702**

**MAY IT PLEASE THE COURT:**

Plaintiffs, Frederick Addison *et al* respectfully submit the following objections and alternatively, opposition to the Waste Connections Defendants, Aptim Corp., and Jefferson Parish's (collectively the "Defendants") Motion in Limine to Exclude Opinion Testimony of Susan Schiffman Pursuant to Federal Rule of Evidence 702. Defendants' Motion cites four topics on which they argue Dr. Schiffman is not qualified to testify and/or lacks evidentiary support for her opinions. For the foregoing reasons, Defendants' challenges to Dr. Schiffman's testimony are without merit and should be denied.

I. **OBJECTION-** Plaintiffs object to Defendants' Motion in Limine as it relates to challenges #1 and 3 as both topics were adjudicated in General Causation and included in the Court's Findings of Fact and Conclusions of Law. Rec. Doc. 323.

1

As a threshold matter, Defendants' motion to exclude Dr. Schiffman's testimony relating to points #1 and #3 is improper, and Plaintiffs object to the filing of the Motion in Limine on these topics. The Court's Minute Entry dated April 2, 2024 states, "Concerning the *Addison* case only, in a status conference held on April 6, 2023, the Court determined that in the trial on specific causation, ***motions in limine will be allowed only for new opinions (i.e., opinions on topics not covered in the trial on general causation) expressed by current experts*** and opinions expressed by new experts on topics related to specific causation." R.Doc. 517. Dr. Schiffman is not a new expert, therefore challenges to her testimony are limited to *new* topics only. Neither of these topics is new. By filing an improper Motion, Defendants are wasting the time and resources of the Court and Plaintiffs' counsel in the critical time leading up to trial.

In an abundance of caution and without waiving the above objections, Plaintiffs file the below opposition in response to Defendants' attempt to limit Dr. Schiffman's testimony.

## II. LAW AND ARGUMENT

Defendants' motion seeks to limit Dr. Schiffman's testimony as to four topics: (1) the ability of hydrogen sulfide to accumulate in Plaintiffs' homes; (2) whether the acceptance of spent lime in a municipal solid waste landfill is known to cause hydrogen sulfide generation; (3) the ability of volatile organic compounds ("VOCs") to contribute to injuries caused by hydrogen sulfide; (4) whether the Plaintiffs injuries were caused by emissions from the JPLF. To the extent that the Court permits re-litigation of issues already decided - which is exactly what Defendants' motion seeks to do - Dr. Schiffman's opinions on all topics of contention are informed, probative, relevant, and based on appropriate scientific analysis.

2

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. The rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[1]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Both scientific and nonscientific expert testimony are subject to this framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant."[2] When expert testimony is challenged, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence.[3]

"Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." [4] A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the technique at issue has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the

---

[1] FED. R. EVID. 702.
[2] *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).
[3] *Moore v. Ashland Chem. Co., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).
[4] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).

3

existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community.[5] The reliability inquiry must remain flexible, however, as "not every . . . factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant."[6]

With respect to the relevancy prong, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue."[7] Finally, divisions of the Eastern District of Louisiana "remain[] cognizant" that "***the rejection of expert testimony is the exception and not the rule***.'"[8] As another division of the Court explained in *Scordill v. Louisville Ladder Group, L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. . . .
>
> The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"[9]

Defendants seek to relitigate topics decided at General Causation trial based upon their erroneous assertion of "a heightened *Daubert* gatekeeping obligation because the factfinder here

---

[5] *Burleson*, 393 F.3d at 584.
[6] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x. 377, 381 (5th Cir. 2006) ("A trial judge has considerable leeway in determining how to test an expert's reliability.") (Internal citations and quotations omitted).
[7] *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).
[8] *Johnson v. Samsung Electronics America, Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing FED. R. EVID. 702 Advisory Committee Notes to 2000 Amendments) (emphasis added).
[9] *Scordill v. Louisville Ladder Group, L.L.C.*, No. 02-2565, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted).

will be a jury," as their brief suggests. Rec. Doc. 563-1 at 4. There is no legal or factual basis for that proposition. In bifurcation of general and specific causation trials, the Parties agreed that the resolution of general causation "will help narrow the focus of the case and the issues at stake." Rec. Doc. 323 at 2. Central to the "issues at stake" were the qualifications and methodologies of the experts (including Dr. Schiffman) who would offer opinions on general causation matters. In April 2023, the Court put specific parameters new opinions and experts by stating that "motions in limine will be allowed only for new opinions (i.e., opinions on topics not covered in the trial on general causation) expressed by current experts and opinions expressed by new experts on topics related to specific causation." Rec. Doc. 517. The *Addison* Plaintiffs requested a trial by jury for all individual claims. This is not a new development; therefore, it is axiomatic that *Daubert* challenges at the general causation trial would be binding for any *Addison* specific causation jury trial, and the failure to properly challenge existing expert's qualifications, experience and/or methodology relating to old opinions is a waiver of such argument. Any other conclusion would allow Defendants' to piece-meal attack the Court's Findings of Facts and Conclusions of Law in subsequent *Addison* jury trials.

