UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


FREDERICK ADDISON, ET AL.,          CIVIL ACTION NO.
                                    19-11133,
VS.                                 C/W 19-14512

LOUISIANA REGIONAL                  SECTION: "E"(5)
LANDFILL COMPANY, ET AL.
                                    JUDGE:  MORGAN

                                    MAGISTRATE JUDGE:
                                    NORTH


          The remote videotaped deposition of

SUSAN SCHIFFMAN, PH.D., appearing from Durham,

North Carolina taken in connection with the

captioned cause pursuant to the following

stipulations before  RITA A. DEROUEN, Certified

Court Reporter, on the 26th of April, 2024,

beginning at 11:05 a.m. Eastern Time.

Page 2

```
 1  REMOTE APPEARANCES:

 2   REPRESENTING THE ADDISON PLAINTIFFS:

 3
    WHITEFORD, TAYLOR & PRESTON LLP
 4  BY:  C. ALLEN FOSTER, ESQ.
    1,800 M Street, NW
 5  Washington, DC 20036
    202-659-6787
 6  cfoster@whitefordlaw.com

 7     - AND -

 8  FORREST CRESSY & JAMES, LLC
    BY:  S. ELIZA JAMES, ESQ.
 9  1222 Annunciation Street
    New Orleans, Louisiana  70130
10  504-605-0777
    eliza@fcjlaw.com

11

12   REPRESENTING THE ICTECH-BENDECK PLAINTIFFS:

13  HAMMEL LAW FIRM, LLC
    BY:  DOUGLAS S. HAMMEL, ESQ.
14  3129 Bore Street
    Metairie, Louisiana  70001
15  504-832-9942
    douglashammel@gmail.com

16

17   REPRESENTING THE WASTE CONNECTIONS DEFENDANTS:

18  BEVERIDGE & DIAMOND PC
    BY:  MEGAN BRILLAULT, ESQ.
19  BY:  KATRINA M. KREBS, ESQ.
    825 Third Avenue
20  16th Floor
    New York, New York  10022
21  212-702-5456
    mbrillault@bdlaw.com
22  kkrebs@bdlaw.com

23     - AND -

24

25
```

Page 3

1   REMOTE APPEARANCES:   (CONTINUED)

2 LISKOW & LEWIS, APLC
  BY:   MICHAEL C. MIMS, ESQ.
3 BY:   CHERRELL S. TAPLIN, ESQ.
  701 Poydras Street
4 Suite 5000
  New Orleans, Louisiana   70139
5 504-581-7979
  mmims@liskow.com
6 ctaplin@liskow.com

7
   REPRESENTING THE DEFENDANT JEFFERSON PARISH:
8
  CONNICK & CONNICK, LLC
9 BY:   MICHAEL S. FUTRELL, ESQ.
  BY:   MATTHEW D. MOGHIS, ESQ.
10 3421 N. Causeway Boulevard
   Suite 408
11 Metairie, Louisiana   70002
   504-681-6649
12 mfutrell@connicklaw.com
   moghis@connicklaw.com
13

14  REPRESENTING THE DEFENDANT APTIM CORP.:

15 GIEGER, LABORDE & LAPEROUSE, LLC
   BY:   JOHN E.W. BAAY, II, ESQ.
16 701 Poydras Street
   Suite 4800
17 New Orleans, Louisiana   70239
   504-654-1373
18 jbaay@glllaw.com

19  Also Present:

20        William Rain, Videographer
          John Kind, Ph.D., CIH, CSP, Expert Witness
21        Pamela Dalton, Ph.D., Expert Witness

22

   Reported by:
23
        Rita A. DeRouen, Certified
24      Court Reporter No. 2014018
        in and for the State of
25      Louisiana

Page 4

1                               I N D E X

2                                                    Page

3    Reporter's Page                                 304
     Certificate                                     305
4
     EXAMINATION
5        BY MS. BRILLAULT:                              5

6
                            *  *  *  *  *
7
                         List of Exhibits
8
Exhibit #1                                            6
9        (Defendants' Notice of Deposition of Susan
         Schiffman)
10
     Exhibit #2                                       39
11       (Expert Report in the Matter of Odor
         Complaints in Jefferson Parish, New Orleans,
12       LA, 1-28-24)

13   Exhibit #3                                       39
         (Rebuttal Report, 3-29-24)
14
     Exhibit #4                                       43
15       (American Psychological Association, Ethical
         Principles of Psychologists and Code of
16       Conduct)

17   Exhibit #5                                       183
         (Virginia Department of Health Paper, 2023)
18

19

20

21

22

23

24

25

```
 1          THE VIDEOGRAPHER:
 2              We are now on the record for the video
 3          deposition of Dr. Susan Schiffman.  The
 4          date is April 26, 2024.  The time is
 5          11:05 a.m., Eastern Time.  The witness is
 6          appearing remotely from Durham,
 7          North Carolina.
 8              This is the matter of Frederick
 9          Addison, et al., vs. Louisiana Regional
10          Landfill Company, et al.  This is filed
11          before the United States District Court
12          for the Eastern District of Louisiana.
13              The court reporter is Rita DeRouen.
14          The videographer is Will Rain.  We both
15          represent Veritext.
16              And will the court reporter please
17          administer the oath.
18              SUSAN SCHIFFMAN, Ph.D.,
19  having been first duly sworn, was examined and
20  testified as follows:
21                      EXAMINATION
22  BY MS. BRILLAULT:
23     Q.  Great.  Good morning, Dr. Schiffman.
24  We've met a few times previously, years ago.  So I
25  will introduce myself again.
```

Page 6

1          My name is Megan Brillault.  I represent

2    the Waste Connections defendants, which consists

3    of Louisiana Regional Landfill Company, Waste

4    Connections U.S., and Waste Connections Bayou.

5          Can you just please restate your name for

6    the record.

7          A.  Susan Schiffman.

8          Q.  I'm going to introduce the first exhibit.

9    We're going to mark it Schiffman 1.  And it's the

10   notice of deposition.  Just give me one second.

11   I'll be bringing it up on the shared screen.

12          (Exhibit 1, remotely introduced and

13          provided electronically to the reporter.)

14   BY MS. BRILLAULT:

15          Q.  Do you see this document, Dr. Schiffman?

16          A.  Uh-huh, yes.

17          Q.  Have you seen it before?

18          A.  I don't think I've seen it.

19          Q.  You're aware of what a notice of

20   deposition is, it's just to require your presence

21   at the deposition today?

22          A.  I was just told that it would be on

23   April 26th, that's all I was told.

24          Q.  Okay.  And you just took an oath.  So you

25   understand that you're under oath as we sit here

SCHIFFMAN SUSAN

 1   today?

 2        A.   Absolutely, uh-huh.

 3        Q.   And you understand that the oath that you

 4   took is the same one you will take at trial in

 5   August?

 6        A.   Correct.

 7        Q.   And it has the same effect as that oath

 8   that you'll be taking in August at trial?

 9        A.   Say that again.

10        Q.   It has the same effect as an oath that you

11   would be taking in court at trial --

12        A.   Yes.

13        Q.   -- that you took today.

14        A.   I assume that's correct.  I mean, I

15   haven't been at trial in August, so I have no

16   idea.

17        Q.   I know you've done depositions.  You and I

18   have been in a deposition together.  So I am sure

19   you understand the rules, but we'll just quickly

20   go over them again so you are on the same page as

21   I am.

22             There's a court reporter.  She's going to

23   be recording everything we say here today that's

24   on the record.  We're doing this by Zoom.  So in

25   order to make sure we have a nice, clear record,

SCHIFFMAN SUSAN

1   you know, please wait until I'm done asking my

2   question; and I will do the same for you, I will

3   wait until you're done responding.

4            That way we can not speak over each other,

5   awkward pauses that happen with technology will be

6   minimal, and then the court reporter has a nice,

7   clear record.

8            Does that make sense?

9       A.  Yes.

10      Q.  If you don't understand my question,

11  please let me know and I will try to rephrase it.

12           Does that make sense?

13      A.  Yes.

14      Q.  If at any time during the deposition you

15  realize that an earlier answer was incorrect or

16  there's something you need to change about your

17  testimony, please let me know and we can revisit

18  that, okay?

19      A.  Yes.

20      Q.  And, of course, if you need to take a

21  break, as long as there's a question not pending,

22  we can go ahead and do so if it makes sense.  I

23  will do my best to do that in a timely manner on

24  breaks.

25           Is that okay?  We need a verbal answer,

Page 9

1  Dr. Schiffman.

2      A.  What?

3      Q.  I said, "Is that okay," for the breaks.

4          THE COURT REPORTER:

5              I'm sorry, this is the court reporter.

6          Can we go off the record for a second?

7          MS. BRILLAULT:

8              Yes.

9          THE VIDEOGRAPHER:

10             We are off the record at 11:09 a.m.

11         (Brief delay.)

12         THE VIDEOGRAPHER:

13             We are back on the record at

14         11:10 a.m.

15 BY MS. BRILLAULT:

16     Q.  Dr. Schiffman, do you understand all the

17 instructions that we went over before we took that

18 quick break?

19     A.  Yes.

20     Q.  Okay.  Is there anything that affects your

21 ability to listen and understand the questions

22 here today --

23     A.  No.

24     Q.  -- and respond to the questions?

25         Dr. Schiffman, are you familiar with the

1 difference between general causation and specific

2 causation?

3      A.  Not particularly, no.

4      Q.  So you have -- you don't -- there -- let

5 me rephrase.

6          If I ask you what general causation is,

7 would you be able --

8      A.  I'm not a lawyer.  I don't go into the

9 details.  I only -- I'm strictly interested in the

10 science.

11      Q.  But in science, there is a difference

12 between general causation and specific causation.

13          Do you understand that?

14      MR. FOSTER:

15              Objection to the form.

16              Go ahead and answer.

17      A.  Why don't you -- why don't you describe it

18 to me and then I can answer it.

19 BY MS. BRILLAULT:

20      Q.  Well, I'm asking you if you know, as a

21 scientist, the difference between general

22 causation and specific causation?

23      A.  It's not a scientific concept.  It's a

24 legal concept.

25      Q.  What is "causation" to you?

Page 11

1      A.   What is "causation" to me?

2      Q.   Yes.   What does "causation" mean?

3      A.   It means that something happened because

4   of an event or a con -- you know,

5   something -- something happened because of a

6   certain event, okay?   That would probably be a

7   good way of describing it.

8      Q.   And if there's multiple causes -- let me

9   rephrase that.

10        If there's multiple possibilities for a

11   cause, how do you determine which cause is

12   actually the reason for that event happening?

13        MR. FOSTER:

14             Objection to the form.

15      A.   Well, you have to give me a specific

16   example.   Are you talking about the Jefferson

17   Landfill or are you talking about something in

18   general?

19        I think, to me, this deposition is about a

20   specific issue, and I think that that's what I

21   had -- I was understood -- it was understood that

22   I was going to be deposed about, not philosophical

23   questions.

24   BY MS. BRILLAULT:

25      Q.   Dr. Schiffman, you've provided an expert

1  opinion in this case, correct?

2      A.  Yes, that is correct.

3      Q.  And I'm allowed to ask you questions that

4  relate to your expert opinion, which includes the

5  methodology, correct?

6      A.  Correct, absolutely.

7      Q.  Okay.  And so I'm testing out trying to

8  figure out your understanding of your methodology,

9  which includes a causation analysis.  So my

10 questions are trying to understand what you

11 understand about causation.

12     A.  I think I am quite clear about what

13 causation means, okay, specifically in this case.

14     Q.  Well, I'm asking you to define that on the

15 record, please.  Tell me what you understand

16 "causation" means in this case.

17     A.  It means that, for the most part, the main

18 reason for something happening is because of a

19 certain event.

20     Q.  You used the word "main reason" there.

21     A.  Uh-huh.

22     Q.  Does that mean that you need to compare it

23 to other reasons that could be causing the event?

24     A.  I certainly looked at other reasons for

25 causing the event in this particular case.

```
 1      Q.  Okay.  And we'll get into that.

 2          But you would agree that in order to

 3  determine if something is the main reason or the

 4  main cause --

 5      A.  Right.

 6      Q.  -- you look at the other causes and rule

 7  them out or decide it's not a --

 8      A.  Yes, that is correct.

 9      Q.  Okay, great.

10          (Reporter clarification.)

11      MR. FOSTER:

12          And also, if you'll give me time, if I

13          have an objection, to object before you

14          start to answer.

15      THE WITNESS:

16          Okay, uh-huh.

17      MR. FOSTER:

18          Thank you.

19  BY MS. BRILLAULT:

20      Q.  Dr. Schiffman, did you read the Court's

21  general causation decision in this case?

22      A.  Yes, I did, and I thought it was well

23  written.

24      Q.  Okay.  And did you understand that, for

25  general causation, she was determining the level
```

1  at which exposure to odors or to hydrogen sulfide

2  was capable of causing an injury?

3      A.  Yes.

4      Q.  Okay.  And when something is capable of

5  causing an injury, it doesn't mean that it

6  actually caused the injury, right?

7      A.  This is what she said, this is -- this is

8  what she said.  But in general -- in general, the

9  level at which -- how do I -- okay, rephrase the

10  question.  Let me just think about how to answer

11  this.

12     Q.  If something is capable of causing an

13  injury, that doesn't necessarily mean it actually

14  caused the injury?

15     A.  The way in which she used the word, that

16  is correct.

17     Q.  Well, I'm asking generally.  If you say

18  something is capable of causing an injury, does

19  that necessarily mean it caused an injury?

20     A.  Those are two different -- those are two

21  different sentences.  One is "capable of" and the

22  other is "did it," okay?  Those are two

23  different -- two different concepts.

24     Q.  Correct.  I agree with you, they're two

25  different concepts.

Page 15

1          In the general causation, the Court

2    determined what was capable of causing an injury.

3        A.   Correct, uh-huh.

4        Q.   And in this phase of the litigation, which

5    some people refer to as specific causation, but

6    just this case, the question is whether something

7    actually caused an injury?

8        A.   Yes.

9        Q.   Okay.  And just because something is

10   capable of causing an injury or it's possible that

11   it was the cause of an injury doesn't mean that it

12   actually caused that injury?

13        MR. FOSTER:

14             Objection; asked and answered.

15        A.   What it means is that, since it's capable

16   of causing an injury, then let's look and see if

17   the injuries that the people had were, in fact,

18   caused by this issue, by this event, that's what

19   it means.  It's now this is capable of doing that.

20          If somebody finds that a certain drug, for

21   example, is capable of causing a cardiac

22   arrhythmia or an asthma attack or whatever, then

23   if a patient comes in that's taking that drug and

24   has a cardiac event or an asthmatic attack, then

25   you look at that drug to see if that's, in fact,

Page 16

1   the problem.

2   BY MS. BRILLAULT:

3       Q.   And as part of that analysis, the example

4   that you just gave, you would look at other

5   reasons that could be causing it and you would try

6   to rule them out to see if it was, indeed, the

7   drug that caused it or if it was other confounding

8   factors?

9       A.   Correct.

10          MR. FOSTER:

11               Objection to the form.

12      A.   But it's -- if it -- you would certainly

13  look there first if that's, in fact, what the

14  problem -- what a person presents with.

15  BY MS. BRILLAULT:

16      Q.   Correct.  But you would look at --

17      A.   That would be the most intelligent thing

18  to do, would be to see if that is, in fact, the

19  problem.  I mean, that's the first thing that

20  happens when you go in for your annual physical;

21  what drugs do you take, do you have any side

22  effects, et cetera, et cetera.

23          So obviously, a good clinician would look

24  to see if something the person is taking would be,

25  in fact, that problem.

 1    Q.  Great.

 2        And a good clinician would also look and

 3 ask questions about other potential causes to rule

 4 them out or determine if possibly that was the

 5 cause instead of the drug?

 6    A.  Right.

 7        MR. FOSTER:

 8            Objection to the form.

 9 BY MS. BRILLAULT:

10    Q.  As a scientist, do you agree that you

11 shouldn't take statements made on face value?

12    A.  I feel like we're going into something

13 that has nothing to do with this case.  When I

14 listen to a patient, I listen carefully to what

15 they say because most of the time patients are

16 telling me the truth.

17        If that's -- do I -- do I listen to what

18 people say?  I -- I don't like the word "face

19 value," okay?  But I think it is important to

20 listen carefully to what people say and to take it

21 seriously and to figure out what's going on.  Is

22 that a way of describing what I feel?  I don't

23 know.

24    Q.  Well, beyond just patients.  I mean, if

25 you read something in the newspaper, it doesn't

SCHIFFMAN SUSAN

1  necessarily mean it's true, right?

2      A.  That's correct.

3      Q.  And so you want to investigate whether the

4  statement that you're looking at is accurate; is

5  that fair?

6      A.  I can't investigate -- I don't investigate

7  things from the newspaper.

8      Q.  You just take them as face value that

9  they're true?

10      A.  Quite frankly, I don't read the newspaper.

11  So...

12      Q.  What about social media, do you believe

13  everything that's written on social media?

14      A.  I never look at social media.  I don't

15  have a Facebook page, any of that kind of thing.

16  I don't listen to it.  I -- some of it's, I'm

17  sure, accurate and some of it's not.  But I don't

18  participate in social media.

19      Q.  What about for your studies, when people

20  are describing experiences, do you investigate to

21  ensure that their descriptions are accurate?

22      A.  There's no way of ensuring it, is what

23  I've learned, okay, having done a few interviews.

24      Q.  So if there's no way to ensure that it's

25  true, do you just believe them, or do you put some

1   type of --

2       A.  I don't understand what this has to do

3   with the landfill or the case that I'm involved in

4   or the research that I've done.  I mean, it's

5   like, you know, in a -- I have no idea what you're

6   even trying to say.

7       Q.  Well, I'm just trying to understand, if

8   you rely on statements that people make, do you

9   investigate those statements to ensure the

10  accuracy of them for your reliance --

11          MR. FOSTER:

12              Objection to the form.

13  BY MS. BRILLAULT:

14      Q.  -- before you include it in your expert

15  report?

16      A.  I rely on people who tell me medical

17  issues that have to do with medical problems, and

18  I listen to them carefully and try to find out

19  what the problem is.

20      Q.  And do you investigate to -- do you take

21  any steps to ensure that what they're telling you

22  is accurate?

23      A.  How do you do that?  You tell me how to do

24  it.

25      Q.  I'm asking you if you do or not.  It's

1   just a yes-or-no question.

2       A.   Well, some things you can -- some things

3   you can verify and some things you can't.  But you

4   have to listen carefully because usually people

5   are telling you something, and you have to find

6   out what the problem is.

7       Q.   So you don't take any steps to confirm

8   what people are saying is accurate?

9       A.   It depends on what -- I think you need

10  something more specific.  I feel you're asking me

11  questions that are so general.  You need to ask

12  something more specific.  I mean, ask me if a

13  certain -- in a certain situation would I do

14  so-and-so-and-so, or what would I do.

15          I'd be perfectly happy to answer that kind

16  of question.  But what you're asking right now is

17  a -- I don't know.  It has no -- it has no

18  relevance to this case whatsoever that I can

19  figure out.

20      Q.   Well, if you can't answer the question,

21  you can say you don't -- you don't -- you can't

22  answer the question.

23      A.   I have no idea what you're driving at, and

24  I think you have to tell me what you're -- what is

25  it specifically you want to know.

Page 21

1          Did I read the newspaper and make a

2    decision as to so-and-so on page -- on June, I

3    don't know, 21, 2019 or something like that?  Ask

4    me what I -- ask me something like that.  But what

5    you're doing right now is totally irrelevant, in

6    my opinion.

7          Q.  That's fine you think it's irrelevant.

8          So I guess my question is:  Am I correct

9    that you can't answer that question that I asked?

10         A.  I have no idea --

11         MR. FOSTER:

12              Objection to form.

13         A.  I have no idea what the question even is

14    about.

15    BY MS. BRILLAULT:

16         Q.  I actually forgot now that you went on.

17         So the question I have is:  Do you take

18    any steps to ensure that statements made to you by

19    patients or study participants or individuals that

20    you're assessing are accurate?

21         MR. FOSTER:

22              Objection to the form.

23         A.  It depends on what situation we're in.  If

24    it's a patient coming into my office, okay, I

25    always took -- I mean, they had -- then there's

1  always the question do they have insurance, all

2  those kinds of questions.

3          You do the most you possibly can to verify

4  what they're saying so that you know what the

5  treatment is.  It depends on whether there's

6  treatment involved.

7          But if somebody comes in and says -- like

8  a neighbor the other day said, I have just this

9  terrible headache.  Am I supposed to say, Oh,

10  well, let me see, let me take you up to get a CAT

11  scan or an MRI to see if you're, in fact, telling

12  me the truth.  That's a ridiculous kind of

13  thought.  So I take for granted that she says she

14  has a headache and she means it.

15  BY MS. BRILLAULT:

16     Q.  Dr. Schiffman, do you believe that telling

17  the truth means telling the entire story?

18          MR. FOSTER

19              Objection to the form.

20     A.  Most people don't understand a lot of

21  times why they have a headache or why they have

22  certain symptoms.  So what does it mean, telling

23  the whole story?  Most people probably don't know

24  the whole story.

25  BY MS. BRILLAULT:

1    Q.  Well, let me ask it a different way.

2         If someone omits information that might

3    change the meaning of what they're saying, do you

4    believe that person is making a misrepresentation?

5         MR. FOSTER:

6              Objection to the form.

7    A.  I feel we're having an irrelevant,

8    philosophical question that has nothing to do with

9    this case and is a waste of time.

10   BY MS. BRILLAULT:

11   Q.  If you omitted information about a study

12   that would otherwise change the meaning or your

13   conclusion in that study, do you believe that

14   would be a misrepresentation?

15              MR. FOSTER:

16                   Objection to the form.

17   A.  I -- I have to tell you, I am frustrated

18   with the questions because they don't seem to have

19   anything to do with what we're -- what this case

20   has to -- why I'm here as an expert witness.

21   BY MS. BRILLAULT:

22   Q.  Dr. Schiffman, are you able to answer that

23   question?

24   A.  I have no idea what the question means.

25   Q.  Okay.  If you omitted material information

1  into -- regarding an analysis that you were doing

2  in a study, would you consider that a

3  misrepresentation?

4      A.  I would not omit -- I would not omit

5  something that I've done, no.

6      Q.  But if you did, would that be a

7  misrepresentation?

8      A.  I don't know what the situation is, so I

9  can't say.  I'm just telling you I don't omit --

10  you have the data.  You have my analysis.  I

11  didn't know -- I mean, that's what it is.  I don't

12  know what -- do you feel that I've omitted

13  something?

14      Q.  I'm asking you if you -- so you don't omit

15  information because you feel that would be a

16  misrepresentation; is that a fair way to say it?

17          MR. FOSTER:

18              Objection to the form.

19      A.  I don't understand the question.  Somehow

20  or another you're driving at something that has

21  nothing to do with me and my credentials in this

22  case, I have no idea what you're talking about.

23  BY MS. BRILLAULT:

24      Q.  Well, I'm asking:  Do you believe that

25  misrepresentation can be done by omission versus a

1  blatant misstatement of --

2      A.  It depends on what they omitted.  I mean,

3  I don't know.

4          MR. FOSTER:

5              Objection to the form.

6  BY MS. BRILLAULT:

7      Q.  And if it was relevant to the final

8  conclusion, that omission would be a

9  misrepresentation?

10     A.  I have --

11         MR. FOSTER:

12             Objection to the form.

13     A.  I don't know what the situation is.  I'd

14  have to see what the situation is.  Otherwise, I

15  have no idea what you're talking about.  It's not

16  relevant to my role in this case.

17  BY MS. BRILLAULT:

18     Q.  That's not the question.

19             But are you familiar with the phrase

20  "compensation neurosis"?

21     A.  Compensation neurosis.  I've heard -- I've

22  heard the word, but I don't know what it is.

23     Q.  Do you understand that it's where there's

24  a monetary incentive involved with respect to a

25  causation determination, that sometimes people

1  will misstate or change the facts in order to --

2      A.  I'm sure that happens.  I'm not --

3          MR. FOSTER:

4              Objection to the form.

5      A.  I would not be surprised if that happens.

6  I used to see workman's comp cases, so I think

7  that there were times that people -- that was

8  always what my role was as a medical psychologist,

9  was to evaluate whether the -- how much of this is

10  a problem and how much of it is not a problem.

11  BY MS. BRILLAULT:

12      Q.  What were you asked to do for this phase

13  of the litigation?

14      A.  For this -- at the beginning, I was just

15  asked to be a consultant on it with regard to

16  odor, and I had no intention of getting involved

17  in the litigation.

18          And then as I saw -- as it moved into it

19  more and more and more, I felt there was a real

20  injustice here, and I finally agreed that I

21  would -- that I would partake as a -- as an

22  expert.  It wasn't something I was looking forward

23  to.

24      Q.  Do you recall when you were first retained

25  as a consultant in this case?

Page 27

```
1        A.   I don't memorize dates.

2        Q.   If I said January 2019, would that sound

3   about right?

4        A.   That sounds about right.

5        Q.   I only say that because I saw your

6   consult -- or plaintiffs' attorneys produced --

7        A.   I remember Barry Newman said would I do

8   it, and I said, Well, I don't know -- I mean, he

9   called me up, and I said I would look at it.  And

10  he said, Well, I think I'll give you a retainer,

11  or something like that.  And then it -- the whole

12  thing was dropped.

13           So then it came back in again.  So I don't

14  know.  But I do not store those kind of things.  I

15  don't know what law firm you're from.  I don't

16  know any of those -- this is just not part of my

17  thinking.  I think strictly in terms of science

18  and how -- how I think things go in terms of

19  reality.

20       Q.   In science, there's a methodology, right?

21       A.   In science there's a methodology.

22       Q.   And part of that methodology is

23  determine -- well, is figuring out an approach to

24  determine what the cause of an injury, for

25  example, is?
```

Page 28

 1      A.  Excellent.  That's an excellent
 2  definition.
 3      Q.  And so in the first phase of this
 4  litigation, we talked about it, that was the
 5  general causation phase, and you issued an expert
 6  report; is that correct?
 7      A.  Correct.
 8      Q.  And in that expert report, you provided
 9  opinions on what types of exposure could cause the
10  injuries, right?
11      A.  Correct, uh-huh.
12      Q.  You went to trial, you testified at trial.
13  The Court issued an opinion on general causation.
14  And now we're in this phase, and you issued a
15  second report at the very end of January of 2024?
16      A.  Right.
17      Q.  And for that report, what were you asked
18  to do?
19      A.  I was just asked to revise my report with
20  regard to those specific subjects, I guess they're
21  called trial plaintiffs, and to look at the
22  modeling -- the new modeling at those particular
23  locations.
24      Q.  Were you asked to do anything else besides
25  look at the new modeling that went to the

1  particular eight locations of the trial

2  plaintiffs?

3      A.  And the specific -- and I went through all

4  the -- all of the depositions of the -- and their

5  fact sheets, you know, of the individual people.

6  I went through the data on -- for each of the

7  individual people.

8          I went through especially -- as I read

9  through them, I could just hear the pain in their

10  voices.  You know, the problem was still there.  I

11  mean, obviously there's memory of how miserable

12  this whole situation was over several years.  So

13  that struck me.  I read through them several

14  times.

15      Q.  You mentioned you went through the data.

16  Let's talk about what data you went through.

17          You mentioned plaintiff fact sheet

18  responses, is that --

19      A.  Fact sheets, and then there were some

20  phone calls, and there were -- and then there were

21  all the depositions.  So I went through all the

22  depositions several times.

23      Q.  Okay.  You said fact sheets -- you said

24  phone calls?  You had individual phone calls?

25      A.  I think there were some data --

1   supplementary data of some kind, I can't remember

2   exactly what it was.  But I think -- I think that

3   there was information that was gathered by phone.

4       Q.  You, yourself, didn't speak to the

5   individuals on the phone?

6       A.  I did not.

7       Q.  Okay.  So the fact sheets and then

8   supplemental responses to those fact sheets; is

9   that correct?

10      A.  Yes, correct, uh-huh.

11      Q.  And then you reviewed the deposition

12  transcripts or watched the video depositions?

13      A.  I didn't watch them.  I read the

14  depositions.

15      Q.  Okay.  Did you review any of the discovery

16  responses, the written discovery responses that

17  plaintiffs provided?  They're called

18  interrogatories.

19      A.  I don't know.  I had so many pieces --

20  pieces of information.  I went through everything

21  that I had, okay?

22      Q.  And just to be clear, everything you had,

23  did you list that in the information considered in

24  your expert report?

25      A.  Probably.

1      Q.  I need to know, because I need to know

2  what information you considered.  So --

3      A.  Well, whatever is -- let me see if I can

4  find it here.

5      Q.  Well, we can come to that.  Let me just --

6      A.  Okay.

7      Q.  So we said fact sheets, supplemental fact

8  sheets, deposition transcripts.

9           Did you review any medical records of the

10  individual plaintiffs?

11      A.  Yes.

12      Q.  You did?  You reviewed the medical

13  records?

14      A.  I reviewed the records of -- no, of the --

15  of two -- two -- Delorenzo and one other person.

16      Q.  Spodak?

17      A.  Yes.  I reviewed those.

18      Q.  Okay.  So when you said "the records," you

19  reviewed their expert reports?

20      A.  I reviewed their expert reports, yes.

21      Q.  Did you review the underlying medical

22  records --

23      A.  No, I did not.

24      Q.  Just let me finish so the court reporter

25  can get it.

 1          Did you review the underlying medical

 2   records for each of the individual plaintiffs?

 3      A.  No.

 4      Q.  Did you review any of the IMEs,

 5   independent medical evaluations, that were

 6   performed on the individual plaintiffs?

 7      A.  No.

 8      Q.  I'm sorry, did you respond?

 9      A.  No, I did not.

10      Q.  You did not review them, okay.  Hold on

11   one sec.

12          Okay.  So going back to the phone calls, I

13   understand that you weren't on the phone calls.

14   Were the phone calls in connection with the fact

15   sheet responses or were they more recently, if you

16   know?

17      A.  No.  The phone calls, what happened I --

18   during -- at some point, I think it was during

19   COVID or whatever, that sometimes people didn't

20   come in and they'd get -- information was gathered

21   by phone call.

22          I had supplemental -- they were labeled in

23   a kind of crazy way, so I couldn't quite figure

24   out exactly what was going on, but I read them.

25   So I don't know exactly how they were obtained,

Page 33

1   whether it was by phone call or in person.

2           But I had the fact sheets and some

3   supplemental information and then the depositions,

4   which are the ones that I relied on.

5       Q.  And then Dr. Spodak's expert report?

6       A.  Right.

7       Q.  And Dr. Delorenzo's?

8       A.  Uh-huh.

9       Q.  You never spoke with the individual

10  plaintiffs?

11      A.  No, I did not.

12      Q.  That means you never had examinations of

13  the individual plaintiffs?

14      A.  I did not.

15      Q.  You didn't speak to any of their

16  physicians, I'm assuming?

17      A.  I did not.  That was the physician -- I

18  mean, that was Dr. Delorenzo.  That was his -- as

19  I understand, that was part of his role.

20      Q.  And so you looked at that information, you

21  looked at the modeling from Mr. Lape that went to

22  each of the eight locations, 13 trial plaintiffs

23  but eight locations; is that accurate?

24      A.  13 people, uh-huh.

25      Q.  And then you provided the opinions on

Page 34

1   specific causation?

2       A.   Okay, so what you're trying to say,

3   specific location -- specific -- specific meaning

4   specific people versus general, meaning more

5   people in the environment; is that the way you

6   want to describe this?

7       Q.   Well, I think it's specific causation --

8   the way I understand it is did this exposure

9   actually cause the injuries complained of?

10          MR. FOSTER:

11              Objection to the form.

12   BY MS. BRILLAULT:

13       Q.   Or said a different way, is --

14       A.   I think -- here's the thing that I would

15   say to you:  Is it -- there are people who are

16   vulnerable to certain things, okay?

17          The reason I happen to be up in the room

18   that I am in at the moment and that we hired

19   somebody to take some -- something off the wall of

20   a basement area.  They used a compound that is so

21   horrendously violent smelling and irritating that

22   we moved our bedroom up someplace else, okay?  And

23   now I'm in a different room, okay?

24          So my husband's very vulnerable to this.

25   So that's -- so if something else happened to him

Page 35

1   while he's got a headache from this horrible stuff

2   that they put on the wall, then he -- then

3   something else happened, what is the cause here,

4   okay?  He is vulnerable to something, okay?

5        So you can have -- you can have somebody

6   who's vulnerable to something and then something

7   else triggers it.  So to say that -- to forget the

8   underlying biological vulnerability of somebody is

9   an inappropriate approach to trying to find out a

10  problem, to solve a problem.

11       If a person gets frequent headaches but

12  this -- something else triggers those headaches,

13  are you going to say, Well, they always get the

14  headaches anyway?  That's not -- that's not an

15  appropriate approach, if that's what we're driving

16  at.  I have no idea where you're going with this,

17  but...

18  Q.  Well, building off of what you just said,

19  said a different way, if someone is not vulnerable

20  to a specific exposure, then they may not have any

21  impacts from that exposure, right?

22       MR. FOSTER:

23            Objection to the form.

24  BY MS. BRILLAULT:

25  Q.  They --

SCHIFFMAN SUSAN

1      A.  Not necessarily.  It may be -- it may be

2   something that most people would have a problem

3   with at a certain level.

4      Q.  But it depends, right?  You have to look

5   at the individual and the actual exposure.

6      A.  I think there's certainly individual

7   differences, no question.

8      Q.  And you have to look at the actual

9   exposure for each individual to make that

10  determination on causation?

11     A.  Sure.

12     Q.  Okay.  You mentioned that the trial was

13  happening in August.  It's starting on

14  August 12th.

15         Is there anything that's going to prevent

16  you from testifying at trial in August with

17  respect to your opinion?

18     A.  I'm doing it by Zoom.  The reason why is

19  that we've lost four of our closest friends to

20  COVID.  And if I were to testify in court, it

21  would be with a mask, and I would prefer not doing

22  that.

23     Q.  But if you had to testify in person, you

24  could do so with a mask?

25     A.  With a mask if I had to.  But I prefer not

                                                        Page 37

 1    to.

 2         Q.  All right.

 3         A.  August 12th?  I thought it was the

 4    20-something.

 5         Q.  The dep -- sorry, the trial starts on

 6    August 12th.  I don't think the lawyers have sat

 7    down and figured out exactly when --

 8         A.  The 12th -- the problem for me is my

 9    husband starts teaching, and I probably will be

10    doing some of it too on -- I don't know, I'd have

11    to look up when NC State starts, okay?

12         Q.  I'll let you have those conversations, the

13    exact conversations, with your attorneys.  But

14    it's scheduled for three weeks.  So you're not

15    going to be there for the full three weeks, I'm

16    assuming.  But there's going to be --

17         A.  I'll be there for one or two days at the

18    very most.  And I thought Mr. Foster sent me a

19    note saying it had been moved several weeks down

20    from the date that it originally was.  I thought

21    it was 20-something.

22         Q.  Maybe he -- I can't speak for Mr. Foster.

23    And, again, you can have this conversation.  But

24    I'm assuming he's estimating when you're actually

25    going to be testifying versus the very first day

Page 38

1    of trial when we're picking the jury and things

2    like that.  So just making sure you're available

3    at some point when you're needed in August for

4    your testimony.

5        A.  I'm certainly available by Zoom.

6        Q.  And in person with a mask if required but

7    not preferred?

8        A.  Yeah.  But my goal would be not because --

9    well, I won't go through all the details.  But I

10   would prefer -- I don't like doing it.  When I am

11   in -- it's just very frustrating to have to go on

12   a plane where -- I have to fly to something in a

13   couple weeks.  And just being on a plane with a

14   mask and the whole situation, I just don't like

15   doing it.  When we have friends over, everybody

16   tests.

17           MS. BRILLAULT:

18               All right.  I think we're going to

19           shift.  We're going to introduce -- I'm

20           just going to have us mark two exhibits

21           right away.  It's your expert report from

22           January, I think it was dated 28, 2024;

23           and then your reply report, we'll just --

24           we'll mark the expert report as Schiffman

25           2 and then the reply report that was

```
 1              issued -- I don't remember the date of
 2              it -- March 29th, I'll mark that Schiffman
 3              3.
 4              (Exhibit 2, remotely introduced and
 5              provided electronically to the reporter.)
 6              (Exhibit 3, remotely introduced and
 7              provided electronically to the reporter.)
 8              MS. BRILLAULT:
 9                 But we'll focus on the January expert
10              report first.  And I will ask my lovely
11              assistant, Katrina, to turn to page 6.
12    BY MS. BRILLAULT:
13       Q.  And, Dr. Schiffman, if you have an expert
14    report in front of you, that's fine.  We'll be
15    sharing the screen and --
16       A.  Yeah, unfortunately it's double-sided.  I
17    was trying to save paper.
18       Q.  Yeah.
19       A.  Okay, I'm there.
20       Q.  We're going to start with your
21    qualification section.
22       A.  Uh-huh.
23       Q.  And I'm going to try to focus, since it
24    seems like a lot of your expert report was carried
25    over from your initial expert report back in
```

1   2021 --

2       A.   Yeah, correct, uh-huh.

3       Q.   -- I'll do my best to focus in on some of

4   the different -- the changes, the additions or,

5   you know, whatever has changed, but there may be

6   some questions I ask on things that you had in

7   your prior report.

8            All right.  So according to this

9   paragraph, in 2022 you became -- and I say "this

10  paragraph," paragraph 1, apologies -- you became

11  an adjunct professor in the Joint Department of

12  Biomedical Engineering?

13      A.   Correct.

14      Q.   And that's at University of North Carolina

15  and North Carolina State?

