## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| **Plaintiffs** | **NO.  19-11133 c/w 19-14512** |
| *versus* | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | **JUDGE SUSIE MORGAN** |
| **Defendants** | **MAG. JUDGE MICHAEL B. NORTH** |
| ***APPLIES TO ALL CASES*** | |

### DEFENDANTS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY ON ISSUES LITIGATED AND DECIDED IN THE GENERAL CAUSATION PHASE

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

    I. The General Causation Order's narrow holding does not limit Defendants'
       ability to contest specific causation. ............................................................... 2

        A. The parties understood the limited scope of the General Causation
           holding. ...................................................................................................... 2

        B. Specific causation involves distinct legal issues and evidence from
           those presented during the general causation phase. ........................... 4

        C. Defendants are entitled to present evidence of the *likelihood* that
           exposure to 5 ppb of $H_2S$ over 30 minutes would cause the
           Trial Plaintiffs' symptoms. .................................................................... 6

        D. The province of the jury to weigh the credibility of the evidence must
           not be intruded. ....................................................................................... 13

    II. Defendants are entitled to challenge Plaintiffs' expert opinions concerning
        specific causation. ......................................................................................... 14

        A. Dr. Zannetti opinion regarding $H_2S$ accumulation. .......................... 14

        B. Dr. Dalton's opinion regarding sleep disturbance. ........................... 15

        C. Dr. Dalton's opinion regarding intermittent odors. .......................... 16

        D. Dr. Dalton's opinion regarding regarding trigeminally stimulated
           symptoms. ............................................................................................... 17

        E. Dr. Dalton opinion regarding "general population." ........................ 18

        F. Expert opinions rebutting Plaintiffs' experts Dr. Pietari and Mr. Sananes........ 18

CONCLUSION .............................................................................................................. 20

# INTRODUCTION

Plaintiffs' motion to exclude expert testimony concerning issues "litigated and decided" during General Causation brings to the forefront the critical issue of the scope of the Court's holding in the General Causation Order.[1] Defendants[2] are not seeking to relitigate the Court's General Causation *holdings*—in which the Court narrowly held that Plaintiffs proved by a preponderance of the evidence two distinct issues:

> (i)     odors and gases were emitted by the Jefferson Parish Landfill ("Landfill" or "JPLF") during the relevant time period, including some emissions of hydrogen sulfide ($H_2S$) at an average concentration of 5 parts per billion ("ppb") over 30 minutes (the "Emission Holding"); and

> (ii)     exposure to $H_2S$ at an average concentration of 5 ppb over 30 minutes is capable of causing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment or use of property in the general population (the "Capability Holding").[3]

While the 46-page General Causation Order addresses numerous other observations giving background to the Court's holding—any statements in the General Causation Order beyond the Emission Holding and the Capability Holding are not holdings, fall outside the scope of general causation as defined by the Fifth Circuit and the Court's Case Management Order, and have no place in the upcoming specific causation trial as it would intrude on the province of the jury to weigh the credibility of the evidence.

In the current specific causation phase of the case, and at the merits trial for the first thirteen *Addison* Plaintiffs (the "Trial Plaintiffs") in August, Plaintiffs must present new evidence and arguments to prove the distinct legal issue of whether odors or emissions from the JPLF *did* in fact

---

[1] R. Doc. 323 ("General Causation Order").
[2] "Defendants" refers to Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc., Jefferson Parish, and APTIM Corp.
[3] R. Doc. 46; R. Doc. 202 at 2, ¶ 1.

cause the Trial Plaintiffs' injuries. Attempting to minimize their burden to prove specific causation, Plaintiffs seek to use background language from the General Causation Order (e.g., that exposure to 5 ppb of $H_2S$ is "always a nuisance") as holdings of the Court that may not be disturbed—but to do so would leave little to be resolved at the upcoming trial and would deprive Defendants of the ability to defend themselves on the issue of specific causation. This case did not end with the general causation determination, and Plaintiffs are not entitled to use the General Causation Order in a manner that would result in a *de minimis* burden of proving specific causation.

## ARGUMENT

### I. The General Causation Order's narrow holding does not limit Defendants' ability to contest specific causation.

Defendants do not seek to relitigate the Court's General Causation *holdings,* i.e. the Emission Holding and the Capability Holding. Rather, at the upcoming trial, Defendants intend to challenge the sufficiency of Plaintiffs' evidence on specific causation—an issue that involves a different legal burden and additional evidence that was not part of the first phase of the case. Defendants should not be precluded from presenting evidence to rebut Plaintiffs' case on specific causation and to do so would be highly prejudicial.

#### A. The parties understood the limited scope of the General Causation holding.

In September 2019, the parties agreed to consolidated discovery limited to the issue of general causation.[4] This was formalized in the First Case Management Order in November 2019 where the parties agreed to bifurcate the issue of "general causation," the purpose of which was the "determination of whether odors and gases were being emitted by the Jefferson Parish Landfill during the relevant time period and whether any such odors and gases were *capable* of producing

---

[4] R. Doc. 97 at 3.

the injuries claimed by any one more of the Plaintiffs in this case."[5] The First Case Management Order limited discovery on general causation to a defined set of categories.[6] The Court later distinguished the general causation issues of whether "odors and gases [from the JPLF] were capable of producing the injuries claimed" from the specific causation inquiry of "*did* the emissions from the Jefferson Parish Landfill cause the injuries individual Plaintiffs . . . allegedly suffered."[7] The Court expressly limited discovery that went to specific causation issues.[8]

After the bench trial and *Daubert* hearing in early 2022, the Court issued its General Causation Order on November 29, 2022,[9] which consisted of two holdings:

(i)     The Emission Holding: odors and gases were emitted by JPLF during the relevant time period, including some emissions of $H_2S$ at an average concentration of 5 ppb over 30 minutes; and

(ii)    The Capability Holding: exposure to $H_2S$ at an average concentration of 5 ppb over 30 minutes is capable of causing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment or use of property in the general population.[10]

These two findings must be treated as the only *holdings* of the General Causation Order, as they are the only two issues allowed to be resolved at the general causation phase under the CMO and the law of the Fifth Circuit. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (general causation inquiry is limited to the question of whether the alleged exposure was *capable* of causing a plaintiffs' alleged injuries).[11] This Court has previously held that it was

---

[5] R. Doc. 80 at ¶ 1 (emphasis added).

