# In the Matter Of:

## Ictech-Bendeck vs Waste Connections Bayou

18-7889

# PAOLO ZANNETTI, PHD

*April 25, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 4   ELIAS JORGE "GEORGE"           CIVIL ACTION
     ICTECH-BENDECK,
 5          Plaintiff               NO. 18-7889
                                    c/w 18-8071,
 6   v.                             18-8218, 18-9312

 7   WASTE CONNECTIONS BAYOU,       SECTION: "E"(5)
     INC., ET AL.,
 8          Defendants              CIVIL ACTION

 9   Related Case:                  NO. 19-11133,
                                    c/w 19-14512
10      FREDERICK REGIONAL
     LANDFILL COMPANY, ET AL.,      SECTION: "E"(5)
11          Defendants

12   Applies to: Both Cases

13
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14

15                    Deposition of
                   PAOLO ZANNETTI, PhD
16
                 taken on April 25, 2024
17               commencing at 9:08 a.m.

18               in New Orleans, Louisiana

19

20

21

22   Reported by:  Evangeline A. Langston, CCR, RPR
                   Certified Court Reporter
23                 in and for the State of Louisiana,
                   Federal Certified Realtime Reporter,
24                 Registered Professional Reporter

25
```



```
 1                 Okay.
 2            MR. FOSTER:  Okay.  Is it up now?
 3            MS. JAMES:  Yes.
 4            MR. FOSTER:  Do you see the reference,
 5       John?
 6            THE WITNESS:  Third paragraph.
 7            MR. PAUL:  Yes, I do.  Thank you.
 8            MR. FOSTER:  Sure.
 9  BY MR. FOSTER:
10       Q.   Now, you recognize that the court found
11  that exposure to an average of 5 parts per billion
12  over 30 minutes is sufficient by itself for
13  individuals generally to be able to smell hydrogen
14  sulfide and for the exposure to cause a reaction?
15            MR. PAUL:  Object to form.
16  BY MR. FOSTER:
17       Q.   Correct?
18       A.   I remember reading this sentence, yes.
19       Q.   Okay.  You just don't agree with that?
20       A.   I'm not an expert in odor thresholds and
21  odor effects.  It is an individual experience.  It
22  is a subjective experience.  The odor is not an
23  objective parameter that a scientist can really
24  fully evaluate.  But I'm aware that the judge has
25  selected 5 ppb as a reference level.
```



1    Q.    And you're not -- not being an odor
2  expert, you're not in a position to challenge that.
3          Isn't that correct?
4          MR. PAUL:  Object to form.
5    A.    I'm not challenging anybody -- the
6  judge, for sure.  But as a scientist, I've done a
7  literature review, and this value is clearly in
8  the -- sort of the lower end of the range that you
9  can find in the literature, both the scientific and
10 the regulatory literature.
11   Q.    Now, in your report at Page 7 --
12         MR. FOSTER:  Is that up?
13         MS. JAMES:  Yes.
14 BY MR. FOSTER:
15   Q.    You make the point that interpreting
16 concentration levels to assess odor impacts is
17 complicated by characterizing the intensity of an
18 odor from bare detection above the odor threshold to
19 recognition of the type of odor to levels that can
20 be considered offensive; correct?
21   A.    Yes.  You read it correctly.
22   Q.    And isn't that exactly what Judge Morgan
23 decided when she found that the exposure at which
24 people generally are able to smell hydrogen sulfide,
25 that's detection and recognition; right?



1            updated overnight, so it's a different
2            format.
3                   Whenever you're ready.
4    BY MR. FOSTER:
5         Q.   You see about in the first paragraph,
6    about a little more than halfway down in the first
7    paragraph, the court says:  In the ambient air, the
8    court finds the exposure at which people generally
9    are able to smell hydrogen sulfide and which is
10   capable of causing a reaction in those exposed is an
11   average exposure over a 30-minute period of at least
12   5 parts per billion.
13             Correct?
14        A.   Yeah.  Correct.
15        Q.   So the court has considered both the
