**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| **Plaintiffs** | **NO. 19-11133, c/w 19-14512** |
| **V.** | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| **Defendants** | **JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |
| ***Applies to: Both Cases*** | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE
TO LIMIT THE TESTIMONY OF PLAINTIFFS' EXPERT, ROBERT
DELORENZO, M.D., P.h.D., M.P.H.**

Plaintiffs oppose the Defendants' Motion in Limine to Limit the Testimony of Plaintiffs' Expert, Robert DeLorenzo, M.D.  For the reasons stated herein, the Motion should be denied.

## I.     INTRODUCTION

Dr. Robert DeLorenzo, M.D., P.h.D., M.P.H., is a distinguished professor of neurology at Virginia Commonwealth University.[1] He obtained a medical degree at Yale Medical School where he also studied and obtained his P.h.D. *Id.* in pharmacology and toxicology. He obtained his Masters in Public Heath from Yale School of Epidemiology and Public Health in 1974. *Id.* Dr. DeLorenzo examined each of the *Addison* Trial Plaintiffs and provided expert opinions on the effect of exposure to hydrogen sulfide and VOC that emanated from the Jefferson Parish Landfill ("JPLF") during the relevant time period.

---

[1] *See* Rec. Doc. 561, Exhibit 1- Report of Dr. Robert DeLorenzo, M.D. (February 2, 2024).

Defendants' motion seeks to limit two aspects of Dr. DeLorenzo's testimony: first, on Plaintiffs' injuries that were caused by exposure to the emissions on the JPLF; and second, the presence and effect of VOCs, when combined with hydrogen sulfide on the Trial Plaintiffs.

## II.     LAW AND ARGUMENT

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. The rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[2]

The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Both scientific and nonscientific expert testimony are subject to this framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant."[3] When expert testimony is challenged, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence.[4]

---

[2] FED. R. EVID. 702.

[3] *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

[4] *Moore v. Ashland Chem. Co., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

"Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." [5] A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the technique at issue has been tested, (2) whether the technique has been subjected to peer review and publication, (3) the potential error rate, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique is generally accepted in the relevant scientific community.[6] The reliability inquiry must remain flexible, however, as "not every . . . factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant."[7]

With respect to the relevancy prong, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue."[8] Finally, divisions of the Eastern District of Louisiana "remain[] cognizant" that "*the rejection of expert testimony is the exception and not the rule*.'"[9] As another division of the Court explained in *Scordill v. Louisville Ladder Group, L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. . . .
>
> The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that

---

[5] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007).
[6] *Burleson*, 393 F.3d at 584.
[7] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x. 377, 381 (5th Cir. 2006) ("A trial judge has considerable leeway in determining how to test an expert's reliability.") (Internal citations and quotations omitted).
[8] *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).
[9] *Johnson v. Samsung Electronics America, Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing FED. R. EVID. 702 Advisory Committee Notes to 2000 Amendments) (emphasis added).

opinion rather than its admissibility and should be left for the jury's consideration.'"[10]

### A. There is sufficient evidence that the Trial Plaintiffs were exposed to VOCs, and a specific causation analysis is not necessary for VOCs by themselves as Plaintiffs are not claiming that their injuries were solely caused by exposure to VOCs.

 "Although not necessary to the Court's opinion, the Court also finds that other compounds present in the Landfill's emissions enhanced the intensity of the bad odor… VOCs, even when individually below odor detection thresholds, can have an additive, sub-addtitive, or synergistic effect to enhance the bad odors." Rec. Doc. 323 at 34-35. The Court further found that these VOCs were a "unique chemical signature for what's coming off the landfill and that VOCs accompanied hydrogen sulfide to form the odor clouds" *Id* at 25 and 35. Having found that communities adjacent to the landfill were exposed to VOCs from the landfill, since these chemicals travel with hydrogen sulfide as essential parts of the odor clouds- logic requires that where Mr. Lape's air modeling shows exposure to hydrogen sulfide at a Trial Plaintiff's residence, there was also exposure to VOCs from the JPLF.

