UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| **Plaintiffs** | **NO. 19-11133 c/w 19-14512** |
| *versus* | **SECTION: "E" (5)** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | **JUDGE SUSIE MORGAN** |
| **Defendants** | **MAG. JUDGE MICHAEL B. NORTH** |
| ***APPLIES TO ALL CASES*** | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE
EXPERT TESTIMONY OF MICHAEL CORN**

Defendants Aptim Corp., Jefferson Parish, Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc., through undersigned counsel, respectfully submit the following Memorandum in Opposition to the Motion to Exclude Expert Testimony of Michael Corn filed by Plaintiffs, Frederick Addison, et al.[1] For the following reasons, Plaintiffs' Motion should be denied.

**INTRODUCTION**

Plaintiffs do not challenge Mr. Corn's qualifications or methodologies.[2] Instead, Plaintiffs' Motion asserts relevance arguments under Federal Rules of Evidence 401 and 403. Plaintiffs' motion disregards their nuisance claims, the unresolved issue of specific causation, their burden of proving causation when relying only on circumstantial evidence, and how Mr. Corn's expert opinions, based on more than 50 years of environmental engineering experience, specifically bear upon the foregoing. Mr. Corn's analyses and opinions are relevant and

---

[1] *See* R. Doc. 545.
[2] *See generally* R. Doc. 545.

Plaintiffs' Motion should be denied.

## BACKGROUND

Mr. Corn, an environmental and water resources engineer and environmental consultant, is a recognized expert in air emission estimates, air permitting, air modeling, ambient air monitoring, fate and transport issues, and environmental engineering, with decades of specialized and technical experience pertinent to this litigation.[3] Mr. Corn evaluated the various chemicals and substances produced and emitted by non-landfill air emissions sources in and near Jefferson Parish in order to arrive at an opinion as to whether, and to what extent, odors from those sources likely impacted the Trial Plaintiffs during the relevant time period.[4] In the end, Mr. Corn, relying on his knowledge, experience, expertise, and study of myriad documents from this case and information from other sources, formed the following principal expert opinion:

> It is my opinion that odors and emissions from the fifteen non-landfill industrial and municipal facilities distributed in and near Jefferson Parish more likely than not impacted the *Addison* trial plaintiffs at their homes and/or during their travel to other locations in and near Jefferson Parish during the relevant time period . . . [and] based on the fate and transport of mechanisms of the various chemicals, it is my opinion that no one source impacted the trial plaintiffs and that more likely than not that odors detected by an individual trial plaintiff on any given day originated from one or more of these facilities and not, or not solely, the Jefferson Parish Landfill.[5]

In addition, Mr. Corn formed the following opinions:

1. Given the weather data collected do not show a preferential wind direction, no one source (*i.e.,* the Jefferson Parish Landfill) could have impacted all Trial Plaintiffs at all times. The variable wind directions confirm that odors and emissions from the alternative odor sources more proximate to each individual plaintiff were more likely transported into the residential areas where the Trial Plaintiffs live and travel through.[6]

---

[3] *See* Expert Report of Michel R. Corn, Curriculum Vitae of Michael R. Corn, R. Doc. 588-4 at 131-160.
[4] *See generally* Expert Report of Michael R. Corn (R. Doc. 588-4).
[5] *See id*. at 10.
[6] *See id*. at 11. By way of support, Mr. Corn cites the testimony of Trial Plaintiff, Mary Ann Winningkoff, who explained in her deposition that the frequency of odors depended "on which way the wind blew . . . If it blew toward my house, I got it. If it blew toward my neighbor's house across the street, she got it. You know? It just depended on the wind."

