1. The scientific causation methodology must be followed when attributing an adverse condition to exposure to a chemical, such as hydrogen sulfide.

2. There is insufficient scientific basis for the trial Plaintiffs' claims that airborne exposure to 5 ppb hydrogen sulfide for 30 minutes is capable of causing their claimed nuisance health effects.

3. Exposure to emissions from the JPLF are more than likely not the cause and certainly not the most likely cause of the trial Plaintiffs' claimed health conditions.

    a. The health conditions alleged by the trial Plaintiffs are non-specific and occur frequently in the general population in the absence of exposures to odors.

    b. The conditions alleged by the trial Plaintiffs are confounded by a multitude of alternate potential causes unrelated to the JPLF, including preexisting conditions and side effects of prescriptions.

4. Emissions and fate and transport data do not support the trial Plaintiffs' allegation that the JPLF is a substantial factor contributing to the cause of the nuisance impacts claimed by the trial Plaintiffs.

5. The trial Plaintiffs' allegations that odors from the JPLF accumulate in their homes and are adsorbed to household fabrics in sufficient quantities to cause or exacerbate their claimed nuisance injuries are not supported by scientific fact.

6. Dr. Schiffman's opinions are unreliable and do not employ any scientifically reliable methodology for determining specific causation as to the trial Plaintiffs. She also relies on the court's general causation nuisance standard without objective evidence demonstrating that any of the trial Plaintiffs fall within the most sensitive population, further undermining the reliability of her opinions.

7. Dr. DeLorenzo and Dr. Spodak's conclusions that hydrogen sulfide and VOC emissions from the JPLF were a substantial cause of the health complaints reported by the trial Plaintiffs is not supported by reliable and credible evidence, nor was it conducted with a scientifically reliable methodology.

All my opinions in this report are stated to a reasonable degree of toxicological and scientific certainty. This report supplements my April 30, 2021 report issued in the *Ictech-Bendeck* and *Addison* actions. I reserve the right to amend or supplement my opinions as new information and data become available.

Supplemental Expert Report of John Kind, PhD, CIH, CSP
Frederick Addison, et al. v. Louisiana Regional Landfill Company, et al.
March 8, 2024

Page | 9



appendix, I further list the documents and scientific literature I considered to form the basis of my opinions.

**Opinion 1: Exposure to 5 ppb of hydrogen sulfide is not always a nuisance to those exposed and is unlikely to have caused nuisance injuries or health conditions to the Trial Plaintiffs.**

Plaintiffs' expert Dr. Schiffman testified during the General Causation phase (and has again stated in her January 28, 2024 report) that 5 ppb of hydrogen sulfide represented the concentration of hydrogen sulfide that would be considered a common nuisance odor, leading to complaints and symptoms. She based the concentration of 5 ppb on a guideline published by the World Health Organization ("WHO") Regional Office for Europe (WHO, 2020). Following the General Causation trial, the Court found that "exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction." Although the Court determined that 5 ppb of $H_2S$ is *capable* of causing certain injuries—specifically headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, a decrease in quality of life, and a loss of enjoyment and use of property—the literature shows, and it is my opinion, that the *likelihood* of it causing injury is exceedingly low, particularly for all 13 Trial Plaintiffs given that there is no evidence that they can detect hydrogen sulfide at this low concentration (or at any specific concentration).

While hydrogen sulfide at a concentration of 5 ppb may be detectable and deemed unpleasant by some individuals, it is an extremely conservative estimate of detectability for the general population in real-world conditions. Odor detection thresholds in published studies and cited by various guidance documents, including the WHO guideline document relied on by Dr. Schiffman, represent the concentration of a sample that can be determined to be "different" from a clean air sample under filtered and clean background air conditions. The individual does not have any quality information (e.g., is it floral, musty, fruity, sulfurous?) at the odor detection threshold. Thresholds for $H_2S$ have ranged from 0.5 ppb to over 130 ppb in more than 100 peer-reviewed studies reporting laboratory-collected thresholds, suggesting a wide range of sensitivity to this compound even under the most sensitive circumstances for detecting $H_2S$ odor (i.e., in clean laboratory conditions versus ambient outdoor environmental conditions). Even in the WHO guideline document for $H_2S$, it is stated that "[t]he threshold of perception of this odour ($H_2S$) varies considerably depending on individual sensitivity, but under laboratory conditions, it ranges from 0.0008 to 0.20 mg/m 3 (0.5-130 ppb)" (WHO, 2000).

The concentration at which an individual can detect the quality and the identity of an odor is the odor recognition threshold, which laboratory studies have found is multiple times higher than the odor detection threshold. As stated in the WHO guidance document relied on by Dr. Schiffman, $H_2S$'s "characteristic smell of rotten eggs appears at concentrations 3-4 times higher than the odour threshold" (WHO 2000). And the concentration at which one can recognize that one is smelling $H_2S$ varies across the population, just as the odor detection threshold does. It is important to acknowledge, and it is my opinion, that recognition alone does not imply nuisance. The WHO guidance document relied on by Dr. Schiffman recognizes this, stating "since annoyance will be influenced by a number of psychological and socioeconomic factors, a nuisance threshold level cannot be defined on the basis of concentration alone" (WHO, 2000).