UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,**<br>   Plaintiffs<br><br>**VERSUS**<br><br>**LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**<br>   Defendants | **CIVIL ACTION**<br><br>**NO. 19-11133, c/w 19-14512**<br><br>**SECTION: "E" (5)**<br><br><br>**JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS, REPORTS AND TESTIMONY BY MATTHEW STUTZ**

The *Addison* Plaintiffs submit this memorandum in reply to Defendants' Opposition To Exclude Opinions, Reports, and Testimony by Matthew Stutz.

The Defendants' brief is a perfect example of why Mr. Stutz's inappropriate testimony must be excluded under Rule 702. The Defendants' brief only adds to the confusion, and even Mr. Stutz's own affidavit cannot rescue him from the confusion caused by his testimony.

**I.   BACKGROUND AND SUMMARY**

Two very basic concepts destroy the smoke screen emitted by the Defendants in their Opposition brief.

First, with regard to the Jefferson Parish Landfill, as the Court recited in its Findings and Conclusions on General Causation, the specific issues for trial, and the issues being decided in the General Causation Phase, included (1) whether odors and gases were emitted by the Landfill and (2) whether the emitted odors and gases were capable of producing the injuries claimed by any one or more of the Plaintiffs. R.Doc. 323 at 4. Now, a year and a half after the Court ruled on both issues, Mr. Stutz seeks to provide his opinions on emissions from the Jefferson Parish Landfill

1

and, based on Mr. Stutz's analysis, Defendants seek to contend that the emissions were of such insufficient amount they could not have caused the injuries; *i.e.*, that they were incapable of causing the injuries, in direct contradiction of the Court's finding after hearing evidence from Defendants' emissions then-experts on the subject. Mr. Stutz's opinions on both subjects were due long ago, and it is too late now to render them.[1]

Second, with regard to the emissions from the Highway 90 Landfill, Defendants forget that methane is odorless and, on average, methane makes up approximately fifty percent of landfill gas. It is the only gas tracked during surface emissions monitoring for regulatory reporting purposes. Methane is a proxy for landfill gas in general--when methane is present, so is every other gas generated by the decomposition of waste, including hydrogen sulfide.

Defendants argue that Plaintiffs misunderstand the purpose of why the Highway 90 Landfill applied to the LDEQ for a permit in 2008 to burn excess landfill gas with a flare. The purpose was clear, and stated by that Landfill itself: *to control odors* related to the decomposition of Hurricane Katrina-related sheetrock, not just to burn methane. And it worked. By 2010, not enough landfill gas was being generated to keep the flares lit, and the permit was rescinded in early 2011. When not enough methane gas was generated to keep the flares lit, then a reduction is rationally and scientifically expected in all of the landfill gases for which methane is a proxy, including hydrogen sulfide. In other words, because Mr. Stutz says that the concentration of H2S remained the same, when the amount of flareable gas declined almost to zero, the amount of H2S must have also declined almost to zero. On the other side of the coin, Mr. Stutz's estimate from

---

[1] Defendants fail to observe that Dr. Tarek Abichou and Dr. Mark Yocke already produced emissions estimates from the JPLF that were relied upon in their General Causation defense to rebut the estimate of Plaintiffs' experts. The prior estimates of Dr. Abichou and Dr. Yocke are, at the very least, a tacit acknowledgment by Defendants that they understood the time for estimating the JPLF's emissions was during General Causation.

2008-2020 is reliable, there would have been consistent odor complaints from 2008-2020 to corroborate his consistent concentration estimate. Mr. Stutz has shown no such thing.

