```
                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA



ELIAS JORGE "GEORGE"            CIVIL ACTION
ICTECH-BENDECK                  NO. 18-7889 C/W 18-8071,
                                18-8218, 18-9312

VERSUS                          SECTION E (5)

WASTE CONNECTIONS BAYOU,
INC., ET AL

                     RELATED CASE:


FREDERICK ADDISON, ET AL        CIVIL ACTION

VERSUS                          NO. 19-11133 C/W 19-14512

LOUISIANA REGIONAL LANDFILL
COMPANY (LRLC), ET AL           SECTION E (5)
```

VIDEOTAPED DEPOSITION OF JOHN KIND, PHD, CIH, CSP, TAKEN IN THE LAW OFFICES OF LISKOW & LEWIS, 50TH FLOOR, 701 POYDRAS STREET, NEW ORLEANS, LOUISIANA, ON THE 1ST DAY OF MAY, 2024, COMMENCING AT 9:02 A.M. AND CONCLUDING AT 6:24 P.M.

REPORTED BY:

         RUBY M. WALLEN
         CERTIFIED COURT REPORTER


ESQUIRE
DEPOSITION SOLUTIONS

```
 1   odors, that health conditions cannot be attributed to
 2   the odors.  Right?
 3          A.     You have to do the analysis and
 4   eliminate the other potential causes of their
 5   complaints before you can come to that conclusion.
 6          Q.     Right.  But you agree, right, that the
 7   mere fact that these commonly occur in the absence of
 8   odors, does not by itself allow you to conclude that
 9   the health conditions cannot be attributed to the
10   odorous emissions from the Jefferson Parish Landfill?
11          A.     In the abstract, it does not.
12          Q.     Okay.  All right.  And then we talk
13   about the confounders.  And let's look on Page 53.
14   Because you start, after this section you start
15   talking about some of the individuals.  Okay.  See
16   how, if you look on Page 53, you see a chart there of
17   the medication taken by  REDACTED   during the
18   relevant time period?
19          A.     Yes.
20          Q.     Okay.  And then you've got the alleged
21   injuries, anxiety, headaches, insomnia, vomiting and
22   nausea.  Do you see that?
23          A.     Yes.
24          Q.     And then you got medication taken by
25     REDACTED   that can cause the alleged injuries.
```



```
 1   So, for example, under headaches you've got, you
 2   know, you listed a number of medications here that
 3   you say can cause headaches.
 4        A.      Yes.
 5        Q.      Okay.  How much and for how long do
 6   you have to take any of these medications in order
 7   for them to cause headaches?
 8        A.      Well, that again is going to depend
 9   upon the medication and the individual.
10        Q.      Okay.  Because one of the medications
11   that you listed here is Ibuprofen.
12        A.      Yes.
13        Q.      How does Ibuprofen cause headaches?
14        A.      Well, it is a known, it is a known
15   side effect of Ibuprofen dosing.
16        Q.      Right.  And if you take too much of it
17   and then you stop taking it, it can cause some
18   reactions.  Right?
19        A.      I don't know about that specifically.
20        Q.      Okay.  Now, the mere fact that there
21   are known doesn't mean that this actually caused the
22   headache in  REDACTED , does it?
23        A.      Again, that does not.  These are
24   things that should be considered in the analysis that
25   I was pointing out here.
```



```
 1          Q.     So is it your opinion, then, that you
 2   should, before you can determine that whether or not
 3    REDACTED    headaches came from the Jefferson Parish
 4   Landfill, we would have to figure out how many times
 5   and how much Ibuprofen she took during the entire
 6   relevant period?
 7          A.     I think that is something that you
 8   would want to consider as part of that analysis.
 9          Q.     Okay.  So every time that she took
10   Ibuprofen because she had a headache, you would want
11   to do that before you could figure out if you think
12   she was actually smelling odors from the Jefferson
13   Parish Landfill?
14          A.     Well, you kind of changed the frame
15   there.  Whether she takes Ibuprofen has nothing to do
16   with whether or not she is smelling odors from the
17   landfill.
18          Q.     Right.  And it's your, as I understand
19   what you are trying to say, is that before you can
20   determine that the odors were coming from the
21   Jefferson Parish Landfill or the headaches were being
22   caused by the odors coming from the Jefferson Parish
23   Landfill, we'd have to figure out if the headaches
24   were actually being caused by every one of these
25   medications.  Is that right?
```



```
 1          A.      What I'm saying is you should consider
 2   these medications as potential causes of those
 3   headaches.
