UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK E. ADDISON, SR., ET AL.,**<br>    **Plaintiffs** | **CIVIL DOCKET** |
| **VERSUS** | **NO.  19-11133**<br>        **c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL**<br>**COMPANY, ET AL.,**<br>    **Defendants** | **SECTION: "E" (5)** |

***Applies to: Both Cases***

## ORDER AND REASONS

Before the Court are two contested Motions in Limine filed by Plaintiffs[1] and Defendant Jefferson Parish[2] (collectively, the "Movants"), both seeking to exclude testimony of Barry Kline, P.E., a purported expert on landfill gas collection and control, retained by Defendant Aptim Corporation ("Aptim"). Aptim filed memoranda in opposition.[3] The Movants filed reply memoranda in support of their respective Motions in Limine.[4]

## BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "Landfill"), and the resulting odors emitted from the Landfill between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual

---

[1] R. Doc. 551.
[2] R. Doc. 543.
[3] R. Doc. 576 (opposing Plaintiffs' motion); R. Doc. 577 (opposing Jefferson Parish's motion).
[4] R. Doc. 613 (Plaintiffs' reply); R. Doc. 631 (Jefferson Parish's reply).

Plaintiffs.[5] Plaintiffs assert negligence and nuisance claims under Louisiana state law[6] against Defendants: Jefferson Parish, which owns and contracts with others to operate the Landfill; Aptim Corporation, which managed the gas and leachate collection systems of the Landfill from July 2017 to May 2019; and three entities that operated the Landfill from May 2013 to December 2020: Louisiana Regional Landfill Company;[7] Waste Connections Bayou, Inc.;[8] and Waste Connections US, Inc.[9]

On November 5, 2019, the Court issued the first Case Management Order ("CMO"), which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[10] The Court held a trial on general causation in early 2022.[11] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[12] determining that, during the relevant time period: (1) odors and gases were emitted by the Landfill;[13] (2) the emissions of gases and odors from the Landfill occurred during the relevant time period;[14] and (3) exposure to the odors and gases emitted by the Landfill at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction."[15] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial

---

[5] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).
[6] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[7] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[8] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[9] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[10] R. Doc. 80 at pp. 1-2.
[11] R. Docs. 274-278, 286-289.
[12] R. Doc. 323.
[13] *Id.* at p. 5.
[14] *Id.* at p. 26.
[15] *Id.* at p. 27.

be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[16] The first *Addison* trial was set to begin on September 5, 2023,[17] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[18]

Relevant to the instant Motions in Limine, on December 28, 2015, Jefferson Parish contracted with Aptim to provide operation and maintenance services (the "2015 Contract") for the Landfill's gas collection and control system ("GCCS").[19] Aptim operated and maintained the GCCS from January 1, 2017 until May 17, 2019, under the 2015 Contract.[20] Aptim engaged expert Barry Kline, P.E., represented to be an expert on landfill gas collection and control,[21] to "testify regarding the incomplete [GCCS] [Aptim] was provided to operate," as well as to Aptim's duties and responsibilities under the 2015 Contract.[22] Mr. Kline expressed nine opinions in his expert report (the "Kline Report") related to Aptim's "performance as the operator" of the Landfill's GCCS "to support the opinion that Aptim performed competently and professionally at [the Landfill] relative to the limitations place[d] on it."[23]

