UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | **CIVIL ACTION** |
| Plaintiffs | NO. 19-11133, c/w 19-14512 |
| V. | SECTION: "E" (5) |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| Defendants | **JUDGE: Morgan** <br> **MAGISTRATE JUDGE: North** |
| *Applies to: Both Cases* | |

**PLAINTIFFS' OPPOSITION TO
CONTRACTOR DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE ALL
EVIDENCE OF THE WEALTH, REVENUE, PROFITS, AND SIZE OF DEFENDANTS**

Plaintiffs submit the following Opposition to the Contractor Defendants' Motion in Limine to Exclude all Evidence of the Wealth, Revenue, Profits, and Size of Defendants. For the reasons stated herein, the Motion should be denied.  234-235

I.     **INTRODUCTION**

Defendants, Aptim Corporation, Louisiana Regional Landfill Company, Waste Connections, Bayou, Inc. and Waste Connections US, Inc. (collectively, the "Contractor Defendants"), seek to limit all reference, evidence, and argument concerning the financial information of the Contractor Defendants, including but not limited to their income, financial condition, earnings, assets, net worth, market capitalization, United States Securities and Exchange Commission filings, anything related to the companies' overall value or financial status, or other indicators of the relative wealth or size of the parties. However, this type of evidence should be

permitted for numerous reasons: (1) because Waste Connections touts its annual income and balance sheet as the underpinning of its claim that it provides the most "efficient and safe" disposal of CCRs,[1] it's income and wealth is relevant to demonstrate that it knew (or should have known) of the dangers of co-disposing sulfur containing materials with municipal solid waste and the availability of non-negligent methods to dispose of the spent lime;[2] and (2) it goes directly to the allocation of fault amongst the Defendants, which are both matters reserved for determination at trial.

## II. LAW AND ARGUMENT

As this Court ruled, in this case, just last week, "[i]t is well settled that motions in limine are disfavored." (R. Doc. 671 at 3). "[T]he purpose of a motion in limine is to prohibit opposing counsel 'from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' mind.'" *Id.* at 3-4. Because an order in limine "excludes only clearly inadmissible evidence; evidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds." *Id.* at 4. As a result, "[i]f the evidence is not clearly inadmissible on all grounds, it is better for the court to decline to rule in advance of trial so that it will have the opportunity to resolve issues in context." This ruling requires denial of this Motion in Limine.

---

[1] Coal Combustion Residuals, which Defendants' witnesses concede as including flue gas desulfurization materials, such as the spent lime in this case.

[2] Civil Code § 667 conditions recovery for nuisance on a showing that "the damage could have been prevented by the exercise of reasonable care." Plaintiffs' proof includes, as noted above, that Waste Connections advertises that its income and wealth allow it to provide CCR disposal methods and facilities which might otherwise not be available, i.e., it was able to afford to devise disposal methods which could have avoided the generation of massive amounts of hydrogen sulfide which descended on neighboring communities.

**A. Evidence of the Contractor Defendants' wealth, revenue, profits, and size should be permitted at trial because it is relevant to demonstrate the negligent and nuisance-inducing operation of the Jefferson Parish Landfill.**

Despite Contractor Defendants' contentions that evidence relating to their wealth, revenue, profits and size are irrelevant and unfairly prejudicial in this case, this argument must fail. This is because the Waste Connections' Defendants, themselves, have publicly correlated their financial status with guaranteeing the safe and efficient disposal of CCRs to their potential customers. Thus, this type of evidence is relevant to prove (1) that Waste Connections had the resources to know the dangers of co-disposal of CCRs with municipal waste; and (2) that Waste Connections could easily have afforded to employ alternate ways to dispose of the spent lime, such as isolation into containment cells. Indeed, it is precisely this solution that Waste Connections tells its potential customers that its income and wealth allow it to do. (Trial Exhibit 4148/4151; Laubenstein Deposition pp. 234-235; Laubenstein Deposition Exhibit 1292; WC_JPLF_00523447, **Exhibit A**).

The Waste Connections Defendants have advertised their financial status as proof of their ability to provide top-tier and "safe" services within the waste industry and particularly with regard to CCRs. Waste Connections' reliance on their financial status is demonstrated in the marketing materials they send out to potential clients. For example, Waste Connections finds it imperative to include in their advertising brochures, "Waste Connections also provides: [t]he strongest industry balance sheet affording customers the luxury of having Waste Connections build a Subtitle D landfill on the customer's own site." (Exhibit A). Further, during Mr. Joseph Laubenstein's, Director of CCR Management for Waste Connections', deposition, he emphasizes the importance of Waste Connections' financial status in being able to provide top-tier, safe CCR disposal services to customers. In discussing an email chain between Mr. Laubenstein and a potential customer of Waste Connections, Mr. Laubenstein elaborated on this:

Q. Okay. And you say, "Waste Connections is third largest solid waste company in North America, with annual revenues exceeding 4.3 billion." It was important to you to convey that to this potential customer, right?

A. Yes.

Q. And then you go on to explain why it was important. You say, "We have made a commitment to the management of CCRs from the coal burning power industry that far exceeds all our competitors participating in the market," right?

A. Yes.

\*   \*   \*

Q. Okay. You can handle [your material] properly?

A. Yeah.

Q. And by properly, you mean safely, in accordance with regulations and rules?

A. Yes.

\*   \*   \*

Q. Okay. And you go on to say, "No others can offer what we do with our 93 North American landfills," right?

A. Yes.

Q. You have the strongest balance sheet in the solid waste industry, right?

A. Yes.

Q. And that balance sheet is important because of your commitment to capitalize, design, build and operate mono-fill CCR landfill cells, right?

 MS. KREBS: Object to form.

