## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK E. ADDISON, SR., ET AL.,**<br>    **Plaintiffs** | **CIVIL DOCKET** |
| **VERSUS** | **NO.  19-11133**<br>    **c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL**<br>**COMPANY, ET AL.,**<br>    **Defendants** | **SECTION: "E" (5)** |

*Applies to: Both Cases*

## ORDER AND REASONS

Before the Court is Plaintiffs' Motion in Limine to exclude testimony of the Defendants' witness Michael Corn, P.E., a purported expert in emissions rates, fate and effect analysis, and non-landfill odors and emissions sources.[1] The Defendants filed a joint memorandum in opposition.[2] Plaintiffs filed a reply.[3]

## BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "Landfill"), and the resulting odors emitted from the Landfill between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual Plaintiffs.[4] In their Second Amended Complaint, Plaintiffs assert negligence and nuisance

---

[1] R. Doc. 545.
[2] R. Doc. 601.
[3] R. Doc. 607.
[4] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).

claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to operate the Landfill; Aptim Corporation, which managed the gas and leachate collection systems of the Landfill from July 2017 to May 2019; and three entities that operated the Landfill from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc. (collectively, the "Defendants").[8]

On November 5, 2019, the Court issued the first Case Management Order, which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022.[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that: (1) odors and gases were emitted by the Landfill;[12] (2) the emissions of gases and odors from the Landfill occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the Landfill at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction."[14] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[15] The first *Addison* trial was

---

[5] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] R. Doc. 80 at pp. 1-2.
[10] R. Docs. 274-278, 286-289.
[11] R. Doc. 323.
[12] *Id.* at p. 5.
[13] *Id.* at p. 26.
[14] *Id.* at p. 27.
[15] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).

set to begin on September 5, 2023,[16] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[17]

Relevant to the instant Motion in Limine, the Defendants assert several "alternative source arguments,"[18] including that: (1) Plaintiffs' alleged damages were sustained in whole or in part as a result of intervening or superseding causes, including noxious odors originating from sources other than the Landfill; and (2) Plaintiffs' claims are barred or diminished to the extent their injuries were caused by their own comparative fault or the comparative fault of third parties or sources of odors for which the Defendants are not responsible.[19] The Defendants engaged expert Michael Corn, P.E., represented to be an expert in emissions rates, fate and effect analysis, and non-landfill odors and emissions sources, to testify "about potential non-landfill sources of odors and emissions events at those sources, and their impact on [the Trial Plaintiffs]."[20] Mr. Corn expressed four opinions in his expert report (the "Corn Report") related to the impacts of certain non-landfill odors and emissions sources on the Trial Plaintiffs.[21]

In February 2024, the Court issued the Thirteenth CMO, which required the parties to file all motions in limine regarding expert testimony in the first *Addison* trial

---

[16] R. Doc. 340.

[17] R. Doc. 495.

[18] *See* R. Doc. 671 at p. 10 (denying Plaintiffs' motion to exclude evidence related to Defendants' "alternative source arguments" and ruling that "evidence related to Defendants' alternative source arguments is relevant under Rule 401, as 'any potential alternative theories of causation go directly toward a key underlying issue' in this case").

[19] Waste Connections Defendants' Affirmative Defenses and Answer to Plaintiffs' Second Amended Complaint, R. Doc. 502 at p. 2; Jefferson Parish's Answer to Plaintiffs' Second Amended Complaint, R. Doc. 504 at pp. 20-21; Aptim's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint, R. Doc. 111 at pp. 14-15. Aptim's Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint incorporated by reference the affirmative defenses asserted in Aptim's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint. R. Doc. 447 at p. 1.

[20] Waste Connections Defendants' Expert Witness List, R. Doc. 418 at p. 1; Jefferson Parish's Expert Witness List, R. Doc. 419 at p. 1; Aptim Corporation's Expert Witness List, R. Doc. 420 at p. 1.

[21] Corn Rep., R. Doc. 588-4 at pp. 11-12.

by June 6, 2024.[22] The Plaintiffs timely filed their Motion in Limine seeking to exclude the testimony of Mr. Corn *in toto* under Federal Rules of Evidence 401, 403, and 702.[23]

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[24]

"A district court has considerable discretion to admit or exclude expert testimony under Rule 702."[25] Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[26] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[27] The trial court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[28]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[29] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[30] provides the

---

[22] R. Doc. 498 at p. 6.

[23] R. Doc. 545.

[24] FED. R. EVID. 702.

[25] *In re Pool Products Distribution Market Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).

[26] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

[27] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[28] *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702).

[29] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[30] 509 U.S. 579 (1993).

analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[31] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[32] The proponent of expert testimony "need not prove to the judge that the expert's testimony is correct, but [] must prove by a preponderance of the evidence that the testimony is [relevant and] reliable."[33]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[34] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[35] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[36] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[37] "[A]n expert

---

[31] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[32] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

[33] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[34] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

[35] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[36] FED. R. EVID. 704.

[37] *Sudo Properties, Inc. v. Terrebone Parish Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

may never render conclusions of law,"[38] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[39] Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded,"[40] because expert testimony is appropriate only when it will assist the trier of fact.[41]

As part of its "gatekeeping function," "the trial court must probe the reliability . . . of expert testimony any time 'such testimony's factual basis, data, principles, methods, or their application are sufficiently called into question.'"[42] "While 'principles' refers to the theories an expert employs to explain observed facts, 'methods' refers to *how* the expert collects data and derives theories or opinions from them."[43] "The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid."[44] Expert testimony offering "an inference or assertion" on scientific matters is reliable only if the expert's data and theories are "derived by the scientific method" and "rest[] on a reliable foundation."[45] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[46] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and

---

[38] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

[39] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.

[40] *Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).

[41] *Id.* Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).

[42] *EEOC v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

[43] 29 FED. PRAC. & PROC. EVID. § 6268.1 (2d ed.) (2024).

[44] *In re Pool Products*, 166 F. Supp. 3d at 661 (citing *Daubert*, 509 U.S. at 592-93).

[45] *Daubert*, 509 U.S. at 590, 597.

[46] *Daubert*, 509 U.S. at 592–96.

publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[47] The Supreme Court has cautioned the reliability analysis must remain flexible—the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[48] "[N]ot every *Daubert* factor will be applicable in every situation," thus district courts are offered broad latitude in making expert testimony determinations and may "consider other factors it deems relevant."[49]

The trial court is offered "broad latitude" in deciding whether to admit or exclude expert testimony and in deciding "*how* to determine reliability . . . in respect to its ultimate reliability determination."[50] While "[t]rained experts commonly extrapolate from existing data," expert opinions that represent an unfounded extrapolation from the underlying data should be excluded.[51] Indeed, "[t]he reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'"[52] Trial courts routinely exclude expert testimony as unreliable under Rule 702 when opinions offered: fail to "adequately

---

[47] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).

[48] *Kumho Tire*, 526 U.S. at 150.

[49] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004); *Kumho Tire*, 526 U.S. at 151–53.

[50] *Kumho Tire*, 526 U.S. at 142.

[51] "Several post-*Daubert* cases have cautioned about leaping from an accepted scientific premise to an unsupported one. To support a conclusion based on such reasoning, the extrapolation or leap . . . must be reasonable and scientifically valid." *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (citations omitted). *See also Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

[52] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).

account[] for obvious alternative explanations";[53] are "speculative or conjectural";[54] or are based on "unrealistic and contradictory" assumptions[55] or "vague allusions to [the expert's] 'experience.'"[56] In cases requiring scientific expertise, the Fifth Circuit has advised: "To make precise estimates, precise data are required."[57]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[58] "Although the jury ultimately decides the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to justify submitting the issue in the first instance."[59] Rule 403 also allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[60] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[61] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[62] Indeed, as the Fifth Circuit has proclaimed, the "major function"

---

[53] *In re Pool Products*, 166 F. Supp. 3d at 662 (citing *Daubert*, 509 U.S. at 596).

[54] *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

[55] *Id.*

[56] *See, e.g., Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021) (affirming trial court order excluding expert testimony on damages for breach of fiduciary duty as unreliable under Rule 702 when the expert could only invoke vague allusions to his experience when pressed on how he extrapolated from factors on which he relied to reach conclusions regarding damages).

[57] *Gulf South Insulation v. U.S. Consumer Product Safety Com'n*, 701 F.2d 1137, 1147 (5th Cir. 1983); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where the expert's opinion is based on insufficient information, the analysis is unreliable.").

[58] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).

[59] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 Marq. L. Rev. 173, 191 (2006).

[60] Fed. R. Evid. 403.

[61] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

[62] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).

of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[63]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[64] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[65] It is "the role of the adversarial system, not the court, to highlight weak evidence."[66] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on 'completely unsubstantiated factual assertions.'"[67]

## LAW AND ANALYSIS

The Defendants offer Michael Corn, P.E., as an expert in emissions rates, fate and effect analysis, and non-landfill odors and emissions sources.[68] The Defendants engaged Mr. Corn to assess the impacts on the Trial Plaintiffs of non-landfill alternative sources of odors, and emissions events at those sources.[69] According to his Report, Mr. Corn represents he has over 50 years of experience as an environmental and water resources engineer and environmental consultant, working in industrial and government-operated facilities, like the non-landfill emissions sources discussed in the Corn Report.[70] Mr. Corn

---

[63] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).
[64] *Daubert*, 509 U.S. at 596; *see also 14.68 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).
[65] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).
[66] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).
[67] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).
[68] Waste Connections Defendants' Expert Witness List, R. Doc. 418 at p. 1; Jefferson Parish's Expert Witness List, R. Doc. 419 at p. 1; Aptim Corporation's Expert Witness List, R. Doc. 420 at p. 1.
[69] Waste Connections Defendants' Expert Witness List, R. Doc. 418 at p. 1; Jefferson Parish's Expert Witness List, R. Doc. 419 at p. 1; Aptim Corporation's Expert Witness List, R. Doc. 420 at p. 1.
[70] Corn Rep., R. Doc. 588-4 at p. 7.

represents he has conducted or supervised other engineers and scientists in developing air emissions estimates, air permitting, air modeling, and Toxics Release Inventory reporting.[71]

Mr. Corn reviewed documents related to certain non-landfill sources, including:

(1) Title V operating permits ("Title V Permits") and minor source air permits ("Minor Source Permits"), both issued under the Louisiana Department of Environmental Quality ("LDEQ") air emissions program;[72]

(2) Incident reports related to certain "emission events" filed with the LDEQ (the "LDEQ Incident Reports");[73]

(3) Toxic Release Inventory ("TRI") Reports for major air emissions sources published by the U.S. Environmental Protection Agency ("USEPA");[74] and

(4) Relevant literature.

