## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK E. ADDISON, SR., ET AL.,**<br>    **Plaintiffs** | **CIVIL DOCKET** |
| **VERSUS** | **NO.  19-11133**<br>        **c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL**<br>**COMPANY, ET AL.,**<br>    **Defendants** | **SECTION: "E" (5)** |

*Applies to: Both Cases*

## ORDER AND REASONS

Before the Court is Plaintiffs' Motion in Limine to exclude testimony of the Defendants' witness Matthew Stutz, P.E., a purported expert in landfill design, engineering, management, and operations.[1] The Defendants filed a joint memorandum in opposition.[2] Plaintiffs filed a reply.[3]

## BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "JPLF"), and the resulting odors emitted from the JPLF between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass

---

[1] R. Doc. 558.
[2] R. Doc. 590. As an exhibit to their opposition, the Defendants attached an affidavit of Mr. Stutz, which "supplements his April 4, 2024 report and does not offer any new opinions." *Id.* at p. 5 (citing R. Doc. 590-1). The Court declines to decide whether Mr. Stutz's affidavit is a permissible supplement to his expert report under Rule 26(e), as even if so, it would not change the result.
[3] R. Doc. 618.

action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual Plaintiffs.[4] In their Second Amended Complaint, Plaintiffs assert negligence and nuisance claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to operate the JPLF; Aptim Corporation, which managed the gas and leachate collection systems of the JPLF from July 2017 to May 2019; and three entities that operated the JPLF from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc. (collectively, the "Defendants").[8]

On November 5, 2019, the Court issued the first Case Management Order, which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022.[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that: (1) odors and gases were emitted by the JPLF;[12] (2) the emissions of gases and odors from the JPLF occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the JPLF at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure

---

[4] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).
[5] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] R. Doc. 80 at pp. 1-2.
[10] R. Docs. 274-278, 286-289.
[11] R. Doc. 323.
[12] *Id.* at p. 5.
[13] *Id.* at p. 26.

to cause a reaction."[14] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[15] The first *Addison* trial was set to begin on September 5, 2023,[16] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[17]

Relevant to the instant Motion in Limine, the Defendants assert several "alternative source arguments,"[18] including that: (1) Plaintiffs' alleged damages were sustained in whole or in part as a result of intervening or superseding causes, including noxious odors originating from sources other than the JPLF; and (2) Plaintiffs' claims are barred or diminished to the extent their injuries were caused by their own comparative fault or the comparative fault of third parties or sources of odors for which the Defendants are not responsible.[19] The Defendants engaged Matthew Stutz, P.E.—represented to be an expert in "landfill design, engineering, management, and operations"—to offer opinions about modeled emissions and emission rates of landfill gas and hydrogen sulfide ("H2S") from the JPLF and two neighboring landfills, the River Birch Landfill (the "RBLF") and the Highway 90 construction and demolition ("C&D") Landfill (the "Hwy 90 Landfill" or

---

[14] *Id.* at p. 27.

[15] *Id.* at p. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).

[16] R. Doc. 340.

[17] R. Doc. 495.

[18] *See* R. Doc. 671 at p. 10 (denying Plaintiffs' motion to exclude evidence related to Defendants' "alternative source arguments" and ruling that "evidence related to Defendants' alternative source arguments is relevant under Rule 401, as 'any potential alternative theories of causation go directly toward a key underlying issue' in this case").

[19] Waste Connections Defendants' Affirmative Defenses and Answer to Plaintiffs' Second Amended Complaint, R. Doc. 502 at p. 2; Jefferson Parish's Answer to Plaintiffs' Second Amended Complaint, R. Doc. 504 at pp. 20-21; Aptim's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint, R. Doc. 111 at pp. 14-15. Aptim's Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint incorporated by reference the affirmative defenses asserted in Aptim's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint. R. Doc. 447 at p. 1.

"Hwy 90").[20] Mr. Stutz is also offered as a rebuttal expert to rebut the opinions of Plaintiffs' experts, specifically regarding: (1) the generation and emissions of landfill gas and hydrogen sulfide; (2) the design, operation, and maintenance of the JPLF, including its cover, leachate, landfill gas, and odor control systems; and (3) the acceptance of non-hazardous industrial waste at the JPLF.[21] Mr. Stutz expressed several opinions in his expert report (the "Stutz Report") related to modeled gas generation and emissions estimates for the JPLF, the RBLF, and the Hwy 90 Landfill, as well as opinions that rebut those expressed by Plaintiffs' expert Jose Sananes.[22]

Plaintiffs timely filed their Motion in Limine seeking to preclude Mr. Stutz from offering testimony related to certain opinions expressed in the Stutz Report under the law-of-the-case doctrine and Federal Rule of Evidence Rule 702.[23]

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[24]

---

[20] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 3; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 3; Defendant Aptim Corporation's List of Experts, R. Doc. 420 at p. 2.
[21] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 3; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 3; Defendant Aptim Corporation's List of Experts, R. Doc. 420 at p. 2.
[22] Stutz Rep., R. Doc. 558-2 at p. 5.
[23] *See* R. Doc. 558-1.
[24] FED. R. EVID. 702.

