UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FREDERICK E. ADDISON, SR., ET AL.,<br>    Plaintiffs | CIVIL DOCKET |
| VERSUS | NO. 19-11133<br>       c/w 19-14512 |
| LOUISIANA REGIONAL LANDFILL<br>COMPANY, ET AL.,<br>    Defendants | SECTION: "E" (5) |

*Applies to: Both Cases*

## ORDER AND REASONS

Before the Court is Plaintiffs' Motion in Limine to exclude testimony of the Defendants' witness Paolo Zannetti, QEP, a purported expert in atmospheric science, air pollution, and modeling of the dispersion of compounds in air.[1] The Defendants filed a joint memorandum in opposition.[2] Plaintiffs filed a reply.[3]

## BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "JPLF"), and the resulting odors emitted from the JPLF between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual Plaintiffs.[4] In their Second Amended Complaint, Plaintiffs assert negligence and nuisance

---

[1] R. Doc. 559.
[2] R. Doc. 587.
[3] R. Doc. 617.
[4] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).

1

claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to operate the JPLF; Aptim Corporation, which managed the gas and leachate collection systems of the JPLF from July 2017 to May 2019; and three entities that operated the JPLF from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc. (collectively, the "Defendants").[8]

On November 5, 2019, the Court issued the first Case Management Order, which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022.[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that: (1) odors and gases were emitted by the JPLF;[12] (2) the emissions of gases and odors from the JPLF occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the JPLF at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction."[14] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[15] The first *Addison* trial was set to begin on

---

[5] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] R. Doc. 80 at pp. 1-2.
[10] R. Docs. 274-278, 286-289.
[11] R. Doc. 323.
[12] *Id.* at p. 5.
[13] *Id.* at p. 26.
[14] *Id.* at p. 27.
[15] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).

2

September 5, 2023,[16] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[17]

Relevant to the instant Motion in Limine, the Defendants assert several "alternative source arguments,"[18] including that: (1) Plaintiffs' alleged damages were sustained in whole or in part as a result of intervening or superseding causes, including noxious odors originating from sources other than the JPLF; and (2) Plaintiffs' claims are barred or diminished to the extent their injuries were caused by their own comparative fault or the comparative fault of third parties or sources of odors for which the Defendants are not responsible.[19] The Defendants engaged Paolo Zannetti, QEP—represented to be an expert in "atmospheric science, air pollution, and modeling of the dispersion of compounds in air"—to offer opinions about the dispersion of modeled hydrogen sulfide ("$H_2S$") emissions and odors from the JPLF and two neighboring landfills, the River Birch Landfill (the "RBLF") and the Highway 90 Landfill (the "Hwy 90 Landfill" or "Hwy 90"), and the impact of those sources on the Trial Plaintiffs.[20] Dr. Zannetti is also offered as a rebuttal expert to rebut opinions offered by Plaintiffs' experts concerning the dispersion of $H_2S$ and other gases in air.[21]

---

[16] R. Doc. 340.
[17] R. Doc. 495.
[18] *See* R. Doc. 671 at p. 10 (denying Plaintiffs' motion to exclude evidence related to Defendants' "alternative source arguments" and ruling that "evidence related to Defendants' alternative source arguments is relevant under Rule 401, as 'any potential alternative theories of causation go directly toward a key underlying issue' in this case").
[19] Waste Connections Defendants' Affirmative Defenses and Answer to Plaintiffs' Second Amended Complaint, R. Doc. 502 at p. 2; Jefferson Parish's Answer to Plaintiffs' Second Amended Complaint, R. Doc. 504 at pp. 20-21; Aptim's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint, R. Doc. 111 at pp. 14-15. Aptim's Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint incorporated by reference the affirmative defenses asserted in Aptim's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint. R. Doc. 447 at p. 1.
[20] *See* Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 4; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 4; Defendant Aptim Corporation's List of Experts, R. Doc. 420 at p. 3; Zannetti Rep., R. Doc. 559-2 at p. 10.
[21] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 4; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 4; Defendant Aptim Corporation's List of Experts, R. Doc. 420 at p. 3.

