UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,**<br>**Plaintiffs**<br><br>**VERSUS**<br><br>**LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**<br>**Defendants**<br><br>*Applies to: Both Cases* | **CIVIL ACTION**<br><br>**NO. 19-11133, c/w 19-14512**<br><br>**SECTION: "E" (5)**<br><br>**JUDGE: Morgan**<br>**MAGISTRATE JUDGE: North** |

**WASTE CONNECTIONS DEFENDANTS' MEMORANDUM
IN OPPOSITION TO PLAINTIFFS' EXHIBIT OBJECTIONS**

The Waste Connections Defendants[1] submit this memorandum pursuant to the Thirteenth Case Management Order (R. Doc. 498) and July 3, 2024 Minute Entry (R. Doc. 643) in opposition to Plaintiffs' exhibit objections submitted at R. Doc. 696. Plaintiffs blanket object to large categories of documents offered by Defendants, with almost no analysis of why individual exhibits are inadmissible. These objections are premature and should instead be raised during trial, when the objections can be resolved in context. Plaintiffs' objections also have no basis, as the exhibits that they object to are relevant to specific causation, damages, and other issues to be resolved during trial (as the Court has already found with respect to certain categories of exhibits that Plaintiffs object to), are not hearsay or fall within a hearsay objection, and are otherwise admissible. The Court should thus overrule all of Plaintiffs' objections to Defendants' exhibits.

---

[1] "The Waste Connections Defendants" refers to Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.

1

I. **The Trial Plaintiffs' medical records fall within a hearsay exception and are relevant to specific causation and damages.**

Defendants must be allowed to rebut Plaintiffs' allegations that landfill odors allegedly caused them to suffer persistent medical symptoms, including claims of daily vomiting for multiple Trial Plaintiffs.[2] This should include presentation of the Trial Plaintiffs' medical records, as interpreted by Defendants' experts,[3] which are relevant as to (1) causation, as the records establish potential alternative causes of the Trial Plaintiffs' alleged ailments; and (2) damages, as they speak to whether the Trial Plaintiffs' alleged ailments – many related to preexisting conditions – were occurring more or less frequently during the relevant time period. The medical records are plainly relevant, and they fall within the hearsay exception found at Federal Rule of Evidence ("FRE") 803(4) ("Statement Made for Medical Diagnosis or Treatment").

For example, one Trial Plaintiff complains that landfill odors caused her to suffer, among other injuries, daily nausea for the entire relevant time period.[4] But the medical records reveal that this Trial Plaintiff has chronically used opiate medication for many years, including as recent as 2023. Relying on these medical records, Defendants' expert Brobson Lutz, M.D. opines that "[d]aily nausea as reported by [Trial Plaintiff] was far more likely related to her chronic opiate medications than to low level concentrations of hydrogen sulfide from a landfill."[5] In support, Dr. Lutz points to the medical records that show that the Trial Plaintiff was taking a daily regimen of

---

[2] *See, e.g.,* R. Doc. 590-2, Vernice Lewis Deposition Tr. 87:22-88:4; 88:11-16 (testifying that she vomited 2-3 times per day, every day, from 2017-2019); R. Doc. 580-3, Tyrone Thompson Deposition Tr. 161:13-20 (testifying that he vomited once a day during entire 2017-2019 time period); R. Doc. 580-4, Andrew Section Deposition Tr. 73:19-74:8 (testifying that he threw up 2-3 days a week due to odor); R. Doc. 580-5, Jonathan Tate Deposition Tr. 60:12-24 (Feb. 8. 2024) (testifying as to vomiting twice a day due to odors for a few months during 2017-2019 period); R. Doc. 580-6, Stanley Meyers Deposition Tr. 104:2-8 (testifying that every week he experienced nausea twice per week).
[3] At this stage, the Court is required to accept as credible the probative value that Defendants' experts ascribe to the medical records. *See Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1155 (5th Cir. 1981) (reversing trial court's exclusion of prejudicial blood alcohol evidence).
[4] Defendants' Exhibit 2 to R. Doc. 562, DeLorenzo Rebuttal Report at 40
[5] Trial Plaintiffs' Exhibit 1 to R. Doc. 552, Dr. Lutz's Expert Report at 31.

extremely high dosages of hydrocodone, 2-3 times per day, and that hydrocodone is known to cause nausea in at least 44% of patients.[6]

