UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,**  Plaintiffs  V.  **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**  Defendants  *Applies to: Both Cases* | CIVIL ACTION  NO. 19-11133, c/w 19-14512  SECTION: "E" (5)  JUDGE: Morgan  MAGISTRATE JUDGE: North |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION TO RECONSIDER ORDER ON OBJECTIONS TO
THE DEPOSITION DESIGNATION OF JOSEPH
LAUBENSTEIN**

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, and the inherent power of the Court, the *Addison* Trial Plaintiffs respectfully request that the Court reconsider its ruling sustaining certain objections to the deposition designations of Waste Connections' Director of CCR Disposal/Director of CCR Management Joseph Laubenstein. R.Doc. 725.

**I.    STANDARD.**

Federal Rule of Civil Procedure 54(b) provides "that any order that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." In this District, courts "generally evaluate motions to reconsider interlocutory orders under the same standards as those governing motions to alter or amend final judgments brought pursuant to Rule 59(e)." R.Doc. 492 at 3. The factors to be considered include (1) whether the motion is necessary to correct manifest errors of law or fact upon which the order is based and (2)

whether the motion is necessary in order to prevent manifest injustice. Id. at 3-4. Here, both of these factors are met.

## II. INTRODUCTION.

In this case, the Waste Connections Defendants have demanded proof that, in October 2016, when they allowed the spent lime into the Landfill, that that they knew or should have known that placing the spent lime into the landfill would cause odor issues. No Waste Connections witness has denied such knowledge, and Mr. Laubenstein's testimony bears directly on this issue.

The spent lime disposed of at the Jefferson Parish Landfill was a coal combustion residual; otherwise known as "CCR," that resulted from a process of flue gas desulfurization. Mr. Laubenstein held the title of "Director of CCR Management" or "Director of CCR Disposal." He provided services to the entirety of Waste Connections, including the Southern Region, and his office was located in the Southern Region office. In Mr. Laubenstein's title, "CCR" stands for coal combustion residual. Tr. 15:22-24.

In this case, the fact that disposal of spent lime in a landfill <u>can</u> result in H2S generation is not in dispute. The List of Uncontested Material Facts attached to the Pretrial Order states the following:

> 73. The company Rain CII Carbon LLC ("Rain Carbon") manufactures calcined coke.
>
> 74. Rain Carbon uses lime-based sorbents to reduce the amounts of sulfur dioxide from the company's air emissions. This pollution control process is often referred to as a flue gas desulphurization ("FGD") process.
>
> 75. The Rain Carbon FGD process generates a byproduct called "spent lime."
>
> 76. From October 17, 2016, until July 2018, the JPLF accepted about 23,000 tons of spent lime from Rain Carbon Norco and Chalmette. The JPLF received approximately 2,601 tons in 2016, 13,905 tons in 2017, and 6,498 tons in 2018….
>
> 83. The spent lime disposed of at the JPLF contained some amount of sulfate.
>
> 84. Sulfate-containing wastes can generate hydrogen sulfide ("H2S") gas under certain landfill conditions.

2

R.Doc.634-1 at 8-9.  *See also* R.Doc. 323, Findings of Fact and Conclusions of Law at 5-7. Nevertheless, despite having stipulated that co-disposal of the spent lime can result in the generation of H2S, the Waste Connections Defendants contend that Plaintiffs' cannot prove that the Waste Connections Defendants knew or should have known that fact in 2016.

The Waste Connections Defendants objected generally to the Laubenstein testimony on the grounds of relevance, hearsay, foundation and "calls for expert opinion," and the Court's order sustaining the objections does not state the basis upon which the objections were sustained.  Set out below are the specific items of testimony on which Plaintiffs seek reconsideration.

