## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**FREDERICK E. ADDISON, SR., ET AL.,**                    CIVIL DOCKET
   **Plaintiffs**

**VERSUS**                                              NO.  19-11133
                                                           c/w 19-14512

**LOUISIANA REGIONAL LANDFILL**                          SECTION: "E" (5)
**COMPANY, ET AL.,**
   **Defendants**


*Applies to: Both Cases*


### ORDER AND REASONS

Before the Court is a contested Motion in Limine filed by Plaintiffs seeking to exclude the testimony of Defendants' medical causation expert, Dr. Brobson Lutz.[1] Defendants filed a memorandum in opposition.[2] Plaintiffs filed a reply in support of their Motion in Limine.[3]

### BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "Landfill"), and the resulting odors emitted from the Landfill between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual Plaintiffs.[4] Plaintiffs assert negligence and nuisance claims under Louisiana state law[5]

---

[1] R. Doc. 552.
[2] R. Doc. 580.
[3] R. Doc. 614.
[4] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).
[5] *See* Second Amended Complaint, R. Doc. 431 at p. 64.

against Defendants: Jefferson Parish, which owns and contracts with others to operate the Landfill; Aptim Corporation, which managed the gas and leachate collection systems of the Landfill from July 2017 to May 2019; and three entities that operated the Landfill from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc.[8]

On November 5, 2019, the Court issued the first Case Management Order ("CMO"), which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022.[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that, during the relevant time period: (1) odors and gases were emitted by the Landfill;[12] (2) the emissions of gases and odors from the Landfill occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the Landfill at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction."[14] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[15] The first

---

[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] R. Doc. 80 at pp. 1-2.
[10] R. Docs. 274-278, 286-289.
[11] R. Doc. 323.
[12] *Id.* at p. 5.
[13] *Id.* at p. 26.
[14] *Id.* at p. 27.
[15] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).

*Addison* trial was set to begin on September 5, 2023,[16] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[17]

The Movants timely filed their Motion in Limine seeking to preclude Defendants' medical causation expert, Dr. Brobson Lutz, from testifying at trial.

## LEGAL STANDARD

### I.     Federal Rule of Evidence 702 Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[18]

Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[19] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[20]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[21] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[22] provides the analytical framework for determining whether expert testimony is admissible under Rule

---

[16] R. Doc. 340.

[17] R. Doc. 495.

[18] FED. R. EVID. 702.

[19] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

[20] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[21] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[22] 509 U.S. 579 (1993).

702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[23] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[24] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[25]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[26] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[27] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[28] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[29]

"[A]n expert may never render conclusions of law,"[30] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the

---

[23] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[24] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

[25] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[26] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

[27] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[28] FED. R. EVID. 704.

[29] *Sudo Properties, Inc. v. Terrebone Parish Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

[30] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

jury as to that law.'"[31] Allowing such expert testimony in a jury trial is both unhelpful and harmful because

> the jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the [expert]'s experience and expertise, it might think the witness even more reliable than the judge. If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury.[32]

Accordingly, expert testimony that offers a legal opinion is inadmissible.[33] Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded,"[34] because expert testimony is appropriate only when it will assist the trier of fact.[35]

## LAW AND ANALYSIS

Defendants offer Dr. Brobson Lutz, M.D., MPH, an internal medicine physician, as their medical causation expert to testify as to "whether each Trial Plaintiff's medical symptoms were more likely than not caused by exposure to low levels of H2S or some other cause."[36] Dr. Lutz ultimately expressed nine opinions in his Report:

> Opinion No 1: As a medical provider and upon review of Plaintiffs' medical records, the Trial Plaintiffs' medical records do not contain a single medical assessment containing odors or gases, or symptoms potentially caused by odors or gases.
>
> Opinion No. 2: Exposure to extremely low concentrations of hydrogen sulfide at less than 25 ppb per thirty-minute period is not considered to be

---

[31] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.

[32] *Cefalu v. Edwards*, 2013 WL 5592947, at *1 (quoting *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); *see also Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).

[33] *Estate of Sowell v. United States of America*, 198 F.3d 169 (5th Cir. 1999); *Askanase*, 130 F.3d at 669.

[34] *Jarrow*, 2000 WL 1537989, at *2.

[35] *Id.* Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).

[36] R. Doc. 634-3, p. 3.

a typical or likely source of adverse health symptoms such as nausea, vomiting, anxiety, fatigue, and/or sleeplessness.

Opinion No. 3: If the Trial Plaintiffs were experiencing headaches, nausea, vomiting, anxiety, fatigue, sleeplessness, and/or other health symptoms from 2017-2020, the symptoms were more likely caused by something other than exposure to extremely low concentrations of hydrogen sulfide of 25 pbb or less over thirty minutes.

Opinion No. 4: Drs. Spodak and DeLorenzo have unreliably determined the etiology of the Trial Plaintiffs' medical symptoms because they did not perform a differential diagnosis, so their methodology is not reliable. This constitutes a failure to properly determine the etiology of the symptoms of: headaches, nausea and vomiting, anxiety, fatigue, and sleeplessness.

