**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **FREDERICK E. ADDISON, SR., ET AL.,**  **Plaintiffs** | **CIVIL DOCKET** |
| **VERSUS** | **NO.  19-11133**  **c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**  **Defendants** | **SECTION: "E" (5)** |

*Applies to: Both Cases*

## ORDER AND REASONS

Before the Court are the Defendants' motions to exclude testimony of Plaintiffs' witness Jose Sananes, a licensed engineer and purported expert in the field of landfill engineering (the "Motions in Limine").[1] The Plaintiffs filed memoranda in opposition.[2] The Defendants filed reply memoranda in support of their Motions in Limine.[3]

## BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "JPLF"), and the resulting odors emitted from the JPLF between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass

---

[1] Defs.' Mot. in Lim. to Exclude Ops. of Jose Sananes on Standards of Care [hereinafter Standards of Care Mot.], R. Doc. 565 (seeking to exclude Mr. Sananes' testimony relating to standards of care applicable to landfill owners and operators); Defs.' Mot. in Lim. to Exclude Ops. of Jose Sananes on H2S Emissions [hereinafter H2S Emissions Mot.], R. Doc. 572 (seeking to exclude Mr. Sananes' testimony relating to estimates of hydrogen sulfide has generated by and emitted from the JPLF). *See* Pls.' List of Experts, R. Doc. 416 at pp. 2-3 (disclosing scope of Mr. Sananes' testimony).
[2] Pls.' Oppo. to Standards of Care Mot., R. Doc. 594; Pls.' Oppo. to H2S Emissions Mot., R. Doc. 592.
[3] Defs.' Reply Mem. in Supp. of Standards of Care Mot., R. Doc. 624; Defs.' Reply Mem. in Supp. of H2S Emissions Mot., R. Doc. 623.

1

action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual Plaintiffs.[4] In their Second Amended Complaint, Plaintiffs assert negligence and nuisance claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to operate the JPLF; Aptim Corporation, which managed the gas and leachate collection and control systems ("GCCS") of the JPLF from July 2017 to May 2019; and three entities that operated the JPLF from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc. (collectively, the "Defendants").[8]

On November 5, 2019, the Court issued the first Case Management Order, which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022, at which the parties offered live testimony from several expert witnesses (the "General Causation Hearing").[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that: (1) odors and gases were emitted by the JPLF;[12] (2) the emissions of gases and odors from the JPLF occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the JPLF at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen

---

[4] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).
[5] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] R. Doc. 80 at pp. 1-2.
[10] R. Docs. 274-278, 286-289.
[11] R. Doc. 323.
[12] *Id.* at p. 5.
[13] *Id.* at p. 26.

sulfide and for the exposure to cause a reaction."[14] Having found the Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[15] The first *Addison* trial was set to begin on September 5, 2023,[16] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[17] In preparation for the first *Addison* Trial, the Court advised the parties that it would consider motions in limine on any opinions offered by experts who did not testify at the General Causation Hearing, but would only hear motions in limine on *new* opinions offered by experts who had previously testified at the General Causation Hearing.[18]

Relevant to the instant Motions in Limine, the Plaintiffs engaged Jose Sananes to offer opinions on: (1) his estimates of landfill gas ("LFG") and, specifically, hydrogen sulfide ("H2S"), generated and emitted from the JPLF during the relevant time period; (2) "the applicable standard of care in the management" of a municipal solid waste landfill (an "MSW landfill") with respect to "management, care, and construction of landfill [GCCS], landfill gas generation, and acceptance and management of certain waste profiles"; and (3) Plaintiffs' "activities in investigating and analyzing samples taken at the [JPLF] in November 2019."[19] Mr. Sananes testified to his estimates of H2S generation and emissions from the JPLF at the General Causation Hearing.[20] In the expert report he

---

[14] *Id.* at p. 27.

[15] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).

[16] R. Doc. 340.

[17] R. Doc. 495.

[18] R. Doc. 371; R. Doc. 517 (affirming "in the trial on specific causation, motions in limine will be allowed only for new opinions (i.e., opinions on topics not covered in the trial on general causation) expressed by current experts and opinions expressed by new experts on topics related to specific causation").

