UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK ADDISON, ET AL.,** | CIVIL ACTION |
| Plaintiffs | NO. 19-11133, c/w 19-14512 |
| V. | SECTION: "E" (5) |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,** | |
| Defendants | JUDGE: Morgan<br>MAGISTRATE JUDGE: North |
| *Applies to: Both Cases* | |

**PLAINTIFFS' RESPONSE TO OBJECTIONS TO DEMONSTRATIVE EXHIBITS**

The *Addison* Plaintiffs respond to the Waste Connections Defendants Objections to Certain Visual Aids to Be Used During Plaintiffs' Opening Statement as follows:

**I.   RESPONSE TO OBJECTIONS TO DEFINITIONS.**

1. Plaintiffs will correct the location of the River Birch landfill to "northwest."

2. Hydrogen sulfide is a "bad gas." No one – including Defendants' experts – contends it is a "good gas." Plaintiffs have avoided calling it a "dangerous" gas even though such a description would be entirely accurate because, as the Louisiana Department of Health acknowledges, hydrogen sulfide will kill a human being at certain concentrations and this Court has itself described hydrogen sulfide as a "bad" odor. *See* R. Doc. 323 at 29 ("The citizens uniformly experienced a bad odor, and the odors reported were consistent with hydrogen sulfide emitted by a landfill" and, citing Dr. Schiffman, "its [hydrogen sulfide's] malodor 'means bacteria, bad, stay away from this.'" *See also* R. Doc. 323 at 31 where the Court, again quoting Dr. Schiffman, finds that "such a level of exposure [an average of 5 ppb or more for 30-minutes] 'always is a nuisance'

to the individuals exposed." Further, in R. Doc. 323 at 34, the Court again refers to hydrogen sulfide as a "bad odor" ("the Court also finds that other compounds present in the Landfill's emissions enhanced the intensity of the bad odor"). Finally, in R. Doc. 323 at 35-42, the Court details how hydrogen sulfide, even at the low level of an average of 5 ppb over a thirty-minute period can cause headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, decrease in the quality of life and muse an enjoyment of property." Calling such an odor "bad" is an understatement.

3. As to the objection to referring to the Waste Connections Defendants as "Waste Connections," even in this pleading in which they complain about that terminology, the defendant entities style themselves as "the Waste Connections Defendants." That has been their consistent description of themselves since this case began. In Trial Exhibit 1470,[1] another document that Plaintiffs intend to use in opening and which is stipulated into evidence by the Waste Connections Defendants, deals with deficiencies in the leachate collection system at the Jefferson Parish landfill since 2012 and describes the entity involved there as "Waste Connections." Mr. Laubenstein's signature line on his email to Mr. O'Connor in Tr. Ex. 4133 (see discussion below) describes himself as "Director of CCR Disposal" for "Waste Connections." Ms. Thibodaux, the office manager at the Jefferson Parish Landfill describes herself as working for Jefferson Parish Landfill,

---

[1] *See* letter from Rob Neilsen, on "Waste Connections, Inc." stationary with a "WC" logo and an address at 3 Waterway Square Place, The Woodlands, TX, whose signature line styles himself as Southern Region Vice President, which begins: "The purpose of this letter is to follow up on our May 8, 2018 meeting between Jefferson Parish and Waste Connections (WCI) personnel . . . " and ends with "If you have any questions, need any additional information or would like to consider a proposal from Waste Connections to correct the leachate pumping and conveyance system at the Landfill, please feel free to call me . . . or email me at RobN@wasteconnections.com."

IESI LA Landfill Corporation and Waste Connections, Inc.[2] There many, many other examples in which Waste Connections employees in various positions up and down the corporate daisy chain describe themselves as working for "Waste Connections" or "Waste Connections, Inc." when they are dealing with the Jefferson Parish Landfill (or other Waste Connections' landfills) without any differentiation being accorded to any corporate separateness or formality. *See*, *e.g.*, **Exhibit 1,** Trial Exhibit 3160 at WC_JPLF_00279637 (Invoice to Rain Carbon dated December 31, 2017, from "Waste Connections [/] Jefferson Parish Landfill").[3] Thus, it is entirely accurate for Plaintiffs to represent to the jury that their proof will include evidence that the defendants are properly referred to as "Waste Connections."

