### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**FREDERICK E. ADDISON, SR., ET AL.,**     **CIVIL DOCKET**
  **Plaintiffs**

**VERSUS**             **NO.  19-11133**
                 **c/w 19-14512**

**LOUISIANA REGIONAL LANDFILL**    **SECTION: "E" (5)**
**COMPANY, ET AL.,**
  **Defendants**

*Applies to: Both Cases*

### ORDER AND REASONS

Before the Court is a contested Motion in Limine[1] filed by Defendants seeking to exclude testimony of Dr. Susan Schiffman, a purported expert in malodors and their impact on humans.[2] The Plaintiffs filed a memorandum in opposition.[3] The Defendants filed a reply in support of their Motion in Limine.[4]

### BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana ("JPLF" or the "Landfill"), and the resulting odors emitted from the Landfill between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500

---

[1] R. Doc. 563.
[2] *See* R. Doc. 416, pp. 3-4.
[3] R. Doc. 595.
[4] R. Doc. 626.

individual Plaintiffs.[5] Plaintiffs assert negligence and nuisance claims under Louisiana state law[6] against Defendants: Jefferson Parish, which owns and contracts with others to operate the Landfill; Aptim Corporation, which managed the gas and leachate collection systems of the Landfill from July 2017 to May 2019; and the Waste Connections Defendants, which operated the Landfill from May 2013 to December 2020.[7]

On November 5, 2019, the Court issued the first Case Management Order ("CMO"), which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[8] The Court held a trial on general causation in early 2022.[9] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[10] determining that, during the relevant time period: (1) odors and gases were emitted by the Landfill;[11] (2) the emissions of gases and odors from the Landfill occurred during the relevant time period;[12] and (3) exposure to the odors and gases emitted by the Landfill at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction."[13] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[14] The first

---

[5] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).
[6] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[7] *Id.* at pp. 52-53.
[8] R. Doc. 80 at pp. 1-2.
[9] R. Docs. 274-278, 286-289.
[10] R. Doc. 323.
[11] *Id.* at p. 5.
[12] *Id.* at p. 26.
[13] *Id.* at p. 27.
[14] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).

*Addison* trial was set to begin on September 5, 2023,[15] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[16]

At the first *Addison* trial, Plaintiffs intend for Dr. Susan Schiffman to testify "regarding the injuries, severity, and effects of malodors emanating from the Jefferson Parish Landfill on the specific *Addison* Trial Plaintiffs."[17]

In February 2024, the Court issued the Thirteenth CMO, which required the parties to file all motions in limine regarding expert testimony in the first *Addison* trial by June 6, 2024.[18] The Defendants timely filed their Motion in Limine seeking to preclude Dr. Schiffman from offering testimony related to certain opinions expressed in her Report under Federal Rule of Evidence 702.[19]

## **LEGAL STANDARD**

### I.   **Federal Rule of Evidence 702 Standard**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[20]

---

[15] R. Doc. 340.
[16] R. Doc. 495.
[17] R. Doc. 416 at pp. 3-4.
[18] R. Doc. 498 at p. 6.
[19] R. Doc. 563-1; FED. R. EVID. 702.
[20] FED. R. EVID. 702.

Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[21] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[22]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[23] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[24] provides the analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[25] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[26] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[27]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[28] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

---

[21] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

[22] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[23] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[24] 509 U.S. 579 (1993).

[25] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[26] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Crim. Just.*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

[27] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[28] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

evidence."[29] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[30] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[31]

"[A]n expert may never render conclusions of law,"[32] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[33] Allowing such expert testimony in a jury trial is both unhelpful and harmful because

> the jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the [expert]'s experience and expertise, it might think the witness even more reliable than the judge. If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury.[34]

Accordingly, expert testimony that offers a legal opinion is inadmissible.[35] Moreover, "expert testimony on matters which a jury is capable of understanding and

---

[29] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[30] FED. R. EVID. 704.

[31] *Sudo Props., Inc. v. Terrebone Par. Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).

[32] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

[33] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.

[34] *Cefalu v. Edwards*, 2013 WL 5592947, at *1 (quoting *Askanse v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); *see also Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).

