**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**FREDERICK E. ADDISON, SR., ET AL.,**
**Plaintiffs**

**CIVIL DOCKET**

**VERSUS**

**NO. 19-11133**
**c/w 19-14512**

**LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**
**Defendants**

**SECTION: "E" (5)**

***Applies to: Both Cases***

## ORDER AND REASONS

Before the Court is Plaintiffs' Motion in Limine to exclude testimony of the Defendants' witness Pamela Dalton, Ph.D., MPH, a purported expert in odor perception, psychology, and psychogenic symptoms from odor and sensory perception.[1] The Defendants filed a joint memorandum in opposition.[2] The Plaintiffs filed a reply.[3]

## BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "JPLF"), and the resulting odors emitted from the JPLF between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual Plaintiffs.[4] In their Second Amended Complaint, Plaintiffs assert negligence and nuisance

[1] R. Doc. 542.
[2] R. Doc. 583.
[3] R. Doc. 608.
[4] *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).

claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to operate the JPLF; Aptim Corporation, which managed the gas and leachate collection systems of the JPLF from July 2017 to May 2019; and three entities that operated the JPLF from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc. (collectively, the "Defendants").[8]

On November 5, 2019, the Court issued the first Case Management Order, which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022.[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that: (1) odors and gases were emitted by the JPLF;[12] (2) the emissions of gases and odors from the JPLF occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the JPLF at a level of five parts per billion ("ppb") for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction,"[14] "in the general population."[15] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial

---

[5] *See* Second Amended Complaint, R. Doc. 431 at p. 64.
[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] R. Doc. 80 at pp. 1-2.
[10] R. Docs. 274-278, 286-289.
[11] R. Doc. 323.
[12] *Id.* at p. 5.
[13] *Id.* at p. 26.
[14] *Id.* at p. 27.
[15] *Id.* at pp. 35-44.

Plaintiffs").[16] The first *Addison* trial was set to begin on September 5, 2023,[17] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[18]

Relevant to the instant Motion in Limine, the Defendants engaged Pamela Dalton, Ph.D., MPH—represented to be an expert in "odor perception, psychology (including psychological impacts from odor perception), and psychogenic symptoms from odor and sensory perception."[19] In her expert report (the "Dalton Report"),[20] Dr. Dalton expresses several opinions on "the psychological and other impacts (or lack thereof) to the [] Trial Plaintiffs from alleged exposure to odors and emissions from the [JPLF] and other sources."[21] The Defendants also offer Dr. Dalton as a rebuttal expert to rebut opinions offered by Plaintiffs' experts Dr. Susan Schiffman, Dr. Michael Spodak, and Dr. Michael DeLorenzo.[22] Plaintiffs timely filed their Motion in Limine to exclude Dr. Dalton from offering testimony on certain opinions expressed under the law-of-the-case doctrine and Federal Rules of Evidence 702 and 704.[23]

**LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

[16] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).
[17] R. Doc. 340.
[18] R. Doc. 495.
[19] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 2; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 2.
[20] Dalton Rep., R. Doc. 542-3.
[21] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 2; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 2.
[22] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 2; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 2.
[23] *See* R. Doc. 542-1. Plaintiffs seek to exclude certain other opinions expressed in the Dalton Report under the law-of-the-case doctrine in their motion to exclude expert testimony on issues litigated and decided in the general causation phase (the "Motion to Exclude General Causation Topics"). *See* R. Doc. 554. The Court will address the arguments made in Plaintiffs' Motion to Exclude General Causation Topics in a separate Order and Reasons.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[24]

"A district court has considerable discretion to admit or exclude expert testimony under Rule 702."[25] Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[26] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[27] The trial court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[28]

If the expert's qualifications are found to be sufficient, the trial court must then examine whether the expert's opinion satisfies the reliability and relevance requirements of Rule 702 to render the opinion admissible.[29] The United States Supreme Court's decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[30] "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid'" under Rule 702,[31] and of whether that reasoning or methodology "can be reliably applied to the facts of the

