**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **FREDERICK E. ADDISON, SR., ET AL.,**<br>**Plaintiffs** | **CIVIL DOCKET** |
| **VERSUS** | **NO. 19-11133**<br>**c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL COMPANY, ET AL.,**<br>**Defendants** | **SECTION: "E" (5)** |

***Applies to: Both Cases***

**ORDER AND REASONS**

Before the Court is a contested Motion in Limine filed by Defendants seeking to exclude the testimony of Plaintiffs' medical causation expert, Dr. Robert DeLorenzo.[1] Plaintiffs filed a memorandum in opposition.[2] Defendants filed a reply in support of their Motion in Limine.[3]

**BACKGROUND**

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana (the "Landfill"), and the resulting odors emitted from the Landfill between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which contains over 500 individual

[1] R. Doc. 562.
[2] R. Doc. 599.
[3] R. Doc. 621.

Plaintiffs.[4] Plaintiffs assert negligence and nuisance claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to operate the Landfill; Aptim Corporation, which managed the gas and leachate collection systems of the Landfill from July 2017 to May 2019; and three entities that operated the Landfill from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc.[8]

On November 5, 2019, the Court issued the first Case Management Order ("CMO"), which established a bifurcated litigation schedule under which the issue of general causation would be resolved first.[9] The Court held a trial on general causation in early 2022.[10] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[11] determining that, during the relevant time period: (1) odors and gases were emitted by the Landfill;[12] (2) the emissions of gases and odors from the Landfill occurred during the relevant time period;[13] and (3) exposure to the odors and gases emitted by the Landfill at a level of five parts per billion for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction."[14] Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial

---

4 *See generally* Second Amended Complaint, R. Doc. 431. Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc. See* R. Doc. 48 (18-7889).
5 *See* Second Amended Complaint, R. Doc. 431 at p. 64.
6 Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
7 Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
8 Second Amended Complaint, R. Doc. 431 at pp. 52-53.
9 R. Doc. 80 at pp. 1-2.
10 R. Docs. 274-278, 286-289.
11 R. Doc. 323.
12 *Id.* at p. 5.
13 *Id.* at p. 26.
14 *Id.* at p. 27.

be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[15] The first *Addison* trial was set to begin on September 5, 2023,[16] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[17]

The Defendants timely filed their Motion in Limine seeking to preclude Plaintiffs' medical causation expert, Dr. Robert DeLorenzo, from testifying at trial.

## LEGAL STANDARD

### I. Federal Rule of Evidence 702 Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[18]

Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[19] Thus, the threshold inquiry is whether the expert witness possesses the requisite qualifications to render an opinion on particular subject matter.[20]

If the expert's qualifications are found to be sufficient, the court must then examine whether the expert's opinions are reliable and relevant.[21] The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[22] provides the

---

[15] *Id.* at pp. 44, 46. *See also* R. Doc. 642 (defining the Allowed Injuries).
[16] R. Doc. 340.
[17] R. Doc. 495.
[18] Fed. R. Evid. 702.
[19] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).
[20] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").
[21] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).
[22] 509 U.S. 579 (1993).

analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid,'"[23] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[24] The party offering the expert opinion must show by a preponderance of the evidence that the expert's testimony is reliable and relevant.[25]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[26] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[27] With respect to the proper scope of expert testimony, Rule 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[28] Nevertheless, "[i]f the expert's testimony brings no more to the finder of fact than the lawyers can offer in argument, the expert's opinions should be excluded."[29]

"[A]n expert may never render conclusions of law,"[30] as that "would constitute an invasion of 'the province of the court to determine the applicable law and to instruct the

---

[23] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).
[24] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).
[25] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).
[26] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).
[27] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).
[28] FED. R. EVID. 704.
[29] *Sudo Props., Inc. v. Terrebone Par. Consol. Gov't*, 04-2559, 2008 WL 2623000, at *8 (E.D. La. July 2, 2008).
[30] *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009).

jury as to that law.'"[31] Allowing such expert testimony in a jury trial is both unhelpful and harmful because

> the jury would be very susceptible to adopting the expert's conclusion rather making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the [expert]'s experience and expertise, it might think the witness even more reliable than the judge. If an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury.[32]

