## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FREDERICK E. ADDISON, SR., ET AL.,**<br>    **Plaintiffs** | **CIVIL DOCKET** |
| **VERSUS** | **NO.  19-11133**<br>    **c/w 19-14512** |
| **LOUISIANA REGIONAL LANDFILL**<br>**COMPANY, ET AL.,**<br>    **Defendants** | **SECTION: "E" (5)** |

*Applies to: Both Cases*

### ORDER AND REASONS

Before the Court is Plaintiffs' motion to exclude argument and expert testimony on issues litigated in the General Causation Hearing (the "Motion in Limine").[1] The Defendants filed a joint memorandum in opposition.[2] Plaintiffs filed a reply.[3]

### BACKGROUND

This case concerns the operation of the Jefferson Parish Landfill in Waggaman, Louisiana ("JPLF"), and the resulting odors emitted from the JPLF between July 1, 2017, and December 31, 2019 (the "relevant time period"). Plaintiffs, who are Jefferson Parish residents, filed several individual lawsuits that were consolidated into a mass action, *Addison v. Louisiana Regional Landfill Co.*, which includes over 500 individual Plaintiffs (the "*Addison* Action").[4] Plaintiffs assert negligence and nuisance claims under Louisiana state law[5] against Defendants: Jefferson Parish, which owns and contracts with others to

---

[1] R. Doc. 554.
[2] R. Doc. 598.
[3] R. Doc. 610.
[4] *See generally* Second Amended Complaint, R. Doc. 431.
[5] *See id.* at p. 64.

operate the JPLF; Aptim Corporation, which managed the gas and leachate collection systems of the JPLF from July 2017 to May 2019; and three entities that operated the JPLF from May 2013 to December 2020: Louisiana Regional Landfill Company;[6] Waste Connections Bayou, Inc.;[7] and Waste Connections US, Inc. (collectively, the "Defendants").[8] Jefferson Parish residents also filed several related class actions, which were consolidated into one case, *Ictech-Bendeck v. Waste Connections Bayou, Inc.* (the "Class Action").[9]

On November 5, 2019, the Court issued the first Case Management Order ("CMO"), proposed by the parties, which established a bifurcated litigation schedule under which the issue of general causation would be resolved first by the judge in the *Addison* and Class Actions.[10] The first CMO and CMOs issued subsequently define the issue of "general causation" as "the determination of whether odors and gases were being emitted by [the JPLF] during the relevant time period and whether any such odors and gases were capable of producing the injuries claimed by any one or more of the Plaintiffs in this case."[11] This definition incorporates three elements: (1) whether odors and gases were emitted by the JPLF; (2) whether the gases and odors were emitted during the relevant time period; and (3) whether the emitted odors and gases were capable of producing the injuries claimed by any one or more of the Plaintiffs.[12] The parties consented to the Court serving as trier

---

[6] Louisiana Regional Landfill Company is formerly known as IESI LA Landfill Corporation.
[7] Waste Connections Bayou, Inc. is formerly known as Progressive Waste Solutions of LA, Inc.
[8] Second Amended Complaint, R. Doc. 431 at pp. 52-53.
[9] *See* R. Doc. 48 (18-7889).
[10] R. Doc. 80 at pp. 1-2.
[11] *See, e.g.*, *id.* at p 2 (First Case Management Order); R. Doc. 202 (Seventh Case Management Order).
[12] *See* R. Doc. 323 at p. 4.

of fact on the issue of general causation for the *Addison* and Class Actions, and agreed resolution of the issue would "help narrow the focus of the case and the issues."[13]

The Court held a trial on general causation in both the *Addison* and Class Actions in early 2022 (the "General Causation Hearing").[14] On November 29, 2022, the Court issued its Findings of Fact and Conclusions of Law as to General Causation (the "General Causation Order"),[15] determining that: (1) odors and gases were emitted by the JPLF;[16] (2) the emissions of gases and odors from the JPLF occurred during the relevant time period;[17] and (3) exposure to the odors and gases emitted by the JPLF at a level of five parts per billion ("ppb") for thirty minutes "is sufficient by itself for individuals generally to be able to smell hydrogen sulfide and for the exposure to cause a reaction,"[18] and to cause certain Allowed Injuries "in the general population."[19] The Court's Order and Reasons issued on July 3, 2024 (the "July 3 Order"), clarified the scope of the Court's general causation findings with respect to the Allowed Injuries and the relevant time period.[20]