**A. Dr. Schiffman has already been accepted by the Court as being qualified to testify regarding that H2S accumulated in Plaintiffs' homes, and her experience, education, knowledge in the field and research qualify her to make such opinions in the specific causation phase of trial.**

Anticipating that Defendants would seek to dismantle the Court's ruling from General Causation, Plaintiffs preemptively briefed this issue in their Motion in Limine to Exclude Expert Testimony on Issues Litigated and Decided in the General Causation Trial Motion, which is incorporated herein. Rec. Doc. 554. On this exact issue, the Court found:

> The odor from the Landfill also lingered due to hydrogen sulfide's ability to accumulate in homes. Dr. Schiffman's studies, in which she "put monitors outside

and inside homes of somebody who is doing a lot of complaining" about odors, showed that the "hydrogen sulfide levels went up inside the home" to detectable levels. She explained in her report that hydrogen sulfide is "heavier than air and accumulates in enclosed and low-lying areas within the home." Hydrogen sulfide can also get into air conditioning systems, extending the duration of the exposure.[10]

R.Doc. 323 at 34 (footnotes omitted). Defendants' arguments that such opinion and/or the methodology employed is not credible or "supported by objective evidence" is disingenuous, misleading to the Court, and false. ***What Defendants' fail to mention (or include as an exhibit) is Dr. Schiffman's rebuttal report dated March 29, 2024 which specifically addresses the issues of hydrogen sulfide accumulation and the additive effect of VOCs with additional scientific evidence and support.[11]*** This rebuttal report was done in response to Dr. Paolo Zannetti and set forth the following support, all footnoted to specific references:

> This is false. Chemicals from outside sources, including H2S, do accumulate inside homes. For example, Inserra et al. (2002) from the Agency for Toxic Substances and Disease Registry (ATSDR) performed community based exposure estimates for hydrogen sulfide in Dakota City, Nebraska, an agribusiness community. They reported that the air data for 1999 indicated that Dakota City residents were repeatedly exposed, both indoors and outdoors, to levels of H2S ≥90 ppb. Table 1 from Inserra et shows that indoor levels of H2S were as high or even higher than outdoors. This observation regarding the presence of H2S indoors is consistent with the reports by the Trial Plaintiffs. For example, Wendy Gremillion stated: 'Even when it was gone outside, like if it had subsided, it still remained in the house.'
>
> Second, in 11.2 Dr. Zannetti's statement that H2S does not linger is scientifically incorrect. H2S is heavier than air and "can build up in low-lying areas and enclosed spaces" (Washington State Department of Health). The molecular weight of H2S is 38.08 g/mol while the molecular weight of air (mixture of oxygen, nitrogen, argon, carbon dioxide) is 28.96 g/mol. OSHA notes that because H2S is heavier than air, it "may travel along the ground" and "can collect in low-lying and enclosed spaces, such as manholes, sewers, and underground telephone vaults. Its presence makes work in confined spaces potentially very dangerous." This point was also affirmed

---

[10] The Court's own ruling cites authority for the opinions Dr. Schiffman offered at trial relating to H2S accumulation in homes. Specifically, that, in studies she conducted, "hydrogen sulfide levels went up inside the home… it went up from non-detectable to detectable, which would have been at three ppb." Rec. Doc. 299, 697:15-21, 698:3-4. This testimony was offered without objection by Defendants.
[11] *See* Exhibit 1- Schiffman Rebuttal Report, March 29, 2024.

> by the CDC: "Hydrogen sulfide is slightly heavier than air and may accumulate in enclosed, poorly ventilated, and low-lying areas." It is noteworthy that the homes of the Trial Plaintiffs are approximately 40 feet lower than JPLF.

Defendants' further misrepresent the deposition testimony of James Lape, Plaintiffs' air modeler, on the ability of Dr. Schiffman to opinion on indoor air dispersion. Defendants cite to one particular statement in Lape's transcript regarding his own qualifications, but omits later testimony that bolsters Dr. Schiffman's qualifications in this field.