16      A.   Uh-huh, correct.

17      Q.   Okay.  What was the shift from?  You were

18  previously in the --

19      A.   Of the EE, yeah.

20           (Reporter clarification.)

21      A.   Electrical engineering, okay?  I was

22  strictly in electrical engineering.  I was doing a

23  lot of work on electronic nose technology, but I

24  also did work on other areas that are more

25  biological.

SCHIFFMAN SUSAN

1          So it seemed like the more reasonable

2    thing was for me to be in biomedical rather than

3    in EE since -- since biomedical included the

4    e-nose work, included other kinds of things that I

5    do, so we decided that the move would be better to

6    be in EE rather than in -- better to be in

7    biomedical rather than electrical.

8    BY MS. BRILLAULT:

9        Q.   Okay.  And before the EE, you were in --

10   were you in the psychology department before that?

11       A.   I was in the psychiatry department at Duke

12   forever, okay, until I retired from there.  And

13   then -- but I always had -- I had an adjunct

14   appointment at NC State for a long time because I

15   was doing a lot of work in the hog industry doing

16   outdoor air evaluations.

17          So I think -- when was I appointed ag --

18   in ag engineering?  From 1995 to 2007, I had an

19   appointment in that department.

20       Q.   Do you still have a psychology license

21   with the State of North Carolina?

22       A.   Yes.

23       Q.   And it's current?

24       A.   Yes.

25       Q.   Do you know if there's a code of ethics

SCHIFFMAN SUSAN

 1   that you're required to follow?

 2       A.  Absolutely there's a code of ethics.

 3       Q.  And you --

 4       A.  We take ethics courses.  In fact, last

 5   year they had a special one because of a variety

 6   of issues, that we had to take an extra one.  And

 7   then I had -- I think I had maybe eight or ten

 8   hours of ethics last year.

 9           And I also finished -- I've actually

10   finished my ones for this year already.

11       Q.  Okay.  So --

12       A.  It's really, really important, let me tell

13   you.  I think the ethics part is very important.

14       Q.  I agree.

15           And so because it's really important and

16   you've taken all these classes you are very

17   familiar with the principles for --

18       A.  Very, very.

19       Q.  -- the North Carolina --

20       A.  Very familiar.

21       Q.  Do they follow the American Psychologists

22   Association of --

23       A.  Yes, they do, uh-huh.

24           (Multiple speakers.)

25           (Clarification by reporter.)

 1   BY MS. BRILLAULT:

 2       Q.  If I brought up the code of ethics and we

 3   just went through a couple sections, you'd be able

 4   to say that you're familiar with it, is that --

 5   can we do that quickly?

 6       A.  Well, we go by the -- I go by the -- by

 7   the North Carolina one.  But you can certainly --

 8   it's consistent with the APA.

 9       Q.  If I show you something on the APA, it

10   would be consistent with the North Carolina ethics

11   rules for psychology?

12       A.  Uh-huh.

13       Q.  Okay.  So we're going to introduce as

14   Exhibit 4...

15           (Exhibit 4, remotely introduced and

16           provided electronically to the reporter.)

17   BY MS. BRILLAULT:

18       Q.  And Dr. Schiffman, just to be totally

19   transparent, I did go to the North Carolina state

20   website, the bar, and it had the APA link for the

21   code of ethics as its ethics.  So I think you're

22   correct that they're very consistent, or they

23   probably actually adopt the APA.  I think that's

24   fair.

25           Does that make sense?

```
 1      A.  Yes, uh-huh, correct.
 2      Q.  So just the interaction -- we'll go down
 3 to Section 5.  Sharing the screen, this takes a
 4 little while to get through.
 5          Section 5 discusses Advertising and Other
 6 Public Statements.  5.01 covers Avoidance of False
 7 Or Deceptive Statements.
 8      A.  Correct.
 9      Q.  And it defines public statements to
10 include statements in legal proceedings?
11      A.  Correct.
12      Q.  So that would be you're required not to
13 have any false or deceptive statements in legal
14 proceedings, so that would also include your --
15      A.  It's really important.
16      Q.  And you would agree that it would include
17 your expert opinions in this case?
18      A.  Absolutely correct.
19      Q.  All right.  And Section 8 discusses
20 Research and Publications.  And 8.10 addresses
21 Recording Research Results.
22      A.  Uh-huh, correct.
23      Q.  Let me get to the section.
24      A.  Yeah, I've read through all this stuff
25 before, uh-huh.
```

Page 45

1    Q.  And it doesn't want you to fabricate data?

2    A.  Correct, uh-huh.

3    Q.  And if you discover significant errors in

4  your data, you should take reasonable steps to

5  correct those errors, right?

6    A.  Uh-huh.

7    Q.  We can take that down.

8        Dr. Schiffman, have you ever been referred

9  to the licensing board for ethical violations?

10    A.  Never.  No.

11    Q.  And do you believe all of your work in

12  this case, as well as your published work,

13  complies with the code of ethics that you are

14  bound by?

15    A.  Yes.

16    Q.  Okay.  Let's go back to Exhibit 2, please,

17  the expert report.  And we'll go back to that

18  qualification section, Dr. Schiffman, so you can

19  follow along.

20        Okay.  It talks about -- are you the

21  president of Schiffman Consulting?

22    A.  Yes.  This is a company that I've had for

23  a long time, forever, uh-huh.

24    Q.  Do you have any employees or is it just

25  you?

```
 1     A.  No, just me.  Well, I mean, I work with
 2  other people.  But...
 3     Q.  But no one is employed by Schiffman
 4  Consulting, it's just --
 5     A.  No.
 6     Q.  And you said it's been going on for a long
 7  time.  Do you have an idea --
 8     A.  Years, yeah.  From late '70s to now, or
 9  maybe mid '70s to now.
10     Q.  And in paragraph 2, I'm on the same page,
11  it talks about your investigations have "spanned
12  the range from psychological to molecular
13  investigations of malodorous emissions."
14     A.  Correct, uh-huh, uh-huh.
15     Q.  How do you go about performing your
16  psychological investigations of malodorous
17  emissions?
18     A.  Usually using profile mood states.  So
19  I've worked with Steve Wing.  I used -- he's no
20  longer with us, unfortunately.  But he had a bunch
21  of scales that he used.
22          But in terms of publications, the ones
23  that I've used -- I first used them in the
24  fragrance industry because we were looking at
25  whether you could improve mood of women at midlife
```

1  with -- with odors, with whether -- and to avoid

2  medications, for example, estrogen -- estrogen,

3  let's say -- let's say at menopause.

4          So I've used a POMS scale on those.  I've

5  used it with men.  I've used it on hog odors.  And

6  then on various projects that I had over at UNC, I

7  used various scales that Steve Wing would use.

8      Q.  As part of these investigations, would you

9  meet with the participants?

10     A.  After -- on the ones that I did with the

11  hog odors, I did meet afterward.  We -- they

12  were -- they filled them out first.  And then I

13  was surprised by some of the things that came

14  through afterward; people telling me they had

15  terrible headaches and awful eye irritation, going

16  on and on and on.

17         And I said -- well, at first I thought

18  this was all a psychological issue.  And then I

19  decided to meet with some of these people and

20  found that they had a lot of physical symptoms as

21  well.  So that's kind of what propelled me into

22  the hog symptom area.

23     Q.  Hog owners have a lot of -- or they have

24  ammonia and endotoxins and particulates?

25     A.  Correct, uh-huh.

SCHIFFMAN SUSAN

1      Q.  Have you been involved in investigations

2  where there is more than one source at issue, more

3  than one odor source at issue?

4      A.  Almost all the time.

5      Q.  Okay.  When was the last investigation you

6  were involved in that involved more than one

7  potential odor source?

8      A.  Hog farms.  It's -- before -- there will

9  be, sometime between 2000, 2006, probably four or

10  five of those instances.

11      Q.  When you say "hog farms," was it just more

12  than one hog farm, or were there more --

13      A.  Yes, more than -- well, there would be --

14  then there would be a paper mill or something else

15  in -- yeah, in the area.

16          But that was -- that's kind of the area

17  that I got involved in at the beginning, was

18  trying to deconvolve where the problem lay.

19      Q.  Okay.  Let's stick with that, the hog

20  farms in 2000 to 2006.  Was it part of a legal

21  proceeding?

22      A.  No.

23      Q.  It was a study?

24      A.  It was just trying to -- sometimes it

25  would be Department of Environmental whatever it

1    is, our North Carolina one.  Somebody would come

2    into my lab and say, This is going crazy, people

3    are yelling at him, and one says it's this hog

4    farm and somebody says it's somebody else's hog

5    farm, would I please go out and try to figure out

6    what the problem was.

7              So most of my work has always been trying

8    to find out what the problem is and trying to find

9    out a way of solving it.  So that's the way I

10   would describe my role in almost all of these

11   cases -- these issues.

12       Q.  So sticking with the hog farms where --

13       A.  The hog farm, it would be is it the Smith

14   hog farm or the Jones hog farm or a combination of

15   the both?  And then there might be -- there might

16   be some other odorous problem.

17              And also spraying, whether it's the

18   spraying from the Jones farm or whether it was

19   the -- whether it was the lagoon on the Smith

20   farm.  You know, those were the kinds of problems

21   that we tried to -- tried to solve, uh-huh.

22       Q.  And how -- and how did you go about trying

23   to solve those problems?  Did you -- by looking at

24   the potential emissions from each of those

25   sources?

1      A.  Yes.

2      Q.  And you looked at data for those

3  sources -- for those emissions?

4      A.  Yes.

5      Q.  Did you look at wind direction for that?

6      A.  Yes.  And a lot of chemistry, okay, a lot

7  of -- a lot of GCMS.

8      Q.  GCMS, gas chromat -- I can never say that

9  word -- chromatography?

10     A.  Uh-huh, correct.

11     Q.  And so you would look at the particular

12  emissions for each source?

13     A.  Correct.

14     Q.  Would you model each of the -- each of the

15  compounds for each source to determine where they

16  were getting dispersed to?

17     A.  Most of the time we were able to pretty

18  much determine from when roses -- sometimes I

19  modeled it, but not even regularly.

20         It was more looking at statistically what

21  the probability was that it came from one place or

22  the other based on the chemistry of it.

23     Q.  So, yes, let's talk -- what do you mean by

24  that statement, statistically based on the

25  chemistry?  Can you explain that?

Page 51

1      A.  It would be pretty much what we did in

2  this particular case, okay?  It's looking at

3  where -- where did emissions come from, what's the

4  probability that this particular pattern of

5  emissions came from this place or another place.

6            You know, farms use different kind of

7  feed, they use -- have -- they use different types

8  of cleaning agents.  One of them we were able to

9  clearly determine which farm it was coming from on

10  the basis of the cleaning agent that they used

11  for -- for -- for spraying down -- spraying down

12  the houses.

13      Q.  And was that because no other sources used

14  that cleaning agent, so --

15      A.  That's correct.

16      Q.  So you would look at the types of

17  chemicals for each of these different sources and

18  do a statistical analysis comparing one to the

19  other --

20      A.  Correct.

21      Q.  -- instead of just looking at one and

22  saying, Well, this one matches, so it must be;

23  this one matches, this one doesn't match as much,

24  this one matches more?

25            Is that how you would go about determining

Page 52

1  which was a --

2     A.  Yes, uh-huh, uh-huh.

3     Q.  Let's scroll down to paragraph 2.

4         It says, "I am familiar with the standards

5  and best practices for odor control in the waste

6  management and disposal industry."

7         Do you see that?

8     A.  Yes.

9     Q.  Okay.  What makes you familiar with the

10 best practices for odor control and in the waste

11 management and disposal industry?

12    A.  I've had printouts that various -- various

13 landfills -- you know, each company has their own,

14 you know, standards, okay?  And so I would read

15 through them.

16        And also, I'm familiar -- you know, each

17 state has various kinds of standards as to what's

18 -- what's in -- what's considered within -- within

19 the license and what's not within the license.

20 And I've read all of those kinds of things.

21        So they vary with state, they vary with

22 the -- they vary with the type of waste.  But

23 they're printouts that say, This is considered

24 that you're in -- in compliance or you're not in

25 compliance.

1          So I've read all of those kinds of things.

2     So I'm familiar with all those kinds of printouts.

3          Q.  So your basis for the "I am familiar with

4     the standards and best practices for odor control

5     in the waste management and disposal industry" is

6     from reading printouts?

7          A.  Most of the time.  Like, okay, how do you

8     dispose of hogs that are dead in North Carolina?

9     There's specific ways, you know, that you dispose

10    of dead hogs.  You don't let them pile up and have

11    30 hogs, you know, polluting the environment at a

12    certain time.

13         There are certain rules for -- you know,

14    there's certain standards for each of these kinds

15    of things.  So they vary by -- so I'm familiar

16    with those kinds of best practices.

17         Q.  And it makes sense that you're familiar

18    with how to dispose of a hog, you've done a lot of

19    work in the hog industry, I understand that.

20         What about just a general municipal solid

21    waste landfill, have you read best management

22    practices on disposal of waste on a municipal

23    solid waste landfill?

24         A.  Yes.

25              MR. FOSTER:

1          Objection to form.

2    BY MS. BRILLAULT:

3        Q.  And which ones have you read?

4        A.  Probably starting in the '70s, I started

5    reading -- you know, they would send something to

6    me and say, Do you think this will control odor?

7    If we put -- if we put 2 inches of clay on top of

8    so-and-so, you know, that would be the -- each

9    night, will this control the odor?

10           So I would read these kinds of things that

11   were put in there, and that's where I got -- in

12   fact, I mentioned this to Allen, to Mr. Foster, is

13   that that was one of the things that piqued my

14   interest in this, is that at that time, I remember

15   hearing over and over again, You don't put lime on

16   sludge, okay?

17           This is way -- 30-some, 40 probably years

18   ago.  And that kind of piqued my interest in this

19   whole issue when I learned that there was a lime

20   issue in this particular case.  And what struck me

21   was I remembered a publication, and it turned out

22   it was 1985 or '86, because I remembered the name

23   of the authors because they were so weird.

24           His name was Too Good, T-O-O, Good; and

25   Diaper.  And so in the middle of the night a few

1  weeks ago I said, Gee, I wonder if I could find

2  that article.  And I called NC State, they found

3  it.

4            And it goes through in one little

5  paragraph in there that says, you know, at the

6  beginning, if you put lime on sludge, you're

7  blocking it as you would, you know, just with

8  clay, but after a while, the odor is a problem.

9  And that wasn't even spent lime, okay?

10            And lime has always been an issue to me.

11  I work with a woman on one of my committees,

12  Dr. Yael Layor from Israel, who's also published

13  what happens when you put lime on sludge.  So I'm

14  familiar with the whole issue of best practices

15  and not putting lime on waste because you can have

16  an odor issue.

17            So when -- I think that statement came in

18  there because I remember reading in three or four

19  of these landfill things that I was involved in

20  early on that you don't put lime on the waste.

21      Q.   Okay.  And so just to be clear, that

22  statement --

23      A.   Is simply from reading.  And every --

24  everyone has their own -- own standard.  I think

25  that -- I think over probably the last years, I'm

1  sure the major waste companies have their own

2  standards that I don't -- probably haven't read.

3  But I'm certainly aware of the history of it.

4       Q.  It sounds like the standards that you were

5  reading were really early on, like 1970s, early

6  1980s?

7       A.  Oh, no.  I read them all the way through

8  probably.  No, I would say through -- I probably

9  haven't looked at standards in the last five

10  years, okay, for -- the standards for disposal I

11  know a lot -- I'm head of the standards committee

12  for IEEE for the working groups for developing

13  odor standards.

14          But for actual rules for covering, I don't

15  know if they've changed that much.  But, you know,

16  how much -- how much clay or dirt you put on and

17  what kind of -- how thick is any plastic and what

18  is the liner and all that kind of thing, I

19  probably haven't kept up with it in the last five

20  years.

21       Q.  And why were you keeping up with how much

22  clay to put on a landfill before that?

23       A.  Because I -- I used to have so many phone

24  calls, you know.  I used to compare what the rules

25  were in, let's say, Missouri and Arizona.  And I

Page 57

1  did a lot of work overseas.  And they are all so

2  different, that was what surprised me.

3      Q.  Who did you get the phone calls from?

4      A.  I'm known as somebody who will talk to

5  people on the phone, I guess, and they'll just

6  call up.  This happened -- it still happens.

7          Somebody will call up and say I'm from

8  Louisiana -- not from Louisiana, I haven't had

9  someone from there -- but somebody from Iowa that

10  says, We have a problem, what would you suggest

11  and, you know, here's what -- here's what the

12  rules are for Iowa for this particular industry.

13          And I'll look at it and say -- the

14  question is:  Is there a way of controlling it?

15  Those were always the questions.  What can we do

16  to solve this problem?

17      Q.  Okay.  Can you give me a name of one

18  specific individual that called you to ask you

19  about --

20      A.  I haven't --

21      Q.  -- the covered of landfill to --

22      A.  On a landfill?

23      Q.  Yeah, I'm talking about landfills here.

24      A.  No, the last one that called me was a few

25  weeks -- few months ago was a paper -- paper mill

1  someplace in North Carolina.  And I have no idea

2  the names of people.  I don't keep them.  They get

3  deleted from my -- I delete anything with regard

4  to calls like that so it doesn't clutter up my

5  address book.

6      Q.  So going back to:  When was the last time

7  you were called about waste management or disposal

8  industry practices for odor control with respect

9  to a landfill?

10     A.  Nobody -- that's not what they called me

11 for.  It's not for standards or for -- it's not --

12 or for best practices.  That's not why somebody

13 would call me.

14         They would call me, Can you tell me how I

15 should measure the odor, whether my -- whether

16 what I'm doing is -- I used to loan out my

17 olfactometers, okay -- whether they're doing

18 something that is helpful or not.  That's what...

19     Q.  Okay.  So it's about measuring odors at

20 various --

21     A.  Right.

22     Q.  Okay.

23     A.  So it's, right, for odor control.

24     Q.  So you're not -- you're not providing

25 advice on waste management or disposal practices,

Page 59

1   you're providing advice on how to measure --

2      A.   Whether the -- whether the practices are

3   working or not.

4      Q.   Yeah.   So whether there's odor in the air

5   or not?

6      A.   Right.   And whether the practices that

7   they're using are -- I mean, that would be the way

8   in which I describe it, is that -- whether the

9   practices or standards are working for odor

10  control.

11     Q.   But you're not providing advice on the

12  actual standards, you're just providing your --

13     A.   I'm just telling them --

14     Q.   Let me finish the question.

15     A.   -- this isn't working or this is working.

16     Q.   Let me just get the question out because

17  the court reporter is probably dying right now.

18          You are measuring odor, and so you're able

19  to say if odors are there or not, but you're not

20  able to say what they're doing is a best

21  management practice?

22          MR. FOSTER:

23          Objection to the form.

24     A.   Well, they would give me a situation where

25  they've tried A, B, and C, and which is better.

1   BY MS. BRILLAULT:

2       Q.   And you would determine which is better by

3   simply knowing how much odor is in the air at that

4   point?

5       A.   Correct.

6       Q.   Okay.   There would be no other basis for

7   you to opine on which is better except for

8   measuring the odor in the air?

9       A.   Correct.

10          MR. FOSTER:

11              Objection to the form.

12          MS. BRILLAULT:

13              Okay.   We've been going about an hour

14          and ten minutes.   I apologize, I had a big

15          cup of coffee.   Can we take a five-minute

16          break?   Just run to the restroom, and then

17          I'll come back.

18          MR. FOSTER:

19              Sure.

20          THE VIDEOGRAPHER:

21              We are off the record at 12:09 p.m.

22          (A break was taken from 12:09 p.m. to

23          12:21 p.m. Eastern Time)

24          THE VIDEOGRAPHER:

25              We are back on the record at

Page 61

     1          12:21 p.m.

     2   BY MS. BRILLAULT:

     3      Q.  All right.  Dr. Schiffman, thank you for

     4   taking a break.

     5          I'm going to go back to your expert

     6   report, Qualifications.  We're looking at

     7   paragraph 2.  And it notes kind of towards the

     8   bottom right above the sentence we were just

     9   talking about that you previously served as an

    10   expert witness regarding the issue here.

    11          And that was in the Amber vs. Congress

    12   Development Company?

    13      A.  Uh-huh.

    14      Q.  Okay.  Is that the last -- besides this

    15   case, is that the last time you served as an

    16   expert witness in a nuisance odor litigation?

    17      A.  Yes.

    18      Q.  Did Amber involve just a single landfill?

    19      A.  Yes.

    20      Q.  Were there other sources that were

    21   contributing to odors in the area?

    22      A.  Well, it was the geysers and the other

    23   things on the landfill.  I...

    24      Q.  And was Amber a specific causation?  Were

    25   you asked about the merits of the claims?  Or what

Page 62

1  was your -- what was your opinions -- what were

2  your opinions?

3          MR. FOSTER:

4              Objection to the form.

5      A.  My opinion?

6  BY MS. BRILLAULT:

7      Q.  What were you asked to opine on in that

8  case?

9      A.  I was asked to evaluate the level of

10  exposure.  I talked to -- and the -- there were

11  specific people -- now that you talk about

12  specific causation, there were specific people

13  that were involved and then there was a class

14  action afterward.

15          But all the specific people, I interviewed

16  and went through all their medical records and all

17  that kind of thing.  It was settled for

18  $28 million.

19      Q.  And you interviewed and went through the

20  medical records of the plaintiffs, that's what you

21  meant by "specific people"; is that correct?

22      A.  Uh-huh.

23      Q.  Sorry, is that -- it's just that I think

24  you said --

25      A.  That's correct.

1       Q.   Just so we have a clear record.

2            Okay.   And you did that in order to

3    provide your opinions on whether the exposure to

4    odors caused the injuries that they were claiming

5    in that case?

6       A.   Yes.

7       Q.   Is that accurate?

8       A.   Yes.

9       Q.   If we go to the next page, paragraph 3,

10   you say you have "received a number of grants to

11   help advance our understanding of the science of

12   odor from swine operations."

13           Who do you get your grants from?

14      A.   Well, the first one I got from Wendell

15   Murphy, who was the largest hog owner -- hog

16   producer in North Carolina at the time.   I had

17   money from the C. Smith Reynolds Foundation.   I

18   had money from the court council.   And then I had

19   a huge grant on alternative technologies that was

20   put through the State of North Carolina.

21      Q.   How about for your non-odor studies?   I

22   think you mentioned --

23      A.   For what -- for odor studies?

24      Q.   Your non-odor.

25           So you did fragrance -- you've done

Page 64

 1  fragrance studies, is that --

 2      A.  Yeah.  That was -- I was the scientific

 3  director for the Fragrance Research Fund in

 4  New York for a long time.

 5      Q.  When you did those studies, who would you

 6  get grants from?  Like who funded them?

 7      A.  Fragrance industry.  I think that was from

 8  the Fragrance Research Fund.

 9      Q.  And some of your other studies have been

10  on sweeteners; is that right?

11      A.  Correct.

12      Q.  Artificial sweeteners maybe?

13      A.  Yes.

14      Q.  And who grants -- who funds those studies,

15  the studies you've done on --

16      A.  I had a large -- I had grants for many

17  years from The NutraSweet Company.

18      Q.  And when -- when was -- sorry, when

19  were --

20      A.  Don't ask me.  I mean, it would have

21  been -- I started working with NutraSweet on salt

22  substitutes probably the end of the '70s and then

23  moved into sweeteners after Jim Schlatter found

24  the -- well, he had already found the dipeptide.

25          And then I ran the sweetener panels for

1   NutraSweet for years.  I've worked with Coca-Cola.

2   I've had grants from Coca-Cola.  I've had grants

3   from Pepsi.  I've had grants from General Foods.

4        General Foods paid for part of my

5   sabbatical in 1981.  Almost the whole -- the food

6   industry.  I've worked with Wrigley's.  I mean,

7   probably -- I have no idea how many.  Lots.  Lots

8   of food industry.  Sugar Association funded; but I

9   didn't have the money from the Sugar Association,

10  that went to somebody else.

11       Q.  Have they funded some of your work?

12       A.  They funded -- the funding did not go to

13  me directly.

14       Q.  Okay.  But it funded the study that you --

15       A.  One study, yes.

16       Q.  All right.  I don't think it's in these

17  first three paragraphs -- wait, actually, no.

18       You talked about educating and training.

19  And I think you mentioned earlier that you teach

20  courses at the -- at the --

21       A.  Right now I just -- right now I just teach

22  like a single lecture, okay?  I'll be 84 this

23  year.  I've done enough lectures in my life.

24       Q.  You look great for 84, Dr. Schiffman.

25       When you -- are those lectures in person

Page 66

1   or are you --

2       A.  Yes, yeah.  That's why I stopped doing it

3   so much, because I still -- the last one I gave

4   was with a mask on.

5       Q.  When was that one?

6       A.  Oh, probably last year sometime.

7           It's not a good way to teach.

8       Q.  Do you travel for any lectures or --

9       A.  I will be traveling to a conference, and I

10  will be wearing a mask on the plane, I will be

11  wearing a mask inside.  I do not wear a mask

12  outside.

13          But it's a very -- it's just something

14  that my husband and I have decided we -- we have

15  lost our closest friends to this.  And it's a

16  horrible way to die, okay?  And I'm not interested

17  in dying, very frankly.  And that's why I don't --

18  I just don't want to be in an environment where

19  everybody isn't tested if I'm indoors.

20      Q.  When are you traveling to the conference?

21  When is that conference?

22      A.  The conference is -- well, we're going on

23  May 11th, and the conference starts on the 12th

24  and ends on Wednesday.  I have a poster.  I have

25  my N95 masks.

1      Q.   What's the conference on?

2      A.   Odor.  It's ISOEN.  It's the conference on

3   odor detection devices.

4      Q.   This goes back to your electronic nose

5   that you are developing?

6      A.   Correct.

7      Q.   All right.  So next up in your expert

8   report -- I will try to move this on a little bit

9   faster through the expert report, but we're doing

10  a good job.

11          So information considered.  And I had

12  asked you previously the types of data that you

13  were looking at but -- so here's a list of

14  information you considered for your report.

15          Can you just take a look to see if this

16  accurately reflects the information you

17  considered.  I believe your -- like the studies

18  that you referenced are in a different section,

19  but this is, you know, the case information.

20      A.   I hope I got it all in there.  Let's see.

21          I'm trying to see where I put in the

22  depositions.  I may have missed that.  There's so

23  many pieces of paper in this that I can't remember

24  all of them.

25      Q.   Well, you certainly --

Page 68

1      A.   25, Depositions of the Trial Plaintiffs.

2 I have it there.

3      Q.   Great.

4           And if you look, you have reports -- on

5 Number 31, you have reports by Dr. Pietari and

6 Jose Sananes.

7      A.   Yes.

8      Q.   And you previously referenced Jim Lape's

9 dispersion modeling.

10           I didn't see reports of Dr. Spodak or

11 Dr. Delorenzo.

12      A.   Okay, well it should be in there.

13      Q.   Okay.

14      A.   And probably something else that should be

15 in there is a -- it was a council meeting with

16 Dr. Brown, who said that it was clear that

17 Jefferson Parish Landfill was the cause.

18           And there was another one that I think was

19 just a press conference.  There was a Dr. Kanter

20 who had something about, you know, if you smell --

21 he was quoting the CDC and he said, If you smell

22 it and you have a problem, leave.  So those should

23 probably be added there.

24      Q.   I think Number 35, is that what you're

25 referencing?

```
 1      A.  35, transcript of -- yeah, and I also
 2   saw -- yeah.  And I also saw -- yeah, I also saw
 3   the actual -- I actually saw the conference as
 4   well, okay, a video of the conference.
 5      Q.  Okay.  Did you review Dr. Kanter's
 6   deposition testimony in this case?
 7      A.  I did not.  I didn't know he had a
 8   deposition.
 9      Q.  Number 19 -- sorry, before I go to Number
10   19, did you review any other expert reports
11   besides Mr. Lape's, Pietari, Sananes, Spodak, and
12   Delorenzo in this case?
13      A.  No, I didn't -- I didn't, no, huh-uh.
14      Q.  Did you review any of the defense expert
15   reports in this case?
16      A.  Yes.  Dalton and -- well, no, I actually
17   read through all of it, okay, quickly.  And I
18   spent more time on Dalton and Zannetti.
19      Q.  Okay.
20      A.  But I did read -- I read through all of
21   them.
22      Q.  So just --
23      A.  Didn't -- didn't go through line by line
24   as to what I thought were the problems.
25      Q.  So you rebutted Dr. Zannetti in your prior
```

1  report, I recall seeing that.

2      A.  Uh-huh.

3      Q.  I don't recall seeing any opinions

4  directly rebutting Dr. Dalton, but you did read

5  it?

6      A.  Yes.

7      Q.  You reviewed Dr. Kind's report?

8      A.  Yes.

9      Q.  Did you review Dr. Lutz's report?

10     A.  I read all of them, but I remember

11 Dr. Kind's because I was -- I was concerned about

12 a lot of them, let's put it that way.  When you

13 were bringing up ethics, that was the first thing

14 I thought about, was they need to read the ethics

15 for the psychology board as well.

16     Q.  Okay.  But my question, so you read --

17 just I want to make sure the record is clear.

18         You read Dr. Lutz's report?

19     A.  Doctor who?

20     Q.  L-U-T-Z.

21     A.  I'm sure I read it.  It doesn't come to

22 mind right now.  But I did read through all the

23 reports.

24     Q.  Did you read Dr. Stutz's report?

25 S-T-U-T-Z.  He was a --

1       A.   I'm sure I read it, but it's -- whatever

2    was in it, it didn't -- it wasn't something that I

3    wanted to deal with.

4       Q.   Okay.  And I'm going through it for the

5    record.

6            Did you read Dr. -- did you read --

7       A.   I read every single report that was sent

8    to me, okay?

9       Q.   I don't know what was sent, so I'm trying

10   to clarify what was actually reviewed by you,

11   Dr. Schiffman.  I apologize, I know it's painful,

12   but I just need it for the record.

13           Okay.  Did you review Bishow Shaha's

14   report?  And to try to help you --

15      A.   It sounds familiar.  But I have to explain

16   to you, I do not memorize names.  I only look at

17   what the data are, okay?  I don't say -- I know

18   Zannetti because I focused on him.  But -- and I

19   remember Kind because I thought to myself -- it

20   bothered me that his name is Kind.  So I do

21   remember reading that.

22           But if you give me other people's names, I

23   read -- I had a list of deposition -- a list of

24   reports.  I read them and stored what I thought

25   was important.

1      Q.  When you say you had a list of reports, is

2  that a written list that was provided to you?

3      A.  It was the -- they send me the reports.  I

4  had a -- I can go through and tell you what they

5  were.

6      Q.  Yeah, that would be helpful.  I would like

7  to know what --

8      A.  I have to get out of this screen.  How do

9  I -- can you get rid of that screen so I can get

10  into my -- okay.  Let's get out of here.

11         I had an Aptim report, Kline, Barry.  I

12  had Corn; Dalton; Delorenzo; Spodak; Gardemal;

13  Hashimi, Ali Hashimi; Kind; Lutz; McEnery; Shaha;

14  Stutz; and then Zannetti.

15         And I focused -- and I read through them,

16  shook my head many times, and just focused -- I

17  reread Dalton again and Zannetti and focused on

18  Zannetti.

19      Q.  Okay.  That is very helpful.  Thank you

20  for looking.  I appreciate it.

21         All right.  In your -- going back to the

22  information considered, Number 19 is listed as

23  "Historical Documentation of Measurements and

24  Violations At JPL."

25      A.  Yes.

1      Q.   "See Appendix B."

2          The violations at JPL, are you talking

3   about the compliance orders that were issued by

4   LDEQ?

5      A.   I had a copy of those, and I also, of

6   course, went through all the MAML reports.

7      Q.   Yes.  Those are all listed --

8      A.   Yes.

9      Q.   -- in your information considered.

10         Did you review compliance orders for any

11  of the other industrial facilities or other

12  landfills in Jefferson Parish?

13     A.   No.

14     Q.   Okay.

15     A.   But I think I -- let me clarify that.

16         When I listened and read the script from

17  the -- from Dr. Brown, basically he -- and there

18  was an assistant with him -- I can't remember,

19  Chris-somebody, I think it was -- said that all

20  the other -- you know, that all the other areas

21  were in compliance.

22         They did 33 -- 33 reports in 14

23  facilities, and ultimately, with all the other

24  things that went on, that Jefferson Parish

25  Landfill was the one that was out of compliance.

1     Q.  But you didn't confirm that by reviewing

2  any of the compliance orders?

3     A.  I did not, no.

4     Q.  Or the accused website, the EDMS -- EDMS

5  system to --

6     A.  I assumed that Dr. Brown, who was head of

7  the agency, knew what was -- knew the score.

8     Q.  So is it fair to say that you didn't

9  review other sources because you were relying on

10  Dr. Brown's statement?

11          MR. FOSTER:

12              Objection; form.

13  BY MS. BRILLAULT:

14     Q.  Or the other sources were not --

15     A.  I -- I was not asked to look at other

16  places.  I was asked to review the data on

17  Jefferson Parish Landfill.  That was the -- what

18  my chore was.

19     Q.  And when you say you were asked, you were

20  asked by your attorney?

21     A.  I was asked by -- originally with Barry

22  Newton.

23     Q.  Okay.

24     A.  And now with Mr. Foster.

25     Q.  All right.  A couple more questions and

Page 75

1    then we can move on to another exciting section.

2            Let's see.  So 26, 27, 28, looks like

3    they're like news articles and -- well,

4    particularly 27 and 28 are news articles by David

5    Hammer.

6            Do you see those referenced?

7        A.  That's the -- right.  That was the WWL-TV

8    interviews.

9        Q.  And did you take any steps to ensure the

10   accuracy of the reporting Mr. Hammer did?

11       A.  I don't know how to -- I mean, I just -- I

12   read it and took it into account, okay?

13       Q.  But you didn't like take any steps to

14   ensure that what he was saying about the landfill

15   operations or any --

16       A.  Well, the --

17       Q.  Hold on, let me just finish the question.

18            -- any representations he was making in

19   his articles were accurate?

20       A.  I read them and took them into account,

21   that's all I can say.  To how to -- how do I judge

22   whether it's accurate or not?  I read them and

23   took it into account.

24       Q.  But back to my question.  You didn't take

25   any further steps besides just reading them to

1   ensure the accuracy?

2       A.  No.

3       Q.  All right.  Let's go back to the Overview

4   of Opinions.  So if we start on page 3 of your

5   expert report, so the last two lines you say --

6   you're talking about the odors, and then you

7   mention, "...as I understand the use of those

8   terms in connection with violations of the

9   obligations of neighborhood under Louisiana Civil

10  Code 667-669."

11      A.  Right.

12      Q.  I think earlier in the deposition you said

13  you are not a lawyer.  So what is your basis for

14  understanding that --

15      A.  Well, I looked them up -- I looked them up

16  and I got them quoted here, okay?  And as I

17  understand what it says, okay -- I'm not a

18  lawyer -- that's the way I interpret it.

19          It says, "Although a proprietor may do

20  with his estate whatever he pleases, still he

21  cannot make any work on it which may deprive a

22  neighbor of the liberty of enjoying his own or

23  which may be the cause of the damage to him."

24          So to me it's like you're entitled to your

25  rights but don't interfere with my rights, okay?

Page 77

1  And which I think is a very basis of this lawsuit.

2  Obviously, we need landfills; I wish that weren't

3  the way of disposing, but we need to somehow

4  dispose of waste.

5          And it's fine to do that as long as you

6  don't interfere with the well-being of others.  So

7  I just read them, and I remember one of them had

8  been updated and I had to go back for the update,

9  okay?

10     Q.  And the one that you just read and

11  mentioned that may not deprive his neighbor --

12     A.  Right.

13     Q.  What is your understanding of "neighbor"?

14     A.  A neighbor?

15     Q.  Yes.

16     A.  Somebody that lives nearby.

17     Q.  And since "nearby" isn't that specific,

18  what do you mean by "nearby"?  What's "nearby" to

19  you in terms of a neighbor?

20     A.  Somebody who is affected -- if somebody is

21  affected by something, they're a neighbor.

22     Q.  Okay.  And is there a distance involved?

23     A.  No.

24     Q.  Is there --

25     A.  Not with regard to odor.

Page 78

1      Q.   -- any minimum impact or effect -- sorry,

2  I used the word "effect."

3           Is there any minimum effect that would be

4  involved in your definition of "neighbor"?

5      A.   Well, I think it's defined.

6      Q.   So "nearby" doesn't have any --

7      A.   Deprives a neighbor of enjoyment or causes

8  damage to him or her, he is answerable, okay?  He

9  is answerable for the damages, okay, upon showing

10  that he knew or in the exercise of reasonable

11  care.

12          And this is what the prob -- this is what

13  this whole lawsuit is about.  Anybody in their

14  right mind doesn't put spent lime on a landfill; I

15  mean, it's nuts.

16      Q.   Dr. Schiffman, are you being offered as an

17  expert in disposal of spent lime?

18      A.   As what?

19      Q.   As an expert in the disposal --

20      A.   No, I'm not.  No.

21      Q.   Let me just finish --

22      A.   Only by -- only odor.  Only odor.

23      Q.   All right.  So let's go to page 4.  About

24  halfway down in that paragraph after Footnote 21,

25  in that -- the body of the paragraph, it says, "A

Page 79

1    careful analysis of the H2S data that was used as a

2    tracer of airborne contamination indicates that

3    JPLF was the main source of the odor and resulting

4    complaints."