[6] *Id.* at 3-9. The case management order was subsequently amended. The Seventh Case Management Order was operative at the time of trial. R. Doc. 202 ("CMO").

[7] R. Doc. 97 at 9.

[8] *Id.* at 10-11.

[9] Defendants sought interlocutory review of the General Causation Order but the motion was denied. *See* R. Doc. 324; R. Doc. 339. Defendants' later writ of mandamus to the Fifth Circuit did not address the issues set forth in the General Causation Order, and instead sought a determination on class certification prior to the first merits trial in the *Addison* action.

[10] R. Doc. 323 at 46.

[11] Defendants reserve their right to appeal the Court's ruling on general causation for the reasons set forth in their motion for leave for interlocutory appeal. *See* R. Doc. 324.

inappropriate to address issues in the General Causation Order that were not recognized by the Fifth Circuit as proper general causation issues.[12]

Pursuant to Federal Rule of Civil Procedure 52(a), the General Causation Order addressed numerous other observations giving background to the Court's holdings—but those observations are not holdings and they do not preclude Defendants from challenging whether sufficient evidence supports those ancillary observations at the specific causation trial. *See* Fed. R. Civ. Proc. 52(a)(5) ("A party may later question the sufficiency of the evidence supporting the findings").[13]

### B.  Specific causation involves distinct legal issues and evidence from those presented during the general causation phase.

The Court, in holding that 5 ppb of $H_2S$ over 30 minutes is capable of causing some of the complained-of injuries,[14] did not find that emissions from the JPLF in fact **caused** any particular Plaintiffs' injury, or even that such emissions were **likely to cause** any particular Plaintiffs' injury.[15] Rather, in adherence with Fifth Circuit law, the Court reserved for the specific causation phase the question of whether any particular Plaintiff's injuries were more likely than not caused by emissions from the JPLF. *See Watters v. Dep't of Soc. Servs.*, 2008-0977 (La. App. 4 Cir. 6/17/09), 15 So. 3d 1128, 1143 n.18 (it must be shown that "the plaintiff's harm did in fact result from such exposure").

General and specific causation are distinct prongs of the causation analysis and each

---

[12] R. Doc. 323 at 45-46 ("the Court has not found [] any authority which requires the Court to draw geographic boundaries at the general causation stage.")

[13] Plaintiffs misapply the law of the case doctrine. The law of the case doctrine only applies to issues of fact or law actually decided *on appeal*. *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001) (citation omitted); *Falcon v. Gen. Tel. Co.*, 815 F.2d 317, 321 (5th Cir. 1987) ("It is only after a lower court's decision has been reviewed and judgment made thereon that the law of the case doctrine is activated."). Interlocutory rulings do not constitute law of the case in subsequent stages of the district court proceeding. *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997) ("district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack res judicata effect"); *see also Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 227 (5th Cir. 2020) (Rule 54(b) authorizes court to revise interlocutory orders at any time).

[14] *See* R. Doc. 322 at 31.

[15] *See generally* R. Doc. 322.

involve a different legal and factual showing. General causation in the toxic tort context deals with whether a given substance "can cause diseases or disorders in people in general"—in other words, those issues addressed in the Emission Holding and the Exposure Holding. *See Pick v. Am. Med. Sys., Inc.*, 958 F. Supp. 1151, 1164 (E.D. La. 1997) (Berrigan, J.). On the other hand, specific causation concerns whether the implicated substance "was in fact the cause of the ailments or symptoms in the particular patient." *Id*.

The narrow scope of general causation was recognized by the Court's CMO. The CMO and the Court's rulings also called for fact and expert discovery during this phase to be limited to the discrete issue of general causation.[16] At the general causation trial and *Daubert* hearing, Plaintiffs' presentation of evidence was similarly limited to general causation issues—i.e., were JPLF emissions *capable* of causing injury—and Plaintiffs presented no evidence of impacts to any specific Plaintiff. In fact, Plaintiffs vigorously opposed the notion that the Court should draw geographic boundaries, arguing that such a finding would go beyond what the Court was authorized to determine under the CMO and Fifth Circuit law on the scope of general causation.[17]

As for Defendants' evidence at the general causation trial, Defendants did not have the burden on causation and therefore their rebuttal evidence was tailored to refuting whether JPLF emissions were *capable* of causing injury. The Defendants were never put on notice that issues other than general causation (as defined by the Fifth Circuit and the CMO) would be resolved at the general causation trial, and thus were not afforded an opportunity to prepare a defense on these non-general causation issues. *See Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 420 (5th Cir. 1981) ("each party is entitled to know what is being tried, or at least to the means to find out.

---

[16] R. Doc. 202 at 3-6; R. Doc. 80 at 3-11; R. Doc. 97 at 9-11 (limiting discovery into evidence of alternative causes of Plaintiffs' injuries).
[17] R. Doc. 328 at 9.