16   detection, the identification, and the -- and the
17   result on people; correct?
18                  MR. PAUL:  Object to form.
19        A.   I'm not able to agree with this -- what
20   you just said.  My understanding is that the court
21   has selected a level -- a level, a reference level,
22   of 5 ppb.  And I have used this reference level
23   throughout my two reports.  Everywhere, you will
24   find references to this 5 ppb level in my reports.
25        Q.   And won't I also find just about



1  everywhere in your report your contentions that the
2  court was wrong?
3                MR. PAUL:  Objection.
4  BY MR. FOSTER:
5       Q.    That 5 ppb is the wrong reference level?
6                MR. PAUL:  Object to form.
7       A.    I never use this word, "wrong."
8       Q.    Okay.
9       A.    But it's very clear to me based on the
10 literature, scientific literature and regulatory
11 literature, that this level is extremely low and at
12 the lower end of the range of acceptable level.
13      Q.    But it is within the range of acceptable
14 level; right?
15      A.    It -- yeah, it is in the range of value
16 that you find in the literature for odor threshold.
17      Q.    Okay.  And odor -- and odor threshold
18 detection, right, and characterization?
19                MR. PAUL:  Object to form.
20      A.    I'm not sure about the -- what you just
21 said.  I would have to double-check.  But certainly
22 if you look at the literature, odor threshold for
23 H2S, 5 ppb is within the range.
24      Q.    And so that's smelling it and
25 identifying it is H2S; correct?



1   you're going to testify about is what?
2        A.    Any -- any scientific statement in her
3   report that I am competent to comment or to verify
4   or to criticize.
5        Q.    Can you think of any right now in her
6   report that you are competent to criticize?
7        A.    I made some comments in my reports.
8        Q.    And what are they?
9        A.    Perhaps we can open the page --
10       Q.    Yep, please do.
11       A.    All right.  So we are talking about the
12  Addison report.
13       Q.    Yes.
14       A.    Chapter 11, Page 93.
15       Q.    Uh-huh.
16       A.    So you want me to go through?
17       Q.    Yes.  I want you to tell me everything
18  you're going to talk about Dr. Schiffman's report.
19              MR. PAUL:  Object to form.
20       A.    So Section 11.1 is about half a page,
21  and the picture related to her statement on indoor
22  concentrations.  So my criticisms was that you
23  cannot really have a cumulation indoor of any
24  chemical unless the chemical is emitted indoor.  And
25  I show, in Figure 53 -- it's just an example, but



1  it's a conceptual example of what happened when that
2  is some pollution outdoor and the possible intrusion
3  indoor.
4       Q.    And what -- what qualifications do you
5  have to comment on indoor diffusion?
6       A.    I'm an expert in air pollution and in
7  air pollution modeling, and I've done indoor
8  modeling in the past.  Both very advanced indoor
9  modeling used in computation of fluid dynamics and
10 simple -- relatively simple modeling doing programs
11 like the EPA's ALOHA.
12      Q.    Have you ever modeled indoor H2S?
13      A.    I don't remember right now, but this
14 opinion I just mentioned are applicable to all --
15 virtually all chemicals.
16      Q.    Have you ever done any -- participated
17 in any scientific studies with regard to odor
18 accumulation in things like curtains, rugs, and
19 furniture?
20      A.    I'm aware of this indoor emissions by
21 furniture, formaldehyde, and other chemicals, but,
22 no, I've not participated in panels or groups of --
23 study groups.
24      Q.    And you've never been listed as a
25 co-author of any study having to do with the



1    Q.    And you don't take issue with Judge
2  Morgan's finding in that regard, do you?
3              MR. PAUL:  Object to form.
4    A.    I don't take any issue with any opinion
5  of the judge.
6    Q.    Okay.
7    A.    As a scientist, however, I'm aware of