*It must be noted that Plaintiffs are not claiming that any Trial Plaintiff was harmed by exposure to VOCs alone- and none of the injuries for which general causation was determined was based on exposure to VOCs by themselves*. And most importantly, it is Dr. DeLorenzo's opinion that background levels of VOCs- which are not at toxic concentrations- when coupled with hydrogen sulfide can cause injury:

> Even though the VOCs detected during the relevant time period may have been at normal background levels, the combination of hydrogen sulfide with normal-level VOCs irritates the mucus membranes resulting in irritated eyes, irritated nasal passages, irritated throats, irritated bronchi, which, in turn causes eye tearing runny

---

[10] *Scordill v. Louisville Ladder Group, L.L.C.*, No. 02-2565, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted).

noses, coughing, and exacerbates asthma and other pre-existing breathing difficulties.[11]

To support this contention, Dr. DeLorenzo cites MAML reports as well as a peer-reviewed article published in the Archives of Environmental Health. Therefore, any analysis of specific causation related to just VOCs is superfluous and a red herring to the Court's analysis.

Based on Plaintiffs' modeling, the duration of exposure is known to be in excess of 5ppb (of hydrogen sulfide- as a base measurement) for a period of 30 minutes or more. Alternatively, it must be mentioned that Defendants' argument as to this point makes a critical error in analysis. Plaintiffs are not claiming that odors or VOCs from the JPLF are toxic in the concentrations experienced by the Plaintiffs. Plaintiffs are claiming that the odors and VOCs from the JPLF were annoying, interrupted their daily lives, and caused physiological effects as a result of the psychological irritation of the brain through the olfactory and trigeminal nerves. Low levels of VOCs, in combination with H2S caused this annoyance, and it is the "synergistic effect" of the VOCs that enhance the bad odors. (Rec. Doc. 323 at 35). Therefore, Defendants' analysis related to "minimum standards" of specific causation in toxic tort cases are misguided.

**B.  Dr. DeLorenzo should be permitted to testify on general and specific causation as to all injuries suffered by the Plaintiffs as a result of the exposure to emissions from the JPLF.**

In the Court's Findings and Conclusions on General Causation, the Court ruled that

Plaintiffs have proven by a preponderance of the evidence that odors and gases emitted by the Jefferson Parish Landfill during the relevant time period were capable of causing headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and loss of enjoyment or use of property in the general population. R. Doc. 323.

In April 2023, the Court put parameters on expert testimony in specific causation by stating

---

[11] *See* Rec. Doc. 561, Exhibit 1 at 16. *See also Id* at fn. 17 and 18.

that "motions in limine will be allowed only for new opinions expressed by current experts and opinions expressed by new experts on topics related to specific causation." Rec. Doc. 517. Dr. DeLorenzo is a new expert, and as a medical doctor and toxicologist, he is exceedingly qualified to testify about the effects of hydrogen sulfide and VOC exposure on the Trial Plaintiffs. And, it must be noted that Defendants are not challenging his qualifications in their motion.

  i.  **Dr. DeLorenzo should be permitted to testify on the full extent of injuries caused by emissions from the JPLF.**

Defendants seek to limit Dr. DeLorenzo's testimony to the conditions specified by the Court, which Defendants define as "Allowed Claims" or "Allowed Injuries." Rec. Doc 323 at 44 and Rec. Doc. 562-1. Looking at the chart in Defendants' memorandum of "non-allowed" injuries one can immediately see that many conditions are already encompassed by the "allowed claims": gagging, stomach irritation, stomach pain, are "GI issues" that is intertwined with nausea and vomiting;[12] skin infections stress is encompassed by anxiety and worry;[13] lightheadedness is synonymous with dizziness.[14] In sum, Plaintiffs' claims should not be limited due to semantics, and challenges of self-reporting of health symptoms.