2

2. As supported by documented cases of individual impacts to residents residing at similar distances from the fifteen non-landfill industrial and municipal facilities as the Trial Plaintiffs, including during the relevant time period, and the multiple continuous or near-continuous sources of air pollution in Jefferson Parish proximate to the Trial Plaintiffs' homes and/or areas of travel, emissions from the alternative odor sources, permitted or not, resulted in odors in areas that the Trial Plaintiffs lived and traveled through.[7]

3. The proximity of the receptor to sources released at or near ground level is more likely to impact a receptor. Thus, the Trial Plaintiffs living and traveling directly adjacent to the alternative sources, such as Harahan residents who lived close to the Harahan Wastewater Treatment Plant (WTP), were more likely than not directly impacted by odors from the Harahan WTP.[8]

4. Given the variable wind direction in the area and the Trial Plaintiffs' close proximity to many known odor sources, the Trial Plaintiffs are more likely than not subjected to multiple different pollutants released from the industrial facilities, especially the Harahan WTP, and the extensive wetlands in the area. Thus, on any given day, depending on the wind conditions, any odors detected are likely not originating from the same source as the previous day.[9]

## LAW AND ARGUMENT

Plaintiffs assert dubious bases for excluding Mr. Corn's expert opinions. However, more troubling are the several misstatements of both the facts and Mr. Corn's expert opinions, the five most glaring of which must be addressed prior to addressing the merits in order to properly frame the dispute.

## I.    FACTUAL INACCURACIES.

*First*, Plaintiffs allege that, "Mr. Corn seeks to establish that other potential sources of odors exist in the community . . . This fact is not in dispute[.]"[10] This is inaccurate. Plaintiffs have ***never*** admitted that odors that they smelled during the relevant time period came from

---

[7] *See id*. at 11.
[8] According to Mr. Corn, these impacts include the occurrences when Chalmette wastewaters containing ammonia and mercaptans were emptied into the aerobic digester at the WTP, which resulted in 54 Louisiana Department of Environmental Quality (LDEQ) Incident Reports being filed with the agency from July 1, 2017 through May 23, 2018 and 20 LDEQ Incident Reports being filed with the agency from November 15, 2016 through July 19, 2017 concerning odors coming from the WTP. *See id*.
[9] *See id*. at 12.
[10] *See* R. Doc. 545-1 at 2.

anywhere other than the Jefferson Parish Landfill ("JPLF"). And as described above, Mr. Corn does not merely opine that "other potential sources of odors exist in the community." He opines that these other odor sources more likely than not impacted the Trial Plaintiffs and that the odors detected by an individual Trial Plaintiff on any given day originated from one or more of the 15 identified facilities and not, or not solely as Plaintiffs allege, from the JPLF. The Court should disregard Plaintiffs' reductive interpretation of Mr. Corn's opinions.

*Second,* Plaintiffs state that, "Mr. Corn likewise seeks to testify that the wind blows from different directions, which is likewise not in dispute."[11] Again, Plaintiffs have never admitted that they did not smell odors when the wind was not blowing from the JPLF despite the fact that the wind does not blow from the JPLF to a given Plaintiff more than 10% of the time. This red herring is undermined by all Trial Plaintiffs' position from the outset—that they each smelled the odors almost constantly[12] for "30 or more months,"[13] and many claiming detecting odors every day during the relevant time period.[14]

*Third,* Plaintiffs' claim that, "Mr. Corn [has not] identified the specific chemicals associated with these other sources,"[15] is easily dispensed by Mr. Corn's expert report itself. Indeed, not only is the text of Mr. Corn's expert report full of references to specific chemicals routinely emitted from each of the other sources he identifies and the types of odors associated with those chemicals,[16] but Mr. Corn also identifies the specific chemicals used or produced by

---

[11] *See* R. Doc. 545-1 at 2, n.1.
[12] *See generally* R. Doc. 431, Plaintiffs' Second Amended Omnibus Complaint for Damages and Injunctive Relief.
[13] *See* R. Doc. 545-1 at 2.
[14] *See* Expert Report of Pamela Dalton, PhD, MPH (Mar. 8, 2024) at 7-9 (R. Doc. 542-3) (summarizing Trial Plaintiffs' claims of odor experiences).
[15] *See* R. Doc. 545-1 at 2.
[16] *See, e.g.,* R. Doc. 588-4 at 15 (identifying ammonia, hydrogen sulfide, and sulfuric acid), 24-27 (Table 3: Chemicals Used or Produced at the Table 1 Sources).

the other sources in various tables appended to his report.[17]