## II.   LEGAL STANDARD

"If... an expert's opinion is based on reasoning which as a matter of law is insufficient to support the expert's conclusion, that opinion should not be admitted into evidence because, as a matter of law, it cannot be helpful to the trier of fact and is therefore inadmissible." *Bartley v. Euclid, Inc.*, 158 F.3d 261, 288 (5th Cir. 1998), *opinion vacated on other grounds*, 180 F.3d 175 (1998). The Defendants must prove the admissibility of its experts' testimony by a preponderance of the evidence. *Id.* at 992 (citing *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 at 589); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). In addition to having adequate qualifications, any qualifying expert must base their opinions "upon sufficient facts or data." Fed. R. Evid. 702; *see Knight*, 482 F.3d at 355 (stating that "[t]he [Rule 702] reliability analysis applies to all aspects of an expert's testimony, [including] the facts underlying the expert's opinion," and quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). An expert's work "is admissible only to the extent that it ... *is founded on data*." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (emphasis added). Consequently, Mr. Stutz's principles and methodology regarding the Highway 90 Landfill emissions do not have the indicum of reliability required by Rule 702, and, consequently, must be excluded.

## III.   LAW AND ARGUMENT

Despite being a defense expert during General Causation and despite the Defendants providing emissions estimates during General Causation, this is Mr. Stutz's first attempt to estimate the emissions from the JPLF. As this Court is aware, the agreed-upon definition for the General Causation trial was to "determine whether odors and gases were being emitted by the Jefferson

3

Parish Landfill during the relevant period and whether any such odors and gases were capable of producing the injuries claimed by any one or more of the Plaintiffs in this case."[2]  Clearly, the first element of the General Causation definition was determining whether there were odorous emissions from the JPLF, and the second element necessarily incorporated the question of whether there were emissions at such a level that they would reach the Court-established threshold in the surrounding communities.  Hence, emissions estimates from the JPLF were presented during General Causation by both Plaintiffs and Defendants and, after several conferences with the Court, it is the Plaintiffs' understanding that we are not re-doing General Causation.

Nothing prevented Mr. Stutz from performing an estimate in the General Causation Phase; counsel for Defendants simply made a strategic decision at that time not to have him do so.[3]  They presented Dr. Abichou's estimate which was consistent with their theory of the case at that time – that there were no noxious odors emanating from the Landfill.  Now, faced with the Court's decision that there were noxious odors sufficient to reach the threshold in the surrounding communities, the Defendants want a "redo" and, by eliminating Drs. Abichou and Yocke from their witness list and inserting Mr. Stutz into this role for Specific Causation, defense counsel attempts to dissect the General Causation Ruling and re-litigate both the first and second elements.  If Defendants are allowed to use an old expert to conduct a new estimate of what was already done during General Causation (in order to save themselves from Dr. Abichou's absurd estimate and Dr. Yocke's insufficiently based estimate), and could have been done during General Causation, then the General Causation Ruling loses all meaning, and the Defendants get to start over from the beginning to try out their new litigation strategy.

---

[2] CMOs 1-7.

[3] Deposition of Matthew K. Stutz at p. 283, l. 20 – p. 284, l. 5 (attached as Exhibit A).

This wholesale change of expert estimates is only necessary in order to fit the Defendants' ever-changing (Potemkin Village) narrative. During General Causation, the narrative was that the landfill did not stink. Hence, Dr. Abichou's inappreciable estimate was used. But, after the Court's Findings of Fact and Conclusions of Law,[4] the new narrative is that the landfill stinks a little, but not nearly as bad as Highway 90, a narrative that is incompatible with Dr. Abichou's estimate that the Landfill did not stink at all. So, Mr. Stutz has to come up with an estimate that the Jefferson Parish landfill stank enough to migrate off the landfill but not far enough to affect any of the Trial Plaintiffs and certainly not enough to cause them any of their symptoms. In its "gatekeeping" function, and in consideration of its wide discretion to manage the case before it, the Court should not permit this obvious attempt to redo what was already been done, and what already could have been done, as this does not pass the smell test.

1. **Mr. Stutz's opinion regarding Highway 90 emissions estimate is not the product of reliable principles or methods.**

Mr. Stutz's opinion regarding Highway 90 relies heavily on the inexplicable assumption that H2S concentrations contained in the landfill gas from Highway 90 Landfill did not change from 2008 through 2020, regardless of the content, nature and amount of waste deposited in that landfill. And even his attempt to "clarify" his opinion through an affidavit only adds to the confusion. But, even if he were right, the record shows that the overall amount of landfill gas (and with it hydrogen sulfide) being generated <u>did</u> change.