 4          Q.      Okay.  And who is it that should
 5   consider this?
 6          A.      That would be the people reaching
 7   specific causation opinions about that.
 8          Q.      Or the people who are saying, no, it
 9   is something else?
10          MS. BRILLAULT:
11                  Object to form.
12          THE WITNESS:
13                  I don't know how that --
14   BY MR. ROWE:
15          Q.      Okay.  Well, if the, if the plaintiff
16   in the case says, you know, I'm smelling these odors
17   from the landfill and, you know, and they are causing
18   me headaches.  And for the headaches I'm taking
19   Ibuprofen.  And we talked, and we don't have any
20   reason to suspect that it is the Ibuprofen that is
21   causing the headaches.  Okay.  That is what is being
22   taken for the remedy for the headaches.
23                  Why would, why would the plaintiff in
24   the case have to put on evidence to say it is coming
25   from the landfill and I smelled it, and I smelled it
```



```
 1   all the time, and I smelled it here and I smelled it
 2   there.  Here is what happened to me.  But, you know,
 3   I took, and I took Ibuprofen, you know, 25 times.
 4   And here is my doctor who says that the Ibuprofen did
 5   not cause my headaches.  Do you really have to go
 6   that far?  Is that what your testimony is?
 7             MS. BRILLAULT:
 8                  Object to form.
 9             THE WITNESS:
10                  Again, my testimony would be that in
11   order to come to a specific causation conclusion, you
12   need to rule out and eliminate confounding causes of
13   that condition.
14   BY MR. ROWE:
15        Q.    Okay.  And when you reviewed the
16   medical records, how often did REDACTED take
17   Ibuprofen?  Could you tell from the medical record?
18        A.    I don't have a specific for that.
19        Q.    What about some of these other, you
20   know, there is Baclofen, there is Bupropion, there is
21   Celebrex?  Do you know how long she took any of those
22   things?
23        A.    I don't have it summarized here.  I
24   couldn't tell you off the top my head.
25        Q.    But you didn't undertake to look at
```



```
 1   any of those to see if there was an actual basis to
 2   conclude that any of these might actually be an
 3   alternate cause.  Right?
 4          A.     Well, again, the basis would be that
 5   she took the medications and those are known side
 6   effects of these medications.
 7          Q.     Right.  And did you, did anybody ask
 8   her, when you took Ibuprofen, did you have any side
 9   effects from it?  Do you know?
10          A.     I have not seen that information.
11          Q.     Okay.  And but you know that your
12   clients had IMEs done of all these people.  Right?
13          A.     They did.  Yes.
14          Q.     Did you advise them to ask about all
15   these medications and see if they had encountered any
16   of these side effects that you say might be there?
17          A.     I didn't speak with the IME doctors.
18          Q.     Okay.  Do you know if anybody did?
19          A.     I don't know.
20          Q.     Okay.  And is there, is there anywhere
21   in your report where you identify what it is, you
22   know, under what conditions these known side effects
23   of all these drugs exist?
24          A.     I did not get into that level of
25   detail.
```



```
 1          Q.     Okay.  And so all you're, all you are
 2   doing here is just listing things that are on the
 3   known side effects list.  Right?
 4          MS. BRILLAULT:
 5                 Object to form.
 6          THE WITNESS:
 7                 This is a listing of the known side
 8   effects of the drugs that they were taking at the
 9   time.
10   BY MR. ROWE:
11          Q.     Okay.  And so you have no way of
12   knowing if  REDACTED  or anybody else of the
13   plaintiffs actually suffered from any of the side
14   effects from any of these drugs.  Right?
15          A.     Again, that was not part of my
16   analysis.  That was part of the analysis that should
17   be done in reaching a specific causation conclusion.
18          Q.     Okay.  Now, are you aware of any case,
19   in your entire experience, where a plaintiff had to
20   go through and eliminate every single known side
21   effect of every medication that they took in order to
22   establish general, specific causation relating to an
23   exposure?
24          MS. BRILLAULT:
25                 Object to form.
```



```
 1  BY MR. ROWE:
 2        Q.     Are you aware of any case where that
 3  happened?
 4        A.     You know, evaluating potential side
 5  effects from drugs and other lifestyle activities is
 6  part of this analysis.
 7        Q.     Well, my question was, are you aware
 8  of any case in which anyone has actually done that?
 9        A.     I've seen it addressed before.  Yes.
10        Q.     Okay.  When?  What case?
11        A.     I've seen it done multiple times over
12  the years.