---

[16] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).
[17] R. Doc. 340.
[18] R. Doc. 495.
[19] 2015 Contract, R. Doc. 543-1.
[20] Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6 at pp. 1-2.
[21] Aptim's Opp'n to Pls.' Mot. in Lim., R. Doc. 576 at p. 1; Aptim's Opp'n to Jefferson Parish's Mot. in Lim., R. Doc. 577 at p. 1.
[22] Aptim's Expert Witness List for the first *Addison* Trial identifies the scope of Mr. Kline's testimony:
    Considering that Aptim was a contractor hired to operate the [GCCS] as it existed at the [] Landfill, Mr. Kline will testify regarding the incomplete [GCCS] it was provided to operate, that Aptim was not responsible for the receipt of waste materials, that Aptim was not responsible for the design of the [GCCS], that Aptim had no control over the timing of the installation of the [GCCS] components, that Aptim was faced with circumstances beyond its control regarding [GCCS] operations and maintenance, that Aptim was limited in its ability to operate and maintain the [GCCS] by its contract with Jefferson Parish, that Aptim had no control over leachate levels in Phase IIIB or Phase IVA, that Aptim had no control over the timing of installation of in-well pumps in Phase IVA landfill gas wells, that Aptim had no control over the selection or installation of landfill cover materials and that monitoring for onsite or offsite odors was outside of the scope of Aptim's contract with Jefferson Parish. R. Doc. 420 at pp. 3-4.
[23] Kline Rep., R. Doc. 551-2 at pp. 5-6.

In February 2024, the Court issued the Thirteenth CMO, which required the parties to file all motions in limine regarding expert testimony in the first *Addison* trial by June 6, 2024.[24] The Movants timely filed their Motions in Limine seeking to exclude Mr. Kline's Report and testimony under Federal Rules of Evidence 702 and 704.[25]

## LEGAL STANDARD

### I.   Motion in Limine Standard

"It is well settled that motions in limine are disfavored."[26] "[T]he purpose of a motion in limine is to prohibit opposing counsel 'from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' mind.'"[27] "Evidence is relevant" if "it has *any* tendency to make a fact . . . of consequence in determining the action" "more or less probable than it would be without the evidence."[28] "Evidence which is not relevant is not admissible."[29] Under Federal Rule of Evidence 403, the Court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."[30] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[31]

"An order in limine excludes only clearly inadmissible evidence; therefore evidence

---

[24] R. Doc. 498 at p. 6.
[25] Jefferson Parish's Mot. in Lim., R. Doc. 543; Pls.' Mot. in Lim., R. Doc. 551.
[26] *Auenson v. Lewis*, 94-2734, 1996 WL 457258, at *1 (E.D. La. Aug. 12, 1996) (citing *Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)).
[27] *MGMTL, LLC v. Strategic Tech.*, 20-2138, 2022 WL 594894, at *2 (E.D. La. Feb. 28, 2022).
[28] FED. R. EVID. 401 (emphasis added).
[29] FED. R. EVID. 402.
[30] FED. R. EVID. 403.
[31] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

should not be excluded before trial unless it is clearly inadmissible on *all* potential grounds."[32] Instead, courts should reserve evidentiary rulings until trial so that questions as to the evidence "may be resolved in the proper context."[33] "When ruling on motions in limine, the Court 'maintains great discretion [as to] evidentiary determinations.'"[34] If the evidence is not clearly inadmissible on all grounds, it is better for the court to decline to rule in advance of trial so that it will have the opportunity to resolve issues in context.

## II.     Federal Rule of Evidence 702 Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[35]

Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[36] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[37]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[38] The United States Supreme

---

[32] *Rivera v. Robinson*, 464 F. Supp. 3d 847, 853 (E.D. La. 2020) (quoting *Auenson*, 1996 WL 457258, at *1)).

[33] *Auenson*, 1996 WL 457258, at *1.

[34] *Jackson v. State Farm Fire & Cas. Co.*, 656 F. Supp. 3d 676 (W.D. La. 2023) (quoting *Parker v. John W. Stone Oil Distributors, L.L.C.*, 18-3666, 2019 WL 5212285, at *2 (E.D. La. Oct. 16, 2019)).

[35] FED. R. EVID. 702.

[36] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

[37] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[38] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[39] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[40] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[41] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[42]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[43] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[44] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[45] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[46]

---

[39] 509 U.S. 579 (1993).

[40] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[41] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

[42] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[43] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

[44] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[45] FED. R. EVID. 704.