A. Yes.

\*   \*   \*

Q. So you use your strong -- you're advertising to this potential customer that Waste Connections can use the power of its balance sheet to design and build mono-fill cells for CCR disposal either at your existing landfills or at the customer's site, right?

4

    A.    Yes.

*    *    *

    **Q.    So you are saying that Waste Connections is the company that can best manage CCR materials, right?**

    **MS. KREBS:  Object to the form.**

    A.    Better than others.

    **Q.    (BY MR. FOSTER) Better than others?**

    A.    Better than others.

Laubenstein Deposition pp. 234-242, **Exhibit B**.

The deposition excerpts for Mr. Laubenstein demonstrate that Waste Connections intentionally ties their "balance sheet" with their "commitment to capitalize, design, build and operate mono-fill CCR landfill cells." Exhibit B, pp 240-241. This commitment includes handling materials within the landfills they operate "properly" and "safely, in accordance with regulations and rules." *Id.* at 240.

Therefore, Plaintiffs should be able to introduce evidence relating to Waste Connections' wealth, revenue, profits, and/or size, because it is intertwined with the Waste Connections' Defendants ability to adhere to the standard of care they promise within the industry and breached, which applies to both the negligence claim and the nuisance claim by the Plaintiffs. *Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("negligence is not a state of mind; it is a failure . . . to come up to the specified standard of care"); *Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. 18-cv-7889, 2019 WL 4111681, at *2 (E.D. La. Aug. 29, 2019) (Morgan, J.) ("to bring a successful nuisance claim under this provision, a plaintiff must prove a defendant is: (1) a proprietor who (2) negligently (3) conducts 'work' on his property (4) that causes damage to his neighbor").

5

The Defendants contend that Plaintiffs should not be able to introduce this type of evidence because Plaintiffs will use it to demonstrate "intent-based theories of liability, which would require evidence of intentional conduct and a culpable state of mind." (R. Doc. 666 at 5). Plaintiffs are unsure what that means but do confirm that they will not be using this type of evidence to support any intent-based theories, and instead plan to use this evidence to demonstrate that Waste Connections knew (or should have known) of the dangers of co-disposal of CCRs with municipal solid waste, a breach in the standard of care by Waste Connections in administering their CCR operational duties at the Landfill and their ability to prevent the harm they caused by the exercise of reasonable care.

In regard to the introduction of evidence relating to Aptim's wealth, revenue, profits and size, there is no reason why the amount of money involved in Aptim's contract to manage the gas and leachate collection systems of the Landfill should not be permissible evidence.  The amount of the contract and the specific limitations it placed on Aptim (one person, 40 hours per week) are relevant to show why Aptim failed to remove leachate from the gas wells, causing them to "water in" and be unable to collect the H2S and other gases being generated at the Jefferson Parish Landfill.  Plaintiffs do not intend to introduce this type of evidence related to Aptim for any reason other than to prove Aptim's negligence and nuisance-inducing actions during the relevant time period. Plaintiffs will not be introducing any of this type of evidence to assert any "intent-based" theories against Aptim.

While the Defendants assert that introduction of this type of evidence is unfairly prejudicial, its probative value prevails. "Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *Thibodeaux v. WellMate,* No. CIV.A. 12-1375, 2014 WL 1329802, at *12

6

(E.D. La. Mar. 31, 2014) (Morgan, J.) (quoting *U.S. v. McCrae*, 593, F.2d 700, 707 (5th Cir. 1979)). In this case, this evidence and Plaintiffs' argument that the Contractor Defendants' financial situation directly relates to their ability to provide safe and effective Landfill services is highly relevant to the negligence and nuisance claims. In addition, Waste Connections' reliance on its income and wealth in touting its "safe" disposal of CCRs has opened the door to that very evidence.

Therefore, because this type of evidence is not clearly inadmissible on all potential grounds, Plaintiffs should be permitted to introduce this evidence at trial.

**B. Evidence of the Contractor Defendants' wealth, revenue, profits, and size should be permitted at trial because it is relevant to the allocation of fault amongst the Defendants based on comparative fault principles.**

Louisiana is a pure comparative fault state, and thus a jury must assign fault based on those who caused or contributed to the Plaintiffs' alleged injuries. Under Louisiana's Civil Code, "the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, [or] immunity by statute." La. Civ. Code art. 2323.

In this case, as discussed above, information relating to Waste Connections' revenue, wealth, and size is relevant to Plaintiffs' claims for negligence and nuisance and to allocation of fault because that wealth and size enabled Waste Connections to take steps to avoid causing harm. As such, any evaluation of each of the Defendants' liability under these claims will be impacted by a presentation of this type of evidence at trial. "In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." *Watson v. State Farm Fire and Cas. Ins. Co.*, 469 So. 2d 967, 974 (La. 1985). "In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including . . . (4) the capacities of the

7

actor, whether superior or inferior." *Id.* at 974. In this case, in determining the degree of fault of each of the Defendants, it is integral to be able to discuss each of their "capacities" as operators of the Landfill and managers of the gas and leachate collection systems.

Therefore, because this type of evidence is not clearly inadmissible on all potential grounds, Plaintiffs should be permitted to introduce this evidence at trial.

### III.  CONCLUSION

The wealth, revenue, profits, and size of the Contractor Defendants is undoubtedly relevant to the Plaintiffs' theories of liability pursuant to Rules 401 and 402, and thus should be admissible at trial. For the reasons stated above, the Contractor Defendants' Motion in Limine to Exclude all Evidence of the Wealth, Revenue, Profits, and Size of Defendants should be denied.

Respectfully submitted, this 24th day of July, 2024.

/s/ S. Eliza James
FORREST CRESSY & JAMES, LLC
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

/s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573

Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)
James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

*Counsel For Addison Plaintiffs*