Mr. Corn evaluated two "Non-Facility Emissions Sources" and fifteen "Facility Emissions Sources" represented by him to be non-landfill alternative sources of odors. The two Non-Facility Emissions Sources are identified as:

(1) The Harahan Sewer Collection System (the "Harahan Sewer"); and

(2) Nearby wetlands and forested wetlands (the "Wetlands").[75]

The fifteen Facility Emissions Sources are identified as:

---

[71] *Id.* at p. 8.

[72] Title V Permits are required for air emissions sources that exceed 100 tons per year ("tpy") of any criteria pollutant, 25 tpy of total hazardous air pollutants ("HAPs"), or 10 tpy of any single HAP. *See id.* at pp. 13-14. Title V Permits express the "amounts of various substances [the permitted facilities] are allowed to release," not their actual emissions. *See id.* at p. 10.

[73] LDEQ Incident Reports must "be filed by facilities for unpermitted, unauthorized air emissions." *See id.* at p. 16.

[74] "TRI [R]eports give the total actual combined emissions (either measured or calculated)" emitted by two facilities during the relevant time period: the Cornerstone Chemical Complex, which includes emissions from seven separately permitted sources, and the River Birch Landfill (including emissions from the landfill and non-landfill operations). *See id.* at p. 15.

[75] *Id.* at pp. 104-06.

(1) The Seven chemical plants or support facilities within the Cornerstone Chemical Complex (the "Cornerstone Complex"), which include:

    a.  The Acrylonitrile Plant,

    b.  The Urea and Melamine Plant,

    c.  The Sulfuric Acid Regeneration Plant,

    d.  The Utilities Plant/Site Services (the "Utilities Plant"),

    e.  The Dyno Nobel Ammonia Plant,

    f.  The Roehm America Plant, and

    g.  The Kemira Chemicals Plant;

(2) The American River Transportation Company Fleeting Services facility (the "ARTCO Facility");

(3) The International Matex Tank Terminal facility (the "IMTT Facility");

(4) The Harahan Wastewater Treatment Plant (the "Harahan WTP");

(5) The Archer Daniel Midland Grain River System facility (the "ADM Grain Facility");

(6) The Cargill Westwego Marine Terminal ("Cargill");

(7) Kirby Inland Marine;

(8) The Composing Facility at Wood Materials, LLC (the "Composting Facility"); and

(9) Non-landfill operations at the River Birch Landfill.

The Facility Emissions Sources are listed in Table 1 of the Corn Report.[76]

---

[76] *Id.* at pp. 18-19.

The Plaintiffs do not challenge Mr. Corn's qualifications.[77] Instead, the Plaintiffs seek to exclude Mr. Corn's testimony under Rules 401, 403, and 702, insofar as Mr. Corn's testimony is not relevant, is unreliable, and will not assist the trier of fact, and has the potential to confuse the issues and mislead the jury.[78]

## I. The subject of Mr. Corn's testimony may be relevant under Rule 401.

First, Plaintiffs argue Mr. Corn's opinions are not relevant under Rule 401 because he offers opinions only as to "the mere existence of potential other sources," a fact which Plaintiffs claim is "not in dispute."[79] In opposition, the Defendants accuse Plaintiffs of mischaracterizing Mr. Corn's testimony and urge the Court to deny Plaintiffs' Motion in Limine.[80] The Defendants argue Mr. Corn's testimony is relevant because he "does not merely opine that 'other potential sources of odors exist in the community,'" but rather "opines that these other odor sources more likely than not impacted the Trial Plaintiffs and that the odors detected by an individual Trial Plaintiff . . . originated from one or more of the 15 identified facilit[y] [and two non-facility emissions sources,] and not . . . from [the Landfill]."[81] The Defendants contend Mr. Corn's testimony supports their alternative source arguments and is directly relevant to the causation element of Plaintiffs' claims.[82]

On July 17, 2024, the Court issued its Order and Reasons determining, in relevant part, that "evidence related to Defendants' alternative source arguments is relevant under Rule 401, as 'any potential alternative theories of causation go directly toward a key

---

[77] *See* R. Doc. 545-1.
[78] *See* R. Doc. 545-1.
[79] *Id.* at p. 2.
[80] R. Doc. 601 at pp. 3-6.
[81] *Id.* at pp. 3-4.
[82] *Id.* at pp. 7-8.

underlying issue' in this case."[83] Because Mr. Corn's proposed testimony is relevant to the

Defendants' alternative source arguments, the Court will not exclude Mr. Corn's

testimony under Rule 401.

## II.    Mr. Corn's testimony will be excluded under Rules 702 and 403.

In his Report, Mr. Corn expressed four opinions based on his findings:

> Opinion #1: Given that the weather data collected do not show
> a preferential wind direction, it is my opinion that no one
> source (i.e., the [] Landfill) could have impacted all [Trial
> Plaintiffs] at all times. The variable wind directions confirm
> that odors and emissions from the alternative odor sources
> more proximate to each individual plaintiff were more likely
> transported into the residential areas where the [Trial
> Plaintiffs] live and travel through. The wind direction is
> known to impact odors that reach an individual resident and
> not her neighbor . . . .

> Opinion #2: Emissions from the alternative odor sources,
> permitted or not, resulted in odors in areas that the [Trial
> Plaintiffs] lived and traveled through. This opinion is
> supported by documented cases of individual impacts to
> residents residing at similar distances from these fifteen non-
> landfill industrial and municipal facilities as the [Trial
> Plaintiffs], including during the relevant time period. There
> are multiple continuous or near-continuous sources of air
> pollution in Jefferson Parish proximate to the [Trial
> Plaintiffs'] homes and/or the areas through which they travel.

> Opinion #3: It is my opinion that the proximity of the receptor
> to sources released at or near ground level is more likely to
> impact a receptor. Thus, the [Trial Plaintiffs] living and
> traveling directly adjacent to the alternative sources, such as
> the residents in Harahan who lived close to the Harahan
> Wastewater Treatment Plant (WTP), were more likely than
> not directly impacted by odors from the Harahan WTP,
> including the occurrences when Chalmette wastewaters
> containing ammonia and mercaptans were emptied into the
> aerobic digester at the WTP. This resulted in fifty-four
> Louisiana Department of Environmental Quality (LDEQ)
> Incident Reports being filed with the agency from July 1, 2017

---

[83] R. Doc. 671 at p. 10 (citing *Robinson v. Ethicon Inc.*, 20-3760, 2022 WL 20689753, at *4 (S.D. Tex. Oct. 5, 2022); *In re Katrina Canal Breaches Consol. Litig.*, 05-4182, 2009 WL 982104, at *5 (E.D. La. Apr. 13, 2009)).

through May 23, 2018 and twenty LDEQ Incident Reports from November 15, 2016 through June 19, 2017 concerning odors coming from the WTP.

Opinion #4: Given the variable wind direction in the area and the plaintiffs' close proximity to many known odor sources, it is my opinion that the [Trial Plaintiffs] are more likely than not subjected to multiple different pollutants released from the industrial facilities, especially the Harahan WTP, and the extensive wetlands in the area. That is, on any given day, depending on the wind conditions, it is my opinion that any odors detected are likely not originating from the same source as the previous day.[84]

Plaintiffs argue Mr. Corn's testimony should be excluded under Rule 702 because his opinions are "matters of common knowledge," which "ordinary jurors" can ascertain from their own experience without "special expertise or training," and thus will not assist the trier of fact.[85] Plaintiffs further contend Mr. Corn's opinions are excludable under Rule 702 as unreliable because he failed to consider "odor thresholds, emission rates and amounts, and air modeling" of the alternative sources' purported emissions, and merely speculates as to the impacts of certain "emissions events" identified in LDEQ Incident Reports.[86] For the same reasons, Plaintiffs argue the probative value of Mr. Corn's testimony is outweighed by "the potential to confuse the issues and mislead the jury" and thus should be excluded under Rule 403.[87]

In opposition, the Defendants represent they intend to offer Mr. Corn's testimony on:

[T]he effect of wind direction on odors emanating from 15 non-landfill industrial and municipal facilities, . . . the likely effect of same on [the Trial Plaintiffs] residing in different proximity to [the Landfill] and alternative

---

[84] Corn Rep., R. Doc. 588-4 at pp. 11-12 (citations omitted).
[85] R. Doc. 545-1 at pp. 3-5 ("Mr. Corn offers noting more than what the lawyers could do if they put a map on the wall of the 'other source' locations and argued that what the Plaintiffs were really smelling was one of them.").
[86] *Id.* at pp. 6-7.
[87] *Id.* at p. 7.