"A district court has considerable discretion to admit or exclude expert testimony under Rule 702."[25] Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[26] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[27] The trial court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[28]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[29] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[30] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[31] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[32] The proponent of expert testimony "need not prove to the judge that the expert's testimony is correct, but [] must prove by a preponderance of the evidence that the testimony is [relevant and] reliable."[33]

---

[25] *In re Pool Products Distribution Market Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).

[26] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

[27] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[28] *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702).

[29] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[30] 509 U.S. 579 (1993).

[31] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[32] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

[33] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[34] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[35] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[36] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[37] "[A]n expert may never render conclusions of law,"[38] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[39] Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded,"[40] because expert testimony is appropriate only when it will assist the trier of fact.[41]

As part of its "gatekeeping function," "the trial court must probe the reliability . . . of expert testimony any time 'such testimony's factual basis, data,

---

[34] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

[35] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[36] FED. R. EVID. 704.

[37] *Sudo Properties, Inc. v. Terrebone Parish Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

[38] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

[39] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.

[40] *Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).

[41] *Id.* Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).

principles, methods, or their application are sufficiently called into question.'"[42] "While 'principles' refers to the theories an expert employs to explain observed facts, 'methods' refers to *how* the expert collects data and derives theories or opinions from them."[43] "The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid."[44] Expert testimony offering "an inference or assertion" on scientific matters is reliable only if the expert's data and theories are "derived by the scientific method" and "rest[] on a reliable foundation."[45] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[46] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[47] The Supreme Court has cautioned the reliability analysis must remain flexible—the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[48] "[N]ot every *Daubert* factor will be applicable in every situation," thus district courts are offered broad latitude in making expert testimony determinations and may "consider other factors it deems relevant."[49]

---

[42] *EEOC v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

[43] 29 FED. PRAC. & PROC. EVID. § 6268.1 (2d ed.) (2024).

[44] *In re Pool Products*, 166 F. Supp. 3d at 661 (citing *Daubert*, 509 U.S. at 592-93).

[45] *Daubert*, 509 U.S. at 590, 597.

[46] *Daubert*, 509 U.S. at 592–96.

[47] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).

[48] *Kumho Tire*, 526 U.S. at 150.

[49] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004); *Kumho Tire*, 526 U.S. at 151–53.

The trial court is offered "broad latitude" in deciding whether to admit or exclude expert testimony and in deciding "*how* to determine reliability . . . in respect to its ultimate reliability determination."[50] While "[t]rained experts commonly extrapolate from existing data," expert opinions that represent an unfounded extrapolation from the underlying data should be excluded.[51] Indeed, "[t]he reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'"[52] Trial courts routinely exclude expert testimony as unreliable under Rule 702 when opinions offered: fail to "adequately account[] for obvious alternative explanations";[53] are "speculative or conjectural";[54] or are based on "unrealistic and contradictory" assumptions[55] or "vague allusions to [the expert's] 'experience.'"[56] In cases requiring scientific expertise, the Fifth Circuit has advised: "To make precise estimates, precise data are required."[57]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[58] "Although the jury ultimately decides

---

[50] *Kumho Tire*, 526 U.S. at 142.

[51] "Several post-*Daubert* cases have cautioned about leaping from an accepted scientific premise to an unsupported one. To support a conclusion based on such reasoning, the extrapolation or leap . . . must be reasonable and scientifically valid." *Moore*, 151 F.3d at 279 (citations omitted). *See also Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

[52] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).

[53] *In re Pool Products*, 166 F. Supp. 3d at 662 (citing *Daubert*, 509 U.S. at 596).

[54] *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

[55] *Id.*

[56] *See, e.g., Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021) (affirming trial court order excluding expert testimony on damages for breach of fiduciary duty as unreliable under Rule 702 when the expert could only invoke vague allusions to his experience when pressed on how he extrapolated from factors on which he relied to reach conclusions regarding damages).

[57] *Gulf South Insulation v. U.S. Consumer Product Safety Com'n*, 701 F.2d 1137, 1147 (5th Cir. 1983); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where the expert's opinion is based on insufficient information, the analysis is unreliable.").

[58] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).

the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to justify submitting the issue in the first instance."[59] Rule 403 also allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[60] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[61] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[62] Indeed, as the Fifth Circuit has proclaimed, the "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[63]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[64] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[65] It is "the role of the adversarial system, not the court, to highlight weak evidence."[66] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on

---

[59] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 MARQ. L. REV. 173, 191 (2006).
[60] FED. R. EVID. 403.
[61] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).
[62] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).
[63] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).
[64] *Daubert*, 509 U.S. at 596; *see also 14.68 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).
[65] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).
[66] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

'completely unsubstantiated factual assertions.'"[67]

## LAW AND ANALYSIS

The Defendants offer Matthew Stutz, P.E., as an expert in "landfill design, engineering, management, and operations."[68] After preparing landfill gas generation models and emissions estimates for the JPLF, the RBLF, and the Hwy 90 Landfill, using mathematical analysis and relevant source material, Mr. Stutz expressed several opinions in his Report.[69] The Plaintiffs seek to exclude Mr. Stutz's testimony on the following 16 opinions expressed therein (the "contested opinions"):