3

Plaintiffs timely filed their Motion in Limine seeking to exclude Dr. Zannetti from offering testimony under Federal Rule of Evidence 702.[22]

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[23]

"A district court has considerable discretion to admit or exclude expert testimony under Rule 702."[24] Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[25] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[26] The trial court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[27]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[28] The United States Supreme

---

[22] *See* R. Doc. 559-1. Plaintiffs also seek to exclude certain opinions expressed in the Zannetti Report under the law-of-the-case doctrine in their motion to exclude expert testimony on issues litigated and decided in the general causation phase (the "Motion to Exclude General Causation Topics"). *See* R. Doc. 554. The Court will address the arguments made in Plaintiffs' Motion to Exclude General Causation Topics in a separate Order and Reasons.
[23] FED. R. EVID. 702.
[24] *In re Pool Products Distribution Market Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).
[25] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[26] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").
[27] *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702).
[28] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

4

Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[29] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[30] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[31] The proponent of expert testimony "need not prove to the judge that the expert's testimony is correct, but [] must prove by a preponderance of the evidence that the testimony is [relevant and] reliable."[32]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[33] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[34] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[35] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[36] "[A]n expert

---

[29] 509 U.S. 579 (1993).
[30] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).
[31] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[32] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[33] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).
[34] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).
[35] FED. R. EVID. 704.
[36] *Sudo Properties, Inc. v. Terrebone Parish Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

5

may never render conclusions of law,"[37] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[38] Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded,"[39] because expert testimony is appropriate only when it will assist the trier of fact.[40]

As part of its "gatekeeping function," "the trial court must probe the reliability . . . of expert testimony any time 'such testimony's factual basis, data, principles, methods, or their application are sufficiently called into question.'"[41] "While 'principles' refers to the theories an expert employs to explain observed facts, 'methods' refers to *how* the expert collects data and derives theories or opinions from them."[42] "The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid."[43] Expert testimony offering "an inference or assertion" on scientific matters is reliable only if the expert's data and theories are "derived by the scientific method" and "rest[] on a reliable foundation."[44] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that courts may consider in evaluating the reliability of expert testimony.[45] "These factors are (1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and

---

[37] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).
[38] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.
[39] *Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).
[40] *Id.* Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).
[41] *EEOC v. Freeman*, 778 F.3d 463, 472 (4th Cir. 2015) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).
[42] 29 FED. PRAC. & PROC. EVID. § 6268.1 (2d ed.) (2024).
[43] *In re Pool Products*, 166 F. Supp. 3d at 661 (citing *Daubert*, 509 U.S. at 592-93).
[44] *Daubert*, 509 U.S. at 590, 597.
[45] *Daubert*, 509 U.S. at 592–96.

publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[46] The Supreme Court has cautioned the reliability analysis must remain flexible—the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[47] "[N]ot every *Daubert* factor will be applicable in every situation," thus district courts are offered broad latitude in making expert testimony determinations and may "consider other factors it deems relevant."[48]

      The trial court is offered "broad latitude" in deciding whether to admit or exclude expert testimony and in deciding "*how* to determine reliability . . . in respect to its ultimate reliability determination."[49] While "[t]rained experts commonly extrapolate from existing data," expert opinions that represent an unfounded extrapolation from the underlying data should be excluded.[50] Indeed, "[t]he reliability prong mandates that expert opinion 'be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief.'"[51] Trial courts routinely exclude expert testimony as unreliable under Rule 702 when opinions offered: fail to "adequately

---

[46] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[47] *Kumho Tire*, 526 U.S. at 150.
[48] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004); *Kumho Tire*, 526 U.S. at 151–53.
[49] *Kumho Tire*, 526 U.S. at 142.
[50] "Several post-*Daubert* cases have cautioned about leaping from an accepted scientific premise to an unsupported one. To support a conclusion based on such reasoning, the extrapolation or leap . . . must be reasonable and scientifically valid." *Moore*, 151 F.3d at 279 (citations omitted). *See also Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").
[51] *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012).

account[] for obvious alternative explanations";[52] are "speculative or conjectural";[53] or are based on "unrealistic and contradictory" assumptions[54] or "vague allusions to [the expert's] 'experience.'"[55] In cases requiring scientific expertise, the Fifth Circuit has advised: "To make precise estimates, precise data are required."[56]