The medical records are also relevant to demonstrate the shortcomings in the specific causation analysis of Plaintiffs' experts. For example, Dr. DeLorenzo's report fails to mention that he reviewed any of the 41,000 pages of the Trial Plaintiffs' medical records,[7] fails to mention potential alternative causes of injury (such as the above Trial Plaintiff's opiate use), and wholly fails to demonstrate that he conducted a differential diagnosis. This testimony is relevant as to whether Dr. DeLorenzo performed a scientifically valid specific causation analysis. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987) (affirming exclusion of plaintiff's expert given failure to consider potential alternative causes of injury); *McNabney v. Lab. Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005) (same). Defendants must be allowed to use the Trial Plaintiffs' medical records to demonstrate the shortcomings in Dr. DeLorenzo's specific causation analysis, i.e., that the Trial Plaintiffs have extensive medical histories that he failed to consider.

Thus, the medical records are plainly relevant, as they have a tendency to make Plaintiffs' allegations of causation less probable[8] – and that is true whether they are offered in rebuttal to Dr. DeLorenzo's analysis or the Trial Plaintiffs' own testimony.[9]

---

[6] *Id*. at 32.

[7] Dr. DeLorenzo's report includes eight pages of documents that he reviewed to render his opinions. Medical records are not listed. Dr. DeLorenzo admits that his report does not mention any of the Trial Plaintiffs' medical records. He also admits that none of his invoices to counsel indicate that he reviewed medical records or set out the time spent reviewing medical records. Nevertheless, he insists that he indeed reviewed the Trial Plaintiffs' medical records. At his deposition, he could not decide whether he reviewed the records for 10 hours (R. Doc. 580-7, Dr. DeLorenzo Deposition Tr. Vol. I 299:18-21), 15-20 hours (*id*. 330:23-331:2), 40-50 hours (R. Doc. 580-8, Dr. DeLorenzo Deposition Tr. Vol. II 409:16-410:2), or 50-60 hours (*id*. 493:18-25).

[8] FRE 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[9] Should the Court preclude Plaintiffs' medical experts from testifying at trial, the medical records would remain necessary and crucial pieces of evidence for the Defendants. They will be used not only to rebut

Further, the medical records are relevant not only as to causation, but also as to damages. Even if the jury concludes that the Trial Plaintiffs' preexisting maladies were exacerbated by landfill odors – which Defendants deny – the medical records will be vital in helping the jury understand the severity of the exacerbation. For example, the medical records will speak to the severity of the Trial Plaintiffs' symptoms before the relevant time period, during the relevant time period, and after the relevant time period.[10]

Plaintiffs cite a series of cases all speaking to a plaintiff's burden of proof to defeat summary judgment – which has nothing to do with the relevance of the Trial Plaintiffs' medical records in this trial.[11] Those cases stand for the proposition that a plaintiff may survive summary judgment without providing expert testimony on specific causation where the claimed injuries are the types of temporary or transient injuries that are within the common knowledge of lay persons. They say nothing about precluding a defendant from using a plaintiff's medical records to rebut the plaintiff's analysis on causation and damages. Certainly, Defendants are allowed to present a defense as to causation and damages, even as to so-called "common sense" injuries, and those cases say nothing to the contrary.

Finally, Plaintiffs complain of hearsay without acknowledging the applicable exception of Federal Rules of Evidence 803(4), which broadly exempts medical records and other statements related to medical treatment from the hearsay rule.[12] "Medical records are [also] routinely admitted

---

Plaintiffs' experts, but also to rebut the testimony of Plaintiffs themselves regarding the most likely explanations for the symptoms they were allegedly suffering from 2017-2019.

[10] Trial Plaintiffs' Exhibit 1 to R. Doc. 552, Dr. Lutz's Expert Report at 62 (noting that one Trial Plaintiff suffered "classic nasal and sinus allergies before, during, and after the Relevant Time Period.").

[11] *See, e.g., Guidry v. Dow Chem. Co.*, No. 19-cv-12233, 2021 WL 4460505, at *2 (E.D. La. Sept. 29, 2021) (Feldman, J.); *Stephens v. BP Expl. & Prod. Inc.*, No. 17-cv-4294, 2022 WL 1642136, at *4 (E.D. La. May 24, 2022) (Barbier, J.).

[12] FRE 803(4) provides a hearsay exception for: "[a] statement that: (A) is made for — and is reasonably pertinent to — medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."

via the business records exception under [FRE] 803(6)(B)."[13] The Trial Plaintiffs are free to point out any alleged inaccuracies in their medical records, which are admissible under the federal rules.