### III. TESTIMONY CONCERNING INDUSTRY STANDARDS AND BEST PRACTICES.

**Testimony excluded: 116:23 – 117:17; 118:2-11; 119:8 – 120:17; 125:14-19; 126:11 – 22; 127:12; 127:18 – 128:11**

The excluded testimony deals with Mr. Laubenstein's knowledge of an industry-directed blog dated June 17, 2016, by SCS Engineers concerning a paper by Jeffrey Marshall (an expert for the Waste Connections Defendants in the General Causation phase) entitled "Hydrogen Sulfide Issues at CCR and MSW Co-Disposal Sites," precisely the subject matter of this case. In addition, the excluded testimony includes Mr. Laubenstein's knowledge of a presentation by Mr. Marshall on that subject at an industry conference in July 2016.[1]  The blog, conference presentation, paper and Mr. Laubenstein's testimony demonstrate that the industry standards at the relevant time included being aware of, and taking steps to reduce or eliminate, odor issues resulting from the co-disposal of CCRs, such as spent lime, with municipal solid waste. In determining whether the Defendants knew *or should have known* that solidification of liquid waste with spent lime at the

---

[1] Mr. Marshall's 2017 paper on the subject was ultimately appended to in the May 2018 draft Carlson Report which prompted Jefferson Parish to issue the moratorium on solidification of industrial waste with spent lime.  See Tr. Exs. 1490 (Carlson Preliminary Report and 6219 (Marshall 2017 paper).

3

JPLF was likely to lead to massive H2S odors, the jury is entitled to see whether the Waste Connections executive charged with responsibility for that subject knew that co-disposal of such wastes was a well-known problem in his industry, and that the steps necessary to avoid the resulting odors were the industry standard at the time Waste Connections made the decision to accept spent lime at the JPLF (the blog is dated June 17, 2016 and the industry program was held in July, 2016, before the decision to accept spent lime was made).

The blog and the program are not opinion testimony because they establish *the fact* of the industry standard. Even if they were opinion testimony, they are opinions by an expert in this case, Mr. Marshall. Indeed, as noted above, the statements in the paper referred to in the blog and presented at the conference are largely stipulated in this case *as true*. Thus, there is no concern about the accuracy of the blog, paper and presentation. Indeed, to the extent that Mr. Laubenstein's testimony does not admit the accuracy of the statements, that demonstrates to the jury that the Waste Connections executive with responsibility for soliciting the disposal of such waste was indifferent to industry standards and thereby did not comply with the standard of care.

Further, for these same reasons, the blog, paper, program and testimony are not hearsay. They are admissions by an agent of the Waste Connections Defendants in this case (SCS and its employee, Mr. Marshall.[2] In addition, even if SCS and Mr. Marshall were not agents of the parties, Mr. Marshall's paper, referred to in the blog and which was presented at the conference, was ultimately adopted by the parties when it was expressly used in the decision to discontinue acceptance of industrial waste and solidification with spent lime. They are, therefore, admissions on that ground as well. *See* Advisory Committee Notes to Fed. R. Civ. P. 801(d)(2) ("Under

---

[2] It is undisputed that SCS is an expert/consultant for Waste Connections under a long-term contract. SCS and Mr. Marshall himself are experts for all the parties in this case.

established principles an admission may be made by adopting or acquiescing in the statement of another. * * * Adoption or acquiescence may be manifested in any appropriate manner.")

Even if the blog and the paper are hearsay, they (and the testimony about them) should be admitted not for their truth but to establish that the Waste Connections Defendants were on notice that a respected authority in the field was cautioning against the co-disposal of CCR's and municipal solid waste because of the potential for odor generation, and that, therefore, *the standard of care required them to investigate to determine whether the statements were true, i.e. whether the decision to accept and solidify with spent lime would likely cause massive odor problems.* Moreover, that portion of the testimony in which Mr. Laubenstein denies knowledge or denies doing anything to learn such industry standards is admissible to show that Waste Connections did not take reasonable steps to be aware of industry standards which governed its conduct.

For the foregoing reasons, the conditions for reconsideration have been met on this issue.