Opinion No. 5: Though the Court has already concluded that there is insufficient evidence to suggest that exposure to low concentrations of hydrogen sulfide causes the symptoms of eye, nose, or throat irritation, coughing, trouble breathing/asthma, skin irritation, burning lungs, nosebleeds, exacerbation of neurological issues, or exacerbation of COPD, to the extent any Trial Plaintiff complained of these symptoms, these symptoms were caused by something other than exposure to Hydrogen Sulfide. This is particularly the case with respect to asthma and related symptoms as well.

Opinion No. 6: A proper differential diagnosis for the trial Plaintiffs shall include "compensation neurosis," or the phenomenon of exaggerating health symptoms because one seeks legal compensation. This concept is a likely explanation for why Plaintiffs expanded on their symptoms over time.

Opinion No. 7: The Trial Plaintiffs did not in the past or present meet criteria for referral to mental health specialist for alleged mental health injuries related to landfill odors. Dr. Spodak did not properly consider alternative causes of Plaintiff's mental health injuries.

Opinion No. 8: Dr. DeLorenzo met with five of the Trial Plaintiffs over telemedicine, and his conclusions from those visits are inconsistent with what is possible to observe during a telemedicine encounter.

Opinion No. 9: Based on Dr. Lutz's experience, the most accurate and reliable history given by a patient is usually what they report at or near the time of the incident as opposed to those further away in time. As a result, Plaintiffs' accounts of symptoms from 2017-2020 are likely more reliable than those from 2023-2024.[37]

---

[37] R. Doc. 552-15. pp. 5-8.

The Plaintiffs seek to exclude Dr. Lutz's testimony as irrelevant under Federal Rule of Evidence 401 because his "opinions and testimony do not bear upon any fact of consequence in this case."[38] Plaintiffs also challenge Dr. Lutz's qualifications to opine on odor science and related fields as they are outside the expertise of an internal medicine physician.

First, Plaintiffs argue "the failure of Dr. Lutz to consider that all of the symptoms complained of by Plaintiffs can be caused by [merely] exposure to odors, as opposed to the toxic effect of the chemical, renders his opinions inadmissible."[39] They further argue "[n]o special expertise is required to give the testimony that complaints about odors are not reflected in the medical records," and that whether or not odors are included in the medical records does not bear on the factual question of whether the odors occurred, or whether the odors can cause symptoms of headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety, and worry.[40] Plaintiffs argue Dr. Lutz's opinions are not relevant because he fails to consider the reports of Drs. Dalton and Schiffman, the parties' experts on odors and the psychological effects of odors on individuals, and because he fails to implement a differential diagnosis because he does not consider the effects of odors in his medical assessment of each Trial Plaintiff.[41] Plaintiffs also point out that Dr. Lutz concedes he has no knowledge about mechanisms by which odors can cause people to experience symptoms, and he acknowledged in his

---

[38] R. Doc. 634-3, p. 2; FED. R. EVID. 401.
[39] R. Doc. 552-1, p. 3.
[40] *Id.* at p. 4. The Court clarified in its Order and Reasons dated July 3, 2024, the list of "Allowed Injuries": headaches, nausea, vomiting, gagging, loss of appetite, sleep disruption, dizziness, lightheadedness, fatigue, lethargy, a decrease in energy level, anxiety and worry, stress, concern regarding long term effects, decreased focus, crying, a decrease in quality of life, decreased productivity, feeling sad and overwhelmed; a decrease in mood, depression, and loss of enjoyment or use of property in the general population. R. Doc. 642, pp. 4-5.
[41] *Id.* at p. 5.

deposition that odors have the potential to cause the complained of symptoms.[42] Plaintiffs also argue Dr. Lutz's individual review and evaluation of each Trial Plaintiff's medical records does not assist the jury because in producing his expert report, he excluded information about the odors from the start and focused solely on finding other causes for Plaintiffs' symptoms.[43]

Second, Plaintiffs generally argue that because Dr. Lutz's testimony will not assist the jury it should be excluded at trial.[44] Plaintiffs argue expert testimony should be excluded when it concerns topics that can be argued by counsel, when it contains conclusions of law, and when it opines on matters of common knowledge.[45] Plaintiffs argue the symptoms allegedly suffered by the Plaintiffs occur in the general population and the observation that "lots of things can cause these symptoms" is a matter of common knowledge. As a result, Plaintiffs argue Dr. Lutz should not be allowed to offer expert testimony on the symptoms and their causes.[46] Plaintiffs argue the observation that Trial Plaintiffs added to and/or expanded upon their symptoms  as the first *Addison* trial date approached does not require expert testimony, as "it takes no special expertise or training to compare answers provided in the plaintiff fact sheets to [their] deposition answers. The lawyers can make that argument . . . ."[47]

Finally, Plaintiffs point out that the Defendants' independent medical examiner ("IME") physicians could not conclude with medical certainty, for at least nine Trial Plaintiffs, whether their symptoms were caused by the odors. As a result, Plaintiffs argue

---

[42] *Id.* at pp. 5-6.
[43] *Id.* at p. 13.
[44] *Id.* at p. 7.
[45] *Id.* at pp. 7-10.
[46] *Id.* at pp. 10-11.
[47] *Id.* at p. 12. Plaintiffs also highlight that with respect to Trial Plaintiffs' changed symptoms, in his deposition, Dr. Lutz states "I think [it] takes more common sense than medical training to reach that conclusion." *Id.* at p. 13.