[19] Pls.' List of Experts, R. Doc. 416 at pp. 2-3. Mr. Sananes is also offered to comment on the opinions offered by Defendants' experts relevant to his areas of expertise. *Id.*

[20] *See* R. Doc. 323 at p. 3; Tr. of General Causation Hr'g (Jan. 31, 2022), R. Doc. 295 (direct examination of Mr. Sananes); Tr. of General Causation Hr'g (Feb. 1, 2022), R. Doc. 296 (direct, cross-, and redirect examinations of Mr. Sananes).

prepared for the first *Addison* Trial (the "Sananes Report"), Mr. Sananes expresses his opinions on the same topics on which he testified at the General Causation Hearing, as well as his opinions on new topics—including the standards of care applicable to landfill owners and operators.[21]

The Defendants filed two Motions in Limine seeking to exclude testimony regarding certain opinions of Mr. Sananes under Federal Rule of Evidence 702. Notwithstanding the Court's determination that motions in limine on expert opinions previously offered at the General Causation Hearing would not be considered at the first *Addison* Trial, the Defendants now move the Court to exclude Mr. Sananes' opinions related to his H2S generation and emissions estimates as unreliable under Rule 702 (the "H2S Emissions Motion").[22] To ensure fairness to the Defendants, the Court will review the Defendants' H2S Emissions Motion under the *Daubert* standard for a jury trial. The Defendants also move the Court to exclude Mr. Sananes' new opinions on "standards of care applicable to landfill owners and operators," arguing he is unqualified to offer such opinions under Rule 702 (the "Standards of Care Motion").[23]

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data; (c) the testimony is the

---

[21] Second Supplemental Expert Report of Jose Sananes (Feb. 16, 2024) [hereinafter Sananes Rep.], R. Doc. 565-4.
[22] H2S Emissions Mot., R. Doc. 572-1 at p. 3.
[23] Standards of Care Mot., R. Doc. 565-1 at p. 3.

product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[24]

"A district court has considerable discretion to admit or exclude expert testimony under Rule 702."[25] Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[26] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[27] The trial court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[28]

If the expert's qualifications are found to be sufficient, the trial court must then examine whether the expert's opinion satisfies the reliability and relevance requirements of Rule 702 to render the opinion admissible.[29] The United States Supreme Court's decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[30] "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid'" under Rule 702,[31] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[32] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that trial courts may consider in evaluating the reliability of expert testimony, including: "(1) whether the expert's theory can or has been tested, (2) whether the theory has been

---

[24] FED. R. EVID. 702.

[25] *In re Pool Products Distribution Market Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).

[26] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

[27] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[28] *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702).

[29] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[30] 509 U.S. 579 (1993).

[31] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[32] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[33] The Supreme Court has cautioned the reliability analysis must remain flexible—the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[34] "[N]ot every *Daubert* factor will be applicable in every situation," thus district courts are offered broad latitude in making expert testimony determinations and may "consider other factors it deems relevant."[35]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[36] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[37] The proponent of expert testimony "need not prove to the judge that the expert's testimony is correct, but [] must prove by a preponderance of the evidence that the testimony is [relevant and] reliable."[38]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[39] "Although the jury ultimately decides

---

[33] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).

[34] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

[35] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004); *Kumho Tire*, 526 U.S. at 151–53.

[36] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

[37] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[38] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[39] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).

the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to justify submitting the issue in the first instance."[40] Rule 403 also allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[41] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[42] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[43] Indeed, as the Fifth Circuit has proclaimed, the "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[44]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[45] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[46] It is "the role of the adversarial system, not the court, to highlight weak evidence."[47] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on

---

[40] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 MARQ. L. REV. 173, 191 (2006).
[41] FED. R. EVID. 403.
[42] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).
[43] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).
[44] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).
[45] *Daubert*, 509 U.S. at 596; *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).
[46] *14.38 Acres of Land*, 80 F.3d at 1077.
[47] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

'completely unsubstantiated factual assertions.'"[48]