## II. PRESENTATION ON DISPOSAL OF CCRS, INCLUDING FGD MATERIALS LIKE SPENT LIME, IN MUNICIPAL SOLID WASTE LANDFILLS.

Although it is only the Laubenstein deposition designations that discuss the attachment to Mr. Laubenstein's email to Mr. O'Connor (Trial Ex. 4133) that are the subject of Plaintiffs' Motion to Reconsider, R. Doc. 730, regardless of the result of that Motion, the email itself will be identified by its recipient, Mr. O'Conner, and will be admissible, including the attached slide deck, for the reasons set forth in that Motion. Briefly summarized, the email and its attachment are relevant because, just days after the Jefferson Parish Landfill began placing the spent lime into the Jefferson Parish Landfill, the Director of CCR Disposal for the entire company sent a document to

---

[2] Interestingly, the reference to "Waste Connections, Inc." in Tr. Ex. 4002 has obviously been added by typeface dissimilar to her other "affiliations" because of the acquisition of IESI by Waste Connections through the merger with Progressive Waste which has just occurred three and one-half months before the date of Tr. Ex. 4002. So, insofar as Ms. Thibodaux is concerned, the supposed corporate existence of Louisiana Regional Landfill Corporation and Waste Connections Bayou, Inc. simply don't exist and the entity she represents, which operates the Jefferson Parish Landfill, is Waste Connections, Inc. Thus, referring to it as "Waste Connections" is highly appropriate.

[3] The "Waste Connections" invoice prompted Rain Carbon to ask for paperwork to be filled out to change the name. *See* Tr. Ex. 3160 at WC_JPLF_00279636.

Mr. O'Connor (whose department had just approved disposal of the spent lime in the JP Landfill) warning of the dangers of disposing of such materials (including the byproducts of flue gas desulfurization (FGD) like spent lime) in municipal solid waste landfills. The facts permit an inference that Messrs. Laubenstein and O'Connor talked about the attachment before it was sent (or at the very least that Mr. O'Connor would immediately recognize its importance), because both of them worked in the same office, and the forwarding email contained no message to Mr. O'Connor describing the attachment, beyond the title "Energy Waste (CCR) Disposal in Subtitle D Landfills 10-18-16.pdf."

The email is not hearsay, because Mr. Laubenstein sent the email in the course of his duties as a Waste Connections employee. Statements in the attachment are not excluded as hearsay because they are offered to show *notice* to both of these Waste Connections executives *that odor problems can result from the disposal of FGDs such as spent lime into municipal solid waste landfills* such that, when the contemporaneous decision was made to accept Rain Carbon's spent lime (see Tr. Ex. 4002 – River Birch tells Dawn Thibodaux that the last day River Birch will accept it is October 14, 2016 and urges her to expedite approval from "the engineer for the company" (who is a corporate, not a local, executive)), the jury can easily infer that the Waste Connections Defendants knew or should have known that odor problems would almost certainly result from accepting that waste stream into Jefferson Parish's "wet" landfill with no gas collection system in Phase IV-A.

Whether or not all the facts and circumstances surrounding this email indicate that Mr. Laubenstein adopted the statements[4] in the attachment is a question for the jury.

---

[4] Mr. Laubenstein specifically requests the PowerPoint ("Can you send me the power point presentation you said you just dusted off"); he expresses great regard for the author ("From your SOQ you certainly have done some exciting and challenging projects within the coal burning

4

The Waste Connections Defendants' final objection – that the presentation asserting odor problems resulting from spent lime in a MSWLF – is not "reliable" is flatly belied by the stipulated facts in this case. Indeed, the undisputed material facts set forth in the Pretrial Order, R. Doc. 634-1 at 73-84, are the very facts set forth in the attached PowerPoint: *See* R.Doc. 743-1. Rain Carbon uses lime-based sorbents to reduce the amounts of sulfur dioxide from the company's air emissions; this pollution control process is often referred to as a flue gas desulphurization ("FGD") process; the Rain Carbon process generates a product called "spent lime;" the spent lime disposed of at the JPLF contained some amount of sulfate; sulfate-containing waste can generate hydrogen sulfide ("H2S") gas under certain landfill conditions. We would only ask the Court to compare these stipulations to the contents of the PowerPoint to see the remarkable congruence. Thus, it is eminently reliable.