[35] *Estate of Sowell v. United States of America*, 198 F.3d 169 (5th Cir. 1999); *Askanse*, 130 F.3d at 669.

deciding without an expert's help should be excluded,"[36] because expert testimony is appropriate only when it will assist the trier of fact.[37]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[38] "Although the jury ultimately decides the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to justify submitting the issue in the first instance."[39] Rule 403 also allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[40] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[41] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[42] Indeed, as the Fifth Circuit has proclaimed, the "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[43]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking

---

[36] *Jarrow*, 2000 WL 1537989, at *2.
[37] *Id*. Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).
[38] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).
[39] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 MARQ. L. REV. 173, 191 (2006).
[40] FED. R. EVID. 403.
[41] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).
[42] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).
[43] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

shaky but admissible evidence."[44] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[45] It is "the role of the adversarial system, not the court, to highlight weak evidence."[46] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on 'completely unsubstantiated factual assertions.'"[47]

## <u>LAW AND ANALYSIS</u>

Dr. Schiffman expressed 5 major opinions in her report:[48]

Opinion 1: Malodor perception and psychological effects. The salient odor quality of the emissions reported by the trial plaintiffs was "rotten eggs" and "sulfur" that are characteristic descriptions of the aversive odor of H2S. Qualities of "trash/garbage/waste" and "sewage" that contain H2S were salient as well. The trial plaintiffs' descriptions of the odors are consistent with the reports by other non-trial residents of the affected areas. Aversive and noxious odors caused negative emotions including anxiety and worry.

Opinion 2: Malodor FIDO and Daily Activities. The exposure to the aversive odors from the JPLF was frequent, temporally unpredictable, and uncontrollable. It significantly interfered with the trial plaintiffs' daily activity, quality of life, and as well as use and enjoyment of their property.

Opinion 3: Malodor source – the JPLF. The maximum 30-minute and hourly averages of H2S emitted to the Addison plaintiffs' locations from the JPLF as modeled by CALPUFF exceed the hourly average of H2S measured by LDEQ in that vicinity. Although LDEQ clearly documented elevated levels of H2S in these communities, their measurements over short discrete intervals significantly underestimated the magnitude of H2S emissions during the years 2017-2019. Volatile organic compounds (VOCs) detected in the community where the plaintiffs reside are consistent with the fingerprint of VOCs emitted by the JPLF (P=2.28E−15). The fingerprint of VOCs along with additional documents and evidence indicate that JPLF was the source of the malodors experienced by the trial plaintiffs.

---

[44] *Daubert*, 509 U.S. at 596; *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).

[45] *14.38 Acres of Land*, 80 F.3d at 1077.

[46] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

[47] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).

[48] R. Doc. 563-4, pp. 9-35.

Opinion 4: Malodor health effects. The malodorous emissions from the JPLF are the major contributor to the health complaints reported by the trial plaintiffs.

Opinion 5: Malodor lasting impact. Learned odor aversions likely resulted from pairing of adverse biological effects with noxious emissions and odor; these conditioned odor aversions will likely persist for the plaintiffs over time.

The Defendants seek to exclude Dr. Schiffman's testimony on the following four grounds: (1) Dr. Schiffman lacks expertise to opine on whether hydrogen sulfide ("H2S") lingered inside the Trial Plaintiffs' homes; (2) Dr. Schiffman lacks expertise to testify as to Defendants' best management practices for waste disposal; (3) Dr. Schiffman lacks sufficient evidence that the Trial Plaintiffs were actually exposed to VOCs, which should preclude her from offering testimony on the subject, and her opinion is unreliable; and (4) Dr. Schiffman generally fails to provide a specific causation analysis in her expert report because she has failed to properly evaluate the Trial Plaintiffs by ruling out other causes of their injuries.[49] Defendants seek to exclude Dr. Schiffman's testimony under Rule 702, insofar as the opinions expressed in her report improperly opine beyond the scope of Dr. Schiffman's expertise, are based on speculative, unreliable methodology, and do not meet Fifth Circuit requirements for specific causation.[50]

Because the first *Addison* Trial is a jury trial, Defendants emphasize the need for the Court to apply the more rigorous *Daubert* standard to Dr. Schiffman's testimony in comparison to the Court's determinations during the general causation trial.[51] The Court will apply the more rigorous *Daubert* standard to the determination of this motion.

---

[49] R. Doc. 563-1, pp. 2-4.
[50] *See generally id.*
[51] *Id.* at pp. 5-6.