---

[24] FED. R. EVID. 702.
[25] *In re Pool Products Distribution Market Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).
[26] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[27] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").
[28] *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702).
[29] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).
[30] 509 U.S. 579 (1993).
[31] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

case."[32] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that trial courts may consider in evaluating the reliability of expert testimony, including: "(1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[33] The Supreme Court has cautioned the reliability analysis must remain flexible—the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[34] "[N]ot every *Daubert* factor will be applicable in every situation," thus district courts are offered broad latitude in making expert testimony determinations and may "consider other factors it deems relevant."[35]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[36] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[37] The proponent of expert testimony "need not prove to the judge that the

[32] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[33] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).
[34] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).
[35] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004); *Kumho Tire*, 526 U.S. at 151–53.
[36] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).
[37] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

expert's testimony is correct, but [] must prove by a preponderance of the evidence that the testimony is [relevant and] reliable."[38]

"[A]n expert may never render conclusions of law,"[39] as that invades "'the province of the court to determine the applicable law and to instruct the jury as to that law.'"[40] Allowing such expert testimony in a jury trial is both unhelpful and harmful because:

> [T]he jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the [expert]'s experience and expertise, it might think the witness even more reliable than the judge. If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury.[41]

Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded," because expert testimony is appropriate only when it will assist the trier of fact.[42] "As a general rule, an expert may not opine on another witness's credibility because this testimony does not help the trier of fact, who can make its own credibility determinations."[43]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[44] "Although the jury ultimately decides the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to

---

[38] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[39] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).
[40] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.
[41] *Cefalu v. Edwards*, 2013 WL 5592947, at *1 (quoting *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); *see also Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).
[42] *Jarrow*, 2000 WL 1537989, at *2. Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).
[43] *Nale v. Finley*, 505 F. Supp. 3d 635, 645 (W.D. La. Dec. 7, 2020).
[44] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).

justify submitting the issue in the first instance."[45] Rule 403 also allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[46] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[47] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[48] Indeed, as the Fifth Circuit has proclaimed, the "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[49]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[50] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[51] It is "the role of the adversarial system, not the court, to highlight weak evidence."[52] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on

---

[45] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 MARQ. L. REV. 173, 191 (2006).
[46] FED. R. EVID. 403.
[47] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).
[48] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).
[49] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).
[50] *Daubert*, 509 U.S. at 596; *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).
[51] *14.38 Acres of Land*, 80 F.3d at 1077.
[52] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

'completely unsubstantiated factual assertions.'"[53]

**LAW AND ANALYSIS**

The Defendants offer Pamela Dalton, Ph.D., MPH, as their expert in "odor perception, psychology (including psychological impacts from odor perception), and psychogenic symptoms from odor and sensory perception."[54] According to her Report, Dr. Dalton is a research scientist and principal investigator who studies "the chemical senses—smell, taste, and chemical irritation,"[55] with a research focus on "the human perception of odor, irritation, and acute symptoms from odorous chemical exposures, especially as this perception is influenced by psychological factors."[56] Dr. Dalton represents she has 30 years of experience in "determining detection, recognition and chemesthetic (irritation) threshold for a wide variety of odorous chemicals," including sulfur compounds, and conducting and analyzing studies involving odor monitoring to document odors from sources, including landfills.[57] The Defendants engaged Dr. Dalton to assess evidence pertaining to "the frequency, intensity, and duration of odors" the Plaintiffs allege emanated from the JPLF, "the concentration of hydrogen sulfide [("H2S")] [] likely to cause nuisance and symptom reports, and the alleged injuries of the [Trial Plaintiffs]."[58]

After reviewing relevant documents, including odor complaints of the Plaintiffs and other Jefferson Parish residents, odor and air monitoring reports prepared by the

---

[53] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).
[54] Waste Connections Defendants' List of Experts, R. Doc. 418 at p. 2; Defendant Jefferson Parish's List of Experts, R. Doc. 419 at p. 2.
[55] Dalton Rep., R. Doc. 542-3 at p. 3.
[56] *Id.*
[57] *Id.*
[58] *Id.* at p. 2.