Accordingly, expert testimony that offers a legal opinion is inadmissible.[33] Moreover, "expert testimony on matters which a jury is capable of understanding and deciding without an expert's help should be excluded,"[34] because expert testimony is appropriate only when it will assist the trier of fact.[35]

**LAW AND ANALYSIS**

Plaintiffs offer Dr. Robert DeLorenzo, M.D., Ph.D., M.P.H., a professor of Neurology and Ph.D. in Pharmacology, as their medical causation expert.[36] Dr. DeLorenzo examined each of the Trial Plaintiffs and "provide[s] expert opinions on the effect of exposure to hydrogen sulfide and Volatile Organic Compounds ("VOCs") that emanated from the Jefferson Parish Landfill during the relevant time period."[37]

---

[31] *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991) (quoting *United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988)); *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996); *Goodman*, 571 F.3d at 399.
[32] *Cefalu v. Edwards*, 2013 WL 5592947, at *1 (quoting *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997)); *see also Jarrow v. Cupit*, 99-3539, 2000 WL 1537989, at *2 (E.D. La. Oct. 17, 2000) ("[I]t is the Court's role, not that of one party's expert witness, to instruct the jury on the law of this case. The law 'requires only one spokesperson . . . who of course is the judge." (quoting *Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988))).
[33] *Estate of Sowell v. United States of America*, 198 F.3d 169 (5th Cir. 1999); *Askanase*, 130 F.3d at 669.
[34] *Jarrow*, 2000 WL 1537989, at *2.
[35] *Id.* Rule 702 requires the expert's knowledge must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).
[36] R. Doc. 599, p. 1.
[37] *Id.*; R. Doc. 568-2, p. 14.

In his report, beyond evaluating each Trial Plaintiff, Dr. DeLorenzo describes how humans are affected by exposure to hydrogen sulfide and explains that the combination of exposure to hydrogen sulfide and VOCs irritates and exacerbates symptoms like "irritated eyes, irritated nasal passages, irritated throats, and irritated bronchi . . . [which] causes eye tearing, runny noses, coughing, and exacerbates asthma and other pre-existing breathing difficulties."[38] He opines that based on "(a) the air modeling done by Mr. Lape and the emissions calculations by Dr. Pietari and Mr. Sananes, (b) the overlap of characteristics between the hydrogen sulfide and VOCs measures in the trial plaintiffs' communities with the hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill, and (c) the statements of Jefferson Parish officials and Louisiana officials confirming the landfill as the primary source of emissions," the malodors experienced by the Trial Plaintiffs were mostly comprised of hydrogen sulfide and that the landfill was the source of exposure to hydrogen sulfide and VOCs.[39] As a result, Dr. DeLorenzo opines that the combination of hydrogen sulfide and VOC emissions from the Jefferson Parish Landfill "were a substantial cause of the health complaints reported by the trial plaintiffs during the relevant time period, including headaches, nausea, vomiting, dizziness, sleep disruption, fatigue, loss of appetite, and irritation of the eyes, nose and throat," that exposure to these emissions decreased their quality of life, and more likely than not caused some of the Trial Plaintiffs' symptoms to persist to this day.[40]

Defendants argue in their motion in limine that this Court should preclude Dr. DeLorenzo from (1) offering testimony as to any injuries occurring outside the relative time period, which the Court has previously set in this matter, or offering testimony of

[38] *Id.* at p. 16.
[39] *Id.* at p. 17.
[40] *Id.* at pp. 17-18.

pre-determined "Non-Allowed Injuries," and (2) that Dr. DeLorenzo has not produced any reliable methodology to support that the Plaintiffs were exposed to VOCs in addition to hydrogen sulfide.[41] With respect to the non-allowed injuries, Defendants argue Dr. DeLorenzo improperly "opines on numerous injuries and symptoms that either fall outside of the relevant time period,[42] or for which Plaintiffs failed to establish general causation regardless of the time period."[43] For one, Defendants argue Dr. DeLorenzo seeks to testify regarding numerous injuries, such as allergies, coughing, nosebleeds, eye, nose, and throat irritation, asthma exacerbation, and others, beyond the scope of the Court's determination of the "Allowed Injuries."[44] Defendants also argue that Dr. DeLorenzo seeks to testify as to symptoms and chronic injuries "persisting to this day," which is outside the scope of the relevant time period.[45] Finally, Defendants argue Dr. DeLorenzo conceded that exposure to hydrogen sulfide over 5 ppb was not known to cause the "Non-Allowed Injuries nor other chronic injuries."[46]