Having found that Plaintiffs established general causation for certain Allowed Injuries, the Court ordered that a trial be conducted with a select number of *Addison* Plaintiffs (the "Trial Plaintiffs").[21] The first *Addison* trial was set to begin on September

---

[13] R. Doc. 202 at pp. 2, 8.
[14] R. Docs. 274-278, 286-289.
[15] R. Doc. 323.
[16] *Id.* at p. 5.
[17] *Id.* at p. 26.
[18] *Id.* at p. 27.
[19] *Id.* at pp. 35-44.
[20] R. Doc. 642 at pp. 4-5 (defining the Allowed Injuries); *id.* at p. 14 (granting summary judgment on "on Plaintiffs' claims for injuries not included in the Allowed Injuries or for damages as a result of those Allowed Injuries outside the relevant time period of July 1, 2017 through December 31, 2019").
[21] R. Doc. 323 at pp. 44, 46.

5, 2023,[22] and has since been continued to begin on August 12, 2024 (the "first *Addison* Trial").[23]

      Plaintiffs timely filed the instant Motion in Limine seeking to preclude Defendants from offering argument and expert testimony on issues adjudicated in the General Causation Hearing under the law-of-the-case doctrine and Federal Rule of Evidence 704, arguing "these facts and issues should be presented to the jury as having been decided."[24]

## LEGAL STANDARD

### I.    Motion in Limine Standard

      "It is well settled that motions in limine are disfavored."[25] "[T]he purpose of a motion in limine is to prohibit opposing counsel 'from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' mind.'"[26] "Evidence is relevant" if "it has *any* tendency to make a fact . . . of consequence in determining the action" "more or less probable than it would be without the evidence."[27] "Evidence which is not relevant is not admissible."[28] Under Federal Rule of Evidence 403, the Court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."[29] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an

---

[22] R. Doc. 340.
[23] R. Doc. 495.
[24] R. Doc. 554 at p. 2.
[25] *Auenson v. Lewis*, 94-2734, 1996 WL 457258, at *1 (E.D. La. Aug. 12, 1996) (citing *Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)).
[26] *MGMTL, LLC v. Strategic Tech.*, 20-2138, 2022 WL 594894, at *2 (E.D. La. Feb. 28, 2022).
[27] FED. R. EVID. 401 (emphasis added).
[28] FED. R. EVID. 402.
[29] FED. R. EVID. 403.

emotional one."[30]

"An order in limine excludes only clearly inadmissible evidence; therefore evidence should not be excluded before trial unless it is clearly inadmissible on *all* potential grounds."[31] Instead, courts should reserve evidentiary rulings until trial so that questions as to the evidence "may be resolved in the proper context."[32] "When ruling on motions in limine, the Court 'maintains great discretion [as to] evidentiary determinations.'"[33] If the evidence is not clearly inadmissible on all grounds, it is better for the court to decline to rule in advance of trial so that it will have the opportunity to resolve issues in context.

## II.    Federal Rule of Evidence 702 Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.[34]

"A district court has considerable discretion to admit or exclude expert testimony under Rule 702."[35] Testimony from a *qualified* expert is admissible only if it is both relevant and reliable.[36] Thus, the threshold inquiry is whether the expert witness possesses the

---

[30] *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

[31] *Rivera v. Robinson*, 464 F. Supp. 3d 847, 853 (E.D. La. 2020) (quoting *Auenson*, 1996 WL 457258, at *1)).

[32] *Auenson*, 1996 WL 457258, at *1.

[33] *Jackson v. State Farm Fire & Cas. Co.*, 656 F. Supp. 3d 676 (W.D. La. 2023) (quoting *Parker v. John W. Stone Oil Distributors, L.L.C.*, 18-3666, 2019 WL 5212285, at *2 (E.D. La. Oct. 16, 2019)).

[34] FED. R. EVID. 702.

[35] *In re Pool Products Distribution Market Antitrust Litig.*, 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)).