> Q: Are you familiar with Dr. Schiffman's qualifications with regard to indoor air modeling?
> A: I am aware that she has done a considerable amount of investigation related to indoor air and published these.
> Q: And has her work included peer-reviewed publications?
> A: That's what it appears, yes.[12]

**B. Dr. Schiffman is qualified to testify about H2S odor production at landfills.**

Plaintiffs are not proffering Dr. Schiffman as an expert in contracts or landfill management. Dr. Schiffman is an expert in H2S odors and therefore is qualified to testify on the foreseeability of hydrogen sulfide generation at MSW landfills- i.e. *odor issues* that result from co-disposal of residential garbage with spent lime. During her deposition, Dr. Schiffman was unequivocal about the "lane" which her opinions occupy:

> Q: I think we confirmed earlier, you're not providing any expert opinions with respect to best management practices at landfills; you're only providing expert opinions with respect to odors?
>
> A: From the standpoint of odor—something I explained to you early—earlier, there are certain things that I learned over the years that you don't do, okay? And one… struck me was fly ash and spent lime. I saw those as a serious problem from the standpoint of odor and should have been stopped earlier than they were or never started in the first place, from the standpoint of odor.[13]

---

[12] *See* Exhibit 2- Lape Dep. 226:9-16 (April 22, 2024).
[13] *See* Exhibit 3- Schiffman Dep. 99:18-25, 100:1-6 (April 26, 2024).

It is not disputed that Dr. Schiffman is an expert in odor and odor generation. Therefore, any opinions rendered on this topic should not be limited.

### C. Dr. Schiffman's opinions that Plaintiffs' exposure to H2S was exacerbated by VOCs is supported by data, and has been previously found by the Court.

Once again, Defendants' attempt to re- litigate previous findings by the Court by repackaging the same argument they made at the General Causation trial. "Although not necessary to the Court's opinion, the Court also finds that other compounds present in the Landfill's emissions enhanced the intensity of the bad odor… VOCs, even when individually below odor detection thresholds, can have an additive, sub-addtitive, or synergistic effect to enhance the bad odors." Rec. Doc. 323 at 34-35. The Court further found that these VOCs were a "unique chemical signature for what's coming off the landfill and that VOCs accompanied hydrogen sulfide to form the odor clouds" *Id* at 25 and 35. Having found that communities adjacent to the landfill were exposed to VOCs from the landfill, since these chemicals travel with hydrogen sulfide- logic requires that where Mr. Lape's air modeling shows exposure to hydrogen sulfide at a Trial Plaintiff's residence, there was also exposure to VOCs from the JPLF. Based on Plaintiffs' modeling, the duration of exposure is known to be in excess of 5ppb (of hydrogen sulfide- as a base measurement) for a period of 30 minutes or more.

Alternatively, it must be mentioned that Defendants' argument as to this point makes a critical error in analysis. Plaintiffs are not claiming that odors or VOCs from the JPLF are toxic in the concentrations experienced by the Plaintiffs. Plaintiffs are claiming that the odors and VOCs from the JPLF were annoying, interrupted their daily lives, and caused physiological effects as a result of the psychological irritation of the brain through the olfactory and trigeminal nerves. Low levels of VOCs, in combination with H2S caused this annoyance, and it is the "synergistic effect" of the VOCs that enhance the bad odors. (Rec. Doc. 323 at 35). Therefore, Defendants' analysis

8

related to "minimum standards" of specific causation in toxic tort cases are misguided. Here, general causation has already been established by expert testimony and the cause injuries are issues of common knowledge.[14] *See Guidry v. Dow Chem. Co.*, No. CV 19-12233, 2021 WL 4460505, at *2 (E.D. La. Sept. 29, 2021). In *Guidry*, the Court noted that almost identical injuries "eyes, nose, or throat irritation, coughing, choking or gagging, or nausea, or headaches, dizziness, trouble breathing, or other respiratory issues" caused by ethyl acrylate exposure was common knowledge. *Id*. Therefore, since general causation has already been established and the injuries are of "common knowledge" Plaintiffs' experts are not required to engage in an analysis of the type of chemical, level, or dose.

### D. Dr. Schiffman is qualified to testify about, and has sufficient evidence to support, her opinions that emissions from the JPLF cased the injuries of the 13 Trial Plaintiffs.