5         And JPLF you had defined as Jefferson

6    Parish Landfill.  So I think, if we say JPLF, we

7    know it's the Jefferson Parish Landfill; is that

8    fair?

9         A.  Right.

10        Q.  And so with respect to that sentence, you

11   used the words "main source of odor and resulting

12   complaints."

13        A.  Right.

14        Q.  But you were directed to only look at

15   Jefferson Parish Landfill, correct?

16        A.  Correct.

17        Q.  And you didn't look at any other sources

18   of odors?

19        A.  No.

20        Q.  Okay.  So what is your basis of saying

21   that the Jefferson Parish Landfill odors are the

22   main source if you're not looking at any other

23   sources?

24        A.  The pattern of other compounds emitted,

25   the fact that -- I don't know if you've looked at

Page 80

1    the July MAML report, what -- when they took a --

2    they took three canisters that were very clear.

3           One -- not -- not worrying about the

4    canisters.  They took actual data.  The MAML

5    Flores data, and then they had two -- had two of

6    the hand-held devices' measurements.  And it was

7    either 2 ppb or 0 on River Ridge.  It was -- I can

8    tell you exactly what -- well, I can't --

9       Q.  Why don't you just tell me like the data

10   that you're looking at.  We don't have to do this

11   whole --

12      A.  Okay, good.

13          Can you go into the July MAML report?

14      Q.  We'll get to that.

15          I'm just saying -- so you're relying on

16   the July -- let's just outline --

17      A.  The July MAML report, yes, uh-huh.

18      Q.  So for that statement, that JPLF was the

19   main source of the odor and resulting complaints,

20   you're basing that on the July 2018 MAML report?

21      A.  And I'm relying on the findings of LDEQ,

22   which are very clear.

23      Q.  And "the findings of LDEQ," meaning what?

24      A.  Meaning that they have -- after having

25   investigated this problem of putting people on the

Page 81

1  landfill day after day, doing a thorough

2  investigation, they came to the conclusion that

3  the problem was even -- they even state, even

4  though there are other sources of odor, that the

5  main problem is Jefferson Parish Landfill.

6      Q.  And "they" meaning Dr. Brown?

7      A.  LDEQ, as stated by Dr. Brown.

8      Q.  Okay.  Were there any documents that you

9  reviewed in which LDEQ made that statement, that

10 Jefferson Parish Landfill was the main source of

11 odor?

12     A.  It's in the -- yeah, that Dr. Brown made,

13 yes.

14     Q.  That was Dr. Brown's statement.  I'm

15 asking if there's anything -- like any of the MAML

16 reports or any --

17     A.  Right, yeah, there was a report in 2019.

18     Q.  Are you talking about the Louisiana

19 Department of Health report?

20     A.  Yes.

21     Q.  Okay.

22     A.  Uh-huh.

23     Q.  So we have the July 2018 MAML report, we

24 have Dr. Brown's statement, you have the Louisiana

25 Department of Health report from January of 2019.

```
 1           What other information are you relying on
 2    to say that --
 3       A.  I'm --
 4           (Multiple speakers.)
 5           (Clarification by court reporter.)
 6           MS. BRILLAULT:
 7               I said, What other information are you
 8           relying on for your statement that JPLF
 9           was the main source of odor and the
10           resulting complaints?
11    BY MS. BRILLAULT:
12       Q.  And Dr. Schiffman, you can -- I think she
13    said Mr. Lape's modeling, is that correct,
14    Dr. Schiffman?
15       A.  Yes.  And measurements on the -- I'm
16    trying to think of all the things that I've
17    considered.  I've read so many things.
18           And, obviously, the mismanagement of the
19    landfill, the leachate issues, the fact that the
20    hydrogen sulfide was not being collected but,
21    rather, coming through the -- from the surface.  I
22    mean, it's just the whole -- the whole situation.
23    It's the whole combination of everything, many
24    different points.
25       Q.  Okay.  You mentioned the measurements.
```

Page 83

1    Are you talking about Ramboll's measurements that
2    were done in November of 2019?
3        A.   Right.  And those were included in --
4    those were included in Mr. Lape's measure -- you
5    know, modeling.
6        Q.   Understood.
7             I'm really focused on the word "main
8    source."  Because when you're talking about the
9    main source, aren't you usually comparing it
10   against something else?  You're not just saying
11   it's a source, you're saying it's the main source.
12           So what --
13           MR. FOSTER:
14               Objection.
15   BY MS. BRILLAULT:
16       Q.   -- information did you rely on to say that
17   JPLF is the main source, not just a source?
18           MR. FOSTER:
19               Objection to the form.
20       A.   LDEQ spent enormous amounts of time and
21   money on this and came to the conclusion.  I don't
22   know what's going on in every one of their minds.
23           But it was perfectly clear to me in
24   reading that presentation at the council meeting
25   that LDEQ spent a huge amount of time and effort

                                                   Page 84
1  trying to figure out what the problem was.  They

2  had odor patrols, they had measurements on the --

3  on the -- on the landfill, they had -- they had

4  measurements in the field.

5        There's -- I need to get into -- I have to

6  somehow move you --

7  BY MS. BRILLAULT:

8     Q.  Dr. Schiffman, I --

9     A.  I mean, in order for me to answer the

10 question, I need to give you some idea about what

11 these were, and I didn't print anything out

12 because I was trying to save paper.

13    Q.  Dr. Schiffman, we will go through the

14 July 2018 MAML report, I promise you.  That is --

15    A.  But the April one as well.  The April one

16 as well.  There are three canisters in there,

17 okay?

18    Q.  So your understanding is LDEQ, in April

19 and May, pointed to the --

20    A.  April and July.

21    Q.  Sorry, in April and July pointed to

22 Jefferson Parish Landfill as the main source of

23 odors?

24    A.  No, they did not do that.  But it is

25 the -- it is the entire meta-analysis -- is that

Page 85

1  the right word to use -- of all of the data that

2  have been collected in this case from LDEQ to my

3  own looking at the other compounds that are

4  emitted to -- to modeling.

5        All of this together points directly as

6  Jefferson Parish as the main source of the odor

7  and the resulting complaints.

8      Q.  Your analysis of -- let me rephrase.

9        The purposes of making that statement,

10  that Jefferson Parish Landfill was the main source

11  of the odor and resulting complaints, you yourself

12  didn't go out and look at any data with respect to

13  the other sources and their emissions or odors?

14      A.  I did not.

15      Q.  Okay.

16      A.  I don't know of any.

17      Q.  You also have Footnote 22, and you cite

18  for that sentence on Jefferson Parish Landfill

19  being the main source, you take the Court's

20  opinion on general causation.

21      A.  Yes.

22      Q.  So is it your opinion that the general

23  causation decision by the Court supports your

24  statement that Jefferson Parish Landfill is the

25  main source of odors?

Page 86

1       A.   Yes.

2       Q.   You understand that the Court didn't look

3   at any other sources of odors as part of her

4   general causation opinion?

5       A.   I thought --

6            MR. FOSTER:

7                 Objection to the form.

8       A.   I thought it was -- I thought she did an

9   excellent job.

10  BY MS. BRILLAULT:

11      Q.   Did you understand that, as part of

12  general causation, she was only looking at

13  Jefferson Parish Landfill and she wasn't -- the

14  Court wasn't looking at any other sources for

15  contributions to odors in the Jefferson Parish

16  area?

17      A.   I feel --

18           MR. FOSTER:

19                 Objection to the form.

20      A.   My answer to that is I feel we're going

21  round and round in circles.  The Court already has

22  looked at Jefferson Parish as the main cause of

23  problems.  My own analysis is that it's the main

24  cause of problems.  LDEQ says it's the main cause

25  of problems.  And Jim Lape says it is a problem.

Page 87

1          So from my point of view, we're going

2     around in circles and going no place.

3     BY MS. BRILLAULT:

4          Q.  And if the Court didn't say Jefferson

5     Parish was the main source of odors and if the

6     LDEQ reports didn't say it was the main source of

7     odors and you said Mr. Lape only said it was a

8     source of odors --

9               MR. FOSTER:

10                  Objection to the form.

11     BY MS. BRILLAULT:

12          Q.  -- you wouldn't have a basis to say that

13     Jefferson Parish Landfill is the main source of

14     odors, would you?

15               MR. FOSTER:

16                  Objection to the form.

17          A.  My answer to that is that you're

18     misrepresenting what LDEQ said.

19     BY MS. BRILLAULT:

20          Q.  Well, if I'm not, would you agree with it?

21               MR. FOSTER:

22                  Objection to the form.

23          A.  I don't agree with you, what you said,

24     because LDEQ clearly said -- I don't know if I

25     wrote it down, I guess I probably didn't.

Page 88

1   BY MS. BRILLAULT:

2       Q.  Let's get it.

3       A.  Dr. Brown said -- I think I had wrote it

4   down -- definitely the landfill was the major

5   source of odors.

6       Q.  And that was Dr. Brown at a press

7   conference, right?

8           MR. FOSTER:

9               Objection to the form.

10      A.  Why would you want to belittle the head of

11  LDEQ, who has gone -- who has spent his time

12  looking over the data?  I mean --

13  BY MS. BRILLAULT:

14      Q.  I'm just asking, Dr. Schiffman, you're

15  talking about Dr. Brown's statement at a press

16  conference, correct?

17          MR. FOSTER:

18              Objection.

19      A.  Yes.  After having reviewed the data, this

20  is what he said.  They've spent thousands and

21  thousands of dollars looking into this.

22  BY MS. BRILLAULT:

23      Q.  Okay.  Just -- sorry, there's some

24  feedback going on there.

25          You cited the Court's general causation

Page 89

1  decision and you mentioned earlier you read it.  I

2  had a question about a statement the Court made,

3  and she cited your testimony at trial.

4         And your testimony at trial, and I'll just

5  quote it, was, "See, what we try to do is to

6  see -- to program our machine so that they can

7  pick something -- pick up something at 5 ppb.

8  This is for the level we're using.  This is the

9  level which is agreed to, people from China,

10  Japan, all over the world.  5 ppb is well thought

11  of throughout the world with people who work in

12  this area."

13         So you just mentioned people from China

14  and Japan.  Can you give me specifics on who from

15  China and Japan use 5 parts per billion?

16     A.  Members of my committee and people -- I'm

17  on Zoom every week, okay?  I can't name everybody

18  who -- I mean, and it's inappropriate for me to

19  name people who say something on confidential IEEE

20  calls.  I mean, I don't understand what you're

21  asking for.

22     Q.  Well, I'm asking who in China and Japan

23  used 5 parts per billion as a standard to --

24     A.  They don't -- they consider it a standard,

25  but they can't get -- but what happens is that --

1    it's exactly what's happening -- what you are just

2    quoting, bringing up, is exactly the problem in

3    Japan and in China that we are facing in

4    Louisiana, which has an outrageous level of

5    hydrogen sulfide, which is acceptable, but it's

6    not acceptable from the standpoint of human --

7    humans living downwind from it, okay?

8          People throughout the world that I deal

9    with and have been dealing with for 20, 30 years

10   consider 5 ppb as an appropriate level of hydrogen

11   sulfide that will -- above that, people will start

12   getting complaints, okay?

13         Do the laws say that that's what the level

14   is for a state or for a country or -- they don't,

15   okay?  I completely agree with you.  That's the

16   problem, is the discrepancy between what is

17   allowed and what is the reality of people's

18   perception.

19         And the reason why the levels are higher

20   is because industries which pollute are sometimes

21   necessary for that country.

22   Q.  Okay.  So is it fair to say that people in

23   China and Japan aren't actually using 5 parts per

24   billion as a nuisance standard but, like you, they

25   would like to?

```
 1          MR. FOSTER:

 2              Objection to the form.

 3      A.  I don't know about how -- I gave a talk in

 4  Japan, must have been 2018.  It was right before

 5  COVID hit.  And I remember having a -- sitting

 6  down with a bunch of people, and they were all

 7  saying -- telling me about all the problems that

 8  they had with odor and how 5 ppb was the

 9  absolute -- we had to find some way of making sure

10  that this was -- this was instituted in law.

11              I said, I don't have anything to do with

12  the law or making legal rules.  I said, I don't

13  know how you do it.

14              But I remember everybody saying that there

15  was a serious problem and they were involved in

16  all this.  I don't know anything about the law

17  in -- I mean, I know what the -- I mean, I've seen

18  the rules in Japan and China.  China is worthless.

19              But I don't know what happens in a court

20  of law.  I have no idea.  I don't know if it has

21  any...

22  BY MS. BRILLAULT:

23      Q.  Let's see.  Page 5, probably the last

24  third of that paragraph, it starts with, "The

25  anxiety and dread of a renewed onslaught of
```

Page 92

1  malodors which the trial plaintiffs felt during

2  the relevant time period..."

3          Your phrase "trial plaintiffs felt,"

4  that's based on your review of the deposition

5  transcripts and their written statements and the

6  fact sheets and discovery responses?

7      A.  That is correct, uh-huh.

8      Q.  You didn't interview them --

9      A.  No.

10     Q.  -- we've established.

11         Have you ever conducted a physical

12 examination of a patient over Zoom?

13     A.  Have I?  No.

14         I'm -- you know, that's a very interesting

15 question.  Over the -- over the years, there have

16 been physicians who have had problems with trying

17 to figure out a taste or smell disorder and would

18 link a patient in with me asking for help --

19 asking for help, if we could try various kinds of

20 things.

21         So I would ask them to get things from the

22 refrigerator, you know, could they smell this in

23 one nostril, the other nostril.  You know, we

24 would do various kinds of things trying to see if

25 I could isolate the problem.

1         So from that -- and then going through

2   their medical histories -- I do a lot of work on

3   cytochrome p450.  You don't need to know what it

4   is.

5         But certain drugs are metabolized by

6   certain enzymes, so I look at the drugs to see

7   whether there are possible interactions, or we

8   could look for a higher level of concentration of

9   a drug that may have -- there might have been a

10  drug interaction, so from that standpoint.

11        But I've never charged for this.  It's

12  just I'll help some physician from Oklahoma, I can

13  think of one, called me because he was trying to

14  figure out how to help a patient.  So from that

15  standpoint, yes, but not -- not officially, let's

16  put it that way.

17    Q.   Okay.  Have you or did anyone test the

18  odor detection threshold for any of the trial

19  plaintiffs in this case?

20    A.   That was brought up, very interestingly,

21  by Pam Dalton.  Because my first response to that

22  was, is she suggesting that the malodorous plumes

23  actually damaged the olfactory tissue, okay?

24        And we probably -- it would -- it might

25  have been nice to do some biopsies just to see

Page 94

1   whether there was an invagination of respiratory

2   tissue.  But my response -- second response was

3   that -- if you read through every one of their

4   depositions, you get the FIDO characteristic,

5   okay?

6            And her own data showed the repeated taste

7   and smells, the threshold will decrease.  And that

8   is -- I have found that for years, okay, in doing

9   panels, that you can take somebody who can barely

10   smell something at the beginning, give them

11   repeated smells, and you will, in fact, increase

12   their sensitivity to it.

13            So I didn't worry about it mostly from the

14   FIDO characteristics.  But nobody that I know of

15   did the thresholds.  I wasn't asked to do it.

16       Q.  So you don't -- since no one did the

17   thresholds for these 13 plaintiffs, you don't

18   know --

19       A.  No, but I --

20            (Multiple speakers.)

21            (Reporter clarification.)

22       A.  I did not test -- I did not test odor

23   thresholds for this -- for the trial plaintiffs.

24   BY MS. BRILLAULT:

25       Q.  And because --

1      A.   Because --

2      Q.   Hold on, let me -- and because they're --

3    you did not and you are not aware of any testing

4    of the odor detection thresholds for these

5    individual plaintiffs, you don't know what the

6    actual odor detection thresholds are for these

7    individual plaintiffs with respect to hydrogen

8    sulfide?

9           MR. FOSTER:

10             Objection to form.

11     A.   I do not know the exact numbers, but I

12   can -- I am quite clear that the amount that they

13   were exposed intermittently lowered the thresholds

14   so that they have a good sense of smell.

15           There's no indication, as I read through

16   trying to catch anything that I thought was a

17   fake, which I'm very, very sensitive to, I felt

18   that every single one of them had a good sense of

19   smell, yes.

20   BY MS. BRILLAULT:

21     Q.   And you said the concentration at which

22   they were exposed to.

23           In order to smell the odor, they would

24   have to be able to detect it at a certain

25   concentration that they have the ability to detect

Page 96

1    it at, right?

2        A.   Right.

3        Q.   Okay.  And so unless you know what that

4    threshold is numerically, you're just assuming

5    that Mr. Lape's modeling at 5 parts per billion is

6    an exposure that they can smell?

7        A.   Correct.

8             MR. FOSTER:

9                  Objection to the form.

10   BY MS. BRILLAULT:

11       Q.   I think you just mentioned that -- I'm not

12   going to start it that way, let me strike it.

13            Your opinions rely on plaintiffs providing

14   accurate and truthful accounts of their

15   experiences; do you agree with that?

16       A.   Say that again.

17       Q.   Your opinions in this case rely on

18   plaintiffs providing accurate and truthful

19   accounts of their experiences?

20       A.   Correct.

21       Q.   Did you question the accuracy or

22   truthfulness of any information that was provided

23   by plaintiffs in their discovery responses, their

24   fact sheets, or their deposition testimony?

25       A.   I assume it's correct.

Page 97

1      Q.  And so the flip side, if a plaintiff's

2  statements about their experiences prove to be

3  untrue or inaccurate, would that impact your

4  opinions in this case?

5      A.  It depends on what the statements were.

6      Q.  So still on page 5, we're focused in on --

7  kind of going back to the top of that paragraph.

8      A.  Back to page 5 again, okay.

9      Q.  Yeah.  Towards the top of the paragraph,

10  you list a bunch of types of operations, "sulfides

11  in the spent lime and fly ash used to solidify

12  liquid waste, and other breaches in the waste

13  treatment system, all of which were known or

14  should have been known to the defendants at times

15  when preventive action could and should have been

16  taken."

17      A.  Correct.

18      Q.  I think we confirmed earlier, you're not

19  providing any expert opinions with respect to best

20  management practices at landfills; you're only

21  providing expert opinions with respect to odors?

22      A.  From the standpoint of odor, something --

23  as I explained to you early -- earlier, there are

24  certain things that I learned over years that you

25  don't do, okay?

Page 98

1          And one -- and fly -- what struck me was

2     fly ash and spent lime.  I saw those as a serious

3     problem from the standpoint of odor and should

4     have been stopped earlier than they were or

5     never -- or never started in the first place, from

6     the standpoint of odor.

7          Q.  When was the first time you heard of the

8     phrase "spent lime," Dr. Schiffman?

9          A.  I've heard that word for years.

10         Q.  Give or take, when was the first time?

11         A.  I have absolutely no idea.

12         Q.  And in what context did you hear the words

13    "spent lime"?

14         A.  Because people use it to get rid of sulfur

15    dioxide.  I've heard it many times.

16         Q.  How many landfills have you operated?

17         A.  Have I worked -- I have no idea.

18         Q.  No.  How many landfills have you operated?

19         A.  Never.

20         Q.  How many landfill gas collection systems

21    have you worked on?

22         A.  I have -- I have no idea how many -- I

23    don't work on them.  I collect odor samples or

24    people send me odor samples.

25         Q.  You've never operated a gas collection and

SCHIFFMAN SUSAN

1   control system at a landfill?

2       A.   No, I have not.

3       Q.   Is it fair to say you have never operated

4   a leachate collection system at a landfill?

5       A.   I have never operated a leachate.  But I

6   have -- but I have had many samples in my

7   laboratory where I have taken -- had Tedlar bags

8   where I've done odor samples where I've looked at

9   odor thresholds that have been collected from

10  leachate, okay, and also liquid samples looking at

11  how many times I had to dilute it, okay?  Lots of

12  those in order to get rid of the odor.

13      Q.   Have you ever operated or maintained an

14  odor-misting system at a landfill?

15      A.   No.

16      Q.   Have you ever provided consulting services

17  to any landfill with respect to the type of waste

18  it was accepting for disposal at the landfill?

19      A.   I was aware of the different types of

20  waste, but I was not a person who made any

21  decisions about that.

22      Q.   Have you ever made decisions about how

23  waste is handled for disposal at a landfill?

24      A.   Only insofar as various remediation

25  techniques were effective or not.

1     Q.   And by "effective," you mean --

2     A.   With regard to reducing the odor, yes.

3     Q.   Once again, you're just measuring the

4  odor?

5     A.   Correct.

6     Q.   Okay.  How many cover systems have you

7  provided consulting services on with respect to a

8  landfill?

9     A.   I don't do -- it's, again, the same answer

10  to all your questions, which is does a cover

11  system work or not, okay?

12       I've certainly done a lot of that with hog

13  farms as well as to whether it covers on lagoons

14  as to whether -- how thick should -- how thick

15  should the plastic be.  So let's say there's an

16  intervention, okay, of plastic that's this thick

17  or from -- from different providers.

18       So you take your odor samples and then you

19  make a decision as to which is the most effective.

20  I don't make the decision as to how you put the

21  cover on, but I make a decision as to what is the

22  best, most effective one with regard to odor.

23     Q.   Again, your effective determination is

24  based on what odors are occurring, not anything

25  else with respect to the --

Page 101

```
 1     A.  Correct.

 2         MR. FOSTER:

 3              Objection to the form.

 4  BY MS. BRILLAULT:

 5     Q.  Are you familiar with regulations

 6  governing covering leachate systems, gas

 7  collection systems in municipal solid waste

 8  landfills in Louisiana?

 9     A.  I probably have read them many times, and

10  it kind of goes in one ear and out the other.

11     Q.  So sitting here today, you're not familiar

12  with respect to the specific regulations regarding

13  covering leachate systems or --

14     A.  I've read them -- I've read them many

15  times.

16     Q.  How many times have you read the

17  regulations?

18     A.  Have I read regulations?

19     Q.  Regulations in Louisiana with respect

20  to --

21     A.  Oh, not with -- no, no, I have not read

22  the regulations in Louisiana, I take that back.

23  No.

24     Q.  And to be clear, what expert opinions are

25  you offering in this case?
```

Page 102

1    A.  Odor and whether the people could have

2  suffered the complaints that they have and whether

3  it came from Jefferson Parish Landfill.

4    Q.  Odor, whether they could have suffered the

5  complaints they had, and whether the odors came

6  from Jefferson Parish Landfill.

7       Are you providing any opinions on whether

8  the individuals did, in fact, suffer injuries from

9  odors from Jefferson Parish Landfill?

10    A.  That each individual?

11    Q.  Correct.  For each individual of the 13

12  trial plaintiffs.

13    A.  I didn't -- I did not -- those were

14  decisions that were made by others, okay?  I'm

15  just saying what the mechanism would be given that

16  those are the complaints.

17    Q.  So your opinion goes more towards whether

18  it's capable of causing those injuries, not

19  whether it actually did cause those injuries of

20  the trial plaintiffs?

21       MR. FOSTER:

22          Objection to the form.

23    A.  See, I don't -- my work as a medical

24  psychologist has taught me to listen to patients.

25  If they say they have a headache, they have a

1  headache, okay?

2        And whether -- and they said that they got

3  it at the time that this odor came in and that

4  they had an eye irritation, et cetera, et cetera,

5  I listen to that.  Otherwise, you can't solve

6  patients' problems.

7        So from my point of view, from reading

8  what I read, I do believe that these people had

9  these types of symptoms.  But was I there when

10  they had the symptoms?  I wasn't.  I'm just saying

11  that it's highly likely that this is the cause.

12  BY MS. BRILLAULT:

13    Q.  And your opinion that it's highly

14  likely -- "this" meaning the Jefferson Parish

15  Landfill odors are the cause of their injuries --

16  was made looking solely at the Jefferson Parish

17  Landfill and not looking at other sources or other

18  confounding factors?

19        MR. FOSTER:

20          Objection to the form.

21    A.  But we have to go back to LDEQ again,

22  which is that they said that that is the main

23  source.  So that is -- dismissing the amount of

24  work that LDEQ tried to -- I mean, I have to

25  applaud them for the amount of effort they put in,

1 because a lot of people don't do that.

2        They had people on site.  And they would

3 keep telling them that something was wrong and the

4 next day come back and the same problems are

5 there.  There's obviously a problem in either

6 expertise or willingness to do something about it;

7 I don't know.

8 BY MS. BRILLAULT:

9    Q.  So going back to something you said just a

10 couple of questions ago, you had mentioned you

11 were -- you were making -- you're opining -- let

12 me start over.

13    A.  I don't like the word "opine," it's too

14 legal, okay?

15    Q.  You are providing opinions --

16    A.  Yes.

17    Q.  -- on whether the landfill odors could

18 cause the injuries, and other people are making --

19 rendering opinions on whether those odors did

20 cause the injuries.

21        Is that a fair characterization of what

22 you said?

23    A.  No.

24        MR. FOSTER:

25           Objection to the form.

```
 1      A.  No.  I -- it is -- this is what I did for
 2  a living for my whole life, is to see patients who
 3  had physical problems and to determine whether the
 4  problem was entirely made up or psychological or
 5  they were trying to collect money on a workman's
 6  comp case or whatever.
 7          I was asked to look at the depositions, to
 8  look at the medical complaints, and to determine
 9  whether I thought those symptoms that they had
10  were related to the odor from Jefferson Parish
11  Landfill.
12  BY MS. BRILLAULT:
13      Q.  Understood.
14          And you were not asked, and you did not
15  look at, whether they were more likely related to
16  other sources of odors or other confounding
17  factors?
18          MR. FOSTER:
19              Objection to the form, asked and
20              answered.
21      A.  Okay, now --
22          MS. BRILLAULT:
23              I haven't gotten an answer, Allen.
24              I'm just trying to get a yes or no from
25              her.
```

```
 1          MR. FOSTER:

 2               You've gotten it two or three times.

 3      A.   Okay, now let me just say to you,

 4  confounding factors -- every human being has some

 5  physical problem, okay?  To find the perfect

 6  subjects in an experiment is really an interesting

 7  one.

 8               So if a person, let's say, has some

 9  biological wiring like my husband has -- just

10  really strong odors really get to him, okay?  If

11  it -- and then he has a problem with Jefferson

12  Parish Landfill, yes, he has that biological

13  disposition.

14               I, who used to wear contact lenses, have

15  absolutely no effect whatsoever from eye

16  irritation, zero, okay?  I had subject -- I had

17  kids who I would train to be -- come out with me,

18  that I can't be out here because my eyes are just

19  watering and watering and watering; to me it's no

20  problem, so I guess because I can wear contact

21  lenses, it doesn't bother me.

22               So what you have to be able to do is to

23  take into account that people have certain

24  predispositions and not to ignore it.  Ignoring it

25  is a real problem, from my point of view.  And
```

SCHIFFMAN SUSAN

1    that's why, you know, people come in and are told

2    by their doctor they don't have a problem, and

3    then they go home and they have -- sometimes drop

4    dead.

5          I mean, you have to listen to what people

6    say in order to determine if there's a problem.

7    In my reading of these -- of these depositions, it

8    is my opinion that the complaints that they had

9    were real, that they came from Jefferson Parish

10   Landfill because that was the most -- most likely

11   cause.

12         And that is based on my analysis of the

13   other components of the -- that get into the

14   neighborhood, as well as LDEQ modeling and all put

15   together.  So to me it's a meta-analysis of

16   everything hanging together as a -- as a result.

17     Q.  Are you aware of any expert opinions or

18   any evidence that suggests that some of the trial

19   plaintiffs were exaggerating their symptoms or

20   their impacts?

21     A.  It's always possible.  I mean, I'm relying

22   on what I read and what I -- my opinion as to what

23   evidence that I had.

24     Q.  So you're not aware, sitting here today,

25   of any expert opinion or any information that --

```
 1      A.  If I -- if I read it in any of the
 2 reports, I dismissed it because I think that
 3 denying symptoms is something that really bothers
 4 me, okay?
 5           Now, I have to rely on further -- you
 6 know, there are other people who are involved in
 7 looking at their symptoms as well.  So I'm just
 8 telling you from my own point of view.
 9      Q.  All right.  Still in that paragraph, the
10 sentence that starts with, "When the emissions
11 from JPLF migrated to neighboring communities, the
12 malodorous plumes frequently contained H2S levels
13 that exceeded the World Health Organization (WHO)
14 perception threshold of an average of 5 parts per
15 billion of H2S or greater over a 30-minute
16 interval."
17           You use the word "perception threshold."
18 What did you mean by that?
19      A.  I just meant an odor threshold.
20      Q.  So the WHO 5 parts per billion is not a
21 perception threshold, it's --
22      A.  It's -- it's -- I didn't mean a threshold
23 there; that's probably the wrong word, okay?
24 It's -- the threshold -- I shouldn't use the word
25 "threshold" there.  The threshold level it should
```

1  be, okay?  Get rid of the word "threshold."

2          And then the threshold, is it 4.2 or is it

3  4.3, that was -- that was the thinking.  I need to

4  go back and read that.

5      Q.  All right.  So this is the last sentence

6  on 5, you're quoting the WHO, and it goes on to 6,

7  but we can really focus on 5.

8          Health -- you say, quote, "Health is a

9  state of complete physical, mental, and social

10  well-being, not merely the absence of disease or

11  infirmity."

12      A.  Correct.

13      Q.  Okay.  Is it your opinion that, but for

14  the odors and emissions from the Jefferson Parish

15  Landfill, each of the trial plaintiffs would be in

16  a state of complete physical, mental, and social

17  well-being?

18      A.  Each of them had physical complaints, each

19  of them -- they all had mental complaints, and

20  they all had social complaints.

21      Q.  When you say they had complaints, are you

22  talking before the relevant time period or from

23  the odors from the Jefferson Parish Landfill?

24      A.  The odors, yes.

25      Q.  So my question to you is:  Is it your

1  opinion that, but for those odors, so if those

2  odors had not occurred from the Jefferson Parish

3  Landfill, that each of the trial plaintiffs would

4  be in a state of complete physical, mental, and

5  social well-being?

6       A.  No, absolutely not.

7       Q.  Okay.

8       A.  It's exactly what I just said to you.

9  People have vulnerabilities.  Some of them may

10  have -- I mean, I didn't do a medical workup on

11  them, nor did I look at their past history.

12           But either it caused it -- if they were in

13  perfect health, it caused a problem; if they were

14  not in perfect health, it exacerbated the problem.

15      Q.  So because you haven't looked at a

16  complete workup of their medical history or social

17  his -- you know, past -- I guess, how would you

18  attribute the impact of the odors from Jefferson

19  Parish Landfill on each of these individuals if

20  you haven't accounted for what -- where they

21  started with respect to their physical, mental,

22  and social well-being prior to any alleged odors?

23      A.  Well, there was one person who obviously

24  had some emotional problems, okay, I remember

25  reading.  I can't remember which one it was.

 1          But if you take somebody with emotional

 2   problems and add another stressor to it, you make

 3   it even worse.  So I -- this is the thing that's

 4   so concerning to me, is dismissing -- if people

 5   have a mental health problem and then you add more

 6   pressure to it, you exacerbate the problem.

 7          And this is a stressor.  Intermittent

 8   malodor over a period of two and a half years is a

 9   stressor, and you're adding it to whatever problem

10   they had in the first place.

11          So I don't think that we're going to --

12   including all of us sitting here today, there's

13   not one of us who has been unscathed by living in

14   this world, okay, including you and me and

15   everybody else.

16          I mean, I'm facing -- we all face things

17   that are just absolutely outrageous.  And how do

18   you deal with that?  You add another stressor to

19   it, it makes it worse.

20   Q.  Did you consider for each of the trial

21   plaintiffs their state of physical, mental, and

22   social well-being prior to any odors such that you

23   could figure out the impact of --

24   A.  Not ahead of time, no, I do not.  But it

25   really doesn't matter to me, because this just

Page 112

 1   adds another level of stress, if they had stress

 2   before.

 3       Q.  All right.

 4           MS. BRILLAULT:

 5               I think we are out of the Overview

 6           section.  We've been going an hour and a

 7           little over.  We're going to be turning

 8           into the body of the opinion, it's 1:30,

 9           12:30 Central.

10               How do you guys feel?  Do you want to

11           take a five-, ten-minute break and keep

12           going?

13           MR. FOSTER:

14               How long do you have to go?

15           MS. BRILLAULT:

16               Based on the responses, I think we're

17           going to be here a while, Allen.  If we

18           can get quicker, yes or no, then we might

19           move along.  But...

20           MR. FOSTER:

21               I won't comment on the questions.  But

22           why don't we take a lunch break.

23           MS. BRILLAULT:

24               Okay, sounds good.  Do you want to do

25           like a half hour, make it a little

 1    shorter?

 2    MR. FOSTER:

 3        It's now 12:25 where we are, 1:25

 4    where Dr. Schiffman is.

 5        How long do you need, Dr. Schiffman?

 6    THE WITNESS:

 7        Half an hour.  I had -- made some

 8    things for lunch yesterday, so I can heat

 9    it up in the microwave.

10    MS. BRILLAULT:

11        Let's do -- I should have gone off the

12    record, but that's fine.  Let's do --

13    return at 2 o'clock Eastern, 1 o'clock

14    Central.

15    THE VIDEOGRAPHER:

16        We are off the record at 1:27 p.m.

17    (A break was taken from 1:27 p.m. to

18    2:07 p.m., Eastern Time.)

19    THE VIDEOGRAPHER:

20        We are back on the record at 2:07 p.m.

21    MR. FOSTER:

22        And, Megan, before you start, let me

23    just confirm what we discussed over the

24    lunch break.

25        Dr. Schiffman recognized, as a result

1    of some of the questions, that we had

2    failed to include her rebuttal to

3    Dr. Dalton in connection with -- she had

4    two different rebuttals, one of

5    Dr. Zannetti, one of Dr. Dalton, and we

6    had failed to include her rebuttal to

7    Dr. Dalton in the documents that we served

8    back on the 26th, or whenever it was, of

9    March.

10        Eliza has now circulated that rebuttal

11    to everyone.  Obviously, I don't expect

12    you to be able to ask questions on it

13    today.  And if we need to have some

14    additional time in the future with

15    Dr. Schiffman on it, that's fine.

16    MS. BRILLAULT:

17        Understood, Allen.  Thank you.

18    Obviously, defendants are reserving the

19    right with respect to anything on late

20    service for the rebuttal.

21        But agreed that we will just address

22    that at a later time, and if we need

23    Dr. Schiffman to come back for a very

24    short video deposition on that rebuttal

25    report, we can discuss that.

1          MR. FOSTER:

2               Okay, thank you.

3          THE WITNESS:

4               The idea would be to answer anything

5               that's in that rebuttal report, from my

6               standpoint, today, okay?  I'll give my

7               point of view on those.

8          MS. BRILLAULT:

9               That's fine.  Dr. Schiffman, I'm just

10              not going to be in a position to do that

11              since it's not even in my inbox yet right

12              now.  So we will revisit that at another

13              time.

14              Okay.  Are we -- we're back on the

15              record, right?

16     BY MS. BRILLAULT:

17          Q.  Okay.  So let's continue on with your

18     expert report, Schiffman Exhibit 2.  And we'll

19     start with your Opinion 1, which is on page 9.

20          A.  Right.

21          Q.  Okay.  And this is entitled "Malodor

22     Perception and Psychological Effects."  Okay.

23     It's just a little delayed, that's all.

24              And here you -- in that first paragraph,

25     the bolded paragraph, you're talking about odor

1  qualities, and then at the end you say, "Aversive

2  and noxious odors caused negative emotions

3  including anxiety and worry."

4       Is caused -- do you also include worsen in

5  that, as kind of per our discussion earlier before

6  the break?

7       A.  To worsen negative emotions?

8       Q.  Yes.

9       A.  Yes.  That would be a good point.

10      Q.  Okay.  And specifically which plaintiffs,

11  which of the 13 trial plaintiffs did the noxious

12  odors cause negative emotions or worsen their --

13  sorry, cause anxiety and worry or worry their

14  anxiety and worry?

15      A.  I'd have to go back and read.  But I think

16  I would have to -- I think, if we take everybody

17  on this panel right now, there are certain people

18  who -- all of us have some negative emotion.

19           So, I mean, to say that worsen for

20  every -- you know, it's hard to -- I would say

21  cause -- I think it's okay to leave it as it is,

22  okay, to say it caused negative emotions, which

23  may pile on from other negative emotions, right?

24           Do you know what I'm saying?  If somebody

25  has -- the basic bottom thing is that everybody

SCHIFFMAN SUSAN

1  has some kind of negative emotions, unless you're

2  some kind of Buddhist monk, okay, who has mastered

3  all of it, which would be wonderful.

4          So I think it's -- leaving it as "caused

5  negative emotions" is okay because if somebody has

6  negative emotions already, it just -- it causes

7  more negative emotions.  So let's leave it.

8      Q.  And before the break you said, you know,

9  you've got to take the individual for -- how you

10  get them, right?  And so if they have anxiety in

11  their life --

12      A.  Right.

13      Q.  -- and something causes them additional

14  anxiety, it's piling on, right?

15      A.  It is, uh-huh.

16      Q.  And did you -- for purposes of your

17  opinion in this case, did you determine if any

18  particular plaintiff had increased anxiety from

19  the odors?  So they already had anxiety and it

20  increased --

21      A.  Well --

22      Q.  Sorry.

23          -- they already had anxiety issues and

24  they had increased anxiety because of the odors?

25      A.  What I determined was that the odor,

1  malodor, caused anxiety and worry for these

2  people, whether it piled on from where they were

3  before, like the Mary Ann -- I think of Mary Ann

4  Winningkoff.

5       I mean, she obviously just lost her

6  husband, and she wasn't able to really help or

7  enjoy him as she -- I mean, look at the number of

8  times her house was hit by odor -- I mean,

9  malodor; it's disgusting.