Notice remains a first-reader element of procedural due process, and trial by ambush is no more favored here than elsewhere."). In short, Defendants must be allowed to put up a defense as to specific causation issues, including on issues discussed in the General Causation Order, which under Fifth Circuit law are properly deemed to be issues of specific causation.

### C. Defendants are entitled to present evidence of the *likelihood* that exposure to 5 ppb of H₂S over 30 minutes would cause the Trial Plaintiffs' symptoms.

In rebutting Plaintiffs' specific causation case, among other things, Defendants must be allowed to present evidence on the *likelihood* that exposure to 5 ppb of $H_2S$ over 30 minutes would cause the Trial Plaintiffs' symptoms. This is a specific causation question and does not infringe on either the Emission Holding or the Capability Holding.

Plaintiffs wish to tell the jury that exposure to 5 ppb of $H_2S$ over 30 minutes is "always a nuisance," and they wish to bar Defendants from rebutting this false notion. To handcuff Defendants in such a manner would create a *de minimis* burden of proof for Plaintiffs, leave little to be resolved at the upcoming trial, and deprive Defendants of the ability to defend themselves on the issue of specific causation. Defendants must be allowed to inform the jury that people detect odors at different levels, and that 5 ppb represents the level at which only a certain sensitive segment of the population is annoyed by $H_2S$. Guidelines issued by the World Health Organization Regional Office for Europe ("WHO"), which Dr. Schiffman cited and the Court relied on for its general causation decision,[18] reinforce this conclusion. For example, Defendants' experts Drs. Kind and Dalton have opined that, as they interpret the WHO guidelines and accompanying definition for odor annoyance, an average of 5 ppb of $H_2S$ over 30 minutes represents the level at which, according to those guidelines, less than 5% of the population would be annoyed less than

---

[18] R. Doc. 323 at 31.

2% of the time.[19] This is not inconsistent with the Court's Capability Holding concerning the "general population." The "general population" does not mean "all people" and does not resolve the inquiry of whether a specific individual experiences a nuisance.

Defendants must be allowed to present this evidence to the jury, as Fifth Circuit law demands that a specific causation analysis consider the relative likelihoods of potential causes of the plaintiff's injuries. *McNabney v. Lab. Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005) ("[causation expert's] failure to consider and exclude other potential causes of [plaintiff's] injury before offering an opinion renders his testimony unreliable."); *Becnel v. Lamorak Ins. Co.*, No. 19-cv-14536, 2022 WL 3704028, at *4 (E.D. La. Aug. 26, 2022) (Lemelle, J.). In *Becnel*, Judge Lemelle recognized that a specific causation analysis may properly involve a differential diagnosis; in other words, "determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or *determining which of those that cannot be excluded is the most likely*." *Id.* (citing *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012)) (emphasis added). Similarly, in *Wagoner v. Exxon Mobil Corp.*, Judge Fallon noted that a specific causation analysis may involve a physician who "begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. *The physician then 'rules out' the least plausible causes of injury until the most likely cause remains*." 813 F. Supp. 2d 771, 804 (E.D. La. 2011) (citing *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001); *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1195 (11th Cir. 2010); *Best v. Lowe's Home Ctr., Inc.*, 563 F.3d 171, 178 (6th Cir. 2009) (emphasis added).

In light of the foregoing, Defendants intend to present evidence—proper under Fifth Circuit law—of whether the Trial Plaintiffs' symptoms were more likely caused by exposure to 5 ppb of

---

[19] Expert Report of Dr. John Kind at 13 (R. Doc. 550-2); Expert Report of Dr. Pamela Dalton at 4 (R. Doc. 542-3).

$H_2S$ as opposed to some other cause or set of causes (*e.g.*, medical conditions, side effects of drugs, or other confounding factors). In order to conduct a differential diagnosis and present it to the jury, Defendants must necessarily present the jury with evidence regarding the ***likelihood*** that exposure to 5 ppb of $H_2S$ over 30 minutes would cause the Trial Plaintiffs' symptoms, in comparison to the ***likelihood*** of such symptoms being caused by some other cause or set of causes.[20]

### D. Plaintiffs' own experts concede that specific causation involves weighing the relative risks of the exposure and alternative causes.

Notably, Plaintiffs' own experts concede that such a differential diagnosis is appropriate in a specific causation analysis, even after general causation has been established. For example, Plaintiffs' forensic psychiatrist, Michael Spodak, M.D.—who has testified before a jury "200 or more" times—was involved in a series of lead paint exposure cases which are instructive here. In those cases, Dr. Spodak testified on behalf of the defendants, a set of landlords who were being sued by tenants for allegations of lead poisoning. Dr. Spodak acknowledged in those cases that the plaintiffs' lead exposures were indeed capable of causing their alleged injuries (cognitive and behavior issues), but he also testified that, "despite the effects of lead, there were numerous psychosocial problems that were going on in the individual's life" that "were more likely causes" of the plaintiff's injuries. Today, he stands by that testimony as a valid and reliable specific causation analysis. Indeed, in this case, Dr. Spodak acknowledged that the Court has established 5 ppb of $H_2S$ over 30 minutes as "the threshold level, but individual causation has to be case-by-case . . . That means you have to look at each individual and their specific exposure levels and -- and duration and things like that . . . ."[21]

---

[20] *See, e.g.,* Expert Report of Dr. Lutz at 62 (R. Doc. 554-4) (even if exposure to 5 ppb of $H_2S$ is ***capable*** of causing Ms. Winningkoff's alleged injuries, "Allergies lead the diagnostic differential diagnosis[.]").