8  the literature on odor thresholds and level of
9  concern and regulatory standards for H2S.  And based
10 on this literature review, I would have used a much
11 larger values.
12   Q.    But we've already discussed that the
13 level that the judge used is within the range of the
14 literature; correct?
15   A.    It is in the range of the odor threshold
16 literature, but not in the range of regulatory
17 concern.  For example, California has a standard of
18 30 ppb.  And California has a reputation of being a
19 state with the very strict environmental
20 regulations.  So it's a complicated issue.
21   Q.    And regulatory standards have to do with
22 physiological health effects; correct?
23             MR. PAUL:  Object to form.
24   A.    Regulatory standards, like the
25 California one, are created after years of



1    sorry for going back and forth here.
2         A.    I'm sorry, Counsel.  Give me 30 second.
3         Q.    No problem.
4         A.    All right.
5         Q.    The -- almost -- the third line from the
6    bottom, the court says:  Dr. Schiffman's reports
7    cites a 1983 study by W. H. Bruvold and his
8    colleagues that found hydrogen sulfide, quote,
9    levels from 0.8 to 7.9 micrograms per meter cubed
10   (around .6 to 5.7 parts per billion) led to
11   interference with daily living along with health
12   concerns.
13              Are you familiar with that study?
14        A.    I'm familiar with the levels that were
15   cited, yes.  I've seen 0.6, 0.5 ppb cited before as
16   the lowest range of possible odor threshold together
17   with the 500 ppb.  That's what I've been saying
18   several times today, that the literature is
19   incredibly valuable in terms of odor threshold of
20   H2S.
21        Q.    And you don't dispute that Mr. Bruvold
22   and his colleagues concluded that those levels,
23   those .6 to 5.7 parts per billion, led to
24   interference with daily living, along with health
25   concerns; right?



1   what page that is in your revised report.
2           Well, so let's -- rather than worry
3   about that, do you disagree with Judge Morgan that
4   an average of 5 parts per billion over 30 minutes is
5   always a nuisance?
6                MR. PAUL:  Object to form.
7       A.   No, I don't have elements to agree or
8   disagree.  I only have my literature review that
9   shows that Judge Morgan decision to select 5 ppb is
10  an extreme one in terms of the normal range found in
11  the literature.
12      Q.   But it is, as we have discussed, within
13  the range?
14      A.   It is within the range of odor
15  thresholds published in the literature.  That is
16  correct.
17      Q.   Do you know what is the definition of a
18  nuisance under Louisiana law?
19      A.   I'm not sure I know.
20      Q.   Now, if Mr. Lape is correct about the
21  number of exposures to 5 parts per billion over
22  30 minutes for each of the trial plaintiffs -- and
23  you've seen his charts with regard to those
24  exposures; correct?
25      A.   Yeah.  Sorry, Counsel, let me clarify my



1  previous answer.
2      Q.   All right.
3      A.   I'm familiar with the concept of
4  nuisance in terms of odor.  Typically, in the
5  literature, we'll find that if a concentration is
6  five to seven times greater than the odor threshold,
7  that could be a nuisance.
8      Q.   And what literature are you citing for
9  that?
10     A.   It is -- this is part of my comment in
11 my report, this concept of five to seven or five to
12 ten, it is well-founded in the literature.
13     Q.   And you cite the literature you're
14 relying upon?
15     A.   I believe it's cited in my report, yes.
16     Q.   Okay.  So you disagree with Judge Morgan
17 that five parts per billion -- an average of 5 parts
18 per billion over 30 minutes is always a nuisance?
19          MR. PAUL:  Object to form.
20     A.   I don't disagree or agree with the
21 judge.  As I explained before, the judge made a
22 decision which is legal based on some understanding
23 of the science, and I point out that this is an
24 extreme value in comparison with the range in the
25 literature.