Defendants' argument that Plaintiffs have not established general causation relating to chronic conditions that continue after the relevant time period is without merit. Defendants' here

---

[12] *See* Exhibit 2- DeLorenzo Dep. vol. 1 at 387:17:24 (May 3, 2024).

[13] *Id* at 386:24-25, 387:1-2.

[14] It is important to note that most of Plaintiffs' injuries were self-reported, which raises issues of vocabulary and one's ability to communicate their symptoms. One example of this is Trial Plaintiff Vernice Lewis who testified during her deposition that to her, "vomiting" felt like "food was about ready to come up" but food did not leave her stomach and come out her mouth. In this context, Ms. Lewis' symptoms would be medically described as "gagging" and not "vomiting". Ex. 3- Lewis Dep. at 112:11-25, 113:1-6. Dr. DeLorenzo engages in a similar discussion during this deposition, where Defendants' counsel provides him a list of "non-allowed" injuries, and DeLorenzo testifies that they are, in fact, encompassed in the Court's ruling but are presented under a different name on the chart.

conflate a finding general causation as to the mechanism of injury- ie the emissions from the JPLF- which the Court did find to could case the underlying conditions alleged by specific Trial Plaintiffs- with the temporal element of impact of the injury. Both Dr. DeLorenzo and Dr. Schiffman cite authority that supports the idea that hydrogen sulfide exposure can cause long lasting clinical effects. Therefore, testimony as to injuries that continued after the relevant time period is proper.[15]

Moreover, it must be noted that, as a medical doctor, public health professional, and toxicologist, Dr. DeLorenzo is qualified to provide both general and specific causation opinions as to all injuries described in his report. Defendants' cherry-picking testimony as a basis for undermining Dr. DeLorenzo's opinions as to whether exposure to hydrogen sulfide at 5 ppb could cause conditions outside of the scope of the Court's general causation order. Dr. DeLorenzo's report makes clear that even at normal background levels, VOCs, when combined with hydrogen sulfide in landfill gas, irritates mucus membranes causing symptoms like eye irritation, irritated bronchi (and therefore coughing, and exacerbation of asthma and other breathing difficulties.)[16]

As a procedural matter, Plaintiffs filed and Offer of Proof relating to certain claims as a part of their post-trial briefing. Rec. Doc. 291-1. The Court limited Dr. Schiffman's testimony in the general causation phase on certain conditions due to her lack of a medical or toxicology degree, over objections from the Plaintiffs. Dr. DeLorenzo is able to opine on both topics- and conducted examinations on all Trial Plaintiffs and authored his report to show the full breadth of Plaintiffs injuries. In the event that the Court does not permit Dr. DeLorenzo to testify as to general and specific causation of the full universe of injuries, Plaintiffs plan to submit an offer of proof as to

---

[15]*See* Rec. Doc. 561, Exhibit 2, Rebuttal Report of Robert DeLorenzo, M.D. *See also* Exhibit 3-Schiffman Rebuttal Report (April 26, 2024).
[16] *See* Rec. Doc. 561, Exhibit 1 at 16. *See also Id* at fn. 17 and 18.

these issues to preserve all rights on appeal. Therefore, having all such issues included in his

extensive review of Plaintiffs' medical records, examinations, and ultimately his report, were vital,

and Defendants' deposed Dr. DeLorenzo over two days about the full scope of his opinions.

### III.    CONCLUSION

For the foregoing reasons, Defendants' Motion in Limine to limit the testimony of Dr.

Robert DeLorenzo should be denied.

Respectfully submitted, this 13th day June, 2024.

<div style="margin-left:40%">

_/s/ Eric C. Rowe_
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)
James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

FORREST CRESSY & JAMES, LLC
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com

</div>

nicholas@fdjlaw.com
eliza@fcjlaw.com

*Counsel For Addison Plaintiffs*