*Fourth,* Plaintiffs contend that Mr. Corn "admitted in this deposition, the fact that a facility has a permit is not proof that any chemicals or odors were actually emitted."[18] This is an incomplete and taken-out-of-context citation. The subject colloquy is as follows:

> Q. But the fact that they are permitted to discharge these gases doesn't tell us whether they're actually emitting any of the gases at all, right?
>
> A. It does not, **but the TRI says they did emit those gases if they give a mass for the year**.
>
> ***
>
> Q. Okay. And so now the TRI thing that you talked about, that is an amount that's discharged over some time period. Is that what you're telling us?
>
> A. A one-year period.[19]

Put differently, Mr. Corn clarifies that while a permit does not equate to actual emissions, TRI (Toxics Release Inventory) reports, which are required for major air emission sources, do report total actual emissions for each year.[20] Moreover, Mr. Corn relies on the other facilities' Title V permits, which provide both the planned discharges and releases and an estimate of the maximum emissions that a facility may have.[21] Mr. Corn also explains that a facility's permitted releases are not based on odor nuisance levels but based upon air quality standards, which means that a facility that meets its permit can still be a source of offsite odors.[22]

*Finally*, in support of their argument that Mr. Corn's opinions may confuse the issues and

---

[17] *See, e.g., id.* at 24 (Table 3: Chemicals Used or Produced at the Table 1 Sources), 37 (Table 5: Chemicals and Criteria Pollutants Listed in the Title V Permits for the Cornerstone Chemical Complex), 82 (Table 28: Volatile Organics that May Be Emitted from the Harahan WTP), and 90 (Table 29: Chemicals Released by Kirby Island).
[18] *See* R. Doc. 545-1 at 5.
[19] *See* Excerpt of Michael Corn's Deposition Testimony, 212:9-23 (R. Doc. 545-3) (emphasis added).
[20] *See* R. Doc. 588-4 at 15.
[21] *See* Deposition Transcript of Michael Corn, taken April 23, 2024, appended to the accompanying Declaration of Michael C. Mims (dated June 14, 2024) ("Mims Decl.") as Exhibit 1 (hereafter "Corn Tr.") 133:7-14, 168:12-18.
[22] Corn Tr. 307:6-17.
5

mislead the jury, Plaintiffs argue that, "[T]here is no assertion that any of the Plaintiffs were exposed to either ammonia or propylene."[23] Plaintiffs appear to disregard the many references in Mr. Corn's report to these compounds being emitted, which include "ammonia" (294 times) and "petroleum" (15 times), and that Trial Plaintiffs describe odors and impacts that aligned with these types of chemical emissions.[24] Mr. Corn, therefore, is explaining that these compounds are being emitted by the alternative odor sources, which were, depending on wind direction, likely odors to which the Trial Plaintiffs were exposed to on any given day.

Having clarified Plaintiffs' inaccuracies, Defendants now turn to the merits of their Motion. As explained below, Plaintiffs' Motion should be denied.

## II.    MR. CORN'S EXPERT OPINIONS ARE RELEVANT AND ADMISSIBLE.

Plaintiffs argue that Mr. Corn's expert opinions are irrelevant, unhelpful to the jury, and likely to confuse the issues and mislead the jury. Plaintiffs are wrong on all points.

*First,* Mr. Corn's expert opinions are relevant. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. "Whether a fact is of consequence is a question governed by the substantive law applicable to the case." *Jones v. Cannizzaro*, No. Civ.A 18-503, 2021 WL 217282, at *1 (Milazzo, J.) (citing *U.S. v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981)). "For a fact to be 'of consequence,' under the substantive law of the case, the 'proposition to be proved must be . . . probative of a matter that is in issue." *Labat v. Rayner*, No. Civ.A 20-477, 2022 WL 1442982, at *6 (E.D. La. May 4, 2022) (Ashe, J.) (quotation omitted). The strength of the evidence is irrelevant to whether it is relevant. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985) ("[I]t is universally recognized that evidence, to

---

[23] *See* R. Doc. 545-1 at 7.
[24] *See* R. Doc. 588-4 at 109-110 (Table 33 "Odor Descriptions of Trial Plaintiffs").

be relevant to an inquiry, need not conclusively prove the ultimate fact in issue.").