The Townsend paper relied upon by Mr. Stutz recites that C&D landfills "are not considered to produce a very large volume of gas." R.Doc. 590-2 at page 16 of 98. Nevertheless,

---

[4] "It is also clear emissions from the Landfill migrated off the Landfill site and into the surrounding areas." R.Doc. 323, P. 20. These migrating gases had to be at least at the Court-determined threshold or the Plaintiffs would not have established General Causation.

5

in 2008, the Hwy 90 Landfill was generating enough landfill gas, primarily methane, so that the pressure of the gas inside the waste mass, like air escaping from a balloon, could power three flares – in most simple terms, pipes were driven into the waste mass through which landfill gas could escape, and the escaping gas was then set on fire.  By 2010, not enough landfill gas was being generated to power the flares.  This means that the amount of landfill gas, and with it the amount of hydrogen sulfide, went down.  At this point, the concentration of hydrogen sulfide hardly matters because it is the overall amount of hydrogen sulfide that was sent out into the community that counts.

Mr. Stutz's conclusion that the Highway 90 Landfill, and not the Jefferson Parish Landfill, was the main source of odors plaguing our community from July 2017 through December 2020 is only possible by relying on the 2008 outlier H2S concentrations from the Highway 90 Landfill as proof of what happened in every subsequent year. After Hurricane Katrina, the Highway 90 Landfill accepted and buried more vegetative debris and sulfate-containing waste than ever in its history; *i.e.*, the content, nature and amount of the waste changed.  As a result, the Highway 90 Landfill experienced increased odor complaints and thereafter applied to the LDEQ for a permit to install flares at the site.  That permit was rescinded in January 2011, after the volume of landfill gas generated, which includes H2S, had decreased significantly. On page 4 of their Brief, Defendants admit that the vegetative debris would increase the total volume of landfill gas – and that's the point.  Because of the increase in the total volume of landfill gas, flares needed to be installed in order to control the odors.  By the end of 2010, the flares were no longer needed.  Less overall landfill gas, and fewer odors (because there was less overall gas), resulted.

Nevertheless, Mr. Stutz extrapolates that exact same 2008 H2S concentration every year from 2008-2020.[5] Mr. Stutz's opinion flies in the face of objective facts as his estimate pays no heed to the odor complaints in the community or the content of the waste deposited in the Highway 90 Landfill that undeniably impacts H2S generation and concentrations. Mr. Stutz relies on "Townsend," a 2002 experiment, the main thrust of which is cement's impact on the production of H2S in a laboratory setting.[6] By using post-Hurricane Katrina Highway 90 Landfill data (outlier) and disregarding the obvious impact that the content of waste has on the generation (volume) and concentration of H2S, and even disregarding the clear findings in a study upon which he relies, Mr. Stutz remains steadfast in saying that the H2S concentration remained constant for 12 years.

With his flawed principles (ignoring evidence of 2010 measurements indicating a sharp decline in landfill gas generation five years after Hurricane Katrina as well as reduced H2S concentrations, as predicted) and methodology (assuming a landfill has the same H2S concentration year after year despite variations in volume and types of wastes deposited, despite variations in where the waste was deposited, and despite evidence of 2010 measurements

---

[5] Stutz Dep. at p. 133, l. 22 – p. 134, l. 1. (*see* Ex. A).

[6] Plaintiffs reject that Townsend is applicable for what the Defendants propose. Q: "Going back to Townsend 2002 document that you rely on in your paper, can you tell me how much concrete was deposited into the Hwy 90 Landfill? A: I don't know the number of concrete that was deposited. Q: Do you know why Townsend says that's important? A: I don't recall. Q: So in your opinion is knowing the amount of concrete that is buried with gypsum important when estimating the amount of hydrogen sulfate generated in a C&D Landfill? A: I don't recall. Q: Did you adjust your estimate of the amount of hydrogen sulfide that was generated from the Hwy 90 Landfill based on the amount of concrete? A: I don't … I don't recall … I know I didn't make any adjustments for concrete. Any concrete that was placed in the landfill would have been accounted for. Q Do you know that the document that you rely on, the Townsend 2002 document, has a finding that the amount of concrete deposited with gypsum effects the amount of hydrogen sulfide generated. A: That would be accounted for, yes. That's the concrete that's in Hwy 90 that's there with the gypsum would be part of the analysis. Q: How? Well, it's those concentrations that were taken into account for the fact that there's concrete and there's gypsum in the landfill." Stutz Dep. at pp. 255-256 (*see* Ex. A). The Townsend paper also notes that the presence of wood waste lowered the pH range of the leaching solution "out of the ideal range for sulfate-reducing bacteria." R.Doc. 590-2 at page 15 of 98. The Hwy 90 Landfill contained wood waste, which Defendants improperly equate to the organic waste found in municipal solid waste landfills.