13        Q.     Okay.  So what you are saying here is,
14  you know, we've got this list of 30 some medications,
15  all of which have known side effects.  You have no
16  way of knowing if any of the individual plaintiffs
17  actually suffered from the side effects.
18               And, but you are saying that the
19  plaintiffs should have gone through and eliminated
20  every potential side effect from every medication.
21  Is that right?
22        MS. BRILLAULT:
23               Object to form.
24        THE WITNESS:
25               Again, if you are going to conduct and
```



```
 1   come up with an analysis and come up with those
 2   opinions, you should consider the side effects from
 3   the medications.
 4   BY MR. ROWE:
 5        Q.    And my question was, are you aware of
 6   any case in which you have actually done that?
 7        A.    You didn't ask if I had actually done
 8   it.
 9        Q.    Yeah.  I know.
10        A.    Others.
11        Q.    I know.  And I'm rephrasing my
12   question.  Is there any case in which you have
13   actually done that, where you have gone through the
14   list of medications and known side effects of every
15   single plaintiff to figure out if any of these other
16   things actually caused the injury?
17        A.    In other cases I've certainly done
18   what I've done here and pointed out medications and
19   side effects related to those.
20        Q.    Right.  And what you've done, all
21   you've done here, as I can tell, is listed drugs and
22   listed the potential side effects.  And my question
23   was whether you have ever gone the next step to see
24   if the plaintiff actually suffered from the side
25   effects, so that you can actually rule in or rule out
```



```
 1   these medications as an alternate source?
 2           MS. BRILLAULT:
 3                   Object to form.
 4           THE WITNESS:
 5                   Again, this is something that I've
 6   done in past cases, addressing the drugs and side
 7   effects.  I remember one in the past where somebody
 8   was taking ACE inhibitors and complaining of a
 9   persistent cough.  And that is a side effect of an
10   ACE inhibitor, for example.  Some of these are common
11   parts of this type of analysis.
12   BY  MR. ROWE:
13           Q.      Okay.  But you have listed not just
14   one, but dozens here.
15           A.      Well, it just depends on what they had
16   taken during that time.
17           Q.      Okay.  Did you in your analysis go
18   through and figure out, you know, if they took it for
19   a lengthy period of time, they took it one time?
20   They started and stopped, or they took it early on in
21   their treatment?  And, I mean, did you look at any of
22   that?
23           A.      I don't have that level of detail here
24   in this summary.  This, again, is just looking at
25   drugs that were taken during that time period.
```



```
 1            Q.      Okay.  And so based on, on this, we
 2     can't even really tell if any of these things are
 3     actually confounders, to use your word, or not.
 4     Right?
 5            MS. BRILLAULT:
 6                    Object to form.
 7            THE WITNESS:
 8                    Again, this is a list of potential
 9     confounders during that time.
10     BY MR. ROWE:
11            Q.      Okay.  Is there anywhere where you
12     have identified actual confounders?
13            A.      I have not, again, taken this to that
14     next step, because that is not part of the analysis
15     that I did here.
16            Q.      Okay.  So all you are doing is
17     speculating on things that might be.  Right?
18            MS. BRILLAULT:
19                    Object to form.
20            THE WITNESS:
21                    I wouldn't call it speculation.  As
22     you know --
23     BY MR. ROWE:
24            Q.      Well, what is it?
25            A.      Again, it's listing the potential
```



```
 1   confounders based upon what is known about these
 2   medications.  It is not guessing that, you know,
 3   headache can be part of a side effect from Ibuprofen.
 4   That is a known side effect.
 5          Q.     Okay.  But don't you need to know in
 6   order to decide whether a particular other source can
 7   be ruled in or ruled out, particularly ruled in, in
 8   your case, that that actually happened?
 9          A.     Again, my analysis was not to rule
10   these in. That is something that falls on the burden
11   of the, of your experts in this case.
12          Q.     Okay.  And what is your basis for
13   saying that?  You know, you said that a number of
14   times, that this burden is on the plaintiffs.  What
15   is your basis for saying that?
16          A.     Well, it is my understanding that it
17   is the plaintiffs' burden to establish that the
18   exposures from the landfill caused their complaints.
19   And this would be part, again, of that analysis.
20          Q.     Okay.  So is it your opinion that in
21   order to prevail in this case, the plaintiffs have to
22   eliminate every possible source, no matter how
23   speculative?
24          MS. BRILLAULT:
25                 Object to form.
```