[46] *Sudo Properties, Inc. v. Terrebone Parish Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

"[A]n expert may never render conclusions of law,"[47] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[48] Allowing such expert testimony in a jury trial is both unhelpful and harmful because

> the jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the [expert]'s experience and expertise, it might think the witness even more reliable than the judge. If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury.[49]

Accordingly, expert testimony that offers a legal opinion is inadmissible.[50] Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded,"[51] because expert testimony is appropriate only when it will assist the trier of fact.[52]

## LAW AND ANALYSIS

Defendant Aptim offers Barry Kline, P.E., a principal remediation engineer, as its "landfill gas collection and control expert."[53] According to his Report, Mr. Kline currently operates or oversees the operation of landfill gas collection and treatment systems and leachate pumping systems and has experience designing, operating, and maintaining

---

[47] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

[48] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.

[49] *Cefalu v. Edwards*, 2013 WL 5592947, at *1 (quoting *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); *see also Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).

[50] *Estate of Sowell v. United States of America*, 198 F.3d 169 (5th Cir. 1999); *Askanase*, 130 F.3d at 669.

[51] *Jarrow*, 2000 WL 1537989, at *2.

[52] *Id.* Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).

[53] R. Doc. 576 at p. 2; R. Doc. 577 at p. 1.

mechanical remediation systems.[54] Aptim engaged Mr. Kline to evaluate its performance as operator of the Landfill's GCCS during the relevant time period.[55] Mr. Kline ultimately expressed nine opinions in his Report:

> Opinion No 1: APTIM was only provided with a partially-installed GCCS to operate in Phase IVA and the timing of its installation and expansion was outside of APTIM's control.

> Opinion No. 2: APTIM was not responsible for the receipt of waste materials, waste placement, waste processing, or waste solidification, including the deposition or use of materials, such as spent lime or fly ash, that may have led to the increased concentrations of hydrogen sulfide (H2S) within the landfill gas being generated.

> Opinion No. 3: APTIM did not have control over the design of the GCCS in Phase IVA nor did APTIM have control over the timing of installation of various GCCS components, such as gas extraction wells and collection system piping. Additionally, APTIM could only operate the partially-installed GCCS in the condition and configuration provided to it by Jefferson Parish.

> Opinion No. 4: APTIM did not have control over various limitations placed on the GCCS operation by others, especially when circumstances beyond APTIM's control, such as limited vacuum and vacuum interruptions to the wellfield, further impeded GCCS operation. Such restrictions limited optimization of the GCCS operation and its ability to capture the landfill gas being produced within the landfill by the breakdown of waste materials.

> Opinion No. 5: APTIM's work at JPLF was limited by Contract/Agreement provisions and language to specific tasks. Additionally, the Contract/Agreement further limited APTIM's efforts by placing restrictions on the amount of time/effort O&M personnel could spend working on the GCCS, including being subject to Jefferson Parish's approval for all non-routine GCCS work and limits on spending relative to expenses necessary for the Operation and Maintenance tasks.

> Opinion No. 6: APTIM did not have control over the leachate levels in Phase IVA that allegedly impaired the operation of the GCCS.

> Opinion No. 7: APTIM did not have control over the timing of the purchase and installation of the in-well leachate/condensate pumps in Phase IVA gas

---

[54] Kline Rep., R. Doc. 551-2 at p. 5.
[55] *Id.*

wells, or in other phases. APTIM did operate and maintain pneumatic pumps, once installed, in gas wells throughout the landfill.

Opinion No. 8: APTIM did not have control over the specification, procurement, inspection, or placement of landfill cover materials. APTIM was not contracted to maintain any cover materials in any of the Phases of the landfill. APTIM only inspected landfill cover materials in conjunction with performing NSPS-required Surface Emissions Monitoring on a quarterly basis.