14

> sources, how proximity of the receptor to sources . . . is more likely to impact a receptor, and how the foregoing are influenced by the fate and transport of mechanisms of the various chemicals used and/or processed by the various industrial and municipal facilities identified.[88]

As such, the Defendants claim Plaintiffs are wrong when they argue that "such specialized expert testimony [is] within the common knowledge of the ordinary juror," which they suggest "reflects a . . . drastic oversimplification of this case."[89]

Defendants concede that, to the extent Mr. Corn bases his opinions on air emissions from the Facility Emissions Sources, he "relies on [those] facilities' [air] permits, which provide both the planned discharges and releases and an *estimate* of the maximum emissions that a facility *may* have."[90] The Defendants argue the bases of Mr. Corn's testimony nevertheless are reliable, and his testimony poses no risk of misleading or confusing the jury.[91] Specifically, the Defendants contend: Mr. Corn's reliance on the air permits to inform his testimony as to the types and quantities of pollutants the Facility Emissions Sources are "authorized to emit . . . is relevant to whether Plaintiffs' alleged injuries arise from one or more of [those alternative] sources";[92] Mr. Corn's discussion of emissions events outside the relevant time period is relevant to demonstrate the alternative sources "have the *potential* to release pollutants capable of adversely impacting Plaintiffs";[93] and Mr. Corn's reliance on TRI Reports from certain Facility Emissions Sources is reliable because "[t]he TRI data represents *actual* emissions by [those] alternative odor sources."[94]

---

[88] R. Doc. 601 at p. 8 (quoting Corn Rep., R. Doc. 588-4 at p. 10).
[89] *Id.*
[90] *Id.* at p. 5 (emphasis added).
[91] *Id.* at pp. 6-11.
[92] *Id.* at p. 10.
[93] *Id.* at p. 11.
[94] *Id.*

Although the Corn Report expresses four distinct opinions, Opinion Nos. 1,[95] 3, and 4 are dependent upon the conclusion expressed in Opinion No. 2, that emissions from the evaluated non-landfill alternative odor sources resulted in odors in areas in which the Trial Plaintiffs lived and traveled.[96] Expressing Opinion No. 2 based on its basic components, Opinion No. 2 concludes that: (1) "[e]missions from [non-landfill] alternative odor sources . . . resulted in odors;" and (2) those odors were transported to the "areas [in which] the [Trial Plaintiffs] lived and traveled."[97]

The second part of Opinion No. 2, that odors from the non-landfill alternative sources were transported to where the Trial Plaintiffs lived and traveled, is premised entirely on Mr. Corn's speculative assumptions concerning the fate and transport mechanisms of various pollutants purportedly emitted from the Table 1 sources. He provides no air dispersion or emissions modeling.[98] As also discussed in detail below, this portion of Opinion No. 2 is based on Mr. Corn's speculation and subjective belief rather than "sufficient facts or data" as required by Rule 702.

With respect to the first part of Opinion No. 2, that non-landfill alternative sources generated odors during the relevant time period, Mr. Corn represents there are four specific chemicals "known to be emitted and/or used at the Table 1 sources,"[99] which have

---

[95] Opinion No. 1 also includes matters of common knowledge that ordinary jurors can ascertain, such as that wind direction is known to impact odors, which are excluded under Rule 702. R. Doc. 588-4 at p. 11.
[96] *Id.* at pp. 11-12 (Opinion No. 2 stating "[e]missions from the alternative odor sources . . . resulted in odors in areas [in which] the [Trial Plaintiffs] lived and traveled"; Opinion No. 1 stating "odors and emissions from the alternative odor sources . . . were more likely transported into the residential areas [in which] the [T]rial [P]laintiffs live and travel"; Opinion No. 3 providing the Trial Plaintiffs "were more likely than not directly impacted by odors from the Harahan WTP"; and Opinion No. 4 stating the Trial Plaintiffs' "close proximity to many known odor sources . . . more likely than not subjected [them] to multiple different pollutants released from the industrial facilities").
[97] *Id.* at p. 11.
[98] Mr. Corn relies on the same unsupported assumptions to reach his conclusion expressed in Opinion No. 3. *See id.* at pp. 11-12.
[99] *Id.* at p. 27.

"unique odor and/or commonality between multiple emissions sources and LDEQ Incident Reports"—hydrogen sulfide, sulfur, ammonia, and methyl mercaptan.[100] Mr. Corn provides no support for this statement. Table 3 lists additional chemicals purportedly released from Table 1 sources, also with no support.[101] Mr. Corn attempts to support the first part of Opinion No. 2 further by offering LDEQ Incident Reports, air permits, and TRI Reports related to the various Facility Emissions Sources. However, as discussed in detail below, a thorough review reveals this basis of the first part of Opinion No. 2 is grounded in Mr. Corn's speculative and subjective beliefs rather than "sufficient facts or data" as required by Rule 702.

### A. Non-Facility Emissions Sources

The Court will now examine the basis for Mr. Corn's Opinion No. 2, that the Non-Facility Emissions Sources generated odors that could have been detected by the Trial Plaintiffs at their residences and areas through which they traveled. Mr. Corn bases Opinion No. 2 in part by his finding that two "large potential area or network sources"— the Harahan Sewer and the Wetlands—constitute "likely alternative emissions source[s] to the [Trial Plaintiffs] at their residences," but as shown below this finding is unsupported by any data whatsoever.[102]

### 1. Harahan Sewer Collection System (the "Sewer System")

Mr. Corn supports Opinion No. 2 in part by his finding that localized emissions from the Sewer System generated odors that likely impacted the Trial Plaintiffs "resid[ing] nearby."[103] As discussed in Section II.B.4,[104] the sole basis for this finding is

---

[100] *Id.* at p. 27.
[101] *Id.* at pp. 24-26.
[102] *Id.* at pp. 104-06.
[103] *Id.* at p. 104.
[104] *See* discussion *infra* Section II.B.4.

one LDEQ Incident Report dated June 28, 2018, before the relevant time period, which describes odors generated by the Sewer System as "strong, horrible, and foul."[105] Mr. Corn concedes even "this source will not impact all [Trial Plaintiffs]," especially those outside Harahan, due to the fact that the release points for the system (i.e., individual sewer manholes) are localized, as described in the one incident report. He provides no analysis of the extent of the impact of this one event or how long the impact would have lasted. Mr. Corn's documentation of this one incident report does not support his finding that localized emissions from the Sewer System generated odors that likely impacted the Trial Plaintiffs.

Further, while "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact,"[106] expert testimony should be excluded if it "does nothing more than 'mirror' testimony offered by fact witnesses."[107] Likewise, expert testimony should be excluded if "the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[108] To the extent Mr. Corn opines the Harahan Sewer Collection System produces odors, without more, the jury will be able to reach that conclusion without Mr. Corn's testimony.

### 2. Wetlands

Mr. Corn supports Opinion No. 2 by pointing to the "the large expanse of wetlands

---

[105] Corn Rep., R. Doc. 588-4 at p. 104.

[106] Fed. R. Evid. 704.

[107] *In re Tasch, Inc.*, 97-15901, 1999 WL 596261, at *2 (E.D. La. Aug. 5, 1999). *See also Sudo Properties, Inc.*, 2008 WL 2623000, at *8 ("If the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded.").

[108] *Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (citing Fed. R. Evid. 702, Advisory Committee Note).

and forested wetlands that surround the local areas," which he says "presents a significant likely alternative emissions source to the [Trial Plaintiffs] at their residences and the areas [through which] they travel."[109] Mr. Corn points to two scientific journal articles that support the general principle that wetlands can produce ammonia and hydrogen sulfide.[110] One of those journal articles leads Mr. Corn to the conclusion that "[h]ydrogen sulfide can be produced at rates that can result in atmospheric concentrations of up to 5,200 ppb," but Mr. Corn fails to cite any facts or data related to hydrogen sulfide emissions from the specific wetlands that are the subject of his opinion or that affected the Trial Plaintiffs.[111] Mr. Corn's finding, which is based purely on his speculation with no data relevant to the specific wetlands at issue, does not provide sufficient support for Opinion No. 2.[112] His speculation does not support his finding that localized emissions from the Wetlands generated odors that likely impacted the Trial Plaintiffs.

Further, the Court finds Mr. Corn's contention that unidentified wetlands *can* produce hydrogen sulfide emissions of up to 5,200 ppb with no evidence regarding the ability of the Jefferson Parish wetlands to generate such concentrations should likewise be excluded under Rule 403 due to its likelihood to mislead the jury.[113]

### B. Facility Emissions Sources

Mr. Corn bases Opinion No. 2 in part by his finding that several "industrial and municipal facilities . . . more likely than not" emitted odiferous pollutants in quantities sufficient to "impact[] the individual [Trial Plaintiffs] at their residence[s]."[114] Mr. Corn

---

[109] Corn Rep., R. Doc. 588-4 at p. 106.
[110] *Id.* at pp. 105-06.
[111] *Id.* at p. 105.
[112] Mr. Corn acknowledges most residents of Jefferson Parish grow accustomed to any odors from wetlands and do not think about them on a daily basis. *Id.*
[113] If true, wouldn't it affect Jefferson Parish residents all the time?
[114] Corn Rep., R. Doc. 588-4 at p. 35.

cites the facilities' air permits and TRI Reports, as well as LDEQ Incident Reports documenting unpermitted releases from the facilities.

First, Mr. Corn represents the facilities' Title V Permits and Minor Source Permits support his findings. As proclaimed in his deposition, Mr. Corn *assumes* the "industrial facilities are likely to emit approximately the level of pollutants authorized in their permits."[115] Mr. Corn's reliance on the facilities' permits to support his assumptions regarding the types and quantities of pollutants *actually* emitted by those facilities undermines the reliability of his analysis, as the permits express only the maximum emissions rates allowed for each source, rather than providing any *actual* data on the facilities' operating scenarios. Because Mr. Corn offers no support for this assumption aside from vague allusions to his experience in his deposition, his representation that the quantities of pollutants *actually* emitted by those facilities are equivalent to the maximum emissions rates *allowed* under their permits directly contravenes the mandate of "reliable data" under Rule 702.