> Opinion No. 1: Generally accepted methods by the landfill industry and regulatory agencies supply appropriate factors to be used in modeling the generation and emissions of landfill gas.
>
> Opinion No. 1A: Appropriate k and LO factors for use in modeling of H2S generation at JPLF, RBLF, and Hwy 90 are available based on generally accepted methods, publicly available data, and reasonable assumptions.
>
> Opinion No. 1B: Appropriate H2S concentrations for modeling of emissions from JPLF, RBLF, and Hwy 90 are available for each landfill and are available based on generally accepted methods, publicly available data, and reasonable assumptions.
>
> Opinion No. 1C: Appropriate waste acceptance volumes for each landfill are available based on generally accepted methods, publicly available data, and reasonable assumptions.
>
> Opinion No. 1D: Soil oxidation within landfill cover soils is widely accepted in the industry but initially ignored and then discounted to zero by the Plaintiffs' experts. However, soil oxidation was proven at JPLF by outside engineering firms as well as the Plaintiffs' own study of the site, which showed that soil oxidation did actually occur.

---

[67] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).
[68] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 3; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 3; Defendant Aptim Corporation's List of Experts, R. Doc. 420 at p. 2.
[69] Stutz Rep., R. Doc. 558-2 at p. 5. Mr. Stutz represented that his model used the same assumptions or modeling inputs used by the Plaintiffs' experts where possible and consistent with applicable methods. *Id.*

Opinion No. 1E: Appropriate collection efficiency factors are available for each landfill based on generally accepted methods, publicly available data, and reasonable assumptions.

Opinion No. 2A: Generally accepted industry standards and methods are readily available to determine the H2S emissions from JPLF and each of the nearby landfills. Using these accepted industry practices and methodologies results in a more accurate, representative, and reliable, estimate of H2S emissions. The Plaintiffs' experts disregard industry standards and scientific research. They created methodologies that had never been used before and chose to use the highest unvalidated numbers which made their H2S emission estimates inflated, unreliable, and not representative of the site.

Opinion No. 2B: For the years 2017-2019, the Hwy 90 Landfill was the largest and most significant source of H2S emissions of the three landfills. Although the H2S emissions from River Birch were slightly less than JPLF, they were within the same general range.

Opinion No. 2C: Generally accepted industry standards and methods are readily available to determine the H2S emissions from JPLF Phase IVA. Using these accepted industry practices and methodologies results in a more representative estimate of H2S emissions. The Plaintiffs' experts disregarded industry standards and scientific research, created methodologies that had never been used before, and chose to use the highest unvalidated numbers which made their H2S emission estimates inflated, unreliable, and not representative of the site. JPLF the emissions plume could be confused with JPLF.

Opinion 4A: The Plaintiffs' expert continues to use a one-size-fits-all, unsupported simple assumption for radii of influence (ROI) as the basis for his estimate of landfill gas emissions. This method of determining a ROI for use in estimating actual emissions is not supported by the industry or regulatory agencies and is not realistic.

Opinion 4B: The Plaintiffs' expert continues to claim the landfill is flooded, which leads to a gas generation rate (i.e., k value) that is not supported by the facts or the data and leads to an invalid and unrepresentative emission estimate for the site.

Opinion 4D: The presence of oxygen and elevated vacuum pressures in landfill gas wells are not violations, do not indicate poor GCCS operations, and do not support the Plaintiffs' experts' claim of excess landfill gas emissions.

Opinion 4E: Despite localized cover issues, the landfill covers at JPLF were in place and did reduce H2S emissions as documented by the data collected by the Plaintiffs and others.

Opinion 4F: The municipal solid waste (MSW) contribution of H2S in Phase IVA was double counted by the Plaintiffs' experts.

Opinion 4G: The Plaintiff's experts contradicted themselves when they claimed that readings could not be taken in Phase IVA due to H2S concentrations. They in fact collected many samples in Phase IVA.

Opinion 4H: The JPLF was a conventional landfill and was supported, designed, and monitored by several qualified outside consultants who had first-hand knowledge of the site.[70]

The Plaintiffs do not challenge Mr. Stutz's qualifications or the relevance of his testimony.[71] Instead, the Plaintiffs seek to exclude Mr. Stutz's testimony under Rule 702 and the law-of-the-case doctrine, insofar as the Stutz Report is unreliable and expresses opinions on issues adjudicated in the Court's General Causation Order.[72]

## I.   Mr. Stutz's testimony related to the Hwy 90 Landfill will be excluded under Rule 702.

Plaintiffs seek to exclude the portion of Opinion No. 2B in which Mr. Stutz opines "the Hwy 90 Landfill was the largest and most significant source of H2S emissions of the three landfills" during the relevant time period.[73] The Stutz Report represents "[a] main component[] used in gas generation modeling is the concentration of the specific gas being modeled," which in this case is H2S.[74] Mr. Stutz acknowledges that a reliable H2S emissions model must be based on "a reasonable and representative H2S concentration"[75] and, in Opinion No. 1B, concludes "[a]ppropriate H2S concentrations for modeling of