Under Rule 703, an expert witness may base opinions on facts or data that the expert "has been made aware of or personally observed," including otherwise inadmissible facts or data if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."[57] The district court is "best placed to evaluate" the reasonableness of an expert's reliance on facts or data,[58] and may exclude expert testimony when it is "based on insufficient, erroneous information."[59] Indeed, "[a]n expert's opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture."[60]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[61] "Although the jury ultimately decides the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to justify submitting the issue in the first instance."[62] Rule 403 also allows the trial court to

---

[52] *In re Pool Products*, 166 F. Supp. 3d at 662 (citing *Daubert*, 509 U.S. at 596).
[53] *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).
[54] *Id.*
[55] *See, e.g., Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021) (affirming trial court order excluding expert testimony on damages for breach of fiduciary duty as unreliable under Rule 702 when the expert could only invoke vague allusions to his experience when pressed on how he extrapolated from factors on which he relied to reach conclusions regarding damages).
[56] *Gulf South Insulation v. U.S. Consumer Product Safety Com'n*, 701 F.2d 1137, 1147 (5th Cir. 1983); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) ("Where the expert's opinion is based on insufficient information, the analysis is unreliable.").
[57] FED. R. EVID. 703.
[58] *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 526 (5th Cir. 2013).
[59] *Paz*, 555 F.3d at 389.
[60] *Lewis v. Par. of Terrebonne*, 894 F.2d 142, 146 (5th Cir. 1990).
[61] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).
[62] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 MARQ. L. REV. 173, 191 (2006).

"exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[63] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[64] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[65] Indeed, as the Fifth Circuit has proclaimed, the "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[66]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[67] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[68] It is "the role of the adversarial system, not the court, to highlight weak evidence."[69] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on 'completely unsubstantiated factual assertions.'"[70]

---

[63] FED. R. EVID. 403.
[64] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).
[65] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).
[66] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).
[67] *Daubert*, 509 U.S. at 596; *see also 14.38 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).
[68] *14.38 Acres of Land*, 80 F.3d at 1077.
[69] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).
[70] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).

## **LAW AND ANALYSIS**

The Defendants offer Paolo Zannetti, QEP, as an expert in "atmospheric science, air pollution, and modeling of the dispersion of compounds in air."[71] According to his Report, Dr. Zannetti has more than 50 years of experience performing studies and scientific research in air quality and environmental sciences.[72] Dr. Zannetti represents he has "studied air quality problems all over the world, often using computer models that [he] developed."[73] After preparing air dispersion models of H2S emissions from the JPLF, the RBLF, and the Hwy 90 Landfill, using available meteorological data and H2S emission rates provided by defense expert Matthew Stutz,[74] Dr. Zannetti expressed ten opinions in his Report (the "Zannetti Report"):

> Opinion 1: Waggaman data and H2S pollution roses show H2S concentrations are relatively low and coming from practically all wind directions, with an apparent background of 1 [part per billion ("ppb")]. This demonstrates that there are a multitude of H2S sources in this complex and industrialized region. The data also demonstrates that when the wind direction is from the south-southwest, the plume from JPLF Phase 4A overlaps with the plumes of the [RBLF] and/or [Hwy 90] creating a joint contribution. This effect increases with distance from the JPLF.
>
> Opinion 2: All the computational methods I used—dispersion models, statistical analyses—are based upon the best available science.
>
> Opinion 3: Statistical analysis of my modeling results demonstrates that the number of 30-minute periods with simulated H2S concentrations from JPLF above 5 ppb are extremely rare. For the majority of the Trial Plaintiffs, this number is zero. My results also demonstrate that H2S emissions from Hwy 90 are dominant, about three times higher than the emissions from JPLF and RBLF.

---

[71] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 4; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 4; Defendant Aptim Corporation's List of Experts, R. Doc. 420 at p. 3.
[72] Zannetti Rep., R. Doc. 559-2 at p. 15.
[73] *Id.*
[74] *Id.* at p. 10. *See generally* Stutz Rep., R. Doc. 558-2.