## II. Plaintiffs' objections to the third-party declarations, which are expert reliance materials, are premature.

Plaintiffs raise premature hearsay objections as to Trial Exhibit 3233, which consists of various signed declarations of Jefferson Parish residents regarding their odor experiences during the relevant time period (including their observations of non-landfill sources of odor). While the Waste Connections Defendants presently do not intend to offer these declarations into evidence, they reserve their right to do so if they prove to be relevant and admissible under an applicable hearsay exception. Plaintiffs' objections may be addressed at that time. Further, the hearsay rules do not bar Defendants' experts from using the declarations, and Defendants' experts may rely on those declarations in reaching their opinions under FRE 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

## III. The Court should defer ruling on the admissibility of scholarly papers and deny Plaintiffs' request that Defendants preview cross-examination exhibits.

The Court should defer until trial Plaintiffs' objections to the admissibility of the scholarly papers relied on by the parties' experts in Plaintiffs' Exhibit 2 (R. Doc. 696-2).[14] These papers are plainly relevant because they were considered by the parties' experts and form the bases of the experts' opinions. Challenging an expert's reliance on studies and data is among the most basic forms of cross examination and expressly authorized under FRE 705. Fed. R. Evid. 705 ("[T]he expert may be required to disclose those facts or data on cross-examination.").

---

[13] *Parker v. John W. Stone Oil Distributors, LLC*, No. 18-cv-3666, 2019 WL 5212285, at *3 (E.D. La. Oct. 16, 2019) (Fallon, J.) (declining to "prematurely define the medical records as hearsay").
[14] The Waste Connections Defendants have already removed from their exhibit list a number of the scholarly papers objected to by Plaintiffs.

Even for those studies considered only by Defendants' experts, exclusion before trial on hearsay and relevancy grounds is premature.[15] Defendants' experts need to be able to explain the bases for their opinions, and the federal rules provide that "[l]earned treatises are exempt from the hearsay rule to the extent they are used by an expert witness or in cross-examination of an expert witness, if they are established as reliable authority." *United States v. Norman*, 415 F.3d 466, 473 (5th Cir. 2005) (citing FRE 803(18)). The Court should rule on any objections to the admissibility of scholarly papers in the normal course of the trial.

Further, the Court should deny Plaintiffs' request that "Defendants identify such documents at least two days in advance of the testimony."[16] The Waste Connections Defendants have already significantly narrowed their list of scholarly papers that they may offer into evidence. As to the remaining papers, whether Defendants will use these studies to cross-examine Plaintiffs' experts or with their own experts depends on the testimony of Plaintiffs' experts. In other words, Defendants cannot anticipate in advance the papers that they may need to use at trial. Regardless, Plaintiffs' experts should be prepared to discuss all studies they considered in forming their opinions. The defense experts have already disclosed the materials they considered in forming their opinions, and Plaintiffs have deposed each of these experts at length.

**IV. The Court should defer ruling on the admissibility of government agency documents.**

The Court should reserve until trial any rulings on the admissibility of the government documents in Plaintiffs' Exhibit 3 (R. Doc. 696-3). Without any analysis or explanation, Plaintiffs state that these documents "are only relevant to the issues of general causation."[17] Instead, these documents are simply additional scientific papers or other government documents relied on by

---

[15] *See Parker*, 2019 WL 5212285, at *3-5.
[16] R. Doc. 969 at 3.
[17] *Id*.

6

Defendants' experts, and the same relevancy and admissibility arguments outlined above regarding scholarly papers applies with equal force to these exhibits. The Court can easily rule on any objections to the relevancy or admissibility of these exhibits at trial.

## V. Documents pre- and post-dating the relevant time period are probative and necessary for both parties' cases and should not be categorically excluded.

Despite this Court's directive that the upcoming trial is a search for the truth, Plaintiffs proclaim that all documents that pre- or post-date the relevant time period have no relevance "except in limited instances," which they did not explicitly define.[18] Documents that pre- or post-date the relevant time period are probative to numerous of Defendants' defenses. These documents provide critical data concerning the Landfill that is necessary to calculate reliable estimates of Landfill emissions, provide the only comprehensive set of continuous air monitoring data in the areas surrounding the Landfill that can be used both to verify the parties' modeling approaches and demonstrate trends that can be extrapolated to earlier periods, and to the extent the Landfill is found liable, they pertain to issues relevant to the allocation of liability among Defendants.[19] Exclusion of this evidence would be unfairly prejudicial to Defendants, limiting their ability to both defend against Plaintiffs' allegations or to address any issues of allocation among themselves.