IV. **TESTIMONY CONCERNING A SLIDE DECK ON THE SUBJECT OF CO-DISPOSAL OF CCRS IN MUNICIPAL SOLID WASTE LANDFILLS AND THE ODOR PROBLEMS CREATED THEREBY, WHICH MR. LAUBENSTEIN ADOPTED AND SENT TO MR. O'CONNOR.**
Testimony excluded: 129:1-12; 130:1 – 132:2; 133:20-25; 134:9 – 138:17; 144:1 – 145:22; 146:5 – 147:25; 150:1-5

The excluded testimony deals with the knowledge of Waste Connections, through its executive Mr. Laubenstein *and its Southern Region Engineer, Mr. O'Conner*, of industry standards regarding the disposal of CCRs, including FGD materials like spent lime, in municipal solid waste landfills, particularly relating to the resulting odor problems. The excluded testimony establishes that Waste Connections, through Mr. Laubenstein, had this knowledge in October, 2016, when the decision was being made to accept spent lime.

Mr. Laubenstein *asked for* and received the slide deck from Mr. Grahlherr of Tetra Tech, whom Mr. Laubenstein obviously held in high regard ("From your [Statement of Qualifications]

5

you certainly have done some exciting and challenging projects within the coal burning power industry. We can help each other in the CCR world."). Importantly, Mr. Laubenstein had provided information to be used in the slide presentation. Tr. Ex.4133 (Mr. Grahlherr: "Here is that draft presentation that I am reworking. I need to add some more information like that I received from you [Mr. Laubenstein] today."). The name of the slide deck file was "Energy Waste (CCR) Disposal in Subtitle D Landfills." Tr. Ex. 4133. The JP Landfill is a Subtitle D Landfill.

After having a day to review the slide deck (the jury can certainly infer that he did so, having asked for it), he sent it to Mr. O'Connor, who at time was the new Waste Connections Southern Region Engineer (he had only been in the job for two months) with authority over the Jefferson Parish Landfill. As Waste Connections' Southern Region Engineer, it was certainly within Mr. O'Conner's job responsibilities to be aware of potential odor problems created by co-disposing spent lime with municipal solid waste. And, as Waste Connections' Director of CCR Disposal, it was certainly within Mr. Laubenstein's job responsibilities to make Mr. O'Conner aware of the industry standards governing that co-disposal.

As a result, the slide deck is not opinion testimony. Rather, it is evidence of *the fact* of industry knowledge and standards. And it is evidence of information available to Waste Connections at the time it accepted the spent lime into the JP Landfill.

The slide deck is not hearsay. Under Rule 801(d)(2)(c), a statement "made by a person whom the party authorized to make a statement on the subject" is not hearsay when offered against that party. Here, in performing his job responsibilities, Mr. Laubenstein *sought and obtained* the slide deck and the statements in it, and then forwarded it to Mr. O'Connor, whose was brand new to company and whose job responsibilities included overseeing the approval and rejection of special wastes placed in municipal landfills.

Thus, the slide deck is not hearsay when offered against Waste Connections. Indeed, he sent it to Mr. O'Connor without any cover explanation, except its title, from which it can be inferred that Mr. Laubenstein and Mr. O'Connor had already discussed it.

Regardless, as with the industry blog about, and the contents of, Mr. Marshall's paper, even if the slide deck were hearsay, it and Mr. Laubenstein's testimony about it should be admitted so that the jury can decide whether it was such notice (whether true or not) to Mr. Laubenstein and Mr. O'Conner that they, in the exercise of reasonable care, should have investigated to determine the truth of the contents before Waste Connections accepted 23,004 tons of spent lime into the Jefferson Parish Landfill.[3] And, of course, as demonstrated by the stipulations in this case, the contents of the slide deck were true, and as a result, the facts surrounding the slide deck show that Waste Connections knew those facts in 2016.

For the foregoing reasons, the conditions for reconsideration have been met on this issue.