Dr. Lutz should not have been able to reach such a conclusion either.[48] Plaintiffs also argue Dr. Lutz included in his report two disorders, sleep disorder and anxiety disorder, which none of the Plaintiffs allege they suffer, rendering his opinions on these two disorders irrelevant.[49] Ultimately, Plaintiffs argue, because Dr. Lutz fails to consider the impact of the odors in his medical evaluation and because he formulated his expert testimony based on matters of common knowledge, his opinions will not "help the trier of fact to understand the evidence or to determine a fact at issue" in the first *Addison* trial.[50]

Defendants argue in opposition that Dr. Lutz's opinions are "relevant, based on well-accepted and valid scientific principles and methods, and will assist the jury in assessing the crucial issues of causation and damages" at trial.[51] Defendants argue Dr. Lutz "reviewed more than 41,000 pages of the Trial plaintiffs' medical records, their depositions, the IME's reports, . . . medical publications regarding potential adverse health effects from exposure to [hydrogen sulfide], and related documents" to "perform a differential diagnosis and/or differential etiology for each Trial Plaintiff."[52] Defendants argue Plaintiffs "misrepresent[] [Dr. Lutz's] opinions" because Dr. Lutz "does not intend to merely recite the Trial Plaintiffs' medical records to the jury."[53] Rather, Dr. Lutz will rely on his personal experience and expertise in testifying to the most likely causes of the Trial Plaintiffs' symptoms "to rebut the causation and damages testimony of Plaintiffs and

---

[48] *Id.* at pp. 14-15
[49] *Id.* at pp. 15-16.
[50] *Id.* at p. 17.
[51] R. Doc. 580, p. 2.
[52] *Id.* at p. 3.
[53] *Id.* at p. 4.

their experts."[54] Defendants argue Dr. Lutz's testimony on the following is crucial to the

defense on issues of specific causation and damages because:

> (1) he highlights the shortcomings in the so-called methodologies of Plaintiffs' experts Dr. DeLorenzo and Michael Spodak, M.D.;
> (2) he rebuts that landfill emissions are the most likely explanation for the Trial Plaintiffs' 2017-2019 medical symptoms;
> (3) he gives crucial testimony on damages, e.g., even if Trial Plaintiffs suffered from symptoms caused by landfill emissions, the symptoms, at most, constituted modest worsening of already existing conditions; and
> (4) he explains the medical reasons why Plaintiffs' 2023-2024 descriptions of their injuries conflict with the descriptions they gave closer to the relevant time period.[55]

In their reply, Plaintiffs briefly argue Dr. Lutz "cannot possibly come to a

conclusion that one source is more likely than another unless he can opine with regard to

both . . . he lacks the training and expertise to present a reliable methodology to the jury[]"

because of his "unfamiliarity with the odor science."[56]

The Court will address each of Dr. Lutz's major opinions—and Plaintiffs'

arguments—in turn.

## I. Dr. Lutz will be permitted to testify as to his first opinion regarding whether there are any mentions of odors, or symptoms potentially caused by odors, in each particular Trial Plaintiff's medical records.

Plaintiffs do not contest Opinion No. 1 regarding the lack of references to odors

and gases in the Trial Plaintiffs medical records based on its truth—or assert that the

medical records *do* contain mention of the odors; rather, they argue "[n]o special

expertise is required to give the testimony that complaints about odors are not reflected

in the medical records"[57] and this shows that Dr. Lutz's testimony is irrelevant. Plaintiffs

also object to Dr. Lutz's opinion expressed in his deposition that odors bad enough to

---

[54] *Id.* at pp. 4-5.
[55] *Id.* at p. 6.
[56] R. Doc. 614, p. 1.
[57] R. Doc. 552-1, p. 4.

cause adverse health effects more likely than not would result in the sufferer seeking medical attention.[58]

By the time Dr. Lutz testifies in the defendants' case-in-chief, the jury most likely will be familiar with the concept of a differential diagnosis by a medical expert. Dr. Lutz will  not be allowed to offer a lengthy exposition on the general concept of differential diagnosis. Instead, Dr. Lutz may give his opinions resulting from his differential diagnosis with respect to each particular Plaintiff. With respect to his differential diagnosis for each individual Plaintiff, Dr. Lutz may testify about his review of that Plaintiff's medical records and whether there is any mention of any odors or symptoms potentially caused by odors within those records.[59] With respect to each individual Plaintiff, and the medical records that may be relevant to alternative causes of that Plaintiff's symptoms, those records may be admitted into evidence on a plaintiff-by-plaintiff basis.[60]

Although Dr. Lutz will be allowed to criticize the differential diagnosis conducted by Plaintiffs' medical experts, he will not be allowed to testify that Plaintiffs' experts did no differential diagnosis at all or that they should not be allowed to testify.

## II.    Dr. Lutz will not be permitted to testify at trial:

(1)    **as to his second opinion, regarding the level of exposure at which odors can cause adverse health effects as the Court has ruled on general causation.**

(2)    **as to his third opinion that the Trial Plaintiffs' health symptoms from 2017-2020 were more likely caused by something other than exposure to "extremely low concentrations of hydrogen sulfide of 25 ppb or less over thirty minutes, " to the extent his opinion is based on the level**

---

[58] 552-3 at pp. 34-35.