## LAW AND ANALYSIS

The Plaintiffs offer Jose Sananes, P.E., as their expert in the field of landfill engineering.[49] According to his Report, Mr. Sananes is a principal with the international engineering and consulting firm Ramboll Americas Engineering Solutions, Inc. ("Ramboll"), and has over 25 years of experience as a geo-environmental engineer.[50] After screening, reviewing, and evaluating documents related to the case, including publicly available JPLF inspection reports, reports prepared by Ramboll and other consultants, measurements from the JPLF's GCCS, and waste disposal records for the JPLF, Mr. Sananes expressed several opinions in the Sananes Report.[51] The Defendants seek to exclude Mr. Sananes' testimony on certain opinions expressed therein under Rule 702.[52]

### I.   Mr. Sananes may offer testimony on his opinions related to his estimates of H2S generation and emissions from the JPLF.

In their H2S Emissions Motion, the Defendants seek to exclude Mr. Sananes' testimony as unreliable under Rule 702.[53] According to the Sananes Report, Mr. Sananes used the EPA's LandGEM model to estimate H2S gas generation at the JPLF resulting from the degradation of waste deposited at the landfill.[54] The Defendants first challenge the reliability of Mr. Sananes' methodology for estimating the quantity of H2S gas

---

[48] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).
[49] Specifically, Plaintiffs represent Mr. Sananes is an expert in "landfill environmental control/treatment systems, landfill gas generations and estimation thereof, collection of landfill gas samples for the purpose of analysis, control and treatment of landfill gases, landfill cover, closure and brownfield, landfill redevelopment, soil and groundwater rehabilitation, beneficial reuse programs, and solid waste management." Pls. List of Experts, R. Doc. 416 at pp. 2-3.
[50] Sananes Rep., R. Doc. 565-4 at p. 4.
[51] *Id.* at pp. 4-5.
[52] Standards of Care Mot., R. Doc. 565; H2S Emissions Mot., R. Doc. 572.
[53] R. Doc. 572-1 at p. 3.
[54] Sananes Rep., R. Doc. 565-4 at pp. 11, 30.

generated inside the JPLF, arguing he chose an improper input parameter for his LandGEM model.[55] The Defendants further contend the reliability of Mr. Sananes' methodology for estimating the quantity of H2S collected by the JPLF's GCCS is unreliable because they claim he improperly relied on figures prepared by the Defendants' own contractor, Carlson Environmental Consultants.[56] Finally, the Defendants claim Mr. Sananes' estimates of H2S emissions into ambient air are unreliable because "his methodology ignored factors that decrease emissions" and improperly extrapolated surface H2S concentrations from measurements collected from gas wells within the landfill mass.[57]

In opposition, the Plaintiffs urge the Court to deny the Defendants' H2S Emissions Motion, arguing Mr. Sananes testified to his estimates of H2S generation and emissions from the JPLF at the General Causation Hearing, and thus the Defendants' challenge to his opinions on that topic are not allowed at this stage of the litigation.[58] The Plaintiffs point to the Court's orders proscribing motions in limine at the first *Addison* Trial on opinions offered by experts at the General Causation Hearing.[59] Plaintiffs contend the Court "recognize[d] that the issues raised by such motion[s] have already been litigated . . . , and there [is] no just reason [to] expend the time and resources of the parties and the Court to litigate them again."[60]

At the General Causation Hearing, the Court denied the Defendants' *Daubert* motion challenging the reliability of Mr. Sananes' opinions on H2S generation and

---

[55] R. Doc. 572-1 at pp. 14-15.
[56] *Id.* at pp. 22-25.
[57] *Id.* at pp. 27-28.
[58] R. Doc. 592 at p. 1.
[59] *Id.* at p. 3 (citing R. Docs. 371, 517).
[60] *Id.*

emissions estimates from the JPLF on the same grounds as the Defendants now raise in the instant H2S Emissions Motion.[61] In reaching that decision after hearing Mr. Sananes' testimony, the Court found the Defendants' concerns "go to the weight of the evidence."[62] Although the Defendants are correct that the Court's "*Daubert* obligation is more 'urgent' in jury trials because of the risk of 'exposing the jury to confusing and unreliable expert testimony,'"[63] upon consideration of the merits of the instant H2S Emissions Motion in light of that more rigorous standard, the Court finds the Defendants' concerns with the reliability of Mr. Sananes' opinions still "affect the weight to be assigned" to his testimony rather than its admissibility.[64] Indeed, the Fifth Circuit has advised: "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[65] Accordingly, even under the more rigorous *Daubert* standard, the Court will deny the Defendants' H2S Emissions Motion. The Defendants may raise their concerns at trial through "[v]igorous cross-examination [and] [the] presentation of contrary evidence."[66]

## II. Mr. Sananes may offer testimony related to the standards of care applicable to landfill owners and operators and his opinions with respect to the Defendants' purported breaches of those standards.