So, you might ask: why do you need it? It's because of the date – October 3, 2016. As the stipulations currently exist, the Waste Connections Defendants concede the relevant fact but can argue that they didn't know them in 2016. At the very least, this power point proves they were on notice of them and, thereby, is proof of Plaintiffs' "knew or should have known" case.

---

power industry. I think we can help each other in the CCR world"); he gave Mr. Grahlharr ideas for revisions to the power point (Grahlharr: "I need to add some more information like that I received from you today"); he took a day (during which the jury – considering all these circumstances - could easily find that he reviewed the PowerPoint before sending it to Mr. O'Conner, who had only been in his job as Southern Regional Engineer for two months and whose job included supervision of waste streams to go into Waste Connections landfills); his forwarding reference is "Tetra Tech Contact/Introduction CCRs" from which the jury could find that he was recommending, i.e., adopting, the PowerPoint for Mr. O'Conner's education into the problems with "Energy Waste (CCR) Disposal in Subtitle D Landfills 10-18-16.pdf" (the title of the .pdf attached). And, indeed, the email heading notes that Mr. O'Connor received the email and its attachment just 2 seconds after Mr. Laubenstein sent it.

As a result, Plaintiffs should be able to say, in opening, that they are going to prove that case and should be able to refer to the email and the power point as evidence they are going to adduce in support of it.

## III. THE TIMELINE

The Waste Connections Defendants' objection to being referred to as Waste Connections should be overruled for the reasons set forth above.

The odor complaints recited are amply supported in Tr. Ex. 1559a-g which are the document production of the business records of Jefferson Parish (they are entitled "Jefferson Parish Landfill Odor Control – 2015 Annual Odor Control Report" and the same document is included in Tr. Ex. 1559 for subsequent years through 2020) kept in the ordinary course of business for a business purpose. Indeed, the Court's Findings of Fact, R. Doc. 323 at 26, cite statistics for odor complaints in 2017 (222), 2018 (2,620) and 2019 (627). The numbers which Plaintiffs have used in the time line are lower, and thus conservative, because the documents relied upon for the time line do not include complaints to LDEQ which were included in the Court's statistics.[5] Exhibit 1559a-g is attached for the Court's reference, as the portions of Mr. Palutis' deposition which establish the negligible number of complaints for years earlier than 2015.

As a result, the odor complaint numbers cited in the timeline are amply supported by the Court's Findings of Fact and other admissible evidence

Respectfully submitted, this 10th day of August, 2024.

        /s/ S. Eliza James
        FORREST CRESSY & JAMES, LLC
        Byron M. Forrest (La. Bar No. 35480)

---

[5] Plaintiffs could have used the Court's statistics but, if they had done so, the figures for earlier and later years would have been "apples and oranges" because the earlier and later numbers did not include complaints to LDEQ.

Nicholas V. Cressy (La. Bar No. 35725)
S. Eliza James (La. Bar No. 35182)
1222 Annunciation Street
New Orleans, Louisiana 70130
Tele:(504) 605.0777
Fax: (504) 322.3884
Email: byron@fcjlaw.com
nicholas@fdjlaw.com
eliza@fcjlaw.com

   /s/ Eric C. Rowe
C. Allen Foster (Admitted Pro Hac Vice)
Eric C. Rowe (Admitted Pro Hac Vice)
Masten Childers, III (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
1800 M Street, NW, Suite 450N
Washington, DC 20036
Tele: (202) 659.6800
Fax: (202) 331.0573
Email: cafoster@whiteforlaw.com
erowe@whitefordlaw.com
mchilders@whitefordlaw.com

Harry S. Johnson, (Admitted Pro Hac Vice)
James R. Jeffcoat (Admitted Pro Hac Vice)
WHITEFORD, TAYLOR & PRESTON L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202-1636
(410) 347-8700
hjohnson@whitefordlaw.com
jjeffcoat@whitefordlaw.com

*Counsel For Addison Plaintiffs*