8

**Dr. Schiffman will be allowed to testify on her Opinion 1 with respect to malodor perception, psychological effects, and negative emotions caused by noxious odors.**

In her first opinion, Dr. Schiffman concludes that based on her comparison of complaints made by the Trial Plaintiffs to the scientific literature on odor exposure and its effects, it is likely that "the malodors from the JPLF experienced by neighbors over the period of 2017-2019 impaired their mood and overall health."[52] Dr. Schiffman opines that noxious odors cause negative emotions including anxiety and worry. In her opinion, genetic and biological effects of malodors have an anatomical basis because brain structures and neural circuity that mediate odor overlap with those involved in emotions.

Dr. Schiffman describes the scientific process for determining how hydrogen sulfide odors are perceived by individuals, and she discusses the scientific studies assessing the effects of odor exposure on individuals.[53] Dr. Schiffman reviews the Trial Plaintiffs' depositions, ascertains their descriptions of the odor they experienced and their "characterization of odor characteristics," and explains how these characteristics of the odor were consistent with analyses performed by the Louisiana Department of Environmental Quality ("LDEQ") and hydrogen sulfide odors examined in other studies.[54] For example, Dr. Schiffman describes a study from Heaney, et al. assessing individuals who resided near landfills emitting hydrogen sulfide; when hydrogen sulfide emissions were high, study participants reported higher rates of negative mood.[55] Dr. Schiffman also opines that these odors produce negative feelings like "anxiety, worry, [and] stress."[56] Upon reviewing scientific studies of the psychological effects of odors on

---

[52] R. Doc. 563-4, p. 14.
[53] *Id.* at pp. 9-15.
[54] *Id.* at p. 11.
[55] *Id.* at p. 14.
[56] *Id.* at p. 12.

communities, Dr. Schiffman concludes that "the malodors from the JPLF . . . impaired [the Trial Plaintiffs'] mood . . . [as] [m]alodor is an environmental stressor with psychological, biological, and social consequences."[57]

The Defendants do not challenge this opinion in Dr. Schiffman's expert report. The Court finds Dr. Schiffman employs a sufficiently reliable methodology in Opinion 1 to withstand *Daubert* scrutiny, and she will be permitted to testify to these opinions at trial.[58]

**Dr. Schiffman will be allowed to testify on her Opinion 2 with respect to the impact hydrogen sulfide odors are capable of producing on daily lives, including quality of life and use and enjoyment of property. Dr. Schiffman will be allowed to testify as to the lingering effect of hydrogen sulfide in the air and the ability of hydrogen sulfide to accumulate and concentrate in homes and low-lying areas. Dr. Schiffman will not be allowed to testify regarding the number of times the Trial Plaintiffs experienced malodors during the relevant time period because this testimony is more appropriately given during Mr. Lape's discussion of his dispersion modelling.**

In her second opinion, Dr. Schiffman opines that exposure to the odors was "frequent, temporally unpredictable, and uncontrollable," which significantly interfered with the Trial Plaintiffs' day-to-day activities and enjoyment of their property.[59] Dr. Schiffman reviews Plaintiff's expert James Lape's CALPUFF dispersion model, in which he relied upon emission rates calculated by Plaintiffs' experts Dr. Jaana Pietari and Jose Sananes, to "estimate the average exposures at the homes of the trial plaintiffs."[60] After reviewing the odor incidents at each Plaintiffs' home, Dr. Schiffman opines as to the frequency and duration of odor exposure for each Trial Plaintiff.[61] Dr. Schiffman also

---

[57] *Id.* at pp. 14-15.
[58] Dr. Schiffman will not be allowed to base her opinions on the reports of non-party residents of Jefferson Parish except with respect to the Facebook page created during this time period.
[59] *Id.* at p. 15.
[60] *Id.*
[61] *See id.* at p. 18.

attributes "differences" between the modeling and other information with regards to the Trial Plaintiffs' odor exposure to be "explained by the lingering of [hydrogen sulfide] in the air after dispersion."[62] Dr. Schiffman then connects the odor emissions to the "alterations in daily life reported by the trial plaintiffs in response to the malodors"[63] and opines that the Trial Plaintiffs' frequent exposure to odors "substantially altered the daily activity of the trial plaintiffs," such as through contributing to uncontrollable, unpredictable stress, increased isolation, and a decreased quality of life.[64]