Louisiana Department of Health ("LDH") and the Louisiana Department of Environmental Quality ("LDEQ"), the reports of other experts retained by the parties, and relevant scientific literature, Dr. Dalton expressed seven opinions in her Report:

> Opinion 1: Exposure to 5 ppb of [H2S] is not always a nuisance to those exposed and is unlikely to have caused nuisance injuries or health conditions to the Trial Plaintiffs.[59]
>
> Opinion 2: The Trial Plaintiffs' descriptions of their odor experiences are inconsistent with what is known about human chemosensory function.[60]
>
> Opinion 3: Exposure to odors is not likely to cause the sleep disturbances claimed by certain Trial Plaintiffs.[61]
>
> Opinion 4: The concentration of odors and gases emitted from the JPLF was not likely to cause trigeminally-mediated sensations or physiological-based health conditions in the Trial Plaintiffs.[62]
>
> Opinion 5: Personality traits, expectations about odor, and misattribution of health conditions to odors or a particular source likely impacted the Trial Plaintiffs' alleged injuries.[63]
>
> Opinion 6: The Trial Plaintiffs' memories of certain health conditions are likely due to a type of memory reconstruction that often occurs when post-event details become incorporated into an individual's autobiographical memory.[64]
>
> Opinion 7: The concentration of odors and gases emitted from the JPLF was insufficient to cause the Trial Plaintiffs' learned odor aversions, to the extent that they have such aversions.[65]

In their Motion in Limine, the Plaintiffs seek to exclude Dr. Dalton's testimony on Opinion Nos. 1 and 2 (the "contested opinions"), under the law-of-the-case doctrine, insofar as they opine on issues adjudicated in the Court's General Causation Order,[66] and

---

[59] *Id.* at pp. 4-6.
[60] *Id.* at pp. 6-10.
[61] *Id.* at pp. 10-11.
[62] *Id.* at pp. 11-12.
[63] *Id.* at pp. 12-16.
[64] *Id.* at pp. 17-18.
[65] *Id.* at pp. 18-19.
[66] Plaintiffs incorporate by reference arguments included in their Motion to Exclude General Causation Topics to support Dr. Dalton's opinions challenged in the instant Motion in Limine. *See* R. Doc. 542-1 at p.

under Rules 702 and 704, insofar as Opinion No. 1 will not be helpful to the trier of fact and Opinion No. 2 improperly opines on the credibility of witnesses.[67]

**I. Dr. Dalton may not offer testimony related to her Opinion No. 1, that exposure to an average of 5 ppb of H2S for 30 minutes was not likely or not always a nuisance to the Trial Plaintiffs or that an average exposure to 5 ppb of H2S over 30 minutes may cause injury to only the most sensitive portion of the population. Dr. Dalton may not offer testimony related to her Opinion No. 3, that exposure to odors was not likely to cause sleep disturbances claimed by certain Trial Plaintiffs.**

Plaintiffs argue Opinion No. 1 constitutes an improper opinion on an issue of law that is excludable under Rule 702 because the opinion concludes: "to a reasonable degree of scientific certainty [] the Trial Plaintiffs' exposure at an average of 5 ppb of [H2S] for 30 minutes was not always a nuisance or likely ever a nuisance to them."[68] Plaintiffs argue Dr. Dalton's assumption underlying Opinion No. 1, that Plaintiffs must "fall within the most sensitive population [to] detect H2S at [5 ppb],"[69] is "directly contrary to this Court's

1; *see* R. Doc. 554. To the extent Plaintiffs challenge any other opinions expressed in the Dalton Report under the law-of-the-case doctrine, the Court will address the merits of Plaintiffs' arguments with respect to those other opinions in a separate Order and Reasons related to the Plaintiffs' motion to exclude expert testimony on issues litigated and decided in the general causation phase. *See* R. Doc. 554.

[67] *See* R. Doc. 542-1.