With regard to VOCs, Defendants argue Dr. DeLorenzo lacks evidence that the Trial Plaintiffs were actually exposed to VOCs, which should prevent him from testifying as to Plaintiffs' injuries as a result of VOC exposure.[47] Defendants argue that, as a result, Dr. DeLorenzo's testimony regarding "VOC exposure is inherently unreliable and must be rejected."[48]

---

[41] R. Doc. 562, p. 1.
[42] This Court previously determined at the General Causation trial the relevant time period for Plaintiffs' injuries is from July 1, 2017-December 31, 2019. R. Doc. 323, p. 1.
[43] R. Doc. 562-1, p. 3.
[44] *Id.* at p. 4; *See* R. Doc. 642, pp. 3-4.
[45] R. Doc. 562-1, p. 5.
[46] *Id.*
[47] *Id.* at p. 15.
[48] *Id.* at p. 17.

In opposition, Plaintiffs first argue that many of the symptoms Dr. DeLorenzo seeks to opine on are synonymous with the "Allowed Injuries," and chronic conditions represent "long-lasting clinical effects" of those injuries.[49] Plaintiffs argue that because Dr. DeLorenzo is a new expert, he should be permitted to testify as to specific causation regarding hydrogen sulfide and VOC exposure pursuant to the Court's minute entry limiting the subject of motions in limine prior to the *Addison* trial to new experts or to new opinions by existing experts that were not covered in the general causation trial.[50] Plaintiffs argue Dr. DeLorenzo should be "permitted to testify on the full extent of injuries caused by emissions" from the landfill because many of the conditions Defendants object to are either identical or related to the Allowed Injuries, and "semantics" should not limit Dr. DeLorenzo's testimony.[51] Plaintiffs also argue Defendants "conflate a finding [on] general causation as to the mechanism of injury," and Dr. DeLorenzo relies on studies and other sources to support his testimony that "hydrogen sulfide exposure can cause long lasting clinical effects."[52]

Second, Plaintiffs argue there is sufficient record evidence to allow Dr. DeLorenzo to testify as to the Trial Plaintiffs' exposure to VOCs.[53] For example, Plaintiffs point to this Court's statement in its General Causation Findings of Fact and Conclusions of Law that "other compounds present in the Landfill's emissions enhanced the intensity of the bad odor . . . VOCs, even where individually below odor detection thresholds, can have an additive, sub-additive, or synergistic effect to enhance the bad odors."[54] Plaintiffs argue

---

[49] R. Doc. 599, p. 4.
[50] *Id.* at p. 6; R. Doc. 517, p. 2.
[51] R. Doc. 599, p. 6.
[52] *Id.* at p. 7.
[53] *Id.* at p. 4.
[54] *Id.* at p. 4 (quoting R. Doc. 323, p. 34-35).

Dr. DeLorenzo should be able to testify as to how "the odors and VOCs from the [landfill] were annoying, interrupted their daily lives, and caused physiological effects as a result of the psychological irritation of the brain."[55] Further, Plaintiffs argue "[l]ow levels of VOCs, in combination with [hydrogen sulfide] caused this annoyance, and it is the 'synergistic effect' of the VOCs that enhance the bad odors."[56] Plaintiffs argue that, "since these chemicals travel with hydrogen sulfide as essential parts of the odor clouds[,] logic requires that where Mr. Lape's air modeling shows exposure to hydrogen sulfide at a Trial Plaintiff's residence, there was also exposure to VOCs . . . ."[57] Plaintiffs argue "specific causation analysis is not necessary for VOCs by themselves as Plaintiffs are not claiming that their injuries were solely caused by exposure to VOCs."[58]

## I. Dr. DeLorenzo may testify as to specific medical causation for particular Trial Plaintiffs with respect to hydrogen sulfide because he relies on the expertise of James Lape in forming his medical opinions.