[36] *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

requisite qualifications to render an opinion on particular subject matter.[37] The trial court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'"[38]

If the expert's qualifications are found to be sufficient, the trial court must then examine whether the expert's opinion satisfies the reliability and relevance requirements of Rule 702 to render the opinion admissible.[39] The United States Supreme Court's decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[40] "charges trial courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying [expert] testimony is scientifically valid'" under Rule 702,[41] and of whether that reasoning or methodology "can be reliably applied to the facts of the case."[42] In *Daubert*, the Supreme Court enumerated several non-exclusive factors that trial courts may consider in evaluating the reliability of expert testimony, including: "(1) whether the expert's theory can or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community."[43] The Supreme Court has cautioned the reliability analysis must remain flexible—the *Daubert* factors "may or may not be pertinent in assessing

---

[37] *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 798 (E.D. La. 2011). *See also Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert to testify if it finds that the witness is not qualified to testify in a particular field or a given subject.").

[38] *Wilson*, 163 F.3d at 937 (quoting FED. R. EVID. 702).

[39] *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

[40] 509 U.S. 579 (1993).

[41] *See Pipitone*, 288 F.3d at 243–44 (quoting *Daubert*, 509 U.S. at 592–93).

[42] *Valencia*, 600 F.3d at 423–24; *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). *See also Burleson v. Texas Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584–85 (5th Cir. 2003).

[43] *Bocanegra*, 320 F.3d at 584–85 (citing *Daubert*, 509 U.S. at 593–94).

reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[44] "[N]ot every *Daubert* factor will be applicable in every situation," thus district courts are offered broad latitude in making expert testimony determinations and may "consider other factors it deems relevant."[45]

"[E]xpert testimony proffered" must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[46] This is essentially a relevance requirement—relevant evidence, including relevant expert testimony, is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[47] The proponent of expert testimony "need not prove to the judge that the expert's testimony is correct, but [] must prove by a preponderance of the evidence that the testimony is [relevant and] reliable."[48]

"A district court's gatekeeper function does not replace the traditional adversary system or the role of the jury within this system."[49] "Although the jury ultimately decides the 'weight' of the evidence, the judge ensures there is sufficient probative value . . . to justify submitting the issue in the first instance."[50] Rule 403 also allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

---

[44] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

[45] *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 326 (5th Cir. 2004); *Kumho Tire*, 526 U.S. at 151–53.

[46] *Denley v. Hartford Ins. Co. of Midwest*, 07-4015, 2008 WL 2951926, at *3 (E.D. La. July 29, 2008) (citing *Daubert*, 509 U.S. at 591).

[47] *Cunningham v. Bienfang*, 2002 WL 31553976 (N.D. Tex. Nov. 15, 2002).

[48] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

[49] *In re Pool Products*, 166 F. Supp. 3d at 661 (citations omitted).

[50] Daniel D. Blinka, *Expert Testimony and the Relevancy Rule in the Age of* Daubert, 90 MARQ. L. REV. 173, 191 (2006).

jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[51] "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[52] Because "Rule 403 is meant to relax the iron rule of relevance, to permit the trial judge to preserve the fairness of the proceedings by exclusion despite its relevance," "the application of Rule 403 must be cautious and sparing."[53] Indeed, as the Fifth Circuit has proclaimed, the "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."[54]

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[55] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration."[56] It is "the role of the adversarial system, not the court, to highlight weak evidence."[57] "Courts break from this general rule in exceptional circumstances, such as when an expert's testimony relies on 'completely unsubstantiated factual assertions.'"[58]

## LAW AND ANALYSIS

In their Motion in Limine, Plaintiffs seek to exclude testimony of defense experts that contradict the Court's General Causation Order, arguing such testimony is

---

[51] FED. R. EVID. 403.

[52] *Old Chief*, 519 U.S. at 180.

[53] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).

[54] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

[55] *Daubert*, 509 U.S. at 596; *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996) (quoting *Daubert*, 509 U.S. at 596).

[56] *14.38 Acres of Land*, 80 F.3d at 1077.

[57] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004).

[58] *McCrary v. John W. Stone Oil Distrib., L.L.C.*, 14-880, 2016 WL 760744, at *3 (E.D. La. Feb. 26, 2016) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 n.4 (5th Cir. 2007)).