Again relying on Dr. Schiffman's testimony at the general causation trial, the Court adopted her opinion the odors experienced by the Plaintiffs were from the JPLF. Rec. Doc. 323 at

---

[14] "In toxic tort cases such as this one, the Fifth Circuit has typically required expert testimony to prove causation. *See, e.g., Seaman v. Seacor Marine L.L.C.*, 326 Fed. Appx. 721, 729 (5 Cir. 2009) Thus, if this Court holds that the relation between the ethyl acrylate and the complained-of injuries is "within the layperson's common knowledge," the general causation evidence which Plaintiffs intend to present at trial is sufficient to meet their burden of proof with regard to summary judgment. Louisiana courts have found that common issues such as "dehydration, overheating, exhaustion, mental anguish, fear, stress, anxiety, and depression" are within common knowledge. *Ainsworth v. Am. Home Assur. Co.,* 239 So. 3d 359, 365-366 (La. App. 4 Cir. 2018). The court therein held that "medical expert testimony is not required to establish causation for temporary pain and suffering." Id. at 366. The complaints presented in this case – which include "eyes, nose, or throat irritation, coughing, choking or gagging, or nausea, or headaches, dizziness, trouble breathing, or other respiratory issues," according to the Plaintiffs – are all forms of temporary pain and suffering.[2] Once again, however, Defendants have confused specific and general causation. Plaintiffs have produced an expert whose opinion, if accepted by the jury, will suffice to prove that the injuries suffered by members of the class could have been caused by the ethyl acrylate release. This is the necessary role of expert testimony in a case where issues of common knowledge are at play. *See Guidry v. Dow Chem. Co*., No. CV 19-12233, 2021 WL 4460505, at *2 (E.D. La. Sept. 29, 2021)

9

25. In her report dated January 28, 2024, Dr. Schiffman noted that the "probability that 29 of the 35 of the same [VOC] compounds found at the JPLF appeared, by chance near Plaintiffs'' residences was 2.8 chances in 1,000,000,000,000,000,000.[15]

Dr. Schiffman's opinions on specific causation flows from findings already made by the Court; specifically that the JPLF emitted odors and gases into the community that were capable of causing headaches, nausea, vomiting, fatigue, dizziness, loss of appetite, sleep disruption, anxiety, worry, and decrease in quality of life.[16] And as discussed above, because the injuries of which the Trial Plaintiffs' complain, specific causation expert testimony is unnecessary for these conditions of "common knowledge."[17] Nevertheless, utilizing air modeling from James Lape, Dr. Schiffman is able to state affirmatively that exposure to a substance (in this case, hydrogen sulfide at a level of 5ppb or higher for a period of 30 minutes or more) caused a particular Plaintiff's injuries. Mr. Lape's modeling is based on the emission rate established by Plaintiffs' experts Jose Sananes and Jana Pietari. Lape was able to model particular instances of exposure for each Trial Plaintiffs' residence during the relevant time period. Having found that the JPLF emitted odors capable of causing injury at the 5ppb/30 minute exposure level (general causation ruling); that the individual Trial Plaintiffs were exposed during the relevant time-period (Lape's modeling); and that said Plaintiffs complained of the enumerated injuries during the relevant time period, meets the threshold requirement for a specific causation analysis. Dr. Schiffman's report cites the scores of

---

[15] *See* Exhibit 4- Schiffman Supplemental Report at 29 (January 28, 2024). Dr. Schiffman writes, "the fingerprint of the VOCs along with additional documents and evidence indicate that the JPLF was the source of malodor experienced by the Plaintiffs." Additional data to support her opinions include supported by statements from Parish President Mike Yenni and others, interviews and articles associated with WGNO and WWLTV, reports by Dr. Pietari, Jose Sananes, and Jim Lape, and the 2018 report by Carlson Environmental Consultants Assessment and Report. Id at 29-30.
[16] Rec. Doc. 323 at 44.
[17] *Guidry v. Dow Chem. Co.*, No. CV 19-12233, 2021 WL 4460505, at *2

10

data and information she reviewed in forming specific causation opinions for each Trial Plaintiff. This includes Plaintiffs' deposition testimony, Plaintiff Fact Sheets, discovery responses, and complaints to the LDEQ and through social media.[18]

To the extent a differential diagnosis is required, Dr. Schiffman's opinions on specific causation are bolstered by opinions from Plaintiffs' medical experts Dr. Robert DeLorenzo, M.D. MPH - a board certified neurologist and toxicologist, and Dr. Michael Spodak, M.D., a board certified psychiatrist, who were charged with examining each Plaintiff and providing opinions on medical causation including a differential diagnosis for other potential causes of injuries. [19]

In sum, Dr. Schiffman's five decades of research in the field of odor psychology and impacts of odors is truly unprecedented. Using this wealth of experience, Plaintiff and community data of odor injuries and complaints, as well as modeling by James Lape, Dr. Schiffman clearly possesses the evidence, knowledge, and skill to furnish opinions relating to specific causation.

Dated: June 13, 2024

/s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)

---

[18] *See* Exhibit 4 at 9.
[19] Mr. Lape is not the subject of any current *Daubert* challenges.

11

James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

FORREST CRESSY & JAMES, LLC Byron M. Forrest (La. Bar No. 35480) Nicholas V. Cressy (La. Bar No. 35725) S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

*Counsel For Addison Plaintiffs*

12