10      So I'm sure that this poor woman, who has

11  just lost her husband, had anxiety and worry to

12  start with and this added to it.  So did it cause

13  negative emotions?  Yes, it caused negative

14  emotions, which were ex -- which was an

15  exacerbation of her underlying condition at that

16  time.

17    Q.  Understood.

18      And I guess I'm just trying to really get

19  an understanding of what that exacerbation was and

20  how you're determining it.

21      Because this isn't -- this isn't where

22  we're saying it has a potential to cause anxiety

23  and worry; you're saying it actually did in each

24  of these 12 -- each of these 13 plaintiffs.

25      So for -- let's start with Mr. Section.

Page 119

1  Mr. Section --

2      A.  Let's go through each -- let's read

3  through.  I'm very happy to read through these.

4      Q.  Okay.  And for Mr. Section, did he have

5  anxiety prior to exposure to --

6      A.  I think he was one of them.  I -- no, that

7  I did not -- I didn't keep track of, okay?

8      Q.  It's not in your expert report?

9      A.  It's not in the expert report, no.

10     Q.  Okay.

11     A.  Let's look at what he said.

12         (As read.)  "You couldn't breathe.  I

13  mean, it was horrible.  And we had to live through

14  that, headaches, throwing up, the smell, the lost

15  weight.  I couldn't sleep.  The smell was

16  horrible.

17         "You know the way I feel about the

18  situation?  That smell was so horrible.  I don't

19  know -- I don't know what's going on with my body.

20  They got people that done died already, okay."

21         Now, if somebody tells you that --

22     Q.  And you're on page 12 of your expert

23  report?  Just so we're clear.

24     A.  Page 12, yes.

25     Q.  Okay.

1     A.  Okay.

2     Q.  So can I ask -- I'm going to ask some

3  questions.

4         His statement that people got -- that

5  "they got people that done died already," so is it

6  your opinion that his statement that people died

7  from the odor from the Jefferson Parish Landfill

8  is accurate?

9     A.  No.

10    Q.  Okay.  So --

11    A.  I think it is a statement of fear -- it's

12  a statement of fear, fear of death, fear of

13  feeling horrible.

14        To me, this is a man who, when you ask

15  about the effect of the odor, that had a

16  tremendous amount of stress from it, okay?  Now,

17  did he have stress before that?  Could very well

18  have been.  I don't remember which one -- whether

19  he was one of the ones that did.

20        But clearly you're seeing here that a --

21  the physical distress and everything evoked a fear

22  of death.  And I would go into it more with him if

23  I could discuss it with him.  But when I read

24  something like that, this is obviously a man who

25  was stressed by this malodor.

Page 121

1      Q.  Would you have liked to have talked to

2  Mr. Section about it?  Would that have been

3  helpful to your opinions in this case?

4      A.  This is enough, okay?  I would have liked

5  to mostly because I'd be interested in how he --

6  I'm interested in these kinds of things.  But I

7  don't need to be able to talk to him because this

8  is enough of listening to it.  The smell, the lost

9  weight, I couldn't sleep, the smell was horrible.

10  I don't know what's going on with my body.

11      Q.  All right, Dr. Schiffman.  And in this

12  report, you're not opining on -- well, sorry.

13         Your opinion in this report -- I know you

14  don't like the word "opine," so I'll try and

15  rephrase that for you.

16         So your opinions in this report don't

17  reflect whether Mr. Section had been seeing a

18  mental health professional for his anxiety or

19  whether -- and if he did, whether those visits

20  increased during the relevant time period or

21  whether they didn't; you didn't look at that at

22  all?

23         MR. FOSTER:

24            Objection to the form.

25      A.  I did not -- I do not know because I don't

Page 122

 1   know what medications he was on.  What I do know

 2   is that smell caused anxiety and worry and stress

 3   for this person.

 4   BY MS. BRILLAULT:

 5       Q.  And you're basing that on his statements,

 6   some of which are accurate maybe and some -- at

 7   least one you've pointed out that is not accurate,

 8   that people didn't done die already?

 9           MR. FOSTER:

10               Objection to the form.

11       A.  He didn't say that people died from the

12   smell.  He's stating his fear.  And what happens

13   is they -- when you get a malodor, it goes into

14   the amygdala, which is also the fear center of the

15   brain, so -- it's part of the fear center of the

16   brain.

17           So when I hear people say -- make comments

18   about, I couldn't breathe, I thought I was going

19   to die -- I mean, I've heard this plenty of times,

20   so it's not like this is a new kind of situation

21   for me.  I look at it from the standpoint of the

22   anatomy of the smell system.

23   BY MS. BRILLAULT:

24       Q.  Okay.  Going back to my question, though,

25   you confirmed that you didn't look at any

1  prescriptions that he took?

2      A.  No.

3      Q.  And you didn't look to see if he had been

4  going to a mental health professional and if it --

5      A.  I -- I vaguely remember that he was -- I

6  think it was Andrew Section, but I'd have to go

7  back to look at it.  I was simply looking at --

8  let me finish.

9          I was simply looking at their description

10  of the exposure and how it made them feel, okay?

11  And he states very clearly how it made him feel.

12      Q.  And when you say you were "simply looking

13  at," that means you weren't looking at anything

14  else except their description and how it made them

15  feel?

16      A.  Right.

17      Q.  Okay.  And would that be the same for

18  Mr. Meyers, who's below it?  He describes his --

19  his experience.

20      A.  Uh-huh.

21      Q.  Are you seeing it?

22      A.  Right.

23      Q.  Other than his -- and for Mr. Meyers,

24  other than his description of his experience, you

25  didn't look at medications or whether he was

```
 1   seeing a health professional and, if so, whether
 2   he saw a health professional more often during the
 3   time that he was experiencing odors?
 4        A.  I did not look at that.
 5            MR. FOSTER:
 6                 Objection to the form.
 7        A.  However, I would also like to say that
 8   over the years this is a very common complaint
 9   that I've heard, how it ruined intimate
10   relationships.
11            Sexual dysfunction is something I've heard
12   many times, okay?  So this is not out of the
13   ordinary of something that I've heard with regard
14   to unpleasant smells coming into the room.  And
15   one only needs to look at your local law with all
16   the fragrance places, you know, with -- and sexy
17   photos, how this is perfect for you to know that
18   smell is an important function with regard to
19   intimate relationships.
20   BY MS. BRILLAULT:
21        Q.  And in your prior experiences that you
22   were saying that it impacts intimacy in your
23   relationships, was that at a level of 5 parts per
24   billion of hydrogen sulfide?
25        A.  If you can smell it, it's a problem.
```

1    Q.  And do you know if Mr. Meyers is able to

2 smell hydrogen sulfide at 5 parts per billion?

3    A.  I am assuming that he can just on the

4 basis of what he -- of going through his

5 deposition.

6    Q.  But his deposition doesn't say at what

7 level he's able to smell; it just describes

8 experiences?

9    A.  But I certainly do know that what was --

10 what was available -- you know, at least from

11 MAML, we certainly know what was in the

12 environment.

13    Q.  My question was:  You don't have any

14 objective evidence to establish that Mr. Meyers or

15 Mr. Section or Mrs. Winningkoff or any of the 13

16 trial plaintiffs are able to smell H2S at 5 parts

17 per billion?

18         MR. FOSTER:

19              Objection to the form.

20    A.  There are no -- there have been no studies

21 that I know that have measured their threshold for

22 smell.

23 BY MS. BRILLAULT:

24    Q.  Really quickly -- sorry, I'm just going to

25 flip back to something we were talking about

1  before the lunch break.

2        You mentioned that -- when we were talking

3  about people in China and Japan, you said you had

4  confidential conversations with --

5     A.  Not confidential.  I mean, they're within

6  the realm of scientific discussions.

7     Q.  But they're conversations.

8        So other than the WHO, the World Health

9  Organization, Regional Air Quality guideline that

10 you referenced, are there any other peer-reviewed

11 or published publications that have adopted the

12 5 parts per billion per 30-minute standard?

13    A.  We just -- last year we had a -- we didn't

14 discuss this, but we had a workshop that was --

15 it's on YouTube, if you want to listen to it.  It

16 was -- it's on the olores website, olores.org,

17 okay?

18        And Kirsten Sucker was on it.  Several

19 people were on it, okay?  And I was one of the

20 presenters discussing the nuances of odor

21 annoyance and all the problems.  And Kirsten,

22 she's published things, but would say, If they can

23 smell it and it's frequent -- you know, the

24 frequency is an issue, whether they can smell it

25 is an issue.

Page 127

1          And it varies by person by person.  So, I

2   mean, for some people it may be, I got a hint of

3   it and, man, there it is again; you know, they

4   walk out the door, they got a hint of it, and

5   they're out of sorts.

6        Q.  And for other people, they can walk out

7   the door and they just don't smell it, right?

8        A.  They may smell it, but they say, Oh, damn,

9   I'll just go move on, get in my car.

10       Q.  Okay.  What about somebody who's smoked a

11  pack a day since they were 14?  Probably don't

12  have a great sense of smell anymore.  Are they

13  going to be bothered by 5 parts per billion?

14       A.  One thing I've learned is that you don't

15  make judgments on that, okay?  Because, in fact,

16  the most sensitive person that I tested over a

17  long period of time -- I was doing some work for

18  Williamson -- what was the name of it, Williamson

19  Tobacco, something Louisville, Kentucky.

20          And my most sensitive person who can

21  detect every threshold -- I had diluted things

22  way, way down, could do everything perfectly, was

23  a serious smoker with two packs a day.  And he

24  also smelled like alcohol.  So...

25       Q.  You --

1     A.  It's experience -- experience there,

2  according to Pam Dalton's work.  He did a good job

3  for himself.  He was very sensitive to sense of

4  smells.  So I don't make judgments about that.

5     Q.  No, you really need to study the

6  individual to make an individual determination on

7  what they're able to be -- what they tend to be

8  bothered by?

9     A.  Here's my problem -- unfortunately, you

10  don't have Pam Dalton -- didn't have Pam Dalton's

11  report, which I sent it as a draft and apparently

12  I didn't sign it.  So I thought -- I thought that

13  when he asked me to sign something, that both of

14  them were put together.  What can I say?

15          But all these people, if you go through

16  their reports, they would describe the FIDO

17  concepts of smell; frequency, intensity,

18  offensiveness, and duration -- duration and

19  offensiveness.  So that is what I put in my

20  report.

21          Pam Dalton says that that is the -- she

22  agrees that those are the factors that have to do

23  with annoyance.

24          Now, in Europe -- because I was just on

25  with a -- one the other day, they also put -- they

Page 129

1    call it FIDOL, F-I-D-O-L.  Because location is

2    important.  So something that will give you

3    anxiety in your home may not give you anxiety at

4    work because that's where you're earning money,

5    okay?

6            So when I went through all the reports, I

7    was able to show that the FIDOL -- FIDO concepts

8    were in each of their reports, so I assume that

9    they could smell and that these were annoyances.

10   So that was the assumption that I made, okay?

11           I was not asked to measure their

12   thresholds.  But I don't think I had a wrong

13   assumption.

14       Q.  And the FIDO, so that includes frequency.

15           The frequency that the 13 plaintiffs were

16   describing varied among the 13; some described it

17   every single day, some described it three to four

18   days a week, some described it four to five days a

19   week.

20           Do you agree?

21       A.  Correct.

22           MR. FOSTER:

23               Objection to the form.

24       A.  But I would like to point out for you that

25   for one person smelling it once every two weeks is

1   going to send them up a wall, whereas somebody

2   else it could be -- they could tolerate a couple

3   times a day.  So it depends on the person.

4   BY MS. BRILLAULT:

5       Q.  Agreed.

6           Some people would think it's a nuisance;

7   some people it's not going to bother as much?

8           MR. FOSTER:

9               Objection to the form.

10  BY MS. BRILLAULT:

11      Q.  Is that accurate?

12      A.  Correct.

13      Q.  Okay.  Let's see.  So in paragraph 1.1 on

14  page 9 --

15      A.  1.1 on page 9.

16      Q.  -- talking about the fact sheets of the

17  plaintiffs --

18      A.  Uh-huh.

19      Q.  -- odor qualities.  Sorry.

20          Did you compare -- and so you're also

21  citing to some of the deposition transcripts.

22          Did you compare the descriptions of the

23  odors that each plaintiff made in a fact sheet,

24  which was prior to the general causation decision,

25  as compared to how they were then describing it at

1  their deposition?

2      A.  No, I did not.  And I don't consider that

3  to be a legitimate kind of question, okay?

4  Because people don't have words for smells in

5  general.  And that kind of consistency I wouldn't

6  worry about so much.

7          The main thing is that all of them say it

8  smells terrible, okay?  It's the hedonic factor.

9  As to being able to put a quality on it, most

10  people have difficulty with that.

11     Q.  So to you it doesn't matter the

12  description, it's all going to be H2S because it's

13  coming from a landfill or --

14     A.  No, I mean -- I mean, we have -- here

15  we've got Jonathan Tate, sulfur, okay?  Petroleum,

16  sulfur, we've got rotten egg.  And some people

17  just can't -- sour egg.

18     Q.  What about ammonia and chemical?

19     A.  Yeah, ammonia and chemical, that's the

20  irritation component.

21     Q.  What --

22     A.  But chemical also -- I mean, there are a

23  large number of compounds in landfills, and we

24  only -- we only have data on a few of them.  So

25  who knows.

Page 132

1      Q.  And there's a large number of chemicals in

2   other facilities, right, that are emitting odors?

3      A.  Correct.

4      Q.  Correct?  I'm sorry, I didn't --

5      A.  Correct, yes.

6      Q.  And you didn't look at what the other

7   facilities were emitting in terms of chemicals?

8      A.  The only thing that I know is I did look

9   at Cornerstone, and when -- and I put that into

10   some report, I don't know which one, that they

11   had -- that LDEQ had ruled out Cornerstone even

12   though it didn't -- could emit hydrogen sulfide

13   because there was no ammonia.  So it was the

14   pattern -- the fingerprint wasn't there.

15      Q.  Are you aware of any operations that

16   Cornerstone -- I'll call it the Cornerstone

17   complex; there's a couple entities, you might be

18   aware, that operate in and around --

19      A.  I went through it for the last -- for the

20   last deposition, but I didn't do it for this one.

21      Q.  Are you aware of any operations on the

22   Cornerstone facility footprint that don't require

23   a permit, so there wouldn't be any compliance

24   issues, but they would still be emitting odors?

25      A.  Not aware of that.

                                                      Page 133
1     Q.  And that's because you didn't look -- you

2 didn't look at their operations?

3     A.  I -- no.  The only -- at the beginning, I

4 looked at Cornerstone, and I haven't looked at it

5 since.

6     Q.  Okay.  You didn't compare the descriptions

7 of the odors.

8          Did you compare the injuries that the

9 plaintiffs were describing in their fact sheets as

10 compared to what they were stating at the

11 depositions to see if it changed?

12    A.  What you're getting at -- trying to get at

13 is consistency of a patient.  I just think

14 you're -- it's a hopeless kind of thing.  I

15 take -- if they said it on Monday and then they

16 remember on Wednesday that they had -- something

17 else happened.

18          I just cannot -- I -- it's something that

19 I'm not going to fall into, okay?  I take it at

20 word that at some point along the way, this is

21 what they remembered as to what happened.  But to

22 dismiss it bothers me a lot, okay?

23    Q.  Dr. Schiffman, I just asked a question.  I

24 asked if you compared the types of injuries that

25 they were listing on their fact sheets compared to

Page 134

1   what they were then testifying about in their

2   deposition?

3       A.  I did not.  I took them all together as

4   one thing.

5       Q.  And so are you aware of any plaintiffs

6   that may have made statements such as, I don't

7   remember looking at this fact sheet, I didn't fill

8   it out, I just signed it?

9       A.  I do remember seeing that.  And,

10  obviously, somebody helped them do it.

11          But I worked for years and years with

12  people who are illiterate, who I had to fill out

13  forms for them.  So this does not bother me, okay?

14  I mean, there are many people who don't know how

15  to write.  I mean, it's very sad.

16          And even in today's world where they don't

17  learn cursive anymore, there are many young kids

18  who are very smart who don't know how to do

19  cursive, so -- and can't fill out a form unless

20  it's on a computer.  So that doesn't bother me.

21      Q.  And so you wouldn't have accounted for a

22  difference between someone who said, I didn't fill

23  out the fact sheet, and if those responses were

24  different than what she was testifying about at

25  trial -- at deposition?

Page 135

1      A.  All I can do -- all I can do is hope that

2  the person who helped them fill out the fact sheet

3  put down the right thing, that's all I can do.  I

4  mean...

5      Q.  You're making an assumption, though?

6      A.  I'm making an assumption that the person

7  who helped them fill out the form put down what

8  they said.

9      Q.  On page 11, in Section 1.6 --

10     A.  Uh-huh.

11     Q.  -- you're talking about complaints that

12  were made to LDEQ.

13     A.  Yes.

14     Q.  Okay.  And did you happen to look at

15  whether any of the complaints made to LDEQ or the

16  hotline, the Jefferson Parish hotline, were made

17  by any of the trial plaintiffs?

18     A.  I'm not sure whether that even is an

19  issue, because a lot of people don't bother to

20  call because they have -- they feel helpless about

21  dealing with the government.

22     Q.  I'm not asking --

23     A.  I did not -- I did not look to see if that

24  was true but it wouldn't -- it doesn't matter to

25  me whether they called or didn't call, because

Page 136

1   some people call and some people don't call.

2           In fact, the person's -- people who feel

3   hopeless and helpless a lot of times don't call

4   because they think that nobody is going to respond

5   to them anyway.

6       Q.  So you don't know if any of the trial

7   plaintiffs actually called in complaints and, if

8   they did, whether those aligned with the Jefferson

9   Parish Landfill in terms of wind direction or not?

10      A.  No.  But can I just say that there's

11  one -- they call, okay?  There's one phone number,

12  they get a busy signal, and they just don't call,

13  okay?  Or they're out trying to shop for their

14  food or -- the time that they call it's not

15  necessarily relevant to the time that the odor

16  arrives.

17      Q.  What about any plaintiff that submitted an

18  odor complaint through the online system to LDEQ,

19  did you consider -- trial plaintiff, whether any

20  of the trial plaintiffs' complaining aligned with

21  the Jefferson Parish Landfill emissions or

22  Mr. Lape's model?

23      A.  I was not asked to look at that.  I think

24  Jim Lape would do that.

25      Q.  Did you review any text messages from any

1   of the trial plaintiffs that indicated they were

2   experiencing an odor and then determine if they --

3   that time frame aligned emissions from the

4   Jefferson Parish Landfill?

5         MR. FOSTER:

6               Objection to the form.

7   A.   Okay, we're going down a thing of timeline

8   versus complaint.  And I used to be very

9   enthusiastic about what you were just talking

10  about until I did it myself, okay, trying to --

11  trying to relate when people called in, when they

12  made -- when they said something happened, and it

13  just doesn't -- it just doesn't happen.

14         In fact, when we're doing our e-nose work

15  right now, what I've decided to do is to have

16  people -- when the machine says there's something

17  out there, I want them to go outside and smell it

18  and make a judgment then.  Because if you tell

19  them to just write it down, it doesn't happen.  I

20  wish it did, okay?

21         One of the things we did when I was

22  working with Steve Wing, we would call people up

23  and say, It's time for you to walk outside and

24  please smell it, and then we would watch on our

25  cell phone and we would watch them go outside.

1          Because people just don't do things when

2    you tell them to do it.  And so I have a problem

3    with using when people called or when they entered

4    it into a database and to correlate that with wind

5    direction, because I'm -- unless you have a

6    really, really obsessive-compulsive totally

7    reliable human being, it just doesn't work.

8    BY MS. BRILLAULT:

9        Q.  What if you have a wife texting her

10   husband saying, It smells at the house right now,

11   this is disgusting, would that reflect a time -- a

12   realtime odor complaint?

13       A.  Yes, it probably would, uh-huh.

14       Q.  And --

15       A.  How many of those do you have?

16       Q.  As many -- did you check to see if we had

17   any and if --

18       A.  I have no idea.  I wasn't asked to analyze

19   that data, okay?

20       Q.  And if the -- if the information -- if the

21   wind direction and Mr. Lape's modeling showed that

22   Jefferson Parish Landfill couldn't contribute

23   odors to that individual's house at that time,

24   wouldn't that indicate that there were other

25   sources that were impacting that plaintiff?

Page 139

1      A.   Not necessarily.  And I'll tell you why.

2  One of the problems with modeling is that odors

3  linger, they move off -- in the modeling, for

4  example -- you have a river, right?  You have a

5  river and then you have ground.

6            If -- when the -- the ground heats up, the

7  odor -- the odors will -- the odors will rise and

8  cooler air from the water can slip back in.  So

9  the wind direction is not the only thing here.  I

10 mean, there are lots of other issues that have to

11 do with the movement of air.

12           So wind directions shift very quickly.  I

13 just think that this is a -- I wish it worked,

14 okay?  To be honest with you, I've spent a lot of

15 time trying to do it.

16      Q.   Just to be clear, so it's your opinion

17 that it would be more likely than not that it

18 would be some type of lingering effect because you

19 want to point to the Jefferson Parish Landfill as

20 opposed to another source that is contributing

21 odors to that individual's house when she was

22 texting her husband an odor complaint?

23      A.   I don't know.  I don't know.  You're

24 giving me a hypothetical problem, and I can't deal

25 with hypothetical problems; I try to deal with

1  something real.

2      Q.  Maybe I'm giving you a real problem, you

3  just haven't looked at it; is that an accurate

4  statement?

5          MR. FOSTER:

6              Objection to the form.

7  BY MS. BRILLAULT:

8      Q.  All right.  In some of the complaints,

9  Dr. Schiffman, are you aware that residents and

10  some of the trial plaintiffs were complaining

11  about dust and particulate matter?

12     A.  Yes, uh-huh.

13     Q.  Are you providing any expert opinions on

14  the dust or particulate matter in this case?

15     A.  No, I'm not.  In fact, I think the dust

16  appears to have been grain dust from the river, as

17  I recall.  And if you look at the MAML data, the

18  particulate levels do not go up that much.

19          So I don't think that -- you know, I don't

20  think that that's an issue, at least with regard

21  to the landfill.  I don't know, I mean, I could be

22  wrong, but that was my feeling about it.

23     Q.  So particulates that were making their way

24  to the plaintiffs' homes, could that have been

25  impacting and causing irritation to their --

Page 141

```
 1      A.  Not the burning.  Not the kind of burning
 2  that people are describing.  And it's -- people
 3  are -- the way in which it's described is chemical
 4  burning.  I mean, it's like a chemical burning.
 5  It's different from what you get from particulates
 6  usually.
 7      Q.  But you haven't looked at whether or not
 8  the particulates were sufficient to cause any kind
 9  of irritation in any of these trial plaintiffs?
10      A.  No.  But it seems -- that was short --
11  that was a short-lived event, and this is one that
12  has gone over two and a half years.  So to me, I
13  guess I kind of said, Well, that was a short
14  problem from the middle-of-the-river people, you
15  know, and the barges, and this is something that
16  persisted for a long time.
17      Q.  What's your basis for saying it was a
18  short-lived event?
19      A.  I guess just from everything that I read.
20  But let's look at that.  I mean, I think it's
21  important to look at this, is that it could, in
22  fact -- predisposed people -- you could have a
23  baseline where you have irritants in the -- and I
24  think this is true.
25          You have irritants in the -- in the air
```

Page 142

1    and then there's a burst from out of Jefferson

2    Parish and it puts everything right over the top.

3    I put that in my original report, I mean, the one

4    from long ago.  Gosh, I think I still have it.

5         I think I put it in here saying something

6    about adding -- here, right here.  "When the

7    emissions from JP" -- Jefferson Parish Landfill,

8    we didn't put an F on it -- "were transported to

9    neighboring communities, the concentration of

10   background chemicals" -- background chemicals,

11   this could include the dust -- "at the plaintiffs'

12   homes was elevated to levels that significantly

13   exceeded the threshold for sensory irritation."

14        So would I agree with you that having

15   particulates in the air, you know, had some, you

16   know, effect in raising the -- making it so that

17   people become more sensitive?  Probably.

18        Q.  And you didn't perform any analysis to

19   determine what effects those particulates would

20   have had in --

21        A.  What analysis was I to do?

22        Q.  Let me finish.

23        -- in comparison to the Jefferson Parish

24   Landfill emissions?

25        A.  The problem with your reasoning is that

Page 143

 1  the irritation is -- occurs with the odor, okay?

 2          Listening to the young -- there was a

 3  young daughter, the daughter of -- of one of

 4  the -- of one of the plaintiffs, and she said it

 5  comes in, it burns her eyes at the same time as

 6  the smell, okay?  But she didn't say, I had

 7  burning eyes and then the smell came in.

 8          It's the temporal relationship between the

 9  eye irritation and the odor that is the issue.

10     Q.   Again, you didn't do any analysis of the

11  particulates or anything else to determine that

12  they weren't the main source of their irritation?

13     A.   No.

14     Q.   In the same paragraph, of the 1,800

15  complaints about the stench, did you assess how

16  many individuals made the total 1,800 complaints?

17     A.   I think I had a discussion with Jim Lape.

18  He told me, but I can't remember.

19          But it didn't -- to me, it's not an issue

20  because I've done so much odor work in areas where

21  people feel helpless and they don't call anybody

22  and they wouldn't even know where the phone --

23  what the phone number would be anyway.

24          So, I mean, this is true in communities

25  near hog farms.  I remember talking to somebody

Page 144

1   who said, Who am I supposed to call, nobody cares.

2   You know, I mean, that's basically what you hear.

3          So to me, there are some -- more

4   intelligent people tend to -- or more educated

5   people tend to call and be -- and if they're

6   really pissed off, they'll keep calling and

7   calling.  And people who are really affected

8   terribly may not call at all.

9          So, I mean, there are complaints, and

10  that's what initiated this whole issue, okay?

11  But -- at least getting people to look at it.  But

12  do I think that trying to relate those odor

13  complaints to wind direction or -- you know, or

14  exposure, I don't think it's -- I know it's not

15  viable.  I've tried doing it, okay?

16      Q.  Okay.  So you think looking at odor

17  complaints and wind direction is scientifically

18  sound methodology?

19      A.  I wish it were.  Can I tell you how many

20  times I've tried it?  Probably eight or nine

21  times, and I finally gave up and said this is just

22  not a viable -- it's a waste of my time.

23      Q.  You also mention that the odor complaints

24  began -- well, sorry.

25          You mentioned that LDEQ records indicate

1   the odor complaints began to spike in August 2017.

2          Do you see that in the next paragraph?

3      A.  Yes.

4      Q.  Okay.  Did you look to see -- did you look

5   at any other source to determine whether they

6   might be the cause or contributing cause based on

7   what was going on with their operations at the

8   time?

9          MR. FOSTER:

10             Objection to the form.

11     A.  I took this from the Court decision.  I

12  assumed they looked into it.

13  BY MS. BRILLAULT:

14     Q.  So you don't know if the Court looked into

15  other sources, but you know that they looked at

16  Jefferson Parish Landfill?

17     A.  No.  But, see, LDE -- from my point of

18  view, LDEQ has spent a lot of time on this, and

19  they came to the conclusion that the basic problem

20  is Jefferson Parish Landfill.

21          I don't think that these people are

22  stupid.  I think they spent a lot of time doing

23  this and tried to find out the problem.  And when

24  I look at how -- I mean, doing spent lime and

25  putting spent lime and all the problems with the

Page 146

1  leachate and the wells and everything else that

2  was going on there, I mean, you just put it all

3  together, it's very hard to figure out that

4  another source -- I mean, I'm not saying that

5  there aren't other odor sources.

6          The question is what is the main problem

7  that is a result of these people's complaints?

8  Where -- what is the main cause?  That's what

9  we're dealing with.

10     Q.  I agree, Dr. Schiffman.

11          And my question is:  How do you make that

12  determination without looking at the other

13  sources?

14          If you're only looking at the operations

15  and emissions from one source, how do you make the

16  determination -- you, not LDEQ -- how do you make

17  the determination for your expert opinion in this

18  case that Jefferson Parish is the main source of

19  odors if you don't consider other sources?

20     A.  Okay.

21          MR. FOSTER:

22               Objection to the form.

23     A.  The odor -- odor patrol went out, right?

24  And they collect -- they smelled -- went all

25  around the neighborhood.  And they said, This is a

Page 147

1  landfill odor problem, okay?  Because that was

2  what -- that was the conclusion they came to.

3          There was one -- one time that there was a

4  high hydrogen sulfide level, but it was -- did

5  not -- there was no -- there was no methane

6  associated with it.  They decided that it was a

7  landfill problem.

8          So now we have three landfills, right?  We

9  have River Birch, we have Jefferson Parish, and we

10  have Highway 90, right?  So we have three

11  landfills.

12          Now, how did I rule out other landfills?

13  The way I ruled them out was, number one, I have

14  no data, okay, on the other compounds coming off

15  of -- off of Highway 90, okay?  So I have no

16  reason to consider them as an issue.  And

17  according to -- according to Dr. Brown and his

18  associates, there are no problem -- that they're

19  in compliance, according to him, okay?

20          How did I rule out River Birch?  Well,

21  when I look at the July canisters, okay, the

22  sulfur in that canister -- the actual rating on

23  the Jerome was 2 ppb.

24          They found no sulfur -- no hydrogen

25  sulfide in the canister; however, at the same

 1  time, same time frame, there was a high level of

 2  hydrogen sulfide from Jefferson Parish Landfill,

 3  and at the same time, there was also elevated

 4  levels in the community as measured by MAML.

 5          The canisters were not -- were --

 6  unfortunately sat around for five or six days, so

 7  they didn't get much out of it.  But I compared

 8  those two Jerome readings, the one at Jefferson

 9  Parish Landfill, which was, I can't -- I don't --

10  have it up on my computer here, but I can't see

11  it, and I think -- maybe I can pull it over into

12  something else.

13          And then the one from River Birch.  So

14  I've ruled out River Birch because it refused to

15  take -- to take the spent lime.  And then I ruled

16  out the Highway 90 because they seem to -- there's

17  no data to show that anybody ever collected

18  anything there that would be of an issue.

19  BY MS. BRILLAULT:

20      Q.  Okay.  That's helpful, Dr. Schiffman.

21          And so let's briefly talk about

22  Highway 90.  You said there's no data that,

23  according to Dr. Brown, Highway 90 was in

24  compliance -- they didn't get any compliance

25  orders; is that accurate?

```
 1      A.  Well --

 2      Q.  Is that your understanding?

 3      A.  Let's say that there -- I mean, I don't

 4 know what the data are with regard to compliance.

 5 But with regard -- I just -- what bothers me so

 6 much about what you're doing is that you are

 7 dismissing hours and hours and hours of work from

 8 LDEQ.  That is so disrespectful, in my opinion, to

 9 dismiss hard-working people who are trying to

10 figure out what a problem is, and they come up

11 with what they consider with patrols and being on

12 the landfill.

13          I mean, they came to the conclusion that

14 the problem was -- main problem -- it's not saying

15 that there isn't an odor from time to time from

16 anyplace else -- but the main problem of the

17 people in the community was due to Jefferson

18 Parish Landfill.  And --

19      Q.  I'm going to interrupt you because you've

20 been going on and you're not answering my

21 question.

22          So my question was:  You yourself said,

23 and the MAML reports show, that LDEQ pointed to

24 the landfills, and there was three of them.

25          And the way you determined it was
```

SCHIFFMAN SUSAN

1   Jefferson Parish Landfill was the main source was

2   you took out Highway 90 because there was no data

3   about the type of compounds that were being

4   emitted, and Dr. Brown said that there were --

5   that they were in compliance.

6           Am I accurately reflecting your testimony?

7       A.  No.  I'm not saying that -- I am saying

8   that after their review of the three landfills,

9   not saying that there was never -- you know,

10  landfills are smelly places.  But after their

11  review of the three landfills, they concluded that

12  Jefferson Parish was the major cause.

13          Does Highway 90 sometimes emit an odor?

14  Probably does, okay?  We're looking at why did

15  something -- what happened -- was there something

16  different that happened at Highway 90 over a

17  period from August 2017 up to, let's say, the

18  beginning of -- let's say through 2019, was there

19  something different there than has been going on

20  before that?

21          Look at the -- February.  Let's go back to

22  the February -- the February H2S levels, okay?

23  Have you looked at those?

24      Q.  Dr. Schiffman --

25      A.  No, listen to me.

Page 151

1        Q.  I don't need you to ask me questions.  I

2    am trying to understand your opinions and the

3    basis for your opinions in this case.

4        A.  I'm trying to give you the reason.

5        Q.  Well, you're not doing a very good job.

6    So let me try a different way to ask the questions

7    to see if we can get to where we need to be here.

8            Your opinion is that Jefferson Parish

9    Landfill was the main source of odors?

10       A.  Yes.

11       Q.  Okay.  And the way you said you determined

12   that is you were basing it on LDEQ's conclusion;

13   that, at least, is accurate?

14           MR. FOSTER:

15               Objection to the form.

16       A.  One of the reasons.

17   BY MS. BRILLAULT:

18       Q.  Okay.

19       A.  Let's go -- please listen to me.  Go back

20   to February -- the February MAML report.  Do you

21   see what the mean H2S level was?  What was it?  It

22   was .6, okay?  It was .6.

23       Q.  Dr. Schiffman --

24       A.  Is there something different?  I know of

25   nothing different that happened at Highway 90,

Page 152

1  okay, for the next year and a half or two that

2  happened at Highway 90 that was different from

3  February, while I do know something that's very

4  different from Jefferson Parish Landfill.

5      Q.  Okay.  And we've talked about that.

6  You're not testifying on the operation.

7          How did you make the conclusion that there

8  was nothing different going on at the Highway 90

9  landfill?

10     A.  I know nothing about it.  I haven't read

11 anything about it.  I haven't seen anything about

12 it.

13     Q.  And when you say you haven't read or

14 haven't seen, is that because you didn't look at

15 any documents related to Highway 90 C&D

16 operations?

17     A.  I don't -- no, no -- I have no data on

18 Highway 90.

19     Q.  So you have no basis to say whether or not

20 something changed at Highway 90 C&D landfill, you

21 just didn't look at -- it's not something you

22 looked into?

23         MR. FOSTER:

24             Objection to the form.

25     A.  I can assure you --

SCHIFFMAN SUSAN                                    04/26/2024

1   BY MS. BRILLAULT:

2       Q.  I'm asking a question.

3       A.  Let me just --

4       Q.  I'm --

5       A.  No, you asked me a question and then

6   you're not letting me answer the question.

7       Q.  You're not answering it.  So I need you to

8   answer my --

9       A.  You're interrupting me.  And you asked me

10  a question and you're not letting me answer the

11  question, okay?

12      Q.  Let me rephrase.

13          Did you look at any documents with respect

14  to Highway 90 C&D landfill operations?

15      A.  No.

16      Q.  Thank you.  That's what I was trying to

17  get at.

18      A.  But I would also like to qualify that,

19  that LDEQ is very aware of what any differences

20  were at Highway 90, and they would have considered

21  that before they made the conclusion that

22  Jefferson Parish Landfill was the major problem.

23      Q.  And in the MAML reports that you talk

24  about, February, April, July, I think there's a

25  December one of 2019, none of those reports state

Page 154

1    that Jefferson Parish Landfill was the main source

2    of odors; they simply state the odors came from --

3    they state landfill odors, right?

4        A.   No, no.  The '19 -- the '19 one, that's

5    incorrect.  I can't get into my --

6        Q.   Dr. Schiffman, I think you're talking

7    about the Louisiana Department of Health.

8        A.   Health, yes, yes.

9        Q.   So the LDEQ MAML reports do not come to

10   the conclusion that it was the Jefferson Parish

11   Landfill that was the main source; they simply

12   state landfills -- they notice landfill odors; is

13   that fair?

14           MR. FOSTER:

15               Objection to the form.

16       A.   No, it's not fair, because you don't allow

17   the final conclusion, which is stated by

18   Dr. Brown, after reviewing all of that data, that

19   Jefferson Parish was the main cause.

20   BY MS. BRILLAULT:

21       Q.   I'm asking if the MAML reports that you

22   reviewed indicated that Jefferson Parish Landfill

23   was the main source?

24           MR. FOSTER:

25               Objection to the form.

 1      A.   Not in the reports that I know of.

 2   BY MS. BRILLAULT:

 3      Q.   Okay, thank you.

 4           Did you review any documents by LDEQ

 5   inspectors indicating that they detected odors

 6   from the River Birch landfill off-site?

 7      A.   I had about -- I just had a few LDEQ ones

 8   relating to Jefferson Parish.

 9      Q.   You didn't consider whether or not River

10   Birch landfill was a known emitter of off-site

11   odors, even recorded by LDEQ inspectors?

12           MR. FOSTER:

13              Objection to the form.

14      A.   From my point of view -- let me answer it,

15   please, without interrupting me.  From my point of

16   view, LDEQ has spent hours and hours on this.

17   There could be odors off -- from either Highway 90

18   or River Birch.  Their view was that the main

19   problem, okay, was Jefferson Parish Landfill.

20           There are -- I think in my report I said

21   the main -- main problem, okay?  I am not denying

22   that grain from the barge could have a grain, who

23   knows, smell, okay, or that River Birch from time

24   to time emits some kind of odors, okay, or even

25   Highway 90.

1            The issue is what is the main problem

2  where you get this huge peak in 2018 and 2019,

3  which goes away, okay, when you take away the

4  problem, which predominantly goes away when all

5  the problems are fixed, okay?