[21] *See* Michael Spodak, M.D. Deposition Transcript ("Spodak Tr.") 282:14-283:4, attached as Exhibit 1 to Declaration of Michael C. Mims (dated June 13, 2024).

Similarly, Plaintiffs' expert neurologist, toxicologist, and epidemiologist, Robert DeLorenzo, M.D., agreed that, "[W]hen there is a toxin that only causes symptoms in a small minority of patients, before you can testify that a specific patient did suffer those symptoms caused by exposure to the toxin, you have to determine whether that patient falls within the small minority of patients that are affected."[22] As for 5 ppb of H₂S over 30 minutes, Dr. DeLorenzo—Plaintiffs' chief specific causation expert—testified that he does not have an understanding of "what percentage of the population experiences a reaction when exposed to 5 parts per billion of H₂S over 30 minutes."[23] In fact, Plaintiffs have offered no evidence on whether the Trial Plaintiffs belong to the segment of the population who experiences somatic reactions when exposed to 5 ppb of H₂S over 30 minutes.

Because the question of the **_likelihood_** of H₂S causing the Trial Plaintiffs' injuries was not answered during the general causation trial—considering it was not a proper inquiry for a general causation trial—Defendants must be allowed to present evidence on this issue at the specific causation trial. For example, the general causation testimony of Plaintiffs' expert, Dr. Susan Schiffman, was based, at least in part, on the reference level issued by the WHO, which the Court cited as support in its ruling on general causation[24] and which provided that "in order to avoid substantial complaints about odour annoyance among the exposed population, hydrogen sulfide concentrations should not be allowed to exceed [5 ppb] with a 30-minute averaging period."[25] Defendants' experts, Drs. Kind and Dalton, have opined that, as they interpret the WHO guidelines, an average of 5 ppb of H₂S over 30 minutes represents the level at which, according to those guidelines, less than 5% of the population would be annoyed less than 2% of the time. This

---

[22] *See* Robert DeLorenzo, M.D. Deposition Transcript ("DeLorenzo Tr.") 146:23-147:6, Exhibit 1 to the Mims Decl.
[23] *See* DeLorenzo Tr. 130:10-14.
[24] *See* R. Doc. 323 at 31.
[25] *Id.*

context is important when answering the specific causation question of whether the Trial Plaintiffs' exposure to $H_2S$ concentrations at that level was more likely than not the cause of their alleged injuries.[26]

While Plaintiffs may disagree with this interpretation, the appropriate remedy is exploration on cross-examination. Nevertheless, Plaintiffs seek to shield the jury from any discussion on the likelihood of exposure to 5 ppb of $H_2S$ causing the Trial Plaintiffs' specific injuries at issue. To that end, Plaintiffs would like to present the jury with a cherry-picked passage from the General Causation Order, in which the Court referenced Dr. Schiffman's testimony that 5 ppb is "always a nuisance"—which differs from the WHO guidelines (and Dr. Schiffman's testimony at the general causation trial[27])—as binding and applicable to ***all Plaintiffs*** for purposes of determining specific causation. Plaintiffs are apparently unconcerned that such a jury instruction would misrepresent what Dr. Schiffman actually testified to at the general causation trial, which was only that 5 ppb of $H_2S$ when *combined with* other chemicals (for which Plaintiffs lack any evidence of exposure for the Trial Plaintiffs) is always a nuisance "for a lot more than 5% of the population."[28] Plaintiffs also ignore that Dr. Schiffman agrees that the WHO guidelines represent the level at which "complaints will *start*"[29]—in other words, the level at which the concentration

---

[26] Plaintiffs selectively cite to Dr. Zannetti's testimony to support their arguments regarding a threshold for nuisance, omitting his qualification that Plaintiffs' proposed reference level is extremely low in the scientific and regulatory literature, that as an atmospheric scientist he cannot give an opinion on nuisance, and that odor is highly subjective. *See* Deposition Transcript of Dr. Paolo Zannetti ("Zannetti Tr."), 49:6-10; 52:9-12; 62:7-20; 67:15-20; 70:3-11; 74:12-25; 75:13-20; 144:11-22, Exhibit 3 to Mims Decl. Dr. Zannetti stated multiple times that he was not attempting to challenge the opinions of the court, rather he was presenting the results of his literature. *See id.*, at 48:10-49:10; 51:25-52:12; 62:1-5; 70:3-11; 71:16-25.

[27] R. Doc. 272 at 671:7-19.

[28] *Id.*

[29] *See* R. Doc. 299, General Causation Trial Transcript p. 723 ("I have read a lot of WHO stuff. It depends on what office it's coming out of, who is writing it. But the one thing that's consistent over the years is that they have always said the **complaints will start** -- definitely start when you have an emission with a 5 ppb hydrogen sulfide level. I have attended many meetings in Europe. I'm on Zoom almost every single Monday morning with people because I'm head of committees for IEEE and setting standards. And I know of nobody, at least on my committees, who would [disagree that] -- **when you start at 5 ppb, you're going to start having trouble. So that's when you start getting your problems.**") (emphasis added).

of $H_2S$ rises above the annoyance threshold of the most sensitive persons, not all persons or the majority of persons.