```
 1                  MR. PAUL:  Object to form.
 2        A.    As a scientist, based on my literature
 3   review, nuisance is five, seven, ten times the odor
 4   threshold.  So first we have to agree on an odor
 5   threshold, in my opinion, then multiply by, let's
 6   say, seven, use that as a reference for nuisance,
 7   and trust, of course, the other results to be able
 8   to establish what you just mentioned, that these
 9   people were affected.
10              So it's a little more complicated than
11   just using the number on this table.
12        Q.    So -- but trying to uncomplicate it
13   slightly, if these plaintiffs had to experience that
14   number of odor events during this period of time,
15   you certainly would not consider that to be a mere
16   inconvenience, would you?
17                  MR. PAUL:  Object to form.
18        A.    I'm not qualified to give opinion on
19   inconvenience or nuisances based on these numbers.
20   And also, again, odor is a subjective.  It's not an
21   objective thing that you can fully understand as a
22   scientist.  There are psychological issues.  There
23   are physiological issues, as we mentioned before.
24   So I'm an atmospheric scientist, and I cannot really
25   give an opinion on that.
```



1     Q.    Okay.  And looking at Table 5, which are
2  the odor events for the trial plaintiffs according
3  to Mr. Lape in 2018.
4     A.    Yeah.
5     Q.    They range from 163 to 495; correct?
6     A.    Correct.
7     Q.    So if Mr. Lape's correct, Mr. Tate was
8  bombarded with odor events on average more than once
9  a day.
10           MR. PAUL:  Object to form.
11 BY MR. FOSTER:
12    Q.    Correct?
13    A.    If -- again, to talk about nuisance, you
14 will have to establish a level of concern, an odor
15 threshold, multiply by five or seven, and then use a
16 model that is valid to make this type of simulation.
17 And even after you do that, there are psychological
18 problem and issues that I'm not competent to
19 evaluate.  Odor is a subjective and not an objective
20 phenomenon.
21    Q.    Okay.
22           MR. PAUL:  Is this Exhibit 1573 from
23        Mr. Lape's deposition, if you happen to
24        know?  My marking is that this is
25        Mr. Lape's report, the February report in



1   literature information about this value.
2        Q.   And if his comment had been that the
3   level selected by the judge was within the level
4   reported in the literature, you would have agreed
5   with that.
6             Isn't that right?
7             MR. PAUL:  Object to form.
8        A.   My point is about the difference.  I
9   would have expected Lape to do a literature search
10  like I've done.
11       Q.   But my point -- my question doesn't have
12  to do with that.
13            If Mr. Lape had said, yes, I've done
14  that literature search, and I've found that the
15  reference level determined by the judge was within
16  the range reported in the literature, you would have
17  said, you're right?
18            MR. PAUL:  Object to form.
19       A.   I would have said he's right because the
20  level is in the range of the literature, but it is
21  an extreme value.  So, again, I would have expected
22  a comment on this.
23            MR. FOSTER:  I think that's all I have
24            right now.  Thank you very much,
25            Dr. Zannetti.



1                       REPORTER'S CERTIFICATE

2

3          This certification is valid only for a
    transcript accompanied by my original signature and
    original required seal on this page.
4          I, EVANGELINE A. LANGSTON, Certified Court
    Reporter in and for the State of Louisiana, as the
5   officer before whom this testimony was administered,
    do hereby certify that PAOLO ZANNETTI, PhD, after
6   having been duly sworn by me upon authority of R.S.
    37:2554, did testify as hereinbefore set forth in
7   the foregoing 285 pages;
           That this testimony was reported by me in the
8   stenotype reporting method; was prepared and
    transcribed by me or under my personal direction and
9   supervision, and is a true and correct transcript to
    the best of my ability and understanding;
10         That the foregoing transcript has been
    prepared in compliance with transcript format
11  guidelines required by statute or by the Rules of
    the Louisiana Certified Shorthand Reporter Board;
12  and that I am informed about the complete
    arrangement, financial or otherwise, with the person
13  or entity making arrangement for deposition
    services; that I have acted in compliance with the
14  prohibition on contractual relationships, as defined
    by the Louisiana Code of Civil Procedure Article
15  1434 and in rules and advisory opinions of the
    board;
16         That I have no actual knowledge of any
    prohibited employment or contractual relationship,
17  direct or indirect, between a court reporting firm
    and any party litigant in this matter, nor is there
18  any such relationship between myself and a party
    litigant in this matter;
19         That I am not of counsel, not related to
    counsel or the parties herein, nor am I otherwise
20  interested in the outcome of this matter.

21

22                      

23                      _____
                        EVANGELINE A. LANGSTON, FCRR
24                      CCR #27019, RPR #31609

25