Plaintiffs allege that Defendants' alleged acts and omissions resulted in the persistent emission of odors *from the JPLF* during the relevant time period and that their damages were caused by exposure to those odors.[25]

Plaintiffs bear the burden of proving causation, and Defendants are entitled to offer evidence raising doubt about Plaintiffs' allegations that the JPLF caused their purported injuries.[26] Indeed, to establish a nuisance claim under Louisiana law, a plaintiff must prove "both that the condition constitutes a nuisance and that damages resulted therefrom." *Schulker v. Roberson*, 1991-1228 (La. App. 3 Cir. 6/5/96), 676 So. 2d 684, 689. To that end, causation, when proven by circumstantial evidence as is the case here, requires the Plaintiffs to "exclude other reasonable hypotheses with a fair amount of certainty." *Butler v. Baber*, 529 So. 2d 374, 378 (La. 1988), *holding modified by Inabnet v. Exxon Corp.*, 1993-0681 (La. 9/6/94), 642 So. 2d 1243. Thus, "[w]here there is more than one possible cause to a plaintiff's alleged injuries, a defendant is permitted to present evidence as to any potential alternative and/or intervening causes." *Couturier v. Bard Peripheral Vascular, Inc.*, 548 F. Supp.3d 596, 612 (E.D. La. 2021) (Lemelle, J.).

Mr. Corn's expert opinions speak directly to these issues. Mr. Corn analyzes 15 different industrial sources of emissions within close proximity to the Trial Plaintiffs. Mr. Corn's analyses of these alternative odor sources are highly relevant to whether Plaintiffs have excluded "other reasonable hypotheses with a fair amount of certainty," *Butler*, 529 So. at 378, and fall well within Defendants' right to "present evidence as to any potential alternative and/or intervening

---

[25] *See generally* R. Doc. 431, Plaintiffs' Second Amended Omnibus Complaint for Damages and Injunctive Relief.
[26] *See also* R. Doc. 588, Defendants' Memorandum in Support of Defendants' Joint Opposition to Plaintiffs' Motion to Exclude Evidence Of Other Sources at 3-5.

causes." *Couturier*, 548 F. Supp.3d at 612. Defendants do not have the burden in this case and Plaintiffs do not cite any legal authorities supporting their argument that Mr. Corn's opinions are irrelevant unless he models emissions from these alternative odor sources and demonstrates specific impacts to the Trial Plaintiffs.

*Second,* the heading of Section III of Plaintiffs' brief argues that Mr. Corn's testimony will not assist the jury, but what follows is just four generic paragraphs of case law without any application of law to fact beyond a rote statement in the opening sentence that "ordinary jurors will know from their own experience what wastewater treatment plants and other facilities smell like." Defendants dispute that ordinary jurors know what all the emissions from the alternative odor sources smell like—e.g., benzene, toluene, hydrochloric acid, Diethanolamine.[27] But more importantly, Dr. Corn's expert opinions are not limited to descriptions of odors from alternative sources. Dr. Corn's anticipated expert testimony will involve expert analyses of the effect of wind direction on odors emanating from 15 non-landfill industrial and municipal facilities distributed in and near Jefferson Parish on any given day,[28] the likely effect of same on 13 Trial Plaintiffs residing in different proximity to the JPLF and alternative sources,[29] how proximity of the receptor to sources released at or near ground level is more likely to impact a receptor,[30] and how the foregoing are influenced by the fate and transport of mechanisms of the various chemicals used and/or processed by the various industrial and municipal facilities identified.[31] To characterize such specialized expert testimony as within the common knowledge of an ordinary juror reflects a wrong and drastic oversimplification of this case.

---

[27] R. Doc. 588-4 at 15 (identifying ammonia, hydrogen sulfide, and sulfuric acid), 24-27 (Table 3: Chemicals Used or Produced at the Table 1 Sources).
[28] *Id*. at 31.
[29] *Id*. at 31, 120.
[30] *Id*. at 11.
[31] *Id*. at 106.