7

indicating a sharp decline in H2S concentrations five years after Hurricane Katrina, as predicted), Mr. Stutz uses LandGEM to estimate the emissions from the Highway 90 C&D Landfill[7] to contort more than 2.3 million tons of 2008 post-Hurricane debris into his 2017-2020 emissions estimates from the Highway 90 Landfill.  Predictably, Mr. Stutz opines that the Highway 90 Landfill was our community's main source of odors during the relevant time period.[8]

### 2. Mr. Stutz's affidavit

Defense counsel submitted an affidavit in a clear attempt to distance their witness from the responses he provided during his deposition.[9]  His affidavit purports not to contain new opinions, but much of what he says was nowhere to be found in his Report or deposition.  Specifically, where Mr. Stutz is reviewing LDEQ-EDMS Document number 7775053, Deposition Exhibit 1561 PDF page 11, it is clear that Mr. Stutz selected the 2008 data because there are three measurements and 2010 appears to him to only have one measurement.[10]  And, to Mr. Stutz, that 2010 measurement is reliable, it is just not "relevant."[11]  From this same document, which was excluded from Mr. Stutz's report, in 2010, Hwy 90 estimated the H2S production to be .424 tons per year that was flared at the site.  To be certain that there was no confusion about Mr. Stutz's opinion, he was asked to repeat his opinion, and he stated, "This appears to be the H2S emissions based off of gas going to the flares – the proposed flares at the site."[12]  Clearly, H2S odors were what the Hwy. 90 Landfill was concerned about controlling (methane is odorless) and clearly, it was all completed by the

---

[7] Mr. Ed Lee makes clear in communications with the LDEQ that LandGEM is not an appropriate tool to estimate emissions from C&D landfills as the default settings overestimate emissions by orders of magnitude.  R.Doc. 558-13.

[8] R.Doc. 558-2 at page 6 of 520 (executive summary).

[9] Stutz Dep. at p. 224, l. 3 – p. 226, l. 16 (*see* Ex. A).

[10] *Id.* at p. 225, l. 2 – 14 (*see* Ex. A).

[11] *Id.* at p. 225, l. 20-24 (*see* Ex. A).

[12] *Id.* at p. 226, 1-12 (*see* Ex. A).

8

same company – EnvioOne – by 2011. And it is paragraph 10, where Mr. Stutz lays his scientific and engineering judgment aside.

## IV.   CONCLUSION

This Court should not admit Mr. Stutz's testimony unless it is certain that he will "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *see also Knight v. Kirby Inland Marine, Inc.*, 482 F.3d347, 355 (5th Cir. 2007) ("[T]he expert's testimony must be reliable at each and every step or else it is inadmissible."). Nowhere does Mr. Stutz's testimony, opinions, or report provide the Court with such comfort.

Respectfully submitted, this 18th day of June, 2024.

/s/ S. Eliza James
FORREST CRESSY & JAMES, LLC
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

/s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

                    Harry S. Johnson, (Admitted Pro Hac Vice)
                    James R. Jeffcoat (Admitted Pro Hac Vice)
                    WHITEFORD, TAYLOR & PRESTON L.L.P.
                    Seven Saint Paul Street
                    Baltimore, Maryland 21202-1636
                    (410) 347-8700
                    hjohnson@whitefordlaw.com
                    jjeffcoat@whitefordlaw.com

                    *Counsel For Addison Plaintiff*