Opinion No. 9: Ambient and environmental monitoring for odors onsite and offsite was outside the scope of APTIM's contract with Jefferson Parish. Instead, IESI/Waste Connections' Agreement with Jefferson Parish required it to monitor for and control odors.[56]

The Movants do not challenge Mr. Kline's qualifications, the reliability of his methods, or the relevance of his testimony.[57] Instead, the Movants seek to exclude Mr. Kline's Report and testimony under Rules 702 and 704, insofar as it improperly includes legal conclusions based on Mr. Kline's interpretation of the 2015 Contract and embraces factual issues to which "Aptim's own employees could testify," and which will not otherwise assist the trier of fact.[58]

## I.   Mr. Kline may not offer legal conclusions on the scope of Aptim's contractual duties based on his interpretation of the 2015 Contract.

The Movants argue the Kline Report expresses inadmissible legal conclusions that "attempt to negate fault on the part of Aptim . . . based on [Mr. Kline's] interpretation of [the 2015 Contract]."[59] Specifically, the Movants claim Mr. Kline's opinions that Aptim

---

[56] *Id.* at pp. 6-7.
[57] *See* Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6; Mem. in Supp. of Pls.' Mot. in Lim., R. Doc. 551-1.
[58] *See* Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6 (arguing Mr. Kline's opinions are legal conclusions that attempt to tell "the jury the result to reach as it pertains to the ultimate issue in this case"); Mem. in Supp. of Pls.' Mot. in Lim., R. Doc. 551-1 (arguing Opinion Nos. 1, 2, 3, 4, 6, 7, and 8 "implicate factual issues to which Aptim's own employees could testify . . . [and] state [] legal conclusion[s]"; arguing Opinion Nos. 5 and 8 "purport to analyze the [2015 Contract] and to explain its meaning").
[59] Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6 at p. 6, 9-12; Reply in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 631 at pp. 3-4; Mem. in Supp. of Pls.' Mot. in Lim., R. Doc. 551-1 at pp. 3-5.

"did not have control" or was "limited by [the 2015 Contract]" constitute legal conclusions that attempt to instruct the jury how to apportion fault in this case.[60] The Movants contend Mr. Kline's testimony is unnecessary because "the words of the contract are able to be understood by the jurors, and further will be testified to by fact witnesses."[61] In opposition, Aptim argues Opinion Nos. 1, 2, 3, 4, 6, 7, and 8 offer admissible "expert analysis of the specific, underlying components of the operations at the [Landfill]," which will assist the jury in determining the scope of Aptim's contractual duty and whether Aptim maintained operational control of the GCCS during the relevant time period.[62] Aptim further argues that Opinion No. 5 is "an expert opinion on the *effect* of the subject contract on Aptim's ability to perform its scope of work" at the Landfill, which "'shed[s] light' on contractual terms by citing to customs and usage in the industry."[63] Aptim concedes that the second sentence of Opinion No. 9 "is an admissible legal conclusion" and makes no argument as to the admissibility of the first sentence. [64]

   "Interpretation of a contract is the determination of the common intent of the parties."[65] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[66] "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a

---

[60] Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6 at p. 2, 6.
[61] Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6 at p. 12. *See also* Reply in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 631 at p. 6.
[62] R. Doc. 576 at pp. 5-8 (arguing expert testimony concerning "the degree of completion of the GCCS" is relevant because the condition of the GCCS affected "Aptim's ability to perform its contract scope of work"); R. Doc. 577 at pp. 3-6.
[63] R. Doc 576 at p. 7 (citing *Greenup Indus. LLC v. Five S Group, LLC*, 22-2203, 2023 WL 7335235, at *4 (E.D. La. Nov. 7, 2023).
[64] R. Doc. 576 at p. 8; R. Doc. 577 at pp. 6-7 (conceding the second sentence of Opinion No. 9 is an inadmissible legal conclusion).
[65] LA. CIV. CODE art. 2045.
[66] LA. CIV. CODE art. 2046.

technical matter."[67] "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective."[68] "A doubtful provision must be interpreted in light of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."[69]