Second, Mr. Corn represents the alternative source facilities' TRI Reports for two facilities and relevant LDEQ Incident Reports support his finding that the facilities are "known to" "use, produce, and release a wide variety of different chemical substances, with many known to be odiferous."[116] While the TRI data are more precise than Mr. Corn's speculative impacts of emissions based on the facilities' air permits, he fails to explain the significance of the emissions rates identified in the two facilities' TRI Reports or explain how they are relevant to his conclusion that emissions from all the Facility Emissions Sources generated odors that travelled to the Trial Plaintiffs' residences and areas of

---

[115] *See* Corn Rep., R. Doc. 588-4; R. Doc. 601 at p. 11 (citing Dep. Tr. of Corn, R. Doc. 601-2 at 168:12-18).
[116] Corn Rep., R. Doc. 588-4 at p. 10.

travel. Even with respect to the two facilities, without contextualizing the significance of those emissions rates, any probative value the TRI Reports may have is effectively nullified.[117]

The LDEQ Incident Reports do offer more precise data concerning certain unpermitted releases from the Facility Emissions Sources. However, Mr. Corn gives more credence than warranted to certain isolated incidents of de minimis releases identified in those LDEQ Incident Reports. The Corn Report opines that LDEQ Incident Reports of unpermitted releases, both during and outside the relevant time period, "illustrate" several non-landfill alternative sources were "a source of likely odors in Jefferson Parish" that "likely impacted" the Trial Plaintiffs.[118] The Court has reviewed the actual Incident Reports cited in the Corn Report, which are publicly available through the LDEQ's Electronic Document Management System (the "LDEQ EDMS").[119] As discussed in detail below, the undue influence Mr. Corn affords to the limited LDEQ Incident Reports undermines rather than supports Opinion No. 2 and renders it excludable as unreliable under Rule 702. Further, because any probative value this testimony may have is substantially outweighed by a risk of confusion or misleading the jury, Opinion No. 2 is likewise excludable under Rule 403.

---

[117] Mr. Corn only evaluated TRI data for the two major air emissions sources discussed in his Report. Corn *Id.* at pp. 252-55 (providing TRI Reports during the relevant time period for Cornerstone Chemical Complex and two facilities located therein—Dyno Nobel Ammonia and Roehm America; and the River Birch Landfill).

[118] *Id.* at pp. 40, 47, 56, 59, & 65 (discussing several facilities within the Cornerstone Chemical Complex); *Id.* at p. 71 (discussing ARTCO Fleeting Services); *Id.* at p. 78 (discussing the Cargill – Westwego Marine Terminal); *Id.* at p. 89 (discussing the Harahan Wastewater Treatment Plant); *Id.* at p. 91 (discussing Kirby Inland Marine); *Id.* at p. 103 (discussing non-landfill operations at the River Birch Landfill).

[119] LA. DEP'T OF ENV. QUALITY, ELECTRONIC DOCUMENT MGMT. SYS. [hereinafter LDEQ EDMS], https://www.deq.louisiana.gov/page/edms [https://perma.cc/JE6C-K9QL]. The Court may examine "documents incorporated into the [motion] by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

To the extent Mr. Corn relies on LDEQ Incident Reports of emissions events outside the 30-month relevant time period (i.e., July 1, 2017, through December 31, 2019), his findings on those facilities are excludable under Rule 401 because they are irrelevant to the issue of whether an alternative source of odors impacted the Trial Plaintiffs during the relevant time period. The Court will now examine the basis for Mr. Corn's Opinion No. 2, that the Facility Emissions Sources generated odors that could have been detected by the Trial Plaintiffs at their residences and areas through which they traveled.

### 1. Cornerstone Chemical Complex

Mr. Corn supports Opinion No. 2 in part by his finding that several operating facilities within the Cornerstone Complex generated emissions that likely impacted the Trial Plaintiffs.[120] Mr. Corn represents the Cornerstone Complex "has seven separate operating facilities under four different chemical companies."[121] The operating facilities are: the Acrylonitrile Plant, the Urea and Melamine Plant, the Sulfuric Acid Regeneration Plant, the Utilities Plant, the Dyno Nobel Ammonia Plant, the Roehm America Plant, and the Kemira Chemicals Plant. As discussed in detail below, the Court has reviewed the air permits and LDEQ Incident Reports on which Mr. Corn relies to support his findings related to each operating facility.

Mr. Corn presents TRI Reports from the relevant time period associated with the Cornerstone Complex, which "give the total actual combined emissions (either measured or calculated) that [the Cornerstone Complex] with its seven separately permitted sources have released" during the relevant time period.[122] According to the TRI Reports, the

---

[120] Mr. Corn represents the Cornerstone Complex is located at 10800 River Road in Westwego, which is in Jefferson Parish. Corn Rep., R. Doc. 588-4 at p. 18.
[121] *Id.* at p. 36.
[122] *Id.* at p. 15.

Cornerstone Complex did not report any emissions of hydrogen sulfide during the relevant period and Mr. Corn does not opine as to whether any air pollutants reportedly emitted by the Complex have the same odor as hydrogen sulfide.[123] The TRI Reports show only that the Cornerstone Complex did emit a quantity of the odiferous pollutant ammonia each year, 2017 through 2019,[124] but no Plaintiff has complained of an ammonia odor. Even though TRI data from the entire Complex demonstrates the actual quantities of certain pollutants emitted, and Mr. Corn does not explain the significance of the emissions rates reported therein of other pollutants or explain how the data is relevant to his finding that operating facilities in the Cornerstone Complex generated odors that could have been detected by the Trial Plaintiffs, effectively nullifying any probative value they may have.

### a.  The Acrylonitrile Plant

Mr. Corn bases Opinion No. 2 in part by his finding that the Acrylonitrile Facility is a potential alternative source of odors that may have impacted the Trial Plaintiffs.[125] Mr. Corn represents the Acrylonitrile Plant has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 9 of the Corn Report.[126] According to Table 9, the facility's Title V Permit does not include hydrogen sulfide and Mr. Corn does not opine as to whether any air pollutants that are included have any odor, much less the same odor as hydrogen sulfide.[127] As discussed above, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

---

[123] *Id.* at pp. 252-54.
[124] *Id.*
[125] *Id.* at p. 41.
[126] *Id.* at p. 43.
[127] *Id.*

Mr. Corn further recounts three emissions events that occurred between May 2015 and March 2017, and claims the events "illustrate the impacts that the Acrylonitrile Plant [had] on Jefferson Parish residents" and "demonstrate[] the distance at which air emissions from th[e] facility can impact [the Trial Plaintiffs]."[128] As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the Acrylonitrile Plant impacted the Trial Plaintiffs during the relevant time period. Because the basis of Mr. Corn's finding on the Acrylonitrile Plant is unreliable and irrelevant, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit and the three incident reports that document emissions events from outside the relevant time period does not support his finding that emissions from the Acrylonitrile Plant generated odors that likely impacted the Trial Plaintiffs.

### b.  The Urea and Melamine Plant

Mr. Corn supports Opinion No. 2 in part by his finding that the Urea and Melamine Plant is an alternative source of odors that "might have" impacted the Trial Plaintiffs.[129] Mr. Corn represents the Urea and Melamine Plant has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 11 of the Corn Report.[130] According to Table 11, the facility's Title V Permit does not include hydrogen sulfide but does include the odiferous pollutant ammonia.[131] No Plaintiff has complained of an ammonia odor. As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

---

[128] *Id.* at p. 44.
[129] *Id.* at p. 47.
[130] *Id.* at pp. 46-47.
[131] *Id.*

Mr. Corn further recounts several LDEQ Incident Reports related to emissions events that occurred outside the relevant time period. According to Mr. Corn, only two LDEQ Incident Reports occurring during the relevant time period "illustrate the impacts that the Urea and Melamine Plant might have [had] on [the Trial Plaintiffs]."[132] Mr. Corn identifies these two unpermitted releases as a release of 375 pounds of anhydrous ammonia on October 12, 2017, and 149 pounds of ammonia on January 18, 2018.[133] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable. To the extent that Mr. Corn's finding on the Urea and Melamine Plant is based on the unfounded and speculative extrapolation of two isolated incidents of de minimis releases during the 30-month relevant time period, the finding is unreliable.

Mr. Corn further represents a video recorded on December 17, 2018, and posted to Facebook, depicts "odors [that] appear to be associated with ammonia production or use" potentially associated with the Urea and Melamine Plant.[134] Mr. Corn's analysis of the Facebook video has no basis in the scientific method and is likewise unreliable. Because the basis of Mr. Corn's finding on the Urea and Melamine Plant is unreliable and irrelevant, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit, the two incident reports during the relevant time period, the several incident reports that occurred outside the relevant time period, and the Facebook video does not support his finding that emissions from the Urea and Melamine Plant generated odors that likely impacted the Trial Plaintiffs.

---

[132] *Id.* at p. 47.
[133] *Id.*
[134] *Id.* at p. 48.

### c. The Sulfuric Acid Regeneration Plant

Mr. Corn supports Opinion No. 2 in part by his finding that the Sulfuric Acid Regeneration Plant (the "Regeneration Plant") is an alternative source of "regularly occurring" emissions that "likely" impacted nearby Trial Plaintiffs.[135] Mr. Corn represents the Regeneration Plant has a Title V Permit for the production of sulfuric acid and presents information related to the facility's Title V Permit for the relevant time period in Table 13 of the Corn Report.[136] According to Table 13, the facility's Title V Permit does not include hydrogen sulfide and Mr. Corn does not opine as to whether any air pollutants listed have any odor, much less the same odor as hydrogen sulfide.[137] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Notwithstanding the fact that hydrogen sulfide is not listed in the Regeneration Plant's Title V Permit, Mr. Corn represents the facility is "a continuous emissions source" by virtue of its sulfuric acid production process, by which the facility melts sulfur in a molten sulfur tank.[138] Mr. Corn opines hydrogen sulfide is produced as a byproduct "in the molten sulfur process" and claims "[t]he molten sulfur tank is open to the atmosphere without controls and represents a continuous emission source for hydrogen sulfides as well as other sulfur compounds."[139]

The Corn Report further states the Regeneration Plant "has had numerous unpermitted air emissions both before and during the relevant time period," including "leaking sulfuric acid along the roadways outside the property boundary and in the

---

[135] *Id.* at p. 56.
[136] *Id.* at pp. 51-52.
[137] *Id.*
[138] *Id.* at pp. 48-50.
[139] *Id.* at pp. 49, 53.

production plant itself."[140] Mr. Corn recounts three LDEQ Incident Reports and two letters from the Cornerstone Complex to the LDEQ concerning reported releases from the facility (the "Cornerstone Letters") during the relevant time period, as described in Attachment 2 of the Corn Report, which purportedly identify unpermitted releases from the Regeneration Plant.[141] Mr. Corn's vague conclusion, based on the LDEQ Incident Reports and the Cornerstone Letters (collectively, the "LDEQ Documents"), is that emissions events from Regeneration Plant "illustrate the impacts that the [Regeneration Plant] likely had on nearby [the Trial Plaintiffs] and that they were regularly occurring."[142] The Court has reviewed the relevant LDEQ Documents, publicly available through the LDEQ EDMS,[143] and finds they do not support Mr. Corn's finding on the Regeneration Plant.