---

[70] *Id.* at pp. 6-7.
[71] *See* R. Doc. 558-1.
[72] *See id.* at pp. 1, 13.
[73] Stutz Rep., R. Doc. 558-2 at p. 6.
[74] *Id.* at p. 16.
[75] *Id.*

emissions from [Hwy 90] . . . are available based on generally accepted methods, publicly available data, and reasonable assumptions."[76] Mr. Stutz represents the "reliable and representative H2S concentration" at the Hwy 90 Landfill is 2,900 parts per million ("ppm").[77] As explained in Opinion No. 1B, Mr. Stutz derived this H2S concentration by calculating the simple average of the highest and lowest H2S concentrations—3,800 ppm and 2,000 ppm, respectively—observed at Hwy 90 during a one-day study on February 26, 2008 (the "February 2008 Study").[78] With this figure, Mr. Stutz ran his H2S Generation Model for Hwy 90 (the "Hwy 90 Model"), which as presented in Table 12, results in estimated H2S emission rates from the landfill of: 30,519 cubic meters per year ("m³/yr") for 2017; 34,489 m³/yr for 2018; and 34,443 m³/yr for 2019.[79] After comparing the modeled H2S emission rates for the Hwy 90 Landfill, the RBLF, and the JPLF, as provided in Table 13 of the Stutz Report, Mr. Stutz concluded "the majority of H2S emissions during [the relevant time period] came from Hwy 90," which he expresses in Opinion No. 2B.[80]

Plaintiffs argue the modeled emission rates for Hwy 90 "do not have any indicia of reliability required by Rule 702"[81] because Mr. Stutz improperly "extrapolates [the] exact same 2008 H2S concentration" at the landfill "every year from 2008 [through] 2020,"[82] "when actual facts indicate[] that could not possibly be so."[83] Plaintiffs point to the fact

---

[76] *Id.* at p. 6.
[77] *See id.* at p. 18.
[78] *Id.* at p. 19.
[79] *Id.* at p. 27.
[80] *Id.* at p. 28.
[81] R. Doc. 558-1 at p. 11
[82] *Id.* at p. 9.
[83] *Id.* at p. 7 (citing Dep. Tr. of Stutz, R. Doc. 558-3 at 228-31). In the alternative, Plaintiffs contend the methodology underlying Opinion No. 2B is unreliable because Mr. Stutz used the EPA's LandGEM model to estimate the quantity of landfill gas generated at Hwy 90, which "was not created for use at C&D landfills." *Id.* at p. 7 (citing the EPA's LandGEM User Guide, R. Doc. 558-12 at pp. 1-3 (providing the LandGEM Model "estimates air pollutants and other gases from [MSW] landfills")). However, because Mr.

that, after Hurricane Katrina in late 2005, the Hwy 90 Landfill was declared an "Emergency Debris Site" by the Louisiana Department of Environmental Quality (the "LDEQ") and in accordance with that declaration, both gypsum-containing C&D debris and vegetative debris were disposed at the landfill.[84] Plaintiffs represent that, by 2008 the burial of organic vegetative debris combined with Katrina-related gypsum sheetrock caused the Hwy 90 Landfill to experience issues resulting from elevated H2S concentrations.[85] Plaintiffs cite Hwy 90 records, publicly available through the LDEQ's Electronic Document Management System (the "LDEQ EDMS"),[86] which they claim demonstrate: (1) since 2012, the Hwy 90 Landfill has received "zero (0) tons of vegetative waste"; (2) in 2008, the Hwy 90 Landfill applied for an LDEQ minor source air permit and proposed the installation of passive flares to burn off H2S "resulting from the disposal of hurricane-related material," to control fugitive emissions; and (3) in December 2010, the Hwy 90 Landfill requested the LDEQ rescind its permit, after concluding "not enough gas was being generated inside the [Hwy 90 Landfill] to keep the flares burning."[87] In sum, Plaintiffs argue the de minimis quantity of organic vegetative debris received by Hwy

---

Stutz's emissions estimate for the Hwy 90 Landfill will be excluded on other grounds, the Court will not address Plaintiffs' alternative argument.

[84] *Id.* at pp. 3-4. Plaintiffs represent Hwy 90 received the following quantities of organic vegetative waste post-Katrina: 88,109 tons in 2006; 64,528 tons in 2007; 11,911 tons in 2008; 37,885 tons in 2009; 257 tons in 2010; 248 tons in 2011; and 0 tons in 2012 and every subsequent year. *Id.* Plaintiffs represent Hwy 90 received the following quantities of mixed C&D waste post-Katrina: 1,434,737 tons in 2006; 730,870 tons in 2007; 257,012 tons in 2008; 221,908 tons in 2009; 197,916 tons in 2010; 195,872 tons in 2011; and 185,102 tons in 2012. *Id.*

[85] *Id.* at pp. 2-3 ("As demonstrated by the facts of this case, the co-disposal of gypsum [with] organic waste is likely to generate hydrogen sulfide gas. [Thus,] [o]rdinarily, C&D landfills do not accept organic or vegetative waste.").