10

> Opinion 4: My modeling results are in full agreement with the laws of atmospheric diffusion and air quality science. I also expanded my modeling runs to 2020 to compare the results to the actual, measured concentrations at Waggaman Station. This comparison provides a partial validation of my modeling results and of the methodology used by Weaver Consultants Groups LLC to calculate H2S emission rates from each of the landfills.
>
> Opinion 5: The H2S emission rates used by Lape for the Jefferson Parish Landfill are about 20 times higher than those I used.
>
> Opinion 6: The reference levels Lape presented in his report are very conservative and much lower than typical levels of concern and air quality standards found in the literature. Given Lape's experience, he should have commented on their suitability for their intended use in this case.
>
> Opinion 7: Lape's claim that his model presents lower bound estimates is unsupported.
>
> Opinion 8: Lape's choice to focus only on JPLF emissions is incorrect and his concentration simulations cannot explain the complexity of the combined emissions from the three landfills. By simulating only JPLF emissions, Lape introduces a very incorrect presumptive, *a priori* scenario, i.e., the implication that all concentration impacts can be explained solely by the contribution of JPLF. This scenario is clearly incorrect.
>
> Opinion 9: The modeling results produced by Lape were not verified. Available H2S measurements were insufficient for a full validation. Lape's modeling results fail to reproduce the few LDEQ [MAML] measurements available.
>
> Opinion 10: Dr. Schiffman's conclusions regarding indoor air concentrations, lingering effects, and finger-printing are unsupported and inconsistent with laws of atmospheric diffusion.[75]

The Plaintiffs do not challenge Dr. Zannetti's qualifications or the relevance of his testimony.[76] Instead, the Plaintiffs seek to exclude Dr. Zannetti's testimony under Rule 702, insofar as the dispersion models underlying his opinions are "not based upon reliable data or methodology."[77]

---

[75] Zannetti Rep., R. Doc. 559-2 at pp. 18-19.
[76] *See* R. Doc. 559-1.
[77] *See id.* at p. 3.

## I. Dr. Zannetti's testimony related to the Hwy 90 Landfill will be excluded under Rule 702.

Dr. Zannetti's opinions are based on the CALPUFF air dispersion modeling system ("CALPUFF").[78] According to the Zannetti Report, CALPUFF calculated "predicted 30-minute average H2S concentrations for the 30-month [relevant time period] in every point of the region, including the residential locations of the Trial Plaintiffs."[79] Dr. Zannetti represents "the potential H2S impact was calculated by counting the number of 30-minute average H2S concentrations above 5 ppb," and "was performed individually, for each landfill, and cumulatively, for the combined contribution of the three landfills."[80] Dr. Zannetti explains he used the CALPUFF computer files received from Plaintiffs' expert James Lape to perform his simulations.[81] He further explains that the only changes he made to Mr. Lape's files were: (1) the inclusion of estimated H2S emission rates from each of the three landfills, as provided by Mr. Stutz, and (2) the addition of receptors representative of the residence locations of the Trial Plaintiffs.[82] Dr. Zannetti represents he used the same meteorological inputs in his simulations as Mr. Lape.[83]

Plaintiffs seek to preclude Dr. Zannetti from offering testimony at trial because his CALPUFF models are based on Mr. Stutz's estimated H2S emission rates for the three landfills, which Plaintiffs argue are "wholly unreliable."[84] Plaintiffs contend "an experienced scientist like Dr. Zannetti should have quickly seen the flaws in Mr. Stutz's

---

[78] Zannetti Rep., R. Doc. 559-2 at p. 47 (describing CALPUFF as "a multi-layer, multi-species non-steady-state puff dispersion model that simulates the effects of time- and space-varying meteorological conditions on pollution transport, transformation, and removal").
[79] *Id.* at pp. 14-15.
[80] *Id.* at p. 15.
[81] *Id.* at p. 47.
[82] *See id.* at pp. 48, 50-54.
[83] *Id.* at p. 48.
[84] R. Doc. 559-1 at pp. 2-3.

12

computations of [] Hwy 90['s] [H2S] emissions," but instead, "Dr. Zannetti candidly admitted he did nothing to verify Mr. Stutz's emission rates."[85]

In opposition, the Defendants claim Plaintiffs' Motion in Limine "constitutes a premature attempt to argue the weight of Dr. Zannetti's expert opinions disguised as a concern over reliability."[86] The Defendants argue Dr. Zannetti's reliance on Mr. Stutz's estimated H2S emission rates to inform his CALPUFF models is appropriate because Dr. Zannetti does not "have the expertise to calculate [] emission rate[s] from [] area source[s]."[87] The Defendants contend "adopting an emission rate calculated by another expert . . . is a widely accepted practice," and to support that assertion, point to Plaintiffs' own expert, James Lape, who relied on H2S emission rates estimated by Plainitffs' expert, Ramboll US Consulting, Inc.[88] The Defendants further challenge Plaintiffs' assertion that Dr. Zannetti did not verify Mr. Stutz's emission rates, arguing "Dr. Zannetti in fact conducted a partial validation of Mr. Stutz's emission rate estimates against the continuous air monitoring data collected at LDEQ's Waggaman Station in 2020."[89]