For example, Plaintiffs seek to exclude records relating to the amount of waste disposed at the Landfill on an annual basis before and after the relevant time period.[20] Historic records of waste disposal are relevant to both parties' cases. Waste deposited in the landfill generates gas for years after it is placed, so, under methods adopted by the industry and regulatory agencies, an estimate of a landfill's gas generation at any given time must account for all of the waste in place at that

---

[18] *Id*. at 4.
[19] *See Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 531 n.17 (5th Cir. 1982) (charging jury to consider occurrences before and after relevant time period that bore on occurrences within the relevant time period)).
[20] R. Doc. 696-4 and 696-5.

7

time. Gas generation models like LandGEM (which both parties' experts used) account for the age of the waste in place, including the age of each successive year of waste, when they estimate the total gas volume for each year. For Phase 4A, waste was first placed in 2013, and then every year afterward. As a result, all documents relating to the volumes and types of waste placed in Phase 4A from 2013 forward are critical to either party's estimate of landfill gas generation and emissions.

Similarly, Plaintiffs seek to exclude air monitoring data and meteorological measurements from Louisiana Department of Environmental Quality's ("LDEQ") Waggaman playground monitoring station from 2020.[21] The Court has already denied Plaintiffs' motion to exclude portions of Dr. Zannetti's expert opinions that rely on this data.[22] The LDEQ Waggaman measurements are very important because they are the only continuous and extensive $H_2S$ air monitoring data available in Plaintiffs' communities.[23] These measurements consist of almost 8,000 hourly $H_2S$ data in a residential area very close to the landfills. Dr. Zannetti relied on this data for several aspects of his analysis.

Dr. Zannetti first relied on the data in creating pollution roses, a very common and useful graphical technique that shows where $H_2S$ is coming from by using the $H_2S$ air quality measurements at Waggaman. The pollution roses show the $H_2S$ concentration when wind is blowing from a specific direction and demonstrate the relative contributions from the direction of each of the three Landfills based on actual measured data.[24] Dr. Zannetti further relied on the

---

[21] R. Doc. 696-5, Exhibit 42.
[22] R. Doc. 705 at 15-18.
[23] Expert Report of Dr. Paolo Zannetti, revised April 12, 2024 ("Zannetti Report") at 67 (R. Doc. 559-2); see also Zannetti Tr. 226:24-227:25 (R. Doc. 587-3). Plaintiffs include the LDEQ Waggaman Playground Station Data on their list of exhibit objections (Exhibit 42 at R. Doc. 696-5).
[24] Zannetti Report at 25–31 (R. Doc. 559-2). The pollution roses rely on actual $H_2S$ measurements at Waggaman Station. They do not rely on the estimates provided by Mr. Stutz.

LDEQ Waggaman data as the best available data to perform model verification and corroborate his modeling results.[25] The LDEQ $H_2S$ measurements, which allow for an apples-to-apples comparison of modeled and actual $H_2S$ concentrations for the year 2020, confirm that Dr. Zannetti's modeling approach for the relevant time period as well as in to 2020 is methodologically correct, and provide partial validation of Mr. Stutz's emission rates and methodology for the relevant time period.[26]

As Dr. Zannetti testified, the LDEQ data from 2020 are important and unique. The year 2020 has a similar meteorology as the period from July 2017 to 2019. More importantly, the combined emissions from the landfills are almost constant between 2017 and 2020.[27] Therefore, the unique LDEQ 2020 measurements are very relevant for our understanding of $H_2S$ impacts in the period July 2017 to 2019. Dr. Zannetti will testify to this analysis at trial—as well as his critique of Mr. Lape's competing "corroboration" approach—and it is for the jury to judge the weight of this evidence and testimony.[28]

Plaintiffs also seek to exclude exhibits concerning the leachate collection system at the Landfill and other materials that pre-date the relevant time period that are relevant to Defendants' respective roles and responsibilities at the Landfill.[29] To the extent the Landfill is found liable at trial, the jury will need to allocate liability among the Defendants. The documents concerning the

---

[25] *Id.* at 67–72 (R. Doc. 559-2).
[26] *Id.*
[27] *Id.* at 23; Zannetti Tr. 141:4-142:4, 238:24-239:11 (R. Doc. 587-3); *see also* Zannetti Tr. 240:7-19 (R. Doc. 587-3) (emissions from the three landfills must be considered together when comparing to Waggaman measurements). For this reason, meteorological data from is similarly relevant as it allows for this apples-to-apples comparison. *See* meteorological data cited at R. Doc. 696-5.
[28] The Court has previously rejected Plaintiffs' argument that 2020 air modeling data has no relevance. *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, No. 18-cv-7889, 2021 WL 5177827, at *4 (E.D. La. Nov. 8, 2021) (Morgan, J.) (denying motion to exclude Dr. Yocke's air modeling for months after the relevant time period and after alleged landfill improvements).
[29] *See, e.g.* R. Doc. 696-4, Exhibits 163, 298, 682.

leachate system are directly relevant to the Defendants' roles at the Landfill and to preclude such evidence would threaten to mislead the jury and lead to unfair allocation of fault.