## V.  TESTIMONY CONCERNING AN EMAIL FROM JIM LITTLE, EXECUTIVE VICE PRESIDENT OF WASTE CONNECTIONS, TO ALL WASTE CONNECTIONS' SUPERVISORY LANDFILL PERSONNEL, ABOUT WASTE CONNECTIONS' KNOWLEDGE OF INDUSTRY BEST PRACTICES IN CONNECTION WITH THE OPERATION OF THEIR LANDFILLS.

Testimony excluded: 215:19 – 222:23; 223:11 – 226:4; 226:15 – 228:20

The excluded testimony involves an email from Mr. Jim Little, Waste Connections' Senior Vice President for Engineering and Disposal, to all of the top executives of Waste Connections,

---

[33] *Snyder v. Whittaker Corp.,* 839 F.2d 1085, 1090 (5th Cir. 1988). In *Snyder,* the Court considered the admissibility of a memo between two company officers that purported showed that one material was stiffer than an alternative. Even though the memo in *Snyder* was not a business record (in contrast to the situation here where Mr. Laubenstein's email and attachment are clearly documents kept in the ordinary course of his and Mr. O'Connor's business), it was admissible to show that the recipient *had notice* that the material in question lacked stiffness. As the *Snyder* court said, "the questions pursued a theory of liability" – here, notice of industry standards which imposed a duty to reject spent lime or to take reasonable precautions to prevent odors from it – and was thereby admissible.

including the CEO and COO.  The email was then forwarded to more than 100 Waste Connections landfill personnel, along with executives like Mr. Laubenstein whose jobs had to do with disposal of problematic waste streams that might be affected by the presence of excess water in the landfill.[4] The fact that the email was sent to Mr. Laubenstein reveals that issues of leachate management, gas collection and odors were important to Mr. Laubenstein's job, as they would be if Waste Connections knew that knew placing CCR's into a wet landfill would create odor problems. Indeed, when Mr. Laubenstein's was subsequently asked by the JP Landfill to find a replacement solidification agent for the Rain Carbon spent lime, he specifically asked "does Jefferson Parish Landfill have leachate problems."   Trial Exhibit 3576; Laubenstein Tr. at 257:13-16 (Mr. Laubenstein "could not recall" the reason for this question). *See generally* Tr.at 255:8 – 264:6 (WC objections overruled)

In the excluded testimony about the Jim Little email, Mr. Laubenstein agreed he had received it (Tr. 219:20 – 220:4) but denied he had any understanding concerning its contents or why he had received it.  Tr. 220:5 – 10).  His continuous evasive answers during extensive testimony that has been excluded indicate either a refusal to admit that which he knew was true, or a complete indifference to the consequences of accepting CCRs into wet landfills with inadequate gas collection systems.  Either way, the testimony should not be excluded.

The email establishes Waste Connections' company policies and recognition of industry best practices concerning odor problems and leachate levels which cause odor problems.  Failure to adhere to company-established standards are admissible as evidence of negligence. *Shoemake*

---

[4] Along with Mr. Laubenstein, this email was sent to everyone in the chain of command at the JP Landfill—Rickie Falgoust (Landfill Manager), Nikki Crews (Environmental Engineer), Brett O'Connor (Southern Region Engineer) and Chris Ruane (Engineering Manager for the Southern Region).

*v. Rental Service Corp.,* 2008 U.S. Dist. LEXIS 112335*2 (SD Miss); *Tringali Bros. v. U.S.,* 630 F.2d 1089, 1093 (5th Cir. 1980); *Gordon v. Southtrust Bank,* 108 Fed. Appx. 837, 842 (5th Cir. 2004)[5] In addition, the email and Mr. Laubenstein's testimony about it establishes Waste Connections' knowledge of and interpretation of industry "best practices."