[59] R. Doc. 715 at page 7. The Court overruled the Plaintiffs' objection to the 41,000 pages of medical records listed in R. Doc. 696-1 insofar as the experts Lutz and Kind will be allowed will be allowed to testify that they reviewed the 41000 pages of medical records and saw no mention of odors in a particular Plaintiff's records, but the medical records will not be admitted into evidence in toto.

[60] *See* Order and Reasons at R. Doc. 715 at p. 7.

> **of exposure at which odors can cause adverse health effects, as the Court has ruled on general causation.**
>
> **(3)**   **as to his second and third opinions, to the extent he opines of the level of exposure at which odors can cause adverse health effects, because he is not qualified in toxicology or the science of odors, his testimony is not reliable.**

In his second opinion, Dr. Lutz seeks to testify that, based on his experience as an internal medicine and public health physician and his review of "relevant authorities" in the field, "exposure to extremely low concentrations of hydrogen sulfide (e.g., 25 ppb or less over thirty minutes) is not considered to be a typical or likely source of adverse health symptoms . . . ."[61] In his third opinion, Dr. Lutz opines that the symptoms experienced from 2017-2020 were more likely caused by "something other than exposure to extremely low concentrations of hydrogen sulfide of 25 ppb or less over thirty minutes." To support his opinions, Dr. Lutz relies on his study of the Jefferson Parish landfill, and his review of the toxicology reports by Drs. Kind and Lape, and explained that he consulted the Center for Disease Control and Prevention and the National Institute of Health websites.[62]

In effect, Dr. Lutz attempts to give opinions on matters already decided in this Court's general causation ruling. The Court determined in the general causation trial that "exposure to the odors and gases emitted by the Landfill at a level of five parts per billion ("ppb") for thirty minutes 'is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction.'"[63] As explained in this Court's Order and Reasons issued July 3, 2024, "the issue of general causation was 'actually decided' by the Court's General Causation Order, and [the Court] will not revisit its

---

[61] R. Doc. 552-15, p. 5.
[62] *Id.* at p. 2-5.
[63] *See* R. Doc. 642, p. 3 (quoting R. Doc. 323, p. 27).

findings of fact and conclusions of law expressed therein."[64] As a result, Dr. Lutz will not be permitted to opine on the level of exposure to hydrogen sulfide that is sufficient to cause symptoms in the Trial Plaintiffs.

Not only are Dr. Lutz's opinions about the amount of exposure to hydrogen sulfide necessary to cause symptoms excluded because the Court already has decided general causation, upon review of Dr. Lutz's CV,[65] his publications, the materials he relied on, and his report, the Court finds Dr. Lutz lacks the qualifications to opine on odors and odor science because those topics are outside the scope of his expertise. Dr. Lutz is not an expert in malodors, nor is he a neurologist or toxicologist.  As a practicing internal medicine physician with a focus in infectious diseases and public health, Dr. Lutz lacks the qualifications to opine on the level at which exposure to hydrogen sulfide can cause symptoms in individuals.[66]

### III.   Dr. Lutz may testify to the portion of opinion four addressing general medical assessment and etiology of the Trial Plaintiffs.

The parties agree that medical experts should do a differential diagnosis when assessing the cause of a Plaintiff's injury. Plaintiffs argue Dr. Lutz's medical opinions are irrelevant and inadmissible because he fails to consider the effects of odors on the Trial Plaintiffs' experience of symptoms, which is a failure to conduct a differential diagnosis including the impact of the odors.[67]  Defendants cite cases from within the Fifth Circuit

---

[64] R. Doc. 642, pp. 8-9.

[65] Dr. Lutz is an internal medicine and public health physician and maintains a private practice in New Orleans with a focus in infectious diseases.  He formerly served as the Director of Health for the City of New Orleans from 1983 to 1995, has held various instructor positions at Tulane Medical School, and has served on multiple committees at hospitals where he has had appointments.  Dr. Lutz states in his report he has "been a consultant in several matters related to real and possible airborne contaminations since [he] was asked to assist in a fume related outbreak among RTA workers in their Iberville Street offices in the 1980s," and he was "a lead physician in the city's command center onsite" after a rail car caught fire, causing fumes necessitating evacuation of an area in the city. R. Doc. 552-15, pp. 69-71.

[66] *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[67] R. Doc. 552-1, pp. 3-5.

to argue that, in order to prove specific causation, the expert must conduct a differential diagnosis or the expert's opinion is unreliable and should be excluded.[68]

In the first *Addison* Trial, the Trial Plaintiffs must prove specific causation, that the landfill's odorous emissions caused their respective medical injuries.[69] Courts within the Fifth Circuit have recognized that "[p]erforming a differential diagnosis or a differential etiology is a widely accepted method [by] which medical experts address specific causation enquiries."[70] In performing a differential diagnosis, "a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains."[71] However, "[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness."[72]

"The alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony, . . . unless the expert can offer *no explanation* for why he or she has concluded [an alternative cause offered by the opposing party] was not the sole cause" of the injury.[73] The *McNabney* case, cited by Defendants, involves an expert who *completely failed* to consider other causes of the plaintiff's injuries: in *McNabney*, the expert reviewed only the plaintiff's deposition

---

[68] R. Doc. 580, p. 3-4 (citing *McNabney v. Lab'y Corp. of Am.*, 153 F. App'x 293 (5th Cir. 2005); *Becnel v. Lamorak Ins. Co.*, No. CV 19-14536, 2022 WL 3704028 (E.D. La. Aug. 26, 2022)).