In their Standards of Care Motion, the Defendants urge the Court to exclude Mr. Sananes' testimony related to the standards of care applicable to MSW landfill owners

---

[61] Tr. of General Causation Hr'g (Feb. 2, 2022), R. Doc. 299 at pp. 115-16.
[62] *Id.*
[63] R. Doc. 623 (quoting *Atlantic Specialty Ins. Co. v. Porter, Inc.*, 15-570, 2016 WL 6569346, at *3 (E.D. La. Nov. 4, 2016)).
[64] *14.38 Acres of Land*, 80 F.3d at 1077.
[65] *Id.*
[66] *Daubert*, 509 U.S. at 596; *see also 14.38 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).

and operators and his opinions on the Defendants' purported breaches of those standards, arguing Mr. Sananes is unqualified to offer such testimony under Rule 702.[67] Opinion No. 6.4, which summarizes Mr. Sananes' opinion on the standards of care applicable to landfill owners and operators, provides:

> The standard of care requires, among other items, compliance with all applicable federal and state statutes and regulations and contractual requirements. Many of the Louisiana requirements were not complied with by the [JPLF] owner and operator and contributed to the fugitive emissions. For example,
>
>> (a) As evidenced by the nature of complaints by the Plaintiffs in this case, as well as numerous other residents of the affected areas, and as detailed in Sections 11.1.2 and 13, the daily and interim covers placed in Phase IVA did not meet the requirement of LAC 33:VII.711.B.2.a.v to mitigate noxious odors and outward movement of gases.
>>
>> (b) The Defendants failed to use best management and engineering practices to control odors as required by LAC 33:VII.711.B.3.a, as evidenced by the measurements of gases and odors at and off the site and the nature and frequency of complaints by the Plaintiffs and others in this case.
>>
>> (c) Waste Connections did not "implement a comprehensive odor control plan that included both operational best management practices and odor control systems" or comply with the other provisions of Section II.B.5.H of its contract with Jefferson Parish.
>>
>> (d) As detailed in Sections 11.1.2 and 11.1.4, a significant portion of the leachate collection system equipment, including pumps within the gas wells, was inoperable and need of replacement or repair for extended time periods thereby not meeting the requirements of LAC 33:VII.711.B.3.e.iii. This condition was also documented in the LDEQ inspection reports. Further, as indicated in Section 11.2, measured leachate levels are so high within the waste media that the gas wells, the bottom of which are 10 feet above the bottom liner system, are inundated.
>>
>> (e) As documented by the [JPLF] consultants, the absence or malfunctioning equipment indicated a failure to provide or maintain

---

[67] R. Doc. 565-1 at p. 9.

adequate equipment at the [JPLF] to meet the landfill's operational needs as required by LAC 33:VII.711.B.4.

Waste Connections violated its own internal "minimum standards and expectations of Waste Connections landfills," describing in internal communications its "leachate management practices and gas management practices that are simply not best practices." These communications also indicate that if the "site is experiencing odors or odor complaints from neighbors that is unacceptable" and define their goal "to keep less than 12 inches of leachate stored in any sump;" neither of these two goals was routinely achieved.

Favorable conditions conducive to the generation of [H2S] in landfills have been recognized by the waste management industry for well over two decades. The standard of care and the obligation to use best management practices in the control of odors entails that the Defendants, with the assistance of their consultants, assess these conditions during the planning phase and prior to the disposal of spent lime in a MSW landfill area and prior to implementing the stabilization of liquid waste and sludge using spent lime, which started in October 2016 in Phase IVA. There is no documentation available to indicate that the Defendants or their consultants conducted any evaluation to address and control [H2S] generation and emissions based on the above conditions, specifically in terms of preventing mixing spent lime with MSW. In fact, internal email correspondence from Waste Connection[s] indicates the opposite specifically Waste Connections' knowledge that the neighboring River Birch Landfill stopped accepting liquid waste requiring solidification in around mid-June 2016 due to odor complaints and adverse impacts to their [LFG] production.