In her deposition, Dr. Schiffman reiterated her opinion on the capacity for hydrogen sulfide to "linger" inside homes and "collect in low places."[65] She described how hydrogen sulfide collects "under the stairs, [and] in . . . basements" based on her review of government agency data,[66] and she opined that because hydrogen sulfide is heavier than air, it accumulates "under" places like the kitchen sink and stairs.[67] Though Dr. Schiffman confirmed she never personally examined the individual Trial Plaintiffs' homes in reaching her opinions,[68] she described her experience conducting studies and "finding [hydrogen sulfide levels] higher inside than outside" because it was "building up and . . . not degrading as fast."[69]

Defendants challenge Dr. Schiffman's qualifications with respect to the portion of Opinion 2 which opines on how hydrogen sulfide "lingers" in areas of Plaintiffs' homes because her expertise is in "odor perception and its psychological effects," not air

---

[62] *Id.* at p. 19.
[63] *Id.* at pp. 20-21.
[64] *Id.* at pp. 22-23.
[65] R. Doc. 563-5, p. 25.
[66] *Id.*
[67] R. Doc. 563-6, p. 5.
[68] R. Doc. 563-4, p. 27.
[69] R. Doc. 563-6, pp. 6-7.

dispersion.[70] Further, Defendants briefly argue Dr. Schiffman has not followed any reliable or peer-reviewed methodology in support of her opinion.[71] Though Plaintiffs argue Defendants' first challenge to Dr. Schiffman's qualifications is improper because the Court has previously adjudicated the issue at the general causation trial, the Court disagrees. This Court has not ruled whether hydrogen sulfide odors lingered inside these particular Trial Plaintiffs' homes in this matter.[72]

In her report, Dr. Schiffman asserts she has worked in the field of odor assessment and effects for over fifty years, and she has served as a professor of medical psychology, biomedical engineering, and biological and agricultural engineering.[73] Dr. Schiffman has performed research for over thirty years on malodors in outdoor air, ambient odors from swine operations, wastewater treatment facilities, and landfills.[74] She has investigated the "psychological [and] molecular investigations of malodourous emissions, as well as instrumentation for measuring signals from odorous compounds at confined swine facilities and landfills."[75] She has published extensively on the malodorous emissions, including hydrogen sulfide and ammonia, and has worked in researching and evaluating alternative technologies for odor remediation.[76]

Relevant to Defendants' arguments, in her report, Dr. Schiffman opines as to how the odorous emissions negatively affected the Plaintiffs' daily lives and interfered with the use and enjoyment of their property.[77] Dr. Schiffman reviews the models from Mr. Lape

---

[70] R. Doc. 563-1, p. 2.
[71] *Id.* at p. 9.
[72] *See* R. Doc. 323.
[73] R. Doc. 563-4, p. 6.
[74] *Id.*
[75] *Id.*
[76] *Id.* at pp. 6-7.
[77] *Id.* at p. 15.

and LDEQ's data to explain how, given the data of the emissions in Plaintiffs' communities, the Plaintiffs consistently experienced the odors, which "adversely altered their daily lives."[78] She explains that in her opinion, due to the frequent odor emissions demonstrated by the models, the Plaintiffs "bec[a]me conditioned to expect and to be affected by, the odor whether it was a renewed assault or lingering odor," as the malodors would have "permeated their homes, their furniture and their clothes."[79] She further explains the psychological effects of the odor emissions on the Plaintiffs, citing specific studies to opine how the odors caused "degradation in quality of life" and altered Plaintiffs' daily activities.[80] Plaintiffs highlight in their opposition that in her rebuttal report, Dr. Schiffman further explained the science behind how odors accumulate inside homes.[81]

A witness qualified as an expert "is not strictly confined to his area or practice but may testify regarding related applications; a lack of specialization goes to the weight, not admissibility of the opinion."[82] If there is some "reasonable indication of qualifications," the expert's qualifications become an issue for the trier of fact.[83] With respect to Defendants' challenge to Dr. Schiffman's ability to testify to the concentration of hydrogen sulfide inside particular Trial Plaintiffs' homes, the Court finds Dr. Schiffman is qualified to testify as to the capacity for hydrogen sulfide to linger in homes and low-lying areas.[84] Having studied odors and emissions for decades, conducted studies on the effects of odors