[68] *Id.* at p. 4 (quoting Dalton Rep., R. Doc. 542-3 at p. 6). Plaintiffs also seek to exclude Opinion No. 1 on the grounds that the U.S. Court of Appeals for the Fourth Circuit in *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 962-63 (4th Cir. 2020), affirmed a district court order excluding Dr. Dalton's testimony on a similar topic in a similar case under Rule 702, as "unhelpful" and potentially confusing to the jury. R. Doc. 542-1 at p. 4. In *McKiver*, the Fourth Circuit affirmed a district court order precluding Dr. Dalton from testifying "on her 'odor monitoring study and her opinion regarding the lack of odor nuisance emanating from [a particular source in North Carolina]'" on the grounds that the proposed testimony "would have a strong likelihood of confusing or misleading the jury" because "North Carolina . . . ha[d] not adopted a dilution to threshold ratio or any other objective standard for assessing whether an odor is objectionable." *McKiver*, 980 F.3d at 962-63. Plaintiffs argue "Dr. Dalton's opinions in this case are identical" to those excluded by the trial court in McKiver and contend that because Louisiana, like North Carolina, does not have "an established threshold," Dr. Dalton's Opinion No. 1 improperly "supplant[s] the Plaintiffs' experiences as to what level of odor is and is not objectionable to them." R. Doc. 542-1 at pp. 3-4. In opposition, the Defendants argue *McKiver* has no bearing on this case because in *McKiver*, "Dr. Dalton attempted to define an objective standard—meaning a value that could be measured by an instrument . . . below which any odors would not be considered a nuisance." R. Doc. 583 at p. 3. Because Dr. Dalton's Opinion No. 1 will be excluded on other grounds, the Court will not address Plaintiffs' alternative argument related to *McKiver*.

[69] Dalton Rep., R. Doc. 542-3 at p. 5.

findings" as expressed in the General Causation Order.[70] In opposition, the Defendants argue Dr. Dalton does not dispute the Court's finding that 5 ppb of H2S over 30 minutes is "*capable* of causing" the Allowed Injuries.[71] Rather, the Defendants claim Opinion No. 1 challenges "the *likelihood* that such a dosage of H2S would *in fact cause* the injuries of which the Trial Plaintiffs complain."[72]

The Court's Order and Reasons issued on July 3, 2024 (the "July 3 Order"), affirmed "the issue of general causation was '*actually decided*' by the Court's General Causation Order"[73] and "findings of fact and conclusions of law expressed therein" will not be revisited.[74] Having reviewed the Dalton Report, the Court finds that Opinion Nos. 1 and 3 express improperly challenge the Court's General Causation Order. Specifically, in Opinion No. 1, Dr. Dalton opines:

> The Bruvold study, which was cited by . . . the Court for its decision that 5 ppb is capable of causing nuisance, claimed that exposure to [H2S] levels from 0.6-5.7 ppb led to interference with daily living along with health concerns. However, in my opinion the Bruvold study does not establish that such a level is likely to cause injuries in the general population, let alone among the 13 Trial Plaintiffs.[75]

As expressed in the General Causation Order, the Court found that, "an average exposure to 5 ppb of [H2S] over thirty minutes is capable of producing" certain Allowed Injuries[76] "in the general population."[77] In Opinion No. 1, however, Dr. Dalton opines that an

---

[70] R. Doc. 542-1 at p. 4.
[71] R. Doc. 583 at p. 4.
[72] *Id.* at p. 5.
[73] *See* General Causation Order, R. Doc. 323.
[74] R. Doc. 642 at p. 9 (quoting *Alpha/Omega Ins. Servs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001)).
[75] Dalton Rep., R. Doc. 542-3 at p. 5.
[76] *See* R. Doc. 642 (defining the Allowed Injuries).
[77] R. Doc. 323 at p. 35 (finding 5 ppb of H2S over thirty minutes is capable of causing headaches in the general population); *id.* at p. 36 (same for nausea); *id.* at p. 37 (same for loss of appetite, sleep disruption, and dizziness); *id.* at p. 39 (same for fatigue and anxiety and worry); *id.* at p. 40 (same for decrease in quality of life).