Dr. DeLorenzo may testify as to his evaluation of each particular Trial Plaintiff and his opinion that his or her Allowed Injuries were caused by exposure to hydrogen sulfide. Dr. DeLorenzo relies upon the modeling of James Lape to support his opinion that each of the Trial Plaintiffs was exposed to hydrogen sulfide at levels at or exceeding 5 ppb for 30 and 60 minute increments from the years 2017-2019.[59] Further, Dr. DeLorenzo examined each Trial Plaintiff, reviewed their medical history, and reached the following conclusions:[60]

---

[55] *Id.* at p. 5.
[56] *Id.* at p. 4
[57] *Id.*
[58] *Id.*
[59] R. Doc. 568-2, pp. 15-16.
[60] Dr. DeLorenzo's medical opinions include Non-Allowed Injuries and mention of VOCs, which Defendants challenge. The Court addresses the Non-Allowed Injuries and VOCs in subsequent sections.

For A.G., Dr. DeLorenzo states that her injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 184 odor events in 2017, 361 odor events in 2018, and 156 odor events in 2019.[61] A.G. was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 84 odor events in 2017, 180 odor events in 2018, and 73 odor events in 2019.[62]

For B.G., Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 184 odor events in 2017, 361 odor events in 2018, and 156 odor events in 2019.[63] B.G. was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 84 odor events in 2017, 180 odor events in 2018, and 73 odor events in 2019.[64]

For Scott Gremillion, Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 184 odor events in 2017, 361 odor events in 2018, and 156 odor events in 2019.[65] Scott Gremillion was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 84 odor events in 2017, 180 odor events in 2018, and 73 odor events in 2019.[66]

For Wendy Gremillion, Dr. DeLorenzo states that her injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill

---

[61] R. Doc. 568-2, p. 23.
[62] *Id.*
[63] *Id.* at pp. 29-30.
[64] *Id.*
[65] *Id.* at p. 36.
[66] *Id.*

at levels exceeding 5 ppb over 30 minutes: 184 odor events in 2017, 361 odor events in 2018, and 156 odor events in 2019.[67] Wendy Gremillion was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 84 odor events in 2017, 180 odor events in 2018, and 73 odor events in 2019.[68]

For Geneva Green, Dr. DeLorenzo states that her injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 193 odor events in 2017, 502 odor events in 2018, and 278 odor events in 2019.[69] Geneva Green was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 119 odor events in 2017, 285 odor events in 2018, and 175 odor events in 2019.[70]

For Vernice Lewis, Dr. DeLorenzo states that her injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 53 odor events in 2017, 163 odor events in 2018, and 86 odor events in 2019.[71] Vernice Lewis was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 20 odor events in 2017, 72 odor events in 2018, and 32 odor events in 2019.[72]

For Tyrone Thompson, Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 53 odor events in 2017, 163 odor events in 2018, and 86 odor events in 2019.[73] Tyrone Thompson was also exposed to hydrogen sulfide

[67] *Id.* at p. 43.
[68] *Id.*
[69] *Id.* at p. 51.
[70] *Id.*
[71] *Id.* at p. 59.
[72] *Id.* at p. 60.
[73] *Id.* at p. 67.

during odor events exceeding 5 ppb for over 60 minutes: 20 odor events in 2017, 72 odor events in 2018, and 32 odor events in 2019.[74]

For Terrance Thompson, Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 53 odor events in 2017, 163 odor events in 2018, and 86 odor events in 2019.[75] Terrance Thompson was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 20 odor events in 2017, 72 odor events in 2018, and 32 odor events in 2019.[76]

For Stanley Myers, Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 123 odor events in 2017, 240 odor events in 2018, and 101 odor events in 2019.[77] Stanley Myers was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 57 odor events in 2017, 110 odor events in 2018, and 45 odor events in 2019.[78]

For Reshaun Richardson, Dr. DeLorenzo states that her injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 86 odor events in 2017, 205 odor events in 2018, and 122 odor events in 2019.[79] Reshaun Richardson was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 37 odor events in 2017, 96 odor events in 2018, and 48 odor events in 2019.[80]

---

74 *Id.*
75 *Id.* at p. 74.
76 *Id.*
77 *Id.* at p. 84.
78 *Id.*
79 *Id.* at p. 94.
80 *Id.*