"prejudicial to the case" and "creates bases for confusion of the issues."[59] Plaintiffs contend the recent reports of defense experts Dr. Paolo Zannetti, Dr. Bishow Shaha, Mr. Matthew Stutz, Dr. John Kind, and Dr. Pamela Dalton (collectively, the "Defense Experts"), "seek to revive challenges to the expert testimony" of several witnesses offered by the Plaintiffs at the General Causation Hearing.[60] Specifically, Plaintiffs claim reports prepared by the Defense Experts in anticipation of the first *Addison* Trial now attempt to challenge several topics that were adjudicated by the Court's General Causation Order.[61]

In opposition, the Defendants argue the issues adjudicated by the General Causation Order consist narrowly of:

> The Emission Holding: odors and gases were emitted by JPLF during the relevant time period, including some emissions of H2S at an average concentration of 5 ppb over 30 minutes; and

> The Capability Holding: exposure to H2S at an average concentration of 5 ppb over 30 minutes is capable of causing [the Allowed Injuries] in the general population.[62]

The Defendants represent they intend to use the Defense Experts' testimony "to challenge the sufficiency of Plaintiffs' evidence on specific causation—an issue that involves a different legal burden and additional evidence that was not part of the first phase of the case," rather than to challenge the Court's holdings.[63]

"The law-of-the-case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same

---

[59] R. Doc. 544-1 at pp. 3-4.
[60] *Id.* at p. 3.
[61] *See* R. Doc. 554-1.
[62] *Id.* at p. 5 (citing General Causation Order, R. Doc. 323 at p. 46).
[63] R. Doc. 598 at p. 4.

case."[64] "Despite its importance, the doctrine 'is an amorphous concept' with no 'precise requirements,'"[65] and may be applied at the court's discretion.[66] Generally, when a court decides an issue, "that decision should continue to govern the same issues in subsequent stages of the same case."[67] Nevertheless, the doctrine "applies only to issues that were *actually decided*, rather than all questions in the case that might have been decided but were not."[68] However, "the issues need not have been explicitly decided; the doctrine also applies to those issues decided by 'necessary implication.'"[69]

As affirmed in the Court's Order and Reasons issued on July 3, 2024, "the issue of general causation was '*actually decided*' by the Court's General Causation Order"[70] and "findings of fact and conclusions of law expressed therein" will not be revisited.[71] The Court will consider the specific challenges to the Defense Experts' opinions raised by Plaintiffs' Motion in Limine in turn.

## I. The Defense Experts may not offer testimony that contradicts the Court's General Causation Order, which found an exposure to H2S at an average concentration of 5 ppb over 30 minutes is capable of causing the Allowed Injuries in the general population.

Plaintiffs first point to several opinions in the Defense Experts' reports they argue contradict the Court's holding that exposure to H2S at an average concentration of 5 ppb

---

[64] *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (quoting *United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999), *rev'd on other grounds by Castillo v. United States*, 530 U.S. 120 (2000)) (internal quotation marks omitted).
[65] *Arizona v. California*, 460 U.S. 605, 618 (1983).
[66] *See United States v. Garza*, 624 F. App'x 208, 211 (5th Cir. 2015) (*United States v. Agofsky*, 516 F.3d 280, 283 (5th Cir. 2008)).
[67] *Id.*
[68] *Alpha/Omega Ins. Servs. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001) (emphasis added).
[69] *Id.* (quoting *In re Felt*, 255 F.3d 220, 225 (5th Cir. 2001)).
[70] *See* General Causation Order, R. Doc. 323.
[71] R. Doc. 642 at p. 9 (quoting *Alpha/Omega Ins. Servs.*, 272 F.3d at 279).

over 30 minutes is capable of causing the Allowed Injuries in the general population.[72]

Specifically, the Plaintiffs argue these opinions should be excluded:

1.  Dr. Kind's opinion that "[t]here is insufficient scientific basis for the [Trial Plaintiffs'] claims that airborne exposure to 5 ppb [H2S] for 30 minutes is capable of causing their claimed nuisance health effects";[73]

2.  Dr. Zannetti's opinion that "a more suitable reference level than the 5 ppb selected by [Plaintiffs' expert] Lape is the H2S air quality standard of the State of California[,]" which he indicates is 30 ppb for one hour;[74] and

3.  Dr. Dalton's opinion that "[t]he Bruvold study, which was cited by . . . the Court for its decision that 5 ppb is capable of causing nuisance, claimed that exposure to [H2S] levels from 0.6-5.7 ppb led to interference with daily living along with health concerns. However, in my opinion the Bruvold study does not establish that such a level is likely to cause injuries in the general population, let alone among the 13 Trial Plaintiffs";[75] and

4.  Dr. Dalton's opinion that "the H2S concentrations modeled by the Trial Plaintiffs' experts in this case are not likely to have caused injury to persons of ordinary sensibilities."[76]

Plaintiffs also argue Dr. Dalton's opinion that "[e]xposure to odors is not likely to cause the sleep disturbances claimed by certain Trial Plaintiffs"[77] contradicts the Court's ruling in the General Causation Order that "[e]xposure to an average of 5 ppb of [H2S] over

---

[72] *See* R. Doc. 554-1 at pp. 4-6.