6            So it's the whole -- it's the whole

7  situation taken together that is -- that you make

8  a conclusion.  You don't make it on one single

9  thing in the July report of MAML or in the one

10 complaint over at Highway 90.  That's not how you

11 do it.  It's all of it together.

12           And that's what I think LDEQ did, and

13 I'm -- I think -- I was very impressed that they

14 were willing to spend the time to try to do that

15 because most places don't.

16 BY MS. BRILLAULT:

17    Q.  It's your opinion LDEQ did it.  But to be

18 fair, you did not perform that analysis of the --

19    A.  I did not, no.

20    Q.  Dr. Schiffman, if you knew that workers at

21 the Jefferson Parish Landfill that were working on

22 the landfill throughout the two-and-a-half-year

23 period did not notice a difference in the types of

24 odors or strength of odors while working at that

25 landfill, would that impact your opinion as to

Page 157

1 whether there was an uptick in odors coming from

2 the Jefferson Parish Landfill that was causing

3 impacts to residents?

4     A. No, because they're adapted.

5     MR. FOSTER:

6         Objection to the form.

7     A. They're adapted. They're adapted. Their

8 sense of smell is -- their receptors are saturated

9 so that any increase or decrease is probably not

10 going to have any impact whatsoever.

11 BY MS. BRILLAULT:

12     Q. Okay.

13     A. Or even if they have a sense of smell.

14     Q. And so you agree that individuals can

15 become -- I think the term is noseblind, right?

16 They become noseblind to H2S odors?

17     A. One word. That's one way it's used,

18 uh-huh.

19     Q. People become adapted? Okay.

20         So people, when they are exposed to H2S,

21 over what period of time does it take to become

22 noseblind to H2S?

23     A. There are numerous mechanisms. They

24 can be a peripheral and they can be central, okay?

25 There's central adaptation, there's peripheral

Page 158

1  adaptation, and there's also damage to the

2  olfactory system.

3       So we used to -- we used to take people

4  who were in very chemically intense environments

5  and we used to do biopsies of the olfactory

6  mucosa.  They don't do it anymore.  Insurance used

7  to pay for it.  But you get invagination of

8  respiratory tissue.

9       So I think, if I took some of those people

10 and did an olfactory biopsy, I think that you

11 would find that a good portion of them don't even

12 have a sense of smell.

13    Q.  And I think before you said when you get

14 exposed to odors you can become better at smelling

15 odors, right?

16    A.  Intermittent.  When it's intermittent, but

17 not when it's constant.

18    Q.  And what's the difference to you between

19 intermittent and constant?  If someone is working

20 at a landfill for a couple hours every day, they

21 leave the landfills, there's no odors, they come

22 back, is that intermittent or is that constant

23 exposure?

24    A.  Well, I can tell you what happens.  I hear

25 this -- I've heard this many times, is that

Page 159

1    somebody who's worked on a landfill, they went on

2    vacation for three weeks and they came back and

3    they said, Oh, my God, I can't believe that I work

4    in this environment, but then they adapt to it

5    again.

6        Q.   But if it's every day or every other day

7    that they're smelling those odors, is that

8    intermittent or constant when they're there for a

9    couple hours?

10       A.   Well, people in the environment --

11   neighbors are not -- when they're exposed, it's

12   undulating, it's never exactly the same -- same

13   intensity.  I put it into the Dalton report.

14       Q.   That's another day.  That's another day,

15   Dr. Schiffman.

16       A.   No, no, one minute.

17       Q.   We're not --

18       A.   It's in the original -- it's in the

19   original report that you have, okay?  Let's go

20   into the one from whenever it was, 2001.

21       Q.   And to be clear, you're looking at your

22   general causation report.  So that -- that

23   discussion is based on what can happen to people,

24   not what happened to these 13 individuals?

25           MR. FOSTER:

SCHIFFMAN SUSAN

 1                    Objection; form.

 2   BY MS. BRILLAULT:

 3        Q.  Is that -- is that right, Dr. Schiffman?

 4        A.  No.  This is a point of -- okay.

 5            Do you have my original report?

 6        Q.  I don't need it.

 7        A.  Well, let me just tell you what it says,

 8   okay?  This was a -- H2S measurements obtained at

 9   MAML location in Waggaman, the corner of Dandelion

10   and River Road.  And they measured hydrogen

11   sulfide -- please let me answer the question.

12        Q.  I didn't say anything.

13        A.  -- measure hydrogen sulfide over a 19 -- I

14   think 19-minute interval.  It went -- it varied

15   from 5 ppb to up 121 ppb, okay?

16        Q.  Okay.  Is that constant?  Which trial

17   plaintiff was exposed at Dandelion Road at the

18   description you're telling me right now?

19        A.  They're not.  But the point of the matter

20   is, is that people in the environment -- in the

21   environment are not exposed as a person on the

22   landfill itself to a constant -- constant

23   concentration.

24            It can be like a plane, okay?  It comes

25   in, you hear the noise, then there's nothing.

1  Then another plane comes in, then it's nothing.

2  Then another one comes in, okay, it's nothing

3  again.

4          So you say, Oh, my God, that smell has

5  been here all day long or it's been here all night

6  long.  But the truth of the matter is it's been

7  discrete times and it's a -- you kind of meld it

8  together as a whole, a Gestalt.

9    Q.   Okay.  Let's go to Section 1.7 on page 12

10  at the very top.  We started talking about the

11  individuals, but I just want to go to the very

12  intro paragraph -- or sentence at 1.7.

13          It says, "A review of the transcripts of

14  the videotaped depositions of the plaintiffs

15  listed in Footnote 4 above shows that exposure to

16  these malodors from JPLF over a multiyear period

17  caused enormous anxiety, worry, stress, and

18  unpleasant feelings."

19    A.   Right.

20    Q.   And in order to come to that conclusion,

21  you were assuming that the odor they described and

22  the experience they described from that odor was

23  from the Jefferson Parish Landfill?

24    A.   Yes.

25    Q.   Plaintiffs didn't have sampling to show

1    that it was the Jefferson Parish Landfill, you're

2    just assuming that their description is the

3    Jefferson Parish Landfill odors?

4        A.  Or predominant -- let's say predominantly

5    the Jefferson Parish Landfill.

6        Q.  Okay.  And the anxiety, worry, and stress

7    that you're describing, are those intermittent

8    feelings that these individuals were having or

9    would they be constant?

10          And please feel free to go through each of

11   the 13 of them if you need to do it that way.

12       A.  I can only go by what is said here, okay?

13   Let's just stick by the data, okay?

14       Q.  Okay.  So --

15       A.  I would say that when they get the odor,

16   this is how they feel.  Whether it carries over

17   throughout the day, I would say for some people

18   yes.  I'd say for Wendy Gremillion, yes; for

19   Mary Ann Winningkoff, yes.

20          So that -- I don't feel that I can say

21   that this stress is going to continue throughout

22   the day after the smell goes away; but for some

23   people it does, for some people it doesn't.

24       Q.  And --

25       A.  In my experience.

SCHIFFMAN SUSAN

1    Q.   Okay.  And for purposes of this report,

2  you didn't render an opinion on each of those

3  plaintiffs and whether it was going to continue

4  or --

5    A.   No.

6    Q.   Okay.  So that was anxiety and worry.

7         Would the same impact happen -- sorry,

8  let's do the line of questioning for the other

9  types of injuries, the headaches.

10         When they're experiencing headaches,

11  nausea, is that -- are those constant, like they

12  happen all the time and they extend past the

13  odors, or are they intermittent and occur in

14  connection with the odor experienced?

15    A.   Well, with headache, I can certainly

16  assure you that it can continue on.  Because when

17  he did the hog exposure, we called people, because

18  that was part of our routine, and some people it

19  continued on the next day.  So for headache it

20  could continue on.

21         The nausea, I don't know.  I mean, it's

22  certainly associated with it.  Sleep; well, if you

23  didn't get any sleep, you could be -- have a

24  headache just from the loss of -- lack of sleep

25  the next day.

1      Q.  That makes sense.

2          And you mentioned that, you know, for

3  headaches it could continue on.

4      A.  Yes, it definitely can.

5      Q.  For purposes of your opinion in this case,

6  which of the plaintiffs did headaches continue on

7  and which ones did it seize out?

8      A.  I wasn't asked to assign a mechanism for

9  each person, okay?  I just did it as a -- as I

10  would disclude it happened, okay?

11      Q.  Understood.

12          And that goes for all of the injuries,

13  like whether the exposure that Mr. Lape is

14  predicting could cause the types of injuries that

15  you discuss in your expert report?

16      A.  Correct.

17          At some point I've got to get up and

18  stretch, because I usually -- I always do.

19      Q.  No, this is --

20      A.  I set an alarm -- I set an alarm for my

21  yoga.

22      Q.  No, that's good.  You've got to do that,

23  keep your legs moving.  But I -- after lunch, I

24  usually have to go to the bathroom after an hour.

25  So let's take a quick five-minute break.

 1          Does that work?

 2     A.   Okay, fine.

 3          THE VIDEOGRAPHER:

 4               We are off record at 3:09 p.m.

 5          (A break was taken from 3:09 p.m. to

 6          3:18 p.m. Eastern Time.)

 7          THE VIDEOGRAPHER:

 8               We are back on the record at 3:18 p.m.

 9     BY MS. BRILLAULT:

10     Q.   All right.  Dr. Schiffman, I'm going to

11     read you a statement, please let me know if you

12     agree or disagree.

13          "For exposures in excess of 5 parts per

14     billion, individuals can suffer from nose

15     blindness, which sanitizes the individual to the

16     odor."

17     A.   What?

18     Q.   I can read it again.

19     A.   That's something I would have never said,

20     okay?  After 5 pp -- oh, 5 ppm?

21     Q.   No.  "For exposures in excess of 5 ppb,

22     individuals can suffer from nose blindness, which

23     sanitizes the individual to the odor."

24     A.   No.

25     Q.   You don't agree with that?

Page 166

1      A.   No.

2      Q.   Okay.  Do you have any idea what the -- or

3   do you have any understanding of what the term

4   "sanitizes" means in that context?

5      A.   I don't know.

6           5 ppb, okay.  I think what they're -- what

7   happens with hydrogen sulfide, at high levels, you

8   actually can't smell it anymore, which is the

9   reason why people have to wear monitors.

10          It just knocks out the sense of smell

11  altogether.  So that's what they mean by nose

12  blindness.

13          But you said it had 5 ppb.  That's

14  impossible.

15     Q.   What do you think "sanitizes the

16  individual to the odor" means in that sentence?

17     A.   I have no idea.  No idea.

18     Q.   Neither do I.  Thank you.

19          So when they're talking about adaptation,

20  people adapt to H2S, is that different, in your

21  understanding, as nose blindness?

22     A.   Nose blindness is a word that's used in

23  the oil industry.  I've taken a couple of these

24  courses from the oil industry and they, you know,

25  talk about knockout and all this kind of -- it's

1  just a different vocabulary.  It's adaptation.

2       Receptors are all tied up and, therefore,

3  you can't smell it, which is one of the reasons

4  why people have to wear monitors at the high

5  concentrations.

6       Q.  Okay.  But at low concentrations --

7       A.  I've never heard of such a thing.

8       Q.  And what does low concentrations of H2S

9  mean to you?

10      A.  Well, nose blind -- it depends on -- if

11 you want to consider the entire range of

12 concentrations, I mean, we're at the lower end

13 here.  We're at the sensory end.

14      What we're dealing with in this case is

15 sensory abuse, okay, which is perceived unfort --

16 is unfortunately submitted to the amygdala, which

17 leads to all kinds of emotional responses.

18      Also -- we haven't gotten into the

19 biochemistry of this.  But also, it's accompanied

20 by other compounds, and so, therefore, you can

21 have eye irritation and all kinds of other

22 problems as well.

23      But the high concentrations are the ones

24 which would kill you, okay?  A high concentration

25 is one that I would consider toxic.  This is a

SCHIFFMAN SUSAN

04/26/2024

1  sensory effect, which can cause neuroinflammation,

2  but it's not a toxic effect that can kill you.

3      Q.  Okay.  That's helpful.  Thank you.

4          On page 14 -- I'll try to skip through a

5  little quickly.  Would you have -- do you have the

6  report in front of you or do you need --

7      A.  I'm up to page 14.  I'll never do anything

8  with double-sided again.  Okay, here.

9      Q.  Yes, page 14.

10          Is it Rotton?  Or how do you pronounce it?

11     A.  Yeah, Rotton, uh-huh.

12     Q.  Okay.  You talk about a short exposure

13  study that you did?

14     A.  Uh-huh.

15     Q.  Was that -- you mentioned it was a

16  sulfurous malodor.

17          Was that hydrogen sulfide?

18     A.  I haven't read that for a couple of years.

19  I'd have to go back and look at it.

20     Q.  If I represented that it was ethyl

21  mercaptan --

22     A.  It might have been a mercaptan; otherwise,

23  I would have put in hydrogen sulfide.

24     Q.  Is there any evidence that ethyl mercaptan

25  exposure happened to these plaintiffs at their

1  residences?  When I say "these plaintiffs," I mean

2  the 13 trial plaintiffs.

3      A.  Were there any mercaptans?

4      Q.  Yes.  At their residence.

5      A.  When the -- when they did the canisters, I

6  don't remember seeing any particular levels of

7  mercaptans in them, but I'd have to go back and

8  look at that and see.

9      Q.  And with the Rotton study, would I --

10     A.  Let me look at the -- oh, the reference?

11  I don't have the references.  I didn't print out

12  the reference.  My paper-saving efforts here.

13     Q.  I will represent that the level for ethyl

14  mercaptan in that study was 1.6 parts per million.

15     A.  Uh-huh.

16     Q.  And that's a magnitude that's higher than

17  the 5 parts per billion hydrogen sulfide that

18  we're looking at?

19     A.  You can't compare them.  You can't compare

20  mercaptans with hydrogen sulfide.  I'd have to

21  look up the threshold for ethyl mercaptan; I don't

22  know.

23     Q.  You don't --

24     A.  I do have it in a paper.  But my problem

25  is that your screen is keeping me from going into

1  things that I need to go into.

2      Q.  And so your statement that short-term

3  exposure to a malodorous sulfur-containing

4  compound, you don't -- it's not hydrogen sulfide,

5  it's ethyl mercaptan that's applicable?

6      A.  Let me look and see.

7      Q.  If you don't know it, Dr. Schiffman, we

8  only have --

9      A.  I'd have to go back and look at it.

10     Q.  Sitting here today, you just don't know;

11 is that fair?  You'd have to look?  Yes or no?

12     A.  My guess was a mercaptan, because

13 otherwise I would put in hydrogen sulfide.

14     Q.  Are you aware of any source that used

15 ethyl mercaptans at their -- in their operations

16 in Jefferson Parish?  Sorry, I didn't finish that

17 question.

18     A.  I don't know who's using what chemicals,

19 okay, in -- this is not -- this is not within the

20 realm of what I'm dealing with, okay.  Trying to

21 put the blame elsewhere after LDEQ has spent so

22 much time figuring out what it was is just, to me,

23 a red herring.

24     Q.  I'm just trying to find out the basis of

25 your opinions in this case, Dr. Schiffman.  So

1  this is more of a cleanup, so this should be

2  hopefully quick.

3          On page 14, let's see, in the Conclusion

4  section, you say, "...impaired their mood and

5  overall health as set forth by the World Health

6  Organization (see Footnote 31)."

7          I think you meant Footnote 33, if you

8  scroll up.  I just want to make sure I'm looking

9  at the right citation.

10     A.  "Exposure to malodors for a short time of

11  five minutes can impair emotional status," is that

12  what you're after?

13     Q.  I'm looking at -- sorry, let me get to it.

14  On page 14 it says, "...impaired the mood and

15  overall health as set forth by the World Health

16  Organization."

17          Do you see that?

18     A.  Uh-huh.

19     Q.  And then it references "see Footnote 31."

20  And I'm wondering if you meant to reference see

21  Footnote 33 instead of 31?

22     A.  Probably.

23          Believe me, footnotes drove me nuts.  I

24  finally said I'm not doing any more footnotes.

25  And Allen can assure you that I absolutely refuse

SCHIFFMAN SUSAN

1    to do any more footnotes.

2        Q.  Okay.  All right.

3        A.  33?

4        Q.  Yes.

5        A.  I don't --

6        Q.  It's World Health Organization

7    constitution, versus 31 --

8        A.  Yes, that should be Footnote 33, you're

9    correct.

10        Q.  Okay, great.

11        A.  I may have knocked out some footnotes

12    along the way.

13        Q.  I'm just trying to make sure I'm

14    understanding what you're referencing, that's all.

15            Okay.  Let's go to Opinion 2.  That's on

16    page 15.  This is where you're talking about FIDO

17    and daily activities.

18        A.  Uh-huh.

19        Q.  In Section 2.1 you're talking about -- or

20    referencing using "Integral consulting used the

21    CALPUFF model to estimate the dispersion of

22    emissions."

23        A.  Uh-huh.

24        Q.  And it says, "The CALPUFF" -- later in

25    that same paragraph, "The CALPUFF modeling was

Page 173

1  performed to estimate the average exposures at the

2  homes of the trial plaintiffs as reflected on

3  their PFSs and in their testimony" -- "and in

4  their testimony in their depositions as follows."

5      A.  Uh-huh.

6      Q.  Sorry, I asked some of these questions, so

7  I'm just trying to get through.

8          The cite to CALPUFF modeling, that

9  predicts or estimates; it doesn't show actual

10 impacts?

11     A.  Correct.

12     Q.  On page 16 in Table 2a, 2b, and 2c you're

13 reflecting the counts -- the 30-minute -- the

14 number of 30-minute averages at or above a

15 threshold, and the threshold is on the left; is

16 that right?

17     A.  That's correct.

18     Q.  If the Court determined that exposure to

19 H2S at 5 parts per billion for a 30-minute average

20 is the level where it's capable of causing certain

21 injuries --

22     A.  Yes.

23     Q.  -- why would you also include .7 and 3.5

24 ppb?

25     A.  You're not including -- we're not

1  including .7 and .3 ppb; we're only looking at 7.

2      Q.  Why did you include them in your table?

3  Why did you --

4      A.  I asked -- originally when I talked to Jim

5  about -- Jim Lape about doing this, this was in

6  the very first round, I'd like to know how many of

7  these are just above threshold.  Because some

8  people, if they can smell a whiff of it, it's an

9  issue to them.

10         But we're being very conservative here.

11  We're saying not only can they smell it, but they

12  have to be able to smell it for 30 minutes, okay?

13  It's not like they walk outside and it was there

14  for five minutes, we're not saying that.

15         We're saying -- we're taking a very

16  conservative approach and saying, Anytime that

17  it's 5 ppb or above for an average for a 30-minute

18  period.  And what's worse about this is it could

19  be -- it could be a few, you know, peaks and then

20  nothing and then peaks and nothing, which drives

21  people completely up a wall.

22         So this is just what we're doing.  We're

23  just taking the average over a 30-minute period.

24  And we know that it's ten times above the odor

25  threshold.

1      Q.  And the odor threshold is the threshold

2  that an individual can detect it in a clean

3  laboratory setting?

4      A.  According to -- according to the ATSDR,

5  they use 5 -- .5 ppb.  WHO says the lowest is .2

6  ppb.

7      Q.  In any event, the Court determined that

8  the level that --

9      A.  Right.

10      Q.  The lowest threshold is 5 ppb in this case

11  for an average of 30 minutes; it's not .7 or 3.5

12  in this case?

13      A.  Say that again.  The lowest thresh -- the

14  threshold is .5.  Were you --

15      Q.  The threshold for injuries that -- where

16  the level at which exposure to H2S is capable of

17  causing an injury is 5 parts per billion,

18  according to the Court's decision, for a 30-minute

19  average?

20      A.  The word "injury" may not be the right

21  word.  Having a biological response, okay?  Having

22  a response of a headache, feeling nauseous,

23  getting no sleep, those kinds of things.  Having a

24  biological effect that interferes with quality of

25  life, yes.

Page 176

1    Q.  So the table that we're looking at, if you

2  look at the greater than or equal to 5 ppb.

3    A.  Right.

4    Q.  Listing the number -- for lack of a better

5  word, I think you referred to them or Mr. Lape

6  referred to them as odor events.  So each

7  30-minute average period to that particular

8  plaintiff's location.

9    A.  Yeah, I reordered his -- his are different

10  -- ordered in a different direction than mine.

11  Just had to do with the geography, okay?

12    Q.  And so for Mr. Tate, just so I'm

13  following, in 2017, Mr. Lape's model predicted

14  that on 234 occasions, 234 average occasions, H2S

15  from the Jefferson Parish Landfill would impact

16  his house at 5 parts per billion?

17    A.  Correct, for 30 minutes.

18    Q.  For 30 minutes, yes.

19    A.  We're not saying -- it could be much -- I

20  think, in my opinion, just from modeling it myself

21  over many years and knowing about the laboring,

22  it's obviously much higher than that.  This is the

23  low end.

24    Q.  This is what Mr. Lape's model is showing

25  and --

 1      A.  It's what his model is showing, correct.

 2      Q.  And you're not offering opinions as an air

 3  modeling expert in this case?

 4      A.  No, I'm not.  That was his -- that was his

 5  lane.  I'm staying in my lane.  Mine was the odor

 6  and where did it come from.

 7      Q.  And his model predicts concentrations to

 8  a -- Mr. Lape's -- I'm sorry, Mr. Tate's

 9  residence, correct?

10      A.  Uh-huh.

11      Q.  Okay.  And that's outdoor air, correct?

12      A.  Outdoor air, correct.

13      Q.  His model is not predicting what the

14  indoor concentration of Mr. Tate's house is --

15      A.  No.

16      Q.  -- in Jefferson Parish?

17          Okay.  And in order for Mr. Tate to have

18  been exposed to 5 parts per billion for a

19  30-minute interval from Jefferson Parish Landfill

20  emissions, he would have to be home at each time

21  the model predicted an odor event?

22      A.  Not necessarily.  Because that odor could

23  have gone into his house, and when he came home,

24  it's there.

25      Q.  Okay.  And we'll get to your indoor --

SCHIFFMAN SUSAN
04/26/2024
Page 178

1  I'll call them indoor air opinions in a second.

2        But with respect to -- well, let me -- so

3  for the 234 occasions that Mr. Lape's model

4  predicted hydrogen sulfide at concentrates at or

5  above 5 parts per billion for 30 minutes would

6  breach Mr. Tate's home, how many occasions was

7  Mr. Tate at home for those odor events?

8      A.  I don't know.  But to me, it's not an

9  issue, okay, because it could be in his house and

10  it -- you know, he could still -- still be

11  affected by it when he comes home.

12        But it also points out that where that --

13  it points out where the odor is coming from, okay?

14  That Jefferson Parish Landfill is, in fact,

15  emitting odors that are -- that are offensive

16  throughout the neighborhood.

17        It happens to hit his home 234 times for

18  30 minutes over the half-year period in 2017.

19      Q.  So for the occasions that Mr. Tate is home

20  and an odor event is predicted to occur outside

21  his home, do you have any objective data as to

22  what the concentration of H2S from those emissions

23  would be inside his home?

24      A.  No.  However, I want to qualify it.  I've

25  had many discussions with ATSDR on this.  And I

Page 179

1  have asked them if they're -- you know, for

2  percentages and all those kinds of data, and they

3  said the only thing that they are willing to

4  release -- that it certainly happens all the time,

5  that they were willing to release the one that is

6  published, I think it's Inserra is the first

7  author on it that I used in Zannetti's rebuttal.

8       Q.  And for your statement that if Mr. Tate

9  was not home at the time an odor event was

10 predicted to occur at his residence, if he came

11 home, he could be exposed because it entered his

12 residence and stayed there, is that your --

13      A.  Yes, uh-huh, yes.

14      Q.  And how long would H2S stay in a

15 concentration at 5 parts per billion outside if it

16 entered the home?

17      A.  That's a very good question.  Now, if you

18 look on one of the ATSDR websites, they say that

19 hydrogen -- hydrogen -- hydrogen sulfide can stay

20 around for 42 days, okay?  However, you look at

21 other data, it says 17 hours.

22           So I have called all kinds of people and

23 asked about why -- what's the difference between

24 the 17 hours and the 42 -- 42 hours or 42 days,

25 and they say it can last for many, many days.

 1            Now, I can tell you myself I have been in

 2    many homes where I've gone in with a Jerome meter

 3    and there is ab -- I can measure zero outside and

 4    I can measure 15 ppb or even 30 ppb inside.

 5            How long that happens -- I haven't done a

 6    longevity study with regard to how long it

 7    happens, but I can certainly tell you that it is

 8    inside when it's not outside because they've been

 9    exposed and it got trapped inside.

10    Q.   All right.  There's a lot to have to

11    unpack there.  First I'll do the easy question.

12            Who did you call about indoor --

13    A.   Whoever answers the phone.  And they don't

14    tell you who they are.  And they'll just say,

15    We'll send you to this division or that division.

16    You know, that's what happens.  And they may or

17    may not got on the phone.  And you stay on for 45

18    minutes until somebody shows up.

19    Q.   And were any of your studies or the

20    studies you're relying on, did any of them involve

21    concentrations of 5 parts per billion outdoor air?

22    A.   Of my own?  Oh, absolutely.  I measured it

23    inside when I -- I'm not there all the time, so I

24    can't say.  But I measured it outside over a

25    period of days at 5 or 6 ppb and I measured it

1    inside at 15 ppb.  So I think my opinion about it

2    was that it was absorbing to things and then

3    off-gassing.

4        Q.  Okay.  And what studies are you talking

5    about where you measured it at 5 or 6 ppb?

6        A.  These were things when I was always

7    working in the hog areas.  I mean --

8        Q.  You didn't publish these studies?

9        A.  I have so much data I didn't publish.  I

10   finally think I tossed out about six boxes about

11   two months ago.

12       Q.  So what peer-reviewed articles or studies

13   are you relying on to say that it's outdoor

14   concentrations of 5 parts per billion when you get

15   into a house and increased concentrations inside?

16       A.  I haven't looked for peer review.  I've

17   just -- I've always just considered the -- just

18   used the ATSDR one, because it was a federal

19   agency.

20       Q.  I think you also cited in your report, we

21   might as well go there.  If you go to page 19 I

22   think that's where you start talking about

23   differences between modeling and the frequency.

24       A.  Uh-huh.

25       Q.  You talk about the lingering of H2S in the

1  air after dispersion.

2      A.  Yeah.

3      Q.  Is this lingering occurring outside or is

4  it occurring inside the house?

5      A.  Well, the lingering that the government

6  agencies talk about is outside, but it lingers --

7  they tell you it collects in -- it collects in low

8  places.  I mean, this is one of the things you do,

9  you go around with your Jerome meter and look --

10  under stairs was always a place that I could

11  always find hydrogen sulfide in these areas.

12         In their house under the stairs, in the

13  basement, yeah, it collects.  And then there's so

14  much government data on this.  And it -- I just

15  don't understand why you're even asking this

16  question, okay?

17      Q.  Well, so the government data you cited --

18  let's pull up one of them.

19      A.  Is Zannetti.  I think I put some of it in

20  here, Zannetti's --

21      Q.  I need to -- let's do the ones, yeah, that

22  you cited.  Let's see.

23         You cited a Virginia DOH, Department of

24  Health, ATSDR, and OSHA.

25      A.  Yeah.

Page 183

1      Q.  We can pull up -- either Virginia or OSHA

2  is good.  I couldn't find it in ATSDR.

3      A.  You couldn't find it in ATSDR?  I can...

4      Q.  So this is the Virginia Department of

5  Health?

6      A.  Uh-huh.

7          MS. BRILLAULT:

8              Okay.  We're going to mark this as

9          Schiffman 5.

10         (Exhibit 5, remotely introduced and

11         provided electronically to the reporter.)

12  BY MS. BRILLAULT:

13     Q.  And here, I think this is what you're

14  focused on.  "Hydrogen sulfide is slightly heavier

15  than air and may accumulate in enclosed, poorly

16  ventilated, and low-lying areas."

17     A.  Okay.  Right, uh-huh.

18     Q.  All right.

19     A.  Yeah, because the molecular weight of --

20  what we call the molecular weight of air is 28.96,

21  because you've got a combination of nitrogen,

22  oxygen, and a few other things.  And then the

23  molecular weight of H2S, I had 38.

24     Q.  So out of the 13 trial plaintiffs' homes,

25  or the eight residences of the 13 trial plaintiffs

1   which ones were poorly ventilated?

2       A.   You can have poorly ventilated areas in a

3   house that is well ventilated, okay?  You --

4   cabinets, under stairs.  Not everything is

5   ventilated even though you have vents or whatever,

6   or fans or whatever.  You can have areas that

7   aren't ventilated.

8       Q.   Okay.  So you say you could.  So I'm

9   asking you which ones, which homes?

10      A.   I have not been in the house -- I have not

11  been in the houses.  I'm telling you what can

12  happen, okay?

13      Q.   All right.  And you haven't been in the

14  houses.  You haven't assessed whether they have a

15  basement; is that correct?  Did you look to see

16  which of the trial plaintiffs had a basement?

17      A.   No.

18      Q.   Did you look to see which of the trial

19  plaintiffs had stairs in their house?

20      A.   No.  Although some of them looked like --

21  I did look up their -- I did Google -- I forget

22  what it was called.  I looked at each of their

23  houses just from the outside.

24      Q.   And from looking at them from the outside,

25  could you tell which ones were poorly ventilated?

Page 185

1     A.   No.   See, could I tell you -- I'd like to

2   answer -- the types of questions you're asking,

3   it's a what if, what if, what if, okay?

4          There are certain physical properties that

5   happen when you disperse hydrogen sulfide.

6   There's certain global scientific things that

7   happen.  You're trying to make it so that each --

8   that I would have looked at everybody's medical

9   records, that I've been in everybody's house.

10         I still wouldn't have been able to make

11  any of these kinds of conclusions you're looking

12  at.  I am making a general conclusion that is

13  based on scientific data, okay, that these are the

14  things that are most likely to have happened at

15  these particular people's houses.

16         And you're asking -- to do what you're

17  asking would be millions and millions and millions

18  and millions of dollars.  And it's absolutely

19  worthless because, whether I did it or not, I

20  would come out with the same conclusion.  I mean,

21  it's just -- you're asking something that is just

22  not --

23    Q.   Dr. Schiffman, I'm asking -- you pointed

24  to these references for your support that H2S can

25  accumulate inside an individual's home.

1      A.  Yes.  That is --

2      Q.  And I'm asking -- and this reference

3  states that it may accumulate in enclosed, poorly

4  vented, and low-lying areas.

5      A.  Correct.

6      Q.  And for purposes of this lawsuit, where

7  these 13 individuals are suing my clients and two

8  other companies, I'm asking you:  What is your

9  basis to say that when Mr. Tate -- when the model

10  predicted 234 occurrences in 2017, what is your

11  basis to say that if he wasn't home, when he came

12  back to the house, he would smell hydrogen sulfide

13  inside because it accumulates?

14          You haven't assessed whether it was poorly

15  ventilated.  You haven't assessed whether he has

16  low-lying areas or if he was exposed to those

17  low-lying areas.

18          So I'm asking, what is your basis for that

19  statement?

20          MR. FOSTER:

21              Objection to the form.

22      A.  Statements by the people themselves.

23  Let's take Wendy Gremillion, which I put into

24  this.  Even when it was gone outside, like if it

25  had subsided -- subsided, it still remained in the

1 house.  I am not going to ignore what these people

2 say with a bunch of what ifs, what ifs, what ifs,

3 okay?

4          These people say it's in their house.

5 They say it remains in the house even when after

6 it's gone outside.  It is consistent with the data

7 from ATSDR.  I mean, you can't -- this is why we

8 ultimately need odor sensors, okay, placed in

9 homes, okay?

10          But you're asking something -- I mean,

11 you're trying to say that what these people are

12 saying -- do you disagree with Wendy Gremillion?

13 Do you think she's a liar?

14 BY MS. BRILLAULT:

15     Q.  Dr. Schiffman, it's your opinions that I'm

16 asking about in this lawsuit.  I am trying to find

17 out the basis for your statements that if someone

18 is not home at the time of an odor event, they're

19 still being exposed because it could accumulate

20 inside.  You've --

21     A.  I've agreed with that statement.  I agree

22 with that statement.

23     Q.  And I'm not asking you if you agree or

24 not.  I'm asking you what the basis for that

25 opinion is with respect to each of the 13

SCHIFFMAN SUSAN                                    04/26/2024
                                                    Page 188

1   plaintiffs.  I'm not asking whether it's a global

2   could be, could happen.

3        I'm asking:  Did you assess whether it

4   actually happened for each of the residences at

5   issue in this lawsuit?

6   A.  Each --

7        MR. FOSTER:

8             Objection to the form.

9   A.  The people -- I'd have to go back through

10  every deposition.  A large number of the people

11  said that it was in their house, and I do not

12  disagree with them.  They do not make things up

13  like that.

14       Look -- I mean, if you go back to this

15  poor man, Number 2, whatever his name was, the one

16  after Sections.

17  BY MS. BRILLAULT:

18  Q.  Mr. Meyers?

19  A.  Okay.  Stanley Meyers.  Would you like me

20  to read what he says?  The odors caused sexual --

21  sexual erectile dysfunction, which was clearly --

22  okay, it was due to the smell.  "You don't want to

23  be doing that kind of stuff when you're breathing

24  in all those funky smells."

25            Is he talking about outside air?  He's

1  talking about inside air, which means that it was

2  in his house.  And so I take that at face value,

3  okay?  Now, you may choose to ignore that, but I

4  do not, okay?  I'm taking what people said.

5         Wendy Gremillion said when it was gone

6  outside, it was like it subsided, it remained in

7  the house.  This is consistent with ATSDR.  Did I

8  measure it in their house?  No.  I was not there

9  to measure it.  I am taking at face value what

10 they said, and I think it is really totally

11 disrespectful not to listen to it.  It really

12 annoys me.

13    Q.  So when -- you read out loud Mr. Meyers'

14 testimony about smelling odors.

15        Do you know if he opened or -- kept his

16 windows opened or closed?

17    A.  I have no idea.

18    Q.  So you don't know if it was outside and it

19 was coming through an open air -- a window, or if

20 it was --

21    A.  I do not know.

22    Q.  Do you know if he smokes inside his house?

23    A.  I do not know.

24    Q.  Do you even know if he smokes cigarettes

25 at all?

Page 190

1      A.   It doesn't matter to me whether he smoked

2   or not.  Because cigarette smoke is not a major

3   cause of getting exposed to hydrogen sulfide.

4   Acrolein maybe, acetaldehyde -- I mean, there's

5   all kinds of other things in cigarette smoke,

6   including vanilla, chocolate, menthol, all kinds

7   of other things; but hydrogen sulfide is not one

8   of them.

9      Q.   So if Mr. Meyers smoked inside his home,

10  is it your testimony that he would still be able

11  to smell 5 parts per billion of hydrogen

12  sulfide --

13     A.   Yes.

14     Q.   -- from the Jefferson Parish Landfill --

15     A.   Yes.

16     Q.   -- and not his cigarette smoke?

17     A.   Yes.

18     Q.   Okay.  And you mentioned you didn't

19  have -- you don't have air sampling data from

20  inside each of these plaintiffs' homes.

21     A.   No.

22     Q.   Okay.  You could have obtained it -- you

23  could have obtained air samples from the

24  individual's homes, right?

25     A.   Wrong.  Because this -- this was one of my

1  problems with this whole lawsuit when I first got

2  involved just in consulting on it.  I said, Why

3  are we doing this so late?  I said, You know,

4  we're at the tail end of '19 -- you know, 2019,

5  and all this has been going on for, you know,

6  almost two years, you know, why -- what's going --

7  you know, why are you going out to measure now?

8        That was my first response to Barry Newman

9  was, you know -- I mean, you're not getting the

10  worst of -- the brunt of it.

11        Q.  Dr. Schiffman, you were first retained in

12  January of 2019; is that correct?

13        A.  What?  Sorry, what?

14        Q.  2019, January of 2019.

15        A.  Yeah.

16        Q.  So you had a full year of 2019 that --

17        A.  No, he stopped it.  He --

18        Q.  Let me ask my question before you cut me

19  off, and then the court reporter will be much

20  happier.

21        You had a full year -- you were retained

22  for a full year for 2019 and --

23        A.  No.

24        Q.  -- they could have done indoor air

25  sampling of their individual residences during

1  that time?

2      A.  Wrong.  I was retained to look at the --

3  just for a brief look over all the data so far.

4  And then I got a note from Barry and he says,

5  Don't do any more work, forget it.  So when I

6  heard back from him that it was still going on, I

7  was surprised.

8      Q.  That's not to say that you couldn't have

9  taken samples in the fall of 2019?

10         MR. FOSTER:

11             Objection to the form.

12      A.  I don't know why it was stopped.  I don't

13  know anything about it.  All I know is that I

14  looked over it and I -- whether I was willing to

15  even consult on it and I said, Well -- I think I

16  wrote something to him about wind roses and a few

17  other things.  And that's all I heard from him.

18         And he was -- he said, Don't do any more

19  work on it.  I figured it was gone.  So by the

20  time I got back involved in it, it was far beyond

21  the time when the -- it was far beyond 2018 when

22  all the major problems hit.

23  BY MS. BRILLAULT:

24      Q.  But if there's even one occurrence of 5

25  parts per billion at a plaintiff's residence, that

Page 193

1    can get inside and accumulate in the home.

2         So does it matter that it wasn't during

3    the 2018 peak that was modeled by Mr. Lape?  They

4    could have -- they could have done any kind of

5    indoor air sampling in 2019?

6         MR. FOSTER:

7              Objection to the form.

8    A.  All these questions are so off base from

9    my point of view.  It's like what if, what if,

10   what if, what if.  It's like how many angels are

11   on the head of a pin.