Plaintiffs' desire to instruct the jury that exposure to 5 ppb of $H_2S$ is "always a nuisance" is clearly aimed at misleading the jury—which was further highlighted during Dr. Schiffman's recent deposition. There, Dr. Schiffman acknowledged that, although she and other consultants *want* 5 ppb to be adopted as the standard, no jurisdictions actually *use* the 5 ppb standard, because jurisdictions around the world recognize that "industries which pollute are sometimes necessary."[30] This confession lies in stark contrast to what Dr. Schiffman represented to this Court at the general causation trial, in which she testified that 5 ppb "is the level which is agreed to. People from China, Japan, all over the world."[31]

Regardless of what Dr. Schiffman did or did not say at the general causation trial, it would be error to instruct the jury, as Plaintiffs propose, that exposure to 5 ppb of $H_2S$ is "always a nuisance." Indeed, the Fifth Circuit forbids this sort of "one size fits all" approach to specific causation. *See Bell v. Foster Wheeler Energy Corp.*, No. 15-cv-6394, 2017 WL 876983, at *2 (E.D. La. Mar. 6, 2017) (in which Judge Africk characterized the following as the "fundamental flaw" courts have recognized in the "every exposure" and "every exposure above background" theories of causation: "specific causation opinions untethered to the decedent himself, based only on generalized studies of the effects that certain exposure levels can have on the population."); *see also Hill v. GEO Grp., Inc.*, No. 18-cv-01363, 2021 WL 6053783, at *7 (W.D. La. Dec. 21, 2021) (finding plaintiff's expert's specific causation opinions unreliable when they consisted of little more than opining that, because plaintiffs were exposed to a known-to-be-toxic level of mold and alleged that symptoms followed, the mold must have caused their symptoms); *Smith v.*

---

[30] Deposition Transcript of Susan Schiffman ("Schiffman Tr.") at 89, Exhibit 4 to the Mims Decl.
[31] R. Doc. 299, General Causation Trial Transcript p. 723.

*Glaxosmithkline Corp.*, No. 05-cv-2728, 2008 WL 4938426, at *2 (E.D. La. Nov. 17, 2008) (Zainey, J.) (summary judgment dismissal granted where plaintiff had not presented specific causation evidence that defendant's product was more likely than not the cause of plaintiff's harm).

Louisiana nuisance law likewise requires that Defendants be allowed to give the jury context on 5 ppb of $H_2S$ and what level of intrusion that concentration likely caused the Trial Plaintiffs. The Louisiana Civil Code requires that Plaintiffs prove that Defendants caused "real damage," not just mere "inconvenience."[32] For example, Article 669 only prohibits "certain inconveniences if excessive under local ordinances or customs." *Badke v. USA Speedway, LLC*, 49,060 (La. App. 2 Cir. 5/14/14), 139 So. 3d 1117, 1126; La. Civ. Code arts. 668, 669. To distinguish between "real damage or mere inconvenience[,] . . . consideration of factors such as the character of the neighborhood, the degree of intrusion and the effect of the activity on the health and safety of the neighbors" is required. *Badke,* 139 So. 3d at 1126; *see also Rodrigue v. Copeland*, 475 So. 2d 1071, 1077 (La. 1985) ("In determining whether an activity or work occasions real damage or mere inconvenience, a court is required to determine the reasonableness of the conduct in light of the circumstances. This analysis requires consideration of factors such as the character of the neighborhood, the degree of intrusion and the effect of the activity on the health and safety of the neighbors.").

Thus, while the Court's Capability Holding speaks to the level at which exposure to $H_2S$ is capable of causing a reaction in individuals in the general population, that holding does not translate into a determination that exposure to that level is "always a nuisance" (despite Dr. Schiffman's testimony at the general causation trial) because it does not and cannot answer the question of whether such exposure was reasonable in light of the circumstances, by consideration

---

[32] *See* Louisiana Civil Code arts. 667, 668, and 669.

the character of the neighborhood and degree of intrusion, a requirement for a finding of liability under Articles 667-669.

Plaintiffs wish to shield the jury from any discussion of whether landfill emissions were more likely or less likely to cause the Trial Plaintiffs' injuries versus alternative causes such as unrelated health conditions or the side effects of medication. But Fifth Circuit law demands that this relative likelihood analysis be included in a specific causation determination. Thus, Defendants must be allowed to inform the jury on the context of the 5 ppb of $H_2S$ figure, including a discussion of the relative risk that such a dosage would cause the Trial Plaintiffs' injuries. To hold otherwise would infringe on Defendants' ability to contest specific causation.

### E.  The province of the jury to weigh the credibility of the evidence must not be intruded.

The determination of specific causation is a core factual issue reserved to the jury under the Seventh Amendment. Plaintiffs wish to present nearly the entire General Causation Order to the jury as undisputed fact which may not be second-guessed[33]—but to do so would intrude on the province of the jury to weigh the credibility of the evidence. The jury during the specific causation trial is entitled to reach its own determination with respect to the credibility of the party's fact and expert evidence and witnesses and make an independent determination as to whether Plaintiffs have met their burden of proof. Other than the Emission Holding and the Capability Holding, which are no longer in dispute, the jury should not be limited by the Court's observation as to issues which fall outside of the scope of general causation. To bind the jury to these statements— made by the Court during a different phase of the case that decided a different legal issue based on

---

[33] Defendants object to Plaintiffs' "Requested Charge Concerning Facts Found in General Causation Phase." *See* R. Doc. 554-2. Such an attempt to take focus off the merits—or lack thereof—of Plaintiffs' Motion by prematurely submitting a proposed jury charge should be rejected. Plaintiffs' seven page "charge" is nothing more than a self-serving recitation of the procedural history and facts of this case, which is nothing remotely resembling a proposed jury charge.

a different set of evidence—would usurp the jury's role. *See United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.,* 80 F.3d 1074, 1077 (5th Cir. 1996) ("a district court must defer to 'the jury's role as the proper arbiter of disputes between conflicting opinions'") (quoting *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir. 1987)).