Mr. Corn discusses other technical topics well beyond the ken of the average juror. For example, Mr. Corn analyzes emissions that are not specifically authorized by air permitting, such as the molten sulfur tank at the Cornerstone facility.[32] And Mr. Corn discusses odorous emissions from air sparging—the process of mixing air within tanks at industrial facilities.[33] He also describes in detail the operation of barges and the discharge of emissions and particulate matter and dust, including how emissions can occur due to changes in temperature.[34] Mr. Corn's expert report is replete with highly technical and detailed information about industrial processes and emissions and his testimony will help the jury understand these issues.

*Finally,* without any citations to case law, Plaintiffs wrongly argue that Mr. Corn's testimony will confuse and mislead the jury under Rule 403. Rule 403's "major function is limited to excluding matter of scant or cumulative probative force," and the rule "is not designed to 'even out' the weight of the evidence." *Baker v. Canadian Nat'l/Illinois Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008) (case quotations and citations omitted). All of Plaintiffs' arguments go to the weight of the evidence, and Plaintiffs' cross examination of Mr. Corn at trial—not Rule 403—is the proper avenue for testing the weight and credibility of his opinions. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596 (1993).

Indeed, most of Plaintiffs' argument is based on trying to shift the causation burden to Defendants and complaining that Mr. Corn raises *potential* alternative causes of Plaintiffs' harms. For example, Plaintiffs repeatedly argue that anything less than air-dispersion modeling

---

[32] R. Doc. 588-4 at 48-50.
[33] *See, e.g. id*. at 71.
[34] *Id*. at 67-68.

9

of emissions from the alternative odor sources would be too confusing or misleading for the jury. But "[plaintiff] bears the burden of proving causation; the burden does not fall on Defendants to disprove causation." *Dawsey v. Carnival Corp.*, No. Civ.A 16-23939, 2018 WL 4854651, at *4 (S.D. Fla. Oct. 5, 2018). Mr. Corn's identification of *possible* alternative explanations for Plaintiffs' injuries is relevant and admissible. *See Couturier v. Bard Peripheral Vascular, Inc.*, 548 F. Supp. 3d 596, 612 (E.D. La. 2021) (Lemelle, J.) ("Where there is more than one possible cause to a plaintiff's alleged injuries, a defendant is permitted to present evidence as to any potential alternative and/or intervening causes."); *Simon v. United States*, 51 F. Supp. 2d 739, 746 (W.D. La. 1999) ("The Defendants must only show that some other particular accident could have caused the injury, not that some other accident actually did cause the injury.").

Regardless, Plaintiffs do not identify any topics discussed by Mr. Corn that would be misleading or confusing to the jury. Mr. Corn analyzes air permits for several of the alternative odor sources, both to describe the industrial processes generating the emissions and to identify the types of pollutants emitted from each facility.[35] Mr. Corn also analyzes the permits to discuss the quantities of pollutants the facilities are authorized to emit.[36] All of this is relevant to whether Plaintiffs' alleged injuries arise from one or more of these industrial sources. Defendants do not have the burden in this case, and although the precise amount of pollutants *actually* admitted is unknown, the facilities' *authorization* to emit large amounts of pollutants creates uncertainty as to whether one or more of these sources contributed to Plaintiffs' injuries. Indeed, as Mr. Corn described in his deposition, industrial facilities are likely to emit approximately the level of pollutants authorized in their permits.[37]

---

[35] *See, e.g.*, *id*. at 36-37.
[36] *See, e.g.*, *id*. at 39-40.
[37] Corn. Tr. 168:12-18.

10

Plaintiffs also complain about Mr. Corn's discussion about emissions events outside of the time period for which Plaintiffs claim damages. Mr. Corn rightly notes in his report that these emissions events show that these facilities have the *potential* to release pollutants capable of adversely impacting Plaintiffs.[38] Again, Defendants do not have the burden on causation and are entitled to introduce evidence creating uncertainty and doubt over whether the JPLF is responsible—in whole or part—for Plaintiffs' alleged injuries. Mr. Corn's discussion of emissions events, including those outside the relevant time period, adds to that uncertainty.