Under Louisiana law, "[i]nterpretation of an unambiguous contract is a question of law, while interpretation of an ambiguous contract is a question of fact."[70] "[A]n expert may never render conclusions of law,"[71] and accordingly, may not offer legal conclusions based on the interpretation of an unambiguous contract.[72] Expert testimony is appropriate, however, when "a phrase in a contract is ambiguous and a court seeks to determine 'whether there is a received usage in the trade which would shed light on its meaning.'"[73] Courts in the Fifth Circuit often rely on "individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry."[74] Indeed, "[i]n construing a specific contractual term, [the court] must give consideration to the meaning attributed to that term in the industry."[75] Thus, expert testimony may be admissible to "provide context on an industry practice and interpret contractual provisions specific to such an industry," at the district court's

---

[67] LA. CIV. CODE art. 2047.
[68] LA. CIV. CODE art. 2049.
[69] LA. CIV. CODE art. 2053.
[70] *RSUI Indem. Co. v. American States Inc. Co.*, 127 F. Supp. 3d 649, 658 (E.D. La. 2015).
[71] *Goodman*, 571 F.3d at 399.
[72] *See RSUI Indem. Co.*, 127 F. Supp. 3d at 658.
[73] *Temple v. McCall*, 720 F.3d 301, 305 (5th Cir. 2013) (quoting *Jefferson Disposal Co. v. Jefferson Parish*, 459 So. 2d 639, 642 (La. Ct. App. 1984)).
[74] *Kona Tech. Corp. v. So. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000).
[75] *Personal Preference Video, Inc. v. HBO*, 986 F.2d 110, 114 (5th Cir. 1993).

discretion, but only when the explanation will assist the jury in "more accurately comprehend[ing] the meaning of technical terms used within that industry or trade."[76]

For example, in *Greenup Industries LLC v. Five S Group, LLC*, a recent case arising out of a construction contract dispute between a contractor and subcontractor, Judge Eldon E. Fallon considered a motion to exclude the expert testimony of a civil and environmental engineer, which the movant claimed included inadmissible expert opinions that "sp[oke] to factual questions of contractual interpretation."[77] The relevant opinions expressed by the expert in that case were: (1) that a subcontract at issue incorporated the defendant's bid proposal and that the defendant was entitled to standby time compensation; and (2) that "the primary reason for low productivity and schedule slippage was [the Plaintiff's] inability to provide the required amount of trucks on a consistent basis."[78] Acknowledging the expert was qualified to testify to issues that would help the jury resolve factual questions in the civil and environmental engineering fields, the *Greenup* court found the expert "stepped outside his area of expertise to opine on the contractual responsibilities of the parties."[79] The court reasoned that, although expert testimony "is appropriate when the expert can 'shed light' on contractual terms by citing customs and usage in the industry," the expert's report did not "explain how industry customs support any of his [opinions] regarding the contractual responsibilities of the parties," and ultimately the court precluded the engineer expert from offering "any legal conclusions on the contractual responsibilities of the parties."[80]

---

[76] *Dickson v. Sklarco L.L.C.*, 11-352, 2014 WL 4443423, at *3 (citing *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 281 (5th Cir. 1987)).
[77] 2023 WL 7335235, at *2.
[78] *Id.* at *3.
[79] *Id.* at *4.
[80] *Id.* at *4-5.