The Corn Report states "[m]ultiple LDEQ inspectors have reported odors near the front gate of [the Cornerstone Complex]," and identifies three LDEQ Incident Reports from the relevant time period, which Mr. Corn represents "identify the source of the smell as [the Regeneration Plant]."[144] First, one LDEQ Incident Report dated May 23, 2018 (the "May 2018 Incident Report"), documents multiple leaks at the facility that were ongoing since approximately February 4, 2018, including "a large leak of hot sulfuric acid releasing to the ground" and leaks of sulfur dioxide and sulfur trioxide releasing to the air.[145] The May 2018 Incident Report further reveals the facility stated the leaks would be repaired on May 19, 2018,[146] and the Corn Report identifies no subsequent incident reports related

---

[140] *Id.* at p. 53.
[141] *Id.* at pp. 167-170.
[142] Corn Rep., R. Doc. 588-4 at p. 56.
[143] LDEQ EDMS, *supra* note 119.
[144] Corn Rep., R. Doc. 588-4 at p. 50, 50 n.121 (citing LDEQ Incident Reps. 183968 & 188136).
[145] *See* LDEQ Incident Rep. 183968.
[146] *See* LDEQ Incident Rep. 183968.

to those leaks after the purported repair date. Mr. Corn represents that concentrated sulfuric acid "has a pungent odor" and sulfur dioxide "smells like burnt matches," but does not make any representations as to odor associated with sulfur trioxide.[147] Further, although Mr. Corn represents those two pollutants are odiferous, he does not identify a single odor complaint associated with this leak from February to May 2018, does not describe the odors associated with the leaked substance, the amount of the substance released, or how far the substance travelled.

Second, one LDEQ Incident Report documents a complaint of a "sulfur odor" on River Road near the facility on November 29, 2018, which a Cornerstone representative stated "was likely related to the molten sulfur tank."[148] In response to the odor complaint, the LDEQ conducted several surveillances before issuing the Incident Report on December 13, 2018.[149] On November 29, 2018, an LDEQ inspector noted "no odors" near the location of the complaint; but on November 30, 2018, an LDEQ inspector noticed an odor near the Cornerstone Complex.[150] On December 12, 2018, an LDEQ inspector "noticed a sulfur odor from ~5 [feet] [northwest] of the molten sulfur tank," but observed "the odor dissipated within 20 feet," and then "briefly noticed a faint sulfur odor from 80-100 [feet] downwind of the tank."[151] The LDEQ Inspection Report notes no other odors were observed on site on December 12, 2018, and identifies the investigation as "part of the larger investigation into odor complaints from the Harahan/River Ridge/Waggaman

---

[147] Corn Rep., R. Doc. 588-4 at p. 53.
[148] *See* LDEQ Incident Rep. 188136. The Cornerstone representative stated that, while the molten sulfur tank "can produce odors[,] [] it is unlikely those odors can travel a long enough distance to cross the river." *Id.*
[149] *Id.*
[150] *Id.*
[151] *Id.*

area," from which "it is believed that the primary source of the odor is [the Landfill]."[152]

Third, one LDEQ Incident Report dated April 11, 2019 (the "April 2019 Incident Report"), documents a leak of sulfuric acid at the Cornerstone Complex, which was contained and neutralized shortly thereafter.[153] The LDEQ Incident Report does not document any odor complaints associated with that event. Mr. Corn represents that approximately 76,060 pounds of sulfuric acid were released, but includes no evidence or opinion concerning the duration, intensity, or dispersion of potential odors related to the unpermitted release underlying the April 2019 Incident Report.

The Corn Report also identifies two Cornerstone Letters[154] that document a release of less than 100 pounds of sulfur trioxide on May 24, 2018,[155] and a release of approximately 934 pounds of sulfur trioxide and 456 pounds of sulfur dioxide over the course of ten minutes on November 17, 2018.[156] As discussed, Mr. Corn does not represent that sulfur trioxide is an odiferous pollutant; thus, any leak of sulfur trioxide from the Regeneration Plant is irrelevant to his finding on the facility. Although Mr. Corn does represent sulfur dioxide "smells like burnt matches," he includes no evidence or opinion concerning the duration, intensity, or dispersion of potential odors related to the unpermitted emission from the Regeneration Plant on November 17, 2018.

To the extent the Corn Report recounts "events [that] occurred outside of the relevant time period," as discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the Regeneration Plant impacted the Trial Plaintiffs during the relevant time period.

---

[152] *Id.*
[153] *See* LDEQ Incident Rep. 190570.
[154] Corn Rep., R. Doc. 588-4 at p. 54.
[155] *See* LDEQ EDMS Doc. No. 11183072.
[156] *See* LDEQ EDMS Doc. No. 11567119.

Summarizing Mr. Corn's evidence to support his finding that the Regeneration Plant "likely" impacted the Trial Plaintiffs during the relevant period, the Court finds there was one odor complaint during the 30-month relevant time period, documented in the LDEQ Incident Report dated December 13, 2018. The other two LDEQ Incident Reports and the two Cornerstone Letters cited in the Corn Report concern releases from the facility for which there were no related odor complaints. Mr. Corn fails to provide evidence or opinion supporting his finding that the isolated incident, which was the subject of the odor complaint "likely" affected the Trial Plaintiffs. Instead, Mr. Corn bases his vague finding on one isolated incident documenting an odor complaint during the relevant time period and his speculation that pollutants released from the facility are known to be odiferous. Because the basis of Mr. Corn's finding on the Sulfuric Acid Regeneration Plant is unreliable and irrelevant, it does not support Opinion No. 2. Mr. Corn's speculation as to the facility's industrial processes and documentation of the facility's air permit and one reported odor complaint during the relevant time period does not support his finding that the Regeneration Plant generated odors that likely impacted the Trial Plaintiffs.

### d.  The Utilities Plant/Site Services

Mr. Corn bases Opinion No. 2 in part by his finding that the Utilities Plant "was a source of likely odors in Jefferson Parish."[157] Mr. Corn represents the Utilities Plant has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 7 of the Corn Report.[158] According to Table 7, the facility's Title V Permit does not include hydrogen sulfide but does include the odiferous pollutant

---

[157] Corn Rep., R. Doc. 588-4 at p. 40.
[158] *Id.* at pp. 39-40.

ammonia.[159] No Plaintiff has complained of an ammonia odor. As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Mr. Corn further represents that three LDEQ Incident Reports during the relevant time period "illustrate concrete examples showing that the Utilities Plant/Site Services was a source of likely odors in Jefferson Parish."[160] Mr. Corn recounts the three unpermitted releases that occurred during the relevant time period as a release of 43 pounds of ammonia on August 27, 2017, a release of 76,060 pounds of sulfuric acid mist from a leaking valve on April 11, 2019, and an odor complaint caused by the unloading of a methanol barge on the Mississippi River.[161] Mr. Corn does not describe the duration of these events, the odors associated with them, or how far any odor traveled. To the extent that Mr. Corn's finding on the Utilities Plant is based on the unfounded and speculative extrapolation of three isolated incidents of de minimis releases during the 30-month relevant time period, the finding is unreliable. Because the basis of Mr. Corn's finding on the Utilities Plant is unreliable, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit and the three incident reports during the relevant time period does not support his finding that emissions from the Utilities Plant generated odors that likely impacted the Trial Plaintiffs.

### e. The Dyno Nobel Ammonia Plant

Mr. Corn bases Opinion No. 2 in part by his finding that the Dyno Nobel Ammonia Plant is an alternative source of odors that "likely" impacted some of the Trial Plaintiffs.[162]

---

[159] *Id.*
[160] *Id.* at p. 40.
[161] *Id.*
[162] *Id.* at p. 65.

Mr. Corn represents the Dyno Nobel Ammonia Plant has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 17 of the Corn Report.[163] According to Table 17, the facility's Title V Permit does not include hydrogen sulfide but does include the odiferous pollutant ammonia.[164] No Plaintiff has complained of an ammonia odor. As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Mr. Corn presents TRI Reports providing the facility's annual ammonia and methanol emissions during the relevant time period in Attachment 3 of the Corn Report.[165] Even though TRI data from the facility demonstrates the actual quantities of certain pollutants emitted from the facility, Mr. Corn does not explain the significance of the emissions rates reported therein or explain how they are relevant to his finding that the Dyno Nobel Ammonia Plant generated odors, effectively nullifying any probative value they may have.

Mr. Corn also represents that "numerous" LDEQ Incident Report related to emissions events outside the relevant time period and two LDEQ Incident Reports during the relevant time period "illustrate the impacts that Dyno Nobel Ammonia likely had on some [Trial Plaintiffs]."[166] Mr. Corn recounts the two unpermitted releases that occurred during the relevant time period as a release of 80.2 pounds of anhydrous ammonia on March 7, 2019, and a release of 7 pounds of anhydrous ammonia on September 20, 2019.[167] Mr. Corn does not describe the duration of these events or how far the substances travelled. As discussed, assumptions based on emissions events that occurred outside the

---

[163] *Id.* at p. 64.
[164] *Id.*
[165] *Id.* at p. 255.
[166] *Id.* at p. 65.
[167] *Id.* at p. 64.

relevant time period are irrelevant to the issue of whether the Dyno Nobel Ammonia Plant impacted the Trial Plaintiffs during the relevant time period. Further, to the extent that Mr. Corn's finding on the Dyno Nobel Ammonia Plant is based on the unfounded and speculative extrapolation of two isolated incidents of de minimis releases during the 30-month relevant time period, the finding is unreliable.