[86] LA. DEP'T OF ENV. QUALITY, ELECTRONIC DOCUMENT MGMT. SYS. [hereinafter LDEQ EDMS], https://www.deq.louisiana.gov/page/edms [https://perma.cc/JE6C-K9QL]. The Court may examine "documents incorporated into the [motion] by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). "The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).

[87] R. Doc. 558-1 at pp. 3-6.

90 beginning in 2010 and the remedial measures the landfill undertook to reduce H2S emissions between 2008 and 2010 demonstrate "the odor issue" at Hwy 90 "no longer existed" by the time the landfill filed a request with LDEQ to rescind its permit in December 2010.[88]

Notwithstanding the operational changes and reduction of H2S and landfill gas emissions from Hwy 90, which may be inferred from the landfill's operational history, Plaintiffs point out that "Mr. Stutz based his emissions calculations for [the relevant time period] entirely upon [H2S] measurements taken inside the waste mass at Hwy 90 on February 26, 2008," during the time in which Hwy 90 was known to be experiencing issues related to elevated H2S concentrations.[89] Plaintiffs argue the Stutz Report's omission of Hwy 90's relevant operational history "raise[s] a serious question" about his assumption that the landfill would generate H2S at the same rate during the relevant time period as it did in February 2008.[90] Accordingly, Plaintiffs contend the basis of Mr. Stutz's Opinion No. 2B, that "the H2S concentration remain[ed] constant" from February 2008 through the relevant time period, "is manifestly unreliable."[91]

In opposition, the Defendants argue "[t]he issues raised in Plaintiffs' motion are appropriate topics for cross-examination, but they fall far short of upsetting the reliability and relevance of Mr. Stutz's proposed testimony," as "Plaintiffs' argument[s] go[] to the weight of Mr. Stutz's opinions but not their reliability under Rule 702."[92] The Defendants contend Plaintiffs' challenge does not contest "the accuracy of the 2008 data" that is the

---

[88] Plaintiffs represent "[t]his meant, of course, that the odor issue that had prompted the permit modification two years earlier no longer existed. In other words, the H2S generation from the Katrina-related [] waste had run its course." *Id.* at p. 6.

[89] *Id.* at pp. 4-5.

[90] *Id.* at pp. 6-7.

[91] *Id.* at p. 9.

[92] R. Doc. 590 at p. 3.

basis of Opinion No. 2B, but offer only speculative argument "that circumstantial factors may have affected the H2S concentration in Hwy 90's landfill gas after 2008."[93] The Defendants further claim Plaintiffs ignore several relevant facts, including that: (1) "C&D landfills regularly generate H2S under normal conditions"; (2) "the addition of vegetative debris after Hurricane Katrina [did] not increase the concentration of H2S . . . , but [did] increase the total volume of gas, and would likely increase the amount of methane in the gas" generated at Hwy 90; (3) any elevated H2S concentrations at Hwy 90 were "driven solely by the proportion of drywall (aka sheetrock) in the waste"; and (4) the operational history of Hwy 90 does not indicate H2S concentrations decreased after the landfill's initial permit application in 2008, "nor that H2S concentrations had been necessary for the flare[s] to work in the first place."[94] Accordingly, the Defendants assert Plaintiffs assumption that Hurricane Katrina-related waste caused H2S concentrations at Hwy 90 to be higher in 2008 than during the relevant time period is without merit.[95]

In their reply memorandum, Plaintiffs contend the "Defendants forget that methane is odorless" and "is a proxy for landfill gas in general—when methane is present, so is every other gas generated by the decomposition of waste, including [H2S]."[96] Thus, Plaintiffs argue, "[w]hen not enough methane gas was generated to keep the flares lit, then a reduction is rationally and scientifically expected in all of the landfill gases for which methane is a proxy, including [H2S]."[97]

Plaintiffs raise a major issue concerning the validity of the Hwy 90 Model, which is entirely unaddressed in the Stutz Report. A review of publicly available documents on

---

[93] *Id.* at p. 13.
[94] *Id.* at pp. 5-7.
[95] *Id.* at p. 8.
[96] R. Doc. 618 at p. 2.
[97] *Id.*

LDEQ EDMS clearly shows, contrary to the Defendants' mischaracterization of the landfill's operational history, Hwy 90 sought a permit from the LDEQ to mitigate H2S-related landfill odors in early 2008 that likely resulted from the influx of Hurricane Katrina-related organic vegetative and gypsum sheetrock debris buried at the landfill under the LDEQ's Emergency Debris Site declaration.[98] Subsequently, Hwy 90 sought a rescission of that permit in December 2010 after remedial measures presumably facilitated a decrease in H2S concentrations, as evident by Hwy 90's representation to the LDEQ, observing "the reduced flow rate [of] hydrogen sulfide emissions" at the landfill.[99] Mr. Stutz assumes the H2S concentration at Hwy 90 during the relevant time period was identical to the concentration observed one decade earlier in the February 2008 study[100]—mere months before Hwy 90 admitted "ambient H2S odors [were] an increasing concern at the facility as well as surrounding areas," and sought the LDEQ's permission to use "passive flares [to] assist in odor reduction."[101]