"There is nothing inherently wrong about one expert relying on another expert's opinions and/or data."[90] "Not only does Rule 703 explicitly contemplate such reliance, but also, as a practical matter, it happens in nearly every case."[91] "Nonetheless, it can be problematic in certain situations."[92] For example, when the soundness of the underlying

---

[85] *Id.* (citing Dep. Tr. of Zannetti, R. Doc. 559-3 at 20:19-25 ("Q. . . . You yourself did not do anything to see whether there were any flaws or questionable assumptions in what Mr. Stutz did; correct? A. Correct. I don't have the capabilities and the experience to do – or to check emission rates.")).
[86] R. Doc. 587 at p. 3.
[87] *Id.* at p. 5.
[88] *Id.* at pp. 5-6.
[89] *Id.* at p. 6 (citing Dep. Tr. of Zannetti, R. Doc. 587-3 at 232:23-233:5 ("I verif[ied] for 2020 Waggaman. That was the corroboration that I performed.")).
[90] *Eveler v. Ford Motor Co.*, 16-14776, 2017 WL 3382460, at *6 (E.D. La. Aug. 7, 2017).
[91] *Id.*
[92] *Id.*

13

expert opinion is at issue, one expert cannot be used as "a device for getting unreliable[] results" of the underlying expert into Court.[93]

On July 31, 2024, the Court issued an Order and Reasons (the "July 31 Order") determining that H2S emission rates estimated by Mr. Stutz for the Hwy 90 Landfill are unreliable and excluding Mr. Stutz's testimony related to the Hwy 90 Landfill as inadmissible under Rule 702.[94] Mr. Stutz is a witness testifying in the first *Addison* Trial and his estimated H2S emission rates for Hwy 90 are critical because several opinions expressed in the Zannetti Report are based on Dr. Zannetti's CALPUFF model for the Hwy 90 Landfill (the "Hwy 90 CALPUFF Model"), which uses as a model input the H2S emission rates derived by Mr. Stutz.[95]

Because the Court excluded Mr. Stutz's testimony regarding H2S emissions from the Hwy 90 Landfill, the Court will exclude Dr. Zannetti's testimony related to the Hwy 90 Landfill as unreliable.[96] In the event Dr. Zannetti intends to use at trial depictions of his air modeling that include the Hwy 90 Landfill, those depictions must be revised. Dr.

---

[93] *See id.* at *9.
[94] R. Doc. 703 at p. 18.
[95] The Fifth Circuit recently cautioned, when underlying "inadmissible evidence (1) is from a witness testifying at the same trial, (2) is critical to the expert's testimony, and (3) is not independently verified by the expert—the expert's testimony relying on that inadmissible evidence does not pass muster under Rules 702 and 703." *In re Taxotere (Docetaxel) Products Liability Litig.*, 26 F.4th 256, 269 n.10 (5th Cir. 2022); *see also Legier and Matherne, Apac v. Great Plains Software, Inc.*, 03-278, 2004 WL 1488597, at *3 (E.D. La. June 30, 2004) (Rule 703 "is not satisfied when the expert fails to demonstrate 'any basis for concluding that concluding that another individual's opinion on a subjective financial prediction was reliable.'" (quoting *JRL Enterprises, Inc. v. ProCorp Assocs., Inc.*, 01-2893, 2003 WL 21284020, at *7 (E.D. La. 2003))). Notwithstanding a relying expert's independent verification of underlying evidence, "unanswered questions regarding [the] methods by which data was obtained may render opinions regarding that data unreliable." Indeed, "[a]n expert's opinion must be preceded by facts in evidence." *Lewis*, 894 F.2d at 146. To the extent *In re Taxotere* is instructive, Dr. Zannetti did not "independently verify" the inadmissible Hwy 90 H2S emission rates derived by Mr. Stutz, thus Dr. Zannetti's opinion relying on the inadmissible evidence "does not pass muster under Rules 702 and 703." *See In re Taxotere*, 26 F.4th at 269 n.10.
[96] Dr. Zannetti may not testify as to the portions of Opinion Nos. 1, 3, and 4 that express findings related to the Hwy 90 Landfill, nor may he testify as to the portions of his other opinions that express findings related to the Hwy 90 Landfill.