Furthermore, Plaintiffs are also relying on events both before and after the relevant time period to support their claims, which Defendants are entitled to rebut. For example, Plaintiffs theory of the case begins in October 2016 when the Jefferson Parish Landfill began accepting spent lime.[30] Plaintiffs will introduce evidence to argue that Defendants knew or should have known of the potential for spent lime to generate hydrogen sulfide before it was accepted at the Landfill, an argument that necessarily relies on events before the relevant time period.[31] Plaintiffs have also alleged that the rise and fall in the frequency of odor complaints to the Landfill is directly related to the period the Landfill accepted spent lime and to certain landfill improvements—arguments that necessarily rely on events that pre- and post-date the July 2017 – 2019 time period. The evidence Defendants seek to introduce that pre- or post-dates the relevant time period goes directly to these issues, and to preclude its introduction, particularly on a pre-trial motion, would deprive Defendants of their right to present a defense.

The remaining exhibits Plaintiffs seek to exclude cover a range of topics and data that were relied upon by experts in forming their opinions or which provide context for events or issues that took place during the relevant time period, such as permit applications, gas system drawings, site data, among others. The Court should reserve until trial any rulings on the admissibility of these exhibits.[32]

---

[30] Joint Pre-Trial Order, dated June 25, 2024 § VI(A) (R. Doc. 634).
[31] Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, dated June 13, 2024 at 4-6 (R. Doc. 589).
[32] *See Wells v. Warren Co.*, 328 F.2d 666, 668 (5th Cir. 1964) ("It is the function of the jury, not the court, to weigh and evaluate the evidence on both sides of a contested question. If there is a conflict in the evidence, the jury must resolve such conflict. If legitimate, contrary inferences may be drawn from the evidence, the choice of the proper deduction is also for the jury.").

## VI. The Court has already determined evidence of other sources is relevant, and Plaintiffs' other objections should be reserved for trial.

Plaintiffs attempt to make an end run around the prior findings of the Court and seek categorical exclusion of all documents that concern alternative odor sources. The Court has already determined that information concerning other sources of odors in Jefferson Parish is relevant and denied Plaintiffs' motion to exclude evidence of other sources. R. Doc. 671 at 10 ("the Court finds that evidence related to Defendants' alternative source arguments is relevant under Rule 401, as 'any potential alternative theories of causation go directly toward a key underlying issue' in this case"); *see also* R. Doc. 697 at 13 ("Because Mr. Corn's proposed testimony is relevant to the Defendants' alternative source arguments, the Court will not exclude Mr. Corn's testimony under Rule 401"). While the Court excluded defense expert Michael Corn's testimony concerning alternative sources, the Court did not exclude the underlying facts, finding that portions of his opinions were "matters of common knowledge that ordinary jurors can ascertain." R. Doc. 697 at 16, n.95. Such evidence is directly probative of whether Plaintiffs have met their burden on specific causation to exclude other reasonable potential causes of Plaintiffs' alleged injuries with a fair amount of certainty.[33]

Plaintiffs' objections do not otherwise provide a basis for exclusion and should be reserved for trial when Defendants will have the opportunity to lay the appropriate foundation and address any objections based on hearsay or other grounds. The majority of the documents are public LDEQ records, of the same type the Court took judicial notice in ruling on the admissibility of the opinions of expert Matthew Stutz. R. Doc. 703 at 14. Several LDEQ witnesses have also been identified as witnesses at trial. And while Mr. Corn's opinions were excluded, multiple defense experts relied

---

[33] Defendants' arguments with respect to the relevance of evidence concerning other sources is addressed in their opposition to Plaintiffs' motion *in limine* on this topic. R. Doc. 588.

on documents concerning other sources of odors in Jefferson Parish to reach their opinions and will testify to the bases for those opinions at trial. *See Norman*, 415 F.3d at 473 (citing FRE 803(18)). Plaintiffs finally provide no basis to argue this evidence is more prejudicial than probative, and it is premature to judge such use outside the context of how this evidence will arise at trial. *See Auenson v. Lewis*, No. 94-cv-2734, 1996 WL 457258, at *1 (E.D. La. Aug. 12, 1996) (courts should reserve evidentiary rulings until trial so evidentiary questions are resolved in the proper context). To exclude it would result in a one-sided trial where Defendants were deprived of the opportunity to challenge Plaintiffs' prima facie case.