Mr. Little's email is particularly pertinent to this case. The date is November 29, 2016, just after the decision to accept spent lime in the JPLF has been made but before large amounts of spent lime had actually been received. In it, Mr. Little discusses "some leachate management practices and gas management practices that are simply not best practices and will not be accepted going forward." Thus, he acknowledges and admits that the practices by Waste Connections which he decries are not "best practices" in the industry at a time (June, 2016) when Waste Connections has just taken over the IESI contract for the JPLF which requires "best practices" for odor control. And, by this time, Waste Connections was well aware of the problems with the leachate system at the JP Landfill.

And, in fact, the "best practices" Mr. Little acknowledges specifically involve odor control. He says, "if your site is experiencing odors or odor complaints from neighbors that is unacceptable going forward." So, Waste Connections, through Mr. Little, admitted that "gas management practices" which produce "odor complaints from neighbors" are not "best practices." As such, the email, and the testimony about it, is admissible as admissions of a party.[6]

---

[5] The cases distinguish between contentions that they establish the standard of care vs. failure to comply as evidence of negligence. The excluded testimony is offered as evidence of negligence.

[6] Mr. Laubenstein's disingenuous denial [216:17 – 217:16] that an email of this nature, from a senior executive to all other senior executives and to over 100 operating supervisors, is a "big deal" is also admissible as a demonstration that this and his denials during other aspects of his testimony are untruthful. Similarly, Mr. Laubenstein's testimony that, upon receiving this email about best practices for leachate and gas management practices, he did not go to Mr. Little and say, "What the hell are you talking about?" [220:11 – 221:7] contracts his earlier testimony

Furthermore, the email is a party admission that excessive leachate affects gas management which, in turn, creates odors. Indeed, the email is entitled "Leachate management" and directly connects excessive leachate to "gas management" and "odors." Mr. Little says, "From this day forward, you will keep an inventory of leachate in any cell or sump under your management. If you don't have measuring devices contact your regional engineer for help. Our goal is to keep less than 12 inches of leachate stored in any sump. That isn't always practical for any number of reasons but if you do have more than 12 inches of leachate in your landfill cell you are expected to communicate it to your Division Vice President, Region Engineering Manager and your Controller and tell them what the plan and cost is to get it down as soon as possible." Although Mr. Little initially addresses the leachate issue in aspirational terms, his ultimate command is that Waste Connections personnel have the responsibility to "get it down as soon as possible." And, in a follow-up email in the same email string, Mr. O'Conner recognizes that the 12" level is not just aspirational in Louisiana; it is required by regulation.

Because the email is demonstrably an official communication from Waste Connections' senior executives to Waste Connections executives and supervisory personnel in the ordinary course of Waste Connections' business, it is clearly admissible as a business record. Because Mr. Laubenstein is a recipient of it, and acknowledged receipt of it, his testimony about his understanding of it is admissible not only to show knowledge of best practices but as an admission by Waste Connection of best practices and its obligation to comply with them as part of its duty

---

that, if he got an email from Mr. Little saying that he "expected your projects to include best practices for X, Y and Z," he would go into his office and ask him "What the hell are you talking about?" [93:18 – 94:15] Thus, the testimony is admissible to impeach Mr. Laubenstein's credibility.

of care.[7] Any lack of understanding of the contents or meaning of the email in Mr. Laubenstein's testimony is also admissible to show that the Waste Connections executive with particular responsibility for sulfur-containing waste streams did not understand, or did not care about, the relationship between, or best practices concerning, leachate levels, gas management and odor complaints. As such, it is evidence of breach of the standard of care.

For the foregoing reasons, the conditions for reconsideration have been met on this issue.

## VI. CONCLUSION.

For the foregoing reasons, the *Addison* Trial Plaintiffs respectfully request reconsideration of the Order.

Respectfully submitted, this 8th day of August, 2024.

/s/ S. Eliza James
FORREST CRESSY & JAMES, LLC
Byron M. Forrest (La. Bar No. 35480)
Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

/s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573

---

[7] Amplified, of course, by Waste Connections contractual obligation to use "best practices for odor control," as noted above.

Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)
James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

*Counsel For Addison Plaintiffs*