[69] *See id.* This Court already conducted the general causation trial in this matter and found that hydrogen sulfide levels of at least 5 ppb are capable of causing a reaction, satisfying the general causation requirement. *See* R. Doc. 323.

[70] *Becnel*, 2022 WL 3704028, at *3. *See, e.g.*, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, No. 16-17144, 2019 WL 4007783, *2 (E.D. La. Aug. 23, 2019).

[71] *Taxotere*, 2019 WL 4007783 at *2. *See also Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012).

[72] *Porte v. Illinois Cent. R.R. Co.*, No. CV 17-5657, 2018 WL 4404063, *3 (E.D. La. Sept. 14, 2018) (citing *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 157 (3rd Cir. 1999)). *See Alpizar v. John Christner Trucking, LLC*, 568 F. Supp. 3d 714, 719 (W.D. Tex. 2021) (An expert does not have to undergo an "exhaustive search that forces an expert to disprov[e] or discredit[ ] every possible cause other than the one espoused by him, but, an expert must be aware of the plaintiff's pertinent medical history.'") (internal quotation marks omitted).

[73] *Porte*, 2018 WL 4404063, at *3 (emphasis added).

testimony, was unaware of her medical history, and was found to have completely failed to consider and exclude other causes of the plaintiff's injuries.[74] Dr. Lutz did not completely fail to consider other causes of the Plaintiff's injuries, including odors.

Additional cases discuss what is required to establish admissible expert testimony on specific medical causation. In *Seaman v. Seacor Marine, LLC*, the plaintiff attributed his bladder cancer to inhalation of toxic chemicals while working aboard defendant's vessels.[75] The court recognized that, with respect to specific causation, when general causation is already established and the record contains sufficient evidence to support a plaintiff's exposure to the chemical, shortcomings in an expert's opinion, such as "unknown variables, [go] to the weight and not to the admissibility of the expert's testimony."[76] Because the *Seacor Marine* court determined the medical expert based her opinion "on nothing other than counsel for [plaintiff] informing her that [plaintiff] was exposed" to the chemicals, she could not establish specific causation, and the court affirmed the district court's exclusion of her testimony.[77] "[F]aults in a particular methodology such as 'differential etiology (which requires listing possible causes, then eliminating all causes but one) . . . go to the weight, not the admissibility, of [the expert's] testimony.'"[78]

The Court finds that Dr. Lutz may testify as a defense medical causation expert and opine on his differential diagnosis for each Trial Plaintiff. Dr. Lutz may not expound at length on the proper method of conducting a differential diagnosis outside the context of a particular Trial Plaintiff.

---

[74] *McNabney v. Lab'y Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005).

[75] *Seaman v. Seacor Marine L.L.C.*, 326 F. App'x 721, 723 (5th Cir. 2009).

[76] *Id.* at 727 (discussing *Bocanegra v. Vicmar Svcs.*, 320 F.3d 581 (5th Cir.2003)).

[77] *Id.* at 727-28. The court also held the Plaintiff had failed to establish general causation. *Id.* at 728.

[78] *Alpizar v. John Christner Trucking, LLC*, 568 F. Supp. 3d 714, 719 (W.D. Tex. 2021).

Dr. Lutz reviewed the medical records of Trial Plaintiffs, including the IME examinations and the reports of Drs. Spodak and DeLorenzo, plaintiffs' depositions, and medical publications to form his opinions.[79] Based on his discussion of the effect of odors on health in his report, it is clear Dr. Lutz at least has some knowledge of the odors at issue in this matter, including the Court's findings in the general causation trial.[80] Plaintiffs are correct in pointing out that Dr. Lutz acknowledged in his deposition that odors are capable of causing the symptoms experienced by the Trial Plaintiffs.[81] Courts have found that statements in a medical expert's deposition, even if they are not contained in the expert report, may "alleviate[] concerns about the adequacy of the [expert's] thought processes with regard to specific causation."[82] This demonstrates that Dr. Lutz did not *entirely* "fail to consider" the impact of the odors even though he did not conclude the odors more likely than not caused the Trial Plaintiffs' symptoms.[83]

Generally, any deficiency the Plaintiffs identify with respect to Dr. Lutz's differential diagnoses may be the subject of cross-examination at trial.[84] The Court finds these arguments, such as Plaintiffs' assertion that Dr. Lutz fails to consider the odors in his report, go to the weight, rather than the admissibility, of his expert testimony.[85] Thus, Dr. Lutz may testify to his diagnostic process for each of the Trial Plaintiffs based upon review of their specific records.

---

[79] *See* R. Doc. 552-15. A qualified medical expert need not personally examine the plaintiff to testify upon review of medical records. *See Lacara v. Kohl's Inc.*, No. CV 21-2321, 2023 WL 5508082, *2 (E.D. La. Aug. 25, 2023).

[80] *See* R. Doc. 552-15, p. 5 ("I am aware that, as part of this litigation, the Court has concluded that exposure to an average of 5 ppb of hydrogen sulfide over thirty minutes is capable of causing [the symptoms].").