The Solidification Plan prepared by the [JPLF] did not incorporate most BMPs to minimize or control H2S generation and/or emissions. Notably, there was no segregation of waste processed during the liquid waste and sludge stabilization process using spent lime from the MSW in Phase IVA or use of specifically designed isolated areas to mitigate odors from handling the sulfur containing materials. Additionally, the timely installation of the [LFG] collection system was neglected, and, even when implemented, it did not specifically account for the location of different waste types, particularly the spent lime. Moisture control measures were not implemented, the capping system was deficient, and there was insufficient consideration of SRB inhibitors or other effective controls for waste odors.

The standard of care required the Defendants to have been aware of landfills that accepted sulfate containing materials and had subsequent odor issues before 2016. However, no considerations or proactive measures were taken

by the [JPLF] to mitigate the potential for [H2S] emissions, drawing from the experience provided by historical cases.[68]

Opinion No. 6.5, which summarizes Mr. Sananes' opinion that the Defendants breached the applicable standards of care, provides:

> The Landfill Owner, engineers and/or operator(s) in this case breached the standards of care in the following manners:
>
> (a) They failed to ensure that the [LFG] collection and leachate collection systems were properly designed, constructed, operated, and/or maintained in order to prevent the formation and emission of noxious odors or to collect and treat such odors, and failed to take corrective action, thereby causing noxious odors to escape the landfill and harm neighboring individuals.
>
> (b) They did not ensure that the [LFG] collection and leachate collection systems were being operated and maintained properly. Specifically,
>
>> i. Jefferson Parish failed to ensure that Waste Connections, its landfill operator, operated and maintained the [LFG] collection and leachate collection systems so as to prevent noxious odors from escaping from the landfill, foreseeably affecting neighboring individuals.
>>
>> ii. Waste Connections, the operator and manager of the landfill responsible for the Phase IVA landfill construction and its leachate collection system, did not operate and maintain the landfill leachate collection system so as to prevent leachate buildup within the landfill. This failure resulted in adverse impacts to the gas collection system, which in turn caused noxious odors to escape from the landfill, foreseeably affecting neighboring individuals. Furthermore, given the deficiencies in the leachate and gas collection systems, Waste Connections did not undertake other odor control measures to ensure that noxious odors did not escape from the landfill, foreseeably harming neighboring individuals.
>>
>> iii. Aptim, the operator of the [LFG] collection system, failed to ensure that it was operated and maintained so as to prevent noxious odors from escaping from the landfill, foreseeably affecting neighboring persons.
>
> (c) They failed to ensure the improperly designed, maintained, or operated [LFG] collection and leachate collection systems were remediated (i.e., repaired, replaced or enhanced) in a timely manner. Specifically,

---

[68] Sananes Rep., R. Doc. 565-4 at pp. 13-14 (citations omitted).

i. Waste Connections did not adequately inform Jefferson Parish or ensure that Jefferson Parish remediated the improperly designed, maintained or operated [LFG] collection and leachate collection systems.

ii. Jefferson Parish did not promptly remediate the improperly designed, maintained or operated [LFG] collection and leachate collection systems in a timely manner.

iii. Aptim did not adequately inform the Jefferson Parish or ensure that Jefferson Parish remediated the improperly designed, maintained or operated [LFG] and leachate collection systems.