---

[78] *Id.* at pp. 15-20.
[79] *Id.* at p. 21.
[80] *Id.* at p. 22.
[81] R. Doc. 595, p. 6.
[82] *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195-96 (5th Cir. 2018).
[83] *Prest v. BP Expl. & Prod. Inc.*, 640 F. Supp. 3d 542, 550 (E.D. La. 2022), *aff'd*, No. 22-30779, 2023 WL 6518116 (5th Cir. Oct. 5, 2023).
[84] Dr. Schiffman may not testify as to any property damage or the like as a result of the odors lingering inside homes, pursuant to this Court's prior orders clarifying that the Trial Plaintiffs are not seeking physical property damages. *See* R. Doc. 155, p. 2.

and the impact of odors on communities, particularly with respect to hydrogen sulfide, Dr. Schiffman is qualified to testify as to the mechanisms of how the hydrogen sulfide odors impact the Trial Plaintiffs' communities in this matter, including inside their homes.[85]

Dr. Schiffman will not be allowed to testify regarding the number of times the Trial Plaintiffs experienced malodors during the relevant time period relying on LDEQ's and Mr. Lape's dispersion modelling. This testimony is better given by the experts who did the work and produced the reports.

Defendants may cross-examine Dr. Schiffman on the specifics of her opinion to the extent they challenge her qualifications or her opinions as to hydrogen sulfide accumulation.[86]

## **Dr. Schiffman will not be allowed to testify as to the following portion of her Opinion 3:**

Malodor source – the JPLF. The maximum 30-minute and hourly averages of H2S emitted to the Addison plaintiffs' locations from the JPLF as modeled by CALPUFF exceed the hourly average of H2S measured by LDEQ in that vicinity. Although LDEQ clearly documented elevated levels of H2S in these communities, their measurements over short discrete intervals significantly underestimated the magnitude of H2S emissions during the years 2017-2019.

Dr. Schiffman opines that the CALPUFF models of hydrogen sulfide emissions exceed those measured by LDEQ because LDEQ's measures were underestimated.[87] Dr. Schiffman analyzes the MAML grab canister data of hydrogen sulfide estimates and

---

[85] This Court previously found Dr. Schiffman qualified to testify as an expert on the effect of malodorous emissions on humans, including the psychological effects of exposure to odors on humans and the physiological bases of the Allowed Injuries suffered by Plaintiffs. This Court prohibited Dr. Schiffman from testifying about any Non-Allowed Injuries.

[86] *See, e.g.*, *In re Vioxx Prod. Liab. Litig.*, 401 F. Supp. 2d 565, 582 (E.D. La. 2005) (instructing a party to challenge an expert's qualifications on cross-examination).

[87] R. Doc. 563-4, p. 23.

compares these values to those from the CALPUFF models run by James Lape.[88] The Court is not convinced that this testimony is within Dr. Schiffman's expertise, that it is reliable, or that it is relevant to Dr. Schiffman's opinions. This testimony will be excluded.

**Dr. Schiffman will be allowed to testify as to the following portion of her Opinion 3:**

> Volatile organic compounds (VOCs) detected in the community where the plaintiffs reside are consistent with the fingerprint of VOCs emitted by the JPLF (P=2.28E−15). The fingerprint of VOCs along with additional documents and evidence indicate that JPLF was the source of the malodors experienced by the trial plaintiffs.

In her third opinion, Dr. Schiffman opines that the findings from both LDEQ and Mr. Lape regarding the consistency of VOCs present at the Landfill and in the communities where the Plaintiffs reside demonstrate that the Jefferson Parish Landfill is more likely than not a major contributing cause of the Plaintiffs' injuries.[89] In Opinion 3.4, Dr. Schiffman reviews the individual VOCs within the MAML grab canisters in the Trial Plaintiffs' neighborhoods and opines that 29 of the 35 VOCs present in the neighborhood canisters were also present in the samples obtained from the landfill.[90] Based on this analysis, Dr. Schiffman opines that the Landfill's emissions were a major contributing source of the harms suffered by the Trial Plaintiffs.[91]

With respect to VOCs, in her deposition, Dr. Schiffman affirmed that while she did not personally take samples of the VOCs in the Plaintiffs' residences, she explained that what is important to her analysis is the "mixture of all the VOCs" rather than "identify[ing] them by individual."[92]

---

[88] *Id.* at pp. 23-27.
[89] *Id.* at p. 31.
[90] *Id.* at pp. 27-28.
[91] *Id.* at p. 31. In her third opinion, Dr. Schiffman also includes discussion of the Defendants' roles in the landfill operation. The Court will not permit this testimony.
[92] R. Doc. 563-5, p. 33.