average exposure to 5 ppb of H2S over thirty minutes may cause injury to only the most sensitive portion of the population,[78] *directly* contradicting the Court's finding that such an exposure may cause injury "in the *general* population."[79] Further, as expressed in the July 3 Order, included in the definition of "Allowed Injuries" is "sleep disruption."[80] In Opinion No. 3, Dr. Dalton opines that "[s]cientific literature shows, and it my opinion, that exposure to odors does not cause sleep disturbances,"[81] also *directly* contradicting the Court's finding that odor may cause sleep disturbance.[82]

Because Opinion Nos. 1 and 3 contravene the law-of-the-case with respect to the Court's General Causation Order as clarified by the July 3 Order, Dr. Dalton's testimony related to those opinions will be excluded under the law-of-the-case doctrine. Dr. Dalton may not offer testimony that an average exposure to 5 ppb of H2S over thirty minutes may cause injury to only the most sensitive portion of the population, including her finding that "[e]xposure to 5 ppb of [H2S] is not always a nuisance to those exposed and is unlikely to have caused nuisance injuries or health conditions to the Trial Plaintiffs."[83] Nor may she offer testimony related to her opinion that "[e]xposure to odors is not likely to cause the sleep disturbances claimed by certain Trial Plaintiffs."[84]

## II. Dr. Dalton may offer testimony related to her opinions on factors that influence odor detection, the misattribution of symptoms to a particular odor source, and memory reconstruction.

Plaintiffs next seek to exclude Opinion No. 2—that "[t]he Trial Plaintiffs' descriptions of their odor experiences are inconsistent with what is known about human

[78] *See* Dalton Rep., R. Doc. 543-3 at p. 5.
[79] R. Doc. 323 at p. 44.
[80] *Id.* at p. 37; R. Doc. 642 at pp. 3-4.
[81] Dalton Rep., R. Doc. 542-3 at p. 10.
[82] R. Doc. 323 at p. 37; R. Doc. 642 at pp. 3-4.
[83] Dalton Rep., R. Doc. 542-3 at p. 4.
[84] *Id.* at p. 10.

chemosensory function."[85] Plaintiffs argue Opinion No. 2 improperly opines on the credibility of witnesses—i.e., the Trial Plaintiffs' testimony on their experiences with odors.[86] Plaintiffs point to an opinion of the U.S. Court of Appeals for the Fourth Circuit, *McKiver v. Murphy-Brown, LLC*, in which Plaintiffs claim that court affirmed a district court order excluding an opinion of Dr. Dalton on the same topic.[87] Plaintiffs represent the Fourth Circuit reached that conclusion after "mak[ing] clear that experts should not, and cannot, testify about what level of an exposure constitutes an annoyance to a particular Plaintiff."[88]

While the Defendants acknowledge Opinion No. 2 "is all about the Trial Plaintiffs' descriptions of their odor experiences—which are self-reported experiences," they argue the opinion does not challenge the credibility of the Plaintiffs' testimony.[89] The Defendants claim Opinion No. 2 is "helpful to the trier of fact in understanding the different factors that influence odor detection and why the alleged odors from the [JPLF] were not likely the cause of the Trial Plaintiffs' injuries."[90] The Defendants contend excluding the opinion would "improperly shield[]" the jury "from the crucial information that Trial Plaintiffs' self-report of the frequency they experienced odors is not even closely aligned with [Plaintiffs' expert] Dr. Lape's modeling data, nor does it align with the functions of the olfactory system."[91] Further, the Defendants argue Plaintiffs mischaracterized *McKiver*, which they claim "permitted Dr. Dalton to testify on the

---

[85] R. Doc. 542-1 at pp. 5-7 (citing Dalton Rep., R. Doc. 542-3 at pp. 9-10).
[86] *Id.*
[87] *Id.* at pp. 6-7 (citing *McKiver*, 980 F.3d at 962).
[88] *Id.* (citing *McKiver*, 980 F.3d at 962).
[89] R. Doc. 583 at p. 2.
[90] *Id.*
[91] *Id.* at p. 9.

unreliability of self-reports of odor and recognized that this did not invade the jury's province to assess plaintiffs' credibility."[92]