For Andrew Section, Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 129 odor events in 2017, 263 odor events in 2018, and 159 odor events in 2019.[81] Andrew Section was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 68 odor events in 2017, 153 odor events in 2018, and 84 odor events in 2019.[82]

For Jonathan Tate, Dr. DeLorenzo states that his injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 234 odor events in 2017, 495 odor events in 2018, and 330 odor events in 2019.[83] Jonathan Tate was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 115 odor events in 2017, 272 odor events in 2018, and 173 odor events in 2019.[84]

For Mary Ann Winningkoff, Dr. DeLorenzo states that her injuries were more likely than not caused by exposure to hydrogen sulfide emitted by the Jefferson Parish Landfill at levels exceeding 5 ppb over 30 minutes: 209 odor events in 2017, 390 odor events in 2018, and 231 odor events in 2019.[85] Mary Ann Winningkoff was also exposed to hydrogen sulfide during odor events exceeding 5 ppb for over 60 minutes: 117 odor events in 2017, 226 odor events in 2018, and 136 odor events in 2019.[86]

Because Dr. DeLorenzo relied on Mr. Lape's air modelling data, scientific studies, Dr. Schiffman's testimony as to VOCs, his expertise and experience as a neurologist and

---

[81] *Id.* at p. 102.
[82] *Id.*
[83] *Id.* at p. 111.
[84] *Id.*
[85] *Id.* at p. 120.
[86] *Id.*

pharmacologist, and his examination of the Trial Plaintiffs and their medical history, the Court will allow Dr. DeLorenzo to testify to specific causation at trial regarding each particular Trial Plaintiff's hydrogen sulfide exposure and whether that exposure more likely than not caused the Plaintiffs' Allowed Injuries. Dr. DeLorenzo's reliance on Mr. Lape's modeling of Plaintiffs' hydrogen sulfide exposure and Dr. Schiffman's testimony is sufficient evidence for a "reasonable person [to] conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains."[87]

## II. Dr. DeLorenzo may not testify as to any injuries other than the "Allowed Injuries," nor may he testify to any injuries that extend beyond the relevant time period pursuant to this Court's previous rulings.

In the Court's Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order,") the Court determined the "Allowed Injuries" were headaches, nausea, vomiting, loss of appetite, sleep disruption, dizziness, fatigue, anxiety and worry, and decrease in quality of life.[88] In its July 3, 2024 Order and Reasons, the Court further explained that the Allowed Injuries included "additional injuries identified as being encompassed by the categories of injuries, all to include:

> Headaches, nausea, vomiting, gagging, loss of appetite, sleep disruption, dizziness, lightheadedness, fatigue, lethargy, decrease in energy level, anxiety and worry, stress, concern regarding long term effects, decreased focus, crying, a decrease in quality of life, decreased productivity, feeling sad and overwhelmed, a decrease in mood, depression, and a loss of enjoyment or use of property in the general population.[89]

Beyond these enumerated injuries, the Court explicitly held in its General Causation Findings of Fact that Plaintiffs had failed to prove with a preponderance of the

---

[87] *Harrison v. BP Expl. & Prod. Inc.*, No. CV 17-4346, 2022 WL 2390733, *6 (E.D. La. July 1, 2022) (quoting *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996)).
[88] R. Doc. 323, pp. 35-41.
[89] R. Doc. 642, pp. 3-5.

evidence that hydrogen sulfide emissions can cause injuries such as "irritation to the eyes, nose, or throat; coughing; trouble breathing; asthma; skin irritation; burning lungs; nose bleeds; neurological issues; and COPD."[90]

Plaintiffs make similar arguments as to those made in opposition to Defendants' motion for partial summary judgment "to Dismiss Certain Claims for Lack of Evidence of General Causation."[91] There, Plaintiffs argued they had "reliable expert testimony . . . to prove general causation" for all injuries, including those which are chronic in nature and have persisted beyond the relevant time period.[92] The Court granted partial summary judgment for the Defendants and held that because Plaintiffs "must prove general causation as to each injury claimed, Plaintiffs only, as a matter of law, proved general causation for the allowed injuries."[93] The Court emphasized that "[a]t trial, Plaintiffs only may assert claims for the Allowed Injuries and seek recovery only for damages suffered during the relevant time period."[94] Plaintiffs may only put forth specific causation evidence for injuries for which they have already established general causation.[95]