[73] Kind Rep., R. Doc. 550-2 at p. 13. The Court has already excluded Dr. Kind's testimony on this opinion. *See* R. Doc. 711 at pp. 12-14 (deciding "Dr. Kind may not offer testimony related to his opinion that an average exposure to 5 ppb of H2S over thirty minutes may cause injury to only the most sensitive portion of the population, including his assertion that the Trial Plaintiffs must demonstrate they are particularly sensitive with respect to olfactory sensing").

[74] Zannetti Rep., R. Doc. 559-2 at p. 89.

[75] Dalton Rep., R. Doc. 542-3 at p. 5. The Court has already excluded Dr. Dalton's testimony on this opinion. *See* R. Doc. 746 at pp. 10-12 (deciding "Dr. Dalton may not offer testimony related to her Opinion No. 1, that exposure to an average of 5 ppb of H2S for 30 minutes was not likely or not always a nuisance to the Trial Plaintiffs or that an average exposure to 5 ppb of H2S over 30 minutes may cause injury to only the most sensitive portion of the population").

[76] Dalton Rep., R. Doc. 542-3 at p. 16.

[77] *Id.* at p. 10. The Court has already excluded Dr. Dalton's testimony on this opinion. *See* R. Doc. 746 at pp. 10-12 (deciding "Dr. Dalton may not offer testimony related to her Opinion No. 3, that exposure to odors was not likely to cause sleep disturbances claimed by certain Trial Plaintiffs").

thirty minutes is capable of causing sleep disruption in the general population."[78] The Defendants contend those opinions address "the question of the *likelihood* of H2S causing the Trial Plaintiffs' injuries," which was not adjudicated by the Court's General Causation Order.[79]

As discussed in the Court's Orders and Reasons on Plaintiffs' motions to exclude testimony of Dr. Kind[80] and Dr. Dalton,[81] the Court finds that those opinions referenced above directly contradict the Court's finding in the General Causation Order that an exposure to 5 ppb of H2S over 30 minutes is sufficient to cause the Allowed Injuries, including sleep disturbance, "in the *general* population."[82] Because the opinions contravene the law-of-the-case with respect to the Court's General Causation Order, the Defense Experts' testimony related to those opinions will be excluded under the law-of-the-case doctrine.

## II.    The Defense Experts may offer testimony rebutting Dr. Schiffman's opinions that were not adjudicated in the General Causation Order.

### A.    Dr. Zannetti will be allowed to offer testimony rebutting Dr. Schiffman's opinion on the lingering effect of H2S in the air and the ability of H2S to accumulate and concentrate in homes and low-lying areas.

Plaintiffs challenge an opinion of Dr. Zannetti under the law-of-the-case doctrine.[83] The challenged opinion of Dr. Zannetti is a rebuttal of Dr. Schiffman's opinion that "H2S lingers in the air for up to 18 hours and accumulates and concentrates in enclosed and low-lying areas within the home."[84] Plaintiffs claim Dr. Zannetti's rebuttal

---

[78] R. Doc. 554-1 at p. 7 (citing R. Doc. 323 at p. 38).
[79] R. Doc. 598 at p. 11.
[80] R. Doc. 711 at pp. 12-14.
[81] R. Doc. 746 at pp. 11-12.
[82] General Causation Order, R. Doc. 323 at p. 44.
[83] R. Doc. 554-1 at pp. 6-7 (citing Zannetti Rep., R. Doc. 550-2 at pp. 102-03).
[84] *Id.* (citing Zannetti Rep., R. Doc. 550-2 at pp. 102-03).

contradicts the Court's General Causation Order, which purportedly agreed with Dr. Schiffman's "findings that [H2S] is heavier than air," "accumulates in enclosed and low-lying areas within the home, and can get into air conditioning systems, extending the duration of the exposure."[85] In opposition, the Defendants contend this issue "is for the jury to hear the parties' evidence and assign the appropriate weight."[86]

As discussed in the Court's Order and Reasons on the Defendants' motion to exclude testimony of Dr. Schiffman, "[t]his Court has not ruled whether [H2S] odors lingered inside the[] particular Trial Plaintiffs' homes."[87] In that Order and Reasons, the Court also determined: "Defendants may cross-examine Dr. Schiffman on the specifics of her opinion to the extent they challenge . . . her opinions as to [H2S] accumulation."[88] Because the Court has not *actually decided* the issue underlying Dr. Zannetti's opinion as challenged by the Plaintiffs, Dr. Zannetti will be allowed to offer his rebuttal of Dr. Schiffman's opinion with respect to the lingering effect of H2S in the air and the ability of H2S to accumulate and concentrate in homes and low-lying areas.