12        It reminds me of a philosophy course that

13   I had one time where they said, Does a table exist

14   if you're looking the other direction?  I mean,

15   that's kind of what I feel your questions are

16   like.  So it seems completely out of --

17   BY MS. BRILLAULT:

18   Q.  So you're not going to answer the question

19   of whether they could have sampled in either

20   homes --

21   A.  For whatever reason, they stopped even

22   getting involved in it at one point.  So I don't

23   know.

24   Q.  If Mr. Tate was gone -- I'm just going to

25   use Mr. Tate as an example.  We can go back to --

Page 194

1  so Tables 2a, 2b, and 2c were showing the number

2  of 30-minute averages by year.

3      A.  Uh-huh.

4      Q.  2d, e, and f are by month?

5      A.  Uh-huh.

6          These data I got directly from Mr. Lape,

7  and it's not different from what his report was.

8  So...

9      Q.  Okay, perfect.

10         For purposes of your analysis of the

11  data -- let's just take Mr. Lape for example, in

12  2018.  So that would be Table 2e, it kind of

13  starts on -- the caption is on page 17, but the

14  table itself is on page 18.

15         We're bringing it up, we're just a little

16  slow over here.  It's all good.

17         All right.  So for Mr. Tate, Mr. Lape's

18  model predicted in May he would have 54

19  occurrences, June was 49 occurrences, and July was

20  30 occurrences.  And I believe your -- sorry, I'm

21  just trying to get to what you said.

22         So on average, that's just about every

23  day; is that accurate?

24      A.  Tate?  What did I say?

25      Q.  I'll find out where you said it because

1 I've lost it.

2      Yes, sorry, right below the tables, 2f, it

3 says one, two, three -- it's like five -- four

4 lines down.

5    A.  Uh-huh.

6    Q.  You indicate that "On average during 2018,

7 trial plaintiffs Green, Tate, Winningkoff were

8 exposed on a daily average to H2S concentrations in

9 excess of greater than or equal to 5 parts per

10 billion for a 30-minute period."

11    A.  Greater -- yeah.  Greater than 3 -- well,

12 yeah.

13    Q.  Okay.  So --

14    A.  Greater then 365, right.

15    Q.  So you said -- looking at Table 2e, was

16 your opinion that, on average, they were exposed

17 on a daily average because the monthly numbers

18 were greater than 30 or 31, depending on the

19 number of days in a month?

20    A.  No.  It was based on just the total.

21    Q.  Okay.  So --

22    A.  45, 390.  It's just -- it was just a

23 sentence, okay?  I mean, because it -- sometimes

24 it was -- I mean, you can see October was 14,

25 right?

1      Q.   That's my point, yes.

2      A.   Whereas March was 18 -- was 67.  It was

3   just a statement that -- you know.

4      Q.   So not quite accurate?

5      A.   It's not accurate -- I mean, it's not --

6   it's just -- if you average it out.

7      Q.   But that would assume that every odor

8   happened on a different day, which --

9      A.   No.  It was just a statement.

10     Q.   And Mr. Lape's model didn't show that --

11     A.   No.

12     Q.   -- there's one odor going on every day?

13          And so for purposes of Mr. Tate, in 2018,

14   in order to be exposed to H2S at or above 5 parts

15   per billion for a 30-minute average, he would have

16   had to be home for those 49 -- in June for those

17   49 occurrences?

18     A.   See, this is where there's no way to go

19   post-hoc to know what the levels were in his

20   house, okay?  No way, okay?

21     Q.   Are you not also assuming that he's

22   coming -- he's going to be home at his house

23   within 18 --

24     A.   Yeah, but I -- given the amount that he's

25   exposed to, okay, given the amount of exposure,

1  some of that is going to be in his house, okay?

2  Now, whether it's above 5 ppb, I don't know, or

3  whether it's accumulating, don't know.

4       Q.  But you also are assuming, at some point,

5  he's going to return to his house within a day or

6  two; is that fair?

7       A.  I don't know anything about Mr. Tate.  He

8  may have a girlfriend on the other side of town,

9  okay?  Other than the fact of what I read, okay?

10          The point of the matter is, is that this

11  is a community -- it stems from the original -- my

12  original report.  This is a community that has

13  been exposed to malodor -- a malodor assault over

14  a two-and-a-half-year period.

15          It interfered with people's lives, their

16  health, and all kinds of other -- certainly

17  anxiety and worry due to a problem at the

18  landfill.  And I consider it Jefferson Landfill

19  because I -- of the reasons that we described.

20          Whether -- with each individual person

21  here, I have not been following them around, okay,

22  with a monitor.  So I don't know where they're at,

23  and I also don't know the level in their house,

24  but I know that it could be in their house, okay?

25          And I've asked these questions of ATSDR.

Page 198

1  They shift me from one person to another and they

2  say, Oh, you need to talk to so-and-so; and then I

3  move over to somebody else, and somebody else

4  answers the phone; they tell me some male, and

5  some female answers the phone.

6           And that's the kind of response I get.

7  And they say, Oh, it can definitely be in the

8  house, we measure it all the time in the house.

9  And then I said, Well, can you give me some --

10 give me some literature on that?  And before you

11 know it, we're off the phone, okay, and they're on

12 to another phone call.

13          So this is the problem.  I can give you

14 the reference which I gave to you, which is

15 published.  And I can also tell you, in my own

16 experience, I have measured it in homes many,

17 many, many times, okay.

18    Q.  Again, you didn't measure it in these

19 homes, they didn't measure it in these homes, and

20 you don't know --

21    A.  Correct.

22          (Multiple speakers.)

23          (Reporter clarification.)

24 BY MS. BRILLAULT:

25    Q.  And you have no data to show the

1   concentrations in these homes.

2       So Table 2g, Dr. Schiffman, this is

3   totaling the yearly numbers for each plaintiff; is

4   that accurate?

5       A.  D or G?

6       Q.  G, as in George, on page 19.

7       A.  G, yes.

8       Q.  Okay.

9       A.  Yeah, it's just a compilation, uh-huh.

10      Q.  Okay.  And so the number of 30-minute

11  periods over the full two-and-a-half-year period,

12  I have 43,824.

13      Does that sound right?

14      A.  I didn't add them up.

15      Q.  Okay.  Well, I will just represent that

16  that is the total.

17      And if you divide, let's say, Mr. Tate,

18  where his total is 1,059, you get less than

19  2.5 percent of the time that Mr. Lape's model

20  predicts H2S at a concentration over 5 parts per

21  billion for a 30-minute average to the outside of

22  his residence; is that fair?  If the

23  multiplication -- if the division is done.

24      A.  Uh-huh.

25      MR. FOSTER:

 1              Objection to the form.

 2  BY MS. BRILLAULT:

 3      Q.  Is it your opinion that less than

 4  2.5 percent of the time is frequent odor?

 5      A.  For some people it would be and for some

 6  people it wouldn't be.  I think I gave the example

 7  last time, you know, you're a Mafia boss, you only

 8  kill .5 percent of the time, what's the big deal?

 9  BY MS. BRILLAULT:

10      Q.  And you're not saying that odors kill

11  2.5 percent of the time, right?

12          Dr. Schiffman, did you consider -- I'm

13  going to stick with Mr. Tate and then I'll ask the

14  question more broadly for the other 12 plaintiffs.

15          But for Mr. Tate, did you consider any

16  occurrences where he was away from Jefferson

17  Parish or away from his residence within Jefferson

18  Parish for an extended period of time?

19      A.  No.

20      Q.  So that impact or lack of impact wouldn't

21  be accounted for in your opinion?  Are you

22  aware --

23      A.  If he wasn't home, he essentially wasn't

24  exposed to it unless he was someplace else in the

25  community where he was exposed to it.

1      Q.  Fair enough.

2          Okay.  And your opinion doesn't have

3   information about exposure at other locations in

4   Jefferson Parish, just at their residence?

5      A.  I told you, you know what information I

6   based it on.  It's in the introduction, okay?  It

7   says the things that I reviewed, and my opinions

8   are based on those things that I reviewed.

9      Q.  But your opinion --

10      A.  I know nothing about Mr. Tate's activity

11   as to where he is at all times.

12      Q.  And that holds true with to the other 12

13   plaintiffs as to --

14      A.  Correct, correct.

15      Q.  If odors or H2S is lingering inside

16   someone's home, would that individual become

17   adapted to that H2S odor after a certain period of

18   time?

19      A.  Not necessarily.  That's what's kind of

20   interesting, is that because of air ventilation --

21   you know, people, when they have it inside their

22   home, they'll put fans on or they'll put the air

23   conditioning on in one room and try to pull it out

24   of another room.  So what happens is that it's

25   undulating and it's still there.

1        But it could.  I mean, what happens -- I

2   know -- I can think of people where I -- it seemed

3   fairly stable, you know -- I measured at 4 ppb in

4   a house and then she said, Well, then I went out

5   to the grocery store and I came back in and it

6   just smells absolutely horrible.

7        And I said, Well, that's because you got

8   used to it when you were in the house, and then

9   when you came back in it's horrible.  And then

10  she's all upset again.  So...

11       Q.  And you haven't specifically accounted for

12  those occurrences in your opinion?

13       A.  No.

14       Q.  On page 18 -- sorry, I'm flipping back and

15  forth.

16       A.  Oh, my God, back to 18.  Okay.

17       Q.  It's still in that bottom paragraph.

18       A.  Okay.  Well, it's still double-sided.

19  Okay.

20       Q.  All right.  We have "Plaintiffs Section,

21  Lewis, the Thompson family, and Richardson

22  reported perceiving the malodors all seven days a

23  week."

24       A.  Uh-huh.

25       Q.  The modeling didn't indicate that

1  plaintiffs Section, Lewis, the Thompson family,

2  and Richardson were affected by 5 parts per

3  billion from the Jefferson Parish Landfill seven

4  days a week.

5      A.  And that could very well be due to the

6  lingering or their own perception.  You know, I

7  was giving you the example of the planes coming

8  over, okay?  It just seems like it's worse than --

9  you know, it seems like it's been going on all

10 night, but it could have been at, you know,

11 1 o'clock, 2:30, 3:40, you know, whatever.

12         But I think that the lingering issue is

13 really an important one because I personally have

14 seen so much of it that it's -- and several of the

15 people did mention it.  So...

16     Q.  And is it your opinion that it's more

17 likely than not that the odors that these

18 plaintiffs are claiming to perceive seven days a

19 week all come from the Jefferson Parish Landfill

20 and linger and accumulate indoors rather than

21 there's contributions from other sources of odors?

22         MR. FOSTER:

23             Objection to the form.

24     A.  I am not saying that there's never another

25 source that could be the cause of odor.  I am

Page 204

1   saying that the main cause, which I am very much

2   relying on the data, on LDEQ conclusions, as well

3   as modeling -- everything we've talked about.

4           I'm saying that the main cause is LDEQ.

5   Did once in a while something come from River

6   Birch?  Possible.  Possible from -- from the

7   Highway 90.  But the main cause of the -- of all

8   these exposures is, in fact, at least with regard

9   to modeling, is Jefferson Parish Landfill.

10  BY MS. BRILLAULT:

11      Q.  And that holds true for Mr. Section,

12  Mr. -- well, I'm just going to say Plaintiffs

13  Section, Lewis, Thompson family, and Richardson,

14  who described perceiving odors seven days a week,

15  but the modeling from Mr. Lape shows that they

16  were impacted less than 2.5 percent of the time.

17          It's still your opinion that Jefferson

18  Parish Landfill is the main source and it's the

19  other sources that are contributing more than

20  2.5 percent of the time?

21          MR. FOSTER:

22              Objection to the form.

23      A.  I don't have any data on other sources in

24  terms of quantity or -- I am relying on odor

25  patrol.  They said it's a -- what is in the

Page 205

1 community is a landfill odor, okay?  So anything

2 else other than that is an intermittent annoyance,

3 okay, and it's not a major problem.

4           So then it comes down to three landfills.

5 And I don't hear -- as I understand it, River

6 Birch doesn't -- River Birch, their gas wells are

7 working, they're selling their gas, the H2S is

8 being converted to SO2, it's going up in the

9 atmosphere with regard to Highway 90 and the end

10 on River Birch, it's not coming -- likely coming

11 up through the surface because they've -- their

12 leachate system is pulling the water out.

13          With regard to Highway 90, there may be

14 times when somebody piles a little bit too much

15 stuff in it and it gets into the neighborhood, but

16 that's not the main source.  Because I'm relying

17 on the February data on high H2S which says that it

18 was low until this anaerobic problem started, and

19 then you've got an odor problem, which has gone

20 away now that it's been solved.

21 BY MS. BRILLAULT:

22     Q.  So it's your opinion that there are no

23 more odors in Jefferson Parish?

24     A.  No, I'm sure there are odors in Jefferson

25 Parish.  It's just not this -- it was odors like

1   this, and then all of a sudden (indicating), like

2   this.  And it stayed up.  The Jefferson Parish

3   Landfill got fixed and then it started coming

4   down, okay?

5          And then we still have odors, you know,

6   but low levels; tolerable, not where you're

7   getting hundreds, thousands of phone calls and

8   people going crazy.

9      Q.  Can H2S be accumulating inside plaintiffs'

10  homes such that the concentration was higher

11  inside than outside?

12     A.  Uh-huh.  I've seen it.  It totally

13  confused me at the beginning.

14     Q.  Would that be consistent with the trial

15  plaintiffs' deposition testimony, that to escape

16  odors they would go inside their homes?

17     A.  Yes.

18     Q.  So they would try to go inside the home

19  where the concentration was stronger and --

20     A.  Yes.  I -- honestly, I saw it.  I measured

21  it myself.  It was very confusing.

22     Q.  When did you measure it?

23     A.  Oh, I mean, especially during the hog

24  period.

25          You disappeared from my screen.

Page 207

1      Q.  I can't help it.  I'm looking at myself,

2  so it's something on your computer.

3          Actually, this is probably a good time to

4  take a quick, short break.  It's been an hour.

5      A.  Oh, now it's back.  Okay.

6      Q.  Let's just take a quick, short,

7  five-minute -- try to keep it --

8      A.  Uh-huh.

9      Q.  All right, great.  Thank you.

10         THE VIDEOGRAPHER:

11             We are off the record at 4:14 p.m.

12         (A break was taken from 4:14 p.m. to

13         4:27 p.m., Eastern Time.)

14         THE VIDEOGRAPHER:

15             We are back on the record at 4:27 p.m.

16  BY MS. BRILLAULT:

17      Q.  All right, Dr. Schiffman.  I think I've

18  got one more question in your Opinion 2 with

19  respect to 2h, as in Harold, on page 20 and 21.

20      A.  Uh-huh.

21      Q.  Okay.  You list the alterations in daily

22  life reported by the trial plaintiffs in response

23  to the malodors in order of numerosity.

24          And so I believe you previously had this

25  chart from your old report but you just updated it

SCHIFFMAN SUSAN

1  with trial plaintiffs specifically, their

2  deposition testimony?

3      A.  Correct.

4      Q.  And so for purposes of this chart, you're

5  just directly taking from their deposition

6  testimony --

7      A.  And whatever else -- yeah, whatever

8  information, yeah.

9      Q.  Or their interrogatory responses?

10      A.  Uh-huh.

11      Q.  You didn't -- you didn't go and interview

12  them, we already established that, right?  Is that

13  correct?

14      A.  Correct.

15      Q.  Okay.  All right.  And you didn't

16  undertake any steps to make sure -- you know,

17  to -- you didn't confirm the accuracy, you just --

18  what they said is what you put in here?

19      A.  That is correct.

20      Q.  So, for example, the claim that the person

21  had to smoke in the car rather than outside --

22      A.  Uh-huh.

23      Q.  -- that was the claim that they were

24  making, and you just put it in the chart?

25      A.  Correct.

Page 209

1      Q.  Do you think that the plaintiff was

2  injured because -- and should receive money

3  because he was forced to smoke inside the car

4  rather than outside?

5      A.  I don't make those kinds of decisions.

6  I'm a scientist.  I just go by the data.

7      Q.  Okay.  And here the data is -- you're just

8  reiterating their statements, it's not --

9      A.  I'm -- I think it's a statement of

10  something that makes him feel good, okay?  He

11  enjoys taking that nice, slow, deep breath.  When

12  you take in a nice, slow, deep breath of a

13  cigarette it makes you feel relaxed, okay?

14      You don't -- you're not panting around.

15  You're breathing in.  It feels relaxed.  Maybe it

16  gives him some nice flavor, whatever it is,

17  chocolate and all the things they put on it.  And

18  he can't do that because he's trying to hold his

19  nose and not smell things.

20      So he's not being able to take in like

21  those nice yoga breaths that I do all the -- in my

22  yoga, that -- he can't do that because it's --

23  whatever he has to breathe in is something that's

24  aversive to him.  So he goes to the car.

25      Q.  And his yoga breath in this example that

1  we're talking about, whatever plaintiff this is,

2  is inhaling cigarette smoke?

3      A.  Right.

4      Q.  He's not inhaling clean smoke --

5      A.  Right.

6      Q.  -- he's inhaling cigarette smoke in a

7  different environment versus --

8      A.  Right.  And it gives him pleasure and it

9  makes him relax.

10     Q.  And the statement about missing out on

11 summer camp -- I don't know, I just wrote these

12 all down and I can't find it.  I think it's at the

13 top of -- bottom of page 20.  It's at the very top

14 of the chart.

15     A.  Uh-huh.

16     Q.  Do you know if that summer camp was in

17 Jefferson Parish or the reason --

18     A.  I have no idea.

19     Q.  And for having to throw away clothes, you

20 don't know --

21     A.  I've seen that many times.  So that's not

22 a surprise to me at all.

23     Q.  So it's your opinion that these

24 individuals had to throw away clothes because of

25 the exposure of 5 parts per billion of H2S odors?

Page 211

1    A.  Yes.  In fact, I've actually seen it for a

2  leather skirt.

3    Q.  At 5 parts per billion you've seen it?

4    A.  Yes.

5    Q.  Okay.  And when did you see 5 parts per

6  billion cause --

7    A.  Well, I --

8    Q.  Let me finish.  Let me finish, just for

9  the court reporter.

10       When did you see 5 parts per billion

11  exposure to a leather skirt requiring it to be

12  tossed out?

13    A.  It was -- it was when I was working with

14  the swine facilities.  And I never saw anything

15  higher in her house than 5 parts per billion.  And

16  I smelled it, and we couldn't get rid of it.  We

17  were trying to figure out how, her favorite

18  leather skirt, we could clean.

19    Q.  And swine facilities have endotoxins,

20  particulates, and ammonia?

21    A.  Correct, correct.

22    Q.  But it's your opinion that it was the

23  5 parts per billion of H2S, not the other

24  chemicals, that required the skirt to get tossed

25  out?

Page 212

 1     A.   It smelled like hydrogen sulfide.

 2          Now, were there other things in there?

 3  Probably, obviously.  But I don't know.

 4     Q.   Have you ever seen or studied clothing

 5  that had to be tossed for exposure to 5 parts per

 6  billion of hydrogen sulfide alone and it wasn't

 7  combined with ammonia, particulates, or

 8  endotoxins?

 9     A.   I've never measured hydrogen sulfide

10  anyplace which didn't have other components along

11  with it, other than in my lab, which I did many

12  times.

13     Q.   Okay.  Very quickly, at the bottom of

14  page 21, you say that "The magnitude of the

15  exposure is illustrated by the number of breaths

16  that the plaintiffs endured at concentrations that

17  exceeded the WHO guidelines."

18     A.   Right.

19     Q.   That analysis assumes that the individual

20  was at the location, at their residence, where

21  Mr. Lape -- where Mr. Lape modeled 5 parts per

22  billion?

23     A.   Correct.

24     Q.   Just above that --

25     A.   Or can I just -- let's add on to that,

1  please, that they were at their residence, and

2  this is the minimum amount over 30-minute periods.

3  It does not take into account any lingering.

4       Q.  But, again, you don't have evidence of

5  what concentration it lingered at, how long it

6  lingered at or --

7       A.  Right.

8       Q.  -- if it even did linger at?

9       A.  Right.

10      Q.  So page 23.

11      A.  Okay.

12      Q.  We're on Opinion 3.

13      A.  Uh-huh.

14      Q.  So this is the Malodor Source, the JPLF.

15  Here you're talking -- we start focusing on the

16  LDEQ samples that were taken throughout 2018.

17           Is that --

18      A.  Right.

19      Q.  -- the focus of this opinion?

20      A.  Uh-huh.

21      Q.  All right.  On page 20 -- sorry, on 28 --

22  I may not have had that page right.  Page 23.  I

23  was wrong.

24           It says, "Air samples from neighboring" --

25  okay, there it is.  So just above -- in that first

1  paragraph of Opinion 1 -- sorry, Opinion 3, it's

2  getting late in the day, four lines up from the

3  bottom, it says, "Air samples from neighboring

4  communities contained such a large number of

5  compounds that are emitted from the JPLF that

6  there's an overwhelming support for the conclusion

7  that that malodors suffered by the trial

8  plaintiffs emanated from the JPLF."

9       A.  Correct.

10      Q.  That is the fing -- the VOC fingerprinting

11 analysis that you did later on in this section?

12      A.  Yes.

13      Q.  Is there anything -- any other analysis

14 that you did to support that particular opinion?

15      A.  No.

16      Q.  The very first sentence of 3.1, "LDEQ

17 measured H2S by multiple methods in the area of the

18 Addison plaintiffs' locations."

19          Which trial plaintiffs did LDEQ measure H2S

20 near -- in the area of their location, which of

21 the 13 trial plaintiffs?

22      A.  Well, they didn't measure it at anybody's

23 house; they measured it at certain places in

24 the -- in the community.

25      Q.  I was trying -- what did you mean by "in

1  the area"?

2    A.  I meant in the neighborhood of their

3  homes, in the area.  I said "the area of the

4  Addison plaintiffs' locations."  In the

5  neighborhood -- okay, you want me to say the

6  neighborhood of Waggaman -- actually, I -- of

7  those, with the grab canisters, I'd have to look

8  at -- there were the four in -- let me just see.

9  I pulled over another screen.

10    Q.  Is a more accurate way to say it "in the

11  communities of the Jefferson Parish Landfill"?

12    A.  Sure, that would be fine.

13    Q.  Essentially, LDEQ wasn't close by any

14  particular residential trial plaintiff, they were

15  at the MAML --

16    A.  In the area, right.

17    Q.  This might be pretty quick.  So Table 3a

18  on the next page.

19    A.  Uh-huh.

20    Q.  You say it's -- "The times above the

21  threshold is based on the threshold value of an

22  average of at least 0.5 ppb H2S for the times

23  shown."

24    A.  Where are we at?

25    Q.  The description of Table 3a.

1      A.  Description of Table 3a, right?  "H2S

2  measurements obtained by the MAML" -- okay.

3      Q.  Yes.

4      A.  "The times above the threshold is based on

5  the threshold value," yeah, uh-huh.

6      Q.  To be clear, this table isn't comparing

7  the general causation standard that the Court set

8  at 5 parts per billion; you're comparing it to the

9  protection threshold from ATSDR?

10     A.  Correct, uh-huh.

11     Q.  And the samples taken in River Ridge on

12  February 19 and February 23 at 3 and 2, that's

13  actually below the general causation H2S?

14     A.  Correct.  That's exactly the point, okay?

15  You -- thank you, you've just made the exact

16  point, which is what's happening in River Ridge,

17  in the beginning of February -- in February, the

18  levels were really low; then April they go up;

19  then they go up worse in July; they continue on

20  some in 2019.  Jefferson Parish Landfill gets

21  fixed and the levels go down.

22     Q.  And you don't have the 2019 or any data

23  after that indicated in these tables --

24     A.  No.

25     Q.  -- we're just looking at the --

SCHIFFMAN SUSAN

1     A.   But there are data from 2020 that were in

2   Zannetti's report.

3     Q.   Right below that Table 3a, "One-minute

4   averages were also reported in an e-mail chain

5   from David Wagenecht to Michael Algero."

6          Were these detections traced back to JPLF?

7     A.   They were at the -- Waggaman at the corner

8   of Dandelion and River Road.

9     Q.   And that's reflected in Table 3b?

10    A.   Correct.

11    Q.   Okay.  And, again, were these detections

12  of H2S traced back to Jefferson Parish Landfill?

13    A.   No.  It was just noted as an odor event.

14  And I think -- my recollection is that they had

15  the -- it says they concluded -- this is the one

16  where they concluded.

17         It says the LDEQ also grabbed samples --

18  the grab samples, those -- those grab samples were

19  at 100, 110, and 120 at the same time.  And they

20  concluded that the Cornerstone chemical plant

21  could not contribute to it, and they considered

22  that another major source of -- if there were

23  another source of hydrogen sulfide in the

24  community, that's where it would be coming from.

25    Q.   Did you look to see if the wind direction

SCHIFFMAN SUSAN

1  that's noted in the table lines up with Jefferson

2  Parish Landfill being a potential source?

3      A.  I did not.

4      Q.  Did you look to see if Mr. Lape's modeling

5  confirmed whether or not Jefferson Parish could be

6  a source of the --

7      A.  No.  But I have to tell you, I mean, I

8  have this little Kestrel wind monitor, okay, that

9  I walk around with, I've used for years and years.

10 And wind shifts all the time.

11         So it's very hard -- it's very hard to use

12 wind -- I mean, I'm -- I think Mr. Lape did the

13 best he possibly can.  But you can't always say

14 the wind was coming from that direction.  You

15 don't know whether it came from the other

16 direction and it got shifted back.

17         You can have a clue that sits someplace.

18 It gets moved -- let's say you have a plume in

19 Waggaman, it gets shifted over to River Ridge and

20 Waggaman says, The odor is gone.  Then the wind

21 comes back out of the north, northeast, and it

22 gets shifted right back into -- into -- into

23 Waggaman.

24         So you can't always say -- you can't

25 record those quick changes in wind direction.

Page 219

1   They're not -- they're not recorded anyplace.  So

2   that's the best I can say.

3       Q.  And if wind direction is not accurate,

4   then Mr. Lape's model is not accurate?

5       A.  Yeah, it can be a problem.  I mean,

6   that's -- those are -- those are some of the

7   limitations.  I mean, you do the best you can with

8   what you have.

9           And from my point of view, Mr. Lape did

10  the best he can with what he had, and it's

11  consistent with my own experience of people's

12  complaints and the kinds of times that they --

13  amount of time that they get exposed to it and how

14  many times over, you know, the World Health

15  Organization.

16          You know, it's all consistent with one

17  another.  But perfection is never a guarantee with

18  modeling.

19      Q.  With respect to the Table 3b, you said

20  they ruled out Cornerstone as a source?

21      A.  Yes.

22      Q.  I'm just going to try to clarify.

23          Do you -- are you remembering that LDEQ

24  concluded that Cornerstone was not a source of a

25  different odor event on April 28, 2018?  Because

SCHIFFMAN SUSAN

1  if you look below -- if you look between Tables 3b

2  and 3c --

3      A.  Uh-huh, yeah, uh-huh.

4      Q.  So LDEQ didn't rule out Cornerstone from

5  the July event, they ruled them out from the April

6  event?

7      A.  Right.

8      Q.  Okay.  I just wanted to clarify that.

9      A.  But the odor patrol ruled out Cornerstone

10 because they -- on the basis of the odor quality.

11     Q.  For all of the odor events or just for

12 some?

13     A.  Not all of them, but 60 percent of them

14 they said I think was landfill.  I'd have to go

15 back and look at the exact number.

16     Q.  And -- yeah.  And the odor patrol

17 identified landfills; they never identified a

18 particular landfill?

19     A.  No, they didn't.  But they had garbage --

20 you know, if you add landfill and garbage and a

21 whole bunch of them together, that was the

22 predominant thing.  So it's somewhere up there.

23 And later on, with all the effort that LDEQ put

24 into it, they decided that Jefferson Parish was

25 the main one.

Page 221

1    Q.  I'm curious, when you say "all the

2  effort" --

3    A.  Yes.

4    Q.  -- what do you mean?

5    A.  Well, I listen to the -- they were up

6  there every single day for a long time.

7        Have you listened to the City council --

8  the council meeting?

9    Q.  I read through their inspection reports,

10  yes.  Did you read through the inspection reports?

11    A.  Did you listen to it?  Listen to it.  They

12  were up there every single day, he says.

13    Q.  Dr. Schiffman, did you read through the

14  inspection reports from LDEQ's site visits at the

15  Jefferson Parish Landfill or did you just listen

16  to Dr. Carr on --

17    A.  No, I -- I had a whole bunch of them that

18  Mr. Foster sent to me, and I read through those

19  reports.

20    Q.  And did you see where they noted, quite

21  often, River Birch odors on the Jefferson Parish

22  Landfill?

23    A.  The one that I saw was actually from a

24  MAML report, the July MAML report.  It was just

25  right over the edge.  And they said it's smelly.

Page 222

1  It's smelly.  Except there was no -- there was 2

2  ppb hydrogen sulfide in a -- in a -- from a

3  Jerome.

4          And -- yeah.  I'm not saying that River

5  Birch doesn't have a smell.  It's just what are

6  we -- what is the cause of this huge increase?

7          The question is:  What is the cause of

8  this huge increase in complaints, okay, that goes

9  up; and it's getting really bad in April, May,

10 June, July, stays up; then Jefferson Parish fixes

11 everything, and everything comes down, okay?

12         That is not River Birch, because there's

13 nothing -- they had smells.  Every place has a

14 smell, okay?  So is it -- so does a bakery, so

15 does a coffee shop.  That's not the cause of the

16 complaints that came in at that time.

17         I mean, to deflect it all the time from

18 what the cause of the main event is, what is the

19 second derivative, okay, that happens and that

20 that second derivative comes down after things are

21 fixed, that's what we're looking at.

22    Q.  Dr. Schiffman, you did not review any

23 documents or information related to River Birch's

24 operations during the same time period to

25 determine if they had things going on too; is that

1  fair?

2      A.  They may have had things going on but --

3  please let me finish.

4      Q.  I was trying to get a question --

5      A.  I'm looking at LDEQ's conclusion, who

6  knows all of those kinds of things.  And their

7  conclusion is, in spite of any little things that

8  might be going on in any of the other landfills,

9  the major problem is Jefferson Parish Landfill.

10     Q.  Are you aware that LDEQ concluded that

11  there was no problem with the acceptance of spent

12  lime and solidification at the Jefferson Parish

13  Landfill?

14     A.  God save us, okay?  That's all I can tell

15  you.

16     Q.  So you weren't aware of that, that that

17  was their conclusion?  They didn't issue --

18     A.  They have said -- all I can tell you is

19  that that shocks me totally.  If that is, in fact,

20  true, okay, if that is their conclusion, then the

21  reason for the major problem is, in fact -- okay,

22  let's take that as true.  I do not believe that to

23  be true.

24          But if that is, in fact, true, then the

25  major problem is the fact that the -- the leachate

1  system wasn't working, that they never pulled any

2  of the hydrogen sulfide out, it wasn't burned, and

3  it was all coming up through the -- through the

4  surface.  But I -- yeah.

5      Q.  And the basis for your opinion of what you

6  just stated is -- is that Mr. Sananes' report?

7  What is the basis of your opinion?

8      A.  It's not just that.  I mean, it's -- I

9  think the 2019 -- gosh, I'd have to go back and

10 read.  The CEC report, okay, when they called

11 in -- is it CEC?  I can't remember what it's

12 named.  But they -- I mean, there were just so

13 many problems with Jefferson Parish Landfill.  It

14 was painful to read.

15     Q.  Dr. Schiffman, are you offering an opinion

16 in this case on whether or not the Jefferson

17 Landfill was properly operated?

18     A.  No.  But I am offering an opinion, because

19 it was not properly operated, there were -- there

20 were malodors.

21     Q.  And the basis for your opinion that,

22 because it was not properly operated -- where are

23 you getting that it was not properly operated?  If

24 you're not offering an opinion that it was not

25 properly operated, what is the basis for that

Page 225

1   statement?  Is that Mr. Sananes' opinion?

2       A.  No.  It's CEC.  I have -- CEC, LDEQ,

3   Sananes, all of them.  I mean, I haven't seen

4   anything -- I haven't seen any -- they hired the

5   man who was in charge of River Birch, I can't

6   remember his name, to fix the problem because they

7   were measuring 15 -- I remember 15 feet of water

8   in -- in some parts of the -- of 4a.

9           Everything was above -- it was above the

10  well collection -- the pipes were collecting from

11  the wells.  It had to be fixed, okay?  And so it

12  took awhile to get it fixed.  But when they

13  finally got it fixed, it seems like the complaints

14  have come way down.

15          So it's not just -- it's the movement up

16  and the movement down, which all points to a

17  problem with Jefferson Parish Landfill in which

18  there was spent lime and calcium sulfate and

19  anaerobic digestion and more hydrogen sulfide.

20          And as I recall, the head of River Birch

21  would not even accept that gypsum -- that spent

22  lime because they'd had problems with it before,

23  something that I had read.

24      Q.  Okay.  So you don't know when River Birch

25  accepted the spent lime or how much spent lime was

Page 226

1  accepted by River Birch?

2      A.  I don't.

3      Q.  And you don't know what other types of

4  waste River Birch landfill accepted?

5      A.  I think they accept all kinds of things.

6      Q.  And you don't know the cover practices at

7  River Birch?

8      A.  No.  But I do feel the following, is that

9  you wouldn't hire River Birch -- the head of River

10  Birch to fix your problem if they thought that

11  that was a major problem.

12      Q.  And you don't know when wells were being

13  installed at River Birch such that they may

14  contribute to odors?

15      A.  I didn't understand that.

16      Q.  You don't know when gas wells were being

17  installed at River Birch?

18      A.  No.

19      Q.  Do you know that spent lime contains

20  calcium sulfate?

21      A.  Calcium sulfate, yes.  It's gypsum.

22      Q.  And gypsum is in wall board, right?

23      A.  Yes.

24      Q.  Do you know if River Birch accepts wall

25  board?

1      A.   Could.

2      Q.   Do you know if the C&D landfill accepts

3  wall board?

4      A.   Yes.

5      Q.   Let's go to Section 3.4 of your report,

6  page 27.

7      A.   Uh-huh.

8      Q.   Okay.  This is -- is this your VOC

9  fingerprinting analysis?

10      A.   Yes, uh-huh.

11      Q.   And this is a slightly revised version

12  from the one you had in your general causation

13  report?

14      A.   Right, uh-huh.

15      Q.   You took out, I think, one of the samples

16  that was taken out of the Jefferson Parish

17  Landfill?

18      A.   Right, because it was right on the edge,

19  so I thought that was legitimate, but it's not.

20  So I took the one just from Jefferson Parish

21  Landfill.

22      Q.   Okay.  And you compared --

23      A.   The fingerprint from Jefferson Parish

24  Landfill with what's found in the neighborhood.

25      Q.   Did you -- let me -- you -- sorry.

SCHIFFMAN SUSAN

1          There are -- you listed 35 VOCs in this

2    table?

3      A.   Yes, that's correct, uh-huh.

4      Q.   Why didn't you list all 44 that were

5    sampled for by LDEQ?

6      A.   Because I was only looking at what's on

7    the landfill and what's in the -- what's in the

8    neighboring community.

9      Q.   So it didn't -- if a -- let me strike

10   that.

11          If a VOC was found in a neighboring

12   community and not on the Jefferson Parish

13   Landfill, wouldn't that impact your statistical

14   analysis?

15     A.   Yes.  But I think there were only three of

16   them.

17     Q.   I might disagree.  I think there's seven

18   of them.

19     A.   Seven of them, okay.

20          MR. FOSTER:

21             Objection to the form.

22   BY MS. BRILLAULT:

23     Q.   And so to be fair, your statistical

24   analysis, just based on the fact that you omitted

25   seven that were not detected at the Jefferson

 1   Parish Landfill ground samples, is not accurate in

 2   this?

 3       A.   Wrong.  Because the question is the

 4   following:  What is the probability of 29 of 35

 5   compounds that are Jefferson Parish Landfill land

 6   about -- in the area of the neighborhood for the

 7   plaintiffs' residences?

 8            So I didn't -- the fact that there are

 9   other ones -- now, first of all -- yeah, okay.  So

10   the issue is, is the other ones obviously, either

11   we didn't detect them on the landfill at the time

12   or they come from someplace else.

13       Q.   Because VOCs are chemicals that come from

14   a lot of different sources?

15       A.   Right.

16       Q.   Okay.  But you didn't think it was

17   relevant to include the seven that weren't

18   detected on the Jefferson Parish Landfill that

19   were detected in the --

20       A.   That wasn't the question I was trying to

21   answer.  I'm looking at the fingerprint of

22   Jefferson Parish Landfill and what -- how much of

23   that fingerprint ends up in the community.

24       Q.   Were all the samples that you compared

25   taken on the same day?  I think it's at the top of

1   the chart.  Looks like they're on different days,

2   right?

3        A.  Yeah.

4        Q.  So the sample that was taken at the

5   Jefferson Parish Landfill was on --

6        A.  Yeah, they were all in the same -- within

7   the same range, but they were not exactly on the

8   same day, two of them, yeah.

9        Q.  In fact, one Jefferson Parish Landfill was

10   taken on July 21st?

11        A.  Right.  The others were on the 20th and

12   22nd, yeah, intermittently, right.

13        Q.  24 hours apart at times?

14        A.  Uh-huh.

15        Q.  And so the wind, as you mentioned, varies

16   and can change at all -- you know, within minutes

17   of each other.  So you don't know that the sample

18   that was taken on the 21st contributed to the VOCs

19   that were taken -- that were sampled the day

20   before or the day after?