## II.  Defendants are entitled to challenge Plaintiffs' expert opinions concerning specific causation.

The remaining defense expert opinions Plaintiffs identify similarly do not contradict the General Causation holdings. Plaintiffs try to limit the scope of Defendants' expert opinions arguing they pertain to issues that "could" have been raised during General Causation—but that is not the case, and the Court was silent with respect to the majority of Plaintiffs' expert arguments in reaching the general causation determination.[34] The defense experts' opinions must be weighed in the jury's determination of whether Plaintiffs have met their burden on specific causation. *See Scordill v. Louisville Ladder Grp., LLC*, No. 02-cv-2565, 2003 WL 22427981, at *6 (E.D. La. Oct. 24, 2003) (Vance, J.) (disagreements over the bases and sources of expert opinions affect the weight that the jury gives to the testimony rather than its admissibility).

### A.  Dr. Zannetti's opinion regarding $H_2S$ accumulation.

The Court's recitation of some of the bases for Dr. Schiffman's expert opinions do not constitute "factual findings" of the Court and cannot preclude Defendants' experts from addressing those issue during specific causation. It is for the jury to weigh whether the facts and data underlying Dr. Schiffman's specific causation opinions are sufficient to establish causation for each of the Trial Plaintiffs. Plaintiffs argue that Dr. Zannetti's Figure 53 reinforces the Court's "finding" on $H_2S$ accumulation but in doing so counsel misinterprets this diagram and its purpose.

---

[34] The Court relied on Dr. Schiffman but did not cite to or rely on the opinions from any of Plaintiffs' other experts. Nor is the adoption of the opinions of Plaintiffs' other experts implicit in the Court's determination, as their opinions were not necessary to the Court's determination.

Pls. Br. at 7.[35] Figure 53 is used purely as a generic *example* of indoor concentrations of an unknown chemical and location that does not account for numerous scenario-specific factors. *See* Zannetti Tr. 55:22-56:3; *see also* Deposition Transcript of James Lape ("Lape Tr.") 13:22-15:11, 17:7-20, appended as Exhibit 5 the Mims Decl. In any event, Plaintiffs have had no expert opine on the Figure and a correct interpretation of Figure 53 supports Dr. Zannetti's opinion that "indoor concentrations [blue line] are *generally* lower than outdoor values [red line]." Zannetti Report at 91-92 (R. Doc. 559-2).[36] Dr. Schiffman is an odor psychologist with no qualifications in air dispersion. In contrast, Dr. Zannetti is an air dispersion modeler with over 50 years of experience. It is for the jury to hear the parties' evidence and assign the appropriate weight.

**B.  Dr. Dalton's opinion regarding sleep disturbance.**

Dr. Dalton has also not "directly attacked" the Court's General Causation holding. Plaintiffs make egregious accusations that Dr. Dalton is challenging the Court's General Causation Order when she is truly working within the General Causation "capable of causing" standard to now explain the "likelihood" that exposure at 5 ppb of $H_2S$ over 30 minutes caused sleep disruption, for specific causation purposes.[37] Dr. Dalton also explained in her deposition that she is not disputing the General Causation findings regarding sleep disturbances.[38] Rather, she understands the General Causation findings and discussion of Dr. Schiffman's opinions to imply that the sleep disturbance is caused by another effect of a malodor, such as a headache; the Court's decision did not find that exposure to 5 ppb of $H_2S$ itself caused the sleep disturbance (which is in line with the known science).[39]

---

[35] R. Doc. 554-1.

[36] R. Doc. 559-2.

[37] Deposition Transcript of Pamela Dalton ("Dalton Tr.) at 48:7-21, appended as Exhibit 6 to the Mims Decl., (explaining how the scope of her work is now narrowed for specific causation "to look at the *likelihood* that these specific trial plaintiffs experienced injuries in odor … issues from the Jefferson Parish Landfill") (emphasis added).

[38] Dalton Tr. 292:14-23.

[39] *Id*. at 292:22-293:4.

Sleep disturbance is a prime example of Plaintiffs' cherry-picking Dr. Dalton's statements to fit their narrative. Dr. Dalton devoted a whole opinion (Opinion 3) to sleep disturbances where she explains "[e]xposure to odors is not *likely* to cause the sleep disturbances claimed by certain Trial Plaintiffs."[40] (emphasis added). Following her discussion of the Trial Plaintiffs' alleged sleep disruptions, studies on whether odors perturb sleep, and the modeling of Dr. Zannetti and Mr. Lape, Dr. Dalton concludes that the low levels of $H_2S$ predicted to be present at the Trial Plaintiffs' residences are more than likely not the cause of any their sleep disturbances.[41] Yet Plaintiffs cherry-pick quotes from her Expert Report to make it seem like Dr. Dalton is simply saying that "odors do not cause sleep disturbances."[42] That is a misrepresentation of Dr. Dalton's opinion.

**C. Dr. Dalton's opinion regarding intermittent odors.**

Again, Dr. Dalton is not relitigating any general causation decision. The General Causation Order incorporates discussion from both Dr. Schiffman and Dr. Dalton regarding how the intermittent nature of odors relates to issues of sensitivity.[43] As Dr. Dalton clarified in her recent deposition, the General Causation determination explored whether it was *possible* for people to become sensitized to an odor, but Dr. Dalton is permitted to testify whether this result likely *did* occur in these thirteen Trial Plaintiffs, including rebutting Dr. Schiffman's testimony in this specific causation phase.[44] Plaintiffs' argument here also rests on the intermittent nature of landfill odors. But the Trial Plaintiffs were all deposed after the General Causation trial, and Dr. Dalton notes that almost all of them reported they smelled odors continuously, not intermittently or unexpectedly.[45]

---

[40] R. Doc. 542-3, Dalton Report at 10 (R. Doc. 542-3).
[41] *Id.* at 11.
[42] R. Doc. 554-1 at 7-8.
[43] R. Doc. 323 at 33-34.
[44] Dalton Tr. 279:12-19.
[45] *Id.* at 282:10-283:10.