Finally, Plaintiffs criticize Mr. Corn's discussion of emissions data reported by the alternative odor sources in the Toxic Release Inventories ("TRI")—an EPA database tracking emissions of certain pollutants.[39] The TRI data represents *actual* emissions by the alternative odor sources.[40] But Plaintiffs argue that these data are irrelevant unless used to develop emission rates and air dispersion modeling. Yet again, Defendants do not have the burden and are not required to establish that certain emissions impacted certain Plaintiffs on certain dates at certain concentrations. That is Plaintiffs' job. Defendants are allowed to provide evidence of *potential* alternative causes for Plaintiffs' injuries.

In sum, none of Mr. Corn's proposed testimony is misleading or confusing and Plaintiffs will have every opportunity to confront Mr. Corn and test his opinions and underlying bases during cross examination. *See Robinson v. Ethicon Inc.,* No. Civ.A 20-3760, 2022 WL 20689753, at *4 (S.D. Tex. Oct. 5, 2022) ("To the extent that the defense presents convincing alternative theories, the evidence is plainly admissible. To the extent that the defense attempts to make far-fetched alternative causation arguments, the Court is unworried that it would confuse

---

[38] R. Doc. 588-4 at 43-44.
[39] *Id*. at 14-15.
[40] *Id*.

and mislead the jury; rather, to the extent that the defense proffers preposterous alternative causes of the plaintiff's present injuries, they would only prejudice the jury against them.").

## CONCLUSION

For the above and foregoing reasons, Plaintiffs' Motion should be denied.

Respectfully submitted,

LISKOW & LEWIS, APLC

By:   /s/ Michael C. Mims
      Michael Cash (#31655)
      Cherrell Simms Taplin (#28227)
      Michael C. Mims (#33991)
      Brady M. Hadden (#37708)
      J. Hunter Curtis (#39150)
      Alec Andrade (#38659)
      701 Poydras Street, Suite 5000
      New Orleans, LA 70139
      Telephone: (504) 581-7979
      Telefax: (504) 556-4108

BEVERIDGE & DIAMOND, P.C.

Megan R. Brillault (*pro hac vice*)
Michael G. Murphy (*pro hac vice*)
John H. Paul (*pro hac vice*)
Katelyn E. Ciolino (*pro hac vice*)
Katrina M. Krebs (*pro hac vice*)
825 Third Avenue, 16th Floor
New York, NY 10022
(212) 702-5400

James B. Slaughter (*pro hac vice*)
1900 N Street, NW, Suite 100
Washington, DC 20036
(202) 789-6000

Michael F. Vitris (*pro hac vice*)
400 W. 15th Street, Suite 1410

        Austin, TX 78701
        (512) 391-8035

        *Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*


CONNICK AND CONNICK, LLC

By:    /s/ Michael S. Futrell
      William P. Connick, La. Bar No. 14158
      Michael S. Futrell, La. Bar No. 20819
      Matthew D. Moghis, La. Bar No. 33994
      Anya M. Jones, La. Bar No. 36923
      3421 N. Causeway Blvd., Suite 408
      Metairie, Louisiana 70002
      Telephone: (504) 681-6658
      Facsimile: (504) 838-9903
      E-mail: moghis@connicklaw.com

      *Counsel for Defendant Jefferson Parish*


/s/ Nicholas S. Bergeron
Ernest P. Gieger, Jr. (6154)
John E. W. Baay (22928)
J. Michael DiGiglia (24378)
Nicholas S. Bergeron (37585)
Blaise Chadwick Hill (*pro hac vice*)
GIEGER, LABORDE & LAPEROUSE, L.L.C.
Hancock Whitney Center
701 Poydras Street, Suite 4800
New Orleans, Louisiana 70139
Telephone:   (504) 561-0400
Facsimile:    (504) 561-1011
Email:       egieger@glllaw.com
           jbaay@glllaw.com
           mdigiglia@glllaw.com
           nbergeron@glllaw.com
           chill@glllaw.com

*Attorneys for Aptim Corporation*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing has been forwarded to all counsel of record via the Court's electronic case management system on this 14th day of June, 2024.

*/s/ Michael C. Mims*