In this case, although Aptim contends the 2015 Contract contains "specialized language," neither party to the 2015 Contract suggests it is ambiguous and Aptim fails to call attention to any particular term that warrants expert testimony to properly contextualize.[81] A review of the Kline Report reveals instead that each of Mr. Kline's nine opinions purports to interpret the scope of Aptim's duty under the 2015 Contract. Specifically, Opinion Nos. 1, 2, 3, 4, 6, 7, and 8 express Kline's opinion that Aptim "did not have control over" or "was not responsible for": the timing of the installation and expansion of the Landfill's GCCS;[82] the receipt of waste materials, waste placement, waste processing, or waste solidification;[83] the design of the GCCS in Phase IVA or the timing of installation of various GCCS components;[84] various limitations placed on the GCCS operation by others;[85] the leachate levels in Phase IVA;[86] the timing of the purchase and installation of the in-well leachate/condensate pumps in Phase IVA gas wells or in other phases;[87] and the specification, procurement, inspection, placement, or maintenance of landfill cover materials in any phases of the Landfill.[88] Further, Opinion Nos. 5, 8, and 9 explicitly express legal conclusions based on Mr. Kline's interpretation of the 2015 Contract, including in relevant part: "Aptim's work at [the Landfill] was limited by Contract/Agreement provisions and language to specific tasks";[89] "Aptim was not contracted to maintain any cover materials";[90] and "[a]mbient and environmental

---

[81] *See* Aptim's Opp'n to Jefferson Parish's Mot. in Lim., R. Doc. 577; Mem. in Supp. of Jefferson Parish's Mot. in Lim., R. Doc. 543-6.
[82] Kline Rep., R. Doc. 551-2 at p. 6 (Opinion No. 1).
[83] *Id.* (Opinion No. 2).
[84] *Id.* (Opinion No. 3).
[85] *Id.* (Opinion No. 4).
[86] *Id.* at p. 7 (Opinion No. 6).
[87] *Id.* (Opinion No. 7).
[88] *Id.* (Opinion No. 8).
[89] *Id.* at p. 5 (Opinion No. 5).
[90] *Id.* at pp. 6-7 (Opinion No. 8).

monitoring for odors onsite and offsite was outside the scope of APTIM's contract with Jefferson Parish" and the 2015 Contract "required [Jefferson Parish] to monitor for and control odors."[91]

The Court finds the scope of Aptim's duty under the 2015 Contract and whether Aptim's performance complied with the 2015 Contract are issues about which fact witnesses will testify and lawyers will argue rather than matters suitable for expert testimony. Accordingly, Mr. Kline's testimony providing legal conclusions on the contractual responsibilities of the parties to the 2015 Contract, including the scope of Aptim's duties and whether Aptim complied with its obligations, as expressed in Opinion Nos. 2, 5, 6, and 9 and portions of Opinion Nos. 1, 3, 4, 7, and 8, will be excluded.[92]

## II.    Mr. Kline may not parrot the testimony of fact witnesses. Mr. Kline will be allowed to offer the portion of Opinion No. 4, in which he opines limited vacuum and vacuum interruptions to the wellfield "impeded" or "limited optimization" of the GCCS operation.

As discussed, portions of Opinion Nos. 1, 3, 4, 7, and 8 will be excluded because they are legal conclusions based on Mr. Kline's interpretations of the 2015 Contract.

---

[91] *Id.* at p. 7 (Opinion No. 9).

[92] On these grounds, the Court excludes Opinion Nos. 2, 5, 6, and 9 *in toto*, and those certain portions of Opinion Nos. 1, 3, 4, 7, and 8, as set out below:

Opinion No. 1:  "[T]he timing of its installation and expansion was outside of APTIM's control."

Opinion No. 3:  "APTIM did not have control over the design of the GCCS in Phase IVA nor did APTIM have control over the timing of installation of various GCCS components, such as gas extraction wells and collection system piping."

Opinion No. 4:  "APTIM did not have control over various limitations placed on the GCCS operation by others, especially when circumstances beyond APTIM's control . . . ."

Opinion No. 7:  "APTIM did not have control over the timing of the purchase and installation of the in-well leachate/condensate pumps in Phase IVA gas wells, or in other phases."

Opinion No. 8:  "APTIM did not have control over the specification, procurement, inspection, or placement of landfill cover materials. APTIM was not contracted to maintain any cover materials in any of the Phases of the landfill."

*See id.* at pp. 6-7. The Court will analyze the admissibility of the remaining portions of Opinion Nos. 1, 3, 4, 7, and 8 in Part II.