Mr. Corn further represents a video recorded on December 17, 2018, and posted to Facebook, depicts "odors [that] appear to be associated with ammonia production or use" potentially associated with the Dyno Nobel Ammonia Plant.[168] Mr. Corn's analysis of the Facebook video has no basis in the scientific method and is likewise unreliable. Because the basis of Mr. Corn's finding on the Dyno Nobel Ammonia Plant is unreliable and irrelevant, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit, TRI Reports, two incident reports from the relevant time period, and the Facebook video does not support his finding that emissions from the Dyno Nobel Ammonia Plant generated odors that likely impacted the Trial Plaintiffs.

### f. The Roehm America Plant

Mr. Corn bases Opinion No. 2 in part by his finding that the Roehm America Plant is an alternative source of odors that may have impacted the Trial Plaintiffs.[169] Mr. Corn represents the Roehm America Plant has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 15 of the Corn Report.[170] According to Table 15, the facility's Title V Permit does not include hydrogen sulfide but does include the odiferous pollutants ammonia and methyl methacrylate,

---

[168] *Id.* at p. 65.
[169] *Id.* at p. 59.
[170] *Id.* at pp. 58-59.

which Mr. Corn describes as a colorless liquid with a "sharp, fruit odor."[171] No Plaintiffs have complained about odors associated with those pollutants. As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Mr. Corn presents TRI Reports providing the facility's annual emissions of pollutants, including ammonia and methyl methacrylate, during the relevant time period in Attachment 3 of the Corn Report.[172] Even though TRI data from the facility demonstrates the actual quantities of certain pollutants emitted from the facility, Mr. Corn does not explain the significance of the emissions rates reported therein or explain how they are relevant to his finding that the Roehm America Plant generated odors, effectively nullifying any probative value they may have.

Mr. Corn also represents that "numerous" LDEQ Incident Reports related to emissions events outside the relevant time period and one LDEQ Incident Report during the relevant time period "illustrate the impacts that the Roehm America Plant has had near [the Trial Plaintiffs]."[173] Mr. Corn identifies the unpermitted release that occurred during the relevant time period as a release of 9.3 pounds of hydrogen cyanide, which can purportedly smell like almonds, on October 15, 2018.[174] Mr. Corn does not describe the duration of this event or how far any associated odor traveled. As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the Roehm America Plant impacted the Trial Plaintiffs during the relevant time period. Further, to the extent that Mr. Corn's finding on the Roehm America

---

[171] *Id.* at pp. 56-59.
[172] *Id.* at pp. 254-55.
[173] *Id.* at p. 59.
[174] *Id.*

Plant is based on the unfounded and speculative extrapolation of one isolated incident of a de minimis release during the 30-month relevant time period, the finding is unreliable. Because the basis of Mr. Corn's finding on the Roehm America Plant is unreliable and irrelevant, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit, TRI Reports, and the one incident report during the relevant time period does not support his finding that emissions from the Roehm America Plant generated odors that likely impacted the Trial Plaintiffs.

### g. The Kemira Chemicals Plant

With respect to the Kemira Chemicals Plant located within the Cornerstone Complex.[175] Mr. Corn represents the Kemira Chemicals Plant has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 19 of the Corn Report.[176] According to Table 19, the facility's Title V Permit does not include hydrogen sulfide and Mr. Corn does not state whether any air pollutants listed have any odor, much less the same odor as hydrogen sulfide.[177] Otherwise, Mr. Corn identifies no emissions events whatsoever and expresses no finding as to the potential impacts of any purported emission from the Kemira Chemicals Plant on the Trial Plaintiffs.[178] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable. Accordingly, the basis of any purported finding of Mr. Corn on the Kemira Chemicals Plant is unreliable and does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit does not support his finding emissions from the Kemira Chemicals Plant generated odors that likely impacted

---

[175] *Id.* at p. 65.
[176] *Id.* at pp. 66-67.
[177] *Id.*
[178] *Id.* at p. 65-67.

the Trial Plaintiffs.

## 2. The ARTCO Facility

Mr. Corn supports Opinion No. 2 in part by his finding that the ARTCO Facility is an alternative source of odors that "likely impacted nearby [Trial Plaintiffs]."[179] Mr. Corn represents the ARTCO Facility has a Title V Permit and presents information related to the facility's Title V Permit for the relevant time period in Table 21 of the Corn Report.[180] According to Table 21, the facility's Title V Permit does not include hydrogen sulfide and Mr. Corn does not state whether any air pollutants listed have any odor, much less the same odor as hydrogen sulfide.[181] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Mr. Corn recounts one LDEQ Incident Report from July 2018, in which a resident located 0.6 miles from the facility reported a "stench" emanating from the facility caused by soybean meal being loaded onto a barge.[182] Mr. Corn represents soybean meal can generate hydrogen sulfide in storage and opines the one LDEQ Incident Report during the relevant time period "demonstrate[s] [] that [the ARTCO Facility] likely impacted nearby [Trial Plaintiffs]."[183] Mr. Corn does not describe the duration of this event nor how the odor travelled. To the extent that Mr. Corn's finding on the ARTCO Facility is based on the unfounded and speculative extrapolation of one isolated incident of a de minimis release during the 30-month relevant time period, the finding is unreliable. Because the basis of Mr. Corn's finding on the ARTCO Facility is unreliable, it does not support

---

[179] *Id.* at p. 71. Mr. Corn represents the facility is located at 8400 River Road in Westwego, which is in Jefferson Parish. *Id.* at p. 67.
[180] *Id.* at p. 70.
[181] *Id.*
[182] *Id.* at pp. 70-71.
[183] *Id.*

Opinion No. 2. Mr. Corn's documentation of the facility's air permit and one incident report during the relevant time period does not support his finding that emissions from the ARTCO Facility generated odors that likely impacted the Trial Plaintiffs.

### 3. The IMTT Facility

Mr. Corn supports Opinion No. 2 in part by his finding that the IMTT Facility is an alternative source of odors that "might have" had an impact on the Trial Plaintiffs.[184] Mr. Corn represents the IMTT Facility has a Minor Source Permit and presents information related to the facility's Minor Source Permit for the relevant time period in Table 24 of the Corn Report.[185] According to Table 24, the facility's Minor Source Permit includes a quantity of 1.05 tons per year ("tpy") hydrogen sulfide, but Mr. Coen does not represent there have been any complaints related to H2S emissions from the facility.[186] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is inherently unreliable.

Mr. Corn further represents an LDEQ Incident Report from October 2016, before the relevant time period, in which "a resident located about 1.5 miles upriver" from the facility complained about the facility's operations, "illustrates the distance and impacts that [the IMTT Facility] might have on [the Trial Plaintiffs]" during the relevant time period.[187] As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the IMTT Facility impacted the Trial Plaintiffs during the relevant time period. Because the basis of Mr. Corn's finding on the IMTT Facility is unreliable and irrelevant, it does not support Opinion No. 2. Mr.

---

[184] *Id.* at p. 76. Mr. Corn represents the facility is located at 5450 River Road, Avondale, which is in Jefferson Parish. *Id.* at p. 71.
[185] *Id.* at p. 74.
[186] *Id.*
[187] *Id.* at pp. 75-76.

Corn's documentation of the facility's air permit and one incident report from outside the relevant time period does not support his finding that emissions from the IMTT Facility generated odors that might have impacted the Trial Plaintiffs.

### 4. The Harahan Waste Treatment Plant

Mr. Corn bases Opinion No. 2 in part by his finding that the Harahan WTP is an alternative source of odors that "likely" had an impact on the Trial Plaintiffs.[188] Mr. Corn does not cite to any air permit or actual emissions data from the facility. Instead, he represents the Harahan WTP has a Louisiana Pollutant Discharge Elimination System ("LPDES") Permit for discharging treated effluent to the Mississippi River, which includes volatile organic compounds ("VOCs") that "can enter the atmosphere."[189] Information related to the facility's LPDES Permit for the relevant time period is presented in Table 28 of the Corn Report.[190] According to Table 28, the facility's LPDES Permit does not include hydrogen sulfide but does include the odiferous pollutant ammonia.[191] Mr. Corn does not represent there have been any complaints related to ammonia emissions from the facility. As discussed, inferences as to the types and quantities of pollutants emitted from a facility's air permit are unreliable. So too are inferences based on a facility's LPDES Permit.

The Corn Report further states the Harahan WTP "has had numerous unpermitted air emissions both before and during the relevant time period."[192] Mr. Corn recounds nine LDEQ Incident Reports associated with the facility during the relevant time period, as

---

[188] *Id.* at p. 89. Mr. Corn represents the facility is located at 1000 Dickory Avenue in Harahan, which is in Jefferson Parish. *Id.* at p. 80.
[189] *Id.* at pp. 81-82.
[190] *Id.* at p. 82.
[191] *Id.*
[192] *Id.* at p. 86.

listed in footnotes 238 and 239 and described in Attachment 2 of the Corn Report.[193] The Court has reviewed the Incident Reports Mr. Corn represents as falling within the relevant time, publicly available through the LDEQ EDMS,[194] and finds only one Incident Report cited in the Corn Report concerns an event that occurred during the relevant time period—LDEQ Incident Report 185091,[195] discussed below. As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the Harahan WTP impacted the Trial Plaintiffs during the relevant time period.

The only support for Mr. Corn's vague finding that emissions events from the Harahan WTP "illustrate the impacts that [the facility] likely had on [the Trial Plaintiffs]"[196] is one LDEQ Incident Report from the relevant time period and a petition for injunctive relief filed against the Harahan WTP in Louisiana state court in May 2018 (the "Harahan WTP Lawsuit"). The Court's review of the LDEQ Incident Report and Mr. Corn's representation of the Harahan WTP Lawsuit reveals those complaints do not support the finding expressed in the Corn Report. LDEQ Incident Report 185091, dated June 8, 2018, documents a complaint that "raw sewage was being blown all over the street by pumps . . . and that sewage shot several feet up from the toilet" in the complaining individual's residence.[197] Mr. Corn offers no evidence as to the duration of this very localized event nor as to whether odors related to the event travelled to the Plaintiffs.  As

---

[193] *Id.* at p. 86 n.238 & 239; *id.* at pp. 204-26.