The Court finds the scant and uncharacteristic H2S concentration data from February 2008 on which Mr. Stutz bases the Hwy 90 Model for the relevant time period renders Opinion No. 2B unreliable. Generally, when an "expert's opinion is based on insufficient information, the analysis is unreliable."[102] In this case, Mr. Stutz relies on two data points collected on a single day nearly one decade before the relevant time period to derive the H2S concentration that informs his Hwy 90 Model. Hwy 90 records demonstrate the landfill experienced elevated H2S concentrations in 2008, which likely

---

[98] *See* Hwy 90 Operator's Request for Pilot Study, R. Doc. 588-6 (LDEQ EDMS, Doc. No. 3467899 (Apr. 23, 2008)).

[99] *See* Hwy 90's Air Permit Rescission Request, LDEQ EDMS, Doc. No. 7775053 (Dec. 23, 2010).

[100] Stutz Rep., R. Doc. 558-2 at pp. 19, 476-78.

[101] *See* Hwy 90 Operator's Request for Pilot Study, R. Doc. 588-6 (LDEQ EDMS, Doc. No. 3467899).

[102] *Paz*, 555 F.3d at 388.

resulted from the burial of organic vegetative and gypsum sheetrock debris when the LDEQ designated the landfill an Emergency Debris Site post-Hurricane Katrina. Mr. Stutz offers no explanation as to the validity or general acceptance in the scientific community of his methodology for deriving an H2S concentration based on such scant and uncharacteristic data.[103] Because Mr. Stutz fails to adequately account for the obvious flaw in his assumption,[104] as raised in Plaintiffs' Motion in Limine, the Court finds that Mr. Stutz's reliance on a singular data point from February 2008 as the basis for his Hwy 90 Model, as well as his omission of any discussion concerning Hwy 90's post-Katrina operational history, renders the Hwy 90 Model speculative and unreliable.[105] Because the H2S emission rates estimated by the Hwy 90 Model are unreliable, so too is Opinion No. 2B, which expresses Mr. Stutz's conclusion based on those unreliable emission rates.

Accordingly, the Court will exclude Mr. Stutz's testimony related to the Hwy 90 Landfill as unreliable under Rule 702.[106] The Court also finds the probative value of Mr. Stutz's testimony on the Hwy 90 Landfill is substantially outweighed by the risk of misleading the jury. Thus, the Court will also exclude Mr. Stutz's testimony related to the Hwy 90 Landfill under Rule 403.

---

[103] Mr. Stutz represents 2,900 ppm is a "reasonable and representative H2S concentration" for the Hwy 90 Landfill, but derived that figure by calculating the simple average of the highest and lowest H2S concentrations observed at Hwy 90 during the February 2008 Study. Stutz Rep., R. Doc. 558-2 at p. 16. Data from the February 2008 Study on which Mr. Stutz relies is limited—the document is one page and summarily provides "[t]he concentrations [of H2S] observed ranged from 2,000 ppm to 3,800 ppm." *See id.* at p. 478. Even if the operational history of Hwy 90 did not raise issues concerning the reliability of the H2S value used in Mr. Stutz's Hwy 90 Model, the methodology employed by Mr. Stutz in deriving the value based on this limited evidence makes it unreliable. Mr. Stutz offers no support for the proposition that the derivation of an H2S concentration on such scant data is "generally accepted in the scientific community" or otherwise "rests on a reliable foundation." *See Daubert*, 509 U.S. at 590, 597; *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94). Without support, Mr. Stutz's unfounded and speculative extrapolation of the limited data is unreliable under Rule 702.

[104] *In re Pool Products*, 166 F. Supp. 3d at 662 (citing *Daubert*, 509 U.S. at 596).

[105] FED. R. EVID. 702.

[106] Mr. Stutz may not testify as to the portion of Opinion No. 2B that expresses emission rates for the Hwy 90 Landfill, nor may he testify as to the portions of his other opinions that express findings related to the Hwy 90 Landfill.