14

Zannetti may use revised depictions provided they are given to Plaintiffs' counsel on or before August 12, 2024.

> II. **Dr. Zannetti's testimony on pollution roses and air dispersion models related to the JPLF and RBLF will not be excluded under Rule 702.**

Independent of the Zannetti Report's reliance on the emission rates calculated by Mr. Stutz, Plaintiffs argue "Dr. Zannetti's opinions are not based upon reliable data or methodology," and are thus excludable under Rule 702 in their own right.[97] Specifically, Plaintiffs challenge the reliability of Dr. Zannetti's "pollution roses,"[98] which "were constructed with data that omitted 'hours with light, variable winds, even though 'emissions are more likely to be strong and felt when the wind is still or very light,'" and which "are based on data from the Waggaman station, which did not begin operation until February 2020, after improvements to the JPLF were substantially complete."[99] Plaintiffs also contend the Zannetti Report improperly fails to account for "improvements to the JPLF in 2019 and 2020" and the LDEQ's finding that "the JPLF was the major source of the odors plaguing the [community]."[100]

In opposition, the Defendants challenge Plaintiffs' "litany of conclusory arguments concerning Dr. Zannetti's emission rate input and circumstantial evidence . . . that Dr.

---

[97] R. Doc. 559-1 at p. 3.
[98] The Zannetti Report represents:
> A pollution rose is a graphical technique that shows where pollution is coming from by using air quality measurements collected at a specific location. The length of each segment (or "petal") of the pollution rose is proportional to the concentration measured with winds coming from the direction of the segment. They can thus help identify possible emission sources of measured chemicals in the ambient air. Each segment/petal of the pollution rose has a length proportional to the average (or median) concentration measured only at times when the wind was blowing from the direction to which the segment points. Longer segment lengths therefore indicate higher concentrations of measured chemicals during times when the wind blows from the corresponding direction of the segment. Zannetti Rep., R. Doc. 559-2 at pp. 34-35.

[99] R. Doc. 559-1 at p. 3.
[100] *Id.*

15

Zannetti's opinions are not based on reliable data" as issues that are more appropriately challenged on cross-examination, as they go to the weight of Dr. Zannetti's testimony rather than its admissibility.[101] Defendants cite deposition testimony of Dr. Zannetti, which they claim refutes Plaintiffs' arguments that he ignored the LDEQ's findings, community odor complaints, and improvements to the JPLF.[102] In response to Plaintiffs' argument that Dr. Zannetti's pollution roses are unreliable, the Defendants contend Dr. Zannetti "did not include hours with light and variable winds in his pollution roses because that would not be a scientifically acceptable approach to plotting the pollution rose."[103]

Plaintiffs assert Opinion Nos. 1, 3, 4, 5, and 8 in the Zannetti Report rely on H2S emission inputs from Mr. Stutz,[104] and the Defendants concede to this assertion with respect to Opinion Nos. 3, 4, and 5.[105] Having reviewed the Zannetti Report, the Court finds only Opinion Nos. 3 and 4 rely on H2S emission inputs from Mr. Stutz.[106] Opinion No. 1 expresses Dr. Zannetti's opinions based on pollution rose data collected in 2020, which he purports "informs earlier periods because the meteorology is similar and total emissions from the three landfills are almost constant over the 4 years 2017-2020."[107] Opinion No. 2 expresses Dr. Zannetti's methodology underlying his substantive

---

[101] R. Doc. 587 at p. 7.
[102] *Id.* at p. 8 (citing Dep. Tr. of Zannetti, R. Doc. 587-3 at 91:6-25 ("[T]hese improvement[s] are reflected in the emission data that I used from Stutz."); *id.* at 244:5-14 ("I found very little correlation between wind direction and the contribution for the three landfills.")).
[103] *Id.* (citing Dep. Tr. of Zannetti, R. Doc. 587-3 at 120:17-122:2 ("A pollution rose establish[es] a correlation between pollution and wind direction, And wind direction is not reliable when the wind speed is too [strong]. So to do a pollution rose, you have to exclude those values.")).
[104] R. Doc. 617 at p. 2.
[105] R. Doc. 587 at p. 3 n.2.
[106] Zannetti Rep., R. Doc. 559-2 at p. 18.
[107] *Id.*

opinions,[108] and Opinion Nos. 5, 6, 7, 8, 9, and 10 contain Dr. Zannetti's rebuttal of Plaintiffs' experts' opinions.[109]