**VII. Documents related to the Paradise Manor Country Club are admissible for a variety of purposes.**

The Court should overrule Plaintiffs' objections as to the Paradise Manor Country Club documents.[34] The Court has already ruled that Defendants "may call identified witnesses from the community to testify with respect to use of … the community swim club, Paradise Manor Country Club." R. Doc. 702 at 6. The Court has also ruled that Defendants "may introduce evidence related to [financial information from Paradise Manor Country Club] for impeachment purposes if appropriate." *Id*. at 9. Defendants' witness list includes Lee Adams, the president of Paradise Manor Country Club during the relevant time period. The documents that Plaintiffs seek to exclude consist entirely of documents that Lee Adams either (1) personally authored; or (2) personally collected from the business records of Paradise Manor Country Club in response to a subpoena and in his role as a custodian of those records. In light of the Court's order allowing testimony on the use of Paradise Manor Country Club during the relevant time period, Defendants must be allowed to use the club's records for purposes of (1) impeachment; (2) refreshing a witness's

---

[34] R. Doc. 696-7.

recollection;[35] or (3) if the documents themselves become relevant based on the trial testimony, to introduce them into evidence.

### VIII. Plaintiffs' objections to a miscellaneous four-page list of potential exhibits is premature and cannot be addressed categorically.

Plaintiffs also object to a four-page list of varied documents as either irrelevant or whose relevance is outweighed by the risk of "wasting time and delay."[36] Plaintiffs' list embraces too wide a range of documents to be addressed as a category or on a single basis. Plaintiffs, for example, seek to categorically exclude engineering drawings of the Jefferson Parish Landfill, regulatory correspondence from River Birch Landfill, responses to a subpoena served on a Plaintiff's employer, responses to a subpoena served on the City of Harahan, documents related to alternative odor sources, air monitoring conducted by LDEQ, wind data, and invoices of proposed expert witnesses.[37] Plaintiffs' assertion of objections to these documents is premature and has no basis, *see, e.g.*, *supra* Section VI, and the Court should treat Plaintiffs' generic objection as a reservation of objections to the listed documents. Plaintiffs' objections can be addressed specifically and efficiently if any of the listed documents are proffered at trial.[38]

### CONCLUSION

The Court should overrule Plaintiffs' objections to Defendants' exhibits because the objections are premature and properly raised at trial, when the objections to the exhibits can be evaluated in context. Moreover, the exhibits to which Plaintiffs object are relevant and admissible.

---

[35] *See* FRE 612.
[36] R. Doc. 696 at 5.
[37] R. Doc. 696-8.
[38] *See Parker*, 2019 WL 5212285, at *3-5.

Respectfully submitted,

                    LISKOW & LEWIS, APLC

By:   */s/ Michael C. Mims*
      Michael Cash (#31655)
      Cherrell Simms Taplin (#28227)
      Michael C. Mims (#33991)
      Brady M. Hadden (#37708)
      J. Hunter Curtis (#39150)
      Alec Andrade (#38659)
      701 Poydras Street, Suite 5000
      New Orleans, Louisiana 70139
      (504) 581-7979

      BEVERIDGE & DIAMOND, P.C.

      Megan R. Brillault (*pro hac vice*)
      Michael G. Murphy (*pro hac vice*)
      John H. Paul (*pro hac vice*)
      Katelyn E. Ciolino (*pro hac vice*)
      Katrina M. Krebs (*pro hac vice*)
      825 Third Avenue, 16th Floor
      New York, NY 10022
      (212) 702-5400

      James B. Slaughter (*pro hac vice*)
      1900 N Street, NW, Suite 100
      Washington, DC 20036
      (202) 789-6000

      Michael F. Vitris (*pro hac vice*)
      400 W. 15th Street, Suite 1410
      Austin, TX 78701
      (512) 391-8035

      *Counsel for Defendants Louisiana Regional Landfill Company, Waste Connections Bayou, Inc., and Waste Connections US, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed on August 2, 2024. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Michael C. Mims*
OF COUNSEL