[81] *See* R. Doc. 552-1, p. 5 (excerpting R. Doc. 552-2, Lutz Dep. at 73-74).

[82] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 805 (E.D. La. 2011).

[83] *See McNabney v. Lab'y Corp. of Am.*, 153 F. App'x 293, 295 (5th Cir. 2005).

[84] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[85] *See, e.g., Porte v. Illinois Cent. R.R. Co.*, No. CV 17-5657, 2018 WL 4404063, *3 (E.D. La. Sept. 14, 2018).

To the extent Dr. Lutz seeks to attack the differential diagnoses of the Plaintiffs' expert witnesses Drs. DeLorenzo and Spodak as set forth in his fourth opinion, he may do so only in the context of their testimony regarding a specific Trial Plaintiff. Dr. Lutz may rebut Plaintiffs' medical experts, Drs. Spodak and DeLorenzo, only with respect to their testimony with respect to a specific Trial Plaintiff. Dr. Lutz will be allowed to criticize the differential diagnosis conducted by Plaintiffs' medical experts, but he will not be allowed to testify that Plaintiffs' experts did *no* differential diagnosis at all or that they should not be allowed to testify.

Dr. Lutz may not provide a lengthy discourse on the causes of symptoms such as headaches because the various causes of headaches are matters of common knowledge.[86] Dr. Lutz may not testify as to disorders or symptoms for which the Trial Plaintiffs do not claim damages, such as anxiety disorder or sleep disorder, because the testimony is irrelevant to the claims in this matter.

To the extent Plaintiffs argue that Dr. Lutz's testimony is inadmissible because he reaches conclusions as to the cause of the Trial Plaintiffs' symptoms when the IME doctors could not reach any conclusion,[87] the Court rejects the argument. Dr. Lutz explained in his deposition his opinion is "that there were other factors that [he] considered to be far more likely the cause of any alleged health conditions than any odors exposure regardless of where it came from" and that "the medical records do not reflect any physical injuries from the odors."[88] Dr. Lutz opines on his view of the "more likely

---

[86] Because many of the Trial Plaintiffs' symptoms are "transient or temporary medical conditions . . . likely within the common knowledge of lay people," Dr. Lutz is not needed to testify generally as to the general etiology of these symptoms out of the context of discussing a particular Trial Plaintiff. *See Wallace on behalf of Wallace v. BP Expl. & Prod. Inc.*, No. CV 13-1039, 2022 WL 1642166, *4 (E.D. La. May 24, 2022).

[87] *See* R. Doc. 552-1, p. 14-15 (referencing exhibits 3-12 at R. Doc. 552-4 through 552-13, the independent medical reports of nine Trial Plaintiffs).

[88] R. Doc. 552-3, pp. 6-7.

causes" based on medical records and the IME examinations, not *the* cause. Plaintiffs may cross-examine Dr. Lutz on any inconsistencies between his testimony and that of the IME doctors.

### IV.   Dr. Lutz may not testify as to his fifth opinion as the Court did not find general causation as to these injuries.

Dr. Lutz may not testify as to his fifth opinion that symptoms such as "irritation to the eyes, nose, or throat, coughing, neurological issues, or exacerbation of COPD" were more likely caused by something other than the odors.[89] This Court ruled at the general causation trial that Plaintiffs did not meet their burden of proving by a preponderance of the evidence that the hydrogen sulfide emissions are capable of causing certain symptoms.[90]  The Trial Plaintiffs and Plaintiffs' medical experts will not be allowed to offer testimony about these excluded symptoms and, as a result, Dr. Lutz's opinions as to these symptoms are irrelevant. Dr. Lutz will not be allowed to testify to his fifth opinion at trial.

### V.   Dr. Lutz may not testify as to his sixth and ninth opinions on Plaintiffs' alleged "compensation neurosis" and when the most accurate medical history is given. His opinions are not tied to the particular facts in the record with respect to any particular Plaintiff, he does not have sufficient expertise to testify on these topics, opinion nine is within the knowledge and understanding of the jury, and any probative value of the testimony is outweighed by its prejudicial value.

In his sixth opinion, Dr. Lutz opines that a proper differential diagnosis for the Trial Plaintiffs would "include what has been labeled as compensation neurosis," a "phenomenon" described as an "exaggeration of symptoms that occur as a result of the

---

[89] R. Doc. 552-15, pp. 6-7.
[90] R. Doc. 323, p. 42. At the general causation trial, the Court found the excluded symptoms to include: irritation to the eyes, nose, or throat; coughing; trouble breathing; asthma; skin irritation; burning lungs; nose bleeds; neurological issues"; and chronic obstructive pulmonary disease. See also R. Doc. 642 at p. 10.

unique stressor of seeking legally awarded compensation."[91] In his report, Dr. Lutz cites one article in support of his opinion, titled "Compensation Neurosis: A Too Quickly Forgotten Concept?" published in 2012 in the Journal of the American Academy of Psychiatry and the Law Online.[92]