(d) Waste Connections and Jefferson Parish accepted sulfur-containing materials without considering BMPs for controlling gas fugitive emissions and without implementing a proper and effective odor control plan, despite having firsthand knowledge of the issues experienced by River Birch with this same material (refer to Section 6.4) or its own experience with the disposal of other sulfur-containing materials (e.g., coal combustion residuals or CCR) since at least October 2016 (refer to Section 16.3).

i. Jefferson Parish and Waste Connections co-disposed sulfur-containing materials, such as spent lime, with MSW, which have the well-known reasonably foreseeable potential to generate noxious odors that would escape the landfill and affect neighboring individuals.

ii. As indicated in Section 6.4, the neighboring River Birch Landfill stopped accepting the liquid waste requiring solidification in around mid-June 2016 due to odor complaints and impacts to their [LFG] production.

iii. In email correspondence to prospective clients and accompanying 2016-2017 brochure titled "Safe Reliable and Cost-Effective CCR Disposal," Waste Connections presents itself as a leader in the management of CCR, a sulfur-containing material category that includes fly ash, bottom ash, slag, and flue gas desulfurization waste, such as the spent lime in this case. Since at least October 2016, when Waste Connections received a presentation on "Energy Waste (CCR) Disposal in Subtitle D Landfills," it has been aware of the challenges for MSW landfills handling CCRs. This document specifically outlined considerations for MSW landfills that may receive CCRs that included, among others, the generation of odors through the conversion of sulfate and sulfites in flue gas desulfurization waste into [H2S] which can cause problems. This document concluded that it "*helps to not comingle CCRs with MSW.*"

> iv. Given that (1) sulfur-containing materials were disposed or processed within the MSW landfill area without waste segregation by physical containment (e.g., isolated cell), (2) the [JPLF] is a municipal landfill containing organic waste, (3) the [JPLF] had historical serious problems in controlling leachate levels and (4) there was no gas collection system in place in Phase 4A to collect any landfill gases that were generated prior to the spring of 2019, the Jefferson Parish and Waste Connections should have refused to allow the disposal of spent lime in the [JPLF].[69]

The Defendants claim Mr. Sananes lacks the "education, training, experience, or skill in recommending or implementing standards of care at active [MSW] landfills," and is thus unqualified under Rule 702 to offer testimony related to Opinion Nos. 6.4 or 6.5.[70] First, the Defendants suggest Mr. Sananes does not have the requisite education or training to opine on standards of care for waste acceptance/management or general operations of an active MSW landfill and its GCCS simply because he was educated and trained as a geo-environmental engineer.[71] Next, the Defendants contend Mr. Sananes has not otherwise established "the experience or practical skills in the operations of active [MSW] landfills . . . necessary to testify as an expert on operational standards of care" because, they claim, he "has never advised the owner or operator of an active [MSW] landfill" on compliance with odor control requirements, the scope of foreseeable harm due to odors, or the acceptance of any type of waste, much less the acceptance of sulfur-containing materials or spent lime.[72] Accordingly, the Defendants argue Mr. Sananes

---

[69] *Id*. at pp. 15-17 (citations omitted).
[70] R. Doc. 565-1 at p. 10; R. Doc. 624 at p. 5 ("Defendants affirm that this motion challenges Mr. Sananes' qualifications to testify about standards of care applicable to [MSW] landfill operators or owners, as well as his qualifications to testify about breaches of those asserted standards.").
[71] R. Doc. 565-1 at p. 11.
[72] *Id*. at p. 12 (citing Dep. Tr. of Sananes, R. Doc. 565-5 at 63:20-64:10; 75:19-22; 179:4-180:8; 213:14-22; 259:17-260:15).

cannot "substitute his knowledge . . . for the expertise necessary to understand the complex systems" at an MSW landfill.[73]

In opposition, the Plaintiffs argue that the Court accepted Mr. Sananes' testimony as "an expert in the field of landfill engineering and evaluation of [LFG] and leachate collection systems" at the General Causation Hearing with no objection from the Defendants as to his qualifications to opine on those topics.[74] Next, Plaintiffs point to Mr. Sananes' curriculum vitae, which they claim highlights his recent experience leading "the collection of landfill gas and condensate samples to assess variability between waste disposal areas and evaluated landfill gas collection system design, operation and maintenance in relation to industry standards and best management practices," at an active MSW landfill.[75] Plaintiffs further cite to a few opinions of the Fifth Circuit and the Western District of Texas interpreting Rule 702, which demonstrate an expert need not be "'highly qualified' in order to testify about a given issue"[76] and provide that "the absence of hands-on experience is certainly relevant to the determination [of] whether to accept a witness as an expert, [but] it is not determinative."[77] Considering Mr. Sananes' experience through the lens of those judicial opinions, the Plaintiffs argue Mr. Sananes satisfies the threshold qualifications to testify on applicable standards of care under Rule 702 because he has sufficient experience and knowledge on the issue "to assist the trier of fact to 'understand the evidence or to determine a fact in issue.'"[78]

---

[73] *Id.* at p. 10.