Beyond challenging Dr. Schiffman's qualifications to opine on VOCs, Defendants also argue that Dr. Schiffman should not be permitted to testify as to VOCs because she has no evidence that "any Trial Plaintiff was exposed to VOCs, much less the type of VOC or the duration and concentration of the exposure."[93] Defendants argue Dr. Schiffman's lack of evidence of VOC exposure and concentration mandates that her opinion be considered unreliable, as the Fifth Circuit requires "the type of chemical or the level, and duration of exposure" for specific causation testimony.[94]

The Court rejects Defendants' arguments. Dr. Schiffman may testify as to her third opinion concerning VOCs, to the extent the VOC concentrations tend to show that the emissions of hydrogen sulfide causing the Trial Plaintiffs' damages came from the Jefferson Parish Landfill.[95] In relying on LDEQ and CALPUFF models, Dr. Schiffman points to concrete data to support her conclusion that "the consistency between the compounds that were measured by LDEQ in communities adjacent to the JPLF . . . indicate that the JPLF is more likely than not, at the very least, the major contributing cause of the harms suffered by the trial plaintiffs."[96]

Further, Dr. Schiffman references numerous studies she has conducted demonstrating the interaction of hydrogen sulfide and airborne VOCs, which increases symptom-reporting in subjects.[97] Dr. Schiffman does not, and will not be allowed to, opine that the VOCs *by themselves* actually caused any of the Trial Plaintiffs' damages; Plaintiffs did not establish at the general causation trial that VOCs were independently

---

[93] R. Doc. 563-1, pp. 11-12.
[94] *Id*. at p. 13 (citing *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)).
[95] R. Doc. 563-4, p. 31.
[96] *Id*.
[97] *Id*. at pp. 31-24.

capable of causing Plaintiffs' injuries,[98] and the Court did not make that finding.[99] Rather, in Dr. Schiffman's report, she presents evidence of the similarity of the VOCs present in the Trial Plaintiffs' communities to those at the Landfill to show that the malodors experienced by the particular Trial Plaintiffs were likely caused by the hydrogen sulfide emissions from the landfill.[100] Dr. Schiffman also references scientific studies of the impact of VOCs on enhancing a Plaintiff's damages through intensifying "interrelated health effects that can occur from activation of sensory nerves by airborne chemicals."[101]

The Court finds Dr. Schiffman employs sufficiently reliable methodology in her reliance on the emissions values from various experts, examination of tables, and value comparisons to reach her third opinion, which ultimately is about the source of the hydrogen sulfide emissions and the unique impact of the combination of hydrogen sulfide and VOCs on Plaintiffs.[102] Because "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits . . . [as] the fact-finder is entitled to hear . . . testimony and decide whether it should accept or reject that testimony,"[103] the Court finds Dr. Schiffman's testimony as to VOCs is admissible. Defendants may cross-examine Dr. Schiffman with respect to any insufficiency in the data or other questions as to the reliability of Dr. Schiffman's conclusions.

Dr. Schiffman will be allowed to testify that volatile organic compounds (VOCs) detected in the community where the plaintiffs reside are consistent with the fingerprint of VOCs emitted by the Jefferson Parish Landfill. Dr. Schiffman will not be allowed to

---

[98] *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (noting that a party must establish general causation before seeking to offer specific causation evidence).
[99] *See generally* R. Doc. 323.
[100] R. Doc. 563-4 at pp. 27-31.
[101] *Id.* at p. 31.
[102] *Id.* at p. 31, 35.
[103] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

testify that VOCs directly caused any of the Trial Plaintiffs' injuries as there has been no finding of general causation with respect to VOCs.