Having reviewed the Dalton Report, the Court finds that the substance of Opinion No. 2 does not question the credibility of the Plaintiffs, but rather opines on the reliability of human self-reports of odor. Opinion No. 2 is based on Dr. Dalton's opinion that "[e]xposure to detectable but weak odors of H2S should thus have led to very rapid desensitization of the Trial Plaintiffs during the modeled 'odor events,' not continuous odor impacts as they reported."[93] A review of the *McKiver* court's opinion reveals the district court in that case found Dr. Dalton qualified to testify on that topic and did not otherwise find her opinion inadmissible under Rule 704.[94]

This Court similarly finds Opinion No. 2 "embraces an ultimate issue to be decided by the trier of fact"—i.e., whether the odors that emanated from the JPLF and caused a nuisance to the Trial Plaintiffs—however, Dr. Dalton's testimony is both relevant and likely to "help the trier of fact to understand the evidence or to determine a fact in issue."[95] Dr. Dalton may testify as to Opinion Nos. 2, 5, and 6, with respect to factors that influence odor detection, the misattribution of symptoms to a particular odor source, and memory reconstruction.[96] However, to the extent Opinion No. 2 expresses her opinion that "the Trial Plaintiffs' testimony regarding their odor experience is not credible,"[97] the Court will

---

[92] *Id.* at p. 9 (citing *McKiver*, 980 F.2d at 962).
[93] Dalton Rep., R. Doc. 542-3 at p. 9.
[94] *McKiver*, 980 F.3d at 962.
[95] FED. R. EVID. 702(a).
[96] *See* Dalton Rep., R. Doc. 542-3 (Opinion Nos. 2, 5, and 6).
[97] *Id.* at p. 10.

limit Dr. Dalton's testimony because experts may not to opine on another witness's credibility or "the veracity [a party's] testimony."[98]

Accordingly, the Court will grant in part and deny in part the Plaintiffs' Motion in Limine with respect to Opinion No. 2. Dr. Dalton may offer testimony related to her opinions concerning factors that influence odor detection but may not offer testimony challenging the credibility of any other witness, including the Trial Plaintiffs. Dr. Dalton may also offer testimony as to Opinion Nos. 5 and 6 with respect to the misattribution of symptoms to a particular odor source, and memory reconstruction.[99]

## CONCLUSION

**IT IS ORDERED** that Plaintiffs' motion to exclude expert testimony of Dr. Pamela Dalton is **GRANTED IN PART AND DENIED IN PART**.[100] Dr. Dalton may not offer testimony related to Opinion No. 1, that exposure to an average of 5 ppb of H2S for 30 minutes was not likely or not always a nuisance to the Trial Plaintiffs or that an average exposure to 5 ppb of H2S over thirty minutes may cause injury to only the most sensitive portion of the population. Dr. Dalton may not offer testimony related to Opinion No. 3, that exposure to odors is not likely to cause the sleep disturbances claimed by certain Trial Plaintiffs. Dr. Dalton may offer testimony related to Opinion Nos. 2, 5, and 6, with respect to factors that influence odor detection, the misattribution of symptoms to a particular odor source, and memory reconstruction. However, Dr. Dalton's testimony

[98] *Nale*, 505 F. Supp. 3d at 645; *Schmidt v. MTD Prod., Inc.*, 04-3412, 2006 WL 5127539, at *3 (E.D. La. July 5, 2006).
[99] *See* Dalton Rep., R. Doc. 542-3. Opinion Nos. 4 and 7 contain Dr. Dalton's rebuttal of Plaintiffs' experts' opinions. *See id.* at pp. 10-12; 18-19. With the exception of any testimony that contravenes the Court's General Causation Order, Dr. Dalton's rebuttal of Plaintiffs' experts' opinions, as expressed in Opinion Nos. 4 and 7, is not excluded to the extent Plaintiffs' experts testify to those opinions. *See* General Causation Order, R. Doc. 323.
[100] R. Doc. 542.

with respect to Opinion No. 2 is limited to the extent she opines on the credibility of the Trial Plaintiffs.

**New Orleans, Louisiana, this 10th day of August, 2024.**

Susie Morgan

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**