As reasoned in its July 3, 2024 Order, Plaintiffs may not seek to prove Non-Allowed Injuries at trial, such as coughing, eye, throat, and nasal irritation, asthma, and the like.[96] Plaintiffs also may not seek to prove any injuries that occurred outside the Relevant Time Period, including any testimony regarding chronic conditions, even if related to the Allowed Injuries.[97]

---

[90] R. Doc. 323, p. 42.
[91] *See* R. Doc. 561; R. Doc. 597.
[92] R. Doc. 642, p. 12 (quoting R. Doc. 597, p. 2, 5).
[93] *Id.* at p. 13.
[94] *Id.*
[95] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007).
[96] R. Doc. 642.
[97] *Id.*

Therefore, Dr. DeLorenzo may not testify regarding specific causation as to any "Non-Allowed" injuries beyond those enumerated in the Court's July 3, 2024 Order.[98] He may not testify as to injuries beyond the relevant time period. Dr. DeLorenzo may testify only as to the Allowed Injuries that occurred during the relevant time period of July 1, 2017 to December 31, 2019.[99]

III. **Dr. DeLorenzo may testify regarding VOCs only with respect to the VOCs' ability to enhance the damages or effects of hydrogen sulfide odors experienced by the Trial Plaintiffs. Dr. DeLorenzo may not testify (1) that VOCs alone caused any Allowed or Non-Allowed Injuries or that (2) the VOCs alter the Court's determination of the necessary 5 ppb over 30 minutes exposure level to hydrogen sulfide.**

The Court finds that Dr. DeLorenzo reasonably relies upon the expert reports and opinions of Dr. Schiffman and Mr. Lape as well as the MAML data on VOCs[100] to support his opinion that "the hydrogen sulfide and VOC emissions from the Jefferson Parish Landfill were a substantial cause of the health complaints reported by the trial plaintiffs during the relevant time period . . . ."[101] As described above, Dr. Lape opines on the specific

[98] *Id.* at pp. 3-5.

[99] As stated in the Court's July 3, 2024 Order and Reasons, "The undisputed fact that the Addison Plaintiffs only seek damages incurred within the relevant time period is further supported by the representations of Plaintiffs' counsel Eric Rowe to the Court, as recorded in the transcript of the general causation trial:

> The Court: [W]hat [is] the time period [] that they're asking for damages[?]
> [Eric] Rowe: . . . If they had asked us the question, are you asking for damages into 2020, we would have said no. We've only modeled the years 2017, 2018, and 2019.
> The Court: Okay. That was my understanding, too. So that is – you're correct on that. They're only asking for damages through 2019.

*See* Gen. Causation Tr., R. Doc. 229 at 756:6-22. Further, after the general causation trial, the Court requested via email that the Plaintiffs 'clarify the exact time period for which they are requesting damages during 2017 to 2019 (month and date).' R. Doc. 561-6 at p. 2. In response, Plaintiffs' counsel in the Class Action, Jason Landry, confirmed that 'Plaintiffs are seeking damages from July 1, 2017 through December 31, 2019 for Plaintiffs in the [Landfill's] surrounding areas on the West Bank (Waggaman, Avondale) and across the river (South Kenner, River Ridge, and Harahan).' *Id.*" R. Doc. 642, n.77.

[100] Dr. DeLorenzo cites the MAML data on VOCs in support of his opinions. R. Doc. 568-2, p. 17 ("Based upon . . . the overlap of characteristics between the hydrogen sulfide and VOCs measured in the trial plaintiffs' communities with the hydrogen sulfide and VOCs emitted by the Jefferson Parish Landfill . . . .") (citing MAML reports from 2/19/2018, 4/27/2018, and 7/20/2018).