## B. Dr. Dalton will be allowed to offer testimony rebutting Dr. Schiffman's opinion on the effect of repeated exposure to H2S odor on odor perception.

Plaintiffs challenge a portion of Dr. Dalton's Opinion No. 2 under the law-of-the-case doctrine.[89] The challenged portion of Dr. Dalton's Opinion No. 2 is a rebuttal of Dr. Schiffman's opinion that "persistent [odors] over several days" would have led to "very rapid desensitization of the Trial Plaintiffs during the modeled 'odor events.'"[90] Plaintiffs

---

[85] *Id.* at p. 6 (citing General Causation Order, R. Doc. 323 at p. 34).
[86] R. Doc. 598 at p. 17.
[87] R. Doc. 745 at p. 12.
[88] *Id.* at p. 14.
[89] R. Doc. 554-1 at pp. 8-9 (citing Dalton Rep., R. Doc. 542-3 at p. 9).
[90] *Id.* (citing Dalton Rep., R. Doc. 542-3 at p. 9).

contend "Dr. Dalton wants to relitigate" the Court's General Causation Order, which purportedly found H2S odor perception "would get stronger with time and repeated exposure."[91] In opposition, the Defendants argue "[t]he General Causation Order incorporates discussion from both Dr. Schiffman and Dr. Dalton regarding how the intermittent nature of odors relates to issues of sensitivity."[92]

Plaintiffs did not establish at the General Causation Hearing that H2S odor perception is capable of getting stronger with time and repeated exposure and the Court did not make that finding in the General Causation Order.[93] Because the Court has not *actually decided* the issue underlying Dr. Dalton's opinion as challenged by the Plaintiffs, Dr. Dalton will be allowed to offer her rebuttal of Dr. Schiffman's opinion with respect to the effect of repeated exposure to H2S odor on odor perception.

### C. Dr. Dalton will be allowed to offer testimony rebutting Dr. Schiffman's opinion on the effect of H2S mixed with VOCs on trigeminal nerve activation.

Plaintiffs challenge Dr. Dalton's Opinion No. 4 under the law-of-the-case doctrine.[94] Dr. Dalton's Opinion No. 4 is a rebuttal of Dr. Schiffman's opinion that H2S mixed with volatile organic compounds ("VOCs") resulted in trigeminal nerve activation.[95] Plaintiffs argue Dr. Dalton's opinion contradicts the Court's General Causation Order, which purportedly "made specific findings regarding the mechanism by which odors activate both the olfactory and trigeminal nerves."[96] In opposition, the

---

[91] *Id.* at p. 8 (citing General Causation Order, R. Doc. 323 at p. 33).
[92] R. Doc. 598 at p. 18 (citing General Causation Order, R. Doc. 323 at pp., 33-34).
[93] *See* General Causation Order, R. Doc. 323.
[94] R. Doc. 554-1 at p. 11 (citing Dalton Rep., R. Doc. 542-3 at p. 12).
[95] *Id.* (citing Dalton Rep., R. Doc. 542-3 at p. 12).
[96] *Id.* at p. 9 (citing General Causation Order, R. Doc. 323 at p. 35).

Defendants argue the General Causation Order's "discussion of trigeminal nerve activation was not tied to a specific level of H2S exposure" in combination with VOCs.[97]

As determined in the Court's Order and Reasons on the Defendants' motion to exclude testimony of Dr. Schiffman, "Dr. Schiffman may testify as to her third opinion concerning VOCs, to the extent the VOC concentrations tend to show that the emissions of [H2S] causing the Trial Plaintiffs' damages came from the [JPLF]."[98] In that Order and Reasons, the Court also determined: "Dr. Schiffman will be allowed to testify that the malodors generated by the [JPLF] have the capacity to cause the Allowed Injuries and that VOCs may enhance or exacerbate the injuries."[99] Plaintiffs did not establish at the General Causation Hearing that H2S mixed with VOCs resulted in trigeminal nerve activation and the Court did not make that finding in the General Causation Order.[100] Because the Court has not *actually decided* the issue underlying Dr. Dalton's opinion as challenged by the Plaintiffs, Dr. Dalton will be allowed to offer her rebuttal of Dr. Schiffman's opinion with respect to the effect of H2S mixed with VOCs on trigeminal nerve activation.