21        A.  I have done hundreds of these kinds of

22   computations, and this is -- this is the way we

23   standardly do it.  We take what are the VOCs on an

24   emitting source, and then we look downwind to find

25   if any of those are in the community, okay?

1          And then we take -- if there are multiple

2   sources, then we take those and we try -- we do

3   the statistics on what's the probabilities.  The

4   probability of a hit -- this is what, you know,

5   the chance, by chance, that 29 of 35 compounds end

6   up in the community in a short period of time is

7   so low as to be almost impossible.

8          So looking at different dates here, the

9   only thing that dates bothered me in this

10  particular study is that the sulfur detectors --

11  the sulfur detection in the canisters was done --

12  terribly delayed, five, six days after the

13  canisters were taken.  But the --

14      Q.  That would impact the accuracy of the

15  sulfur --

16      A.  The accuracy, yeah.

17      Q.  All right.  You mentioned two things.

18  You've done this -- the times you've done it

19  before --

20      A.  Many times.

21      Q.  -- you would -- would you take the samples

22  on the same day?

23      A.  Sometimes yes, sometimes no.  I mean,

24  sometimes they were a month apart.  If we're

25  trying to -- I mean, I can think of all kinds of

Page 232

1   problems.

2          One was in Europe.  You know, everybody

3   was complaining that it was somebody else's

4   problem.  So we couldn't do all the GCMS at one

5   time, so we would take our canisters in one day

6   and then we'd take the other in another day.  We

7   were able to figure out exactly what the problem

8   was.

9          But, I mean, this is the best you can do,

10  okay?  And no sampling is exactly perfect.

11     Q.   In that time in Europe that you just

12  talked about when you had to do them on different

13  days, when you would take the samples, would you

14  make sure you were downwind of the source you were

15  trying to fingerprint?

16     A.   Not always.  We were just trying to take

17  samples around the neighborhood.

18     Q.   You don't think it's important to be

19  downwind of a source?  -

20     A.   I think it's nice but not always

21  necessary.  What's sticking around, okay?  You

22  could see these are very low levels.  And I don't

23  know -- I don't know exactly why these levels are

24  so low.  Did they sit -- did they sit these

25  around?

Page 233

1        I think I figured out it's like 12 ppb.

2   And if you look at the total -- let me see if I

3   have it here, the total --

4        Q.  Let me ask you this, Dr. Schiffman:  Did

5   you look to see if the Jefferson Parish Landfill

6   was downwind -- I'm sorry, was upwind of the three

7   neighborhood samples when LDEQ took those

8   neighborhood samples?

9        A.  I did not, no.

10       Q.  So it could have been -- those

11  neighborhood samples could have been done with a

12  different source, and then you would be comparing

13  apples and oranges basically at this point?

14       MR. FOSTER:

15            Objection to the form.

16       A.  Not one that -- not one that -- not one

17  that happens to be -- is there a landfill up in

18  Metairie?  I didn't know about a landfill in

19  Metairie.

20  BY MS. BRILLAULT:

21       Q.  Have you looked at the other industrial

22  sources you mentioned to determine if they also

23  emit VOCs or not and which ones they emit?

24       A.  What I did go is look -- I mean --

25       Q.  Yes-or-no question, did you look?

Page 234

```
 1      A.  This is a statistical issue, okay?  What
 2  is the probability of 29 of the same compounds and
 3  the -- in a neighborhood that also happen to be on
 4  a landfill, okay?  It's a statistical -- it's a
 5  statistical calculation.
 6           And you can have lingering and you can
 7  have wind shifts.  And it's just an irrelevant
 8  kind of question, okay?  If I had -- if you can
 9  give me a source in Metairie or some other place
10  that has the same fingerprint, then I'm open to
11  looking at it, okay?  But I don't see it.  This is
12  the data.  These are the data.
13      Q.  All right.  Let's -- I can actually pull
14  up the MAML report.
15           (Discussion off the record.)
16  BY MS. BRILLAULT:
17      Q.  Are you aware that LDEQ took samples on
18  the River Birch landfill?
19      A.  On the River -- well, okay.  Am I aware
20  that they did -- yeah, they took one sample -- one
21  of the samples is on the River Birch landfill.
22  It's sample -- that was the one that I included
23  last time, which was not a good idea, okay?  But
24  it was right on the edge.
25           So the problem is, if this is -- if
```

```
 1   this -- if these VOCs are coming off Jefferson

 2   Parish Landfill and landing in Waggaman and in

 3   River Ridge, they're certainly going to end up

 4   over in the River Birch landfill.

 5        Correct?

 6   Q.   You didn't bother to look to see if LDEQ

 7   took other grab samples of VOCs in other locations

 8   and compared the number of VOCs in that sample to

 9   what was being found in the neighborhood to see if

10   that statistical number was higher than the

11   Jefferson Parish number you calculated?

12   A.   No.  I don't have --

13        MR. FOSTER:

14             Objection to the form.

15   A.   I don't have any data like that.

16   BY MS. BRILLAULT:

17   Q.   Okay.  But you did do that in prior cases

18   where you had multiple sources, you looked at

19   multiple sources?

20   A.   That's correct, uh-huh.

21   Q.   You just chose not to do it here?

22        MR. FOSTER:

23             Objection to the form.

24   A.   I didn't choose not to do it.  I wasn't

25   invited to go on the River Birch landfill.  And
```

 1   what's more, I haven't even gone because of this

 2   COVID.  I was supposed to go down in, I think,

 3   April 2020.

 4            And by that time, we had two -- our two

 5   closest friends had died, and I wasn't about to

 6   get on a plane with -- no matter what kind of

 7   mask, you know, to collect any kind of sample.

 8   BY MS. BRILLAULT:

 9       Q.   The fact that a concentration taken -- a

10   concentration of VOC taken at the Jefferson Parish

11   Landfill was lower than the concentration out in

12   the neighborhoods, did you factor that into your

13   fingerprinting analysis?

14       A.   That a concentration on -- well, I'll tell

15   you, after having looked at the -- what I feel

16   confident about in the analysis is the following:

17   I feel confident that they did identify the peaks

18   correctly.

19            What I don't have con -- well, tremendous

20   confidence in is whether the quantity is correct.

21   And I feel the same way with regard to the -- with

22   regard to the hydrogen sulfide.

23            Because I don't know how long they kept

24   them there.  You know, for example, one of them I

25   was thinking about, the Jefferson Parish Landfill

 1  was collected at 87 degrees.

 2           Well, you bring it back to the lab, okay,

 3  and you've got a lab at 68 degrees, you're going

 4  to have -- some of your compounds are going to go

 5  into the -- into the water, and if there are

 6  particulates, some of them could absorb onto

 7  particulates.

 8           So you lose some of your data.  And I

 9  noticed the MAML -- the River Ridge MAML was done

10  at 80 degrees and the River Birch one was done at

11  90 degrees Fahrenheit.

12           So the problem for me in terms of

13  quantification, having done this and worried about

14  temperature for too many years, is that I'm not --

15  I'm not willing to say, Well, look at here, you

16  know, LA 2017 is .45 and it's .43 for 2760, but

17  it's only 36 for freon on the landfill.  I'm not

18  willing to say that that's meaningful because of

19  the issues I just described.

20      Q.  Put it this way:  You didn't account for

21  the difference in concentrations?

22      A.  No, I did not, no.  It was just a -- it

23  was just a yes or a no, okay?  And I -- and that's

24  typically what we've done in the past also,

25  because, you know, these contract organizations

Page 238

1  let things sit around and you don't know what

2  temperature they put them at.

3        I mean, I'm -- I'm pretty confident about

4  the peaks because I've never seen a problem

5  particularly with the peaks, but -- as to

6  identification.  But quantities can be an issue.

7     Q.  And if LDEQ had taken a grab sample, not

8  on the border but on the River Birch landfill, and

9  the number of VOCs equaled the -- was the same

10  number of VOCs that matched in the Jefferson

11  Parish Landfill --

12     A.  I'd like to see the data.

13     Q.  -- how would that impact your opinion?

14     A.  I would have to see the data first.

15     Q.  Well, I'm asking if it's the same

16  number -- if it's the same number -- your

17  statistical analysis isn't about concentration,

18  it's about the number of VOCs that match,

19  according to you, from the Jefferson Parish

20  Landfill --

21     A.  Then that could be another source of --

22  that could be another source, yeah.  But I haven't

23  seen the data.

24     Q.  And, Dr. Schiffman, do you think it was

25  proper to compare a single sample from Jefferson

1   Parish Landfill to three different samples taken

2   in neighborhoods and three different locations to

3   come up with a number of 29 matching VOCs?

4       A.  It's something that has been done forever,

5   okay?  I've been doing this for 50 years.  We do

6   it all the time, okay?  It's not anything

7   different.

8          I don't do anything different from what

9   colleagues in Europe do.  I mean, one person in

10  Japan that I know does this.  It's just a kind of

11  standard thing you do.  You do a GCMS.  That's why

12  I'm trying to avoid a GCMS with my sensors.  But

13  this is a way in which we try to find out what is

14  the most highly probable source, you know,

15  statistically of the odors in a place, and you

16  look at what the fingerprint is.

17      Q.  Dr. Schiffman, isn't it plausible that if

18  you took enough samples in the neighborhood, you

19  could come up to 100 percent matching in one

20  sample of JPLF?

21      A.  No.  Because we -- there are -- there

22  are -- there are at least 400 compounds coming off

23  that landfill.  They -- all we have here is a

24  T015.  All we have here is a small subset of

25  what's coming off of that landfill.

Page 240

1        I used what I had to be able to predict,

2  and I can assure you that the probability the

3  Jefferson Parish Landfill is a very major source

4  of this is not even disputable, okay?  This, in

5  addition to the fact that LDEQ says it, okay?

6        The -- I mean, it would just go on and on

7  and on.  There are -- it's just another

8  confirmatory fact, okay?

9     Q.  Well, I'm trying to get to the methodology

10  behind the confirmatory fact that you're saying,

11  and you're saying you have a friend in Japan that

12  would take a single sample from a source and

13  compare it to three samples in various areas of a

14  community and do a statistical analysis to prove a

15  fingerprint; is that what your -- is that what

16  your testimony is right now?

17        MR. FOSTER:

18           Objection to the form.

19     A.  I don't know what he would do, okay?  But

20  this -- there's a certain amount of money that

21  people have, okay?  And you're trying to trace a

22  problem.

23        The cost of doing this is enormous.  And

24  what we have here, I think LDEQ did a -- I mean,

25  I'm very impressed with what they did because they

Page 241

1   really tried to figure out what the problem was.

2   But, I mean, this is -- this is -- what I did here

3   is no different from what people do in many

4   different places, they try to find a fingerprint.

5         And one -- whether you have one or whether

6   you have three, you do the best with what you

7   have, okay?  The probability of this coming out

8   the way it did is virtually zero, okay?  It's

9   almost zero.  There is very, very low chance that

10  it happens this way.

11        Now, is it possible that River Birch has

12  the same -- same one?  Okay, I did look at the

13  River Birch because that was part of the original

14  analysis.  And the River Birch does match it quite

15  well, except that it happens to be right next to

16  Jefferson Parish Landfill, so that whatever the --

17  whatever the fingerprint is for River Birch could

18  be related to Jefferson Parish, because if it's

19  going downwind into the community, it's also going

20  over into River Birch.

21  BY MS. BRILLAULT:

22      Q.  Or vice versa, right?  I mean, the sample

23  taken at the Jefferson Parish Landfill could be

24  influenced by VOCs being emitted by the Jefferson

25  Parish Landfill?

                                                       Page 242
1       A.   But these may not even be the main

2   odorants that are a problem in the community,

3   okay?

4       Q.   I'm just asking, isn't it possible that --

5   just like you said, the one that was on the border

6   between Jefferson Parish and River Birch could be

7   influenced by Jefferson Parish, same thing goes

8   that the sample taken at Jefferson Parish could be

9   influenced by River Birch; you don't know because

10  you didn't check wind speed, wind direction, or

11  the meteorological data, right?

12      A.   That is -- the problem is, is that -- is

13  that you have -- these are shifting back and forth

14  and back and forth, so you cannot know -- would it

15  be nice to have more samples?  Correct, it would

16  be nice to -- this is -- this is one more

17  confirmatory issue, okay?

18           You're not listening, so I'll wait till

19  you...

20      Q.   One more confirmatory issue, I heard you.

21      A.   Okay.  This is one more confirmatory

22  issue.  LDEQ says this.  This is another one.

23  Jim's data shows it.  Problems with the wells.

24  Problems with the leachate.  It's just one more

25  piece of data.

1     Q.  And I'm trying to get to, not the data

2   that was taken, but your analysis of the data and

3   your statistical analysis and whether you have

4   done and whether you think it's proper and what

5   the basis for that is.

6         Give me the studies, give me the

7   publications that show it's proper to take a

8   single sample from one source and compare it to

9   three different samples taken in three different

10   locations on three different occurrences to say

11   that, statistically, it is virtually impossible

12   that it's not the Jefferson Parish Landfill?

13         MR. FOSTER:

14              Objection to the form.

15     A.  Okay, the fact -- what you're saying right

16   now makes it even stronger, okay?  The fact that I

17   have a probability that is so minute a match with

18   one sample matching three samples at that level of

19   probability, you're giving -- you're giving my

20   argument right now, okay?

21         You're giving -- you're just adding on to

22   my argument that -- this just increases the

23   statistical probability of correctness.

24   BY MS. BRILLAULT:

25     Q.  Dr. Schiffman, wouldn't it have been more

Page 244

1  proper to at least compare one sample to one

2  sample rather than add up all of the various --

3       A.  No, it would not, because we're talking

4  about a neighborhood of people who are affected.

5       Q.  And in, in fact -- like let's look at

6  acrolein.  So acrolein was detected on the

7  Jefferson Parish Landfill, and it was detected in

8  one, but it wasn't detected in the other two

9  samples.

10      A.  Correct.

11      Q.  So how does that make sense to compare and

12 say Jefferson Parish Landfill is contributing

13 acrolein only to one place but not the other two;

14 but then at ethanol, it is contributing to the

15 other one but not the third?  How does that make

16 sense?

17          MR. FOSTER:

18             Objection -- objection to the form.

19      A.  These are the most stupid questions I've

20 ever heard and I can't even describe to you how

21 silly it is.

22          This is -- this is a standard method

23 that -- people do this all the time.  And,

24 obviously, you don't understand statistics.  So, I

25 mean, I can't -- there's no rational way of

Page 245

1 dealing with your question because you're not

2 rational about it, okay?

3 BY MS. BRILLAULT:

4     Q.  Dr. Schiffman, you say people do it all

5 the time.  I don't see any peer-reviewed study or

6 textbook that shows this is the proper way to do a

7 statistical analysis to show a fingerprint.  So I

8 don't see one in your report.

9         Who are the people that would do it this

10 way, that would support your approach?

11        MR. FOSTER:

12            Objection to the form.

13     A.  These are ways that consulting firms work.

14 You try to find out what the source of something

15 is.  You look at noise levels, you know, what

16 frequency -- I mean, people do it with noise, what

17 frequency is coming off of this building and what

18 frequencies are coming here and who's creating the

19 noise over here and deconvolve the signals.

20        People do all kinds of fourier analyses.

21 I've seen all kinds of analyses.  But this is

22 something that is done usually in trying to solve

23 a problem.

24 BY MS. BRILLAULT:

25     Q.  My question was --

Page 246

1    A.  Why isn't it -- why isn't it in the

2  literature?  I have no idea.  I've never written

3  it up and I've done it 50 times.  I've never

4  written it up.

5    Q.  Give me somebody that you know that would

6  do this.  Give me a name, give me a --

7    A.  I don't give people's names to things,

8  okay?  I don't -- you're asking questions that are

9  really irresponsible, and I don't appreciate it.

10  It's nasty, okay?  And I don't appreciate the

11  nastiness.  It's disrespectful.  We're dealing

12  here with a case where there -- where a compound,

13  acrolein, is found in a neighborhood, and yet it

14  was on the landfill, okay?

15        And maybe it wasn't in the other two

16  places because of the wind direction; who knows.

17  Chloromethane was found in two of the places but

18  it was -- it was found on the landfill and two

19  other places.

20        I mean, disrespect -- I have to tell you

21  something.  This is the kind of reason why --

22  we're going to poison ourselves out of -- out of

23  civilization with people like you who are trying

24  to demean -- demean data that shows that a

25  compound on a landfill is in the -- is in the --

1  is in the community.

2         You find me another place that is -- that

3  is given this same range of compounds, exactly the

4  same -- the same fingerprint, and I'm open to --

5  open to discussing it.  But the kinds of questions

6  you're asking are not nice and they're also

7  irresponsible.  Lack of concern for others is

8  really pervaded.  It's disgusting.

9     Q.  All right.  So I'm going to start over on

10  this.

11        Just to be clear, I would like you to walk

12  me through your methodology for comparing the VOCs

13  on the Jefferson Parish Landfill to the samples

14  taken in the neighborhood to reach your opinion

15  that the Jefferson Parish Landfill was the source

16  of those VOCs.

17     A.  Yes.

18     Q.  Step by step, break it down.

19     A.  It's the probability of 29 so-called

20  successes, okay?  That means, thinking from a

21  statistical standpoint, the 29 successes that --

22  of 35 compounds reached that community.

23        What you do, the N is 35 and the X being

24  29, you take N factorial divided by X factorial

25  divided -- times N minus X factorial, which is 35

Page 248

1  factorial over 29 factorial, and then times --

2  divided by 35 point -- 35 minus 29 factorial.

3       Then the probability of that area being

4  .2, let's say about 20 percent, to the 29th power,

5  and then it's 1 minus .2 to the sixth power.  And

6  if you calculate that out, which I did on my

7  calculator, you end up with P equals -- P -- the

8  probability of 29 compounds is 2.28439 times 10 to

9  the minus 15.  And I checked it on my computer.

10      Q.  So the 29 successes were in sample LA

11  2294, the successes?

12      A.  The successes, that 29 of the 35 compounds

13  in 2294, reached the neighborhood, someplace in

14  the neighborhood, yes, that is the way I did it.

15      Q.  And, again, can you explain to me why you

16  chose to use 35 compounds instead of 44?

17      If we're talking about successes, wouldn't

18  it matter how many were also were detected or not

19  detected on Jefferson Parish Landfill?

20      A.  Because the 44 -- of the ones that weren't

21  there, I don't know where they came from, okay?

22  There's no data that shows that those were on

23  Jefferson Parish Landfill.  I am only looking at

24  what happened -- what was emitted from Jefferson

25  Parish Landfill into the community.

Page 249

1      Q.  And if those seven came from someplace

2  else other than the Jefferson Parish Landfill,

3  isn't it true that all of the other VOCs also

4  could have come from someplace else other than the

5  Jefferson Parish Landfill?

6      A.  No.

7      Q.  Why is it no for the 29 and yes for the

8  seven that came from someplace else?

9      A.  We're looking at a pattern.  I -- you

10  clearly don't understand this, so I don't think

11  that this is -- there's any point of pursuing

12  this.  You obviously do not understand statistics,

13  and there's no point in my continuing trying to

14  explain to you basic statistics.  I think it's

15  time to move on.

16      Q.  So you're not going to explain to me why

17  it's probable --

18      A.  I don't think you're capable of

19  understanding it or wanting to understand it.

20          (Multiple speakers.)

21          (Clarification by reporter.)

22      A.  There is no point, my point, in trying to

23  explain to somebody who does not want to

24  understand.  Or cares not to understand.

25  BY MS. BRILLAULT:

SCHIFFMAN SUSAN

1     Q.  For this analysis, Dr. Schiffman, did you

2  consider or factor in background levels of VOCs in

3  the samples in the neighborhood?

4     A.  This is a background level in the

5  neighborhood.

6     Q.  If it's a background level in the

7  neighborhood, how are you -- how are you saying

8  Jefferson Parish Landfill was the source?

9     A.  The Jefferson Parish Landfill contributed

10  to the background level in the neighborhood.

11     Q.  Jefferson Parish Landfill was the only

12  source that contributes to background levels in

13  the neighborhood?

14     A.  There are other -- other sources, I'm

15  sure, as well.

16     Q.  And so it would have been helpful to look

17  at other sources, at least what they're

18  potentially contributing, based on even like the

19  TRI data, known VOCs that they emit?

20     A.  I think this is a really unproductive

21  discussion, okay?  I feel that what you're asking

22  is despicable and disrespectful.  You're showing

23  that left -- the people from LDEQ, if they felt

24  that there was a problem of going over to

25  someplace in the middle of Metairie to determine

Page 251

1  if there was a conse -- a problem from there of --

2  because the direction a lot of the winds are

3  coming from, why were they not going out and

4  taking samples from that area?

5      They weren't because they already had

6  decided that the problem was a landfill problem,

7  okay?  That's the issue.  They took samples from

8  where they thought was the source.  So as far as

9  I'm concerned, not only are you insulting me, but

10  you're insulting LDEQ, nor do you understand

11  what's going on.

12    Q.  Dr. Schiffman, do you feel it's your role

13  to help protect the residents in the community?

14    A.  To protect what?

15    Q.  The residents in this community.  Do you

16  feel that that --

17    A.  Do I feel -- no.  I feel that they've been

18  wronged.  I feel -- I feel that they have been

19  exposed to a -- I don't feel it's my role to

20  protect.  I -- they -- it's something that's

21  happened to them already.

22      I feel that it is unfair to expose people

23  to vile odors over a period of time for

24  two-and-a-half years that affects their life.

25  That's why I decided to get involved in this.  I

1  mean, I ordinarily don't.

2         I usually back off and say that my role is

3  to try to find out how to solve the problem.  But

4  I just felt that this was -- really, it's

5  unacceptable to expose people to this over a

6  period of time.  It's not -- we can't live a life

7  like this unless somebody stands up.

8         I mean, I have not stood up so many times

9  before when I saw some things like this happening,

10 but I -- and this one I finally decided to.

11     Q.  And you're standing --

12     A.  It may not -- and given what I'm dealing

13 with with regard to you, it may not have been a

14 good idea, because if this is what I'm seeing from

15 the other side, how do you deal with people like

16 this?

17         When I see you I say to myself, I wish you

18 lived in that community and let you see what it

19 was like, let you experience it.

20     Q.  You're here to provide your opinions to

21 make sure that these people don't have to

22 experience odors anymore?

23     A.  No, that's not --

24         MR. FOSTER:

25             Objection to the form.

```
 1      A.  That is not what I'm here for, okay?
 2  They're not going to be experiencing odors because
 3  it appears to have been fixed, okay?  At least the
 4  major problem seems to have been fixed.  When I
 5  got involved in it, it wasn't fixed.
 6  BY MS. BRILLAULT:
 7      Q.  Dr. Schiffman, do you think you
 8  approached -- let me withdraw that.
 9          So just to be clear, when you did this
10  comparison of the VOC's sampled at the Jefferson
11  Parish Landfill and the three samples taken out in
12  the neighborhoods, you didn't consider wind
13  direction when the VOCs were sampled in the
14  neighborhood?
15          MR. FOSTER:
16              Objection to the form, asked and
17          answered.
18      A.  I did not take the samples.  The samples
19  were taken by LDEQ.  They were analyzed by
20  Australian Laboratory Services.  I took their data
21  and compared them.  It is one of many reasons why
22  I think that they came from Jefferson Land --
23  Jefferson Parish Landfill.  It is one line of
24  evidence.
25  BY MS. BRILLAULT:
```

Page 254

 1      Q.  But, again, you didn't account for wind
 2  direction or wind data; you just looked at a
 3  concentration and said detect or not detect?
 4          MR. FOSTER:
 5              Objection to the form.
 6      A.  Have you ever been out in the field and
 7  collected a sample?
 8  BY MS. BRILLAULT:
 9      Q.  Dr. Schiffman, I have a question pending.
10  If you don't understand the question, I can
11  restate it, but I need you to answer my questions.
12      A.  I did not collect wind data.  I did not
13  collect these samples.  I am analyzing the data
14  collected by LDEQ.
15      Q.  And you didn't analyze wind data either?
16  You didn't collect it, but you didn't even analyze
17  it?
18      A.  I did not, no.
19      Q.  Thank you.
20          All right.  Now, the VOCs you looked at to
21  compare the fingerprint, those were taken in
22  neighborhoods; I think we established that they
23  weren't taken at the resident locations?
24          MR. FOSTER:
25              Objection to the form.

 1      A.  Correct.

 2  BY MS. BRILLAULT:

 3      Q.  And you're not aware of any samples of

 4  VOCs taken at the resident locations, the trial

 5  plaintiffs' locations?

 6      A.  I have no data of that type.

 7      Q.  And Mr. Lape didn't do any modeling of

 8  VOCs in this case?

 9      A.  He didn't send me any modeling of VOCs,

10  no.

11      Q.  Have you identified the specific mixture

12  of VOCs that you assert caused the trial

13  plaintiffs' injuries in this case?

14      A.  It is a mixture of all the VOCs.  They are

15  not -- you don't identify them by individual, it's

16  the total amount, and we don't know what that is

17  at the moment.

18      Q.  So you haven't identified a particular

19  mixture?

20      A.  No.

21      Q.  No, you haven't; or, no, that is correct?

22  Sorry, that was a bad question.  Let me rephrase.

23      A.  I feel sad for you.  I feel very sad for

24  you.  That's all I can tell you.

25      Q.  Thank you.  I appreciate it.

 1          Have you identified the specific

 2    mixture --

 3          A.  No, I have not.

 4          Q.  On page 29 you have in that first

 5    paragraph, underneath the table, towards the end,

 6    second-to-last sentence, "VOCs such as n-heptane,

 7    n-hexane, n-octane, and n-nonane that were

 8    individually below the odor threshold in JPLF and

 9    community samples can interact to produce a

10    suprathreshold 'petroleum-like' odor sensation."

11          A.  Right, uh-huh.

12          Q.  What is the basis for your statement

13    there?

14          A.  I've done that.

15          Q.  And when have you done it?

16          A.  We've been doing this -- I've been trying

17    to get samples for standards for -- for landfills,

18    mixtures.  And I know that if you take those

19    together all below threshold, you do affect it by

20    suprathreshold odor.

21          Q.  Is that in a peer-reviewed study?

22          A.  No, no.  This is stuff that we do all the

23    time.

24          Q.  Okay.  And you say "we."  Who is -- you

25    and who?

1    A.   I have people that I'm working with right

2  now on these committees that I'm working on with

3  regard to developing standards.  We've just

4  finished our humidity and temperature standard

5  development, and we're working on trying to find

6  standards for delivering to e-noses to see whether

7  it can discriminate -- make fine discriminations.

8    Q.   And, again, you're not relying on any

9  peer-reviewed publication for that?

10   A.   No, no.

11   Q.   Does it matter the concentration of those

12  VOCs?

13   A.   These are all below threshold.

14   Q.   Understood.

15        Does it matter the particular

16  concentration of each VOC when combined to create

17  a petroleum-like --

18   A.   We know -- we know -- we know at what

19  level we can add things to.  We're trying to --

20  some are one-half the level of threshold, we're

21  doing one-quarter.  Yeah, I mean, you can take

22  things -- you can take some that are -- I'm seeing

23  times when we've had things that were 150 at the

24  threshold, let's say for three or four compounds,

25  and we still get an odor.

 1      Q.  And what compounds were those?

 2      A.  Some of them are aldehydes.

 3      Q.  So the heptane, hexane, octane, nonane

 4  that you referenced in this, what concentrations

 5  do those need to be so that when they're

 6  combined --

 7      A.  I don't know at the moment.  But I'm

 8  just -- I just used that as a possibility to

 9  explain the petroleum-type odors, okay?  It was

10  just -- it was a -- it was a suggestion, shall we

11  say.

12      Q.  But concentration matters, you just don't

13  know the concentration?

14      A.  I don't know the concentration, no.  And

15  also I don't know the concentrations even from

16  these -- from the -- from ALS, because we don't

17  know how long they held them or under what

18  conditions, et cetera.

19      Q.  So in your last paragraph on page 29,

20  second sentence, "In the cases where Dr. --

21  Mr. Lape's modeling shows H2S concentrations at or

22  near the minimum detection levels, these are

23  likely conservative because the other VOCs emitted

24  from the JPLF would have made the malodors

25  detectible even when the H2S concentrations were,

Page 259

1  by themselves, below the detection level."

2      A.  Correct.

3      Q.  You don't have evidence of what VOCs at

4  what concentration --

5      A.  No.

6      Q.  -- for every particular trial plaintiff,

7  correct?

8      A.  Correct.

9      Q.  So you're just assuming this to be true?

10     A.  I'm assuming it to be true on the basis of

11  50 years of experience.

12     Q.  But you just said concentration matters of

13  VOCs.

14     A.  There are at least 400 compounds coming

15  off of that landfill, and you add hydrogen sulfide

16  to it, and I can assure you that it certainly will

17  affect the threshold.

18     Q.  But you're not citing to any peer-reviewed

19  articles for the --

20     A.  No.

21     Q.  Okay.  And you don't have evidence of any

22  particulate mixture that reached any particular

23  plaintiff in this case; is that accurate?

24     A.  If I went through the literature, I'm sure

25  I could find something.  But I don't at the

1  moment.

2      Q.  And, again, with respect to the evidence,

3  you don't have evidence of H2S plus a particular

4  mixture of VOCs to any individual resident's

5  homes, trial plaintiff's homes?

6      A.  Nobody measured them exactly at their home

7  at the time of the -- of the -- during the time

8  frame of the -- of the -- of the complaints.

9          MS. BRILLAULT:

10              Is it break time?

11         MS. KREBS:

12              Yes.

13         MS. BRILLAULT:

14              Okay.  Let's take a really short

15         break.

16         THE VIDEOGRAPHER:

17              We are off the record at 5:35 p.m.

18         (A break was taken from 5:35 p.m. to

19         5:53 p.m. Eastern Time.)

20         THE VIDEOGRAPHER:

21              We are back on the record at 5:53 p.m.

22  BY MS. BRILLAULT:

23      Q.  All right, Dr. Schiffman.  I just have a

24  couple more questions in Opinion 3 and we can move

25  to Opinion 4.

Page 261

1        On page 30, towards -- in that last

2   paragraph towards the bottom, you say,

3   "Furthermore, River Birch stopped accepting spent

4   lime as a solidification agent because of odor

5   problems."

6        A.  Uh-huh.

7        Q.  What is the basis for that statement?

8        A.  I think Mr. Foster was telling me about

9   this.

10       Q.  Okay.  So you're not relying on any

11  documents?

12       A.  No document that I know of.

13       Q.  Is that an assumption that Mr. Foster had

14  you consider?

15       A.  Uh-huh.

16       Q.  Okay.  You didn't speak to anyone at River

17  Birch either?

18       A.  What?

19       Q.  You didn't speak to anyone at River Birch

20  either?

21       A.  I don't speak to -- I've never spoken to

22  anybody at River Birch, no.

23       Q.  And then the next sentence that goes on to

24  the next page, "Overall, the data from all of

25  these sources corroborate that H2S odors came from

SCHIFFMAN SUSAN                          04/26/2024
                                          Page 262

1    the JPLF due to the acceptance of the spent lime,

2    along with the malfunctioning leachate and gas

3    collection systems that were the responsibility of

4    Waste Connections and Aptim."

5         A.  Correct.

6         Q.  Are you offering opinions as to

7    contractual claims in this case?

8         A.  No.

9         Q.  And you're not an expert in contracts?

10        A.  No.

11        Q.  What was the basis for that statement

12   then?

13        A.  Just looking at who was being sued.

14        Q.  Okay.  All right.  I think we can turn to

15   Opinion 4, which starts on page 32.  All right.

16   And this is entitled "Malodor Health Effects."

17        A.  Uh-huh.

18        Q.  And this is where you're saying,

19   "Malodorous emissions from the JPLF are the major

20   contributor to the health complaints reported by

21   the trial plaintiffs."

22             When you say "reported by the trial

23   plaintiffs," that's relying on their deposition

24   testimony, fact sheets, and the discovery

25   responses?

1      A.   Yes.

2      Q.   Not relying on any other information?

3      A.   And also Dr. Delorenzo, and what's -- I

4  can't remember the other guy's name.

5      Q.   Dr. Spodak?

6      A.   Spodak, yeah.

7      Q.   When did you first review these reports?

8  Let me go one at a time so it's less confusing.

9           When did you first review Dr. Spodak's

10  report -- expert report in this case?

11     A.   I have no idea.  I don't -- those are just

12  things that are not part of my life space.

13     Q.   How about, did you review the ex --

14  Dr. Spodak's expert report prior to finalizing

15  your expert report?

16     A.   I'm sure I did, but I'd have to look at

17  when I downloaded it.  I don't know.  I'd have to

18  look at the data, okay?  I don't know.

19     Q.   Are you aware that Dr. Spodak is not

20  opining on causation in this case?

21     A.   I have no idea.

22     Q.   But you're relying on his report for the

23  health complaints reported by the trial

24  plaintiffs?

25     A.   I mean, I just read them.  My opinions in

SCHIFFMAN SUSAN

1 this, I -- shouldn't say that I'm relying on their

2 reports.  I'm relying on my own experience of

3 having dealt with this for 50 years and on some

4 literature.

5      Q.  And then you're relying on the

6 self-reports by plaintiffs --

7      A.  Correct.

8      Q.  -- through their fact sheet or deposition

9 testimony?

10      A.  Right, uh-huh.

11      Q.  All right.  I hate to do this, but if we

12 go back up to page 4, it's in the Overview.

13      A.  Uh-huh.

14      Q.  Sorry, I'm just trying to find that.

15 Okay.  There.  Thanks.  I'm on the wrong page,

16 that's what I'm doing.  Okay.

17          So on page 4, this is in your Overview of

18 Opinions.  The sentence actually starts on page 3,

19 but "The frequency, intensity, duration, and

20 offensiveness (FIDO characteristics) of the

21 malodorous mixture of H2S along with other volatile

22 organic compounds caused psychological effects

23 with physiological underpinnings, including

24 headaches, nausea, or vomiting."

25      A.  Correct.

Page 265

1      Q.  Do you see that?

2      A.  Uh-huh.

3      Q.  What do you mean by "psychological effects

4  with physiological underpinnings"?

5      A.  It means that people are feeling a certain

6  way and there's a physiological underlying basis

7  for it.

8      Q.  So when you say they're feeling a certain

9  way, they're anxious?  Can you give me an example?

10     A.  Headaches.

11     Q.  Okay.

12     A.  Nauseous.

13     Q.  Okay.

14     A.  Feel nauseous, don't feel good.  It makes

15  them feel stress, headache, can't concentrate,

16  feel stressed, didn't get enough sleep, can't do

17  my work, feel stressed, can't think through

18  something, vomiting, don't feel like eating,

19  doesn't make me feel good, feel stressed, dizzy.

20     Q.  Sorry, I'm just going to interrupt because

21  you're giving me a lot of examples.  I just want

22  to pull them apart.

23         So what's the psychological effect and

24  what's the physiological underpinning?

25     A.  Well, they go both ways, okay?  I mean,

Page 266

1  you can feel stressed, that modifies

2  neurotransmitters, and that can lead to a

3  headache.  Or you can have a headache and it can

4  go the other direction, and then you feel like,

5  Oh, my God, I have to go to work, I can't deal

6  with this.  So there's an interplay between the

7  two.

8       Q.  And for purposes of your opinion in this

9  case, are you opining that you feel stress --

10  like, for example, someone feels stressed and then

11  they get a headache?

12       A.  That's one way they can get a headache,

13  right.  There are other ways you can get a

14  headache, and that is activation of TRP channels

15  or like ASIC channels can be activated just by

16  acidity, which may have to do with hydrogen

17  sulfide in the liquid area of the br -- I mean, of

18  the eyes.  I've been told I'm not supposed to talk

19  about eye irritation, so I don't know.

20       Q.  And that's exactly what I'm trying to get

21  to, kind of get a little finer point on, is are

22  you opining that these individuals were stressed

23  and, therefore, they had headaches; or are you

24  providing opinions that -- a physiological opinion

25  that they had headaches, which then caused them

1  stress; or are you opining both?

2     A.  I am -- I don't like the word "opine."  I

3  am saying that when a combination of odor -- of

4  hydrogen sulfide plus the VOCs activate the

5  trigeminal nerve in the nose.  Now, there -- I

6  will tell you that these trip channels have also

7  been found on the olfactory nerve and in cells

8  outside of the system itself.

9        But there's the release of CGRP and

10 substance P, which can dilate blood vessels, which

11 also -- which activates the trigeminal nerve and

12 causes headaches.  That's one mechanism, okay?

13       Another mechanism is, is that it's an

14 aversive odor.  And there's -- Solve and Pardo

15 (phonetic) have shown that -- with hydrogen

16 sulfide that it causes regional increases in blood

17 flow, which does not occur with a pleasant odor,

18 okay; or that people can feel stressed and that

19 activates the whole stress area and all the

20 cingulate gyrus and all these different parts of

21 the brain, and that that, in fact, can lead to

22 headache as well.

23       And then lack of sleep, that they keep

24 getting interrupted by an adverse odor, and they

25 can't get any sleep and they feel stressed from

Page 268

1   that so that they can get a headache from that.

2   There are lots of ways that you can get a

3   headache, and it's a very complicated area.

4           I mean, I've been involved in this for

5   many years, and it's -- I did a study for

6   NutraSweet Company as to whether aspartame causes

7   headaches.  It was required by the FDA.  And I

8   learned more than -- learned that our

9   understanding of headaches is not exactly at the

10  top of our knowledge list.

11      Q.  And is it fair to say that you're

12  providing opinions in this case about headaches

13  and the other physical injuries that are going

14  both ways, one is that it's a psychological

15  effect --

16      A.  Uh-huh.

17      Q.  -- a psychological, I don't know, effect

18  that causes these physiological injuries; but also

19  that these individuals are having physiological

20  injuries as a result of the odors that are causing

21  psychological effects?