**D.  Dr. Dalton's opinion regarding trigeminally stimulated symptoms.**

The Court's discussion in the General Causation decision regarding trigeminally stimulated symptoms reflects general findings with no specific application to the Trial Plaintiffs here. Defendants offer Dr. Dalton's testimony to shed light on that application to the Trial Plaintiffs— she is not disputing the General Causation finding.[46] Plaintiffs mischaracterize the General Causation Order, which never made a finding that trigeminally stimulated symptoms, such as headaches, can be caused by exposure to 5 ppb of $H_2S$ alone. The Court's discussion of trigeminal nerve activation was not tied to a specific level of $H_2S$ exposure, nor does Dr. Schiffman's trial testimony, cited by the Court, provide a level at which any activation could occur.  Further, Dr. Dalton's testimony is consistent with Dr. Schiffman's trial testimony that this activation is capable only when low levels of $H_2S$ (such as the 5 ppb level) are combined with other compounds.[47] As Dr. Dalton explained in her deposition, consistent with the foregoing, exposure to $H_2S$ may activate the trigeminal nerve in combination with other VOCs.[48]

In addition, Dr. Dalton does not "ignore" her own trial testimony, as Plaintiffs have alleged. She does not ignore the LDEQ finding that noxious odors "*may* result…in headache[s]."[49] Based on her experience, the scientific literature, and review of the Trial Plaintiffs' odor experiences (taking into account the Trial Plaintiffs' fact sheets, deposition transcripts, discovery responses, and odor complaints), Dr. Dalton now concludes that "certain symptoms complained of by the Trial Plaintiffs (such as headaches) are exceedingly unlikely to have been caused by trigeminal nerve activation by $H_2S$ emissions."[50] This is precisely the inquiry for specific causation.

---

[46] Dalton Tr. 318:19-23 ("I know that the Court decision in general causation said that … $H_2S$ in combination with VOC mixtures could cause trigeminal activation.")
[47] R. Doc. 298 at 602-03.
[48] Dalton Tr. 317:7-14; 320:2-11.
[49] R. Doc. 323 at 36.
[50] R. Doc. 542-3 at 11.

### E.  Dr. Dalton's opinion regarding "general population."

At the specific causation trial, Dr. Dalton intends to address the *likelihood* that the Trial Plaintiffs' predicted exposures caused the alleged injuries to these specific Trial Plaintiffs. Dr. Dalton has never said the Trial Plaintiffs were not part of the general population; but "general population" does not mean "all people" and is not the relevant inquiry.[51] The focus for this upcoming trial is the specific causation inquiry of whether $H_2S$ at 5 ppb over 30 minutes likely caused alleged injuries to a specific person(s), here the Trial Plaintiffs. During Dr. Dalton's deposition, Plaintiffs repeatedly pushed the issue of whether the Trial Plaintiffs are considered part of the "general population,"[52] so they could simply conclude the analysis stops there. But as discussed above, Defendants must be allowed to present a defense as to specific causation issues.

### F.  Expert opinions rebutting Plaintiffs' experts Dr. Pietari and Mr. Sananes

Unburdened by any citations to legal authority or to the Court's General Causation Order, Plaintiffs ask the Court to broadly prohibit Defendants from offering any expert testimony rebutting the opinions of Dr. Jaana Pietari or Mr. Jose Sananes. This is not a serious argument. "[T]he law of the case doctrine is a discretionary rule," *United States v. Agofsky*, 516 F.3d 280, 283 (5th Cir. 2008) (citation omitted), and "applies only to issues that were actually decided, rather than all questions in the case that might have been decided, but were not." *Lindquist v. City of Pasadena Tex.*, 669 F.3d 225, 239 (5th Cir. 2012) (quotation and citation omitted); *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997) (Fifth Circuit's law-of-the-case doctrine applies only to re-litigation of issues decided at the *appellate* level). Plaintiffs' argument fails for the simple reason that the Court has not made any prior rulings related to Dr. Pietari or Mr. Sananes' opinions.

---

[51] Dalton Tr. 166:3-9 ("No, I'm not saying they're not part of a general population. I'm saying that that was a general causation finding. And now I'm looking at specific causation, did it cause, did exposure at 5 parts per billion or any concentration cause these annoyances or injuries.").

[52] The Court in its General Causation Decision did not define who is included in the "general population" and gave not indication its determination was binding on the issue of specific causation for the Trial Plaintiffs.

Plaintiffs state—without any legal or evidentiary support—that Dr. Pietari's methodology "can no longer be at issue because it was the foundation of the emissions data which proved Plaintiffs' claim that there were emissions from the Landfill which migrated into surrounding neighborhoods in sufficient intensity, duration and frequency to cause Plaintiffs' claimed injuries."[53] But the Court's decision on General Causation did not rely on any of Dr. Pietari's testimony.[54] In fact, the Court's ruling does not even mention Dr. Pietari apart from her inclusion in a list of witnesses who testified at the hearing.[55] Nothing precludes Defendants from offering expert testimony rebutting Dr. Pietari's opinions at trial.