However, "evidence should not be excluded before trial unless it is clearly inadmissible on *all* potential grounds."[93] Accordingly, the Court will analyze the admissibility of the remaining portions of those opinions.

The Movants argue portions of Opinion Nos. 1, 3, 4, 7, and 8 "implicate factual issues to which Aptim's own employees could testify," and which are otherwise inadmissible under Rule 702 because they do not "assist the trier of fact to understand the evidence or to determine a fact in issue."[94] In opposition, Aptim concedes the Kline Report "partially asserts [] factual conclusion[s] drawn from information in the possession of lay witnesses," but claims Mr. Kline's testimony is admissible under Rule 703 to contextualize "the overly technical issues" of the case, which are "well outside the understanding of a lay juror."[95] Aptim contends Mr. Kline's opinions are "essential for the jury to understand and appreciate the complex workings of [the GCCS]" and "will assist the jury in determining Aptim's fault."[96]

A review of the Kline Report reveals the portions of Opinion Nos. 1, 3, 4, 7, and 8 that do not contain inadmissible legal conclusions merely parrot testimony by fact witnesses.[97] While "testimony in the form of an opinion or inference otherwise admissible

---

[93] *Rivera*, 464 F. Supp. 3d at 853 (quoting *Auenson*, 1996 WL 457258, at *1)).

[94] Mem. in Supp. of Pls.' Mot. in Lim., R. Doc. 551-1 at p. 3, 6 (claiming portions of those opinions should be excluded because they "merely state facts" and that experts "may not be employed simply to present the client's version of the facts").

[95] R. Doc. 576 at pp. 3-4.

[96] *Id*. at p. 5-6.

[97] Federal Rule of Evidence 1006 allows a proponent to "use a summary . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006; *see also United States v. Bishop*, 364 F.3d 535, 547 (5th Cir. 2001) ("Rule 1006 allows admission of summaries when (1) the evidence previously admitted is voluminous, and (2) review by the jury would be inconvenient."). The Fifth Circuit "expressly allows summary witnesses to summarize voluminous records in complex cases" under Rule 1006. *United States v. Baker*, 923 F.3d 390, 397 (5th Cir. 2019) (citing *United States v. Armstrong*, 619 F.3d 380 (5th Cir. 2010). A summary witness is permitted to "read[] the contents of exhibits and sort[] through the evidence to show how the documents relate[] to each other," but may not offer "expert-type testimony." *Baker*, 923 F.3d at 398; *United States v. Nicholson*, 961 F.3d 328, 336 (5th Cir. 2020). Mr. Kline was disclosed as an expert witness, not a summary witness under Rule 1006. He cannot merely summarize the testimony offered by fact witnesses.

is not objectionable because it embraces an ultimate issue to be decided by the trier of fact,"[98] "[e]xpert testimony that does nothing more than 'mirror' testimony offered by fact witnesses should [] be excluded."[99] When determining whether an expert may opine on technical issues, courts evaluate "the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[100]

The Court finds the portions of Opinion Nos. 1, 3, 7, and 8 mirroring fact testimony "embrace an ultimate issue to be decided by the trier of fact" that "the untrained layman would be qualified to determine intelligently" without Mr. Kline's testimony.[101] Those opinions merely repeat certain fact testimony related to Aptim's operation at the Landfill during the relevant time period. Specifically, Opinion Nos. 1, 3, 7, and 8 express that Aptim: "was only provided with a partially-installed GCCS to operate in Phase IVA";[102] "could only operate the partially-installed GCCS in the condition and configuration provided to it by Jefferson Parish";[103] operated and maintained pneumatic pumps in gas wells throughout the Landfill;[104] and "inspected landfill cover materials in conjunction with performing . . . Surface Emissions Monitoring on a quarterly basis," as required by federal regulation.[105] These portions of Mr. Kline's opinions do nothing more than mirror

---

[98] FED. R. EVID. 704.