[194] LDEQ EDMS, *supra* note 119.

[195] The remainder of the LDEQ Incident Reports related to the Harahan WTP cited in the Corn Report fall outside the relevant time period. *See* LDEQ Incident Rep. 176642 (Mar. 21, 2017); LDEQ Incident Rep. 176685 (Mar. 25, 2017); LDEQ Incident Rep. 176952 (Apr. 7, 2017); LDEQ Incident Rep. 178314 (June 15, 2017); LDEQ Incident Rep. 176769 (Mar. 30, 2017); LDEQ Incident Rep. 178046 (June 1, 2017).

[196] Corn Rep., R. Doc. 588-4 at p. 89.

[197] LDEQ Incident Rep. 185091.

described in the Corn Report, the Harahan WTP Lawsuit concerned two River Ridge residents living 0.78 miles from the Harahan WTP who sued the facility for "repeated intrusion of [] fetid and vile effluent running onto [the] plaintiffs' property" caused by sewage overflowing from a manhole.[198] Mr. Corn likewise offers no evidence as to the duration of this very localized event nor as to whether odors related to the event travelled to the Plaintiffs.

Mr. Corn fails to provide evidence or opinion supporting his finding that these isolated incidents "likely" affected the Trial Plaintiffs. Instead, Mr. Corn bases his vague conclusion on two isolated complaints of sewage intrusion onto individuals' properties during the relevant time period, rather than any widespread complaint of noxious odors in the air. To the extent that Mr. Corn's finding on the Harahan WTP is based on the unfounded and speculative extrapolation of two isolated complaints of sewage intrusion during the 30-month relevant time period, the finding is unreliable. Because the basis of Mr. Corn's finding on the Harahan WTP is unreliable and irrelevant, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's LPDES permit, the one incident report during the relevant time period, and the Harahan WTP Lawsuit does not support his finding that the facility generated odors that likely impacted the Trial Plaintiffs.

### 5.  The ADM Grain Facility

Mr. Corn supports Opinion No. 2 in part by his finding that the ADM Grain Facility is an alternative source of odors that "might have" had an impact on the Trial Plaintiffs.[199] Mr. Corn represents the ADM Grain Facility has a Minor Source Permit and presents

---

[198] Corn Rep., R. Doc. 588-4 at p. 88 (citing Pet. for Injunctive Relief and Damages, Mullin et al. v. Jefferson Par. (No. 784209) (24th Judicial Court for the Parish of Jefferson, May 25, 2018)).

[199] *Id.* at p. 80. Mr. Corn represents the facility is located at 11079 River Road in Ama, Louisiana, which is outside of Jefferson Parish but upwind of the area under certain wind conditions. *Id.* at p. 78.

information related to that permit for the relevant time period in Table 27 of the Corn Report.[200] According to Table 27, the facility's Minor Source Permit does not include hydrogen sulfide and Mr. Corn does not state whether any air pollutants listed have any odor, much less the same odor as hydrogen sulfide.[201] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Mr. Corn further represents "at least one unpermitted air emissions event before the relevant time period" demonstrates the facility "has the capacity to impact locations some distance from the facility" and "illustrates the impacts [the ADM Grain Facility] might have had on [the Trial Plaintiffs]."[202] As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the ADM Grain Facility impacted the Trial Plaintiffs during the relevant time period. Because the basis of Mr. Corn's finding on the ADM Grain Facility is unreliable, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit and incident reports from outside the relevant period does not support his finding that the ADM Grain Facility generated odors that might have impacted on the Trial Plaintiffs.

### 6. The Cargill Westwego Marine Terminal

Mr. Corn supports Opinion No. 2 in part by his finding that Cargill is an alternative source of odors that "might have" had an impact on the Trial Plaintiffs.[203] Mr. Corn represents Cargill has a Minor Source Permit for silos and loading/unloading of barges at a loading barging/dock on the Mississippi River and presents information related to the

---

[200] *Id.* at p. 79.
[201] *Id.*
[202] *Id.* at pp. 79-80 (citing two LDEQ Incident Reports documenting complaints from persons located 0.7 to 0.9 miles from the facility).
[203] *Id.* at pp. 76-78. Mr. Corn represents the facility is located at 933 River Road in Westwego, which is in Jefferson Parish. *Id.* at p. 76.

facility's Minor Source Permit for the relevant time period in Table 25 of the Corn Report.[204] According to Table 25, the facility's Title V Permit does not include hydrogen sulfide and Mr. Corn does not state whether any air pollutants listed have any odor, much less the same odor as hydrogen sulfide.[205] As discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

The Corn Report further states Cargill "has had numerous unpermitted air emissions during the relevant time period."[206] Mr. Corn represents there have been nine LDEQ Incident Reports associated with the facility filed during the relevant time period, as listed in footnote 223 and described in Attachment 2 of the Corn Report.[207] The Court has reviewed the Incident Reports falling within the relevant period, publicly available through the LDEQ EDMS.[208] Mr. Corn's finding, based on the LDEQ Incident Reports, is that the emissions from Cargill "illustrate the impacts that [Cargill] might have had on [the Trial Plaintiffs]."[209] The only support for Mr. Corn's rather vague finding is the LDEQ Incident Reports. The Court's review of the Incident Reports reveals they do not support even the very limited finding expressed in the Corn Report:

> One LDEQ Incident Report dated October 13, 2017, documents a complaint of "grain dust and odor releasing from facility."[210]

> Three LDEQ surveillances that month did not detect "any odors or observe dust emissions from the facility," and Cargill "informed the inspector that the crop of soybeans travelling to the facility by rail at that time was in poor condition and did have an odor."[211]

> Two LDEQ Incident Reports dated November 18, 2017, document

---

[204] *Id.* at pp. 76-77.
[205] *Id.* at p. 77.
[206] *Id.* at p. 78.
[207] *Id.* at p. 78 n.223; *id.* at pp. 228-30.
[208] LDEQ EDMS, *supra* note 119.
[209] Corn Rep., R. Doc. 588-4 at pp. 78.
[210] *See* LDEQ Incident Rep. 180662.
[211] *Id.*

complaints of grain dust being released to the air and soil but includes no complaint of odor.[212]

Two LDEQ Incident Reports dated January 29, 2018,[213] and February 3, 2019,[214] document complaints of grain dust and odor; an LDEQ inspection revealed the odors emanated from the feces deposited by a large number of migrating ducks congregating in a ditch near the levee, presumably on the Cargill site.[215]

One LDEQ Incident Report dated October 2, 2018, documents an odor complaint; an LDEQ inspection revealed the source of the odor was floating material in the water in the ditch where the grain conveyors cross River Road.[216] Cargill subsequently dredged the ditch, and by October 18, 2018, no odor was detected.[217]

One LDEQ Incident Report dated November 21, 2019, documents complains of grain dust and odor; an LDEQ inspection revealed a pungent odor of bird feces.[218] Subsequently, Cargill filled in the ditches on its site and an LDEQ inspection revealed no birds were there.[219]

One LDEQ Incident Report dated November 26, 2019, documents complaints of grain and grain husks.[220]

Mr. Corn also references LDEQ Incident Report 164482, which he represents as being related to a complaint in 2019;[221] however, a review of the report shows the complaint was made on June 19, 2015, before the relevant time period, not in 2019.[222]

Summarizing Mr. Corn's evidence to support his finding that Cargill might have had an impact on Trial Plaintiffs during the relevant period, the Court finds there were four complaints of odor over the 30-month relevant period. Three of the odor complaints were the result of large numbers of migrating birds along the Mississippi River, not the

---

[212] *See* LDEQ Incident Reps. 181352 & 181354.
[213] *See* LDEQ Incident Rep. 188655.
[214] *See* LDEQ Incident Rep. 189339.
[215] *See* LDEQ Incident Reps. 188655 & 189339.
[216] *See* LDEQ Incident Rep. 187356.
[217] *Id.*
[218] *See* LDEQ Incident Rep. 194293.
[219] *Id.*
[220] *See* LDEQ Incident Rep. 194350.
[221] Corn Rep., R. Doc. 588-4 at p. 78 n.223 & 224; *id.* at p. 229.
[222] *See* LDEQ Incident Rep. 164482.

Cargill facility. Mr. Corn includes no evidence, or even opinion, about how long the odors from the bird droppings persisted, how they were spread, or how far they were spread. The fourth odor complaint was the result of floating material in a Cargill ditch from which the complaint was received on October 2, 2018 and was resolved by October 18, 2018. To the extent that Mr. Corn's finding on Cargill is based on the unfounded and speculative extrapolation of a few isolated incidents during the 30-month relevant time period, the finding is unreliable. Because the basis of Mr. Corn's finding on Cargill is unreliable, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit and four incident reports during the relevant time period does not support his finding that emissions from Cargill generated odors that might have impacted the Trial Plaintiffs.

### 7. Kirby Inland Marine

Mr. Corn supports Opinion No. 2 in part by his finding that Kirby Inland Marine is an alternative source of odors that "likely" impacted Trial Plaintiffs.[223] Mr. Corn does not cite to any air permit or actual emissions data from the facility. Instead, he represents Kirby Inland Marine "had at least seven unpermitted air emissions events during the relevant time period," "occurring over several miles in the [Mississippi] River."[224] The Corn Report, however, only identifies one LDEQ Incident Report arising from an unpermitted release that occurred during the relevant time period when a damaged barge released 202 barrels of biodiesel that spilled into an adjacent canal.[225] Other than that one incident, the Corn Report only cites LDEQ Incident Reports documenting releases that occurred outside the relevant time period.[226]

---

[223] Corn Rep., R. Doc. 588-4 at p. 91. Mr. Corn represents the facility is located at 7224–7698 Mississippi River Trail, Harahan, which is in Jefferson Parish. *Id.* at p. 89.