## II.   Mr. Stutz may offer testimony on the JPLF and the RBLF.

### A.   Mr. Stutz's testimony on the JPLF and RBLF will not be excluded under Rule 702.

Plaintiffs also seek to exclude the portion of Opinion No. 2B in which Mr. Stutz expresses findings related to the JPLF and the RBLF under Rule 702.[107] Plaintiffs argue Mr. Stutz improperly neglects to calculate the total H2S that may be generated from material at the landfills, which renders his modeled H2S emissions from those facilities "nothing more than a wild guess."[108] Specifically, Plaintiffs claim Mr. Stutz's modeled H2S emissions from the JPLF are not the product of reliable principles or methods because his model does not account for "the forty-six million [] pounds of spent lime buried in [Phase IVA]."[109] Plaintiffs also contend Mr. Stutz's findings on the JPLF and the RBLF, as expressed in Opinion No. 2B, "ignore[] site-specific data like the robust gas collections system and synthetic liner at [the RBLF], which the JPLF did not have, and the serious leachate collection problems and landfill cover issues that [the] JPLF did have."[110]

In opposition, the Defendants argue Mr. Stutz's modeled H2S emission rates from the JPLF and RBLF are reliable because he "used modeling factors and methods that are well established within the solid waste industry and accepted by regulatory authorities."[111] With respect to the RBLF, the Defendants contend Mr. Stutz derived H2S concentrations from "site-specific data based on measured gas generation rates and information reported" by the RBLF to the LDEQ.[112] With respect to the JPLF, the Defendants claim Mr. Stutz based H2S concentrations on "actual[] measure[ments] at the JPLF," on which

---

[107] R. Doc. 558-1 at pp. 13-14.
[108] *Id.* at p. 13.
[109] *Id.* at pp. 14-15.
[110] *Id.* at pp. 13-14.
[111] R. Doc. 590 at p. 11.
[112] *Id.*

the Plaintiffs' H2S emissions models also rely.[113] The Defendants further contend any elevated H2S concentration attributable to the spent lime at the JPLF is reflected in those actual measurements.[114]

The Court has reviewed the bases of the portions of Opinion No. 2B related to the JPLF and the RBLF. Unlike the H2S concentration used in his Hwy 90 Model, a review of Opinion Nos. 1B and 2B reveals the H2S concentrations Mr. Stutz used in the H2S Generation Models for the JPLF and the RBLF (the "JPLF Model" and "RBLF Model," respectively) are more "grounded in the methods and procedures of science"[115] than in Mr. Stutz's unsupported speculative or subjective belief. With respect to the JPLF Model, Mr. Stutz represents he "uses the same average H2S concentrations as the Plaintiffs' experts,"[116] and Plaintiffs do not challenge this assertion. With respect to the RBLF Model, although Mr. Stutz's H2S concentration is based on limited data, the H2S concentration is based on a study from June 2018, during the relevant time period.[117] Further, unlike Hwy 90, Plaintiffs do not raise any facts concerning changes in the RBLF's operations to challenge Mr. Stutz's assumption that the H2S concentration at RBLF would be constant during the relevant time period. To the extent Plaintiffs challenge Mr. Stutz's omission of site-specific data, including his failure to calculate the total H2S generated at the landfills, the Court finds these concerns go to the weight of Mr. Stutz's opinions rather than their reliability and should be left for the factfinder's consideration.[118] The Plaintiffs may

---

[113] R. Doc. 590 at p. 11, 16.
[114] *Id.* at p. 11.
[115] *Johnson*, 685 F.3d at 459.
[116] Stutz Rep., R. Doc. 558-2 at p. 19.
[117] *Id.* (citing River Birch's June 2018 Part 70 (Title V) Operating Permit Application, *id.* at p. 475).
[118] *United States v. 14.38 Acres of Land*, 80 F.3d at 1077.

express these concerns at trial through "[v]igorous cross-examination [and] presentation of contrary evidence."[119]

Accordingly, Mr. Stutz's testimony related to the RBLF and the JPLF will not be excluded under Rule 702.

### B. Mr. Stutz's testimony on the JPLF will not be excluded under the law-of-the-case doctrine.

Plaintiffs seek to exclude the remaining contested opinions—Opinion Nos. 1, 1D, 2A, 2C, 4A, 4B, 4D, 4E, 4F, 4G, and 4H, and portions of Opinion Nos. 1A, 1B, 1C, and 1E related to the JPLF—on the basis that the opinions relate to issues adjudicated in the general causation phase and should be excluded under the law-of-the-case doctrine.[120] In opposition, the Defendants claim the Court's General Causation Order "did not find any specific emission rate of H2S" from the JPLF or otherwise "adopt any expert's emissions modeling, so there is no expert modeling that could be now binding on Mr. Stutz."[121] Thus, the Defendants contend, Mr. Stutz's opinions on the JPLF were provided in a timely manner and should not be excluded under the law-of-the-case doctrine.[122]

As affirmed in the Court's Order and Reasons issued on July 3, 2024, "the issue of general causation was '*actually decided*' by the Court's General Causation Order"[123] and "findings of fact and conclusions of law expressed therein" will not be revisited.[124] The Court found that, "at times during the relevant time period odors and gases, including hydrogen sulfide, were being emitted by the Jefferson Parish Landfill in levels of at least

---

[119] *Daubert*, 509 U.S. at 596; *see also 14.68 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).
[120] R. Doc. 558-1 at p. 13.
[121] R. Doc. 590 at p. 15.
[122] *Id.*
[123] *See* General Causation Order, R. Doc. 323.
[124] R. Doc. 642 at p. 9 (quoting *Alpha/Omega Ins. Servs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001)).