The Court has reviewed the bases of Opinion No. 1 related to Dr. Zannetti's pollution roses and finds the opinion is sufficiently "grounded in the methods and procedures of science."[110] To the extent Plaintiffs challenge Dr. Zannetti's assumptions underlying his pollution roses, including his decision to exclude certain wind data from his analysis, the Court finds those concerns go to the weight of Dr. Zannetti's opinions rather than their reliability and thus should be left for the factfinder's consideration.[111] The Court has also reviewed the bases of the portions of Opinion Nos. 3 and 4 related to the JPLF and the RBLF. Unlike the H2S emission rates used in Dr. Zannetti's Hwy 90 CALPUFF Model, the Court's July 31 Order determined Mr. Stutz's testimony related to the JPLF and the RBLF is admissible.[112] To the extent Plaintiffs' challenge Dr. Zannetti's assumptions underlying his findings on the JPLF and the RBLF, including Plaintiffs' assertions that Dr. Zannetti ignored the LDEQ's findings, improvements made at the JPLF, and odor complaints during the relevant time period, the Court likewise finds those concerns go to the weight of Dr. Zannetti's opinions rather than their reliability and thus should be left for the factfinder's consideration.[113] Further, with respect to the portions of Opinion Nos. 1, 3, and 4 related to the pollution roses, the JPLF, and the RBLF, Plaintiffs may express their concerns at trial through "[v]igorous cross-examination [and] presentation of contrary evidence."[114]

---

[108] *Id.*
[109] *Id.* at pp. 18-19.
[110] *Johnson*, 685 F.3d at 459.
[111] *14.38 Acres of Land*, 80 F.3d at 1077.
[112] R. Doc. 703 at pp. 20-21, 23.
[113] *14.38 Acres of Land*, 80 F.3d at 1077.
[114] *Daubert*, 509 U.S. at 596; *see also 14.68 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).

To the extent the portion of Dr. Zannetti's Report explaining his methodologies is necessary to establish the foundation of his testimony on the pollution roses, the JPLF, and/or the RBLF, Opinion No. 2 is not excluded. With the exception of any testimony that contravenes the Court's General Causation Order,[115] Dr. Zannetti's rebuttal of Plaintiffs' experts' opinions on the JPLF and/or the RBLF, as expressed in Opinion Nos. 5, 6, 7, 8, 9, and 10, is likewise not excluded to the extent Plaintiffs' experts testify to those opinions.

Accordingly;

## CONCLUSION

**IT IS ORDERED** that the Plaintiffs' motion to exclude expert testimony of Dr. Paolo Zannetti is **GRANTED IN PART AND DENIED IN PART**.[116] Dr. Zannetti may not base his opinions on Mr. Stutz's opinions regarding the Hwy 90 Landfill. In the event Dr. Zannetti intends to use at trial depictions of his air modeling that include the Hwy 90 Landfill, those depictions must be revised. Dr. Zannetti may use revised depictions provided they are given to Plaintiffs' counsel on or before August 12, 2024. Dr. Zannetti may offer testimony on the pollution roses and his findings on the JPLF and the RBLF. Dr. Zannetti may offer his rebuttal of Plaintiffs' experts' opinions on the JPLF and the RBLF, as necessary, but may not offer rebuttal opinion based on Mr. Stutz's opinions regarding the Hwy 90 Landfill.

**New Orleans, Louisiana, this 2nd day of August, 2024.**

                                           *Susie Morgan*
                                 **SUSIE MORGAN**
                         **UNITED STATES DISTRICT JUDGE**

---

[115] Plaintiffs' arguments that certain opinions expressed in the Zannetti Report contravene the Court's General Causation Order will be discussed in a separate Order and Reasons with the Court's findings on to Plaintiffs' Motion to Exclude General Causation Topics. *See* R. Doc. 554.

[116] R. Doc. 559.