The article argues for the need "to recognize . . . conditions [such as compensation neurosis] in their own right" and to add objective diagnostic criteria to the DSM-5 to "fill the diagnostic void."[93] The authors of the article admit there has been vigorous debate about this diagnosis over many years.[94] Ultimately, the diagnosis was not included in DSM-5 as there is a "clear movement away from making 'pejorative or stigmatizing' diagnoses and recognizing diagnostic conditions more as "spectrum disorders."[95] The concept has been replaced by more nuanced consideration and is now more often discussed in terms of pain disorders, PTSD, adjustment disorders, and post concussive syndrome, amongst others.[96] The article also notes:

> Compensation neurosis is not exaggeration . . . [or] malingering. Malingering is the overt and intentional gross misrepresentation of symptoms for secondary gain, defined as an external incentive, such as financial gain . . . . One of the unfortunate drawbacks to using the term compensation is that many automatically associate compensation with financial reward. Although there can be financial secondary gain as part of a compensation neurosis, the distinction is that the exaggeration occurs entirely, or at least primarily, for the external incentives in malingering . . . [but] internal motivators [are] in equal or larger factor in compensation neurosis" than financial secondary gain.[97]

---

[91] R. Doc. 552-15, p. 7.
[92] Ryan C. W. Hall & Richard C. W. Hall, *Compensation Neurosis: A Too Quickly Forgotten Concept?*, 40 J. Am. Acad. Psychiatry & L. 390 (2012).
[93] *Id.* at 397.
[94] *Id.* at 395.
[95] *Id.*
[96] *Id.* at 390-91.
[97] *Id.* at 392.

Dr. Lutz relies upon this article to support his opinion that "for any symptoms of which the Trial Plaintiffs complain that do not present a reliable physiological explanation, and there are no objective criteria to support the symptoms, compensation neurosis belongs in the differential diagnosis" because Plaintiffs have "dramatically expanded on the symptoms allegedly suffered" over time.[98]

In his ninth opinion, Dr. Lutz states that it is his opinion, based on his experience and expertise, that "the most accurate and reliable history given by a patient is usually the account given at or near the time of the incident . . . . [so] the symptoms complained of during medical encounters from 2017 through 2020 . . . are likely to be more accurate than the accounts given by the plaintiffs in their 2023-2024 depositions and 2023-2024 [medical] exams."[99] He does not cite any academic articles, studies, or other sources to support this opinion.

The Court finds Dr. Lutz may not testify to his sixth and ninth opinions. Dr. Lutz is an internal medicine physician.[100] As a general practitioner, he has not demonstrated he is qualified to express an opinion on compensation neurosis, a complicated and controversial topic in the fields of psychiatry and psychology.[101] Dr. Lutz does not provide the Court with sufficient evidence that he has the expertise necessary to render his opinion reliable.

---

[98] R. Doc. 552-15, p. 7.

[99] *Id*. at p. 8.

[100] *Id*. at p. 69.

[101] The Court notes that the cited article describes compensation neurosis as distinct from "malingering," which more fully encompasses financial motivations. Hall, *supra* note 92, at 392. Dr. Lutz's opinion that compensation neurosis explains "seeking legally awarded compensation" in the Trial Plaintiffs does not seem to accurately encompass the nuances the article explains with the motivations underlying compensation neurosis, further supporting the Court's finding that Dr. Lutz is not qualified to provide expert testimony on the subject.

Furthermore, Dr. Lutz does not state in his report that any particular Plaintiff exhibits symptoms of compensation neurosis.[102] Dr. Lutz does not base his compensation neurosis opinion on specific facts in the medical records particular to any Plaintiff. As a result, Dr. Lutz "may not speculate, without specific factual evidence, that [the Plaintiffs have] . . . deliberately exaggerated [their] pain and symptoms" such that they are exhibiting signs of compensation neurosis.[103]

With respect to his ninth opinion, Dr. Lutz expresses his opinion that, in general, patients report their symptoms and injuries more accurately closer in time to an incident as opposed to later. The subject matter of this opinion is within the knowledge and experience of an ordinary juror and expert testimony will not be helpful to the jury. Furthermore, Dr. Lutz did not opine that this phenomenon actually occurred with respect to any of the Trial Plaintiffs. To the extent Defendants wish to highlight the differences in symptom reporting over time, they may do so upon cross-examination of any particular Trial Plaintiff.

Finally, the Court finds that testimony as to Dr. Lutz's sixth and ninth opinions should be excluded under Rule 403 because any limited probative value the testimony may have is outweighed by its potential for unfair prejudice.[104] Because Dr. Lutz will testify as a medical expert, jurors are likely to attribute significance to his testimony despite the fact there is no record evidence supporting his opinions and he has no particular expertise in this area.[105]

---

[102] *See generally id.*, pp. 9-63.
[103] *See Rollins v. Calderon*, No. B:17-CV-244, 2019 WL 13193247, *4 (S.D. Tex. May 13, 2019). The court prevented a medical expert from testifying generally that the plaintiff could be inaccurately representing symptoms due to "malingering" or "exaggeration of symptoms" without any evidence in the record demonstrating that the plaintiff was doing so. *Id.* at *4-5.
[104] FED. R. EVID. 403.
[105] *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) ("[E]xpert evidence can be both powerful and quite misleading . . . [Rule] 403 . . . exercises more control over experts than over lay