[74] R. Doc. 594 at p. 1.

[75] *Id.* at p. 4 n.1 (quoting Sananes Rep., R. Doc. 565-4 at p. 94).

[76] *Id.* at p. 5 (citing *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

[77] *Id.* (first citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990), *abrogated on other grounds by Little v Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994); then citing *Maes v. Lowe's Home Centers LLC*, 17-107, 2018 WL 3603114, at *3 (W.D. Tex. May 25, 2018)).

[78] *Id.* (quoting FED. R. EVID. 702(a)).

"Rule 702 'embodies a liberal policy towards qualification as an expert.'"[79] "[T]he expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.'"[80] An expert need not "be *highly* qualified in order to testify about a given issue"[81] and need not even have "practical experience, provided that he has received suitable training or education or has otherwise gained the requisite knowledge or skill."[82] Having reviewed the relevant portions of the Sananes Report and Mr. Sananes' curriculum vitae, the Court finds that Mr. Sananes' practical experience as a landfill engineer renders him sufficiently qualified under Rule 702 to offer testimony on standards of care applicable to landfill owners and operators and on his opinions with respect to the Defendants' purported breaches of those standards.

A review of the Sananes Report reveals Mr. Sananes has led and contributed to the investigation, design, and implementation of large-scale geo-environmental engineering projects at landfill sites.[83] Specifically, Mr. Sananes represents he has been involved in landfill projects related to: landfill permitting; landfill investigations, assessments, and remediation; LFG and leachate generation, control, and treatment; landfill closure and post-closure care; and landfill redevelopment.[84] As raised in Plaintiffs' opposition memorandum, Mr. Sananes has recent relevant experience evaluating an MSW landfill's LFG collection system design, operation, and maintenance "in relation to industry standards and best management practices."[85] Further, even the Defendants acknowledge

---

[79] *Wagoner*, 813 F. Supp. 2d at 800 (quoting *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1242 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987)).
[80] *Id.* at 798 (quoting FED. R. EVID. 702).
[81] *Huss*, 571 F.3d at 452 (emphasis added).
[82] *Lavespere*, 910 F.2d at 176-77.
[83] Sananes Rep., R. Doc. 565-4 at p. 4.
[84] *Id.*
[85] R. Doc. 594 at p. 4 n.1 (quoting Sananes Rep., R. Doc. 565-4 at p. 94).

Mr. Sananes has relevant experience advising on waste acceptance to reduce odors at an inactive landfill as part of a redevelopment project.[86]

Recognizing that "[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility,"[87] the Court will deny the Defendants' Standards of Care Motion.[88] The Defendants raise their concerns with Mr. Sananes' expertise at trial through "[v]igorous cross-examination [and] [the] presentation of contrary evidence."[89]

Accordingly;

### CONCLUSION

**IT IS ORDERED** that the Defendants' H2S Emissions Motion is **DENIED**.[90]

**IT IS FURTHER ORDERED** that the Defendants' Standards of Care Motion is **DENIED**.[91]

**New Orleans, Louisiana, this 8th day of August, 2024.**

_____

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[86] R. Doc. 565-1 at p. 13 (Although, the Defendants argue this experience is insufficient to qualify Mr. Sananes as an expert.). *See* Sananes Rep., R. Doc. 565-4 at p. 95.
[87] *Huss*, 571 F.3d at 452 (citing *Daubert*, 509 U.S. at 596).
[88] Mr. Sananes may offer testimony related to the standards of care applicable to landfill owners and operators and his opinions with respect to the Defendants' purported breaches of those standards. Mr. Sananes will not be allowed to testify on whether individual Plaintiffs were harmed.
[89] *Daubert*, 509 U.S. at 596; *see also 14.38 Acres of Land*, 80 F.3d at 1078 (quoting *Daubert*, 509 U.S. at 596).
[90] R. Doc. 572.
[91] R. Doc. 565.