**Dr. Schiffman will be allowed to testify as to her Opinion 4 but only to the extent that she may testify that malodorous emissions have the capacity to cause the Allowed Injuries. Dr. Schiffman will not be allowed to testify that the Trial Plaintiffs have established specific causation as to each Plaintiff.**

In her fourth opinion, Dr. Schiffman explains that the health complaints of the Plaintiffs are characteristic of symptoms that typically occur from repeated exposures to air pollution of the type generated by municipal solid waste landfills. She opines that the malodors emitted from the Jefferson Parish Landfill "are a major contributor to the health complaints reported by the trial plaintiffs."[104] Dr. Schiffman reviewed the injuries[105] reported by Plaintiffs in their depositions and opines that these symptoms are "characteristic of symptoms that typically occur from repeated exposure to malodorous air pollution" typically generated by landfills.[106] Dr. Schiffman highlights specific studies she has conducted that demonstrate how hydrogen sulfide in combination with airborne VOCs "increase[] the prevalence" of the Trial Plaintiffs' reported symptoms.[107] Dr. Schiffman concludes that "to the extent that airborne chemicals from other sources were mixed with the H2S and VOCs from the JPLF, the health symptoms suffered by the trial plaintiffs were the consequence of activation of sensory nerves by the combination of those sources."[108] Dr. Schiffman will be allowed to testify that the malodors generated by

---

[104] R. Doc. 563-4, p. 31.
[105] *See* R. Doc. 642, pp. 3-5 (describing Plaintiffs' allowed injuries).
[106] R. Doc. 563-4, p. 31.
[107] *See id.* at pp. 32-34 ("[S]ubjects were 7.8 times more likely to report nausea when they were exposed to 24 ppb H2S (along with very low concentrations of VOCs) compared with clean air during a one-hour exposure in an environmental chamber.").
[108] *Id.* at p. 35.

the Jefferson Parish Landfill have the capacity to cause the Allowed Injuries and that VOCs may enhance or exacerbate the injuries.

Defendants argue Dr. Schiffman should be precluded from testifying as to specific causation because she did not conduct a proper specific causation analysis of each Trial Plaintiff.[109] Defendants argue she "has not examined the Trial Plaintiffs, has not reviewed their medical records or otherwise considered their medical history, [and] has not considered other potential causes of their alleged injuries" such that her testimony is not reliable.[110] Defendants cite *McNabney v. Laboratory Corporation of America* in support of this argument.[111] Defendants highlight portions of Dr. Schiffman's deposition when, in response to Defendants' question regarding her assessment of the injuries suffered by the thirteen Trial Plaintiffs, she stated: "those were decisions that were made by others . . . I'm just saying what the mechanism would be given that those are complaints."[112]

Dr. Schiffman will not be allowed to testify that exposure to the malodors caused each particular Trial Plaintiff's injuries (specific causation). Other, more qualified medical experts will provide opinions on this topic.

The Court will not allow Dr. Schiffman to testify as to specific causation for each Trial Plaintiff.

**Dr. Schiffman will be allowed to testify as to her Opinion 5 to the extent she discusses malodor's lasting impacts on health within the relevant time period of July 1, 2017, to December 31, 2019. Dr. Schiffman may not testify to chronic injuries occurring beyond the relevant time period.**

In her fifth opinion, Dr. Schiffman opines that exposure to odors can cause "conditioned odor aversions" and "subsequent exposure to the landfill odor alone in the

---

[109] R. Doc. 563-1, pp. 3-4.
[110] *Id.*
[111] 153 F. App'x 293 (5th Cir. 2005).
[112] R. Doc. 563-1, p. 17.

absence of the adverse health effects will be perceived as a threat signal or potential danger that [Plaintiffs] must avoid for their safety and survival."[113] Dr. Schiffman further opines that "aversive odor conditioning induces long-term alterations in the piriform cortex and the amygdala," all to explain that "[t]he exposures from JPL experienced by the plaintiffs may have long-term consequences."[114] The Court determined general causation existed only for injuries suffered during the relevant time period of July 1, 2017 until December 31, 2019.[115] As a result, Dr. Schiffman may testify to the substance of this opinion only to the extent she is speaking of damages suffered by the Trial Plaintiffs, such as the effects of repeated exposure to odors, between July 1, 2017 and December 31, 2019. Dr. Schiffman may not testify to long-term effects of odor-exposure beyond December 31, 2019.

**Dr. Schiffman will not be allowed to testify on best practices in the waste management industry. the contractual relationship amongst the Defendants, or any testimony about Defendants' responsibilities in managing the landfill.**

Defendants challenge Dr. Schiffman's qualifications to testify as to "landfill operations and contracts" and "best management practices," and "maintenance issues" because the subject is outside her scope of expertise.[116]   Defendants challenge Dr. Schiffman's qualifications to discuss contractual responsibilities because she is not an

---

[113] R. Doc. 563-4, p. 35.