[101] *Id. See id.*, n. 22-24. Dr. DeLorenzo cites the reports of Mr. Lape, Dr. Pietari, Mr. Sananas, three MAML reports from 2018, Louisiana Department of Health reports, and other data in reaching his opinions. Dr. DeLorenzo also relies upon Dr. Schiffman's expert reports, two of her scholarly articles, and her testimony at the general causation trial. *Id.* at p. 6, 11, 13.

levels and number of occasions each Trial Plaintiff was exposed to hydrogen sulfide at his or her residence.[102] As she testified at the general causation trial, Dr. Schiffman opines that particular VOC emissions combined with hydrogen sulfide worsened the effects of the exposure and contributed to the extent of the Trial Plaintiffs' injuries.[103] Dr. Schiffman also presents LDEQ's studies that show that, of the 35 VOCs identified in the Landfill, 29 also were found in the neighborhoods in River Ridge and Waggaman where Plaintiffs resided.[104] She describes scientific evidence that low-level VOC exposure in the air enhances the effects of hydrogen sulfide's odor and manifestation of symptoms in humans.[105] The Court has ruled that Dr. Schiffman may testify about the background level of VOCs, as measured by LDEQ.[106]

Furthermore, the Court finds the Plaintiffs do not advance a theory that the VOCs alone actually caused injuries to the Trial Plaintiffs. If they had, Plaintiffs would be required to identify a "necessary dose of exposure" for Plaintiffs to prove specific causation.[107] Rather, "it is the synergistic effect of the VOCs that *enhance the bad odors*" of hydrogen sulfide.[108] In other words, there is sufficient record evidence that the existence of airborne VOCs, combined with the modeled evidence of hydrogen sulfide emissions, affected the Trial Plaintiffs' perception of the odors and the damages Plaintiffs'

---

[102] *See id.* at pp. 15-16.
[103] R. Doc. 323, p. 35 ("Dr. Schiffman found this subset [of VOCs present at the Landfill and in River Ridge and Waggamn] when combined with hydrogen sulfide, is sub-additive or additive, enhancing the intensity of the bad odor.").
[104] R. Doc. 563-4, p. 28 (excerpt of LDEQ MAML evaluation of VOCs in relevant locations).
[105] *See id.* at pp. 32-35 (describing studies as to each allowed injury which found that when subjects were exposed to hydrogen sulfide in a chamber with VOCs versus a chamber of clean air, subjects far more often reported symptoms in chambers containing VOCs).
[106] *See id.* at p. 28 (Table 3f of "Volatile organic compounds found in grab canisters in River Ridge and Waggaman as well as JPLF in July 2018").
[107] *See Harrison v. BP Expl. & Prod. Inc.*, No. CV 17-4346, 2022 WL 2390733, *6 (E.D. La. July 1, 2022).
[108] R. Doc. 599, p. 5 (emphasis added).

incurred as a result.[109] The Court mentioned this "synergistic effect" in its General Causation Findings of Fact and Conclusions of Law and "explained that the literature and [Dr. Schiffman's] studies have found that combinations of VOCs [have a] . . . synergistic effect to enhance the bad odor" of hydrogen sulfide.[110]

In his report, Dr. DeLorenzo specifically relies upon Dr. Schiffman's expert report, her testimony at the General Causation trial, and several academic studies on the effects of the combination of hydrogen sulfide and VOCs, to support his conclusions.[111] Dr. DeLorenzo describes the interaction of the VOCs and hydrogen sulfide as part of his evaluation of each Trial Plaintiffs' injuries and states that this mixture caused the odors, which caused Plaintiffs' injuries.[112] Because Dr. DeLorenzo adequately relies on the expertise of Dr. Schiffman, the MAML data, and other scientific evidence in opining on the effect of the hydrogen sulfide odors, as enhanced by the existence of VOCs in the air, he will be permitted to testify as such at trial. Any perceived inadequacy as to the bases of Dr. DeLorenzo's testimony regarding the effect of the mixture of hydrogen sulfide and VOCs on Plaintiffs' injuries may be addressed through cross-examination.[113]

---

[109] Defendants argue that the Fifth Circuit case *Allen v. Pennsylvania Engineering Corp.* requires that Dr. DeLorenzo's testimony as to VOCs be excluded. 102 F.3d 194 (5th Cir. 1996). In *Allen*, the Fifth Circuit affirmed a district court's finding that an expert failed to produce any "scientifically valid basis for [their] conclusion." *Id.* at 198. There, the expert also failed to rely on facts "reasonably relied on by other experts in the field" because there was no evidence of the level at which the chemical was capable of causing injury and no evidence the plaintiff was actually exposed to the chemicals. *Id.* at 199. In this matter, there is evidence of the "normal" level of VOCs in the Plaintiffs' neighborhoods and ample scientific evidence as to the effects of hydrogen sulfide and VOCs on producing odors and enhancing symptoms. This is the subject of Dr. Schiffman's expert testimony, which the Court recognized at the general causation trial, and Dr. DeLorenzo relies on Dr. Schiffman's testimony. R. Doc. 323; R. Doc. 562-2.