### III.   Mr. Stutz may offer testimony on his H2S emissions estimates from the JPLF during the relevant time period and his rebuttal of Plaintiffs' experts' opinions on the topic.

Plaintiffs challenge under the law-of-the-case doctrine Mr. Stutz's rebuttal of opinions offered by Plaintiffs' experts Dr. Jaana Pietari and Mr. Jose Sananes.[101] Plaintiffs argue the Defendants should be precluded from challenging the methodologies of those

---

[97] R. Doc. 598 at p. 19 (citing General Causation Order, R. Doc. 323 at p. 36).
[98] R. Doc. 745 at p. 16.
[99] *Id.* at p. 19.
[100] *See* General Causation Order, R. Doc. 323.
[101] R. Doc. 554-1 at pp. 12-14.

experts because their "testimony was essential for establishing general causation."[102] Plaintiffs claim the Court rejected Mr. Stutz's rebuttal of Mr. Sananes' H2S emissions estimate at the General Causation Hearing,[103] contending "had [Mr. Stutz's challenges to Mr. Sananes' H2S emissions estimates] been meritorious, the Court would have rejected the opinions of the Plaintiffs' experts and could not have come to the conclusions it did" in the General Causation Order.[104] In opposition, the Defendants argue "Plaintiffs' argument fails for the simple reason that the Court has not made any prior rulings related to Dr. Pietari and Mr. Sananes' opinions," which could "conceivably prevent" Mr. Stutz from offering his rebuttal testimony at trial.[105]

    As discussed in the Court's Order and Reasons on Plaintiffs' motion to exclude testimony of Mr. Stutz, the Court's General Causation Order determined, "that 'at times during the relevant time period odors and gases, including hydrogen sulfide, were being emitted by the Jefferson Parish Landfill in levels of at least 5 ppb of hydrogen sulfide over thirty minutes.'"[106] In that Order and Reasons, the Court also affirmed "the General Causation Order did not determine particular H2S emission rates for the JPLF during the relevant time period," and the Plaintiffs "do not cite any portion of the General Causation Order in which the Court established an H2S emission rate."[107] Because the Court has not *actually decided* the issue underlying Mr. Stutz's opinion as challenged by the Plaintiffs, Mr. Stutz will be allowed to offer testimony on H2S emissions estimates from the JPLF

---

[102] *Id.* at p. 13.
[103] Specifically, Plaintiffs challenge Mr. Stutz's opinions Plaintiffs' H2S emissions estimates are flawed because: (a) Plaintiffs' experts method for determining a radius of influence for use in estimating H2S emissions is unsupported by industry or regulatory agencies, and (b) Plaintiffs' experts reliance on the wet nature of the JPLF leads to an invalid unrepresentative emission estimate for the site. *Id.* (citing Stutz Rep., R. Doc. 558-2 at 37).
[104] *Id.* at p. 14.
[105] R. Doc. 598 at pp. 20, 22.
[106] R. Doc. 703 at pp. 21-22 (quoting General Causation Order, R. Doc. 323 at p. 44).
[107] *Id.* at p. 22.

during the relevant time period and his rebuttal of Plaintiffs' experts' opinions on the topic.

Accordingly;

## <u>CONCLUSION</u>

**IT IS ORDERED** that Plaintiffs' motion to exclude argument and expert testimony on issues litigated in the General Causation Hearing is **GRANTED IN PART AND DENIED**.[108] The Defense Experts may not offer testimony that contradicts the Court's General Causation Order, which found an exposure to H2S at an average concentration of 5 ppb over 30 minutes is capable of causing the Allowed Injuries in the general population. The Defense Experts may offer testimony on issues not adjudicated in the General Causation Order, including: (1) rebuttal of the opinions of Dr. Schiffman, as discussed; (2) H2S emissions estimates from the JPLF during the relevant time period; and (3) rebuttal of Plaintiffs' experts' opinions on the topic of H2S emissions estimates from the JPLF during the relevant time period.

**New Orleans, Louisiana, this 11th day of August, 2024.**

_____

**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[108] R. Doc. 554.