22      A.  I don't like the word "injury" because

23  it's sensory -- it's a sensory effect.  It's an

24  adverse odor, an adverse odor quality, which is

25  coded in the brain, in the amygdala, in a

Page 269

1  different way than a pleasant odor is.

2         So there's a biological underpinning to it

3  that says, Stay away.  Why don't we put mercaptans

4  into, let's say, propane gas, okay?  Because we

5  know that that smell is not well-liked by anybody

6  and so, therefore, it's an innate, aversive odor,

7  and so that's why people put it in as a warning.

8         And so that warning signal is the reason

9  why people have an adverse reaction to it.

10 Warning -- but the warning comes intermittently

11 and they have no control over it.  I think that

12 Wendy Gremillion -- I thought she was smack on

13 when she was saying, It comes and goes whenever it

14 wants to.  You have no control over it.

15        And so it's an issue of lack of control,

16 an adverse thing that's happening when you don't

17 want it to come.  And that's one -- one trigger

18 for a headache.

19    Q.  Okay.  Let's go back to page 32.  Hang on.

20    A.  32, okay.

21    Q.  So, sorry, before, like 31, 32, you have

22 Table 4, which is the compilation of health

23 effects.

24    A.  Uh-huh.

25    Q.  And so this is -- they're self-reporting

Page 270

1    these health effects?

2         A.   Uh-huh.

3         Q.   And you're taking them at face value?

4         A.   I take them at face value.

5         Q.   In 4.1 you say, "Headaches occur" -- five

6    lines down kind of towards the right, "Headaches

7    occur as a result of exposure to H2S emissions as

8    well as to mixtures of VOCs that do not contain

9    H2S."

10        A.   Where are you at?

11        Q.   About four lines down in that first

12   paragraph of 4.1, "Headaches" --

13        A.   Uh-huh.

14        Q.   Do you see that sentence?

15        A.   Uh-huh.

16        Q.   Okay.  Headaches actually occur for many

17   reasons besides exposure to H2S and/or VOCs?

18        A.   Uh-huh.

19        Q.   You would agree with that?

20        A.   Yes.

21        Q.   And you didn't -- for purposes of making

22   your opinions on whether any of the trial

23   plaintiffs had headaches outside of exposure to

24   emissions from the Jefferson Parish Landfill, you

25   didn't --

Page 271

1      A.  Could I ask you a question, which is

2  really what is so annoying with your questions.

3  You start off by saying, "You didn't do," okay?

4      Q.  I --

5      A.  If you just asked me, "Did you do

6  something," I will answer the question.  But when

7  you place it in that way, it's a hostile -- it's

8  hostile and it's very difficult to deal with in a

9  kind way, okay?

10      I think some kindness on your part would

11  be a big step forward, and I will be kind in

12  return.  But please don't start something like

13  that.  It really is unpleasant.

14      Q.  Dr. Schiffman, I appreciate that.  If

15  that's going to help us get through this --

16      A.  It will definitely help us get through it.

17  Just ask me did I -- did I do something or other.

18  Especially if you know that I didn't do it, then

19  please don't ask, okay?  Because you know, if it's

20  not in the report, I didn't do it, okay?

21      But if you think that I might have done

22  it, ask me did I do it, and I will tell you yes or

23  no.  But please don't start a sentence like that.

24  It's really -- I mean --

25      Q.  Understood.  I --

1        A.   I learned interviewing technique at Duke,

2   okay, for many years, and it was always something

3   that you always made sure you didn't ask a

4   patient, because it starts out with utter

5   hostility.

6            And it sounds like hostile to me and it

7   makes me very annoyed, okay?  I wish I didn't get

8   annoyed with it.  I feel sorry for you that you do

9   it, okay?  But I think the best thing is for us to

10  figure out what's going on here, try to get it

11  clear, and find out what the exact situation is

12  here and find out my opinion.

13           And you can look at other people's

14  opinion, but I will tell you what my opinion is,

15  okay?  And I think it will make it a lot easier

16  for us.

17       Q.   I think so too.  That's a great idea.

18           So you made a statement that if you didn't

19  write it in your expert report, you didn't do it.

20       A.   Correct.

21       Q.   And so if it's not in your expert report,

22  you didn't consider it?

23       A.   Correct.

24       Q.   Okay.  That's going to help a lot.  All

25  right.  Now I'm like stumped.  So many questions I

Page 273

1  don't need to ask you, Dr. Schiffman.  All right.

2         For the headaches, is there a particular

3  number of exposures that are required -- are there

4  a particular number of

5  5-parts-per-billion-for-30-minutes exposures that

6  are required before one of the trial plaintiffs

7  that complain about headaches would get a headache

8  from that exposure?

9     A.  Okay, well, if I had thought about that, I

10 would have put it in my report.

11    Q.  Okay.

12    A.  I am simply stating here that it is

13 possible to have an exposure, okay?  Which I did

14 for one hour, okay?  Now, I did mine for one hour

15 and 20 -- this was a controlled study at 22 ppb,

16 which is considerably higher than we're talking

17 about.  It had plenty -- plenty of problems.  But

18 if I had done that, I would have put it into the

19 report.

20    Q.  Great.

21    A.  Okay?

22    Q.  And is it safe -- so for the individuals

23 that complained about headaches, that's

24 Mr. Section -- according to your testimony, that's

25 Mr. Section, Tyrone Thompson, Geneva Green, Scott

Page 274

1  Gremillion, and Wendy Gremillion.

2      A.  Uh-huh.

3      Q.  I know it's not in there, but I'm going to

4  ask it so it's on the record.

5          Did you determine a particular combination

6  -- combination and concentration of VOC and H2S

7  exposure that caused their headaches?

8      A.  It's not in the report, so I didn't do it.

9      Q.  That last sentence in the first paragraph

10 on headaches, "Volatile emissions can stimulate

11 trigeminal nerve endings."

12         Again, you're saying what can happen --

13     A.  Correct.

14     Q.  -- not what did happen in this case?

15     MR. FOSTER:

16         Objection to the form.

17 BY MS. BRILLAULT:

18     Q.  Sorry, I can restate it, Dr. Schiffman.

19         Here you're stating what can happen, not

20 what necessarily did happen to these trial

21 plaintiffs?

22     A.  No, and this -- trying to figure out why

23 people have headaches is this -- is the real

24 challenge.  I mean, there are headache clinics

25 where people have -- they try various kinds of

Page 275

1    MRIs and PET scans and measuring epinephrine.

2         Like low epinephrine will dilate blood

3    vessels and higher epinephrine will constrict

4    blood vessels.  I mean, it's a very complicated

5    thing.  And for us to determine why these people

6    had headaches from all the different mechanisms --

7    I mean, there are just so many mechanisms, it's

8    very, very difficult to determine.

9         Q.  It could be a simple, like they just had a

10   bad day at work and they came home and they're

11   annoyed and had a headache, right?

12        A.  The problem for that argument is that they

13   associate it with the odor, okay, of the -- from

14   the -- from the facilities, from Jefferson Parish

15   Landfill.  And I know over many, many years -- I

16   mean, I've had people who I've trained to be

17   experts in helping me collect data, and they just

18   can't be out there because they get a headache.

19        I mean, and they may -- there was one guy

20   who I loved him, and he just couldn't -- he

21   couldn't be out on a hog farm.  He just would have

22   a splitting headache and couldn't come in the next

23   day.  So -- and he needed the money.  So it's -- I

24   mean, there are just some people who cannot

25   tolerate being around odors.

Page 276

```
 1      Q.  Hog farm odors are different than --
 2      A.  Hog farm odors or landfill odors.
 3      Q.  Hog farm odors are different than landfill
 4  odors?
 5      A.  Oh, absolutely, absolutely.
 6      Q.  All right.  I'm going to ask the question
 7  because I think you said no, but I think you meant
 8  no yes.  So let me just ask it slightly different.
 9          That sentence, "volatile emissions can
10  stimulate trigeminal nerve endings" --
11      A.  That's correct.
12      Q.  It's a "can," it's not actually a "did"
13  here; is that accurate?
14      A.  I can't -- I can't say that that's what
15  happened with an individual person.
16      Q.  Right.
17      A.  But it happens -- let us say that the
18  animal data is so clear that it can -- it does, in
19  fact, activate the trigeminal nerve.  That's what
20  you do, you put an electrode in -- I mean, I've
21  done this.  I had -- you put it into the
22  trigeminal nerve and record -- and record the
23  spikes.
24          So, yes, you can do it.  But does it do it
25  with these individual people?  We can't put an
```

Page 277

1  electrode into their -- I mean, that would not be

2  a very nice thing to do.

3      Q.  It would not be.

4          All right.  On page 33 --

5      A.  Uh-huh.

6      Q.  -- in the paragraph starting with, "Second

7  exposure to the odor of H2S produced strong

8  increase in regional cerebral blood flow (rCBF)

9  bilaterally in the amygdala and in the left

10  orbitofrontal cortex."

11     A.  Correct.

12     Q.  I think that's what you were telling me

13  earlier.

14     A.  Uh-huh.

15     Q.  Did you evaluate blood flow on the

16  plaintiffs?

17     A.  It's not in my report.

18     Q.  So you did not do it?

19     A.  Correct.

20     Q.  All right.  Next, "Third, the frequent,

21  temporally unpredictable, uncontrollable odor and

22  its effects on quality of life contributed to the

23  headaches.  Anxiety, worry, stress, and mood

24  changes can trigger and/or exacerbate headaches."

25     A.  Correct.

1    Q.  Same question, it can do it, you haven't

2 assessed in these particular plaintiffs whether it

3 had been done?

4    A.  I would say that in certainly most of

5 these people that that is, in fact, a

6 precipitating factor in the headaches.

7    Q.  And that's based on their self-reporting

8 statements?

9    A.  Self-reporting statements, yes.

10    Q.  Okay.  You're right, Dr. Schiffman,

11 rephrasing questions makes us fly through this

12 report.

13    A.  Yes.

14    Q.  We're on 4.2, Nausea, Vomiting, and Loss

15 of Appetite.  Let's see, I think this is the study

16 we were just talking about.  Schiffman, et al.,

17 reported -- so this is four lines down or so.

18        The 2005 study reported that "subjects are

19 7.8 times more likely to report nausea when they

20 were exposed to 24 ppb H2S."

21    A.  Uh-huh, yes.

22    Q.  And that was swine odors with --

23    A.  Yes.

24    Q.  And it was with ammonia and particulates

25 included?

Page 279

 1       A.  Yes.  Very low-level particulates.

 2       Q.  All right.  So for Tyrone Thompson, Geneva

 3  Green, Scott Gremillion, Wendy Gremillion, and

 4  Andrew Section, you are basing the -- your

 5  opinions based on their self-reports?

 6       A.  Uh-huh, yes.

 7       Q.  And the studies that show it can happen?

 8       A.  Yes, correct.

 9       Q.  And the same goes for what you said

10  before, because you didn't state that you ruled

11  out alternative causes or do a specific analysis

12  of the concentration of VOCs in H2S, you didn't

13  state that in the report, so you didn't do it?

14       A.  Did not do it.  Nobody did it.

15       Q.  Fair enough.

16            4.3, Sleep Disruption, Dizziness, and

17  Fatigue.

18       A.  Yes.

19       Q.  Okay.  So of the studies that you cite for

20  sleep disturbances, which ones looked at sleep

21  disturbances with respect to hydrogen sulfide

22  concentrations?

23       A.  None of them really.  I mean, they're

24  all -- there's hydrogen sulfide in the landfill

25  one.  They're just complaints that people make of

1  sleep disturbances down from facilities that do,

2  in fact, have -- you know, that do have emissions

3  that contain hydrogen sulfide.  Heaney -- Heaney

4  there was hydrogen sulfide, but that wasn't really

5  high.

6        So, I mean, it's -- the issue is it's a

7  malodor, it's unpleasant, it's going into the

8  amygdala, it's -- it says aversive, and it can

9  cause sleep disturbances.

10     Q.  And the studies that are cited in this

11 paragraph, you said they involve facilities that

12 had hydrogen sulfide odor, but did they also have

13 other chemicals?

14     A.  They have other compounds, yeah.  The one

15 I did with Steve Wing when we -- when we were out

16 in the community a lot, people constantly -- this

17 was obviously hog farms.  But people said, I can't

18 sleep.  I was a consultant on one in -- I don't

19 know if it was Montana, I think, where there was a

20 lot of sleep disturbance, and it was also from

21 swine.

22     Q.  Are you aware of any peer-reviewed

23 literature or studies, peer-reviewed studies, that

24 have looked at sleep disturbances with respect to

25 hydrogen sulfide gas only?

Page 281

1      A.  You know, I have never, in all my 50 years

2  of doing this, never seen hydrogen sulfide by

3  itself in any -- in any chemical analysis.

4  There's always plenty of other stuff with it.

5  It's just not there by itself.

6           It's just salient because it has such a

7  low threshold.  And that's what's the problem in

8  this case, is that it just happens to have a low

9  threshold.  And that's -- so it becomes salient.

10      Q.  So the answer -- the answer to my question

11  about whether those peer-reviewed articles --

12      A.  I --

13      Q.  -- you're aware of that study, hydrogen

14  sulfide only and sleep disturbances?

15      A.  One of the things that I thought about

16  actually, where you keep bringing up peer

17  review -- it's really sad.  You know, all the data

18  that's been collected in this particular case, for

19  example, okay, it really should be peer -- it

20  should be going into a journal.

21           If everybody -- if everybody's data and

22  all the intelligence and thought -- I mean, I

23  think of Jose -- I think of everybody who's been

24  involved in this case.  All these data could go

25  into peer-reviewed journals; it never does because

1  they -- it's either a contract with the company

2  that, you know, they signed confidentiality

3  agreements.

4        I've signed so many confidentiality

5  agreements I can't see straight.  And it's to help

6  solve a problem.  I think we'd be a lot -- we'd be

7  a lot further.  Because there's a lot of data that

8  really should go into peer review.

9        And maybe -- maybe when this is all

10 settled, if somebody would use this as a sample --

11 you know, example case of how to avoid problems

12 with the community and best practices and how we

13 can move this forward, because we're going to have

14 a lot of waste in the future, and maybe this could

15 be a contribution to society.  I mean, maybe you

16 want to write the article, okay?

17    Q.  Okay.  Dr. Schiffman, can we just go back

18 to my question?

19    A.  Uh-huh.

20    Q.  While I appreciate everything you just

21 said, it didn't answer my question, which was:

22 Are you aware of any peer-reviewed article or

23 study that looked at hydrogen sulfide gas only and

24 its affect on sleep disturbances?

25    A.  Well, Shusterman has.  And there's a

Page 283

1  landfill study.  And he -- all those that just --

2  that are in there that are just mentioned, they

3  are mixtures that contain hydrogen sulfide.

4     Q.  And my question was:  Are you aware of any

5  study that doesn't have mixtures, it's just

6  looking at hydrogen sulfide?

7     A.  And I just said to you that hydrogen

8  sulfide never occurs on its own in the

9  environment, never.

10     Q.  So you're not aware of any study; is that

11  fair to say?

12     A.  I don't know of any.

13     Q.  The next paragraph --

14     A.  That was one of my little studies.

15     Q.  Yes.  "I have performed numerous studies

16  to determine if an odorant formula could be

17  developed."

18        What's the odorant formula you were

19  looking at?

20     A.  We had different combinations.  We had

21  things that were high trigeminal and things that

22  were low trigeminal.

23        It was a lovely man who was hearing

24  impaired, deaf, and his -- I don't know whether

25  it's his cousin or somebody else.  And I worked

Page 284

1  with them because they were trying -- they don't

2  like the buzzing alarms, you know, trying -- I

3  mean, that I have on my wrist no less, my watch

4  that buzzes me.

5        They were trying to find out ways that we

6  could use smell as an auditory alarm.  So I was

7  working with them and we developed canisters and

8  we did a little -- a couple little tests.

9        And then I -- somebody asked me at the

10  fragrance foundation whether -- I was telling them

11  about it and they said, Well, could I get

12  permission to write up a little report in the

13  fragrance -- whether it was a fragrance forum or

14  something like that.

15        So I got permission from them to do that,

16  whether they -- I think they never really were

17  able to sell it because other people in the room

18  didn't like the odor.

19    Q.  Was H2S involved in that odorant?

20    A.  No, absolutely not.

21    Q.  Okay.  And the question I was going to ask

22  about the studies that you cited in that first

23  paragraph, understanding H2S was a mixture, do you

24  recall if the concentrations of H2S that --

25  concentrations of H2S that were in the mixture

1  that, according to this paragraph, cause sleep

2  disturbances, what the level of that H2S was?

3      A.  Well, he needs -- they were low, okay?

4  With Shusterman and -- I don't know how you

5  pronounce that -- Vrijheid, I'd have to go back

6  and look at that.

7          I just -- there's quite a bit of data on

8  this, but I -- it's just mentioned, okay, you

9  know, that people complained that they couldn't

10  get any sleep or they -- you know, it bothered

11  them.

12      Q.  What was low for Heaney?  You said it was

13  low.

14      A.  Heaney, I think it's like 6, 7.  I mean, I

15  think it was -- it was -- it was in the single

16  digits, I remember that.  But there were other

17  problem -- there were other garbage-type smells

18  along with it as well, you know.

19          So it's not just hydrogen sulfide we're

20  dealing with here.  I think the thing to emphasize

21  is we used that as a tracer, you know, as a marker

22  of what was going downwind, but -- because we

23  didn't have all -- we didn't model any other

24  compounds.

25      Q.  Fair enough.

1        And because you didn't model, you don't

2    know what the concentration, if any, was at the

3    various receptor points, meaning the various trial

4    plaintiffs' homes?

5        A.  I don't know.

6        Q.  You also suggest in the last sentence of

7    the first paragraph of 4.3 that "One potential

8    cause of this disruption in sleep, along with

9    dizziness and fatigue, may be due to interruption

10   of breathing patterns caused by the aversive

11   odors."

12       A.  Yes.

13       Q.  Okay.  So for the plaintiffs that had

14   sleep issues -- and in the chart it reflects

15   Andrew Section, Geneva Green, Scott Gremillion,

16   Wendy Gremillion, and Tyrone Thompson -- which

17   plaintiffs would have had a breathing pattern

18   issue that caused their sleep disturbance?

19       A.  They don't -- this is one of the things

20   that people have done a lot of studies on, you

21   know, they -- they look at apnea, okay?  Some

22   people get -- if they smell something and it's an

23   irritant, they'll hold their breath, okay?

24       And this is the way in which they used to

25   do the animal studies, that's -- the LD50s.  They

```
 1  would say, at what point does an animal stop

 2  breathing, okay, or lower its breathing rate in

 3  response to an odor?  There's a lot of data on

 4  that.

 5        So do I know whether these people have

 6  some kind of apnea with response to odors?  Don't

 7  know; otherwise, it would be in the report.

 8        Q.  Again, this is just a possibility?

 9        A.  It's a possibility, absolutely.  And a

10  probability, I would say.

11        Q.  Probability.

12        And what's the basis for changing?

13        A.  I've done observational studies where we

14  were looking -- we were looking at -- there was

15  this company that wanted to pipe odors out into

16  the environment to see whether -- to see whether

17  people would come in and buy their products, okay?

18        And we found -- and then we asked people

19  whether it made them want to go in.  And we looked

20  at how many people wanted to -- it was a crazy

21  study.  But people said, It makes me want to hold

22  -- I don't like the smell, it makes me want to

23  hold my breath, I held my breath as I went by, I

24  couldn't stand it.

25        So that -- when somebody, you know, is
```

1  talking about cigarettes -- I hate to admit this,

2  but I used to smoke, okay?  And I loved smoking,

3  okay?  It's just bad for you.  My father died of

4  lung cancer.

5        I liked the pleasure of breathing in,

6  relaxing, and blowing.  It was pleasurable, okay?

7  And I put the last cigarette out as my father died

8  of lung cancer.  So a lot of people like breathing

9  in, they'll go into -- they'll -- aroma therapy,

10  okay?

11     Q.  I'm sorry, I don't mean to interrupt you,

12  only because we only have an hour left and --

13     A.  But you're asking do people have

14  differences in breathing patterns.

15     Q.  No, I said you changed from possibility to

16  probability, and what was the basis for changing

17  that --

18     A.  Yes.  And if you get an unpleasant odor or

19  something with an irritant, it will change

20  people's breathing patterns.

21     Q.  It can change people's breathing patterns?

22     A.  It almost always changes people's

23  breathing patterns.

24     Q.  Did you study if it changed the breathing

25  patterns in these --

Page 289

1      A.  I did not study whether it changed the

2   breathing patterns here.

3      Q.  Okay.  All right.  I think we're on to

4   Opinion 4, Rationals.  Second paragraph, "Reactive

5   chemistry may have played a role in activation of

6   the trigeminal nerve and subsequent headaches."

7           And you're saying it may have?

8      A.  Yes.

9      Q.  You haven't assessed for these particular

10  13 individuals if it actually did?

11     A.  We don't know if it actually did.  But

12  there was high ozone in the area, and certainly

13  ozone can alter compounds in the air.

14     Q.  Are you aware of whether there was high

15  ozone at the plaintiffs' homes?

16     A.  Don't know.  It's not in the report.

17     Q.  In the conclusion, Opinion 4, towards the

18  end of it you say, "There was likely variability

19  in the frequency and intensity of the trial

20  plaintiffs' symptoms based on their distance from

21  the landfill."

22          So is that another way you acknowledge

23  that distance from a landfill impacts the

24  potential for the landfill to -- landfill odors to

25  affect individual plaintiffs?

Page 290

1        A.   It probably does, yes, although it's --

2   now that I read it again, I start thinking about

3   the fires in Canada were -- I could smell them for

4   a long time in Bethesda, so that's pretty far

5   away.

6        Q.   Is it your opinion that the landfill can

7   go as far as Bethesda in this case?

8        A.   No.  It probably -- I'm sure it doesn't.

9   But, in general, I would say that that's true.

10        Q.   As you get away from a source, the

11   concentration of the emissions decreases?

12        A.   Hopefully, yes.

13        Q.   All right.  Opinion 5, Malodor Lasting

14   Impact.  I think we're going to do the same thing

15   we did before.  You say, "Learned odor aversions

16   likely resulted from pairing of adverse biological

17   effects with noxious emissions and odors."

18             Likely -- you said -- did you say "likely"

19   because you haven't studied these individual trial

20   plaintiffs to determine if --

21        A.   Correct.  Although it's clear, as you read

22   a deposition that is where the event occurred

23   several years ago, they still have an effect.  I

24   mean, it still has an emotional effect for them.

25             So there's clearly a learned effect in the

1  fact that they have a memory of it.  You know, the

2  memory of that is laid down in their brain, and

3  it's still an issue for them.

4      Q.  So your opinion regarding whether or not

5  they have -- or the likelihood of them having a

6  learned odor aversion is based on the deposition

7  testimony?

8      A.  Yes.  And it -- odor aversions can last

9  for a long time.  So if they had nausea --

10  especially nausea.  If they had nausea in response

11  to it, I would guess that the next -- if they --

12  if they smelled hydrogen sulfide again they would

13  have nausea at that time.  That would be highly

14  probable, or certainly possible.  But I have -- I

15  did not test them.

16      Q.  Okay.  You answered my question before I

17  could ask it.

18          Did you perform any brain scans to

19  determine if there's been any change in their

20  brain waves?

21      A.  Not in -- not in the report so, therefore,

22  I didn't do it.

23      Q.  Did you assess any pre-existing conditions

24  of the trial plaintiffs to determine whether that

25  impacted their --

Page 292

1      A.   I don't understand what you're asking.

2      Q.   Some of them had a lot of anxiety or PTSD

3  prior to the alleged odor exposure.  Did you take

4  that into account for determining whether they had

5  a learned odor aversion?

6      A.   No.  But I -- I do think that adding this

7  on to PTSD would probably not be a good idea,

8  okay?  Adding the exposure on to PTSD would make

9  it worse.  In terms of conditioning, I don't know

10 what it would have to do with conditioning.

11     Q.   It would make it worse, but that's a

12 guess, you would have to assess the individual?

13     A.   I'd have to --

14     Q.   Assess the individual?

15     A.   Yeah.  I mean, what we're talking about

16 here is that these are mechanisms that are -- have

17 been shown to be related to odor exposure and to

18 the possibility that these can occur.

19          In listening and reading the people's

20 depositions, I hear a lot of anxiety, I hear

21 complaints that are consistent with each of

22 these -- of these symptoms, and I take the

23 complaints seriously.

24     Q.   Since issuing your last report from 2021,

25 I'll just call it the general causation report,

1   but your prior report from the prior --

2       A.  Uh-huh.

3       Q.  -- are you aware of my peer-reviewed

4   studies or peer-reviewed articles in which

5   exposure to 5 parts per billion for 30 minutes of

6   hydrogen sulfide caused learned odor aversion?

7       A.  No.

8       Q.  All right.  Let's see.  I just want to

9   touch on the Heaney article.  You just raised it

10  but you also mentioned it back on page 14.  So if

11  we can go back to page 14 of your expert report.

12      A.  I wrote it a long time ago.  So...

13      Q.  Okay.  And Heaney is the landfill?

14  There's a landfill --

15      A.  Yeah.  He was a student of Steve Wing's,

16  and he went up to Hopkins.  I don't know where he

17  is now.

18      Q.  And the residents -- according to my

19  notes, you don't have to believe me, but the

20  residents lived about .75 miles from the landfill;

21  is that right?

22      A.  Yes, uh-huh.

23      Q.  Okay.  And to kind of paraphrase what

24  happened, and then towards the end, "For this

25  reason, the authors concluded that negative

Page 294

 1  effects on mood appeared to arise predominantly

 2  from fresh garbage added to the landfill rather

 3  than anaerobic decay of organic material over

 4  time."

 5      A.  Uh-huh.

 6      Q.  That was Heaney's conclusion from his

 7  study?

 8      A.  That's correct.

 9      Q.  Then you say, "Regardless of that

10  conclusion, the findings regarding the effects of

11  H2S odors on the subjects were consistent with the

12  effects on the trial plaintiffs and, in the study,

13  were at lower levels and for a shorter period of

14  time."

15          So do you typically disregard a conclusion

16  from a peer-reviewed study?

17      A.  No, it's just -- it was simply that H2S was

18  possibly -- positively associated with malodor;

19  it's just that in this particular case, the

20  garbage smell was worse than the hydrogen sulfide

21  smell.

22      Q.  So in the sentence right before "For this

23  reason," it says, "While H2S was positively

24  associated with malodor, qualitative odor

25  descriptions of the strongest odors were not the

1  characteristic rotten egg smell of H2S but rather

2  rotting (garbage, food, carcasses)."

3      A.  Correct.

4      Q.  And so you're saying, regardless of that,

5  H2S on these subjects in this case --

6      A.  It's just simply that, yes, there is a

7  correlation between the strongest -- you know, H2S

8  was there, okay?  It's just that it turns out that

9  the rotting garbage was more of -- more of a

10  problem than the H2S.

11         I was mixed about adding this paper into

12  it.  But it's just that there's so little -- there

13  has been enormous amounts of work on landfills and

14  odor, and it's not in the peer-reviewed journals,

15  okay?  So I was trying to include something that

16  was at least in a peer-reviewed journal.

17      Q.  Okay.  All right.  I think we can go to

18  your CV.

19      A.  Uh-huh.

20      Q.  And that's on page -- it's way at the end.

21      A.  I'm going to have to pull out my CV

22  because I -- well, I'll have to see what you put

23  up there.

24      Q.  Well, actually, it's not way at the end.

25  I think it's stuck in the middle.  Hold on.  I

 1  should have written it down but I forgot.

 2      A.  I don't have a copy of my CV here.

 3      Q.  Here it is, page 60, Appendix C.

 4          And I com -- to be honest, I compared it

 5  to the other -- to the CV that was included in

 6  your last report.  There's a few minor changes.  I

 7  think we went over kind of the background ones, so

 8  we don't have to do that.

 9          There was four -- there are four new

10  articles.  So if we go to the publications,

11  there's four new articles, and you added them --

12  they're in reverse chronology, so the oldest is

13  first and the most recent is last.

14      A.  Uh-huh.

15      Q.  Does that make sense?

16          Okay.  So for publications, Dr. Schiffman,

17  are you familiar with an expression of concern as

18  it relates to --

19      A.  Yes.  This is -- this is a problem that

20  I'm having with Heartland Foods.  What happened is

21  I published this paper, it was submitted to the

22  Journal of Toxicology and Environmental Health.

23  And there were three reviews, all of them

24  terrific.  It's a very respectable journal.  It

25  was published.

1           My university put out a press release on

2    it, and the -- and it got picked up a lot.  And

3    then they asked me to -- I see two M's in it; oh,

4    my goodness.  And then they called me up and asked

5    me if I would do a news release, and the -- a

6    news -- local news program.  And I said, Well, I'm

7    out of town; I do Zoom.  And after that I got hit

8    with a lawsuit by Heartland Foods.

9           Now, the person who has put in this

10   concern, okay, is claiming that two -- that some

11   of the -- claiming that there's a problem with

12   our -- our analysis of the cytochrome p450.

13          This woman makes a living at doing this,

14   okay?  Look into her.  She is -- that's what

15   she -- this is her line of work.  She complains

16   about people that -- two things look the same to

17   her.  The argument is absolutely irrational.

18          First of all, the data -- those data -- I

19   met with the woman who did it.  She's an associate

20   professor in a cancer center.  We -- we asked her

21   to do the analysis on the cytochrome p450 and the

22   P -- and the P-glycoprotein.

23          I met with her over a weekend, went over

24   the data with her, saw -- I know how to do the

25   data.  You cannot look in a journal and say that

1  two things look the same, okay?  What you need is

2  an optical device to be able to look at the raw

3  data and to look at the absorption.

4          So anyway, she's been paid.  She is part

5  of the Heartland lawsuit.  And let us just say

6  that there is nothing wrong with that paper.  In

7  fact, I've been back and forth with the people

8  from Europe, the EFSA, the European Food

9  Authority, who had all the data ahead of time.

10         And so because they can't get anything on

11 this -- this latest paper, they're going back to

12 an earlier paper and have hired this woman to say

13 that the data for our cytochrome p450 and P-gp in

14 that paper, Oh, these two things look the same.

15         There is absolutely nothing to this, it's

16 just causing a lot of trouble and will not go

17 unpunished, let's put it that way.  But it's just

18 a disgusting situation at the moment.

19    Q.  Okay.  Understood.

20        Let's put the Splenda --

21    A.  Splenda?

22    Q.  Yeah, the Heartland Food lawsuit aside.

23        So just with the expression of concern,

24 there was an expression of concern related to a

25 2008 --

```
 1      A.  Correct.

 2      Q.  -- article?

 3          Okay.  And that basically means that the

 4  journal has concerns about the reliability of the

 5  data that was used in the report?

 6      A.  Just wait, okay?  Just wait.

 7      Q.  Did the journal reach out to you and ask

 8  for --

 9      A.  Yes, yes.  I was going to -- I've written

10  something to submit to them.  My lawyer said,

11  Let's wait.  Okay?

12      Q.  Okay.  So you don't have any more

13  information yet?

14      A.  They've been told that -- I'm not at

15  liberty to say what's going on with this, okay?

16  Other than to tell you don't worry about it, okay?

17      Q.  Is this the only expression of concern

18  you've had issued against your publications?

19      A.  Correct.

20      Q.  And then in the lawsuit -- I'm not going

21  to ask for details, I understand you have separate

22  representation -- but, in general, it's a

23  defamation and misrepresentation lawsuit claim?

24      A.  I can justify everything that I've said.

25  There is nothing wrong with the data.
```

Page 300

1     Q.   It's the only time that you've been

2  accused of misrepresenting data in a study?

3     A.   That is correct.  It's not even data

4  that -- the data that they're -- the complaint is

5  that I'm saying something is in their product that

6  they say is not in their product.  We won't go any

7  further with that one, okay?

8          And that's -- and the other one is this

9  woman, whatever her name is, who testifies against

10  people in all kind -- she testified against people

11  in a whole bunch of cases.  This is her -- this is

12  the way -- she says, These two things look the

13  same to me.

14          Well, a journal has to take that -- I

15  mean, take that seriously.  And so I got a letter,

16  I gave it off to my attorney, and he said let him

17  deal with it.  And I went through all the data as

18  to why it was incorrect.

19          MS. BRILLAULT:

20              If we take a quick, short break, I'm

21              going to look through my notes, see if

22              there's anything else that I have to do

23              for cleanup.  I'm approaching the end.  So

24              I'm not taking a break just for fun, I

25              really want to speed this along.

Page 301

```
 1                    I appreciate it, thanks.
 2          THE VIDEOGRAPHER:
 3                    We are off the record at 6:48 p.m.
 4          (A break was taken from 6:48 p.m. to
 5          6:55 p.m. Eastern Time.)
 6          THE VIDEOGRAPHER:
 7                    We are back on the record at 6:55 p.m.
 8  BY MS. BRILLAULT:
 9      Q.  Dr. Schiffman, I just have one quick
10  question related to the journal article that's at
11  issue for Splenda, The toxicological and
12  pharmacokinetic properties --
13      A.  Uh-huh.
14      Q.  -- of sucralose-6-acetate, so Number 383
15  on your CV.
16      A.  Right, uh-huh.
17      Q.  Who funded that research?
18      A.  I did.
19      Q.  You did, okay.
20          Did you get grants from anybody?
21      A.  No.
22      Q.  So it was out-of-your-own-pocket money?
23      A.  Out of my own pocket.
24          MS. BRILLAULT:
25                    All right.  I am done for today.  We
```

1  are obviously going to keep the deposition

2  open, Allen, for purposes of the rebuttal

3  report.

4      Well, Dr. Schiffman, I appreciate your

5  time and cooperation today.  Thank you for

6  working through these questions with me.

7  I know it's a lot and it's a long day.  So

8  I appreciate it.

9  THE WITNESS:

10     All right.  I think we're done.

11  MS. BRILLAULT:

12     Correct.

13  THE WITNESS:

14     Okay.  Bye.

15  THE VIDEOGRAPHER:

16     Mr. Foster, did you want to purchase a

17  copy of the video?

18  MR. FOSTER:

19     I don't know how to answer those

20  questions.  Somebody will -- I don't think

21  so, but somebody will answer that

22  definitively.

23  THE VIDEOGRAPHER:

24     Thank you.

25     And Ms. Brillault, did you want us to

                                          Page 303
1          sync the video with the transcript?

2          MS. BRILLAULT:

3              Yes, please.

4          THE VIDEOGRAPHER:

5              Thank you.

6              We are off the record at 6:56 p.m.

7     DEPOSITION CONCLUDED AT 6:56 P.M. EASTERN TIME

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 304

1                    REPORTER'S PAGE

2      I, RITA DEROUEN, Certified Court Reporter in and

3  for the State of Louisiana, (CCR #2014018),

4  Registered Professional Reporter (RPR #006908),

5  the officer, as defined in Rule 28 of the Federal

6  Rules of Civil Procedure and/or Article 1434(B) of

7  the Louisiana Code of Civil Procedure, do hereby

8  state on the record:

9      That due to the interaction in the spontaneous

10  discourse of the proceeding, double dashes (--)

11  have been used to indicate pauses, changes in

12  thought, and/or talkovers; that same is the proper

13  method for a transcription of proceedings, and

14  that the double dashes (--) do not indicate that

15  words or phrases have been left out of this

16  transcript;

17      That any spelling of words and/or names which

18  could not be verified through reference material

19  have been denoted with the parenthetical

20  "(phonetic)";

21      That the parenthetical "(sic)" is used to denote

22  when a witness stated a word or phrase that

23  appears odd or erroneous to show that it was

24  quoted exactly as it stands.

25                        RITA DEROUEN, CCR, RPR

1                    CERTIFICATE

2

3      This certification is valid only for a

4  transcript accompanied by my original signature

5  and original required seal on this page.

6      I, RITA A. DEROUEN, Certified Court Reporter in

7  and for the State of Louisiana, (CCR #2014018),

8  Registered Professional Reporter (RPR #006908), as

9  the officer before whom this testimony was taken,

10  do hereby certify that SUSAN SCHIFFMAN, Ph.D.,

11  having been duly sworn by me upon authority of

12  R.S. 37:2554, did testify on April 26, 2024, as

13  hereinbefore set forth in the foregoing 304 pages;

14  that this testimony was reported by me in

15  stenographic shorthand, was prepared and

16  transcribed by me or under my personal direction

17  and supervision, and is a true and correct

18  transcript to the best of my ability and

19  understanding; that the transcript has been

20  prepared in compliance with the transcript format

21  guidelines required by statute and rules of the

22  Board; that I am informed about the complete

23  arrangement, financial or otherwise, with the

24  person or entity making arrangements for

25  deposition services; that I have acted in

Page 306

1 compliance with the prohibition on contractual

2 relationships, as defined by Louisiana Code of

3 Civil Procedure Article 1434 and the Rules and

4 Advisory Opinions of the Board; that I have no

5 actual knowledge of any prohibited employment or

6 contractual relationship, direct or indirect,

7 between a court reporting firm and any party

8 litigant in this matter, nor is there any such

9 relationship between myself and a party litigant

10 in this matter; that I am not related to counsel

11 or to any of the parties hereto, I am in no manner

12 associated with counsel for any of the interested

13 parties to this litigation, and I am in no way

14 concerned with the outcome thereof.

15     Signed and stamped this 30th day of April, 2024,

16 Baton Rouge, Louisiana.

17

18

19

20

21

22 _____

23     Rita DeRouen, RPR, CCR

24

25