Plaintiffs make similar conclusory arguments regarding Mr. Sananes. Without any citations to the Court's decision on General Causation, Plaintiffs state that "Mr. Sananes' testimony was essential for establishing general causation and, therefore, his methodology can no longer be at issue."[56] Again, the Court's decision on General Causation did not rely on any of Mr. Sananes' testimony and did not even reference Mr. Sananes beyond his inclusion in the list of witnesses.[57] Plaintiffs also reference certain opinions offered by Defendants' expert Mr. Matt Stutz to rebut Mr. Sananes' opinions, claiming that "[t]hese very arguments were raised before and necessarily were rejected because, had they been meritorious, the Court would have rejected the opinions of the Plaintiff's experts and could not have come to the conclusions that it did."[58] Yet again, the Court's decision on General Causation did not make any rulings related to Mr. Stutz's opinions and did not even reference him beyond the list of testifying witnesses.[59] Plaintiffs' argument that the Court implicitly rejected Mr. Stutz's opinions also fails, given the Court's detailed explanation for its

---

[53] R. Doc. 554-1 at 12-13.
[54] R. Doc. 323.
[55] *Id.* at 3,
[56] R. Doc. 554-1 at 13.
[57] R. Doc. 323 at 3.
[58] R. Doc. 554-1 at 13-14.
[59] R. Doc. 323 at 3.

decision without any references to Mr. Sananes or Mr. Stutz's testimony. In short, the Court has made no ruling that could conceivably prevent Mr. Stutz from fully rebutting Mr. Sananes' opinions at trial.

Finally, in a meandering footnote without any citations to evidence or the Court's General Causation decision, Plaintiffs argue that the Court implicitly (1) rejected Dr. Tarek Abichou's opinion estimating a landfill emission rate and (2) accepted Dr. Pietari and Mr. Sananes' emission rates.[60] The Court's decision on General Causation does not make any rulings or findings related to Dr. Abichou's opinions (explicitly or implicitly) and does not even reference him apart from a list of witnesses.[61] And as already discussed above, the Court made no findings or rulings related to Dr. Pietari or Mr. Sananes. The Court provided a detailed explanation for its decision—including the evidence on which it relied—and nothing in the Court's opinion can be read to incorporate the testimony of Dr. Abichou, Dr. Pietari, or Mr. Sananes.

## CONCLUSION

This case did not end with the Court's general causation determination. Defendants must be allowed to present a defense on specific causation—and under Fifth Circuit standards, such defense must necessarily include a discussion on the ***likelihood*** that the alleged exposure caused injuries to the thirteen Trial Plaintiffs. These issues are directly relevant to Defendants' rebuttal of Plaintiffs' ability to make their prima facie case. Preclusion of which would be highly prejudicial. Plaintiffs' Motion should be denied.

---

[60] R. Doc. 554-1 at 13, n.8.
[61] R. Doc. 323 at 3.

Respectfully submitted,

LISKOW & LEWIS, APLC

By:   */s/ Michael C. Mims*
      Michael Cash (#31655)
      Cherrell Simms Taplin (#28227)
      Michael C. Mims (#33991)
      Brady M. Hadden (#37708)
      J. Hunter Curtis (#39150)
      Alec Andrade (#38659)
      701 Poydras Street, Suite 5000
      New Orleans, LA 70139
      Telephone: (504) 581-7979
      Telefax: (504) 556-4108

      BEVERIDGE & DIAMOND, P.C.

      Megan R. Brillault (*pro hac vice*)
      Michael G. Murphy (*pro hac vice*)
      John H. Paul (*pro hac vice*)
      Katelyn E. Ciolino (*pro hac vice*)
      Katrina M. Krebs (*pro hac vice*)
      825 Third Avenue, 16th Floor
      New York, NY 10022
      (212) 702-5400

      James B. Slaughter (*pro hac vice*)
      1900 N Street, NW, Suite 100
      Washington, DC 20036
      (202) 789-6000

      Michael F. Vitris (*pro hac vice*)
      400 W. 15th Street, Suite 1410
      Austin, TX 78701
      (512) 391-8035

      *Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

CONNICK AND CONNICK, LLC

By:    _/s/ Michael S. Futrell_____
        William P. Connick, La. Bar No. 14158
        Michael S. Futrell, La. Bar No. 20819
        Matthew D. Moghis, La. Bar No. 33994
        Anya M. Jones, La. Bar No. 36923
        3421 N. Causeway Blvd., Suite 408
        Metairie, Louisiana 70002
        Telephone: (504) 681-6658
        Facsimile: (504) 838-9903
        E-mail: moghis@connicklaw.com

*Counsel for Defendant Jefferson Parish*


GIEGER, LABORDE & LAPEROUSE, L.L.C.

By:    _/s/ Nicholas S. Bergeron_____
        Ernest P. Gieger, Jr. (6154)
        John E. W. Baay (22928)
        J. Michael DiGiglia (24378)
        Nicholas S. Bergeron (37585)
        Blaise Chadwick Hill (*pro hac vice*)
        GIEGER, LABORDE & LAPEROUSE, L.L.C.
        Hancock Whitney Center
        701 Poydras Street, Suite 4800
        New Orleans, Louisiana 70139
        Telephone:   (504) 561-0400
        Facsimile:   (504) 561-1011
        Email:   egieger@glllaw.com
                jbaay@glllaw.com
                mdigiglia@glllaw.com
                nbergeron@glllaw.com
                chill@glllaw.com

*Attorneys for Aptim Corporation*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing was electronically filed on June 13, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

 /s/ Michael C. Mims
OF COUNSEL