[99] *In re Tasch, Inc.*, 97-15901, 1999 WL 596261, at *2 (E.D. La. Aug. 5, 1999). *See also Sudo Properties, Inc.*, 2008 WL 2623000, at *8 ("If the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded.").

[100] *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (citing FED. R. EVID. 702, Advisory Committee Note).

[101] *See id.*; FED. R. EVID. 704.

[102] Kline Rep., R. Doc. 551-2 at p. 6 (Opinion No. 1).

[103] *Id.* (Opinion No. 3).

[104] *Id.* at p. 7 (Opinion No. 7).

[105] *Id.* (Opinion No. 8). *See also* 40 C.F.R. § 60 *et seq.* (governing standards of performance for new stationary sources).

testimony offered by Aptim's fact witnesses and are "well within the common sense understanding of jurors."[106] Accordingly, Mr. Kline's testimony, as expressed in the remainder of Opinion Nos. 1, 3, 7, and 8, will be excluded.

While the portion of Opinion No. 4 expressing the fact that limited vacuum and vacuum interruptions to the wellfield impeded the GCCS operation "embrace[s] an ultimate issue to be decided by the trier of fact," the Court finds the opinion implicates issues that are beyond "the common sense" and general knowledge of an "untrained layman."[107] In relevant part, Opinion No. 4 states that certain "circumstances beyond APTIM's control, such as limited vacuum and vacuum interruptions to the wellfield, [] impeded GCCS operation[,] [and] [s]uch restrictions limited optimization of the GCCS operation and its ability to capture the landfill gas being produced within the landfill by the breakdown of waste materials."[108] The opinion expressed in Opinion No. 4 is unlike those expressed in Opinion Nos. 1, 3, 7, and 8, as the jury may have difficulty "adeptly assess[ing] [the] situation using only their common experience and knowledge."[109] The Court finds that Mr. Kline's "specialized understanding of the subject [matter]"[110] underlying Opinion No. 4 is likely to "help the trier of fact to understand the evidence or determine a fact in issue."[111]

As discussed, Mr. Kline may not testify as to the legal conclusion that certain "circumstances [were] beyond APTIM's control."[112] However, the Court will allow Mr. Kline to offer limited testimony related to Opinion No. 4—that limited vacuum and

---

[106] *Vogler*, 352 F.3d at 155; *see also In re Tasch*, 1999 WL 596261, at *2.
[107] FED. R. EVID. 704; *In re Tasch*, 1999 WL 596261, at *2.
[108] Kline Rep., R. Doc. 551-2 at p. 6.
[109] *Greenup Indus.*, 2023 WL 7335235, at *3.
[110] *Vogler*, 352 F.3d at 156 n.5.
[111] FED. R. EVID. 702(a).
[112] *See supra* Law and Analysis, Part I.

vacuum interruptions to the wellfield "impeded" or "limited optimization" of the GCCS operation.[113]

Accordingly;

## **CONCLUSION**

**IT IS ORDERED** that Plaintiffs' Motion in Limine is **GRANTED IN PART AND DENIED IN PART** as stated herein.[114]

**IT IS FURTHER ORDERED** that Jefferson Parish's Motion in Limine is **GRANTED IN PART AND DENIED IN PART**.[115]

Mr. Kline may not offer testimony on Opinion Nos. 1, 2, 3, 4, 5, 6, 7, 8, and 9, which express legal conclusions on the scope of Aptim's contractual duties based on his interpretation of the 2015 contract and/or merely parrot facts that will be testified to by fact witnesses. Mr. Kline may offer limited testimony related to Opinion No. 4, insofar as he expresses his opinion that limited vacuum and vacuum interruptions to the wellfield impeded or limited optimization of the GCCS operation.

**New Orleans, Louisiana, this 10th day of July, 2024.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[113] Kline Rep., R. Doc. 551-2 at p. 6 (Opinion No. 4).
[114] R. Doc. 551.
[115] R. Doc. 543.