[224] *Id.* at p. 91.

[225] *Id.*

[226] *Id.*

As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether emissions from Kirby Inland Marine impacted the Trial Plaintiffs during the relevant time period. Further, to the extent that Mr. Corn's finding on Kirby Inland Marine is based on the unfounded and speculative extrapolation of one isolated incident of a de minimis release during the 30-month relevant time period, the finding is unreliable. Because the basis of Mr. Corn's finding on Kirby Inland Marine is unreliable, it does not support Opinion No. 2. Mr. Corn's documentation of the one incident report during the relevant time period does not support his finding that emissions from Kirby Inland Marine generated odors that likely impacted the Trial Plaintiffs.

### 8.  The Composing Facility

Mr. Corn supports Opinion No. 2 in part by his finding that "odor emissions (ammonia, hydrogen sulfide, etc.) during composting are practically unavoidable," thus "numerous unpermitted air emissions events" associated with the Composting Facility that occurred "before the relevant time period . . . illustrate the impacts the facility might have [had] on [the Trial Plaintiffs] during the relevant time period."[227] Mr. Corn does not cite to any air permit or actual emissions data from the facility whatsoever. Instead, he points only to emissions events that occurred outside the relevant time period, which are irrelevant to the issue of whether the Composting Facility impacted the Trial Plaintiffs during the relevant time period. Because the basis of Mr. Corn's finding on the Composting Facility is irrelevant, it does not support Opinion No. 2. Mr. Corn's documentation of the facility's incident reports from outside the relevant time period does

---

[227] *Id.* at pp. 91, 94. Mr. Corn represents the facility is located at 6148 River Road in Harahan, which is in Jefferson Parish.

not support his finding that emissions from the Composting Facility generated odors that might have impacted the Trial Plaintiffs.

### 9.  Non-landfill operations at the River Birch Landfill

Mr. Corn supports Opinion No. 2 in part by his finding that non-landfill operations at the River Birch Landfill,[228] constitute alternative sources of odors that might have impacted the Trial Plaintiffs.[229] Mr. Corn represents that, "[i]n addition to the landfill operations, River Birch operates a wastewater treatment system and a methane production facility on-site," and proclaims he does "not [] discuss[] the landfill operations in this report."[230]

Mr. Corn represents the River Birch Landfill has two Title V Permits, which "provide[] calculated emissions for the wastewater treatment system, including the ponds and the landfill gas processing," and presents information related to the facility's Title V Permits for the relevant time period in Table 31 of the Corn Report.[231] According to Table 31, the facility's Title V Permits include a quantity of 1.49 tpy hydrogen sulfide.[232] Notwithstanding his representation that the Corn Report focuses on non-landfill-related operations, Mr. Corn does not attempt to separate which emissions in Table 31 are attributable to non-landfill versus landfill operations at River Birch. Thus, Mr. Corn bases his finding in part on the facility's landfill operations. According to the Defendants' disclosure, the impact of landfill-related operations is a topic beyond the scope of Mr.

---

[228] Mr. Corn represents he evaluated only non-landfill operations (i.e., gas processing operations, wastewater treatment operations, and leachate ponds) at the River Birch Landfill. *See id.* at p. 101.
[229] *Id.* at p. 103.
[230] *Id.* at p. 97.
[231] *Id.* at pp. 100-02.
[232] *Id.* at p. 102.

Corn's testimony.[233] Further, to the extent Mr. Corn's finding on River Birch is based on permitted emissions from the non-landfill operations at the facility, as discussed, inferring the types and quantities of pollutants emitted by a facility from the facility's air permit is unreliable.

Mr. Corn presents TRI Reports providing the facility's annual emissions of pollutants, including carbon dioxide, methane, and nitrous oxide, during the relevant time period in Attachment 3 of the Corn Report.[234] Mr. Corn represents "TRI Reports for the River Birch Landfill include emissions from the landfill and non-landfill operations,"[235] and explains "[t]he River Birch TRI reports do not provide a breakdown of the emissions from the landfill operations, the gas processing operations, wastewater treatment operations, or the leachate ponds."[236] Notwithstanding his representation that the Corn Report does not cover landfill-related operations, Mr. Corn does not attempt to separate which emissions identified in the TRI Reports are attributable to non-landfill versus landfill operations at River Birch. Thus, Mr. Corn bases his finding on non-landfill operations at River Birch in part on the facility's landfill operations. According to the Defendants' disclosure, landfill-related operations is a topic beyond the scope of Mr. Corn's testimony.[237] Further, to the extent Mr. Corn's finding on River Birch is based on reported emissions from the non-landfill operations at the facility, Mr. Corn does not

---

[233] The Defendants disclosed the topic of Mr. Corn's testimony as "potential non-landfill sources of odors and emissions." *See* Waste Connections Defendants' Expert Witness List, R. Doc. 418 at p. 1; Jefferson Parish's Expert Witness List, R. Doc. 419 at p. 1; Aptim Corporation's Expert Witness List, R. Doc. 420 at p. 1.
[234] Corn Rep., R. Doc. 588-4 at p. 255.
[235] *Id.* at p. 15.
[236] *Id.* at p. 101.
[237] The Defendants disclosed the topic of Mr. Corn's testimony as "potential non-landfill sources of odors and emissions." *See* Waste Connections Defendants' Expert Witness List, R. Doc. 418 at p. 1; Jefferson Parish's Expert Witness List, R. Doc. 419 at p. 1; Aptim Corporation's Expert Witness List, R. Doc. 420 at p. 1.

express the significance of the emissions rates reported therein or explain how they are relevant to his finding that non-landfill operations at River Birch generated odors, effectively nullifying any probative value they may have.

Mr. Corn also represents that "on at least [two] occasions," LDEQ inspectors have noted odors from the River Birch Landfill's leachate ponds when the inspectors were downwind from the facility.[238] Of the two occasions referenced in the Corn Report, only one occurred during the relevant time period.[239] As discussed, assumptions based on emissions events that occurred outside the relevant time period are irrelevant to the issue of whether the River Birch Landfill impacted the Trial Plaintiffs during the relevant time period. Even accepting Mr. Corn's representation that odors from the leachate ponds are related to non-landfill operations at River Birch, his finding related to the facility is unreliable because it is based entirely on the unfounded and speculative extrapolation of one isolated incident of an LDEQ inspector detecting an odor from the River Birch Landfill leachate pond during the 30-month relevant period. Because the basis of Mr. Corn's finding the facility is unreliable, irrelevant, and based in part on landfill-related operations—a topic beyond the scope of his expertise—his finding related to non-landfill operations at River Birch does not support Opinion No. 2. Mr. Corn's documentation of the facility's air permit and one incident report during the relevant time period does not support his finding that emissions from River Birch generated odors that might have impacted the Trial Plaintiffs.

## **CONCLUSION**

Rule 702 charges the Court as "gate-keeper" with the responsibility of conducting

---

[238] R. Doc. 588-4 at p. 103.
[239] *Id.* at p. 103 n.284.

a preliminary assessment into whether the reasoning and methodology underlying expert testimony is scientifically valid and reliable.[240] As set forth above, the proponent of expert testimony must prove by a preponderance of the evidence that the testimony is reliable.[241] Having conducted a comprehensive review of Opinion No. 2 and the relevant reliance documents, the Court finds that the Defendants have not satisfied their burden of proving Mr. Corn's testimony is reliable by a preponderance of the evidence. Mr. Corn's opinion is peppered with his statements that the emissions sources "may have" or "might have" impacted the Trial Plaintiffs, or at the very best "likely" did so. This illustrates even Mr. Corn's lack of confidence in his argument. Coupled with the unconvincing combination of weak and irrelevant support for his opinions, in its role as gatekeeper, the Court must exclude Mr. Corn's testimony as unreliable. The fact that he discusses 17 emissions sources cannot, by volume alone, compensate for the fact that he lacks compelling evidence or argument for any of them.

Indeed, Mr. Corn's opinions are grounded in his speculative and subjective belief rather than "sufficient facts or [precise] data" as mandated by Rule 702.[242] Mr. Corn's rank conjecture concerning the types and quantities of pollutants emitted by the alternative sources and his assumptions concerning transport mechanisms of the purported pollutants, unsupported by any air modeling, show that Opinion No. 2 is not the product of reliable principles and methods. Accordingly, the Court will exclude Opinion No. 2 as unreliable under Rule 702.

To the extent that any basis of Opinion No. 2 *is* reliable, the Court finds the probative value of Mr. Corn's testimony is outweighed by the risk of confusing the issues

---

[240] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).
[241] *See Moore*, 151 F.3d at 276.
[242] *See* FED. R. EVID. 702.

and misleading the jury. Thus, the Court will also exclude Opinion No. 2 under Rule 403.[243]

Further, because Opinion No. 2 serves as the basis for the other opinions expressed in the Corn Report, the Court will likewise exclude Opinion Nos. 1, 3, and 4.

To the extent that Mr. Corn's opinions express the general conclusion that "potential sources of odors exist" in Jefferson Parish, this fact is not disputed by the parties.[244] Thus, the Court also will preclude Mr. Corn from testifying as to his opinions under Rule 401, as his testimony has no "tendency to make a fact" of consequence "more or less probable than it would be without" it.[245]

Accordingly;

**IT IS ORDERED** that Plaintiffs' Motion in Limine to exclude the testimony of Michael Corn is **GRANTED**.[246]

**New Orleans, Louisiana, this 30th day of July, 2024.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[243] With respect to Opinion No. 1, the Court finds Mr. Corn's conclusions merely mirror fact testimony that "the untrained layman would be qualified to determine intelligently" without his testimony. *See Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (citing FED. R. EVID. 702, Advisory Committee Note); FED. R. EVID. 704.

[244] R. Doc. 545-1 at p. 2.

[245] *See* FED. R. EVID. 401.

[246] R. Doc. 545.