5 ppb of hydrogen sulfide over thirty minutes."[125] However, the General Causation Order did not determine particular H2S emission rates for the JPLF during the relevant time period. Thus, with respect to the H2S emissions models, the General Causation Order only established that at times the H2S concentration at the surface of the landfill was at least 5 ppb over thirty minutes during the relevant time period. Although Plaintiffs contend the contested opinions are "[an] obvious attempt to redo what was already done—and should have already been done during General Causation," they do not cite any portion of the General Causation Order in which the Court established an H2S emission rate.[126]

The Court has reviewed the Stutz Report and finds Plaintiffs' argument is without merit. Table 4 of the Stutz Report provides a comparison of 2019 H2S concentrations at the JPLF, which identifies an average H2S concentration at the JPLF Phase IVA of: (1) 3,633 ppm (i.e., 3,633,000 ppb) collected inside the landfill; (2) 0.43 ppm (i.e., 430 ppb) at the landfill surface; and (3) 1.126 ppm (i.e., 1,126 ppb) collected from ambient readings at approximately three feet from the landfill surface.[127] To the extent the Plaintiffs challenge Mr. Stutz's opinions under the law-of-the-case doctrine, Mr. Stutz input the H2S concentration of 3,633 ppm into his JPLF Model for Phase IVA, which is the same figure relied upon by Plaintiffs' H2S emissions model.[128] This figure is several orders of magnitude greater than the 5 ppb H2S concentration the Court found the JPLF emitted "at times during the relevant time period."[129] Because Mr. Stutz's JPLF Model does not

---

[125] General Causation Order, R. Doc. 323 at p. 44.
[126] *See* R. Doc. 558-1 at p. 13.
[127] Stutz Rep., R. Doc. 558-2 at p. 16.
[128] Tables 17 and 18 in the Stutz Report indicate the JPLF models of both Plaintiffs' experts and Mr. Stutz use a concentration of 3,633 ppm for the JPLF Phase IVA. *See id.* at p. 30.
[129] *See* General Causation Order, R. Doc. 323 at p. 44.

contravene the law-of-the-case with respect to the H2S emissions decided by the Court's General Causation Order, Mr. Stutz's testimony related to modeled H2S emission rates from the JPLF will not be excluded based on the law-of-the-case doctrine.

Having reviewed the Stutz Report, the Court also finds several assertions purported to be opinions therein actually express methodology underlying substantive opinions or rebuttal of Plaintiffs' experts' opinions. The entirety of Opinion Nos. 1, 1A, 1B, 1C, and 1E,[130] and a portion of Opinion No. 1D,[131] express Mr. Stutz's methodology underlying his substantive expert opinions. The entirety of Opinion Nos. 4A, 4B, 4D, 4E, 4F, 4G, and 4H,[132] and portions of Opinion Nos. 1D,[133] 2A,[134] and 2C,[135] contain Mr. Stutz's rebuttal of Plaintiffs' experts' opinions. To the extent the portion of Mr. Stutz's Report explaining his methodologies is necessary to establish the foundation of his testimony on the JPLF and/or the RBLF, the opinions are not excluded. Mr. Stutz's rebuttal of Plaintiffs' experts' opinions on the JPLF and/or RBLF is likewise not excluded to the extent Plaintiffs' experts testify to those opinions.

Accordingly;

---

[130] Stutz Rep., R. Doc. 558-2 at p. 6.

[131] The portion of Opinion No. 1D expressing methodology underlying Mr. Stutz's opinions is: "Soil oxidation within landfill cover soils is widely accepted in the industry." *Id.*

[132] *Id.* at p. 7.

[133] The portion of Opinion No. 1D expressing Mr. Stutz's rebuttal opinion is: "However, soil oxidation was proven at JPLF by outside engineering firms as well as the Plaintiffs' own study of the site, which showed that soil oxidation did actually occur." *Id.* at p. 6.

[134] The portion of Opinion No. 2A expressing Mr. Stutz's rebuttal opinion is: "The Plaintiffs' experts disregard industry standards and scientific research. They created methodologies that had never been used before and chose to use the highest unvalidated numbers which made their H2S emission estimates inflated, unreliable, and not representative of the site." *Id.*

[135] The portion of Opinion No. 2C expressing Mr. Stutz's rebuttal opinion is: "The Plaintiffs' experts disregarded industry standards and scientific research, created methodologies that had never been used before, and chose to use the highest unvalidated numbers which made their H2S emission estimates inflated, unreliable, and not representative of the site." *Id.*

## <u>CONCLUSION</u>

**IT IS ORDERED** that the Plaintiffs' motion to exclude expert testimony of Matthew Stutz is **GRANTED IN PART AND DENIED IN PART**.[136] Mr. Stutz may not offer testimony related to the Hwy 90 Landfill. Mr. Stutz may offer testimony related to the JPLF and the RBLF. Mr. Stutz may offer his rebuttal of Plaintiffs' experts' opinions on the JPLF and RBLF, as necessary, but may not offer rebuttal opinion related to the Hwy 90 Landfill.

**New Orleans, Louisiana, this 31st day of July, 2024.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[136] R. Doc. 558.