**VI.  Dr. Lutz may testify as to his seventh and eighth opinions regarding the opinions of Drs. Spodak and DeLorenzo only to the extent he frames his differential diagnosis with regard to the medical records he reviewed and his own diagnostic process with respect to each particular Trial Plaintiff. He may not testify on these opinions generally without regard to a specific Trial Plaintiff.**

Dr. Lutz critiques the findings of Drs. Spodak and DeLorenzo in his seventh and eighth opinions. In his seventh opinion, Dr. Lutz opines that the Trial Plaintiffs do not meet criteria for referral to mental health specialists, generally contesting the need for Dr. Spodak to testify at all.[106] Dr. Spodak is a forensic psychiatrist.[107] Dr. Lutz is an internist, not a psychiatrist or psychologist. While internists may at times refer patients to specialists, Dr. Lutz will not be allowed to testify generally about whether the Trial Plaintiffs are in need of a referral to a mental health specialist for their alleged symptoms.[108] Dr. Lutz's opinions must be narrowed to the specific facts of a particular Trial Plaintiff and his or her medical history.

In opinion seven, Dr. Lutz also opines that Dr. Spodak conducted an improper mental health assessment of the Trial Plaintiffs because he did not sufficiently consider other causes of their symptoms.[109] In his eighth opinion, Dr. Lutz opines that Dr. DeLorenzo's telemedicine examination of five Trial Plaintiffs is unreliable because his findings are "inconsistent with what is actually possible to observe during a telemedicine encounter."[110] Dr. Lutz may raise these issues, critiquing and rebutting Plaintiffs' medical experts, but only to the extent he is speaking in the context of testimony about a particular

---

witnesses."); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987) (an expert opinion's "lack of reliable support may render it more prejudicial than probative, making it inadmissible under [Rule] 403.").

[106] R. Doc. 552-15, p. 8.

[107] R. Doc. 416, pp. 4-5.

[108] *See* R. Doc. 552-15, p. 8 ("[T]he Trial Plaintiffs did not in the past, and do not today, meet criteria for referral to a mental health specialist  . . . .").

[109] *Id.*

[110] *Id.*

Trial Plaintiff. He may testify as to the factors he considers in evaluating patients who present with symptoms and history similar to a particular Trial Plaintiff, how he would have considered and evaluated Plaintiffs with respect to their reported medical history, present description of their symptoms, and the like.

Accordingly;

## **CONCLUSION**

**IT IS ORDERED** that Plaintiffs' Motion in Limine is **GRANTED IN PART AND DENIED IN PART** as stated herein.[111]

Generally, the Court will permit Dr. Lutz to testify as to his specific differential diagnosis for each particular Trial Plaintiff, including each one's unique medical records, symptoms, and his medical opinion on the more likely causes of each particular Trial Plaintiff's symptoms. Dr. Lutz may testify as to what he considered in formulating his differential diagnosis for each Plaintiff. Dr. Lutz may rebut and critique Plaintiffs' medical experts' testimony on their differential diagnoses but only with respect to a particular Trial Plaintiff. To the extent Dr. Lutz wishes to opine generally, without regard to a particular Trial Plaintiff's medical history or conditions, he will be prevented from doing so.

**Dr. Lutz *may testify* with respect to each particular Trial Plaintiffs as to:**

Major opinion one: regarding whether or not odors are reflected in that Plaintiff's medical records;

Major opinions three and four: regarding his differential diagnosis of each particular Trial Plaintiff;

---

[111] R. Doc. 552.

Major opinions seven and eight: rebuttal to the differential diagnoses of Drs. Spodak and DeLorenzo with respect to each particular Trial Plaintiff.[112]

**Dr. Lutz *may not testify* as to:**

That portion of Major opinions two and three regarding the level of exposure to hydrogen sulfide ppb that is sufficient to cause symptoms in humans;

Major opinion five: regarding excluded symptoms: irritation of the eyes, nose, or throat, coughing, trouble breathing, asthma, skin irritation, burning lungs, nose bleeds, neurological issues, and COPD;[113]

Portions of major opinions three and four: regarding the level of hydrogen sulfide ppb that is sufficient to cause a reaction in humans, and;

Major opinions six and nine: regarding compensation neurosis and the general reliability of medical history reporting over time.

**New Orleans, Louisiana, on this 8th day of August, 2024.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[112] Generally, the Court will permit Dr. Lutz to testify as to his specific differential diagnosis for each separate Trial Plaintiff, including each one's unique medical records, symptoms, and his medical opinion on the more likely causes of each particular Trial Plaintiff's symptoms. Dr. Lutz may testify as to what he considered in formulating his differential diagnosis for each Plaintiff. Dr. Lutz may rebut and critique Plaintiff's medical experts' testimony on their differential diagnoses but only with respect to each particular Trial Plaintiffs. To the extent Dr. Lutz wishes to opine generally, without regard to a particular Trial Plaintiff's medical history or conditions, he will be prevented from doing so. As a reminder, Dr. Lutz may not provide a lengthy discourse on the causes of symptoms such as headaches because the various causes of headaches are matters of common knowledge.[112] Dr. Lutz may not testify as to disorders or symptoms for which the Trial Plaintiffs do not claim damages, such as anxiety disorder or sleep disorder, because the testimony is irrelevant to the claims in this matter.
[113] R. Doc. 323, p. 42.