[114] *Id.*

[115] As stated in the Court's July 3, 2024 Order and Reasons, "The undisputed fact that the Addison Plaintiffs only seek damages incurred within the relevant time period is further supported by the representations of Plaintiffs' counsel Eric Rowe to the Court, as recorded in the transcript of the general causation trial:

> The Court: [W]hat [is] the time period [] that they're asking for damages[?]
> [Eric] Rowe: . . . If they had asked us the question, are you asking for damages into 2020, we would have said no. We've only modeled the years 2017, 2018, and 2019.
> The Court: Okay. That was my understanding, too. So that is – you're correct on that. They're only asking for damages through 2019."

*See* R. Doc. 642 (quoting Gen. Causation Tr., R. Doc. 229 at 756:6-22).

[116] R. Doc. 563-1, p. 11.

expert in contracts.[117] Plaintiffs respond by arguing that Dr. Schiffman, as an expert in odors, is qualified to testify on the "foreseeability of hydrogen sulfide generation at MSW landfills" and "odor issues" resulting from waste disposal at landfills.[118]

In the overview to her report, Dr. Schiffman discusses "breaches in the waste treatment system, all of which were known, or should have been known, to the Defendants at times when preventive action could, and should, have been taken."[119] She also states she is "familiar with the standards and best practices for odor control in the waste management and disposal industry."[120] In opinion 3.5, Dr. Schiffman opines as to the causation of the odors emitted from the landfill and elaborates that "the malfunctioning leachate and gas collection systems . . . [were] the responsibility of Waste Connections and Aptim."[121] Nevertheless, in her deposition, Dr. Schiffman clarified that she is not offering opinions as to contractual responsibilities but was "[j]ust looking at who was being sued."[122]

Dr. Schiffman may not testify regarding the standard of care applicable to Defendants' operation of the landfill, her interpretation of the contractual relationship amongst the Defendants, or any testimony about Defendants' responsibilities in managing the landfill, such as the opinion that certain Defendants "should have" taken "preventative action."[123] Dr. Schiffman also may not opine as to which specific Defendant was responsible for various operations at the Jefferson Parish Landfill.

---

[117] *Id.* at pp. 10-11.
[118] R. Doc. 595, p. 7.
[119] R. Doc. 563-4, p. 5.
[120] *Id.* at p. 6.
[121] *Id.* at p. 31.
[122] R. Doc. 563-5, p. 36.
[123] *Id.* at p. 5.

**Dr. Schiffman will not be allowed to testify with respect to statements by Jefferson Parish officials, media sources, and other non-party residents, except for evidence about the Facebook page created around this time.**

In Opinion 3.5 to her Third Major Opinion, Dr. Schiffman states that "[f]urther evidence that JPLF is the main source and cause of the malodors . . . is supported by statements from Parish President Mike Yenni and others, interviews and articles associated with WGNO and WWLTV, [and] reports by [experts] . . . ."[124] Dr. Schiffman further describes what occurred during Jefferson Parish Press Conferences and in an investigative media series, and she concludes the data from these sources corroborates her opinion that the odors came from the Jefferson Parish Landfill.[125]

Dr. Schiffman may not testify as to statements made by any third parties,[126] such as nonparty Jefferson Parish residents (except for evidence regarding the Facebook page created around this time) or television reporters, to bolster her opinions. Dr. Schiffman may also not testify as to any statements made by Defendants' representatives, agents or employees to bolster her opinions.

Accordingly;

## CONCLUSION

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[127] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its

---

[124] R. Doc. 563-4, p. 30.
[125] *Id.*
[126] *See* R. Doc. 702 (Rulings on Motions in Limine). This Court already has excluded evidence from nonparty Jefferson Parish residents with two exceptions.
[127] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993); *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).

admissibility and should be left for the [factfinder's] consideration."[128] It is "the role of the adversarial system, not the court, to highlight weak evidence."[129] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on 'completely unsubstantiated factual assertions.'"[130] The Defendants may raise their concerns regarding Dr. Schiffman's testimony at trial.

For the foregoing reasons, **IT IS ORDERED** that Defendants' Motion in Limine is **GRANTED IN PART AND DENIED IN PART**.[131]

**New Orleans, Louisiana, this 10th day of August, 2024.**

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[128] *14.38 Acres of Land*, 80 F.3d at 1077.
[129] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).
[130] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).
[131] R. Doc. 563.