[110] R. Doc. 323, pp. 34-35.

[111] R. Doc. 568-2, pp. 6-13.

[112] *See generally id.*

[113] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

However, as explained above, Dr. DeLorenzo is *not* permitted to testify as to any Non-Allowed injuries. This prevents Dr. DeLorenzo from opining that "the combination of hydrogen sulfide with normal-level VOCs irritates the mucus membranes resulting in irritated eyes, irritated nasal passages, irritated throats, and irritated bronchi, which in turn, causes eye tearing, runny noses, coughing, and exacerbates asthma and other pre-existing breathing difficulties."[114] Because the Court found that Plaintiffs failed to prove general causation as to these injuries based on exposure to hydrogen sulfide,[115] the Plaintiffs may not include these additional injuries. Further, Plaintiffs did not prove at the general causation trial that any VOCs have the capacity to cause any non-allowed injuries, either on their own, or in combination with hydrogen sulfide.[116] Plaintiffs did not adequately prove general causation as to any Non-Allowed Injuries, regardless of the substance they allege caused the injuries. Plaintiffs also confirm they "are not claiming that any Trial Plaintiff was harmed by exposure to VOCs alone-and none of the injuries for which general causation was determined was based on exposure to VOCs by themselves."[117]

Additionally, Dr. DeLorenzo may not offer testimony regarding any level of hydrogen sulfide below 5 ppb that, in combination with VOCs, may cause injuries, regardless of any other expert opinion stating otherwise. For similar reasons as to those stated above, because Plaintiffs did not prove at the general causation trial any theory that VOCs in combination with hydrogen sulfide cause injury at a lower ppb level, they will not

---

[114] R. Doc. 568-2, p. 16.
[115] R. Doc. 323, p. 42.
[116] *See generally* R. Doc. 323. [116] *See Harrison v. BP Expl. & Prod. Inc.*, No. CV 17-4346, 2022 WL 2390733, *6-7 (E.D. La. July 1, 2022) (excluding an expert under *Daubert* when the expert 1) failed to identify a level of exposure himself and 2) failed to rely upon other experts' determination of exposure levels).
[117] R. Doc. 599, p. 4.

be allowed to produce evidence that contradicts the Court's finding as to the minimum 5 ppb of hydrogen sulfide sufficient to cause the Allowed Injuries in the Trial Plaintiffs.[118]

Accordingly;

## CONCLUSION

**IT IS ORDERED** that Defendants' Motion in Limine is **GRANTED IN PART AND DENIED IN PART** as stated herein.[119]

Dr. DeLorenzo may testify as to his specific causation medical opinion with respect to each individual Trial Plaintiff and their Allowed Injuries during the relevant time period. Additionally, Dr. DeLorenzo may testify that the combination of hydrogen sulfide and VOCs enhanced the hydrogen sulfide odor experienced by Plaintiffs, which is relevant to Trial Plaintiffs' claimed injuries and damages at trial.

Dr. DeLorenzo may not testify as to any injuries other than the Allowed Injuries. Dr. DeLorenzo may not testify to any chronic conditions or injuries occurring outside the relevant time period in this matter, which is between July 1, 2017, and December 31, 2019. Dr. DeLorenzo may not testify that VOCs alone specifically caused Plaintiff's Allowed Injuries or any Non-Allowed Injuries. Dr. DeLorenzo may not testify that the combination of VOCs and any level of hydrogen sulfide below 5 ppb is capable of causing any injuries.

**New Orleans, Louisiana, on this 10th day of August, 2024.**

Susie Morgan

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[118] *See* R. Doc. 323, p. 44.
[119] R. Doc. 562.